1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  BRANDON S. WALKER, State Bar No. 254581
   Supervising Deputy Attorney General
3  JACK C. NICK, State Bar No. 160196
   ISABELLA A. PANICUCCI, State Bar No. 318984
4  Deputy Attorneys General
     1300 I Street, Suite 125
5     Sacramento, CA 95814
      Telephone: (916) 210-7662
6     Fax: (916) 327-2319
      E-mail: Isabella.Panicucci@doj.ca.gov
7  *Attorneys for Defendant*
   *State of California*

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12 | **PACIFIC PIPELINE COMPANY, a** | Case No. |
   | **Delaware Corporation,** | |
13 | | (Kern County Superior Court Case No. BCV- |
   | Plaintiff, | 25-103508) |
14 | | |
   | v. | **NOTICE OF REMOVAL OF ACTION** |
15 | | **UNDER 28 U.S.C. SECTION 1441(a)** |
   | | **(FEDERAL QUESTION)** |
16 | **STATE OF CALIFORNIA and DOES 1** | |
   | **through 25, inclusive,** | |
17 | | |
   | Defendant. | |
18

19

20      **TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

21      **PLEASE TAKE NOTICE** that Defendant State of California hereby removes to this Court

22 the state court action described below.

23      1.      On September 29, 2025, an action was commenced in the Superior Court of the State

24 of California for the County of Kern, entitled Pacific Pipeline Company, Plaintiff, vs. State of

25 California and Does 1 through 25, Defendants, as case number BCV-25-103508. A true and

26 correct copy of the complaint and summons are attached hereto as **Exhibit A.**

27      2.      On January 21, 2026, Plaintiff Pacific Pipeline Company filed a verified first

28 amended complaint. The first amended complaint added a second cause of action alleging that

                                     1

1   under the federal Pipeline Safety Act, at 49 U.S.C. section 60104(c), state agencies are precluded

2   from imposing any safety standards for California Pipelines 324 and 325. (First Amended

3   Complaint, ¶ 68.) A true and correct copy of the first amended complaint, which was served on

4   Defendant State of California on January 21, 2026, is attached hereto as **Exhibit B**.

5       3.    Defendant State of California has not yet filed a responsive pleading because the first

6   amended complaint was served before a responsive pleading was due.

7       4.    True and correct copies of the remainder of the process, pleadings, and orders served

8   upon Defendant State of California to date are attached hereto as **Exhibit C.**

9       5.    This action is a civil action of which this Court has original jurisdiction under 28

10   U.S.C. section 1331, and is one which may be removed to this Court by Defendant State of

11   California pursuant to the provisions of 28 U.S.C. section 1441(a) in that the second cause of

12   action in the first amended complaint seeks a judicial declaration that California Senate Bill 237's

13   application to California Pipelines 324 and 325 is preempted by 49 U.S.C. section 60104(c).

14   (First Amended Complaint, ¶ 73.)

15       6.    No other defendant has been served with the summons, complaint, or first amended

16   complaint.

17

18   Dated:  February 20, 2026              Respectfully submitted,

19

20                      ROB BONTA
                       Attorney General of California

21                      BRANDON WALKER
                       Supervising Deputy Attorney General

22                      JACK C. NICK
                       Deputy Attorney General

23

24

25                      ISABELLA A. PANICUCCI
                       Deputy Attorney General

26                      *Attorneys for Defendant*
                       *State of California*

27   SA2025306665
     39639672

28

# Exhibit A

# OFFICE OF THE ATTORNEY GENERAL
## DEPARTMENT OF JUSTICE
### Civil Service of Process Cover Sheet
SAC   SF   OAK   LA   SD   FR



REC.CA DEPT OF JUSTICE
NOV 5 '25 PM 1:13

Date Stamp & Time

Service of Process Disclaimer:

To All Persons Attempting Service of Process Upon The Office Of The Attorney General:

Please be advised that staff assigned to receive documents delivered to the Attorney General's Office are not authorized to accept such documents as properly served. Further, **staff are not authorized to receive documents on behalf of any individual.** In receiving documents delivered by process servers and/or other members of the public, office personnel do not thereby waive any right of the State of California, the Attorney General's Office, any other entity of the State of California, or any individual to object to the validity of the service.

Please complete this form when delivering documents to the Attorney General's Office:

| Case Name: |
|---|
| Pacific Pipeline ✓ State of California |

| County: Kern | Court No.: BCV25103508 |
|---|---|

| Document(s) served: | ☒ Summons and Complaint/Cross Complaint/Amended Complaint | ☐ Notice of Consumer or Employee and Objection and check for $15.00 |
|---|---|---|
| | ☐ Notice to Attorney General's Office pursuant to Section _____ | ☐ Writ of Mandate and Complaint for Declaratory Relief |
| | ☐ Petition For Relief From Late Claim Filing (Gov. Code, § 946.6) | ☐ Other (please list): _____ |
| | ☐ Pitchess Motion | _____ |
| | ☐ Small Claims | _____ |
| | ☐ Deposition Subpoena for Production of Business Records | _____ |

| Document(s) For (Specify State Agency): | State of California |
|---|---|
| Process Server's Name: | |
| Name of Company: (business name, address, and number) | |
| Receptionist Signature: | |

FOR SERVICE DEPUTY'S USE ONLY

| Forwarded to: | | Date Forwarded: | |
|---|---|---|---|
| Name of Service Deputy, section, and telephone number: | | | |
| NOTES: | | | |

The attached document(s) appear(s) to be the responsibility of your section; if they are **not**, please return them to the Service Deputy named above, noting the section to which they are to be directed.                    (Rev. 7/2014)

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

<table>
<tr><td>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
STATE OF CALIFORNIA and DOES 1 through 25, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
PACIFIC PIPELINE COMPANY, a Delaware corporation,

</td><td>

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**ELECTRONICALLY FILED**
Superior Court of California,
County of Kern
By: Vickie Fogerson, Deputy Clerk
11/05/2025

</td></tr>
</table>

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

<table>
<tr><td>

The name and address of the court is:
*(El nombre y dirección de la corte es)*: Superior Court of California

County of Kern, 1215 Truxtun Avenue, Bakersfield, CA 93301

</td><td>

**CASE NUMBER:**
*(Número del Caso):*
BCV25103508

</td></tr>
</table>

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es)*:
Jeffrey D. Dintzer, Alston & Bird, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071; (213) 576-1000 (See Attachment 1)

<table>
<tr><td>

DATE:
*(Fecha)* 11/05/2025

</td><td>Tara Leal</td><td>Clerk, by<br>*(Secretario)* /s/ **Vickie Fogerson**</td><td>, Deputy<br>*(Adjunto)*</td></tr>
</table>

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*


[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☑ on behalf of *(specify)*: STATE OF CALIFORNIA
   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☑ other *(specify)*: 416.50 public entity
4. ☑ by personal delivery on *(date)*:

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

MC-025

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| PACIFIC PIPELINE COMPANY v. STATE OF CALIFORNIA | BCV25103508 |

**ATTACHMENT** *(Number):* 1

*(This Attachment may be used with any Judicial Council form.)*

Additional Plaintiff Attorney:

Benjamin J. Hanelin, SBN (237595)
Paul Hastings
1999 Avenue of the Stars
27th Floor
Century City, CA 90067
Telephone:  (310) 620-5879

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page   1   of   1

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT**
**to Judicial Council Form**

www.courtinfo.ca.gov

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:    (213) 576-1000
Facsimile:    (213) 576-1100

**PAUL HASTINGS**
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:    (310) 620-5879
Facsimile:    (310) 620-5899

Attorneys for Plaintiffs
PACIFIC PIPELINE COMPANY

FILED
KERN COUNTY
SUPERIOR COURT

SEP 2 9 2025

BY_____ DEPUTY

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF KERN**

PACIFIC PIPELINE COMPANY, a
Delaware corporation,

                    Plaintiffs,

        v.

STATE OF CALIFORNIA and DOES 1
through 25, inclusive,

                    Defendants.

Case No. BCV25103508

**VERIFIED COMPLAINT FOR
DECLARATORY RELIEF**

(Code Civ. Proc. § 1060)

- 1 -

VERIFIED COMPLAINT FOR DECLARATORY RELIEF

FILED BY FAX

Plaintiff Pacific Pipeline Company brings this Complaint for Declaratory Relief against Defendant the State of California. By this verified pleading, Plaintiff alleges as follows:

## INTRODUCTION

1.  Pacific Pipeline Company owns the Las Flores Pipelines, which include Line CA-324 and Line CA-325 (collectively, the "Las Flores Pipelines"). Portions of the Las Flores Pipelines are located in Kern County, with other portions in San Luis Obispo and an unincorporated area of the County of Santa Barbara ("County") that sits in the Coastal Zone.

2.  Sable Offshore Corp. ("Sable") owns the Santa Ynez Unit oil production infrastructure ("SYU Facilities") located both offshore of and onshore in the County's Gaviota Coast. Sable acquired the SYU Facilities and Pacific Pipeline Company, which owns the Las Flores Pipelines, in February 2024.

3.  Since that time, Pacific Pipeline Company has worked with federal and state agencies toward resuming petroleum transportation from the SYU Facilities through the Las Flores Pipelines, including performing repair and maintenance work on the Las Flores Pipelines.

4.  On September 13, 2025, the California Legislature adopted Senate Bill ("SB") 237.

5.  Among other things, SB 237 adds Section 51014.1 of the Government Code, which provides that "[a]ny existing oil pipeline that is six inches or larger that has been idle, inactive, or out of service for five years or more, shall not be restarted without passing a spike hydrostatic testing program."

6.  SB 237 also amends Section 30262 of the California Coastal Act to require a person to obtain a new coastal development permit ("CDP") for the "[r]epair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more."

7.  SB 237 does not define "idled, inactive, or out of service."

8.  On September 19, 2025, Governor Gavin Newsom signed SB 237 into law.

VERIFIED COMPLAINT FOR DECLARATORY RELIEF

9.      The State of California has taken the position that the Las Flores Pipelines have been idled, inactive, or out of service for five years or more. Pacific Pipeline Company disagrees. The Las Flores Pipelines are active. They are not idle and not out of service. In fact, the pipelines have retained their active status under state and federal law since 2015. More recently, Pacific Pipeline Company has been diligently performing necessary work on the Las Flores Pipelines to resume petroleum transportation. Under all relevant and applicable meanings of the words, the Las Flores Pipelines are not idle, inactive, or out of service.

10.      An actual and present controversy exists between Pacific Pipeline Company and Defendant concerning their respective rights and duties regarding the Las Flores Pipelines' status. Consequently, Pacific Pipeline Company seeks a judicial declaration from this Court that the Las Flores Pipelines are not idle, inactive, or out of service as those terms are used in SB 237.

**THE PARTIES**

11.      Plaintiff Pacific Pipeline Company is a Delaware Corporation and does business in Kern County, California. Pacific Pipeline Company owns the Las Flores Pipelines.

12.      Pacific Pipeline Company is a "person interested under a statute" within the meaning of Code of Civil Procedure § 1060, because Pacific Pipeline Company's rights and obligations under SB 237 are directly at issue in this action.

13.      Defendant State of California is responsible for enacting and enforcing the laws of the State of California.

14.      Pacific Pipeline Company is unaware of the true names and/or capacities of Defendants DOES 1 through 25, inclusive, and therefore sues said Defendants by such fictitious names. Pacific Pipeline Company will amend this pleading to insert the true names and/or capacities of DOES 1 through 25, inclusive, when the same have been ascertained. Pacific Pipeline Company is informed and believe and thereon alleges that each such fictitiously named Defendant is, in some manner or for some reason, responsible for the actions or omissions alleged in this pleading, and each is subject to the relief being sought herein.

VERIFIED COMPLAINT FOR DECLARATORY RELIEF

## JURISDICTION AND VENUE

15.    This Court has subject-matter jurisdiction over this action under California Constitution, article VI, section 10, and section 1060 of the Code of Civil Procedure.

16.    Venue is proper in this Court pursuant to Code of Civil Procedure section 392 because portions of the Las Flores Pipelines at issue in this litigation are located in the County of Kern.

## FACTUAL AND LEGAL STATEMEMT

**A.    The SYU Facilities**

17.    The Santa Ynez Unit consists of sixteen federal leases across approximately 76,000 acres of outer continental shelf and produces crude oil and natural gas from Platforms Hondo, Harmony, and Heritage, located in federal waters off the California Coast in the Santa Barbara Channel.

18.    The oil and gas are transported through the subsea SYU Facilities to the onshore Las Flores Canyon Oil and Gas Plant and the Pacific Offshore Pipeline Company Gas Plant, both of which are located in Las Flores Canyon in unincorporated Santa Barbara County.

19.    The onshore facilities in Las Flores Canyon separate oil, propane, butane, sulfur products, and fuel quality gas. The natural gas is dried, treated, compressed, and delivered to a local utility company. Oil is transferred through the Las Flores Pipelines to a refinery for final processing.

20.    In February 1988, the California Coastal Commission ("Coastal Commission") reviewed and analyzed Sable's predecessor-in-interest's (Exxon Company U.S.A.) proposal for the construction, operation, and ongoing maintenance of the SYU Facilities, as part of a "Development and Production Plan" ("DPP") submitted to the federal Minerals Management Service in 1987.

21.    The Coastal Commission issued two approvals for the SYU Facilities: (1) Consistency Certification No. CC-64-87, which confirmed pursuant to the federal Coastal Zone Management Act ("CZMA") that construction, operation, and maintenance of the SYU Facilities

- 4 -

1   would be consistent with the Coastal Act, and (2) CDP No. E-88-1 (the "Offshore CDP"), which

2   authorized the construction, operation, and maintenance of those portions of the SYU Facilities

3   located in California state waters.

4   **B.    The Las Flores Pipelines**

5        22.    Line CA-325 is a thirty-inch diameter pipeline with a maximum permitted

6   throughput capacity of 300,000-barrels of crude oil per day and transports crude oil

7   approximately 113.5 miles north from the Gaviota Pump Station to the Sisquoc Pump Station,

8   then east through the Los Padres National Forest and Cuyama Valley, ultimately delivering crude

9   oil to the existing Pentland Delivery Point in the San Joaquin Valley in Kern County.

10       23.    Line CA-324 is a twenty-four-inch diameter pipeline with a maximum permitted

11  throughput capacity of 150,000-barrels of crude oil per day. Line CA-324 transports crude oil

12  approximately 10.9 miles from the Las Flores Pump Station in Las Flores Canyon, west along

13  the Gaviota Coast, to the existing Gaviota Pump Station located approximately one mile east of

14  Gaviota State Park in Santa Barbara County.

15       24.    In the mid-1980s, the California State Lands Commission, federal Bureau of Land

16  Management, and Department of the Interior prepared a joint Environmental Impact Report and

17  Environmental Impact Statement ("EIR/EIS") for the Celeron Pipeline Project, which includes

18  analysis of the construction and long-term operation of Lines CA-324 and CA-325. The locations

19  of Lines CA-324 and CA-325 were identified as an environmentally superior alignment to

20  minimize impacts to environmental resources. The State Lands Commission certified the

21  EIR/EIS in January 1985.

22       25.    After reviewing the EIR/EIS, the County Planning Commission made a final

23  decision to approve the Celeron Pipeline Project and associated entitlements in February 1986.

24  The County's approval was not challenged during the appeal period, and the Planning

25  Commission's approval action became final and effective.

26       26.    Pursuant to the County of Santa Barbara's certified Local Coastal Program

27  ("LCP"), the County issued CDP No. 86-CDP-189 for the Celeron Pipeline Project on July 27,

28

VERIFIED COMPLAINT FOR DECLARATORY RELIEF

1986. CDP No. 86-CDP-189 approved "[c]learing, grading and trenching activities for [the] Celeron Pipeline Project." On August 5, 1986, the County issued CDP No. 86-CDP-205 for the "[r]emainder of all construction activities for the Celeron Pipeline [P]roject." The CDPs were not appealed by any party and are, therefore, final, valid, and not subject to further appeal.

27.    Although the County has issued separate CDPs for major improvements, such as relocations and realignments of pipeline segments since the Las Flores Pipelines' CDPs were first issued, the County has not required new or amended CDPs for repair and maintenance work on the Las Flores Pipelines.

**C.    The Refugio Oil Spill and Resulting Repair Work**

28.    On May 19, 2015, a leak along CA-324 resulted in an oil spill. The Las Flores Pipelines have remained active, but petroleum has not flowed through them since that time. To maintain the Las Flores Pipelines in an active state, they were filled with nitrogen to prevent oxidation and internal corrosion, and the cathodic protection system is active and has been regularly inspected and maintained.

29.    On March 13, 2020, the prior owner and operator of the Las Flores Pipelines and SYU Facilities entered into a federal Consent Decree with the United States and the State of California on behalf of several federal and state regulatory agencies to resolve issues related to the oil spill. (See Consent Decree, *United States of America et al. v. Plains All American Pipeline, L.P. et al.*, Case No. 2:20-cv-02415 (C.D. Cal. Mar. 13, 2020).)

30.    Since that time, Pacific Pipeline Company (including its predecessor in interest, Plains Pipeline, L.P. ("Plains")), has maintained the pipelines as active and has undertaken substantial efforts to diligently repair the Las Flores Pipelines to ensure compliance with industry standards for active pipelines and resume petroleum transportation.

31.    For example, in April 2021, Plains secured approval from the Office of the State Fire Marshal ("OSFM") to retrofit the Pipelines with 16 safety valves as required by law, including seven valves in the Coastal Zone. In December 2021, Plains submitted applications to

VERIFIED COMPLAINT FOR DECLARATORY RELIEF

the County for approval to complete the safety valve installation work. Pacific Pipeline Company has since installed the safety valves in the Las Flores Pipelines.

32.    In addition, multiple in-line inspections ("ILI") have been conducted on the Las Flores Pipelines:

      a.    Two ILI runs have been performed on Line CA-324, one in February 2022 and another in December 2022;

      b.    An ILI run was performed on a portion of on Line CA-325 in September 2023; and

      c.    An ILI run was performed on the remainder of Line CA-325 in October 2023.

33.    In May 2024, Pacific Pipeline Company separately began anomaly[1] repair and maintenance work on the pipelines per the Consent Decree and under the County's 1986 approvals and permits that authorized ongoing pipeline maintenance. On February 12 and March 21, 2025, in response to Pacific Pipeline Company's request to address claims from the Coastal Commission that the repair and maintenance work was not authorized, the County confirmed that no further permits were required for Pacific Pipeline Company's anomaly repair work. Pacific Pipeline Company has completed the anomaly repairs, as well as subsequent pipeline hydrotesting, under OSFM supervision.

34.    In compliance with the Consent Decree, in April 2024, Pacific Pipeline Company submitted "State Waiver" applications to OSFM for Lines CA-324 and CA-325 to modify regulatory pipeline safety requirements based on the specifications applicable to the individual pipeline facilities. On December 17, 2024, OSFM granted both State Waivers and imposed over sixty separate conditions on Pacific Pipeline Company's operation of the Las Flores Pipelines, conditional on the Pipeline and Hazardous Materials Safety Administration ("PHMSA") expressing no objection to the State Waivers. On February 11, 2025, PHMSA notified OSFM that it had no objection to its issuance of the State Waivers.

---

[1] A pipeline anomaly refers to a pipeline segment with some deviation from its original configuration.

VERIFIED COMPLAINT FOR DECLARATORY RELIEF

1    35.    The Consent Decree separately requires Pacific Pipeline Company to submit and

2  obtain OSFM's approval of a written "Restart Plan" before resuming petroleum transportation in

3  either Line CA-324 or Line CA-325. Pacific Pipeline Company submitted a Restart Plan to

4  OSFM for review on July 29, 2024. OSFM is currently reviewing Pacific Pipeline Company's

5  Restart Plan and associated documentation, and in August and September 2025, OSFM

6  performed multiple inspections of the Las Flores Pipelines in connection with its review of the

7  Restart Plan.

8    36.    As of May 15, 2025, Sable resumed petroleum transportation from the SYU

9  Facilities' offshore platforms to its storage facilities in Las Flores Canyon.

10    37.    At all times, Pacific Pipeline Company intended to resume petroleum

11  transportation from Sable's storage facilities in Las Flores Canyon through the Las Flores

12  Pipelines. Pacific Pipeline Company and its predecessors never abandoned the Las Flores

13  Pipelines, rather they have been operated as active pipelines under the law and Pacific Pipeline

14  Company has worked diligently to maintain their use under existing and valid CDPs.

15  **D.    Senate Bill 237**

16    38.    On September 13, 2025, the California Legislature passed SB 237. On September

17  19, 2025, Governor Newsom signed SB 237 into law.

18    39.    SB 237 adds Section 51014.1 of the Government Code, which states in part,

19  "[a]ny existing oil pipeline that is six inches or larger that has been *idle, inactive, or out of*

20  *service* for five years or more, shall not be restarted without passing a spike hydrostatic testing

21  program." (Emphasis added).

22    40.    SB 237 also amends Section 30262 of the Coastal Act to provide, in relevant part:

23      (2) Repair, reactivation, and maintenance of an oil and gas facility,
       including an oil pipeline, that has been idled, inactive, or out of
24      service for five years or more shall be considered a new or expanded
       development requiring a new coastal development permit.
25
       (3) Development associated with the repair, reactivation, or
26      maintenance of an oil pipeline that has been idled, inactive, or out
       of service for five years or more requires a new coastal development
27      permit consistent with this section. (Pub. Res. Code §§ 30262(b)(2)
       and (3)).
28

- 8 -

VERIFIED COMPLAINT FOR DECLARATORY RELIEF

41.    State law does not define the terms "idled," "inactive," and "out of service." However, such terms are defined or described by PHMSA, the federal agency that administers the federal law pursuant to which the pipelines are regulated.

42.    The Pipelines are subject to the federal Hazardous Liquid Pipeline Safety Act ("Pipeline Safety Act") administered by PHMSA. (49 U.S.C. §§ 60101 *et seq.*) The Pipeline Safety Act provides that state agencies may apply to and become certified by PHMSA to enforce equivalent or more stringent intrastate pipeline safety regulations (49 U.S.C. § 60105.) In California, the Legislature has vested OSFM with the "exclusive safety[,] regulatory and enforcement authority over intrastate hazardous liquid pipelines ..." (Gov. Code, § 51010.)

43.    PHMSA recognizes two categories of pipeline status: (i) active and (ii) abandoned. (See 81 Fed. Reg. 54512 [federal "regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned."]; see also PHMSA Advisory Bulletin ADB 2016-0075 (Aug. 11, 2016).) Federal regulations for hazardous liquid pipelines define the term "abandoned" to mean "permanently removed from service." (See 49 C.F.R. 195.3.)

44.    Federal regulations do not recognize "idle," "inactive," or "out of service" status at all. (See 81 Fed. Reg. 54512.) "If a pipeline is not properly abandoned and may be used in the future for transportation of hazardous liquid or gas, PHMSA regulations consider it as an active pipeline." (81 Fed. Reg. 54513.) "Owners and operators of pipelines that are not operating but contain hazardous liquids and gas must comply with all applicable safety requirements, including periodic maintenance, integrity management assessments, damage prevention programs, response planning, and public awareness programs." (*Ibid.*)

45.    Pacific Pipeline Company is informed and believes, and on that basis alleges, that it is the position of the State of California that the Las Flores Pipelines have been "idled, inactive, or out of service for five years or more" and, therefore, repair, reactivation, maintenance, and development associated with such work is new or expanded development requiring a new CDP.

VERIFIED COMPLAINT FOR DECLARATORY RELIEF

1    46.    The State, through the Coastal Commission and the Legislature, has previously
2  made numerous statements and findings concerning its position on the Las Flores Pipelines'
3  status.

4    47.    The Staff Report for the Coastal Commission's Cease and Desist Order CCC-25-
5  CD-01, Restoration Order CCC-25-RO-01, and Administrative Civil Penalty Order CCC-25-
6  AP3-01, characterizes the Pipelines as "offline and out-of-service" since the 2015 oil spill. (Staff
7  Report, p. 3.) "[T]he pipelines remained in service until the 2015 oil spill, at which point they
8  were placed out of service." (*Ibid.*) The Staff Report also characterizes the Pipelines as
9  "inoperable," having "sat inactive for a decade." (*Id.*, p. 65.)

10    48.    Similarly, the Senate Rules Committee digest for SB 237 makes clear that SB 237
11  is intended to apply to the Las Flores Pipelines. (See Sen. Com. on Natural Resources, Analysis
12  of Senate Bill No. 237 (2025-2026 Reg. Sess.) as amended on Sept. 10, 2025, attached hereto as
13  <u>Exhibit A</u>.)

14    a.    "This Bill [applies to] pipelines of a certain size that have been out of service for
15        more than five years (which would notably include certain pipelines serving the
16        Sable Corporation's Santa Ynez Unit)[.]" (Ex. A, p. 3.)

17    b.    "Preventing oil spills from pipelines. On May 19, 2015 an offshore pipeline
18        ruptured, spilling over 140,000 gallons of heavy crude oil along the Gaviota coast
19        at Refugio Beach in Santa Barbara County. Sable announced they were restarting
20        oil production in the Santa Ynez unit (in federal waters) on May 15, 2025, and
21        restarting the use of those two pipelines. Sable has not replaced, but has rather
22        made repairs to the pipelines. Some of the provisions of SB 237 are intended to
23        address concerns surrounding the safety of restarting use of the repaired pipelines
24        by requiring testing of the pipelines' durability." (Ex. A, p. 5.)

25    49.    Based on the State's authority under the Coastal Act and SB 237, Pacific Pipeline
26  Company faces an immediate choice to either (i) resume petroleum transportation pursuant to its
27  existing entitlements, permits, and approvals, including County-issued CDPs, but risk possible

28

1  enforcement action, fines, and other penalties by the State; or (ii) not resume petroleum

2  transportation at all. State law provides no administrative procedure for addressing a dispute

3  concerning the applicability of SB 237 to the Las Flores Pipelines.

4      50.      Given the absence of a process under the law for resolving this dispute, a judicial

5  determination concerning the applicability of SB 237 to the Las Flores Pipelines is necessary.

6                              **FIRST CAUSE OF ACTION**

7                    **Declaratory Relief (Code of Civ. Proc., § 1060)**

8      51.      Pacific Pipeline Company realleges and incorporates by reference each of the

9  above paragraphs as though fully set forth herein.

10     52.      Pacific Pipeline Company is a "person interested" under Code of Civil Procedure

11 § 1060, because Pacific Pipeline Company owns and operates the Las Flores Pipelines pursuant

12 to existing CDPs issued by the County and is the target of the amendments to the Government

13 Code and Coastal Act enacted by SB 237.

14     53.      The Las Flores Pipelines have not been "idled, inactive, or out of service for five

15 years or more" within the meaning of SB 237, because Pacific Pipeline Company has diligently

16 undertaken repair and maintenance efforts since the 2015 spill under existing entitlements,

17 permits, and approvals to resume petroleum transportation through the Las Flores Pipelines. The

18 Las Flores Pipelines have not been "abandoned" under federal or state law applicable to oil and

19 gas pipelines.  Rather, the Las Flores Pipelines are deemed "active" under these laws by the

20 agencies who administer them.

21     54.      Further, the Legislature did not make SB 237 retroactive. As such, SB 237 and its

22 new rules for what is an idled, inactive, or out of service pipelines and what permitting standards

23 may or may not be followed only applies prospectively. This means that SB 237 can only apply

24 to pipelines that are eventually "idled, inactive, or out of service for five years or more"

25 commencing on January 1, 2026. Thus, since the five-year idle, inactive, or out of service period

26 must commence on January 1, 2026, the earliest a pipeline could be "idled, inactive, or out of

27 service *for five years or more*" is January 1, 2031 (i.e., five years from SB 237's effective date).

28

                                    - 11 -

55.     Given statements the State, through the Coastal Commission and Legislature, has previously made concerning the Las Flores Pipelines' status as "idle," "inactive," and "out of service" for more than five years, an actual, present controversy exists between the parties concerning the applicability of SB 237 to the Las Flores Pipelines. This controversy is definite and concrete, touches the legal relations of parties with adverse legal interests, and is of sufficient immediacy and reality to warrant declaratory relief. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 79–80.)

56.     This action does not seek an advisory opinion or abstract interpretation of law. Pacific Pipeline Company must make immediate operational and financial decisions regarding whether to resume petroleum transportation under its existing CDPs at the risk of enforcement actions, penalties, or orders by the State. This presents a justiciable controversy under Code of Civil Procedure § 1060. (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 647.)

57.     Declaratory relief is necessary and proper within the meaning of Code of Civil Procedure § 1061, because a judicial declaration will clarify the parties' rights and duties, guide Pacific Pipeline Company's conduct, and prevent multiplicity of actions.

58.     Accordingly, Pacific Pipeline Company seeks a judicial declaration that the Las Flores Pipelines have not been "idled, inactive, or out of service for five years or more" under SB 237.

## PRAYER FOR RELIEF

WHEREFORE, Pacific Pipeline Company respectfully prays for judgment against the Defendant as follows:

1.     For a judicial declaration that the Las Flores Pipelines have not been "idled, inactive, or out of service for five years or more" under Government Code Section 51014.1 and Public Resources Code Sections 30262 (b)(1) and (b)(2), as amended by SB 237;

2.     For costs of suit incurred herein; and

3.     For such other and further relief as the Court deems just and proper, including supplemental relief under Code of Civil Procedure § 1062.

- 12 -

1

2

3   DATED:  September 29, 2025

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

ALSTON & BIRD LLP

By: _____
    JEFFREY D. DINTZER

    Attorney for Plaintiff
    PACIFIC PIPELINE COMPANY

- 13 -

VERIFIED COMPLAINT FOR DECLARATORY RELIEF

## VERIFICATION

I, Steven P. Rusch, am Vice President of Regulatory and Environmental Affairs of Sable Offshore Corp., and I am an Authorized Representative of Pacific Pipeline Company. I am authorized to execute this verification on behalf of them. I have read the attached Verified Complaint for Declaratory Relief and am familiar with its contents. The Facts provided in the Complaint are true of my personal knowledge, except for those alleged on information and belief, and I believe those to be true.

DATED: September 29, 2025

_____
Steven P. Rusch

VERIFIED COMPLAINT FOR DECLARATORY RELIEF

# EXHIBIT A

**SENATE RULES COMMITTEE**
Office of Senate Floor Analyses
(916) 651-1520   Fax: (916) 327-4478

SB 237

---

UNFINISHED BUSINESS

---

Bill No:   SB 237
Author:    Grayson (D), Hurtado (D), McNerney (D), Richardson (D) and
           Wilson (D), et al.
Amended:   9/10/25
Vote:      21

---

SENATE JUDICIARY COMMITTEE: 12-0, 5/6/25
AYES:  Umberg, Niello, Allen, Arreguín, Ashby, Caballero, Durazo, Laird, Stern,
   Wahab, Weber Pierson, Wiener
NO VOTE RECORDED:  Valladares

SENATE FLOOR:  34-0, 5/15/25 (Consent)
AYES:  Allen, Archuleta, Arreguín, Ashby, Becker, Blakespear, Cabaldon,
   Caballero, Choi, Cortese, Dahle, Durazo, Gonzalez, Grayson, Hurtado, Jones,
   Laird, Limón, McGuire, McNerney, Menjivar, Niello, Ochoa Bogh, Pérez,
   Richardson, Seyarto, Smallwood-Cuevas, Stern, Strickland, Umberg,
   Valladares, Wahab, Weber Pierson, Wiener
NO VOTE RECORDED:  Alvarado-Gil, Cervantes, Grove, Padilla, Reyes, Rubio

ASSEMBLY FLOOR:  59-4 , 9/13/25 – Roll call not available.

---

**SUBJECT:**   Oil spill prevention:  gasoline specifications:  suspension:  California
            Environmental Quality Act:  exemptions:  County of Kern:
            transportation fuels assessment:  coastal resources

**SOURCE:**   Author

---

**DIGEST:**  This bill contains a number of provisions that seek to safely and
responsibly increase in-state oil production (such as through testing of previously-
idled pipelines, greater disclosure of financial assurances, and resolving ongoing
litigation in favor of easier approval of drilling permits in Kern County), while also
soliciting additional information to mitigate rising fuel costs (such as by relaxing
California gasoline standards) and assess medium- to long-term strategies in line
with recent work from the California Energy Commission (CEC).

*Assembly Amendments* of 9/10/25 rewrote the bill entirely.

**ANALYSIS:**

Existing law:

1) Establishes the CEC tasks it with monitoring, analyzing, and making recommendations on statewide trends in the energy sector, including fuel supply and demand. (Public Resources Code §25200 et. seq.)

2) Establishes California Geologic Energy Management Division (CalGEM) for the purposes of overseeing the drilling, operation, maintenance, and removal of oil and gas wells. (Public Resources Code §3000 et. seq.)

3) Requires the Office of the State Fire Marshal (OSFM) to adopt hazardous liquid pipeline safety regulations that comply with federal law regarding hazardous liquid pipeline safety. (Government Code §51010 et. seq.)

4) Establishes the Office of Oil Spill Prevention and Response (OSPR) in the California Department of Fish and Wildlife as the state's principal regulator for oil spill prevention and response. (Government Code (GOV) §§8574.1 *et seq.*, GOV §§8670.1 *et seq.*, Public Resources Code §§8750 *et seq.*).

5) Institutes the California Environmental Quality Act (CEQA), which requires lead agencies with the principal responsibility for carrying out or approving a project to prepare a negative declaration (ND), mitigated negative declaration (MND), or environmental impact report (EIR) for the project, unless the project is exempt from CEQA. (Public Resources Code (PRC) §21000 et seq.). (CEQA Guidelines §15064(a)(1), (f)(1))

6) Establishes and defines a Program EIR (PEIR) in the CEQA guidelines as an EIR which may be prepared for a series of actions that can be characterized as one large project and are related either:
   a) Geographically;
   b) As logical parts in the chain of contemplated actions;
   c) In connection with issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program; or
   d) As individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways. (California Code of Regulations CEQA Guidelines § 15168)

This bill:

1) Makes findings and declarations regarding, among other things, California's mid-transition phase of the energy transition.

2) Requires the OSPR to solicit feedback on and periodically update its worst case scenario spill volumes.

3) Requires the OSPR to list, among other things, all applications for certificates of financial responsibility, and to revise worst case scenario spill volumes, and operators' assurance of financial responsibility in case of a spill.

4) Requires pipelines of a certain size that have been out of service for more than five years (which would notably include certain pipelines serving the Sable Corporation's Santa Ynez Unit), to meet specific testing requirements.

5) Permits the Governor to, under certain circumstances and with specified considerations, suspend the requirement "summer blend" gasoline in order to protect against "extraordinary gasoline price increases," among other things.

6) Deems the Kern County Second Supplemental Recirculated Environmental Impact Report (SCH2013081079; the SSREIR), including all appendices (SSREIR, March 2025), until January 1, 2036, sufficient for full compliance with CEQA.

7) Directs CEC to, as part of the next Transportation Fuels Assessment, evaluate the cost and supply impacts of gasoline that is not "California reformulated gasoline blendstock for oxygenate blending" (CARBOB), and, among other things, potentially make various recommendations regarding how such non-CARBOB gasoline could benefit California.

8) Requires CEC to, on or before March 31, 2026, submit an assessment to the Legislature that evaluates certain information in the June 2025 letter to Governor Newsom from CEC Vice Chair Siva Gunda.

9) Requires oil produced offshore by new, expanded, or reactivated operations (of the same types of pipelines covered by #4 above) to be transported once

onshore by pipelines using the best available technology, as defined, and certain projects require a new Coastal Development Permit.

## Background

*Declining domestic oil production may impact in-state oil pipelines.* California's reliance on crude oil has steadily declined since the 1980s; however, oil consumption recently increased from pandemic lows in 2020. Despite this rebound, California's in-state production of petroleum remains low and California largely relies on imports for its petroleum supplies. Several refineries maintain existing petroleum supplies by using pipelines to in-state oil fields. However, as supply from those fields decreases, the economic viability of those pipelines sharply declines. Some of the policies advanced by this bill (namely restoring the pipelines for offshore oil production in Sable's Santa Ynez Unit and the Kern County SSREIR being deemed approved) appear to address this problem by increasing in-state oil production.

   a) *Tests for moving oil safely via pipelines.* To prevent accidents and spills, state and federal regulations require pipeline operators to conduct hydrostatic pressure tests to ensure the integrity of their pipelines.

   b) *Financial assurances in the case of oil spills.* Because the threat of an oil spill is never zero, OSPR issues Certificate of Financial Responsibility to facilities, vessels, and pipelines that are required to have a California Oil Spill Contingency Plan, following submittal of an application and proof that the applicant has the financial resources to cover the cost of response for a "worst-case scenario" spill.

*Kern County oil and gas ordinance's iterative EIRs.* In 2013, Kern County began the process of amending its zoning ordinance addressing local permitting for oil and gas exploration, development and production. For the last ten years, the County has gone back and forth in litigation as plaintiffs challenged the ordinance and the drilling permitted under it. Courts have at different times and to various degrees sided with one side or the other, and the original EIR has been revisited in supplemental EIRs (SEIR). As of 2025, the most recent iteration of the EIR, the Second Supplemental Recirculated EIR (SSREIR), faces legal challenge.

*Energy Commission Recommendations for the mid transition.* On June 27, 2025, the Vice Chair of the energy commission submitted a letter to the Governor outlining the CEC's recommendation's on changes to state policy to ensure

"adequate transportation fuels supply during this pivotal time in our state's clean energy transition." The letter recommended pursuit of three concurrent strategies, briefly:

c) Stabilize fuel supply through imports of refined fuels and maintaining in-state refining capacity;

d) Provide sufficient confidence to industry to invest in maintaining reliable and safe infrastructure operations to meet demand; and

e) Develop and execute a holistic transportation fuels transition strategy.

## Comments

*Purpose of Bill.* According to the author, "California faces an affordability crisis on a number of fronts, most notably when it comes to the cost of fuel. This affects all of us—both directly and indirectly—whether it be at the gas pump, where Californians pay some of the prices in the country, or in the form of higher prices for goods and services, which are also affected by the higher costs of energy to produce and deliver. As was noted in a June 27, 2025 report by California Energy Commission Vice-Chair, Siva Gunda, "If a lack of proactive management during this phase of the transition leads to rising energy prices and less reliable fuel supplies, that instability could erode support for continued decarbonization." SB 273 seeks to answers this call for proactive management."

*Preventing oil spills from pipelines.* On May 19, 2015 an offshore pipeline ruptured, spilling over 140,000 gallons of heavy crude oil along the Gaviota coast at Refugio Beach in Santa Barbara County. Sable announced they were restarting oil production in the Santa Ynez unit (in federal waters) on May 15, 2025, and restarting the use of those two pipelines. Sable has not replaced, but has rather made repairs to the pipelines. Some of the provisions of SB 237 are intended to address concerns surrounding the safety of restarting use of the repaired pipelines by requiring testing of the pipelines' durability.

*Updating financial assurances for oil spills.* There is no requirement that the regulations governing worst-case spills be regularly updated, and as such, they have not been. The marine facility reasonable "worst-case spill" volume calculations were established in regulation in 1993 using methods aligned with federal worst-case discharge calculations, and there have only been minor and infrequent updates since then. SB 237 would require more disclosure about and decadal updates of the certificates of financial responsibility.

*Ending the Kern Oil and Gas Ordinance litigation, with some guardrails.* SB 237 'puts the lid' on any further revisions to or legal objections against Kern County's zoning ordinance focused on oil and gas (except purely typographical fixes). SB 237 also specifies that the zoning ordinance SSREIR is sufficient to meet the requirements of CEQA for compliant projects, meaning that no further, project-specific EIR's for a given oil well are required so long as the new wells fit in the four corners of the existing SSREIR. However, SB 237 could prevent appropriate mitigations measures or other environmental considerations from being applied to drilling projects that are atypical, use emerging technology or technology not considered the SSREIR, or are otherwise not considered in the SSREIR.

To help address some of these concerns, SB 237 adds some environmental guardrails to the application of the SSREIR, briefly:

a)  It sets a cap for drilling in Kern County at 2,000 new oil wells, a 26% reduction in total planned wells per year compared to the original estimate in Kern County's oil and gas ordinance EIR. (However, this can be waived under certain CEC findings);
b)  It contains a ten-year sunset on the provisions that specify that the SSREIR is sufficient, complete, and not subject to lawsuits for new drilling (However, the SSREIR itself would remain in effect after the sunset);
c)  It specifies that CalGEM, rather than Kern County, must be the lead agency in a health protection zone, presumably making it harder to drill new wells in those zone (although not impossible).

*Maintaining capacity to stabilize fuel supply.* Several of this bill's provisions appear to follow recommendations in CEC Vice Chair Gunda's June letter, and would be expected to boost in-state production, which would be expected to support California's refinery capacity, which would be expected to help keep refineries operating in state.

*Using more tools in the toolbox to manage gas prices.* Parts of SB 237 contemplate changes to California's fuel blend to reduce fuel prices. Summer blend gasoline in California contributes less to smog, but is more expensive. California's unique gasoline blendstock, CARBOB, was formulated to help meet California's nation-leading air pollution challenges. However, it also means that fuel in neighboring states cannot be used in California. Both of these measures could be expected to reduce fuel prices, at the cost of increased air pollution. However, these do not address the long-term challenges the state faces in larger-scale decarbonization

across all sectors of the economy.

*Navigating the mid-transition.* Whether through the intentional phase-down of fossil fuels in California, shifting global market dynamics, the costs associated with repair and maintenance, or a combination of all of the above and more, it is clearly becoming more and more difficult to profitably operate fossil fuel infrastructure in California. How do we embrace and deploy clean technologies while they are more expensive than the fossil fuel alternatives? How do we maintain the fossil fuel supply we need as it becomes less lucrative and less feasible to do so?

We are in a period described by academics as the "mid-transition". As described in a recent review:

> "Many aspects of transition will be felt, and shaped, directly by individuals because of our direct interactions with energy systems. Even rare missteps are likely to have significant and potentially system design relevant impacts on perception, political support, and implementation. Comparisons of the new system to the old system are likely to rest on experience of a world less affected by climate change, such that concerns about lower reliability, higher costs, and other challenges might be perceived as inherent to zero-carbon systems, versus energy systems facing consequences of climate change and longterm underinvestment."[1]

California's economy today relies on an immense volume of fossil fuels (by some accounts as much as 84% of our total energy today)[2]. In turn, extracting, transporting, refining, distributing, and using those fossil fuels relies on an immense network of infrastructure owned by a number of private companies and operated by tens of thousands of skilled workers. Those private companies rely on certainty about the profitability of their investments. What happens when—not if— it is no longer profitable to operate fossil fuel infrastructure in California? What— if not profit—would compel private companies to continue maintaining and operating their infrastructure? How can California keep its economy afloat and its people thriving in the crucial period between when fossil fuels stop being profitable, and when they stop being needed?

Pursuant to SBX1-2, the California Energy Commission produced a Transportation

---

[1] Grubert and Hastings-Simon, 2022. Designing the mid-transition: A review of medium-term challenges for coordinated decarbonization in the United States. WIRES Climate Change, Vol 13, Issue 3.
[2] California State Profile & Energy Estimates. U.S. Energy Information Administration. https://www.eia.gov/state/?sid=CA

Fuels Assessment, which has begun to wrestle with some of these questions. One of several possible solutions under consideration is state ownership of refineries, in which, "The State of California would purchase and own refineries in the State to manage the supply and price of gasoline." However, doing so would be extremely costly and represent a significant departure from how this industry has operated in California to date. As the Legislature considers this bill and other proposals to assuage or mitigate the very real tensions of the mid-transition, it is worth also contemplating solutions on the longer time horizon as well.

There is no clear best way to transition the world's fourth largest economy off of fossil fuels. California is leading the way and charting a path to navigate this transition. This monumental task will have consequences, both expected and unforeseen. Nevertheless, the Legislature should evaluate the information and options available and take action before GHG emissions continue unabated, fossil fuel infrastructure falls into disrepair (with potentially catastrophic results), and communities surrounding this infrastructure continue to face air pollution and economic uncertainty alike.

Vice Chair Gunda's June letter described the importance of a holistic strategy for a managed transition away from fossil fuels, alongside more pressing and immediate matters. Boosting in-state production today, as SB 237 proposes to do, to keep critical infrastructure online is a reasonable response to less-than-ideal circumstances. But what lessons can be learned? What could California begin doing now to make the next refinery to announce its closure *less* disruptive to California's well-being, not more? What information is needed about California's refineries (both their operations and the financial liabilities associated with their site remediation) to better equip California to handle the next stage of this transition? Although SB 237 does not answer these questions, it helps get information that might. These continue to be questions the Legislature should consider, lest we find ourselves blindsided by the next nigh-inevitable refinery closure.

**FISCAL EFFECT:** Appropriation: No   Fiscal Com.:   Yes   Local:  Yes

**SUPPORT:** (Verified  9/13/25)

350 Humboldt
Associated Builders and Contractors of California
Berry Petroleum Company, LLC
California Business Roundtable
California Independent Petroleum Association

California Resources Corporation and Subsidiaries
California State Association of Electrical Workers
California State Pipe Trades Council
City of Bakersfield
Climate Action California
County of Kern

**OPPOSITION:** (Verified 9/13/25)

Asian Pacific Environmental Network Action
California Coastal Protection Network
California Environmental Justice Alliance Action
California Environmental Voters
Campaign for a Safe and Healthy California
Ceja Action
Center for Biological Diversity
Center on Race, Poverty & the Environment
Central California Environmental Justic Network
Central California Environmental Justice Network
Clean Water Action
Climate First: Replacing Oil & Gas
Communities for a Better Environment
Consumer Watchdog
Earthjustice
Leadership Council for Justice and Accountability
Natural Resources Defense Council
Natural Resources Defense Council
Physicians for Social Responsibility - Los Angeles
Sierra Club
Sierra Club California
The Climate Center


Prepared by:  Heather Walters / E.Q. / (916) 651-4108
9/13/25 11:10:30

**\*\*\*\* END \*\*\*\***

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.:                    FAX NO *(Optional).*: <br> E-MAIL ADDRESS *(Optional)*: <br> ATTORNEY FOR *(Name)* : | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF KERN** <br> STREET ADDRESS: <br> MAILING ADDRESS: <br> CITY AND ZIP CODE: <br> BRANCH NAME: | |
| PLAINTIFF: <br><br> DEFENDANT: | |
| **ADR STIPULATION AND ORDER FORM** | CASE NUMBER: |

1. Pursuant to California Rule of Court 3.221(a)(4), the parties and their attorneys stipulate that all claims in

   this action will be submitted to the following alternative dispute resolution (ADR) process:

   a. ☐ Private Mediation.

   b. ☐ Neutral Evaluation.

   c. ☐ Binding Arbitration.

   d. ☐ Referee/Special Master.

   e. ☐ Settlement Conference with Private Neutral.

   f. ☐ Non-binding Judicial Arbitration pursuant to CCP§1141.10 et seq., and applicable Rules of Court.

   g. ☐ Discovery will remain open until 30 days before trial.

   h. ☐ Other:

2. It is also stipulated that

   a. _____ (name of individual neutral, not organization)

      has consented to and will serve as

   b. _____ (neutral function/process) and that the session will take place on

   c. _____ (enter a FIRM date) and that all persons necessary to effect a settlement
      and having full authority to resolve the dispute will appear at such session.

---

CEB® | Essential
ceb.com | Forms

| PLAINTIFF:  DEFENDANT: | CASE NUMBER: |
|---|---|

3. Date:

    a.   On behalf of Plaintiff/s

_____         _____
(TYPE OR PRINT NAME)                 (SIGNATURE OF PLAINTIFF OR ATTORNEY)

_____         _____
(TYPE OR PRINT NAME)                 (SIGNATURE OF PLAINTIFF OR ATTORNEY)

       ☐ Continued on *Attachment 3a* (form MC-025).

    b.   On behalf of Defendant/s

_____         _____
(TYPE OR PRINT NAME)                 (SIGNATURE OF DEFENDANT OR ATTORNEY)

_____         _____
(TYPE OR PRINT NAME)                 (SIGNATURE OF DEFENDANT OR ATTORNEY)

       ☐ Continued on *Attachment 3a* (form MC-025).

4. ORDER:

    a.   ☐ The ADR process is to be completed by

    b.   ☐ The Case Management Conference currently set for        , at

          ☐ a.m. ☐ p.m. in Department       :

       i.   ☐ Remains on calendar.

       ii.  ☐ Is hereby vacated.

    c.   ☐ Mediation Status Review.

    d.   ☐ Case Status Review re:

    e.   ☐ Final Case Management Conference is set for      , at     ☐ a.m.
       ☐ p.m. in Department

    f.   ☐ Judicial Arbitration Order Review Hearing will be set by notice upon assignment of arbitrator.

**IT SO ORDERED.**

Date:                     _____
                            JUDICIAL OFFICER

CEB® | Essential Forms
ceb.com

SUPERIOR COURT OF CALIFORNIA, COUNTY OF KERN
ALTERNATIVE DISPUTE RESOLUTION (ADR)
INFORMATION PACKET



Kern County Superior Court encourages, and under certain circumstances, may require parties to try ADR before trial.  Courts have also found ADR to be beneficial when used early in the case process. The courts, community organizations and private providers offer a variety of ADR processes to help people resolve disputes without a trial.  Below is information about the potential advantages and disadvantages of ADR, the most common types of ADR, and how to find a local arbitrator, mediator or neutral evaluator. You may find more information about these ADR processes at www.courts.ca.gov/programs/adr.

## Possible Advantages and Disadvantages of ADR
ADR may have a variety of advantages or disadvantages over a trial depending on the type of ADR process used as well as the particular type of case involved.

Possible Advantages:  Saves time; saves money; gives the parties more control over the dispute resolution process and outcome; helps to preserve and/or improve party relationships.

Possible Disadvantages:  May add additional time and costs to the litigation if ADR does not resolve the dispute; procedures such as discovery, jury trial, appeals, and other legal protections may be limited or unavailable.

## Most Common Types of ADR
Mediation:  A neutral person or "mediator" helps the parties communicate in an effective and constructive manner so the parties can try to resolve their dispute.  The mediator does not decide the outcome, but helps the parties to do so.  Mediation is generally confidential and may be particularly useful where ongoing relationships are involved, such as between family members, neighbors, employers/employees or business partners.

Settlement Conferences:  A judge or another neutral person assigned by the court helps the parties to understand the strengths and weaknesses of their case and to discuss settlement.  The judge or settlement conference neutral does not make a decision in the case but helps the parties to negotiate a settlement.  Settlement conferences may be particularly helpful when the parties have very different views about the likely outcome of a trial in their case.

Neutral Evaluation:  The parties briefly and informally present their facts and arguments to a neutral person who is often an expert in the subject matter of the dispute.  The neutral does not decide the outcome of the dispute, but helps the parties to do so by providing them with a non-binding opinion about the strengths, weaknesses and likely outcome of their case.  Depending on the neutral evaluation process, and with the parties' consent, the neutral may then help the parties try to negotiate a settlement.  Neutral evaluation may be appropriate when the parties desire a neutral's opinion about how the case might be resolved at trial; and, if the primary dispute is about the amount of damages or technical issues, the parties would like a neutral expert to resolve those disputes.

Arbitration:  The parties present evidence and arguments to a neutral person or "arbitrator" who then decides the outcome of the dispute.  Arbitration is less formal than a trial, and the rules of evidence are generally more relaxed.  If the parties agree to *binding* arbitration, they waive their right to a jury trial and agree to accept the arbitrator's decision.  With *nonbinding* arbitration, any party may reject the arbitrator's decision and request a trial.  Arbitration may be appropriate when the parties want another person to decide the outcome of their dispute but would like to avoid the formality, time and expense of a trial, or desire an expert in the subject matter of their dispute to make a decision.

## Local Court ADR Programs
The Superior Court, County of Kern offers two types of ADR:  Arbitration in cases in which the amount in controversy as to each plaintiff is $50,000 or less; and DRPA mediation services on the day of the hearing, settlement conference or trial.

**Arbitration:**  The Superior Court of California, County of Kern does use Arbitrators in civil cases where the amount in controversy as to each individual plaintiff is $50,000 or less.  The Court may order the parties to Arbitration or the parties may agree to Arbitration any time before the first case management conference statement is filed. See Local Rule 3.14 at https://www.kern.courts.ca.gov/system/files/local_rules_of_court.pdf

**Dispute Resolution Program Act (DRPA):**  The Superior Court of California, County of Kern also offers mediation services in small claims and unlawful detainer, civil harassment, family law and probate matters.  The Court has contracted with the Better Business Bureau (BBB) under the Dispute Resolution Programs Act (DRPA) to provide these mediation services.  For more information about BBB Mediation Services go to https://www.bbb.org/local-bbb/bbb-serving-central-california-and-inland-empire-counties.

## ADR Coordinator:
Although complaints about arbitrators and mediators are rare, the Superior Court of California, County of Kern does provide a complaint procedure in our Local Rules, Rule 3.14.7.  If you have a complaint or a concern with any of this Court's ADR programs, or simply have a question about ADR, please contact the ADR Administrator at ADRAdministrator@kern.courts.ca.gov or 661-868-5695.

## Resources:
**California Department of Consumer Affairs:**  https://www.dca.ca.gov/consumers/mediation_guides.shtml
**Judicial Branch California Courts – ADR:** www.courts.ca.gov/selfhelp-adr.htm
**ADR Stipulation Form:** https://www.kern.courts.ca.gov/system/files/adr_stipulation_and_order_form.pdf

| | FOR COURT USE ONLY |
|---|---|
|  **SUPERIOR COURT OF CALIFORNIA** <br> **COUNTY OF KERN** <br> Bakersfield Metropolitan Justice <br> 1215 Truxtun Ave <br> Bakersfield, CA 93301 <br> Phone: (661) 610-6000 | FILED <br> SUPERIOR COURT OF <br> CALIFORNIA <br> COUNTY OF KERN <br><br> November 3, 2025 <br><br> /s/ Alexandra Valles-Guerrero, <br> Deputy Clerk |
| **PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION** <br> **v. STATE OF CALIFORNIA** | |
| Notice of Assignment to Judicial Officer for All Purposes, Notice of Order to Show Cause Re: California Rules of Court, Rule 3.110, and Notice of Case Management Conference | Case Number: <br> BCV25103508 |

By order of the presiding judge, the above-entitled case is assigned to the Honorable Bernard C. Barmann, Jr for all purposes. It will be managed in Department/Division H until its conclusion. Peremptory challenges, if any, must be made within the times set out in Code of Civil Procedure §170.6.

To Plaintiff(s) and Plaintiff(s) Counsel:
You are required to serve this Notice of Assignment and Notice of Order to Show Cause date and Notice of Case Management Conference date with the Summons, Complaint [Local Rule 3.7(a), Alternative Dispute Resolution (ADR) Information Packet, and ADR Stipulation and Order Form (California Rules of Court, Rule 3.221).

You are ordered to appear on January 12, 2026 at 8:30 A.M. in Division H at 1215 Truxtun Ave, Bakersfield, CA 93301 to give any legal reason why sanctions shall not be imposed for failure to serve the complaint on all named defendants and file proof(s) of service with the court within sixty (60) days after the filing of the complaint pursuant to California Rules of Court, Rule 3.110. All appearances are mandatory, unless the court receives the required proof(s) of service five (5) court days prior to the hearing date, and then no appearance is necessary.

To each party and their respective attorney(s) of record:
Your attention is directed to the California Rules of Court and the Code of Civil Procedure provisions regarding mandatory expedited jury trial procedures, specifically to California Rules of Court Rules 3.1546, et seq., and Code of Civil Procedure section 630.20, et seq.

This case is set for Case Management Conference on March 25, 2026 at 8:30 A.M. in Division H located at 1215 Truxtun Ave, Bakersfield, CA 93301. Parties shall comply with and file case management statements at least fifteen (15) days prior to the conference in accordance with California Rules of Court, Rules 3.720 – 3.730.

To Cross Complainant(s) and Cross Complainant(s) Counsel:
If you are bringing cross complaint against new parties, you are, likewise, required to serve this Notice of Assignment pursuant to California Rules of Court, Rule 3.110, Notice of Order to Show Cause date and Notice of Case Management Conference date on the new cross defendants.

<div style="text-align:center">Tara Leal<br>Clerk of the Superior Court</div>

Date: November 3, 2025

By:     /s/ Alexandra Valles-Guerrero <br>
           Alexandra Valles-Guerrero, Deputy Clerk

PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION v. STATE OF CALIFORNIA
BCV25103508

The Clerk of the Superior Court's office has received a civil complaint from you for filing. Pursuant to the Trial Court Delay Reduction Act, your case has been assigned to the Honorable Bernard C. Barmann, Jr as monitoring judge.

Judge Bernard C. Barmann, Jr has instituted a direct calendaring system for all cases assigned to him/her as the monitoring judge.

All law and motion, case management and trial setting conferences, ex parte matters and trials will be scheduled before him/her in Division H at 1215 Truxtun Ave, Bakersfield, CA 93301.

Law & Motion and Ex-Parte hearing dates must be pre-cleared by contacting the Direct Calendaring Clerk at 661-610-6460. Tentative rulings are not provided in advance of the hearing.

At the time of filing the complaint, plaintiff's counsel will be given a Notice of Case Management Conference which sets a conference approximately one hundred eighty (180) days after filing of the complaint. This notice must be served with the summons and complaint on all defendants. Defendants must serve the notice on all cross-defendants named. The notice must also be served on interveners and lien claimants.

Pursuant to Local Rule 3.2.1. a party wishing to appear remotely in any civil proceeding other than an evidentiary hearing or trial, including conferences and law and motion hearings, is permitted to appear without advance notice to the court or other parties. By appearing remotely those persons will be deemed to have requested a remote appearance. Instructions for accessing Remote Court Hearings can be found on the court's website. Each judicial officer retains the discretion to require a party to appear in person at a conference, hearing, or proceeding, as authorized by Code of Civil Procedure section 367.75. Remote proceedings for evidentiary hearings or trials in all divisions shall be noticed and conducted as authorized by Code of Civil Procedure section 367.75 and California Rules of Court, rule 3.672.

The Court does not provide court reporters for civil matters. Parties wishing to have a matter reported must provide their own reporter. The court maintains a list of pre-approved official reporters pro tem. Your preferred reporter can be added to this list. Information regarding the court's list is on the court's website.

Another judge will hear settlement conferences in cases assigned to Judge Bernard C. Barmann, Jr. However, those cases that do not settle will be set for trial before him/her.

PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION v. STATE OF CALIFORNIA
BCV25103508

Superior Court Of California County Of Kern Special Rules Relating To Case Management Conferences

At least fifteen (15) days prior to the case management conference, each party shall prepare, file and serve on each other party a case management conference statement providing the Court with the following information:

1. The "at-issue" status of the case including any new parties that may be contemplated;

2. A brief statement of the type of case and the general facts or contentions;

3. A description of the discovery done to date and that contemplated to be done;

4. Estimated time for trial and whether a jury is demanded;

5. Whether or not the case is entitled to priority in trial setting and if so, the legal authority thereof;

6. An evaluation of the case for alternative dispute resolution, including arbitration (judicial or binding), mediation or private judge handling;

7. If a person injury action, a description of the injuries sustained by each plaintiff and the elements of claimed damage;

8. A statement of any settlement negotiations undertaken thus far;

9. The name of the attorney primary responsible for the case on behalf of the party filing the statement.

More than one party may join in the filing of a single statement.

The case management conference shall be attended by the attorney primarily responsible for the case on behalf of each party or a member of his or her firm or counsel formally associated in the case. The attorney attending shall be thoroughly familiar with the case, and be able to engage in meaningful discussions with court and counsel, and to enter into agreements on behalf of his or her client on the following subjects:

1. The "at-issue" status of the case including the dismissal of the unnamed doe defendants or cross-defendants by agreement of all parties;

2. Discovery conducted and remaining to be done;

3. Amenability of the case to alternative dispute resolution including, but no limited to, arbitration (judicial or binding), mediation, and private judge handling.

4. Delineation of issues including stipulation of facts not in substantial controversy;

5. Settlement prospects;

6. Setting the matter for trial, pre-trial conferences, settlement conference or further case management conference;

7. Any other matters relevant to the processing of the case to a final resolution.

Any violation of these rules shall result in the imposition of substantial sanctions which may include monetary, issue, termination, or other appropriate sanctions.

PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION v. STATE OF CALIFORNIA
BCV25103508

Certificate of Service

The undersigned, of said Kern County, certify: That I am a Deputy Clerk of the Superior Court of the State of California, in and for the County of Kern, that I am a citizen of the United States, over 18 years of age, I reside in or am employed in the County of Kern, that I am not a party to the within action and that my business address is 1215 Truxtun Ave, Bakersfield, CA 93301, that I served the Notice of Assignment to Judicial Officer for All Purposes, Notice of Order to Show Cause Re: California Rules of Court, Rule 3.110, and Notice of Case Management Conference attached hereto on all interested parties and any respective counsel of record in the within action, following standard Court practices, by: (a) enclosing true copies thereof in a sealed envelope(s) with postage fully prepaid and depositing/placing for collection and delivery in the United States mail at Bakersfield, California; and/or (b) enclosing true copies thereof in a Kern County interoffice envelope(s) and placing for collection and delivery; and/or (c) electronically transmitting true copies thereof by electronic service or e-mail. Service address(es) are indicated on the attached service list.

Date of service:          November 3, 2025

Place of service:         Bakersfield, California

Sent from electronic service address: donotreply@kern.courts.ca.gov

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Tara Leal
Clerk of the Superior Court

Date:  November 3, 2025

By:    /s/ Alexandra Valles-Guerrero
       Alexandra Valles-Guerrero, Deputy Clerk

PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION v. STATE OF CALIFORNIA
BCV25103508

Service List

Benjamin Hanelin
355 S Grand Ave Ste 100
Los Angeles, CA  90071
benjamin.hanelin@lw.com

Garrett Stanton
333 S Hope St Fl 16
Los Angeles, CA  90071
garrett.stanton@alston.com

Jeffrey Dintzer
333 S Hope St Ste 1600
Los Angeles, CA  90071
jeffrey.dintzer@alston.com

Natalie Rogers
12670 High Bluff Dr
San Diego, CA  92130
natalie.rogers@lw.com



| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF KERN<br>Bakersfield Metropolitan Justice<br>1215 Truxtun Ave<br>Bakersfield, CA 93301<br>Phone: (661) 610-6000 | FOR COURT USE ONLY<br><br>FILED<br>SUPERIOR COURT OF<br>CALIFORNIA<br>COUNTY OF KERN<br><br>October 9, 2025<br><br>/s/ Alexandra Valles-Guerrero,<br>Deputy Clerk |
|---|---|
| **PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION<br>v. STATE OF CALIFORNIA** | |
| Notice of Assignment to Judicial Officer for All Purposes, Notice of<br>Order to Show Cause Re: California Rules of Court, Rule 3.110, and<br>Notice of Case Management Conference | Case Number:<br>BCV25103508 |

By order of the presiding judge, the above-entitled case is assigned to the Honorable Bernard C. Barmann, Jr for all purposes. It will be managed in Department/Division H until its conclusion. Peremptory challenges, if any, must be made within the times set out in Code of Civil Procedure §170.6.

To Plaintiff(s) and Plaintiff(s) Counsel:
You are required to serve this Notice of Assignment and Notice of Order to Show Cause date and Notice of Case Management Conference date with the Summons, Complaint [Local Rule 3.7(a), Alternative Dispute Resolution (ADR) Information Packet, and ADR Stipulation and Order Form (California Rules of Court, Rule 3.221).

You are ordered to appear on March 25, 2026 at 8:30 A.M. in Division H at 1215 Truxtun Ave, Bakersfield, CA 93301 to give any legal reason why sanctions shall not be imposed for failure to serve the complaint on all named defendants and file proof(s) of service with the court within sixty (60) days after the filing of the complaint pursuant to California Rules of Court, Rule 3.110. All appearances are mandatory, unless the court receives the required proof(s) of service five (5) court days prior to the hearing date, and then no appearance is necessary.

To each party and their respective attorney(s) of record:
Your attention is directed to the California Rules of Court and the Code of Civil Procedure provisions regarding mandatory expedited jury trial procedures, specifically to California Rules of Court Rules 3.1546, et seq., and Code of Civil Procedure section 630.20, et seq.

This case is set for Case Management Conference on January 12, 2026 at 8:30 A.M. in Division H located at 1215 Truxtun Ave, Bakersfield, CA 93301. Parties shall comply with and file case management statements at least fifteen (15) days prior to the conference in accordance with California Rules of Court, Rules 3.720 – 3.730.

To Cross Complainant(s) and Cross Complainant(s) Counsel:
If you are bringing cross complaint against new parties, you are, likewise, required to serve this Notice of Assignment pursuant to California Rules of Court, Rule 3.110, Notice of Order to Show Cause date and Notice of Case Management Conference date on the new cross defendants.

<div style="text-align:center">Tara Leal<br>Clerk of the Superior Court</div>

Date: October 9, 2025

By:    /s/ Alexandra Valles-Guerrero
       Alexandra Valles-Guerrero, Deputy Clerk

PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION v. STATE OF CALIFORNIA
BCV25103508

The Clerk of the Superior Court's office has received a civil complaint from you for filing. Pursuant to the Trial Court Delay Reduction Act, your case has been assigned to the Honorable Bernard C. Barmann, Jr as monitoring judge.

Judge Bernard C. Barmann, Jr has instituted a direct calendaring system for all cases assigned to him/her as the monitoring judge.

All law and motion, case management and trial setting conferences, ex parte matters and trials will be scheduled before him/her in Division H at 1215 Truxtun Ave, Bakersfield, CA 93301.

Law & Motion and Ex-Parte hearing dates must be pre-cleared by contacting the Direct Calendaring Clerk at 661-610-6460. Tentative rulings are not provided in advance of the hearing.

At the time of filing the complaint, plaintiff's counsel will be given a Notice of Case Management Conference which sets a conference approximately one hundred eighty (180) days after filing of the complaint. This notice must be served with the summons and complaint on all defendants. Defendants must serve the notice on all cross-defendants named. The notice must also be served on interveners and lien claimants.

Pursuant to Local Rule 3.2.1. a party wishing to appear remotely in any civil proceeding other than an evidentiary hearing or trial, including conferences and law and motion hearings, is permitted to appear without advance notice to the court or other parties. By appearing remotely those persons will be deemed to have requested a remote appearance. Instructions for accessing Remote Court Hearings can be found on the court's website. Each judicial officer retains the discretion to require a party to appear in person at a conference, hearing, or proceeding, as authorized by Code of Civil Procedure section 367.75. Remote proceedings for evidentiary hearings or trials in all divisions shall be noticed and conducted as authorized by Code of Civil Procedure section 367.75 and California Rules of Court, rule 3.672.

The Court does not provide court reporters for civil matters. Parties wishing to have a matter reported must provide their own reporter. The court maintains a list of pre-approved official reporters pro tem. Your preferred reporter can be added to this list. Information regarding the court's list is on the court's website.

Another judge will hear settlement conferences in cases assigned to Judge Bernard C. Barmann, Jr. However, those cases that do not settle will be set for trial before him/her.

PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION v. STATE OF CALIFORNIA
BCV25103508

Superior Court Of California County Of Kern Special Rules Relating To Case Management Conferences

At least fifteen (15) days prior to the case management conference, each party shall prepare, file and serve on each other party a case management conference statement providing the Court with the following information:

1. The "at-issue" status of the case including any new parties that may be contemplated;

2. A brief statement of the type of case and the general facts or contentions;

3. A description of the discovery done to date and that contemplated to be done;

4. Estimated time for trial and whether a jury is demanded;

5. Whether or not the case is entitled to priority in trial setting and if so, the legal authority thereof;

6. An evaluation of the case for alternative dispute resolution, including arbitration (judicial or binding), mediation or private judge handling;

7. If a person injury action, a description of the injuries sustained by each plaintiff and the elements of claimed damage;

8. A statement of any settlement negotiations undertaken thus far;

9. The name of the attorney primary responsible for the case on behalf of the party filing the statement.

More than one party may join in the filing of a single statement.

The case management conference shall be attended by the attorney primarily responsible for the case on behalf of each party or a member of his or her firm or counsel formally associated in the case. The attorney attending shall be thoroughly familiar with the case, and be able to engage in meaningful discussions with court and counsel, and to enter into agreements on behalf of his or her client on the following subjects:

1. The "at-issue" status of the case including the dismissal of the unnamed doe defendants or cross-defendants by agreement of all parties;

2. Discovery conducted and remaining to be done;

3. Amenability of the case to alternative dispute resolution including, but no limited to, arbitration (judicial or binding), mediation, and private judge handling.

4. Delineation of issues including stipulation of facts not in substantial controversy;

5. Settlement prospects;

6. Setting the matter for trial, pre-trial conferences, settlement conference or further case management conference;

7. Any other matters relevant to the processing of the case to a final resolution.

Any violation of these rules shall result in the imposition of substantial sanctions which may include monetary, issue, termination, or other appropriate sanctions.

PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION v. STATE OF CALIFORNIA
BCV25103508

Certificate of Service

The undersigned, of said Kern County, certify:  That I am a Deputy Clerk of the Superior Court of the State of California, in and for the County of Kern, that I am a citizen of the United States, over 18 years of age, I reside in or am employed in the County of Kern, that I am not a party to the within action and that my business address is 1215 Truxtun Ave, Bakersfield, CA 93301, that I served the Notice of Assignment to Judicial Officer for All Purposes, Notice of Order to Show Cause Re: California Rules of Court, Rule 3.110, and Notice of Case Management Conference attached hereto on all interested parties and any respective counsel of record in the within action, following standard Court practices, by: (a) enclosing true copies thereof in a sealed envelope(s) with postage fully prepaid and depositing/placing for collection and delivery in the United States mail at Bakersfield, California; and/or (b) enclosing true copies thereof in a Kern County interoffice envelope(s) and placing for collection and delivery; and/or (c) electronically transmitting true copies thereof by electronic service or e-mail. Service address(es) are indicated on the attached service list.

Date of service:        October 9, 2025

Place of service:       Bakersfield, California

Sent from electronic service address: donotreply@kern.courts.ca.gov

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

                                        Tara Leal
                                        Clerk of the Superior Court
Date:  October 9, 2025

                        By:     /s/ Alexandra Valles-Guerrero
                                Alexandra Valles-Guerrero, Deputy Clerk

PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION v. STATE OF CALIFORNIA
BCV25103508

Service List

Benjamin Hanelin
355 S Grand Ave Ste 100
Los Angeles, CA  90071
benjamin.hanelin@lw.com

Garrett Stanton
333 S Hope St Fl 16
Los Angeles, CA  90071
garrett.stanton@alston.com

Jeffrey Dintzer
333 S Hope St Ste 1600
Los Angeles, CA  90071
jeffrey.dintzer@alston.com

Natalie Rogers
12670 High Bluff Dr
San Diego, CA  92130
natalie.rogers@lw.com

# Exhibit B

1  **ALSTON & BIRD LLP**
   JEFFREY D. DINTZER, SBN 139056
2  jeffrey.dintzer@alston.com
   GARRETT B. STANTON, SBN 324775
3  garrett.stanton@alston.com
   350 South Grand Avenue, 51st Floor
4  Los Angeles, CA 90071-1410
   Telephone:    (213) 576-1000
5  Facsimile:    (213) 576-1100

6  **PAUL HASTINGS LLP**
   BENJAMIN J. HANELIN, SBN 237595
7  benjaminhanelin@paulhastings.com
   NATALIE C. ROGERS, SBN 301254
8  natalierogers@paulhastings.com
   1999 Avenue of the Stars, 27th Floor
9  Century City, California, 90067
   Telephone:    (310) 620-5879
10 Facsimile:    (310) 620-5899

11 Attorneys for Plaintiff
   PACIFIC PIPELINE COMPANY
12

**ELECTRONICALLY FILED**
Superior Court of California,
County of Kern
By: Julia Barrera
Deputy Clerk
**01/21/26 5:59 PM**

13              **SUPERIOR COURT OF CALIFORNIA**

14                   **COUNTY OF KERN**

15
   PACIFIC PIPELINE COMPANY, a
16 Delaware corporation,

17          Plaintiffs,

18     v.

19 STATE OF CALIFORNIA and DOES 1
   through 25, inclusive,
20
            Defendants.
21

Case No. BCV-25-103508

**VERIFIED FIRST AMENDED
COMPLAINT FOR DECLARATORY
RELIEF**

(Code Civ. Proc. § 1060)

22

23

24

25

26

27

28

- 1 -

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

1    Plaintiff Pacific Pipeline Company brings this First Amended Complaint for Declaratory

2  Relief against Defendant the State of California. By this verified pleading, Plaintiff alleges as

3  follows:

4                                    **INTRODUCTION**

5    1.    Sable Offshore Corp. ("Sable") operates an interconnected pipeline facility known

6  as the Santa Ynez Pipeline System, which includes both offshore and onshore components. Two

7  onshore segments of this System are known as Segments CA-324 and CA-325, sometimes

8  referred to as the Las Flores Pipeline, which are owned by Pacific Pipeline Company. Portions of

9  Segments CA-325 are located in Kern County, San Luis Obispo County, and an unincorporated

10  area of the County of Santa Barbara ("County"), including portions both inside and outside the

11  Coastal Zone. Other onshore portions of the Santa Ynez Pipeline System, including Segment

12  CA-324, are located in Santa Barbara County and within the Coastal Zone.

13    2.    Sable is the lessee and operator of federal offshore oil and gas leases in federal

14  waters off the coast of California that form the Santa Ynez Unit. Offshore pipeline segments (the

15  "Offshore Pipeline Segments") transport oil from this offshore field to intermediate onshore

16  processing facilities at Las Flores Canyon (the "LFC Facilities"), and Segments CA-324 and CA-

17  325 transport oil from the LFC Facilities to Gaviota and Pentland Stations and further

18  downstream. Sable operates the Offshore Pipeline Segments, the LFC Facilities, and Segments

19  CA-324 and CA-325 as part of the integrated Santa Ynez Pipeline System, which moves crude

20  oil from offshore waters into and through California. Sable acquired the Santa Ynez Unit, the

21  Offshore Pipeline Segments, the LFC Facilities and Pacific Pipeline Company in February 2024.

22    3.    Since that time, Sable and Pacific Pipeline Company have worked with federal

23  and state agencies toward resuming petroleum transportation through the entirety of the Santa

24  Ynez Pipeline System, including Segments CA-324 and CA-325. This has involved the

25  performance of repair and maintenance work on all components of the Santa Ynez Pipeline

26  System, including Segments CA-324 and CA-325.

27

28

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

1    4.    On September 13, 2025, the California Legislature adopted Senate Bill ("SB")

2    237.

3    5.    Among other things, SB 237 adds Section 51014.1 of the Government Code,

4    which provides that "[a]ny existing oil pipeline that is six inches or larger that has been idle,

5    inactive, or out of service for five years or more, shall not be restarted without passing a spike

6    hydrostatic testing program."

7    6.    SB 237 also amends Section 30262 of the California Coastal Act to require a

8    person to obtain a new coastal development permit ("CDP") for the "[r]epair, reactivation, and

9    maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or

10    out of service for five years or more."

11    7.    SB 237 does not define "idled, inactive, or out of service."

12    8.    On September 19, 2025, Governor Gavin Newsom signed SB 237 into law.

13    9.    The State of California has taken the position that Segments CA-324 and CA-325

14    have been idled, inactive, or out of service for five years or more. Pacific Pipeline Company

15    disagrees. The entire Santa Ynez Pipeline System—including Segments CA-324 and CA-325—

16    is active. The Segments are not idle nor out of service. In fact, the entire Pipeline System has

17    retained its active status under state and federal law since 2015. More recently, Pacific Pipeline

18    Company and Sable have been diligently performing necessary work on Segments CA-324 and

19    CA-325 to resume petroleum transportation through them. Under all relevant and applicable

20    meanings of the words, the Santa Ynez Pipeline System, including Segments CA-324 and CA-

21    325, is not idle, inactive, or out of service.

22    10.    On December 17, 2025, the Pipeline and Hazardous Materials Safety

23    Administration ("PHMSA") determined the Santa Ynez Pipeline System is an interstate pipeline

24    under its exclusive pipeline safety jurisdiction. In making its determination, PHMSA confirmed

25    the Santa Ynez Pipeline System is considered an "active" pipeline. Since assuming jurisdiction

26    over the Santa Ynez Pipeline System, PHMSA approved Sable's Restart Plan for Segments CA-

27

28

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

1  324 and CA-325 on December 22, 2025 and issued Sable an Emergency Special Permit with

2  respect to Segments CA-324 and CA-325 on December 23, 2025.

3      11.     An actual and present controversy exists between Pacific Pipeline Company and

4  Defendant concerning their respective rights and duties regarding the Santa Ynez Pipeline

5  System's status, and the applicability of SB 237 to Segments CA-324 and CA-325 in light of

6  PHMSA's assumption of jurisdiction over the Santa Ynez Pipeline System. Consequently,

7  Pacific Pipeline Company seeks a judicial declaration from this Court that: 1) the Santa Ynez

8  Pipeline System, including Segments CA-324 and CA-325, is not idle, inactive, or out of service

9  as those terms are used in SB 237; and 2) the application of SB 237 as to the Santa Ynez Pipeline

10  System is preempted by federal law.

11                              **THE PARTIES**

12      12.     Plaintiff Pacific Pipeline Company is a Delaware Corporation and does business

13  in Kern County, California. Pacific Pipeline Company owns Segments CA-324 and CA-325,

14  which are critical portions of the Santa Ynez Pipeline System.

15      13.     Pacific Pipeline Company is a "person interested under a statute" within the

16  meaning of Code of Civil Procedure § 1060, because Pacific Pipeline Company's rights and

17  obligations under SB 237 are directly at issue in this action.

18      14.     Defendant State of California is responsible for enacting and enforcing the laws of

19  the State of California.

20      15.     Pacific Pipeline Company is unaware of the true names and/or capacities of

21  Defendants DOES 1 through 25, inclusive, and therefore sues said Defendants by such fictitious

22  names. Pacific Pipeline Company will amend this pleading to insert the true names and/or

23  capacities of DOES 1 through 25, inclusive, when the same have been ascertained. Pacific

24  Pipeline Company is informed and believe and thereon alleges that each such fictitiously named

25  Defendant is, in some manner or for some reason, responsible for the actions or omissions

26  alleged in this pleading, and each is subject to the relief being sought herein.

27

28

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

1

## JURISDICTION AND VENUE

2  16.  This Court has subject-matter jurisdiction over this action under California

3  Constitution, article VI, section 10, and section 1060 of the Code of Civil Procedure.

4  17.  Venue is proper in this Court pursuant to Code of Civil Procedure section 392

5  because significant portions of the Santa Ynez Pipeline System at issue in this litigation are

6  located in Kern County and the Santa Ynez Pipeline System ultimately delivers crude oil to the

7  Pentland Delivery Point in Kern County.

8

## FACTUAL AND LEGAL STATEMEMT

9  **A.   The Santa Ynez Unit**

10  18.  The Santa Ynez Unit consists of sixteen federal leases across approximately

11  76,000 acres of outer continental shelf and produces crude oil and natural gas from Platforms

12  Hondo, Harmony, and Heritage, located in federal waters off the California Coast in the Santa

13  Barbara Channel.

14  19.  The oil and gas are transported through the Santa Ynez Pipeline System's

15  Offshore Pipeline Segments to the onshore LFC Facilities, comprised principally of the Las

16  Flores Canyon Oil and Gas Processing Facilities and the Pacific Offshore Pipeline Company-

17  owned Gas Plant, both of which are located in Las Flores Canyon in unincorporated Santa

18  Barbara County.

19  20.  The LFC Facilities separate oil, propane, butane, sulfur products, and fuel quality

20  gas. The natural gas is dried, treated, compressed, and delivered to a local utility company. The

21  partially processed crude oil continues through the Santa Ynez Pipeline System via Segments

22  CA-324 and CA-325 to Pentland Station, where the oil enters third-party owned and operated

23  infrastructure and is transported to a refinery for final processing.

24  21.  In February 1988, the California Coastal Commission ("Coastal Commission")

25  reviewed and analyzed Sable's predecessor-in-interest's (Exxon Company U.S.A.) proposal for

26  the construction, operation, and ongoing maintenance of the Santa Ynez Unit-related assets and

27

28

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

1  the Offshore Pipeline Segments, as part of a "Development and Production Plan" ("DPP")

2  submitted to the federal Minerals Management Service in 1987.

3      22.  The Coastal Commission issued three approvals for the Santa Ynez Unit-related

4  assets and Offline Pipeline Segments: (1) Consistency Certification No. CC-7-83, which

5  confirmed pursuant to the federal Coastal Zone Management Act ("CMZA") that a Development

6  and Production Plan ("DPP") for the Santa Ynez Unit-related assets would be consistent with the

7  Coastal Act, (2) Consistency Certification No. CC-64-87, which confirmed pursuant to the

8  CZMA that construction, operation, and maintenance of the Santa Ynez-related assets and

9  Offshore Pipeline Segments pursuant to a revised DPP would be consistent with the Coastal Act,

10  and (3) CDP No. E-88-1 (the "Offshore CDP"), which authorized the construction, operation,

11  and maintenance of those portions of the Offshore Pipeline Segments located in California state

12  waters.

13  **B.  Segments CA-324 and CA-325 of the Santa Ynez Pipeline System**

14      23.  The Santa Ynez Pipeline System is made up of various segments. One segment is

15  known as Segment CA-325. Segment CA-325 is a thirty-inch diameter pipeline with a maximum

16  permitted throughput capacity of 300,000-barrels of crude oil per day and transports crude oil

17  approximately 113.5 miles north from the Gaviota Pump Station to the Sisquoc Pump Station,

18  then east through the Los Padres National Forest and Cuyama Valley, ultimately delivering crude

19  oil to the existing Pentland Delivery Point in the San Joaquin Valley in Kern County.

20      24.  Another segment is Segment CA-324. Segment CA-324 is a twenty-four-inch

21  diameter pipeline with a maximum permitted throughput capacity of 150,000-barrels of crude oil

22  per day. Segment CA-324 transports crude oil approximately 10.9 miles from the Las Flores

23  Pump Station in Las Flores Canyon, west along the Gaviota Coast, to the existing Gaviota Pump

24  Station located approximately one mile east of Gaviota State Park in Santa Barbara County. The

25  Offshore Pipeline Segments, as described above, comprise a third segment of the Santa Ynez

26  Pipeline System and transport oil from the Santa Ynez Unit to the onshore LFC Facilities in Las

27  Flores Canyon.

28

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

25.    In the mid-1980s, the California State Lands Commission, federal Bureau of Land Management, and Department of the Interior prepared a joint Environmental Impact Report and Environmental Impact Statement ("EIR/EIS") for the Celeron Pipeline Project, which includes analysis of the construction and long-term operation of what are now known as Segments CA-324 and CA-325. The locations of Segments CA-324 and CA-325 were identified as an environmentally superior alignment to minimize impacts to environmental resources. The State Lands Commission certified the EIR/EIS in January 1985.

26.    After reviewing the EIR/EIS, the County Planning Commission made a final decision to approve the Celeron Pipeline Project and associated entitlements in February 1986. The County's approval was not challenged during the appeal period, and the Planning Commission's approval action became final and effective.

27.    Pursuant to the County of Santa Barbara's certified Local Coastal Program ("LCP"), the County issued CDP No. 86-CDP-189 for the Celeron Pipeline Project on July 27, 1986. CDP No. 86-CDP-189 approved "[c]learing, grading and trenching activities for [the] Celeron Pipeline Project." On August 5, 1986, the County issued CDP No. 86-CDP-205 for the "[r]emainder of all construction activities for the Celeron Pipeline [P]roject." The CDPs were not appealed by any party and are, therefore, final, valid, and not subject to further appeal.

28.    Although the County has issued separate CDPs for major improvements, such as relocations and realignments of pipeline segments since Segments CA-324 and CA-325's CDPs were first issued, the County has not required new or amended CDPs for repair and maintenance work on Segments CA-324 and CA-325.

C.    **The Refugio Oil Spill and Resulting Repair Work**

29.    On May 19, 2015, a leak along Segment CA-324 resulted in an oil spill. Segments CA-324 and CA-325 remained active, but petroleum has not flowed through them since that time, even though petroleum began flowing through other portions of the Santa Ynez Pipeline System in May 2025. To maintain Segments CA-324 and CA-325 in an active state, they were

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

1   filled with nitrogen to prevent oxidation and internal corrosion, and the cathodic protection

2   system is active and has been regularly inspected and maintained.

3        30.    Since 2015, Pacific Pipeline Company (including its predecessor in interest,

4   Plains Pipeline, L.P. ("Plains")), has maintained Segments CA-324 and CA-325 as active and

5   has undertaken substantial efforts to diligently repair Segments CA-324 and CA-325 to ensure

6   compliance with industry standards for active pipelines and resume petroleum transportation.

7        31.    For example, in April 2021, Plains secured approval from the Office of the State

8   Fire Marshal ("OSFM") to retrofit Segments CA-324 and CA-325 with 16 safety valves as

9   required by law, including seven valves in the Coastal Zone. In December 2021, Plains

10  submitted applications to the County for approval to complete the safety valve installation work.

11  Pacific Pipeline Company has since installed the safety valves along Segments CA-324 and CA-

12  325.

13       32.    In addition, multiple in-line inspections ("ILI") have been conducted on Segments

14  CA-324 and CA-325:

15       a.    Two ILI runs have been performed on Segment CA-324, one in February 2022

16             and another in December 2022;

17       b.    An ILI run was performed on a portion of on Segment CA-325 in September

18             2023; and

19       c.    An ILI run was performed on the remainder of Segment CA-325 in October 2023.

20       33.    In May 2024, Pacific Pipeline Company and Sable separately began anomaly[1]

21  repair and maintenance work on Segments CA-324 and CA-325 under the County's 1986

22  approvals and permits that authorized ongoing pipeline maintenance. On February 12 and March

23  21, 2025, in response to Pacific Pipeline Company's request to address claims from the Coastal

24  Commission that the repair and maintenance work was not authorized, the County confirmed that

25  no further permits were required for Pacific Pipeline Company's anomaly repair work. Pacific

26

27  ──────────────
[1] A pipeline anomaly refers to a pipeline segment with some deviation from its original
28  configuration.

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

1    Pipeline Company has completed the anomaly repairs, as well as subsequent pipeline

2    hydrotesting, under OSFM supervision.

3        34.    Since 2016, Segments CA-324 and CA-325 had been considered an "intrastate"

4    pipeline under the regulatory oversight of OSFM. In April 2024, Pacific Pipeline Company

5    submitted "State Waiver" applications to OSFM for Segments CA-324 and CA-325 to modify

6    regulatory pipeline safety requirements based on the specifications applicable to the individual

7    pipeline facilities. On December 17, 2024, OSFM granted both State Waivers and imposed over

8    sixty separate conditions on Pacific Pipeline Company's operation of Segments CA-324 and CA-

9    325, conditional on the Pipeline and Hazardous Materials Safety Administration ("PHMSA")

10   expressing no objection to the State Waivers. On February 11, 2025, PHMSA notified OSFM

11   that it had no objection to its issuance of the State Waivers. On December 17, 2025, PHMSA

12   designated the entire Santa Ynez Pipeline System (including Segments CA-324 and CA-325) as

13   an interstate pipeline. As a result, OSFM no longer retains any regulatory oversight of Segments

14   CA-324 and CA-325 and the State Waivers have been rendered moot.

15       35.    Pacific Pipeline Company further submitted a Restart Plan to OSFM for review

16   on July 29, 2024. In August and September 2025, OSFM performed multiple inspections of

17   Segments CA-324 and CA-325 in connection with its review of the Restart Plan. As of

18   December 17, 2025, PHMSA has assumed complete safety jurisdiction over the Santa Ynez

19   Pipeline System, including Segments CA-324 and CA-325, including the processing and

20   approval of Pacific Pipeline Company's Restart Plan.

21       36.    As of May 15, 2025, Sable resumed petroleum transportation through the Santa

22   Ynez Pipeline System's Offshore Pipeline Segments to its storage facilities in Las Flores

23   Canyon.

24       37.    At all times, Pacific Pipeline Company has intended to resume petroleum

25   transportation from Sable's storage facilities in Las Flores Canyon through the remainder of the

26   Santa Ynez Pipeline System, including Segments CA-324 and CA-325. Pacific Pipeline

27   Company and its predecessors never abandoned Segments CA-324 and CA-325. Rather, these

28

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

1  segments have been operated as part of an active pipeline under the law and Pacific Pipeline

2  Company has worked diligently to maintain their use under existing and valid CDPs.

3  **D.    Senate Bill 237**

4       38.    On September 13, 2025, the California Legislature passed SB 237. On September

5  19, 2025, Governor Newsom signed SB 237 into law.

6       39.    SB 237 adds Section 51014.1 of the Government Code, which states in part,

7  "[a]ny existing oil pipeline that is six inches or larger that has been *idle, inactive, or out of*

8  *service* for five years or more, shall not be restarted without passing a spike hydrostatic testing

9  program." (Emphasis added).

10      40.    SB 237 also amends Section 30262 of the Coastal Act to provide, in relevant part:

11           (2) Repair, reactivation, and maintenance of an oil and gas facility,
            including an oil pipeline, that has been idled, inactive, or out of
12           service for five years or more shall be considered a new or expanded
            development requiring a new coastal development permit.

13           (3) Development associated with the repair, reactivation, or
14           maintenance of an oil pipeline that has been idled, inactive, or out
            of service for five years or more requires a new coastal development
15           permit consistent with this section. (Pub. Res. Code §§ 30262(b)(2)
            and (3)).

16

17      41.    State law does not define the terms "idled," "inactive," and "out of service."

18  However, such terms are defined or described by PHMSA, the federal agency that administers

19  the federal law pursuant to which the Santa Ynez Pipeline System is regulated.

20      42.    The Santa Ynez Pipeline System is subject to the federal Hazardous Liquid

21  Pipeline Safety Act ("Pipeline Safety Act") administered by PHMSA. (49 U.S.C. §§ 60101 *et*

22  *seq.*) On December 17, 2025, PHMSA determined that the Santa Ynez Pipeline System is an

23  interstate pipeline under PHMSA's exclusive jurisdiction. (See Dec. 17, 2025 Letter from

24  PHMSA to Sable, attached hereto as Exhibit B.) In making its determination, PHMSA confirmed

25  that PHMSA regulations consider the Santa Ynez Pipeline System to be an "active" pipeline.

26  (Ex. B, p. 3, fn. 8.)

27

28

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

43.    PHMSA recognizes two categories of pipeline status: (i) active and (ii) abandoned. (See 81 Fed. Reg. 54512 [federal "regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned."]; see also PHMSA Advisory Bulletin ADB 2016-0075 (Aug. 11, 2016).) Federal regulations for hazardous liquid pipelines define the term "abandoned" to mean "permanently removed from service." (See 49 C.F.R. 195.3.)

44.    Federal regulations do not recognize "idle," "inactive," or "out of service" status at all. (See 81 Fed. Reg. 54512.) "If a pipeline is not properly abandoned and may be used in the future for transportation of hazardous liquid or gas, PHMSA regulations consider it as an active pipeline." (81 Fed. Reg. 54513.) "Owners and operators of pipelines that are not operating but contain hazardous liquids and gas must comply with all applicable safety requirements, including periodic maintenance, integrity management assessments, damage prevention programs, response planning, and public awareness programs." (*Ibid.*)

45.    Pacific Pipeline Company is informed and believes, and on that basis alleges, that it is the position of the State of California that Segments CA-324 and CA-325 have been "idled, inactive, or out of service for five years or more" and, therefore, repair, reactivation, maintenance, and development associated with such work is new or expanded development requiring a new CDP.

46.    The State, through the Coastal Commission and the Legislature, has previously made numerous statements and findings concerning its position on the status of Segments CA-324 and CA-325.

47.    The Staff Report for the Coastal Commission's Cease and Desist Order CCC-25-CD-01, Restoration Order CCC-25-RO-01, and Administrative Civil Penalty Order CCC-25-AP3-01, characterizes Segments CA-324 and CA-325 as "offline and out-of-service" since the 2015 oil spill. (Staff Report, p. 3.) "[T]he pipelines remained in service until the 2015 oil spill, at which point they were placed out of service." (*Ibid.*) The Staff Report also characterizes the Segments as "inoperable," having "sat inactive for a decade." (*Id.*, p. 65.)

48.     Similarly, the Senate Rules Committee digest for SB 237 makes clear that SB 237 is intended to apply to the Santa Ynez Pipeline System. (See Sen. Com. on Natural Resources, Analysis of Senate Bill No. 237 (2025-2026 Reg. Sess.) as amended on Sept. 10, 2025, attached hereto as Exhibit A.)

   a.   "This Bill [applies to] pipelines of a certain size that have been out of service for more than five years (which would notably include certain pipelines serving the Sable Corporation's Santa Ynez Unit)[.]" (Ex. A, p. 3.)

   b.   "Preventing oil spills from pipelines. On May 19, 2015 an offshore pipeline ruptured, spilling over 140,000 gallons of heavy crude oil along the Gaviota coast at Refugio Beach in Santa Barbara County. Sable announced they were restarting oil production in the Santa Ynez unit (in federal waters) on May 15, 2025, and restarting the use of those two pipelines. Sable has not replaced, but has rather made repairs to the pipelines. Some of the provisions of SB 237 are intended to address concerns surrounding the safety of restarting use of the repaired pipelines by requiring testing of the pipelines' durability." (Ex. A, p. 5.)

49.     Based on the State's asserted authority under the Coastal Act and SB 237, Pacific Pipeline Company faces an immediate choice to either (i) resume petroleum transportation pursuant to its existing entitlements, permits, and approvals, including County-issued CDPs and PHMSA approvals, but risk possible enforcement action, fines, and other penalties by the State; or (ii) not resume petroleum transportation at all. State law provides no administrative procedure for addressing a dispute concerning the applicability of SB 237 to the Santa Ynez Pipeline System.

50.     Given the absence of a process under the law for resolving this dispute, a judicial determination concerning the applicability of SB 237 to the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, is necessary.

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

**E.     PHMSA's Assumption of Jurisdiction**

51.     On December 17, 2025, PHMSA determined that the entirety of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, is an interstate pipeline subject to PHMSA's exclusive jurisdiction. This determination eliminated any jurisdiction of OSFM over Segments CA-324 and CA-325. In making its determination that the Santa Ynez Pipeline System is an interstate pipeline, PHMSA notified OSFM that the Pipeline System is "subject to the regulatory oversight of PHMSA." (Ex. B, p. 3.) PHMSA further confirmed that the Santa Ynez Pipeline System is considered an "active" pipeline under PHMSA regulations. (Ex. B, p. 3, fn. 8.)

52.     On December 22, 2025, PHMSA approved Sable's Restart Plan for Segments CA-324 and CA-325. (See Dec. 22, 2025 Letter from PHMSA to Sable, attached hereto as Exhibit C.)

53.     On December 23, 2025, PHMSA granted Sable an Emergency Special Permit for Segments CA-324 and CA-325. (See Dec. 23, 2025 Emergency Special Permit issued by PHMSA to Sable, attached hereto as Exhibit D.) The Emergency Special Permit takes the place of the OSFM-issued State Waivers and carried forward substantially the same conditions as issued in the State Waivers.

54.     No other PHMSA approvals or permits are necessary to flow oil through Segments CA-324 and CA-325.

55.     Given PHMSA's assumption of jurisdiction over the Santa Ynez Pipeline System as an interstate pipeline, OSFM is without jurisdiction to regulate Segments CA-324 and CA-325, or any other portion of the Santa Ynez Pipeline System. The requirements of the State Waivers have therefore been mooted and preempted by these federal actions. A judicial determination concerning whether the application of SB 237 as to the Santa Ynez Pipeline System is preempted by federal law is therefore necessary.

1

2

**FIRST CAUSE OF ACTION**

**Declaratory Relief (Code of Civ. Proc., § 1060)**

3      56.    Pacific Pipeline Company realleges and incorporates by reference each of the

4  above paragraphs as though fully set forth herein.

5      57.    Pacific Pipeline Company is a "person interested" under Code of Civil Procedure

6  § 1060, because Pacific Pipeline Company owns and operates Segments CA-324 and CA-325 of

7  the Santa Ynez Pipeline System, which are operated pursuant to existing CDPs issued by the

8  County and are the target of the amendments to the Government Code and Coastal Act enacted

9  by SB 237.

10      58.    Segments CA-324 and CA-325 of the Santa Ynez Pipeline System have not been

11  "idled, inactive, or out of service for five years or more" within the meaning of SB 237, because

12  Pacific Pipeline Company has diligently undertaken repair and maintenance efforts since the

13  2015 spill under existing entitlements, permits, and approvals to resume petroleum transportation

14  through Segments CA-324 and CA-325. Segments CA-324 and CA-325 have not been

15  "abandoned" under federal or state law applicable to oil and gas pipelines. Rather, the Santa

16  Ynez Pipeline System, including Segments CA-324 and CA-325, has been deemed "active"

17  under these laws by the agencies who administer them.

18      59.    Further, the Legislature did not make SB 237 retroactive. As such, SB 237 and its

19  new rules for what is an idled, inactive, or out of service pipelines and what permitting standards

20  may or may not be followed only applies prospectively. This means that SB 237 can only apply

21  to pipelines that are eventually "idled, inactive, or out of service for five years or more"

22  commencing on January 1, 2026. Thus, since the five-year idle, inactive, or out of service period

23  must commence on January 1, 2026, the earliest a pipeline could be "idled, inactive, or out of

24  service *for five years or more*" is January 1, 2031 (i.e., five years from SB 237's effective date).

25      60.    Given statements the State, through the Coastal Commission and Legislature, has

26  previously made concerning the status of Segments CA-324 and CA-325 as "idle," "inactive,"

27  and "out of service" for more than five years, an actual, present controversy exists between the

28

1    parties concerning the applicability of SB 237 to the Santa Ynez Pipeline System, including

2    Segments CA-324 and CA-325. This controversy is definite and concrete, touches the legal

3    relations of parties with adverse legal interests, and is of sufficient immediacy and reality to

4    warrant declaratory relief. (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 79–80.)

5        61.    This action does not seek an advisory opinion or abstract interpretation of law.

6    Pacific Pipeline Company must make immediate operational and financial decisions regarding

7    whether to resume petroleum transportation under its existing CDPs at the risk of enforcement

8    actions, penalties, or orders by the State. This presents a justiciable controversy under Code of

9    Civil Procedure § 1060. (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 647.)

10        62.    Declaratory relief is necessary and proper within the meaning of Code of Civil

11    Procedure § 1061, because a judicial declaration will clarify the parties' rights and duties, guide

12    Pacific Pipeline Company's conduct, and prevent multiplicity of actions.

13        63.    Accordingly, Pacific Pipeline Company seeks a judicial declaration that the Santa

14    Ynez Pipeline System, including Segments CA-324 and CA-325, have not been "idled, inactive,

15    or out of service for five years or more" under SB 237.

16    <div align="center">**SECOND CAUSE OF ACTION**</div>

17    <div align="center">**Declaratory Relief (Code of Civ. Proc., § 1060)**</div>

18        64.    Pacific Pipeline Company realleges and incorporates by reference each of the

19    above paragraphs as if fully set forth herein.

20        65.    Pacific Pipeline Company is a "person interested" under Code of Civil Procedure

21    § 1060, because Pacific Pipeline Company owns and operates Segments CA-324 and CA-325 of

22    the Santa Ynez Pipeline System pursuant to existing CDPs and is the target of the amendments to

23    the Government Code and Coastal Act enacted by SB 237.

24        66.    With PHMSA's assumption of jurisdiction and December 17, 2025 determination

25    that the Santa Ynez Pipeline System is an interstate pipeline under its exclusive regulatory

26    oversight, OSFM no longer retains any regulatory authority over Segments CA-324 and CA-325,

27    including the resumption of petroleum transportation through the Segments.

28

67.    Moreover, with PHMSA's approval of Sable's Restart Plan on December 22, 2025 and issuance of the Emergency Special Permit (which overrides the State Waivers) on December 23, 2025, no other PHMSA approvals or permits are necessary to flow oil through Segments CA-324 and CA-325.

68.    Under the federal Pipeline Safety Act, at 49 U.S.C. § 60104(c), state agencies, such as OSFM or the Coastal Commission, are precluded from imposing any safety standards for interstate pipeline facilities, including the Santa Ynez Pipeline System.

69.    Moreover, under the federal pipeline safety regulations administered by PHMSA under 49 C.F.R. Part 195, Pacific Pipeline Company, as owner of Segments CA-324 and CA-325, is subject to several ongoing pipeline operation, maintenance, and repair requirements that are, in many cases, time-sensitive and not otherwise subject to advance permitting or approval requirements by PHMSA.

70.    Article VI, Clause 2 of the U.S. Constitution provides that "the Laws of the United States ... shall be the supreme Law of the Land," such that federal laws preempt state laws that purport to override or otherwise conflict with the implementation of federal laws.

71.    This action does not seek an advisory opinion or abstract interpretation of law. Segments CA-324 and CA-325 are now ready for resumed petroleum transportation pursuant to PHMSA's approvals and Pacific Pipeline Company must make immediate operational and financial decisions regarding whether to resume petroleum transportation through the Segments at the risk of enforcement actions, penalties, or orders by the State. This presents a justiciable controversy under Code of Civil Procedure § 1060. (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 647.)

72.    Declaratory relief is necessary and proper within the meaning of Code of Civil Procedure § 1061, because a judicial declaration will clarify the parties' rights and duties, guide Pacific Pipeline Company's conduct, and prevent multiplicity of actions.

73.    Accordingly, Pacific Pipeline Company seeks a judicial declaration that the application of SB 237 as to the Santa Ynez Pipeline System has been preempted by federal law.

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

**PRAYER FOR RELIEF**

WHEREFORE, Pacific Pipeline Company respectfully prays for judgment against the Defendant as follows:

1.     For a judicial declaration that the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, has not been "idled, inactive, or out of service for five years or more" under Government Code Section 51014.1 and Public Resources Code Sections 30262 (b)(1) and (b)(2), as amended by SB 237;

2.     For a judicial declaration that the application of SB 237 as to the Santa Ynez Pipeline System is preempted by federal law;

3.     For costs of suit incurred herein; and

4.     For such other and further relief as the Court deems just and proper, including supplemental relief under Code of Civil Procedure § 1062.

Respectfully submitted,

DATED: January 21, 2026                    ALSTON & BIRD LLP

By: _____
JEFFREY D. DINTZER

Attorney for Plaintiff
PACIFIC PIPELINE COMPANY

- 17 -
VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

1

## VERIFICATION

2

3    I, Steven P. Rusch, am Vice President of Regulatory and Environmental Affairs of Sable

4    Offshore Corp., and I am an Authorized Representative of Pacific Pipeline Company. I am

5    authorized to execute this verification on behalf of them. I have read the attached Verified

6    Complaint for Declaratory Relief and am familiar with its contents. The Facts provided in the

7    Complaint are true of my personal knowledge, except for those alleged on information and

8    belief, and I believe those to be true.

9

10    DATED: January 21, 2026

11    _____

12                                    Steven P. Rusch

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**SENATE RULES COMMITTEE**
Office of Senate Floor Analyses
(916) 651-1520   Fax: (916) 327-4478

SB 237

UNFINISHED BUSINESS

| | |
|---|---|
| Bill No: | SB 237 |
| Author: | Grayson (D), Hurtado (D), McNerney (D), Richardson (D) and Wilson (D), et al. |
| Amended: | 9/10/25 |
| Vote: | 21 |

**SENATE JUDICIARY COMMITTEE:** 12-0, 5/6/25
AYES:  Umberg, Niello, Allen, Arreguín, Ashby, Caballero, Durazo, Laird, Stern, Wahab, Weber Pierson, Wiener
NO VOTE RECORDED:  Valladares

**SENATE FLOOR:**  34-0, 5/15/25 (Consent)
AYES:  Allen, Archuleta, Arreguín, Ashby, Becker, Blakespear, Cabaldon, Caballero, Choi, Cortese, Dahle, Durazo, Gonzalez, Grayson, Hurtado, Jones, Laird, Limón, McGuire, McNerney, Menjivar, Niello, Ochoa Bogh, Pérez, Richardson, Seyarto, Smallwood-Cuevas, Stern, Strickland, Umberg, Valladares, Wahab, Weber Pierson, Wiener
NO VOTE RECORDED:  Alvarado-Gil, Cervantes, Grove, Padilla, Reyes, Rubio

**ASSEMBLY FLOOR:** 59-4 , 9/13/25 – Roll call not available.

**SUBJECT:**  Oil spill prevention:  gasoline specifications:  suspension:  California Environmental Quality Act:  exemptions:  County of Kern: transportation fuels assessment:  coastal resources

**SOURCE:**   Author

**DIGEST:**  This bill contains a number of provisions that seek to safely and responsibly increase in-state oil production (such as through testing of previously-idled pipelines, greater disclosure of financial assurances, and resolving ongoing litigation in favor of easier approval of drilling permits in Kern County), while also soliciting additional information to mitigate rising fuel costs (such as by relaxing California gasoline standards) and assess medium- to long-term strategies in line with recent work from the California Energy Commission (CEC).

*Assembly Amendments* of 9/10/25 rewrote the bill entirely.

**ANALYSIS:**

Existing law:

1) Establishes the CEC tasks it with monitoring, analyzing, and making recommendations on statewide trends in the energy sector, including fuel supply and demand. (Public Resources Code §25200 et. seq.)

2) Establishes California Geologic Energy Management Division (CalGEM) for the purposes of overseeing the drilling, operation, maintenance, and removal of oil and gas wells. (Public Resources Code §3000 et. seq.)

3) Requires the Office of the State Fire Marshal (OSFM) to adopt hazardous liquid pipeline safety regulations that comply with federal law regarding hazardous liquid pipeline safety. (Government Code §51010 et. seq.)

4) Establishes the Office of Oil Spill Prevention and Response (OSPR) in the California Department of Fish and Wildlife as the state's principal regulator for oil spill prevention and response. (Government Code (GOV) §§8574.1 *et seq.*, GOV §§8670.1 *et seq.*, Public Resources Code §§8750 *et seq.*).

5) Institutes the California Environmental Quality Act (CEQA), which requires lead agencies with the principal responsibility for carrying out or approving a project to prepare a negative declaration (ND), mitigated negative declaration (MND), or environmental impact report (EIR) for the project, unless the project is exempt from CEQA. (Public Resources Code (PRC) §21000 et seq.). (CEQA Guidelines §15064(a)(1), (f)(1))

6) Establishes and defines a Program EIR (PEIR) in the CEQA guidelines as an EIR which may be prepared for a series of actions that can be characterized as one large project and are related either:
   a) Geographically;
   b) As logical parts in the chain of contemplated actions;
   c) In connection with issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program; or
   d) As individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways. (California Code of Regulations CEQA Guidelines § 15168)

This bill:

1) Makes findings and declarations regarding, among other things, California's mid-transition phase of the energy transition.

2) Requires the OSPR to solicit feedback on and periodically update its worst case scenario spill volumes.

3) Requires the OSPR to list, among other things, all applications for certificates of financial responsibility, and to revise worst case scenario spill volumes, and operators' assurance of financial responsibility in case of a spill.

4) Requires pipelines of a certain size that have been out of service for more than five years (which would notably include certain pipelines serving the Sable Corporation's Santa Ynez Unit), to meet specific testing requirements.

5) Permits the Governor to, under certain circumstances and with specified considerations, suspend the requirement "summer blend" gasoline in order to protect against "extraordinary gasoline price increases," among other things.

6) Deems the Kern County Second Supplemental Recirculated Environmental Impact Report (SCH2013081079; the SSREIR), including all appendices (SSREIR, March 2025), until January 1, 2036, sufficient for full compliance with CEQA.

7) Directs CEC to, as part of the next Transportation Fuels Assessment, evaluate the cost and supply impacts of gasoline that is not "California reformulated gasoline blendstock for oxygenate blending" (CARBOB), and, among other things, potentially make various recommendations regarding how such non-CARBOB gasoline could benefit California.

8) Requires CEC to, on or before March 31, 2026, submit an assessment to the Legislature that evaluates certain information in the June 2025 letter to Governor Newsom from CEC Vice Chair Siva Gunda.

9) Requires oil produced offshore by new, expanded, or reactivated operations (of the same types of pipelines covered by #4 above) to be transported once

onshore by pipelines using the best available technology, as defined, and certain projects require a new Coastal Development Permit.

## Background

*Declining domestic oil production may impact in-state oil pipelines.* California's reliance on crude oil has steadily declined since the 1980s; however, oil consumption recently increased from pandemic lows in 2020. Despite this rebound, California's in-state production of petroleum remains low and California largely relies on imports for its petroleum supplies. Several refineries maintain existing petroleum supplies by using pipelines to in-state oil fields. However, as supply from those fields decreases, the economic viability of those pipelines sharply declines. Some of the policies advanced by this bill (namely restoring the pipelines for offshore oil production in Sable's Santa Ynez Unit and the Kern County SSREIR being deemed approved) appear to address this problem by increasing in-state oil production.

a) *Tests for moving oil safely via pipelines.* To prevent accidents and spills, state and federal regulations require pipeline operators to conduct hydrostatic pressure tests to ensure the integrity of their pipelines.

b) *Financial assurances in the case of oil spills.* Because the threat of an oil spill is never zero, OSPR issues Certificate of Financial Responsibility to facilities, vessels, and pipelines that are required to have a California Oil Spill Contingency Plan, following submittal of an application and proof that the applicant has the financial resources to cover the cost of response for a "worst-case scenario" spill.

*Kern County oil and gas ordinance's iterative EIRs.* In 2013, Kern County began the process of amending its zoning ordinance addressing local permitting for oil and gas exploration, development and production. For the last ten years, the County has gone back and forth in litigation as plaintiffs challenged the ordinance and the drilling permitted under it. Courts have at different times and to various degrees sided with one side or the other, and the original EIR has been revisited in supplemental EIRs (SEIR). As of 2025, the most recent iteration of the EIR, the Second Supplemental Recirculated EIR (SSREIR), faces legal challenge.

*Energy Commission Recommendations for the mid transition.* On June 27, 2025, the Vice Chair of the energy commission submitted a letter to the Governor outlining the CEC's recommendation's on changes to state policy to ensure

"adequate transportation fuels supply during this pivotal time in our state's clean energy transition." The letter recommended pursuit of three concurrent strategies, briefly:

c) Stabilize fuel supply through imports of refined fuels and maintaining in-state refining capacity;
d) Provide sufficient confidence to industry to invest in maintaining reliable and safe infrastructure operations to meet demand; and
e) Develop and execute a holistic transportation fuels transition strategy.

## Comments

*Purpose of Bill.* According to the author, "California faces an affordability crisis on a number of fronts, most notably when it comes to the cost of fuel. This affects all of us—both directly and indirectly—whether it be at the gas pump, where Californians pay some of the prices in the country, or in the form of higher prices for goods and services, which are also affected by the higher costs of energy to produce and deliver. As was noted in a June 27, 2025 report by California Energy Commission Vice-Chair, Siva Gunda, "If a lack of proactive management during this phase of the transition leads to rising energy prices and less reliable fuel supplies, that instability could erode support for continued decarbonization." SB 273 seeks to answers this call for proactive management."

*Preventing oil spills from pipelines.* On May 19, 2015 an offshore pipeline ruptured, spilling over 140,000 gallons of heavy crude oil along the Gaviota coast at Refugio Beach in Santa Barbara County. Sable announced they were restarting oil production in the Santa Ynez unit (in federal waters) on May 15, 2025, and restarting the use of those two pipelines. Sable has not replaced, but has rather made repairs to the pipelines. Some of the provisions of SB 237 are intended to address concerns surrounding the safety of restarting use of the repaired pipelines by requiring testing of the pipelines' durability.

*Updating financial assurances for oil spills.* There is no requirement that the regulations governing worst-case spills be regularly updated, and as such, they have not been. The marine facility reasonable "worst-case spill" volume calculations were established in regulation in 1993 using methods aligned with federal worst-case discharge calculations, and there have only been minor and infrequent updates since then. SB 237 would require more disclosure about and decadal updates of the certificates of financial responsibility.

*Ending the Kern Oil and Gas Ordinance litigation, with some guardrails.* SB 237 'puts the lid' on any further revisions to or legal objections against Kern County's zoning ordinance focused on oil and gas (except purely typographical fixes). SB 237 also specifies that the zoning ordinance SSREIR is sufficient to meet the requirements of CEQA for compliant projects, meaning that no further, project-specific EIR's for a given oil well are required so long as the new wells fit in the four corners of the existing SSREIR. However, SB 237 could prevent appropriate mitigations measures or other environmental considerations from being applied to drilling projects that are atypical, use emerging technology or technology not considered the SSREIR, or are otherwise not considered in the SSREIR.

To help address some of these concerns, SB 237 adds some environmental guardrails to the application of the SSREIR, briefly:

a) It sets a cap for drilling in Kern County at 2,000 new oil wells, a 26% reduction in total planned wells per year compared to the original estimate in Kern County's oil and gas ordinance EIR. (However, this can be waived under certain CEC findings);

b) It contains a ten-year sunset on the provisions that specify that the SSREIR is sufficient, complete, and not subject to lawsuits for new drilling (However, the SSREIR itself would remain in effect after the sunset);

c) It specifies that CalGEM, rather than Kern County, must be the lead agency in a health protection zone, presumably making it harder to drill new wells in those zone (although not impossible).

*Maintaining capacity to stabilize fuel supply.* Several of this bill's provisions appear to follow recommendations in CEC Vice Chair Gunda's June letter, and would be expected to boost in-state production, which would be expected to support California's refinery capacity, which would be expected to help keep refineries operating in state.

*Using more tools in the toolbox to manage gas prices.* Parts of SB 237 contemplate changes to California's fuel blend to reduce fuel prices. Summer blend gasoline in California contributes less to smog, but is more expensive. California's unique gasoline blendstock, CARBOB, was formulated to help meet California's nation-leading air pollution challenges. However, it also means that fuel in neighboring states cannot be used in California. Both of these measures could be expected to reduce fuel prices, at the cost of increased air pollution. However, these do not address the long-term challenges the state faces in larger-scale decarbonization

across all sectors of the economy.

*Navigating the mid-transition.* Whether through the intentional phase-down of fossil fuels in California, shifting global market dynamics, the costs associated with repair and maintenance, or a combination of all of the above and more, it is clearly becoming more and more difficult to profitably operate fossil fuel infrastructure in California. How do we embrace and deploy clean technologies while they are more expensive than the fossil fuel alternatives? How do we maintain the fossil fuel supply we need as it becomes less lucrative and less feasible to do so?

We are in a period described by academics as the "mid-transition". As described in a recent review:

> "Many aspects of transition will be felt, and shaped, directly by individuals because of our direct interactions with energy systems. Even rare missteps are likely to have significant and potentially system design relevant impacts on perception, political support, and implementation. Comparisons of the new system to the old system are likely to rest on experience of a world less affected by climate change, such that concerns about lower reliability, higher costs, and other challenges might be perceived as inherent to zero-carbon systems, versus energy systems facing consequences of climate change and longterm underinvestment."[1]

California's economy today relies on an immense volume of fossil fuels (by some accounts as much as 84% of our total energy today)[2]. In turn, extracting, transporting, refining, distributing, and using those fossil fuels relies on an immense network of infrastructure owned by a number of private companies and operated by tens of thousands of skilled workers. Those private companies rely on certainty about the profitability of their investments. What happens when—not if— it is no longer profitable to operate fossil fuel infrastructure in California? What— if not profit—would compel private companies to continue maintaining and operating their infrastructure? How can California keep its economy afloat and its people thriving in the crucial period between when fossil fuels stop being profitable, and when they stop being needed?

Pursuant to SBX1-2, the California Energy Commission produced a Transportation

---

[1] Grubert and Hastings-Simon, 2022. Designing the mid-transition: A review of medium-term challenges for coordinated decarbonization in the United States. WIRES Climate Change, Vol 13, Issue 3.
[2] California State Profile & Energy Estimates. U.S. Energy Information Administration. https://www.eia.gov/state/?sid=CA

Fuels Assessment, which has begun to wrestle with some of these questions. One of several possible solutions under consideration is state ownership of refineries, in which, "The State of California would purchase and own refineries in the State to manage the supply and price of gasoline." However, doing so would be extremely costly and represent a significant departure from how this industry has operated in California to date. As the Legislature considers this bill and other proposals to assuage or mitigate the very real tensions of the mid-transition, it is worth also contemplating solutions on the longer time horizon as well.

There is no clear best way to transition the world's fourth largest economy off of fossil fuels. California is leading the way and charting a path to navigate this transition. This monumental task will have consequences, both expected and unforeseen. Nevertheless, the Legislature should evaluate the information and options available and take action before GHG emissions continue unabated, fossil fuel infrastructure falls into disrepair (with potentially catastrophic results), and communities surrounding this infrastructure continue to face air pollution and economic uncertainty alike.

Vice Chair Gunda's June letter described the importance of a holistic strategy for a managed transition away from fossil fuels, alongside more pressing and immediate matters. Boosting in-state production today, as SB 237 proposes to do, to keep critical infrastructure online is a reasonable response to less-than-ideal circumstances. But what lessons can be learned? What could California begin doing now to make the next refinery to announce its closure *less* disruptive to California's well-being, not more? What information is needed about California's refineries (both their operations and the financial liabilities associated with their site remediation) to better equip California to handle the next stage of this transition? Although SB 237 does not answer these questions, it helps get information that might. These continue to be questions the Legislature should consider, lest we find ourselves blindsided by the next nigh-inevitable refinery closure.

**FISCAL EFFECT:**  Appropriation:  No   Fiscal Com.:   Yes   Local:  Yes

**SUPPORT:**  (Verified  9/13/25)

350 Humboldt
Associated Builders and Contractors of California
Berry Petroleum Company, LLC
California Business Roundtable
California Independent Petroleum Association

California Resources Corporation and Subsidiaries
California State Association of Electrical Workers
California State Pipe Trades Council
City of Bakersfield
Climate Action California
County of Kern

## OPPOSITION: (Verified 9/13/25)

Asian Pacific Environmental Network Action
California Coastal Protection Network
California Environmental Justice Alliance Action
California Environmental Voters
Campaign for a Safe and Healthy California
Ceja Action
Center for Biological Diversity
Center on Race, Poverty & the Environment
Central California Environmental Justic Network
Central California Environmental Justice Network
Clean Water Action
Climate First: Replacing Oil & Gas
Communities for a Better Environment
Consumer Watchdog
Earthjustice
Leadership Council for Justice and Accountability
Natural Resources Defense Council
Natural Resources Defense Council
Physicians for Social Responsibility - Los Angeles
Sierra Club
Sierra Club California
The Climate Center


Prepared by:   Heather Walters / E.Q. / (916) 651-4108
9/13/25 11:10:30

**** **END** ****

# EXHIBIT B



U.S. Department
of Transportation

1200 New Jersey Avenue SE
Washington, D.C. 20590

**Pipeline and Hazardous
Materials Safety
Administration**

December 17, 2025

Via Electronic Mail to: cflores@sableoffshore.com

J. Caldwell Flores
President and Chief Operating Officer
Sable Offshore Corp.
845 Texas Ave. Ste 2920
Houston, TX 77002

Re: Determination of Interstate Classification

Dear Mr. Flores:

This responds to your letter of November 26, 2025 regarding the Las Flores Pipeline owned and
operated by Sable Offshore Corp. (Sable). Your letter notifies the Pipeline and Hazardous
Materials Safety Administration (PHMSA) that Sable has determined the pipeline to be an
interstate pipeline facility under the Pipeline Safety Act (PSA) and requests PHMSA transition
regulatory oversight from the California Office of the State Fire Marshal (OSFM) to PHMSA.

As noted in your letter, portions of the Las Flores Pipeline (previously known as Lines 901 and
903) have been considered intrastate since 2016 and subject to regulatory oversight by OSFM
pursuant to its certification with PHMSA under 49 U.S.C. § 60105(a). Prior to 2016, Lines 901
and 903 were considered interstate and regulated by PHMSA. The classification change in 2016
corresponded to the pipelines' previous owner cancelling tariffs with the Federal Energy
Regulatory Commission (FERC). In 2024, Sable acquired Lines 901 and 903 and other assets
comprising the Las Flores Pipeline, including offshore pipelines transporting crude oil from the
Outer Continental Shelf (OCS) and an onshore processing facility at Las Flores Canyon. Sable
operates the Las Flores Pipeline assets as a single pipeline system transporting crude oil from the
OCS to the Pentland Station terminal in Kern County, California.

Upon receipt of your letter, PHMSA initiated a review of the Las Flores Pipeline. This review
included an on-site inspection on December 9 through December 11, 2025. OSFM
representatives accompanied PHMSA on the inspection. PHMSA also reviewed Sable's written
procedures and records and conducted field observations of the Las Flores facility, the pump
stations at Gaviota and Sisquoc, the control room in Santa Maria, and the offshore Harmony
platform. In addition, PHMSA reviewed the 2025 program inspections conducted by OSFM. For

the following reasons, PHMSA agrees with your determination that the Las Flores Pipeline is an interstate pipeline.

The PSA authorizes PHMSA to prescribe and enforce minimum safety standards for pipeline transportation and for pipeline facilities.[1] The PSA vests with PHMSA exclusive regulatory authority over interstate pipelines and preempts States from adopting or continuing in force safety standards for interstate pipelines.[2] With respect to intrastate pipelines, the PSA provides a State authority may regulate the intrastate pipelines within its borders upon submission to PHMSA of an annual certification.[3] Both the PSA and the Federal pipeline safety regulations define interstate and intrastate pipelines.[4] An interstate pipeline is a pipeline or part of a pipeline used to transport hazardous liquids in interstate or foreign commerce; an intrastate pipeline is a hazardous liquid pipeline that is not an interstate pipeline.

Determining whether a hazardous liquid pipeline is an interstate or intrastate pipeline requires a factual inquiry.[5] To assist in that determination, PHMSA adopted Appendix A to 49 CFR Part 195 providing a statement of agency policy and interpretation on the delineation between Federal and State jurisdiction.[6] In short, "if there is a tariff or concurrence filed with FERC governing the transportation of hazardous liquids over a pipeline facility . . . then [PHMSA] will, as a general rule, consider the facility to be an interstate pipeline facility within the meaning of the [PSA]." The absence of a FERC tariff generally means a pipeline is intrastate; however, in certain situations, PHMSA will consider a pipeline to be interstate despite the lack of a filing with FERC. Several examples of this are listed in Appendix A. As it relates to the Las Flores Pipeline, one example provides that a pipeline originating on the OCS will be considered an interstate pipeline even if the pipeline does not have a tariff with FERC.[7]

PHMSA's evaluation of the Las Flores Pipeline confirms that it transports crude oil from the OCS to an onshore processing facility at Las Flores Canyon and continues the transportation of crude oil from Las Flores Canyon to Pentland, California. Consistent with Appendix A, the Las

---

[1] 49 U.S.C. § 60101 et seq.

[2] 49 U.S.C. § 60104(c). *See* Olympic Pipe Line Co. v. City of Seattle, 437 F.3d 872, 878 (9th Cir. 2006) (discussing how the "PSA differentiates between the regulation of interstate and intrastate hazardous liquid pipelines.")

[3] 49 U.S.C. § 60105(a). OSFM has a certification with PHMSA to regulate intrastate hazardous liquid pipelines in California.

[4] 49 U.S.C. § 60101(a)(7), (a)(8)(B), (a)(10); 49 CFR § 195.2. *See* S. Pac. Pipe Lines Inc. v. DOT, 796 F.2d 539 (D.C. Cir. 1986) (finding PHMSA's definition of interstate and intrastate pipelines reasonable under the PSA).

[5] Transportation of Liquids by Pipeline, 46 Fed. Reg. 38,357, 38,359 (Jul. 27, 1981) (PHMSA's predecessor agency (hereafter PHMSA) explained that it had "reviewed examples of what it believes are the most frequent and likely configurations of liquid pipelines and pipeline facilities and considered various ways of cataloging or classifying them as either interstate or intrastate."); *see also* Shell Oil Co. v. City of Santa Monica, 830 F.2d 1052, 1064 (9th Cir. 1987) (noting that whether the pipeline was interstate or intrastate turned on a disputed issue of fact).

[6] Transportation of Hazardous Liquids by Pipeline; Regulation of Intrastate Pipelines, 50 Fed. Reg. 15,895, 15,897 (Apr. 23, 1985).

[7] 49 CFR Part 195, App. A. "Example 7. Pipeline Company P operates a pipeline that originates on the Outer Continental Shelf. P does not file any tariff for that line with FERC. [PHMSA] will consider the pipeline to be an interstate pipeline facility."

Flores Pipeline is an interstate pipeline.[8] As portions of the Las Flores Pipeline were previously considered to be intrastate and regulated by OSFM, PHMSA is notifying OSFM that the Las Flores Pipeline is subject to the regulatory oversight of PHMSA. Please direct further correspondence on this matter to Dustin Hubbard, Director, Western Region, Office of Pipeline Safety, PHMSA, at (720) 963-3183.

Sincerely,


Linda Daugherty
Acting Associate Administrator for Pipeline Safety


cc:    James Hosler, Chief, Pipeline Safety Division, OSFM
       Varun Shekhar, Shareholder, Babst Calland Clements & Zomnir, PC

---

[8] PHMSA regulations consider the Las Flores Pipeline to be an "active" pipeline. *See* Pipeline Safety: Clarification of Terms Relating to Pipeline Operational Status, 81 Fed. Reg. 54,512 (Aug. 12, 2016) ("The regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned.")

# EXHIBIT C



U.S. Department
of Transportation
**Pipeline and Hazardous**
**Materials Safety**
**Administration**

12300 W. Dakota Ave., Suite 340
Lakewood, CO 80228

<u>**VIA ELECTRONIC MAIL TO: lyearwood@sableoffshore.com**</u>

December 22, 2025

Mr. Lance Yearwood
Vice President
Pacific Pipeline Company / Sable Offshore Corp.
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**RE:**   **Approval of Sable Offshore Corp.'s Restart Plan for the Las Flores Pipeline System Line CA-324 and Line CA-325**

Dear Mr. Yearwood:

From December 4 to December 12, 2025, the Pipeline and Hazardous Materials Safety Administration (PHMSA) received several documents from Sable Offshore Corp. These documents included:

1. Line CA-324 and Line CA-325 Fill Plan and Startup Procedures
2. A letter requesting the removal of pressure restrictions for Line CA-324
3. A letter requesting the removal of pressure restrictions for Line CA-325
4. The Las Flores Pipeline Linefill Positioning Plan Assignments
5. The Las Flores Pipeline Linefill Contact List

These documents addressed the Restart Plan for Line CA-324 and Line CA-325 (previously known as Plains Line 901 and Line 903, respectively). In addition, PHMSA conducted a field inspection with Sable Offshore Corp. to discuss its process and safety procedures for the pipeline restart.

PHMSA has reviewed these documents and hereby approves the submitted Restart Plan. This approval is valid from the date of this letter.

Should you have any questions or concerns, please contact me at (720) 963-3160 or by email at dustin.hubbard@dot.gov.

Sincerely,

Dustin Hubbard
Director, Western Region
Pipeline and Hazardous Materials Safety Administration

cc:     Trent Fontenot, Sr. Vice President - Operations, tfontenot@sableoffshore.com
        Jim Hosler, Assistant Deputy Director – Pipeline Safety and CUPA, CalFire,
        jim.hosler@fire.ca.gov

# EXHIBIT D

# U.S. DEPARTMENT OF TRANSPORTATION
# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION
# EMERGENCY SPECIAL PERMIT

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | 2025-1502 |
| **Requested By:** | Sable Offshore Corp. PPC |
| **Operator ID#:** | 40881 |
| **Date Requested:** | December 19, 2025 |
| **Issuance Date:** | December 23, 2025 |
| **Expiration Date:** | February 21, 2026 |
| **Code Section:** | 49 CFR § 195.452(h)(4)(iii)(H) |

## Grant of Special Permit:

By this order, subject to the terms and conditions set forth below, the Pipeline and Hazardous Materials Safety Administration (PHMSA) Office of Pipeline Safety (OPS)[1] grants this emergency special permit to Sable Offshore Corp. PPC (Sable) for 124.42 miles of 24- and 30-inch diameter hazardous liquid pipelines, Lines CA-324 and CA-325 (*special permit segments*), transporting crude oil from Las Flores Canyon to Pentland in Santa Barbara, San Luis Obispo, and Kern counties, California. This emergency special permit waives compliance from 49 CFR § 195.452(h)(4)(iii)(H), which requires corrosion of or along a longitudinal seam weld be scheduled for evaluation and remediation within 180 days of discovering the condition.

## I.    Purpose and Need

On December 19, 2025,[2] Sable requested an emergency special permit for relief from the requirement to evaluate and remediate corrosion occurring at longitudinal seam welds within 180 days. The *special permit segments* are under polyurethane foam and polyethylene tape wrap insulation, which can inhibit the effectiveness of cathodic protection and contribute to a risk of corrosion due to shielding effects. Sable proposed an alternative approach to safely manage this risk, which was previously reviewed and approved as part of two state waivers issued by the California Office of State Fire Marshal (OSFM) on December 17, 2024 to Sable for the *special permit segments*. PHMSA previously reviewed the state waivers pursuant to 49 U.S.C. § 60118(d).

---

[1] Throughout this special permit, the usage of "PHMSA" means the U.S. Department of Transportation (DOT), Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety.
[2] Sable submitted supplemental information related to its application on December 23, 2025.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 1 of 16

Sable sought this special permit to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the U.S. District Court for the Central District of California, which provides, among other requirements, that a "State Waiver" must be applied for and received from OSFM prior to restarting Lines CA-324 and CA-325. The *special permit segments* were previously considered intrastate at the time of entry of the Consent Decree and were regulated by OSFM pursuant to its state certification with PHMSA under 49 U.S.C. § 60105(a). However, the *special permit segments* are now considered interstate pursuant to Sable's designation on November 26, 2025, and PHMSA's concurrence on December 17, 2025. As a result, PHMSA has exclusive pipeline safety regulatory agency over Lines CA-324 and CA-325. The conditions ordered by OSFM in the two state waivers are now being re-issued by PHMSA as a special permit subject to Federal oversight and enforcement.

Sable requested PHMSA grant a special permit for the above reasons on an emergency basis pursuant to 49 U.S.C. § 60118(c)(2) and 49 CFR § 190.341(g). In its application, Sable stated that expedited review of its application was warranted in light of the national energy emergency declared by the President under the National Emergencies Act (50 U.S.C. § 1601 et seq.) in Executive Order 14156 (January 20, 2025). In Executive Order 14156, the President declared a national energy emergency based on a finding that "[t]he United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[3] The Executive Order directs agencies, such as PHMSA, to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate," among other activities, the "production, transportation, refining, and generation of domestic energy resources."[4] The Executive Order further directs agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States . . . ."[5]

Sable's application stated that grant of this special permit on an emergency basis would facilitate the restart of Lines CA-324 and CA-325 to provide relief in response to the acute energy shortage conditions identified in Executive Order 14156 within California and in the West Coast region of the United States.[6] Sable further noted that grant of this special permit on an emergency basis is appropriate to address the gap in coverage under the OSFM State Waivers created by redesignation of Lines CA-324 and CA-325 as interstate, given that the proposed special permit is substantially the same as that which was previously reviewed and approved by OSFM and PHMSA for issuance of the State Waivers.

This emergency special permit allows Sable to operate Lines CA-324 and CA-325 without being subject to the requirement to evaluate and remediate corrosion of or along a longitudinal seam weld within 180 days. On the condition that Sable comply with the terms and conditions set forth below, the emergency special permit waives compliance with 49 CFR § 195.452(h)(4)(iii)(H) for the *special permit segments*.

---

[3] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 1.

[4] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 2(a). The order's definition of "energy" or "energy resources" includes "crude oil," and its definition of "transportation" includes "the physical movement of energy, including through, but not limited to, pipelines." Sec. 1(a); 1(c).

[5] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 3(b).

[6] For more information regarding these effects, see Attachments C, D, E, and F.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 2 of 16

## II. Special Permit Segments

This emergency special permit pertains to the specified pipeline segments which make up the Las Flores Pipeline called Line CA-324 and CA-325. Line CA-325 can be further divided into two segments: Lines CA-325A and CA-325B. The Las Flores Pipeline is part of the Santa Ynez Pipeline System (SYPS), an interstate pipeline facility that Sable operates from the Outer Continental Shelf off the coast of Santa Barbara to Kern County, California. A map of the special permit segments is available in Revised Attachment A.

**Special Permit Segments:**

| Special Permit Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|
| CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

## III. Conditions

PHMSA grants this emergency special permit subject to Sable implementing each of the following conditions. These conditions must be implemented and complied with in addition to all applicable requirements of 49 CFR Part 195 except for compliance with limitations on scheduling instances of corrosion on or near longitudinal seam welds for evaluation and remediation within 180 days of discovery in 49 CFR § 195.452(h)(4)(iii)(H), which would be waived.

**General Conditions:**

1) The *special permit segments* may only be used to transport crude oil.

2) Prior to transporting crude oil in the *special permit segments*, Sable must develop and implement procedures for the conditions and requirements described in this emergency special permit.

3) Sable shall not exceed maximum operating pressure (MOP) limits for the *special permit segments*, as follows:

   a) The MOP of Line CA-324 cannot exceed 1003 pounds per square inch gauge (psig).

   b) The MOP of Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) cannot exceed 1000 psig.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 3 of 16

    c) The MOP of Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) cannot exceed 1292 psig.

4) Sable shall not exceed maximum operating temperature limits for crude oil transported in the *special permit segments*, as follows:

    a) The maximum operating temperature of the crude oil that is transported in Line CA-324 must not exceed 140 degrees Fahrenheit for more than 12 consecutive hours.

    b) The maximum operating temperature of the crude oil that is transported in Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) must not exceed 125 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Gaviota station to monitor the temperature of Line CA-325A.

    c) The maximum operating temperature of the crude oil that is transported in Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) must not exceed 110 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Sisquoc station to monitor the temperature of Line CA-325B.

5) This emergency special permit does not relieve Sable from complying with applicable requirements under 49 CFR Part 195, other than those waived in this emergency special permit.

6) This emergency special permit does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).

7) In-line inspections (ILIs) performed pursuant to this emergency special permit must include:

    a) Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion, defined as follows:

        i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.

        ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.

    b) Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).

    c) Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI.

8) Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 4 of 16

pipe body, heat affected zone (HAZ)[7], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-324.[8]

9)    Prior to placing Line CA-325 (including CA-325A and CA-325B) in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:

    a)  API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.

    b)  API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ), and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-325A/B.[9]

10)   All existing immediate and 180-day repair conditions must be evaluated and remediated pursuant to the Consent Decree repair criteria prior to restarting CA-325A/B.[10] Upon restart Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by PHMSA. Sable must utilize the Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results to identify, evaluate and remediate any immediate and 180-day repair conditions that are listed in this emergency special permit.

11)   Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines*. If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss

---

[7] The heat affected zone (HAZ), as used in this emergency special permit, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[8] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-324.

[9] Sable indicated in its application that it has already completed the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-325.

[10] Sable indicated in its application that it has already completed the repairs required in this sentence. Sable must submit all of the results to PHMSA prior to restarting CA-324 and CA-325.

anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

12) Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of CA-324 and CA-325A/B.

13) Pressure Testing:[11]

   a) Prior to placing CA-324 in operation, Sable must conduct a spike hydrostatic pressure test of CA-324 at a minimum pressure that is at least 1.5 times the maximum operating pressure (MOP) or 100% specified minimum yield strength (SMYS), for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

      i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

      ii. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

   b) Immediately following the spike hydrostatic pressure test specified in Condition 13(a), Sable must conduct an 8-hour hydrostatic pressure test of CA-324 at a minimum of 1.25 times the MOP.

   c) Prior to placing Line CA-325A (segment of Line 325 between Gaviota and Sisquoc stations) in operation, Sable must conduct a spike hydrostatic pressure test of CA-325A at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:

      i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

      ii. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

   d) Immediately following the spike hydrostatic pressure test specified in Condition 13(c), Sable must conduct an 8-hour hydrostatic pressure test of CA-325A at a minimum of 1.25 times the MOP.

   e) Prior to placing Line CA-325B (segment of Line 325 between Sisquoc and Pentland stations) in operation, Sable must conduct a hydrostatic pressure test of CA-325B at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the

---

[11] Sable indicated in its application that it has already completed all of the testing and repairs required in this Condition. Sable must submit the results to PHMSA prior to restart and confirm that no failures occurred during the required pressure testing.

hydrostatic test on CA-325B:

    i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

    ii. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

f) Sable must obtain the Test ID for each hydrostatic pressure test from PHMSA (or OSFM if such testing was performed prior to November 26, 2025) and have the approved independent testing firm forward separately the certified test results to PHMSA or the OSFM, as applicable.

g) Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 CFR Part 195 Subpart E -- Pressure Testing and monitored by an independent testing firm listed under PHMSA or OSFM (as applicable) approved hydrostatic testing companies.

h) Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported to PHMSA.[12]

i) Section(s) of the *special permit segments* that failed during the required hydrotesting must be repaired by removing and replacing the failed section. PHMSA reserves the right to revoke this emergency special permit if failure(s) raise the concern that the *special permit segments* cannot be safely operated.

14) In-Line Inspection (ILI) Assessment and Frequency:

a) Prior to performing in-line inspections of the *special permit segment*, Sable shall provide PHMSA with a written notification to PHMSA describing its assessment plan with the following information:

    i. Dates for integrity assessment

    ii. In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[13] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications;

    iii. In-line inspection tool vendor(s)

    iv. Required tool specifications including operational specifications and anomaly sizing tolerances

    v. Tool validation methodology

    vi. Anomaly feature identification criteria and reporting thresholds -- wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

---

[12] All submissions to PHMSA required by this emergency special permit shall be submitted through email to the OPS Western Region Director, Dustin Hubbard, email address: Dustin.Hubbard@dot.gov or his designee.

[13] Industry standards referenced in this emergency special permit must utilize the editions that are incorporated by reference in 49 CFR 195.3 unless another edition is explicitly specified in this emergency special permit.

      vii.  Criteria used to identify locations for excavation and field verification

     viii.  Non-destructive examination

b) Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

c) Metal Loss Tool(s):

     i.  Initial ILI tool runs – Each year, during the first two (2) years of operating the *special permit segments*, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

     ii.  Subsequent ILI tool runs – After the first two (2) years of operating the *special permit segments*, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the *special permit segment* within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

d) Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[14] or the ILI assessment must be assessed at more frequent intervals if condition 21 determined a shorter assessment interval.

     i.  These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

     ii.  USCD Performance Specification Requirements

         1.  The USCD tools must have a probability of detection that is

---

[14] Sable may petition PHMSA to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to PHMSA approval.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 8 of 16

≥ 90% for axial and circumferential cracks.

2. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

3. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

4. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

e) Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

f) Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the ***special permit segment*** in which the ILI tool velocity was outside of the specified tool velocity range.

g) All ILI tool runs must obtain the Test ID from PHMSA prior to run.

h) Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

i) Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

j) Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[15] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

k) Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second

---

[15] A minimum of four (4) independent direct examination excavations must be used for unity plots.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 9 of 16

Edition, April 2013).

15) Discovery of Condition: The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

16) Immediate Repair Conditions:[16]

    a) A crack or crack-like anomaly that meets any of the following criteria:

        i. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.

        ii. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

    b) Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

    c) Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[17]

17) 180-Day Repair Conditions:[18]

    a) A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.

    b) Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.

    c) All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[19]

    d) For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

18) Corrosion Growth Rate Analysis (CGRA):

    a) Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to

---

[16] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[17] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

[18] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(iii), except for those associated with 49 CFR 195.452(h)(4)(iii)(H). All immediate repair conditions must be remediated with a permanent repair method.

[19] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify PHMSA, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 CFR § 195.452 until the indication is remediated or until otherwise authorized by PHMSA.

prior ILI) and perform pipeline remediations needed to assure the integrity of the *special permit segments* is maintained.[20] The timing of remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.

b) The CGRA procedure must include ILI data matching methods[21] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

c) Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

d) When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates.[22]

e) All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

19) Pressure Reduction: If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in this emergency special permit, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

20) In Field Direct Examination of Pipe:

a) Direct examinations[23] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[24] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

b) Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

   i. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

   ii. Sable must increase the metal loss anomaly's depth by 20% when

---

[20] At a minimum, Sable must include signal matching between ILI data sets.

[21] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[22] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[23] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[24] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complemented by shear wave technology or inspection by phased array ultrasonic testing.

they input it into the formula for calculating the number of wraps needed for repair method 5.

   iii. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

c) Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

d) Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[25]

e) All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

21) Integrity Management:

a) A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

   i. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 CFR § 192.712(d)(1).

   ii. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 CFR § 192.712(d)(2).

b) Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

c) When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

d) Sable must send all field measurements to the ILI tool vendor within 90 days

---

[25] The coating procedure must be submitted to PHMSA prior to the effective date of this emergency special permit.

of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

    e) Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the *special permit segments*. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by PHMSA prior to being selected.

    f) Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is

    g) occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

22) Data Requirements for Predicted Failure Analysis:

    a) Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

    b) The analyses performed in accordance with this emergency special permit must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in traceable, verifiable, and complete records.

23) Recordkeeping:

    a) Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this emergency special permit shall be kept for the life of the *special permit segments* and must be submitted to PHMSA, in the manner requested (electronic, hardcopy, or other format) within 30 days.

    b) Sable must maintain the following records:

        i. Technical approach used for the analysis

        ii. All data used and analyzed

        iii. Pipe and longitudinal weld seam properties

        iv. Procedures used to implement emergency special permit conditions

v.    Evaluation methodology used

vi.    Models used

vii.    Direct in situ examination data

viii.    All in-line inspection tool assessments information evaluated

ix.    Pressure test data and results

x.    All in-the-ditch assessments performed on the *special permit segments*

xi.    All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results

xii.    All finite element analysis results

xiii.    The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

xiv.    The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

xv.    Safety factors used for fatigue life and/or predicted failure pressure calculations

xvi.    Reassessment time interval and safety factors

xvii.    The date of the review

xviii.    Confirmation of the results by qualified technical subject matter expert(s)

xix.    Approval by responsible Sable management personnel

xx.    Records of additional preventive and mitigative (P&M) measures performed

xxi.    Reports required by this emergency special permit.

24)    Reporting:

    a)    Any release on the *special permit segments* shall be reported to PHMSA at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery.[26]

    b)    An email notification shall be made at least three (3) days prior to a *special permit segment* being exposed for non-emergency purposes of field evaluation and repair to PHMSA. The email notification shall include, if applicable:

        i.    Tool type and run date

        ii.    Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

---

[26] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state, or Federal regulations.

      iii. Dig sheets

      iv. Field contact information for Sable

      v. Time and location of the field evaluation and repair.

c) Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run to PHMSA and include:

      i. Tool type

      ii. Run date

      iii. Summary of Conditions Report[27]

      iv. Final Vendor Report and Pipe Tally

d) Sable shall provide a report to PHMSA by June 15th of every year for the duration of this special permit, including any renewals. The report shall be submitted to PHMSA. At a minimum, the annual report shall contain the following, if applicable:

      i. A Closure Report for the previous calendar (CY) which contains:

            1. Features that were remediated in previous CY, including documentation for in-the-ditch assessments and repairs

            2. Identify features that remain to be assessed

            3. Unity Plots for previous ILI runs

      ii. Fracture mechanics and pressure cycling analyses in accordance with Condition 21(a);

      iii. The third-party ILI expert reviews in accordance with condition 21(e).

      iv. AC and DC Interference surveys that are due in accordance with condition 21(f).

      v. A copy of the CGRA for prior year including:

            1. Mean corrosion growth rate for the **special permit segments**

            2. Distribution graph of the corrosion growth rate for the **special permit segments** (e.g. occurrences (#) vs. corrosion rate (mpy)

The above conditions are based on PHMSA's review and consideration of information provided by Sable, including information in their emergency special permit application which can be found at Docket No. PHMSA-2025-1502 in the Federal Docket Management System located at www.regulations.gov. PHMSA has determined the conditions listed above would be necessary to ensure this Emergency Special Permit is not inconsistent with pipeline safety.

---

[27] PHMSA may stipulate specific formatting or other information (e.g., condition type, anomaly details, remaining strength calculation method, failure pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

## IV. Limitations:

This special permit is subject to the limitations set forth in 49 CFR § 190.341, as well as the following limitations:

1) This emergency special permit is limited to an initial term of sixty (60) days from the date of issuance. If Sable elects to seek renewal of this emergency special permit, it must submit a renewal request to PHMSA pursuant to 49 CFR § 190.341(g).

2) Should Sable fail to comply with any conditions of this emergency special permit or should PHMSA determine that this emergency special permit is no longer appropriate or is inconsistent with pipeline safety, PHMSA may revoke the emergency special permit and require Sable to comply with all appropriate regulatory requirements.

3) PHMSA may order the ***special permit segments*** to be shutdown at any time.

4) PHMSA may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this emergency special permit. The terms and conditions of any compliance order shall take precedence over the terms of this emergency special permit.

5) In the event of conflict between the conditions of this emergency special permit and industry standards, the emergency special permit conditions shall prevail.

6) If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the emergency special permit, Sable must provide PHMSA written notice of the change within 60 days of the consummation date. In the event of such transfer, PHMSA reserves the right to revoke, suspend, or modify the emergency special permit.

AUTHORITY: 49 United States Code 60118 (c)(1) and 49 CFR § 1.97.

Issued in Washington, D.C., on December 23, 2025.

**LINDA GAIL DAUGHERTY**
Digitally signed by LINDA GAIL DAUGHERTY
Date: 2025.12.23 15:48:57 -05'00'

Linda Daugherty
Acting Associate Administrator
  for Pipeline Safety

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 16 of 16

**PROOF OF SERVICE**

I, **Kim Niz**, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On January 21, 2026, I served the document(s) **PACIFIC PIPELINE COMPANY'S VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF** on the interested parties stated below, by the following means of service:

> Brandon Walker
> Jack C. Nick
> Isabella A. Panuccini
> 1300 I Street, Suite 125
> Sacramento, CA 95814
> Telephone: (916) 210-6395
> Fax: (916) 327-2319
> Brandon.Walker@doj.ca.gov
> Jack.Nick@doj.ca.gov
> Isabella.Panuccini@doj.ca.gov
> Attorneys for Defendant State of California

☒    BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on January 21, 2026, at Los Angeles, California.

*/s/ Kim Niz*
Kim Niz

VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF

# Exhibit C

**CM-010**

| | |
|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*<br>Jeffrey D. Dintzer, (SBN 139056), Alston & Bird LLP, 350 S. Grand Ave., 51st Floor, Los Angeles, CA 90071<br>Benjamin J. Hanelin, (SBN 237595), Paul Hastings, 1999 Avenue of the Stars, Century City, CA 90067 | **FOR COURT USE ONLY** |

TELEPHONE NO.: (213) 576-1000 / (310) 620-5879    FAX NO.: (213) 576-1100 / (310) 620-5899
EMAIL ADDRESS: jeffrey.dintzer@alston.com; benjaminhanelin@paulhastings.com
ATTORNEY FOR *(Name):* Plaintiff Pacific Pipeline Company

**ELECTRONICALLY FILED**
Superior Court of California,
County of Kern
By: Marina Mercado, Deputy Clerk
**10/17/25 12:18 PM**

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **KERN**
STREET ADDRESS: 1215 Truxtun Ave
MAILING ADDRESS: 1215 Truxtun Ave
CITY AND ZIP CODE: Bakersfield, CA 93301
BRANCH NAME: Metropolitan Division

CASE NAME:
Pacific Pipeline Company v. State of California

| **CIVIL CASE COVER SHEET** | | **Complex Case Designation** | CASE NUMBER: |
|---|---|---|---|
| [X] **Unlimited**<br>(Amount<br>demanded<br>exceeds $35,000) | [ ] **Limited**<br>(Amount<br>demanded is<br>$35,000 or less) | [ ] Counter    [ ] Joinder<br>Filed with first appearance by defendant<br>*(Cal. Rules of Court, rule 3.402)* | BCV25103506 |
| | | | JUDGE: Barmann, Bernard C. Jr<br>DEPT.: H |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[X] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is  [X] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. [ ] monetary  b. [X] nonmonetary; declaratory or injunctive relief  c. [ ] punitive
4. Number of causes of action *(specify):* one
5. This case [ ] is  [X] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: October 17, 2025
Jeffrey D. Dintzer
_____        ▶        _____
(TYPE OR PRINT NAME)                              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. January 1, 2024] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courts.ca.gov* |

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
    Damage/Wrongful Death
Uninsured Motorist (46) *(if the
    case involves an uninsured
    motorist claim subject to
    arbitration, check this item
    instead of Auto)*
**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death) Tort**
Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
        Wrongful Death
Product Liability *(not asbestos or
    toxic/environmental)* (24)
Medical Malpractice (45)
    Medical Malpractice–
        Physicians & Surgeons
    Other Professional Health Care
        Malpractice
Other PI/PD/WD (23)
    Premises Liability (e.g., slip
        and fall)
    Intentional Bodily Injury/PD/WD
        (e.g., assault, vandalism)
    Intentional Infliction of
        Emotional Distress
    Negligent Infliction of
        Emotional Distress
    Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
    Practice (07)
Civil Rights (e.g., discrimination,
    false arrest) *(not civil
    harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
        *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease
        Contract *(not unlawful detainer
        or wrongful eviction)*
    Contract/Warranty Breach–Seller
        Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
        Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally
    complex)* (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
    Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent
        domain, landlord/tenant, or
        foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
    drugs, check this item; otherwise,
    report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
        Case Matter
    Writ–Other Limited Court Case Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor Commissioner
        Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
    *(arising from provisionally complex
    case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
    Abstract of Judgment (Out of County)
    Confession of Judgment *(non-domestic
        relations)*
    Sister State Judgment
    Administrative Agency Award
        *(not unpaid taxes)*
    Petition/Certification of Entry of
        Judgment on Unpaid Taxes
    Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-
        harassment)*
    Mechanics Lien
    Other Commercial Complaint
        Case *(non-tort/non-complex)*
    Other Civil Complaint
        *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
    Governance (21)
Other Petition *(not specified above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late Claim
    Other Civil Petition

**CIVIL CASE COVER SHEET**

POS-010

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:<br>Jeffrey D. Dintzer (SBN 139056); Garrett B. Stanton (SBN 324775)<br>ALSTON & BIRD LLP<br>350 South Grand Avenue, Suite 5100 Los Angeles, CA 90071<br>TELEPHONE NO.: (213) 576-1000 \| FAX NO. (213) 576-1100 \| E-MAIL ADDRESS:<br>ATTORNEY FOR *(Name)*: Plaintiffs: PACIFIC PIPELINE COMPANY | *FOR COURT USE ONLY*<br><br>**ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of Kern<br>By: Karren Blanton<br>Deputy Clerk<br>**11/14/25 11:33 AM** |

| |
|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF KERN**<br>STREET ADDRESS: 1215 Truxtun Avenue<br>CITY AND ZIP CODE: Bakersfield, CA 93301<br>BRANCH NAME: BAKERSFIELD COURT |

| | |
|---|---|
| PLAINTIFF/PETITIONER: PACIFIC PIPELINE COMPANY, a Delaware corporation<br>DEFENDANT/RESPONDENT: STATE OF CALIFORNIA | CASE NUMBER:<br>BCV25103508 |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.:<br>2513715CE |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. ☑ Summons
   b. ☑ Complaint
   c. ☑ Alternative Dispute Resolution (ADR) package
   d. ☐ Civil Case Cover Sheet
   e. ☐ Cross-Complaint
   f. ☑ other *(specify documents)*: **NOTICE OF ASSIGNMENT TO JUDICIAL OFFICER FOR ALL PURPOSES, NOTICE OF ORDER TO SHOW CAUSE RE: CALIFORNIA RULES OF COURT, RULE 3.110, AND NOTICE OF CASE MANAGEMENT CONFERENCE FILED NOVEMBER 3, 2025; NOTICE OF ORDER TO SHOW CAUSE RE: CALIFORNIA RULES OF COURT, RULE 3.110, AND NOTICE OF CASE MANAGEMENT CONFERENCE FILED OCTOBER 9, 2025**
3. a. Party served *(specify name of party as shown on documents served)*:
   **STATE OF CALIFORNIA**
   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:
   **M. Brooks (Black, Female, 40yrs, 6'0", 180lbs, Brown eyes, Bald) #50 Badge, Authorized person to accept service of process**
4. Address where the party was served: **1300 "I" Street**
   **Sacramento, CA 95814**
5. I served the party *(check proper box)*
   a. ☑ **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: **11/5/2025**   (2) at *(time)*: **1:11 PM**
   b. ☐ **by substituted service.** On *(date)*:   at *(time)*:   I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3)*:
      (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him of her of the general nature of the papers.
      (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.
      (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him of her of the general nature of the papers.
      (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date)*:   from *(city)*:   **or** ☐ a declaration of mailing is attached.
      (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| Plaintiff: PACIFIC PIPELINE COMPANY, a Delaware corporation | CASE NUMBER: |
|---|---|
| Defendant: STATE OF CALIFORNIA | BCV25103508 |

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

   (1) on *(date):*                                (2) from *(city):*

   (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.) *(Code Civ. Proc., § 415.30.)*

   (4) ☐ to an address outside California with return receipt requested. *(Code Civ. Proc., § 415.40.)*

d. ☐ **by other means** *(specify means of service and authorizing code section):*

   ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐ as an individual defendant.
b. ☐ as the person sued under the fictitious name of *(specify):*
c. ☐ as occupant.
d. ☑ On behalf of *(specify):* **STATE OF CALIFORNIA**
   under the following Code of Civil Procedure section:

| | |
|---|---|
| ☐ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☐ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☑ 416.50 (public entity) | ☐ 415.46 (occupant) |
| | ☐ other: |

7. **Person who served papers**
  a. Name: **Brian Bernal - Ace Attorney Service, Inc.**
  b. Address: **800 S. Figueroa Street, Suite 900  Los Angeles, CA 90017**
  c. Telephone number: **(213) 623-3979**
  d. The fee for service was: **$ 135.72**
  e. I am:

    (1) ☐ not a registered California process server.
    (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
    (3) ☑ registered California process server:
      (i) ☐ owner    ☑ employee    ☐ independent contractor.
      (ii) Registration No.: **2023-044**
      (iii) County: **SACRAMENTO**

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

   or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **11/6/2025**

_____**Brian Bernal**_____      ▶                               
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)        (Signature - Per CC §1633.7)

1  ROB BONTA
   Attorney General of California
2  BRANDON S. WALKER SBN. 254581
   Supervising Deputy Attorney General
3  JACK C. NICK SBN. 160196
   ISABELLA A. PANUCCINI SBN. 318984
4  Deputy Attorneys General
   1300 I Street, Suite 125
5  Sacramento, CA 95814
   Telephone: (916) 210-6395
6  Fax: (916) 327-2319
   E-mail: Brandon.Walker@doj.ca.gov
7  *Attorneys for Defendant State of California*

**ELECTRONICALLY FILED**
Superior Court of California,
County of Kern
By: Marina Mercado
Deputy Clerk
**12/5/25 1:54 PM**

*Exempt from Filing Fees Pursuant to Government Code § 6103*

8

9

10  SUPERIOR COURT OF THE STATE OF CALIFORNIA

11  COUNTY OF KERN

12  METROPOLITAN DIVISION

13

14

15  **Pacific Pipeline Company, A Delaware Corporation,**

16                                          Plaintiff,

17            v.

18  **State of California and DOES 1 through 25,**

19                                          Defendants.

20

Case No. BCV25103508

**NOTICE OF MOTION AND MOTION TO CHANGE VENUE**

Date:      February 3, 2026
Time:      8:30 a.m.
Dept:      H
Judge:     Hon. Bernard C. Barmann, Jr.
Action Filed: September 29, 2025

21

22

23

24

25

26

27

28

1

1           **NOTICE OF MOTION AND MOTION TO CHANGE VENUE**

2     TO ALL PARTIES AND ATTORNEYS OF RECORD:

3        PLEASE TAKE NOTICE that on February 3, 2026, at 8:30 a.m., in Department H of the

4 Superior Court of California for the County of Kern, Metropolitan Division, located at 1215

5 Truxtun Avenue, Bakersfield, California 93301, Defendant State of California will move and

6 hereby does move this Court for an order transferring the above-referenced action to the Superior

7 Court of California for the County of Santa Barbara.

8        This Motion to Change Venue (Motion) is made pursuant to Code of Civil Procedure

9 sections 392, 396b, and 397, subdivisions (a) and (c). This Court is not the proper venue for this

10 action and the convenience of witnesses and the ends of justice would be promoted by the change.

11        This action seeks declaratory relief in the form of a judicial declaration that the oil pipelines

12 (Las Flores Pipelines) owned by Plaintiff Pacific Pipeline Company are not subject to the newly-

13 enacted Senate Bill 237. However, the potentially justiciable claim in this case relates to portions

14 of the Las Flores Pipelines within the Coastal Zone of California, which does not extend to Kern

15 County. Accordingly, venue is not proper in this Court and the action should be transferred to

16 Santa Barbara County, where the pipelines within the Coastal Zone are located and several other

17 lawsuits involving the Las Flores Pipelines are already pending.

18        Alternatively, the only potential witnesses in this action are officials or staff members of the

19 California Coastal Commission or the Office of the State Fire Marshal (OSFM). Both the

20 Commission and OSFM are nonparties. (See Gov. Code, § 11043, subs. (c), (d).) These witnesses

21 are already participating in multiple litigations involving the Las Flores Pipelines in Santa

22 Barbara County and it is inconvenient and disruptive to their duties to require their participation

23 in separate litigation involving the Las Flores Pipelines in Kern County as well. Moreover, most

24 of the pipelines and all of the issues related to the Coastal Zone, including the potential impacts

25 on the Coastal Zone from restarting the pipelines, are in Santa Barbara County. Accordingly, this

26 case should be transferred to the Superior Court for Santa Barbara County for the additional and

27 independent reason that transfer would be more consistent with the convenience of nonparty

28 witnesses and the ends of justice.

1    Defendant State of California bases this Motion on this notice of motion and motion, the

2    accompanying memorandum of points and authorities, the concurrently-filed declaration of

3    Brandon S. Walker, the pleadings and papers on file in this action, and any such other and further

4    evidence as the Court may consider at the hearing on this Motion.

5    Dated:  December 5, 2025                              Respectfully submitted,

6                                                          ROB BONTA
                                                           Attorney General of California
7                                                          BRANDON S. WALKER
                                                           Supervising Deputy Attorney General
8                                                          JACK C. NICK
                                                           Deputy Attorney General
9                                                          ISABELLA A. PANICUCCI
                                                           Deputy Attorney General
10

11                                                         /s/ Brandon S. Walker

12
                                                           BRANDON S. WALKER
13                                                         Supervising Deputy Attorney General
                                                           *Attorneys for Defendant*
14                                                         *State of California*

15    SA2025306665
      39502728.docx

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF SERVICE BY E-MAIL

| | |
|---|---|
| **Case Name:** | Pacific Pipeline Company, A Delaware Corporation v. State of California |
| **Case Number:** | BCV25103508 |
| **Party Represented:** | State of California |

**Declaration of Electronic Service**

1. I am at least 18 years of age and not a party to this matter.

2. I am employed in the Office of the Attorney General of the State of California. My business address is 1300 I Street, Suite 125, Sacramento, CA 95814, County of Sacramento.

3. My electronic service address is Valerie.Tamulevich@doj.ca.gov.

4. On <u>December 5, 2025</u>, I electronically served the following document[s]:

    **NOTICE OF MOTION AND MOTION TO CHANGE VENUE**

5. I electronically served the aforementioned document[s] by emailing them to the following individual[s]:

    **PLEASE SEE ATTACHED SERVICE LIST**

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct, and that this declaration was executed on <u>December 5, 2025</u>.

| | |
|---|---|
| _____Valerie A. Tamulevich_____ | _____*/s/ Valerie A. Tamulevich*_____ |
| Declarant | Signature |

## SERVICE LIST

Jeffrey Dintzer
Garrett B. Stanton
ALSTON & BIRD
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
**E-mail Address**: jeffrey.dintzer@alston.com
**E-mail Address**: garrett.stanton@alston.com

Benjamin J. Hanelin
Natalie C. Rogers
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, CA 90067
**E-mail Address**: benjaminhanelin@paulhastings.com
**E-mail Address**: natalierogers@paulhastings.com

SA2025306665
39501664.docx

**ELECTRONICALLY FILED**
Superior Court of California,
County of Kern
By: Marina Mercado
Deputy Clerk
**12/5/25 1:54 PM**

1  ROB BONTA
   Attorney General of California
2  BRANDON WALKER SBN. 254581
   Supervising Deputy Attorney General
3  JACK C. NICK SBN. 160196
   ISABELLA A. PANUCCINI SBN. 318984
4  Deputy Attorneys General
   · 1300 I Street, Suite 125
5  Sacramento, CA 95814
   Telephone: (916) 210-6395
6  Fax: (916) 327-2319
   E-mail: Brandon.Walker@doj.ca.gov          ***Exempt from Filing Fees Pursuant to***
7  *Attorneys for Defendant State of California*     ***Government Code § 6103***

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                            COUNTY OF KERN

10                         METROPOLITAN DIVISION

11

12  | | |
    |---|---|
13  **Pacific Pipeline Company,** | Case No. BCV25103508
    | |
14                        Plaintiff, | |
    | |
15           v. | **MEMORANDUM OF POINTS AND**
    | **AUTHORITIES IN SUPPORT OF**
16  **State of California and Does 1 through 25,** | **MOTION TO CHANGE VENUE**
    | |
17                        Defendants. | Date:     February 3, 2026
    | Time:     8:30 a.m.
18  | Dept:     H
    | Judge:    Hon. Bernard C. Barmann, Jr.
19  | Action Filed: September 29, 2025

20

21

22

23

24

25

26

27

28

1

1

# TABLE OF CONTENTS

2

**Page**

3

INTRODUCTION ................................................................................................................ 5

4

STATEMENT OF FACTS .................................................................................................. 6

DISCUSSION .................................................................................................................... 14

5

    I.    The Superior Court of Kern County Is the Wrong Court and the Proper

6

           Venue Is in Santa Barbara County. ................................................................ 14

    II.   Alternatively, this Case Should be Transferred to the Superior Court for

7

           Santa Barbara County for the Convenience of Nonparty Witnesses and the

           Ends of Justice. ............................................................................................... 17

8

CONCLUSION .................................................................................................................. 18

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

Page

3 **CASES**

4 *Alexander v. Superior Court*
5 (2003) 114 Cal.App.4th 723.................................................................................. 14

6 *Brown v. Superior Court*
(1984) 37 Cal.3d 477 ......................................................................................... 15
7
*Crestwood Behavioral Health, Inc. v. Superior Court*
8 (2021) 60 Cal.App.5th 1069................................................................................ 14

9 *Dow AgroSciences LLC v. Superior Court*
(2017) 16 Cal.App.5th 1067................................................................................ 15
10
*Freeman v. Dowling*
11 (1933) 219 Cal. 213 ........................................................................................... 15

12
*General Steel & Wire Co. v. Stryco Mfg. Co.*
13 (1963) 213 Cal.App.2d 495................................................................................. 15

14 *Hasrat v. Superior Court for Los Angeles County*
(1966) 241 Cal.App.2d 330................................................................................. 14
15
*Housing Group v. United Nat. Ins. Co.*
16 (2001) 90 Cal.App.4th 1106................................................................................ 15

17
*Massae v. Superior Court*
18 (1981) 118 Cal.App.3d 527............................................................................ 15, 16

19 *Redevelopment Agency of the City of San Marcos v. Commission on State
Mandates*
20 (1996) 43 Cal.App.4th 1188................................................................................ 17

21 *State of California v. Superior Court*
(1974) 12 Cal.3d 237 ..................................................................................... 15, 17
22
23 *Wilson & Wilson v. City Council of Redwood City*
(2011) 191 Cal.App.4th 1559.............................................................................. 16
24
25 **STATUTES**

26 California Coastal Act of 1976................................................................................. 9

27 Civil Code
§ 658.................................................................................................................. 15
28 § 660.................................................................................................................. 15

3

**TABLE OF AUTHORITIES**
(continued)

Page

Code of Civil Procedure
   § 392.................................................................................................. 16
   § 392, subd. (a)(1)............................................................................... 15
   § 393.................................................................................................. 15
   § 395.................................................................................................. 15
   § 396b................................................................................................ 14
   § 397, subd. (a)................................................................................... 14
   § 397, subd. (c)................................................................................... 17

Government Code
   § 11043, subd. (c)............................................................................ 6, 18
   § 11043, subd. (d)............................................................................ 6, 18
   § 51010................................................................................................ 7
   § 51010.5............................................................................................. 7
   § 51010.5, subd. (a)............................................................................. 6
   § 51013.5............................................................................................. 7
   § 51014................................................................................................ 7
   § 51014.1........................................................................................ 7, 12

Public Resources Code
   § 30000 et seq..................................................................................... 8
   § 30001................................................................................................ 8
   § 30001.5............................................................................................. 8
   § 30008................................................................................................ 8
   § 30100................................................................................................ 8
   § 30103................................................................................................ 8
   § 30103, subd. (a)........................................................................... 6, 16
   § 30106................................................................................................ 8
   § 30107................................................................................................ 9
   § 30262.......................................................................................... 7, 8, 9
   § 30600, subd. (a)........................................................................... 8, 16

**OTHER AUTHORITIES**

81 Fed. Reg. 54513-54514.................................................................... 13

D. Venue, Cal. Prac. Guide Civ. Pro. Before Trial Chapter 3-D ................ 18

Senate Bill
   No. 237........................................................................................... *passim*

4

1

**INTRODUCTION**

2      Defendant, the State of California (State), brings this motion for a change in venue

3  because the potentially judiciable claim in this action relates to activities and portions of certain

4  pipelines within the Coastal Zone. And the potential activities within the Coastal Zone are not

5  within Kern County. Accordingly, by filing this action in the Superior Court for Kern County,

6  Plaintiff Pacific Pipeline Company (Pacific Pipeline) filed it in the wrong court. The Court should

7  order the action transferred to any proper county requested by the State, which is the Superior

8  Court for Santa Barbara County.

9      Pacific Pipeline attacks the newly enacted, but not yet effective, Senate Bill (SB) 237 on

10  the grounds that it may require a spike hydrostatic test of the pipelines and new coastal

11  development permit before Pacific Pipeline can restart the transportation of oil through the Las

12  Flores Pipelines. However, the Las Flores Pipelines are already subject to an existing legal

13  requirement of a spike hydrostatic test before restarting based on requirements imposed by the

14  Office of the State Fire Marshal (OSFM) under pre-SB 237 authority and a consent decree. Thus,

15  the question of whether SB 237 requires a spike hydrostatic test for the Las Flores Pipelines is

16  moot and non-justiciable. That leaves only a potential claim related to the coastal development

17  permit.

18      A coastal development permit is only required for development within the Coastal Zone.

19  Accordingly, only the portions of the Las Flores Pipelines that are within the Coastal Zone are

20  potentially subject to SB 237's coastal development permit requirements. The Coastal Zone does

21  not extend into Kern County. Contrary to Pacific Pipeline's conclusory allegation, no portion of

22  the Las Flores Pipelines that is potentially affected by SB 237's coastal development permit

23  requirement and this action is in Kern County. Accordingly, Pacific Pipeline filed this action in

24  the wrong court.

25      The portions of the Las Flores Pipelines that may potentially be affected by this action are

26  within the Coastal Zone in Santa Barbara County. The Superior Court for Santa Barabara County

27  is the proper venue, and the case should be transferred there.

28      Additionally, the only potential witnesses in this action are officials or staff members of

5

1    the California Coastal Commission (Commission) or OSFM. As neither the Commission nor

2    OSFM were named or served in this action, and there is no cause of action alleged against them,

3    these are nonparty witnesses. (See Gov. Code, § 11043, subs. (c), (d).) These witnesses are

4    already participating in multiple litigations involving the Las Flores Pipelines in Santa Barbara

5    County and it is inconvenient and disruptive to their duties to require their participation in

6    separate litigation involving the Las Flores Pipelines in Kern County as well. Moreover, most of

7    the pipelines and all of the issues related to the Coastal Zone, including the potential impacts on

8    the Coastal Zone from restarting the pipelines, are in Santa Barbara County. Accordingly, this

9    case should be transferred to the Superior Court for Santa Barbara County for the additional and

10   independent reason that transfer would be more consistent with the convenience of nonparty

11   witnesses and the ends of justice.

12                                **STATEMENT OF FACTS**

13         As alleged, the Las Flores Pipelines are intended to transport crude oil produced from the

14   Santa Ynez Unit to a refinery for final processing. (Complaint ¶¶ 17, 19.) The Las Flores

15   Pipelines are comprised, in part, of Line CA-325 and Line CA-324. (Complaint ¶¶ 22-23.) The

16   Las Flores Pipelines are intrastate pipelines. (See Gov. Code §, 51010.5, subd. (a).)

17         Line CA-324 connects the Las Flores Pump Station and the Gaviota Pump Station, all

18   within Santa Barbara County. (Complaint ¶ 23.) All of Line CA-324 is within the Coastal Zone.

19   (Complaint ¶ 26.)

20         A portion of Line CA-325 runs from the Gaviota Pump Station to the Sisquoc Pump

21   Station. (Complaint ¶ 22.) This portion of CA-325 is entirely within Santa Barbara County. A

22   segment of this portion of Line CA-325 within Santa Barbara County is also within the Coastal

23   Zone. (Complaint ¶ 26.) The portion of CA-325 that extends out of Santa Barbara County is not

24   within the Coastal Zone. (Pub. Resources Code, § 30103, subd. (a).)

25         The Las Flores Pipelines received its initial approvals, including necessary coastal

26   development permits, in the 1980s. (Complaint ¶¶ 24-26.) "On May 19, 2015, a leak along Line

27   CA-324 resulted in an oil spill." (Complaint ¶ 28.) Since 2015, no crude oil has flowed through

28   the Las Flores Pipelines. (Complaint ¶ 28.) However, it has been the pipeline owners' intent to

1    resume use of the pipelines. (Complaint ¶¶ 35, 37.)

2    　　　　Pursuant to its sovereign authority to regulate intrastate oil pipelines and the Coastal Zone,

3    the State of California enacted Senate Bill 237 (SB 237) on September 19, 2025. (Complaint ¶

4    38.) SB 237 is not effective until January 1, 2026. (Complaint ¶ 54.) SB 237 is intended "to enact

5    immediate measures to stabilize the transportation fuels market and to take future action to

6    holistically address the mid-transition." (SB 237, § 1, subd. (i).) Among the immediate measures

7    enacted are the addition of Government Code section 51014.1 and the amendment of Public

8    Resources Code section 30262.

9    　　　　SB 237 adds Government Code section 51014.1 to the Elder California Pipeline Safety

10   Act of 1981 (California Pipeline Safety Act), Government Code section 51010, et seq. The

11   California Pipeline Safety Act gives exclusive safety regulatory and enforcement authority over

12   intrastate oil pipelines to OSFM and sets testing requirements, among other items. (Gov. Code, §§

13   51010, 51013.5, 51014.) The new section 51014.1 states:

14   

15   　　　　(a) Any existing oil pipeline that is six inches or larger that
　　　　has been idle, inactive, or out of service for five years or more, shall

16   　　　　not be restarted without passing a spike hydrostatic testing
　　　　program.[1]

17   　　　　(b) (1) (A) The hydrostatic spike test shall be at least 139
　　　　percent of the maximum operating pressure of the pipeline and shall

18   　　　　not exceed 80 percent of the specific minimum yield strength, as
　　　　determined appropriate by the State Fire Marshal.

19   

20   　　　　(B) Notwithstanding subparagraph (A), at the operator's
　　　　request, the minimum hydrostatic spike test pressure may be lower

21   　　　　than 100 percent of the specified minimum yield strength if the
　　　　maximum operating pressure of the pipeline is correspondingly

22   　　　　reduced.

23   　　　　(i) Pursuant to this subparagraph the hydrostatic spike test
　　　　shall be at least 139 percent of the reduced maximum operating

24   　　　　pressure of the pipeline, as determined appropriate by the State Fire
　　　　Marshal.

25   　　　　(ii) The hydrostatic spike test shall be performed in
　　　　segments to ensure every elevation point is tested.

26   

27   　　　　[1] Unless specifically referenced and incorporated, definitions contained in the federal
Hazardous Liquid Pipeline Safety Act are irrelevant to the definitions of terms used in the

28   California Pipeline Safety Act. (See Gov. Code, § 51010.5.)

7

(2) If the specified minimum yield strength is unknown, the specified minimum yield strength shall be determined pursuant to Section 195.106(b) of Title 49 of the Code of Federal Regulations before performing the hydrostatic spike test.

(c) The hydrostatic spike test shall be no more than 15 minutes, and be immediately followed by a hydrostatic test, which shall be held for a minimum of eight hours and meet the requirements of the State Fire Marshal.

(d) The hydrostatic and hydrostatic spike test shall be performed in segments to ensure every elevation point is tested.

(e) All tests shall be performed by a qualified testing company that is compliant with this chapter, as determined by the State Fire Marshal.

(f) The Office of the State Fire Marshal shall promulgate regulations as necessary to implement this section.

(g) The requirements of this section shall become operative upon the effective date of this statute.

(h) The State Fire Marshal shall post on its public internet website information fully characterizing the parameters and results of each hydrostatic spike test performed, subject to any such information deemed confidential and proprietary, no less than 30 calendar days after each hydrostatic spike test is conducted pursuant to this section.

Public Resources Code section 30262 is part of the California Coastal Act of 1976 (Coastal Act), Public Resources Code 30000 et seq. The Coastal Act delineates the Coastal Zone and sets policies and requirements for development to protect the distinct and valuable natural resources within the Coastal Zone. (Pub. Resources Code, §§ 30001, 30001.5, 30008, 30103.) Pursuant to the Coastal Act, "any person . . . wishing to perform or undertake any development in the coastal zone . . . shall obtain a coastal development permit." (Pub. Resources Code, § 30600, subd. (a).) The Coastal Act provides its own definitions. (Pub. Resources Code, § 30100.)[2] "'Development' means . . . the placement or erection of any solid material or structure; . . . grading[;] . . . construction, reconstruction, demolition, or alteration of the size of any structure. . . ." (Pub. Resources Code, § 30106.) A structure includes any pipe. (*Ibid.*) An energy

---

[2] Definitions provided in the Federal Pipeline Safety Act are also irrelevant to the interpretation of the Coastal Act.

1   facility includes any transmitting facility for petroleum. (Pub. Resources Code, § 30107.) Public

2   Resources Code section 30262 specifically discusses oil and gas development within the Coastal

3   Zone. The relevant portions of amended Public Resources Code section 30262 state (with new

4   language in bold):

> [(a)(5)](B) Once oil produced offshore California is
> onshore, it shall be transported to processing and refining facilities
> by **pipeline that uses the best available technology pursuant to
> Section 51013.1 of the Government Code**.

> [¶] . . .[¶]

> [(C)](iii) Subparagraphs (A) and (B) shall apply only to new
> or expanded oil extraction operations. "New extraction operations"
> means production of offshore oil from leases that did not exist or
> had never produced oil, as of January 1, 2003, or from platforms,
> drilling islands, subsea completions, or onshore drilling sites, that
> did not exist as of January 1, 2003. "Expanded oil extraction"
> means an increase in the geographic extent of existing leases or
> units, including lease boundary adjustments, an increase in the
> number of well heads, **reactivation of a facility idled, inactive, or
> out of service for more than five years, or an increase in oil
> extraction from the use of hydraulic fracturing, extended reach
> drilling, acidization, or other unconventional technologies,** on or
> after January 1, 2003.

> [¶] . . . [¶]

> (b) **(1)** Repair and maintenance of an existing oil and gas
> facility may be permitted in accordance with Section 30260 only if
> it does not result in expansion of capacity of the oil and gas facility,
> and if all applicable conditions of subdivision (a) are met.

> **(2) Repair, reactivation, and maintenance of an oil and
> gas facility, including an oil pipeline, that has been idled,
> inactive, or out of service for five years or more shall be
> considered a new or expanded development requiring a new
> coastal development permit consistent with this section.**

> **(3) Development associated with the repair, reactivation,
> or maintenance of an oil pipeline that has been idled, inactive,
> or out of service for five years or more requires a new coastal
> development permit consistent with this section.**

> **(4) The commission or local government with a certified
> local coastal program shall review and approve, modify,
> condition, or deny the permit based on the requirements of this
> section.**

27   Pacific Pipeline intends to resume petroleum transportation through the Las Flores

28   Pipelines. (Complaint ¶¶ 3, 9, 37.) It alleges that, prior to the effective date of SB 237, Pacific

9

1   Pipeline undertook repairs and other development related to its intent to resume petroleum

2   transportation through the pipelines. (Complaint ¶¶ 31, 33, 53.) The Complaint is silent on

3   whether any additional repairs or development are required. The Complaint admits, pursuant to a

4   Consent Decree, that a written Restart Plan must be approved by OSFM before resuming

5   petroleum transportation through Lines CA-324 or -325. (Complaint ¶ 35.) Pacific Pipeline

6   alleges that OSFM recently performed inspections of the pipelines but did not concluded its

7   review of the Restart Plan. (Complaint ¶ 35.) It is unknown if and when OSFM will approve the

8   Restart Plan and whether any additional repairs or related development will be required. The

9   Complaint is silent as to any other reason why petroleum transportation through the Las Flores

10  Pipelines will not, or cannot, occur before the effective date of SB 237.[3]

11          OSFM maintains a webpage dedicated to informing the public on the pathways for

12  restarting Lines CA-324 and -325. (Declaration of Brandon S. Walker (Walker Dec.), Ex. A

13  [https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-restarting-pipelines

14  [accessed on Dec. 3, 2025] [OSFM Website].) "Before restarting CA-324 and CA-325, pipeline

15  operators must adhere to specific standards regulated by the OSFM, including strict compliance

16  with all" of the following requirements: (1) coastal best available technology (CBAT); (2) the

17  applicable consent decree; (3) the integrity management program; (4) issuance and compliance

18  with State waivers; (5) performance of all deferred maintenances;[4] and (6) compliance with an

19  approved startup plan. (*Ibid.*; see also Complaint ¶¶ 29, 31, 34, 35.) These requirements are

20  discussed further below, but as will be seen, they often overlap or are interlaced with each other.

21          "In adhering to CBAT regulations, operators are required to submit a risk analysis to

22  OSFM for approval." (Walker Dec., Ex. A.) OSFM approved a risk analysis for the pipelines in

23  2021. (*Ibid.*; Complaint ¶ 31.) Pacific Pipeline alleges that the safety valves identified in the

24  approved risk analysis have been installed. (Complaint ¶ 31; compare with Walker Dec., Ex. B

25          [3] Pacific Pipeline's need of additional approvals contradicts its claim that immediate
    decisions are required. (See Complaint ¶ 56.) Pacific Pipeline and the Las Flores Pipelines are
26  also subject to an injunction issued by the Superior Court for Santa Barbara County. (Walker
    Dec., Ex. I.)
27          [4] Although irrelevant to the interpretation of SB 237, it is noteworthy that the PHMSA
    allows the deferment of maintenance for idled pipelines, which Pacific Pipeline has utilized for
28  the Las Flores Pipelines.

1    [OSFM's July 2024 denial of Sable's alternative risk analysis seeking to avoid installation of the

2    valves due to problems getting local permits].) However, litigation ensued between Pacific

3    Pipeline and the Commission regarding whether the installation of the safety valves and other

4    work on the Las Flores Pipelines within the Coastal Zone require a new coastal development

5    permit or was covered by the original permit. (Walker Dec., Ex. C [final ruling denying writ].)

6    Recently the Superior Court for Santa Barbara County denied Pacific Pipeline's petition for writ

7    of mandate, upholding the Commission's decision that the work was not covered by the original

8    permit. (*Ibid.*)[5]

9        Lines CA-324 and -325 are subject to the obligations of a consent decree mandated by the

10    United States District Court, Central District of California. (Walker Dec., Ex. D; Complaint ¶ 29.)

11    The consent decree identifies California-specific requirements for Lines CA-324 and -325,

12    including a State waiver; replacement, restart, or abandonment options; integrity management;

13    valves; risk analysis; and leak detection. (Walker Dec., Exs. A and D, pp. 75-88 [consent

14    decree].) Also, the consent decree refers to segments of the pipelines being "not in service" and

15    sets requirements for their return to service. (Walker Dec., Ex. D, pp. 85, 94, 95.)

16        An integrity management program is established by the PHMSA, and further defined by

17    the consent decree. (Walker Dec., Exs. A and D, pp. 77-79.) The integrity management program

18    requires pipeline operators to implement measures and mitigate risks associated with pipeline

19    integrity. (Walker Dec., Ex. A.) As part of the integrity management program, the OSFM

20    mandates that active pipelines undergo an assessment test at least once every five years. (*Ibid.*)

21    The assessment typically involves either a hydrostatic pressure test or an in-line inspection using

22    a tool. (*Ibid.*; see also Walker Dec, Ex. D, pp. 79-80 [consent decree requiring additional in-line

23    inspections]; Ex. E, pp. 4-5 [State waiver requiring additional spike hydrostatic and hydrostatic

24    testing]; Ex. F p. 5 [same].) Because OSFM considers Lines CA-324 and -325 active but idle,

25    OSFM will require that the pipelines undergo integrity assessment testing and implement relevant

26    preventive and mitigative actions before restarting. (Walker Dec., Ex. A; see also Exs. E, F.)

27

28    _____
    [5] This may also render moot, or subject to collateral estoppel, aspects of Pacific Pipeline's
    attack on SB 237 related to a coastal development permit.

1    Although it is alleged that some inspections and tests were performed (Complaint ¶¶ 32, 33),

2    Pacific Pipeline does not allege that the performed inspections and tests satisfy what is required

3    by the integrity management program, the consent decree, and the State waivers.

4        The consent decree requires the operator to apply for a State waiver through OSFM

5    regarding the limited effectiveness of cathodic protection on the pipelines. (Complaint ¶ 34;

6    Walker Dec., Ex. A; Ex. D, p. 75].) A State waiver modifies compliance with regulatory

7    requirements if the operator demonstrates that alternative measures are consistent with pipeline

8    safety. (Complaint ¶ 34; Walker Dec., Ex. A.) The Las Flores Pipelines received State waivers on

9    December 17, 2024. (Complaint 34; Walker Dec., Ex. E [waiver for CA-324]; Ex. F [waiver for

10   CA-325].) The State waivers require spike hydrostatic pressure tests and hydrostatic tests on the

11   pipelines before they are placed back into operation. (Walker Dec., Ex. E, pp. 4-5; Ex. F, p.5.)

12   Specifically, the State waiver for Line CA-324 requires:

13           12. Prior to placing the pipeline in operation, Sable must
14       conduct a spike hydrostatic pressure test of the state waiver
         pipeline segments at a minimum pressure that is at least 1.5 times
15       the MOP [maximum operating pressure] or 100% SMYS
         [specified minimum yield strength], for a minimum of 15 minutes
16       after the spike test pressure is stabilized. Sable must field evaluate
         and remediate the following anomalies before performing the spike
17       hydrostatic test on CA-324:

18
             a.      All metal loss anomalies that have an ILI [in-line
19       inspection] reported depth of 40% and greater wall loss.

20           b.      All anomalies that have a predicted failure pressure
21       less than or equal to 1.6 times MOP.

22           13.     Immediately following the spike hydrostatic
         pressure test, Sable must conduct an 8-hour hydrostatic pressure
23       test of the state waiver pipeline segments at a minimum of 1.25
         times the MOP. (Walker Dec., Ex. E, pp. 4-5.)
24

25       The requirements for spike hydrostatic pressure tests in the State waivers are consistent

26   with the spike hydrostatic pressure tests required by SB 237. (Compare Walker Dec., Ex. E, pp.

27   4-5 and Ex. F, p.5 with Gov. Code § 51014.1.) Again, while Pacific Pipeline alleges that some

28   testing has occurred, it does not allege that the testing already conducted satisfies the

1    requirements of the State waivers. (See Complaint ¶ 33.) Additionally, on October 22, 2025,

2    OSFM sent a letter to the operator notifying it that there were deficiencies in the compliance with

3    the State waivers. (Walker Dec., Ex. A.)

4        Consistent with OSFM's and PHMSA's programs (Walker Dec., Ex. A; Ex. G

5    [https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/out-of-service-deferral-program];

6    81 Fed. Reg. 54513-54514), the pipeline operators were allowed to defer certain maintenance

7    activities due to the pipelines' active yet idled status. All deferred maintenance must be

8    completed before the pipelines can restart transporting oil. (Walker Dec., Ex. A.) The Complaint

9    does not allege that all of the deferred maintenance has been completed.

10        The consent decree also requires the operator to obtain OSFM's approval of a restart plan.

11    (Complaint ¶ 35; Walker Dec., Ex. C, pp. 91-95.) A restart plan was submitted for OSFM's

12    review, but OSFM informed the operator that it cannot approve the restart plan until all other

13    requirements are met, including those in the State waivers. (Complaint ¶ 35; Walker Dec., Ex. A.)

14        The Complaint acknowledges the existence, but not the effects, of a cease-and-desist order

15    from the Commission that prohibited ongoing pipeline anomaly work. (Complaint ¶ 47; Walker

16    Dec., Ex. H.) The Complaint fails to acknowledge that Pacific Pipeline has been subject to a

17    preliminary injunction enforcing the cease-and-desist order since June 10, 2025. (Walker Dec.,

18    Ex. I.) Moreover, the Superior Court for Santa Barbara County recently upheld the cease-and-

19    desist order after full briefing and oral argument. (Walker Dec., Ex. C.)

20        Additionally, there are several cases involving the Las Flores Pipelines already pending in

21    the Superior Court for Santa Barbara County. Involving the Commission, there is a petition for

22    writ of mandate and complaint for damages and injunctive relief, as well as a cross-complaint for

23    declaratory and injunctive relief, in *Sable Offshore Corp., et al. v. California Coastal Commission*

24    (Santa Barbara Super. Ct., Case No. 25CV00974). Involving OSFM, two petitions for writ of

25    mandate are consolidated in *Center for Biological Diversity, et al. v. California Department of*

26    *Forestry and Fire Protection, et al.* (Santa Barbara Super. Ct., Case No. 25CV02244) and

27    *Environmental Defense Center, et al. v. California Department of Forestry and Fire Protection,*

28    *et al.* (Santa Barbara Super. Ct., Case No. 25CV02247). There is a complaint for civil penalties

13

1  and injunctive relief for Water Code violations in *People of the State of California ex rel. Central*

2  *Coast Regional Water Quality Board v. Sable Offshore Corp.* (Santa Barbara Super. Ct., Case No.

3  25CV06285). And the Santa Barbara County District Attorney filed a criminal complaint for

4  knowingly discharging material into nearby creeks and waterways, obstructing streambeds, and

5  discharging material harmful to wildlife in *People of the State of California v. Sable Offshore*

6  *Corporation* (Santa Barbara Super. Ct., Case No. 25CR07677).

7  　　　Although Pacific Pipeline did not name the Commission or OSFM as parties, did not

8  serve either agency, and does not allege a cause of action against them, Pacific Pipeline alleges

9  that the Commission made statements "concerning the Las Flores Pipelines' status as 'idle,'

10  'inactive,' and 'out of service' for more than five years. . . ." (Complaint ¶ 55.)

11  <center>**DISCUSSION**</center>

12  **I.    THE SUPERIOR COURT OF KERN COUNTY IS THE WRONG COURT AND THE PROPER**
   **VENUE IS IN SANTA BARBARA COUNTY.**

13

14  　　　The Legislature sets proper venue through statutes that "declare the public policy "of this

15  state with respect to the proper court for an action. . . ." (*Alexander v. Superior Court* (2003) 114

16  Cal.App.4th 723, 731.) Allowing a party to disrupt this statutory scheme can "bring the

17  administration of justice into disrepute" as it would allow a party to "have their cause heard

18  where they believe it will be received most sympathetically." (*Ibid.*) That is why "[v]enue rules

19  give defendants some control over the choice of forum so that the action is not litigated in a

20  faraway county where it would be expensive and difficult to defend." (*Crestwood Behavioral*

21  *Health, Inc. v. Superior Court* (2021) 60 Cal.App.5th 1069, 1077.)

22  　　　When a defendant timely files a motion to change venue, "the court shall, if it appears that

23  the action or proceeding was not commenced in the proper court, order the action or proceeding

24  transferred to the proper court." (Code Civ. Proc., § 396b; see also Code of Civ. Proc. § 397,

25  subd. (a).) "Venue is determined on the basis of the complaint as it stands at the time the motion

26  to change is made, and the plaintiff is not permitted to make a subsequent election of theories by

27  proposed amendments thereto [citation] or affidavits in opposition to the motion [citation]."

28  (*Hasrat v. Superior Court for Los Angeles County* (1966) 241 Cal.App.2d 330, 337 cited by

<center>14</center>

1    *Brown v. Superior Court* (1984) 37 Cal.3d 477, 482.) For the purposes of a motion to change

2    venue, the allegations in a verified complaint may be controverted by declarations or affidavits of

3    the moving party but must be based on admissible evidence. (See *General Steel & Wire Co. v.*

4    *Stryco Mfg. Co.* (1963) 213 Cal.App.2d 495, 497.) The inclusion of a moot, non-justiciable claim

5    in a complaint should not be the basis for determining the proper venue as the court has no

6    jurisdiction over such claims. (See *Housing Group v. United Nat. Ins. Co.* (2001) 90 Cal.App.4th

7    1106, 1111; see also Code Civ. Proc. § 395 [the residence of an improperly joined defendant

8    should not be considered in determining venue], *Freeman v. Dowling* (1933) 219 Cal. 213, 216-

9    217 [sham or frivolous claims should not be used in considering venue and a defendant can seek a

10   change of venue by demonstrating that other defendants are not necessary parties, that no cause of

11   action is stated against them, and that no relief whatever may be awarded against them].)

12        Pacific Pipeline invokes the venue provision in Code of Civil Procedure section 392,

13   subdivision (a)(1). (Complaint ¶ 16.)[6] Section 392, subdivision (a)(1), sets the proper court as the

14   superior court in the county where the real property that is the subject of the action is located

15   when a determination of a right or interest in the property is at issue.[7] Whether property is the

16   subject of the action is determined by whether the main relief sought by the plaintiff pertains to

17   real property. (*Dow AgroSciences LLC v. Superior Court* (2017) 16 Cal.App.5th 1067, 1078.)

18   The question is "whether the *relief sought* amounts to 'the determination in any form, of [a] right

19   or [interest in real property].'" (*Massae v. Superior Court* (1981) 118 Cal.App.3d 527, 539.) An

20   action that "has a real and direct impact on a right or interest in the real property" at issue "is thus

21   ─────────────────────

22        [6] Although Pacific Pipeline brings this action against the State, the Complaint does not
     invoke Code of Civil Procedure section 393, which governs venue when the act of a public
23   official is at issue. The Complaint does not identify any public official that has taken any alleged
     action that it seeks to challenge. In cases for declaratory relief, the State, as opposed to an agency
24   or officer, is not a proper party as to which relief may be granted. (See *State of California v.*
     *Superior Court* (1974) 12 Cal.3d 237, 255.) This deficiency, along with others, will be the basis
25   of a future demurrer if meeting and conferring does not result in an amended pleading.
          [7] Civil Code section 658 defines real property as including "[t]hat which is affixed to
26   land." Furthermore, "[a] thing is deemed to be affixed to land when it is imbedded in it . . . or
     permanently resting upon it . . . or permanently attached to what is permanent, by means of
27   cement, plaster, nails, bolts or screws. . . ." (Civ. Code ¶ 660.) Without surveying the complete
     length of the pipelines, it seems reasonable to assume that much of the Las Flores Pipelines are
28   affixed to land.

1    'local' and should be tried in the county in which the real property is situated." (*Ibid.*) Although

2    the venue rule in Code of Civil Procedure section 392 may be appropriately applied here, Kern

3    County is not the proper venue because the "real property that is the subject of the action is

4    located" in Santa Barbara County, not Kern County.

5        The current action alleges a dispute regarding the potential application of SB 237 to the

6    Las Flores Pipelines.[8] The majority of the pipelines are in Santa Barbara County. And the specific

7    issue is whether the Las Flores Pipelines can be considered "idled, inactive, or out of service for

8    five years or more," which would require that a spike hydrostatic test be performed on the

9    pipelines and a new coastal development permit be obtained before the transportation of oil

10   through the pipelines can be resumed. (Complaint ¶¶ 39, 40, 53.) Accordingly, there are two

11   distinct aspects of Pacific Pipeline's attack on SB 237, one related to the stress hydrostatic test

12   requirement and the other related to the coastal development permit requirement.

13       The claim regarding the stress hydrostatic test requirement, however, is moot and non-

14   justiciable because that same test is already required for the Las Flores Pipelines by the State

15   waivers. (Complaint ¶¶ 29, 34-35 [consent decree requires compliance with approved State

16   waivers]; Walker Dec. Exs. E [State waiver requiring a spike hydrostatic test], F [same].) A claim

17   is moot, and non-justiciable, if the court cannot grant any effectual relief. (*Wilson & Wilson v.*

18   *City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1574.) Here, even if the Court were

19   to determine that the spike hydrostatic test requirement in SB 237 does not apply to the Las Flores

20   Pipelines, that would be an academic exercise as the Court cannot relieve Pacific Pipeline of that

21   same requirement in the State waivers.

22       That leaves the attack on SB 237 related to the coastal development permit requirement. A

23   coastal development permit is only required for development within the Coastal Zone. (Pub.

24   Resources Code § 30600, subd. (a).) The Coastal Zone is delineated on detailed maps adopted by

25   the Commission, but in general it extends inland about 1,000 yards from the mean high tide line.

26   (Pub. Resources Code, § 30103, subd. (a).) No part of Kern County is within the Coastal Zone.

27       [8] The Complaint lacks clarity. It does not present a facial attack on SB 237, nor does it
28   properly allege an "as applied" attack based on an agency's action. Indeed, SB 237 is not even
     effective yet. This is another deficiency in the Complaint that will need to be addressed.

16

1  Accordingly, no potentially affected part of the Las Flores Pipelines is within Kern County. Thus,

2  the Superior Court for Kern County is simply the wrong court for this action.

3  Rather, the potentially effected parts of the Las Flores Pipelines—those that are within the

4  Coastal Zone—are all within Santa Barbara County. Accordingly, this matter should be

5  transferred to the Superior Court for Santa Barbara County.

6  **II.  ALTERNATIVELY, THIS CASE SHOULD BE TRANSFERRED TO THE SUPERIOR COURT
   FOR SANTA BARBARA COUNTY FOR THE CONVENIENCE OF NONPARTY WITNESSES**
7  **AND THE ENDS OF JUSTICE.**

8  Additionally, the Legislature has given courts the discretion to transfer a case to another

9  county to promote the convenience of nonparty witnesses and the ends of justice. (Code Civ.

10  Proc., § 397, subd. (c).) Transfer is appropriate on this additional and independent basis.

11  SB 237 is not yet effective, and so neither OSFM nor the Commission has taken any

12  official action in interpreting or applying SB 237. But they are the State agencies that will be

13  implementing the provisions of SB 237 that Pacific Pipeline is attacking. And Pacific Pipeline is

14  also basing its attack on SB 237, in part, on statements allegedly made by the Commission.

15  (Complaint ¶ 55.) Therefore, it appears that the only potential witnesses would be from OSFM or

16  the Commission.

17  OSFM and the Commission are nonparties to this action. Even though an action for

18  declaratory relief should name an agency or an officer instead of the State (*State* v. *Superior*

19  *Court* (1974) 12 Cal.3d 237, 255) neither agency was named or served. There is no alleged cause

20  of action against either of them. (Complaint ¶¶ 51-58.) Pacific Pipeline does not seek any remedy

21  against them. (Complaint, Prayer for Relief ¶¶ 1-3.) Separate State agencies have a right to

22  represent their positions separately. (See *Redevelopment Agency of the City of San Marcos* v.

23  *Commission on State Mandates* (1996) 43 Cal.App.4th 1188 [Department of Finance interested

24  party in case challenging decision of the Commission on State Mandates].) And recent

25  amendments to the Government Code make clear that "[e]very state agency is a separate legal

26  entity," so "[s]ervice of a summons, complaint, or subpoena on one state agency is not lawful

27  service on any other state agency," and "[w]hen the Attorney General . . . defends an action in

28  their independent capacity on behalf of the State of California . . ., the Attorney General acts in

1   the public interest of the State of California and its residents and not as the legal representative or

2   attorney of any state entity, including entities within the executive, legislative, or judicial

3   branches," which means that "[s]tate agencies are not parties to [the] action. . . ." (Gove. Code, §

4   11043, subds. (c), (d).)

5       Both the Commission and OSFM are already participating in litigation involving the Las

6   Flores Pipelines in the Superior Court for Santa Barbara County. (*Sable Offshore Corp., et al. v.*

7   *California Coastal Commission* [Santa Barbara Super. Ct., Case No. 25CV00974]; *Center for*

8   *Biological Diversity, et al. v. California Department of Forestry and Fire Protection, et al.* [Santa

9   Barbara Super. Ct., Case No. 25CV02244]; *Environmental Defense Center, et al. v. California*

10  *Department of Forestry and Fire Protection, et al.* [Santa Barbara Super. Ct., Case No.

11  25CV02247].) And although they are not named parties, they may also be required to participate

12  in the additional litigation involving the Las Flores Pipelines pending in Santa Barbara County.

13  (*People of the State of California ex rel. Central Coast Regional Water Quality Board v. Sable*

14  *Offshore Corp.* [Santa Barbara Super. Ct., Case No. 25CV06285]; *People of the State of*

15  *California v. Sable Offshore Corporation* [Santa Barbara Super. Ct., Case No. 25CR07677]. It

16  would be inconvenient for the Commission or OSFM to also be required to participate as

17  nonparty witnesses in litigation involving the Las Flores Pipelines in Kern County too.

18      Additionally, most of the work for restarting the pipelines, and the potential impacts of

19  doing so will be felt in Santa Barbara County. (See D. Venue, Cal. Prac. Guide Civ. Pro. Before

20  Trial Ch. 3-D [ends of justice includes permitting view of the scene or making other material

21  evidence available].) Indeed, the oil spill that led to the idling of the Las Flores Pipelines occurred

22  in Santa Barbara County.

23      Thus, to promote the convenience of the nonparty witnesses and the ends of justice, this

24  case should be transferred to the Superior Court for Santa Barbara County.

25                                    **CONCLUSION**

26      The only potentially judiciable claim in the Complaint relates to the portions of the Las

27  Flores Pipelines within the Coastal Zone, in Santa Barbara County. The Superior Court of Kern

28  County is the wrong court and the action should be transferred to the Superior Court of Santa

1   Barbara County. Additionally, the transfer to Santa Barbara County would promote the

2   convenience of the nonparty witnesses and the ends of justice.

3

4   Dated:  December 5, 2025                    Respectfully submitted,

5                                              ROB BONTA
                                               Attorney General of California
6                                              BRANDON S. WALKER
                                               Supervising Deputy Attorney General
7                                              JACK C. NICK
                                               Deputy Attorney General
8                                              ISABELLA A. PANICUCCI
                                               Deputy Attorney General
9
                                               /s/ Brandon S. Walker
10
                                               BRANDON S. WALKER
11                                             Supervising Deputy Attorney General
                                               Attorneys for Defendant
12                                             State of California

13  SA2025306665

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF SERVICE BY E-MAIL

**Case Name:**        Pacific Pipeline Company, A Delaware Corporation v. State of California
**Case Number:**      BCV25103508
**Party Represented:** State of California

**Declaration of Electronic Service**

1. I am at least 18 years of age and not a party to this matter.

2. I am employed in the Office of the Attorney General of the State of California. My business address is 1300 I Street, Suite 125, Sacramento, CA 95814, County of Sacramento.

3. My electronic service address is Valerie.Tamulevich@doj.ca.gov.

4. On <u>December 5, 2025</u>, I electronically served the following document[s]:

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO CHANGE VENUE**

5. I electronically served the aforementioned document[s] by emailing them to the following individual[s]:

### PLEASE SEE ATTACHED SERVICE LIST

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct, and that this declaration was executed on <u>December 5, 2025</u>.

| Valerie A. Tamulevich | /s/ Valerie A. Tamulevich |
|:---:|:---:|
| Declarant | Signature |

## SERVICE LIST

Jeffrey Dintzer
Garrett B. Stanton
ALSTON & BIRD
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
**E-mail Address**: jeffrey.dintzer@alston.com
**E-mail Address**: garrett.stanton@alston.com

Benjamin J. Hanelin
Natalie C. Rogers
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, CA 90067
**E-mail Address**: benjaminhanelin@paulhastings.com
**E-mail Address**: natalierogers@paulhastings.com

SA2025306665
39501664.docx

**ELECTRONICALLY FILED**
Superior Court of California,
County of Kern
By: Marina Mercado
Deputy Clerk
**12/5/25 1:54 PM**

1    ROB BONTA
     Attorney General of California
2    BRANDON S. WALKER SBN. 254581
     Supervising Deputy Attorney General
3    JACK C. NICK SBN. 160196
     ISABELLA A. PANUCCINI SBN. 318984
4    Deputy Attorneys General
     1300 I Street, Suite 125
5    Sacramento, CA 95814
     Telephone: (916) 210-6395
6    Fax: (916) 327-2319
     E-mail: Brandon.Walker@doj.ca.gov
7    *Attorneys for Defendant State of California*

*Exempt from Filing Fees Pursuant to Government Code § 6103*

8            SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      COUNTY OF KERN

10               METROPOLITAN DIVISION

11

12

13   **Pacific Pipeline Company, A Delaware Corporation,**

14                       Plaintiff,

15           v.

16

17   **State of California and DOES 1 through 25,**

18                    Defendants.

Case No. BCV25103508

**DECLARATION OF BRANDON S. WALKER IN SUPPORT OF MOTION TO CHANGE VENUE (Vol. 1 of 3)**

Date:      February 3, 2026
Time:     8:30 a.m.
Dept:      H
Judge:     Hon. Bernard C. Barmann, Jr.

Action Filed: September 29, 2025

19
20
21
22
23
24
25
26
27
28

1

1    I, Brandon S. Walker, declare:

2    1.    I am a Supervising Deputy Attorney General employed by the State of California

3    Department of Justice, Office of the Attorney General. I am one of the attorneys assigned to

4    represent the State of California in this action. I have personal knowledge of the facts set forth

5    below and could and would competently testify to them if called to do so.

6    **Volume 1**

7    2.    Attached as Exhibit A is a true and correct copy of a PDF printout of a website maintained

8    by the Office of the State Fire Marshall (OSFM) describing the pathways for restarting CA-324

9    and CA-325 found at https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/pathways-for-

10    restarting-pipelines.

11    3.    Attached as Exhibit B is a true and correct copy of a redacted letter from the OSFM dated

12    July 10, 2024.

13    4.    Attached as Exhibit C is a true and correct copy of the final ruling denying Pacific

14    Pipeline's petition for writ of mandate in Santa Barbara Superior Court, Case No. 25CV00974.

15    **Volume 2**

16    5.    Attached as Exhibit D is a true and correct copy of the Consent Decree entered into by the

17    parties in United States District Court, Central District of California, Case No. 2:20-cv-02415.

18    **Volume 3**

19    6.    Attached as Exhibit E is a true and correct copy of the State waiver issued by OSFM for

20    Line CA-324.

21    7.    Attached as Exhibit F is a true and correct copy of the State waiver issued by OSFM for

22    Line CA-325.

23    8.    Attached as Exhibit G is a true and correct copy of a PDF printout of a website maintained

24    by OSFM describing the out-of-service deferral program found at https://osfm.fire.ca.gov/what-

25    we-do/pipeline-safety-and-cupa/out-of-service-deferral-program.

26    9.    Attached as Exhibit H is a true and correct copy of a cease and desist order issued by the

27    California Coastal Commission for development activities associated with the return to service of

28    CA-324 and CA-325.

2

1    10.    Attached as Exhibit I is a true and correct copy of the order granting application for

2    preliminary injunction issued in Santa Barbara County Superior Court, Case No. 25CV00974.

3        I declare under penalty of perjury under the laws of the State of California that the

4    foregoing is true and correct and that this declaration was executed in Rocklin, California on

5    December 5, 2025.

6    Brandon S.        Digitally signed by Brandon S. Walker
                       Date: 2025.12.05 11:02:37 -08'00'
7    Walker

8    Brandon S. Walker
     Declarant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

# EXHIBIT "A"



Emergency? Call 911    Translate    Settings



*Search safety information*

Home › What We Do › Pipeline Safety & CUPA › Pathways for Restarting Pipelines

SEARCH

# Pathways for Restarting CA-324 and CA-325

Revised: 10/23/2025

When they were in operation, lines CA-324and CA-325 (previously known as Lines 901 and 903), transported crude oil from the Santa Ynez Unit, which comprises an onshore oil and natural gas processing facility, three offshore platforms, and associated offshore pipelines.

These operations are subject to significant regulatory oversight, with the CAL FIRE - Office of the State Fire Marshal (OSFM) acting as the safety and enforcement regulatory authority over these pipelines. Platforms and offshore pipelines associated with CA-324 and CA-325 also fall under the jurisdiction of various other regulators, including the Pipeline and Hazardous Materials Safety Administration (PHMSA), State Lands Commission, and Bureau of Safety and Environmental Enforcement, among others. Those regulators maintain their own

requirements for restart of platforms and pipelines that may not fall directly under the OSFM jurisdiction.

Before restarting CA-324 and CA-325, pipeline operators must adhere to specific standards regulated by the OSFM, including strict compliance with **all** the listed requirements below.

## Regulatory Oversight of Crude Oil Pipelines in Santa Barbara County
## Pathways to Restarting Lines CA-324 & CA-325 FAQs
## Pathways for Restarting CA-324 and CA-325 Pipelines Infographic

### #1: Coastal Best Available Technology                                    ×

The Coastal Best Available Technology (CBAT) was enacted by the OSFM pursuant to legislative mandates imposed in response to the Refugio Beach pipeline spill in May 2015. It mandates the use of the best available technology for pipelines in environmentally sensitive coastal areas to minimize oil spills.

In adhering to CBAT regulations, operators are required to submit a risk analysis to the OSFM for approval. If an operator identifies the best available technology to mitigate the quantity of hazardous liquid spills in case of a release, it must specify these technologies and propose their retrofitting into the pipeline. Following the installation of these technologies, the OSFM will review the operator's records to confirm compliance with CBAT regulations.

In 2021, the OSFM approved a risk analysis and implementation plan for the lines, which included the installation of valves and incorporating other technologies into the pipelines. To proceed with implementing this technology, the operator needs permits for installing or upgrading specific safety valves in Santa Barbara County. The OSFM does not handle local

permit issuance, and recommends stakeholders contact relevant agencies for updates on those processes as outlined in the approved plan.

In November 2023, the pipeline owner presented an alternative risk analysis to the OSFM for review and approval. The November 2023 risk analysis was withdrawn in March 2024.

On April 11, 2024, Pacific Pipeline Company submitted an alternative risk analysis and implementation plans to amend the current plan. The OSFM denied the April 2024 alternative risk analysis.

## **Coastal Best Available Technology (CBAT) Infographic**

References:

1. Coastal Best Available Technology, Office of State Fire Marshal, Retrieved from: https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/coastal-best-available-technology
2. 901/903 Valve Upgrade, County of Santa Barbara Planning and Development, Retrieved from: https://www.countyofsb.org/880/901903-Valve-Upgrade ☐↗

**LINE 903 REDACTED RISK ANALYSIS (PDF)**

**LINE 901 REDACTED RISK ANALYSIS (PDF)**

**DENIAL LETTER – PACIFIC PIPELINE CBAT RISK ANALYSIS**

**REDACTED RISK ANALYSIS PACIFIC PIPELINE COMPANY**

**PACIFIC PIPELINE (SABLE) LETTER - EXTENSION NOTIFICATION**

**#2: Consent Decree**                                                    ×

After the Refugio spill, CA-324 and CA-325 were subject to the obligations of a Consent Decree mandated by the United States District Court, Central District of California (Civil Action No. 2:20-cv-02415). This decree stipulates a series of prerequisites that must be met before any restart of these lines can be initiated. The operator is responsible for submitting reports and involving the OSFM in reviewing the subject pipelines' compliance with the requirements outlined in the Consent Decree. The California-specific provisions are found in Appendix B of the Consent Decree, and include:

- State Waiver
- Replacement, Restart, or Abandonment of the pipelines
- Integrity Management
- Valves
- Risk Analysis
- Leak Detection

The Appendix should be read in conjunction with the entire Consent Decree for a full understanding of the relevant requirements.

Reference:

1. Consent Decree Civil Action No. 2:20-cv-02415, United States District Court, Central District of California, Retrieved from: https://www.epa.gov/sites/default/files/2020-03/documents/plainsallamericanpipelinelp.pdf ☐

**#3: Integrity Management Program**                                     ×

The Integrity Management Program established by the PHMSA on regulated pipelines is a framework designed to ensure the safe operation of pipelines. This program requires pipeline operators to implement measures to assess and mitigate risks associated with pipeline integrity, with the goal of preventing incidents such as ruptures, or failures.

As part of the integrity management program, the OSFM mandates that active pipelines undergo an Integrity Assessment test at least once every five years. These assessments typically involve either a hydrostatic pressure test or an In-Line inspection using a smart tool. The OSFM reviews and evaluates integrity assessment reports for each regulated pipeline. Since the pipelines in question are currently idle, both must undergo integrity assessment testing and implement relevant preventive and mitigative actions before restarting.

## **Integrity Management Program & Deferred Maintenance Infographic**

Reference:

Hazardous Liquid Integrity Management (HLIM) ⧉

**#4: State Waiver**

✕

A State Waiver is an order that modifies compliance with a regulatory requirement if an operator demonstrates that alternative measures are consistent with pipeline safety. The OSFM evaluates state waiver applications in consultation with the PHMSA to determine if the proposed alternative measures can provide an equal or greater level of safety than the required regulation and may grant a state waiver accordingly.

Certain provisions of the Consent Decree mandate that the pipeline operator applies for a State Waiver through OSFM regarding the limited effectiveness of cathodic protection on CA-324 and CA-325. The pipeline operator must

obtain a State Waiver from the OSFM and a no-objection from PHMSA before restarting the respective pipelines.

## State Waiver Infographic

References:

1. Pipeline Safety: Ineffective Protection, Detection, and Mitigation of Corrosion Resulting from State Waiver information Poster Insulated Coatings on Buried Pipelines, Retrieved from: https://www.federalregister.gov/documents/2016/06/21/2016-14651/pipeline-safety-ineffective-protection-detection-and-mitigation-of-corrosion-resulting-from ↗

2. Special Permits and State Waivers Overview, United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration, Retrieved from: https://www.phmsa.dot.gov/pipeline/special-permits-state-waivers/special-permits-and-state-waivers-overview ↗

3. State Waivers: #0001 (CA-325 A/B) and #0015 (CA-324)

**#5: Deferred Maintenances**                                              ✕

The OSFM continues to oversee idle pipelines under 49 CFR Part 195 and the Elder Pipeline Act until a pipeline is formally abandoned, at which point it is removed from the OSFM's program. An idle pipeline remains temporarily inactive and is not involved in transporting hazardous materials. If the pipeline is purged of hydrocarbon substances, the operator may request to postpone specific maintenance tasks as outlined in PHMSA Advisory Bulletin 2016-0075. Both pipelines have deferred certain maintenance activities, and all the deferred maintenance must be completed before operations can resume.

## Integrity Management Program & Deferred Maintenance Infographic

References:

1. Out-of-Service Deferral Program, Office of State Fire Marshal, Retrieved from: https://osfm.fire.ca.gov/what-we-do/pipeline-safety-and-cupa/out-of-service-deferral-program
2. Pipeline Safety: Clarification of Terms Relating to Pipeline Operational Status, PHMSA Advisory Bulletin 2016-0075, Retrieved from: https://www.phmsa.dot.gov/regulations/federal-register-documents/2016-19494 ⬚

**#6: Startup Plan**

×

A pipeline startup plan delineates the procedures and protocols for safely restarting the operation of a pipeline system. Prior to the potential restart of operations, the OSFM will review the startup plan and perform on-site inspections of the pipelines to verify compliance to the plan.

Appendix D of the Consent Decree specifies the minimum requirements for restarting CA-324 and CA-325. The restart plan typically represents the final step in resuming operations. After the pipeline operator fulfills all other necessary requirements, OSFM finalizes the specific requirements of the restart plan, ensuring they meet or exceed those mandated by the Consent Decree.

Sable has submitted restart plans to the Office of the State Fire Marshal for review. Evaluation will proceed once all compliance and safety requirements, including Coastal Best Available Technology standards, the Consent Decree, the Integrity Management Plan, the State Waiver, and approvals from other state, federal and local agencies, are met.

On October 22, 2025, State Fire Marshal Daniel Berlant sent a letter to Sable notifying the company of deficiencies in its compliance with the State Waiver, which prevents the approval of the restart plan until those requirements are met. OSFM continues to review the restart plan submitted by Sable in September and reserves its rights to provide additional direction or comment as part of that review.

## **Startup Plan Infographic**

References:

1. Sable's Restart Plan for <u>CA-324</u>.

2. Sable's Restart Plan for <u>CA-325</u>.
3. <u>Sable's Fill Plan and Start-Up Procedures.</u>

# **OSFM's Commitment**

The OSFM remains steadfast in its commitment to pipeline safety, serving the interests of both the State and local communities. Both CA-324 and CA-325 must fulfill **all** the aforementioned requirements before restarting operations. The pipeline operator must undergo a multi-stage review process to comply with these requirements and is expected to work with other agencies to meet their regulations, including any environmental review, before potentially restarting the subject pipelines.



QUICK LINKS

Defensible Space

GovMotus Fire Permits

Fire Hazard Severity Zones

Recalls

Subscribe

2024 Strategic Plan

**DIVISIONS**

Code Development & Analysis

Community Wildfire Preparedness & Mitigation

Fire & Life Safety Division

Fire Engineering & Investigations

Pipeline Safety & CUPA

State Fire Training

**TRAINING RESOURCES**

Available Classes

State Fire Training Portal

Continuing Education (FSTEP)

Professional Certification (CFSTES)

Instructor Registration

Instructor Database

Back to Top    Accessibility    Conditions of Use    Privacy Policy    Site Map    Glossary of Terms

Copyright © 2025 State of California

# EXHIBIT "B"

STATE OF CALIFORNIA · NATURAL RESOURCES AGENCY                                    Gavin Newsom, Governor



DEPARTMENT OF FORESTRY AND FIRE PROTECTION
OFFICE OF THE STATE FIRE MARSHAL
Pipeline Safety Division
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806
(562) 497-0350
Website: www.fire.ca.gov



## CERTIFIED MAIL NO.: 7022-0410-0000-6648-0406

July 10, 2024

Pacific Pipeline Company
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:    REJECTION OF REVISED RISK ANALYSIS AND IMPLEMENTATION PLAN
(OSFM #0001, CA-325 GAVIOTA TO EMIDIO)
(OSFM #0015, CA-321 LAS FLORES CANYON TO GAVIOTA)**

Dear [                    ]:

CAL FIRE – Office of the State Fire Marshal (OSFM) acknowledges receipt of your letter
dated April 11, 2024, requesting approval for the acceptance of the amended risk
analysis and initial implementation plan concerning the best available technology for the
aforementioned pipelines. Thank you for the additional responses to OSFM's questions,
dated May 31, 2024.

Having thoroughly reviewed your risk analysis and supplementary response records, the
OSFM regrets to inform you that the April 11, 2024 risk analysis is determined to be
inadequate. The risk analysis is denied due to the following identified deficiencies:

1. The OSFM denies the proposal based on a comparison of the worst-case
   discharge volumes between the proposed risk analysis and the previously
   accepted risk analysis submitted by Plains All American Pipeline in April of 2021.
   According to Pacific Pipeline, the worst-case discharge volume in the proposed
   plan was lower. Given the lower worst-case discharge volume in the previous
   plan, it indicates that the previous proposal offers a smaller release in the event
   of a worst-case spill, thus providing superior spill volume reduction and
   associated environmental benefits. Therefore, the current proposal is not
   considered as effective in mitigating potential environmental impacts compared to
   the previous plan.
2. Our office appreciates the efforts by Pacific Pipeline to reduce spill response
   times in the event of a failure. However, this is not a consideration for CBAT
   because at that point, product has already been released. The focus is on spill

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

July 10, 2024
Page 2

volume reduction, not on spill containment and response.

3. Pacific Pipeline discusses the unavailability of construction permits as determinative of the issue of "availability" with regard to installation of valves. Our office does not perceive permitting issues at the local level as determinative of the availability of valves in general. It is also our understanding that Pacific Pipeline currently possesses the valves required for installation and that discussions around permitting issues between the County of Santa Barbara and Pacific Pipeline are being held to resolve the differences between parties. No other pipeline in the State has been denied construction permits for valves to comply with State law and reduce spill volumes and we see no difference here.

The previously approved risk analysis submitted by Plains All American Pipeline in April of 2021 remains in effect and represents best available technology. We look forward to working with you in implementing the approved risk analysis.

If you have any questions regarding this issue, please contact Andy Chau, Supervising Pipeline Safety Engineer, at (562) 305-0679.

Sincerely,

James Hosler

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs

cc:     Andy Chau, Supervising Pipeline Safety Engineer, OSFM
        Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
        Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
        Doug Allen, Supervising Pipeline Safety Engineer, OSFM
        Alin Pcdoreanu, Supervising Pipeline Safety Engineer, OSFM

# EXHIBIT "C"

# Civil Law and Motion Calendar
# 10/15/25
## 10 am

### _Sable Offshore Corp. and Pacific Pipeline Company v. California Coastal Commission_ - Case No. 25CV00974

### HEARING

Petition of Petitioners Sable Offshore Corp. and Pacific Pipeline Co. for Writ of Mandate

### ATTORNEYS

_For Plaintiffs and Petitioners Sable Offshore Corp. and Pacific Pipeline Company_: Jeffrey D. Dintzer, Garrett B. Stanton, Alston & Bird LLP; Trevor D. Large, Fauver, Large, Archbald & Spray LLP

_For Defendant and Respondent California Coastal Commission_: Rob Bonta, Norman N. Franklin, Wyatt E. Sloan-Tribe, Office of the California Attorney General

Emails: jeffrey.dintzer@alston.com; garrett.stanton@alston.com; dan.seabolt@alston.com; Wyatt.Sloan-Tribe@doj.ca.gov; Isabella.Langone@doj.ca.gov; Kevin.Kelly@doj.ca.gov; Thomas.Kinzinger@doj.ca.gov; John.Natalizio@doj.ca.gov; tlarge@flasllp.com;

### RULING

**1. For the reasons set forth herein, the Court finds in favor of Respondent California Coastal Commission and against Petitioners Sable Offshore Corp. and Pacific Pipeline Company on Petitioners' first cause of action for issuance of a writ of mandate.**

**2. The Court does not now address the extent to which this ruling resolves or otherwise impacts other causes of action of the FAP or of the Commission's cross-complaint, which will be addressed in subsequent proceedings.**

**3. There is currently a motion to compel discovery now pending and set for hearing on 10/22/25 at 10 am. That matter is continued to 12/3/25, at 10 am.**

1

Document received by the CA 2nd District Court of Appeal.

**4. There is currently a CMC set for 10/31/25; that CMC is vacated. The Court sets the next CMC for 12/3/25, at 10 am. CMCS's filed one week in advance.**

**5. There is currently a motion filed for leave to file a SAC that is set for 12/3/25 at 10am; the hearing will go forward. Briefing on the issue, if any, will be accomplished so the final brief is filed one week in advance.**

<div align="center">Background</div>

This matter arises out of work done by Petitioners Sable Offshore Corp. (Sable OC) and Pacific Pipeline Company (PPC) (collectively, Sable or Petitioners) subject to the California Coastal Act of 1976 (Coastal Act, Pub. Resources Code, § 30000 et seq.). To address the issues raised in the petition, it is first useful to summarize the history of the underlying oil pipeline construction and maintenance. The summary is intended to provide sufficient background to address the issues before the Court and is not intended to be a complete recitation of the facts. Nonetheless, the Court has considered the complete record in this matter in making this ruling. Citations to the Administrative Record (AR) are in the form of "AR [page number(s)]" with leading zeros omitted.

(1)    Factual Background

    (A)    The Oil Pipeline

PPC, a wholly-owned subsidiary of Sable OC, is the owner of the Las Flores Pipelines, which includes the pipeline segments CA-324 (Line 324) (previously known as Line 901) and CA-325 (Line 325) (previously known as Line 903) (collectively, the Las Flores Pipelines or Pipelines), portions of which are located within the coastal zone in an unincorporated area of the County of Santa Barbara (County). (First Amended Petition [FAP], ¶ 1; Answer to FAP [Answer], ¶ 1; AR 1-3.)

Line 324 is designed to transport crude oil from a pump station in Las Flores Canyon approximately 11 miles west along the coast to a pump station about a mile east of Gaviota State Park. (FAP, ¶ 26; Answer, ¶ 26; AR 3, 64.) Line 325 of the Pipelines is designed to transport crude oil from there to a location approximately 113.5 miles north, eventually reaching the Pentland Delivery Point in Kern County. (*Ibid.*)

The Pipelines were constructed in the 1980s and were referred to at the time as the "Celeron/ All American Pipeline Project." (AR 3832.) The Final Development Plan (FDP) Conditional Use Permit (CUP), dated March 3, 1986, was issued following

<div align="center">2</div>

Document received by the CA 2nd District Court of Appeal.

approval by the Santa Barbara County Planning Commission. (*Ibid.*) The project description in the CUP is:

"Celeron proposes to construct a 30-inch diameter, insulated welded steel pipeline designed to transport up to a maximum of 425,000 barrels per day (BPD) with an optimal throughput of 300,00 BPD, of Outer Continental Shelf and other locally produced crude oils. The pipeline would extend approximately 135 miles from Las Flores Canyon to the Emidio pump station in the southern San Joaquin Valley. Three pump stations would be constructed, one at Las Flores Canyon, one at Gaviota, and one near the Sisquoc River in northern Santa Barbara County. The pipeline would be buried to a minimum cover depth of three feet throughout its length according to Department of Transportation specifications, with increased cover depth in selected areas. [¶] The pipeline will require a 100-foot wide construction corridor and a 50-foot wide permanent easement. The proposed route parallels Highway 101 from Las Flores to Gaviota, turns north at Gaviota State Park west of Highway 101 and continues to the Sisquoc River. From the Sisquoc River the route follows Santa Maria then Suey Canyons north toward the Cuyama River. It crosses the river in the Western Cuyama Valley, and exits the County." (AR 3836.)

The final environmental impact report/environmental impact statement (EIR/EIS) regarding the project includes the following statement in its abstract:

"The Celeron and All American Pipeline Companies propose to construct a 1,200-mile pipeline that would transport Outer Continental Shelf and other locally produced crude oils from the Santa Barbara and Santa Maria Basins through Emidio station, CA, to McCamey, TX. The 122-mile Celeron segment would extend from Las Flores, CA to Emidio, CA, and the 1,084-mile All American segment would extend from Emidio, CA to McCamey, TX; both would transport heated crude oil. Getty Trading and Transportation Company (Getty) proposes to construct a 113-mile buried pipeline that would transport heated crude oil from Getty's existing marine terminal facility at Gaviota, CA, to Emidio station, CA. The Celeron/All American pipeline proposal and the Getty pipeline proposal are not dependent upon each other. Both projects could be approved or either project could be approved independently of the other.

"The Celeron/All American and Getty Pipeline Projects Environmental Impact Report/Environmental Impact Statement (EIR/EIS) addresses both applications to construct pipelines from the Santa Barbara coast to Emidio in Kern County. The EIR/EIS also addresses Celeron/All American's application for a pipeline from Emidio to McCamey, Texas.

"The EIR/EIS analyzes the environmental effects of the proposed pipelines; pump, heating, and delivery stations; and a tank farm through construction, operation, maintenance, and abandonment. This report analyzes the impacts of the

Document received by the CA 2nd District Court of Appeal.

3

Celeron/All American and Getty Proposals and four routing alternatives that have been identified. These are the Santa Maria Canyon, Desert Plan Utility Corridor, Brenda, and McCamey to Freeport Alternatives. The Santa Maria Canyon Alternative crosses a portion of the Los Padres National Forest in Santa Barbara County; the Desert Plan Alternative is in the Mojave Desert in eastern California; the Brenda Alternative is in western Arizona near the Kofa National Wildlife Refuge; and the McCamey to Freeport Alternative. extends from West Texas to the Gulf Coast. These alternatives were identified to provide optional locations for the pipelines in sensitive areas. The No Project Alternative is also analyzed." (AR 3191-3192.)

Two coastal development permits (CDPs) were issued for the project. CDP 86-CDP-189 was issued on July 27, 1986. (AR 3891) The CDP is for the approved project: "Clearing, grading, and trenching activities for Celeron Pipeline Project as approved by 85-DP-66cz, in the area described below." (*Ibid.*) The area for this CDP is: "Gaviota State Park (survey station #1725+40) to Gaviota pump station." (*Ibid.*) CDP 86-CDP-205 was issued on August 5, 1986. (AR 3894.) The CDP is for the approved project: "Remainder of all construction activities for the Celeron Pipeline project as approved by 85-DP-66cz, in the area described below." (*Ibid.*) The area for this CDP is: "Gaviota State Park (survey station #1725+40) to Gaviota pump station." (*Ibid.*) Both CDPs state as special conditions: "The project description, pipeline route, conditions and plans required pursuant to those conditions described by the approved Final Development Plan 85-DP-66cz are incorporated herein by reference as terms of this permit. (AR 3891, 3894.)

The CDPs were not appealed or otherwise challenged after their issuance.

The FDP's Conditions of Approval include:

Under the heading "Authority to Impose Feasible Mitigations":

"This permit is premised upon findings that where feasible, all significant environmental effects of the project identified in the EIR/EIS (State Clearinghouse No. 83110902), which occur in Santa Barbara County, will be substantially mitigated by the permit conditions. Prior to approval of the Final Development Plan, County shall review any findings that identified certain mitigation measures as being in the primary jurisdiction of another agency but are also within County's jurisdiction. County shall thereupon determine either (1) that such mitigation has or is being implemented by such other agency or (2) that such other agency and County determine such mitigation to be infeasible. If County determines that no other agency is or may be implementing such feasible mitigation measures then County may impose those feasible measures within its jurisdiction to mitigate those environmental impacts in accordance with appropriate mitigation measures identified by the EIS/R." (AR 6714.)

4

Document received by the CA 2nd District Court of Appeal.

Under the heading "Facility Throughput and Source Limits":
"All facilities constructed under this permit shall be used only for the shipment of a maximum volume of heated crude oil demonstrated to be within the design parameters of the pipeline facilities as built. The subject volumes will be outer continental shelf (OCS) and other locally produced onshore and offshore petroleum from the Santa Barbara and Santa Maria Basins. PPC shall obtain a new or modified permit, or authority to continue operation under the existing permit prior to undertaking any of the following activities which may, in the judgment of the County, result in significant changes to the impacts on the County. Such changes could include but not be limited to: 1) major pipeline or pump station modifications; 2) major changes in pipeline throughput; 3) introduction of production to the pipeline from sources other than those described above; and 4) introduction of a different product from any source." (AR 6710.)

Respondent California Coastal Commission (Commission) issue a CDP for offshore portion of the Pipelines in 1988, CDP E-88-1. (AR 61-62.)

In 2015, a corroded portion of Line 324 ruptured, causing an oil spill (2015 Refugio Oil Spill). (AR 3.) Following the 2015 Refugio Oil Spill, the Pipelines were placed out of service. (*Ibid.*)

In 2020, Sable's predecessor-in-interest entered into a Federal Consent Decree with the United States and the State of California to resolve issues related to the 2015 Refugio Oil Spill. (AR 6049-6150.) The Federal Consent Decree requires, among other things, that if Line 324 (former Line 901) is to restart, a written Restart Plan must first be approved by the California Office of the State Fire Marshal (OSFM). (AR 6144-6145.) No Restart Plan has yet been approved and restart of the Pipelines is not at issue in this litigation. (Sable Opening Brief, at p. 8, fn. 6.)

      (B)     Pipeline Activities

In 2024, Sable identified 121 sites on the onshore pipelines requiring Anomaly Repair Work. (AR 1750-1751.) A pipeline "anomaly" refers to a pipeline segment with some deviation from its original configuration. (AR 1750.)

According to Sable: "Sable detects anomalies by using a roving data gathering instrument located within the pipeline interior, typically referred to as an inspection 'pig,' which examines a pipeline's conditions as the pig travels through the Onshore Pipelines. Data collected from the inspection pig is used to identify the approximate location of anomalies from the surface so that excavation and repair activities can be planned. Sable generally must complete the following steps to repair any particular anomaly detected by the pig: (1) access the affected pipeline segment via existing roadways and rights-of-way, which in some locations requires

5

Document received by the CA 2nd District Court of Appeal.

placing metal plates over water courses; (2) excavate the anomaly site, including the dirt beneath the affected pipeline segment, which in some locations may require dewatering and associated discharge; (3) expose the pipeline segment by removing insulation and sandblasting; (4) evaluate whether a 'Composite Repair' or 'Cut-Out Repair' is required, (5) conduct the Composite or Cut-Out Repair as appropriate, sandblast the repaired pipeline segment, and apply an epoxy coating, pipe tape, and rockguard wrap; (6) backfill the anomaly site, and (7) conduct final site cleanup including erosion control and revegetation work (collectively, the 'Anomaly Repair Work'). Anomaly Repair Work is short-term and temporary (often lasting less than a week) within the Onshore Pipelines' operational right-of-way. It requires the use of heavy equipment and may involve the removal of vegetation." (AR 1751, fns. omitted.)

According to Sable, Sable completed the Anomaly Repair Work at 48 of these anomaly sites before it received communications from the Commission. (AR 1751.)

On September 20, 2024, Commission Enforcement Analyst Jo Ginsberg sent an email to Errin Briggs, Deputy Director, Energy Minerals & Compliance of the County stating:

"We have learned that Sable Offshore Corporation (Sable) is undertaking development in the coastal zone related to Lines 324/325 (formerly known as Lines 901/903) without any Coastal Act authorization, which is a violation of the County's LCP, and we hereby request the County to take enforcement action. At the same time, we are also aware of both the recent litigation and settlement between the County and Sable, and we assume that, as a result of that settlement, the County will not take the requested action. However, we do believe the work requires Coastal Act authorization. Thus, the Commission will assume enforcement jurisdiction based on the understanding that you are declining this request unless you indicate otherwise by close of business on Sept. 23, 2024." (AR 300-301.)

Later on September 20, the Briggs replied: "Received. We will review this and get back to you ASAP." (AR 300.)

On September 27, 2024, Ginsberg, on behalf of the Commission, sent by email its Notice of Violation (NOV) No. V-9-24-0152 (2024 NOV) to Steve Rusch, Vice President Environmental & Regulatory Affairs of Sable, stating in part:

"As you have recently discussed with Cassidy Teufel and Wesley Horn of our staff, it has come to our attention that unpermitted activities are currently taking place in the Coastal Zone, including excavation and other activities at various locations along the existing Lines 324/325 (formerly known as Lines 901/903) now owned by [Sable] associated with a proposed restart of the Santa Ynez Unit. These activities

constitute violations of the Coastal Act and Santa Barbara County's Local Coastal Program ('LCP'). (AR 208-209, fn. omitted.)

"It has been confirmed that Sable is currently performing various unpermitted construction activities in the Coastal Zone associated with upgrades to Lines 324/325 in connection with Sable's proposed restart of that pipeline. As part of that proposed restart, Sable is currently undertaking work including a pipeline upgrade project to address pipeline corrosion in locations within the Coastal Zone and to install new safety valves in portions of the pipeline in the Coastal Zone. These activities constitute development and are not exempt from coastal development permit ('CDP') requirements." (AR 209, fn. omitted.)

"Please note that in certain cases when unpermitted development takes place, but Commission staff believe that some version of the work could have been found to be consistent with the applicable standard of review and authorized accordingly, staff recommends that the party undertaking the development submit a CDP application to the regulating authority (in this case, Santa Barbara County), seeking after-the-fact ('ATF') authorization for the previously undertaken unpermitted development within the County's LCP jurisdiction. In other cases, when staff has determined that the unpermitted development is not something for which staff would recommend approval due its inconsistency with the Coastal Act/certified LCP, staff advises the alleged violator to seek resolution through removal, mitigation, restoration, and/or payment of penalties, etc., and not to seek a CDP to authorize such development.

"In this case, we are uncertain at this time whether Santa Barbara County would be able to approve a CDP application from Sable that was seeking ATF authorization for the unpermitted construction activities that have already taken place, as well as authorization going forward for continued construction or other development activities related to the pipeline, such as the installation of safety valves. More information regarding the project would be necessary to come to any such conclusion at this time; however, since such an application might be found approvable by the County, we recommend that you submit a CDP application to the County as soon as possible. Please note that should the County grant approval of such a CDP application, those portions of the project that are located within the Coastal Commission's appeals jurisdiction would be appealable to the Commission and those portions of the project, if any, that are located within the Commission's original jurisdiction would require a CDP from the Commission." (AR 211.)

The Commission followed up with a letter to Sable, dated October 4, 2024 (October 4 Letter), from Kate Huckelbridge, Executive Director, which asked for confirmation that the activity referred to in the 2024 NOV fully ceased and for additional information. (AR 214-217.) According to Sable, at the time of their receipt of the October 4 Letter, Sable completed the Anomaly Repair Work at 48 of the identified

Document received by the CA 2nd District Court of Appeal.

7

anomaly sites. (AR 1751.) At that time, 45 anomaly sites were open (Open Sites) where excavation and other steps had been undertaken, but the Anomaly Repair Work had not been completed. (*Ibid.*)

On November 12, 2024, the Commission's Executive Director issued an Executive Director Cease and Desist Order (EDCDO). (AR 13311-13320.) This EDCDO orders Sable to cease and desist from conducting any further unpermitted development and to immediately take steps to avoid irreparable injury to the properties at issue, including, safely securing and stabilizing the Open Sites. (AR 13312-13313.)

On November 21, 2024, Cassidy Teufel, Deputy Director of the Commission, sent an email to Rusch of Sable stating that any work on the offshore portions of the Pipelines would also require a CDP from the Commission. (AR 247-249.)

On November 22, 2024, SCS Engineers, on behalf of Sable, sent a request to Briggs for Zoning Clearances to conduct certain Anomaly Repair Work on Line 324. (AR 6866-6868.) The request identifies that Sable had previously commenced Anomaly Repair Work and had received the 2024 NOV and the EDCDO. (AR 6867.) Sable sought both after-the-fact Zoning Clearances for the Anomaly Repair Work previously undertaken and Zoning Clearances to complete the Anomaly Repair Work in the future. (*Ibid.*)

The Commission received reports that Sable was conducting work on the offshore portions of the Pipelines beginning on November 29, 2024. (AR 4, 6-7, 8.)

On December 6, 2024, SCS Engineers, on behalf of Sable, sent a second request for Zoning Clearances. (AR 7916-7917.) "Sable is submitting two Zoning Clearance applications for this anomaly repair work: (i) an application for the anomaly repair work that is not located in proximity to environmentally sensitive habitat areas, and (ii) an application associated with 6 anomaly repairs for locations that are potentially located in proximity to areas of sensitive habitat." (AR 7916.)

"Through its inspection pig activities, Sable identified one hundred and twenty-one (121) anomalies where Anomaly Repair Work was required within unincorporated Santa Barbara County and within the Coastal Zone. Sable completed the Anomaly Repair Work at forty-eight (48) of these anomaly sites before receiving the 2024 [Notice of Violation (NOV)] and October 4 Letter. Forty-five (45) anomaly sites were open (i.e., excavation and other steps had been undertaken, but the Anomaly Repair Work had not been completed) at the time Sable received the 2024 NOV and October 4 Letter. At that time, twenty-eight (28) remaining anomaly sites had been identified for future Anomaly Repair Work that had not yet commenced." (AR 1751, fns. omitted.)

On February 10, 2025, the Commission's ECDCO expired by operation of law. (See Pub. Resources Code, § 30809, subd. (e).)

Document received by the CA 2nd District Court of Appeal.

On February 11, 2025, Ginsberg, on behalf of the Commission, sent by email a second NOV, V-9-25-001 (2025 NOV). (AR 219-226.) The 2025 NOV identified the violation as: "Unpermitted offshore development including, but not necessarily limited to, deploying sand/cement bags on the seafloor and positioning them to provide support to Sable's out-of-service offshore oil and water pipelines as part of an effort to restart SYU oil production operations and bring the pipelines back into use." (AR 219.)

On February 12, 2025, Briggs of the County sent a letter to Sable in response to the November 22, 2024 and December 6, 2024, Zoning Clearance applications, stating in part:

"On November 22, 2024 and December 6, 2024, Santa Barbara County Planning and Development received four Zoning Clearance applications for pipeline 'anomaly repair work' to Lines 324 and 325a. These applications stated that they sought to permit anomaly repair work in the enclosed descriptions of work for case numbers 24ZCl-00090, 24ZCl-00091, 24ZCl-00095, and 24ZCl-00096. Sable's position is that the Zoning Clearance process meets the requirements of the County's Local Coastal Program because it is a means for the County to determine if the activities fall within an existing Coastal Development Permit or if a new Coastal Development Permit is required.

"The County conducted a detailed review of pipeline permitting history and the Coastal Zoning Ordinance. Planning and Development concludes that this pipeline anomaly repair work is authorized by the existing permits (Final Development Plan, Major Conditional Use Permit, and associated Coastal Development Permits) and was analyzed in the prior Environmental Impact Report/Environmental Impact Statement (EIR/EIS). The County previously exercised its authority under its Local Coastal Program and delegated Coastal Act authority in approving the permits and the requested anomaly repair work is within the scope of those approved permits. (Pub. Resources Code§ 30519.) The County's assessment is consistent with the type of reviews conducted by the County, both inside and outside the Coastal Zone, on a regular basis to determine whether proposed development activities fall within the scope of existing permits. Planning and Development will be returning the Zoning Clearance applications to Sable without taking action on them. Alternatively, Sable can choose to withdraw the applications.

"This conclusion is related to the requested pipeline anomaly repair work in case numbers 24ZCl-00090, 24ZCl-00091, 24ZCl-00095, and 24ZCl-00096 and the information supplied with those applications and does not speak to permitting or jurisdiction on any other past or future work on or changes to the Pipeline and associated equipment.

9

Document received by the CA 2nd District Court of Appeal.

"This is not a: 1) permit exemption; 2) Director determination on the meaning or applicability of the provisions of the Coastal Zoning Ordinance; 3) decision on an application for a Coastal Development Permit; or 4) any other ground set forth in Article II Section 35-182. Rather, this letter confirms that the requested anomaly repair work was contemplated, analyzed, and approved in the existing Final Development Plan, Major Conditional Use Permit, associated Coastal Development Permits and certified EIR/EIS. Thus, no further application to or action by the County is required. This conclusion is not appealable to the Planning Commission, Board of Supervisors, or Coastal Commission and it does not require a Notice of Final Action. (Article II §§ 35-182; 35-181.4.)" (AR 543-544.)

On February 14, 2025, Sable sent a letter to the Commission addressing the 2024 NOV and the October 4 Letter. (AR 282-299.) Among other things, the February 14 letter points to the County's February 12 letter as confirming Sable's position that the Anomaly Repair Work does not require any further authorization under the Coastal Act or the County's LCP. (AR 295.)

On February 16, 2025, the Commission Executive Director sent a response to Sable, stating in part:

"My staff have reviewed your February 14, 2025 letter, in which, at page 4, you cite Santa Barbara County (the 'County') as concluding that 'no further authorization under the Coastal Act or LCP is required for Sable to proceed' with the work you generally describe as 'anomaly repair work' along Las Flores Pipelines CA-324 and CA-325 ('Pipeline'). Your letter suggests that Sable intends to proceed with this work, and we have received evidence suggesting that Sable may already be doing so, despite several conversations with Commission staff, Notice of Violation letters, and a previous Executive Director Cease and Desist Order ('EDCDO') directing Sable to seek Coastal Act authorization for the work already completed and to cease further work until it, too, is authorized by a new coastal development permit ('CDP'), as described in greater detail below. Although your letter argues that the work has been pre-authorized, based on the information we have received to date, I do not agree." (AR 13523.)

The February 16 letter further states:

"I am therefore informing you that if Sable does not immediately cease all unpermitted development activities, as described above, and comply with the requirement in the next paragraph, it may receive an Executive Director Cease and Desist Order ('EDCDO'), the violation of which may subject Sable to additional fines and penalties. [¶] In order to avoid issuance of an EDCDO, you must confirm, in writing, by Monday, February 17, 2025, no later than 4pm, that Sable will cease all development of the sort described in this notice unless and until it either: (a) demonstrates, to my satisfaction and receives my written confirmation, that it

Document received by the CA 2nd District Court of Appeal.

10

already possesses the necessary Coastal Act authorization for the work, which Sable has not yet demonstrated; or (b) obtains a new, final, operative CDP or other valid Coastal Act authorization specifically covering the work at issue and complies with the terms of any final, validly issued CDPs." (AR 13526.)

On February 17, 2025, the Commission, by Enforcement Counsel Stephanie Cook, sent a letter to the County expressing surprise and disappointment with the February 14 letter sent to Sable. (AR 1078.) The letter states that the Commission received notice that Sable was refusing to halt its operations. (*Ibid.*) The letter asks the County to initiate enforcement proceedings. (*Ibid.*) The letter concludes by stating that unless the Commission hears from the County by noon on February 18, the Commission will "assume that the County has declined to act and conclude that, in any event, the County has not taken action in a timely manner. And as such, we may issue our EDCDO." (AR 1079.)

On February 18, 2025, the Commission's Executive Director issued a second EDCDO (ED-25-CD-01), violation numbers V-9-25-0013 and V-9-24-0152. (AR 233-246.) This EDCDO included a notice of intent to commence cease and desist order, restoration order, and administrative order proceedings. (*Ibid.*)

After receiving the County's letter, Sable resumed onshore Anomaly Repair Work. (AR 1748; Sable Opening Brief, at pp. 4-5.)

    (C)    Legal and Administrative Proceedings

On February 18, 2025, Sable filed its initial petition in this matter asserting four causes of action: (1) damages for inverse condemnation; (2) declaratory relief for impairment of vested rights; (3) declaratory relief for inverse condemnation; and (4) declaratory relief re Public Resources Code section 30803.

On March 10, 2025, submitted a Statement of Defense to the Commission. (AR 1740-10165.)

The Commission set the matter for a formal administrative adjudication and, on March 28, 2025 issued its staff report and recommendation. (AR 117-205.)

On April 10, 2025, the Commission held a public hearing on its proposed enforcement orders against Sable. (AR 12973-13227.) At this hearing, Sable presented its defense. (*Ibid.*) At the conclusion of the hearing, following deliberation among the Commissioners, the Commission voted to issue three orders (collectively, the April 10 Orders): Cease and Desist Order No. CCC-25-CD-01 (CDO); Restoration Order No. CCC-25-RO-01 (RO); and Administrative Penalty No. CCC-25-AP3-01 (AP). (AR 12497-12522.) The AP provided an administrative penalty of $18,022,500. (AR 12501.)

Document received by the CA 2nd District Court of Appeal.

11

Also on April 10, 2025, the Commission filed a demurrer to Sable's original complaint in this Court.

On April 16, 2025, Sable filed its FAP. The FAP asserts six causes of action: (1) for writ of traditional mandamus, or alternatively for administrative mandamus; (2) for declaratory relief; (3) for inverse condemnation; (4) for declaratory relief for impairment of vested rights; (5) for declaratory relief for inverse condemnation; and (6) for declaratory relief under Public Resources Code section 30803. The first cause of action seeks issuance of a writ of mandate to set aside the NOVs, EDCDOs, and April 10 orders.

Also on April 16, 2025, the Commission filed a cross-complaint against Sable asserting two causes of action: (1) equitable relief to restrain violation of a cease and desist order; and (2) for declaratory relief.

On May 15, 2025, the Commission filed its first amended cross-complaint (FACC) asserting five causes of action: (1) equitable relief to restrain violation of a cease and desist order; (2) equitable relief to restrain violation of a restoration order; (3) equitable relief to restrain violation of an administrative civil penalty order; (4) for declaratory relief for Sable's violation of CDO CCC-25-CD-01; and (5) for declaratory relief for Sable's violation of RO CCC-25-RO-01.

On May 16, 2025, the Commission made a motion to bifurcate and separately try the writ of mandate claims before the non-writ claims. Also on May 16, the Commission filed its demurrer to the FAP.

On June 16, 2025, Sable filed its demurrer to the FACC.

On June 18, 2025, the Court sustained, without leave to amend, the Commission's demurrer to the sixth cause of action of the FAP and otherwise overruled the demurrer.

On July 23, 2025, the Court overruled Sable's demurrer to the FACC. The Court also granted the Commission's motion to bifurcate. The Court set a briefing schedule for resolution of the writ claims on the administrative record.

The parties have lodged the administrative record with the Court. The parties have filed their respective briefs.

## Analysis

(1)    Requests for Judicial Notice

Document received by the CA 2nd District Court of Appeal.

In support of the petition, Sable requests that the Court take judicial notice of selected provisions of the Coastal Zoning Ordinance of the County. This request for judicial notice is granted. (See Evid. Code, § 452, subds. (b), (c).)

In support of the petition in reply, Sable also requests that the Court take judicial notice of "the dictionary definition of 'act.' " (Reply Request for Judicial Notice [RRJN], at p. 2.) The Court will take judicial notice of the fact that definition of "act" in exhibit 2 the RRJN appears at the website for merriam-webster.com. (See Evid. Code, § 452, subd. (h).) "When interpreting a statute, Courts 'appropriately refer to the dictionary definition' to ascertain the ordinary, usual meaning of a word." (*California Public Records Research, Inc. v. County of Stanislaus* (2016) 246 Cal.App.4th 1432, 1445.) The Court may therefore appropriately consider that dictionary definitions in determining statutory meaning (as discussed below). However, judicial notice does not extend to determining that this specific definition of "act" applies in the relevant a statutory context.

(2)    Standards of Review

"Any aggrieved person shall have a right to judicial review of any decision or action of the commission by filing a petition for a writ of mandate in accordance with Section 1094.5 of the Code of Civil Procedure ...." (Pub. Resources Code, § 30801.)

"Administrative mandamus [citation] provides for judicial review of an agency decision resulting from a proceeding in which '(1) by law a hearing is required to be given, (2) evidence is required to be taken, and (3) the determination of the facts is the responsibility of the administrative agency.' [Citations.]" (*Save Oxnard Shores v. California Coastal Com.* (1986) 179 Cal.App.3d 140, 148.)

Both parties agree that, notwithstanding that Sable's first cause of action is stated in the alternative of a traditional writ of mandate under Code of Civil Procedure section 1085, the appropriate procedure and standards are for an administrative writ of mandate under section 1094.5. (Sable Notice of Motion, at p. 2; Sable Opening Brief, at p. 8; Commission Opposition Brief, at p. 8.)

"The inquiry in such a case shall extend to the questions whether the Respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the Respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).)

" ' "The general rule" ' ' in [writ of administrative mandate] actions is that judicial review ' "is conducted solely on the record of the proceeding before the administrative agency. [Citation.]" [Citation.]' [Citation.] A reviewing Court may

13

Document received by the CA 2nd District Court of Appeal.

receive additional evidence only if that evidence 'in the exercise of reasonable diligence, could not have been produced or ... was improperly excluded at the hearing before' the administrative agency. [Citations.] Thus, in reviewing the Commission's decision, Courts are 'confined to the record before the Commission unless' the Petitioner shows it 'could not have produced' the new evidence 'in the exercise of reasonable diligence or unless relevant evidence was improperly excluded at the administrative hearing.' [Citation.]" (*Sierra Club v. California Coastal Com.* (2005) 35 Cal.4th 839, 863.)

The administrative record is reviewed " 'to determine whether the Commission's findings are supported by substantial evidence.' [Citation.]" (*Reddell v. California Coastal Com.* (2009) 180 Cal.App.4th 956, 962 (*Reddell*).) " ' "Courts may reverse an agency's decision only if, based on the evidence before the agency, a reasonable person could not reach the conclusion reached by the agency." ' [Citation.]" (*Ibid.,* italics omitted.)

"It is presumed that an administrative agency regularly performed its duty, and the burden is on the party challenging the agency's actions to prove an abuse of discretion." (*Save Laurel Way v. City of Redwood City* (2017) 14 Cal.App.5th 1005, 1011.)

(3)    Arguments

Sable argues that the Commission abused its discretion in issuing the April 10 Orders because the County authorized Sable's onshore repair work. In support of this argument Sable argues that the existing onshore CDPs encompass the onshore work, that the County's determination is entitled to deference, and that the Commission lacks statutory authority to issue the CDO. Sable further argues that the OSFM compelled and approved Sable's installation of safety valves. Sable further argues that the offshore repair work was fully authorized.

The Commission disagrees and disputes each of Sable's arguments. Instead, the Commission argues that it was authorized to issue the April 10 Orders and that Sable engaged in unauthorized development in violation of the Coastal Act.

(4)    Coastal Act Requirements

Except as to emergencies not at issue here, "and in addition to obtaining any other permit required by law from any local government or from any state, regional, or local agency, any person, as defined in Section 21066, wishing to perform or undertake any development in the coastal zone, other than a facility subject to Section 25500, shall obtain a coastal development permit." (Pub. Resources Code, § 30600, subd. (a).)

Document received by the CA 2nd District Court of Appeal.

14

" 'Development' means, on land, in or under water, the placement or erection of any solid material or structure; discharge or disposal of any dredged material or of any gaseous, liquid, solid, or thermal waste; grading, removing, dredging, mining, or extraction of any materials; change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act (commencing with Section 66410 of the Government Code), and any other division of land, including lot splits, except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use; change in the intensity of use of water, or of access thereto; construction, reconstruction, demolition, or alteration of the size of any structure, including any facility of any private, public, or municipal utility; and the removal or harvesting of major vegetation other than for agricultural purposes, kelp harvesting, and timber operations which are in accordance with a timber harvesting plan submitted pursuant to the provisions of the Z'berg-Nejedly Forest Practice Act of 1973 (commencing with Section 4511). [¶] As used in this section, 'structure' includes, but is not limited to, any building, road, pipe, flume, conduit, siphon, aqueduct, telephone line, and electrical power transmission and distribution line." (Pub. Resources Code, § 30106.)

There is no essential dispute that Sable's Anomaly Repair Work constitutes "development" within the meaning of the Coastal Act. The Anomaly Repair Work involves grading and other activities within the definition of "development." There is therefore no essential dispute that performing such work requires a CDP. Sable argues both that the CDPs obtained in 1986 authorize the development activities under the Coastal Act and that the Commission does not have authority to issue the CDO based upon the development activities.

(5)    Commission Authority

"The Coastal Act 'was enacted by the Legislature as a comprehensive scheme to govern land use planning for the entire coastal zone of California. The Legislature found that "the California coastal zone is a distinct and valuable natural resource of vital and enduring interest to all the people"; that "the permanent protection of the state's natural and scenic resources is a paramount concern"; that "it is necessary to protect the ecological balance of the coastal zone" and that "existing developed uses, and future developments that are carefully planned and developed consistent with the policies of this division, are essential to the economic and social well-being of the people of this state...." ([Pub. Resources Code,] § 30001, subds. (a) and (d).)' [Citation.] The Coastal Act is to be 'liberally construed to accomplish its purposes and objectives.' (Pub. Resources Code, § 30009.) Under it, with exceptions not applicable here, any person wishing to perform or undertake any development in the coastal zone must obtain a coastal development permit 'in addition to obtaining any other permit required by law from any local government or from any state, regional, or local agency....' (Id., § 30600, subd. (a).)" (*Pacific Palisades Bowl Mobile*

15

Document received by the CA 2nd District Court of Appeal.

*Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 793–794 (*Pacific Palisades*).)

"The Coastal Act expressly recognizes the need to 'rely heavily' on local government '[t]o achieve maximum responsiveness to local conditions, accountability, and public accessibility....' (Pub. Resources Code, § 30004, subd. (a).) As relevant here, it requires local governments to develop local coastal programs, comprised of a land use plan and a set of implementing ordinances designed to promote the act's objectives of protecting the coastline and its resources and of maximizing public access. (*Id.*, §§ 30001.5, 30500–30526; [citation].) Once the California Coastal Commission certifies a local government's program, and all implementing actions become effective, the commission delegates authority over coastal development permits to the local government. (Pub. Resources Code, §§ 30519, subd. (a), 30600.5, subds. (a), (b), (c).) Moreover, '[p]rior to certification of its local coastal program, a local government may, with respect to any development within its area of jurisdiction, ... establish procedures for the filing, processing, review, modification, approval, or denial of a coastal development permit.' (*Id.*, § 30600, subd. (b)(1).) An action taken under a locally issued permit is appealable to the commission. (*Id.*, § 30603.) Thus, '[u]nder the Coastal Act's legislative scheme, ... the [local coastal program] and the development permits issued by local agencies pursuant to the Coastal Act are not solely a matter of local law, but embody state policy.' [Citation.] 'In fact, a fundamental purpose of the Coastal Act is to ensure that state policies prevail over the concerns of local government.' [Citation.]" (*Pacific Palisades, supra,* 55 Cal.4th at p. 794.)

The County established a LCP at the time of the issuance of the 1986 CDPs. There is no essential dispute that the initial construction of the Pipelines were within the scope of the CDPs as issued.

Sable argues that the Commission has no authority to issue the CDO as to the onshore work because the County issued the applicable CDP and the County determined that the work was within the scope of the CDP. The Commission argues that it has authority to issue the EDCDOs and CDO because the County failed and refused to act to enforce the Coastal Act.

"If the executive director determines that any person or governmental agency has undertaken, or is threatening to undertake, any activity that (1) may require a permit from the commission without securing a permit or (2) may be inconsistent with any permit previously issued by the commission, the executive director may issue an order directing that person or governmental agency to cease and desist. The order may be also issued to enforce any requirements of a certified local coastal program ..., or any requirements of this division which are subject to the jurisdiction of the certified program or plan, under any of the following circumstances: [¶] ... [¶] (2) The commission requests and the local government ...

Document received by the CA 2nd District Court of Appeal.

005388

declines to act, or does not take action in a timely manner, regarding an alleged violation which could cause significant damage to coastal resources. [¶] (3) The local government ... is a party to the violation." (Pub. Resources Code, § 30809, subd. (a)(2), (3).)

"If the commission, after public hearing, determines that any person or governmental agency has undertaken, or is threatening to undertake, any activity that (1) requires a permit from the commission without securing a permit or (2) is inconsistent with any permit previously issued by the commission, the commission may issue an order directing that person or governmental agency to cease and desist. The order may also be issued to enforce any requirements of a certified local coastal program ..., or any requirements of this division which are subject to the jurisdiction of the certified program or plan, under any of the following circumstances: [¶] ... [¶] (2) The commission requests and the local government ... declines to act, or does not take action in a timely manner, regarding an alleged violation which could cause significant damage to coastal resources. [¶] (3) The local government ... is a party to the violation." (Pub. Resources Code, § 30810, subd. (a)(2), (3).)

The Commission twice requested that the County take enforcement to stop Sable's construction activity. (AR 300-301, 1078-1079.) The County has taken no enforcement action. Instead, in its February 12 letter to Sable, the County staff took the position that no further application to or action by the County is required for Sable to do the Anomaly Repair Work. (AR 543-544.) The Commission points to the County's February 12 letter as inaction to authorize its own action under sections 30809 and 30810. Sable points to the County's February 12 letter as action by the County precluding Commission action under sections 30809 and 30810.

To resolve this dispute, it is necessary for the Court to interpret the language in sections 30809 and 30810 of "the local government ... declines to act." (Note: For ease of writing, the Court will refer only to section 30810. Because the language is identical and there is no apparent reason for interpreting this language different as between section 30809 and 30810, the same analysis applies to section 30809.)

"We will follow the Act's plain meaning unless doing so would lead to absurd results the Legislature did not intend. [Citation.] If we cannot determine that meaning from the statutory language, we will defer to the Commission's interpretation of the Act so long as it is not clearly erroneous. [Citation.] We may also examine legislative history [citation] and 'consider the impact of an interpretation on public policy' [citation]. But we can neither insert words into the Act that the Legislature omitted nor omit words the Legislature inserted [citation]; our job is not to rewrite statutes to conform to an assumed intent that does not appear from their language [citation]." (*Wall v. California Coastal Commission* (2021) 72 Cal.App.5th 943, 953.)

Document received by the CA 2nd District Court of Appeal.

17

However, "[w]e give no deference to the Coastal Commission's determination in deciding whether its action exceeds the authority delegated to it by the Legislature." (*City of Malibu v. California Coastal Com.* (2012) 206 Cal.App.4th 549, 560.)

Sable argues, citing a definition of "act" as "to give a decision," that the County did act. This interpretation is not, however, consistent with the overall use of language in the statute.

"Pursuant to established principles, our first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a Court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.] Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation. [Citation.] Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387.)

The language of section 30810, subdivision (a)(2) is "The commission requests and the local government … declines to act, or does not take action in a timely manner, regarding an alleged violation which could cause significant damage to coastal resources." The phrase "declines to act" exists in conjunction with the "commission requests" and both are modified by "regarding an alleged violation which could cause significant damage." The phrase "declines to act" thus more naturally reads as a negative response to the Commission's request for action. That is precisely what occurred here—the County, or at least a staff member acting for the County, declined to take enforcement action as requested by the Commission, instead finding that no further action was necessary.

The ostensible purpose of section 30810, subdivision (a) is to allow the Commission to act to stop significant damage to coastal resources, even where there is a LCP in place, where the local government does not act. It is reasonable to assume that if a local government is not acting to stop such potential damage after a request by the Commission, one reason why the local government does not act is because it disagrees with the Commission as to the need or wisdom to act. The statutory language and overall statutory purpose, however, is to protect coastal resources. Thus, under subdivision (a), if the Commission sees a violation and the local government does not, the Commission may issue a CDO.

18

Document received by the CA 2nd District Court of Appeal.

Sable's alternative interpretation is inconsistent with the statutory scheme. As Sable points out, the action by County here is not subject to appeal, within the County or to the Commission. (AR 9358.) Consequently, under this interpretation, if the County's determination that no further authorization is required is legally wrong, the Commission has no authority to act to prevent the violation. The Commission's apparent only avenue would be to seek a writ in civil Court to make the County act differently. That consequence is plainly contrary to the statutory language to allow the Commission to act on its own to protect coastal resources when the local government does not. It is, for the same reason, also inconsistent with subdivision (a)(3) that allows the Commission to issue a CDO, notwithstanding a LCP, where the local government itself is a party to the violation.

The Court finds that, under the facts presented in the AR here, the Commission had authority to issue the April 10 Orders.

(6)    Scope of 1986 CDPs

Sable's next principal argument is that the Anomaly Repair Work was authorized by the 1986 CDPs issued by the County. The County's February 12 letter addresses this issue by stating: "The County conducted a detailed review of pipeline permitting history and the Coastal Zoning Ordinance. Planning and Development concludes that this pipeline anomaly repair work is authorized by the existing permits (Final Development Plan, Major Conditional Use Permit, and associated Coastal Development Permits) and was analyzed in the prior Environmental Impact Report/Environmental Impact Statement (EIR/EIS)." (AR 543.)

This argument was rejected by the Commission in reaching its determination to issue the April 10 Orders. (See AR 6.)

The CDPs by their express terms authorize "[c]learing, grading and trenching activities for Celeron Pipeline Project as approved by 85-DP-66cz" and "[r]emainder of all construction activities for Celeron Pipeline Project as approved by 85-DP-66cz." (AR 3891, 3894.) There is no essential dispute between the parties that the CDPs authorize not only the initial construction of the Pipelines but maintenance activities consistent with the continuing operation of the Pipelines. The parties do not point to anything in the AR to suggest that additional CDPs were required or expected for maintenance activities during the time of the continuous operation of the Pipelines. This is understanding is consistent with the EIR/EIS analysis which very generally addresses maintenance.

The circumstances at the time of the April 10 Orders, however, were markedly different from those contemplated by the CDPs as issued. One significant difference is that in 2015 there was an oil spill that shut down the operation of the Pipelines. The Anomaly Repair Work did not commence until 2024, with approximately nine

19

Document received by the CA 2nd District Court of Appeal.

years of hiatus. (AR 1748-1750.) Another significant difference is that the work in 2024 was significantly more intense than prior maintenance activities. The work done by Sable involved work at 121 sites done during a single year, rather than limited work done throughout nearly a decade.

The definition of "development" under Public Resources Code section 30106 includes "construction" and "reconstruction" of any "structure." "Structure" is further defined to include a "pipe." Because the definition of "development" expressly includes both "construction" and "reconstruction," under ordinary principles of statutory construction, these terms are interpreted to mean different things. Thus, a permit that allows for "construction" would not in the ordinary sense also allow for "reconstruction." And, indeed, the CDPs expressly permit "construction" without mention of "reconstruction." The dictionary definition of "reconstruct" is sensible, including: "to construct again: as a (1): to build again: rebuild <~ing destroyed railroads> (2): to make over: repair <~ed the highways that needed it>." (Webster's 3d New Internat. Dict. (1986) p. 1897.) So "reconstruction" (the action of reconstructing (id., p. 1898)) includes concepts of both rebuilding and repair.

By including "reconstruction" as separate from "construction," it is reasonable to conclude that at some point the extent of maintenance of a project would move from construction to reconstruction, where reconstruction would be a development requiring a CDP separate from the CDP authorizing construction. Whether specific to that part of the definition of "development" or more generally, these concepts provide an analytical framework to distinguish among permitted development as authorized by a CDP and unpermitted further development requiring a separate CDP.

As a starting point, it is useful to note that the EIR/ EIS projected a 30-year life of the project, although the actual life would depend on the availability of crude oil. (AR 2580.) This projected end of life is close to when the 2015 Refugio Oil Spill occurred. In that timeframe, work needed to keep the Pipeline operational would be expected to intensify and thus be more akin to "reconstruction" than mere maintenance. This is consistent with the record of what happened. According to Commission staff, the work done by Sable far exceeds the simple repair and maintenance as described by Sable:

"Sable has excavated and reinforced or replaced the line at more than 130 separate locations along its roughly 14-mile length in the Coastal Zone, in some extended stretches, leaving behind barely any in its original condition. In addition, the type of work being done, which includes permanent removal of the insulating layer on the outside of the line, which was a critical feature of the original design." (AR 13000-13001.) "Based on information from Sable, it has excavated over 3.7 acres across its worksites in the Coastal Zone and an estimated 72,000 cubic yards of soil." (AR

20

Document received by the CA 2nd District Court of Appeal.

13001.) "Considering the additional area of habitat removal and disturbance for access roads and staging areas and stockpile areas for the worksites, the cumulative impact of the work is significantly greater." (AR 13002.)

This last point is also meaningful. Even it is assumed that the same repair and maintenance work that was actually done by Sable (or at the time of the CDO contemplated by Sable) would have ultimately have been required during continuous operation of the Pipelines, such work would have been accomplished under the CDP authorization over the course of approximately nine years. Doing all of that work in the space of a few months has a cumulative effect of a substantially increased intensity of use of the land that is more consistent with "reconstruction" than maintenance "construction."

While there are some factual disputes regarding the scope and nature of the work performed by Sable (and, as of the time of the CDO, to have been performed by Sable), the Commission determined the extent of this work to exceed the scope of "construction" as authorized by the existing CDPs. This is a different conclusion than apparently reached by the County. This disagreement raises an issue about the extent to which deference is owed to either decision. (See *Reddell, supra,* 180 Cal.App.4th 956, 968, quoting *Divers' Environmental Conservation Organization v. State Water Resources Control Bd.* (2006) 145 Cal.App.4th 246, 252, 51 Cal.Rptr.3d 497 [" '... we must also defer to an administrative agency's interpretation of a statute or regulation involving its area of expertise, unless the interpretation flies in the face of the clear language and purpose of the interpreted provision' "].)

As between the County's position and the Commission's position, the Commission's position is more persuasive. The issue presented to each agency is the same. The Commission, in addition to its position as a state-wide agency responsible for Coastal Act issues, adopted its position by action of its Commissioners with a detailed staff report incorporated by reference. (AR 12493-12494.) The County's February 12 letter is conclusory in its analysis, reflects the position of staff rather than a decisional body of the County, and contains express qualifications as to the limitations of it as a County decision. (AR 543-544.) Under these circumstances, to whatever extent deference is to be paid to these determinations, the Commission's determination is entitled to greater deference.

As a consequence, applying these concepts to the instant situation, the scope of the activity is more consistent with "reconstruction" than with "construction." The Court finds that there is substantial evidence to support the Commission's conclusion that the work is beyond the scope of the 1986 CDPs. To whatever extent this is a legal determination, the Court agrees with the Commission's characterization of such work as beyond the scope of the 1986 CDPs.

Document received by the CA 2nd District Court of Appeal.

005393

While the above discussion is focused on the Anomaly Repair Work, the same analysis and conclusion applies to both the installation of safety valves and the offshore repair work, as discussed below.

The Court concludes that Sable has not shown that the Commission was in error in determining that the prior CDPs did not authorize the work subject to the April 10 Orders. Put differently, under the standards applicable to administrative writs, Sable has not shown that its work was authorized under the Coastal Act.

(7)    OSFM Approval of Safety Valve Installation

Sable also argues that because the OSFM compelled and approved Sable's installation of safety valves, that specific work is permitted by the existing CDPs. It is significant to note that the OSFM required operators to retrofit existing pipelines with "best available technology" (BAT), i.e., an automatic shutoff system, by April 1, 2023. (Cal. Code Regs., tit. 19, § 2108, subd. (c).) The work subject to the April 10 Orders occurred in 2024 as part of the extensive work performed by Sable. For the same reasons discussed above, whether or not specific work could under different conditions been considered as within the scope of the existing CDPs, the Commission did not err in determining that the extensive work conducted by Sable was beyond the scope of the 1986 CDPs and hence unpermitted.

(8)    Offshore Work

Sable further argues that the Offshore Repair Work was fully authorized by the prior CDP. This argument is subject to the same analysis as discussed above. The offshore portion of the Pipelines was constructed under a CDP issued by the Commission (rather than the County) in 1988. (AR 61-62.) The Offshore Repair Work included within the unpermitted work identified in the April 10 Orders include the deployment and positioning of sand and concrete bags to provide structural support below section from which the seafloor had scoured or eroded. (AR 6.) As with the onshore work, there is a factual dispute between the parties as to the characterization of the work, among other things, as being within the scope of the 1988 CDPs. For the same reasons discussed above, whether or not specific work could under different conditions have been considered as within the scope of the existing CDPs, the Commission did not err in determining that the extensive work conducted by Sable was beyond the scope of the 1988 CDP and hence unpermitted.

(9)    Conclusion

As the above discussion demonstrates, the issue before the Court is not whether the specific work conducted by Sable was or is ultimately necessary or appropriate for pipeline safety. The issue before the Court is whether the Commission abused its

Document received by the CA 2nd District Court of Appeal.

005394

discretion in issuing the April 10 Orders under the standards for review by petition for administrative writ of mandate.

Based on the foregoing analysis and a review of all of the arguments of the parties and the AR, the Court finds the Commission's factual findings are supported by substantial evidence and that Sable has not met its burden to show an abuse of discretion by the Commission in issuing the April 10 Orders.

Accordingly, the petition for administrative mandate as set forth in the first cause of action of Sable's FAP will be denied.


Thomas P. Anderle, Judge

Document received by the CA 2nd District Court of Appeal.

23

**005395**

1   ROB BONTA
    Attorney General of California
2   BRANDON S. WALKER SBN. 254581
    Supervising Deputy Attorney General
3   JACK C. NICK SBN. 160196
    ISABELLA A. PANUCCINI SBN. 318984
4   Deputy Attorneys General
    1300 I Street, Suite 125
5   Sacramento, CA 95814
    Telephone: (916) 210-6395
6   Fax: (916) 327-2319
    E-mail: Brandon.Walker@doj.ca.gov
7   *Attorneys for Defendant State of California*

**ELECTRONICALLY FILED**
Superior Court of California,
County of Kern
By: Marina Mercado
Deputy Clerk
**12/5/25 1:54 PM**

*Exempt from Filing Fees Pursuant to*
*Government Code § 6103*

8   SUPERIOR COURT OF THE STATE OF CALIFORNIA

9   COUNTY OF KERN

10  METROPOLITAN DIVISION

11

12

13  **Pacific Pipeline Company, A Delaware Corporation,**

14                                          Plaintiff,

15      v.

16  **State of California and DOES 1 through 25,**

17                                          Defendants.

18

Case No. BCV25103508

**DECLARATION OF BRANDON S.
WALKER IN SUPPORT OF MOTION
TO CHANGE VENUE (Vol. 2 of 3)**

Date:       February 3, 2026
Time:       8:30 a.m.
Dept:       H
Judge:      Hon. Bernard C. Barmann, Jr.

Action Filed: September 29, 2025

19

20

21

22

23

24

25

26

27

28

1

# EXHIBIT "D"

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C. 20530
BRADLEY R. O'BRIEN (CA Bar Number: 189425)
Senior Attorney
ANGELA MO (CA Bar Number: 262113)
Trial Attorney
Environmental Enforcement Section
United States Department of Justice
301 Howard Street, Suite 1050
San Francisco, California 94105
Tel: (415) 744-6484;
Tel: (202) 514-1707
E-mail: brad.obrien@usdoj.gov
E-mail: angela.mo@usdoj.gov
Counsel for Plaintiff United States of America

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and the PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* DEPARTMENT OF FISH AND WILDLIFE, PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* CENTRAL COAST REGIONAL WATER QUALITY CONTROL BOARD, *ex rel.* CALIFORNIA DEPARTMENT OF PARKS AND RECREATION, *ex rel.* CALIFORNIA STATE LANDS COMMISSION, *ex rel.* CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S OFFICE OF STATE FIRE MARSHAL, and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, <br><br> Plaintiffs, <br><br> v. <br><br> PLAINS ALL AMERICAN PIPELINE, L.P. and PLAINS PIPELINE, L.P., <br><br> Defendants. | Civil Action No. <br><br> 2:20-cv-02415 <br><br> **CONSENT DECREE** |

1  | XAVIER BECERRA
2  | Attorney General of California
   | ERIC M. KATZ
3  | Supervising Deputy Attorney General
   | MICHAEL ZARRO (CA Bar Number: 110171)
4  | JESSICA BARCLAY-STROBEL (CA Bar Number: 280361)
5  | Deputy Attorneys General
   | 300 South Spring Street, Suite 1702
6  | Los Angeles, California 90013
   | Tel: (213) 269-6635
7  | E-mail: Jessica.BarclayStrobel@doj.ca.gov
8  | *Counsel for Plaintiffs California Department of Fish and Wildlife, Central Coast*
   | *Regional Water Quality Control Board, and California Department of Forestry*
9  | *and Fire Protection's Office of State Fire Marshal*

10 | XAVIER BECERRA
11 | Attorney General of California
   | CHRISTINA BULL ARNDT
12 | Supervising Deputy Attorney General
13 | NICOLE RINKE (CA Bar Number: 257510)
   | MITCHELL E. RISHE (CA Bar Number: 193503)
14 | Deputy Attorney General
15 | 300 South Spring Street, Suite 1702
   | Los Angeles, California 90013
16 | Tel: (213) 269-6394
17 | E-mail: Mitchell.Rishe@doj.ca.gov
   | *Counsel for Plaintiffs California Department of Parks and Recreation and*
18 | *California State Lands Commission*

19 | MARGARET WU (CA Bar Number: 116588)
20 | Deputy General Counsel
   | BARTON LOUNSBURY (CA Bar Number: 253895)
21 | Senior Counsel
   | University of California
22 | Office of the General Counsel
23 | 1111 Franklin Street, 8th Floor
   | Oakland, California 94607-5200
24 | Tel: (510) 987-9800
25 | E-mail: barton.lounsbury@ucop.edu
   | *Counsel for Plaintiff The Regents of the University of California*

26 |
27 |
28 |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

# TABLE OF CONTENTS

I.      BACKGROUND ................................................................ - 5 -

II.     JURISDICTION AND VENUE ............................................ - 6 -

III.    APPLICABILITY ............................................................. - 7 -

IV.     DEFINITIONS ................................................................ - 7 -

V.      CIVIL PENALTIES ......................................................... - 13 -

VI.     NATURAL RESOURCE DAMAGES ................................... - 17 -

VII.    TRUSTEES' MANAGEMENT AND APPLICABILITY

        OF JOINT NRD FUNDS ................................................. - 21 -

VIII.   TRUSTEES' MANAGEMENT OF RECREATIONAL

        USE FUNDS .................................................................. - 22 -

IX.     INJUNCTIVE RELIEF ..................................................... - 23 -

X.      CORRECTIVE ACTION ORDER ....................................... - 27 -

XI.     STIPULATED PENALTIES ............................................... - 27 -

XII.    FORCE MAJEURE ......................................................... - 35 -

XIII.   DISPUTE RESOLUTION ................................................. - 37 -

XIV.    REPORTING .................................................................. - 39 -

XV.     CERTIFICATION ........................................................... - 40 -

XVI.    INFORMATION COLLECTION AND RETENTION .............. - 40 -

XVII.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ......... - 43 -

XVIII.  TRANSFER AND ACQUISITION OF ASSETS ...................... - 49 -

XIX.    COSTS .......................................................................... - 50 -

XX.     NOTICES ...................................................................... - 51 -

XXI.    EFFECTIVE DATE .......................................................... - 54 -

XXII.   RETENTION OF JURISDICTION ...................................... - 54 -

XXIII.  MODIFICATION ............................................................ - 54 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

XXIV.    TERMINATION ................................................................- 55 -

XXV.    PUBLIC PARTICIPATION................................................- 56 -

XXVI.   SIGNATORIES/SERVICE ...............................................- 56 -

XXVII.  INTEGRATION ..............................................................- 57 -

XXVIII. FINAL JUDGMENT .........................................................- 57 -

XXIX.   26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION ................- 57 -

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

1       A.    WHEREAS, on or about May 19, 2015, a hazardous liquid pipeline

2 known as the Line 901 pipeline ("Line 901") owned and operated by Plains

3 Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline, L.P.,

4 (jointly, "Plains" or "Defendants"), failed and discharged approximately 2,934

5 barrels of heavy crude-oil ("Refugio Incident") in Santa Barbara County,

6 California.  A portion of the oil reached the Pacific Ocean and coastal areas such

7 as Refugio State Beach.  The Refugio Incident adversely impacted Natural

8 Resources belonging to, managed by, held in trust by, appertaining to, or

9 otherwise controlled by the United States and the State of California

10 ("California" or the "State").

11       B.    WHEREAS, cleanup actions began immediately after the Refugio

12 Incident at the direction of a Unified Command established by the United States

13 Coast Guard ("USCG") and the State of California Department of Fish and

14 Wildlife ("CDFW"), Office of Spill Prevention and Response ("OSPR").  The

15 Unified Command was comprised of the United States, State agencies, the

16 County of Santa Barbara, and Plains.

17       C.    WHEREAS, on May 21, 2015, the United States Department of

18 Transportation's Pipeline and Hazardous Materials Safety Administration

19 ("PHMSA") issued Plains a Corrective Action Order ("Original CAO"), CPF No.

20 5-2015-5011H, which was subsequently amended on June 3, 2015 ("CAO

21 Amendment No. 1"), November 12, 2015 ("CAO Amendment No. 2"), and June

22 16, 2016 ("CAO Amendment No. 3"), (collectively, "the PHMSA CAO").  The

23 PHMSA CAO directed Plains, among other things, to purge Line 901 and a

24 portion of the adjoining Line 903 pipeline ("Line 903"), between Plains' Gaviota

25 and Pentland pump stations, and to keep Line 901 and the purged sections of

26 Line 903 shut down until the actions required by the PHMSA CAO were

27 satisfactorily completed.

28

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 1 -

1    D.    WHEREAS, on May 19, 2016, PHMSA issued a Failure

2  Investigation Report, which included PHMSA's findings of the "proximate or

3  direct" causes and the "contributing" causes of the Refugio Incident.

4    E.    WHEREAS, Defendants reimbursed Plaintiffs' costs incurred for

5  cleanup, and Plaintiffs have no known unreimbursed claims for cleanup costs

6  arising from the Refugio Incident.

7    F.    WHEREAS, CDFW incurred certain additional costs arising from

8  the administration and civil enforcement of pollution laws, including attorneys'

9  fees that have been reimbursed by Plains.

10    G.    WHEREAS, Plains represents that it has implemented and will

11  continue to utilize an electronic tracking tool and software for maintenance

12  activities, including those activities related to mainline valves.  The software

13  tracks which maintenance activities are performed, who performs the activity,

14  when prior notifications of maintenance activities by field personnel are received,

15  when problems requiring maintenance are first discovered, and when

16  maintenance problems are corrected.  Plains maintains a separate software

17  program to track the training and qualifications of all maintenance personnel.

18    H.    WHEREAS, Plains represents that, following the Refugio Incident

19  and pursuant to PHMSA's CAO, Plains performed a comprehensive review of its

20  Emergency Response Plan and Training Program, and revised and updated its

21  Response Plan for Onshore Oil Pipelines for Line 901 and Line 903 ("Bakersfield

22  District Response Zone Plan") to reflect modifications resulting from the review

23  and the incorporation of lessons learned.  As part of the revision, Plains identified

24  the locations of culverts along the pipelines' rights-of-way and provided

25  containment and recovery techniques for responding to spills that may occur near

26  those culverts.  Plains provided drafts of the updated Bakersfield District

27  Response Zone Plan to PHMSA, incorporated comments provided by PHMSA,

28  and received approval of the revised plan from PHMSA on September 26, 2017.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

1    I.    WHEREAS, Plains represents that it also created a more detailed
2  Geographic Information System ("GIS") based online Tactical Response Plan for
3  its onshore oil pipelines in Southern California, including Line 2000 and the
4  operational portion of Line 903, that, among other things, identifies culverts
5  along the pipelines' rights-of-way, potential receptors and the equipment,
6  supplies and resources that would be necessary to respond to a spill occurring at
7  any given location along those pipelines, identifies the sources and locations for
8  obtaining those resources, and, in some instances, establishes stored inventories
9  of those resources in specific locations.  Plains represents that it intends to keep
10  its Tactical Response Plan updated and available for use in drills and spill
11  response, and that it will make the Tactical Response Plan available to the
12  Plaintiffs upon reasonable request and as needed in connection with a drill or
13  response to a spill.

14    J.    WHEREAS, Plains represents that Plains personnel responding to
15  incidents that trigger the standup of an incident command structure ("ICS") have
16  been provided ICS training appropriate to their responsibilities.

17    K.    WHEREAS, the relevant Natural Resources trustees ("Trustees") for
18  the Refugio Incident are the United States Department of the Interior ("DOI");
19  United States Department of Commerce, on behalf of the National Oceanic and
20  Atmospheric Administration ("NOAA"); CDFW; California Department of Parks
21  and Recreation ("CDPR"); California State Lands Commission ("CSLC"); and
22  The Regents of the University of California ("UC").

23    L.    WHEREAS, pursuant to Section 1006 of the Oil Pollution Act
24  (''OPA''), 33 U.S.C. 2701, *et seq*., the United States and the State Trustees
25  allege that oil from the Refugio Incident caused injuries to Natural Resources,
26  including birds, marine mammals, shoreline and subtidal habitats, and also had
27  an impact upon human uses of Natural Resources and other public resources.
28  The Federal Trustees are designated pursuant to the National Contingency Plan,

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

1   40 C.F.R. § 300.600 and Executive Order 12777. CDFW and CDPR are
2   designated state trustees pursuant to the National Contingency Plan, 40 C.F.R.
3   § 300.605, and the Governor's Designation of State Natural Resource Trustees
4   pursuant to Section 1006(b)(3) of OPA and the Comprehensive Environmental
5   Response, Compensation and Liability Act of 1980. In addition, CDFW has state
6   natural resource trustee authority pursuant to California Fish and Game Code
7   §§ 711.7 and 1802 and the Lempert-Keene-Seastrand Oil Spill Prevention and
8   Response Act (California Government Code § 8670.1 *et seq.*). CDPR and UC
9   have jurisdiction over natural resources within the state park system and the UC
10  Natural Reserve System, respectively, which are held in trust for the people of
11  the State of California. CSLC is a state trustee pursuant to its jurisdiction under
12  Public Resources Code § 6301 and Civil Code § 670.
13      M.    WHEREAS, after the Refugio Incident, the Trustees and Defendants
14  entered into a cooperative Natural Resource Damage Assessment process
15  pursuant to 15 C.F.R. § 990.14, whereby the Trustees and Defendants jointly and
16  independently planned and conducted a number of injury assessment activities.
17  These activities included gathering and analyzing data and other information that
18  the Trustees used to determine and quantify resource injuries and damages. As a
19  result of this process and other activities, the Trustees identified several
20  categories of injured and damaged Natural Resources, including birds, marine
21  mammals, and shoreline and subtidal habitats, as well as effects to human
22  use/recreation resulting from impacts on these Natural Resources, and determined
23  the cost to restore, rehabilitate, replace, or acquire the equivalent of injured
24  Natural Resources. By entering this Consent Decree, Defendants do not admit or
25  agree that the Trustees' NRD findings and determinations are accurate.
26      N.    WHEREAS, due to the specific facts surrounding the Refugio
27  Incident, including the timing, degree, and nature of the spill and the affected
28

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 4 -

1  environment, the Trustees will not seek additional damages, costs, or expenses
2  for Natural Resources resulting from the Refugio Incident.

3      O.    WHEREAS, Plains agrees to reimburse costs incurred by the
4  Trustees in connection with the NRDA through November 15, 2018, and will not
5  reimburse costs incurred by the Trustees in connection with the NRDA after that
6  date.

7      P.    WHEREAS, by entering into this Consent Decree, Plains does not
8  admit the allegations in the Complaint filed in this action, or any liability to the
9  Plaintiffs.

10      Q.    WHEREAS, on January 28, 2019, PHMSA initiated a regularly-
11  scheduled "Integrated Inspection" of a portion of Defendants' Regulated
12  Pipelines, as described below, and other pipeline facilities and records, pursuant
13  to 49 U.S.C. § 60117.

14      R.    WHEREAS, the Parties agree that settlement of this matter without
15  further litigation is in the public interest and that the entry of this Consent Decree
16  is the most appropriate means of resolving this action.

17      S.    WHEREAS, the Parties agree and the Court by entering this Consent
18  Decree finds, that this Consent Decree:  (1) has been negotiated by the Parties at
19  arm's-length and in good faith; (2) will avoid prolonged litigation between the
20  Parties; (3) is fair and reasonable; and (4) furthers the objectives of the federal
21  and state environmental protections, and the federal and state pipeline safety
22  laws.

23                **I.    BACKGROUND**

24      The United States, on behalf of PHMSA, the United States Environmental
25  Protection Agency ("EPA"), DOI, NOAA, and USCG; and the People of the
26  State of California *Ex Relatione* CDFW, CDPR, CSLC, UC, the California
27  Central Coast Regional Water Quality Control Board ("RWQCB"), and the
28  California Department of Forestry and Fire Protection's - Office of the State Fire

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

1   Marshal ("OSFM"), filed a Complaint in this matter pursuant to the Clean Water

2   Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*, and associated regulations and orders;

3   OPA, 33 U.S.C. §§ 2701 *et seq.*, and associated regulations and orders; the

4   federal Pipeline Safety Laws, 49 U.S.C. §§ 60101 *et seq.*, and associated

5   regulations and orders; the Lempert-Keene-Seastrand Oil Spill Prevention and

6   Response Act, California Government Code §§ 8670.1 *et seq.* and associated

7   regulations; California Fish and Game Code §§ 2014, 5650, 5650.1, 12016,

8   13013; California Water Code §§ 13350, 13385; and the Elder California

9   Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.* The

10  Complaint against Plains, *inter alia*, asserts allegations of violations, and seeks

11  penalties, injunctive relief, and Natural Resource Damages.

12      NOW, THEREFORE, before the trial of any claims and without

13  adjudication or admission of any issue of fact or law and with the consent of the

14  Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

15              **II.    JURISDICTION AND VENUE**

16      1.    This Court has jurisdiction over the subject matter of the United

17  States' claims in this action pursuant to Section 311(b)(7)(E) and (n) of the CWA,

18  33 U.S.C. § 1321(b)(7)(E) and (n), Section 1017(b) of OPA, 33 U.S.C. § 2717(b);

19  Sections 60120 and 60122 of the Pipeline Safety Laws, 49 U.S.C. §§ 60120 and

20  60122; and 28 U.S.C. §§ 1331, 1345, and 1355. This Court has supplemental

21  jurisdiction over the State law claims pursuant to 28 U.S.C. § 1367. To the extent

22  the OPA presentment requirement described in 33 U.S.C. § 2713 applies, the

23  United States and the State Agencies have satisfied the requirement.

24      2.    Venue is proper in this District pursuant to Section 311(b)(7)(E) of

25  the CWA, 33 U.S.C. § 1321(b)(7)(E), Section 1017(b) of OPA,

26  33 U.S.C. § 2717(b); Section 60120 of the Pipeline Safety Laws,

27  49 U.S.C. § 60120; and 28 U.S.C. §§ 1391 and 1395(a), because Plains

28

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 6 -

1  does business in this District and the alleged claims occurred in this District.

2      3.    For purposes of this Consent Decree or any action to enforce this
3  Consent Decree, Defendants consent to the Court's jurisdiction over this Consent
4  Decree for such action and Defendants consent to venue in this judicial district.
5  For purposes of this Consent Decree and without admission of liability,
6  Defendants agree that the Complaint states claims upon which relief may be
7  granted.

8  ## III.  APPLICABILITY

9      4.    Subject to the terms herein, the obligations of this Consent Decree
10  apply to and are binding upon the Parties and any successors, assigns, as well as
11  any other entities or persons otherwise bound by law to comply with this Consent
12  Decree.

13      5.    Defendants shall provide a copy of this Consent Decree to all
14  officers, employees, and agents whose duties might reasonably include ensuring
15  compliance with any provision of this Consent Decree, as well as to any
16  contractor retained for the purpose of performing work required under this
17  Consent Decree.  Defendants shall condition any such contract upon performance
18  of the work in conformity with the terms of this Consent Decree by specifying
19  that contractors are obligated to perform work in compliance with this Consent
20  Decree.

21      6.    In any action to enforce this Consent Decree, Defendants shall not
22  raise as a defense the failure by any of their officers, directors, employees,
23  agents, or contractors to take any actions necessary to comply with the provisions
24  of this Consent Decree.

25  ## IV.  DEFINITIONS

26      7.    Terms used in this Consent Decree that are defined in the CWA,
27  OPA, Pipeline Safety Laws, the Lempert-Keene-Seastrand Oil Spill Prevention
28  and Response Act, and the Elder California Pipeline Safety Act of 1981 shall

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 7 -

1    have the meanings assigned to them in these statutes and their regulations, unless

2    otherwise provided in this Consent Decree.  Whenever the terms set forth below

3    are used in this Consent Decree, the following definitions shall apply:

4          "Appendix A" is the set of maps that generally depict Lines 901, 903, and

5    2000;

6          "Appendix B" is the Injunctive Relief that Plains is required to perform

7    under this Consent Decree;

8          "Appendix C" is intentionally left blank;

9          "Appendix D" is the list of remaining corrective actions from the PHMSA

10    CAO that Plains is still required to implement under this Consent Decree.  For

11    the terms of the PHMSA CAO, *see*

12    https://primis.phmsa.dot.gov/comm/reports/enforce/CaseDetail_cpf_520155011H

13    .html?nocache=4888#_TP_1_tab_1;

14          "CDFW" shall mean the California Department of Fish and Wildlife and

15    any of its successor departments or agencies;

16          "CDPR" shall mean the California Department of Parks and Recreation

17    and any of its successor departments or agencies;

18          "Complaint" shall mean the Complaint filed by the Plaintiffs in this action;

19          "Consent Decree" shall mean this Consent Decree and all Appendices

20    attached hereto;

21          "Control Room Management Plan" shall mean Plains' Control Room

22    Management Plan, dated October 2019, and delivered to PHMSA electronically

23    on October 21, 2019, from counsel for Defendants;

24          "Control Center General Procedures" shall mean Plains' Control Center

25    General Procedures, dated October 2019, and delivered to PHMSA electronically

26    on October 21, 2019, from counsel for Defendants;

27          "CSLC" shall mean the California State Lands Commission and any of its

28    successor departments or agencies;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

1      "Day" shall mean a calendar day unless expressly stated to be a working

2  day.  In computing any period of time under this Consent Decree, the rules set

3  forth in Rule 6 of the Federal Rules of Civil Procedure shall apply;

4      "Defendants" shall mean Plains All American Pipeline, L.P. and Plains

5  Pipeline, L.P.;

6      "Delivery Lines" as stated in Appendix B shall mean any pipeline that

7  generally operates to move oil from a delivery meter on a pipeline or facility to

8  another pipeline or facility in close proximity;

9      "DOI" shall mean the United States Department of the Interior, including

10  its bureaus and agencies, and any of its successor departments or agencies;

11      "Elder California Pipeline Safety Act" shall mean the Elder California

12  Pipeline Safety Act of 1981, California Government Code §§ 51010 *et seq.*;

13      "EPA" shall mean the United States Environmental Protection Agency and

14  any of its successor departments or agencies;

15      "Effective Date" shall have the definition provided in Section XXI

16  (Effective Date);

17      "Federal Trustees" shall mean DOI and NOAA in their capacities as

18  Natural Resource Trustees;

19      "Integrity Management Plan" or "IMP" shall mean Plains' Integrity

20  Management Plan, dated September 2019, as delivered to PHMSA by letter dated

21  November 19, 2019, from counsel for Defendants;

22      "Line 901" is Defendants' 24-inch diameter crude-oil pipeline that

23  extends approximately 10.7 miles in length from the Los Flores Pump Station to

24  the Gaviota Pump Station, in Santa Barbara County, California, as generally

25  depicted in Appendix A;

26      "Line 903" is Defendants' 30-inch diameter crude-oil pipeline that extends

27  approximately 129 miles in length from the Gaviota Pump Station in Santa

28  Barbara County, California to the Emidio Pump Station in Kern County,

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 9 -

1  California, with intermediate stations at Sisquoc Mile Post 38.5 and Pentland

2  Mile Post 114.57, as generally depicted in Appendix A;

3      "Line 2000" is Defendants' 20-inch diameter pipeline that extends

4  approximately 130 miles in length and transports crude-oil produced in the outer

5  continental shelf and the San Joaquin Valley.  Line 2000 runs from Bakersfield,

6  California, over the Tehachapi Mountains and through the Grapevine I-5 corridor

7  and extends to delivery locations in the Los Angeles metropolitan area, as

8  generally depicted in Appendix A;

9      "Mainline pipeline" as stated in Appendix B shall mean the principal

10  pipeline or the parallel pipeline in a given pipeline system, excluding connected

11  lateral lines or branch lines that are used locally to deliver product either into the

12  mainline pipeline from, or out of the mainline pipeline to, a nearby facility or a

13  third-party line;

14      "Natural Resource" and "Natural Resources" shall mean land, fish,

15  mammals, birds, wildlife, biota, air, water, ground water, drinking water supplies,

16  and other such resources belonging to, managed by, held in trust by, appertaining

17  to, or otherwise controlled by the United States and/or the State or any

18  subdivision thereof, and shall also mean the services provided by such resources

19  to other resources or to humans;

20      "Natural Resource Damages" or "NRD" shall mean all damages, including

21  restoration or rehabilitation costs, recoverable by the United States or State

22  Trustees for injuries to, destruction of, loss of, or loss of use of, natural resources

23  including any services such natural resources provide, including the reasonable

24  costs of assessing the damage, as described in 33 U.S.C. § 2702(b)(2)(A),

25  resulting from the Refugio Incident;

26      "Natural Resource Damage Assessment" or "NRDA" shall mean the

27  process of collecting, compiling, and analyzing information, statistics, or data

28  through prescribed methodologies to determine damages for injuries to Natural

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 10 -

1  Resources, as described in 15 C.F.R. Part 990, resulting from the Refugio

2  Incident;

3      "NRD Payment" shall mean the payment Defendants are required to pay

4  for the Natural Resource Damages as described in Section VI (Natural Resource

5  Damages);

6      "Natural Resource Trustees" or "Trustees" are those federal and state

7  agencies or officials designated or authorized pursuant to the CWA, OPA, and/or

8  applicable state laws to act as Trustees for the Natural Resources belonging to,

9  managed by, controlled by, or appertaining to the United States or the State.

10  Participating Trustees in the Natural Resource Damage Assessment and in this

11  Consent Decree are DOI, NOAA, CDFW, CDPR, CSLC, and UC;

12      "NOAA" shall mean the National Oceanic and Atmospheric

13  Administration and any of its successor departments or agencies;

14      "Oil Spill Liability Trust Fund" or "OSLTF" shall mean, *inter alia*, the

15  fund established pursuant to 26 U.S.C. § 9509, including the claim-

16  reimbursement provisions set forth in 33 U.S.C. § 2712;

17      "OSFM" shall mean the California Department of Forestry and Fire

18  Protection's - Office of the State Fire Marshal and any of its successor

19  departments or agencies;

20      "Paragraph" shall mean a portion of this Consent Decree identified by an

21  Arabic numeral;

22      "Parties" shall mean the Plaintiffs and Defendants, collectively;

23      "PHMSA" shall mean the United States Department of Transportation,

24  Pipeline and Hazardous Materials Safety Administration and any of its successor

25  departments or agencies;

26      "PHMSA Corrective Action Order" or "PHMSA CAO" shall mean the

27  Original CAO issued on May 21, 2015, by PHMSA, which was subsequently

28  amended on June 3, 2015, November 12, 2015, and June 16, 2016;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 11 -

1     "Pipeline Safety Laws" shall mean 49 U.S.C. §§ 60101 *et seq.*, and

2 regulations promulgated thereunder, including 49 C.F.R. Parts 190-199;

3     "Plaintiffs" shall mean the United States and the State Agencies;

4     "Refugio Incident" shall mean the release of approximately 2,934 barrels

5 of crude-oil from Plains' Line 901 Pipeline, in Santa Barbara County, California

6 on or about May 19, 2015;

7     "Regulated Pipeline" shall mean any pipeline operated by Plains subject to

8 regulation under 49 C.F.R. Subchapter D, 19 California Code of Regulations Div.

9 1 Ch. 14, or the pipeline safety regulations of any other state certified by PHMSA

10 pursuant to 49 U.S.C. § 60105, but excludes facilities other than pipelines;

11     "Requests for Information" or "RFI" shall mean PHMSA's RFIs dated

12 August 19, 2015, August 21, 2015, and September 1, 2016.  RFIs shall also refer

13 to PHMSA's subpoenas issued to Plains dated July 27, 2016 and June 2, 2017;

14     "Restore" or "Restoration" shall mean any action or combination of actions

15 to restore, rehabilitate, replace or acquire the equivalent of any Natural Resource

16 and its services, including Natural Resource-based recreational opportunities that

17 were injured, lost, or destroyed as a result of the Refugio Incident;

18     "RWQCB" shall mean the California Central Coast Regional Water

19 Quality Control Board and any of its successor departments or agencies;

20     "Section" shall mean a portion of this Consent Decree identified by a

21 Roman numeral;

22     "Segment" as stated in Appendix B shall mean any contiguous portion of a

23 pipeline system for which a single hydrostatic test or ILI may be performed, as

24 determined by Defendants;

25     "State Agencies" shall mean the People of the State of California, *Ex*

26 *Relatione* CDFW, CDPR, CSLC, OSFM, RWQCB, and UC.  The State Agencies

27 do not include any entity or political subdivision of the State of California other

28 than those agencies herein designated the "State Agencies";

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

1    "State Trustees" shall mean CDFW, CDPR, CSLC, and UC in their
2    capacities as Natural Resource Trustees;

3       "United States" shall mean the United States of America, on behalf of
4    PHMSA, EPA, DOI, NOAA, and USCG;

5       "UC" shall mean The Regents of the University of California and any of its
6    successor departments or agencies; and

7       "USCG" shall mean the United States Coast Guard and any of its
8    successor departments or agencies.

9                    **V.    CIVIL PENALTIES**

10   A.    Within thirty (30) Days after the Effective Date, Defendants shall pay to
11   the United States, CDFW, and RWQCB a total civil penalty of twenty-four
12   million dollars ($24,000,000), together with interest accruing from the date on
13   which the Consent Decree is lodged with the Court, at a rate specified in 28
14   U.S.C. § 1961 (the "Penalty Payment"). The Penalty Payment shall be allocated
15   as follows:

16       8.    Penalty Payment to the United States (PHMSA). For violations of
17   the Pipeline Safety Laws alleged in the United States' Complaint, Defendants
18   shall pay to the United States a civil penalty of fourteen million five hundred
19   thousand dollars ($14,500,000), together with a proportionate share of the interest
20   accrued on the Penalty Payment. The Penalty Payment shall be made as follows:

21              a.    Thirteen million two hundred fifty thousand dollars
22              ($13,250,000) attributed to Plains' alleged Pipeline Safety Law
23              violations; and

24              b.    One million two hundred fifty thousand dollars ($1,250,000)
25              attributed to Plains' alleged non-compliance with the RFIs.

26              c.    Payment shall be made by FedWire Electronic Funds Transfer
27              ("EFT") to the United States Department of Justice in accordance
28              with written instructions to be provided to Defendants by the

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 13 -

Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Central District of California Western Division after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendants shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

> Megan Prout
> Senior Vice President
> Commercial Law and Litigation
> Plains All American Pipeline, L.P.
> 333 Clay Street, Suite 1600
> Houston, TX 77002

on behalf of Defendants. Defendants may change the individual to receive payment instructions on their behalf by providing written notice of such change to the United States in accordance with Section XX (Notices).

d.    At the time of payment, Defendants shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, which shall state the payment is for the civil penalty owed pursuant to this Consent Decree in the *United States of America and the People of the State of California v. Plains All American Pipeline, L.P., et al.*, and shall reference the Civil Action Number assigned to this case, CDCS Number, and DOJ case number 90-5-1-1-11340, to the United States in accordance with Section XX (Notices).

9.    Penalty Payment to the United States (EPA) shared with CDFW and RWQCB. The Penalty Payment shall be allocated as follows:

a.    As a CWA penalty for violations of 33 U.S.C. § 1321(b) and

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 14 -

the California statutes alleged in the Complaint other than California Government Code § 8670.66(b), Defendants shall pay a civil penalty of nine million four hundred fifty thousand dollars ($9,450,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made as follows:

1)    To CDFW, one million twenty-five thousand dollars ($1,025,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife. The check shall be sent by overnight or certified mail to:

> California Department of Fish and Wildlife
> Office of Spill Prevention and Response
> Attn: Katherine Verrue-Slater, Senior Counsel
> P.O. Box 160362
> Sacramento, California 95816-0362

The check shall reference the "Refugio Oil Spill." CDFW shall deposit the money as follows: one million dollars ($1,000,000) into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70; and twenty-five thousand dollars ($25,000) into the Fish and Wildlife Pollution Account pursuant to California Fish and Game Code §§ 12017 and 13011.

2)    To RWQCB, two million five hundred thousand dollars ($2,500,000), together with a proportionate share of the interest accrued on the Penalty Payment. The Penalty Payment shall be made by check payable to the "State Water Pollution Cleanup and Abatement Account" and sent to:

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

State Water Resources Control Board
Division of Administrative Services, ATTN: Civil
Liability Payment
P.O. Box 1888
Sacramento, California 95812-1888

The check shall reference the "Refugio Oil Spill."

3)      To the United States, five million nine hundred twenty-five thousand dollars ($5,925,000), together with a proportionate share of the interest accrued on the Penalty Payment, by EFT to the United States Department of Justice, in accordance with instructions to be provided to Defendants by the FLU of the United States Attorney's Office for the Central District of California Western Division. Such monies are to be deposited in the OSLTF. The Penalty Payment shall reference the Civil Action Number assigned to this case, DOJ case number 90-5-1-1-11340, and USCG reference numbers FPNs A15017 and A15018, and shall specify that the payment is made for CWA civil penalties to be deposited into the OSLTF pursuant to 33 U.S.C. § 1321(s), Section 4304 of Pub. L. No. 101-380, and 26 U.S.C. § 9509(b)(8). Any funds received after 11:00 a.m. Eastern Standard Time shall be credited on the next business day. Defendants shall simultaneously provide notice of payment in writing, together with a copy of any transmittal documentation to EPA and the United States in accordance with Section XX (Notices) of this Consent Decree, and to EPA by email to acctsreceivable.CINWD@epa.gov and to EPA and the National Pollution Funds Center at the following addresses:

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 16 -

U.S. Environmental Protection Agency
Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268

and

Patricia V. Kingcade
Attorney Advisor
National Pollution Funds Center
U.S. Coast Guard
2703 Martin Luther King Jr. Avenue SE
Washington, D.C. 20593-7605

10.     Penalty Payment to be Paid to CDFW.  For alleged violations of California Government Code § 8670.25.5, Defendants shall pay a civil penalty pursuant to California Government Code § 8670.66(b) of fifty thousand dollars ($50,000) together with a proportionate share of the interest accrued on the Penalty Payment.  The Penalty Payment shall be made by check payable to California Department of Fish and Wildlife.  The check shall be sent by overnight or certified mail to:

California Department of Fish and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater, Senior Counsel
P.O. Box 160362
Sacramento, California  95816-0362

The check shall reference the "Refugio Oil Spill."  CDFW shall deposit the money into the Environmental Enhancement Fund pursuant to California Government Code § 8670.70.

11.     Defendants shall not deduct or capitalize any penalties paid under this Section or under Section XI (Stipulated Penalties) in calculating their federal or state income taxes.

## VI.    NATURAL RESOURCE DAMAGES

12.     Within thirty (30) Days after the Effective Date, Defendants shall pay an NRD Payment of twenty-two million three hundred twenty-five thousand

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 17 -

dollars ($22,325,000) together with interest accruing from November 16, 2018, at a rate specified in 28 U.S.C. § 1961.  The NRD Payment shall be allocated as follows:

    a.    To DOI, eighteen million four hundred twenty-two thousand dollars ($18,422,000) together with a proportionate share of the interest accrued on the NRD Payment.  Such payment shall be used by the Trustees for the purposes set forth in Section VII (Trustees' Management and Applicability of Joint NRD Funds).  Defendants shall make such payment by EFT to the United States Department of Justice in accordance with instructions that the FLU of the United States Attorney's Office for the Central District of California Western Division shall provide to Defendants following the Effective Date of this Consent Decree by this Court.  At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree and to:

> Department of the Interior
> Natural Resource Damage Assessment and
> Restoration Program
> Attention:  Restoration Fund Manager
> 1849 "C" Street, N.W. Mail Stop 4449
> Washington, D.C.  20240

The EFT and transmittal documentation shall reflect that the payment is being made to the Department of the Interior Natural Resources Damage Assessment and Restoration Fund ("Restoration Fund"), Account Number 14X5198.  DOI will maintain these funds as a segregated subaccount named REFUGIO BEACH OIL SPILL NRD Subaccount within the Restoration Fund.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

b. To CDPR, two million eighty-four thousand dollars ($2,084,000) together with a proportionate share of the interest accrued on the NRD Payment, for deposit into the State Park Contingent Fund. Payment shall be made by check payable to the California Department of Parks and Recreation. At the time of payment, Defendants shall simultaneously send written notice of payment and a copy of any transmittal documentation to the Trustees in accordance with Section XX (Notices) of this Consent Decree. The check shall be sent by overnight or certified mail to:

> The California Department of Parks and
> Recreation
> Attn: Laura Reimche, Senior Counsel
> 1416 Ninth Street, Room 1404-6
> Sacramento, California 95814

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the State Parks Contingent Fund. CDPR shall use such monies to fund appropriate projects within State Parks' properties from Gaviota to El Capitan State Park to compensate for recreation losses resulting from the Refugio Incident. CDPR shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

c. To the National Fish and Wildlife Foundation ("NFWF"), one million seven hundred ninety-three thousand dollars ($1,793,000) together with a proportionate share of the interest accrued on the NRD Payment, on behalf of the State Trustees for deposit into the California South Coast Shoreline Parks and Outdoor Recreational Use Account established by NFWF. Payment shall be made by check payable to the National Fish and Wildlife Foundation. At the time of payment, Defendants shall simultaneously send written

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

1    notice of payment and a copy of any transmittal documentation to

2    the Trustees in accordance with Section XX (Notices) of this

3    Consent Decree. The check shall be sent by overnight or certified

4    mail to:

5         California Department of Fish and Game
         Office of Spill Prevention and Response
6         Attn: Katherine Verrue-Slater, Senior Counsel
7         P.O. Box 160362
8         Sacramento, California 95816-0362

9    The check shall reference the "Refugio Beach Oil Spill" and reflect

10   that it is a payment to the California South Coast Shoreline Parks

11   and Outdoor Recreational Use Account. The California South Coast

12   Shoreline Parks and Outdoor Recreational Use Account shall be

13   managed in accordance with the South Coast Shoreline Parks and

14   Outdoor Recreational Use Account Memorandum of Agreement

15   among the State Trustees and NFWF and shall be used by the

16   Trustees for the purposes set forth in Section VIII (Trustees'

17   Management of Recreational Use Funds).

18   d.     To UC, twenty-six thousand dollars ($26,000) together with a

19   proportionate share of the interest accrued on the NRD Payment, for

20   deposit into Natural Reserve System Account. Payment shall be

21   made by check payable to The Regents of the University of

22   California. At the time of payment, Defendants shall simultaneously

23   send written notice of payment and a copy of any transmittal

24   documentation to the Trustees in accordance with Section XX

25   (Notices) of this Consent Decree. The check shall be sent by

26   overnight or certified mail to:

27

28

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 20 -

The Regents of the University of California
Attn: Michael Kisgen, Associate Director
Natural Reserve System
University of California, Office of the President
1111 Franklin Street, 6th Floor
Oakland, California 94607-5200

The check shall reference the "Refugio Beach Oil Spill" and reflect that it is a payment to the Natural Reserve System Account. The University of California Natural Reserve System will administer the monies to fund projects selected by the University of California in coordination with the Trustees. The projects shall address the research, education, and outreach missions of the University of California. UC shall manage such monies in accordance with Section VIII (Trustees' Management of Recreational Use Funds).

13.     The NRD Payment is in addition to the NRDA costs incurred by the Trustees through November 15, 2018, which have been separately reimbursed by Defendants. To date, Plains has paid approximately ten million dollars ($10,000,000) for NRDA costs incurred by the Trustees through November 15, 2018.

## VII.   TRUSTEES' MANAGEMENT AND APPLICABILITY OF JOINT NRD FUNDS

14.     DOI shall, in accordance with law, manage and invest funds in the REFUGIO BEACH OIL SPILL NRD Subaccount, paid pursuant to Paragraph 12, and any return on investments or interest accrued on the REFUGIO BEACH OIL SPILL NRD Subaccount for use by the Natural Resource Trustees in connection with Restoration of Natural Resources affected by the Refugio Incident. DOI shall not make any charge against the REFUGIO BEACH OIL SPILL NRD Subaccount for any investment or management services provided.

15.     DOI shall hold all funds in the REFUGIO BEACH OIL SPILL NRD

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 21 -

1   Subaccount, including return on investments or accrued interest, subject to the

2   provisions of this Consent Decree.

3       16.   The Natural Resource Trustees commit to the expenditure of the

4   funds set forth in Paragraph 12 for the design, implementation, permitting (as

5   necessary), monitoring, and oversight of Restoration projects and for the costs of

6   complying with the requirements of the law to conduct a Restoration planning

7   and implementation process. The Natural Resource Trustees will use the funds to

8   Restore, rehabilitate, replace or acquire the equivalent of any Natural Resource

9   and its services, including lost human use of such services, injured, lost, or

10   destroyed as a result of the Refugio Incident and for the administration and

11   oversight of these Restoration projects.

12       17.   The specific projects or categories of projects will be contained in a

13   Restoration Plan prepared and implemented jointly by the Trustees, for which

14   public notice, opportunity for public input, and consideration of public comment

15   will be provided. Plains shall have no responsibility nor liability for

16   implementation of the Restoration Plan or projects relating to the Refugio

17   Incident, including any future project costs other than the payments set forth in

18   Section VII herein. The Trustees jointly retain the ultimate authority and

19   responsibility to use the funds in the REFUGIO BEACH OIL SPILL NRD

20   Subaccount to Restore Natural Resources in accordance with applicable law, this

21   Consent Decree, and any memorandum or other agreement among them.

## VIII.    TRUSTEES' MANAGEMENT OF RECREATIONAL USE FUNDS

24       18.   CDPR shall allocate the monies paid pursuant to Paragraph 12 for

25   projects providing human use benefits and for the oversight of those projects in

26   accordance with a Restoration Plan prepared and implemented jointly by the

27   Trustees, this Consent Decree, and in accordance with applicable law and any

28   Trustee memorandum or other agreement among them.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

19.    The State Trustees shall allocate the funds in the Recreational Use Account held by NFWF for projects providing human use benefits and for the oversight of those projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

20.    UC shall allocate the monies paid pursuant to Paragraph 12 for research, education, and outreach projects in accordance with a Restoration Plan prepared and implemented jointly by the Trustees, this Consent Decree, and in accordance with applicable law and any Trustee memorandum or other agreement among them.

## IX.    INJUNCTIVE RELIEF

21.    Plains agrees to implement the injunctive relief set forth in Appendix B to this Consent Decree for Plains' Regulated Pipelines.

22.    <u>Material Changes to Plains' IMP</u>.

a.    Plains' Integrity Management Plan shall serve as the baseline IMP for purposes of this Consent Decree. Plains agrees that it will not make any material changes to the following parts of the IMP throughout the term of this Consent Decree without following the process set forth in this Paragraph:

1)    Procedure for the Assessment of In-Line Inspection ("ILI") Results;

2)    Section 9.5, "Continual Evaluation and Assessment of Pipeline Integrity;"

3)    White Papers 32-200.09-S001, "Reassessment Interval Determination on Pipelines with Possible Shielded Coatings," and 32-200.09-S002, "Reassessment Interval Determination on Pipelines with Possible Corrosion Under Insulation;"

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 23 -

4)   Section 11.3, "Conducting Preventive and Mitigative Evaluation Meetings;"

5)   Section 11.4, "Documentation of P&M Evaluation Meetings;" and

6)   Section 11.6, "Implementation of P&M Recommendations."

For purposes of this Paragraph, the term "material change" refers to any substantive modification in the IMP Procedures that could affect the outcome or effect of a particular procedure or requirement.

b.   At least thirty (30) Days prior to making a material change to the above sections of the IMP, Defendants shall provide written notice to PHMSA that includes a copy of the proposed change(s). In the event PHMSA provides a written objection to Defendants' notice prior to the effective date of the material change and they cannot informally resolve the matter, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

c.   In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the IMP described in Subparagraph 22.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material change, stating the basis for the abbreviated notice. In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d.   In the event PHMSA provides a written objection to a material modification of Defendants' IMP, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30)

1    Days. Following the notice period specified in Subparagraphs 22.b

2    and 22.c, Defendants may implement the modification until the

3    dispute is resolved. If the dispute is not resolved as a result of the

4    informal consultation, PHMSA or Defendants may invoke Dispute

5    Resolution pursuant to Section XIII. Stipulated penalties shall not

6    accrue during the informal consultation period described in this

7    Paragraph.

8       23.   <u>Material Changes in Control Room Management Plan and Control</u>

9    <u>Center General Procedures</u>.

10       a.   Plains' Control Room Management Plan and Control Center

11    General Procedures (collectively, "Control Center Plan and

12    Procedures") shall serve as the baseline Control Center Plan and

13    Procedures for purposes of this Consent Decree. Plains agrees that it

14    will not make any material changes to sections 6.5.5, 6.6.8, 8, 9.6.4,

15    9.6.9, 9.6.13, and 9.6.14 of its Control Room Management Plan and

16    procedures 100-2, 100-8, 100-9, 200-1, 300-1, 300-3, 300-5, 400-0,

17    and 500-12 of its Control Center General Procedures throughout the

18    term of this Consent Decree without following the process set forth

19    in this Paragraph. For purposes of this Paragraph, the term "material

20    change" refers to any substantive modification in the Control Center

21    Plan and Procedures that could affect the outcome or effect of a

22    particular procedure or requirement.

23       b.   At least thirty (30) Days prior to making a material

24    modification to the above sections of its Control Room

25    Management Plan and Control Center General Procedures,

26    Defendants shall provide written notice to PHMSA that includes a

27    copy of the proposed change(s). In the event PHMSA provides a

28    written objection to Defendants' notice prior to the effective date of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

the material change(s), Defendants shall have the right to submit the issue to Dispute Resolution (Section XII).

c.     In the event Plains cannot reasonably provide the thirty (30) Day notice of material modification to the Control Room Management Plan and Control Center General Procedures described in Subparagraph 23.b due to an unanticipated emergency, Plains shall provide written notice to PHMSA within seven (7) Days of the material modification, stating the basis for the abbreviated notice. In the event PHMSA provides a written objection to Defendants' modification, Defendants shall have the right to submit the issue to Dispute Resolution (Section XIII).

d.     In the event PHMSA provides a written objection to a material modification of Defendants' Control Room Management Plan and Control Center General Procedures, PHMSA and Defendants shall have sixty (60) Days for informal consultation. The parties may mutually agree to extend the period by no more than thirty (30) Days. Following the notice period specified in Subparagraphs 23.b and 23.c, Defendants may implement the modification until the dispute is resolved. If the dispute is not resolved as a result of the informal consultation, PHMSA or Defendants may invoke Dispute Resolution pursuant to Section XIII. Stipulated penalties shall not accrue during the informal consultation period described in this Paragraph.

24.     Where any compliance obligation under this Consent Decree requires Defendants to obtain a federal, state, or local permit or approval, Defendants shall submit timely applications and take all other actions reasonably necessary to obtain all such permits or approvals. Defendants may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of any such

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 26 -

1   obligation resulting from a failure to obtain, or a delay in obtaining, any permit or
2   approval required to fulfill such obligation, if Defendants have submitted timely
3   applications and have taken all other actions reasonably necessary to obtain all
4   such permits or approvals.

## X.   CORRECTIVE ACTION ORDER

6   25.   Upon the Effective Date of this Consent Decree, the PHMSA CAO
7   shall close and be of no further force or effect.  All outstanding terms and
8   obligations under the PHMSA CAO as of the Effective Date and which Plains is
9   still required to implement under this Consent Decree are set forth in Appendix D.

## XI.   STIPULATED PENALTIES

11   26.   Unless excused under Section XII (Force Majeure), Defendants shall
12   be liable for stipulated penalties for violations of this Consent Decree as specified
13   below.  A violation includes failing to perform any obligation required by the
14   terms of this Consent Decree according to all applicable requirements of this
15   Consent Decree and within the specified time schedules established by or
16   approved under this Consent Decree.

17   27.   Late Payment of Civil Penalties and NRD Payment.
18         a.   If Defendants fail to pay any portion of the Penalty Payment
19         to the United States required under Section V (Civil Penalties) when
20         due, Defendants shall pay to the United States a stipulated penalty of
21         ten thousand dollars ($10,000) per Day for each Day payment is
22         late.
23         b.   If Defendants fail to pay any portion of the Penalty Payment
24         to the CDFW and/or RWQCB as required under Section V (Civil
25         Penalties) when due, Defendants shall pay to the CDFW and/or
26         RWQCB a stipulated penalty of ten thousand dollars ($10,000) each,
27         as applicable, per Day for each Day payment is late.
28         c.   If Defendants fail to pay any portion of the NRD Payments

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 27 -

1    required under Section VI (Natural Resource Damages) when due,

2    Defendants shall pay a stipulated penalty of five thousand dollars

3    ($5,000) to the United States, and five thousand dollars ($5,000) to

4    the State Trustees, per Day for each Day payment is late.

5    28.    Stipulated Penalties for Non-Performance of Injunctive Relief.

6    Unless excused under Section XII (Force Majeure), the stipulated penalties

7    described in this Paragraph shall accrue per violation per Day for Defendants'

8    failure to perform the following injunctive relief required under Section IX

9    (Injunctive Relief) when due:

10    a.    For failure to timely submit to OSFM the applications for

11    State waivers as specified in paragraphs 1.A, 1.B, 1.C, and 1.D of

12    Appendix B;

13    b.    For failure to implement the Integrity Management provisions

14    as specified in paragraphs 4.A.1.a, e, f, g, h, and 4.A.2 of Appendix

15    B;

16    c.    For failure to timely submit to OSFM the EFRD analyses as

17    specified in paragraphs 5.A-5.B of Appendix B;

18    d.    For failure to timely submit to OSFM the risk analysis as

19    specified in paragraph 6.A of Appendix B;

20    e.    For failure to timely submit to PHMSA the modified Section

21    9.5 of Plains' IMP, as specified in paragraph 9.A.3 of Appendix B;

22    f.    For failure to timely submit to PHMSA the modified P&M

23    Recommendation forms, as specified in paragraph 9.B of Appendix

24    B;

25    g.    For failure to timely conduct EFRD analyses for all Regulated

26    Pipelines for which Plains has not previously conducted an EFRD

27    analysis, as specified in paragraph 10.A of Appendix B;

28

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 28 -

h.    For failure to timely have in place revised valve maintenance procedures, as specified in paragraph 10.B of Appendix B;

i.    For failure to timely create a list of rupture detection methods utilized, as specified in paragraph 11.A of Appendix B;

j.    For failure to timely conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change, as specified in paragraph 11.B of Appendix B;

k.    For failure to timely submit to PHMSA the computational pipeline monitoring ("CPM") systems analysis, as specified in paragraph 11.C of Appendix B;

l.    For failure to timely submit to PHMSA the selection of leak detection method procedure, as specified in paragraph 11.D of Appendix B;

m.    For failure to hold or document periodic (at least annual) meetings regarding potential improvements to leak detection, as provided in paragraph 11.E of Appendix B;

n.    For failure to timely have in place a procedure for tracking when instrumentation has been impeded, as provided in paragraph 11.F of Appendix B;

o.    For failure to complete, prior to resuming operations on Lines 901 or 903, the items identified in paragraph 12.A.1-4 of Appendix B;

p.    For failure to timely submit to OSFM confirmation that all alarm descriptors are accurate, as specified in paragraph 12.B of Appendix B;

q.    For failure to timely conduct the surveys and update the

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 29 -

emergency response plans, as specified in paragraph 13.B.1 of Appendix B;

r.    For failure to timely provide emergency response training to employees, as specified in paragraph 13.B.2 of Appendix B;

s.    For failure to timely provide control room supervisor training, as specified in paragraph 13.B.4 of Appendix B;

t.    For failure to timely submit to PHMSA and/or OSFM, and/or OSPR, as applicable, notice of drills, as specified in paragraph 13.B.5 of Appendix B, provided that the penalty under this subsection shall not exceed one Day per drill;

u.    For failure to timely submit to PHMSA the third-party Safety Management System report, as specified in paragraph 14.A.1 of Appendix B;

v.    For failure to timely review and revise the drug and alcohol misuse plans, as specified in paragraph 15 of Appendix B;

w.    For failure to timely submit to PHMSA notice of any material modification to the IMP, as required by Paragraph 22; and

x.    For failure to timely submit to PHMSA notice of any material modification to the Control Room Management Plan or Control Center General Procedures, as required by Paragraph 23;

y.    The penalties stipulated in this Section shall accrue as follows:

| Penalty Per Violation | Per Day Period of Noncompliance |
| --- | --- |
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 30 -

1    29.    Stipulated Penalties for Non-Compliance with Corrective Action

2  Order Terms. Unless excused under Section XII (Force Majeure), the stipulated

3  penalties described in this Paragraph shall accrue per violation per Day for

4  Defendants' failure to perform the following injunctive relief required under

5  Section X (Corrective Action Order) when due:

6           a.    For operation of Line 901 in violation of paragraph 1.a of

7           Appendix D;

8           b.    For failure to timely submit to OSFM a Line 901 Restart Plan,

9           as specified by paragraph 1.b of Appendix D;

10          c.    For failure to comply with the operating pressure restriction,

11          including requirements for removal of the pressure restriction, for

12          Line 901 specified by paragraphs 1.c and 1.d of Appendix D;

13          d.    For operation of Line 903, in violation of paragraph 1.e of

14          Appendix D;

15          e.    For failure to timely submit to OSFM a Line 903 Restart Plan,

16          as specified by paragraph 1.f of Appendix D;

17          f.    For failure to comply with the operating pressure restriction,

18          including requirements for removal of the pressure restriction, for

19          Line 903 specified by paragraphs 1.g and 1.h of Appendix D;

20          g.    For failure to timely submit to OSFM any notification

21          specified by paragraph 1.i of Appendix D; and

22          h.    For failure to submit to OSFM a final Appendix D

23          Documentation Report, as specified by paragraph 1.j of Appendix D.

24          i.    The penalties stipulated in this Section shall accrue as

25          follows:

26

27

28

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 31 -

| Penalty Per Violation | Per Day Period of Noncompliance |
|---|---|
| $2,000 penalty per Day | 1st to 30th Day |
| $4,000 penalty per Day | 31st to 60th Day |
| $5,500 penalty per Day | 61st Day and beyond |

30.    Defendants shall pay stipulated penalties due pursuant to this Section within thirty (30) Days of a written demand.

31.    For stipulated penalties accrued pursuant to Subparagraphs 27.a, 28.e, 28.f, 28.g, 28.h, 28.i, 28.j, 28.k, 28.l, 28.m, 28.n, 28.s, 28.t, 28.u, 28.v, 28.w, or 28.x of this Consent Decree, the United States shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to the United States the full amount of any stipulated penalties due and will not be liable to the State Agencies for any such stipulated penalties.

32.    For stipulated penalties accrued pursuant to Subparagraph 27.b of this Consent Decree, only CDFW and RWQCB shall have the right to issue a written demand for stipulated penalties and Defendants must pay to the CDFW and RWQCB the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

33.    For stipulated penalties accrued pursuant to Subparagraphs 28.a, 28.b, 28.c, 28.d, 28.o, 28.p, or Paragraph 29 of this Consent Decree, only OSFM shall have the right to issue a written demand for stipulated penalties, and Defendants must pay to OSFM the full amount of any stipulated penalties due and will not be liable to United States for any such stipulated penalties.

34.    For stipulated penalties accrued pursuant to Paragraphs 28.q, 28.r, 28.t, or Paragraph 30 of this Consent Decree, the United States, CDFW, OSFM, or all, may demand stipulated penalties by sending a joint or individual written demand to Defendants, with a copy simultaneously sent to the other Plaintiff(s).

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

a. Where only one or two of the Plaintiffs referenced in Paragraph 35 demand stipulated penalties under Paragraph 35, a copy of the demand will simultaneously be sent to the remaining Plaintiff(s) and they will have forty-five (45) Days to join in the demand.

b. Where multiple Plaintiffs referenced in Paragraph 35 demand stipulated penalties for the same violation, Defendants shall pay fifty (50) percent to each of the demanding Plaintiffs (when two Plaintiffs join in the demand); one third to each demanding Plaintiff (when all three Plaintiffs join in the demand); or as allocated by the United States, CDFW, and OSFM.

c. Where only one Plaintiff referenced in Paragraph 35 demands stipulated penalties, and the other Plaintiffs do not join in the demand within forty-five (45) Days of receiving the demand, Defendants shall pay one hundred (100) percent to the Plaintiff making the demand.

d. If a Plaintiff joins in the demand within forty-five (45) Days but subsequently elects to waive or reduce stipulated penalties, in accordance with Paragraphs 38 or 39 for that violation, Defendants shall not be liable for such portion of the stipulated penalties waived or reduced by such Plaintiff and shall be liable for any stipulated penalties due to the other Plaintiffs joining such demand pursuant to the allocation set forth in Subparagraph 34(b).

35. For stipulated penalties arising from a failure to perform obligations pursuant to Subparagraph 27.c, the United States and the State Trustees may demand stipulated penalties by sending a joint written demand to Defendants.

36. For all payments made pursuant to this Section, Defendants must follow the payment instructions set forth in Section V (Civil Penalties). Any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

1   transmittal correspondence shall state that payment is for stipulated penalties and

2   shall identify the date of the written demand to which the payment corresponds.

3       37.    Stipulated penalties under this Section shall begin to accrue on the

4   Day after the performance is due or on the day a violation occurs, whichever is

5   applicable, and shall continue to accrue until performance is satisfactorily

6   completed, or until the violation ceases. Stipulated penalties shall accrue

7   simultaneously for separate violations of this Consent Decree.

8       38.    The United States may, in the unreviewable exercise of its

9   discretion, reduce or waive stipulated penalties otherwise due to the United States

10  under this Consent Decree.

11      39.    The applicable State Agencies may, in the unreviewable exercise of

12  their discretion, reduce or waive stipulated penalties otherwise due to the

13  applicable State Agencies under this Consent Decree.

14      40.    Stipulated penalties shall continue to accrue as provided in

15  Paragraphs 27 through 29, during any Dispute Resolution, but need not be paid

16  until the following:

17          a.    If the dispute is resolved by agreement or by a decision of the

18          United States or the State Agencies, as applicable, that is not

19          appealed to the Court, Defendants shall pay accrued penalties

20          determined to be owing to the United States or the State Agencies,

21          as applicable, together with interest, within thirty (30) Days of the

22          effective date of the agreement or the receipt of the United States' or

23          the State Agencies' decision.

24          b.    If the dispute is appealed to the Court and the Plaintiffs

25          prevail in whole or in part, Defendants shall pay all accrued

26          penalties determined by the Court to be owing, together with

27          interest, within sixty (60) Days of receiving the Court's decision or

28          order, except as provided in Subparagraph c, below.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 34 -

1            c.     If any Party appeals the Court's decision and a Plaintiff

2            prevails in whole or in part, Defendants shall pay all accrued

3            penalties determined to be owing, together with interest, within

4            fifteen (15) Days of receiving the final appellate court decision.

5      41.    If Defendants fail to pay stipulated penalties according to the terms

6 of this Consent Decree, Defendants shall be liable for interest on such penalties,

7 as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.

8 Nothing in this Paragraph shall be construed to limit the United States or the

9 State Agencies from seeking any remedy otherwise provided by law for

10 Defendants' failure to pay any stipulated penalties.

11      42.    The payment of stipulated penalties, if any, shall not alter in any

12 way Defendants' obligation to complete the performance of the requirements of

13 this Consent Decree.

14      43.    Subject to the provisions of Section XVII (Effect of

15 Settlement/Reservation of Rights) of this Consent Decree, the stipulated penalties

16 provided for in this Consent Decree shall be in addition to any other rights,

17 remedies, or sanctions available to the United States or the State Agencies

18 (including, but not limited to, statutory penalties, additional injunctive relief,

19 mitigation or offsets measures, and/or contempt) for Defendants' violation of this

20 Consent Decree or applicable laws.

21               **XII.  FORCE MAJEURE**

22      44.    "Force Majeure," for purposes of this Consent Decree, is defined as

23 any event arising from causes beyond the control of Defendants, of any entity

24 controlled by Defendants, or of Defendants' contractors that delays or prevents

25 the performance of any obligation under this Consent Decree despite Defendants'

26 best efforts to fulfill the obligation. The requirement that Defendants exercise

27 "best efforts to fulfill the obligation" includes using best efforts to anticipate any

28 potential Force Majeure event and best efforts to address the effects of any

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

1   potential Force Majeure event (a) as it is occurring and (b) following the potential

2   Force Majeure, such that the delay and any adverse effects of the delay are

3   minimized. "Force Majeure" does not include Defendants' financial inability to

4   perform any obligation under this Consent Decree.

5        45.    If any event occurs or has occurred that may delay the performance

6   of any obligation under this Consent Decree, whether or not caused by a Force

7   Majeure event, Defendants shall provide notice orally or by electronic

8   transmission to the relevant Plaintiff(s), within five (5) Days of when Defendants

9   first knew that the event might cause a delay. Within ten (10) Days thereafter,

10  Defendants shall provide in writing to such Plaintiffs an explanation and

11  description of the reasons for the delay; the anticipated duration of the delay; the

12  actions taken or to be taken to prevent or minimize the delay; a schedule for

13  implementation of any measures to be taken to prevent or mitigate the delay or

14  the effect of the delay; Defendants' rationale for attributing such delay to a Force

15  Majeure event if it intends to assert such a claim; and a statement as to whether,

16  in the opinion of Defendants, such event may cause or contribute to an

17  endangerment to public health, welfare or the environment. Defendants shall

18  provide with any notice the documentation that Defendants are relying on to

19  support the claim that the delay was attributable to a Force Majeure event.

20  Failure to comply with the above requirements shall preclude Defendants from

21  asserting any claim of Force Majeure for that event for the period of time of such

22  failure to comply, and for any additional delay caused by such failure.

23  Defendants shall be deemed to know of any circumstance of which Defendants,

24  any entity controlled by Defendants, or Defendants' contractors knew or should

25  have known.

26       46.    If Plaintiffs agree that the delay or anticipated delay is attributable to

27  a Force Majeure event, the time for performance of the obligations under this

28  Consent Decree that are affected by the Force Majeure event will be extended by

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

1   Plaintiffs for such time as is necessary to complete those obligations. An

2   extension of the time for performance of the obligations affected by the Force

3   Majeure event shall not, of itself, extend the time for performance of any other

4   obligation. Plaintiffs will notify Defendants in writing of the length of the

5   extension, if any, for performance of the obligations affected by the Force

6   Majeure event.

7       47.    If Plaintiffs do not agree that the delay or anticipated delay has been

8   or will be caused by a Force Majeure event, Plaintiffs will notify Defendants in

9   writing of their decision.

10      48.    If Defendants elect to invoke the Dispute Resolution procedures set

11  forth in Section XIII (Dispute Resolution), in response to Plaintiffs'

12  determination in Paragraph 47 above, it shall do so no later than thirty (30) Days

13  after receipt of Plaintiffs' notice. In any such proceeding, Defendants shall have

14  the burden of demonstrating by a preponderance of the evidence that the delay or

15  anticipated delay has been or will be caused by a Force Majeure event, that the

16  duration of the delay or the extension sought was or will be warranted under the

17  circumstances, that best efforts were exercised to avoid and mitigate the effects

18  of the delay, and that Defendants complied with the requirements of Paragraphs

19  44 and 45. If Defendants carry this burden, the delay at issue shall be deemed not

20  to be a violation by Defendants of the affected obligation of this Consent Decree

21  identified to Plaintiffs and the Court.

22                  **XIII. DISPUTE RESOLUTION**

23      49.    Unless otherwise expressly provided for in this Consent Decree, the

24  Dispute Resolution procedures of this Section shall be the exclusive mechanism

25  to resolve disputes arising under or with respect to this Consent Decree.

26  Defendants' failure to seek resolution of a dispute under this Section shall

27  preclude Defendants from raising any such issue as a defense to an action by

28  Plaintiffs to enforce any obligation of Defendants arising under this Consent

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

1  Decree.

2      50.    Informal Dispute Resolution.  Any dispute subject to Dispute

3  Resolution under this Consent Decree shall first be the subject of informal

4  negotiations.  The dispute shall be considered to have arisen when Defendants

5  send the relevant Plaintiff(s) a written Notice of Dispute.  Such Notice of Dispute

6  shall state clearly the matter in dispute.  The period of informal negotiations shall

7  not exceed thirty (30) Days from the date the dispute arises, unless that period is

8  modified by written agreement.  If the parties cannot resolve a dispute by

9  informal negotiations, then the position advanced by Plaintiffs shall be

10  considered binding unless, within forty-five (45) Days after the conclusion of the

11  informal negotiation period, Defendants invoke formal Dispute Resolution

12  procedures as set forth below.

13      51.    Formal Dispute Resolution.  Defendants shall invoke formal Dispute

14  Resolution procedures, within the time period provided in the preceding

15  Paragraph, by serving on Plaintiffs a written Statement of Position regarding the

16  matter in dispute.  The Statement of Position shall include, but need not be

17  limited to, any factual data, analysis, or opinion supporting Defendants' position

18  and any supporting documentation relied upon by Defendants.

19      52.    Plaintiffs shall serve their Statement of Position within forty-five

20  (45) Days of receipt of Defendants' Statement of Position.  Plaintiffs' Statement

21  of Position shall include, but need not be limited to, any factual data, analysis, or

22  opinion supporting that position and any supporting documentation relied upon

23  by Plaintiffs.  Plaintiffs' Statement of Position shall be binding on Defendants,

24  unless Defendants file a motion for judicial review of the dispute in accordance

25  with the following Paragraph.

26      53.    Defendants may seek judicial review of the dispute by filing with the

27  Court and serving on the relevant Plaintiff(s), in accordance with Section XX

28  (Notices), a motion requesting judicial resolution of the dispute.  The motion

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

1  must be filed within thirty (30) Days of receipt of Plaintiffs' Statement of

2  Position pursuant to the preceding Paragraph.  The motion shall contain a written

3  statement of Defendants' position on the matter in dispute, including any

4  supporting factual data, analysis, opinion, or documentation, and shall set forth

5  the relief requested and any schedule within which the dispute must be resolved

6  for orderly implementation of this Consent Decree.

7       54.   Plaintiffs shall respond to Defendants' motion within the time period

8  allowed by the Local Rules of this Court or by a schedule set by the Court.

9  Defendants may file a reply memorandum to the extent permitted by the Local

10  Rules.

11       55.   Except as otherwise provided in this Consent Decree, in any dispute

12  brought under Paragraph 51, Defendants shall bear the burden of demonstrating

13  that its position complies with this Consent Decree, based on the Statements of

14  Position, and under applicable standards of review.

15       56.   The invocation of Dispute Resolution procedures under this Section

16  shall not, by itself, extend, postpone, or affect in any way any obligation of

17  Defendants under this Consent Decree, unless and until final resolution of the

18  dispute so provides.  Stipulated penalties with respect to the disputed matter shall

19  continue to accrue until the final resolution of the dispute.  Payment shall be

20  stayed pending resolution of the dispute.  If Defendants do not prevail on the

21  disputed issue, stipulated penalties shall be assessed and paid as provided in

22  Section XI (Stipulated Penalties).

23  **XIV.  REPORTING**

24       57.   After the Effective Date, by March 31 and September 30 of the

25  following years until termination of this Consent Decree per Section XXIV

26  (Termination), Defendants shall submit to the Plaintiffs in accordance with

27  Section XX (Notices) bi-annual reports that shall describe the status of

28  Defendants' compliance with the Consent Decree, including implementation of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

1 the injunctive relief requirements set forth in Appendices B and D.  The report

2 will be organized to show the measures taken to comply with each of the

3 requirements set forth in Appendices B and D, whether the measures were taken

4 timely, the status of any permitting action that may affect compliance with the

5 Consent Decree, and whether the measures taken have achieved compliance with

6 the requirement.

## XV.   CERTIFICATION

58.    Each report submitted by Defendants under Section XIV (Reporting)
shall be signed by either the Chief Executive Officer, the President, an Executive
Vice President, a Senior Vice President, or General Counsel who is an authorized
representative of Defendants, and must contain the following statement:

> I certify under penalty of law that this document and all
> attachments were prepared under my direction or
> supervision in accordance with a system designed to
> assure that qualified personnel properly gather and
> evaluate the information submitted.  Based on any
> personal knowledge and my inquiry of the person or
> persons who manage the system, or those persons
> directly responsible for gathering the information, the
> information submitted is, to the best of my knowledge
> and belief, true, accurate, and complete.  I am aware that
> there are significant penalties for submitting false
> information, including the possibility of fine and
> imprisonment for knowing violations.

## XVI. INFORMATION COLLECTION AND RETENTION

59.    Plaintiffs and their representatives shall have the right of entry into
any facility covered by this Consent Decree, at all reasonable times and upon
reasonable notice, upon presentation of credentials, to:

a.    monitor the progress of activities required under this Consent
Decree;

b.    verify any data or information submitted to the Plaintiffs in
accordance with the terms of this Consent Decree;

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

1         c.    obtain documentary evidence, including photographs and

2         similar data; and

3         d.    assess Defendants' compliance with this Consent Decree.

4     60.    Until one (1) year after the termination of this Consent Decree,

5     Defendants shall retain, and shall instruct their contractors and agents to preserve

6     or deliver to Plains, all non-identical copies of all documents, records, or other

7     information (including documents, records, or other information in electronic

8     form) in their or their contractors' or agents' possession or control, or that come

9     into their or their contractors' or agents' possession or control, and that relate in

10    any manner to Defendants' performance of their obligations under this Consent

11    Decree. At any time during this information-retention period, upon request by

12    the Plaintiffs, Defendants shall provide copies of any documents, records, or

13    other information required to be maintained under this Paragraph.

14    61.    This Consent Decree in no way limits or affects any right of entry

15    and inspection, or any right to obtain information, held by the United States or

16    the State Agencies pursuant to applicable federal or state laws, regulations, or

17    permits, nor does it limit or affect any duty or obligation of Defendants to

18    maintain documents, records, or other information imposed by applicable federal

19    or state laws, regulations, or permits.

20    62.    For any documents, records, or other information required to be

21    submitted to Plaintiffs pursuant to this Consent Decree, Plains may assert a claim

22    of business confidentiality or other protections applicable to the release of

23    information by Plaintiffs, covering part or all of the information required to be

24    submitted to Plaintiffs pursuant to this Consent Decree in accordance with, as

25    applicable, 49 C.F.R. Part 7, 49 C.F.R. Part 190, and 40 C.F.R Part 2. Plains

26    must mark the claim of confidentiality in writing on each page, and include a

27    statement specifying the grounds for each claim of confidentiality.

28    63.    The federal agency Plaintiffs are subject to applicable laws

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

governing the disclosure of information under the Freedom of Information Act ("FOIA") (5 U.S.C. § 552 *et seq.*). If a federal agency Plaintiff receives a request pursuant to FOIA for records produced pursuant to the Consent Decree, that Plaintiff will, to the extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to identify portions of documents Defendants have claimed as confidential and that may be subject to the request, and to specify the grounds for each claim of confidentiality. In accordance with applicable regulations, if the federal agency Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

64. For documents provided to PHMSA under this Consent Decree, Defendants need not provide redacted copies when the documents are produced. Within fourteen (14) Days of notification from PHMSA of a FOIA request, or such other time as agreed upon, Defendants will provide a copy of the relevant records with confidential information redacted along with explanations of the asserted grounds for confidentiality.

65. State Agency Plaintiffs are subject to the California Public Records Act ("CPRA") (California Government Code §§ 6250 *et seq.*). If a State Agency Plaintiff receives a request pursuant to the CPRA for records produced pursuant to the Consent Decree, that Plaintiff will, to the maximum extent permitted by law, treat those records as exempt from disclosure, and give Defendants a reasonable opportunity to submit redacted copies of the requested records. If the Plaintiff determines that the records are not exempt from disclosure, the Plaintiff shall provide notice of the determination to Defendants prior to making any record available to the public.

66. The requirements of this Paragraph apply to Defendants' production of documents to PHMSA only. Defendants shall produce all documents required

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 42 -

1   to be produced in connection with this Consent Decree in, at Defendants' option,
2   either native format via electronic media or secure file transfer protocol ("FTP").
3   Any encryption or access restriction shall be on a container level only, *i.e.*, only
4   the electronic media or the top-level folder containing the documents shall be
5   encrypted and Plaintiffs shall have unrestricted access to the files/folders within
6   the electronic media or the top-level folder without need for additional decryption
7   or access codes.  Regardless of production method or encryption, individual
8   documents shall be produced in a manner that allows the Plaintiffs to view, print,
9   copy, save, download, and share each document within Plaintiffs' own
10  environment without restriction, tracking or monitoring by Defendants, or
11  automatically generated changes to the document (*e.g.*, without entering access
12  codes prior to each download, and without automatically generated watermarks
13  stating the download date and time).

14      67.     At the conclusion of the information-retention period, Defendants
15  shall provide ninety (90) Days' notice to Plaintiffs of Defendants' resumption of
16  internal document destruction policies for documents, records, or other information
17  subject to the requirements of Paragraph 60.

18      68.     [*Intentionally left blank.*]

19  **XVII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS**

20      69.     This Consent Decree resolves the civil claims of the United States
21  and the State Agencies for the matters alleged in the Complaint filed in this
22  action for the Refugio Incident.

23      70.     Subject to the reservations of rights specified in Paragraph 71, this
24  Consent Decree also resolves all civil and administrative penalty claims that
25  could be brought by PHMSA, for violations of the Pipeline Safety Laws specified
26  below that occurred on any of Defendants' Regulated Pipelines prior to January
27  28, 2019, the date that PHMSA's ongoing "Integrated Inspection" of a portion of
28  Defendants' Regulated Pipelines and other pipeline facilities began.  The specific

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 43 -

Pipeline Safety Laws subject to this Paragraph are the following (including other regulations expressly incorporated therein):

    a.    49 C.F.R. Part 194 Subpart B – Response Plans;

    b.    49 C.F.R. Part 195 Subpart B – Reporting;

    c.    49 C.F.R. Part 195 Subpart E – Pressure Testing;

    d.    49 C.F.R. Part 195 Subpart F – Operation and Maintenance, sections 195.402, 195.403, 195.404, 195.406, 195.408, 195.412, 195.420, 195.422, 195.428, 195.436, 195.442, 195.444, 195.446, 195.452;

    e.    49 C.F.R. Part 195 Subpart G – Qualification of Pipeline Personnel, as it relates to valve maintenance;

    f.    49 C.F.R. Part 195 Subpart H – Corrosion Control;

    g.    49 C.F.R. Part 199 – Drug and Alcohol Testing; and

    h.    All recordkeeping, documentation, and document production requirements in the provisions listed in subsections 70.a-70.g, and 49 C.F.R. section 190.203 and Part 195.

71.    The United States, on behalf of PHMSA, reserves all legal and equitable remedies to address violations of the Pipeline Safety Laws described in Paragraph 70 that occur on or after January 28, 2019, including violations that may have begun prior to such date and continued subsequent to January 28, 2019. A separate violation of the Pipeline Safety Laws occurs for each day that the violation continues, pursuant to 49 U.S.C. § 60122(a).

72.    This Consent Decree also resolves all civil and administrative penalty claims that could be brought by OSFM against Defendants for violations of the Pipeline Safety Laws and the Elder California Pipeline Safety Act as specified below relating to Line 901, Line 903, or Line 2000 that occurred prior to January 28, 2019. OSFM reserves all legal and equitable remedies to address violations of the specified Pipeline Safety Laws that occur on or after

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 44 -

1  January 28, 2019, including violations that may have begun prior to such date

2  and continued subsequent to January 28, 2019. The specific Pipeline Safety

3  Laws and Elder California Pipeline Safety Act subject to this Paragraph are:

4          a.     The Pipeline Safety Laws specified in Paragraph 70; and

5          b.     California Government Code §§ 51012.3, 51013, 51013.5,

6              51014, 51015, 51015.4, 51015.5 (for Line 901 and Line 903 only),

7              and 51018.

8      73.    For any reportable pipeline accident, as defined in 49 C.F.R.

9  § 195.50, occurring on or after January 28, 2019, on any of Defendants'

10  Regulated Pipelines, Paragraphs 70 and 72 shall not limit the right of PHMSA

11  and OSFM to sue or pursue administrative or other remedies for violations

12  (including penalties) under the Pipeline Safety Laws and the Elder California

13  Pipeline Safety Act for such accident. Nothing in Paragraphs 70 through 72 shall

14  be construed to limit the legal and equitable remedies of the United States or

15  State Agencies, other than PHMSA and OSFM.

16      74.    The United States and the State Agencies reserve all legal and

17  equitable remedies available to enforce the provisions of this Consent Decree.

18  This Consent Decree shall not be construed to limit the rights of the United States

19  or the State Agencies to obtain penalties, injunctive relief, or other administrative

20  or judicial remedies under the CWA, OPA, Pipeline Safety Laws, or under other

21  federal or state laws, regulations, or permit conditions, except as specified in

22  Paragraphs 69, 70, and 72.

23      75.    The United States reserves all legal and equitable remedies to address

24  any imminent and substantial endangerment or threat to the public health or

25  welfare or the environment arising at, or posed by, Defendants' operations,

26  whether related to the violations addressed in this Consent Decree or otherwise.

27  PHMSA further reserves the right to issue to Defendants corrective action orders

28  pursuant to 49 C.F.R § 190.233; emergency orders pursuant to 49 C.F.R.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

1   § 190.236; and safety orders pursuant to 49 C.F.R. § 190.239. The State Agencies

2   reserve all legal and equitable remedies under California Government Code

3   §§ 8670.57, 8670.69.4, 51013.5, 51015.5, 51018.6, 51018.7 and 51018.8,

4   California Water Code §§ 13301, 13304, 13340, and 13386, and California Health

5   & Safety Code § 13107.5 to address (1) conditions threatening to cause or creating

6   a substantial risk of an unauthorized discharge of oil into waters of the State of

7   California, (2) a discharge of waste threatening to cause a condition of pollution or

8   nuisance, or (3) a discharge which poses a substantial probability of harm to

9   persons, property or natural resources.

10       76.    This Consent Decree also shall not be construed to in any way limit or

11   waive the claims set forth in the case entitled *California State Lands Commission,*

12   *et al. v. Plains Pipeline, L.P., et al.*, Case No. 18CV02504 (Cal. Sup. Court) and

13   Case No. B295632 (Cal. Ct. App.).

14       77.    In any subsequent administrative or judicial proceeding initiated by

15   the United States or the State Agencies for injunctive relief, civil penalties, other

16   appropriate relief relating to Defendants' violations alleged in Plaintiffs'

17   Complaint, Defendants shall not assert, and may not maintain, any defense or

18   claim based upon the principles of waiver, *res judicata*, collateral estoppel, issue

19   preclusion, claim preclusion, claim-splitting, or other defenses based upon any

20   contention that the claims raised by the United States or the State Agencies in the

21   subsequent proceeding should have been brought in the instant case, except with

22   respect to claims that have been specifically resolved pursuant to Paragraphs 69,

23   70, and 72.

24       78.    This Consent Decree is not a permit, or a modification of any

25   permit, under any federal, state, or local laws, or regulations. Defendants are

26   responsible for achieving and maintaining full compliance with all applicable

27   federal, state, and local laws, regulations, and permits; and Defendants'

28   compliance with this Consent Decree shall be no defense to any action

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

1  commenced pursuant to any such laws, regulations, or permits, except as set forth

2  herein. The United States and the State Agencies do not, by their consent to the

3  entry of this Consent Decree, warrant or aver in any manner that Defendants'

4  compliance with any aspect of this Consent Decree will result in compliance with

5  provisions of the CWA, OPA, Pipeline Safety Laws, or with any other provisions

6  of federal, state, or local laws, regulations, or permits.

7      79.   This Consent Decree does not limit or affect the rights of Defendants

8  or of the United States or the State Agencies against any third-parties, not party

9  to this Consent Decree, nor does it limit the rights of third-parties, not party to

10 this Consent Decree, against Defendants, except as otherwise provided by law.

11     80.   This Consent Decree shall not be construed to create rights in, or

12 grant any cause of action to, any third-party not party to this Consent Decree.

13     81.   Plaintiffs will not submit any claim for restitution for Natural

14 Resource Damages in *The People of the State of California v. Plains All*

15 *American Pipeline, L.P.,* Case No. 1495091 (Cal. Sup. Court).

16     82.   By entering into this settlement, Defendants do not admit the

17 Pipeline Safety Laws violations alleged in the Complaint or described in this

18 Consent Decree by the United States on behalf of PHMSA; therefore, any

19 allegations of violations of these Pipeline Safety Laws do not constitute a finding

20 of violation and may not be used in any civil proceeding of any kind as evidence

21 or proof of any fact, fault or liability, or as evidence of the violation of any law,

22 rule, regulation, order, or requirement, except in a proceeding to enforce the

23 provisions of this Consent Decree. However, the allegations of violations set

24 forth in the Complaint may be: (1) considered by PHMSA to constitute prior

25 offenses in any future PHMSA enforcement action brought by the agency against

26 Plains, and (2) used for statistical purposes to identify violations that PHMSA

27 deems as causal to an incident or to increase the consequences of an incident.

28 Notwithstanding the forgoing, alleged violations subject to Paragraph 70 shall not

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 47 -

1  be considered by PHMSA to constitute prior offenses in any future PHMSA
2  enforcement action brought by the agency against Plains.

3      83.   By entering into this settlement, Defendants do not admit the
4  allegations of California Water Code §§ 13350 and 13385 violations set forth in
5  the Complaint; therefore, any allegations of violations of these statutes do not
6  constitute a finding of violation and may not be used in any civil proceeding of
7  any kind as evidence or proof of any fact, fault or liability, or as evidence of the
8  violation of any law, rule, regulation, order, or requirement, except in a
9  proceeding to enforce the provisions of this Consent Decree. However, the
10  allegations of California Water Code §§ 13350 and 13385 violations set forth in
11  the Complaint may be considered by the State Water Resources Control Board or
12  Regional Water Quality Control Boards to constitute prior offenses in any future
13  enforcement action brought by any of these agencies against Plains.

14      84.   Subject to the terms of this Consent Decree, no provision contained
15  herein affects or relieves Plains of their responsibilities to comply with all
16  applicable requirements of the CWA, OPA, the Pipeline Safety Laws, federal or
17  state laws, and the regulations and orders issued thereunder. Subject to the terms
18  of this Consent Decree, nothing herein shall limit or reduce the Plaintiffs' right of
19  access, entry, inspection, and information-gathering or their authority to bring
20  enforcement actions against Defendants pursuant to the CWA, OPA, the Pipeline
21  Safety Laws, federal or state laws, the regulations and orders issued thereunder,
22  or any other applicable provision of federal or state law.

23      85.   Defendants hereby covenant not to sue Plaintiffs for any claims
24  related to the Refugio Incident, or response activities in connection with the
25  Incident, pursuant to the CWA, OPA, the Pipeline Safety Laws, federal or state
26  laws, or any other law or regulation for acts or omissions through the date on
27  which this Consent Decree is lodged with the Court.

28      86.   Defendants covenant not to sue and agree not to assert any direct or

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 48 -

1  indirect claim for reimbursement related to the Refugio Incident from the OSLTF
2  or pursuant to any other provision of law.

3      87.    The United States reserves the right to seek reimbursement from
4  Defendants for claims relating to the Refugio Incident paid after the date on
5  which the Consent Decree is lodged with the Court from the OSLTF pursuant to
6  33 U.S.C. § 2712.

7          **XVIII.    TRANSFER AND ACQUISITION OF ASSETS**

8      88.    In the event Defendants sell or transfer ownership of or operating
9  responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901
10 or 903, Defendants will obtain from the transferee an agreement to be bound by
11 those provisions of this Consent Decree and Appendices B and D that are
12 specifically applicable to the asset(s) acquired, unless Defendants have already
13 completed the required action or unless OSFM agrees to relieve the transferee of
14 the obligations of any otherwise applicable provision.  Those provisions of
15 Appendix B are:

16          a.    For existing but non-operational segments of Lines 901 and
17              903, paragraphs 1.A, 1.B, 1.E, 2.B, 2.C., 4, 5, 6, 7.A, 12.A of
18              Appendix B;
19          b.    For the operational segment of Line 903 from Pentland to
20              Emidio, paragraphs 1.C, 1.E, 4, 5, 6, 7.A of Appendix B;
21          c.    For any lines built to replace Lines 901 or 903, paragraphs
22              2.A.1, 5, 7.B, 12.A of Appendix B; and
23          d.    For Line 2000, paragraphs 1.D, 1.E, 4, 5, 6, 7.A, 12.B. of
24              Appendix B.

25     89.    In the event Defendants sell or transfer ownership of or operating
26 responsibility for Lines 901, 903, or 2000, or any lines built to replace Lines 901
27 or 903, Defendants shall provide a copy of this Consent Decree to the prospective
28 transferee at least fourteen (14) Days prior to such transfer.  Defendants shall

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 49 -

1   provide written notice of any such transfer to OSFM within ten (10) Days after

2   the date Defendants publicly disclose the transaction or the date the transaction is

3   closed, whichever is earlier. Prior to the transfer, Defendants may notify OSFM

4   that Defendants have completed certain required actions of this Consent Decree,

5   or request that OSFM relieve the transferee of certain obligations of otherwise

6   applicable provisions, such that the transferee will not be bound by those

7   requirements. Defendants shall provide to Plaintiffs documentation

8   demonstrating the transferee's agreement to be bound by the relevant provisions

9   of the Consent Decree. Defendants shall provide to the transferee copies of those

10   portions of relevant emergency response plans that relate to the transferred asset.

11       90.   In the event of the sale or transfer pursuant to an arm's-length

12   transaction of Defendants' Regulated Pipelines other than Lines 901, 903, or

13   2000, or any lines built to replace Lines 901 or 903, to an independent third-party

14   transferee, the transferee shall not be subject to the requirements of this Consent

15   Decree. Defendants shall provide a copy of this Consent Decree to the transferee

16   at least fourteen (14) Days prior to such transfer. Defendants shall provide

17   written notice of any such transfer, including documentation demonstrating that

18   the Consent Decree was provided to the transferee, to PHMSA within ten (10)

19   Days after the date Defendants publicly disclose the transaction or the date the

20   transaction is closed, whichever is earlier. Defendants' obligations under this

21   Consent Decree with respect to all non-transferred assets shall not be affected.

22       91.   For all Regulated Pipeline assets that Defendants assume operating

23   responsibility for after the Effective Date, Plains is obligated to apply Article II

24   (Company Wide Provisions) of Appendix B of this Consent Decree to the newly

25   acquired assets.

26                     **XIX. COSTS**

27       92.   Except as otherwise stated in this Consent Decree, the Parties shall

28   bear their own costs related to this action and this Consent Decree, including

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

1   attorneys' fees; provided, however, the United States and the State Agencies shall

2   be entitled to collect the costs (including attorneys' fees) incurred in any action

3   necessary to collect any portion of the civil penalty or any stipulated penalties

4   due but not paid by Defendants.

5                           **XX.  NOTICES**

6       93.    Unless otherwise specified in this Consent Decree, whenever

7   notifications, submissions, reports, or communications are required by this

8   Consent Decree, they shall be made in writing, sent electronically by email

9   provided by the Parties, and addressed to all Parties as follows:

As to the United States by email:    eescdcopy.enrd@usdoj.gov
                                     Re: DJ # 90-5-1-1-11340

As to the United States by mail:     EES Case Management Unit
                                     Environment and Natural Resources
                                         Division
                                     U.S. Department of Justice
                                     P.O. Box 7611
                                     Washington, D.C.  20044-7611
                                     Re: DJ # 90-5-1-1-1130

As to PHMSA:                         James M. Pates
                                     Assistant Chief Counsel
                                         for Pipeline Safety
                                     U.S. Department of Transportation
                                     Pipeline and Hazardous Materials
                                         Safety Administration
                                     1200 New Jersey Ave. SE. E-26
                                     Washington, DC. 20590

As to EPA:                           Andrew Helmlinger
                                     Attorney Advisor
                                     U.S. EPA Region IX
                                     75 Hawthorne Street (ORC-3)
                                     San Francisco, California 94104

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 51 -

As to DOI:

Clare Cragan
U.S. Department of the Interior
Office of the Solicitor
755 Parfet St., Suite 151
Lakewood, Colorado 80215

As to NOAA:

National Oceanic and Atmospheric
    Administration
Office of General Counsel
Natural Resources Section
ATTN: Christopher J. Plaisted
501 W. Ocean Blvd, Suite 4470
Long Beach, California 90802

As to USCG:

Patricia V. Kingcade
Attorney Advisor
National Pollution Funds Center,
    US Coast Guard
2703 Martin Luther King Jr. Ave SE
Washington, DC 20593-7605

As to the State Agencies:

Michael Zarro
Deputy Attorney General
Office of the Attorney General
Natural Resources Law Section
300 S. Spring St., Suite 11220
Los Angeles, California 90013

As to CDFW:

California Department of Fish
    and Wildlife
Office of Spill Prevention and Response
Attn: Katherine Verrue-Slater
Senior Counsel
P.O. Box 160362
Sacramento, California 95816-0362

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

1

2

3

4

As to CDPR:              California Department of Parks and
                              Recreation
                         Attn: Laura A. Reimche, Senior Counsel
                         1416 Ninth Street, Room 1404-6
                         Sacramento, California 95814

5

6

7

8

As to CSLC:              California State Lands Commission
                         Attn: Patrick Huber, Legal Division
                         100 Howe Avenue, Suite 100-South
                         Sacramento, California 95825

9

10

11

12

13

As to OSFM:              California Department of Forestry and
                              Fire Protection
                         Legal Services Office
                         Attn: Joshua Cleaver, Staff Counsel
                         P.O. Box 944246
                         Sacramento, California 94244-2460

14

15

16

17

As to RWQCB:             California Central Coast Regional Water
                         Quality Control Board
                         Attn: Naomi Rubin, Attorney III
                         801 K Street
                         Sacramento, California 95814

18

19

20

21

As to UC:                Barton Lounsbury, Senior Counsel
                         University of California
                         Office of the General Counsel
                         1111 Franklin Street, 8th Floor
                         Oakland, California  94607

22

23

24

25

As to Defendants:        Megan Prout
                         Senior Vice President
                         Commercial Law and Litigation
                         333 Clay Street, Suite 1600
                         Houston, Texas  77002

26

27

28

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

Henry Weissmann
Daniel B. Levin
Colin Devine
Munger, Tolles & Olson LLP
350 S. Grand Ave, 50th Floor
Los Angeles, California 90071

Steven H. Goldberg
Nicole Granquist
Downey Brand LLP
621 Capitol Mall, 18th Floor
Sacramento, California  95814

94.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

95.    Notices submitted pursuant to this Section shall be deemed submitted upon mailing, or emailing unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XXI.    EFFECTIVE DATE

96.    The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court, or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XXII.    RETENTION OF JURISDICTION

97.    The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of effectuating or enforcing compliance with the terms of this Consent Decree.

## XXIII.    MODIFICATION

98.    The terms of this Consent Decree, including any attached Appendices, may be modified only by a subsequent written agreement signed by the Parties. Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval of the Court.

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

99.   Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section XIII (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 55, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXIV.   TERMINATION

100.   After Defendants have:  (a) operated under this Consent Decree for five (5) years and three (3) months from the Effective Date; and (b) complied with the requirements of this Consent Decree, including payment of all penalties and accrued stipulated penalties required by this Consent Decree, Defendants may serve on Plaintiffs a Request for Termination, stating that Defendants have satisfied these requirements, together with all necessary supporting documentation.  Plaintiffs shall respond within ninety (90) Days to Defendants' Request for Termination.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

101.   Following receipt by Plaintiffs of Defendants' Request for Termination, Plaintiffs shall respond within ninety (90) Days regarding any disagreement that the Consent Decree may be terminated and state the reason for such disagreement.  The Parties shall confer informally concerning the Request for Termination and any disagreement that the Parties may have as to whether Defendants have complied with the requirements for termination of this Consent Decree.  If Plaintiffs agree that the requirements for termination have been satisfied, the Parties shall submit for the Court's approval a joint stipulation terminating the Consent Decree.

102.   If Plaintiffs do not agree that the requirements for termination have been satisfied, Defendants may invoke Dispute Resolution under Section XIII (Dispute Resolution).  However, Defendants shall not seek Dispute Resolution of

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

1  any dispute regarding termination until sixty (60) Days after receipt of the

2  Plaintiffs' response to Defendants' Request for Termination.

### XXV.    PUBLIC PARTICIPATION

4  103.   This Consent Decree shall be lodged with the Court for a period of

5  not fewer than thirty (30) Days for public notice and comment in accordance with

6  28 C.F.R. § 50.7. The Parties agree and acknowledge that the final approval by

7  Plaintiffs and entry of this Consent Decree are subject to notice of lodging of the

8  Consent Decree and a public comment period. Plaintiffs reserve the right to

9  withdraw or withhold consent if the comments disclose facts or considerations

10  that indicate that this Consent Decree is inappropriate, improper, or inadequate.

11  104.   Defendants consent to entry of this Consent Decree without further

12  notice and agree not to withdraw from or oppose entry of this Consent Decree by

13  the Court or to challenge any provision of the Consent Decree, unless Plaintiffs

14  have notified Defendants in writing that Plaintiffs no longer support entry of the

15  Consent Decree.

### XXVI.    SIGNATORIES/SERVICE

17  105.   Each undersigned representative of Defendants, the State of

18  California Attorney General's Office, CDFW, CDPR, CSLC, OSFM, RWQCB,

19  UC, the Assistant Attorney General for the Environment and Natural Resources

20  Division of the Department of Justice, PHMSA, and EPA certifies that he or she

21  is fully authorized to enter into the terms and conditions of this Consent Decree

22  and to execute and legally bind the Party he or she represents to the terms of this

23  Consent Decree.

24  106.   This Consent Decree may be signed in counterparts, and such

25  counterpart signature pages shall be given full force and effect. For purposes of

26  this Consent Decree, a signature page that is transmitted electronically (*e.g.*, by

27  emailed PDF) shall have the same effect as an original.

28

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

## XXVII.  INTEGRATION

107.  This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXVIII.    FINAL JUDGMENT

108.  Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the Parties.

## XXIX.    26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

109.  For purposes of the identification requirement of Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), performance of Section III (Applicability), Paragraph 5; Section VI (Natural Resource Damages), Paragraph 12; Section IX (Injunctive Relief), Subparagraphs 22.a, 22.b, 22.c, 23.a, 23.b, 23.c, Paragraph 24, and related Appendix B; Section XIV (Reporting), Paragraph 57; Section XV (Certification), Paragraph 58; and Section XVI (Information Collection and Retention), Paragraphs 59, 60, and 66 is restitution or required to come into compliance with law to the extent it applies to federal agencies.

Dated and entered this _____ day of _____, 20__.


_____

UNITED STATES DISTRICT JUDGE


*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

1    THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of
2    *United States of America and the People of the State of California v. Plains All*
     *American Pipeline, L.P. and Plains Pipeline, L.P.*
3

4    FOR THE UNITED STATES OF AMERICA:

5

6    *3/12/2020*

7    Date

     BRUCE S. GELBER
7    Deputy Assistant Attorney General
8    Environment and Natural Resources
9         Division U.S. Department of Justice

10

11   *3/13/2020*

12   Date

     BRADLEY R. O'BRIEN
     ANGELA MO
13   Environmental Enforcement Section
14   Environment and Natural Resources

15                        Division

16

17

18

19

20

21

22

23

24

25

26

27

28
                *United States of America and the People of the State of California v.*
                    *Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
                                                        *Consent Decree*

                                      - 58 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P and Plains Pipeline, L.P.*

FOR THE UNITED STATES DEPARTMENT OF TRANSPORTATION, PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION:

_3 March 2020_
Date

PAUL ROBERTI
Chief Counsel
U.S. Department of Transportation
Pipeline and Hazardous Materials Safety
        Administration
1200 New Jersey Avenue, SE
Washington, DC 20590

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 59 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

3-2-20
Date

Susan Parker Bodine
SUSAN PARKER BODINE
Assistant Administrator
Office of Enforcement and Compliance
Assurance

*United States of America and the People of the State of California v.
Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 60 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of
United States of America and the People of the State of California v. Plains All
American Pipeline, L.P. and Plains Pipeline, L.P.

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

2\26\2020
_____
Date

AMY C. MILLER
Region 9 Director
Enforcement and Compliance Assurance
    Division
U.S. EPA Region 9
Mail Code ENF-1
75 Hawthorne Street
San Francisco, CA 94105

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

1    THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of

2    *United States of America and the People of the State of California v. Plains All*
     *American Pipeline, L.P. and Plains Pipeline, L.P.*
3

4    FOR THE CALIFORNIA DEPARTMENT OF FISH and WILDLIFE:

5

6    2/4/2020

7    Date                                  THOMAS M. CULLEN, JR.
                                           Administrator
8                                          Office of Spill Prevention and Response

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 62 -

1    THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of
2    *United States of America and the People of the State of California v. Plains All*
3    *American Pipeline, L.P. and Plains Pipeline, L.P.*

4    FOR THE CALIFORNIA DEPARTMENT OF PARKS AND RECREATION:

5

6    ___3/2/20___                    ___Lisa Ann L Mangat___

7    Date                           LISA ANN L. MANGAT

8                                   Director
                                    California Department of Parks
9                                       and Recreation

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 63 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA STATE LANDS COMMISSION:

2/28/2020
Date

JENNIFER LUCCHESI
Executive Officer
California State Lands Commission

*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 64 -

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*

FOR THE CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION'S - OFFICE OF THE STATE FIRE MARSHAL:

3/4/2020

Date

THOMAS W. PORTER
Director
California Department of Forestry and
Fire Protection

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 65 -

1   THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of
2   *United States of America and the People of the State of California v. Plains All*
    *American Pipeline, L.P. and Plains Pipeline, L.P.*
3
4   FOR THE CALIFORNIA REGIONAL WATER QUALITY CONTROL
    BOARD, CENTRAL COAST REGION:
5
6
7   March 2, 2020
    Date
8                                                JOHN ROBERTSON
                                                 Executive Officer
9                                                Central Coast Regional Water
                                                    Quality Control Board
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

                      *United States of America and the People of the State of California v.*
                          *Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
                                                                    Consent Decree

1   THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of
2   *United States of America and the People of the State of California v. Plains All*
3   *American Pipeline, L.P. and Plains Pipeline, L.P.*

4   FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

5

6   3/3/20
7   Date                              BARTON LOUNSBURY
                                      Senior Counsel
8                                     Office of the General Counsel

9

10

11  Date                              PEGGY FIEDLER
                                      Executive Director
12                                    UC Natural Reserve System

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

- 67 -

1  THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of
2  *United States of America and the People of the State of California v. Plains All*
   *American Pipeline, L.P. and Plains Pipeline, L.P.*
3

4  FOR THE REGENTS OF THE UNIVERSITY OF CALIFORNIA:

5

6
_____          _____
7  Date                              **BARTON LOUNSBURY**
                                     Senior Counsel
8                                    Office of the General Counsel

9
   3 March 2020
10 _____
11 Date                              **PEGGY FIEDLER**
                                     Executive Director
12                                   UC Natural Reserve System

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
**Consent Decree**

- 67 A -

1   THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of
2   *United States of America and the People of the State of California v. Plains All*
    *American Pipeline, L.P. and Plains Pipeline, L.P.*
3
4   FOR PLAINS ALL AMERICAN PIPELINE, L.P.
5
6   **2/25/2020**
7   Date
    HARRY PEFANIS
    President
8

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

1   THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of

2   *United States of America and the People of the State of California v. Plains All*

    *American Pipeline, L.P. and Plains Pipeline, L.P.*

3

4   FOR PLAINS PIPELINE, L.P.

5

6   _2/25/2020_

7   Date

    HARRY PEFANIS

    President

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
Consent Decree

# APPENDIX A

# *(Set of maps that generally depict Lines 901, 903, and 2000)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*



Sources: Esri, HERE, Garmin, Intermap, increment P Corp., GEBCO, USGS, FAO, NPS, NRCAN, GeoBase, IGN, Kadaster NL, Ordnance Survey, Esri Japan, METI, Esri China (Hong Kong), (c) OpenStreetMap contributors, and the GIS User Community

0   0.5   1        2        3        4
Miles

*Appendix A – Line 901*

Scale: 1:100,000

Sheet No:  1/1

Owner:

**PLAINS**
ALL AMERICAN
PIPELINE, L.P.



Sources: Esri, HERE, Garmin, Intermap, increment P Corp., GEBCO, USGS, FAO, NPS, NRCAN, GeoBase, IGN, Kadaster NL, Ordnance Survey, Esri Japan, METI, Esri China (Hong Kong), (c) OpenStreetMap contributors, and the GIS User Community

*Appendix A – Line 903*

Owner:

PLAINS
ALL AMERICAN
PIPELINE, L.P.

Scale:   1:700,000

Sheet No:   1/1



*Appendix A – Line 2000*

Sources: Esri, HERE, Garmin, Intermap, increment P Corp., GEBCO, USGS, FAO, NPS, NRCAN, GeoBase, IGN, Kadaster NL, Ordnance Survey, Esri Japan, METI, Esri China (Hong Kong), (c) OpenStreetMap contributors, and the GIS User Community

Scale: 1:966,574

Sheet No: 1/1

Owner: PLAINS ALL AMERICAN PIPELINE, L.P.

# APPENDIX B

# *(PHMSA Injunctive Relief)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

# APPENDIX B

## ARTICLE I – CALIFORNIA-SPECIFIC PROVISIONS

1. **State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):**

   A.  Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901. Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

   B.  Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. Plains must receive a State Waiver from the OSFM prior to restarting Line 903.

   C.  Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

   D.  Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

   E.  To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received. Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver. Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

2. **Replacement, Restart, or Abandonment of Lines 901 and 903:**

   A.  Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners. Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of Plains.

1

1. On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

    a. Test for potential AC/DC interference. Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

    b. Conduct a close interval survey (CIS) and AC/DC interference survey.

    c. Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

B. As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

C. As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations.

3. **Third-Party Analysis of Line 2000 ILI Data**

A. Plains shall select, subject to OSFM's approval, a third-party consultant to review and analyze ILI data for Line 2000 and provide a report to the OSFM on its findings.

B. The consultant shall:

    1. Review all ILI results and reports that Plains has received from ILI vendors for Line 2000;

    2. Review Plains' processes and procedures for analyzing ILI data, and Plains' analysis of Line 2000 ILI results, and suggest potential improvements, if any, to Plains' current processes or procedures for analyzing ILI data;

    3. Analyze Plains' implementation of its ILI assessment procedures for Line 2000.

    4. Evaluate ILI vendor specifications to ensure that proper criteria and technology considerations are taken in to account in selecting the specific inspection tool(s) used in the future, with consideration given to best available technology for reliably detecting corrosion, general corrosion, selective seam-weld corrosion, and seam anomalies;

2

5.   Consider disclosed industry standards and regulations, including, but not limited to: 49 CFR § 195.452, the California Elder Pipeline Safety Act, ASME B31.4 (Pipeline Transportation Systems for Liquids and Slurries), ASME B31G (Manual for Determining Strength of Corroded Pipelines) or RSTRENG, API 1160 (Managing System Integrity for Hazardous Liquid Pipelines), API 1163 (In-Line Inspection Systems Qualification), ANSI/ASNT ILI-PQ (In-Line Inspection Personnel Qualification and Certification), NACE SP0169 (Control of External Corrosion on Underground or Submerged Metallic Piping Systems), and the PRCI Pipeline Repair Manual;

6.   Comply with additional requirements specified in the scope of work.

C.   The third-party consultant shall prepare a written report reflecting its findings, conclusions, and any recommendations for improvement found in conducting the analysis.

1.   The consultant may recommend improvements to Plains' ILI analysis process and procedures to improve the quality and integration of ILI data into its IMP going forward. Plains shall give due consideration to the results of the analysis and recommendations of the consultant but will maintain discretion over whether and how to implement any recommendations.

2.   The report shall include a list of documents and data reviewed in conducting the analysis, which shall be provided to the OSFM, if requested.

3.   Within 150 days of entry of the CD, the consultant shall provide a draft report to the OSFM and Plains for comment at the same time. Plains and the OSFM may provide comments to the consultant on the report within 21 days of receipt of the draft.

4.   Within 45 days after receiving comments (if any) from Plains and the OSFM, the consultant shall provide a final report to PHMSA, the OSFM and Plains.

4.   **Integrity Management**

A.   For any operating segments of Lines 901, 903, and 2000 (not to include any replacement lines):

1.   Plains shall implement the following measures and amend its IMP, as needed, to include the requirements of this section for the applicable lines:

a.   In addition to other dig criteria specified by regulation or in its IMP, Plains shall remediate all internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall

3

loss, within one year of discovery. If Plains is unable to remediate such anomalies within one year of discovery, Plains shall notify OSFM and temporarily reduce the operating pressure and/or take further remedial action in accordance with 49 C.F.R. § 195.452 until the anomaly is remediated (or until otherwise authorized by OSFM).

b. Analyze a sample of additional anomalies of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten, unless fewer than ten anomalies are reported within that range, in which case Plains would examine the number of anomalies called.

c. When sizing anomalies, apply interaction/clustering criteria of 6t by 6t for applicable ILI tools;

d. Require its ILI tool vendor to include in the vendor's inspection report all metal loss anomalies of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance;

e. Any time a shrink sleeve is exposed during an anomaly investigation, remove the shrink sleeve, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy;

f. Send all field measurements to the tool vendor within 90 days of completing all digs for any ILI, provided that available data must be submitted prior to the next ILI run, and conduct annual meetings with the tool vendor to discuss tool performance;

g. For any use of magnetic flux leakage (MFL) tools, require its ILI tool vendor to manually grade any metal loss anomalies initially identified by the ILI tool as greater than or equal to 20% of wall loss (i.e., have human eyes on the raw data and not simply rely on a computer algorithm), and require that the vendor's ILI report note any differences between what the computer algorithm reported and the vendor's manual grade;

h. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, re-run the ILI tool to cover the area of failure;

i. Integrate and analyze available data in its P&M process, including:

 i. Assessment data from ILI tool runs;

 ii. Dig and repair data;

4

     iii.    Corrosion data, such as survey results, chemical treatments, and cleaning-pig results;

     iv.    Operational data, such as pressure and flow data;

     v.    Emergency response data, such as tactical response plans and results of recent drills on the pipeline, including locations of conduits to water, as identified in emergency response plans;

     vi.    Evaluation of the capability of the leak detection system, which shall include identification of each leak detection segment between block valves, consideration of length and size of the pipeline, type of product carried, proximity to high consequence areas, swiftness of leak detection (the time period required for a leak to be operationally isolated and/or the pipeline to be shut down), type and location of valves, valve closure time, EFRD analysis results, the location of nearest response personnel, leak history, and risk assessment results;

     vii.    Other pipeline characteristics, such as length, diameter, presence in HCAs and Environmentally and Ecologically Sensitive Areas (as defined in regulations promulgated pursuant to California Government Code § 8574.7(d), including 14 CCR 817.04(k)(3)(A)), maximum operating pressure, normal operating pressure, coating type, elevation data, water crossings, proximity to water bodies, casings, geohazard threats, maximum flow rate, and maximum rupture volume.

2.    ILI Measures

    a.    <u>Initial ILI Runs</u>. Each year during the first two years after entry of the CD, Plains shall conduct at least two ILIs using: (1) a high-resolution MFL tool; and (2) a UT tool with an inertial measurement unit (IMU). Plains shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. If a UT tool run is unsuccessful, Plains shall identify the limitations that prevented the UT tool run from being successful, consider changes to increase the likelihood of a successful UT tool run, and use best efforts to rerun the UT tool within six months (subject to tool availability).

       i.    All ILI assessments in the first two years shall include a sizing tool and a tool capable of identifying dents.

5

        ii.     In each of the first two years, Plains shall run the second ILI tool as soon as practicable after running the first ILI tool, but no later than 90 days after completion of the first ILI tool run. If one of the two tool runs is unsuccessful, Plains shall re-run the tool that was unsuccessful (but need not re-run the tool that was successful) even if the re-run of the unsuccessful tool run would occur more than 90 days from the successful tool run.

    b.    Subsequent ILI Runs. After the first two years, Plains shall run at least one MFL or one UT tool every year, using a different ILI tool type (MFL or UT) in each alternating year. Alternatively, Plains may run a UT tool each year. If, however, any UT tool run is unsuccessful, Plains shall document the reasons why the UT tool was unsuccessful, consider changes to increase the likelihood of a successful UT tool run, and may use MFL technology to complete that year's ILI, but must run a UT tool the following year.

    c.    All ILI Runs. Plains shall provide ILI results and reports to the OSFM within 30 days from its availability to Plains.

5.    **Valves**

    A.    Within one year after entry of the CD for any operating segments of Lines 901, 903, and 2000, and for any new pipeline segments replacing those lines, Plains shall conduct EFRD analyses, which shall include consideration of:

        1.    Swiftness of leak detection and pipeline shutdown capabilities, type of commodity carried, rate of potential leakage, volume that can be released, topography or pipeline profile, potential for ignition (for spilled commodity), proximity to power sources, location of nearest response personnel, specific terrain between the pipeline and the HCA, and benefits expected by reducing the spill size.

        2.    Valve placement and method of valve actuation for all valves (not including valves used for instrumentation purposes, such as on tubing on transmitter calibration manifolds).

    B.    Plains shall submit the EFRD analyses to OSFM within one year of entry of the CD.

    C.    Where practical, Plains shall confirm that check valves that are necessary for the safe operation of the pipeline are in good working order at intervals required by other valve maintenance activities and associated procedures.

6

6.  **Risk Analysis**

   A.   For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines):

      1.   Plains shall submit a risk analysis under proposed regulation 19 CCR § 2111(c) to OSFM (dated January 17, 2019 and publicly noticed in the California Regulatory Notice Register on February 15, 2019), or the final version of such regulation as it may be made effective in the future, regardless of whether or not those lines would otherwise be subject to the proposed regulations.

         a.   The information in the risk analysis shall be limited to the information listed in proposed regulation 19 CCR § 2111(c).

         b.   Plains' responsibility under this subsection is limited to providing the risk analysis to OSFM; Plains will maintain discretion over whether and how to implement the results of the analysis. The OSFM may review and comment on the risk analysis submitted by Plains consistent with provisions found in the proposed regulations, 19 CCR 2100 et seq.

         c.   The risk analysis shall be due within one year from entry of the CD.

7.  **Leak Detection**

   A.   For any operating segments of Lines 901, 903, or 2000 (not to include any replacement lines), Plains shall confirm in writing to the OSFM within 30 days of entry of the CD that it has installed a Computational Pipeline Monitoring (CPM) Real Time Transient Model (RTTM) that is compliant with API 1130.

   B.   Within 12 months after initiating operation of any replacement lines for Lines 901 or 903, Plains shall verify and certify to the OSFM that all Pipeline and Instrumentation Drawings (P&IDs) reflect correct "as-built" information.

8.  **Non-waiver**

   A.   Nothing in this CD shall excuse Plains from otherwise complying with the AB 864 regulations when they are promulgated.

## ARTICLE II – COMPANY-WIDE PROVISIONS ON REGULATED PIPELINES

9.  **Integrity Management**

   A.   New Procedures for Interim Reviews and Assessments

7

1. Plains shall modify Section 9.5 of its Integrity Management Plan ("Continual Evaluation and Assessment of Pipeline Integrity") to provide for an annual, but not to exceed 15 months, Interim Review of each pipeline segment it operates to determine whether, since the last assessment (whether it was an Interim Assessment or a full periodic assessment under Section 6), conditions have changed or new information has been obtained that could significantly impact already-identified threats or create new threats for that segment. If so, Plains shall evaluate whether it should implement any P&M measure(s) to address that threat prior to the next regularly-scheduled assessment. Section 9.5 shall list all the categories of potential threats to be considered as part of the Interim Review and the types of conditions, information and data that will be included in the information analysis conducted under 49 CFR § 195.452(g).

2. Plains shall modify Section 9.5 of its IMP to provide new forms for P&M measures or actions to be taken as a result of an Interim Review. Section 9.5 shall provide that Plains' Integrity Engineer may recommend any P&M measures that may be appropriate, including any P&M measures that could be recommended following a full assessment performed under Section 6 of its IMP.

3. Plains shall submit its proposed modifications of Section 9.5 to PHMSA no later than 60 days after entry of the CD. If PHMSA does not object or request any modification within 60 days, Plains shall proceed to implement the revised procedures in Section 9.5, which shall be completed within 18 months from entry of the CD.

B. Documentation for P&M Recommendations

1. Within 90 days from entry of the CD, Plains shall revise Part B of its P&M Recommendation form (F11-2), to expand the scope and content of comments in the "Basis of Recommendation" field to provide a narrative explanation that reflects, at a minimum:

   a. What drew the engineer's attention and caused him or her to make the recommendation (such as an anomaly, pattern, trend or potential correlation observed in the data, a particular event or occurrence, a particular change in the operation or configuration of the line or in its surrounding environment, "lessons learned" from another event or occurrence, a corporate goal or initiative, etc.);

   b. The specific risk (likelihood or consequence of failure, or both) or concern that the recommended measure is intended to investigate or address; and

8

      c.     The goal or intended outcome that the recommended P&M measure is intended to achieve with regard to that specific risk or concern.

    2.     In the new forms for the Interim Review procedure described in Paragraph A above, Plains shall likewise provide a narrative explanation of the bases for any recommended P&M measures.

    3.     In Part B of its Preventive and Mitigative Evaluation Recommendation Form (F11-2), Plains shall continue to identify the anticipated completion date for the P&M measure in the column titled "Deadline Date."

C.    Tracking of P&M Measures

Plains shall document P&M measures recommended but not implemented. Plains shall document implemented P&M measures through to completion, whether undertaken pursuant to an Interim Review under Section 9.5 or a full assessment under Section 6, such that these actions will be properly documented under 49 CFR § 195.452(l).

## 10.   **Valves and O&M**

A.    Within two years after entry of the CD, Plains shall conduct EFRD analyses for all Regulated Pipelines for which it has not previously completed an EFRD analysis.

B.    Within two years of entry of the CD, Plains shall develop and implement procedures to:

    1.     If a valve fails to respond properly on first actuation command, document the failure and review historical records for that valve to identify any systemic issues.

    2.     Adjust Plains' surge analyses and Emergency Response Plans, if necessary, to account for identified systemic issues associated with valve closure times.

    3.     Timely communicate to the Control Room the status of valve maintenance activity for those valves on Regulated Pipelines that are capable of being operated by the Control Room.

    4.     Verify that personnel assigned to operator-qualification tasks for valve maintenance are qualified to perform those tasks.

C.    Plains shall make all repairs necessary to keep valves in good working order within one year of discovery that the valve is not operating as intended, or, if not possible, Plains shall provide timely notification (including justification) to PHMSA or OSFM as applicable.

9

D.    For all field personnel who perform maintenance on facilities, equipment, or devices, Plains shall provide training:

    1.    Within two years of entry of the CD, that addresses the importance of complying with Plains' policy requiring notification of Control Room personnel before beginning maintenance activities on any such facility, equipment, or device that could change the status of any pump, valve, CPM device, SCADA device, pressure or flow metering or rate that is monitored by the Control Room. Plains shall include in the training a requirement that employees shall notify the Control Room before entering a facility to perform maintenance, or, if not possible, immediately after entering.

E.    Plains shall improve existing valve maintenance recordkeeping to include confirmation whether the valve has been actually operated during maintenance.

11.   **Leak Detection**

A.    Within 90 days after entry of the CD, Plains shall create and maintain a list of its regulated mainline pipelines, excluding gathering lines and Delivery Lines, to indicate which of the following three rupture-detection methods, if any, are used on each line: (1) Rate of Change Combination alarm; (2) low discharge pressure alarm; or (3) 5-minute computational pipeline monitoring (CPM) alarm.

    1.    Within one year after entry of the CD, for any regulated mainline pipeline identified in the list created pursuant to this paragraph that does not utilize at least one of the three rupture detection methods, Plains shall implement at least one.

B.    For the term of the CD, Plains shall conduct annual training for controllers on attributes and benefits of various methods of leak detection, including Analog High/Low Threshold, Alarm Deadband, Creep Deviation, and Analog Rate of Change.

C.    Within 18 months of entry of the CD, for its CPM systems, Plains shall analyze and evaluate the use of accumulated deviation rolling time periods longer than 24 hours.

    1.    Plains shall document its analysis and provide it to PHMSA for comment, but Plains shall maintain discretion over what actions to take, if any, and how to implement the results of its analysis.

D.    Within six months of entry of the CD, Plains shall have in place a written procedure for Selection of Leak Detection Method for its Regulated Pipelines.

    1.    Plains shall provide the Selection of Leak Detection Method procedure to PHMSA for comment, but Plains shall maintain discretion over and be

10

responsible for the final content and implementation of the Selection of Leak Detection Method procedure.

E.  Plains will hold periodic (at least annual) meetings to solicit feedback from Control Room and operations maintenance personnel regarding potential improvements to leak detection. The results of the meetings will be documented and shared with appropriate personnel. The recommendations will be evaluated and documented.

F.  Instrumentation and Display

1.  To minimize and prevent false operating conditions from being displayed, Plains shall, per API 1175 (Pipeline Leak Detection – Program Management (1st Edition, December 2015)), within three years from entry of the CD or such earlier time as required by regulations:

a.  Provide a procedure by which operations maintenance personnel and/or Control Room personnel identify and record when instrumentation has been impeded on an unplanned basis and is no longer providing accurate and updated values on pressure, flow, or temperature due to scheduled or planned maintenance activities.

b.  Track these conditions through to resolution, including instrumentation relocation when necessary.

12.  **Control Room Management**

A.  For Lines 901 and 903, prior to resuming operations on segments currently not in service or commencing operations on any replacement for those lines, Plains shall:

1.  Complete point-to-point verification reviews for all components of its SCADA system, including displays, alarm setpoint values, and alarm log descriptors;

2.  Update its piping and instrumentation diagrams, software, manuals, and operating procedures to accurately reflect the existing field configuration;

3.  Confirm that all Lo-Lo and Hi-Hi SCADA alarms are configured and programmed as critical safety related alarms for pressures and flows, and that alert notifications are correct and accurate; and

4.  Update the names of all facilities, equipment, devices, measurement points and locations in console displays, the Control Room Management Plan and Control Center General Procedures, shift reports, and form templates to reflect current operating conditions (updating or removing out-of-date names).

11

B.     For Line 2000, within six months after entry of the CD, Plains shall confirm to the OSFM that all Alarm Descriptors on the control console are accurate.

C.     Plains shall implement the Control Room Management Plan measures and Control Center General Procedures measures referenced in paragraph 23(a) of the CD.

13.    **Emergency Response and Oil Spill Response Plans**

    A.     California-Specific Provisions:

        1.     Plains shall review and update its Bakersfield District Response Zone Plan periodically, as required by applicable regulations, including 14 CCR 816.05. Plains' review shall include the portions of its Response Plan that address identification of culverts along the pipelines' rights-of-way, potential receptors, access to potential spill sites, and procedures to assure protection of the environment from oil spills. To the extent that Plains has a Tactical Response Plan, Plains shall make it available to the Governments upon reasonable request and as needed in connection with a drill or response to a spill.

    B.     Company-Wide Provisions

        1.     Plains shall, at least once before two years from the date of entry of the CD, and at least one additional time prior to termination of the CD, survey its rights-of-way for all regulated mainline pipelines of at least 24" diameter, by foot or air patrol, to identify all culverts and shall ensure the emergency response plans covering those pipelines (a) reflect the locations of all culverts identified, and (b) address potential containment and recovery techniques for spills that may occur near identified culverts.

        2.     Within 180 days of entry of the CD (or within 180 days of a new employee being hired, or an existing employee being assigned to relevant duties) Plains shall provide or confirm that it has provided all employees who may reasonably be involved in spill response with NIMS ICS training at the 100 and 200 levels. Within 180 days of entry of the CD, Plains shall also provide or confirm that it has provided ICS training at the 300 and 400 level to any employee who may reasonably be expected to coordinate with the Incident Management Team during a spill response. Plains shall provide refresher training to employees within two years after initial training and shall maintain certification of such training and make such documents available to Plaintiffs upon request.

        3.     Going forward from the date of the CD, Plains shall include in its contracts with all Oil Spill Response Organizations (OSROs) a requirement that the OSROs' employees and contract employees receive training at the same level specified for Plains employees, based on their responsibilities, prior to participating in any incident response on behalf of

12

Plains. Plains shall require its OSRO contractors and subcontractors to register with a third-party online compliance verification system and shall use that online verification system to spot-check the NIMS ICS Training histories for randomly-selected OSRO personnel who participate in Plains' table-top drills. Plains' spot-check shall include a reasonable number of OSRO personnel participating in the drills to help ensure that all OSRO personnel participating in incident response are trained at the ICS levels specified herein.

4.    Within 180 days of entry of the CD, Plains shall provide or confirm that it has provided all Control Room supervisors with training regarding the Control Room's emergency response responsibilities and procedures. Plains shall provide this training annually thereafter. Plains shall maintain auditable documentation that supervisors have received such training and shall make such documentation available to PHMSA upon request.

5.    Plains shall notify PHMSA (and, for California Lines, California OSPR and OSFM) of company-sponsored and organized drills in accordance with applicable regulations, including table tops (either with or without equipment deployment). Plains shall provide PHMSA (and, for California Lines, California OSPR and OSFM) with after-action reports for each table-top drill involving equipment deployment within 90 days of completion of the drill. Plains shall include lessons learned in such after-action reports and shall consider such lessons learned for incorporation into future drills or exercises.

6.    For the term of the CD, a representative of Plains' Control Room management team shall participate in any after-action or "hot wash" activity designed to identify areas of improvement following a release, and shall share, in documented form, the information obtained with relevant Control Room personnel.

14.    **Safety Management System (SMS)**

A.    Plains shall continue to implement its SMS, which is based on recommended practices in American Petroleum Institute (API) RP 1173 (Pipeline Safety Management Systems (1st Edition, July 2015)).

1.    Prior to the termination of the CD, Plains shall hire a third party to assess the conformance of its SMS to API RP 1173. Plains shall direct the third party to transmit a copy of the final report to PHMSA. Plains' responsibility under this paragraph shall be limited to engaging the third party to prepare the report and providing the report to PHMSA. Any nonconformance identified by the third party shall not be a violation of the CD.

13

B.      Plains shall participate in the API Pipeline SMS Group to exchange ideas, information, and lessons learned about implementation of API RP 1173.

15.   **Drug and Alcohol Program**

A.      Within one year of entry of the CD, Plains shall review and revise its drug and alcohol misuse plans to comply with post-accident and random drug and alcohol testing required by 49 C.F.R. §§ 199.105(b), (c), and 49 C.F.R. § 199.225(a). This shall include a review of all covered positions among Control Room personnel and field personnel for inclusion in the plans for post-accident testing. Covered positions shall include any person with authority to shut down a pipeline, including Control Room shift supervisors. Plains shall ensure adequate implementation and documentation for all post-accident drug/alcohol tests as required by 49 C.F.R. § 199.117(a)(5) and 49 C.F.R. §§ 199.227(b)(4), (c)(1)(v) and in accordance with its procedures. Should Plains determine that it is not possible to administer a post-accident drug/alcohol test on a covered employee whose performance of a covered function either contributed to the accident or could not be completely discounted as a contributing factor within the time specified in the regulations, Plains shall document why the test was not administered within such time.

14

# APPENDIX C

## *(Intentionally left blank)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

-89-

# APPENDIX D

# *(Remaining Corrective Actions from the PHMSA CAO)*

*United States of America and the People of the State of California v.*
*Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*
*Consent Decree*

# APPENDIX D

1.      All outstanding corrective actions in PHMSA's closed Corrective
Action Order (CAO), CPF No. 5-2015-5011H, as amended, are hereby merged into
this Consent Decree, as outlined below, and subject to the sole regulatory oversight
of the OSFM.

      a. **Line 901 Shutdown.** Plains shall not operate Line 901 until
         authorized to do so by the OSFM.

      b. **Restart Plan for Line 901.** If Plains seeks to restart Line 901,
         Plains shall develop and submit, at least 60 days in advance of a
         scheduled restart, a written Restart Plan for Line 901 to the
         OSFM for review and approval.  Once approved by the OSFM,
         the Restart Plan shall be incorporated by reference into this
         Consent Decree.  The Restart Plan shall include:

           1)      Documentation of the completion of all mandated
           actions, and a management of change plan to ensure that all
           procedural modifications are incorporated into Plains'
           operations and maintenance procedures manual;

           2)      Provisions for adequate patrolling of Line 901 during the
           restart process and shall include incremental pressure increases
           during start-up, with each increment to be held for at least two
           hours;

           3)      Sufficient surveillance of the pipeline during each
           pressure increment to ensure that no leaks are present when
           operation of the line resumes;

           4)      A specific day-light restart that includes advance
           communications with local emergency response officials;

           5)      Master Control Room enhancements, including:

              a) Implementation of advanced leak-detection

- 1 -

capabilities that include mass balance and line pack calculations (the total volume of liquid present in a pipeline section). The leak-detection improvements shall include:

1. Revised alarm threshold adjustments;

2. Additional required instrumentation; installation of additional safety valves as a result of Plains' EFRD evaluation;

b) Review and update of the alarm set-point values of pressures and flows to account for hydraulics and the interaction of topography, pipeline status (running and shutdown), sensor location, and historical pressure and flow values by configuration, in order to provide a basic level of leak detection when the pipeline is down and not running. Dynamic alarm limits based on pipeline status shall be used if hydraulically required;

c) Implementation of modifications to the existing alarm priority/severity system to incorporate low and high pressure and flow values in major or safety-related alarm (SRA) categories;

d) Implementation of emergency shutdown programming associated with Line 901 that can be executed by the Shift Supervisor or Controller;

e) Development and implementation of training associated with the emergency shutdown programming described above; and

f) Provision of additional controller training that

incorporates awareness of abnormal operations and reduced-pressure operational characteristics, including alarm set-point revisions for conditions similar to the Refugio Incident.

6)    Elimination and documentation of actions taken to prevent inappropriate uncommanded Valve 460 (Sisquoc Conoco) status and position changes;

7)    Installation of additional safety valves as a result of Plains' EFRD evaluation;

8)    Installation of additional pressure sensors as a result of Plains' surge study;

9)    Initiation of a UT ILI within seven days after steady-state operation is achieved in accordance with an ILI schedule approved by the OSFM. The tool run shall be initiated during daylight hours. If the tool run does not collect a complete data set, the UT tool shall be promptly re-run. A report from the ILI tool vendor shall be completed within 30 days of running the tool. Plains shall complete its review and analysis of the ILI report within 15 days of receiving the report. Provisions shall be made to address any immediate repairs that result from an initial data analysis of the UT ILI run; and

10)    **Corrosion Prevention.** Plains shall include a long-term plan to address corrosion under insulation (CUI) on Line 901 that meets the requirements of 49 C.F.R. Part 195, Subpart H, in any Restart Plan. Plains may address the inadequate corrosion prevention through any method approved by the OSFM, including but not limited to the provisions contained in CAO Amendment No. 3, Section 2(a)-(c).

c. **Return to Service of Line 901.** After the OSFM approves the Restart Plan, Plains may return Line 901 to service but the operating pressure shall not exceed eighty percent (80%) of the actual operating pressure in effect immediately prior to the Refugio Incident on May 19, 2015.

d. **Removal of Pressure Restriction of Line 901.** The OSFM may allow the removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline. The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary Preventive and Mitigative (P&M) measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 901 during the temporary removal or modification of the pressure restriction.

e. **Line 903 Shutdown.** After purging Line 903, Plains shall not operate Line 903 between Gaviota and Pentland stations until authorized to do so by the OSFM.

f. **Restart Plan for Line 903.** If Plains seeks to restart the Gaviota-to-Pentland segment of Line 903, Plains shall develop and submit, at least 60 days in advance of a scheduled restart, a written Restart Plan for the Gaviota-to-Pentland segment of Line

903 to the OSFM for review and approval. Once approved by the OSFM, the Restart Plan shall be incorporated by reference into this Consent Decree. In addition to all the requirements set forth in the above subparagraphs 1.b.1)-11), excluding subparagraph 1.b.6), the Restart Plan shall include:

1)    Provisions for adequate patrolling during the restart process and the inclusion of incremental pressure increases during start-up, with each increment to be held for at least two hours;

2)    Sufficient surveillance of the pipeline during each pressure increment to ensure that no leaks are present when operation of the line resumes; and

3)    Provisions for a daylight restart and advance communications with local emergency response officials.

g.   **Line 903 Return to Service.** After the OSFM approves the Restart Plan for the Gaviota-to-Pentland segment of Line 903, Plains may return that segment to service, but the operating pressure shall not exceed eighty percent (80%) of the highest pressure sustained for a continuous 8-hour period between April 19, 2015, and May 19, 2015, for Line 903 (Gaviota-to-Sisquoc and Sisquoc-to-Pentland segments).

h.   **Removal of Pressure Restriction for Line 903.** After a return to service, Plains may request the OSFM to remove the pressure restriction for the Gaviota-to-Pentland segment of Line 903.

1)    The OSFM may allow removal or modification of the pressure restriction upon a written request from Plains demonstrating that restoring the pipeline to its pre-Refugio Incident operating pressure is justified, based on a reliable

engineering analysis showing that the pressure increase is safe, considering all known defects, anomalies, and operating parameters of the pipeline.

2) The OSFM may allow the temporary removal or modification of the pressure restriction upon a written request from Plains demonstrating that temporary P&M measures will be implemented prior to and during the temporary removal or modification of the pressure restriction. The OSFM's determination shall be based on consideration of the Refugio Incident's cause and Plains' evidence that P&M measures provide for the safe operation of Line 903 during the temporary removal or modification of the pressure restriction. Requests for removal of the pressure restriction may be submitted by pipeline segment.

i. **Notifications.** Plains shall provide notification to the OSFM within five business days of any of the following events: any investigation and remediation field actions for identified anomalies (i.e., digs and repairs), ILI tool runs, and/or startup dates.

j. **Reporting Requirements for Lines 901 and 903.** If and when Plains has concluded all items in this Appendix D, Plains shall submit a final Appendix D Documentation Report to the OSFM for review and approval.

1) The OSFM may approve the Appendix D Documentation Report incrementally without approving it in its entirety.

2) Once approved by the OSFM, the Appendix D Documentation Report shall be incorporated by reference into this Consent Decree.

3)    The Appendix D Documentation Report shall include but not be limited to:

    A.    Table of Contents;

    B.    [*intentionally left blank.*]

    C.    [*intentionally left blank.*]

    D.    Summary of all tests, inspections, assessments, evaluations, and analysis to the extent required under this Appendix D;

    E.    [*intentionally left blank.*]

    F.    [*intentionally left blank.*]

    G.    Lessons learned while fulfilling the requirements of this Appendix D.

**ELECTRONICALLY FILED**
Superior Court of California,
County of Kern
By: Marina Mercado
Deputy Clerk
**12/5/25 1:54 PM**

1  ROB BONTA
Attorney General of California
2  BRANDON S. WALKER SBN. 254581
Supervising Deputy Attorney General
3  JACK C. NICK SBN. 160196
ISABELLA A. PANUCCINI SBN. 318984
4  Deputy Attorneys General
1300 I Street, Suite 125
5  Sacramento, CA 95814
Telephone: (916) 210-6395
6  Fax: (916) 327-2319
E-mail: Brandon.Walker@doj.ca.gov
7  *Attorneys for Defendant State of California*

*Exempt from Filing Fees Pursuant to
Government Code § 6103*

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF KERN

10                     METROPOLITAN DIVISION

11

12

13  **Pacific Pipeline Company, A Delaware Corporation,**

Case No. BCV25103508

14                                            Plaintiff,

**DECLARATION OF BRANDON S. WALKER IN SUPPORT OF MOTION TO CHANGE VENUE (Vol. 3 of 3)**

15         v.

16  **State of California and DOES 1 through 25,**

Date:       February 3, 2026
Time:      8:30 a.m.
Dept:      H
Judge:     Hon. Bernard C. Barmann, Jr.

17                                         Defendants.

18

Action Filed: September 29, 2025

19

20

21

22

23

24

25

26

27

28

1

# EXHIBIT "E"

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



## CERTIFIED MAIL No: 9589-0710-5270-1475-5353-08

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:  LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR
LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON
THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG
A LONGITUDINAL SEAM WELD (CA-324)**

Operator:    Sable Offshore Corp
             OPID# 40851
             845 Texas Avenue, # 2920
             Houston, Texas 77002

Pipeline:    OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable
             Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara
             County, California as described in the request of state waiver dated April 24,
             2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state
waiver request (*Application*) on April 24, 2024, in accordance with the terms of the
Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and
the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B,
Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations
(49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for
Sable CA-324.

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Lance Yearwood
December 17, 2024
Page 2

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation. Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-324 (OSFM Line ID 0015) which consists of a 10.86 mile long, 24-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara, California and shall be referred herein as *CA-324.*

The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-324, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In the event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control.

Lance Yearwood
December 17, 2024
Page 3


Should additional federal or State statutory or regulatory requirements come into effect
following the implementation of this state waiver, CA-324 shall be subject to those
requirements except where they are in conflict with the State Waiver or the safe operation
of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) of CA-324 cannot exceed 1003
   pounds per square inch gauge (psig).
3. The maximum operating temperature of the crude oil that transports in CA-324
   must not exceed 140 Fahrenheit for more than 12 consecutive hours.
4. Prior to startup, Sable must develop and implement procedures for the
   conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49
   C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than
   contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the
   Consent Decree (United States District Court Central District of California Civil
   Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying
      cluster corrosion and general corrosion. Definition of cluster and general
      corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of
         the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall
          thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion
      at a 90 percent probability of detection (POD) and probability of identification
      (POI).
   c. Use of a tool that is at least capable of reliably detecting and sizing cracks or
      crack-like anomalies at a 90 percent POD and POI.
8. Prior to placing CA-324 in operation, Sable must perform fracture toughness
   tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B
   Standard Test Method for Measurement of Fracture Toughness. All of the test
   specimens must be from the predominant existing 24" pipe, specifically API 5L
   X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by

Lance Yearwood
December 17, 2024
Page 4

Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of its CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 30, 33, and 48. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324. Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by OSFM. Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines*. If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-324.

**Pressure Testing**

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Lance Yearwood
December 17, 2024
Page 5

the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

   a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

   b. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segments at a minimum of 1.25 times the MOP.

14. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM.

15. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

16. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
Subject: OSFM State Waiver - Hydrotest Failure

17. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

## In-Line Inspection (ILI) Assessment and Frequency

18. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:

   a) Dates for integrity assessment

   b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.
[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Lance Yearwood
December 17, 2024
Page 6

        segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications

    c) In-line inspection tool vendor(s)

    d) Required tool specifications including operational specifications and anomaly sizing tolerances

    e) Tool validation methodology

    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

    g) Criteria used to identify locations for excavation and field verification

    h) Non-destructive examination

19. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

20. Metal Loss Tool(s)

    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-324, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-324, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

21. Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15

Lance Yearwood
December 17, 2024
Page 7

months[5] or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval.

   a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

   b. USCD Performance Specification Requirements

      i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

      ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

      iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

      iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

22. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

23. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

24. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

25. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

26. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

27. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

document and justify the values used. Sable must demonstrate ILI tool
tolerance accuracy for each ILI tool run by using calibration, excavations, and
unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy
specification provided by the vendor (typical for depth within +10% accuracy
for 80% of the time). Sable must compare previous indications to current
indications that are significantly different. If a trend is identified where the tool
has been consistently over-calling or under-calling, the remaining ILI features
must be re-graded accordingly.

28. Prior to the ILI final report being received, Sable must perform at least four (4)
separate validation digs that do not interact with each other. At a minimum,
Sable must perform validation digs in accordance with Level 2 of API Standard
1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

29. The discovery date must be within 180 days of any ILI tool run for each type of
ILI tool.

## Immediate Repair Conditions[7]

30. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe
       wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less
       than 1.39 times the MOP as calculated using crack-like flaw evaluation
       method ASME FFS-1/API 579-1.

31. Internal or external metal loss anomalies where the remaining strength of pipe
    shows a predicted failure pressure less than 1.39 times the MOP.

32. Any external cluster corrosion or external general corrosion that is located on the
    bottom half of the pipeline (below the 3 and 9 o'clock positions) where the

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i)*
*Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate
repair conditions must be remediated with a permanent repair method.

Lance Yearwood
December 17, 2024
Page 9

remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

## 180-Day Repair Conditions[9]

33. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
34. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
35. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
36. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

37. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11] The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
38. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

---

[8] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii). All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

Lance Yearwood
December 17, 2024
Page 10

39. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
40. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].
41. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

**Pressure Reduction**

42. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

**In Field Direct Examination of Pipe**

43. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.
44. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:
    a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

---

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.
[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.
[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Lance Yearwood
December 17, 2024
Page 11

    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

45. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]

47. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

## Integrity Management

48. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).

    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

49. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

50. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Lance Yearwood
December 17, 2024
Page 12

51. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

52. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

53. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

54. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

55. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

56. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

57. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions

Lance Yearwood
December 17, 2024
Page 13

> e. Evaluation methodology used
> f. Models used
> g. Direct in situ examination data
> h. All in-line inspection tool assessments information evaluated
> i. Pressure test data and results
> j. All in-the-ditch assessments performed on the pipeline segments
> k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
> l. All finite element analysis results
> m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology
> n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
> o. Safety factors used for fatigue life and/or predicted failure pressure calculations
> p. Reassessment time interval and safety factors
> q. The date of the review
> r. Confirmation of the results by qualified technical subject matter expert(s)
> s. Approval by responsible Sable management personnel
> t. Records of additional preventive and mitigative (P&M) measures performed
> u. Reports required by this State Waiver.

## Reporting

> 58. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]
> 59. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-324.* The email notification shall include, if applicable:
> > a. Tool type and run date
> > b. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
> > c. Dig sheets
> > d. Field contact information for Sable
> > e. Time and location of the field evaluation and repair.
> 60. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-324* and include:

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

Lance Yearwood
December 17, 2024
Page 14

      a. Tool type
      b. Run date
      c. Summary of Conditions Report[18]
      d. Final Vendor Report and Pipe Tally

61. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report CA-324*. At a minimum, the annual report shall contain the following, if applicable:
    a. A Closure Report for the previous calendar (CY) which contains:
        i. Features that were remediated in previous CY
            1. Provide documentation for the in-the-ditch assessments and repairs
        ii. Identify features that remain to be assessed
        iii. Unity Plots for previous ILI runs
    b. Fracture mechanics and pressure cycling analyses in accordance with Condition 48
    c. The third-party ILI expert reviews in accordance with Condition 52
    d. AC and DC Interference surveys that are due in accordance with Condition 53
    e. A copy of the CGRA for prior year including:
        i. Mean corrosion growth rate for the pipeline
        ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

62. This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
63. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
64. The OSFM may order the pipeline shutdown at any time.
65. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for

---

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Lance Yearwood
December 17, 2024
Page 15

failure to comply with this state waiver. The terms and conditions of any
compliance order shall take precedence over the terms of the state waiver.
66. In the event of conflict between the state waiver conditions and industry
standards, the state waiver conditions shall prevail.
67. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets
covered by the state waiver, Sable must provide the OSFM written notice of the
change within 30 days of the consummation date. In the event of such transfer,
the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline
Safety Engineer at (916) 212-8891.

Sincerely,

DocuSigned by:

James Hosler

980F903AE66C42E...
JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-324

cc:    Doug Allen, Supervising Pipeline Safety Engineer, OSFM
Andy Chau, Supervising Pipeline Safety Engineer, OSFM
Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
Tuan Tran, Pipeline Safety Engineer, OSFM
Josh Cleaver, Staff Counsel, CAL FIRE
Max Kieba, Engineering and Research Division, PHMSA
Joshua Johnson, Engineering and Research Division, PHMSA

# EXHIBIT "F"

STATE OF CALIFORNIA—NATURAL RESOURCES AGENCY                                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



### <u>CERTIFIED MAIL No: 9589-0710-5270-1475-5353-15</u>

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

SUBJECT:   **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR**
           **LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON**
           **THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG**
           **A LONGITUDINAL SEAM WELD (CA-325A/B)**

Operator:   Sable Offshore Corp
            OPID# 40851
            845 Texas Avenue, Suite 2920
            Houston, Texas 77002

Pipeline:   OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of
            Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa
            Barbara County, San Luis Obispo County, and Kern County, California as
            described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state
waiver request (*Application*) on April 24, 2024, in accordance with the terms of the
Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and
the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B,
Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations
(49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for
Sable CA-325 A/B.

Sable explained that its goal is to appropriately manage the risk of corrosion under
insulation that may occur as a result of inadequate cathodic protection due to the

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Lance Yearwood
December 17, 2024
Page 2

shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation. Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-325A/B (OSFM Line ID 0001) which consists of a 113.56 mile long, 30-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara County, San Luis Obispo County, and Kern County, California and shall be referred herein as CA-325A/B. CA-325A/B consists of two shorter pipeline segments, CA-325A and CA-325B. The pipeline segment CA-325A, located completely in Santa Barbara County, starts in Gaviota and ends at Sisquoc. CA-325A is approximately 38.72 miles long. The other pipeline segment, CA-325B, which is directly downstream of CA-325A, begins at Sisquoc and terminates in Pentland. CA-325B is approximately 74.84 miles long and traverses Santa Barbara County, San Luis Obispo County, and Kern County, California. The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-325 A/B, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these

Lance Yearwood
December 17, 2024
Page 3

state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R.
§195.452(h)(4)(iii)(H). In event of a conflict between the state waiver conditions and the
applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control.
Should additional federal or State statutory or regulatory requirements come into effect
following the implementation of this state waiver, CA-325 A/B shall be subject to those
requirements except where they are in conflict with the State Waiver or the safe operation
of the pipeline.

## General Conditions

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) cannot exceed:
   a. 1000 pounds per square inch gauge (psig) for CA-325A.
   b. 1292 psig for CA-325B.
3. The maximum operating temperature of the crude oil must not exceed:
   a. 125 Fahrenheit for more than 12 consecutive hours for CA-325A.
      Temperature transmitters must be installed on CA-325A at Gaviota station to
      monitor the temperature of CA-325A/B at this facility.
   b. 110 Fahrenheit for more than 12 consecutive hours for CA-325B.
      Temperature transmitters must be installed on CA-325A/B at Sisquoc station
      to monitor the temperature of CA-325A/B at this facility.
4. Prior to startup, Sable must develop and implement procedures for the
   conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49
   C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than
   contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the
   Consent Decree (United States District Court Central District of California Civil
   Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying
      cluster corrosion and general corrosion. Definition of cluster and general
      corrosion is as follows:
         i. Cluster means two or more adjacent metal loss features in the wall of
            the pipe or weld that may interact based on interaction criteria.
        ii. General corrosion means uniform or gradually varying loss of wall
            thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion
      at a 90 percent probability of detection (POD) and probability of identification
      (POI)
   c. Use of a tool that is at least capable of reliably detecting and sizing crack or
      crack-like anomalies at a 90 percent POD and POI

Lance Yearwood
December 17, 2024
Page 4

8. Prior to placing CA-325A/B in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:
   a. API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.
   b. API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

   At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 31, 34, and 49. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B. Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM. Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B.

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Lance Yearwood
December 17, 2024
Page 5

## Pressure Testing

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:
    **a.** All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    **b.** All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.
13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum of 1.25 times the MOP.
14. Prior to placing the pipeline in operation, Sable must conduct a hydrostatic pressure test of the state waiver pipeline segment *CA-325B* at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.
15. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test segment and have the approved independent testing firm forward the certified test results to the OSFM.
16. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.
17. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
    Subject: OSFM State Waiver - Hydrotest Failure.
18. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

Lance Yearwood
December 17, 2024
Page 6

## In-Line Inspection (ILI) Assessment and Frequency

19. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:
    a) Dates for integrity assessment
    b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications
    c) In-line inspection tool vendor(s)
    d) Required tool specifications including operational specifications and anomaly sizing tolerances
    e) Tool validation methodology
    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications
    g) Criteria used to identify locations for excavation and field verification
    h) Non-destructive examination
20. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.
21. Metal Loss Tool(s)
    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-325 A/B, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.
    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-325 A/B, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If,

---

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Lance Yearwood
December 17, 2024
Page 7

        any UTWM tool run is deemed to be unsuccessful, Sable shall document the
        reasons why the UTWM tool was unsuccessful, consider changes to
        increase the likelihood of a successful UTWM tool run, and must reassess
        the pipeline within 30 days after it was deemed to be unsuccessful. All metal
        loss tool runs must also utilize an Inertial Measurement Unit (IMU).

22. Crack Detection Tools - Sable must run at least one (1) Ultrasonic Shear Wave
    Crack Detection (USCD) tool each calendar year, not to exceed 15 months[5] or
    the ILI assessment must be assessed at more frequent intervals if Condition 49
    determined a shorter assessment interval.

    a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and
       must be able to detect and size axial and circumferential cracks.

    b. USCD Performance Specification Requirements

       i. The USCD tools must have a probability of detection that is $\geq$ 90% for
         axial and circumferential cracks.

       ii. The minimum crack depth that can be detected must be at least 1
         mm for axial and circumferential cracks that are located in the base
         material.

       iii. The minimum crack depth that can be detected must be at least 2
         mm for axial and circumferential cracks that are located in the weld.

       iv. The depth sizing accuracy for cracks must be $\pm$ 0.8 mm for axial
         cracks and $\pm$ 1 mm for circumferential cracks.

23. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation
    ILI tool with each UTWM.

24. Where any ILI tool fails to record data for 5% or more of the external and/or
    internal surface area of the inspected segment, reassess with the ILI tool to
    cover the area that is deemed to be inadequate data of the inspected segment.
    In addition, if the ILI tool travels at a speed that is outside the range of the tool
    velocity listed in the tool specification for 2% or more of the length of the
    inspected segment, Sable must rerun the ILI tool to reassess the pipeline
    segment in which the ILI tool velocity was outside of the specified tool velocity
    range.

25. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

26. Sable must require its ILI tool vendor(s) to include in the vendor's inspection
    report all metal loss indications of 10% or greater, based on raw data, prior to
    adding in any correction for tool tolerance.

27. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service
    provider determines the tolerance of each tool, in accordance with API
    Standard 1163 Second Edition and includes that tolerance in determining the
    size of each indication reported to Sable.

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when
sufficient evidence is available to determine if crack growth rates could support a longer reassessment
interval. Changes to the reassessment interval are subject to the OSFM and PHMSA approval.

Lance Yearwood
December 17, 2024
Page 8

28. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

29. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

30. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

31. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

32. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

33. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[8] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

Lance Yearwood
December 17, 2024
Page 9

## 180-Day Repair Conditions[9]

34. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
35. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
36. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater metal loss, including tool sizing tolerance for depth.[10]
37. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

38. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
39. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.
40. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
41. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

---

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii). All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

Lance Yearwood
December 17, 2024
Page 10

42. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

**Pressure Reduction**

43. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

**In Field Direct Examination of Pipe**

44. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

45. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

    a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

    b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

    c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

---

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.
[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Lance Yearwood
December 17, 2024
Page 11

47. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[16]
48. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

## Integrity Management

49. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.
    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).
    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).
50. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.
51. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).
52. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.
53. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.
54. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC)

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Lance Yearwood
December 17, 2024
Page 12

> interference or direct current (DC) interference or shorting that could contribute
> to external corrosion is occurring. The expert must recommend the frequency
> of subsequent interference surveys. All evaluations must be approved and
> signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

55. Unless the defect dimensions have been verified using a direct examination
measurements, Sable must explicitly analyze uncertainties in reported
assessment results including but not limited to tool tolerance, detection
threshold, probability of detection, probability of identification, sizing accuracy,
conservative anomaly, interaction criteria, location accuracy, anomaly findings,
and unity chart plots or equivalent for determining uncertainties and verifying tool
performance, in identifying and characterizing the type and dimensions of
anomalies or defects used in the analyses.

56. The analyses performed in accordance with this state waiver must utilize pipe
and material properties of the pipe body and longitudinal weld seam that are
documented in *traceable, verifiable, and complete* records.

## Recordkeeping

57. Procedures, records of investigations, data, analyses, and other actions made in
accordance with the requirements of this state waiver shall be kept for the life of
the pipeline and must be submitted to the OSFM, in the manner requested
(electronic, hardcopy, or other format) within 30 days.

58. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions
    e. Evaluation methodology used
    f. Models used
    g. Direct in situ examination data
    h. All in-line inspection tool assessments information evaluated
    i. Pressure test data and results
    j. All in-the-ditch assessments performed on the pipeline segments
    k. All measurement tool, assessment, and evaluation accuracy specifications
    and tolerances used in technical and operations results
    l. All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual
    pressure cycles, and the pressure cycle counting methodology

Lance Yearwood
December 17, 2024
Page 13

      n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
      o. Safety factors used for fatigue life and/or predicted failure pressure calculations
      p. Reassessment time interval and safety factors
      q. The date of the review
      r. Confirmation of the results by qualified technical subject matter expert(s)
      s. Approval by responsible Sable management personnel
      t. Records of additional preventive and mitigative (P&M) measures performed
      u. Reports required by this State Waiver.

## Reporting

59. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

60. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-325 A/B.* The email notification shall include, if applicable:
      d. Tool type and run date
      e. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
      f. Dig sheets
      g. Field contact information for Sable
      h. Time and location of the field evaluation and repair.

61. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-325 A/B* and include:
      i. Tool type
      j. Run date
      k. Summary of Conditions Report[18]
      l. Final Vendor Report and Pipe Tally

62. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report*

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.
[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Lance Yearwood
December 17, 2024
Page 14

*CA-325 A/B*. At a minimum, the annual report shall contain the following, if applicable:
   a. A Closure Report for the previous calendar (CY) which contains:
      i. Features that were remediated in previous CY
         1. Provide documentation for the in-the-ditch assessments and repairs
      ii. Identify features that remain to be assessed
      iii. Unity Plots for previous ILI runs
   b. Fracture mechanics and pressure cycling analyses in accordance with Condition 49
   c. The third-party ILI expert reviews in accordance with Condition 53
   d. AC and DC Interference surveys that are due in accordance with Condition 54
   e. A copy of the CGRA for prior year including:
      i. Mean corrosion growth rate for the pipeline
      ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

63. This state waiver is limited to a term of no more than ten (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
64. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
65. The OSFM may order the pipeline shutdown at any time.
66. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.
67. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.
68. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Lance Yearwood
December 17, 2024
Page 15

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline
Safety Engineer at (916) 212-8891.

Sincerely,

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline a Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-325 A/B

cc:    Doug Allen, Supervising Pipeline Safety Engineer, OSFM
       Andy Chau, Supervising Pipeline Safety Engineer, OSFM
       Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
       Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
       Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
       Tuan Tran, Pipeline Safety Engineer, OSFM
       Josh Cleaver, Staff Counsel, CAL FIRE
       Max Kieba, Engineering and Research Division, PHMSA
       Joshua Johnson, Engineering and Research Division, PHMSA

# EXHIBIT "G"



Emergency? Call 911    Translate    Settings



*Search safety information*

Home › What We Do › Pipeline Safety & CUPA › Out-of-Service Deferral Program

SEARCH

# Out-of-Service Deferral Program

In order to clarify the regulatory requirements that may vary depending on the operational status of a pipeline, the Pipeline and Hazardous Materials Safety Administration (PHMSA) issued Advisory Bulletin (ADB)-2016-0075 to all operators of Hazardous Liquid and Carbon Dioxide pipelines. ADB-2016-0075 advises operators who wish to defer certain activities for purged pipelines to coordinate the deferral in advance with regulatory agencies, such as CAL FIRE - Office of the State Fire Marshal (OSFM) for intrastate pipelines. According to the bulletin, purged pipelines present different risks, and different regulatory treatments may be appropriate. The OSFM will consider each deferral request and approve deferral activities that are deemed impractical for purged pipelines.

It is important to note that PHMSA is currently in the process of rulemaking to establish a defined operational status called "idled" for pipelines that are temporarily taken out of service. This rulemaking also aims to set forth operations and maintenance requirements for idled pipelines and establish inspection requirements for idled pipelines that are subsequently turned to service. The ongoing rulemaking process, with a Regulatory Identification Number (RIN) of 2137-AF52, indicates PHMSA's commitment to add regulatory framework for idled pipelines. Meanwhile, the OSFM follows the guidelines provided in ADB-2016-0075 when reviewing deferred maintenance requests for purged pipelines submitted by operators.

ASK CAL FIRE

Let's Chat

# Procedures

## Step 1: Deferral Request

The operator is required to submit a deferral request to the Assistant Deputy Director of the Pipeline Safety Division at the OSFM. The request should be sent via email to the Pipeline Notification address: pipelinenotification@fire.ca.gov.

The deferral request must provide the following information about the pipeline:

- OSFM Pipeline Identification Number.
- Commodity contained in the pipeline at the time of the application.
- Length of the purged pipeline segment, along with a map showing the beginning and end locations of the purged pipeline.
- Procedure for purging the hazardous liquid from the pipeline.
- Activities for which the operator is requesting a deferral, including specific regulatory sections.
- Supporting documents demonstrating how the line is isolated from the active pipeline system (e.g., pictures with GPS locations for both ends of the subject pipelines).
- Explanation of why each deferred activity is impractical for the subject pipeline.

## Step 2: Field Inspection(s) and/or Records Review

Upon receiving the deferral request, the OSFM may request the operator to provide a schedule of any field activities related to the subject pipeline. The OSFM may also conduct field inspections to verify that the pipeline has been purged and cleaned in accordance with the provided procedure.

At the conclusion of the field activities, the operator must submit the following supporting documents to the OSFM:

- Records demonstrating that the subject pipeline has been purged.

- Pictures and GPS locations of each isolation point.

## Step 3: Acknowledgment

Each deferral request is evaluated based on the criteria outlined in PHMSA-2016-0075:

- Proper purging of the hazardous liquid from the pipeline.

The OSFM will send a letter acknowledging each deferral request upon review.



**Information Bulletin**

- Pipeline Status Terminology

- PHMSA-2016-0075 Advisory Bulletin

- National Pipeline Mapping System  ☒

**Program Contact**

The OSFM is available to discuss the Out-of-Service Deferral Program with any operator in a virtual meeting.

*Virtual Meeting Contact:*

Andy Chau
Supervising Pipeline Safety Engineer
andy.chau@fire.ca.gov
(562) 305-0679



**QUICK LINKS**

Defensible Space

GovMotus Fire Permits

Fire Hazard Severity Zones

Recalls

Subscribe

2024 Strategic Plan

**DIVISIONS**

Code Development & Analysis

Community Wildfire Preparedness & Mitigation

Fire & Life Safety Division

Fire Engineering & Investigations

Pipeline Safety & CUPA

State Fire Training

**TRAINING RESOURCES**

Available Classes

State Fire Training Portal

Continuing Education (FSTEP)

Professional Certification (CFSTES)

Instructor Registration

Instructor Database

Back to Top    Accessibility    Conditions of Use    Privacy Policy    Site Map    Glossary of Terms

Copyright © 2025 State of California

# EXHIBIT "H"

Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 316 of 464

Sable Offshore Corp.
Cease and Desist Order, Restoration Order and Administrative Penalty
CCC-25-CD-01, CCC-25-RO-01 & CCC-25-AP3-01
Page 1 of 26

## CEASE AND DESIST ORDER CCC-25-CD-01,
## RESTORATION ORDER CCC-25-RO-01,
## ADMINISTRATIVE CIVIL PENALTY CCC-25-AP3-01

### 1.0    CEASE AND DESIST ORDER CCC-25-CD-01

Pursuant to its authority under California Public Resource Code ("PRC") Section 30810, the California Coastal Commission ("the Commission") hereby orders and authorizes Sable Offshore Corporation ("Sable"); its successors in interest, heirs, officers, managers, assigns, employees, agents, and contractors; and any other persons or entities acting in concert with any of the foregoing (hereinafter collectively referred to as "Sable") to take all actions required by this Cease and Desist Order, in compliance with its terms, including by complying with the following:

1.1    Cease and desist from engaging in or undertaking any development, as that term is defined in the Coastal Act (PRC Section 30106) and the Santa Barbara County Local Coastal Program (at Section 35-58), that requires a coastal development permit on any of the property and/or locations defined in Section 4.3, below, as the Santa Ynez Unit unless confirmed by the Executive Director of the Coastal Commission to have received the requisite Coastal Act authorization or to be exempt, including but not limited to the following development undertaken or planned at A) locations onshore: excavation; removal of major vegetation; fill of wetlands; grading and widening of roads; installation of metal plates over water courses; dewatering and discharge of water; removal, replacement, and reinforcement of pipeline and pipeline infrastructure; and other development associated with the return to service of Las Flores Pipelines CA-324 and CA-325 and; B) at locations offshore: placement of sand and cement bags on the seafloor below and adjacent to Sable's out-of-service offshore oil and water pipelines; as part of an effort to restart the Santa Ynez Unit oil production operations and bring the pipelines back into use.

1.2    Fully and completely comply with the terms and conditions set forth herein, including the terms and conditions of Cease and Desist Order No. CCC-25-CD-01, Restoration Order No. CCC-25-RO-01, and Administrative Penalty No. CCC-25-AP3-01 (collectively, "Orders"). These Orders provide authorization under the Coastal Act for the development required herein, including any restoration activities described below, so long as such development is undertaken in accordance with the terms and conditions of these Orders.

1.3.A    Within 30 days of the effective date of these Orders, submit complete coastal development permit ("CDP") applications or a single consolidated CDP application (as provided for in the Coastal Act in PRC Section 30601.3) for: (a) after the fact ("ATF") authorization for all unpermitted development as defined in Section 4.2, below, conducted at both onshore and offshore locations; as well as

Sable Offshore Corp.
April 10, 2025
Page 2 of 26

(b) prospective authorization for any proposed development activities that have not yet been completed but that are contemplated in Sable's current plans. Sable shall not withdraw or impede final action in any way on this CDP application(s). Sable shall comply with the terms and conditions of any CDP approved pursuant to the application(s) submitted under these Orders by the deadlines required in the CDP(s).

1.3.B   A complete CDP application shall include, at a minimum,

For onshore development:

- Site plans for each anomaly repair location depicting, but not limited to: topographic contours, grading (cut, fill, export), sensitive resources (Environmentally Sensitive Habitat Area ("ESHA"), wetlands), applicable Best Management Practices ("BMPs"), equipment staging, stockpiles, details specific to work to be performed at each site (wrap, pipeline cut and replacement), cross sections and diagrams of the work to be performed, and surveys of property lines/easements/right-of-ways;
- Grading totals (cut, fill, export) for each site and all of the types of work (anomaly excavation, road creation/widening/maintenance, crossings of wetlands or watercourses, etc.) plus the combined total grading for all of the work (both that already occurred and future proposed development);
- Specific details on the amount and type of vegetation clearing and trimming (area, amount of limbing, plant species and alliances, per the Manual of California Vegetation);
- List of all construction and erosion control BMPs;
- Geology and soils report;
- Site-specific biological survey reports prepared by a qualified biologist;
- A site survey of all ESHA buffers of 100 feet from location of ESHA;
- Site-specific delineation of single parameter wetlands;
- Measures to avoid, minimize and mitigate for adverse impacts to ESHA, wetlands and sensitive plant and animal species;
- Site-specific cultural resources surveys and measures to avoid and minimize potential adverse impacts on cultural resources (including outreach and coordination with Tribes that may have cultural connections to the restoration area and use of tribal monitors during ground disturbance activities);
- Project schedule (with a breakdown of the hours of construction, number of days and time of year that construction took place or is proposed to take place at each location);
- Evidence that permits or authorization from other agencies have been granted or applied for;
- CEQA determination.

Sable Offshore Corp.
April 10, 2025
Page 3 of 26

For offshore development:

- Site plans for each span remediation location depicting, but not limited to: bathymetric contours, fill placement areas, results of marine habitat surveys (such as sandy bottom, rocky, reef, kelp), applicable BMPs including material staging/stockpiles/hazardous materials and spill response, details specific to work to be performed at each site (such as number of bags, slopes), cross sections and diagrams of the work performed;
- Information on the vessels and ROVs that were used for the work and information on how the vessels and ROVs were maintained to prevent the release of any fuel or oils;
- Information on where the vessels were moored and how they transited to and from the site;
- Information on any commercial and recreational fishing in the area that could have been affected by project activities and any advance coordination that occurred with fishing communities;
- Information on the specific type of cement mix used and information demonstrating how it will be safe for use in the marine environment over the life of the development;
- In the event that anchors are needed, identify contingency anchor areas away from sensitive marine habitat and species;
- Marine resources survey including survey of the seafloor and information on marine species in the area of the development. This should also include a quantification of the totals of each type of benthic habitat impacted by the development as well as the methodology used for the survey;
- Analysis of alternatives to the proposed cement bags, and measures to avoid or minimize quantity of fill and potential adverse impacts from the fill (e.g. use different materials other than concrete that may have less of an environmentally impact (i.e., 100% sand, use of "T bar" support, change in orientation/slope of the bags to minimize their impact on the seafloor);
- Site-specific cultural resources surveys of the development area and measures to avoid and minimize potential adverse impacts on cultural resources;
- Project schedule with hours of construction, total number of days, and time of year work occurred;
- Evidence that permits or authorization from other agencies have been granted or applied for;
- CEQA determination

Sable shall provide complete responses to any request for information made by the appropriate permitting agency within 10 days of the date of such request, unless additional time is provided by the Executive Director pursuant to Section 14, below.

Sable Offshore Corp.
April 10, 2025
Page 4 of 26

1.3.C  Sable shall submit the application(s) required by Section 1.3.A in one of the following manners: (a) as one, consolidated permit application, submitted to the Commission pursuant to PRC section 30601.3; or (b) if the County agrees to process an application for the work within its LCP permitting jurisdiction, Sable may submit an application for the work in that area to the County, and a separate application for the work in the Commission's permitting jurisdiction to the Commission. To maximize the likelihood of compliance with these Orders and to rectify this matter in the most efficient manner possible, thereby limiting the costs to the state and increasing the potential for accelerated restoration and reduced impacts on resources, if Sable elects to proceed with option (a), above (consolidated CDP application), the Administrative Penalty outlined in Section 3, below, will be reduced according to the provisions of that section. The Executive Director may extend the deadline for submittal of the CDP application pursuant to Section 14, below.

1.3.D  In the event the appropriate permitting agency denies the CDP application in whole or in part, Sable shall submit, for the review and approval of the Executive Director of the Commission, a Removal Plan that provides for the removal of that development that was already completed but for which after-the-fact authorization was denied. Sable shall submit this Removal Plan within 30 days of final action on said denial and shall commence implementation of this Removal Plan within 30 days of Executive Director approval thereof and shall complete all removal and activities within 30 days of commencement, unless an extension is granted by the Executive Director for good cause pursuant to Section 14, below. If the Executive Director determines that any removal activities negatively impacted resources protected under the Coastal Act, Respondent shall submit an amendment to the Restoration Plan required pursuant to Section 6, below, to restore any resources impacted.

1.3  Obtain and comply with the terms and conditions of all other mandatory approvals or permits for the work required herein that are issued by other government agencies having jurisdiction over that work, consistent with these Orders, and comply with the terms and conditions of such approvals/permits.

1.4  Any questions of intent or interpretation of any condition in the CDP issued pursuant to the terms of these Orders will be resolved by the Executive Director of the Commission after consultation with Sable.

## 2.0  RESTORATION ORDER CCC-25-RO-01

Pursuant to its authority under PRC Section 30811, the Commission hereby orders and authorizes Sable to undertake all the restorative actions set forth in Section 6.0, below.

## 3.0  ADMINISTRATIVE PENALTY CCC-25-AP3-01

Sable Offshore Corp.
April 10, 2025
Page **5** of **26**

3.1.    Pursuant to its authority under PRC Section 30821.3, the Commission hereby imposes on Sable an administrative penalty of $14,987,250

3.2    To maximize the likelihood of compliance with these Orders and to rectify this matter in the most efficient manner possible, thereby limiting the costs to the state and increasing the potential for accelerated restoration and reduced impacts on resources, if Sable elects to proceed with option (a) as described in Section1.3.C, above (consolidated CDP application), the Administrative Penalty will be reduced by 10% of the total amount (i.e., $1,498,725). If, however, at any point prior to the Commission staff filing the CDP application as complete, Sable takes any steps that would interfere with the processing of the CDP application, including any attempt to delay or avoid submittal of the CDP application, the penalty amount shall not be reduced, and Sable shall be required to pay any remaining penalty amount to bring the full payment up to $14,987,250.

3.3    Within 180 days of the effective date of this Administrative Penalty, Sable shall pay the full penalty (or reduced penalty pursuant to Section 3.2, above). The monetary penalty shall be made out to and deposited in the Violation Remediation Account administered by the California State Coastal Conservancy (see PRC Section 30821.3(k) and 30823). The monetary penalty shall be submitted to the Commission's San Francisco office, at the address provided in Section 7.0, to the attention of Stephanie Cook of the Commission, payable to the account designated under the Coastal Act, and include a reference to these Orders by number.

## 4.0    DEFINITIONS COMMON TO ALL ORDERS

4.1    Orders: Cease and Desist Order No. CCC-25-CD-01, Restoration Order No. CCC-25-RO-01, and Administrative Civil Penalty CCC-25-AP3-01 are collectively referred to herein as "the" or "these Orders."

4.2    Unpermitted Development: The phrase "Unpermitted Development" as used herein means all "development" as that term is defined in PRC Section 30106 that Sable has undertaken in the Coastal Zone that required authorization pursuant to the Coastal Act but for which no such authorization was obtained, including, but not limited to, excavation with heavy equipment; removal of major vegetation; grading and widening of roads; installation of metal plates and other fill material within wetlands; dewatering and discharge of water; pipeline removal, replacement, and reinforcement; installation of shutoff valves; and other development associated with the Las Flores Pipelines CA-324 and CA-325; as well as offshore development including, but not necessarily limited to, placing sand and cement bags on the seafloor below and adjacent to out-of-service offshore oil and water pipelines; all without the requisite Coastal

Case 1:26-cv-01486-KES-CDB   Document 1   Filed 02/20/26   Page 321 of 464

Sable Offshore Corp.
April 10, 2025
Page 6 of 26

Act authorization, as part of an effort to restart Santa Ynez Unit oil production operations and bring the pipelines back into use.

4.3   Santa Ynez Unit: The Santa Ynez Unit consists of three offshore platforms (Hondo, Harmony, and Heritage), Las Flores Canyon processing facility, Pacific Offshore Pipeline Company (POPCO) Gas Plant, associated electrical transmission facilities and lines, oil, natural gas and produced water transport pipelines, including pipelines CA-325 and CA-325 and associated rights-of-way (ROW) and easements.

4.4   Restoration Area: All areas within, along, or around the Santa Ynez Unit, as defined above, and any other areas impacted in connection with work on any portion of the Santa Ynez Unit, upon which Unpermitted Development occurred. This identifies the location where the unpermitted development was undertaken.

## 5.0   ENTITIES AND PERSONS SUBJECT TO THIS CEASE AND DESIST ORDER, RESTORATION ORDER, AND ADMINISTRATIVE PENALTY ACTION

Sable Offshore Corp.; its successors in interest, assigns, lessees, officers, managers, employees, agents, and contractors; and any other persons or entities acting in concert with or on behalf of any of the foregoing are jointly and severally subject to all requirements of these Orders.

## 6.0   RESTORATION PLAN

Within 60 days of issuance of these Orders, Sable shall submit, for the review and approval of the Commission's Executive Director a Revegetation Plan; a Temporary Erosion Control Plan, a Remedial Grading Plan, a Cultural Resources Plan, and a Monitoring Plan (hereinafter collectively referred to as "the Restoration Plan"). The Restoration Plan shall set forth the measures that Sable shall undertake to implement erosion control measures, undertake remedial grading, revegetate the Restoration Area to address permanent and temporal losses of habitat and other resources affected by the Unpermitted Development, implement cultural resource protections and monitoring, and monitor the restoration to ensure the success of restoration activities.

6.1   General Provisions of the Restoration Plan:

6.1.A   The Restoration Plan shall include an initial assessment of all Unpermitted Development and a site-specific biological assessment for all of the areas in which Unpermitted Development occurred. This will form the basis of the Restoration Area as defined in Section 4.4. These initial site assessments shall include, at a minimum, a plan that (a) delineates all areas where the development listed in Section 4.2 was undertaken, (b) details the nature of the

Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 322 of 464

Sable Offshore Corp.
April 10, 2025
Page 7 of 26

work undertaken, and (c) identifies the coastal resources, specifically: on the ground environmentally sensitive habitat areas ("ESHA"), including but not limited to riparian, oak woodland, chaparral, coastal sage scrub, and/or native grasslands, as shown on a biological resources survey, (d) a single-parameter wetlands delineation, (e) an evaluation of protected plant and animal species in those areas that could have been affected by the Unpermitted Development, and the timing and duration of all Unpermitted Development, including as such development relates to the timing of bird and other animals' nesting and breeding seasons, including but not limited to those species identified under the California Endangered Species Act or federal Endangered Species Act such as the southern California steelhead, southwestern pond turtle, tidewater goby, and California red-legged frog. For Unpermitted Development that occurred offshore, Sable shall also include in this initial assessment: the physical and chemical composition of the materials used to form the concrete bags, a survey of the seafloor identifying the type of substrate(s) within the area of the Unpermitted Development (i.e., sandy bottom or rock reef/bedrock) and a quantification of the total of each type of substrate impacted by the Unpermitted Development, a survey identifying the marine species in the area of the Unpermitted Development, and location of any anchor points that were used. Based on this initial assessment, Sable shall identify areas where the work may have adversely affected coastal resources protected under the Coastal Act and/or the Santa Barbara County Local Coastal Program, and where restoration is needed to address temporal and permanent losses of habitat. The Executive Director will make the final determination of the size and scale of location of, and impacts caused by, the Unpermitted Development. These areas will be known as the Restoration Area.

6.1.A.1    Within 15 days of the effective date of these Orders and prior to the submittal of the Restoration Plan, Sable shall submit, for the Executive Director's review and approval, a description of the qualifications of the proposed Specialist(s), including a description of their educational background, training, and experience related to the preparation and implementation of the Restoration Plan described herein. To meet the requirements to be a qualified Specialist specifically for the restoration component of the Restoration Plan, one must have experience successfully completing restoration projects of a similar scale and scope involving restoration of ESHA in the Gaviota region of Santa Barbara County. A qualified Specialist must also have experience in wildlife surveys, including those species identified under the California Endangered Species Act or federal Endangered Species Act that may be present in or near the Restoration Area (see also Section 6.3.A, below). In addition, to meet the requirements for the development and implementation of plans related to the remedial grading, and erosion activities required herein, a qualified Specialist must have experience successfully designing plans for and implementing these plans for

Sable Offshore Corp.
April 10, 2025
Page **8** of **26**

restoration of wetlands, restorative grading, erosion control, and hydrology.

6.1.A.2    The Restoration Plan shall include a survey map from a licensed surveyor, with input from the Specialist(s), drawn to scale, that shows the specific parameters, locations and extents of: 1) the boundaries of the Restoration Area and associated areas affected by the Unpermitted Development; 2) the physical items placed or allowed to come to rest on or in the Restoration Area; 3) the areas from which native vegetation and wetlands were removed or impacted; 4) the current topography of all landscape features within the Restoration Area and the topography of all landscape features within 100 feet of the Restoration Area; 5) the locations of all erosion control measures to be installed pursuant to Section 6.7, below; 6) the locations of all species, individually delineated and labeled, to be planted pursuant to Section 6.9, below; 8) the specific locations and directions from which photographs will be taken for the annual monitoring reports; and 9) the locations where remedial grading will take place. Pursuant to Section 6.8, below.

6.1.A.3    The Restoration Plan shall provide that, prior to the initiation of any restoration activities, the boundaries of the Restoration Area shall be physically delineated in the field using temporary non-plastic measures such as fencing or colored wooden stakes. The Restoration Plan shall further provide that all delineation materials shall be removed when no longer needed, and verification of such removal shall be provided in the annual monitoring report corresponding to the reporting period during which the removal occurred. No more than one week prior to commencement of ground disturbance in a particular work area at all restoration sites, a qualified biologist shall survey the ground-disturbance area for any sensitive, protected and/or endangered species, which may include, but be not limited to, California red-legged frog (*Rana draytonii*), southwestern pond turtle (*Actinemys pallida*), tidewater goby (Eucyclogobius newberryi) and southern California steelhead (*Oncorhynchus mykiss irideus*), and if any such animals are present within the Restoration Area, shall coordinate with the California Department of Fish and Wildlife ("CDFW") staff to determine if work should be delayed until the species is no longer present or if it can be relocated to nearby suitable habitats an appropriate distance away from the work area.

6.1.A.4    The Restoration Plan shall include a specific schedule/timeline of activities for each of the Restoration Plan components; the procedures to be used, and identification of the parties who will be conducting the restoration activities. The schedule/timeline of activities in the Restoration Plan shall be in accordance with the deadlines in these Orders and shall be in

Sable Offshore Corp.
April 10, 2025
Page **9** of **26**

accordance with the ideal planting seasons. In addition, the schedule/timeline of activities shall incorporate the following restrictions:

6.1.A.4.1    The Restoration Plan shall include a detailed explanation of how Sable will proactively address potential impacts to raptors and protected bird species and other protected animals, from restoration activities. This explanation shall be based on a nesting bird/habitat survey of areas within 500 feet of all work to be conducted. In the event that Sable is unable to obtain access to neighboring properties for surveying, survey areas shall be limited to on or along the Sable easements to which impact from the Unpermitted Development occurred. The survey shall be attached to and incorporated into the Restoration Plan. Both the biologist and the methods for the survey must be approved by the Executive Director.

6.1.A.4.2    All in-creek or stream work for temporary erosion control and remedial grading activities under the approved Restoration Plan shall occur during the dry season from May 1 through October 31. This period may be extended for a limited period of time if the situation warrants such a limited extension, if approved by the Executive Director. Restoration activities restricted to this period include any work within the bed to the bank or the outer edge of riparian vegetation, whichever is the greater distance.

6.1.A.4.3    If during the rainy season (Nov 1-April 30) season, in-creek or stream work is necessary and such work is authorized by the Executive Director to occur during this time, Sable shall implement the following best management practices (BMPs), and include such measures in the Restoration Plan:

6.1.A.4.3.1    In addition to other measures that may be required by CDFW and the Regional Water Quality Control Board (RWQCB), all in-water construction work shall, at a minimum, be done with a qualified biological monitor with expertise in the identification of threatened, endangered and/or sensitive species on-site at all times during all in-water restoration work. Should the biological monitor identify any sensitive species that could be adversely affected by restoration activities, restoration work shall be halted and Sable shall contact the appropriate resource agency (USFWS or CDFW) to determine an appropriate course of action.

6.1.A.4.3.2    Any materials or structures temporarily placed within the creek or stream where protected species, such as those noted above, are or may be present, shall be designed, constructed, and maintained such that it does not constitute a barrier to upstream or downstream movement of the species. Additionally, Sable shall

Sable Offshore Corp.
April 10, 2025
Page **10** of **26**

include: 1) measures to avoid capture of fish and wildlife in pumps or other equipment that contain mechanisms; 2) measures to maintain acceptable noise levels (e.g. using low-noise equipment, placing sandbags or another noise reduction device around pumps); and 3) measures to prevent sediment and debris from entering the creek channel or adjacent areas. Dust control measures shall be provided. Any and all debris resulting from construction activities shall be removed immediately. Any debris inadvertently discharged into coastal waters shall be recovered immediately and disposed of consistent with the requirements of this order.

6.1.A.4.3.3   Equipment shall avoid contact with water to the extent feasible. If that is infeasible, there shall be protocols for ensuring that all equipment that may come into contact with surface or subsurface water in the creek or stream channel is cleaned prior to contact, in order to prevent introduction of invasive species or substances that could impact the water quality of or native habitat in the creek or stream.

6.1.A.4.3.4   Water in the creek or stream shall either be diverted from work areas or barriers, such as coffer dams, shall be installed to prevent water from entering the work area.

6.1.A.4.3.5   Any fueling, maintenance and washing of construction equipment shall occur within upland areas outside of ESHA/wetlands and within designated staging areas. Mechanized heavy equipment or other vehicles shall not be refueled, maintained or washed within 100 feet of coastal waters.

6.1.A.4.3.6   Fuels, lubricants, and solvents shall not be allowed to enter coastal waters. Hazardous materials management equipment including oil containment booms and absorbent pads shall be available immediately on-hand at the project site, and a registered first-response, professional hazardous materials clean-up/remediation service shall be locally available on call. Any accidental spill shall be rapidly contained and cleaned up.

6.1.A.5 Each component of the Restoration Plan shall include a narrative report, specific to that component, describing the restoration activities to take place, the procedures to be used, and identification of the parties who will be conducting such activities. Along with a narrative report of each component of the Restoration Plan to be completed, Sable shall also submit photographs depicting the work, taken from the designated photo points. The photographic report shall show implementation of each

Case 1:26-cv-01486-KES-CDB    Document 1    Filed 02/20/26    Page 326 of 464

Sable Offshore Corp.
April 10, 2025
Page 11 of 26

component of the Restoration Plan, demonstrating progress before, during, and after completion of each component of the work.

6.1.A.6 The Restoration Plan shall provide appropriate contact information for each landowner where restoration activities would be carried out to facilitate coordination with Commission staff regarding the scope of proposed work. Commission staff will use that information to make all reasonable efforts to reach out to and consider input provided by such landowners prior to approval of the Restoration Plan.

6.2    The Restoration Plan shall include a detailed description of all equipment to be used. Non-mechanized hand tools shall be used for invasive, non-native plant removal. The Restoration Plan shall state that any equipment utilized to implement the Restoration Plan shall not adversely impact resources protected under the Coastal Act, including, but not limited to: public access, geological stability, erosion, integrity of landforms, water quality, sensitive species, and the existing and restored native vegetation. If circumstances require the use of mechanized equipment, Sable shall submit a supplemental plan, for the review and approval of the Executive Director, that describes the proposed use of such equipment, including routes the equipment will take and locations of such use, and shall detail the following in the supplemental plan:

6.2.A  Limitations on the hours of operations for all equipment and measures that addresses, at a minimum: 1) potential impacts from equipment use, including disturbance of areas where revegetation will occur and the responses thereto; 2) potential spills of fuel or other hazardous releases that may result from the use of mechanized equipment and the responses thereto; and 3) any potential water quality impacts.

6.2.B  Designated areas for staging of any mechanized equipment and other materials, including receptacles and temporary stockpiles of materials, provided that equipment shall be covered, enclosed on all sides, located as far away as possible from drain inlets and any waterway, a minimum of 100 feet from any sensitive habitat, and not stored in contact with the soil or sandy beach, and not stored in areas reserved for public parking.

6.2.C  Designated and confined areas for fueling, maintaining and washing machinery and equipment shall be specifically designed to control runoff. Thinners or solvents shall not be discharged into sanitary or storm sewer systems. The discharge of hazardous materials into any receiving waters is prohibited.

6.2.D  Prior to commencement of work under the approved Restoration Plan, Sable shall submit to the Executive Director written evidence that all necessary approvals have been obtained. If an agency requires a change to the Restoration

Sable Offshore Corp.
April 10, 2025
Page 12 of 26

Plan as submitted and/or approved, Sable shall submit proposed revisions for Executive Director review and approval.

6.3     Wildlife Protection

6.3.A   Sable shall retain the services of a qualified biologist (hereinafter, "biologist") with appropriate qualifications acceptable to the Executive Director, to monitor the site during restoration activities and conduct surveys of sensitive species and to monitor all restoration activities. Sable shall submit the contact information and qualifications of all monitors with a description of their duties and their on-site schedule to the Executive Director for review and approval pursuant to Section 6.1.A.1, above. Should a biological monitor identify any sensitive species that could be adversely affected by restoration activities, such work shall be halted, and Sable shall contact the appropriate resource agency (USFWS or CDFW) to determine an appropriate course of action. For the purpose of these Orders, "sensitive species" shall be taken to mean any special-status wildlife species. Special-status species are species listed as: Endangered, Threatened, or Rare under the federal or state Endangered Species Acts; Candidate Species, California Fully Protected Species, and, pursuant to CEQA Guidelines Section 15380(d), all other species tracked by the California Natural Diversity Database (CNDDB), which are considered by the CDFW to be those species of greatest conservation concern (e.g. S1-S3 and G1-G3 Listed Species), and locally important species including, but not limited to: raptors, Steelhead trout, California red-legged frog, Tidewater goby, and Western pond turtle.

6.3.B   To avoid impacts to nesting birds, restoration activities shall be scheduled outside of the avian breeding and nesting season (February 1 through September 15). No restoration activities shall occur within 300 feet of roosting or foraging birds. If the Executive Director determines that restoration activities may occur during the breeding and nesting season, then restoration activities shall be done with the following protective measures:

6.3.C   If restoration activities must occur during bird nesting season (February 1 through September 15), a qualified biologist with experience conducting bird surveys shall survey for active nests of any federally or state listed threatened or endangered species, species of special concern, fully protected species, species with global rarity rankings of G1-G3 and/or state rarity rankings of S1-S3, or any species of raptor or wading birds, within 7 days prior to commencement of restoration activities, and once a week thereafter during construction, to detect any such activity within 500 feet of the project area.

6.3.D   If an active nest(s) of any of the above species is located within 300 feet of construction activities (500 feet for raptors), the qualified biologist shall halt construction activities to enable Respondent to employ BMPs to ensure that construction activities do not disturb or disrupt nesting activities.

Sable Offshore Corp.
April 10, 2025
Page 13 of 26

6.3.E  Results of nesting bird surveys, ambient noise studies, and any follow-up construction avoidance measures shall be documented in monthly reports by the qualified biologist and submitted to the Commission Executive Director throughout the bird breeding season.

6.4  Prior to commencement of work under the approved Restoration Plan, Sable shall submit to the Executive Director written evidence that all other necessary government approvals have been obtained. If an agency requires a change to the approved Restoration Plan, Sable shall submit proposed revisions for the Executive Director's review and approval under Section 7.0 (Submittal of Documents). These Orders provide Coastal Act authorization for all development required herein.

6.5  These Orders require the following deadlines that shall be reflected in the Restoration Plan:

6.5.A  Within 15 days of the effective date of these Orders, Sable shall submit the qualifications of the proposed Specialist(s) for the Executive Director's review and approval.

6.5.B  Within 60 days of the approval of the Specialist(s) by the Executive Director, Sable shall submit the proposed Restoration Plan to the Commission's Executive Director for their review and written approval.

6.5.C  Within 30 days of the approval of the Restoration Plan by the Executive Director, Sable shall commence implementation of the Restoration Plan through commencing the restoration activities and installing temporary erosion control measures. Sable shall implement each phase of the Restoration Plan according to the deadlines set forth in each section, as described more fully, below.

6.5.D  Within 15 days of the completion of each element of the Restoration Plan (i.e., Erosion Control Plan, Remedial Grading Plan, etc.), Sable shall submit a narrative report pursuant to Section 6.1.A.5, prepared by the Specialist(s), for the review and approval of the Executive Director, documenting all restoration work performed pursuant to the plan, which shall include a summary of dates on which work was performed and accompanying photographs documenting implementation of the respective components of the Restoration Plan.

6.5.E  If timing in which the Executive Director approves the Restoration Plan creates a situation that causes work to occur during avian nesting season, breeding season for protected species, or outside of the ideal planting season as determined by the Specialist, Sable shall request an extension of deadlines pursuant to Section 14.0 and the Executive Director may, for good cause, extend this deadline to provide for a more successful restoration and to protect such species.

6.6   Sable shall actively monitor for trash and/or other debris and promptly remove any such debris or trash from the Restoration Area, as necessary, to ensure the ongoing success of the restoration activities.

6.7   <u>TEMPORARY EROSION CONTROL PLAN</u>

6.7.A  Sable shall submit, as part of the Restoration Plan, a Temporary Erosion Control Plan, prepared by a qualified Specialist approved pursuant to Section 6.1.A.1, to stabilize the soil and prevent erosion, to address ground disturbance during any restoration activities, and to stabilize the soil and prevent erosion during the establishment of any vegetation planted pursuant to Section 6.9, below.

6.7.B  The Temporary Erosion Control Plan shall include: 1) a narrative report describing all temporary run- off and erosion control measures to be used including replacement and/or re-compaction of any excavated materials, and restorative grading to be done during and after restoration activities; and 2) a site plan identifying and delineating the locations of all temporary erosion control measures that will be installed pursuant to this plan, including seeding of location-appropriate plant species to assist in erosion control and 3) specify that the remedial grading and installation of erosion control features shall take place only during the dry season (May 1 through October 31).

6.7.C  The Temporary Erosion Control Plan shall indicate that all erosion control measures are required to be installed and fully functional in the Restoration Area prior to, or concurrent with, the initial restoration activities required by these Orders and maintained at all times of the year throughout the remedial grading, revegetation, and monitoring process, to minimize erosion across the site, and consistent with the deadlines established herein for the removal of the temporary erosion control measures.

6.7.D  All temporary construction related erosion control materials shall be comprised of bio-degradable materials, including the material used to encase fiber rolls and other erosion control devices. To minimize wildlife entanglement and plastic debris pollution, the use of temporary rolled erosion and sediment control products with plastic netting (such as polypropylene, nylon, polyethylene, polyester, or other synthetic fibers used in fiber rolls, erosion control blankets, and mulch control netting) is prohibited. Any erosion-control associated netting shall be made of natural fibers and constructed in a loose-weave design with movable joints between the horizontal and vertical twines.

6.7.E  The erosion control measures shall remain in place and be maintained at all times of the year until the plantings have become established, or in the case of erosion control measures for winter rainstorms, until such time period established by the approved Restoration Plan, and then all such measures shall be removed and properly disposed of by Sable. Verification of such removal shall be provided

in the monitoring or completion report for the monitoring report period during which the removal occurred.

6.7.F    The Temporary Erosion Control Plan shall include the following deadlines:

6.7.F.1    Within 15 days of the approval of the Restoration Plan by the Executive Director, Sable shall commence the implementation of the Temporary Erosion Control Plan.

6.7.F.2    Within 15 days of commencing installation activities under the Temporary Erosion Control Plan, Sable shall conclude installation.

6.7.F.3    Within 15 days of the completion of the installation of erosion control measures under the Temporary Erosion Control Plan, Sable shall submit evidence for the Executive Director's review and approval in the form of a narrative report. The Temporary Erosion Control Plan Report shall also show the devices installed, the type of devices installed, and document their impact, if any.

6.8    REMEDIAL GRADING PLAN

6.8.A    The Restoration Plan shall include a Remedial Grading Plan prepared by a qualified Specialist approved pursuant to Section 6.1.A.1 above, that will describe all measures necessary to return the Restoration Area to the original, pre-violation topography if it is determined by the Executive Director, based upon the information received pursuant to Section 6.1.A, that such remedial grading is necessary to restore the pre-violation topography.

6.8.B    The Remedial Grading Plan shall include a narrative description that demonstrates how the proposed remedial grading will restore the Restoration Areas to the pre-violation topography. If fill materials are to be used, the narrative shall discuss which fill materials will be used, the origin of the fill materials, how the fill materials are compatible for use within the Restoration Area, how much of each type of material will be used, and the differences and similarities between the fill materials and existing materials located in the corresponding portions of the Restoration Area.

6.8.C    If historic data or topographical maps are not available for this location, Sable shall propose an approximation of the topography which existed in the area prior to the Unpermitted Development based on undisturbed slopes in the area, for the review and approval of the Executive Director. If an approximation is used, the Specialist shall submit in writing that the proposed approximation is the most accurate depiction of what the topography looked like prior to the occurrence of the Unpermitted Development. If it is determined by the Specialist that a different topography will result in a more successful restoration and will benefit coastal

resources, the Specialist may propose a different topography to meet these goals.

6.8.D The Remedial Grading Plan shall include sections showing original and finished grades, and a quantitative breakdown of grading amounts (cut/fill/export), drawn to scale with contours that clearly illustrate, as accurately as possible, the pre-violation topography and the current, unpermitted topography. The Remedial Grading Plan shall demonstrate how the proposed remedial grading will restore impacted areas to their original, pre-violation topography. The Remedial Grading Plan shall identify the source and date for all of the data used to produce this information.

6.8.E The Remedial Grading Plan shall state that remedial grading activities undertaken pursuant to the Restoration Plan shall not disturb areas outside of the Restoration Area. Prior to initiation of any activities resulting in physical alteration of the areas affected by the Unpermitted Development, the disturbance boundary shall be physically delineated in the field using temporary non-plastic measures such as fencing or colored wooden stakes.

6.8.F The Remedial Grading Plan shall include the following deadlines:

6.8.F.1 Within 15 days of completing Temporary Erosion Control Plan, Sable shall begin implementation of the Remedial Grading Plan.

6.8.F.2 Within 45 days of commencing implementation of the remedial grading activities, Sable shall complete implementation of the Remedial Grading Plan.

6.8.F.3 Within 15 days of the completion of the implementation of the Remedial Grading Plan Sable shall submit evidence, for the Executive Director's review and approval, in the form of a narrative report as described in 6.1.A.5, showing that the remedial grading has been completed pursuant to the approved Restoration Plan.

## 6.9    REVEGETATION PLAN

6.9.A The Restoration Plan shall include a Revegetation Plan prepared by a qualified Specialist, approved pursuant to Section 6.1.A.1 above, that will describe the measures necessary to revegetate the Restoration Areas such that these areas meet the goals, standards and objectives of these Orders.

6.9.B The Revegetation Plan shall include a detailed description of the methods that shall be utilized to restore the Restoration Area that is determined, pursuant to Section 6.1.A, to have been adversely impacted by the Unpermitted Development. The Revegetation Plan shall include detailed descriptions, including graphic representations, narrative reports, and photographic evidence,

as necessary. The Revegetation Plan shall demonstrate that the Restoration Area and additional areas to account for the temporal and permanent losses of habitat caused by the Unpermitted Development will be revegetated using plant species endemic to and appropriate for the locations where Unpermitted Development occurred.

6.9.C The Revegetation Plan shall identify the natural habitat type(s) that are the reference site(s)/model(s) for the restoration and shall describe the desired relative abundance of particular species in each vegetation community. The reference site(s) shall be natural areas with the least amount of disturbance and located as close as possible to the Restoration Area, so long as the habitat type is similar to that impacted by the Unpermitted Development. If an undisturbed reference site does not exist, an otherwise representative area may be proposed, accounting for vegetation and topography changes due to disturbance, and in conjunction with published descriptions of local habitat using relevant, peer-reviewed literature. Alternatively, if an undisturbed reference site or otherwise representative area are not available or suitable for the proposed restoration, the peer-reviewed literature along with membership rules per the Manual of California Vegetation (Sawyer,Keeler-Wolf and Evens 2009; available online at https://vegetation.cnps.org) for the appropriate habitat alliance-level, may be used to determine the desired relative abundance of native vegetation and particular species in each vegetation community. The Revegetation Plan shall be based on one or more reference sites specific to the habitat type(s) upon which the Unpermitted Development occurred. The Revegetation Plan shall explicitly lay out the restoration goals, standards and objectives for the restoration based on the respective model(s).

6.9.D The Revegetation Plan shall be based on these Reference Sites, which, along with information from the scientific literature, shall be used to identify the plant species that are native to the site and will be planted in the areas determined by the Executive Director pursuant to Section 6.1.A, above, to be adversely impacted in the Restoration Area. The Revegetation Plan shall explicitly state the restoration goals, standards and objectives for the revegetation effort, with the goal of achieving the revegetation performance standards in the allotted period, which may include, but are not limited to, diversity and native plant cover requirements and require the control of invasive plants. Based on these goals, the Revegetation Plan shall identify the species that are to be planted (plant "palette") and provide a rationale for and description of the size and number of container plants, seed mix, the rate and method of seed application, the method of planting, irrigation requirements and irrigation schedule. The Revegetation Plan shall indicate that plant propagules and seeds must come from local, native stock. If plants, cuttings, or seeds are obtained from a nursery, the nursery must certify that they are of local origin and are not cultivars. The Revegetation Plan shall provide specifications for preparation of nursery stock. Technical details of planting methods (e.g., spacing, mycorrhizal inoculation, etc.) shall be included.

Sable Offshore Corp.
April 10, 2025
Page **18** of **26**

shall not employ non-native plant species, which could supplant native plant species in the Restoration Area.

6.9.E The Revegetation Plan shall include a schedule for installation of plants, removal of non-native plants, and completion of revegetation within the Restoration Area and any other area revegetated to account for the temporal and permanent losses of habitat caused by the Unpermitted Development. The Specialist shall recommend removal of non-natives outside the Restoration Area if they determine that such non-natives could impact or limit the success of the native plantings within the Restoration Area.

6.9.F The revegetation schedule shall include specific time periods and deadlines, including identifiable interim goals for planting, other revegetation activities, and additional non-native species removal work spread out over the time period established in this section.

6.9.G Sable is responsible for ensuring the ongoing survival of the plantings, shall undertake measures necessary to ensure the success of such plantings, and shall replace any dead or dying plants with native plants approved through this Revegetation Plan.

6.9.H The Revegetation Plan shall describe the proposed use of artificial inputs, such as irrigation, fertilizer, or herbicides, including the full range of amounts of the inputs that may be utilized. The minimum amount necessary to support the establishment of the plantings for successful restoration shall be utilized.

6.9.I The Revegetation Plan shall include the following deadlines:

6.9.I.1 Within 15 days of completing implementation of the Remedial Grading Plan, Sable shall begin implementation of the Revegetation Plan. The schedule/timeline of activities in the Restoration Plan shall be in accordance with the deadlines in these Orders and shall be in accordance with the ideal planting seasons.

6.9.I.2 Within 45 days of commencing implementation of activities under the Revegetation Plan, Sable shall complete implementation of all planting activities under the Revegetation Plan.

6.9.I.3 Within 15 days of the completion of all revegetation activities, Sable shall submit evidence, for the Executive Director's review and approval, in the form of a narrative report as described in Section 6.1.A.5, demonstrating that the revegetation has been completed pursuant to these Orders and the approved Restoration Plan.

6.10 CULTURAL RESOURES SURVEY AND PLAN

Sable Offshore Corp.
April 10, 2025
Page **19** of **26**

6.10.A Sable shall submit, for review and approval of the Executive Director, a Cultural Resources Survey and Cultural Materials Plan prepared by a qualified professional, defined in Section 6.1.A.1 below as the "Archeological Specialist", which shall assess the extent to which the restoration activities required by these Orders have any potential to uncover or otherwise disturb cultural resources. Prior to the preparation of the Cultural Resources Survey and Cultural Materials Plan, Sable shall submit the qualifications of the proposed Archeological Specialist for the Executive Director's review and approval, including a description of the archeologist's background, training, and experience.

After the Executive Director has approved the Restoration Plan, but before the first commencement of activities required by the Restoration Plan, Sable shall convene an on-site pre-meeting with the Archeological Specialist, the Native American Most Likely Descendant(s) (MLD) and Native American Monitor(s), as defined in Section 6.10.D, below, to ensure that all parties understand the procedures to be followed pursuant to these Orders and the approved Cultural Resources Survey and Cultural Materials Plan

In order to protect cultural resources on any location where restoration activities will occur pursuant to these Orders, the Cultural Resources Survey and Cultural Materials Plan shall incorporate the following measures and procedures, and Sable shall implement such measures and procedures.

6.10.B In preparing Cultural Resources Survey and Cultural Materials Plan, the Archeological Specialist, as defined in Section 6.10.C, below, shall consult with the Native American Monitor(s), as defined in Section 6.10.D, below.

6.10.C The Archeologist Specialist shall be a professional archeologist who has experience in cultural and archeological fieldwork, preferably in Santa Barbara County. The archeologist must be selected in consultation with the Executive Director consistent with the standards of the Native American Heritage Commission ("NAHC"). The Cultural Resources Survey and Cultural Materials Plan shall identify the Archaeological Specialist and include a description of his/her education, training, and experience. Native American Monitors

6.10.D The Native American Monitor(s) shall be the monitor(s) who will monitor work to be conducted pursuant to these Orders, according to the provisions of the Cultural Resources Survey and Cultural Materials Plan. The Native American monitors shall be selected by the appropriate tribe as designated by the NAHC.

6.10.E The Cultural Resources Survey and Cultural Materials Plan shall require that the Archeological Specialist shall document any cultural materials, including but not limited to, human remains and grave-related artifacts, traditional cultural sites, religious or spiritual site, village sites, or other artifacts, ("Cultural Materials")

Sable Offshore Corp.
April 10, 2025
Page **20** of **26**

encountered during the course of work conducted pursuant to these Orders, and such documentation shall be included in a report to the Executive Director within 15 days of identification.

6.10.F During all ground disturbance and subsurface activity that occurs on the Restoration Area or any location where restoration activities may occur pursuant to the requirements of these Orders that have any potential to uncover or otherwise disturb cultural deposits, the Native American Monitors may be present on the Restoration Area.

6.10.G Sable shall fund sufficient Native American Monitors to assure that all remedial grading or other restoration activities that have any potential to uncover or otherwise disturb cultural deposits are monitored at all times. More than one Monitor at the Restoration Area may be necessary during times with multiple soil disturbance locations. In instances where more than one Monitor is necessary and less than all Native American Monitors necessary respond to request to monitor particular areas within 7 days, Sable shall halt work until Native American Monitors are available.

6.10.H Prior to the disposal of any materials from the restoration activities, the Archeological Specialist shall identify, as best as possible, soil that may contain cultural materials and, if determined by the Archeological Specialist and the MLD and Native American Monitors to be necessary, screen it for evidence of such materials. Any cultural materials, including cultural midden materials, human remains, and archeological features, shall be documented and reburied, or transported offsite in coordination with guidance from the Archeological Specialist and Native American Monitors. If human remains are encountered during soil screening, Sable shall comply with all applicable State and Federal laws, including but not limited to, contacting the County Coroner, NAHC, and the MLDs

6.10.I All identification of soil; soil screening, and restoration activities conducted pursuant to these Orders shall be monitored by the Native American Monitors. In addition, the Native American Monitors shall be provided access to the site to inspect the Restoration Area prior to removal and/or restoration. Sable shall not restrict the Native American Monitors from communicating with Commission staff. If human remains are encountered during inspection of the Restoration Area, Sable shall comply with all applicable State and Federal laws including, but not limited to, immediately stopping working and contacting the County Coroner, NAHC, and the MLD

6.10.J If any Cultural Materials are discovered, all restoration activities in that particular area shall cease. The Archaeological Specialist shall submit a proposal to the Executive Director for his review and approval on how Sable will address such discovery, consistent with the Cultural Resources Survey and Cultural Materials Plan. Restoration activity may proceed only at such time as the Executive

Director has determined that Sable has complied with all obligations of the Cultural Resources Survey and Cultural Materials Plan.

6.10.K    Should human remains be discovered on-site during the course of the restoration activities, immediately after such discovery, the on-site archaeologist and Native American monitor(s) shall notify the County Coroner within 24 hours of such discovery, and all restoration activities shall be temporarily halted until the remains can be identified. An "exclusion zone" may be established around the discovery area. If the County coroner determines that the human remains are those of a Native American, the coroner shall contact the NAHC within 24 hours, pursuant to Health and Safety Code Section 7050.5. The NAHC shall deem the Native American most likely descendant (MLD) to be invited to participate in the identification process pursuant to Public Resources Code Section 5097.98. Sable shall comply with the requirements of Section 5097.98 and work with the MLD person(s) to preserve the remains in place, move the remains elsewhere onsite, relinquish the remains to the descendants for treatment, or determine other culturally appropriate treatment. Within five (5) calendar days of notification to NAHC, Sable shall notify the Executive Director of the discovery of human remains and identify any changes to the proposed Cultural Resources Survey and Cultural Materials Plan that may be needed related to the inadvertent discovery. The Executive Director will maintain confidentiality regarding the presence of human remains on the site. If such discovery requires changes to the Restoration Plan, Sable shall submit, within 30 days of notifying the Executive Director, and amendment to the plan for the Executive Director's review and approval.

## 6.11    MONITORING PLAN

6.11.A The Restoration Plan shall include a Monitoring Plan prepared by a qualified Specialist, approved pursuant to Section 6.1.A.1 above, that will provide for monitoring the Restoration Area over a period of, at a minimum, 5 years from the completion and full implementation of the Restoration Plan to ensure successful restoration.

6.11.B  The Monitoring Plan shall describe the monitoring and maintenance methodology, including sampling procedures, sampling frequency, goals, standards, objectives, and contingency plans to address potential problems with restoration activities or unsuccessful restoration of the Restoration Area.

6.11.C  The Monitoring Plan shall include an initial site survey showing the Restoration Area, the areas and types of revegetation mapped to the appropriate alliance-level, and specific photo points that will be used for the annual reports and site visits described below.

Sable Offshore Corp.
April 10, 2025
Page 22 of 26

6.11.D The Monitoring Plan shall specify the number of site visits (at a minimum on a quarterly basis) that the Specialist shall conduct annually for the duration of the monitoring period for the purpose of inspecting and maintaining, at a minimum, the following: all erosion control measures; non-native species eradication; trash and debris removal; and the health and abundance of original and/or replacement plantings planted pursuant to these Orders and consistent with the Revegetation Plan. It is Sable's obligation to ensure a successful restoration that will meet the established goals, standards, and objectives, which may necessitate more site visits than required herein.

6.11.E Sable shall submit no later than December 31 of the first year of monitoring and subsequently on an annual basis and during the same one-month period of each year for at least 5 years from the completion of the revegetation phase of the Restoration Plan, for the review and approval of the Executive Director, a monitoring report prepared by the Specialist that evaluates compliance with the approved Restoration Plan. These reports shall also include photographs taken during the periodic site inspections demonstrating the success of the restoration. The locations from which the photographs are taken shall not change over the course of the monitoring period.

6.11.F If periodic inspections or the annual monitoring reports indicate that the restoration project or a portion thereof is not in conformance with the Restoration Plan or these Orders or has failed to meet the goals and/or performance standards specified in the Restoration Plan, Sable shall implement approved contingency plans.

6.11.G At the end of the five-year monitoring period, Sable shall submit, for the review and approval of the Executive Director, a final detailed report prepared by the Specialist that documents the successful implementation of the Restoration Plan. If the Executive Director determines from this final report that the restoration has in part, or in whole, been unsuccessful and/or did not meet the final success criteria, based on the requirements of the respective plan, Sable shall submit a Revised Restoration Plan, and the monitoring program shall be revised accordingly.

6.11.H The Revised Restoration Plan shall be prepared by the Specialist, approved by the Executive Director, and shall specify measures to correct those restoration activities that have failed or are not in conformance with the original, approved Restoration Plan. The Executive Director will then determine whether the Revised Restoration Plan must be processed as a new Restoration Order, or a CDP. After the Revised Restoration Plan has been approved, these measures, and any subsequent measures necessary to carry out the original, approved Restoration Plan, shall be undertaken by Sable as required by the Executive Director until the goals of the original, approved Restoration Plan have been met. Following Sable's full implementation of the Revised Restoration Plan, the

Sable Offshore Corp.
April 10, 2025
Page 23 of 26

duration of the monitoring period shall be extended for a period of time equal to that during which the project remained out of compliance, but in no case less than two annual reporting periods.

6.11.I   The Monitoring Plan shall include the following deadlines:

6.11.I.1   As part of the Restoration Plan, within 60 days of the effective date of these Orders, Sable shall submit, for review and approval of the Executive Director, the Monitoring Plan.

6.11.I.2   The monitoring period shall begin immediately upon the full implementation of the Restoration Plan and shall extend for a period of, at a minimum, 5 years.

6.11.I.3   Sable shall submit no later than December 31 of the first year of monitoring and subsequently on an annual basis and during the same one-month period of each year for at least 5 years from the completion of the revegetation phase of the Restoration Plan, for the review and approval of the Executive Director, a monitoring report.

6.11.I.4   At the end of the five-year monitoring, Sable shall submit, for the review and approval of the Executive Director, a final detailed report prepared by the Specialist that documents the successful implementation of the Restoration Plan.

## ADDITIONAL PROVISIONS COMMON TO THESE ORDERS

## 7.0   SUBMITTAL OF DOCUMENTS

All plans, reports, photographs, documents and funds submitted to the Commission pursuant to these Orders shall be sent to both of the following addresses, with the original sent to the San Francisco office, and additionally sent via electronic mail to:

<u>With a copy sent to:</u>

California Coastal Commission
Attn:  Stephanie Cook
455 Market Street, Suite 300
San Francisco, CA 94105
Stephanie.Cook@coastal.ca.gov

California Coastal Commission
Attn: Wesley Horn
89 S. California Street, STE 200
Ventura, CA 93001
<u>Wesley.Horn@coastal.ca.gov</u>

## 8.0   FINDINGS

This Cease and Desist Order, Restoration Order, and Administrative Penalty Assessment are issued on the basis of the findings adopted by the Commission, as set forth in the document entitled "Staff Report: Recommendations and

Sable Offshore Corp.
April 10, 2025
Page 24 of 26

Findings for Cease and Desist Order, Restoration Order, and Administrative Civil Penalties." The Commission has ordered and authorized the activities required in these Orders and has determined them to be consistent with the resource protection policies set forth in Chapter 3 of the Coastal Act if carried out in compliance with the terms of these Orders.

## 9.0   EFFECTIVE DATE AND TERMS OF THESE ORDERS

The effective date of these Orders is the date the Commission votes to approve these Orders. These Orders shall remain in effect permanently unless and until rescinded by the Commission.

## 10.0   COMMISSION JURISDICTION

The Commission has jurisdiction to issue the Cease and Desist Order pursuant to PRC Section 30810, jurisdiction to issue the Restoration Order pursuant to PRC Section 30811, and jurisdiction to impose the Administrative Civil Penalties pursuant to PRC Section 30821.3.

## 11.0   SITE ACCESS

11.1   Sable shall provide Commission staff and staff of any agency having jurisdiction over the work being performed under these Orders with access to all portions of the Restoration Area and any area needed for Commission staff to safely access the Restoration area  Nothing in these Orders is intended to limit in any way the right of entry or inspection that any agency may otherwise have by operation of any law. The Commission staff and other relevant agency staff may enter and move freely about the following areas: (1) any areas on which the development as defined in Section 4.2, above, occurred, (2) any areas where work is to be performed pursuant to these Orders or pursuant to any plans adopted pursuant to these Orders, (3) any areas necessary in order to view the areas where work is being performed pursuant to the requirements of these Orders, (4) any areas where evidence of compliance with these Orders may lie for purposes including but not limited to, inspecting records, logs and contracts; and overseeing, inspecting, documenting, and reviewing the progress of Sable in carrying out the terms of these Orders.

11.2   Sable shall provide Commission staff with documentation of their right to enter and take action as required pursuant to these Orders on any property not owned by Sable.

## 12.0   APPEAL

Pursuant to PRC Section 30803 (b), any person or entity against whom this Cease and Desist Order under Section 1.0 is issued may file a petition with the

Sable Offshore Corp.
April 10, 2025
Page 25 of 26

Superior Court for a stay of this Cease and Desist Order. Pursuant to Section 30803(a), any person may maintain an action for declaratory and equitable relief to restrain any violation of this division, including violations of a cease and desist or restoration order issued pursuant to this division.

## 13.0   GOVERNMENT LIABILITY

Neither the State of California, nor the Commission, nor its employees shall be liable for injuries or damages to persons or property resulting from acts or omissions by Sable in carrying out activities pursuant to these Orders; nor shall the State of California, the Commission or its employees be held as a party to any contract entered into by Sable or their agents in carrying out activities pursuant to these Orders.

## 14.0   DEADLINES

The Executive Director may extend deadlines specified herein. Any extension request must be made in writing and received by Commission staff ten (10) days prior to expiration of the subject deadline. Any such request shall be sent to the address listed in Section 7.0, above

## 15.0   SUCCESSORS AND ASSIGNS

These Orders shall bind Sable and all its successors in interest, newly created LLCs, partnerships, and corporations, heirs, and assigns.

## 16.0   REVISION OF DELIVERABLES

The Executive Director may require revisions to deliverables under these Orders, as necessary to satisfy the requirements in these Orders, and Sable shall revise any such deliverable consistent with the Executive Director's specifications and resubmit them for review and approval by the Executive Director by the deadline established by the modification request from the Executive Director.

## 17.0   MODIFICATION AND AMENDMENTS

Except as provided in Section 14 of these Orders, or for ministerial corrections, these Orders may be amended or modified only in accordance with the standards and procedures set forth in Section 13188(b) and 13197 of Title 14 of the California Code of Regulations.

## 18.0   SEVERABILITY

Should any provision of these Orders be found invalid, void, or unenforceable, such illegality or unenforceability shall not invalidate the whole, but these Orders shall be construed as if the provision(s) containing the illegal or unenforceable part were not a part hereof.

Sable Offshore Corp.
April 10, 2025
Page 26 of 26

## 19.0   GOVERNMENT JURISDICTION

These Orders shall be interpreted, construed, governed, and enforced under and pursuant to the laws of the State of California.

## 20.0   COMPLIANCE OBLIGATION

Strict compliance with this Cease and Desist Order, Restoration Order, and Administrative Penalty by all parties subject hereto is required. Failure to resolve violations addressed herein or comply with any term or condition of this Cease and Desist Order, Restoration Order, and Administrative Penalty, including any deadline contained herein, will constitute a violation of these Orders and may result in the imposition of civil penalties under PRC Section 30821.6 of up to six thousand dollars ($6,000) per day for each day in which each violation persists. In addition, failure to comply with any terms or conditions of these Orders may result in the Commission seeking judicial relief and additional penalties as authorized under Chapter 9 of the Coastal Act, including PRC Sections 30820, 30821.3(d), and 30822

## 21.0   NO LIMITATION OF AUTHORITY

Except as expressly provided herein, nothing in these Orders shall limit or restrict the exercise of the Commission's enforcement authority pursuant to Chapter 9 of the Coastal Act (PRC Sections 30800 to 30824), including the authority to require and enforce compliance with these Orders and the authority to take enforcement action for Coastal Act violations beyond those that are specified in Section 4.2 of these Orders.

Executed in _____ on behalf of the California Coastal Commission:

_____                    _____

Dr. Kate Huckelbridge                                              Date
Executive Director
California Coastal Commission

# EXHIBIT "I"

Pursuant to CRC 2.259 this document has been electronically filed by the
Superior Court of California, County of Santa Barbara, on 5/29/2025

TC

**FILED**
SUPERIOR COURT of CALIFORNIA
COUNTY of SANTA BARBARA
**06/10/2025**
Darrel E. Parker, Executive Officer
BY__Chavez, Terri____
Deputy Clerk

1    ROB BONTA
     Attorney General of California
2    NORMA N. FRANKLIN
     Supervising Deputy Attorney General
3    WYATT E. SLOANE-TRIBE (State Bar No. 260319)
     JOHN M. NATALIZIO (State Bar No. 311482)
4    Deputy Attorneys General
     300 South Spring Street, Suite 1702
5    Los Angeles, CA 90013-1230
     Telephone: (213) 269-6380
6    Fax: (916) 731-2121                         *Fee exempt per Govt. Code § 6103*
     E-mail: Wyatt.Sloan-Tribe@doj.ca.gov
7    *Attorneys for Cross-Complainant, Respondent, and*
     *Defendant California Coastal Commission*
8
                    SUPERIOR COURT OF THE STATE OF CALIFORNIA
9
                              COUNTY OF SANTA BARBARA
10
                                   ANACAPA DIVISION
11

12

13   **SABLE OFFSHORE CORP., a Delaware**        Case No. 25CV00974
     **corporation; PACIFIC PIPELINE**
14   **COMPANY, a Delaware corporation, and**    [~~PROPOSED~~] ORDER GRANTING
     **DOES 1 through 25, inclusive,**           APPLICATION FOR PRELIMINARY
15                                               INJUNCTION
                        Plaintiffs, Petitioners, and
16                             Cross-Defendants,   Date:      May 28, 2025
                                                  Time:      10:00 a.m.
17              v.                                Dept:      3
                                                  Judge:     The Honorable Thomas Pearce
18                                                           Anderle
     **CALIFORNIA COASTAL COMMISSION,**          Trial Date: Not set.
19   **a state agency; and DOES 1 through 25,**   Action Filed: February 18, 2025
     **inclusive,**
20
                             Cross-Complainant,
21                      Respondent, and Defendant.

22

23

24

25

26

27

28

                                        1

1        Cross-Complainant, Respondent, and Defendant California Coastal Commission

2 ("Commission") came before this Court on May 28, 2025 for its Application for Preliminary

3 Injunction.

4        The Court, having considered the Application, the Memorandum of Points and Authorities

5 in support thereof, the Request for Judicial Notice, and all supporting declarations filed therewith,

6 the Opposition and Reply briefs, the supplemental materials presented by Sable Offshore Corp.

7 and Pacific Pipeline Company (collectively, "Sable"), and oral argument at the hearing, finds that

8 good cause exists to **GRANT** the Commission's Application.

9                       **PRELIMINARY INJUNCTION**

10        Pending a final judgment on the merits of this case, or an order of this Court dissolving

11 the instant injunction, Sable its employees and agents, and any other persons acting with Sable or

12 on its behalf, are hereby restrained and enjoined from conducting any further development in

13 violation the duly-ordered cease and desist order issued by the Commission on April 10, 2025.

14 The Court incorporates by reference into this order its ruling issued on May 28, 2025, attached

15 hereto as exhibit "A". The activities that shall be restrained include, but are not limited to, the

16 following:

17     1.     Any "development" as that term is defined in the California Coastal Act (Pub.

18 Resources Code § 30106) and the Santa Barbara County Local Coastal Program (LCP) that has

19 not been specifically identified and authorized by a new, final action pursuant to the Coastal Act

20 and/or the LCP.

21     2.     Development undertaken or planned at locations onshore, including: excavation;

22 removal of major vegetation; fill of wetlands; grading and widening of roads; installation of metal

23 plates over water courses; dewatering and discharge of water; removal, replacement, and

24 reinforcement of pipeline and pipeline infrastructure; and other development associated with the

25 return to service of Las Flores Pipelines CA-324 and CA-325.

26 \\\

27 \\\

28 \\\

2

1    3.    Development undertaken or planned at locations offshore, including: placement of

2  sand and cement bags on the seafloor below and adjacent to Sable's offshore oil and water

3  pipelines.

4  **IT IS SO ORDERED.**

5  DATED:    **06/10/2025**

Hon. Thomas P. Anderle

3



ELECTRONICALLY FILED
Superior Court of California,
County of Kern
By: Marina Mercado
Deputy Clerk
12/5/25 1:54 PM

1   ROB BONTA
    Attorney General of California
2   BRANDON WALKER SBN. 254581
    Supervising Deputy Attorney General
3   JACK C. NICK SBN. 160196
    ISABELLA A. PANUCCINI SBN. 318984
4   Deputy Attorneys General
        1300 I Street, Suite 125
5       Sacramento, CA 95814
        Telephone: (916) 210-6395
6       Fax: (916) 327-2319
        E-mail: Brandon.Walker@doj.ca.gov          ***Exempt from Filing Fees Pursuant to***
7   *Attorneys for Defendant State of California*      ***Government Code § 6103***

8                   SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                                COUNTY OF KERN

10                            METROPOLITAN DIVISION

11

12
    **Pacific Pipeline Company, A Delaware**          Case No. BCV25103508
13  **Corporation,**
                                                      **DECLARATION OF SERVICE BY**
14                                  Plaintiff,        **E-MAIL**

15              v.                                    Date:    February 3, 2026
                                                      Time:    8:30 a.m.
16  **State of California and DOES 1 through 25,**    Dept:    H
                                                      Judge:   Hon. Bernard C. Barmann, Jr.
17                                 Defendants.
                                                      Action Filed: September 29, 2025
18

19

20

21

22

23

24

25

26

27

28

                                        1

1    **Declaration of Electronic Service**

2    I am at least 18 years of age and not a party to this matter.

3    I am employed in the Office of the Attorney General of the State of California.  My

4    business address is 1300 I Street, Suite 125, Sacramento, CA 95814, County of Sacramento.

5    My electronic service address is Valerie.Tamulevich@doj.ca.gov.

6    On December 5, 2025, I electronically served the following document[s]:

7    a.  **DECLARATION OF BRANDON S. WALKER IN SUPPORT OF MOTION TO**

8    **CHANGE VENUE (Vol. 1 of 3)**

9    b.  **DECLARATION OF BRANDON S. WALKER IN SUPPORT OF MOTION TO**

10    **CHANGE VENUE (Vol. 2 of 3)**

11    c.  **DECLARATION OF BRANDON S. WALKER IN SUPPORT OF MOTION TO**

12    **CHANGE VENUE (Vol. 3 of 3)**

13    I electronically served the aforementioned document[s] by emailing them to the following

14    individual[s]:

15    Jeffrey Dintzer

16    Garrett B. Stanton
ALSTON & BIRD

17    **E-mail Address**: jeffrey.dintzer@alston.com
**E-mail Address**: garrett.stanton@alston.com

18    Benjamin J. Hanelin

19    Natalie C. Rogers
PAUL HASTINGS LLP

20    **E-mail Address**: benjaminhanelin@paulhastings.com
**E-mail Address**: natalierogers@paulhastings.com

21

22    I declare under penalty of perjury under the laws of the State of California and the United

23    States of America that the foregoing is true and correct, and that this declaration was executed on

24    December 5, 2025.

25    | Valerie A. Tamulevich | */s/ Valerie A. Tamulevich* |
26    |---|---|
| Declarant | Signature |

27

28

2

Declaration of Service by E-Mail (BCV25103508)

Superior Court of California,
County of Kern
By: Marina Mercado
Deputy Clerk
01/21/2026

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:    (213) 576-1000
Facsimile:    (213) 576-1100

**PAUL HASTINGS LLP**
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:    (310) 620-5879
Facsimile:    (310) 620-5899

Attorneys for Plaintiffs
PACIFIC PIPELINE COMPANY

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF KERN

## METROPOLITAN DIVISION

| | |
|---|---|
| PACIFIC PIPELINE COMPANY, | Case No. BCV25103508 |
| Plaintiffs, | **PACIFIC PIPELINE COMPANY'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO CHANGE VENUE** |
| v. | |
| STATE OF CALIFORNIA and DOES 1 through 25, | Date:        February 3, 2026<br>Time:        8:30 a.m. |
| Defendants. | Dept.        H<br>Judge:      Hon. Bernard C. Barmann, Jr. |
| | Action Filed: September 29, 2025 |

- 1 -

RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE

1

**TABLE OF CONTENTS**

2    INTRODUCTION ............................................................................................................... 5

3    STATEMENT OF FACTS .................................................................................................. 6

4    LEGAL STANDARD .......................................................................................................... 9

5    ARGUMENT ....................................................................................................................... 9

6        I.     Kern County is the Proper Venue Because Large Portions of the Pipeline
7              System are Situated in Kern County. .................................................................. 10

    II.    The State Raises Premature Merits Arguments, Which Also Fail. ...................... 11
8
    III.   A Motion to Transfer Venue for the Convenience of Witnesses and the
9              Ends of Justice is Premature Before an Answer is Filed. ................................... 13

10    CONCLUSION ................................................................................................................... 14

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**STATE CASES**

4

*Anmaco, Inc. v. Bohlken*
(1993) 13 Cal.App.4th 891 .................................................................................6

5

*Battaglia Enterprises, Inc. v. Superior Court*
(2013) 215 Cal.App.4th 309 ..............................................................................9

6

7

*Brown v. Superior Court*
(1984) 37 Cal.3d 477 ..........................................................................................9

8

*Cholakian & Assocs. v. Superior Court*
(2015) 236 Cal. App. 4th 361 ..........................................................................13

9

10

*County of San Bernardino v. Superior Court*
(1994) 30 Cal.App.4th 378 ..............................................................................11

11

12

*Easton v. Superior Court,*
(1970) 12 Cal. App. 3d 243 .........................................................................9, 13

13

*Foreman & Clark Corp. v. Fallon,*
(1971) 3 Cal.3d at 875 ........................................................................................6

14

15

*Freedman v. Imperial Cattle Co.*
(1952) 112 Cal. App. 2d 593 .......................................................................9, 11

16

17

*Freeman v. Dowling*
(1933) 219 Cal. 213 ..........................................................................................11

18

*Goldtree v. McAllister*
(1890) 86 Cal. 93 ..............................................................................................10

19

20

*Haines v. Lamb*
(1962) 206 Cal.App.2d 322 ...............................................................................9

21

22

*Housing Group v. United Nat. Ins. Co.*
(2001) 90 Cal. App.4th 1106 ...........................................................................11

23

*McCarthy v. Superior Court*
(1987) 191 Cal.App.3d 1023 ...........................................................................11

24

25

*Meyer v. State Board of Equalization*
(1954) 42 Cal.2d 376 ..........................................................................................6

26

27

*Mills v. Brown*
(1928) 205 Cal. 38 ............................................................................................11

28

RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE

*Pearson v. Superior Court,*
     (1962) 199 Cal. App. 2d 69 ..................................................................13

*Richardson v. Rose*
     (1961) 197 Cal.App.2d 318 ..................................................................12

*State Compensation Ins. Fund v. Superior Court*
     (2010) 184 Cal.App.4th 1124 ................................................................5

*Sylmar Air Conditioning v. Pueblo Contracting Services, Inc.*
     (2004) 122 Cal.App.4th 1049 ................................................................5

*Ward Mfg. Co. v. Miley*
     (1955) 131 Cal.App.2d 603 ..................................................................11

*White v. Kaiser-Frazer Corp.*
     (1950) 100 Cal.App.2d 754 ....................................................................9

**FEDERAL STATUTES**

49 U.S.C. § 60118(c)(2)(A) ........................................................................8

**STATE STATUTES**

Cal. Code Civ. Proc. § 392 ........................................................................10

Cal. Code Civ. Proc. § 397(c).....................................................................13

Cal. Code Civ. Proc. § 472, subd. (a) ..........................................................5

Cal. Pub. Res. Code § 30262 ......................................................................8

Civ. Code § 658 ........................................................................................10

Civ. Code § 660 ........................................................................................10

Elder California Pipeline Safety Act of 1981 ...............................................12

§ 51014.1 of the Government Code ...............................................................7

**SUPPLEMENTAL SOURCES**

50 Cal. Forms of Pleading & Practice, Annotated (2021) § 571.17 ...............10

- 4 -

1

**INTRODUCTION**

2   Defendant State of California's (the "State") Motion to Change Venue (the "Motion")
3   attempts to piecemeal the Santa Ynez Pipeline System—an active pipeline with significant
4   portions located in Kern County—in a manner inconsistent with both the operation of an integrated
5   pipeline and the plain language of SB 237. The Santa Ynez Pipeline System (or the "Pipeline
6   System") has been continually repaired and maintained, and crude oil has been flowing through
7   portions of the Pipeline System since May 2025. Moreover, the entire Santa Ynez Pipeline System
8   is now an interstate pipeline under the jurisdiction of the federal Pipeline and Hazardous Materials
9   Safety Administration ("PHMSA").[1] Since assuming jurisdiction, PHMSA confirmed the Pipeline
10  System's active status on December 17, 2025, approved Plaintiff's Restart Plan for Segments CA-
11  324 and CA-325 of the Pipeline System on December 22, 2025, and issued an Emergency Special
12  Permit for those Segments on December 23, 2025. (RJN, Exs. A through C.) The Santa Ynez
13  Pipeline System is therefore an active pipeline ready to resume transportation of crude oil
14  throughout the entirety of the System pursuant to PHMSA's approvals.

15  The State relies on self-serving attorney declarations to argue venue should be transferred
16  to Santa Barbara County because certain portions of the Santa Ynez Pipeline System run through
17  there, and certain approvals under SB 237, if required, would need to be issued by the Coastal
18  Commission. Even if the State's extraneous facts were properly considered on a motion to change
19  venue (they are not), the State's Motion fails on its merits. Plaintiff Pacific Pipeline Company filed
20  its action in Kern County for a very simple reason: the Santa Ynez Pipeline System operates in
21  and will ultimately deliver crude oil to Kern County. This case challenges SB 237's application to

22

23  [1] Concurrently with this Response, Pacific Pipeline Company filed its Verified First Amended
24  Complaint ("FAC") pursuant to California Code of Civil Procedure Section 472, subdivision (a)
    to plead additional facts and a separate cause of action related to PHMSA's assumption of
25  jurisdiction and actions taken with respect to the Santa Ynez Pipeline System in December of
    2025. "Because there is but one complaint in a civil action, the filing of an amended complaint
26  moots a motion directed to a prior complaint." (See *Sylmar Air Conditioning v. Pueblo
    Contracting Services, Inc.* (2004) 122 Cal.App.4th 1049, 1054; *State Compensation Ins. Fund v.
27  Superior Court* (2010) 184 Cal.App.4th 1124, 1131.) The State's Motion is therefore mooted by
    the FAC. To the extent the Court determines the Motion or any portion thereof remains live,
28  Pacific Pipeline Company responds to the Motion as set forth herein.

1   an integrated pipeline system that extends over 135 miles into Kern County and terminates there;
2   it cannot be reduced to its segments in Santa Barbara as the State contends. Moreover, the State's
3   arguments on mootness and justiciability go to the substance of Plaintiff's claims, not whether
4   venue is proper in Kern County. Deciding venue on those bases would be improper. And finally,
5   the State's argument on convenience of witnesses and interests of justice is unsupported by
6   evidence and prohibited at this early stage. Throughout its Motion, the State misapplies the law
7   and prematurely litigates the substance of what it unilaterally ascertains to be the sole "potentially
8   judiciable claim" in this case. Its Motion should be denied.

9                                   **STATEMENT OF FACTS**

10      Sable Offshore Corp. ("Sable") is the lessee and operator of federal offshore oil and gas
11  leases in federal waters off the coast of California that form the Santa Ynez Unit. (FAC ¶ 2.)[2] Sable
12  operates the interconnected Santa Ynez Pipeline System, which consists of offshore pipeline
13  infrastructure, onshore processing and storage facilities, and two onshore pipeline segments that
14  have been referred to as Lines CA-324 and CA-325 and as the Las Flores Pipeline (collectively,
15  "Segments CA-324 and CA-325"). (*Ibid.*) In February 2024, Sable acquired the Santa Ynez Unit
16  oil production infrastructure (the "SYU Facilities") and Pacific Pipeline Company, which owns
17  Segments CA-324 and CA-325. (*Ibid.*)

18      Portions of the Santa Ynez Pipeline System are located in Kern County, San Luis Obispo
19  County, and an unincorporated area of Santa Barbara County. (FAC ¶ 1.) Since the acquisition in
20  February 2024, Pacific Pipeline Company has worked with federal and state agencies toward
21  resuming petroleum production from the SYU Facilities through the Santa Ynez Pipeline System,
22  including performing repair and maintenance work on Segments CA-324 and CA-325. (FAC ¶ 3.)

23

24

25  [2] The FAC supersedes the original Complaint, which "ceases to perform any function as a
    pleading" upon filing of an amended complaint. (See *Foreman & Clark Corp. v. Fallon* (1975) 3
26  Cal.3d 875, 884, quoting *Meyer v. State Board of Equalization* (1954) 42 Cal.2d 376, 384.) The
    FAC now furnishes "the sole basis for the cause of action, and the original complaint ceases to
27  have any effect either as a pleading or a basis for judgment." (*Anmaco, Inc. v. Bohlken* (1993) 13
    Cal.App.4th 891, 901.) All citations herein are therefore to the FAC, which is the operative
28  complaint in this action.

1       The SYU Facilities consist of sixteen federal leases across approximately 76,000 acres of
2 outer continental shelf and produce crude oil and natural gas from platforms located in federal
3 waters off the California Coast in the Santa Barbara Channel. (FAC ¶ 18.) Oil and gas is
4 transported through the Santa Ynez Pipeline System's offshore pipeline infrastructure to the
5 Pipeline System's onshore processing facilities in Las Flores Canyon, and then Segments CA-324
6 and CA-325 transport oil from Las Flores Canyon to the Gaviota and Pentland Stations further
7 downstream. (FAC ¶¶ 2, 18, 19, 20.) The Gaviota Pump Station, the end point of Segment CA-
8 324, is located in Santa Barbara County. (FAC ¶ 24.) The Pentland Delivery Point, the end point
9 of Segment CA-325, is located in the San Joaquin Valley in Kern County. (FAC ¶ 23.)

10       In the late 1980s, Segments CA-324 and CA-325 received their initial approvals and
11 development permits. (FAC ¶¶ 25-27.) In May 2015, a leak and oil spill occurred along Segment
12 CA-324 in Santa Barbara County. (FAC ¶ 29.) Segments CA-324 and CA-325 remained active
13 after this leak – these segments were filled with nitrogen to prevent oxidation and internal
14 corrosion, and the cathodic protection system remains active, regularly inspected, and maintained.
15 (*Id.*) In May 2024, Pacific Pipeline Company began anomaly repairs to Segments CA-324 and
16 CA-325, which were completed under OSFM supervision. (FAC ¶ 34.)

17       As of May 2025, Sable resumed petroleum transportation from the SYU Facilities' offshore
18 platforms through the Santa Ynez Pipeline System to storage facilities in Las Flores Canyon. (FAC
19 ¶ 36.) Since the pause in production related to the spill, Pacific Pipeline Company and its
20 predecessors always intended to resume petroleum transportation through Segments CA-324 and
21 CA-325. (FAC ¶ 37.) Pacific Pipeline Company and its predecessors never abandoned Segments
22 CA-324 and CA-325 and continued to maintain and repair the Segments. (*Ibid.*)

23       In September 2025, the California Legislature passed, and Governor Newsom signed into
24 law, SB 237. (FAC ¶ 38.) SB 237 went into effect on January 1, 2026, and is not retroactive. (FAC
25 ¶ 59.) Among other things, SB 237 adds Section 51014.1 of the Government Code, which states
26 in part: "[a]ny existing oil pipeline that is six inches or larger that has been idle, inactive, or out of
27 service for five years or more, shall not be restarted without passing a spike hydrostatic testing

28

1   program." (FAC ¶ 39.) SB 237 separately amends Section 30262 of the Coastal Act to provide

2   requirements for coastal development permits ("CDPs") for pipelines that have been "idled,

3   inactive, or out of service" for five years or more. (FAC ¶ 40.) While state law does not define

4   "idle," "inactive," and "out of service," analogous terms are defined or described by PHMSA.

5   (FAC ¶ 41.)

6          On December 17, 2025, PHMSA determined that the entirety of the Santa Ynez Pipeline

7   System, including Segments CA-324 and CA-325, is an interstate pipeline subject to PHMSA's

8   exclusive jurisdiction. (FAC ¶ 51.) This determination eliminated any jurisdiction OSFM had over

9   Segments CA-324 and CA-325. (RJN, Ex. A, p. 2.) In making its determination that the Santa

10  Ynez Pipeline System is an interstate pipeline, PHMSA notified OSFM that Segments CA-324

11  and CA-325 are "subject to the regulatory oversight of PHMSA." (*Ibid.*, pp. 2–3.) On December

12  22, 2025, PHMSA approved Plaintiff's Restart Plan for Segments CA-324 and CA-325 (the

13  "Restart Approval"). (RJN, Ex. B.) On December 23, 2025, PHMSA granted Plaintiff an

14  "emergency special permit" for Segments CA-324 and CA-325 pursuant to 49 U.S.C. Section

15  60118(c)(2)(A) (the "Emergency Special Permit"). (RJN, Ex. 3, p. 2.) With the Restart Approval

16  and the Emergency Special Permit, no other PHMSA approvals or permits are necessary to flow

17  oil through the entirety of the Santa Ynez Pipeline System, including Segments CA-324 and CA-

18  325. Given PHMSA's assertion of jurisdiction over the entirety of the Santa Ynez Pipeline System

19  as an interstate pipeline, OSFM is without jurisdiction to regulate Segments CA-324 and CA-325,

20  or any other portion of the Pipeline System. (FAC ¶ 55.)

21         Pacific Pipeline Company brought this declaratory action to determine its rights and

22  obligations under SB 237. In particular, Pacific Pipeline Company seeks a declaration regarding:

23  1) whether the requirements associated with idle, inactive, or out of service pipelines apply to the

24  Santa Ynez Pipeline System, including Segments CA-324 and CA-325; and 2) whether the

25  application of SB 237 as to the Santa Ynez Pipeline System is preempted by federal law. The

26  duties and obligations arising under SB 237, if they are not preempted by federal law, would impact

27  Pacific Pipeline Company's ability and timeline to resume petroleum transportation across the

28

1 entire Pipeline System. As such, SB 237 impacts all counties associated with the Santa Ynez
2 Pipeline System, including Kern County, where crude oil is ultimately delivered.

3 <div align="center">**LEGAL STANDARD**</div>

4 Venue is determined from "the complaint on file at the time the motion to change venue is
5 made." (*Brown v. Superior Court* (1984) 37 Cal.3d 477, 482.) The trial court is therefore confined
6 to the complaint's allegations, together with only those facts "which were judicially noticed," when
7 evaluating a venue motion. (*Haines v. Lamb* (1962) 206 Cal.App.2d 322, 325.) In determining a
8 motion for a change in venue, "the court must accept as true the material allegations of the
9 complaint which are not controverted." *(Freedman v. Imperial Cattle Co.* (1952) 112 Cal. App. 2d
10 593).

11 A plaintiff's choice of venue is presumptively correct, and the defendant bears the burden
12 of demonstrating that venue is improper in the selected forum. (See *Battaglia Enterprises, Inc. v.*
13 *Superior Court* (2013) 215 Cal.App.4th 309, 313–314; *Easton v. Superior Court* (1970) 12 Cal.
14 App. 3d 243, 247.) And, absent narrow, inapplicable circumstances, "upon a motion for change of
15 venue, the court should not try disputed issues of fact going to the merits of the cause, upon the
16 conflicting affidavits, in order to determine whether or not a cause of action does in reality exist."
17 (*White v. Kaiser-Frazer Corp.* (1950) 100 Cal.App.2d 754, 758.)

18 <div align="center">**ARGUMENT**</div>

19 Venue is clearly proper in Kern County, where significant portions of the Santa Ynez
20 Pipeline System, including Segment CA-325's delivery point, are situated. The State improperly
21 advances arguments on the substance of Plaintiff's claims, which are not properly adjudicated on
22 a motion to transfer venue. Finally, the State's argument regarding a change in venue for the
23 convenience of witnesses and to serve the ends of justice is premature at this early stage. The
24 State's Motion should be denied.

25

26 //

27 //

28

<div align="center">- 9 -</div>
<div align="center">RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE</div>

I.  **Kern County is the Proper Venue Because Large Portions of the Pipeline System are Situated in Kern County.**

First, the State asserts that venue is improper in Kern County because "no portion of the [Santa Ynez Pipeline System] that is potentially affected by SB 237's coastal permit requirement … is in Kern County." (Mot. at 5.)

Not so. California Code of Civil Procedure Section 392 establishes proper venue for actions concerning real property. Under Section 392, venue is proper "in the superior court [of] the county where the real property that is the subject of the action, or some part thereof, is situated." (See also 50 Cal. Forms of Pleading & Practice, Annotated (2021) § 571.17 [citing *Goldtree v. McAllister* (1890) 86 Cal. 93, 106] [explaining that, under the relevant section, venue is proper "in any county in which any part of real property is situated"].) Real property includes all that is "affixed to land." (Civ. Code § 658.) Property is affixed to land when that property is "imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or permanently attached to what is permanent, by means of cement, plaster, nails, bolts or screws." (Civ. Code § 660.)

As the State concedes, "it is reasonable to assume that much of the [Santa Ynez Pipeline System's segments] are attached to land." (Mot. at 15, n.7.) Recognizing that Section 392 "may be appropriately applied here," the State cannot escape that significant portions of the Santa Ynez Pipeline System, including Segment CA-325's delivery point, are situated in Kern County and affixed to the land here. On that basis alone, venue is proper.

So instead, the State breaks the Santa Ynez Pipeline System into pieces, ignoring the stretch of Segment CA-325 in Kern County—which could be inoperable if SB 237 applied—and focusing on Santa Barbara County's issuance of Coastal Development Permits within the Coastal Zone. But the repair and maintenance that could be covered by such a Coastal Development Permit does not exist in a silo and would instead impact the operation of the integrated Pipeline System as a whole. The plain text of SB 237 accounts for this reality and purports to regulate pipelines system-wide, turning on whether "an existing oil pipeline" has been "idle, inactive, or out of service" for the relevant period instead of treating pipelines as severable pieces. (FAC ¶ 6.) The Complaint and

RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE

1   FAC follow the singular language of the statute, asserting that SB 237 does not apply because the
2   Santa Ynez Pipeline System, as an integrated system, has retained its active status since at least
3   2015. (See FAC ¶ 9.) The State's effort to rewrite the statute to isolate Segments CA-324 and CA-
4   325 as a Santa Barbara-exclusive "subject" of this action should be rejected.

5       **II.    The State Raises Premature Merits Arguments, Which Also Fail.**

6           The State argues that a challenge to SB 237's stress hydrostatic testing requirements is
7   moot and nonjusticiable because the same test may already be required under certain State
8   Waivers.[3] Mootness and justiciability are legal questions about the merits of a cause of action.
9   They have no bearing on venue. (See *County of San Bernardino v. Superior Court* (1994) 30
10  Cal.App.4th 378 [explaining that courts cannot transfer venue based on substantive considerations
11  but must adhere to the statutory scheme]; *McCarthy v. Superior Court* (1987) 191 Cal.App.3d
12  1023 [holding that trial judges cannot make rulings on the substance of a plaintiff's action while
13  venue is in question].)

14          California law is clear: "[u]pon a motion for change of venue, the court should not try
15  disputed issues of fact going to the merits of the cause, upon the conflicting affidavits, in order to
16  determine whether or not a cause of action does in reality exist against the resident defendant."
17  (*Freedman v. Imperial Cattle Co.* (1952) 112 Cal.App.2d 593, 596; see also *Ward Mfg. Co. v.*
18  *Miley* (1955) 131 Cal.App.2d 603, 608 [explaining that it is "not the function of the trial judge to
19  consider the merits of plaintiff's plea" when deciding whether venue is appropriate].) Further, when
20  considering a defendant's motion to change venue, the defendant's "statement of a legal

21

22

23  [3] In support of its argument, Defendant cites irrelevant case law concerning fraudulent joinder and
    sham litigation. (See *Housing Group v. United Nat. Ins. Co.* (2001) 90 Cal. App.4th 1106, 1111-
24  1112; *Freeman v. Dowling* (1933) 219 Cal. 213, 216.) The line of cases invoked by Defendant
    requires the complaint to have been filed in bad faith, "so glaringly and vitally defective as to be
25  beyond correction by amendment." (*Mills v. Brown* (1928) 205 Cal. 38, 41.) However, for all the
    reasons enumerated in the Complaint and the FAC, this action has not been brought in bad faith.
26  There is a clear case in controversy before this Court, as Plaintiff seeks a declaration that SB 237
    is inapplicable to the Las Flores Pipeline, which has been active since long before the law's
27  effective date (January 1, 2026). Plaintiff's FAC further demonstrates that SB 237 is preempted as
    to the Las Flores Pipeline, which is now under the exclusive jurisdiction of PHMSA.

28

1  conclusion in support of a motion is ineffective, and provides no sufficient support for an order

2  granting the motion." (*Richardson v. Rose* (1961) 197 Cal.App.2d 318, 320.)

3       Even if mootness were properly considered on a motion to transfer venue, the State's

4  argument fails on the merits. Here, the testing requirements under SB 237 impose different

5  liabilities than those under the State Waivers. As one example, SB 237 violations of the Elder

6  California Pipeline Safety Act of 1981 constitute a crime. (SB 237 Legislative Digest, Filed with

7  Secretary of State September 19, 2025 at (2) [explaining that "[a]ny violation" of the provision at

8  issue "would constitute a crime"].) Under SB 237, the Act now prohibits the restart of an existing

9  oil pipeline that is six inches or larger that has been idle, inactive, or out of service for five years

10  or more without passing a hydrostatic testing program that meets the requirements established by

11  the State Fire Marshal. Any violation of that provision would constitute a crime, potentially

12  imposing more severe liabilities on Plaintiff than could be imposed under the State Waivers.

13       Moreover, as demonstrated by the exhibits attached to Plaintiff's Request for Judicial

14  Notice, the requirements of the State Waivers have now been mooted with PHMSA's assumption

15  of jurisdiction over the Santa Ynez Pipeline System. Segments CA-324 and CA-325 are portions

16  of the Santa Ynez Pipeline System, which had been considered intrastate since 2016 and thus

17  subject to OSFM's regulatory oversight. (RJN, Ex. A, p. 1.) However, on December 17, 2025,

18  PHMSA determined that the entire Santa Ynez Pipeline System (including Segments CA-324 and

19  CA-325) is an "interstate pipeline" that is subject to PHMSA's exclusive jurisdiction and notified

20  OSFM that the Santa Ynez Pipeline System is "subject to the regulatory oversight by

21  PHMSA." (*Id.*, pp. 2–3.) Since assuming federal jurisdiction over the Pipeline System, PHMSA

22  granted all remaining approvals necessary to resume petroleum transportation through Segments

23  CA-324 and CA-325, including approval of the Restart Plan (which is now under PHMSA's

24  jurisdiction, not OSFM's) and issuance of the Emergency Special Permit. (RJN, Exs. B and C.)

25  The Emergency Special Permit is the federal equivalent and takes the place of the State Waivers.

26  (See RJN, Ex. C, p. 2.)

27

28

1    Because SB 237 imposes additional obligations and liabilities on Plaintiff's operation of

2    the Santa Ynez Pipeline System, declaratory judgment from the Court would provide relief

3    regarding Plaintiff's rights and duties and is therefore not moot.

4    **III.    A Motion to Transfer Venue for the Convenience of Witnesses and the Ends of**

5    **Justice is Premature Before an Answer is Filed.**

6        Finally, the State requests to transfer venue under CCP § 397(c), arguing Santa Barbara

7    County would serve the interests of justice and be more convenient for nonparty witnesses. (Mot.

8    at 17-18.) This is premature because "a motion to transfer venue on such ground cannot be made

9    before an answer is filed." (*Easton*, 12 Cal. App. 3d at 245 ["The matter of convenience of

10   witnesses was not properly before the court, because [defendant] had not filed its answer. Only

11   then could the court ascertain what the issues and the evidence relating to those issues would be.

12   Before the answer is filed, the court cannot determine whether the witnesses whose convenience

13   is involved have material testimony to offer…"]; *Cholakian & Assocs. v. Superior Court* (2015)

14   236 Cal. App. 4th 361, 372; *Pearson v. Superior Court* (1962) 199 Cal. App. 2d 69, 74 (1962) ["A

15   motion for change of venue on the ground of the convenience of witnesses will not be entertained

16   when the defendant has not filed an answer…"]).

17       In support of its argument, the State broadly claims that "the only potential witnesses in

18   this action are officials or staff members" of the Coastal Commission or OSFM. (Mot. at 17.)

19   However, Plaintiff's Complaint did not identify any witnesses from the Coastal Commission or

20   OSFM. The State's argument about potential or hypothetical witnesses is therefore purely

21   speculative and is not grounds for a change in venue. Moreover, there is no evidence to suggest

22   that Santa Barbara would somehow be a more convenient venue for Coastal Commission or OSFM

23   witnesses, who are expected to be primarily located in Sacramento and San Francisco where the

24   agencies' main offices are located—locations that are closer to Kern County.

25       The State also argues that the "ends of justice" favor transfer, because "most of the work

26   for restarting the pipelines, and the potential impacts of doing so, will be felt in Santa Barbara

27   County." (Mot. at 18.) In support, the State points to authority indicating that permitting view of

28

1  the scene or making material evidence available promotes the ends of justice. However, this case

2  is not an environmental damages action requiring on-site fact-finding. It is a declaratory action

3  asking the court to interpret SB 237's terms and evaluate certain evidence regarding the pipeline's

4  operational history, which does not depend on venue location in any particular county. Instead, the

5  Court will be interpreting SB 237's terms ("idle," "inactive," etc.), considering the impact of

6  PHMSA regulations on such interpretation, and evaluating certain evidence regarding the

7  pipeline's operational history. These tasks do not depend on any judge's personal observation of

8  Santa Barbara geography or conditions. The prior oil spill and coastal resources are part of the

9  background context, but they are undisputed historical facts that can be presented through the

10  record. A venue change to Santa Barbara would thus yield no improvement in access to proof or

11  justice; it would only shift the forum away from a county with a concrete connection to the case

12  and a significant interest in its outcome.

13  <div align="center">**CONCLUSION**</div>

14  The State ignores the key purpose of the dispute: declaring Plaintiff's rights and duties

15  under the inapplicable and now preempted SB 237 as to an active pipeline system that operates

16  throughout Santa Barbara, San Luis Obispo, and Kern Counties, a major delivery point located in

17  the county where this action was filed. Plaintiff's operation of the pipeline system will bring oil to

18  the state's refineries, create jobs in Kern County, and bolster in-state oil production. The pipeline

19  system's impact will be felt in Kern, even if portions of the system operate in other counties as

20  well. Venue is proper in Kern County because impermissible hurdles to the operation of the

21  pipeline apply to the pipeline as a whole, including where delivery is intended to occur. Kern

22  County has a concrete connection to this case and a significant interest in its outcome, and as such,

23  venue here is appropriate.

24

25  //

26  //

27  //

28

RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE

Respectfully submitted,

DATED: January 21, 2026

**ALSTON & BIRD LLP**

By: _____

JEFFREY D. DINTZER

Attorney for Plaintiff
PACIFIC PIPELINE COMPANY

RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE

1

**PROOF OF SERVICE**

2

I, **Kim Niz**, declare:

3

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand

4

Avenue, 51st Floor, Los Angeles, CA 90071.

5

On January 21, 2026, I served the document(s) **PACIFIC PIPELINE COMPANY'S RESPONSE IN OPPOSITION TO DEFEDANT'S MOTION TO CHANGE VENUE**

6

on the interested parties stated below, by the following means of service:

7

8

Brandon Walker

9

Jack C. Nick

Isabella A. Panuccini

10

1300 I Street, Suite 125

Sacramento, CA 95814

11

Telephone: (916) 210-6395

Fax: (916) 327-2319

12

Brandon.Walker@doj.ca.gov

Jack.Nick@doj.ca.gov

13

Isabella.Panuccini@doj.ca.gov

14

Attorneys for Defendant State of California

15

☒   BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the

16

Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

17

I declare under penalty of perjury under the laws of the State of California that the above

18

is true and correct.

19

Executed on January 21, 2026, at Los Angeles, California.

20

_/s/ Kim Niz_
Kim Niz

21

22

23

24

25

26

27

28

RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE

**ELECTRONICALLY FILED**
Superior Court of California,
County of Kern
By: Marina Mercado
Deputy Clerk
**01/21/26 7:37 PM**

1    **ALSTON & BIRD LLP**
     JEFFREY D. DINTZER, SBN 139056
2    jeffrey.dintzer@alston.com
     GARRETT B. STANTON, SBN 324775
3    garrett.stanton@alston.com
     350 South Grand Avenue, 51st Floor
4    Los Angeles, CA 90071-1410
     Telephone:    (213) 576-1000
5    Facsimile:    (213) 576-1100

6    **PAUL HASTINGS LLP**
     BENJAMIN J. HANELIN, SBN 237595
7    benjaminhanelin@paulhastings.com
     NATALIE C. ROGERS, SBN 301254
8    natalierogers@paulhastings.com
     1999 Avenue of the Stars, 27th Floor
9    Century City, California, 90067
     Telephone:    (310) 620-5879
10   Facsimile:    (310) 620-5899

11   Attorneys for Plaintiff
     PACIFIC PIPELINE COMPANY
12

13                **SUPERIOR COURT OF CALIFORNIA**

14                     **COUNTY OF KERN**

15                  **METROPOLITAN DIVISION**

16
     PACIFIC PIPELINE COMPANY,          Case No. BCV25103508
17
                Plaintiffs,             **PACIFIC PIPELINE COMPANY'S**
18                                      **REQUEST FOR JUDICIAL NOTICE IN**
                                        **SUPPORT OF RESPONSE IN**
19          v.                          **OPPOSITION TO DEFENDANT'S**
                                        **MOTION TO CHANGE VENUE;**
20   STATE OF CALIFORNIA and DOES 1     **DECLARATION OF GARRETT B.**
     through 25,                        **STANTON**
21
                Defendants.             *[Filed concurrently with Response in*
22                                      *Opposition to Defendant's Motion to Change*
                                        *Venue]*
23
                                        Date:        February 3, 2026
24                                      Time:        8:30 a.m.
                                        Dept.        H
25                                      Judge:       Hon. Bernard C. Barmann, Jr.

26                                      Action Filed: September 29, 2025

27

28
                                      - 1 -

1

## REQUEST FOR JUDICIAL NOTICE

2      Pursuant to Evidence Code sections 452 and 453, Plaintiff Pacific Pipeline Company

3   hereby requests that the Court take judicial notice of the following document in support of

4   Plaintiff's Response in Opposition to Defendant's Motion to Change Venue (the "Response").

5      1.      Attached hereto as **Exhibit A** is a true and correct copy of the December 17, 2025

6   letter from the Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued to

7   Sable Offshore Corporation ("Sable").

8      2.      Attached hereto as **Exhibit B** is a true and correct copy of the December 22, 2025

9   PHMSA approval of Sable's Restart Plan.

10      3.      Attached hereto as **Exhibit C** is a true and correct copy of the December 23, 2025

11   Emergency Special Permit granted by PHMSA to Sable.

12      Exhibits A through C constitute "official acts" of an executive department of the United

13   States within the meaning of Evidence Code section 452, subdivision (c). Exhibits A through C

14   are necessary to respond to Defendant State of California's (the "State") argument that a challenge

15   to SB 237's stress hydrostatic testing requirements is moot and nonjusticiable because the same

16   test is already required under certain State Waivers issued by the California Office of the State

17   Fire Marshal ("OSFM").

18      Exhibits A through C are relevant to Plaintiff's Response because they demonstrate the

19   Santa Ynez Pipeline System (including Segments CA-324 and CA-325) is now an interstate

20   pipeline subject to PHMSA's jurisdiction, the requirements of the State Waivers issued by OSFM

21   are now moot and preempted, and the Santa Ynez Pipeline System is now ready to resume

22   transportation of crude oil through its entirety pursuant to PHMSA's approvals. More specifically,

23   Exhibit A demonstrates that OSFM no longer retains any regulatory oversight over Segments CA-

24   324 and CA-325 and was notified by PHMSA on December 17, 2025 that the Santa Ynez Pipeline

25   System is now subject to PHMSA's jurisdiction. Exhibit B demonstrates that on December 22,

26   2025, PHMSA approved Sable's Restart Plan for Segments CA-324 and CA-325. Exhibit C

27

28

REQUEST FOR JUDICIAL NOTICE; DECLARATION OF GARRETT B. STANTON

1   demonstrates that on December 23, 2025, PHMSA granted Sable an Emergency Special Permit

2   for Segments CA-325 and CA-325.

3       Evidence Code section 452, subdivision (c) "enables courts in California to take notice of

4   a wide variety of official acts . . . [and] an expansive reading must be provided to certain of its

5   phrases[;] included in 'executive' acts are those performed by administrative agencies." (*Scott v.*

6   *JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 743, 752-52, citing Simons, California

7   Evidence Manual (2013) Judicial Notice § 7:11, p. 558.) The Court may therefore properly take

8   judicial notice of Exhibits A through C pursuant to Evidence Code section 452, subdivision (c).

9       In accordance with Evidence Code section 453, Plaintiff has given the State sufficient

10   notice of this request to enable it to meet the request, and Plaintiff has also furnished the Court

11   with sufficient information to take judicial notice of Exhibits A through C.

12

13

14                             Respectfully submitted,

15

16   DATED:  January 21, 2025             **ALSTON & BIRD LLP**

17

18                           By: _____

19                              JEFFREY D. DINTZER

20                              Attorney for Plaintiff
                                PACIFIC PIPELINE COMPANY

21

22

23

24

25

26

27

28

REQUEST FOR JUDICIAL NOTICE; DECLARATION OF GARRETT B. STANTON

1

## DECLARATION OF GARRETT B. STANTON

2        I, Garrett B. Stanton, declare as follows:

3        1.        I am an attorney duly licensed to practice law before all courts of the State of

4  California. I am a senior associate at Alston & Bird LLP, counsel of record for Plaintiff Pacific

5  Pipeline Company. I make this declaration in support of Plaintiff's Request for Judicial Notice. I

6  have personal knowledge of the facts set forth in this declaration and, if called as a witness, could

7  and would testify competently to them.

8        2.        I am familiar with the case files for this matter. The files for this matter are

9  maintained by various attorneys, legal assistants, and other firm employees in a secure electronic

10  format at the offices of Alston & Bird LLP.

11        3.        Attached as **Exhibit A** is a true and correct copy of a letter, dated December 17,

12  2025, issued by PHMSA to Sable. I received a copy of this letter from Plaintiff, whereupon I stored

13  it on Alston & Bird LLP's secure electronic file management system. In preparing this declaration,

14  I retrieved the true and correct copy of the document described as **Exhibit A** from Alston & Bird

15  LLP's secure electronic file management system and prepared it for inclusion in my declaration.

16        4.        Attached as **Exhibit B** is a true and correct copy of a letter, dated December 22,

17  2025, issued by PHMSA to Sable. I received a copy of this letter from Plaintiff, whereupon I stored

18  it on Alston & Bird LLP's secure electronic file management system. In preparing this declaration,

19  I retrieved the true and correct copy of the document described as **Exhibit B** from Alston & Bird

20  LLP's secure electronic file management system and prepared it for inclusion in my declaration.

21  / / /

22

23  / / /

24

25  / / /

26

27  / / /

28

- 4 -

REQUEST FOR JUDICIAL NOTICE; DECLARATION OF GARRETT B. STANTON

5.      Attached as **Exhibit C** is a true and correct copy of an Emergency Special Permit dated December 23, 2025, issued by PHMSA to Sable. I received a copy of this Emergency Special Permit from Plaintiff, whereupon I stored it on Alston & Bird LLP's secure electronic file management system. In preparing this declaration, I retrieved the true and correct copy of the document described as **Exhibit C** from Alston & Bird LLP's secure electronic file management system and prepared it for inclusion in my declaration.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 21st day of January, 2026, in Bakersfield, California.


GARRETT B. STANTON
Attorney for Plaintiff
PACIFIC PIPELINE COMPANY

- 5 -
REQUEST FOR JUDICIAL NOTICE; DECLARATION OF GARRETT B. STANTON

# EXHIBIT A



U.S. Department
of Transportation

1200 New Jersey Avenue SE
Washington, D.C. 20590

**Pipeline and Hazardous
Materials Safety
Administration**

December 17, 2025

Via Electronic Mail to: cflores@sableoffshore.com

J. Caldwell Flores
President and Chief Operating Officer
Sable Offshore Corp.
845 Texas Ave. Ste 2920
Houston, TX 77002

Re: Determination of Interstate Classification

Dear Mr. Flores:

This responds to your letter of November 26, 2025 regarding the Las Flores Pipeline owned and operated by Sable Offshore Corp. (Sable). Your letter notifies the Pipeline and Hazardous Materials Safety Administration (PHMSA) that Sable has determined the pipeline to be an interstate pipeline facility under the Pipeline Safety Act (PSA) and requests PHMSA transition regulatory oversight from the California Office of the State Fire Marshal (OSFM) to PHMSA.

As noted in your letter, portions of the Las Flores Pipeline (previously known as Lines 901 and 903) have been considered intrastate since 2016 and subject to regulatory oversight by OSFM pursuant to its certification with PHMSA under 49 U.S.C. § 60105(a). Prior to 2016, Lines 901 and 903 were considered interstate and regulated by PHMSA. The classification change in 2016 corresponded to the pipelines' previous owner cancelling tariffs with the Federal Energy Regulatory Commission (FERC). In 2024, Sable acquired Lines 901 and 903 and other assets comprising the Las Flores Pipeline, including offshore pipelines transporting crude oil from the Outer Continental Shelf (OCS) and an onshore processing facility at Las Flores Canyon. Sable operates the Las Flores Pipeline assets as a single pipeline system transporting crude oil from the OCS to the Pentland Station terminal in Kern County, California.

Upon receipt of your letter, PHMSA initiated a review of the Las Flores Pipeline. This review included an on-site inspection on December 9 through December 11, 2025. OSFM representatives accompanied PHMSA on the inspection. PHMSA also reviewed Sable's written procedures and records and conducted field observations of the Las Flores facility, the pump stations at Gaviota and Sisquoc, the control room in Santa Maria, and the offshore Harmony platform. In addition, PHMSA reviewed the 2025 program inspections conducted by OSFM. For

the following reasons, PHMSA agrees with your determination that the Las Flores Pipeline is an interstate pipeline.

The PSA authorizes PHMSA to prescribe and enforce minimum safety standards for pipeline transportation and for pipeline facilities.[1] The PSA vests with PHMSA exclusive regulatory authority over interstate pipelines and preempts States from adopting or continuing in force safety standards for interstate pipelines.[2] With respect to intrastate pipelines, the PSA provides a State authority may regulate the intrastate pipelines within its borders upon submission to PHMSA of an annual certification.[3] Both the PSA and the Federal pipeline safety regulations define interstate and intrastate pipelines.[4] An interstate pipeline is a pipeline or part of a pipeline used to transport hazardous liquids in interstate or foreign commerce; an intrastate pipeline is a hazardous liquid pipeline that is not an interstate pipeline.

Determining whether a hazardous liquid pipeline is an interstate or intrastate pipeline requires a factual inquiry.[5] To assist in that determination, PHMSA adopted Appendix A to 49 CFR Part 195 providing a statement of agency policy and interpretation on the delineation between Federal and State jurisdiction.[6] In short, "if there is a tariff or concurrence filed with FERC governing the transportation of hazardous liquids over a pipeline facility . . . then [PHMSA] will, as a general rule, consider the facility to be an interstate pipeline facility within the meaning of the [PSA]." The absence of a FERC tariff generally means a pipeline is intrastate; however, in certain situations, PHMSA will consider a pipeline to be interstate despite the lack of a filing with FERC. Several examples of this are listed in Appendix A. As it relates to the Las Flores Pipeline, one example provides that a pipeline originating on the OCS will be considered an interstate pipeline even if the pipeline does not have a tariff with FERC.[7]

PHMSA's evaluation of the Las Flores Pipeline confirms that it transports crude oil from the OCS to an onshore processing facility at Las Flores Canyon and continues the transportation of crude oil from Las Flores Canyon to Pentland, California. Consistent with Appendix A, the Las

---

[1] 49 U.S.C. § 60101 et seq.

[2] 49 U.S.C. § 60104(c). *See* Olympic Pipe Line Co. v. City of Seattle, 437 F.3d 872, 878 (9th Cir. 2006) (discussing how the "PSA differentiates between the regulation of interstate and intrastate hazardous liquid pipelines.")

[3] 49 U.S.C. § 60105(a). OSFM has a certification with PHMSA to regulate intrastate hazardous liquid pipelines in California.

[4] 49 U.S.C. § 60101(a)(7), (a)(8)(B), (a)(10); 49 CFR § 195.2. *See* S. Pac. Pipe Lines Inc. v. DOT, 796 F.2d 539 (D.C. Cir. 1986) (finding PHMSA's definition of interstate and intrastate pipelines reasonable under the PSA).

[5] Transportation of Liquids by Pipeline, 46 Fed. Reg. 38,357, 38,359 (Jul. 27, 1981) (PHMSA's predecessor agency (hereafter PHMSA) explained that it had "reviewed examples of what it believes are the most frequent and likely configurations of liquid pipelines and pipeline facilities and considered various ways of cataloging or classifying them as either interstate or intrastate."); *see also* Shell Oil Co. v. City of Santa Monica, 830 F.2d 1052, 1064 (9th Cir. 1987) (noting that whether the pipeline was interstate or intrastate turned on a disputed issue of fact).

[6] Transportation of Hazardous Liquids by Pipeline; Regulation of Intrastate Pipelines, 50 Fed. Reg. 15,895, 15,897 (Apr. 23, 1985).

[7] 49 CFR Part 195, App. A. "Example 7. Pipeline Company P operates a pipeline that originates on the Outer Continental Shelf. P does not file any tariff for that line with FERC. [PHMSA] will consider the pipeline to be an interstate pipeline facility."

Flores Pipeline is an interstate pipeline.[8] As portions of the Las Flores Pipeline were previously considered to be intrastate and regulated by OSFM, PHMSA is notifying OSFM that the Las Flores Pipeline is subject to the regulatory oversight of PHMSA. Please direct further correspondence on this matter to Dustin Hubbard, Director, Western Region, Office of Pipeline Safety, PHMSA, at (720) 963-3183.

Sincerely,


Linda Daugherty
Acting Associate Administrator for Pipeline Safety


cc:    James Hosler, Chief, Pipeline Safety Division, OSFM
       Varun Shekhar, Shareholder, Babst Calland Clements & Zomnir, PC

---

[8] PHMSA regulations consider the Las Flores Pipeline to be an "active" pipeline. *See* Pipeline Safety: Clarification of Terms Relating to Pipeline Operational Status, 81 Fed. Reg. 54,512 (Aug. 12, 2016) ("The regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned.")

# EXHIBIT B



U.S. Department
of Transportation
**Pipeline and Hazardous**
**Materials Safety**
**Administration**

12300 W. Dakota Ave., Suite 340
Lakewood, CO 80228

**VIA ELECTRONIC MAIL TO: lyearwood@sableoffshore.com**

December 22, 2025

Mr. Lance Yearwood
Vice President
Pacific Pipeline Company / Sable Offshore Corp.
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**RE:    Approval of Sable Offshore Corp.'s Restart Plan for the Las Flores Pipeline System Line**
**CA-324 and Line CA-325**

Dear Mr. Yearwood:

From December 4 to December 12, 2025, the Pipeline and Hazardous Materials Safety Administration
(PHMSA) received several documents from Sable Offshore Corp. These documents included:

    1. Line CA-324 and Line CA-325 Fill Plan and Startup Procedures
    2. A letter requesting the removal of pressure restrictions for Line CA-324
    3. A letter requesting the removal of pressure restrictions for Line CA-325
    4. The Las Flores Pipeline Linefill Positioning Plan Assignments
    5. The Las Flores Pipeline Linefill Contact List

These documents addressed the Restart Plan for Line CA-324 and Line CA-325 (previously known as
Plains Line 901 and Line 903, respectively). In addition, PHMSA conducted a field inspection with Sable
Offshore Corp. to discuss its process and safety procedures for the pipeline restart.

PHMSA has reviewed these documents and hereby approves the submitted Restart Plan. This approval is
valid from the date of this letter.

Should you have any questions or concerns, please contact me at (720) 963-3160 or by email at
dustin.hubbard@dot.gov.

Sincerely,

Dustin Hubbard
Director, Western Region
Pipeline and Hazardous Materials Safety Administration

cc:     Trent Fontenot, Sr. Vice President - Operations, tfontenot@sableoffshore.com
        Jim Hosler, Assistant Deputy Director – Pipeline Safety and CUPA, CalFire,
        jim.hosler@fire.ca.gov

# **EXHIBIT C**

# U.S. DEPARTMENT OF TRANSPORTATION
# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION
# EMERGENCY SPECIAL PERMIT

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | 2025-1502 |
| **Requested By:** | Sable Offshore Corp. PPC |
| **Operator ID#:** | 40881 |
| **Date Requested:** | December 19, 2025 |
| **Issuance Date:** | December 23, 2025 |
| **Expiration Date:** | February 21, 2026 |
| **Code Section:** | 49 CFR § 195.452(h)(4)(iii)(H) |

## Grant of Special Permit:

By this order, subject to the terms and conditions set forth below, the Pipeline and Hazardous Materials Safety Administration (PHMSA) Office of Pipeline Safety (OPS)[1] grants this emergency special permit to Sable Offshore Corp. PPC (Sable) for 124.42 miles of 24- and 30-inch diameter hazardous liquid pipelines, Lines CA-324 and CA-325 (*special permit segments*), transporting crude oil from Las Flores Canyon to Pentland in Santa Barbara, San Luis Obispo, and Kern counties, California. This emergency special permit waives compliance from 49 CFR § 195.452(h)(4)(iii)(H), which requires corrosion of or along a longitudinal seam weld be scheduled for evaluation and remediation within 180 days of discovering the condition.

## I.    Purpose and Need

On December 19, 2025,[2] Sable requested an emergency special permit for relief from the requirement to evaluate and remediate corrosion occurring at longitudinal seam welds within 180 days. The *special permit segments* are under polyurethane foam and polyethylene tape wrap insulation, which can inhibit the effectiveness of cathodic protection and contribute to a risk of corrosion due to shielding effects. Sable proposed an alternative approach to safely manage this risk, which was previously reviewed and approved as part of two state waivers issued by the California Office of State Fire Marshal (OSFM) on December 17, 2024 to Sable for the *special permit segments*. PHMSA previously reviewed the state waivers pursuant to 49 U.S.C. § 60118(d).

---

[1] Throughout this special permit, the usage of "PHMSA" means the U.S. Department of Transportation (DOT), Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety.
[2] Sable submitted supplemental information related to its application on December 23, 2025.

Sable sought this special permit to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the U.S. District Court for the Central District of California, which provides, among other requirements, that a "State Waiver" must be applied for and received from OSFM prior to restarting Lines CA-324 and CA-325. The *special permit segments* were previously considered intrastate at the time of entry of the Consent Decree and were regulated by OSFM pursuant to its state certification with PHMSA under 49 U.S.C. § 60105(a). However, the *special permit segments* are now considered interstate pursuant to Sable's designation on November 26, 2025, and PHMSA's concurrence on December 17, 2025. As a result, PHMSA has exclusive pipeline safety regulatory agency over Lines CA-324 and CA-325. The conditions ordered by OSFM in the two state waivers are now being re-issued by PHMSA as a special permit subject to Federal oversight and enforcement.

Sable requested PHMSA grant a special permit for the above reasons on an emergency basis pursuant to 49 U.S.C. § 60118(c)(2) and 49 CFR § 190.341(g). In its application, Sable stated that expedited review of its application was warranted in light of the national energy emergency declared by the President under the National Emergencies Act (50 U.S.C. § 1601 et seq.) in Executive Order 14156 (January 20, 2025). In Executive Order 14156, the President declared a national energy emergency based on a finding that "[t]he United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[3] The Executive Order directs agencies, such as PHMSA, to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate," among other activities, the "production, transportation, refining, and generation of domestic energy resources."[4] The Executive Order further directs agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States . . . ."[5]

Sable's application stated that grant of this special permit on an emergency basis would facilitate the restart of Lines CA-324 and CA-325 to provide relief in response to the acute energy shortage conditions identified in Executive Order 14156 within California and in the West Coast region of the United States.[6] Sable further noted that grant of this special permit on an emergency basis is appropriate to address the gap in coverage under the OSFM State Waivers created by redesignation of Lines CA-324 and CA-325 as interstate, given that the proposed special permit is substantially the same as that which was previously reviewed and approved by OSFM and PHMSA for issuance of the State Waivers.

This emergency special permit allows Sable to operate Lines CA-324 and CA-325 without being subject to the requirement to evaluate and remediate corrosion of or along a longitudinal seam weld within 180 days. On the condition that Sable comply with the terms and conditions set forth below, the emergency special permit waives compliance with 49 CFR § 195.452(h)(4)(iii)(H) for the *special permit segments*.

---

[3] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 1.
[4] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 2(a). The order's definition of "energy" or "energy resources" includes "crude oil," and its definition of "transportation" includes "the physical movement of energy, including through, but not limited to, pipelines." Sec. 1(a); 1(c).
[5] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 3(b).
[6] For more information regarding these effects, see Attachments C, D, E, and F.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 2 of 16

## II. Special Permit Segments

This emergency special permit pertains to the specified pipeline segments which make up the Las Flores Pipeline called Line CA-324 and CA-325. Line CA-325 can be further divided into two segments: Lines CA-325A and CA-325B. The Las Flores Pipeline is part of the Santa Ynez Pipeline System (SYPS), an interstate pipeline facility that Sable operates from the Outer Continental Shelf off the coast of Santa Barbara to Kern County, California. A map of the special permit segments is available in Revised Attachment A.

### Special Permit Segments:

| Special Permit Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|
| CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

## III. Conditions

PHMSA grants this emergency special permit subject to Sable implementing each of the following conditions. These conditions must be implemented and complied with in addition to all applicable requirements of 49 CFR Part 195 except for compliance with limitations on scheduling instances of corrosion on or near longitudinal seam welds for evaluation and remediation within 180 days of discovery in 49 CFR § 195.452(h)(4)(iii)(H), which would be waived.

### General Conditions:

1)  The *special permit segments* may only be used to transport crude oil.

2)  Prior to transporting crude oil in the *special permit segments*, Sable must develop and implement procedures for the conditions and requirements described in this emergency special permit.

3)  Sable shall not exceed maximum operating pressure (MOP) limits for the *special permit segments*, as follows:

    a)  The MOP of Line CA-324 cannot exceed 1003 pounds per square inch gauge (psig).

    b)  The MOP of Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) cannot exceed 1000 psig.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 3 of 16

    c) The MOP of Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) cannot exceed 1292 psig.

4)    Sable shall not exceed maximum operating temperature limits for crude oil transported in the *special permit segments*, as follows:

    a) The maximum operating temperature of the crude oil that is transported in Line CA-324 must not exceed 140 degrees Fahrenheit for more than 12 consecutive hours.

    b) The maximum operating temperature of the crude oil that is transported in Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) must not exceed 125 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Gaviota station to monitor the temperature of Line CA-325A.

    c) The maximum operating temperature of the crude oil that is transported in Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) must not exceed 110 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Sisquoc station to monitor the temperature of Line CA-325B.

5)    This emergency special permit does not relieve Sable from complying with applicable requirements under 49 CFR Part 195, other than those waived in this emergency special permit.

6)    This emergency special permit does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).

7)    In-line inspections (ILIs) performed pursuant to this emergency special permit must include:

    a) Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion, defined as follows:

        i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.

        ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.

    b) Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).

    c) Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI.

8)    Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the

pipe body, heat affected zone (HAZ)[7], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-324.[8]

9)  Prior to placing Line CA-325 (including CA-325A and CA-325B) in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:

   a)  API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.

   b)  API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ), and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-325A/B.[9]

10)  All existing immediate and 180-day repair conditions must be evaluated and remediated pursuant to the Consent Decree repair criteria prior to restarting CA-325A/B.[10] Upon restart Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by PHMSA. Sable must utilize the Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results to identify, evaluate and remediate any immediate and 180-day repair conditions that are listed in this emergency special permit.

11)  Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss

---

[7] The heat affected zone (HAZ), as used in this emergency special permit, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[8] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-324.

[9] Sable indicated in its application that it has already completed the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-325.

[10] Sable indicated in its application that it has already completed the repairs required in this sentence. Sable must submit all of the results to PHMSA prior to restarting CA-324 and CA-325.

anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

12)    Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of CA-324 and CA-325A/B.

13)    Pressure Testing:[11]

    a) Prior to placing CA-324 in operation, Sable must conduct a spike hydrostatic pressure test of CA-324 at a minimum pressure that is at least 1.5 times the maximum operating pressure (MOP) or 100% specified minimum yield strength (SMYS), for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

        i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

        ii. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

    b) Immediately following the spike hydrostatic pressure test specified in Condition 13(a), Sable must conduct an 8-hour hydrostatic pressure test of CA-324 at a minimum of 1.25 times the MOP.

    c) Prior to placing Line CA-325A (segment of Line 325 between Gaviota and Sisquoc stations) in operation, Sable must conduct a spike hydrostatic pressure test of CA-325A at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:

        i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

        ii. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

    d) Immediately following the spike hydrostatic pressure test specified in Condition 13(c), Sable must conduct an 8-hour hydrostatic pressure test of CA-325A at a minimum of 1.25 times the MOP.

    e) Prior to placing Line CA-325B (segment of Line 325 between Sisquoc and Pentland stations) in operation, Sable must conduct a hydrostatic pressure test of CA-325B at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the

---

[11] Sable indicated in its application that it has already completed all of the testing and repairs required in this Condition. Sable must submit the results to PHMSA prior to restart and confirm that no failures occurred during the required pressure testing.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 6 of 16

hydrostatic test on CA-325B:

    i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

    ii. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

f) Sable must obtain the Test ID for each hydrostatic pressure test from PHMSA (or OSFM if such testing was performed prior to November 26, 2025) and have the approved independent testing firm forward separately the certified test results to PHMSA or the OSFM, as applicable.

g) Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 CFR Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under PHMSA or OSFM (as applicable) approved hydrostatic testing companies.

h) Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported to PHMSA.[12]

i) Section(s) of the **special permit segments** that failed during the required hydrotesting must be repaired by removing and replacing the failed section. PHMSA reserves the right to revoke this emergency special permit if failure(s) raise the concern that the **special permit segments** cannot be safely operated.

14) In-Line Inspection (ILI) Assessment and Frequency:

a) Prior to performing in-line inspections of the **special permit segment**, Sable shall provide PHMSA with a written notification to PHMSA describing its assessment plan with the following information:

    i. Dates for integrity assessment

    ii. In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[13] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications;

    iii. In-line inspection tool vendor(s)

    iv. Required tool specifications including operational specifications and anomaly sizing tolerances

    v. Tool validation methodology

    vi. Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

---

[12] All submissions to PHMSA required by this emergency special permit shall be submitted through email to the OPS Western Region Director, Dustin Hubbard, email address: Dustin.Hubbard@dot.gov or his designee.

[13] Industry standards referenced in this emergency special permit must utilize the editions that are incorporated by reference in 49 CFR 195.3 unless another edition is explicitly specified in this emergency special permit.

      vii.  Criteria used to identify locations for excavation and field verification

     viii.  Non-destructive examination

b) Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

c) Metal Loss Tool(s):

       i.  Initial ILI tool runs – Each year, during the first two (2) years of operating the *special permit segments*, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

      ii.  Subsequent ILI tool runs – After the first two (2) years of operating the *special permit segments*, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the *special permit segment* within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

d) Crack Detection Tools – Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[14] or the ILI assessment must be assessed at more frequent intervals if condition 21 determined a shorter assessment interval.

       i.  These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

      ii.  USCD Performance Specification Requirements

          1.  The USCD tools must have a probability of detection that is

---

[14] Sable may petition PHMSA to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to PHMSA approval.

&ge; 90% for axial and circumferential cracks.

2. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

3. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

4. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

e) Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

f) Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the *special permit segment* in which the ILI tool velocity was outside of the specified tool velocity range.

g) All ILI tool runs must obtain the Test ID from PHMSA prior to run.

h) Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

i) Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

j) Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[15] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

k) Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second

---

[15] A minimum of four (4) independent direct examination excavations must be used for unity plots.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 9 of 16

Edition, April 2013).

15) Discovery of Condition: The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

16) Immediate Repair Conditions:[16]

   a) A crack or crack-like anomaly that meets any of the following criteria:

      i. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.

      ii. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

   b) Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

   c) Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[17]

17) 180-Day Repair Conditions:[18]

   a) A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.

   b) Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.

   c) All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[19]

   d) For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

18) Corrosion Growth Rate Analysis (CGRA):

   a) Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to

---

[16] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[17] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

[18] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(iii), except for those associated with 49 CFR 195.452(h)(4)(iii)(H). All immediate repair conditions must be remediated with a permanent repair method.

[19] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify PHMSA, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 CFR § 195.452 until the indication is remediated or until otherwise authorized by PHMSA.

prior ILI) and perform pipeline remediations needed to assure the integrity of the ***special permit segments*** is maintained.[20] The timing of remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.

b) The CGRA procedure must include ILI data matching methods[21] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

c) Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

d) When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates.[22]

e) All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

19) Pressure Reduction: If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in this emergency special permit, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

20) In Field Direct Examination of Pipe:

a) Direct examinations[23] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[24] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

b) Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

i. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

ii. Sable must increase the metal loss anomaly's depth by 20% when

---

[20] At a minimum, Sable must include signal matching between ILI data sets.

[21] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[22] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[23] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[24] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complemented by shear wave technology or inspection by phased array ultrasonic testing.

they input it into the formula for calculating the number of wraps needed for repair method 5.

    iii. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

  c) Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

  d) Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[25]

  e) All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

21) Integrity Management:

  a) A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

    i. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 CFR § 192.712(d)(1).

    ii. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 CFR § 192.712(d)(2).

  b) Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

  c) When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

  d) Sable must send all field measurements to the ILI tool vendor within 90 days

---

[25] The coating procedure must be submitted to PHMSA prior to the effective date of this emergency special permit.

of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

e) Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the *special permit segments*. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by PHMSA prior to being selected.

f) Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is

g) occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

22) Data Requirements for Predicted Failure Analysis:

a) Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

b) The analyses performed in accordance with this emergency special permit must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in traceable, verifiable, and complete records.

23) Recordkeeping:

a) Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this emergency special permit shall be kept for the life of the *special permit segments* and must be submitted to PHMSA, in the manner requested (electronic, hardcopy, or other format) within 30 days.

b) Sable must maintain the following records:

    i.   Technical approach used for the analysis

    ii.  All data used and analyzed

    iii. Pipe and longitudinal weld seam properties

    iv.  Procedures used to implement emergency special permit conditions

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 13 of 16

v.      Evaluation methodology used

vi.     Models used

vii.    Direct in situ examination data

viii.   All in-line inspection tool assessments information evaluated

ix.     Pressure test data and results

x.      All in-the-ditch assessments performed on the *special permit segments*

xi.     All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results

xii.    All finite element analysis results

xiii.   The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

xiv.    The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

xv.     Safety factors used for fatigue life and/or predicted failure pressure calculations

xvi.    Reassessment time interval and safety factors

xvii.   The date of the review

xviii.  Confirmation of the results by qualified technical subject matter expert(s)

xix.    Approval by responsible Sable management personnel

xx.     Records of additional preventive and mitigative (P&M) measures performed

xxi.    Reports required by this emergency special permit.

24)    Reporting:

a) Any release on the *special permit segments* shall be reported to PHMSA at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery.[26]

b) An email notification shall be made at least three (3) days prior to a *special permit segment* being exposed for non-emergency purposes of field evaluation and repair to PHMSA. The email notification shall include, if applicable:

i. Tool type and run date

ii. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

---

[26] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state, or Federal regulations.

      iii. Dig sheets

      iv. Field contact information for Sable

      v. Time and location of the field evaluation and repair.

c) Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run to PHMSA and include:

      i. Tool type

      ii. Run date

      iii. Summary of Conditions Report[27]

      iv. Final Vendor Report and Pipe Tally

d) Sable shall provide a report to PHMSA by June 15th of every year for the duration of this special permit, including any renewals. The report shall be submitted to PHMSA. At a minimum, the annual report shall contain the following, if applicable:

      i. A Closure Report for the previous calendar (CY) which contains:

            1. Features that were remediated in previous CY, including documentation for in-the-ditch assessments and repairs

            2. Identify features that remain to be assessed

            3. Unity Plots for previous ILI runs

      ii. Fracture mechanics and pressure cycling analyses in accordance with Condition 21(a);

      iii. The third-party ILI expert reviews in accordance with condition 21(e).

      iv. AC and DC Interference surveys that are due in accordance with condition 21(f).

      v. A copy of the CGRA for prior year including:

            1. Mean corrosion growth rate for the *special permit segments*

            2. Distribution graph of the corrosion growth rate for the *special permit segments* (e.g. occurrences (#) vs. corrosion rate (mpy)

The above conditions are based on PHMSA's review and consideration of information provided by Sable, including information in their emergency special permit application which can be found at Docket No. PHMSA-2025-1502 in the Federal Docket Management System located at www.regulations.gov. PHMSA has determined the conditions listed above would be necessary to ensure this Emergency Special Permit is not inconsistent with pipeline safety.

---

[27] PHMSA may stipulate specific formatting or other information (e.g., condition type, anomaly details, remaining strength calculation method, failure pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 15 of 16

## IV. Limitations:

This special permit is subject to the limitations set forth in 49 CFR § 190.341, as well as the following limitations:

1) This emergency special permit is limited to an initial term of sixty (60) days from the date of issuance. If Sable elects to seek renewal of this emergency special permit, it must submit a renewal request to PHMSA pursuant to 49 CFR § 190.341(g).

2) Should Sable fail to comply with any conditions of this emergency special permit or should PHMSA determine that this emergency special permit is no longer appropriate or is inconsistent with pipeline safety, PHMSA may revoke the emergency special permit and require Sable to comply with all appropriate regulatory requirements.

3) PHMSA may order the *special permit segments* to be shutdown at any time.

4) PHMSA may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this emergency special permit. The terms and conditions of any compliance order shall take precedence over the terms of this emergency special permit.

5) In the event of conflict between the conditions of this emergency special permit and industry standards, the emergency special permit conditions shall prevail.

6) If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the emergency special permit, Sable must provide PHMSA written notice of the change within 60 days of the consummation date. In the event of such transfer, PHMSA reserves the right to revoke, suspend, or modify the emergency special permit.

AUTHORITY: 49 United States Code 60118 (c)(1) and 49 CFR § 1.97.

Issued in Washington, D.C., on December 23, 2025.

**LINDA GAIL DAUGHERTY**
Digitally signed by LINDA GAIL DAUGHERTY
Date: 2025.12.23 15:48:57 -05'00'

Linda Daugherty
Acting Associate Administrator
  for Pipeline Safety

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 16 of 16

1

**PROOF OF SERVICE**

2

I, **Kim Niz**, declare:

3       I am employed in the County of Los Angeles, State of California. I am over the age of 18
and not a party to the within action. My business address is Alston & Bird LLP, 350 South Grand
4   Avenue, 51st Floor, Los Angeles, CA 90071.

5       On January 21, 2026, I served the document(s) **PACIFIC PIPELINE COMPANY'S
REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF RESPONSE IN OPPOSITION
6   TO DEFENDANT'S MOTION TO CHANGE VENUE; DECLARATION OF
GARRETT B. STANTON** on the interested parties stated below, by the following means of
7   service:

8                           Brandon Walker
                            Jack C. Nick
9                        Isabella A. Panuccini
                        1300 I Street, Suite 125
10                       Sacramento, CA 95814
                     Telephone: (916) 210-6395
11                        Fax: (916) 327-2319
                   Brandon.Walker@doj.ca.gov
12                     Jack.Nick@doj.ca.gov
                  Isabella.Panuccini@doj.ca.gov
13             Attorneys for Defendant State of California
14

15       ☒   BY ELECTRONIC SERVICE on the date stated below, I caused the document(s)
             described above to be served electronically on the recipients designated on the
16           Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-
             service of documents.
17

         I declare under penalty of perjury under the laws of the State of California that the above
18   is true and correct.

19       Executed on January 21, 2026, at Los Angeles, California.

20                                           */s/ Kim Niz*
                                              Kim Niz
21

22

23

24

25

26

27

28

- 6 -

REQUEST FOR JUDICIAL NOTICE; DECLARATION OF GARRETT B. STANTON

**ELECTRONICALLY FILED**
Superior Court of California,
County of Kern
By: Marina Mercado
Deputy Clerk
**01/27/26 3:49 PM**

1  ROB BONTA
   Attorney General of California
2  BRANDON S. WALKER SBN. 254581
   Supervising Deputy Attorney General
3  JACK C. NICK SBN. 160196
   ISABELLA A. PANICUCCI SBN. 318984
4  Deputy Attorneys General
   1300 I Street, Suite 125
5  Sacramento, CA 95814
   Telephone: (916) 210-6395
6  Fax: (916) 327-2319
   E-mail: Brandon.Walker@doj.ca.gov
7  *Attorneys for Defendant State of California*

NO FEE PURSUANT TO
GOVERNMENT CODE § 6103

8       SUPERIOR COURT OF THE STATE OF CALIFORNIA

9               COUNTY OF KERN

10            METROPOLITAN DIVISION

| | |
|---|---|
| **Pacific Pipeline Company, A Delaware Corporation,**<br><br>         Plaintiff,<br><br>   v.<br><br>**State of California and DOES 1 through 25,**<br><br>         Defendant. | Case No. BCV25103508<br><br>**STATE OF CALIFORNIA'S REPLY TO PACIFIC PIPELINE'S RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE**<br><br>Date:     February 3, 2026<br>Time:    8:30 a.m.<br>Dept:    H<br>Judge:   Hon. Bernard C. Barmann, Jr.<br><br>Action Filed: September 29, 2025 |

## INTRODUCTION

Defendant, the State of California (State), filed a motion to change venue because (1) the only property that could properly be a subject of the action (Pipeline CA-324) is located wholly in Santa Barbara County and (2) the potential nonparty witnesses from the Office of State Fire Marshal (OSFM) and the Coastal Commission (Commission) are already engaged in litigation related to Pipelines CA-324 and CA-325 in Santa Barbara County. Plaintiff Pacific Pipeline Company (Plaintiff) filed a response to the motion and a First Amended Complaint, which it erroneously argues moots this motion, but in truth the amended complaint merely confirms and

1

1    reinforces the reasons why venue is not proper in Kern County and supports transferring this case

2    to Santa Barbara County.

3                                         **DISCUSSION**

     **I.    THE FIRST AMENDED COMPLAINT DOES NOT MOOT THE MOTION AND CONFIRMS**
4          **WHY KERN COUNTY IS AN IMPROPER VENUE.**

5           The filing of the First Amended Complaint does not moot the pending motion to change

6    venue. "Venue is determined based on the complaint on file at the time the motion to change

7    venue is made." (*Brown v. Superior Court* (1984) 37 Cal.3d 477, 482.) This rule is specifically

8    intended to prevent a plaintiff from manipulating venue by filing strategic amendments after a

9    defendant has already moved to transfer the case. (See *Haurat v. Superior Court for Los Angeles*

10   *County* (1966) 241 Cal.App.2d 330, 337.) However, where an amended complaint makes material

11   changes that present a new question for a change of venue, that new question can be considered

12   by the court. (*South v. Wishard* (1954) 123 Cal.App.2d 642, 653-654.) Additionally, "admissions

13   in an original complaint that has been superseded by an amended pleading remain within the

14   court's cognizance." (*Berg & Berg Enterprises, LLC v. Boyle* (2009) 178 Cal.App.4th 1020, 1043

15   fn. 25.)

16          Plaintiff's citations to *Sylmar Air Conditioning v. Pueblo Contracting Services, Inc.* (2004)

17   122 Cal.App.4th 1049, 1054 and *State Compensation Ins. Fund v. Superior Court (SCIF)* (2010)

18   184 Cal.App.4th 1124, 1131 are misplaced. *Sylmar* addresses the effects of an amended

19   complaint on a demurrer (*Sylmar, supra*, 122 Cal.App.4th at p. 1054), and *SCIF* addresses the

20   effects of an amended complaint on a motion for summary adjudication (*SCIF, supra*, 184

21   Cal.App.4th at p. 1131). Neither case applies to a motion to change venue and as explained

22   above, the amended complaint does not moot such a motion. (*Brown, supra*, 37 Cal.3d at p. 482.)

23          Plaintiff's First Amended Complaint now alleges that the federal Pipeline and Hazardous

24   Materials Safety Administration (PHMSA) asserts jurisdiction over Pipelines CA-324 and CA-

25   325 pursuant to the federal Hazardous Liquid Pipeline Safety Act, which Plaintiff alleges divests

26   OSFM of its regulatory jurisdiction pursuant to the Elder California Pipeline Safety Act of 1981.[1]

27   _____
     [1] Although Plaintiff seeks a declaration that OSFM's regulatory authority is preempted, Plaintiff
     has not named OSFM as a defendant. In comparison to its express allegations that OSFM's
28                                                                              (continued...)

                                                 2

1    (First Amended Complaint ¶¶ 10-11, 34, 51-55, 66.) The question of whether OSFM's authority

2    is preempted is currently pending before the Ninth Circuit Court of Appeals and has also been

3    raised by Plaintiff in the case involving OSFM pending in Santa Barbara County Superior Court,

4    via a motion that is currently scheduled to be heard on February 27, 2026.[2] (Supplemental

5    Declaration of Brandon S. Walker, Exs. J and K.) This issue will be resolved well before this

6    Court will have an opportunity to address it.

7         Additionally, if OSFM's authority is preempted, as Plaintiff alleges and which the State and

8    OSFM dispute, then this an alternative basis for finding that any claims or issues related to SB

9    237's effect on property located in Kern County are moot and demonstrate that Kern County is

10   the wrong venue. The complaint only contains allegations related to two state agencies, OSFM

11   and the Commission, which are both nonparties. Of those two state agencies, only OSFM has

12   jurisdiction over the portion of the pipelines in Kern County. Thus, if OSFM were to be deprived

13   of jurisdiction, Plaintiff's claims relating to the portions of Pipeline CA-325 in Kern County

14   would be mooted, and the only remaining issue would possibly be whether SB 237 requires

15   Plaintiff to obtain a coastal development permit prior to resuming oil transport through the

16   pipeline located within the Coastal Zone, i.e., Pipeline CA-324. The Coastal Zone is solely within

17   Santa Barbara County and does not extend into Kern County.

18        Accordingly, the First Amended Complaint further supports the motion to change venue.

19   **II.   VENUE IS PROPER IN SANTA BARABARA COUNTY, WHERE THE PROPERTY THAT IS
         THE SUBJECT OF THE ACTION IS LOCATED.**

20

21        The venue statute at issue, Code of Civil Procedure section 392, places venue in the county

22   where the real property that is the subject of the action is located. For the reasons stated above,

23   the only pipeline that could properly be the subject of this action is that which is subject to SB

24   237's requirement to obtain a coastal development permit, i.e., Pipeline CA-324, which is located

25   _____

26   authority is preempted, the First Amended Complaint does not allege that the Commission's
     authority pursuant to the Coastal Act is preempted. (See also, Response to Motion at p. 8:18-20
27   [only discussing preemption of OSFM's authority].)
     [2] PHMSA's assertion of jurisdiction and the dispute over preemption also demonstrates that
28   claims regarding an attempt by OSFM to enforce SB 237 on Pipelines CA-324 and CA-325 are
     currently speculative and unripe.

3

1    exclusively in Santa Barabara County. Plaintiff attempts to avoid this result by asking the court to

2    ignore the actual location of the property that is the subject of the action, which is Pipeline CA-

3    324 located in Santa Barbara County, and instead consider portions of a different pipeline,

4    Pipeline CA-325 within Kern County, that may indirectly feel the effects of regulation over

5    Pipeline CA-324. It is irrelevant, however, that some indirect effects may be felt downstream in a

6    separate pipeline in a different county outside of the Coastal Zone. That is not where the property

7    that is the subject of the action is located. Accordingly, proper venue is in Santa Barbara County.

8        Additionally, a court can properly disregard moot claims added to manipulate venue under

9    the doctrine of improper joinder. (See *Housing Group v. United Nat. Ins. Co.* (2001) 90

10   Cal.App.4th 1106, 1111; see also Code Civ. Proc., § 395 [the residence of an improperly joined

11   defendant should not be considered in determining venue]; *Freeman v. Dowling* (1933) 219 Cal.

12   213, 216-217 [sham or frivolous claims should not be used in considering venue and a defendant

13   can seek a change of venue by demonstrating that other defendants are not necessary parties, that

14   no cause of action is stated against them, and that no relief whatever may be awarded against

15   them]; *Alexander v. Superior Court* (2003) 114 Cal.App.4th 723, 731 [manipulating the venue

16   provisions can "bring the administration of justice into disrepute"].) Plaintiff admits that such

17   arguments may be considered when the complaint is "so glaringly and vitally defective as to be

18   beyond correction by amendment. (*Mills v. Brown* (1928) 205 Cal. 38, 41.)" (Response to

19   Motion, p. 11, fn. 3.) The mootness of Plaintiff's claims pertaining to Pipeline CA-325 can be

20   considered at this time because they are glaring, defective, and beyond correction. Indeed,

21   Plaintiff also argues that those same claims are moot because they are preempted by PHMSA's

22   orders. Although the State and OSFM are challenging those orders, Plaintiff confirms that the

23   claims regarding the portion of Pipeline CA-325 in Kern County are moot, one way or another.

24       Plaintiff does not dispute that the State Waivers already require it to perform the same

25   stress hydrostatic testing required by SB 237, which moots its claims regarding the portion of

26   Pipeline CA-325 in Kern County. (Declaration of Brandon S. Walker (Walker Dec.), Exs. E and

27   F.) Instead, Plaintiff argues that SB 237 imposes different liabilities than the State Waivers.

28   (Response to Motion, p. 12.) But whether or not SB 237 adds or changes the nature of liability is

4

1    irrelevant to a motion to change venue that is based on where the property, which is the subject of

2    the action, is located. (Code of Civil Proc., § 392.) On one hand, Plaintiff must comply with the

3    State Waivers before it can restart the pipelines. If, on the other hand, OSFM lacks jurisdiction or

4    authority as Plaintiff now alleges, then the stress hydrostatic testing aspect of SB 237 would not

5    apply, and venue is still proper only in Santa Barbara County.[3]

6            Put simply, the only possible effect that SB 237 could have on property located within

7    Kern County relates to SB 237's stress hydrostatic testing requirements, which are either already

8    required by the State Waivers, or preempted in light of PHMSA's alleged assumption of

9    jurisdiction over the pipelines. Again, that leaves only the claims regarding the coastal

10   development permit requirements, which only apply to Pipeline CA-324. Pipeline CA-324 is a

11   separate and distinct pipeline. It is the only pipeline that is properly the subject of this action. And

12   it is wholly located in Santa Barabara County.

13           Plaintiff's argument that the pipelines are part of a larger integrated pipeline system that

14   cannot be considered individually is belied by their own allegations and the regulatory history of

15   these pipelines.[4] As admitted in the original complaint, oil is brought to onshore facilities from

16   the Santa Ynez Unit through separate offshore pipelines. (Complaint ¶¶ 17-19.) At those onshore

17   facilities, the oil is separated from propane, butane, sulfur products, and fuel quality gas.

18   (Complaint ¶ 19.) The natural gas is treated, compressed, and delivered to a local utility company.

19   (Complaint ¶ 19.) Currently, the offshore pipeline has allegedly been used since May 2025 and

20   the transported oil is being stored in storage tanks at the onshore processing facility. (Complaint ¶

21   36; compare with Complaint ¶ 28 [no oil transported through Pipelines CA-324 and CA-325 since

22   2015].) Thus, there is a clear physical and practical distinction and break between the offshore

23   and submerged pipelines and Pipeline CA-324. Similarly, there are admitted distinctions between

24   Pipelines CA-324 and CA-325. (Compare ¶¶ 22 and 23 [different diameters and permitted

25   throughputs].) This is further confirmed by the admitted fact that the two onshore pipelines are

---

[3] Even if OSFM's regulatory jurisdiction is otherwise preempted, the pipelines are still subject to
the requirements of the Consent Decree. (Walker Dec., Ex. D.)
[4] Even if Pipeline CA-324 were considered part of a larger, integrated system, the Coastal Act
would still apply to the portions of that system within the Coastal Zone, which are wholly within
Santa Barbara County.

1     regularly treated separately by regulatory agencies and Plaintiff. (Complaint ¶¶ 22, 32 [testing

2     performed on the pipelines separately], 34 [separate State Waivers issued for the two pipelines];

3     see also Walker Dec., Exs. D [consent decree deals with Lines CA-324 and CA-325 separately,

4     applying different requirements for each pipeline], E [State Waiver for Line CA-324, not CA-

5     325], F [State Waiver for Line CA-325, not CA-324].) The unremarkable fact that CA-324 at

6     some point interacts with and attaches to other facilities (as all pipelines must), does not negate

7     that it is a separate and distinct pipeline for regulatory purposes.

8        As a separate and distinct pipeline, and the only pipeline that could properly be the subject

9     of this action, Pipeline CA-324's physical location in Santa Barbara County is determinative of

10    proper venue pursuant to Code of Civil Procedure section 392. (Compare with Code of Civil

11    Proc., §393 [proper venue is where the effect of an agency's action is felt].)[5] Section 392 does not

12    extend venue to counties where the property is not located based merely on a potential indirect,

13    downstream effect on other property, and Plaintiff cites no authority suggesting otherwise.

14    **III.**    **THE STATE APPROPRIATELY RAISED ADDITIONAL CONSIDERATIONS.**

15        The State was required to bring its motion to change venue before, or at the same time as,

16    answering. (Code of Civil Procedure § 396b, subd. (a).) In consideration of that motion, it was

17    appropriate to bring to the Court's attention the various other cases currently pending in Santa

18    Barabara County pertaining to Pipelines CA-324 and CA-325, some of which involve OSFM and

19    the Commission and raise issues that relate to or overlap with those alleged in this case. Plaintiff

20    does not dispute, or even address, the State's lengthy list of existing litigation in Santa Barbara

21    County Superior Court.

22        Even without a specific witness list, it is clear that if witnesses will be called, they will be

23    nonparties from OSFM and/or the Commission. And if the preemption allegations in the First

24    Amended Complaint are accepted, the group of potential witnesses, if any, would be narrowed

25    even further to just the nonparty Commission. The Commission does not have permitting or

26

27    [5] As stated in the moving papers, Plaintiff brought this action against the State and invokes Code

of Civil Procedure section 392. It did not identify any public official that has taken an alleged

28    action or invoke Code of Civil Procedure section 393.

1   regulatory authority, an office, or personnel in Kern County at all and is already engaged in

2   litigation involving Pipeline CA-324 in Santa Barabara County. Giving the Court this fuller

3   picture is appropriate. Additionally, courts generally disfavor a multiplicity of motions to change

4   venue. (*Connell v. Bowes* (1942) 49 Cal.App.2d 542, 544; *South v. Wishard* (1954) 123

5   Cal.App.2d 642, 653-654.)

6                          **CONCLUSION**

7         Proper venue is in Santa Barabara County because that is where the only property that is

8   properly the subject of this action is located. Accordingly, the motion to change venue should be

9   granted.

10   Dated:  January 27, 2026                  Respectfully submitted,

11                               ROB BONTA
                                 Attorney General of California

12                               BRANDON S. WALKER
                               Supervising Deputy Attorney General

13                               JACK C. NICK
                               Deputy Attorney General

14                               ISABELLA A. PANICUCCI
                               Deputy Attorney General

15

16                               /s/ Brandon S. Walker

17                               BRANDON S. WALKER
                               Supervising Deputy Attorney General

18                               *Attorneys for Defendant*
                               *State of California*

19

20   SA2025306665
     39603840.docx

21

22

23

24

25

26

27

28

## DECLARATION OF SERVICE BY E-MAIL

**Case Name:**       Pacific Pipeline Company, A Delaware Corporation v. State of
                     California
**Case Number:**     BCV25103508
**Party Represented:** State of California

**Declaration of Electronic Service**

1. I am at least 18 years of age and not a party to this matter.

2. I am employed in the Office of the Attorney General of the State of California. My
   business address is 1300 I Street, Suite 125, Sacramento, CA 95814, County of
   Sacramento.

3. My electronic service address is Valerie.Tamulevich@doj.ca.gov.

4. On January 27, 2026, I electronically served the following document[s]:

   **STATE OF CALIFORNIA'S REPLY TO PACIFIC PIPELINE'S RESPONSE IN
   OPPOSITION TO MOTION TO CHANGE VENUE**

5. I electronically served the aforementioned document[s] by emailing them to the
   following individual[s]:

   **PLEASE SEE ATTACHED SERVICE LIST**

I declare under penalty of perjury under the laws of the State of California and the United States
of America that the foregoing is true and correct, and that this declaration was executed on
January 27, 2026.

|  |  |
|---|---|
| Valerie A. Tamulevich | */s/ Valerie A. Tamulevich* |
| Declarant | Signature |

## SERVICE LIST

Jeffrey Dintzer
Garrett B. Stanton
ALSTON & BIRD
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
**E-mail Address**: jeffrey.dintzer@alston.com
**E-mail Address**: garrett.stanton@alston.com

Benjamin J. Hanelin
Natalie C. Rogers
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, CA 90067
**E-mail Address**: benjaminhanelin@paulhastings.com
**E-mail Address**: natalierogers@paulhastings.com

SA2025306665
39603832.docx

ELECTRONICALLY FILED
Superior Court of California,
County of Kern
By: Marina Mercado
Deputy Clerk
01/27/26 3:49 PM

1   ROB BONTA
  Attorney General of California
2   BRANDON S. WALKER SBN. 254581
  Supervising Deputy Attorney General
3   JACK C. NICK SBN. 160196
  ISABELLA A. PANICUCCI SBN. 318984
4   Deputy Attorneys General
  1300 I Street, Suite 125
5   Sacramento, CA 95814
  Telephone: (916) 210-6395
6   Fax: (916) 327-2319
  E-mail: Brandon.Walker@doj.ca.gov
7   *Attorneys for Defendant State of California*

NO FEE PURSUANT TO
GOVERNMENT CODE § 6103

8      SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              COUNTY OF KERN

10          METROPOLITAN DIVISION

| | |
|---|---|
| **Pacific Pipeline Company, A Delaware Corporation,**<br><br>            Plaintiff,<br><br>   v.<br><br>**State of California and DOES 1 through 25,**<br><br>            Defendant. | Case No. BCV25103508<br><br>**SUPPLEMENTAL DECLARATION OF BRANDON S. WALKER IN SUPPORT OF STATE OF CALIFORNIA'S REPLY TO PACIFIC PIPELINE'S RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE**<br><br>Date:      February 3, 2026<br>Time:     8:30 a.m.<br>Dept:     H<br>Judge:    Hon. Bernard C. Barmann, Jr.<br><br>Action Filed: September 29, 2025 |

1

1    I, Brandon S. Walker, declare:

2    1.    I am a Supervising Deputy Attorney General employed by the State of California

3  Department of Justice, Office of the Attorney General. I am one of the attorneys assigned to

4  represent the State of California in this action. I have personal knowledge of the facts set forth

5  below and could and would competently testify to them if called to do so.

6    2.    Attached as Exhibit J is a true and correct copy of the petition for review filed in the

7  Ninth Circuit Court of Appeals by the State of California, by and through the Attorney General's

8  Office and the Office of the State Fire Marshal that challenges three orders by the federal Pipeline

9  and Hazardous Materials Safety Administration.

10    3.    Attached as Exhibit K is a true and correct copy of the motion for reconsideration of

11  preliminary injunction filed by Pacific Pipeline Company in Santa Barabara County Superior

12  Court.

13  Dated: January 27, 2026

14

15                Brandon S.    Digitally signed by Brandon S. Walker

16                Walker      Date: 2026.01.27 09:30:13 -08'00'

17                Brandon S. Walker
                   Declarant

18  SA2025306665
    39600921.docx
19

20

21

22

23

24

25

26

27

28

2

# Exhibit J

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

STATE OF CALIFORNIA,

*Petitioner,*

V.

PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION, PAUL
ROBERTI, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE PIPELINE AND
HAZARDOUS MATERIALS SAFETY ADMINISTRATION, UNITED STATES
DEPARTMENT OF TRANSPORTATION, AND SEAN DUFFY, IN HIS OFFICIAL
CAPACITY AS SECRETARY OF THE DEPARTMENT OF TRANSPORTATION,

*Respondents,*

## PETITION FOR REVIEW

ROB BONTA
*Attorney General of California*
ANNADEL A. ALMENDRAS
DEBORAH M. SMITH
 *Senior Assistant Attorneys General*
MYUNG J. PARK
VANESSA MORRISON
 *Supervising Deputy Attorneys General*

MATTHEW BULLOCK
MICHAEL S. DORSI
MITCHELL RISHE
RAFAEL J. HURTADO
REBECCA HUNTER
 *Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3802
Fax: (415) 703-1107
Michael.Dorsi@doj.ca.gov
Mitchell.Rishe@doj.ca.gov
 *Attorneys for State of California*

January 23, 2026

## PETITION FOR REVIEW

Pursuant to 49 U.S.C. Section 60119(a)(1), Federal Rule of Appellate Procedure 15, and Ninth Circuit Rule 15-1, the State of California, by and through Attorney General Rob Bonta and Office of the State Fire Marshal (OSFM), a unit of the California Department of Forestry and Fire Protection, petitions this Court for review of orders issued by the Pipeline and Hazardous Materials Safety Administration (PHMSA), an agency within the United States Department of Transportation.

This Petition challenges three unlawful orders by PHMSA.

First, on December 17, 2025, PHMSA issued an order (the "Federalization Order") purporting to assume exclusive federal jurisdiction over the Las Flores Pipelines—a pair of onshore pipelines designated CA-324 and CA-325 that, in sequence, originate at Las Flores Canyon in Santa Barbara County, California, and terminate at the Pentland Station terminal, in Kern County, California. The assertion of federal jurisdiction is erroneous, and, if allowed to stand, would displace OSFM from its role in regulating pipeline safety for the Las Flores Pipelines. PHMSA's December 17, 2025, Federalization Order is attached to this Petition as Exhibit 1.

Second, on December 22, 2025, PHMSA issued an order approving a Restart Plan (the "Restart Approval Order") for the Las Flores Pipelines, allowing

2

them to return to service without completion of OSFM's requirements imposed
pursuant to the consent decree—to which PHMSA and OSFM are signatories—
after the catastrophic 2015 oil spill on these lines near Refugio State Beach, in
Santa Barbara County, California. *See United States, et al. v. Plains All American
Pipeline, L.P., et al.*, Case No. 2:20-cv-02415, ECF Nos. 6, 6-1, and 33 (C.D. Cal.
2020). The Restart Approval Order, if permitted to become effective, would allow
the Las Flores Pipelines to operate (a) despite the failure to finish required repairs
and remediation on the pipelines to address the lack of corrosion protection, which
PHMSA determined to be the root cause of the Refugio Oil Spill, and (b) without
complying with OSFM's alternative conditions, outlined in the OSFM State
Waivers.[1] Pursuant to 49 USC § 60118(d), PHMSA did not object to granting of
these waivers by OSFM for the CA-324 and CA-325 pipelines. A copy of
PHMSA's Restart Approval Order is attached to this Petition as Exhibit 2.

Third, on December 23, 2025, PHMSA issued an order granting an
"Emergency Special Permit" (the "Emergency Special Permit") to the Las Flores
Pipelines' owner, Sable Offshore Corp., pursuant to 49 U.S.C. Section

---

[1] A State Waiver is an order that allows a state to impose additional safety
requirements on a pipeline facility where continued operation would violate State
or federal pipeline safety laws. Every State Waiver must be submitted to PHMSA
for review; if PHMSA does not object to the terms of the order, it will issue. The
State Waivers issued to Sable are available on CAL FIRE's web page Pathways for
Restarting CA-324 and CA-325, https://osfm.fire.ca.gov/what-we-do/pipeline-
safety-and-cupa/pathways-for-restarting-pipelines.

3

60118(c)(2)(A), waiving compliance with federal pipeline safety regulations. The
Emergency Special Permit bypassed federal procedures for approval of a special
permit and lacks any legal or factual basis. PHMSA's Emergency Special Permit is
attached to this Petition as Exhibit 3.

Pursuant to 49 U.S.C. Section 60119(a), orders issued by PHMSA under the
Pipeline Safety Act ("PSA") may be challenged by filing a Petition for Review
directly in the federal court of appeals where the petitioner resides, and the petition
must be filed within 89 days of the issuance of PHMSA's order. Accordingly,
Petitioner has timely and properly sought review of PHMSA's orders directly in
this Court.

Judicial review of PHMSA orders is conducted under the standards of Section
706 of the Administrative Procedure Act. 49 U.S.C. § 60119(a)(3). As the basis for
this Petition for Review, Petitioner alleges that PHMSA's actions and orders were
"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with
law" and/or "without observance of procedure required by law." 5 U.S.C. §
706(2)(A) & (D).

Petitioner prays for an order setting aside PHMSA's orders dated December
17, 22, and 23, 2025.

4

Respectfully submitted this 23rd day of January, 2026.

ROB BONTA
*Attorney General of California*

*/s/ Michael S. Dorsi*
MICHAEL S. DORSI
*Deputy Attorney General*
455 Golden Gate Ave, Suite 11000
San Francisco, CA 94102
Tel: (415) 510-3802
Email: Michael.Dorsi@doj.ca.gov
*Attorneys for State of California*

## STATEMENT OF RELATED CASES

The following related case is pending: *Environmental Defense Center, et al. v.*

*Pipeline and Hazardous Materials Safety Administration*, Ninth Circuit Court of

Appeals Case No. 25-8059.

# Exhibit 1

Exhibit 1
to Petition for Review



U.S. Department
of Transportation

1200 New Jersey Avenue SE
Washington, D.C. 20590

**Pipeline and Hazardous
Materials Safety
Administration**

December 17, 2025

Via Electronic Mail to: cflores@sableoffshore.com

J. Caldwell Flores
President and Chief Operating Officer
Sable Offshore Corp.
845 Texas Ave. Ste 2920
Houston, TX 77002

Re: Determination of Interstate Classification

Dear Mr. Flores:

This responds to your letter of November 26, 2025 regarding the Las Flores Pipeline owned and
operated by Sable Offshore Corp. (Sable). Your letter notifies the Pipeline and Hazardous
Materials Safety Administration (PHMSA) that Sable has determined the pipeline to be an
interstate pipeline facility under the Pipeline Safety Act (PSA) and requests PHMSA transition
regulatory oversight from the California Office of the State Fire Marshal (OSFM) to PHMSA.

As noted in your letter, portions of the Las Flores Pipeline (previously known as Lines 901 and
903) have been considered intrastate since 2016 and subject to regulatory oversight by OSFM
pursuant to its certification with PHMSA under 49 U.S.C. § 60105(a). Prior to 2016, Lines 901
and 903 were considered interstate and regulated by PHMSA. The classification change in 2016
corresponded to the pipelines' previous owner cancelling tariffs with the Federal Energy
Regulatory Commission (FERC). In 2024, Sable acquired Lines 901 and 903 and other assets
comprising the Las Flores Pipeline, including offshore pipelines transporting crude oil from the
Outer Continental Shelf (OCS) and an onshore processing facility at Las Flores Canyon. Sable
operates the Las Flores Pipeline assets as a single pipeline system transporting crude oil from the
OCS to the Pentland Station terminal in Kern County, California.

Upon receipt of your letter, PHMSA initiated a review of the Las Flores Pipeline. This review
included an on-site inspection on December 9 through December 11, 2025. OSFM
representatives accompanied PHMSA on the inspection. PHMSA also reviewed Sable's written
procedures and records and conducted field observations of the Las Flores facility, the pump
stations at Gaviota and Sisquoc, the control room in Santa Maria, and the offshore Harmony
platform. In addition, PHMSA reviewed the 2025 program inspections conducted by OSFM. For

the following reasons, PHMSA agrees with your determination that the Las Flores Pipeline is an interstate pipeline.

The PSA authorizes PHMSA to prescribe and enforce minimum safety standards for pipeline transportation and for pipeline facilities.[1] The PSA vests with PHMSA exclusive regulatory authority over interstate pipelines and preempts States from adopting or continuing in force safety standards for interstate pipelines.[2] With respect to intrastate pipelines, the PSA provides a State authority may regulate the intrastate pipelines within its borders upon submission to PHMSA of an annual certification.[3] Both the PSA and the Federal pipeline safety regulations define interstate and intrastate pipelines.[4] An interstate pipeline is a pipeline or part of a pipeline used to transport hazardous liquids in interstate or foreign commerce; an intrastate pipeline is a hazardous liquid pipeline that is not an interstate pipeline.

Determining whether a hazardous liquid pipeline is an interstate or intrastate pipeline requires a factual inquiry.[5] To assist in that determination, PHMSA adopted Appendix A to 49 CFR Part 195 providing a statement of agency policy and interpretation on the delineation between Federal and State jurisdiction.[6] In short, "if there is a tariff or concurrence filed with FERC governing the transportation of hazardous liquids over a pipeline facility . . . then [PHMSA] will, as a general rule, consider the facility to be an interstate pipeline facility within the meaning of the [PSA]." The absence of a FERC tariff generally means a pipeline is intrastate; however, in certain situations, PHMSA will consider a pipeline to be interstate despite the lack of a filing with FERC. Several examples of this are listed in Appendix A. As it relates to the Las Flores Pipeline, one example provides that a pipeline originating on the OCS will be considered an interstate pipeline even if the pipeline does not have a tariff with FERC.[7]

PHMSA's evaluation of the Las Flores Pipeline confirms that it transports crude oil from the OCS to an onshore processing facility at Las Flores Canyon and continues the transportation of crude oil from Las Flores Canyon to Pentland, California. Consistent with Appendix A, the Las

---

[1] 49 U.S.C. § 60101 et seq.

[2] 49 U.S.C. § 60104(c). *See* Olympic Pipe Line Co. v. City of Seattle, 437 F.3d 872, 878 (9th Cir. 2006) (discussing how the "PSA differentiates between the regulation of interstate and intrastate hazardous liquid pipelines.")

[3] 49 U.S.C. § 60105(a). OSFM has a certification with PHMSA to regulate intrastate hazardous liquid pipelines in California.

[4] 49 U.S.C. § 60101(a)(7), (a)(8)(B), (a)(10); 49 CFR § 195.2. *See* S. Pac. Pipe Lines Inc. v. DOT, 796 F.2d 539 (D.C. Cir. 1986) (finding PHMSA's definition of interstate and intrastate pipelines reasonable under the PSA).

[5] Transportation of Liquids by Pipeline, 46 Fed. Reg. 38,357, 38,359 (Jul. 27, 1981) (PHMSA's predecessor agency (hereafter PHMSA) explained that it had "reviewed examples of what it believes are the most frequent and likely configurations of liquid pipelines and pipeline facilities and considered various ways of cataloging or classifying them as either interstate or intrastate."); *see also* Shell Oil Co. v. City of Santa Monica, 830 F.2d 1052, 1064 (9th Cir. 1987) (noting that whether the pipeline was interstate or intrastate turned on a disputed issue of fact).

[6] Transportation of Hazardous Liquids by Pipeline; Regulation of Intrastate Pipelines, 50 Fed. Reg. 15,895, 15,897 (Apr. 23, 1985).

[7] 49 CFR Part 195, App. A. "Example 7. Pipeline Company P operates a pipeline that originates on the Outer Continental Shelf. P does not file any tariff for that line with FERC. [PHMSA] will consider the pipeline to be an interstate pipeline facility."

Flores Pipeline is an interstate pipeline.[8] As portions of the Las Flores Pipeline were previously considered to be intrastate and regulated by OSFM, PHMSA is notifying OSFM that the Las Flores Pipeline is subject to the regulatory oversight of PHMSA. Please direct further correspondence on this matter to Dustin Hubbard, Director, Western Region, Office of Pipeline Safety, PHMSA, at (720) 963-3183.

Sincerely,

LINDA GAIL DAUGHERTY   Digitally signed by LINDA GAIL DAUGHERTY Date: 2025.12.17 07:56:55 -05'00'

Linda Daugherty
Acting Associate Administrator for Pipeline Safety


cc:     James Hosler, Chief, Pipeline Safety Division, OSFM
        Varun Shekhar, Shareholder, Babst Calland Clements & Zomnir, PC

---

[8] PHMSA regulations consider the Las Flores Pipeline to be an "active" pipeline. *See* Pipeline Safety: Clarification of Terms Relating to Pipeline Operational Status, 81 Fed. Reg. 54,512 (Aug. 12, 2016) ("The regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned.")

# Exhibit 2

Exhibit 2
to Petition for Review



U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

12300 W. Dakota Ave., Suite 340
Lakewood, CO 80228

**VIA ELECTRONIC MAIL TO: lyearwood@sableoffshore.com**

December 22, 2025

Mr. Lance Yearwood
Vice President
Pacific Pipeline Company / Sable Offshore Corp.
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**RE:     Approval of Sable Offshore Corp.'s Restart Plan for the Las Flores Pipeline System Line
CA-324 and Line CA-325**

Dear Mr. Yearwood:

From December 4 to December 12, 2025, the Pipeline and Hazardous Materials Safety Administration
(PHMSA) received several documents from Sable Offshore Corp. These documents included:

     1. Line CA-324 and Line CA-325 Fill Plan and Startup Procedures
     2. A letter requesting the removal of pressure restrictions for Line CA-324
     3. A letter requesting the removal of pressure restrictions for Line CA-325
     4. The Las Flores Pipeline Linefill Positioning Plan Assignments
     5. The Las Flores Pipeline Linefill Contact List

These documents addressed the Restart Plan for Line CA-324 and Line CA-325 (previously known as
Plains Line 901 and Line 903, respectively). In addition, PHMSA conducted a field inspection with Sable
Offshore Corp. to discuss its process and safety procedures for the pipeline restart.

PHMSA has reviewed these documents and hereby approves the submitted Restart Plan. This approval is
valid from the date of this letter.

Should you have any questions or concerns, please contact me at (720) 963-3160 or by email at
dustin.hubbard@dot.gov.

Sincerely,

# DUSTIN B HUBBARD
Digitally signed by DUSTIN B HUBBARD
Date: 2025.12.22 13:19:33 -07'00'

Dustin Hubbard
Director, Western Region
Pipeline and Hazardous Materials Safety Administration

cc:    Trent Fontenot, Sr. Vice President - Operations, tfontenot@sableoffshore.com
       Jim Hosler, Assistant Deputy Director – Pipeline Safety and CUPA, CalFire,
       jim.hosler@fire.ca.gov

# Exhibit 3

Exhibit 3
to Petition for Review

# U.S. DEPARTMENT OF TRANSPORTATION
# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION
# EMERGENCY SPECIAL PERMIT

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | 2025-1502 |
| **Requested By:** | Sable Offshore Corp. PPC |
| **Operator ID#:** | 40881 |
| **Date Requested:** | December 19, 2025 |
| **Issuance Date:** | December 23, 2025 |
| **Expiration Date:** | February 21, 2026 |
| **Code Section:** | 49 CFR § 195.452(h)(4)(iii)(H) |

## Grant of Special Permit:

By this order, subject to the terms and conditions set forth below, the Pipeline and Hazardous Materials Safety Administration (PHMSA) Office of Pipeline Safety (OPS)[1] grants this emergency special permit to Sable Offshore Corp. PPC (Sable) for 124.42 miles of 24- and 30-inch diameter hazardous liquid pipelines, Lines CA-324 and CA-325 (*special permit segments*), transporting crude oil from Las Flores Canyon to Pentland in Santa Barbara, San Luis Obispo, and Kern counties, California. This emergency special permit waives compliance from 49 CFR § 195.452(h)(4)(iii)(H), which requires corrosion of or along a longitudinal seam weld be scheduled for evaluation and remediation within 180 days of discovering the condition.

## I. Purpose and Need

On December 19, 2025,[2] Sable requested an emergency special permit for relief from the requirement to evaluate and remediate corrosion occurring at longitudinal seam welds within 180 days. The *special permit segments* are under polyurethane foam and polyethylene tape wrap insulation, which can inhibit the effectiveness of cathodic protection and contribute to a risk of corrosion due to shielding effects. Sable proposed an alternative approach to safely manage this risk, which was previously reviewed and approved as part of two state waivers issued by the California Office of State Fire Marshal (OSFM) on December 17, 2024 to Sable for the *special permit segments*. PHMSA previously reviewed the state waivers pursuant to 49 U.S.C. § 60118(d).

---

[1] Throughout this special permit, the usage of "PHMSA" means the U.S. Department of Transportation (DOT), Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety.

[2] Sable submitted supplemental information related to its application on December 23, 2025.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 1 of 16

Sable sought this special permit to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the U.S. District Court for the Central District of California, which provides, among other requirements, that a "State Waiver" must be applied for and received from OSFM prior to restarting Lines CA-324 and CA-325. The *special permit segments* were previously considered intrastate at the time of entry of the Consent Decree and were regulated by OSFM pursuant to its state certification with PHMSA under 49 U.S.C. § 60105(a). However, the *special permit segments* are now considered interstate pursuant to Sable's designation on November 26, 2025, and PHMSA's concurrence on December 17, 2025. As a result, PHMSA has exclusive pipeline safety regulatory agency over Lines CA-324 and CA-325. The conditions ordered by OSFM in the two state waivers are now being re-issued by PHMSA as a special permit subject to Federal oversight and enforcement.

Sable requested PHMSA grant a special permit for the above reasons on an emergency basis pursuant to 49 U.S.C. § 60118(c)(2) and 49 CFR § 190.341(g). In its application, Sable stated that expedited review of its application was warranted in light of the national energy emergency declared by the President under the National Emergencies Act (50 U.S.C. § 1601 et seq.) in Executive Order 14156 (January 20, 2025). In Executive Order 14156, the President declared a national energy emergency based on a finding that "[t]he United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[3] The Executive Order directs agencies, such as PHMSA, to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate," among other activities, the "production, transportation, refining, and generation of domestic energy resources."[4] The Executive Order further directs agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States . . . ."[5]

Sable's application stated that grant of this special permit on an emergency basis would facilitate the restart of Lines CA-324 and CA-325 to provide relief in response to the acute energy shortage conditions identified in Executive Order 14156 within California and in the West Coast region of the United States.[6] Sable further noted that grant of this special permit on an emergency basis is appropriate to address the gap in coverage under the OSFM State Waivers created by redesignation of Lines CA-324 and CA-325 as interstate, given that the proposed special permit is substantially the same as that which was previously reviewed and approved by OSFM and PHMSA for issuance of the State Waivers.

This emergency special permit allows Sable to operate Lines CA-324 and CA-325 without being subject to the requirement to evaluate and remediate corrosion of or along a longitudinal seam weld within 180 days. On the condition that Sable comply with the terms and conditions set forth below, the emergency special permit waives compliance with 49 CFR § 195.452(h)(4)(iii)(H) for the *special permit segments*.

---

[3] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 1.

[4] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 2(a). The order's definition of "energy" or "energy resources" includes "crude oil," and its definition of "transportation" includes "the physical movement of energy, including through, but not limited to, pipelines." Sec. 1(a); 1(c).

[5] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 3(b).

[6] For more information regarding these effects, see Attachments C, D, E, and F.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 2 of 16

## II. Special Permit Segments

This emergency special permit pertains to the specified pipeline segments which make up the Las Flores Pipeline called Line CA-324 and CA-325. Line CA-325 can be further divided into two segments: Lines CA-325A and CA-325B. The Las Flores Pipeline is part of the Santa Ynez Pipeline System (SYPS), an interstate pipeline facility that Sable operates from the Outer Continental Shelf off the coast of Santa Barbara to Kern County, California. A map of the special permit segments is available in Revised Attachment A.

### Special Permit Segments:

| Special Permit Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|
| CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

## III. Conditions

PHMSA grants this emergency special permit subject to Sable implementing each of the following conditions. These conditions must be implemented and complied with in addition to all applicable requirements of 49 CFR Part 195 except for compliance with limitations on scheduling instances of corrosion on or near longitudinal seam welds for evaluation and remediation within 180 days of discovery in 49 CFR § 195.452(h)(4)(iii)(H), which would be waived.

### General Conditions:

1) The *special permit segments* may only be used to transport crude oil.

2) Prior to transporting crude oil in the *special permit segments*, Sable must develop and implement procedures for the conditions and requirements described in this emergency special permit.

3) Sable shall not exceed maximum operating pressure (MOP) limits for the *special permit segments*, as follows:

    a) The MOP of Line CA-324 cannot exceed 1003 pounds per square inch gauge (psig).

    b) The MOP of Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) cannot exceed 1000 psig.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 3 of 16

      c) The MOP of Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) cannot exceed 1292 psig.

4) Sable shall not exceed maximum operating temperature limits for crude oil transported in the *special permit segments*, as follows:

      a) The maximum operating temperature of the crude oil that is transported in Line CA-324 must not exceed 140 degrees Fahrenheit for more than 12 consecutive hours.

      b) The maximum operating temperature of the crude oil that is transported in Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) must not exceed 125 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Gaviota station to monitor the temperature of Line CA-325A.

      c) The maximum operating temperature of the crude oil that is transported in Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) must not exceed 110 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Sisquoc station to monitor the temperature of Line CA-325B.

5) This emergency special permit does not relieve Sable from complying with applicable requirements under 49 CFR Part 195, other than those waived in this emergency special permit.

6) This emergency special permit does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).

7) In-line inspections (ILIs) performed pursuant to this emergency special permit must include:

      a) Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion, defined as follows:

            i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.

            ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.

      b) Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).

      c) Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI.

8) Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the

pipe body, heat affected zone (HAZ)[7], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-324.[8]

9)  Prior to placing Line CA-325 (including CA-325A and CA-325B) in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:

   a) API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.

   b) API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

   At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ), and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-325A/B.[9]

10) All existing immediate and 180-day repair conditions must be evaluated and remediated pursuant to the Consent Decree repair criteria prior to restarting CA-325A/B.[10] Upon restart Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by PHMSA. Sable must utilize the Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results to identify, evaluate and remediate any immediate and 180-day repair conditions that are listed in this emergency special permit.

11) Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines*. If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss

---

[7] The heat affected zone (HAZ), as used in this emergency special permit, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[8] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-324.

[9] Sable indicated in its application that it has already completed the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-325.

[10] Sable indicated in its application that it has already completed the repairs required in this sentence. Sable must submit all of the results to PHMSA prior to restarting CA-324 and CA-325.

Docket Number PHMSA-2025-1502 -- Sable Offshore Corp. PPC
Emergency Special Permit -- Corrosion Mitigation -- California

Page 5 of 16

anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

12)  Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of CA-324 and CA-325A/B.

13)  Pressure Testing:[11]

a)  Prior to placing CA-324 in operation, Sable must conduct a spike hydrostatic pressure test of CA-324 at a minimum pressure that is at least 1.5 times the maximum operating pressure (MOP) or 100% specified minimum yield strength (SMYS), for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

   i.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

   ii.  All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

b)  Immediately following the spike hydrostatic pressure test specified in Condition 13(a), Sable must conduct an 8-hour hydrostatic pressure test of CA-324 at a minimum of 1.25 times the MOP.

c)  Prior to placing Line CA-325A (segment of Line 325 between Gaviota and Sisquoc stations) in operation, Sable must conduct a spike hydrostatic pressure test of CA-325A at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:

   i.  All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

   ii.  All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

d)  Immediately following the spike hydrostatic pressure test specified in Condition 13(c), Sable must conduct an 8-hour hydrostatic pressure test of CA-325A at a minimum of 1.25 times the MOP.

e)  Prior to placing Line CA-325B (segment of Line 325 between Sisquoc and Pentland stations) in operation, Sable must conduct a hydrostatic pressure test of CA-325B at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the

---

[11] Sable indicated in its application that it has already completed all of the testing and repairs required in this Condition. Sable must submit the results to PHMSA prior to restart and confirm that no failures occurred during the required pressure testing.

hydrostatic test on CA-325B:

  i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

  ii. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

f) Sable must obtain the Test ID for each hydrostatic pressure test from PHMSA (or OSFM if such testing was performed prior to November 26, 2025) and have the approved independent testing firm forward separately the certified test results to PHMSA or the OSFM, as applicable.

g) Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 CFR Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under PHMSA or OSFM (as applicable) approved hydrostatic testing companies.

h) Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported to PHMSA.[12]

i) Section(s) of the *special permit segments* that failed during the required hydrotesting must be repaired by removing and replacing the failed section. PHMSA reserves the right to revoke this emergency special permit if failure(s) raise the concern that the *special permit segments* cannot be safely operated.

14) In-Line Inspection (ILI) Assessment and Frequency:

a) Prior to performing in-line inspections of the *special permit segment*, Sable shall provide PHMSA with a written notification to PHMSA describing its assessment plan with the following information:

  i. Dates for integrity assessment

  ii. In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[13] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications;

  iii. In-line inspection tool vendor(s)

  iv. Required tool specifications including operational specifications and anomaly sizing tolerances

  v. Tool validation methodology

  vi. Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

---

[12] All submissions to PHMSA required by this emergency special permit shall be submitted through email to the OPS Western Region Director, Dustin Hubbard, email address: Dustin.Hubbard@dot.gov or his designee.

[13] Industry standards referenced in this emergency special permit must utilize the editions that are incorporated by reference in 49 CFR 195.3 unless another edition is explicitly specified in this emergency special permit.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 7 of 16

       vii. Criteria used to identify locations for excavation and field verification

      viii. Non-destructive examination

b) Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

c) Metal Loss Tool(s):

      i. Initial ILI tool runs – Each year, during the first two (2) years of operating the *special permit segments*, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

      ii. Subsequent ILI tool runs – After the first two (2) years of operating the *special permit segments*, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the *special permit segment* within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

d) Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[14] or the ILI assessment must be assessed at more frequent intervals if condition 21 determined a shorter assessment interval.

      i. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

      ii. USCD Performance Specification Requirements

          1. The USCD tools must have a probability of detection that is

---

[14] Sable may petition PHMSA to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to PHMSA approval.

≥ 90% for axial and circumferential cracks.

2. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

3. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

4. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

e) Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

f) Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the *special permit segment* in which the ILI tool velocity was outside of the specified tool velocity range.

g) All ILI tool runs must obtain the Test ID from PHMSA prior to run.

h) Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

i) Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

j) Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[15] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

k) Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second

---

[15] A minimum of four (4) independent direct examination excavations must be used for unity plots.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 9 of 16

Edition, April 2013).

15) Discovery of Condition: The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

16) Immediate Repair Conditions:[16]

    a) A crack or crack-like anomaly that meets any of the following criteria:

        i. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.

        ii. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

    b) Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

    c) Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[17]

17) 180-Day Repair Conditions:[18]

    a) A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.

    b) Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.

    c) All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[19]

    d) For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

18) Corrosion Growth Rate Analysis (CGRA):

    a) Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to

---

[16] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(i). All immediate repair conditions must be remediated with a permanent repair method.

[17] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria. General corrosion means uniform or gradually varying loss of wall thickness over an area.

[18] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(iii), except for those associated with 49 CFR 195.452(h)(4)(iii)(H). All immediate repair conditions must be remediated with a permanent repair method.

[19] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify PHMSA, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 CFR § 195.452 until the indication is remediated or until otherwise authorized by PHMSA.

prior ILI) and perform pipeline remediations needed to assure the integrity of the *special permit segments* is maintained.[20] The timing of remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.

    b) The CGRA procedure must include ILI data matching methods[21] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

    c) Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

    d) When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates.[22]

    e) All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

19) Pressure Reduction: If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in this emergency special permit, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

20) In Field Direct Examination of Pipe:

    a) Direct examinations[23] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[24] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

    b) Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

        i. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

        ii. Sable must increase the metal loss anomaly's depth by 20% when

---

[20] At a minimum, Sable must include signal matching between ILI data sets.

[21] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[22] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[23] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[24] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complemented by shear wave technology or inspection by phased array ultrasonic testing.

they input it into the formula for calculating the number of wraps needed for repair method 5.

    iii. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

c) Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

d) Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[25]

e) All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

21) Integrity Management:

a) A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

    i. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 CFR § 192.712(d)(1).

    ii. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 CFR § 192.712(d)(2).

b) Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

c) When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

d) Sable must send all field measurements to the ILI tool vendor within 90 days

---

[25] The coating procedure must be submitted to PHMSA prior to the effective date of this emergency special permit.

of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

e) Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the *special permit segments*. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by PHMSA prior to being selected.

f) Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is

g) occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

22) Data Requirements for Predicted Failure Analysis:

    a) Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

    b) The analyses performed in accordance with this emergency special permit must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in traceable, verifiable, and complete records.

23) Recordkeeping:

    a) Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this emergency special permit shall be kept for the life of the *special permit segments* and must be submitted to PHMSA, in the manner requested (electronic, hardcopy, or other format) within 30 days.

    b) Sable must maintain the following records:

        i. Technical approach used for the analysis

        ii. All data used and analyzed

        iii. Pipe and longitudinal weld seam properties

        iv. Procedures used to implement emergency special permit conditions

v.   Evaluation methodology used

vi.   Models used

vii.   Direct in situ examination data

viii.   All in-line inspection tool assessments information evaluated

ix.   Pressure test data and results

x.   All in-the-ditch assessments performed on the *special permit segments*

xi.   All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results

xii.   All finite element analysis results

xiii.   The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

xiv.   The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

xv.   Safety factors used for fatigue life and/or predicted failure pressure calculations

xvi.   Reassessment time interval and safety factors

xvii.   The date of the review

xviii.   Confirmation of the results by qualified technical subject matter expert(s)

xix.   Approval by responsible Sable management personnel

xx.   Records of additional preventive and mitigative (P&M) measures performed

xxi.   Reports required by this emergency special permit.

24)   Reporting:

   a) Any release on the *special permit segments* shall be reported to PHMSA at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery.[26]

   b) An email notification shall be made at least three (3) days prior to a *special permit segment* being exposed for non-emergency purposes of field evaluation and repair to PHMSA. The email notification shall include, if applicable:

      i. Tool type and run date

      ii. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

---

[26] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state, or Federal regulations.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 14 of 16

      iii. Dig sheets

      iv. Field contact information for Sable

      v. Time and location of the field evaluation and repair.

  c) Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run to PHMSA and include:

      i. Tool type

      ii. Run date

      iii. Summary of Conditions Report[27]

      iv. Final Vendor Report and Pipe Tally

  d) Sable shall provide a report to PHMSA by June 15th of every year for the duration of this special permit, including any renewals. The report shall be submitted to PHMSA. At a minimum, the annual report shall contain the following, if applicable:

      i. A Closure Report for the previous calendar (CY) which contains:

          1. Features that were remediated in previous CY, including documentation for in-the-ditch assessments and repairs

          2. Identify features that remain to be assessed

          3. Unity Plots for previous ILI runs

      ii. Fracture mechanics and pressure cycling analyses in accordance with Condition 21(a);

      iii. The third-party ILI expert reviews in accordance with condition 21(e).

      iv. AC and DC Interference surveys that are due in accordance with condition 21(f).

      v. A copy of the CGRA for prior year including:

          1. Mean corrosion growth rate for the *special permit segments*

          2. Distribution graph of the corrosion growth rate for the *special permit segments* (e.g. occurrences (#) vs. corrosion rate (mpy)

The above conditions are based on PHMSA's review and consideration of information provided by Sable, including information in their emergency special permit application which can be found at Docket No. PHMSA-2025-1502 in the Federal Docket Management System located at www.regulations.gov. PHMSA has determined the conditions listed above would be necessary to ensure this Emergency Special Permit is not inconsistent with pipeline safety.

---

[27] PHMSA may stipulate specific formatting or other information (e.g., condition type, anomaly details, remaining strength calculation method, failure pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

## IV. Limitations:

This special permit is subject to the limitations set forth in 49 CFR § 190.341, as well as the following limitations:

1) This emergency special permit is limited to an initial term of sixty (60) days from the date of issuance. If Sable elects to seek renewal of this emergency special permit, it must submit a renewal request to PHMSA pursuant to 49 CFR § 190.341(g).

2) Should Sable fail to comply with any conditions of this emergency special permit or should PHMSA determine that this emergency special permit is no longer appropriate or is inconsistent with pipeline safety, PHMSA may revoke the emergency special permit and require Sable to comply with all appropriate regulatory requirements.

3) PHMSA may order the *special permit segments* to be shutdown at any time.

4) PHMSA may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this emergency special permit. The terms and conditions of any compliance order shall take precedence over the terms of this emergency special permit.

5) In the event of conflict between the conditions of this emergency special permit and industry standards, the emergency special permit conditions shall prevail.

6) If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the emergency special permit, Sable must provide PHMSA written notice of the change within 60 days of the consummation date. In the event of such transfer, PHMSA reserves the right to revoke, suspend, or modify the emergency special permit.

AUTHORITY: 49 United States Code 60118 (c)(1) and 49 CFR § 1.97.

Issued in Washington, D.C., on December 23, 2025.

**LINDA GAIL DAUGHERTY**
Digitally signed by LINDA GAIL DAUGHERTY
Date: 2025.12.23 15:48:57 -05'00'

Linda Daugherty
Acting Associate Administrator
  for Pipeline Safety

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 16 of 16

# CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of January, 2026, the foregoing Petition for Review and exhibits were served on Respondents by sending a copy via certified mail, return receipt requested, to each of the following addresses:

Paul J. Roberti, Administrator
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Office of Chief Counsel
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Sean Duffy, Secretary of Transportation
U.S. Department of Transportation,
Pipeline and Hazardous Materials Safety Administration
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Pamela Bondi
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W. Washington,
D.C. 20530- 0001

Dated: January 23, 2026

                                        /s/ Michael S. Dorsi
                                        MICHAEL S. DORSI

Exhibit K



ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
1/5/2026 6:59 PM
By: Narzralli Baksh , Deputy

1  Jeffrey D. Dintzer (SBN: 139056)
   Garrett B. Stanton (SBN: 324775)
2  **ALSTON & BIRD, LLP**
   350 South Grand Avenue, 51st Floor
3  Los Angeles, CA 90071
   Tel: (213) 576-1000; Fax: (213) 576-1100
4  Jeffrey.Dintzer@alston.com
   Garrett.Stanton@alston.com
5
   Duncan Joseph Moore (SBN: 233955)
6  Benjamin J. Hanelin (SBN: 237595)
   Natalie C. Rogers (SBN: 301254)
7  **PAUL HASTINGS LLP**
   1999 Avenue of Stars, 27th Floor
8  Century City, CA 90067
   Tel: (310) 620-5879; Fax: (310) 620-5899
9  djmoore@paulhastings.com
   benjaminhanelin@paulhastings.com
10 natalierogers@paulhastings.com

11 Trevor D. Large (SBN: 214886)
   Victoria C. Diffenderfer (SBN: 350018)
12 **FAUVER LARGE ARCHBALD & SPRAY**
   820 State Street, 4th Floor
13 Santa Barbara, CA 93101
   Tel: (805) 966-7000; Fax: (805) 966-7227
14 tlarge@flasllp.com
   vdiffenderfer@flasllp.com
15
   Attorneys for Real Parties in Interest
16 SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY

17           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

18               **COUNTY OF SANTA BARBARA**

19 CENTER FOR BIOLOGICAL DIVERSITY          Case No.: 25CV02244
   and WISHTOYO FOUNDATION,                 [Consolidated with 25CV02247]
20
              Petitioners/Plaintiffs,       **REAL PARTIES IN INTEREST SABLE**
21                                          **OFFSHORE CORP. AND PACIFIC**
        v.                                  **PIPELINE COMPANY'S NOTICE OF**
22                                          **MOTION AND MOTION FOR**
   CALIFORNIA DEPARTMENT OF                 **RECONSIDERATION OF**
23 FORESTRY AND FIRE PROTECTION;            **PRELIMINARY INJUNCTION;**
   OFFICE OF THE STATE FIRE MARSHAL;        **MEMORANDUM OF POINTS AND**
24 DANIEL BERLANT, in his official capacity  **AUTHORITIES**
   as State Fire Marshal; and DOES 1 through
25 10; inclusive,                           [Filed concurrently with Declarations of J.
                                            Caldwell Flores and Trevor D. Large;
26            Respondents/Defendants.       [Proposed] Order Immediately Rescinding
                                            Preliminary Injunction]
27

28
                                    1
        REAL PARTIES IN INTERESTS NOTICE OF MOTION AND MOTION FOR RECONSIDERATION

Date:    April 17, 2026
Time:    10:00 a.m.
Dept.:    4

Complaint Filed: April 15, 2025

[Assigned for Purposes to the Honorable
Donna D. Geck, Dept. 4]

SABLE OFFSHORE CORP., a Delaware
Corporation, PACIFIC PIPELINE
COMPANY, a Delaware Corporation, and
DOES 11 through 20, inclusive,

    Real Parties in Interest

ENVIRONMENTAL DEFENSE CENTER, a    Case No.: 25CV02247
California non-profit corporation; GET OIL
OUT!, a California non-profit corporation;
SANTA BARBARA COUNTY ACTION
NETWORK, a California non-profit
corporation; SIERRA CLUB, a national non-
profit corporation; and SANTA BARBARA
CHANNELKEEPER, a California non-profit
corporation,

    Petitioners/Plaintiffs,

    v.

CALIFORNIA DEPARTMENT OF
FORESTRY AND FIRE PROTECTION, an
agency of the State of California; OFFICE OF
THE STATE FIRE MARSHAL, an agency of
the State of California; DANIEL BERLANT,
in his official capacity as State Fire Marshal;
and DOES 1 to 10; inclusive,

    Respondents/Defendants.

SABLE OFFSHORE CORP., a Delaware
Corporation, and PACIFIC PIPELINE
COMPANY, a Delaware Corporation.

    Real Parties in Interest.

2

1      **TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

2   **PLEASE TAKE NOTICE** that on Friday, April 17, 2026 at 10:00 a.m., in Department 4 of the

3 Superior Court of California for the County of Santa Barbara, located at 1100 Anacapa Street,

4 Santa Barbara, California, before the Honorable Donna D. Geck, Real Parties in Interest Sable

5 Offshore Corp. and Pacific Pipeline Company (collectively referred to herein as "Sable") will, and

6 hereby do, move the Court pursuant to Code of Civil Procedure section 1008 and Code of Civil

7 Procedure section 533 for an order rescinding the July 29, 2025 Order re: Preliminary Injunction

8 in the above-referenced matters (the "Preliminary Injunction").

9      This motion is made pursuant to California Code of Civil Procedure section 1008, on the

10 grounds that new and different facts and circumstances exist that warrant reconsidering and

11 rescinding the Preliminary Injunction, including that the Las Flores Pipeline is now an interstate

12 pipeline under the exclusive federal jurisdiction of the Pipeline and Hazardous Materials Safety

13 Administration ("PHMSA"), PHMSA has issued all necessary approvals for the restart of the Las

14 Flores Pipeline, and ***Petitioners in these consolidated actions are separately pursuing relief in***

15 ***the United States Court of Appeals for the Ninth Circuit directed at challenging PHMSA's***

16 ***actions***. Given this federal posture and given that the California Office of the State Fire Marshal

17 ("OSFM") no longer has jurisdiction over the Las Flores Pipeline, the Preliminary Injunction is

18 now moot and must be rescinded. In addition, Sable will continue to suffer significant and

19 irreparable harm if the Preliminary Injunction is not immediately rescinded, based on the following

20 specific facts and legal authority:

21     1.    On July 29, 2025, the Court issued the Preliminary Injunction. Based on the Court's

22 finding that Petitioners had a likelihood of success on their state law claims under the California

23 Pipeline Safety Act, the Court enjoined the restart of the Las Flores Pipeline "until 10 court days

24 following the filing and service of notice by or on behalf of real parties in interest . . . that Sable

25 has received all necessary approvals and permits for restarting the Las Flores Pipeline and that

26 Sable intends to commence such restart." (July 29, 2025 Order at p. 18.)

27

28

---

REAL PARTIES IN INTERESTS NOTICE OF MOTION AND MOTION FOR RECONSIDERATION

1    2.    Lines CA-324 and CA-325 (formerly known as Lines 901 and 903) are portions of

2  the Las Flores Pipeline, which also includes offshore pipelines transporting crude oil from the

3  Outer Continental Shelf and an onshore processing facility at Las Flores Canyon. Lines CA-324

4  and CA-325 had been considered intrastate since 2016 and thus subject to oversight by the OSFM.

5  At the time the Court entered the Preliminary Injunction, Lines CA-324 and CA-325 were still

6  designated as intrastate, and subject to OSFM's regulatory oversight.

7    3.    On December 17, 2025, PHMSA determined that the entirety of the Las Flores

8  Pipeline is an interstate pipeline subject to PHMSA's exclusive jurisdiction. This determination

9  eliminated any jurisdiction of OSFM over Lines CA-324 and CA-325. (See Declaration of J.

10  Caldwell Flores in Support of Motion for Reconsideration ["Flores Decl.], Exhibit A, p. 2.) In

11  making its determination that *the Las Flores Pipeline is an interstate pipeline,*" PHMSA notified

12  "OSFM that the Las Flores Pipeline is subject to the regulatory oversight of PHMSA." (*Id.*, pp. 2–

13  3 [emphasis added].)

14    4.    On December 22, 2025, PHMSA approved Sable's Restart Plan for Lines CA-324

15  and CA-325 (the "Restart Approval"). (See Flores Decl., Exhibit B.)

16    5.    On December 23, PHMSA granted Sable a "emergency special permit" for the

17  operation of Lines CA-324 and CA-325 pursuant to 49 U.S.C. Section 60118(c)(2)(A) (the

18  "Emergency Special Permit"). (See Flores Decl., Exhibit C, p. 6.)

19    6.    Given PHMSA's assertion of jurisdiction over the Las Flores Pipeline as an

20  interstate pipeline, OSFM is without jurisdiction to regulate Lines CA-324 and CA-325, or any

21  other portion of the Las Flores Pipeline.

22    7.    On December 24, 2025, Petitioners in these consolidated actions, recognizing that

23  approval to flow oil through the pipeline is now under federal jurisdiction, filed an Emergency

24  Motion for Stay Pending Appeal and a Petition for Review in the United States Court of Appeals

25  for the Ninth Circuit, seeking a stay, pending appeal, of the issuance of the Restart Approval and

26  Emergency Special Permit issued by PHMSA. (*Environmental Defense Center, et al. v. U.S.*

27  *Department of Transportation, et al.* (9th Cir.) Case No. 25-8059 (the "Ninth Circuit Action"),

28

REAL PARTIES IN INTERESTS NOTICE OF MOTION AND MOTION FOR RECONSIDERATION

1    Declaration of Trevor D. Large in Support of Ex Parte Application for Order Shortening Time

2    ["Large Decl.", Exhibit D] [Emergency Motion for Stay Pending Appeal].)

3        8.    On December 25, 2025, Sable filed an Emergency Motion to Intervene in the Ninth

4    Circuit Action. (Large Decl., Exhibit D.)

5        9.    On December 31, 2025, the United States Court of Appeals for the Ninth Circuit

6    granted Sable's Emergency Motion to Intervene, denied Petitioners' Emergency Motion for Stay

7    Pending Appeal, and set an expedited briefing schedule in the Ninth Circuit Action. (Large Decl.,

8    Exhibit D.)

9        10.    On January 5, 2026 at 9:56 a.m., Trevor D. Large, counsel for Sable, sent an email

10    to counsel for Petitioners and Respondents providing notice of Sable's Ex Parte Application for

11    Order Shortening Time for the Court to hear this Motion for Reconsideration, and providing

12    counsel with the date, time, department, and requested briefing schedule. (Large Decl., ¶¶ 6-7.)

13        This motion is based on this Notice of Motion and Motion, the attached Memorandum of

14    Points and Authorities, the Declaration of J. Caldwell Flores in Support of Sable's Motion For

15    Reconsideration, the Declaration of Trevor D. Large in Support of Sable's Ex Parte Application

16    for Order Shortening Time, their exhibits, the concurrently lodged [Proposed] Order Rescinding

17    Preliminary Injunction, the record on file with the Court in this matter, and upon such further

18    evidence and argument as may be presented to the court at or before the hearing.

19

20    DATED: January 5, 2026                    Respectfully submitted,
                                                ALSTON & BIRD

21

22

23    By: _____    for

24                                                Jeffrey D. Dintzer

25                                                Attorneys for Real Parties in Interest
                                                SABLE OFFSHORE CORP. and
                                                PACIFIC PIPELINE COMPANY

26

27

28

REAL PARTIES IN INTERESTS NOTICE OF MOTION AND MOTION FOR RECONSIDERATION

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    INTRODUCTION**

3        Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (collectively

4    referred to herein as "Sable") move the Court to reconsider and rescind the July 29, 2025 Order

5    re: Preliminary Injunction (the "Preliminary Injunction") because new facts and circumstances

6    render the Preliminary Injunction moot. First, the Las Flores Pipeline has been designated as an

7    interstate pipeline under exclusive federal jurisdiction, and the California Office of the State Fire

8    Marshal ("OSFM") no longer has any regulatory authority. Second, the federal Pipeline and

9    Hazardous Materials Safety Administration ("PHMSA") has issued approvals authorizing the flow

10   of oil through the Las Flores Pipeline. Third, Petitioners in these consolidated actions have now

11   sought relief in the Court of Appeals for the Ninth Circuit challenging PHMSA's actions. Thus, the

12   basis for the Court's Preliminary Injunction—which was grounded in OSFM's regulatory authority

13   over the Las Flores Pipeline under the California Pipeline Safety Act—is now moot. In addition,

14   the Preliminary Injunction should be dissolved to avoid the risk of collateral disputes and

15   inconsistent directives across forums. As such, Sable respectfully requests that the Court rescind

16   the Preliminary Injunction.

17   **II.    FACTUAL BACKGROUND**

18       On July 29, 2025, the Court issued the Preliminary Injunction. Based on the Court's finding

19   that Petitioners had a likelihood of success on their state law claims under the California Pipeline

20   Safety Act, the Court enjoined the restart of Lines CA-324 and CA-325 "until 10 court days

21   following the filing and service of notice by or on behalf of real parties in interest . . . that Sable

22   has received all necessary approvals and permits for restarting the Las Flores Pipeline and that

23   Sable intends to commence such restart." (See July 29, 2025 Preliminary Injunction at 18.)

24       Lines CA-324 and CA-325 are portions of the Las Flores Pipeline,[1] and had been

25

26   _____

     [1] Lines CA-324 and CA-325 (formerly known as Lines 901 and 903) are portions of the Las Flores
     Pipeline, which also includes offshore pipelines transporting crude oil from the Outer Continental

27   Shelf and an onshore processing facility at Las Flores Canyon.

28   _____

1   considered intrastate since 2016 and thus subject to OSFM's regulatory oversight. (Declaration of

2   J. Caldwell Flores ["Flores Decl."], Ex. A, p. 1.) However, on December 17, 2025, PHMSA

3   determined that "the Las Flores Pipeline is an interstate pipeline" subject to PHMSA's exclusive

4   jurisdiction and notified "OSFM that the Las Flores Pipeline is subject to the regulatory oversight

5   by PHMSA." (*Id.*, pp. 2–3.)

6       On December 22, 2025, PHMSA approved the Restart Plan for Lines CA-324 and CA-325.

7   (See Flores Decl. Ex. B.) In approving the Restart Plan for Lines CA-324 and CA-325, PHMSA

8   reviewed Sable's Fill Plan and Startup Procedures, Linefill Positioning Plan Assignments, Line

9   Fill Contact List, and letters requesting removal of pressure restrictions for the Las Flores Pipeline.

10  (*Ibid.*) PHMSA also conducted field inspections with Sable to discuss process and safety

11  procedures for Restart. (*Ibid.*) PHMSA's letter confirms that its "approval is valid from the date of

12  [PHMSA's] letter." (*Ibid.*)

13      On December 23, 2025, PHMSA issued an Emergency Special Permit for Lines CA-324

14  and CA-325.[2] (See Flores Decl., Ex. C, p. 6.) Special permits are the federal equivalent of state

15  waivers, like those states waivers that were the subject of Petitioners' now moot challenge against

16  OSFM. This Emergency Special Permit takes the place of the State Waivers OSFM previously

17  issued. The OSFM State Waiver is no longer necessary because the Las Flores Pipeline is now

18  designated as an interstate pipeline. (Flores Decl., Ex. C, p. 6.)

19      In issuing the Emergency Special Permit, PHMSA "confirm[ed] that the special permit

20  conditions ensure that [Sable] has an ongoing program to locate and remediate safety threats" and

21  that "compliance with [permit] conditions . . . would provide an equivalent level of safety as

22  compliance with [federal regulations]." (Flores Decl., Ex. C, p. 6.) "The full set of conditions

23  imposed by the special permit sufficiently address the risk of a failure or release as a result of []

24  corrosion and provide an equivalent level of safety as compliance with [federal regulations],

25  ///

26  _____
    [2] A special permit is an order that waives or modifies compliance with a regulatory requirement if
27  the pipeline operator requesting it demonstrates the need and PHMSA determines that granting a
    special permit would be consistent with pipeline safety. (49 U.S.C. § 60118(c).)

28  _____7_____

1    demonstrating the expected environmental impacts of the action will not be significant." (*Id.*, p.

2    4.)

3        PHMSA further found that "[g]ranting this special permit is necessary to address the

4    emergency declared by the President in Executive Order 14156"[3] because "the special permit

5    would enable and facilitate the [Las Flores Pipeline] to meet regional energy demands, reduce

6    refinery feedstock prices, mitigate the risks of fuel shortages on the West Coast, and reduce United

7    States dependency on imported oil and the associated energy security risks of such

8    imports." (Flores Decl., Ex. C, p. 7.)

9        On December 24, 2025, recognizing that approval to flow oil through the pipeline is now

10    under federal jurisdiction, Petitioners filed an Emergency Motion for Stay Pending Appeal and a

11    Petition for Review in the United States Court of Appeals for the Ninth Circuit, seeking a stay,

12    pending appeal, of the issuance of PHMSA's Restart Approval and Emergency Special Permit.

13    (See Declaration of Trevor D. Large in Support of Ex Parte Application for Order Shortening Time

14    ["Large Decl."], Ex. D.) On December 25, 2025, Sable filed an Emergency Motion to Intervene.

15    (Large Decl., Ex. D.) On December 31, 2025, the Ninth Circuit granted Sable's Emergency Motion

16    to Intervene, denied Petitioners' Emergency Motion for Stay Pending Appeal, and set an expedited

17    briefing schedule in the Ninth Circuit Action. (Large Decl., Ex. D.)

18    **III.    LEGAL STANDARD**

19        Code of Civil Procedure section 1008 authorizes the Court to reconsider a prior ruling if it

20    finds there are new or different facts, circumstances, or law than those before the Court at the time

21    of the original ruling. Once the Court determines the existence of new or different facts,

22    circumstances, or law, it can either modify or affirm its prior decision. (*Corns v. Miller* (1986) 181

23    Cal.App.3d 195, 202.) Section 1008, subd. (a) provides: "When an application for an order has

24    been made to a judge, or to a court, and refused in whole ... any party affected by the order may,

25    within 10 days after service upon the party of written notice of entry of the order and based upon

26    ─────────────────────────
[3] Executive Order 14156, issued January 20, 2025, declares a national energy emergency and vests
27    federal agencies, including PHMSA, with authority to facilitate the identification, leasing, siting,
production, transportation, refining, and generation of domestic energy resources.

28

1  new or different facts, circumstances, or law, make application to the same judge or court that

2  made the order, to reconsider the matter and modify, amend, or revoke the prior order." The party

3  making the application shall state by affidavit (i) what application was made before, (ii) when and

4  to what judge, (iii) what order or decisions were made, and (iv) what new or different facts,

5  circumstances, or law are claimed to be shown. (Code Civ. Proc. § 1008, subd. (a).) To be entitled

6  to reconsideration, a party must show new or different facts and a satisfactory explanation for

7  failing to produce such evidence earlier. (*Kalivas v. Barry Controls Corp.* (1996) 49 Cal.App.4th

8  1152, 1160-61.)

9        Section 533 additionally allows the court to dissolve a preliminary injunction upon a

10  showing that "there has been a material change in the facts upon which the injunction or temporary

11  restraining order was granted, that the law upon which the injunction or temporary restraining

12  order was granted has changed, or that the ends of justice would be served by the modification or

13  dissolution of the injunction or temporary restraining order." (Code Civ. Proc., § 533.)

14  **IV.  ARGUMENT**

15        **A.  This Motion is Timely**

16        A motion for reconsideration must be filed within 10 days after the introduction of new or

17  different facts, circumstances, or law. (Code Civ. Proc § 1008, subd. (a).) Here, PHMSA

18  determined the Las Flores Pipeline is an interstate pipeline subject to PHMSA's exclusive

19  regulatory oversight and issued approvals for which Petitioners sought review in the Court of

20  Appeals for the Ninth Circuit. The Court of Appeals for the Ninth Circuit issued an order on

21  December 31, 2025 denying Petitioners' Emergency Motion for Stay Pending Appeal and setting

22  an expedited briefing schedule on Petitioners' Petition for Review. This motion follows within 10

23  days of those new or different facts. No entry of an order has been issued. Thus, this motion is

24  timely.

25        **B.  Material New Facts and Circumstances Warrant Reconsidering and**

26                **Rescinding the Preliminary Injunction**

27        New facts and circumstances warrant reconsideration of the Preliminary Injunction. The

28

1  Preliminary Injunction enjoins Sable from restarting Lines CA-324 and CA-325 of the Las Flores

2  Pipeline until it gives 10 days' notice that it received all necessary approvals and permits from

3  OSFM. (July 29, 2025 Order at 18.) With PHMSA's designation of the Las Flores Pipeline as an

4  interstate pipeline under its exclusive federal jurisdiction, OSFM no longer has regulatory

5  authority over Lines CA-324 and CA-325, or any portion of the Las Flores Pipeline. The basis for

6  this Court's Preliminary Injunction is therefore now moot, no legal justification exists to continue

7  the Preliminary Injunction, and Sable will be irreparably harmed if the Court does not rescind the

8  Preliminary Injunction. (Previously filed Declaration of Steve Rusch in Support of Opposition to

9  Application for Preliminary Injunction, filed July 8, 2025, ¶¶ 66–72.)

10  On December 17, 2025, PHMSA designated the Las Flores Pipeline as interstate and

11  subject to PHMSA's exclusive jurisdiction. (Flores Decl., Ex. A, p. 3.) PHMSA's determination

12  eliminates OSFM's jurisdiction over the Las Flores Pipeline, which only exercises jurisdiction

13  over *intrastate* pipelines. (*Ibid.*) Given PHMSA's determination that "*the Las Flores Pipeline is*

14  *an interstate pipeline,*" PHMSA notified "OSFM that the Las Flores Pipeline is subject to the

15  regulatory oversight of PHMSA." (*Ibid.*)

16  Since assuming federal jurisdiction over the Las Flores Pipeline, PHMSA has asserted

17  regulatory oversight over the Las Flores Pipeline. PHMSA approved Sable's Restart Plan for Lines

18  CA-324 and CA-325 on December 22, 2025 and issued an Emergency Special Permit on

19  December 23, 2025. (Flores Dec., Exs. B and C.) These approvals are in lieu of and render moot

20  the OSFM-issued State Waivers that are the subject of Petitioners' lawsuit and the Preliminary

21  Injunction. PHMSA specifically confirmed that "[t]he conditions ordered by OSFM in the two

22  state waivers are now being re-issued by PHMSA as a special permit subject to Federal oversight

23  and enforcement." (See Flores Dec., Ex. C, p. 6.)

24  Given the Las Flores Pipeline has now been designated an interstate pipeline under the

25  exclusive jurisdiction of PHMSA, the Court's Preliminary Injunction frustrates Sable's prompt

26  compliance with "the accomplishment of a federal objective" and "make[s] it impossible . . . to

27  comply with both state and federal law." (*Geier v. Am. Honda Motor Co.* (2000) 529 U.S. 861,

28

873-84.) The Supremacy Clause of the United States provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the Supreme law of the land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (U.S. Cons. Art. VI, cl. 2; *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 655 [noting that California courts are "duty-bound" to follow federal law].)

The Preliminary Injunction is also preempted. Conflict preemption arises when "it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." (*Silkwood v. Kerr-McGee Corp.* (1983) 464 U.S. 238, 248.) Where, as here, "compliance with both federal and state regulations is a physical impossibility," state law must immediately yield. (*Florida Lime & Avocado Growers, Inc. v. Paul* (1963) 373 U.S. 132, 142.) Preemption may be based on an Executive Order, such as the President's Executive Order 14156 issued on January 20, 2025, which is specifically referenced in PHMSA's findings supporting Sable's Emergency Special Permit. (See *Old Dominion Branch No. 496, National Ass'n of Letter Carriers, AFL-CIO v. Austin* (1974) 418 U.S. 264, 273.)

Moreover, given that PHMSA's approvals are now the subject of an appeal pending before the Ninth Circuit, the operation of the Preliminary Injunction increases the risk of collateral disputes and inconsistent directives across forums while the parties litigate parallel issues in federal proceedings. Recognizing the federal posture, Petitioners sought review of PHMSA's actions in the Court of Appeals for the Ninth Circuit by filing a Petition for Review and Emergency Motion for Stay Pending Appeal on December 24, 2025. (See Large Dec., Ex. D.) On December 31, 2025, the Court of Appeals for the Ninth Circuit granted Sable's Motion to Intervene, denied Petitioners' Emergency Motion for Stay Pending Appeal, and set an expedited briefing schedule on Petitioners' Petition for Review. (See Large Dec., Ex. D.) The parties are now actively litigating these issues in federal court on an abbreviated schedule.

///

1      The designation of the Las Flores Pipeline as an interstate pipeline under the exclusive

2  jurisdiction of PHMSA, PHMSA's approval of Sable's Restart Plan and issuance of the

3  Emergency Special Permit, and the pendency of the Ninth Circuit action all constitute material

4  new facts and circumstances that warrant reconsidering and rescinding the Preliminary Injunction

5  pursuant to Code of Civil Procedure sections 1008 and 533.

6  **V.    CONCLUSION**

7      For the foregoing reasons, Sable respectfully requests that this Court reconsider and rescind

8  the Preliminary Injunction.

9

10  DATED: January 5, 2025           Respectfully submitted,

11                            ALSTON & BIRD, LLP

12

                      By: _____  **for**

13                          Jeffrey D. Dintzer

14

                          Attorneys for Real Parties in Interest

15                          SABLE OFFSHORE CORP. and PACIFIC
                          PIPELINE COMPANY

16

17

18

19

20

21

22

23

24

25

26

27

28
                                   12

1

## PROOF OF SERVICE

2      I am a resident of the State of California, over the age of eighteen, and not a party to the
within action. My business address is 820 State Street, 4th Floor, Santa Barbara, CA 93101. On
3  January 5, 2026, I served the within document:

4

5  **REAL PARTIES IN INTEREST SABLE OFFSHORE CORP. AND PACIFIC
PIPELINE COMPANY'S NOTICE OF MOTION AND MOTION FOR**
6  **RECONSIDERATION; MEMORANDUM OF POINTS AND AUTHORITIES**

7

8      By Mail: By placing the document(s) listed above in a sealed envelope with postage
thereon fully prepaid, in the United States mail at Santa Barbara, addressed as set forth below.
9
        I am readily familiar with the firm's practice of collection and processing correspondence
10  for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same
day with postage thereon fully prepaid in the ordinary course of business. I am aware that on
11  motion of the party served, service is presumed invalid if postage cancellation date or postage
meter date is more than one day after the date of deposit for mailing in affidavit.
12
        By Hand Delivery: By personally delivering the document(s) listed above to the person(s)
13  at the address(es) set forth below.

14      By Overnight Delivery: I enclosed the document(s) in an envelope or package provided by
an overnight delivery carrier and addressed to the persons at the address(es) set forth below. I
15  placed the envelope or package for collection and overnight delivery at an office or a regularly
utilized drop box of the overnight delivery carrier.
16
     X  By Electronic Mail: I caused said document(s) to be transmitted to the email address(es) of
17  the addressee(s) designated below.

18
     **SEE ATTACHED SERVED LIST**
19

20      I declare under penalty of perjury under the laws of the State of California, that the above is
true and correct.
21
        Executed on January 5, 2026, at Santa Barbara, California.
22

23

24                        *Marina L. Ratliff*
                        Marina L. Ratliff
25

26

27

28

LEGAL02/47827721v3

1

2

3

4

**SERVICE LIST**

| | |
|---|---|
| Jeffrey D. Dintzer<br>Garrett B. Stanton<br>**ALSTON & BIRD, LLP**<br>350 South Grand Avenue, 51st Floor<br>Los Angeles, CA 90071<br>Tel: (213) 576-1000<br>Fax: (213) 576-1100<br>Jeffrey.Dintzer@alston.com<br>Garrett.Stanton@alston.com | *Attorneys for Real Parties in Interest:*<br>*Sable Offshore Corp. and Pacific*<br>*Pipeline Company* |
| Julie Teel Simmonds, Esq.<br>David Pettit, Esq.<br>Talia Nimmer, Esq.<br>Center for Biological Diversity<br>2011 Franklin Street, Suite 375<br>Oakland, CA 94612<br>Tel.: (510) 844-7100<br>Fax: (510) 844-7150<br>jteelsimmonds@biologicaldiversity.org<br>dpettit@biologicaldiversity.org<br>tnimmer@biologicaldiversity.org | *Attorneys for Petitioners: Center for*<br>*Biological Diversity and Wishtoyo*<br>*Foundation* |
| Duncan Joseph Moore<br>Benjamin J. Hanelin<br>Natalie C. Rogers<br>**PAUL HASTINGS**<br>1999 Avenue of Stars, 27th Floor<br>Century City, CA 90067<br>Tel: (310) 620-5879<br>Fax: (310) 620-5899<br>djmoore@paulhastings.com<br>benjaminhanelin@paulhastings.com<br>natalierogers@paulhastings.com | *Attorneys for Real Parties in Interest:*<br>*Sable Offshore Corp. and Pacific*<br>*Pipeline Company* |
| Trevor D. Large (SBN: 214886)<br>Victoria C. Diffenderfer (SBN: 350018)<br>**FAUVER LARGE ARCHBALD &**<br>**SPRAY**<br>820 State Street, 4th Floor<br>Santa Barbara, CA 93101<br>Tel: (805) 966-7000<br>Fax: (805) 966-7227<br>tlarge@flasllp.com<br>vdiffenderfer@flasllp.com | *Attorneys for Real Parties in Interest:*<br>*Sable Offshore Corp. and Pacific*<br>*Pipeline Company* |

LEGAL02/47827721v3

| Linda Krop, Esq.<br>Jeremy M. Frankel, Esq.<br>Tara C. Rengifo, Esq.<br>ENVIRONMENTAL DEFENSE<br>CENTER<br>906 Garden Street<br>Santa Barbara, CA 93101<br>Tel: (805) 963-1622; (510) 844-7100<br>Fax: (805) 962-3152; (510) 844-7150<br>lkrop@environmentaldefensecenter.org<br>jfrankel@environmentaldefensecenter.org<br>trengifo@environmentaldefensecenter.org | *Attorneys for Petitioners:*<br>*Environmental Defense Center, a*<br>*California non-profit corporation; Get*<br>*Oil Out!, a California non-profit*<br>*corporation, Santa Barbara County*<br>*Action Network, a California non-*<br>*profit corporation, Sierra Club, a*<br>*national non-profit corporation, and*<br>*Santa Barbara Channelkeeper, a*<br>*California non-profit corporation* |
|---|---|
| Michael S. Dorsi, Esq.<br>California Attorney General's Office<br>55 Golden Gate Ave, Ste 11000<br>San Francisco, CA 94102<br>Tel.: (415) 510-3802<br>Michael.dorsi@doj.ca.gov | *Attorneys for*<br>*Respondents/Defendants: California*<br>*Department of Forestry and Fire*<br>*Protection, Office of the State Fire*<br>*Marshal, Daniel Berlant (in his*<br>*official capacity as State Fire*<br>*Marshal)* |

LEGAL02/47827721v3

## DECLARATION OF SERVICE BY E-MAIL

**Case Name:**    Pacific Pipeline Company, A Delaware Corporation v. State of California

**Case Number:**    BCV25103508

**Party Represented:**    State of California

**Declaration of Electronic Service**

1. I am at least 18 years of age and not a party to this matter.

2. I am employed in the Office of the Attorney General of the State of California. My business address is 1300 I Street, Suite 125, Sacramento, CA 95814, County of Sacramento.

3. My electronic service address is Valerie.Tamulevich@doj.ca.gov.

4. On January 27, 2026, I electronically served the following document[s]:

   **SUPPLEMENTAL DECLARATION OF BRANDON S. WALKER IN SUPPORT OF STATE OF CALIFORNIA'S REPLY TO PACIFIC PIPELINE'S RESPONSE IN OPPOSITION TO MOTION TO CHANGE VENUE**

5. I electronically served the aforementioned document[s] by emailing them to the following individual[s]:

<div align="center">

**PLEASE SEE ATTACHED SERVICE LIST**

</div>

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct, and that this declaration was executed on January 27, 2026.

| Valerie A. Tamulevich | /s/ Valerie A. Tamulevich |
|:---:|:---:|
| Declarant | Signature |

## SERVICE LIST

Jeffrey Dintzer
Garrett B. Stanton
ALSTON & BIRD
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
**E-mail Address**: jeffrey.dintzer@alston.com
**E-mail Address**: garrett.stanton@alston.com

Benjamin J. Hanelin
Natalie C. Rogers
PAUL HASTINGS LLP
1999 Avenue of the Stars, 27th Floor
Century City, CA 90067
**E-mail Address**: benjaminhanelin@paulhastings.com
**E-mail Address**: natalierogers@paulhastings.com

SA2025306665
39601922.docx

ELECTRONICALLY FILED
Superior Court of California,
County of Kern
By: Gricelda Evans
Deputy Clerk
02/9/26 5:49 PM

1  **ALSTON & BIRD LLP**
   JEFFREY D. DINTZER, SBN 139056
2  jeffrey.dintzer@alston.com
   GARRETT B. STANTON, SBN 324775
3  garrett.stanton@alston.com
   350 South Grand Avenue, 51st Floor
4  Los Angeles, CA 90071-1410
   Telephone:    (213) 576-1000
5  Facsimile:    (213) 576-1100

6  **PAUL HASTINGS LLP**
   BENJAMIN J. HANELIN, SBN 237595
7  benjaminhanelin@paulhastings.com
   NATALIE C. ROGERS, SBN 301254
8  natalierogers@paulhastings.com
   1999 Avenue of the Stars, 27th Floor
9  Century City, California, 90067
   Telephone:    (310) 620-5879
10 Facsimile:    (310) 620-5899

11 Attorneys for Plaintiff
   PACIFIC PIPELINE COMPANY

12

13                    **SUPERIOR COURT OF CALIFORNIA**

14                          **COUNTY OF KERN**

15                       **METROPOLITAN DIVISION**

16

   PACIFIC PIPELINE COMPANY,          | Case No. BCV-25-103508
17
              Plaintiff,              | **PACIFIC PIPELINE COMPANY'S**
18                                    | **CORRECTED NOTICE OF RULING**
        v.                            | **REGARDING STATE OF**
19                                    | **CALIFORNIA'S MOTION TO**
   STATE OF CALIFORNIA and DOES 1     | **CHANGE VENUE**
20 through 25,
                                      | Date:      February 3, 2026
21            Defendants.             | Time:      8:30 a.m.
                                      | Dept.      H
22                                    | Judge:     Hon. Bernard C. Barmann, Jr.

23                                      Action Filed: September 29, 2025

24

25

26

27

28

                                   - 1 -

**TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on February 3, 2026, the Court held a hearing concerning Defendant State of California's ("Defendant") Motion to Change Venue ("Motion"). During that hearing, Plaintiff Pacific Pipeline Company ("Plaintiff") was ordered to give notice of the Court's rulings, which follow:

1. Defendant's Motion is denied;

2. Plaintiff's Request for Judicial Notice is granted; and

3. Defendant may file a responsive pleading within 30 days of the Court's February 3, 2026 Ruling.

Attached as **Exhibit A** and incorporated by reference is a true and correct copy of the Court's February 3, 2026, Minute Order, which reflects the foregoing rulings.

Dated: February 9, 2026                Respectfully submitted,

**ALSTON & BIRD**
JEFFREY D. DINTZER
GARRETT B. STANTON

**PAUL HASTINGS LLP**
BENJAMIN J. HANELIN
NATALIE C. ROGERS


By: _____
                        Jeffrey D. Dintzer

Attorneys for Plaintiff PACIFIC PIPELINE COMPANY

- 2 -

NOTICE OF RULING REGARDING MOTION TO CHANGE VENUE

# EXHIBIT A



# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF KERN

### Minute Order

Date: February 3, 2026        Time: 8:30 AM        Location: Division H

**Case Number: BCV25103508**

**PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION**
　　　　**Plaintiff/Petitioner**
　　v.
**STATE OF CALIFORNIA**
　　　　**Defendant/Respondent**

| | | | |
|---|---|---|---|
| Judicial Officer: | Bernard C. Barmann, Jr | Clerk: | Daisy Ayon Vallarta |
| Court Reporter: | Susan Wood | Finalized by: | Daisy Ayon Vallarta |

**Nature of Proceedings: Motion to change venue; filed by Defendant State of California**

Case called at: 09:17 AM

Appearances:

Attorney, Garrett Stanton is present on behalf of Plaintiff, PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION.

Attorney, Jeffrey Dintzer is present on behalf of Plaintiff, PACIFIC PIPELINE COMPANY, A DELAWARE CORPORATION.

Attorney, Brandon Sheldon Walker is appearing remotely on behalf of Defendant, STATE OF CALIFORNIA.

The Court appoints Susan Wood from the Pro Tempore list as the Official Court Reporter for today's proceedings.

Certified shorthand reporter provided their full name and license number pursuant to the Business and Professions Code 8016.

The Court announces a tentative decision.

Matter is argued and submitted by counsel.

The Court makes the following findings and orders:

Defendant's Motion to change venue is denied.

Discussion

(A) Whether venue is proper in Sant Barbara County

Defense arguments. Defendants argue that the current action alleges a dispute regarding the

potential application of SB 237 to the Las Flores Pipelines. The majority of the pipelines are in Santa Barbara County. And the specific issue is whether the Las Flores Pipelines can be considered "idled, inactive, or out of service for five years or more," which would require that a spike hydrostatic test be performed on the pipelines and a new coastal development permit be obtained before the transportation of oil through the pipelines can be resumed. (Complaint ¶¶ 39, 40, 53.) Accordingly, there are two distinct aspects of Pacific Pipeline's attack on SB 237, one related to the stress hydrostatic test requirement and the other related to the coastal development permit requirement.

Defendant argues this leaves the attack on SB 237 related to the coastal development permit requirement. A coastal development permit is only required for development within the Coastal Zone. (Pub. Resources Code § 30600, subd. (a).) The Coastal Zone is delineated on detailed maps adopted by the Commission, but in general it extends inland about 1,000 yards from the mean high tide line. (Pub. Resources Code, § 30103, subd. (a).) No part of Kern County is within the Coastal Zone.

Plaintiff's arguments

Pacific argues that California Code of Civil Procedure Section 392 establishes proper venue for actions concerning real property. Under Section 392, venue is proper "in the superior court [of] the county where the real property that is the subject of the action, or some part thereof, is situated." (See also 50 Cal. Forms of Pleading & Practice, Annotated (2021) § 571.17 [citing Goldtree v. McAllister (1890) 86 Cal. 93, 106] [explaining that, under the relevant section, venue is proper "in any county in which any part of real property is situated"].) Real property includes all that is "affixed to land." (Civ. Code § 658.) Property is affixed to land when that property is "imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or permanently attached to what is permanent, by means of cement, plaster, nails, bolts or screws." (Civ. Code § 660.)

Pacific argues that the State concedes, "it is reasonable to assume that much of the [Santa Ynez Pipeline System's segments] are attached to land." (Mot. at 15, n.7.) Recognizing that Section 392 "may be appropriately applied here," the State cannot escape that significant portions of the Santa Ynez Pipeline System, including Segment CA-325's delivery point, are situated in Kern County and affixed to the land here. On that basis alone, venue is proper.

Segment CA-325 in Kern County—which could be inoperable if SB 237 applied—and focusing on Santa Barbara County's issuance of Coastal Development Permits within the Coastal Zone. This fact suggests that venue would be proper in Kern County under CCP § 392 which states, (a) Subject to the power of the court to transfer actions and proceedings as provided in this title, the superior court in the county where the real property that is the subject of the action, or some part thereof, is situated, is the proper court for the trial of the following actions:
(1) For the recovery of real property, or of an estate or interest therein, or for the determination in any form, of that right or interest, and for injuries to real property.
(2) For the foreclosure of all liens and mortgages on real property.
(b) In the court designated as the proper court in subdivision (a), the proper court location for trial of a proceeding for an unlawful detainer, as defined in Section 1161, is the location where the court tries that type of proceeding that is nearest or most accessible to where the real property that is the subject of the action, or some part thereof, is situated. Otherwise any location of the

superior court designated as the proper court in subdivision (a) is a proper court location for the trial. The court may specify by local rule the nearest or most accessible court location where the court tries that type of case.

CCP § 392

It appears that significant portions of the Santa Ynez Pipeline System, including Segment CA-325's delivery point, are situated in Kern County and affixed to the land here.

However, the State challenges this by arguing that Pacific ignores the actual location of the property that is the subject of the action, which is Pipeline CA-324 located in Santa Barbara County, and instead consider portions of a different pipeline, Pipeline CA-325 within Kern County, that may indirectly feel the effects of regulation over Pipeline CA-324.

The State further contends the only possible effect that SB 237 could have on property located within Kern County relates to SB 237's stress hydrostatic testing requirements, which are either already required by the State Waivers, or preempted in light of PHMSA's alleged assumption of jurisdiction over the pipelines. Again, that leaves only the claims regarding the coastal development permit requirements, which only apply to Pipeline CA-324. Pipeline CA-324 is a separate and distinct pipeline. It is the only pipeline that is properly the subject of this action. And it is wholly located in Santa Barbara County.

Merits argument

Pacific argues that the State's motion raises premature merits arguments. In their motion, the State argued that the claim regarding the stress hydrostatic test requirement, however, is moot and nonjusticiable because that same test is already required for the Las Flores Pipelines by the State waivers. (Complaint ¶¶ 29, 34-35 [consent decree requires compliance with approved State waivers]; Walker Dec. Exs. E [State waiver requiring a spike hydrostatic test], F [same].) A claim is moot, and non-justiciable, if the court cannot grant any effectual relief. (Wilson & Wilson v. City Council of Redwood City (2011) 191 Cal.App.4th 1559, 1574.) Here, even if the Court were to determine that the spike hydrostatic test requirement in SB 237 does not apply to the Las Flores Pipelines, that would be an academic exercise as the Court cannot relieve Pacific Pipeline of that same requirement in the State waivers.

Pacific contends mootness and justiciability are legal questions about the merits of a cause of action. They have no bearing on venue. (See County of San Bernardino v. Superior Court (1994) 30 Cal.App.4th 378 [explaining that courts cannot transfer venue based on substantive considerations but must adhere to the statutory scheme]; McCarthy v. Superior Court (1987) 191 Cal.App.3d 1023 [holding that trial judges cannot make rulings on the substance of a plaintiff's action while venue is in question].)

Pacific argues that the testing requirements under SB 237 impose different liabilities than those under the State Waivers. As one example, SB 237 violations of the Elder California Pipeline Safety Act of 1981 constitute a crime. (SB 237 Legislative Digest, Filed with Secretary of State September 19, 2025 at (2) [explaining that "[a]ny violation" of the provision at issue "would constitute a crime"].) Under SB 237, the Act now prohibits the restart of an existing oil pipeline that is six inches or larger that has been idle, inactive, or out of service for five years or more

without passing a hydrostatic testing program that meets the requirements established by the State Fire Marshal. Any violation of that provision would constitute a crime, potentially imposing more severe liabilities on Plaintiff than could be imposed under the State Waivers.

In their reply, the State argues that the mootness of Plaintiff's claims pertaining to Pipeline CA-325 can be considered at this time because they are glaring, defective, and beyond correction. Indeed, Plaintiff also argues that those same claims are moot because they are preempted by PHMSA's orders. Although the State and OSFM are challenging those orders, Plaintiff confirms that the claims regarding the portion of Pipeline CA-325 in Kern County are moot, one way or another.

The State further argues that Plaintiff argues that SB 237 imposes different liabilities than the State Waivers. (Response to Motion, p. 12.) But whether or not SB 237 adds or changes the nature of liability is irrelevant to a motion to change venue that is based on where the property, which is the subject of the action, is located. (Code of Civil Proc., § 392.) On one hand, Plaintiff must comply with the State Waivers before it can restart the pipelines. If, on the other hand, OSFM lacks jurisdiction or authority as Plaintiff now alleges, then the stress hydrostatic testing aspect of SB 237 would not apply, and venue is still proper only in Santa Barbara County.

All of these arguments assess the merits of the underlying claim which are not proper on motion to change venue. It appears that the State's argument summarily contends the only possible effect that SB 237 could have on property located within Kern County relates to SB 237's stress hydrostatic testing requirements. The State concludes that these are either already required by the State Waivers, or preempted in light of PHMSA's alleged assumption of jurisdiction over the pipelines. To reach this result, we are required to go to the substance of Plaintiff's claims, not whether venue is proper in Kern County.

(B) Whether (alternatively) this case should be transferred to the superior court for Santa Barbara County for the convenience of nonparty witnesses and the ends of justice

Defendant argues that both the Commission and OSFM are already participating in litigation involving the Las Flores Pipelines in the Superior Court for Santa Barbara County. (Sable Offshore Corp., et al. v. California Coastal Commission [Santa Barbara Super. Ct., Case No. 25CV00974]; Center for Biological Diversity, et al. v. California Department of Forestry and Fire Protection, et al. [Santa Barbara Super. Ct., Case No. 25CV02244]; Environmental Defense Center, et al. v. California Department of Forestry and Fire Protection, et al. [Santa Barbara Super. Ct., Case No. 25CV02247].) And although they are not named parties, they may also be required to participate in the additional litigation involving the Las Flores Pipelines pending in Santa Barbara County. (People of the State of California ex rel. Central Coast Regional Water Quality Board v. Sable Offshore Corp. [Santa Barbara Super. Ct., Case No. 25CV06285]; People of the State of California v. Sable Offshore Corporation [Santa Barbara Super. Ct., Case No. 25CR07677]. It would be inconvenient for the Commission or OSFM to also be required to participate as nonparty witnesses in litigation involving the Las Flores Pipelines in Kern County too.

Defendant contends additionally, most of the work for restarting the pipelines, and the potential impacts of doing so will be felt in Santa Barbara County. (See D. Venue, Cal. Prac. Guide Civ. Pro. Before Trial Ch. 3-D [ends of justice includes permitting view of the scene or making other

material evidence available].) Indeed, the oil spill that led to the idling of the Las Flores Pipelines occurred in Santa Barbara County.

Pacific argues that this case is not an environmental damages action requiring on-site fact-finding. It is a declaratory action on asking the court to interpret SB 237's terms and evaluate certain evidence regarding the pipeline's operational history, which does not depend on venue location in any particular county. Instead, the Court will be interpreting SB 237's terms ("idle," "inactive," etc.), considering the impact of PHMSA regulations on such interpretation, and evaluating certain evidence regarding the pipeline's operational history. These tasks do not depend on any judge's personal observation of Santa Barbara geography or conditions. The prior oil spill and coastal resources are part of the background context, but they are undisputed historical facts that can be presented through the record. A venue change to Santa Barbara would thus yield no improvement in access to proof or justice; it would only shift the forum away from a county with a concrete connection to the case and a significant interest in its outcome.

Here, Pacific's argument is persuasive. Pacific argues that a motion to transfer venue for the convenience of witnesses and the ends of justice is premature before an answer is filed. Pacific cites to Easton v. Superior Court (1970) 12 Cal.App.3d 243 where the Court states, (1) The matter of convenience of witnesses was not properly before the court, because Schneider Bros. had not filed its answer. Only then could the court ascertain what the issues and the evidence relating to those issues would be. Before the answer is filed, the court cannot determine whether the witnesses whose convenience is involved have material testimony to offer (Cook v. Pendergast, 61 Cal. 72; Pearson v. Superior Court, 199 Cal.App. 2d 69, 75 [18 Cal.Rptr. 578]). (2) "It is a long established rule that a motion for change of venue must satisfy two requirements: (1) It must be *246 shown the action is proper in the county to which the movant seeks transfer; and (2) it must be shown the county in which the action was filed was improper under any applicable theory (Citation)." (La Mirada Community Hospital v. Superior Court, 249 Cal.App.2d 39, 42 [57 Cal.Rptr. 42].) Neither requirement was satisfied here. (Id. at 245–246)

Currently, no answer has been filed.

Conclusion

The motion is denied. Pacific's request for judicial notice is granted.

Defendant may file a responsive pleading within 30 days.

The Court deems the minute order to be the Order After Hearing.

The Counsel for Plaintiff(s) shall provide notice of the court's ruling.

1

**PROOF OF SERVICE**

2

I, Kim Niz, declare:

3

I am employed in the County of Los Angeles, State of California. I am over the age of 18

4

and not a party to the within action. My business address is Alston & Bird LLP, 350 South

5

Grand Avenue, 51st Floor, Los Angeles, California 90071.

6

On February 9, 2026, I served the document **PACIFIC PIPELINE COMPANY'S**

7

**CORRECTED NOTICE OF RULING REGARDING STATE OF CALIFORNIA'S**

**MOTION TO CHANGE VENUE** on the interested parties in this action addressed as follows:

8

**See Attached Service List**

9

10

**I.**    ☒    BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

11

12

I declare under penalty of perjury under the laws of the State of California that the above

13

is true and correct.

14

Executed on February 9, 2026, at Los Angeles, California.

15

16

/s/ *Kim Niz*

_____

Kim Niz

17

18

19

20

21

22

23

24

25

26

27

NOTICE OF RULING REGARDING MOTION TO CHANGE VENUE

28

1

**Pacific Pipeline Company v. State of California, et al.**
**Case No. BCV-25-103508**
**Service List**

2

3  Brandon Walker
   Jack C. Nick
4  Isabella A. Panuccini
   1300 I Street, Suite 125
5  Sacramento, CA 95814
   Telephone: (916) 210-6395
6  Fax: (916) 327-2319
   Brandon.Walker@doj.ca.gov
7  Jack.Nick@doj.ca.gov
   Isabella.Panuccini@doj.ca.gov
8

9  *Attorneys for Defendant*
   State of California

10

11 PAUL HASTINGS LLP
   BENJAMIN J. HANELIN, SBN 237595
12 benjaminhanelin@paulhastings.com
   NATALIE C. ROGERS, SBN 301254
13 natalierogers@paulhastings.com
   1999 Avenue of the Stars, 27th Floor
14 Century City, California, 90067
   Telephone: (310) 620-5879
15 Facsimile: (310) 620-5899

16
   *Attorneys for Plaintiff*
17 PACIFIC PIPELINE COMPANY

18

19

20

21

22

23

24

25

26

27

NOTICE OF RULING REGARDING MOTION TO CHANGE VENUE

28