# EXHIBIT H

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:    (213) 576-1000
Facsimile:    (213) 576-1100

**PAUL HASTINGS LLP**
BENJAMIN J. HANELIN, SBN 237595
benjaminhanelin@paulhastings.com
NATALIE C. ROGERS, SBN 301254
natalierogers@paulhastings.com
1999 Avenue of the Stars, 27th Floor
Century City, California, 90067
Telephone:    (310) 620-5879
Facsimile:    (310) 620-5899

Attorneys for Plaintiff
PACIFIC PIPELINE COMPANY

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

## METROPOLITAN DIVISION

| | |
|---|---|
| PACIFIC PIPELINE COMPANY, a Delaware corporation,<br><br>                  Plaintiffs,<br><br>        v.<br><br>STATE OF CALIFORNIA, a state government; CALIFORNIA COASTAL COMMISSION, a state agency; CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, a state agency; OFFICE OF THE STATE FIRE MARSHAL, a state agency; DANIEL BERLANT, in his official capacity as State Fire Marshal and DOES 1 through 25, inclusive,<br><br>                  Defendants. | Case No. 1:26-CV-01486-KES-CDB<br><br>(*Originally filed as Case No. BCV-25-103508*)<br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY RELIEF AND INJUNCTIVE RELIEF, CONSTITUTIONAL VIOLATIONS, INVERSE CONDEMNATION, AND DAMAGES** |

- 1 -
SECOND AMENDED COMPLAINT

Plaintiff Pacific Pipeline Company brings this Second Amended Complaint for Declaratory Relief and Injunctive Relief, Constitutional Violations, Inverse Condemnation Damages, and Prospective Injunctive Relief against Defendants the State of California, California Coastal Commission, California Department of Forestry and Fire Protection, Office of State Fire Marshal, and Daniel Berlant (collectively, "Defendants"). By this pleading, Plaintiff Pacific Pipeline Company alleges as follows:

**INTRODUCTION**

1.     Sable Offshore Corp. ("Sable") operates an interconnected pipeline facility known as the Santa Ynez Pipeline System, which includes both offshore and onshore components. Two onshore segments of this System are known as Segments CA-324 and CA-325, sometimes referred to as the Las Flores Pipeline, which are owned by Pacific Pipeline Company. Portions of Segments CA-325 are located in Kern County, San Luis Obispo County, and an unincorporated area of the County of Santa Barbara ("County"), including portions both inside and outside the Coastal Zone. Other onshore portions of the Santa Ynez Pipeline System, including Segment CA-324, are located in Santa Barbara County and within the Coastal Zone.

2.     Sable is the lessee and operator of federal offshore oil and gas leases in federal waters off the coast of California that form the Santa Ynez Unit. Offshore pipeline segments (the "Offshore Pipeline Segments") transport oil from this offshore field to intermediate onshore processing facilities at Las Flores Canyon (the "LFC Facilities"), and Segments CA-324 and CA-325 transport oil from the LFC Facilities to Gaviota and Pentland Stations and further downstream. Sable operates the Offshore Pipeline Segments, the LFC Facilities, and Segments CA-324 and CA-325 as part of the integrated Santa Ynez Pipeline System, which moves crude oil from offshore waters into and through California. Sable acquired the Santa Ynez Unit, the Offshore Pipeline Segments, the LFC Facilities and Pacific Pipeline Company in February 2024.

3.     Since that time, Sable and Pacific Pipeline Company have worked with federal and state agencies toward resuming petroleum transportation through the entirety of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325. This has involved the

SECOND AMENDED COMPLAINT

performance of repair and maintenance work on all components of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325.

4.    On September 13, 2025, the California Legislature adopted Senate Bill ("SB") 237.

5.    Among other things, SB 237 adds Section 51014.1 of the Government Code, which provides that "[a]ny existing oil pipeline that is six inches or larger that has been idle, inactive, or out of service for five years or more, shall not be restarted without passing a spike hydrostatic testing program."

6.    SB 237 also amends Section 30262 of the California Coastal Act to require a person to obtain a new coastal development permit ("CDP") for the "[r]epair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more."

7.    SB 237 does not define "idled, inactive, or out of service."

8.    On September 19, 2025, Governor Gavin Newsom signed SB 237 into law.

9.    Defendants have taken the position that Segments CA-324 and CA-325 have been idled, inactive, or out of service for five years or more. Pacific Pipeline Company disagrees. The entire Santa Ynez Pipeline System—including Segments CA-324 and CA-325—is active. The Segments are not idle nor out of service. In fact, the entire Pipeline System has retained its active status under state and federal law since 2015. More recently, Pacific Pipeline Company and Sable have been diligently performing necessary work on Segments CA-324 and CA-325 to resume petroleum transportation through them. Under all relevant and applicable meanings of the words, the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, is not idle, inactive, or out of service.

10.    On December 17, 2025, the Pipeline and Hazardous Materials Safety Administration ("PHMSA") determined the Santa Ynez Pipeline System is an interstate pipeline under its exclusive pipeline safety jurisdiction. In making its determination, PHMSA confirmed the Santa Ynez Pipeline System is considered an "active" pipeline. Since assuming jurisdiction

SECOND AMENDED COMPLAINT

over the Santa Ynez Pipeline System, PHMSA approved Sable's Restart Plan for Segments CA-324 and CA-325 on December 22, 2025 and issued Sable an Emergency Special Permit with respect to Segments CA-324 and CA-325 on December 23, 2025.

11.    On February 18, 2026, the California Coastal Commission sent a correspondence to Sable indicating that it has "independent authority over any resumption of use of [Segments CA-324 and CA-325]" and will require Pacific Pipeline Company to "apply for and receive a CDP from the Commission that meets the standards of Section 30262" as amended by SB 237. Feb. 18, 2026 Letter from California Coastal Commission to Sable, attached hereto as Exhibit E.

12.    On March 13, 2026, the Secretary of Energy, pursuant to the powers delegated to him from the President of the United States, commanded Sable and Pacific Pipeline Company to immediately commence the flow of oil through the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, pursuant to the Defense Production Act, 50 U.S.C §§ 4501 et seq. (the "DPA Order"). Exhibit F.

13.    On March 16, 2026, State Fire Marshal Berlant notified Sable that "OSFM reserves all rights to enforcement action if operations on Lines 324 and/or 325 re-commence without a valid State Waiver" issued by OSFM. March 16, 2026, Letter to DJ Moore, attached hereto as Exhibit I.

14.    On March 19, 2026, the California Coastal Commission, sent a further correspondence to Sable explaining its position that "[a]s of January 1, 2026, the Pipelines had been idled, inactive, and out of service for more than five years," and "Sable has not obtained a new Coastal Development Permit for reactivation of the Pipelines. Thus, any reactivation of the Pipelines is unpermitted development and would be grounds for further enforcement action by the Commission." March 19, 2026, Letter to Steve Rusch, attached hereto as Exhibit H.

15.    An actual and present controversy exists between Pacific Pipeline Company and Defendants concerning their respective rights and duties regarding the Santa Ynez Pipeline System's status, and the applicability of SB 237 to Segments CA-324 and CA-325 in light of

SECOND AMENDED COMPLAINT

PHMSA's assumption of jurisdiction over the Santa Ynez Pipeline System and the issuance of the DPA Order.

16.    Consequently, Pacific Pipeline Company seeks a judicial declaration from this Court that the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, is not idle, inactive, or out of service as those terms are used in SB 237.

17.    Pacific Pipeline Company seeks injunctive relief and a judicial declaration from this Court that: 1) the application of SB 237 as to the Santa Ynez Pipeline System is preempted by the Federal Pipeline Safety Act; and 2) the application of SB 237 as to the Santa Ynez Pipeline System is preempted by the DPA Order.

18.    Further, Pacific Pipeline Company seeks additional declaratory relief and/or damages on the grounds that the enforcement or threatened enforcement of SB 237 constitutes:

    a.   a violation of Pacific Pipeline Company's due process rights under Article I, Section 7 of the California Constitution and the Fourteenth Amendment to the United States Constitution;

    b.   a violation of Pacific Pipeline Company's equal protection rights under Article I, Section 7 of the California Constitution and the Fourteenth Amendment to the United States Constitution;

    c.   a bill of attainder in violation of Article I, Section 9, of the California Constitution and Article I, Section 9, Clause 3 or Article I, Section 10, Clause 1, of the United States Constitution;

    d.   an impairment of Pacific Pipeline Company's vested rights; and

    e.   a temporary and permanent taking of Pacific Pipeline Company's private property for public use without prior compensation in violation of Article I, Section 19 of the California Constitution and the Takings Clause of the Fifth Amendment of the United States Constitution, as incorporated by the Fourteenth Amendment.

SECOND AMENDED COMPLAINT

19.    In pursuing this action, which involves enforcement of important rights affecting the public interest, Pacific Pipeline Company will confer a substantial benefit on the general public, citizens of the County of Kern, and the State of California, and therefore will be entitled to attorneys' fees and costs pursuant to Code of Civil Procedure section 1021.5 and section 1988, title 42, of the United States Code. In addition, Pacific Pipeline Company will be entitled to recover attorneys' fees and costs as part of its claim for inverse condemnation pursuant to Code of Civil Procedure section 1036.

## THE PARTIES

20.    Plaintiff Pacific Pipeline Company is a Delaware Corporation and does business in Kern County, California. Pacific Pipeline Company owns Segments CA-324 and CA-325, which are critical portions of the Santa Ynez Pipeline System.

21.    Pacific Pipeline Company is a "person interested under a statute" within the meaning of Code of Civil Procedure § 1060, because Pacific Pipeline Company's rights and obligations under SB 237 are directly at issue in this action.

22.    Defendant State of California is the government entity responsible for enacting and enforcing the laws of the State of California, with the capacity to sue and be sued. The State of California must comply with the State and United States Constitutions. SB 237 is an act of the State itself, through the state Legislature, and the provisions of SB 237 impose duties on state agencies, state officials, and the Legislature to carry out and enforce its provisions, including the provision marking "[a] violation of the act is a crime."

23.    Defendant California Coastal Commission is a "Commission of the State of California established by voter initiative in 1972 (Proposition 20) and later made permanent by the Legislature through adoption of the California Coastal Act of 1976." Specifically, the California Coastal Commission is "an independent, quasi-judicial state agency[,]" "[u]nder California's federally-approved Coastal Management Program[] [that] manages development

- 6 -
SECOND AMENDED COMPLAINT

along the California coast except for San Francisco Bay[.]"[1] The California Coastal Commission has the capacity to sue and be sued.

24.    Defendant California Department of Forestry and Fire Protection is a political division of the State of California, organized and existing under the laws of the State of California, with capacity to sue and be sued. The California Department of Forestry and Fire Protection includes several organizational programs, including the Office of the State Fire Marshal.

25.    Defendant Office of the State Fire Marshal is a political subdivision of the State of California, organized and existing under the laws of the State of California, with the capacity to sue and be sued. The Office of the State Fire Marshal is the state agency responsible for ensuring the safety of intrastate hazardous liquid pipelines.

26.    Defendant Daniel Berlant is the State Fire Marshal and is sued in his official capacity as head of the Office of the State Fire Marshal.

27.    Pacific Pipeline Company is unaware of the true names and/or capacities of Defendants DOES 1 through 25, inclusive, and therefore sues said Defendants by such fictitious names. Pacific Pipeline Company will amend this pleading to insert the true names and/or capacities of DOES 1 through 25, inclusive, when the same have been ascertained. Pacific Pipeline Company is informed and believe and thereon alleges that each such fictitiously named Defendant is, in some manner or for some reason, responsible for the actions or omissions alleged in this pleading, and each is subject to the relief being sought herein.

**JURISDICTION AND VENUE**

28.    This Court has federal question jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. § 1331, as this action arises under 49 U.S.C. § 60101 *et seq.*, 50 U.S.C §§ 4501 *et seq.* (the Defense Production Act), and the Supremacy Clause of the United States Constitution.

---

[1] *See* California Coastal Commission's "Mission" Page listed on its Website, accessible at https://www.coastal.ca.gov/whoweare.html.

SECOND AMENDED COMPLAINT

29.     The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the claims herein asserted under California Constitution, article VI, section 10, and section 1060 of the Code of Civil Procedure, because they are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

30.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all defendants "reside" in the State of California and are subject to personal jurisdiction here, and because significant portions of the Santa Ynez Pipeline System at issue in this litigation are located in the Eastern District of California and the Santa Ynez Pipeline System ultimately delivers crude oil to the Pentland Delivery Point in Kern County, embraced within the Eastern District of California.

**FACTUAL AND LEGAL STATEMEMT**

**A.     The Santa Ynez Unit**

31.     The Santa Ynez Unit consists of sixteen federal leases across approximately 76,000 acres of outer continental shelf and produces crude oil and natural gas from Platforms Hondo, Harmony, and Heritage, located in federal waters off the California Coast in the Santa Barbara Channel.

32.     The oil and gas are transported through the Santa Ynez Pipeline System's Offshore Pipeline Segments to the onshore LFC Facilities, comprised principally of the Las Flores Canyon Oil and Gas Processing Facilities and the Pacific Offshore Pipeline Company-owned Gas Plant, both of which are located in Las Flores Canyon in unincorporated Santa Barbara County.

33.     The LFC Facilities separate oil, propane, butane, sulfur products, and fuel quality gas. The natural gas is dried, treated, compressed, and delivered to a local utility company. The partially processed crude oil continues through the Santa Ynez Pipeline System via Segments CA-324 and CA-325 to Pentland Station, where the oil enters third-party owned and operated infrastructure and is transported to a refinery for final processing.

- 8 -

34. In February 1988, the California Coastal Commission ("Coastal Commission") reviewed and analyzed Sable's predecessor-in-interest's (Exxon Company U.S.A.) proposal for the construction, operation, and ongoing maintenance of the Santa Ynez Unit-related assets and the Offshore Pipeline Segments, as part of a "Development and Production Plan" ("DPP") submitted to the federal Minerals Management Service in 1987.

35. The Coastal Commission issued three approvals for the Santa Ynez Unit-related assets and Offline Pipeline Segments: (1) Consistency Certification No. CC-7-83, which confirmed pursuant to the federal Coastal Zone Management Act ("CMZA") that a Development and Production Plan ("DPP") for the Santa Ynez Unit-related assets would be consistent with the Coastal Act, (2) Consistency Certification No. CC-64-87, which confirmed pursuant to the CZMA that construction, operation, and maintenance of the Santa Ynez-related assets and Offshore Pipeline Segments pursuant to a revised DPP would be consistent with the Coastal Act, and (3) CDP No. E-88-1 (the "Offshore CDP"), which authorized the construction, operation, and maintenance of those portions of the Offshore Pipeline Segments located in California state waters.

**B. Segments CA-324 and CA-325 of the Santa Ynez Pipeline System**

34. The Santa Ynez Pipeline System is made up of various segments. One segment is known as Segment CA-325. Segment CA-325 is a thirty-inch diameter pipeline with a maximum permitted throughput capacity of 300,000-barrels of crude oil per day and transports crude oil approximately 113.5 miles north from the Gaviota Pump Station to the Sisquoc Pump Station, then east through the Los Padres National Forest and Cuyama Valley, ultimately delivering crude oil to the existing Pentland Delivery Point in the San Joaquin Valley in Kern County.

35. Another segment is Segment CA-324. Segment CA-324 is a twenty-four-inch diameter pipeline with a maximum permitted throughput capacity of 150,000-barrels of crude oil per day. Segment CA-324 transports crude oil approximately 10.9 miles from the Las Flores Pump Station in Las Flores Canyon, west along the Gaviota Coast, to the existing Gaviota Pump Station located approximately one mile east of Gaviota State Park in Santa Barbara County. The

SECOND AMENDED COMPLAINT

Offshore Pipeline Segments, as described above, comprise a third segment of the Santa Ynez Pipeline System and transport oil from the Santa Ynez Unit to the onshore LFC Facilities in Las Flores Canyon.

36.     In the mid-1980s, the California State Lands Commission, federal Bureau of Land Management, and Department of the Interior prepared a joint Environmental Impact Report and Environmental Impact Statement ("EIR/EIS") for the Celeron Pipeline Project, which includes analysis of the construction and long-term operation of what are now known as Segments CA-324 and CA-325. The locations of Segments CA-324 and CA-325 were identified as an environmentally superior alignment to minimize impacts to environmental resources. The State Lands Commission certified the EIR/EIS in January 1985.

37.     After reviewing the EIR/EIS, the County Planning Commission made a final decision to approve the Celeron Pipeline Project and associated entitlements in February 1986. The County's approval was not challenged during the appeal period, and the Planning Commission's approval action became final and effective.

38.     Pursuant to the County of Santa Barbara's certified Local Coastal Program ("LCP"), the County issued CDP No. 86-CDP-189 for the Celeron Pipeline Project on July 27, 1986. CDP No. 86-CDP-189 approved "[c]learing, grading and trenching activities for [the] Celeron Pipeline Project." On August 5, 1986, the County issued CDP No. 86-CDP-205 for the "[r]emainder of all construction activities for the Celeron Pipeline [P]roject." The CDPs were not appealed by any party and are, therefore, final, valid, and not subject to further appeal.

39.     Although the County has issued separate CDPs for major improvements, such as relocations and realignments of pipeline segments since Segments CA-324 and CA-325's CDPs were first issued, the County has not required new or amended CDPs for repair and maintenance work on Segments CA-324 and CA-325.

**C.     The Refugio Oil Spill and Resulting Repair Work**

40.     On May 19, 2015, a leak along Segment CA-324 resulted in an oil spill. Segments CA-324 and CA-325 remained active, but petroleum has not flowed through them since that

- 10 -

SECOND AMENDED COMPLAINT

time, even though petroleum began flowing through other portions of the Santa Ynez Pipeline System in May 2025. To maintain Segments CA-324 and CA-325 in an active state, they were filled with nitrogen to prevent oxidation and internal corrosion, and the cathodic protection system is active and has been regularly inspected and maintained.

41.     Since 2015, Pacific Pipeline Company (including its predecessor in interest, Plains Pipeline, L.P. ("Plains")), has maintained Segments CA-324 and CA-325 as active and has undertaken substantial efforts to diligently repair Segments CA-324 and CA-325 to ensure compliance with industry standards for active pipelines and resume petroleum transportation.

42.     For example, in April 2021, Plains secured approval from the Office of the State Fire Marshal ("OSFM") to retrofit Segments CA-324 and CA-325 with 16 safety valves as required by law, including seven valves in the Coastal Zone. In December 2021, Plains submitted applications to the County for approval to complete the safety valve installation work. Pacific Pipeline Company has since installed the safety valves along Segments CA-324 and CA-325.

43.     In addition, multiple in-line inspections ("ILI") have been conducted on Segments CA-324 and CA-325:

    a.  Two ILI runs have been performed on Segment CA-324, one in February 2022 and another in December 2022;

    b.  An ILI run was performed on a portion of on Segment CA-325 in September 2023; and

    c.  An ILI run was performed on the remainder of Segment CA-325 in October 2023.

44.     In May 2024, Pacific Pipeline Company and Sable separately began anomaly[2] repair and maintenance work on Segments CA-324 and CA-325 under the County's 1986 approvals and permits that authorized ongoing pipeline maintenance. On February 12 and March 21, 2025, in response to Pacific Pipeline Company's request to address claims from the Coastal

---

[2] A pipeline anomaly refers to a pipeline segment with some deviation from its original configuration.

SECOND AMENDED COMPLAINT

Commission that the repair and maintenance work was not authorized, the County confirmed that no further permits were required for Pacific Pipeline Company's anomaly repair work. Pacific Pipeline Company has completed the anomaly repairs, as well as subsequent pipeline hydrotesting, under OSFM supervision.

45.      Since 2016, Segments CA-324 and CA-325 had been considered an "intrastate" pipeline under the regulatory oversight of OSFM. In April 2024, Pacific Pipeline Company submitted "State Waiver" applications to OSFM for Segments CA-324 and CA-325 to modify regulatory pipeline safety requirements based on the specifications applicable to the individual pipeline facilities. On December 17, 2024, OSFM granted both State Waivers and imposed over sixty separate conditions on Pacific Pipeline Company's operation of Segments CA-324 and CA-325, conditional on the Pipeline and Hazardous Materials Safety Administration ("PHMSA") expressing no objection to the State Waivers. On February 11, 2025, PHMSA notified OSFM that it had no objection to its issuance of the State Waivers. On December 17, 2025, PHMSA designated the entire Santa Ynez Pipeline System (including Segments CA-324 and CA-325) as an interstate pipeline. As a result, OSFM no longer retains any regulatory oversight of Segments CA-324 and CA-325 and the State Waivers have been rendered moot.

46.      Pacific Pipeline Company further submitted a Restart Plan to OSFM for review on July 29, 2024. In August and September 2025, OSFM performed multiple inspections of Segments CA-324 and CA-325 in connection with its review of the Restart Plan. As of December 17, 2025, PHMSA has assumed complete safety jurisdiction over the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, including the processing and approval of Pacific Pipeline Company's Restart Plan.

47.      As of May 15, 2025, Sable resumed petroleum transportation through the Santa Ynez Pipeline System's Offshore Pipeline Segments to its storage facilities in Las Flores Canyon.

48.      At all times, Pacific Pipeline Company has intended to resume petroleum transportation from Sable's storage facilities in Las Flores Canyon through the remainder of the

SECOND AMENDED COMPLAINT

Santa Ynez Pipeline System, including Segments CA-324 and CA-325. Pacific Pipeline Company and its predecessors never abandoned Segments CA-324 and CA-325. Rather, these segments have been operated as part of an active pipeline under the law and Pacific Pipeline Company has worked diligently to maintain their use under existing and valid CDPs.

**D.     Senate Bill 237**

49.     On September 13, 2025, the California Legislature passed SB 237. On September 19, 2025, Governor Newsom signed SB 237 into law.

50.     SB 237 adds Section 51014.1 of the Government Code, which states in part, "[a]ny existing oil pipeline that is six inches or larger that has been *idle, inactive, or out of service* for five years or more, shall not be restarted without passing a spike hydrostatic testing program." (Emphasis added).

51.     SB 237 also amends Section 30262 of the Coastal Act to provide, in relevant part:

(2) Repair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more shall be considered a new or expanded development requiring a new coastal development permit.

(3) Development associated with the repair, reactivation, or maintenance of an oil pipeline that has been idled, inactive, or out of service for five years or more requires a new coastal development permit consistent with this section. (Pub. Res. Code §§ 30262(b)(2) and (3)).

52.     SB 237 further provides that "[a] violation of the act is a crime."

53.     State law does not define the terms "idled," "inactive," and "out of service." However, such terms are defined or described by PHMSA, the federal agency that administers the federal law pursuant to which the Santa Ynez Pipeline System is regulated.

54.     The Santa Ynez Pipeline System is subject to the federal Hazardous Liquid Pipeline Safety Act ("Pipeline Safety Act") administered by PHMSA. 49 U.S.C. §§ 60101 *et seq.* On December 17, 2025, PHMSA determined that the Santa Ynez Pipeline System is an interstate pipeline under PHMSA's exclusive jurisdiction. *See* Dec. 17, 2025 Letter from PHMSA to Sable, attached hereto as <u>Exhibit B</u>. In making its determination, PHMSA confirmed that PHMSA

- 13 -

regulations consider the Santa Ynez Pipeline System to be an "active" pipeline. Exhibit B, p. 3, fn. 8.

55.    PHMSA recognizes two categories of pipeline status: (i) active and (ii) abandoned. *See* 81 Fed. Reg. 54512 (federal "regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned."); *see also* PHMSA Advisory Bulletin ADB 2016-0075 (Aug. 11, 2016). Federal regulations for hazardous liquid pipelines define the term "abandoned" to mean "permanently removed from service." *See* 49 C.F.R. 195.3.

56.    Federal regulations do not recognize "idle," "inactive," or "out of service" status at all. *See* 81 Fed. Reg. 54512. "If a pipeline is not properly abandoned and may be used in the future for transportation of hazardous liquid or gas, PHMSA regulations consider it as an active pipeline." 81 Fed. Reg. 54513. "Owners and operators of pipelines that are not operating but contain hazardous liquids and gas must comply with all applicable safety requirements, including periodic maintenance, integrity management assessments, damage prevention programs, response planning, and public awareness programs." *Ibid*.

57.    Pacific Pipeline Company is informed and believes, and on that basis alleges, that it is the position of the State of California that Segments CA-324 and CA-325 have been "idled, inactive, or out of service for five years or more" and, therefore, repair, reactivation, maintenance, and development associated with such work is new or expanded development requiring a new CDP.

58.    The State, through the Coastal Commission and the Legislature, has previously made numerous statements and findings concerning its position on the status of Segments CA-324 and CA-325.

59.    The Staff Report for the Coastal Commission's Cease and Desist Order CCC-25-CD-01, Restoration Order CCC-25-RO-01, and Administrative Civil Penalty Order CCC-25-AP3-01, characterizes Segments CA-324 and CA-325 as "offline and out-of-service" since the 2015 oil spill. Staff Report, p. 3. "[T]he pipelines remained in service until the 2015 oil spill, at

SECOND AMENDED COMPLAINT

which point they were placed out of service." *Id*. The Staff Report also characterizes the Segments as "inoperable," having "sat inactive for a decade." *Id*., p. 65.

60.    Similarly, the Senate Rules Committee digest for SB 237 makes clear that SB 237 is intended to apply to the Santa Ynez Pipeline System. *See* Sen. Com. on Natural Resources, Analysis of Senate Bill No. 237 (2025-2026 Reg. Sess.) as amended on Sept. 10, 2025, attached hereto as <u>Exhibit A</u>.

   a.  "This Bill [applies to] pipelines of a certain size that have been out of service for more than five years (which would notably include certain pipelines serving the Sable Corporation's Santa Ynez Unit)[.]" <u>Exhibit A</u>, p. 3.

   b.  "Preventing oil spills from pipelines. On May 19, 2015 an offshore pipeline ruptured, spilling over 140,000 gallons of heavy crude oil along the Gaviota coast at Refugio Beach in Santa Barbara County. Sable announced they were restarting oil production in the Santa Ynez unit (in federal waters) on May 15, 2025, and restarting the use of those two pipelines. Sable has not replaced, but has rather made repairs to the pipelines. Some of the provisions of SB 237 are intended to address concerns surrounding the safety of restarting use of the repaired pipelines by requiring testing of the pipelines' durability." *Id.*, p. 5.

61.    On September 18, 2025, California Assembly Member Gregg Hart made clear that the purpose of SB 237 is specifically to stymie Pacific Pipeline Company's business operations and prevent restart of Segments CA-324 and CA-325. In an interview with Newsmakers TV, Assembly Member Hart championed SB 237 and stated that "We need an umbrella organization or state agency that will look at the [restart of Segments CA-324 and CA-325] in its entirety and really give it the rigorous environmental review that it needed."[3] Assembly Member Hart additionally stated, "I introduced a bill that would really codify the

---

[3] Santa Barbara Independent, *Gregg Hart's Sable Oil Pushback Bill Lands in Gov's Grand Bargain Enviro Deal* (Sept. 19, 2025) available at: https://www.independent.com/2025/09/19/gregg-harts-sable-oil-pushback-bill-lands-in-govs-grand-bargain-enviro-deal/.

- 15 -

SECOND AMENDED COMPLAINT

existing law. The Coastal Commission has the authority to do this now, but it's under dispute. Sable has contested that jurisdiction…So my bill simply clarified that jurisdictional authority for the Coastal Commission." Assembly Member Hart additionally singled out Sable and Pacific Pipeline Company and stated that "Sable can't begin operations until that happens."

62.     On February 18, 2026, the California Coastal Commission, carbon-copying the Office of State Fire Marshal, indicated that it has "independent authority over any resumption of use of [Segments CA-324 and CA-325]" and will require Pacific Pipeline Company to "apply for and receive a CDP from the Commission that meets the standards of Section 30262" as amended by SB 237. February 18, 2026 Letter to Steve Rusch, attached hereto as Exhibit E.

63.     On March 19, 2026, the California Coastal Commission, carbon-copying the California State Lands Commission, California Department of Conservation, California State Parks, and CalFire, further explained its position that "[a]s of January 1, 2026, the Pipelines had been idled, inactive, and out of service for more than five years," and "Sable has not obtained a new Coastal Development Permit for reactivation of the Pipelines. Thus, any reactivation of the Pipelines is unpermitted development and would be grounds for further enforcement action by the Commission." March 19, 2026, Letter to Steve Rusch, attached hereto as Exhibit H.

64.     Based on the State's asserted authority under the Coastal Act and SB 237 and Defendants' threat of enforcement of SB 237 made on February 18, 2026 and again on March 19, 2026, Pacific Pipeline Company faces an immediate choice to either (i) flow petroleum through the Santa Ynez Pipeline System pursuant to its existing entitlements, permits, and approvals, including County-issued CDPs, PHMSA approvals, and a DPA Order, but risk possible enforcement action, fines, and other penalties by Defendants; or (ii) cease petroleum transportation and risk enforcement actions, fines, and other penalties by the United States. State law provides no administrative procedure for addressing a dispute concerning the applicability of SB 237 to the Santa Ynez Pipeline System.

SECOND AMENDED COMPLAINT

65.     Given the absence of a process under the law for resolving this dispute, a judicial determination concerning the applicability of SB 237 to the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, is necessary.

**E.      PHMSA's Assumption of Jurisdiction**

66.     In general, states and local governments may not exercise jurisdiction over hazardous liquid interstate pipelines. 49 U.S.C. § 60104(c) ("A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation.")

67.     On December 17, 2025, PHMSA determined that the entirety of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, is an interstate pipeline subject to PHMSA's exclusive jurisdiction. This determination eliminated any jurisdiction of OSFM over Segments CA-324 and CA-325. In making its determination that the Santa Ynez Pipeline System is an interstate pipeline, PHMSA notified OSFM that the Pipeline System is "subject to the regulatory oversight of PHMSA." Exhibit B, p. 3. PHMSA further confirmed that the Santa Ynez Pipeline System is considered an "active" pipeline under PHMSA regulations. Exhibit B, p. 3, fn. 8.

68.     On December 22, 2025, PHMSA approved Sable's Restart Plan for Segments CA-324 and CA-325. *See* Dec. 22, 2025 Letter from PHMSA to Sable, attached hereto as Exhibit C.

69.     On December 23, 2025, PHMSA granted Sable an Emergency Special Permit for Segments CA-324 and CA-325. *See* Dec. 23, 2025 Emergency Special Permit issued by PHMSA to Sable, attached hereto as Exhibit D. The Emergency Special Permit takes the place of the OSFM-issued State Waivers and carried forward substantially the same conditions as issued in the State Waivers.

70.     No other PHMSA approvals or permits are necessary to flow oil through Segments CA-324 and CA-325.

- 17 -
SECOND AMENDED COMPLAINT

71.      Given PHMSA's assumption of jurisdiction over the Santa Ynez Pipeline System as an interstate pipeline, OSFM is without jurisdiction to regulate Segments CA-324 and CA-325, or any other portion of the Santa Ynez Pipeline System. The requirements of the State Waivers have therefore been mooted and preempted by these federal actions. A judicial determination concerning whether the application of SB 237 as to the Santa Ynez Pipeline System is preempted by federal law is therefore necessary.

**F.      California Demands Ongoing Energy and Hydrocarbons, While Increased Reliance on Imported Oil Causes National Defense and Environmental Impacts.**

68.      California's population and economy, both the largest and most diverse in the country, require a continued, reliable supply of hydrocarbons to maintain economic stability and foster economic growth.

69.      The demand for oil within the State has remained high and is not likely to decrease in the near future. California is the second largest consumer of motor gasoline and all petroleum products in the United States.[4]

70.      The transportation sector uses about eighty-five percent (85%) of the petroleum consumed in the State.[5]  According to the California Department of Transportation, Californians significantly increased their vehicle miles traveled over the last two decades.[6]

---

[4]  U.S. Energy Info. Admin., *California State Energy Profile*, https://www.eia.gov/state/print.php?sid=CA (last updated May 16, 2024).
[5] U.S. Energy Info. Admin., *California State Profile and Energy Estimates*, available at https://www.eia.gov/state/analysis.php?sid=CA (last updated May 16, 2024).
[6] Caltrans, California VMT Data, available at https://dot.ca.gov/programs/esta/sb-743/ca-vmt.

SECOND AMENDED COMPLAINT



71.    Although the State has supported and subsidized the sale or lease of electric vehicles for decades, electric and plug-in hybrid vehicles still only make up about five percent (5%) of the light-duty vehicles on the road in California.[7] The vast majority of Californians still depend on vehicles powered by gasoline.

72.    In the last ten years, California has fallen from the third-largest producer of crude oil in the nation to seventh.[8] From 1986 to 2023, oil production within California has declined by about sixty-nine percent (69%).[9]

---

[7] California Energy Commission, *Light-Duty Vehicle Population in California*, available at https://www.energy.ca.gov/data-reports/energy-almanac/zero-emission-vehicle-and-infrastructure-statistics/light-duty-vehicle.
[8] U.S. Energy Info. Admin., *California State Profile and Energy Estimates*, available at https://www.eia.gov/state/analysis.php?sid=CA.
[9] California Energy Commission, *Oil Supply Sources to California Refineries*, available at https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/oil-supply-sources-california-refineries.

SECOND AMENDED COMPLAINT



73.     California's legislative and regulatory hostility causing this decline in production is self-evident and well-documented.[10] The U.S. Energy Information Administration concluded that "[a]s crude oil production in California and Alaska declined, the state's refineries increased their supply from foreign oil imports."[11]

74.     According to the California Energy Commission and the U.S. Energy Information Administration, approximately twenty-three percent (22.9%) of the oil consumed in California in

[10] *See, e.g.,* Bakersfield Californian, *Oil drilling all but dries up as well rework permits rise* (July 17, 2023), available at https://www.bakersfield.com/news/oil-drilling-all-but-dries-up-as-well-rework-permits-rise/article_6001fd72-2500-11ee-9ff7-f3ca6fe0250b.html; Reuters, *California new oil well approvals have nearly ground to a halt* (July 13, 2023), available at https://www.reuters.com/business/energy/california-new-oil-well-approvals-have-nearly-ground-halt-data-show-2023-07-13/; LA Times, *Newsom's oil regulators deny new fracking permits, but industry is pushing back* (July 9, 2021), available at https://www.latimes.com/environment/story/2021-07-09/california-oil-regulators-deny-new-fracking-permits; San Francisco Chronicle, *Report Criticizes Oil Regulations:  Environmental rules blamed for decline in state's production* (March 29, 1993).
[11] U.S. Energy Info. Admin., *California State Profile and Energy Estimates*, available at https://www.eia.gov/state/analysis.php?sid=CA.

SECOND AMENDED COMPLAINT

2025 was produced under the protection of California's laws. The market for hydrocarbons is global and hydrocarbons are a commodity. Over sixty percent (61.1%) of the oil consumed in California is imported from foreign countries, increasingly from Iraq, Saudi Arabia, Brazil, Guyana, and Ecuador.[12] These countries do not adhere to California's high environmental and human-rights standards.[13]



[12] Cal. Energy Comm., *Oil Supply Sources To California Refineries*, https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/oil-supply-sources-california-refineries; *see, e.g.*, Cal. Energy Comm., *Foreign Sources of Crude Oil Imports to California 2023*, https://www.energy.ca.gov/data-reports/energy-almanac/californias-petroleum-market/foreign-sources-crude-oil-imports; U.S. Energy Info. Admin., California State Energy Profile, https://www.eia.gov/state/print.php?sid=CA.

[13] U.S. State Dept., *Ecuador 2023 Human Rights Report*, available at https://www.state.gov/wp-content/uploads/2024/02/528267_ECUADOR-2023-HUMAN-RIGHTS-REPORT.pdf; U.S. State Dept., *Brazil 2023 Human Rights Report*, available at https://www.state.gov/wp-content/uploads/2024/02/528267_BRAZIL-2023-HUMAN-RIGHTS-REPORT.pdf; U.S. State Dept., *Saudi Arabia 2023 Human Rights Report*, available at https://www.state.gov/wp-content/uploads/2024/02/528267-SAUDI-ARABIA-2023-HUMAN-RIGHTS-REPORT.pdf; U.S. State Dept., *Iraq 2023 Human Rights Report*, available at https://www.state.gov/wp-content/uploads/2024/03/528267_IRAQ-2023-HUMAN-RIGHTS-REPORT.pdf; U.S. State Dept., *2024 Trafficking in Persons Report: Saudi Arabia*, available at https://www.state.gov/reports/2024-trafficking-in-persons-report/saudi-arabia.

SECOND AMENDED COMPLAINT

75.     State officials are fully aware of the continued growth of hydrocarbon use in California, and yet they are facilitating a policy that would shift oil and gas production out-of-state and abroad. During a hearing before the Kern County Board of Supervisors on January 14, 2020, Department of Conservation Director David Shabazian admitted that "[i]t is important to acknowledge that even as oil production has decreased steadily since it peaked 35 years ago here in California, consumption of fossil fuels has actually grown, whether in the form of gasoline, diesel fuel, jet fuel or in a variety of other products, from asphalt to electronics from roof tiles to rugs. That is an important context for today's conversation."[14]

76.     The California Department of Conservation, Geologic Energy Management Division ("CalGEM") also acknowledged, in an environmental impact report certified on July 1, 2015 analyzing the impacts of well stimulation, that a decrease in oil production within the state "would require importing oil from other sources to meet demand, thus increasing ship, rail, and tanker truck traffic to the State from the foreign and domestic suppliers."[15]  CalGEM explained in detail that the importation of crude oil from out of state will have increased environmental impacts, particularly increased GHG emissions:

> "Sources of GHG at oil and gas fields outside of California are not subject to California's regulatory setting [citation], which ensures that GHG sources in the business of oil and gas production in California are subject to multiple programs aimed at reducing GHG. Emissions of GHG that occur at a point of oil and gas extraction outside of California are not subject to the Cap-and-Trade Program, and by increasing the activity of oil and gas extraction outside of California, this alternative would cause increased GHG from sources that are not required to offset the GHG to comply with California's cap, resulting in an overall net increase in GHG emissions compared with both existing conditions and the project."

> "Although the oil and gas extraction and associated GHG emissions would occur outside California, California would continue to experience the adverse environmental effects of global climate change driven by GHG emissions worldwide. This impact would occur from GHG sources that are not covered by

---

[14] Bd. of Supervisors, Kern Cnty., Regular Meeting (Jan. 14, 2020) (video and minutes), https://kern.granicus.com/MediaPlayer.php?view_id=56&clip_id=4169.

[15] CalGEM, *Well Stimulation Environmental Impact Report* ("WST EIR") at 12.2-49 C.2-84, available at https://www.conservation.ca.gov/calgem/Pages/SB4_Final_EIR_TOC.aspx.

SECOND AMENDED COMPLAINT

California's regulatory setting and outside of the potential control of [CalGEM] to feasibly mitigate. As a result of increasing GHG emissions from sources beyond California's control, no feasible mitigation would be available."[16]

**G.    The Defense Production Act Order**

77.    On January 29, 2025, the President of the United States issued an executive order declaring a national emergency. Executive Order 14156.

78.    On March 13, 2026, the President of the United States issued Executive Order 13603, delegating "certain authorities of the President under the Defense Production Act (50 U.S.C. 4501 et seq.), to specified executive department and agency (agency) heads," including the Secretary of Energy.

79.    On March 13, 2026, the Secretary of Energy, pursuant to the delegated authority from the President of the United States, commanded Pacific Pipeline Company and Sable to immediately commence the flow of oil through the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, pursuant to the Defense Production Act ("DPA"). 50 U.S.C §§ 4501 *et seq*.

80.    The DPA Order finds the "[a]n affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation" and these "problems are most pronounced in our Nation's West Coast, 'where dangerous State and local policies jeopardize our Nation's core national defense and security needs, and devastate the prosperity of not only local residents but the entire United States population.'" Exhibit F, at p. 1. The DPA Order further finds that the Santa Ynez Pipeline System is a "critical energy resource on the West Coast" but "cannot be used to address the shortages identified in EO 14156 and the resulting vulnerabilities, including adversarial dependence" because "California agencies have deployed an array of state measures—including SB 237 []—to block pipeline operations." *Id*., at p. 2.

*81*.    Specifically, the DPA Order directs Sable and Pacific Pipeline Company "to

_____

[16] *Id.* at p. 12.2-37; *see also id*. at p. C.2-63 ["[CalGEM] has given considerable weight to the fact that increased oil imports would lead to increased greenhouse gas generation").)

- 23 -

SECOND AMENDED COMPLAINT

immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU [Santa Ynez Unit] through the SYPS [Santa Ynez Pipeline System]" and "immediately commence performance under contracts or orders for services… for hydrocarbon transportation capacity in the SYPS[.]" Exhibit F, at p. 3. The DPA Order further requires Sable and Pacific Pipeline Company to "comply with this order immediately and maintain such compliance until such time as the conditions necessitating the issuance of this order abate or until Sable is directed otherwise." *Id.*

82.    When enacting the DPA, Congress found "the development of domestic productive capacity" critical for ensuring the national defense, 50 U.S.C. § 4502(a)(3), and similarly found it necessary "to assure the availability of domestic energy supplies." (*Id.*, § 4502(a)(5).) The DPA thus vests "the President with an array of authorities," all designed "to maintain and enhance the domestic industrial base." 50 U.S.C. § 4502(a)(4). The President may use those authorities "whether or not an 'emergency' situation exists." *Legal Authorities Available to the President to Respond to a Severe Energy Supply Interruption or Other Substantial Reduction in Available Petroleum Products*, 6 Op. O.L.C. 644, 662 (1982) ("*Energy Supply Interruption*"). Thus, the DPA confers "broad and flexible" authority on the President to regulate private parties and preempt contrary state law to shape domestic industry in the interest of national defense. H.R. Rep. No. 81-2759, at 4 (1950).

83.    The President is authorized "to allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(2). The President may use this section "to facilitate petroleum transportation," such as "by requiring pipelines, marine terminals, and other facilities to perform oil transport contracts necessary or appropriate to promote the national defense." *Energy Supply Interruption*, *supra,* 6 Op. O.L.C. at p. 665. Moreover, the "sweeping language [of 50 U.S.C. § 4511(a)(2)] allows the President to preempt contrary state law by ordering Pacific Pipeline Company and Sable to produce the recoverable oil located on the Santa Ynez Pipeline System and transport such production to the California refinery complex using the Santa

- 24 -

SECOND AMENDED COMPLAINT

Ynez Pipeline System." Exhibit G, at pp. 16-17; *see, e.g.*, *Johnson v. Tyson Foods, Inc.* 580 F.Supp. 3d 382, 389 (N.D. Tex. 2022) (holding that the President's allocation authority under the DPA allowed him to require meat facilities to remain open during the COVID-19 pandemic and preempt state tort law); *Reed v. Tyson Foods, Inc.*, No. 21-cv-01155, 2021 WL 5107725, at *6 (W.D. Tenn. Nov. 3, 2021) ("Because the purpose of the DPA cannot otherwise be accomplished while allowing states to implement their own, potentially inconsistent policy decisions for meat and poultry processor operations during the COVID-19 pandemic, the state law must yield.").

84.    Additionally, "[t]he President's prioritization authority under section 4511(a)(1) also allows him to preempt state law." Exhibit G at p. 18. "Section 4511(a)(1) authorizes the President 'to require that performance under contracts or orders' that 'he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order.'" *Id.* The President's DPA Order preempts those laws that, in the President's judgment, impair or delay prioritized contract performance as required by the DPA Order. *See id.* at pp. 18-19, citing *E. Air Lines, Inc. v. McDonnell Douglas Corp.* 532 F.2d 957, 993 (5th Cir. 1976) ("Congress intended to accord the Executive Branch great flexibility in molding its priorities policies to the frequently unanticipated exigencies of national defense."). State law rendering the DPA Order's prioritization impossible is now preempted. *See id.* at p. 19.

85.    Furthermore, to "assure the availability of domestic energy supplies," the DPA grants the President the ability to take actions and issue orders to "maximize domestic energy supplies." 50 U.S.C. § 4511(c). The President may exempt Pacific Pipeline Company from compliance with laws, such as SB 237, threatening the ability to "maximize domestic energy supplies." *Id.*, § 4511(c)(1). The President's preemptive powers exist "even in the absence of a national-defense finding." Exhibit G at p. 19, citing *Energy Supply Interruption*, *supra*, 6 Op. O.L.C. at p. 668.

## FIRST CAUSE OF ACTION

### Declaratory Relief (Applicability of SB 237) – As To All Defendants

86.    Pacific Pipeline Company realleges and incorporates by reference each of the above

- 25 -

SECOND AMENDED COMPLAINT

paragraphs as though fully set forth herein.

87.    Pacific Pipeline Company is a "person interested" under Code of Civil Procedure § 1060, because Pacific Pipeline Company owns and operates Segments CA-324 and CA-325 of the Santa Ynez Pipeline System, which are operated pursuant to existing CDPs issued by the County and are the target of the amendments to the Government Code and Coastal Act enacted by SB 237.

88.    Segments CA-324 and CA-325 of the Santa Ynez Pipeline System have not been "idled, inactive, or out of service for five years or more" within the meaning of SB 237, because Pacific Pipeline Company has diligently undertaken repair and maintenance efforts since the 2015 spill under existing entitlements, permits, and approvals to resume petroleum transportation through Segments CA-324 and CA-325. Segments CA-324 and CA-325 have not been "abandoned" under federal or state law applicable to oil and gas pipelines. Rather, the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, has been deemed "active" under these laws by the agencies who administer them.

89.    Further, the Legislature did not make SB 237 retroactive. As such, SB 237 and its new rules for what is an idled, inactive, or out of service pipelines and what permitting standards may or may not be followed only applies prospectively. This means that SB 237 can only apply to pipelines that are eventually "idled, inactive, or out of service for five years or more" commencing on January 1, 2026. Thus, since the five-year idle, inactive, or out of service period must commence on January 1, 2026, the earliest a pipeline could be "idled, inactive, or out of service *for five years or more*" is January 1, 2031 (i.e., five years from SB 237's effective date).

90.    Given statements the State, through the Coastal Commission and Legislature, has previously made concerning the status of Segments CA-324 and CA-325 as "idle," "inactive," and "out of service" for more than five years, including most recently letters sent to Pacific Pipeline Company on February 18, 2026 (Exhibit E) and March 19, 2026 (Exhibit H) threatening to enforce SB 237 to the Santa Ynez Pipeline System, an actual, present controversy exists between the parties concerning the applicability of SB 237 to the Santa Ynez Pipeline System, including Segments

- 26 -
SECOND AMENDED COMPLAINT

CA-324 and CA-325. This controversy is definite and concrete, touches the legal relations of parties with adverse legal interests, and is of sufficient immediacy and reality to warrant declaratory relief. *City of Cotati v. Cashman*, 29 Cal.4th 69, 79–80 (Cal. 2002).

91.	This action does not seek an advisory opinion or abstract interpretation of law. Pacific Pipeline Company must make immediate operational and financial decisions regarding whether to continue to transport petroleum under its existing CDPs at the risk of enforcement actions, penalties, or orders by the State. Moreover, SB 237 states that "[a] violation of the act is a crime." This presents a justiciable controversy under Code of Civil Procedure § 1060. *Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 647.

92.	Declaratory relief is necessary and proper within the meaning of Code of Civil Procedure § 1061, because a judicial declaration will clarify the parties' rights and duties, guide Pacific Pipeline Company's conduct, and prevent multiplicity of actions.

93.	Accordingly, Pacific Pipeline Company seeks a judicial declaration that the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, have not been "idled, inactive, or out of service for five years or more" under SB 237.

## SECOND CAUSE OF ACTION

### Declaratory Relief (Federal Preemption – Federal Pipeline Safety Act) – As To All Defendants

94.	Pacific Pipeline Company realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

95.	Pacific Pipeline Company is a "person interested" under Code of Civil Procedure § 1060, because Pacific Pipeline Company owns and operates Segments CA-324 and CA-325 of the Santa Ynez Pipeline System pursuant to existing CDPs and is the target of the amendments to the Government Code and Coastal Act enacted by SB 237.

96.	With PHMSA's assumption of jurisdiction and December 17, 2025 determination that the Santa Ynez Pipeline System is an interstate pipeline under its exclusive regulatory oversight, OSFM no longer retains any regulatory authority over Segments CA-324 and CA-325,

SECOND AMENDED COMPLAINT

including the resumption of petroleum transportation through the Segments.

97.     Moreover, with PHMSA's approval of Sable's Restart Plan on December 22, 2025 and issuance of the Emergency Special Permit (which overrides the State Waivers) on December 23, 2025, no other PHMSA approvals or permits are necessary to flow oil through Segments CA-324 and CA-325.

98.     Under the federal Pipeline Safety Act, at 49 U.S.C. § 60104(c), state agencies, such as OSFM or the Coastal Commission, are precluded from imposing any safety standards for interstate pipeline facilities, including the Santa Ynez Pipeline System.

99.     Moreover, under the federal pipeline safety regulations administered by PHMSA under 49 C.F.R. Part 195, Pacific Pipeline Company, as owner of Segments CA-324 and CA-325, is subject to several ongoing pipeline operation, maintenance, and repair requirements that are, in many cases, time-sensitive and not otherwise subject to advance permitting or approval requirements by PHMSA.

100.     Article VI, Clause 2 of the U.S. Constitution provides that "the Laws of the United States … shall be the supreme Law of the Land," such that federal laws preempt state laws that purport to override or otherwise conflict with the implementation of federal laws.

101.     This action does not seek an advisory opinion or abstract interpretation of law. Segments CA-324 and CA-325 are currently transporting petroleum pursuant to PHMSA's approvals and the DPA Order, and Pacific Pipeline Company must make immediate operational and financial decisions regarding whether to transport petroleum through the Segments at the risk of enforcement actions, penalties, or orders by the State. This presents a justiciable controversy under Code of Civil Procedure § 1060. (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 647.)

102.     Declaratory relief is necessary and proper within the meaning of Code of Civil Procedure § 1061, because a judicial declaration will clarify the parties' rights and duties, guide Pacific Pipeline Company's conduct, and prevent multiplicity of actions.

103.     Accordingly, Pacific Pipeline Company seeks a judicial declaration that the

- 28 -
SECOND AMENDED COMPLAINT

application of SB 237 as to the Santa Ynez Pipeline System has been preempted by federal law.

104.    Additionally, as SB 237 is preempted by federal law, injunctive relief is appropriate to avoid the continued deprivation of federal constitutional rights that will result if SB 237 were to remain in effect.

### THIRD CAUSE OF ACTION

### Declaratory Relief (Federal Preemption – DPA Order) – As To All Defendants

105.    Pacific Pipeline Company realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

106.    Pacific Pipeline Company is a "person interested" under Code of Civil Procedure § 1060, because Pacific Pipeline Company owns and operates Segments CA-324 and CA-325 of the Santa Ynez Pipeline System pursuant to existing CDPs and is the target of the amendments to the Government Code and Coastal Act enacted by SB 237.

107.    On March 13, 2026, the President of the United States issued Executive Order 13603, delegating "certain authorities of the President under the Defense Production Act (50 U.S.C. 4501 *et seq.*), to specified executive department and agency (agency) heads," including the Secretary of Energy. Upon this delegation and on behalf of the President, on March 13, 2026, the Secretary of Energy commanded Sable and Pacific Pipeline Company to commence the flow of crude oil through the Santa Ynez Pipeline System pursuant to the DPA Order. *See* Exhibit F.

108.    Article VI, Clause 2 of the U.S. Constitution provides that "the Laws of the United States … shall be the supreme Law of the Land," such that federal laws preempt state laws that purport to override or otherwise conflict with the implementation of federal laws.

109.    This action does not seek an advisory opinion or abstract interpretation of law. Segments CA-324 and CA-325 are currently transporting petroleum pursuant to PHMSA's approvals and the DPA Order, and Pacific Pipeline Company must make immediate operational and financial decisions regarding whether to transport petroleum through the Segments at the risk of enforcement actions, penalties, or orders by the State. This presents a justiciable controversy under Code of Civil Procedure § 1060. *Meyer v. Sprint Spectrum L.P.* 45 Cal.4th 634, 647 (2009).

SECOND AMENDED COMPLAINT

110.    Accordingly, Pacific Pipeline Company seeks a judicial declaration that the application of SB 237 as to the Santa Ynez Pipeline System has been preempted by the DPA Order.

111.    As SB 237 is preempted by the DPA Order pursuant to federal law, injunctive relief and a judicial determination are necessary and appropriate to avoid the continued deprivation of federal constitutional rights that will result if SB 237 were to remain in effect.

## FOURTH CAUSE OF ACTION

### Declaratory Relief (Due Process Clause Violation) – As To All Defendants

112.    Pacific Pipeline Company realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

113.    The United States Constitution's Fifth Amendment provides, in relevant part: "No person shall ...be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." Likewise, the Due Process Clause of the 14th Amendment to the United States Constitution provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." The California Constitution also separately prohibits a person from being "deprived of life, liberty, or property without due process of law[.]" Cal. Const. art. I, § 7.

114.    The Constitutional due process guarantees have both procedural and substantive components, the latter which protects fundamental rights that are so "implicit in the concept of ordered liberty" that "neither liberty nor justice would exist if they were sacrificed." *Palko v. Conn.* 302 U.S. 319, 325 (1937). These fundamental rights include those guaranteed by the Bill of Rights, as well as certain liberty and privacy interests implicitly protected by the Due Process Clause.

115.    "The due process clauses of the federal and state Constitutions are the most basic substantive checks on government's power to act unfairly or oppressively." *Hale v. Morgan* 22 Cal.3d 388, 398 (1978). "Courts have consistently assumed that 'oppressive' or 'unreasonable' statutory penalties may be invalidated as violative of due process." *Id.* at p. 399.

116.    By enforcement or threat of enforcement of SB 237, Defendants violate Pacific Pipeline Company's substantive and procedural rights under the due process clauses of Article I,

SECOND AMENDED COMPLAINT

Section 7 of the California Constitution and the Fourteenth Amendment to the United States Constitution.

117. As enacted, SB 237 sets forth a requirement that an oil pipeline "idled, inactive, or out of service for more than five years" "shall not be restarted" before obtaining a new CDP and completing a hydrostatic pressure test in an arbitrary, irrational, and oppressive manner that is unreasonable, improper, and not related to any legitimate governmental purpose.

118. SB 237 imposes requirements prior to restart of commencing the flow of crude oil through Segments CA-324 and CA-325 of the Santa Ynez Pipeline System that are not tied to any harm allegedly caused by the operation of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325. There is also no rational basis for imposing additional requirements to commence the flow of crude oil through the Santa Ynez Pipeline System, including Segments CA-324 and CA-325.

119. By enforcement or the threat of enforcement of SB 237, Defendants violate Pacific Pipeline Company's procedural due process rights.

120. A bona fide and actual controversy exists between Pacific Pipeline Company and Defendants in that Pacific Pipeline Company alleges, and is informed and believes that Defendants deny, that SB 237 violates the due process clauses of Article I, Section 7 of the California Constitution and the Fourteenth Amendment to the United States Constitution.

121. Pursuant to California Code of Civil Procedure section 1060 and section 1983, title 42, of the United States Code, Pacific Pipeline Company seeks a judicial determination that SB 237 violates Pacific Pipeline Company's due process rights in violation of the federal and state constitutions.

122. As SB 237 constitutes a violation of Pacific Pipeline Company's due process rights, injunctive relief and a judicial determination are necessary and appropriate to avoid the continued deprivation of state and federal constitutional rights that will result if SB 237 were to remain in effect.

/ / /

SECOND AMENDED COMPLAINT

## FIFTH CAUSE OF ACTION

### Declaratory Relief (Equal Protection Violation) – As To All Defendants

123.    Pacific Pipeline Company realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

124.    The United States and California Constitutions guarantee that a person may not be denied equal protection of the laws. Cal. Const. art. 1, § 7(a); U.S. Constitution, 14th Amend. Corporations are "persons" within the meaning of this provision and thus entitled to equal protection of the laws.

125.    The purpose of the Equal Protection Clause is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by the express terms of a statute or by its improper execution through duly constituted agents.

126.    The Equal Protection Clause of the California Constitution requires that similarly situated individuals be treated similarly, absent an adequate basis for disparate treatment by the state legislature.

127.    SB 237 intentionally singles out and discriminates against Pacific Pipeline Company by imposing additional permitting requirements applicable only to the Santa Ynez Pipeline System, including Segments CA-324 and CA-325. SB 237 does not impose any requirements on other pipeline facilities within the State of California. SB 237 applies to Pacific Pipeline Company as a "class of one."

128.    By enforcement or the threat of enforcement of SB 237, Respondents violate Pacific Pipeline Company's right to equal protection of the laws under Article 1, Section 7(a) of the California Constitution.

129.    A bona fide and actual controversy exists between Pacific Pipeline Company and Defendants in that Pacific Pipeline Company alleges, and is informed and believes that Defendants deny, that SB 237 violates the equal protection clauses of Article I, Section 7 of the California Constitution and the Fourteenth Amendment to the United States Constitution.

130.    Pursuant to California Code of Civil Procedure section 1060 and section 1983, title

- 32 -

SECOND AMENDED COMPLAINT

42, of the United States Code, Pacific Pipeline Company seeks a judicial determination that SB 237 violates Pacific Pipeline Company's equal protection rights in violation of the federal and state constitutions.

131.    As SB 237 constitutes a violation of Pacific Pipeline Company's equal protection rights, injunctive relief and a judicial determination are necessary and appropriate to avoid the continued deprivation of state and federal constitutional rights that will result if SB 237 were to remain in effect.

## SIXTH CAUSE OF ACTION

### Declaratory Relief (Violation of the Prohibition on Bills of Attainder) – As To All Defendants

132.    Pacific Pipeline Company realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

133.    The United States and California Constitutions prohibit passage of a bill of attainder. A bill of attainder imposes punishment on a specific individual or group.

134.    SB 237 applies with specificity only to Pacific Pipeline Company as the owner of the Santa Ynez Pipeline System.

135.    SB 237 punishes Pacific Pipeline Company by subjecting only Pacific Pipeline Company to the requirements of Section 51014.1 of the Government Code and Section 30262 of the Coastal Act. Moreover, SB 237 makes "[a] violation of the act [] a crime."

136.    SB 237 amounts to a trial by Legislature. It usurps the role of the judicial branch by punishing the conduct of a single, specific entity, in the absence of any evidentiary basis that the harm which the statute purportedly addresses actually exists.

137.    A bona fide and actual controversy exists between Pacific Pipeline Company and Defendants in that Pacific Pipeline Company alleges, and is informed and believes that Defendants deny, that SB 237 is a bill of attainder in violation of Section 9, Clause 3 or Section 10, Clause 1, of Article I of the United States Constitution and Article 1, Section 9, of the California Constitution.

SECOND AMENDED COMPLAINT

138.    Pursuant to California Code of Civil Procedure section 1060 and section 1983, title 42, of the United States Code, Petitioner is entitled to a declaration that SB 237 constitutes an unconstitutional bill of attainder under the United States and California Constitution.

139.    As SB 237 constitutes an unconstitutional bill of attainder, injunctive relief and a judicial determination are necessary and appropriate to avoid the continued deprivation of state and federal constitutional rights that will result if SB 237 were to remain in effect.

<b><u>SEVENTH CAUSE OF ACTION</u></b>

<b>Declaratory Relief (Impairment of Vested Rights) – As To All Defendants</b>

140.    Pacific Pipeline Company realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

141.    Pacific Pipeline Company seeks a declaration from this Court that Pacific Pipeline Company has fully-vested rights of ownership of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325.  Pacific Pipeline Company further seeks a declaration that, as a result of these vested rights, Defendants may not enforce the provisions of SB 237 to punish Pacific Pipeline Company's ownership interests in the Santa Ynez Pipeline System, including Segments CA-324 and CA-325.

142.    Pacific Pipeline Company has a property interest in the Santa Ynez Pipeline System, including Segments CA-324 and CA-325.

143.    The doctrine of vested rights seeks to protect property owners and developers who have substantially relied on past permits and proceeded accordingly with the government's acknowledgement. The doctrine protects a permit holder's right not only to construct, but also to use the premises as authorized by the permit. *Cnty. of San Diego v. McClurken*, 37 Cal. 2d 683, 691 (Cal. 1951).

144.    By enforcement or threat of enforcement of SB 237, Defendants impair Pacific Pipeline Company's vested rights over the ownership of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325.

145.    A bona fide and actual controversy exists between Pacific Pipeline Company and

- 34 -

SECOND AMENDED COMPLAINT

Defendants in that Pacific Pipeline Company alleges, and is informed and believes that Defendants deny, that Defendants' enforcement or threatened enforcement of SB 237 impairs Pacific Pipeline Company's vested rights concerning ownership of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325.

146.   Pursuant to California Code of Civil Procedure section 1060, Pacific Pipeline Company seeks a judicial determination that Defendants' enforcement or threatened enforcement of SB 237 impairs Pacific Pipeline Company's vested rights concerning ownership of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325.

## EIGHTH CAUSE OF ACTION

### Declaratory Relief (Inverse Condemnation) – As To All Defendants

147.   Pacific Pipeline Company realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

148.   SB 237 is invalid because it substantially impairs Pacific Pipeline Company's vested rights in the ownership of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325.

149.   By their enforcement or threatened enforcement of SB 237, Defendants impair Pacific Pipeline Company's ownership interest and operating rights in the Santa Ynez Pipeline System, including Segments CA-324 and CA-325. Defendants, therefore, violate article I, section 19, of the California Constitution and the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution by enforcing or threatening to enforce SB 237.

150.   The enactment of SB 237 is part of a statewide effort to prevent the transport of crude oil within Segments CA-324 and CA-325 of the Santa Ynez Pipeline System purely due to political machinations and without regard to ongoing business interests or actual impacts to neighboring uses.

151.   Defendants' enforcement or threatened enforcement of SB 237 substantially impairs Pacific Pipeline Company's property rights as to the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, for the benefit of the public without prior compensation

- 35 -
SECOND AMENDED COMPLAINT

to Pacific Pipeline Company.

152.    SB 237 forces Pacific Pipeline Company to bear public burdens which, in all fairness and justice, should be borne by the public as a whole

153.    By enactment, enforcement, or the threat of enforcement of SB 237, Defendants violate article I, section 19, of the California Constitution, which prohibits the temporary or permanent taking or damaging of private property for public use without prior, just compensation. Further, Defendants violate the takings clause of the Fifth Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, which prohibits the temporary or permanent taking of private property for public use without prior, just compensation.

154.    Pacific Pipeline Company's interests will be materially, substantially, and irreparably harmed by SB 237. Defendants' enforcement or threat of enforcement of SB 237 will interfere with Pacific Pipeline Company's reasonable investment-backed expectations.

155.    A bona fide and actual controversy exists between Pacific Pipeline Company and Defendants in that Pacific Pipeline Company alleges, and is informed and believes that Defendants deny, that SB 237 violates article I, section 19, of the California Constitution and the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution.

156.    Pursuant to California Code of Civil Procedure section 1060, Pacific Pipeline Company seeks a judicial determination that SB 237 would result in a taking of Pacific Pipeline Company's property rights in violation of the federal and state constitutions.

157.    As SB 237 would result in a taking of Pacific Pipeline Company's property rights in violation of the federal and state constitutions, injunctive relief and a judicial determination are necessary and appropriate to avoid the continued deprivation of state and federal constitutional rights that will result if SB 237 were to remain in effect.

## NINTH CAUSE OF ACTION

**Damages for Taking or Damaging Property for Public Use Without Prior Compensation –**

**As To All Defendants**

158.    Pacific Pipeline Company realleges and incorporates by reference each of the above

- 36 -

SECOND AMENDED COMPLAINT

paragraphs as if fully set forth herein.

159.   At the time the State enacted SB 237, Pacific Pipeline Company had an ownership interest in the Santa Ynez Pipeline System, including Segments CA-324 and CA-325.

160.   For years prior to the State's action in enacting SB 237, Pacific Pipeline Company had vested rights concerning the ownership and use of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325.

161.   Defendant State of California's enforcement or threatened enforcement of SB 237 substantially impairs Pacific Pipeline Company's vested rights in the Santa Ynez Pipeline System and eliminates substantially all of Pacific Pipeline Company's economically viable use of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, for the benefit of the public without prior compensation to Pacific Pipeline Company.

162.   By enforcing or threatening to enforce SB 237, Defendant State of California violates article I, section 19, of the California Constitution, which prohibits the temporary or permanent taking or damaging of private property for public use without prior, just compensation. Further, Defendant State of California violates the takings clause of the Fifth Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, which prohibits the temporary or permanent taking of private property for public use without prior, just compensation.

163.   To date, Pacific Pipeline Company has not received any compensation from Defendant State of California on account of the above alleged taking of, or damage to, its property rights with respect to the Santa Ynez Pipeline System, including Segments CA-324 and CA-325.

164.   As a direct and proximate result of Defendant State of California's violation of article I, section 19, of the California Constitution and the takings clause of the Fifth Amendment of the U.S. Constitution, as alleged above, Pacific Pipeline Company has been and will be damaged from the interference with its reasonable investment-backed expectations in its interest in the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, and will suffer further damages in an amount to be determined at trial.

165.   Pacific Pipeline Company is entitled to damages in the amount in excess of

- 37 -

SECOND AMENDED COMPLAINT

$347,000,000 and attorneys' fees for Defendant State of California's constitutional violation under Sections 1983 and 1988 of the Federal Civil Rights Act of 1871. Additionally, Pacific Pipeline Company is entitled to reputational damages in an amount to be determined.

### TENTH CAUSE OF ACTION

### Injunctive Relief – As To All Defendants

166.    Pacific Pipeline Company realleges and incorporates by reference each of the above paragraphs as if fully set forth herein.

167.    Defendants have threatened to enforce the provisions of SB 237 against Pacific Pipeline Company. On February 18, 2026, the California Coastal Commission sent a letter, carbon-copying California Department of Forestry and Fire Protection, Office of State Fire Marshal, and Daniel Berlant in his official capacity as State Fire Marshal (collectively "CalFire"), to Pacific Pipeline Company indicating that it has "independent authority over any resumption of use of [Segments CA-324 and CA-325]" and will require Pacific Pipeline Company to "apply for and receive a CDP from the Commission that meets the standards of Section 30262" as amended by SB 237. Feb. 18, 2026 Letter from California Coastal Commission to S. Rusch, Exhibit E. Thereafter on March 19, 2026, the Commission explained its position that "[a]s of January 1, 2026, the Pipelines had been idled, inactive, and out of service for more than five years," and "Sable has not obtained a new Coastal Development Permit for reactivation of the Pipelines. Thus, any reactivation of the Pipelines is unpermitted development and would be grounds for further enforcement action by the Commission." Exhibit H, at p. 1. In addition, SB 237 provides CalFire with authority "to administer provisions regulating the inspection of intrastate pipelines used for the transportation of hazardous liquid." Specifically, SB 237 prohibits "the restarting of an existing oil pipeline that is 6 inches or larger that has been idle, inactive, or out of service for 5 years or more without passing a spike hydrostatic testing program that meets the requirements established by the State Fire Marshal[.]" SB 237 requires a hydrostatic spike test "shall be at least 139 percent of the maximum operating pressure of the pipeline and shall not exceed 80 percent of the specific minimum yield strength, as determined appropriate by the State Fire Marshal." Unless

- 38 -
SECOND AMENDED COMPLAINT

immediately enjoined, Defendants' actions will cause substantial and irreparable harm to Pacific Pipeline Company and the parties with whom it contracts, as well as the public that depends on the petroleum products shipped through the Santa Ynez Pipeline System.

168.    Defendants' attempt to apply the provisions of SB 237 to the Santa Ynez Pipeline System would cause irreparable harm to the consistent, uniform scheme of federal pipeline regulation and the implementation of the DPA Order, and would result in significantly increased costs to Pacific Pipeline Company and the public with little or no corresponding safety benefit.

169.    Pacific Pipeline Company seeks a temporary and/or permanent injunction to prevent Defendants from taking enforcement action in furtherance of SB 237 as to the Santa Ynez Pipeline System. Including Segments CA-324 and CA-325, which would interfere with a) the free flow of petroleum products in interstate commerce; b) federal control over safety, design, construction, installation, testing, inspection, training, staffing, maintenance, and operations of the Santa Ynez Pipeline System, including Segments CA-324 and CA-325; and c) and enforcement of the uniform, consistent scheme of federal hazardous liquid pipeline safety regulations.

## PRAYER FOR RELIEF

WHEREFORE, Pacific Pipeline Company respectfully prays for judgment against the Defendant as follows:

1.    For a judicial declaration that the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, has not been "idled, inactive, or out of service for five years or more" under Government Code Section 51014.1 and Public Resources Code Sections 30262 (b)(1) and (b)(2), as amended by SB 237;

2.    For a judicial declaration that the application of SB 237 as to the Santa Ynez Pipeline System is preempted by the federal Pipeline Safety Act;

3.    For a judicial declaration that the application of SB 237 as to the Santa Ynez Pipeline System is preempted by the DPA Order;

4.    For a declaration that SB 237 is unlawful and void as violating Petitioner's substantive and procedural due process rights;

SECOND AMENDED COMPLAINT

5.      For a judicial declaration that the application of SB 237 as to the Santa Ynez Pipeline System is unlawful and void as violating the equal protection clauses of the federal and state constitutions;

6.      For a judicial declaration that SB 237 is unlawful and void as violating the prohibition against bills of attainder;

7.      For a judicial declaration that SB 237 is unlawful and void as it infringes upon and violates Pacific Pipeline Company's vested rights;

8.      For a judicial declaration that SB 237 is unlawful and void as it violates article I, section 19, of the California Constitution and the takings clause of the Fifth and Fourteenth Amendments to the United States Constitution;

9.      For damages in the amount in excess of $347,000,000 for just compensation and interest thereon, according to proof, for the temporary and permanent taking of Pacific Pipeline Company's property in violation of article I, section 19, of the California Constitution and the Fifth Amendment to the United States Constitution (as to only Defendant State of California);

10.     For a preliminary and permanent injunction prohibiting Defendants from taking enforcement action in furtherance of SB 237 as to the Santa Ynez Pipeline System, including Segments CA-324 and CA-325;

11.     For reasonable attorneys' fees incurred in this matter pursuant to sections 1021.5 or 1036 of the California Code of Civil Procedure, section 1988, title 42, of the United States Code, and other applicable law;

12.     For costs of suit incurred herein; and

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

- 40 -

SECOND AMENDED COMPLAINT

13. For such other and further relief as the Court deems just and proper, including supplemental relief under Code of Civil Procedure § 1062.

Respectfully submitted,

DATED: April 10, 2026

ALSTON & BIRD LLP

By: _____
JEFFREY D. DINTZER

Attorney for Plaintiff
PACIFIC PIPELINE COMPANY

- 41 -

SECOND AMENDED COMPLAINT

# **<u>EXHIBIT A</u>**

**SENATE RULES COMMITTEE**                                             SB 237
Office of Senate Floor Analyses
(916) 651-1520   Fax: (916) 327-4478

---

UNFINISHED BUSINESS

---

Bill No:   SB 237
Author:    Grayson (D), Hurtado (D), McNerney (D), Richardson (D) and
           Wilson (D), et al.
Amended:   9/10/25
Vote:      21

---

SENATE JUDICIARY COMMITTEE:  12-0, 5/6/25
AYES:  Umberg, Niello, Allen, Arreguín, Ashby, Caballero, Durazo, Laird, Stern,
  Wahab, Weber Pierson, Wiener
NO VOTE RECORDED:  Valladares

SENATE FLOOR:  34-0, 5/15/25 (Consent)
AYES:  Allen, Archuleta, Arreguín, Ashby, Becker, Blakespear, Cabaldon,
  Caballero, Choi, Cortese, Dahle, Durazo, Gonzalez, Grayson, Hurtado, Jones,
  Laird, Limón, McGuire, McNerney, Menjivar, Niello, Ochoa Bogh, Pérez,
  Richardson, Seyarto, Smallwood-Cuevas, Stern, Strickland, Umberg,
  Valladares, Wahab, Weber Pierson, Wiener
NO VOTE RECORDED:  Alvarado-Gil, Cervantes, Grove, Padilla, Reyes, Rubio

ASSEMBLY FLOOR: 59-4 , 9/13/25 – Roll call not available.

---

**SUBJECT:**  Oil spill prevention:  gasoline specifications:  suspension:  California
           Environmental Quality Act:  exemptions:  County of Kern:
           transportation fuels assessment:  coastal resources

**SOURCE:**  Author

---

**DIGEST:**  This bill contains a number of provisions that seek to safely and
responsibly increase in-state oil production (such as through testing of previously-
idled pipelines, greater disclosure of financial assurances, and resolving ongoing
litigation in favor of easier approval of drilling permits in Kern County), while also
soliciting additional information to mitigate rising fuel costs (such as by relaxing
California gasoline standards) and assess medium- to long-term strategies in line
with recent work from the California Energy Commission (CEC).

**Provided by LRI History LLC**

*Assembly Amendments* of 9/10/25 rewrote the bill entirely.

**ANALYSIS:**

Existing law:

1) Establishes the CEC tasks it with monitoring, analyzing, and making recommendations on statewide trends in the energy sector, including fuel supply and demand. (Public Resources Code §25200 et. seq.)

2) Establishes California Geologic Energy Management Division (CalGEM) for the purposes of overseeing the drilling, operation, maintenance, and removal of oil and gas wells. (Public Resources Code §3000 et. seq.)

3) Requires the Office of the State Fire Marshal (OSFM) to adopt hazardous liquid pipeline safety regulations that comply with federal law regarding hazardous liquid pipeline safety. (Government Code §51010 et. seq.)

4) Establishes the Office of Oil Spill Prevention and Response (OSPR) in the California Department of Fish and Wildlife as the state's principal regulator for oil spill prevention and response. (Government Code (GOV) §§8574.1 *et seq.*, GOV §§8670.1 *et seq.*, Public Resources Code §§8750 *et seq.*).

5) Institutes the California Environmental Quality Act (CEQA), which requires lead agencies with the principal responsibility for carrying out or approving a project to prepare a negative declaration (ND), mitigated negative declaration (MND), or environmental impact report (EIR) for the project, unless the project is exempt from CEQA. (Public Resources Code (PRC) §21000 et seq.). (CEQA Guidelines §15064(a)(1), (f)(1))

6) Establishes and defines a Program EIR (PEIR) in the CEQA guidelines as an EIR which may be prepared for a series of actions that can be characterized as one large project and are related either:
   a) Geographically;
   b) As logical parts in the chain of contemplated actions;
   c) In connection with issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program; or
   d) As individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways. (California Code of Regulations CEQA Guidelines § 15168)

This bill:

1) Makes findings and declarations regarding, among other things, California's mid-transition phase of the energy transition.

2) Requires the OSPR to solicit feedback on and periodically update its worst case scenario spill volumes.

3) Requires the OSPR to list, among other things, all applications for certificates of financial responsibility, and to revise worst case scenario spill volumes, and operators' assurance of financial responsibility in case of a spill.

4) Requires pipelines of a certain size that have been out of service for more than five years (which would notably include certain pipelines serving the Sable Corporation's Santa Ynez Unit), to meet specific testing requirements.

5) Permits the Governor to, under certain circumstances and with specified considerations, suspend the requirement "summer blend" gasoline in order to protect against "extraordinary gasoline price increases," among other things.

6) Deems the Kern County Second Supplemental Recirculated Environmental Impact Report (SCH2013081079; the SSREIR), including all appendices (SSREIR, March 2025), until January 1, 2036, sufficient for full compliance with CEQA.

7) Directs CEC to, as part of the next Transportation Fuels Assessment, evaluate the cost and supply impacts of gasoline that is not "California reformulated gasoline blendstock for oxygenate blending" (CARBOB), and, among other things, potentially make various recommendations regarding how such non-CARBOB gasoline could benefit California.

8) Requires CEC to, on or before March 31, 2026, submit an assessment to the Legislature that evaluates certain information in the June 2025 letter to Governor Newsom from CEC Vice Chair Siva Gunda.

9) Requires oil produced offshore by new, expanded, or reactivated operations (of the same types of pipelines covered by #4 above) to be transported once

onshore by pipelines using the best available technology, as defined, and certain projects require a new Coastal Development Permit.

## Background

*Declining domestic oil production may impact in-state oil pipelines.* California's reliance on crude oil has steadily declined since the 1980s; however, oil consumption recently increased from pandemic lows in 2020. Despite this rebound, California's in-state production of petroleum remains low and California largely relies on imports for its petroleum supplies. Several refineries maintain existing petroleum supplies by using pipelines to in-state oil fields. However, as supply from those fields decreases, the economic viability of those pipelines sharply declines. Some of the policies advanced by this bill (namely restoring the pipelines for offshore oil production in Sable's Santa Ynez Unit and the Kern County SSREIR being deemed approved) appear to address this problem by increasing in-state oil production.

a) *Tests for moving oil safely via pipelines.* To prevent accidents and spills, state and federal regulations require pipeline operators to conduct hydrostatic pressure tests to ensure the integrity of their pipelines.

b) *Financial assurances in the case of oil spills.* Because the threat of an oil spill is never zero, OSPR issues Certificate of Financial Responsibility to facilities, vessels, and pipelines that are required to have a California Oil Spill Contingency Plan, following submittal of an application and proof that the applicant has the financial resources to cover the cost of response for a "worst-case scenario" spill.

*Kern County oil and gas ordinance's iterative EIRs.* In 2013, Kern County began the process of amending its zoning ordinance addressing local permitting for oil and gas exploration, development and production. For the last ten years, the County has gone back and forth in litigation as plaintiffs challenged the ordinance and the drilling permitted under it. Courts have at different times and to various degrees sided with one side or the other, and the original EIR has been revisited in supplemental EIRs (SEIR). As of 2025, the most recent iteration of the EIR, the Second Supplemental Recirculated EIR (SSREIR), faces legal challenge.

*Energy Commission Recommendations for the mid transition.* On June 27, 2025, the Vice Chair of the energy commission submitted a letter to the Governor outlining the CEC's recommendation's on changes to state policy to ensure

"adequate transportation fuels supply during this pivotal time in our state's clean energy transition." The letter recommended pursuit of three concurrent strategies, briefly:

c) Stabilize fuel supply through imports of refined fuels and maintaining in-state refining capacity;

d) Provide sufficient confidence to industry to invest in maintaining reliable and safe infrastructure operations to meet demand; and

e) Develop and execute a holistic transportation fuels transition strategy.


**Comments**

*Purpose of Bill.* According to the author, "California faces an affordability crisis on a number of fronts, most notably when it comes to the cost of fuel. This affects all of us—both directly and indirectly—whether it be at the gas pump, where Californians pay some of the prices in the country, or in the form of higher prices for goods and services, which are also affected by the higher costs of energy to produce and deliver. As was noted in a June 27, 2025 report by California Energy Commission Vice-Chair, Siva Gunda, "If a lack of proactive management during this phase of the transition leads to rising energy prices and less reliable fuel supplies, that instability could erode support for continued decarbonization." SB 273 seeks to answers this call for proactive management."

*Preventing oil spills from pipelines.* On May 19, 2015 an offshore pipeline ruptured, spilling over 140,000 gallons of heavy crude oil along the Gaviota coast at Refugio Beach in Santa Barbara County. Sable announced they were restarting oil production in the Santa Ynez unit (in federal waters) on May 15, 2025, and restarting the use of those two pipelines. Sable has not replaced, but has rather made repairs to the pipelines. Some of the provisions of SB 237 are intended to address concerns surrounding the safety of restarting use of the repaired pipelines by requiring testing of the pipelines' durability.

*Updating financial assurances for oil spills.* There is no requirement that the regulations governing worst-case spills be regularly updated, and as such, they have not been. The marine facility reasonable "worst-case spill" volume calculations were established in regulation in 1993 using methods aligned with federal worst-case discharge calculations, and there have only been minor and infrequent updates since then. SB 237 would require more disclosure about and decadal updates of the certificates of financial responsibility.

*Ending the Kern Oil and Gas Ordinance litigation, with some guardrails.* SB 237 'puts the lid' on any further revisions to or legal objections against Kern County's zoning ordinance focused on oil and gas (except purely typographical fixes). SB 237 also specifies that the zoning ordinance SSREIR is sufficient to meet the requirements of CEQA for compliant projects, meaning that no further, project-specific EIR's for a given oil well are required so long as the new wells fit in the four corners of the existing SSREIR. However, SB 237 could prevent appropriate mitigations measures or other environmental considerations from being applied to drilling projects that are atypical, use emerging technology or technology not considered the SSREIR, or are otherwise not considered in the SSREIR.

To help address some of these concerns, SB 237 adds some environmental guardrails to the application of the SSREIR, briefly:

a) It sets a cap for drilling in Kern County at 2,000 new oil wells, a 26% reduction in total planned wells per year compared to the original estimate in Kern County's oil and gas ordinance EIR. (However, this can be waived under certain CEC findings);

b) It contains a ten-year sunset on the provisions that specify that the SSREIR is sufficient, complete, and not subject to lawsuits for new drilling (However, the SSREIR itself would remain in effect after the sunset);

c) It specifies that CalGEM, rather than Kern County, must be the lead agency in a health protection zone, presumably making it harder to drill new wells in those zone (although not impossible).

*Maintaining capacity to stabilize fuel supply.* Several of this bill's provisions appear to follow recommendations in CEC Vice Chair Gunda's June letter, and would be expected to boost in-state production, which would be expected to support California's refinery capacity, which would be expected to help keep refineries operating in state.

*Using more tools in the toolbox to manage gas prices.* Parts of SB 237 contemplate changes to California's fuel blend to reduce fuel prices. Summer blend gasoline in California contributes less to smog, but is more expensive. California's unique gasoline blendstock, CARBOB, was formulated to help meet California's nation-leading air pollution challenges. However, it also means that fuel in neighboring states cannot be used in California. Both of these measures could be expected to reduce fuel prices, at the cost of increased air pollution. However, these do not address the long-term challenges the state faces in larger-scale decarbonization

**Provided by LRI History LLC**

across all sectors of the economy.

*Navigating the mid-transition.* Whether through the intentional phase-down of fossil fuels in California, shifting global market dynamics, the costs associated with repair and maintenance, or a combination of all of the above and more, it is clearly becoming more and more difficult to profitably operate fossil fuel infrastructure in California. How do we embrace and deploy clean technologies while they are more expensive than the fossil fuel alternatives? How do we maintain the fossil fuel supply we need as it becomes less lucrative and less feasible to do so?

We are in a period described by academics as the "mid-transition". As described in a recent review:

> "Many aspects of transition will be felt, and shaped, directly by individuals because of our direct interactions with energy systems. Even rare missteps are likely to have significant and potentially system design relevant impacts on perception, political support, and implementation. Comparisons of the new system to the old system are likely to rest on experience of a world less affected by climate change, such that concerns about lower reliability, higher costs, and other challenges might be perceived as inherent to zero-carbon systems, versus energy systems facing consequences of climate change and longterm underinvestment."[1]

California's economy today relies on an immense volume of fossil fuels (by some accounts as much as 84% of our total energy today)[2]. In turn, extracting, transporting, refining, distributing, and using those fossil fuels relies on an immense network of infrastructure owned by a number of private companies and operated by tens of thousands of skilled workers. Those private companies rely on certainty about the profitability of their investments. What happens when—not if— it is no longer profitable to operate fossil fuel infrastructure in California? What— if not profit—would compel private companies to continue maintaining and operating their infrastructure? How can California keep its economy afloat and its people thriving in the crucial period between when fossil fuels stop being profitable, and when they stop being needed?

Pursuant to SBX1-2, the California Energy Commission produced a Transportation

---

[1] Grubert and Hastings-Simon, 2022. Designing the mid-transition: A review of medium-term challenges for coordinated decarbonization in the United States. WIRES Climate Change, Vol 13, Issue 3.
[2] California State Profile & Energy Estimates. U.S. Energy Information Administration. **https://www.eia.gov/state/?sid=CA**

Fuels Assessment, which has begun to wrestle with some of these questions. One of several possible solutions under consideration is state ownership of refineries, in which, "The State of California would purchase and own refineries in the State to manage the supply and price of gasoline." However, doing so would be extremely costly and represent a significant departure from how this industry has operated in California to date. As the Legislature considers this bill and other proposals to assuage or mitigate the very real tensions of the mid-transition, it is worth also contemplating solutions on the longer time horizon as well.

There is no clear best way to transition the world's fourth largest economy off of fossil fuels. California is leading the way and charting a path to navigate this transition. This monumental task will have consequences, both expected and unforeseen. Nevertheless, the Legislature should evaluate the information and options available and take action before GHG emissions continue unabated, fossil fuel infrastructure falls into disrepair (with potentially catastrophic results), and communities surrounding this infrastructure continue to face air pollution and economic uncertainty alike.

Vice Chair Gunda's June letter described the importance of a holistic strategy for a managed transition away from fossil fuels, alongside more pressing and immediate matters. Boosting in-state production today, as SB 237 proposes to do, to keep critical infrastructure online is a reasonable response to less-than-ideal circumstances. But what lessons can be learned? What could California begin doing now to make the next refinery to announce its closure *less* disruptive to California's well-being, not more? What information is needed about California's refineries (both their operations and the financial liabilities associated with their site remediation) to better equip California to handle the next stage of this transition? Although SB 237 does not answer these questions, it helps get information that might. These continue to be questions the Legislature should consider, lest we find ourselves blindsided by the next nigh-inevitable refinery closure.

**FISCAL EFFECT:**  Appropriation:  No   Fiscal Com.:   Yes   Local:  Yes

**SUPPORT:**  (Verified  9/13/25)

350 Humboldt
Associated Builders and Contractors of California
Berry Petroleum Company, LLC
California Business Roundtable
California Independent Petroleum Association

California Resources Corporation and Subsidiaries
California State Association of Electrical Workers
California State Pipe Trades Council
City of Bakersfield
Climate Action California
County of Kern

**OPPOSITION:** (Verified 9/13/25)

Asian Pacific Environmental Network Action
California Coastal Protection Network
California Environmental Justice Alliance Action
California Environmental Voters
Campaign for a Safe and Healthy California
Ceja Action
Center for Biological Diversity
Center on Race, Poverty & the Environment
Central California Environmental Justic Network
Central California Environmental Justice Network
Clean Water Action
Climate First: Replacing Oil & Gas
Communities for a Better Environment
Consumer Watchdog
Earthjustice
Leadership Council for Justice and Accountability
Natural Resources Defense Council
Natural Resources Defense Council
Physicians for Social Responsibility - Los Angeles
Sierra Club
Sierra Club California
The Climate Center


Prepared by: Heather Walters / E.Q. / (916) 651-4108
9/13/25 11:10:30

**\*\*\*\* END \*\*\*\***

# EXHIBIT B



| | |
|---|---|
| **U.S. Department**<br>**of Transportation** | 1200 New Jersey Avenue SE<br>Washington, D.C. 20590 |

**Pipeline and Hazardous**
**Materials Safety**
**Administration**

December 17, 2025

<u>Via Electronic Mail to: cflores@sableoffshore.com</u>

J. Caldwell Flores
President and Chief Operating Officer
Sable Offshore Corp.
845 Texas Ave. Ste 2920
Houston, TX 77002

Re:  Determination of Interstate Classification

Dear Mr. Flores:

This responds to your letter of November 26, 2025 regarding the Las Flores Pipeline owned and operated by Sable Offshore Corp. (Sable). Your letter notifies the Pipeline and Hazardous Materials Safety Administration (PHMSA) that Sable has determined the pipeline to be an interstate pipeline facility under the Pipeline Safety Act (PSA) and requests PHMSA transition regulatory oversight from the California Office of the State Fire Marshal (OSFM) to PHMSA.

As noted in your letter, portions of the Las Flores Pipeline (previously known as Lines 901 and 903) have been considered intrastate since 2016 and subject to regulatory oversight by OSFM pursuant to its certification with PHMSA under 49 U.S.C. § 60105(a). Prior to 2016, Lines 901 and 903 were considered interstate and regulated by PHMSA. The classification change in 2016 corresponded to the pipelines' previous owner cancelling tariffs with the Federal Energy Regulatory Commission (FERC). In 2024, Sable acquired Lines 901 and 903 and other assets comprising the Las Flores Pipeline, including offshore pipelines transporting crude oil from the Outer Continental Shelf (OCS) and an onshore processing facility at Las Flores Canyon. Sable operates the Las Flores Pipeline assets as a single pipeline system transporting crude oil from the OCS to the Pentland Station terminal in Kern County, California.

Upon receipt of your letter, PHMSA initiated a review of the Las Flores Pipeline. This review included an on-site inspection on December 9 through December 11, 2025. OSFM representatives accompanied PHMSA on the inspection. PHMSA also reviewed Sable's written procedures and records and conducted field observations of the Las Flores facility, the pump stations at Gaviota and Sisquoc, the control room in Santa Maria, and the offshore Harmony platform. In addition, PHMSA reviewed the 2025 program inspections conducted by OSFM. For

2

the following reasons, PHMSA agrees with your determination that the Las Flores Pipeline is an interstate pipeline.

The PSA authorizes PHMSA to prescribe and enforce minimum safety standards for pipeline transportation and for pipeline facilities.[1] The PSA vests with PHMSA exclusive regulatory authority over interstate pipelines and preempts States from adopting or continuing in force safety standards for interstate pipelines.[2] With respect to intrastate pipelines, the PSA provides a State authority may regulate the intrastate pipelines within its borders upon submission to PHMSA of an annual certification.[3] Both the PSA and the Federal pipeline safety regulations define interstate and intrastate pipelines.[4] An interstate pipeline is a pipeline or part of a pipeline used to transport hazardous liquids in interstate or foreign commerce; an intrastate pipeline is a hazardous liquid pipeline that is not an interstate pipeline.

Determining whether a hazardous liquid pipeline is an interstate or intrastate pipeline requires a factual inquiry.[5] To assist in that determination, PHMSA adopted Appendix A to 49 CFR Part 195 providing a statement of agency policy and interpretation on the delineation between Federal and State jurisdiction.[6] In short, "if there is a tariff or concurrence filed with FERC governing the transportation of hazardous liquids over a pipeline facility . . . then [PHMSA] will, as a general rule, consider the facility to be an interstate pipeline facility within the meaning of the [PSA]." The absence of a FERC tariff generally means a pipeline is intrastate; however, in certain situations, PHMSA will consider a pipeline to be interstate despite the lack of a filing with FERC. Several examples of this are listed in Appendix A. As it relates to the Las Flores Pipeline, one example provides that a pipeline originating on the OCS will be considered an interstate pipeline even if the pipeline does not have a tariff with FERC.[7]

PHMSA's evaluation of the Las Flores Pipeline confirms that it transports crude oil from the OCS to an onshore processing facility at Las Flores Canyon and continues the transportation of crude oil from Las Flores Canyon to Pentland, California. Consistent with Appendix A, the Las

---

[1] 49 U.S.C. § 60101 et seq.

[2] 49 U.S.C. § 60104(c). *See* Olympic Pipe Line Co. v. City of Seattle, 437 F.3d 872, 878 (9th Cir. 2006) (discussing how the "PSA differentiates between the regulation of interstate and intrastate hazardous liquid pipelines.")

[3] 49 U.S.C. § 60105(a). OSFM has a certification with PHMSA to regulate intrastate hazardous liquid pipelines in California.

[4] 49 U.S.C. § 60101(a)(7), (a)(8)(B), (a)(10); 49 CFR § 195.2. *See* S. Pac. Pipe Lines Inc. v. DOT, 796 F.2d 539 (D.C. Cir. 1986) (finding PHMSA's definition of interstate and intrastate pipelines reasonable under the PSA).

[5] Transportation of Liquids by Pipeline, 46 Fed. Reg. 38,357, 38,359 (Jul. 27, 1981) (PHMSA's predecessor agency (hereafter PHMSA) explained that it had "reviewed examples of what it believes are the most frequent and likely configurations of liquid pipelines and pipeline facilities and considered various ways of cataloging or classifying them as either interstate or intrastate."); *see also* Shell Oil Co. v. City of Santa Monica, 830 F.2d 1052, 1064 (9th Cir. 1987) (noting that whether the pipeline was interstate or intrastate turned on a disputed issue of fact).

[6] Transportation of Hazardous Liquids by Pipeline; Regulation of Intrastate Pipelines, 50 Fed. Reg. 15,895, 15,897 (Apr. 23, 1985).

[7] 49 CFR Part 195, App. A. "Example 7. Pipeline Company P operates a pipeline that originates on the Outer Continental Shelf. P does not file any tariff for that line with FERC. [PHMSA] will consider the pipeline to be an interstate pipeline facility."

3

Flores Pipeline is an interstate pipeline.[8] As portions of the Las Flores Pipeline were previously considered to be intrastate and regulated by OSFM, PHMSA is notifying OSFM that the Las Flores Pipeline is subject to the regulatory oversight of PHMSA. Please direct further correspondence on this matter to Dustin Hubbard, Director, Western Region, Office of Pipeline Safety, PHMSA, at (720) 963-3183.

Sincerely,


Linda Daugherty
Acting Associate Administrator for Pipeline Safety


cc:     James Hosler, Chief, Pipeline Safety Division, OSFM
        Varun Shekhar, Shareholder, Babst Calland Clements & Zomnir, PC

---

[8] PHMSA regulations consider the Las Flores Pipeline to be an "active" pipeline. *See* Pipeline Safety: Clarification of Terms Relating to Pipeline Operational Status, 81 Fed. Reg. 54,512 (Aug. 12, 2016) ("The regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned.")

# EXHIBIT C



U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

12300 W. Dakota Ave., Suite 340
Lakewood, CO  80228

**VIA ELECTRONIC MAIL TO: lyearwood@sableoffshore.com**

December 22, 2025

Mr. Lance Yearwood
Vice President
Pacific Pipeline Company / Sable Offshore Corp.
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**RE:    Approval of Sable Offshore Corp.'s Restart Plan for the Las Flores Pipeline System Line
CA-324 and Line CA-325**

Dear Mr. Yearwood:

From December 4 to December 12, 2025, the Pipeline and Hazardous Materials Safety Administration
(PHMSA) received several documents from Sable Offshore Corp. These documents included:

1. Line CA-324 and Line CA-325 Fill Plan and Startup Procedures
2. A letter requesting the removal of pressure restrictions for Line CA-324
3. A letter requesting the removal of pressure restrictions for Line CA-325
4. The Las Flores Pipeline Linefill Positioning Plan Assignments
5. The Las Flores Pipeline Linefill Contact List

These documents addressed the Restart Plan for Line CA-324 and Line CA-325 (previously known as
Plains Line 901 and Line 903, respectively). In addition, PHMSA conducted a field inspection with Sable
Offshore Corp. to discuss its process and safety procedures for the pipeline restart.

PHMSA has reviewed these documents and hereby approves the submitted Restart Plan. This approval is
valid from the date of this letter.

Should you have any questions or concerns, please contact me at (720) 963-3160 or by email at
dustin.hubbard@dot.gov.

Sincerely,



Dustin Hubbard
Director, Western Region
Pipeline and Hazardous Materials Safety Administration

cc:    Trent Fontenot, Sr. Vice President - Operations, tfontenot@sableoffshore.com
       Jim Hosler, Assistant Deputy Director – Pipeline Safety and CUPA, CalFire,
       jim.hosler@fire.ca.gov

# EXHIBIT D

# U.S. DEPARTMENT OF TRANSPORTATION

# PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION

# EMERGENCY SPECIAL PERMIT

## Special Permit Information:

| | |
|---|---|
| **Docket Number:** | 2025-1502 |
| **Requested By:** | Sable Offshore Corp. PPC |
| **Operator ID#:** | 40881 |
| **Date Requested:** | December 19, 2025 |
| **Issuance Date:** | December 23, 2025 |
| **Expiration Date:** | February 21, 2026 |
| **Code Section:** | 49 CFR § 195.452(h)(4)(iii)(H) |

## Grant of Special Permit:

By this order, subject to the terms and conditions set forth below, the Pipeline and Hazardous Materials Safety Administration (PHMSA) Office of Pipeline Safety (OPS)[1] grants this emergency special permit to Sable Offshore Corp. PPC (Sable) for 124.42 miles of 24- and 30-inch diameter hazardous liquid pipelines, Lines CA-324 and CA-325 (*special permit segments*), transporting crude oil from Las Flores Canyon to Pentland in Santa Barbara, San Luis Obispo, and Kern counties, California.  This emergency special permit waives compliance from 49 CFR § 195.452(h)(4)(iii)(H), which requires corrosion of or along a longitudinal seam weld be scheduled for evaluation and remediation within 180 days of discovering the condition.

## I.    Purpose and Need

On December 19, 2025,[2] Sable requested an emergency special permit for relief from the requirement to evaluate and remediate corrosion occurring at longitudinal seam welds within 180 days.  The *special permit segments* are under polyurethane foam and polyethylene tape wrap insulation, which can inhibit the effectiveness of cathodic protection and contribute to a risk of corrosion due to shielding effects. Sable proposed an alternative approach to safely manage this risk, which was previously reviewed and approved as part of two state waivers issued by the California Office of State Fire Marshal (OSFM) on December 17, 2024 to Sable for the *special permit segments*.  PHMSA previously reviewed the state waivers pursuant to 49 U.S.C. § 60118(d).

---

[1] Throughout this special permit, the usage of "PHMSA" means the U.S. Department of Transportation (DOT), Pipeline and Hazardous Materials Safety Administration, Office of Pipeline Safety.

[2] Sable submitted supplemental information related to its application on December 23, 2025.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC                                            Page 1 of 16
Emergency Special Permit – Corrosion Mitigation – California

Sable sought this special permit to implement the terms of a Consent Decree entered in Civil Action No. 2:20-CV-02415 by the U.S. District Court for the Central District of California, which provides, among other requirements, that a "State Waiver" must be applied for and received from OSFM prior to restarting Lines CA-324 and CA-325. The ***special permit segments*** were previously considered intrastate at the time of entry of the Consent Decree and were regulated by OSFM pursuant to its state certification with PHMSA under 49 U.S.C. § 60105(a). However, the ***special permit segments*** are now considered interstate pursuant to Sable's designation on November 26, 2025, and PHMSA's concurrence on December 17, 2025. As a result, PHMSA has exclusive pipeline safety regulatory agency over Lines CA-324 and CA-325.  The conditions ordered by OSFM in the two state waivers are now being re-issued by PHMSA as a special permit subject to Federal oversight and enforcement.

Sable requested PHMSA grant a special permit for the above reasons on an emergency basis pursuant to 49 U.S.C. § 60118(c)(2) and 49 CFR § 190.341(g). In its application, Sable stated that expedited review of its application was warranted in light of the national energy emergency declared by the President under the National Emergencies Act (50 U.S.C. § 1601 et seq.) in Executive Order 14156 (January 20, 2025). In Executive Order 14156, the President declared a national energy emergency based on a finding that "[t]he United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[3]  The Executive Order directs agencies, such as PHMSA, to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate," among other activities, the "production, transportation, refining, and generation of domestic energy resources."[4]  The Executive Order further directs agencies to "identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States . . . ."[5]

Sable's application stated that grant of this special permit on an emergency basis would facilitate the restart of Lines CA-324 and CA-325 to provide relief in response to the acute energy shortage conditions identified in Executive Order 14156 within California and in the West Coast region of the United States.[6]  Sable further noted that grant of this special permit on an emergency basis is appropriate to address the gap in coverage under the OSFM State Waivers created by redesignation of Lines CA-324 and CA-325 as interstate, given that the proposed special permit is substantially the same as that which was previously reviewed and approved by OSFM and PHMSA for issuance of the State Waivers.

This emergency special permit allows Sable to operate Lines CA-324 and CA-325 without being subject to the requirement to evaluate and remediate corrosion of or along a longitudinal seam weld within 180 days.  On the condition that Sable comply with the terms and conditions set forth below, the emergency special permit waives compliance with 49 CFR § 195.452(h)(4)(iii)(H) for the ***special permit segments***.

---

[3] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 1.
[4] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 2(a).  The order's definition of "energy" or "energy resources" includes "crude oil," and its definition of "transportation" includes "the physical movement of energy, including through, but not limited to, pipelines." Sec. 1(a); 1(c).
[5] Exec. Order 14156: Declaring a National Energy Emergency (Jan. 20, 2025), Sec. 3(b).
[6] For more information regarding these effects, see Attachments C, D, E, and F.

## II. Special Permit Segments

This emergency special permit pertains to the specified pipeline segments which make up the Las Flores Pipeline called Line CA-324 and CA-325.  Line CA-325 can be further divided into two segments: Lines CA-325A and CA-325B.  The Las Flores Pipeline is part of the Santa Ynez Pipeline System (SYPS), an interstate pipeline facility that Sable operates from the Outer Continental Shelf off the coast of Santa Barbara to Kern County, California.  A map of the special permit segments is available in Revised Attachment A.

**Special Permit Segments:**

| Special Permit Segment Name | Location | Mileage | California County or Counties |
|---|---|---|---|
| CA-324 | Las Flores Canyon Processing Facility to Gaviota Pump Station | 10.86 | Santa Barbara |
| CA-325A | Gaviota Pump Station to Sisquoc Pump Station | 38.72 | Santa Barbara |
| CA-325B | Sisquoc Pump Station to Pentland Station | 74.84 | Santa Barbara; San Luis Obispo; Kern |

## III.  Conditions

PHMSA grants this emergency special permit subject to Sable implementing each of the following conditions.  These conditions must be implemented and complied with in addition to all applicable requirements of 49 CFR Part 195 except for compliance with limitations on scheduling instances of corrosion on or near longitudinal seam welds for evaluation and remediation within 180 days of discovery in 49 CFR § 195.452(h)(4)(iii)(H), which would be waived.

**General Conditions:**

1)      The *special permit segments* may only be used to transport crude oil.

2)      Prior to transporting crude oil in the *special permit segments*, Sable must develop and implement procedures for the conditions and requirements described in this emergency special permit.

3)      Sable shall not exceed maximum operating pressure (MOP) limits for the *special permit segments*, as follows:

   a)  The MOP of Line CA-324 cannot exceed 1003 pounds per square inch gauge (psig).

   b)  The MOP of Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) cannot exceed 1000 psig.

c) The MOP of Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) cannot exceed 1292 psig.

4) Sable shall not exceed maximum operating temperature limits for crude oil transported in the ***special permit segments***, as follows:

a) The maximum operating temperature of the crude oil that is transported in Line CA-324 must not exceed 140 degrees Fahrenheit for more than 12 consecutive hours.

b) The maximum operating temperature of the crude oil that is transported in Line CA-325A (the segment of Line CA-325 between Gaviota and Sisquoc stations) must not exceed 125 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Gaviota station to monitor the temperature of Line CA-325A.

c) The maximum operating temperature of the crude oil that is transported in Line CA-325B (the segment of Line CA-325 between Sisquoc and Pentland stations) must not exceed 110 degrees Fahrenheit for more than 12 consecutive hours. Temperature transmitters must be installed on Line CA-325 at Sisquoc station to monitor the temperature of Line CA-325B.

5) This emergency special permit does not relieve Sable from complying with applicable requirements under 49 CFR Part 195, other than those waived in this emergency special permit.

6) This emergency special permit does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).

7) In-line inspections (ILIs) performed pursuant to this emergency special permit must include:

a) Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion, defined as follows:

i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.

ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.

b) Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).

c) Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI.

8) Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by Nippon Steel Corp. in the 1980s. At least three (3) separate tests must be performed to obtain the fracture toughness values of the

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 4 of 16

pipe body, heat affected zone (HAZ)[7], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-324.[8]

9)  Prior to placing Line CA-325 (including CA-325A and CA-325B) in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness. All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:

   a)  API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.

   b)  API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.

   At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ), and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 11, 16, 17, and 21. Sable may use pipe samples taken opportunistically during ongoing maintenance and repair efforts on Line CA-325A/B.[9]

10)  All existing immediate and 180-day repair conditions must be evaluated and remediated pursuant to the Consent Decree repair criteria prior to restarting CA-325A/B.[10] Upon restart Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by PHMSA. Sable must utilize the Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results to identify, evaluate and remediate any immediate and 180-day repair conditions that are listed in this emergency special permit.

11)  Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss

---

[7] The heat affected zone (HAZ), as used in this emergency special permit, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[8] Sable indicated in its application that it has already completed all of the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-324.

[9] Sable indicated in its application that it has already completed the testing required in this condition. Sable must submit all fracture toughness results to PHMSA prior to restarting Line CA-325.

[10] Sable indicated in its application that it has already completed the repairs required in this sentence. Sable must submit all of the results to PHMSA prior to restarting CA-324 and CA-325.

anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

12) Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of CA-324 and CA-325A/B.

13) Pressure Testing:[11]

a) Prior to placing CA-324 in operation, Sable must conduct a spike hydrostatic pressure test of CA-324 at a minimum pressure that is at least 1.5 times the maximum operating pressure (MOP) or 100% specified minimum yield strength (SMYS), for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

   i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

   ii. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

b) Immediately following the spike hydrostatic pressure test specified in Condition 13(a), Sable must conduct an 8-hour hydrostatic pressure test of CA-324 at a minimum of 1.25 times the MOP.

c) Prior to placing Line CA-325A (segment of Line 325 between Gaviota and Sisquoc stations) in operation, Sable must conduct a spike hydrostatic pressure test of CA-325A at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized. Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:

   i. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

   ii. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.

d) Immediately following the spike hydrostatic pressure test specified in Condition 13(c), Sable must conduct an 8-hour hydrostatic pressure test of CA-325A at a minimum of 1.25 times the MOP.

e) Prior to placing Line CA-325B (segment of Line 325 between Sisquoc and Pentland stations) in operation, Sable must conduct a hydrostatic pressure test of CA-325B at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours. Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP. Sable must field evaluate and remediate the following anomalies before performing the

---

[11] Sable indicated in its application that it has already completed all of the testing and repairs required in this Condition. Sable must submit the results to PHMSA prior to restart and confirm that no failures occurred during the required pressure testing.

hydrostatic test on CA-325B:

     i.   All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

    ii.   All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.

f)   Sable must obtain the Test ID for each hydrostatic pressure test from PHMSA (or OSFM if such testing was performed prior to November 26, 2025) and have the approved independent testing firm forward separately the certified test results to PHMSA or the OSFM, as applicable.

g)   Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 CFR Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under PHMSA or OSFM (as applicable) approved hydrostatic testing companies.

h)   Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported to PHMSA.[12]

i)   Section(s) of the *special permit segments* that failed during the required hydrotesting must be repaired by removing and replacing the failed section. PHMSA reserves the right to revoke this emergency special permit if failure(s) raise the concern that the *special permit segments* cannot be safely operated.

14)   In-Line Inspection (ILI) Assessment and Frequency:

a)   Prior to performing in-line inspections of the *special permit segment*, Sable shall provide PHMSA with a written notification to PHMSA describing its assessment plan with the following information:

     i.   Dates for integrity assessment

    ii.   In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[13] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications;

   iii.   In-line inspection tool vendor(s)

    iv.   Required tool specifications including operational specifications and anomaly sizing tolerances

    v.   Tool validation methodology

    vi.   Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

---

[12] All submissions to PHMSA required by this emergency special permit shall be submitted through email to the OPS Western Region Director, Dustin Hubbard, email address: Dustin.Hubbard@dot.gov or his designee.

[13] Industry standards referenced in this emergency special permit must utilize the editions that are incorporated by reference in 49 CFR 195.3 unless another edition is explicitly specified in this emergency special permit.

vii.  Criteria used to identify locations for excavation and field verification

viii.  Non-destructive examination

b) Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

c) Metal Loss Tool(s):

i.  Initial ILI tool runs – Each year, during the first two (2) years of operating the *special permit segments*, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU). Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months. If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

ii.  Subsequent ILI tool runs – After the first two (2) years of operating the *special permit segments*, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the *special permit segment* within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

d) Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[14] or the ILI assessment must be assessed at more frequent intervals if condition 21 determined a shorter assessment interval.

i.  These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

ii.  USCD Performance Specification Requirements

1.  The USCD tools must have a probability of detection that is

---

[14] Sable may petition PHMSA to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval.  Changes to the reassessment interval are subject to PHMSA approval.

$\geq 90\%$ for axial and circumferential cracks.

2. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

3. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

4. The depth sizing accuracy for cracks must be $\pm$ 0.8 mm for axial cracks and $\pm$ 1 mm for circumferential cracks.

e) Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

f) Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the *special permit segment* in which the ILI tool velocity was outside of the specified tool velocity range.

g) All ILI tool runs must obtain the Test ID from PHMSA prior to run.

h) Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

i) Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

j) Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals. Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[15] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different. If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

k) Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second

---

[15] A minimum of four (4) independent direct examination excavations must be used for unity plots.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 9 of 16

Edition, April 2013).

15)    Discovery of Condition: The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

16)    Immediate Repair Conditions:[16]

    a)  A crack or crack-like anomaly that meets any of the following criteria:

        i.   Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.

        ii.  Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

    b)  Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

    c)  Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[17]

17)    180-Day Repair Conditions:[18]

    a)  A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.

    b)  Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.

    c)  All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[19]

    d)  For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

18)    Corrosion Growth Rate Analysis (CGRA):

    a)  Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to

---

[16] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(i).  All immediate repair conditions must be remediated with a permanent repair method.

[17] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

[18] The criteria specified in this emergency special permit is supplemental to, and does not relieve Sable from complying with, the requirements set forth in 49 CFR 195.452(h)(4)(iii), except for those associated with 49 CFR 195.452(h)(4)(iii)(H).  All immediate repair conditions must be remediated with a permanent repair method.

[19] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth. If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify PHMSA, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 CFR § 195.452 until the indication is remediated or until otherwise authorized by PHMSA.

prior ILI) and perform pipeline remediations needed to assure the integrity of the *special permit segments* is maintained.[20] The timing of remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.

b) The CGRA procedure must include ILI data matching methods[21] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

c) Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.

d) When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates.[22]

e) All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

19) Pressure Reduction: If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in this emergency special permit, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

20) In Field Direct Examination of Pipe:

a) Direct examinations[23] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[24] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

b) Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition. However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

   i. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

   ii. Sable must increase the metal loss anomaly's depth by 20% when

---

[20] At a minimum, Sable must include signal matching between ILI data sets.

[21] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[22] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

[23] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[24] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complemented by shear wave technology or inspection by phased array ultrasonic testing.

they input it into the formula for calculating the number of wraps needed for repair method 5.

iii. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs. If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

c) Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

d) Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy. Sable must recoat in accordance with their coating repair procedure.[25]

e) All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

21) Integrity Management:

a) A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

i. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 CFR § 192.712(d)(1).

ii. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 CFR § 192.712(d)(2).

b) Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

c) When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

d) Sable must send all field measurements to the ILI tool vendor within 90 days

---

[25] The coating procedure must be submitted to PHMSA prior to the effective date of this emergency special permit.

Docket Number PHMSA-2025-1502 – Sable Offshore Corp. PPC
Emergency Special Permit – Corrosion Mitigation – California

Page 12 of 16

of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

e) Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the *special permit segments*. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by PHMSA prior to being selected.

f) Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is

g) occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

22) Data Requirements for Predicted Failure Analysis:

a) Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

b) The analyses performed in accordance with this emergency special permit must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in traceable, verifiable, and complete records.

23) Recordkeeping:

a) Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this emergency special permit shall be kept for the life of the *special permit segments* and must be submitted to PHMSA, in the manner requested (electronic, hardcopy, or other format) within 30 days.

b) Sable must maintain the following records:

i. Technical approach used for the analysis

ii. All data used and analyzed

iii. Pipe and longitudinal weld seam properties

iv. Procedures used to implement emergency special permit conditions

v.      Evaluation methodology used

vi.      Models used

vii.      Direct in situ examination data

viii.      All in-line inspection tool assessments information evaluated

ix.      Pressure test data and results

x.      All in-the-ditch assessments performed on the *special permit segments*

xi.      All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results

xii.      All finite element analysis results

xiii.      The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

xiv.      The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

xv.      Safety factors used for fatigue life and/or predicted failure pressure calculations

xvi.      Reassessment time interval and safety factors

xvii.      The date of the review

xviii.  Confirmation of the results by qualified technical subject matter expert(s)

xix.      Approval by responsible Sable management personnel

xx.      Records of additional preventive and mitigative (P&M) measures performed

xxi.      Reports required by this emergency special permit.

24)      Reporting:

a)  Any release on the *special permit segments* shall be reported to PHMSA at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery.[26]

b)  An email notification shall be made at least three (3) days prior to a *special permit segment* being exposed for non-emergency purposes of field evaluation and repair to PHMSA. The email notification shall include, if applicable:

i.  Tool type and run date

ii.  Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)

---

[26] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state, or Federal regulations.

      iii. Dig sheets

      iv. Field contact information for Sable

      v. Time and location of the field evaluation and repair.

c) Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run to PHMSA and include:

      i. Tool type

      ii. Run date

      iii. Summary of Conditions Report[27]

      iv. Final Vendor Report and Pipe Tally

d) Sable shall provide a report to PHMSA by June 15th of every year for the duration of this special permit, including any renewals. The report shall be submitted to PHMSA. At a minimum, the annual report shall contain the following, if applicable:

      i. A Closure Report for the previous calendar (CY) which contains:

            1. Features that were remediated in previous CY, including documentation for in-the-ditch assessments and repairs

            2. Identify features that remain to be assessed

            3. Unity Plots for previous ILI runs

      ii. Fracture mechanics and pressure cycling analyses in accordance with Condition 21(a);

      iii. The third-party ILI expert reviews in accordance with condition 21(e).

      iv. AC and DC Interference surveys that are due in accordance with condition 21(f).

      v. A copy of the CGRA for prior year including:

            1. Mean corrosion growth rate for the *special permit segments*

            2. Distribution graph of the corrosion growth rate for the *special permit segments* (e.g. occurrences (#) vs. corrosion rate (mpy)

The above conditions are based on PHMSA's review and consideration of information provided by Sable, including information in their emergency special permit application which can be found at Docket No. PHMSA-2025-1502 in the Federal Docket Management System located at www.regulations.gov.  PHMSA has determined the conditions listed above would be necessary to ensure this Emergency Special Permit is not inconsistent with pipeline safety.

---

[27] PHMSA may stipulate specific formatting or other information (e.g., condition type, anomaly details, remaining strength calculation method, failure pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

## IV. **Limitations:**

This special permit is subject to the limitations set forth in 49 CFR § 190.341, as well as the following limitations:

1)      This emergency special permit is limited to an initial term of sixty (60) days from the date of issuance. If Sable elects to seek renewal of this emergency special permit, it must submit a renewal request to PHMSA pursuant to 49 CFR § 190.341(g).

2)      Should Sable fail to comply with any conditions of this emergency special permit or should PHMSA determine that this emergency special permit is no longer appropriate or is inconsistent with pipeline safety, PHMSA may revoke the emergency special permit and require Sable to comply with all appropriate regulatory requirements.

3)      PHMSA may order the *special permit segments* to be shutdown at any time.

4)      PHMSA may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this emergency special permit. The terms and conditions of any compliance order shall take precedence over the terms of this emergency special permit.

5)      In the event of conflict between the conditions of this emergency special permit and industry standards, the emergency special permit conditions shall prevail.

6)      If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the emergency special permit, Sable must provide PHMSA written notice of the change within 60 days of the consummation date. In the event of such transfer, PHMSA reserves the right to revoke, suspend, or modify the emergency special permit.


AUTHORITY:  49 United States Code 60118 (c)(1) and 49 CFR § 1.97.

Issued in Washington, D.C., on <u>December 23, 2025</u>.

LINDA GAIL DAUGHERTY

Digitally signed by LINDA GAIL DAUGHERTY
Date: 2025.12.23 15:48:57 -05'00'

Linda Daugherty
Acting Associate Administrator
  for Pipeline Safety

# EXHIBIT E

STATE OF CALIFORNIA - NATURAL RESOURCES AGENCY                                    GAVIN NEWSOM, *GOVERNOR*

# CALIFORNIA COASTAL COMMISSION

NORTH CENTRAL COAST DISTRICT OFFICE
455 MARKET STREET, SUITE 300
SAN FRANCISCO, CA 94105
VOICE (415) 904-5260
FAX (415) 904-5400

February 18, 2026


Email: srusch@sableoffshore.com
Steve Rusch
Sable Offshore Corporation
12000 Calle Real
Goleta, CA 93117

**Re:    Restart of Las Flores Pipelines**

Dear Mr. Rusch:

California Coastal Commission (Commission) staff are writing to provide Sable Offshore Corp. (Sable) with a courtesy reminder regarding the Commission's independent authority over any resumption of use of the Las Flores Pipelines (CA 324 and CA 325), such as through the reintroduction of oil into those lines, and the recent amendment to California's Public Resources Code.

On September 13, 2025, the California Legislature passed Senate Bill (SB) 237, which was then approved by Governor Gavin Newsom and filed with the Secretary of State on September 19, 2025.[1] SB 237 became effective on January 1, 2026. Pursuant to SB 237, Section 30262 of the Coastal Act[2] was amended (in part) to add subsections (b)(2)-(4), which state that:

> *(b) … (2) Repair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more shall be considered a new or expanded development requiring a new coastal development permit consistent with this section.*
>
> *(3) Development associated with the repair, reactivation, or maintenance of an oil pipeline that has been idled, inactive, or out of service for five years or more requires a new coastal development permit consistent with this section.*
>
> *(4) The commission or local government with a certified local coastal program shall review and approve, modify, condition, or deny the permit based on the requirements of this section. …*

---

[1] https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202520260SB237
[2] The Coastal Act is codified in the California Public Resources Code, Sections 30000 to 30900. Unless otherwise indicated, references to section numbers in this letter are to that code, and thus, to the Coastal Act.

SB 237 also amended subsection (a)(5)(C)(iii) to clarify that reactivation of these types of dormant facilities constitutes expanded oil extraction, so that the standard articulated in Section 30262(a) would govern such development.

In 2015, a corroded portion of the Las Flores Pipelines CA-324 and CA-325 (pipelines) ruptured, releasing more than 123,000 gallons of oil. As a result of the oil spill, all oil production at the Santa Ynez Unit (SYU) was halted in 2015, and the pipelines have remained idle, inactive, and out of service since that time. Since the pipelines have been in that state for a period of more than five years, pursuant to the amended text of Section 30262, the repair, reactivation, or maintenance of those pipelines, as well as any other development associated with the repair, reactivation, or maintenance of the pipelines, is the sort of development that would require a coastal development permit (CDP) that would need to be consistent with the standards in that section.

Thus, Commission staff wanted to ensure that you were aware that in order for Sable to reactivate the pipelines, it will not only need to satisfy all other agency requirements and obtain any other authorization required by other laws, but also, at a minimum, apply for and receive a CDP from the Commission that meets the standards of Section 30262.

For additional information, you may contact Liam Stowe at (415) 729-1646, Liam.Stowe@coastal.ca.gov, or at our Headquarters Enforcement Office at:

Attn: Liam Stowe
455 Market Street, Suite 300
San Francisco, CA 94105


Sincerely,

Kate Hucklebridge
Executive Director
California Coastal Commission

Cc:
Matthew Dumlao, Executive Officer, California State Lands Commission
Jennifer Lucchesi, Director, California Department of Conservation
Armando Quintero, Director, California State Parks
Joe Tyler, Director, CalFire

# EXHIBIT F

## PIPELINE CAPACITY PRIORITIZATION AND ALLOCATION ORDER

### I.        AUTHORITY

The Department of Energy (DOE) is authorized to issue orders pursuant to Executive Order 13603 section 201, which delegates to the Secretary of Energy the authority of the President conferred by the Defense Production Act of 1950 (DPA), sections 101(a) & (c).  By delegation, section 101(a) authorizes the Secretary to require acceptance and priority performance of contracts or orders and to allocate materials, services, and facilities, as deemed necessary or appropriate to promote the national defense with respect to all forms of energy.  Section 101(c)[1] authorizes the Secretary to require the allocation of, or the priority performance of contracts or orders relating to, materials, equipment, and services to maximize domestic energy supplies where those supplies of materials, services, and facilities are scarce, critical, and essential to maintain or expand exploration, production, refining, or transportation.

### II.       COVERED ENTITIES

Sable Offshore Corp. and Pacific Pipeline Company (collectively "Sable")
Attn: Lance Yearwood
845 Texas Avenue
Suite 2800
Houston, TX 77002
(713) 579-8118

### III.      NEED FOR PRIORITY PERFORMANCE AND ALLOCATION

In Executive Order 14156, President Trump declared a national emergency, determining that the "United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[2]  Further, President Trump found, "[i]n an effort to harm the American people, hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets.  An affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation."[3]  The President determined that problems are most pronounced in our Nation's West Coast, "where dangerous State and local policies jeopardize our Nation's core national defense and security needs, and devastate the prosperity of not only local residents but the entire United States population."[4]

Sable is the lessee, owner, and operator of the Santa Ynez Unit (SYU), an offshore oil and gas unit located in Federal waters off the coast of California.[5]  Sable and the Department of the Interior are

---

[1] Pub. L. No. 81-774 (50 U.S.C. §§ 4511(a), 4511(c)).

[2] Executive Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025) (Declaring a National Energy Emergency), https://www.federalregister.gov/documents/2025/01/29/2025-02003/declaring-a-national-energy-emergency.

[3] *Id.*

[4] *Id.*

[5] Sable Offshore Corp. (2025). Form 10-K. U.S. Securities and Exchange Commission, at 1-2, available at: https://d18rn0p25nwr6d.cloudfront.net/CIK-0001831481/652c5f0a-582e-42c9-b069-e47f9af7bc7f.pdf ("the 'Santa Ynez Unit' or 'SYU' refers to the 16 federal leases, three offshore production platforms (Hondo, Harmony, and

currently updating a previously approved Development and Production Plan, which would allow for continuous production to address energy vulnerabilities on the West Coast.[6]  The SYU is a critical energy resource on the West Coast.  It is one of the largest known offshore oilfields in the United States.[7]  This resource cannot be used to address the shortages identified in EO 14156 and the resulting vulnerabilities, including adversarial dependence, without reliable transport of SYU's production through the Santa Ynez Pipeline System (SYPS) to market on mainland California.

For most of SYU's production history, oil and gas were produced through pipeline infrastructure connecting offshore platforms to onshore facilities in Las Flores Canyon, California.[8]  From there, crude oil was transported via onshore pipeline to a California refinery complex via the Las Flores Pipeline System.[9]  This interstate pipeline system running from the SYU to the Pentland Station terminal in Pentland, California is known as the SYPS, which Sable owns and operates.[10]  According to Sable, the State of California is impeding it from resuming transportation of SYU production through the SYPS.  As Sable reports, "California agencies have deployed an array of state measures—including SB 237, the state waiver process, novel interpretations of state agency jurisdiction and authority, excessive delay in granting a long-term easement through a state park for an existing pipeline, and the Restart Plan requirements under [a] Consent Decree—to block pipeline operations."[11]

---

Heritage), and associated ancillary facilities located in federal waters offshore California") (hereinafter "Sable 10-K").

[6] *See* Letter for Jonathan Brightbill, General Counsel, Department of Energy, from James Noe, Partner, Holland & Knight, *Re: Sable Offshore Corp.—Request for Action Under the Defense Production Act* at 1-2 (Dec. 12, 2025) (hereinafter "Sable Request").

[7] U.S. Energy Information Administration, *Top 100 U.S. Oil and Gas Fields*, at 5 (Mar. 2015), https://www.eia.gov/naturalgas/crudeoilreserves/top100/pdf/top100.pdf.

[8] Sable Request at 2.

[9] *Id.*

[10] *Id. See also*, Letter for Linda Daugherty, Acting Associate Administrator for Pipeline Safety, Pipeline and Hazardous Materials Safety Administration (PHMSA), from J. Caldwell Flores, President and Chief Operating Officer, Pacific Pipeline Company / Sable Offshore Corp., *RE: Application for Emergency Special Permit Sable Offshore Corp.* at 1 (Dec. 19, 2025) ("As part of this Application, Sable requests that PHMSA issue an Emergency Special Permit covering two pipeline segments (Lines CA-324 and CA-325) that together, constitute the Las Flores Pipeline, which is part of an interstate pipeline facility that Sable operates from the Outer Continental Shelf (OCS) off the coast of Santa Barbara, California to Kern County, California, known as the Santa Ynez Pipeline System (SYPS)."); Letter for J. Caldwell Flores, President and Chief Operating Officer, Sable Offshore Corp., *RE: Determination of Interstate Classification* at 2 (Dec. 17, 2025) ("PHMSA agrees with your determination that the Las Flores Pipeline is an interstate pipeline."); Sable 10-K at 1-2 ("the 'Santa Ynez Pipeline System' (or 'SYPS') refers to the interstate pipeline connecting the Santa Ynez Unit to the Pentland Station terminal, inclusive of 'Pipeline Segment 324' and 'Pipeline Segment 325', or collectively referred to as 'Pipeline Segments 324 and 325' (formerly known as '901/903 Assets' and as defined in the Sable-[Exxon Mobil Corporation] Purchase Agreement), the Las Flores Canyon ('LFC') onshore processing, storage, and related pipeline assets, and the offshore pipeline connecting the Santa Ynez Unit to LFC. The SYU Assets include the Santa Ynez Unit and the Santa Ynez Pipeline System.").

[11] Sable Request at 6.

IV.       ORDER

In light of my findings and determinations in accordance with Title I of the DPA that the actions directed below are necessary or appropriate to promote the national defense and to maximize domestic energy supplies where those supplies of materials, services, and facilities are scarce, critical, and essential to maintain or expand exploration, production, refining, or transportation and maintenance or expansion of exploration, production, refining, transportation cannot reasonably be accomplished without exercising the authority in this Order, it is directed that:

A. Pursuant to sections 101(a) and (c) of the DPA, Sable is directed to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California.

B. Sable is directed to immediately commence performance under contracts or orders for services, including contracts or orders hereinafter entered into or sought, for hydrocarbon transportation capacity in the SYPS from the point of production in the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, at which point hydrocarbons move through the Plains All American Line 2000 for transport to refineries.

C. Such contracts for hydrocarbon transportation services from the point of production in the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, shall take priority over other non-SYPS hydrocarbon transportation contracts or orders for such services from the SYU that are entered, hereinafter are entered, or could as an alternative to the SYPS be entered into for hydrocarbon transportation services from the point of production in the SYU.  For purposes of assuring such priority, Sable is directed to accept and perform such contracts or order up to and so long as the SYPS has capacity to transport.

D. Any person contracting for or ordering, or who hereinafter does contract for or order hydrocarbon transportation services from Sable from the point of production in the SYU is directed to prefer and utilize such capacity in the SYPS from the point of production in the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, in preference to other such non-pipeline contracts or orders by other persons capable of hydrocarbon transportation service, including but not limited to by truck, vessel, or alternative pipeline, up to the capacity of the SYPS.

E. Sable, and any person seeking hydrocarbon transportation services from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California, are authorized to enter into such orders and contracts as those parties negotiate, as appropriate.

F. Sable is directed to provide a monthly report to DOE via askcr@hq.doe.gov on the use of this priority and allocation order, including the volumes of hydrocarbons transported or contracted for under this Order during the previous month.

G. Sable is ordered to comply with this order immediately and to maintain such compliance until such time as the conditions necessitating the issuance of this order abate or until Sable is directed otherwise.

Issued in Washington, D.C. on this 13th day of March 2026

_____

Chris Wright
Secretary of Energy

# EXHIBIT G

(Slip Opinion)

# Preemptive Effect of Defense Production Act Order on State Law

Presidential orders issued as an exercise of congressionally delegated authority or the President's constitutional powers have the force of federal law under the Supremacy Clause and may preempt state law.

An order issued pursuant to the Defense Production Act may preempt state laws expressly or by conflict.

An order issued pursuant to the Defense Production Act may displace sanctions for non-compliance with a contrary consent decree, even if that consent decree rests on federal-law claims.

March 3, 2026

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF ENERGY

Sable Offshore Corp. ("Sable") is the lessee and operator of the Santa Ynez Unit ("SYU"), an offshore oil and gas unit located in federal waters off the coast of California. Sable and the Department of the Interior are updating a previously approved Development and Production Plan, which would allow for continuous production on the SYU to address energy vulnerabilities on the West Coast. But, according to Sable, the State of California has impeded it from operating the SYU and transporting production through the Santa Ynez Pipeline System.

You have asked whether an order issued under the Defense Production Act of 1950 ("DPA" or "Act"), Pub. L. No. 81-774, 64 Stat. 798 (codified as amended at 50 U.S.C. § 4501 *et seq.*), to Sable by the President or his delegee would preempt the California laws currently impeding Sable from resuming production and operating the associated pipeline infrastructure. We conclude that it would. An order issued as an exercise of congressionally delegated authority or the President's constitutional powers has the force of federal law under the Supremacy Clause and may preempt contrary state law. Because the DPA authorizes the President to order certain actions that may otherwise be prohibited by state law, an order issued pursuant to the DPA could preempt those laws expressly or by conflict. That is true regardless of the form of the President's order, although we refer in this memorandum to executive orders for simplicity. *See Legal Effectiveness of a Presidential Directive, as Compared to an Executive*

1

50 Op. O.L.C. __ (Mar. 3, 2026)

*Order*, 24 Op. O.L.C. 29, 29 (2000) ("[T]here is no substantive difference in the legal effectiveness of an executive order and a presidential directive that is styled other than as an executive order.").[1]

## I.

### A.

On January 20, 2025, President Trump declared a national emergency related to the Nation's energy supply and infrastructure. *See generally* Exec. Order No. 14156. The President determined that the Nation's "insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy." *Id.* § 1. "These numerous problems," the President emphasized, "are most pronounced in our Nation's Northeast and West Coast, where dangerous State and local policies jeopardize our Nation's core national defense and security needs." *Id.*

The President directed the heads of executive departments and agencies to wield "any lawful emergency authorities available to them" to bolster the "production, transportation, refining, and generation of domestic energy resources." *Id.* § 2(a). "If an agency assesses that use of either Federal eminent domain authorities or authorities afforded under the Defense Production Act are necessary to achieve this objective, the agency shall submit recommendations for a course of action to the

---

[1] President Obama delegated Title I authority under the DPA to the Secretary of Energy for all energy-related matters. *See* Exec. Order No. 13603 (2012). For convenience, we refer in this memorandum to determinations made, and orders given, by the President, even though that authority has been lawfully delegated to the Secretary. We note that an executive order issued by President Trump provides that if an agency seeks to invoke the DPA, it "shall submit recommendations for a course of action to the President." Exec. Order No. 14156 § 2(a) (2025). This language does not, however, impliedly limit the scope of the power delegated by the President to the Secretary. The provisions of each executive order are not "in irreconcilable conflict," nor is President Trump's order "clearly intended as a substitute" for President Obama's delegation. *Carcieri v. Salazar*, 555 U.S. 379, 395 (2009) (cleaned up). Instead, President Trump's order provides only that the Secretary should submit a recommendation to the President before wielding delegated authority. *See* Exec. Order No. 14156 § 2(a). The Secretary could, for instance, recommend that the Secretary himself—rather than the President—issue a DPA order. And nothing in President Trump's executive order requires the President's affirmative approval of a recommendation before the Secretary acts. *See generally id.*

*Preemptive Effect of DPA Order*

President . . . ." *Id.* (internal citation omitted). The President also instructed agencies to expedite the completion of energy infrastructure, including by "facilitat[ing] the supply, refining, and transportation of energy in and through the West Coast of the United States." *Id.* § 3(b).

**B.**

The SYU—which Sable leases and operates—is a critical energy resource on the West Coast. Located in federal waters in the Pacific Ocean, it is the largest known offshore oilfield in the United States. *See* Letter for Jonathan Brightbill, General Counsel, Department of Energy, from James W. Noe, Partner, Holland & Knight LLP, *Re: Sable Offshore Corp.—Request for Action Under the Defense Production Act* at 1 (Dec. 12, 2025) ("Sable Letter").[2] It has an estimated 904 million barrels in place, and from 1981 to 2014, it produced more than 670 million barrels of oil. *Id.*

For most of the SYU's production history, oil and gas were produced through pipeline infrastructure connecting offshore platforms to onshore facilities in Las Flores Canyon, California. *Id.* at 2. From there, crude oil was transported via onshore pipeline to a California refinery complex via the Las Flores Pipeline System. *Id.* This network of on- and offshore pipelines is known as the Santa Ynez Pipeline System. *Id.* Currently, Sable and the Department of the Interior are updating a previously approved Development and Production Plan to address West Coast energy vulnerabilities. *Id.* at 1–2.

But according to Sable, the State of California is impeding it from resuming transportation of SYU production through the Santa Ynez Pipeline System. Sable reports that "California agencies have deployed an array of state measures—including SB 237, the state waiver process, novel interpretations of state agency jurisdiction and authority, excessive delay in granting a long-term easement through a state park for an existing pipeline, and the Restart Plan requirements under [a] Consent Decree—to block pipeline operations." *Id.* at 6.

---

[2] For purposes of this advice, we accept the veracity of the factual statements set forth in Sable's letter, although we are not presently in a position to verify their accuracy.

3

50 Op. O.L.C. __ (Mar. 3, 2026)

Sable has thus requested the Secretary of Energy ("Secretary") to make necessary findings under the DPA and issue an order "requiring Sable to operate the Santa Ynez Unit and the Santa Ynez Pipeline System to maximize domestic energy production." *Id.* at 9. In Sable's view, such an order would conflict with—and therefore preempt—California state law. *Id.* at 6.

## II.

Preemption doctrine derives from the constitutional hierarchy established by the Supremacy Clause. That clause provides that "the Laws of the United States," as well as the Constitution and treaties, "shall be the supreme Law of the Land," notwithstanding "any Thing in the Constitution or Laws of any State to the Contrary." U.S. Const. art. VI, cl. 2. The Supremacy Clause thus enshrines two principles into our legal system: It places federal law above state law in the constitutional hierarchy, and it establishes a choice-of-law rule that federal law must prevail whenever it conflicts with state law. The Supreme Court has "identified three different types of preemption—conflict, express, and field—but all of them work in the same way." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018) (cleaned up). Federal law typically "imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Id.* At times, federal law "might appear to operate directly on the States," such as in the form of an express preemption provision, but such provisions operate "just like any other federal law with preemptive effect" by conferring on private entities "a federal right to engage in certain conduct subject only to certain (federal) constraints." *Id.* at 478–79.

We first explain that an executive order may preempt state law when the President is empowered by the Constitution or statute to regulate private parties or where state law would otherwise conflict with a lawful exercise of the President's official powers. We then describe the two primary ways in which executive orders might displace state law—expressly or by conflict.

4

*Preemptive Effect of DPA Order*

## A.

The Constitution vests the entire executive power in a single President, whose "duties are of 'unrivaled gravity and breadth.'" *Trump v. United States*, 144 S. Ct. 2312, 2327 (2024) (quoting *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020)). The President's authority to wield these powers "necessarily stems either from an act of Congress or from the Constitution itself." *Id.* (cleaned up) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). The Constitution that the President must defend, and the federal laws that he must execute, are "the supreme Law[s] of the Land." U.S. Const. art. VI, cl. 2; *see also id.* art. II, § 1, cl. 8; *id.* art. II, § 3. Of course, "the President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates." *Myers v. United States*, 272 U.S. 52, 117 (1926).

The power of executive agencies—literally, the Chief Executive's agents—to preempt state law is well understood. Congress may authorize executive agencies to promulgate regulations that "have the force and effect of law." *Chrysler Corp. v. Brown*, 441 U.S. 281, 295 (1979) (citation and internal quotation marks omitted). "This doctrine is so well established that agency regulations implementing federal statutes have been held to pre-empt state law under the Supremacy Clause." *Id.* at 295–96. Put simply, when agencies issue regulations implementing federal statutes, those regulations are fully clothed in "the Laws of the United States" for purposes of preemption and therefore can displace contrary state law. U.S. Const. art. VI, cl. 2. To be sure, an agency's power to preempt state law is not unlimited. "[A] federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority, for an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *New York v. FERC*, 535 U.S. 1, 18 (2002) (cleaned up). But within the confines of delegated authority, executive preemption of state law is an unremarkable feature of our governmental structure.

This logic applies *a fortiori* to the President, who is the head of the Executive Branch and wields independent constitutional powers that agencies lack on their own. Regardless of whether the President derives his authority from statute or directly from the Constitution, he wields a piece

50 Op. O.L.C. __ (Mar. 3, 2026)

of federal sovereignty itself, so long as he acts within the bounds of his authority. States thus lack the power to impede the exercise of the President's official powers, as to do so would be to interfere with the United States itself. *See, e.g.*, *Tarble's Case*, 80 U.S. (13 Wall.) 397, 403–04 (1872) (holding that this rule applies "whether that authority be exercised by a Federal officer or be exercised by a Federal tribunal"); *see also In re Neagle*, 135 U.S. 1, 75 (1890) (holding that California murder law could not be applied to prosecute a federal officer "for an act which he was authorized to do by the law of the United States"). The Constitution's command that federal law prevails over contrary state law thus necessarily entails that valid presidential action preempts and displaces conflicting state law. *See In re Neagle*, 135 U.S. at 62 ("While [the federal government] is limited in the number of its powers, so far as its sovereignty extends[,] it is supreme."); *see, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 416 (2003) (concluding that executive agreements, which do not require congressional approval, "are fit to preempt state law, just as treaties are").

Presidential preemption is most likely to arise when "the President acts pursuant to an express or implied authorization of Congress." *Youngstown Sheet & Tube Co.*, 343 U.S. at 635 (Jackson, J., concurring). In such circumstances, the President's authority to regulate "is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Id.* That is, when Congress authorizes the President to act, the President may do so in a way that shunts aside conflicting state enactments, provided he acts within the scope of the congressional authorization or his independent constitutional authority.

Like regulations issued by agencies, executive orders authorized by the Constitution or a federal statute may preempt state law. As the Supreme Court has explained, executive orders "may create rights protected against inconsistent state laws through the Supremacy Clause," especially when such orders are issued pursuant to "congressional authorization." *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 273 n.5 (1974) (citing *Youngstown Sheet & Tube Co.*, 343 U.S. at 635–37 (Jackson, J., concurring)). Our Office, too, has long recognized an executive order "can of course have the force and effect of law," "particularly" if it "rests on specific statutory authority." Memorandum for Phyllis Coven, Deputy Associate Attorney General, Office of the

6

Associate Attorney General, from Daniel L. Koffsky, Acting Assistant Attorney General, Office of Legal Counsel, *Re:* Matter of Chu *and* Matter of Tsun at 17 n.15 (July 1, 1993). Thus, when an executive order is authorized by the Constitution or a federal statute (or both), "it can be enforced by the government against private parties and may preempt conflicting state law." Kevin M. Stack, *The Statutory President*, 90 Iowa L. Rev. 539, 551 (2005) (footnotes omitted); *see also, e.g.*, *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 171 (D.D.C. 2025).

Importantly, Congress need not mention preemption by name when authorizing the President to displace state law. Rather, Congress may authorize the President to preempt state law simply by conferring upon him regulatory power. *See, e.g.*, *Letter Carriers*, 418 U.S. at 273 n.5. When determining whether Congress has delegated such authority to the Executive Branch, courts simply "interpret the statute," "without any presumption one way or the other" about preemption. *FERC*, 535 U.S. at 18. "In other words, we must interpret the statute to determine whether Congress has given [the Executive Branch] the power to act," using ordinary principles of statutory interpretation. *Id.* As with any statute authorizing the Executive Branch to regulate pursuant to flexible statutory terms, courts must identify "the best reading of [the] statute" and "effectuate the will of Congress" as expressed by the text. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024).

In sum, executive orders may preempt state law when the President's regulatory power stems from either congressional authorization or the Constitution itself.

## B.

Executive orders, like statutes, may preempt state law in one of two ways: expressly or by implication.

Start with express preemption, which operates "through express language" in a presidential order or statute declaring certain state laws preempted. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015); *see, e.g.*, *Preemption of State and Local Requirements Under a PREP Act Declaration*, 45 Op. O.L.C. __, at *4–10 (Jan. 19, 2021). In some prior cases, the Court would begin its preemption analysis "with the assumption

50 Op. O.L.C. __ (Mar. 3, 2026)

that the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," especially when Congress "legislated in a field traditionally occupied by the States." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (cleaned up). Today, however, at least when a "statute contains an express pre-emption clause," the Court does "not invoke any presumption against preemption but instead focus[es] on the plain wording of the clause." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (cleaned up).[3] Of course, the existence of an express preemption clause "does not immediately end the inquiry" into a federal law's preemptive effect. *Altria Grp.*, 555 U.S. at 76. "[T]he question of the substance and scope of [the] displacement of state law still remains." *Id.* Determining the scope of an express preemption provision turns on "the plain wording of the clause." *Chamber of Com. of the U.S. v. Whiting*, 563 U.S. 582, 594 (2011) (citation omitted).

Although express preemption clauses often "appear to operate directly on the States," their preemptive effect in truth operates by conferring on private parties "a federal right to engage in certain conduct subject only to certain (federal) constraints." *Murphy*, 584 U.S. at 478–79. Federal law regulating medical devices intended for human use, for example, expressly preempts state law by declaring that no state may establish "any requirement . . . which is different from, or in addition to, any requirement applicable under this chapter to the device." 21 U.S.C. § 360k(a). This provision appears to operate directly on states, but it actually confers on medical-device manufacturers a federal right to be free from requirements other than those imposed by the federal government.

Implied preemption operates in much the same way. "This mechanism is shown most clearly in cases involving 'conflict preemption.'" *Murphy*, 584 U.S. at 478. When federal law confers a right or imposes a restriction on regulated parties, "state law is pre-empted to the extent that it actually conflicts with federal law." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). Thus, "when a regulated party cannot comply with both federal

---

[3] *See also, e.g.*, *Carson v. Monsanto Co.*, 72 F.4th 1261, 1267 (11th Cir. 2023) (en banc); *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1101 (9th Cir. 2024). *But see AbbVie, Inc. v. Fitch*, 152 F.4th 635, 645 (5th Cir. 2025) (per curiam) (continuing to apply the presumption); *Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 767–68 (9th Cir. 2025) (same).

and state directives, the Supremacy Clause tells us the state law must yield." *Martin v. United States*, 145 S. Ct. 1689, 1700 (2025); *see also Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1672 (2019). The Supreme Court has found conflict preemption where, for example, it was impossible for a pharmaceutical company to "comply with both its state-law duty to strengthen the warnings" on the label for one of its drugs "and its federal-law duty not to alter" the label for that same drug. *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013).

There are other forms of implied preemption, which we need not dwell on here. Field preemption, for instance, "occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Murphy*, 584 U.S. at 479 (quoting *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140 (1986)). And obstacle preemption contemplates the displacement of state law "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of federal law. *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citation and internal quotation marks omitted). But we need not address those theories today; when an executive order expressly or by conflict preempts state law, resort to these other theories of implied preemption is unnecessary.

## III.

The President may expressly or by conflict preempt certain state laws by issuing an order under the DPA. We first situate the DPA within the broader context of national-defense laws, explaining why it authorizes the President to preempt state law. We then identify the particular provisions that would most likely allow the President to preempt state law in the circumstances presented here.

## A.

"It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (quoting *Aptheker v. Sec'y of State*, 378 U.S. 500, 509 (1964)). "Recognizing this fact, the Framers listed 'providing for the common defence' as a motivating purpose for the Constitution," *Wayte v. United States*, 470 U.S. 598, 612 (1985) (cleaned up), conferring on the federal

government a "complete delegation of authority" to ensure the Nation's safety, *Torres v. Tex. Dep't of Pub. Safety*, 142 S. Ct. 2455, 2463 (2022). This power is not "limited to the 'context of an actual war.'" *Id.* at 2465 (citation omitted). It also includes the authority to act prophylactically— the government may act to secure the national defense well before the country's safety is in peril. *Cf. Dennis v. United States*, 341 U.S. 494, 509 (1951) ("Obviously, the words cannot mean that before the Government may act, it must wait until the putsch is about to be executed, the plans have been laid and the signal is awaited." (emphasis omitted)). Because national defense is vested exclusively in the federal government, "the structure of the Constitution prevents States from frustrating national objectives in this field." *Torres*, 142 S. Ct. at 2464. Even legitimate state interests generally must yield to the common defense of the Nation, for the Constitution "is not a suicide pact." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963).

In providing for the common defense, Congress and the President have "time and again, as exigencies arose," taken actions that have displaced ordinary state laws, such as those pertaining to property or torts. *Bank Markazi v. Peterson*, 578 U.S. 212, 235 (2016). Following World War II, for example, the Renegotiation Act allowed the federal government "to recover excess profits" on wartime contracts—even with respect to con-tracts between two private parties rather than only those "made directly with the Government." *Lichter v. United States*, 334 U.S. 742, 788–89 (1948). The Court upheld "the right of the Government to recover excess profits on" such contracts, *id.* at 789, emphasizing the wartime exigencies that necessitated the legislation, *see id.* at 754–72. The Court subsequently sustained President Carter's decision to nullify attachments and liens on Iranian assets in the United States and to direct that those assets be trans-ferred to Iran. *See Dames & Moore v. Regan*, 453 U.S. 654, 660, 674 (1981). In doing so, the Supreme Court emphasized that the International Emergency Economic Powers Act ("IEEPA"), Pub. L. No. 95-223, 91 Stat. 1626, "delegate[d] broad authority to the President to act in times of national emergency with respect to property of a foreign country." 453 U.S. at 677. And because IEEPA authorized the actions taken, the Court upheld the nullification of the attachments and the transfer of the assets, traditional property rules notwithstanding. *Id.* at 674.

*Preemptive Effect of DPA Order*

Modelled on "the First and Second War Powers Acts of 1941 and 1942, which gave the [E]xecutive [B]ranch broad authority to regulate industry during World War II," the DPA is yet another example of Congress delegating to the President powers to regulate domestic policy for the national defense. Alexandra G. Neenan, Cong. Rsch. Serv., R43767, *The Defense Production Act of 1950: History, Authorities, and Considerations for Congress* at 2 (updated Oct. 6, 2023), https://www.congress.gov/crs-product/R43767 [https://perma.cc/S6L9-UUJE]. The DPA differs from those earlier statutes, however, in one key respect: Although its predecessor statutes conferred sweeping authority upon the President during wartime, the DPA "is not an 'emergency' statute." *Legal Authorities Available to the President to Respond to a Severe Energy Supply Interruption or Other Substantial Reduction in Available Petroleum Products*, 6 Op. O.L.C. 644, 662 (1982) ("*Energy Supply Interruption*"). Instead, it includes power to act prophylactically. Congress recognized that "the security of the United States is dependent on the ability of the domestic industrial base to supply materials and services for the national defense." 50 U.S.C. § 4502(a)(1). The Act thus vests "the President with an array of authorities," all designed "to maintain and enhance the domestic industrial base." *Id.* § 4502(a)(4). The President may use those authorities "whether or not an 'emergency' situation exists." *Energy Supply Interruption*, 6 Op. O.L.C. at 662.

The DPA confers "broad and flexible" authority on the President to regulate private parties and preempt contrary state law. *Id.* (quoting H.R. Rep. No. 81-2759, at 4 (1950)). In general terms, section 4511 authorizes the President to control the distribution of materials, services, and facilities, and to require entities to prioritize the performance of some contracts over others, as "necessary or appropriate to promote the national defense" or "to maximize domestic energy supplies." 50 U.S.C. § 4511(a), (c). And because the President may regulate and direct private conduct when exercising such authority, he may also necessarily displace contrary state law.

And lest there be any doubt, the DPA makes explicit that orders issued pursuant to the Act displace state-law liability. It provides that "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter." *Id.* § 4557. Such immunity

11

from liability exists even when the related DPA rule, regulation, or order is subsequently "declared by judicial or other competent authority to be invalid." *Id.* Section 4557 is an express preemption provision, even though it does not appear to operate directly on state law. *See Murphy*, 584 U.S. at 478. "It confers on private entities . . . a federal right to engage in certain conduct"—conduct required by a DPA order—"subject only to certain (federal) constraints," not constraints imposed by state law. *Id.* at 478–79.

The provisions in section 4511 authorizing the President to issue regulatory (and thus preemptive) orders are united by a central principle: necessity. At a high level, section 4511(a) allows the President to require the prioritized performance of certain contracts or to allocate materials and other resources as he considers "necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(1)–(2). Section 4511(c) similarly allows the President to require the priority performance of certain contracts or allocate materials and resources "in order to maximize domestic energy supplies." *Id.* § 4511(c)(1). Ensuring the availability of such energy supplies, the DPA makes clear, is "necessary and appropriate" to secure "national defense preparedness." *Id.* § 4502(a)(5).

Necessity has long functioned as a defense to private liability under state law. When an otherwise tortious action—like trespass or conversion—is necessary to avoid "public disaster," the actor will not be held liable under tort law. *See* Restatement (Second) of Torts § 196 (1965) (trespass); *id.* § 262 (conversion); *see also id.* § 892D (describing the emergency doctrine). Necessity similarly excuses contractual nonperformance when supervening events make performance impracticable or frustrate the contract's purpose. *See* Restatement (Second) of Contracts § 261 (1981) (discharge by supervening impracticability); *id.* § 265 (discharge by supervening frustration). And force majeure clauses typically "relieve a party from its contractual duties when its performance has been prevented by a force beyond its control." *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 123 (2d Cir. 2022) (citation omitted). Necessity even may excuse liability for criminal conduct: "Every American jurisdiction, without exception, has adopted the necessity defense in its criminal jurisprudence." Shaun P. Martin, *The Radical Necessity Defense*, 73 U. Cin. L. Rev. 1527, 1535 (2005).

*Preemptive Effect of DPA Order*

The DPA operates on parallel logic to preempt state private law. When compliance with a presidential DPA order would otherwise violate state law—whether by causing tortious injury or breaching contractual obligations—the Act displaces that liability in the name of national defense. *See* 50 U.S.C. § 4557. Indeed, the DPA expressly contemplates reprioritizing contractual commitments for national-defense interests, notwithstanding that doing so may cause a party to breach its obligations under state contract law. *See id.* § 4511(a)(1), (c).

The DPA's displacement of state regulatory law follows from the same principle. State regulation often accomplishes *ex ante* what private law accomplishes *ex post*—the mitigation of social costs. *See* Susan Rose Ackerman, *Regulation and the Law of Torts*, 81 Am. Econ. Rev. 54, 54 (1991). The means are different, but the purpose is the same. For example, a state licensing regime and common-law negligence each address the risk of substandard professional conduct. Environmental regulations and common-law nuisance claims each address pollution and its harmful effects. *Cf.* Samuel Issacharoff, *Regulating After the Fact*, 56 DePaul L. Rev. 375, 380 (2007) ("The key is that both ex ante and ex post review are essential parts of the regulatory model—sometimes operating in tandem, sometimes as substitutes." (emphasis omitted)). The DPA contemplates the preemption of *ex ante* regulations much as it contemplates the preemption of *ex post* private-law remedies, all in the name of necessity. After all, although the interests protected by state regulation are doubtlessly important, "[f]ew interests can be more compelling than a nation's need to ensure its own security." *Wayte*, 470 U.S. at 611.

"Necessity" is not, of course, a constitutional prerequisite for Congress to confer on the President preemptive authority. But the Act functions as the Nation's necessity defense to state law. And under the DPA, the President possesses broad discretion to determine when to invoke that immunity, *see* 50 U.S.C. § 4511(a), (c), for it is the President who possesses the institutional competence to make such judgments on behalf of the Nation, *see id.* § 4502(a)(4); *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 33 (2010) (emphasizing the need to defer to the "evaluation of the facts by the Executive" in the national-security context).

13

Moreover, such a finding of necessity is likely immune from judicial review under the Administrative Procedure Act ("APA") and other statutes, even if the Secretary makes the determination by exercising delegated presidential power.[4] Under the APA, "agency action is not subject to judicial review to the extent that such action is committed to agency discretion by law." *Lincoln v. Vigil*, 508 U.S. 182, 190–91 (1993) (citation and internal quotation marks omitted). Review of an agency determination "is not to be had in those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 191 (citation and internal quotation marks omitted). Section 4511(a) clearly commits action to the discretion of the President or his delegee, allowing the decisionmaker to allocate materials "to such extent as *he shall deem* necessary or appropriate." 50 U.S.C. § 4511(a)(2) (emphasis added); *see also id.* § 4511(a)(1). In *Webster v. Doe*, the Supreme Court construed similar language to preclude APA review. 486 U.S. 592 (1988). The provision at issue allowed "termination of [a Central Intelligence] Agency employee whenever the Director 'shall *deem* such termination necessary or advisable in the interests of the United States,' not simply when the dismissal *is* necessary or advisable to those interests." *Id.* at 600 (emphases in original). The Court concluded that this provision "foreclose[d] the application of any meaningful judicial standard of review." *Id.* So too here, especially given the national-security context, where the Executive Branch traditionally wields broad and often-unreviewable discretion. *See Dep't of the Navy v. Egan*, 484 U.S. 518, 527, 529–30 (1988); *Lee v. Garland*, 120 F.4th 880, 886 (D.C. Cir. 2024).

## B.

As we have emphasized, the DPA immunizes entities from liability "for damages or penalties" stemming from "any act or failure to act resulting directly or indirectly from compliance" with an order issued under the Act. 50 U.S.C. § 4557. Three provisions of 50 U.S.C. § 4511 authorize the President to direct that Sable resume production of the SYU and

---

[4] The APA does not apply to the President, although "the President's actions may still be reviewed for constitutionality." *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).

14

*Preemptive Effect of DPA Order*

operate the associated pipeline infrastructure. An order issued under one of these provisions could preempt state law either expressly or by conflict. We address these provisions in the order best suited to our analysis: We start with the President's allocation authority under section 4511(a)(2); we then discuss his prioritization authority under section 4511(a)(1); and we conclude with his energy-production authority under section 4511(c).

**1.**

We consider first the President's allocation authority under section 4511(a)(2). That provision authorizes the President "to allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(2). The term "materials" encompasses "any raw materials (including minerals, metals, and advanced processed materials), commodities, articles, components (including critical components), products, and items of supply," as well as "any technical information or services ancillary to the use of any such materials, commodities, articles, components, products, or items." *Id.* § 4552(13). The term "services" includes "any effort that is needed for or incidental to": (A) "the development, production, processing, distribution, delivery, or use of an industrial resource or a critical technology item"; (B) "the construction of facilities"; (C) "the movement of individuals and property by all modes of civil transportation"; or (D) "other national defense programs and activities." *Id.* § 4552(16).[5] And the "term 'facilities' includes all types of buildings, structures, or other improvements to real property . . . , and services relating to the use of any such building, structure, or other improvement." *Id.* § 4552(8). In the light of these broad definitions, we have previously opined that this section could "be used to facilitate petroleum transportation," such as "by requiring pipelines, marine terminals, and other facilities to perform oil transport contracts necessary or appropriate to promote the national defense." *Energy Supply Interruption*, 6 Op. O.L.C. at 665.

---

[5] Moreover, the phrase "industrial resources" as used in the Act means "materials, services, processes, or manufacturing equipment (including the processes, technologies, and ancillary services for the use of such equipment) needed to establish or maintain an efficient and modern national defense industrial base." 50 U.S.C. § 4552(12).

15

50 Op. O.L.C. __ (Mar. 3, 2026)

The President could expressly preempt California law through an order issued under this section. Section 4511(a)(2) authorizes the President to allocate materials, services, and facilities "in such manner" and "to such extent as he shall deem necessary or appropriate to promote the national defense." 50 U.S.C. § 4511(a)(2). This sweeping language allows the President to preempt contrary state law by ordering Sable to produce the recoverable oil located on the SYU and transport such production to the California refinery complex using the Santa Ynez Pipeline System. That conclusion follows directly from the capacious definitions of "materials," "services," and "facilities." *See id.* § 4552(8), (13), (16). The production and transportation of such oil—a "material"—is plainly a "service" within the meaning of the Act. *See id.* § 4552(13), (16). The Santa Ynez Pipeline System is, in our view, a facility within the meaning of the DPA, because it is an "improvement[] to real property," and operation of the pipeline system is a service "relating to the use" of that improvement. *Id.* § 4552(8). A DPA order could thus declare on its face that particular California environmental regulations, permitting requirements, or other restrictions are preempted with respect to Sable's production on the SYU and operation of the Santa Ynez Pipeline System. Indeed, if the President were to find that Sable being noncompliant with particular state laws is "necessary" to promote the national defense, *id.* § 4511(a)(2), he could instruct Sable to disregard state laws that would otherwise frustrate its obligations under the order.

One might suggest that the word "allocate" in section 4511(a)(2) allows the President only to *distribute* resources, not to compel their production. But that reading ignores critical statutory language. Section 4511(a)(2) authorizes the President to allocate not just materials but also "services"—which the Act defines to include "any effort that is needed for or incidental to" the "development" or "production" of "an industrial resource." *Id.* § 4552(16). The President's power to allocate services thus includes the power to allocate productive capacity itself. Moreover, section 4511(a)(2) grants the President discretion to allocate services "in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate," *id.* § 4511(a)(2), making clear that the President may determine how and to what degree to allocate productive capacity. That discretion necessarily entails the authority to compel production, not just to allocate materials that already exist. *See, e.g.,*

16

*Preemptive Effect of DPA Order*

*Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382, 389 (N.D. Tex. 2022) (holding that the President's allocation authority under the DPA allowed him to require meat facilities to remain open during the COVID-19 pandemic and preempt state tort law); *see also Reed v. Tyson Foods, Inc.*, No. 21-cv-01155, 2021 WL 5107725, at *6 (W.D. Tenn. Nov. 3, 2021) ("Because the purpose of the DPA cannot otherwise be accomplished while allowing states to implement their own, potentially inconsistent policy decisions for meat and poultry processor operations during the COVID-19 pandemic, the state law must yield." (cleaned up)). Indeed, an allocation order can "require[] a person to take or refrain from taking certain actions," including with respect to production of a resource. 15 C.F.R. § 700.33(b).

Our reading is also consistent with the DPA's context and history. The Act was modeled on the War Powers Acts, which conferred on the President sweeping authority to regulate industry during wartime. *See* Neenan, *supra*, at 2. And a critical component of wartime authority is ensuring adequate productive capacity. The DPA supplies comparable authority but before the outbreak of any conflict. When enacting the DPA, Congress found "the development of domestic productive capacity" critical for ensuring the national defense, 50 U.S.C. § 4502(a)(3), and similarly found it necessary "to assure the availability of domestic energy supplies," *id.* § 4502(a)(5). These congressional findings would mean little if the President could only shuffle existing inventory rather than direct facilities to produce energy.[6]

We emphasize that the precise preemptive scope of a presidential order would depend upon the language employed in relation to the obligations imposed by state law. We cannot opine on the preemptive reach of an order not yet drafted. Moreover, because "hypothetical or potential conflict is insufficient" to preempt state law by conflict, the wording

---

[6] The President's authority to compel production is even more pronounced under section 4511(c), which allows the President to use the allocation power "in order to maximize domestic energy supplies." 50 U.S.C. § 4511(c)(1). We discuss section 4511(c) in greater detail below, but the word "allocate" must be "given more precise content by the neighboring words with which it is associated," *Fischer v. United States*, 144 S. Ct. 2176, 2183 (2024) (citation omitted), and "identical words and phrases within the same statute should normally be given the same meaning," *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007).

of any DPA order will affect the scope of conflict preemption. *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982).[7] According to Sable, "California agencies have deployed an array of state measures . . . to block pipeline operations," including "[enforcement of California] SB 237, the state waiver process, novel interpretations of state agency jurisdiction and authority, [and] excessive delay in granting a long-term easement through a state park for an existing pipeline." Sable Letter at 6. If such state measures make it impossible for Sable immediately to resume production and distribution of oil located on the SYU, they would be displaced as a matter of conflict preemption if a presidential order directed Sable to resume production immediately. Such an order would "irreconcilably conflict" with the terms of California state law. *Merck Sharp & Dohme Corp.*, 139 S. Ct. at 1679 (cleaned up).

## 2.

The President's prioritization authority under section 4511(a)(1) also allows him to preempt state law. Section 4511(a)(1) authorizes the President "to require that performance under contracts or orders" that "he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order." 50 U.S.C. § 4511(a)(1). Recall that "[i]n executing a contract under the DPA, a contractor is not liable for actions taken to comply with" a presidential order issued pursuant to the Act. Neenan, *supra*, at 6. Moreover, the President can also "prioritize the performance of contracts between two private parties." *Id.*

The President could issue an order under section 4511(a)(1) to expressly preempt certain state laws that, in the President's judgment, would impair or delay prioritized contract performance. *See E. Air Lines, Inc. v.*

---

[7] The DPA immunizes entities from liability for any act "resulting directly *or indirectly* from compliance" with an order issued under the Act. 50 U.S.C. § 4557 (emphasis added). It is thus possible that a DPA order might preempt state law to the extent that an entity's compliance with that order would result—even indirectly—in a breach of state law. Section 4557's immunity for acts resulting indirectly from compliance with a DPA order suggests that Congress anticipated that DPA orders might engender conflict with other legal obligations, even where dual compliance remains technically possible. But it is not necessary for us in answering your question to decide whether the DPA in effect lowers the standard for conflict preemption, so we do not decide it here.

*Preemptive Effect of DPA Order*

*McDonnell Douglas Corp.*, 532 F.2d 957, 993 (5th Cir. 1976) ("Congress intended to accord the Executive Branch great flexibility in molding its priorities policies to the frequently unanticipated exigencies of national defense."). The President could, for instance, instruct that Sable's contracts for oil production and transportation take priority over Sable's other contractual obligations and expressly preempt California environmental regulations insofar as they would impede that prioritized performance. By naming the preempted state laws on the face of the order, the President would eliminate any doubt about which legal requirements must give way to defense needs under the terms of the order.

An order issued under section 4511(a)(1) might also displace state contract law—which is often judge-made rather than statutory—by conflict. If the President requires that performance of certain contracts be prioritized over performance under any other contract or purchase order, state law rendering that prioritization impossible would be preempted. *Cf.* Memorandum for the Files, from Henry C. Whitaker, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Use of the Defense Production Act and the International Emergency Economic Powers Act to Regulate Industry During the Early Stages of the COVID-19 Pandemic* at 5–6 (Jan. 18, 2021). As we have explained, conflict preemption is a demanding standard; if Sable could prioritize the designated contracts while also complying with state law, state law would not necessarily be preempted. *But cf.* 50 U.S.C. § 4557 (shielding entities from liability for any act "resulting directly or indirectly from compliance" with a DPA order). But if state law would render Sable incapable of prioritizing the designated contracts, that state law would be displaced.

### 3.

Finally, section 4511(c) allows the President to preempt state law by wielding the allocation and prioritization powers "to maximize domestic energy supplies"—even in the absence of a national-defense finding. *See Energy Supply Interruption*, 6 Op. O.L.C. at 668 (citation omitted).[8]

---

[8] When updating our 1982 advice about the DPA in 2021, we wrote that "the powers granted in" section 4511 are "limited by" section 4511(b). Memorandum for Stuart F. Delery, Deputy Counsel to the President, Executive Office of the President, from Martin S. Lederman, Deputy Assistant Attorney General, Office of Legal

50 Op. O.L.C. __ (Mar. 3, 2026)

Section 4511(c) allows the President, upon making certain other findings, to "require the allocation of, or the priority performance under contracts or orders . . . relating to, materials, equipment, and services in order to maximize domestic energy supplies." 50 U.S.C. § 4511(c)(1). The words "materials" and "services" have the same capacious meanings as described above. *See id.* § 4552(13), (16).

The preemption analysis under section 4511(c) parallels that of the two provisions described above. In a directive requiring Sable to resume production and distribution of oil from the SYU, the President could exempt Sable from compliance with particular state laws, especially if the President were to find that compliance with such laws would threaten the ability to "maximize domestic energy supplies." *Id.* § 4511(c)(1). At minimum, an executive order would displace conflicting California law under traditional conflict-preemption principles, with the scope of preemption turning on the order's specific terms.

## IV.

State law, we have been advised, is not currently the only impediment to Sable's ability to resume production and transportation of oil. A consent decree entered in *United States v. Plains All American Pipeline L.P.*, No. 20-cv-02415 (C.D. Cal. Oct. 14, 2020), Dkt. 33 ("Consent Decree"), "currently vests authority over resumption of transportation through the onshore portions of the Santa Ynez Pipeline System with the California Office of the State Fire Marshal." Sable Letter at 9. We have been advised that, in addition to the United States and various State of California entities, Sable is a party to the Consent decree as a result of an acquisition. You have asked whether an executive order under the DPA would displace these provisions of the Consent Decree, even though there are both federal- and state-law claims at issue in that case. For three reasons, we think it would.

---

Counsel, *Re: Preliminary Review of Possible Legal Authorities Related to the Cyberattack Targeting the Colonial Pipeline* at 10 (May 12, 2021). But section 4511(c)(1) applies "[n]otwithstanding any other provision of this chapter." 50 U.S.C. § 4511(c)(1). To the extent that our more recent advice inadvertently suggested that section 4511(b) would limit the President's authority under section 4511(c), we take this opportunity to disclaim that suggestion.

20

*Preemptive Effect of DPA Order*

*First*, section 4557 would likely immunize Sable from needing to satisfy these provisions of the Consent Decree if acting to comply with a DPA order. The Consent Decree includes a "stipulated penalties" provision for violations of its requirements. *See* Consent Decree at 27. But section 4557 provides that "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter." 50 U.S.C. § 4557. Thus, Sable would be immune from any penalties—including those imposed under the Consent Decree—for "any act or failure to act resulting directly or indirectly from compliance with" a DPA order. *Id.*

Section 4557 would also immunize Sable from liability for contempt under such circumstances. *See* Consent Decree at 39 (leaving "contempt" open as a sanction for violations). Civil contempt sanctions are "penalties designed to compel future compliance" with a consent decree. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994); *see also Lackey v. Stinnie*, 145 S. Ct. 659, 671 (2025) ("Violation of a consent decree is enforceable by a citation for contempt."). Civil contempt sanctions can take the form of monetary fines or sentences of imprisonment. *See Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 631–32 (1988). Monetary fines to compel future compliance with the Consent Decree here, of course, may not be imposed for any act or omission resulting from compliance with a DPA order. *See* 50 U.S.C. § 4557. So too for sentences of imprisonment imposed for the same reason. The word "penalty" meant "a punishment imposed or incurred for a violation of law or rule." *The American College Dictionary* 895 (1948 ed.); *see also Webster's New Collegiate Dictionary* 621 (2d ed. 1956) ("*Webster's*"); *The Oxford Universal Dictionary* 1462 (3d ed. 1955). Nor was the word "liable" limited to monetary liability. *See, e.g.*, *Webster's* at 484 ("Bound or obliged by law or submission to other forces; answerable"). And limiting the word "penalties" to only monetary fines would be incongruous with the rest of section 4557 and the DPA more broadly, which ensure that the President can displace impediments to productive capacity when necessary. Indeed, it would be anomalous to think that section 4557 forbids the imposition of monetary fines but not the harsher penalty of imprisonment.

*Second*, a DPA order could constitute a force majeure under the Consent Decree. In particular, the Consent Decree defines a force majeure "as

21

50 Op. O.L.C. __ (Mar. 3, 2026)

any event arising from causes beyond the control of Defendants . . . that delays or prevents the performance of any obligation under this Consent Decree despite Defendants' best efforts to fulfill the obligation." Consent Decree at 35. The issuance of a DPA order would likely constitute an "event" arising from causes beyond the control of Sable, and complying with the order might delay or prevent the performance of Sable's obligations under the Consent Decree.

*Third*, the issuance of a DPA order might also constitute changed circumstances sufficient to require modification of the Consent Decree. A consent decree "must" be modified if one of its obligations "has become impermissible under federal law." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 388 (1992). And as we have explained, a DPA order has the force of federal law. If a DPA order requires Sable to take an action that is prohibited by the Consent Decree, the Consent Decree likely must be modified.

\* \* \* \* \*

The DPA authorizes the President to regulate private entities in ways that may be inconsistent with state law. An order issued under that authority could preempt state law either expressly or by conflict. And it may displace certain provisions of the Consent Decree described above, including those vesting authority over resumption of transportation with the California Office of the State Fire Marshal.

T. ELLIOT GAISER
*Assistant Attorney General*
*Office of Legal Counsel*

# EXHIBIT H

STATE OF CALIFORNIA - NATURAL RESOURCES AGENCY                                GAVIN NEWSOM, *Governor*

# CALIFORNIA COASTAL COMMISSION

455 MARKET STREET, SUITE 300
SAN FRANCISCO, CA 94105
VOICE (415) 904-5260
FAX (415) 904-5400

March 19, 2026

Email: srusch@sableoffshore.com
Steve Rusch
Sable Offshore Corporation
12000 Calle Real
Goleta, CA 93117

**Re:**     **Announcement of Pipeline Reactivation and Implications**

Dear Mr. Rusch:

California Coastal Commission ("Commission") staff are aware of the announcement by Sable Offshore Corp. ("Sable") that the Las Flores Pipelines (CA 324 and CA 325) ("Pipelines") have been returned to active use transporting oil processed at the Las Flores facility. This announcement came in the form of a press release from Sable stating that "on March 14, 2026, the Company resumed the transportation of hydrocarbons (oil) produced at the Santa Ynez Unit . . . . from Las Flores Canyon ("LFC") to Pentland Station . . . ." Commission staff are writing to remind you that returning the Pipelines to active service transporting oil without Coastal Act authorization constitutes a violation of the Coastal Act,[1] and if such development has indeed taken place, the Commission will need to decide what enforcement actions to take.

First, as noted in the Commission's February 18, 2026, letter to Sable, Section 30262(b)(2) of the Coastal Act states that:

> *Repair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more shall be considered a new or expanded development requiring a new coastal development permit consistent with this section.*

As of January 1, 2026, the Pipelines had been idled, inactive, and out of service for more than five years, since oil production was halted at the Santa Ynez Unit in 2015. Sable has not obtained a new Coastal Development Permit for reactivation of the Pipelines. Thus, any reactivation of the Pipelines is unpermitted development and would be grounds for further enforcement action by the Commission.

Second, an injunction presently prohibits Sable's legal authority to reactivate the Pipelines, and the reported reactivation of the pipelines is in violation of that judicial

---

[1] The Coastal Act is codified in the California Public Resources Code, Sections 30000 to 30900. All references to section numbers in this letter are to that code, and thus, to the Coastal Act.

order. As you know, in *Center for Biological Diversity, et al., v. California Dept. of Forestry and Fire Protection, et al.* (Santa Barbara County Superior Court Case No. 25CV02244), the Court issued a preliminary injunction preventing restart of the Pipelines until—among other requirements—"10 court days following Sable's filing and service of notice that Sable has received all necessary approvals and permits for restarting." As such, any reactivation of the pipelines at issue would violate this court order as well.

Furthermore, as you also know, in *Sable Offshore Corp., et al., v. California Coastal Commission* (Santa Barbara County Superior Court Case No. 25CV00974), the Court issued a preliminary injunction requiring Sable to adhere to the provisions of the Commission's Cease-and-Desist Order (No. CCC-25-CD-01), which prohibits Sable from engaging in any further development in the Coastal Zone unless it is authorized by a new Coastal Act authorization or acknowledged as exempt, pending resolution of the litigation.

We are aware that U.S. Secretary of Energy Chris Wright issued an order on March 13, 2025, entitled "Pipeline Capacity Prioritization and Allocation Order." However, even if that order is not entirely invalidated, we do not believe it could or would absolve Sable of its legal obligation to comply with the above-referenced requirements.

Therefore, please respond by **5 p.m. on Friday, March 20, 2026,** updating Commission staff on recent developments that have occurred at the Pipelines, including but not limited to reactivation of the pipeline, and your plans going forward.

For additional information, you may contact Liam Stowe at (415) 729-1646, Liam.Stowe@coastal.ca.gov, or at our Headquarters Enforcement Office at:

Attn: Liam Stowe
455 Market Street, Suite 300
San Francisco, CA 94105


Sincerely,

DocuSigned by:

*Kate Hucklebridge*

0D697AECAB0D4F4...

Kate Hucklebridge
Executive Director
California Coastal Commission

Cc:
Matthew Dumlao, Executive Officer, California State Lands Commission
Jennifer Lucchesi, Director, California Department of Conservation
Armando Quintero, Director, California State Parks
Joe Tyler, Director, CalFire

# EXHIBIT I

Docusign Envelope ID: 249085FD-1771-4383-8354-0670B77879FC

STATE OF CALIFORNIA – NATURAL RESOURCES AGENCY                                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
P.O. Box 944246
SACRAMENTO, CA 94244-2460
(916) 653-7772
Website: www.fire.ca.gov



Duncan Joseph Moore
Paul Hastings LLP
1999 Avenue of the Stars, 27th floor
Los Angeles, CA 90067


March 16, 2026

RE: Sable - Relinquishment of State Waivers Lines 324 & 325A/B

Dear Mr. Moore,

The Office of the State Fire Marshal (OSFM) received your letter dated February 26, 2026, in which your client, Sable Offshore Corp. and Pacific Pipeline Company (Sable), notified OSFM that Sable "relinquishes, surrenders and abandons the State Waivers" granted by the OSFM and associated with the above captioned pipelines.

The OSFM disagrees with your contention that Sable has complied with the terms of the State Waivers. I notified Sable of OSFM's concerns about Sable's compliance in my October 22, 2025, letter to Sable's Vice President, Lance Yearwood. Specifically, repairs to Lines 324 and 325 that include wall loss depth, plus tool tolerances, were to be completed prior to restart. They were not. Similarly, OSFM disputes your contention that the Pipeline and Hazardous Materials Safety Administration is the current safety and regulatory authority over Lines 324 and 325. Importantly, the terms of the Consent Decree—including the requirement for a State Waiver to be in effect if and when operations re-commence—are still binding on all parties, including Sable and PHMSA.

Nonetheless, Sable is free to "relinquish[], surrender[] and abandon" the State Waivers associated with Lines 324 and 325. Should Sable desire to operate Lines 324 and 325, State Waivers will be required and OSFM will review Sable's application for new State Waivers at that time.

Any re-commencement of operations prior to OSFM's determination that Sable has complied with all terms of State Waivers is prohibited by both the Consent Decree and the July 2025 Preliminary Injunction issued by Santa Barbara Superior Court. OSFM reserves all rights to enforcement action if operations on Lines 324 and/or 325 re-commence without a valid State Waiver.

Sincerely,

DANIEL BERLANT
State Fire Marshal


*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*