ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General
MATTHEW BULLOCK (SBN 243377)
MICHAEL S. DORSI (SBN 281865)
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 510-3802
  Fax: (415) 703-5480
  E-mail: Michael.Dorsi@doj.ca.gov
*Attorneys for Defendants*
*California Department of Forestry and*
*Fire Protection, Office of the State Fire*
*Marshal, and Daniel Berlant, in his official*
*capacity as State Fire Marshal*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PACIFIC PIPELINE COMPANY, a Delaware Corporation,**<br><br>                                    Plaintiff,<br><br>           v.<br><br>**STATE OF CALIFORNIA, a state government; CALIFORNIA COASTAL COMMISSION, a state agency; CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, a state agency; OFFICE OF THE STATE FIRE MARSHAL, a state agency; DANIEL BERLANT, in his official capacity as State Fire Marshal and DOES 1 through 25, inclusive,**<br><br>                                    Defendants. | 1:26-CV-01486-KES-CDB<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, OFFICE OF THE STATE FIRE MARSHAL, AND DANIEL BERLANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Date:          September 8, 2026<br>Time:         1:30 p.m.<br>Courtroom:  6 [7th Floor]<br>Judge:        The Honorable Kirk E. Sherriff<br><br>Trial Date:   None Set<br>Action Filed: September 29, 2025 |

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS:

PLEASE TAKE NOTICE that Defendants California Department of Forestry and Fire Protection, Office of the State Fire Marshal, and Daniel Berlant, in his official capacity as State Fire Marshal (collectively, the "Fire Marshal Defendants") seek judicial notice of the attached documents under Federal Rule of Evidence 201. The exhibits and the facts that they identify are the proper subject of judicial notice because the facts and documents are official government-issued documents (Exhibits 1-3, 5), court orders (Exhibits 4, 8-11), and private party submissions to government agencies, which became official records upon receipt by the relevant agency (Exhibits 6-7), and the facts for which they are relied upon here can be accurately and readily determined from these sources whose accuracy cannot reasonably be questioned. *See, e.g.*, *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010) (stating that it was appropriate to take judicial notice of information on government websites where "neither party disputes the authenticity of the web sites or the accuracy of the information displayed therein"); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (a court may "consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice."). The documents to be judicially noticed are identified in the index on the following page.

Dated:  July 31, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
MYUNG J. PARK
Supervising Deputy Attorney General

*/s/ Michael S. Dorsi*
MICHAEL DORSI
Deputy Attorney General
*Attorneys for Defendants*
*California Department of Forestry and*
*Fire Protection, Office of the State Fire*
*Marshal, and Daniel Berlant, in his official*
*capacity as State Fire Marshal*

1

**DECLARATION OF AUTHENTICATION**

As the attorney who prepared this Declaration, I attest that I compiled the attached exhibits and confirmed their authenticity by obtaining the documents from official government websites or from government employees with knowledge of their authenticity.

Dated:  July 31, 2026

/s/ Michael S. Dorsi
MICHAEL DORSI
Deputy Attorney General

***

**INDEX OF EXHIBITS TO REQUEST FOR JUDICIAL NOTICE**

Exhibit 1:   State Waiver for CA-324

Exhibit 2:   State Waiver for CA-325

Exhibit 3:   PHMSA Non-Objection to OSFM Waivers

Exhibit 4:   Order Granting Motions for Preliminary Injunction
Santa Barbara County Superior Court

Exhibit 5:   OSFM Warning Letter to Sable

Exhibit 6:   Sable Letter to PHMSA

Exhibit 7:   Sable Waiver Cancellation Letter

Exhibit 8:   Order Denying First Motion for Reconsideration
Santa Barbara County Superior Court

Exhibit 9:   Order Denying Second Motion for Reconsideration
Santa Barbara County Superior Court

Exhibit 10: Order Granting Motion to Dismiss
U.S. District Court, Central District of California

Exhibit 11: Supplemental Briefing Order
U.S. Court of Appeals for the Ninth Circuit

Request for Judicial Notice ISO California Fire Marshal's Mot. to Dismiss Plaintiff's Second Amended Complaint
(1:26-CV-01486-KES-CDB)

# Exhibit 1

Exhibit 1
to Request for Judicial Notice
in Support of Motion to Dismiss
by CAL FIRE, OSFM, and Fire Marshal Berlant

Fire Marshal Exhibits 001

Docusign Envelope ID: 87118E7A-ED76-4881-86B3-BCE5F180FFD7

STATE OF CALIFORNIA – NATURAL RESOURCES AGENCY                                                                 Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov



## CERTIFIED MAIL No: 9589-0710-5270-1475-5353-08

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:**  **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-324)**

Operator:  Sable Offshore Corp
OPID# 40851
845 Texas Avenue, # 2920
Houston, Texas 77002

Pipeline:  OSFM Line ID 0015 - 10.86 miles (Las Flores Canyon to Gaviota) of Sable Offshore Corp CA-324 (OSFM Line ID 0015) located in Santa Barbara County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-324.

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Fire Marshal Exhibits 002

Docusign Envelope ID: 87118E7A-ED76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 2

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-324 (OSFM Line ID 0015) which consists of a 10.86 mile long, 24-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara, California and shall be referred herein as *CA-324.*

The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-324, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In the event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control.

Docusign Envelope ID: 87118E7A-ED76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 3

Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-324 shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

**General Conditions**

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) of CA-324 cannot exceed 1003 pounds per square inch gauge (psig).
3. The maximum operating temperature of the crude oil that transports in CA-324 must not exceed 140 Fahrenheit for more than 12 consecutive hours.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI).
   c. Use of a tool that is at least capable of reliably detecting and sizing cracks or crack-like anomalies at a 90 percent POD and POI.
8. Prior to placing CA-324 in operation, Sable must perform fracture toughness tests on the existing 24" pipe from CA-324 in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness.  All of the test specimens must be from the predominant existing 24" pipe, specifically API 5L X65 HF-ERW pipe with a nominal thickness of 0.344" that was manufactured by

Docusign Envelope ID: 87118E7A-ED76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 4

Nippon Steel Corp. in the 1980s.  At least three (3) separate tests must be performed to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the HF-ERW long seam weld on the pipe to represent the fracture toughness of its CA-324 (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the HF-ERW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 30, 33, and 48. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-324.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-324.

**Pressure Testing**

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segments at a minimum pressure that is at least 1.5 times the MOP or 100% SMYS, for a minimum of 15 minutes after

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.

[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Docusign Envelope ID: 87118E7A-ED76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 5

the spike test pressure is stabilized.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-324:

   a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.

   b. All anomalies that have a predicted failure pressure less than or equal to 1.6 times MOP.

13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segments at a minimum of 1.25 times the MOP.

14. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test and have the approved independent testing firm forward separately the certified test results to the OSFM.

15. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 Subpart E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.

16. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
Subject: OSFM State Waiver - Hydrotest Failure

17. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

## In-Line Inspection (ILI) Assessment and Frequency

18. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:

   a) Dates for integrity assessment

   b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.
[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Fire Marshal Exhibits 006

Docusign Envelope ID: 87118E7A-ED76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 6

        segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications

    c) In-line inspection tool vendor(s)

    d) Required tool specifications including operational specifications and anomaly sizing tolerances

    e) Tool validation methodology

    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications

    g) Criteria used to identify locations for excavation and field verification

    h) Non-destructive examination

19. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.

20. Metal Loss Tool(s)

    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-324, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU).  Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months.  If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.

    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-324, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful.  All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

21. Crack Detection Tools - Sable shall conduct at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15

Docusign Envelope ID: 87118E7A-ED76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 7

months[5] or ILI assessment must be assessed at more frequent intervals if condition 48 determined a shorter assessment interval.

   a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

   b. USCD Performance Specification Requirements

       i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

       ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

       iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

       iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

22. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

23. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

24. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

25. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

26. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

27. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals.  Sable must

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to OSFM and PHMSA approval.

Docusign Envelope ID: 87118E7A-ED76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 8

document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different.  If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

28. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

29. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

30. A crack or crack-like anomaly that meets any of the following criteria:
    a.  Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b.  Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.
31. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.
32. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i).  All immediate repair conditions must be remediated with a permanent repair method.

Docusign Envelope ID: 87118E7A-ED76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 9

remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

## 180-Day Repair Conditions[9]

33. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
34. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
35. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
36. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

37. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
38. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.

---

[8]  Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify the OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

Docusign Envelope ID: 87118E7A-ED76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 10

39. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
40. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].
41. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

**Pressure Reduction**

42. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

**In Field Direct Examination of Pipe**

43. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15]  PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.
44. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:
    a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

---

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.
[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.
[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Docusign Envelope ID: 87118E7A-ED76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 11

b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs.  If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

45. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy.  Sable must recoat in accordance with their coating repair procedure.[16]

47. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

## Integrity Management

48. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.

a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).

b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

49. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

50. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Docusign Envelope ID: 87118E7A-ED76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 12

51. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

52. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

53. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC) interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

54. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

55. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

56. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

57. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions

Fire Marshal Exhibits 013

Lance Yearwood
December 17, 2024
Page 13

e.  Evaluation methodology used
f.  Models used
g.  Direct in situ examination data
h.  All in-line inspection tool assessments information evaluated
i.  Pressure test data and results
j.  All in-the-ditch assessments performed on the pipeline segments
k.  All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
l.  All finite element analysis results
m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology
n.  The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods
o.  Safety factors used for fatigue life and/or predicted failure pressure calculations
p.  Reassessment time interval and safety factors
q.  The date of the review
r.  Confirmation of the results by qualified technical subject matter expert(s)
s.  Approval by responsible Sable management personnel
t.  Records of additional preventive and mitigative (P&M) measures performed
u.  Reports required by this State Waiver.

## Reporting

58. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

59. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-324.* The email notification shall include, if applicable:
    a.  Tool type and run date
    b.  Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
    c.  Dig sheets
    d.  Field contact information for Sable
    e.  Time and location of the field evaluation and repair.

60. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-324* and include:

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

Docusign Envelope ID: 87118E7A-ED76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 14

      a. Tool type
      b. Run date
      c. Summary of Conditions Report[18]
      d. Final Vendor Report and Pipe Tally

61. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report CA-324.* At a minimum, the annual report shall contain the following, if applicable:

      a. A Closure Report for the previous calendar (CY) which contains:
            i. Features that were remediated in previous CY
                 1. Provide documentation for the in-the-ditch assessments and repairs
            ii. Identify features that remain to be assessed
            iii. Unity Plots for previous ILI runs
      b. Fracture mechanics and pressure cycling analyses in accordance with Condition 48
      c. The third-party ILI expert reviews in accordance with Condition 52
      d. AC and DC Interference surveys that are due in accordance with Condition 53
      e. A copy of the CGRA for prior year including:
            i. Mean corrosion growth rate for the pipeline
            ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

62. This state waiver is limited to a term of no more than (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
63. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
64. The OSFM may order the pipeline shutdown at any time.
65. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for

---

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docusign Envelope ID: 87118E7A-ED76-4881-86B3-BCE5F180FFD7

Lance Yearwood
December 17, 2024
Page 15

failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.

66. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.

67. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.

Sincerely,

DocuSigned by:

*James Hosler*

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-324

cc:    Doug Allen, Supervising Pipeline Safety Engineer, OSFM
       Andy Chau, Supervising Pipeline Safety Engineer, OSFM
       Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
       Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
       Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
       Tuan Tran, Pipeline Safety Engineer, OSFM
       Josh Cleaver, Staff Counsel, CAL FIRE
       Max Kieba, Engineering and Research Division, PHMSA
       Joshua Johnson, Engineering and Research Division, PHMSA

# Exhibit 2

Exhibit 2
to Request for Judicial Notice
in Support of Motion to Dismiss
by CAL FIRE, OSFM, and Fire Marshal Berlant

Fire Marshal Exhibits 017

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600F3B

STATE OF CALIFORNIA – NATURAL RESOURCES AGENCY                                    Gavin Newsom, Governor



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website: www.fire.ca.gov

**CERTIFIED MAIL No: 9589-0710-5270-1475-5353-15**

December 17, 2024

Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:** **LETTER OF DECISION ON THE STATE WAIVER REQUEST FOR LIMITED EFECTIVENESS OF CATHODIC PROTECTION ON THERMALLY INSULATED PIPELINE AND CORROSION OF OR ALONG A LONGITUDINAL SEAM WELD (CA-325A/B)**

Operator:     Sable Offshore Corp
              OPID# 40851
              845 Texas Avenue, Suite 2920
              Houston, Texas 77002

Pipeline:     OSFM Line ID 0001 - 113.56 miles (Gaviota to Sisquoc to Pentland) of Sable Offshore Corp CA-325A/B (OSFM Line ID 0001) located in Santa Barbara County, San Luis Obispo County, and Kern County, California as described in the request of state waiver dated April 24, 2024

Dear Mr. Yearwood:

The Office of the State Fire Marshal (OSFM) received Sable Offshore Corp's (*Sable*) state waiver request (*Application*) on April 24, 2024, in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

In addition, Sable requested a regulatory relief from Title 49 Code of Federal Regulations (49 C.F.R.), § 195.452(h)(4)(iii)(H) *Corrosion of or along a longitudinal seam weld* for Sable CA-325 A/B.

Sable explained that its goal is to appropriately manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the

*"The Department of Forestry and Fire Protection serves and safeguards the people and protects the property and resources of California."*

Fire Marshal Exhibits 018

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 2

shielding effects of the polyurethane foam and the polyethylene tape wrap. Sable described the measures it has taken to address this risk and implemented and proposed a number of additional measures designed to mitigate the risk of corrosion under insulation that may result from potential ineffective cathodic protection (CP).

Sable provided the OSFM with its proposed measures to mitigate the risk of corrosion under insulation.  Sable also provided the OSFM information from the completed in-line inspections and additional data requested by our office. The OSFM Pipeline Safety Engineers have reviewed the materials provided and have been in communication with the United States Department of Transportation (USDOT), Pipeline and Hazardous Materials Safety Administration (PHMSA) Engineering and Research Division to incorporate PHMSA's recommended conditions into the state waiver.

The OSFM has regulatory jurisdiction over the safety standards and practices of intrastate hazardous liquid pipeline transportation within California. As a Pipeline Safety Program that is certified under 49 USC § 60105, the OSFM may grant a state waiver with a pipeline safety regulation adopted by the state of California. Title 49 C.F.R., Part 195 was adopted by reference as it relates to hazardous liquid pipelines within Title 19 California Code of Regulations (19 CCR), Section 2000.

This state waiver applies to Sable's Line CA-325A/B (OSFM Line ID 0001) which consists of a 113.56 mile long, 30-inch outside diameter pipeline segment with the origin and termination points as described in the application. The pipeline is located in Santa Barbara County, San Luis Obispo County, and Kern County, California and shall be referred herein as CA-325A/B. CA-325A/B consists of two shorter pipeline segments, CA-325A and CA-325B.  The pipeline segment CA-325A, located completely in Santa Barbara County, starts in Gaviota and ends at Sisquoc.  CA-325A is approximately 38.72 miles long.  The other pipeline segment, CA-325B, which is directly downstream of CA-325A, begins at Sisquoc and terminates in Pentland. CA-325B is approximately 74.84 miles long and traverses Santa Barbara County, San Luis Obispo County, and Kern County, California. The state waiver shall not become effective until (1) PHMSA issues an Order approving the waiver or stating it has no objection to the waiver or (2) PHMSA takes no action on the waiver within sixty (60) days after receiving the Letter of Decision from the OSFM.

The state waiver is limited to a term of no more than ten (10) years from the date it becomes effective, which shall be considered as the date of issuance. The OSFM may terminate the state waiver under conditions detailed below.

**Applicable Regulations**

The OSFM hereby grants this state waiver for CA-325 A/B, provided that Sable complies with the specific requirements in this state waiver and any additional conditions outlined by PHMSA. The pipeline must be operated and maintained in accordance with the CD, these

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 3

state waiver conditions and 49 C.F.R. Part 195, with the exception of 49 C.F.R. §195.452(h)(4)(iii)(H). In event of a conflict between the state waiver conditions and the applicable requirements under 49 C.F.R. Part 195, the state waiver conditions control. Should additional federal or State statutory or regulatory requirements come into effect following the implementation of this state waiver, CA-325 A/B shall be subject to those requirements except where they are in conflict with the State Waiver or the safe operation of the pipeline.

## General Conditions

1. The pipeline can only be used to transport crude oil as stated in the application.
2. The maximum operating pressure (MOP) cannot exceed:
   a. 1000 pounds per square inch gauge (psig) for CA-325A.
   b. 1292 psig for CA-325B.
3. The maximum operating temperature of the crude oil must not exceed:
   a. 125 Fahrenheit for more than 12 consecutive hours for CA-325A. Temperature transmitters must be installed on CA-325A at Gaviota station to monitor the temperature of CA-325A/B at this facility.
   b. 110 Fahrenheit for more than 12 consecutive hours for CA-325B. Temperature transmitters must be installed on CA-325A/B at Sisquoc station to monitor the temperature of CA-325A/B at this facility.
4. Prior to startup, Sable must develop and implement procedures for the conditions and requirements described in the state waiver.
5. This state waiver does not relieve Sable from other requirements under 49 C.F.R. Part 195 or the Elder California Pipeline Safety Act of 1981 other than contained herein.
6. This state waiver does not relieve Sable from any requirements imposed by the Consent Decree (United States District Court Central District of California Civil Action No. 2:20-cv-02415).
7. In-line inspection must include:
   a. Use of a tool that is at least capable of reliably detecting and identifying cluster corrosion and general corrosion. Definition of cluster and general corrosion is as follows:
      i. Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.
      ii. General corrosion means uniform or gradually varying loss of wall thickness over an area.
   b. Use of a tool that is at least capable of reliably detecting and sizing corrosion at a 90 percent probability of detection (POD) and probability of identification (POI)
   c. Use of a tool that is at least capable of reliably detecting and sizing crack or crack-like anomalies at a 90 percent POD and POI

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
   Page 4

8. Prior to placing CA-325A/B in operation, Sable must perform fracture toughness tests on the existing 30" pipe from CA-325A/B in accordance with ASTM E1820-23B Standard Test Method for Measurement of Fracture Toughness.  All of the test specimens must be from both of the two following predominant existing 30" pipe specifications:
   a. API 5L X70 pipe with a nominal thickness of 0.281" that was manufactured by the various pipe mills in the 1980s.
   b. API 5L X65 pipe with a nominal thickness of 0.344" that was manufactured by the various pipe mills in the 1980s.
   At least three (3) separate tests must be performed from each pipe mill, for both of the two pipe specifications listed above, to obtain the fracture toughness values of the pipe body, heat affected zone (HAZ)[1], and the DSAW long seam weld on the pipe to represent the fracture toughness of CA-325A/B (i.e. three (3) samples for pipe body, three (3) samples for HAZ, and three (3) samples for the DSAW long seam weld). The lowest fracture toughness value must be applied to conditions 10, 31, 34, and 49. Sable may use pipe samples taken opportunistically during ongoing pipeline maintenance and repair efforts.[2]

9. All immediate and 180-day repair conditions that are listed in this state waiver must be evaluated and remediated prior to restarting CA-325A/B.  Sable must utilize Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) tools within seven (7) days of achieving initial steady state operation in accordance with an ILI survey schedule approved by the OSFM.  Sable must utilize the most recent Ultrasonic Thickness Wall Measurement (UTWM) and Ultrasonic Shear Wave Crack Detection (USCD) in-line inspection (ILI) results when identifying these repair conditions.

10. Remaining strength of pipe calculation for all metal loss anomalies must be in accordance with the Modified B31G method as described in ASME B31G *Manual for Determining the Remaining Strength of Corroded Pipelines.* If ASME B31G 2012 Edition is used, then it must comply with the conditions in accordance with Section 1.2 and exclusions in accordance with Section 1.3 of ASME B31G 2012 Edition. However, if the metal loss anomaly intersects or is within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must also calculate the predicted failure pressure of the anomaly by using the crack-like flaw evaluation method ASME FFS-1/API 579-1.

11. Sable must utilize cleaning pigs at regular intervals not to exceed a biweekly basis to maintain adequate cleanliness on the internal pipe wall of its CA-325A/B.

---

[1] The heat affected zone (HAZ), as used in the state waiver, is defined as a 1-inch-wide area on either side of the longitudinal weld seam.
[2] Sable must submit all fracture toughness results to the OSFM prior to restarting the pipeline.

Fire Marshal Exhibits 021

Lance Yearwood
December 17, 2024
Page 5

**Pressure Testing**

12. Prior to placing the pipeline in operation, Sable must conduct a spike hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum pressure that is at least 1.39 times the MOP, for a minimum of 15 minutes after the spike test pressure is stabilized.  Sable must ensure that the spike hydrostatic pressure at the highest elevation of each testable segment is at least 1.39 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the spike hydrostatic test on CA-325A:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.5 times MOP.
13. Immediately following the spike hydrostatic pressure test, Sable must conduct an 8-hour hydrostatic pressure test of the state waiver pipeline segment *CA-325A* at a minimum of 1.25 times the MOP.
14. Prior to placing the pipeline in operation, Sable must conduct a hydrostatic pressure test of the state waiver pipeline segment *CA-325B* at a minimum pressure of 1.25 times the MOP, for a minimum of 8 hours.  Sable must ensure that the hydrostatic pressure at the highest elevation of each testable segment is at least 1.25 times the MOP.  Sable must field evaluate and remediate the following anomalies before performing the hydrostatic test on CA-325B:
    a. All metal loss anomalies that have an ILI reported depth of 40% and greater wall loss.
    b. All anomalies that have a predicted failure pressure less than or equal to 1.4 times MOP.
15. Sable must obtain the Test ID from the OSFM for each hydrostatic pressure test segment and have the approved independent testing firm forward the certified test results to the OSFM.
16. Each hydrostatic pressure test must be performed in accordance with the applicable requirements of 49 C.F.R., Part 195 E – Pressure Testing and monitored by an independent testing firm listed under the OSFM approved hydrostatic testing companies.
17. Failures resulting from the spike hydrostatic pressure test or the 8-hour strength test shall be immediately reported[3] to the OSFM via email at PipelineNotification@fire.ca.gov
Subject: OSFM State Waiver - Hydrotest Failure.
18. Section(s) of the state waiver pipeline segments that failed during the required hydrotesting must be repaired by removing and replacing the failed section. The OSFM reserves the right to revoke the state waiver if failure(s) raise the concern that the pipeline cannot be safely operated.

---

[3] In addition to the OSFM reporting, Sable shall follow all additional state reporting requirements.

Lance Yearwood
December 17, 2024
Page 6

### In-Line Inspection (ILI) Assessment and Frequency

19. At least 90 days prior to performing in-line inspections of the state waiver segment, Sable shall provide the OSFM with a written notification to PipelineNotification@fire.ca.gov describing its assessment plan with the following information:
    a) Dates for integrity assessment
    b) In-line inspection tool(s) selected, in accordance with API Standard 1163 Section 5 and NACE SP0102[4] to assess the integrity of the subject pipe segment(s) in which ILIs must be capable to detect and size wall loss, dents, internal corrosion, external corrosion, cracks and crack-like indications
    c) In-line inspection tool vendor(s)
    d) Required tool specifications including operational specifications and anomaly sizing tolerances
    e) Tool validation methodology
    f) Anomaly feature identification criteria and reporting thresholds – wall loss, dents, internal corrosion, external corrosion, cracks, and crack-like indications
    g) Criteria used to identify locations for excavation and field verification
    h) Non-destructive examination
20. Within seven (7) days prior to any anticipated ILI tool run, Sable must utilize extensive brush pigs and solvents (xylene or other chemicals) to ensure that the internal pipe wall does not have any corrosive products, wax, and bacteria buildup that may affect the ILI tool performance.
21. Metal Loss Tool(s)
    a. Initial ILI tool runs – Each year, during the first two (2) years of operating CA-325 A/B, Sable shall conduct at least two (2) ILIs using a UTWM tool with an inertial measurement unit (IMU).  Sable shall compare both runs and evaluate all available information, including these tool runs and corresponding IMU data. Sable shall perform the UTWM tool run every six (6) months not to exceed nine (9) months.  If a UTWM tool run is unsuccessful, Sable shall identify the limitations that prevented the UTWM tool run from being successful, consider changes to increase the likelihood of a successful UTWM tool run, and use best efforts to rerun the UTWM tool within 30 days.
    b. Subsequent ILI tool runs – After the first two (2) years of operating CA-325 A/B, Sable shall conduct at least one (1) Ultrasonic Wall Measurement tool (UTWM) each calendar year, not to exceed 15 months or the ILI assessment must be assessed at more frequent intervals if the remaining Failure Pressure Ratio will be less than 1.39 times MOP prior to the next ILI assessment, based upon anomaly growth estimates and pressure cycling. If,

---

[4] Industry standards that are referenced in this state waiver must utilize the editions that are incorporated by referenced in Title 49 Part 195.3 unless another edition was explicitly specified.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 7

any UTWM tool run is deemed to be unsuccessful, Sable shall document the reasons why the UTWM tool was unsuccessful, consider changes to increase the likelihood of a successful UTWM tool run, and must reassess the pipeline within 30 days after it was deemed to be unsuccessful. All metal loss tool runs must also utilize an Inertial Measurement Unit (IMU).

22. Crack Detection Tools - Sable must run at least one (1) Ultrasonic Shear Wave Crack Detection (USCD) tool each calendar year, not to exceed 15 months[5] or the ILI assessment must be assessed at more frequent intervals if Condition 49 determined a shorter assessment interval.

   a. These crack tool runs must utilize an Inertial Measurement Unit (IMU) and must be able to detect and size axial and circumferential cracks.

   b. USCD Performance Specification Requirements

      i. The USCD tools must have a probability of detection that is ≥ 90% for axial and circumferential cracks.

      ii. The minimum crack depth that can be detected must be at least 1 mm for axial and circumferential cracks that are located in the base material.

      iii. The minimum crack depth that can be detected must be at least 2 mm for axial and circumferential cracks that are located in the weld.

      iv. The depth sizing accuracy for cracks must be ± 0.8 mm for axial cracks and ± 1 mm for circumferential cracks.

23. Dents and Pipe Deformation: Sable shall conduct a high-resolution deformation ILI tool with each UTWM.

24. Where any ILI tool fails to record data for 5% or more of the external and/or internal surface area of the inspected segment, reassess with the ILI tool to cover the area that is deemed to be inadequate data of the inspected segment. In addition, if the ILI tool travels at a speed that is outside the range of the tool velocity listed in the tool specification for 2% or more of the length of the inspected segment, Sable must rerun the ILI tool to reassess the pipeline segment in which the ILI tool velocity was outside of the specified tool velocity range.

25. All ILI tool runs must obtain the Test ID from the OSFM prior to run.

26. Sable must require its ILI tool vendor(s) to include in the vendor's inspection report all metal loss indications of 10% or greater, based on raw data, prior to adding in any correction for tool tolerance.

27. Sable must incorporate ILI tool accuracy by ensuring that each ILI tool service provider determines the tolerance of each tool, in accordance with API Standard 1163 Second Edition and includes that tolerance in determining the size of each indication reported to Sable.

---

[5] Sable may petition the OSFM to revise the reassessment interval for Crack Detection Tool(s) when sufficient evidence is available to determine if crack growth rates could support a longer reassessment interval. Changes to the reassessment interval are subject to the OSFM and PHMSA approval.

Fire Marshal Exhibits 024

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 8

28. Sable must account for ILI tool tolerance and anomaly growth rates in scheduled response times, repairs, and future reassessment intervals.  Sable must document and justify the values used. Sable must demonstrate ILI tool tolerance accuracy for each ILI tool run by using calibration, excavations, and unity plots[6] that demonstrate ILI tool accuracy to meet the tool accuracy specification provided by the vendor (typical for depth within +10% accuracy for 80% of the time). Sable must compare previous indications to current indications that are significantly different.  If a trend is identified where the tool has been consistently over-calling or under-calling, the remaining ILI features must be re-graded accordingly.

29. Prior to the ILI final report being received, Sable must perform at least four (4) separate validation digs that do not interact with each other. At a minimum, Sable must perform validation digs in accordance with Level 2 of API Standard 1163, "In-line Inspection System Qualification" (Second Edition, April 2013).

## Discovery of Condition

30. The discovery date must be within 180 days of any ILI tool run for each type of ILI tool.

## Immediate Repair Conditions[7]

31. A crack or crack-like anomaly that meets any of the following criteria:
    a. Crack or crack-like anomaly that is equal to or greater than 50% of pipe wall thickness.
    b. Crack or crack-like anomaly that has predicted failure pressure of less than 1.39 times the MOP as calculated using crack-like flaw evaluation method ASME FFS-1/API 579-1.

32. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.39 times the MOP.

33. Any external cluster corrosion or external general corrosion that is located on the bottom half of the pipeline (below the 3 and 9 o'clock positions) where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.[8]

---

[6] A minimum of four (4) independent direct examination excavations must be used for unity plots.

[7] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(i) Immediate repair conditions* and does not relieve Sable from complying with §195.452(h)(4)(i).  All immediate repair conditions must be remediated with a permanent repair method.

[8] Cluster means two or more adjacent metal loss features in the wall of the pipe or weld that may interact based on interaction criteria.  General corrosion means uniform or gradually varying loss of wall thickness over an area.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 9

## 180-Day Repair Conditions[9]

34. A crack or crack-like anomaly that has predicted failure pressure of less than 1.5 times the MOP.
35. Internal or external metal loss anomalies where the remaining strength of pipe shows a predicted failure pressure less than 1.5 times the MOP.
36. All internal or external metal loss anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth.[10]
37. For any crack (likely crack or possible crack) or crack-like anomaly, regardless of its dimensions, that interacts with metal loss anomalies and are within one (1) inch (circumferentially) of the longitudinal seam weld, Sable must integrate the ILI results from the most recent crack tool run and the most recent metal loss tool run before the discovery date deadline.

## Corrosion Growth Rate Analysis (CGRA)

38. Sable must develop a CGRA procedure to annually calculate corrosion growth rates between successive ILI's (using most recent ILI compared to prior ILI) and perform pipeline remediations needed to assure the integrity of the pipeline is maintained.[11]  The timing of pipeline remediations under this condition shall be based on the most recent calculation of short-term corrosion rates.
39. The CGRA procedure must include ILI data matching methods[12] to analyze data from successive ILI's, methodologies for growth rate calculations and errors from comparing ILI data.
40. Sable must identify the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss.
41. When determining the projected date when remaining metal loss indications will reach a depth of 70% or greater wall loss, Sable must account for reported ILI depth, tool tolerance and corrosion growth rates[13].

---

[9] The criteria outlined in the state waiver is supplemental to the requirements set forth in *§195.452(h)(4)(iii) 180-day conditions* and does not relieve Sable from complying with §195.452(h)(4)(iii).  All 180-day repair conditions must be remediated with a permanent repair method.

[10] For example, if the ILI tool reports a 31% metal loss anomaly and the tool sizing tolerance is ±10 for depth, then this anomaly is a 180-day repair condition since it can be considered as an external metal loss anomaly with 41% metal loss depth.  If Sable is unable to remediate such indications within 180 days of discovery, Sable must notify OSFM, temporarily reduce the operating pressure, and take further remedial action in accordance with 49 C.F.R. §195.452 until the indication is remediated or until otherwise authorized by the OSFM.

[11] At a minimum, Sable must include signal matching between ILI data sets.

[12] If there are several matching techniques that can be used, Sable must utilize the most accurate method of comparing ILI data sets.

[13] Growth projections must use corrosion rates determined in accordance with the CGRA procedure. A default corrosion rate of 32 mpy must be used in determining projections, if corrosion rates determined by CGRA are less than the default value.

Fire Marshal Exhibits 026

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 10

42. All metal loss indications that are projected to reach a depth of 70% or greater wall loss prior to the next ILI, will become actionable and must be remediated before the next ILI.

## Pressure Reduction

43. If Sable is unable to perform field evaluation and remediation of any required conditions within the time limit conditions specified in the state waiver, Sable must temporarily implement a minimum 20 percent or greater operating pressure reduction, based on actual operating pressure for two (2) months prior to the date of inspection, until the anomaly is repaired.

## In Field Direct Examination of Pipe

44. Direct examinations[14] of pipe must include appropriate non-destructive examination methods for cracking such as magnetic particle inspection (MPI), shear wave technology or phased array ultrasonic testing (PAUT).[15] PAUT must be used for sizing any crack or crack-like anomaly lengths and depths.

45. Permanent repairs of metal loss anomalies are required for any section of pipe with wall loss equal to or greater than 40% in accordance with repair method 1, 4b, or 5 of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.  However, the following additional conditions are applied if Sable chooses repair method 5 for metal loss anomalies:

   a. Method 5 must not be used on metal loss anomalies that are in the HAZ, girth weld, or longitudinal seam weld.

   b. Sable must increase the metal loss anomaly's depth by 20% when they input it into the formula for calculating the number of wraps needed for repair method 5.

   c. After the anomaly is repaired via repair method 5, Sable must monitor the anomaly's wall loss depth in subsequent UTWM tool runs.  If the anomaly's wall loss depth increases by more than 15% of the wall thickness in the subsequent UTWM tool runs, Sable must repair this anomaly via repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

46. Permanent repairs are required for all cracks and/or crack-like anomalies discovered during direct examination, regardless of crack depth or crack length in accordance with repair method 1 or 4b of Table 451.6.2(b)-1 of ASME B31.4 2006 Edition.

---

[14] Any time the pipeline is exposed for direct examination of an indication or to perform a repair, Sable must document the condition of the coating and carrier pipe (including anomalies) with photographs.

[15] Direct examinations for ILI reported crack or crack-like indications must include a magnetic particle inspection complimented by shear wave technology or inspection by phased array ultrasonic testing.

Fire Marshal Exhibits 027

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 11

47. Sable must develop a coating repair procedure for excavated or remediated corrosion anomalies that prevents further external corrosion and seals transition areas from currently insulated pipe to newly coated sections. Any time a shrink sleeve or coating is exposed, remove the shrink sleeve and coating, investigate circumferentially and longitudinally along the pipe for external corrosion and coating deterioration, and recoat with two-part epoxy.  Sable must recoat in accordance with their coating repair procedure.[16]

48. All external polyurethane foam and the polyethylene tape wrap on buried pipe that are exposed during the field evaluation must not be replaced with new insulation or polyethylene tape wrap.

## Integrity Management

49. A fracture mechanics and pressure cycling evaluation is required for un-remediated cracks and crack-like indications detected by ILI or indirect inspection tools.
    a. Sable must determine the predicted failure pressure, failure stress pressure and crack growth of un-remediated cracks and crack-like anomalies in accordance with 49 C.F.R. §192.712(d)(1).
    b. Sable must perform a fatigue analysis using an applicable fatigue crack growth law or other technically appropriate engineering methodology in accordance with 49 C.F.R. §192.712(d)(2).

50. Sable must analyze a sample of additional indications of varying amounts of metal loss between 10% and 40% for validation. The sample size shall be at least ten (10), unless fewer than ten (10) indications are reported within that range, in which case Sable would examine the number of indications called.

51. When sizing metal loss indications, apply interaction/clustering criteria of 6t by 6t for applicable ILI tool(s).

52. Sable must send all field measurements to the ILI tool vendor within 90 days of completing direct examinations and require the ILI vendor to validate the accuracy of the tool. Sable must conduct annual meetings with the ILI tool vendor to discuss tool performance and incorporate lessons learned.

53. Sable must utilize a third-party expert to review all ILI reports, verification of digs, data integration, ILI tool tolerances, development of unity plots, measured field findings, failure pressure ratios and any other finding that could affect the integrity of the pipeline. The review must be conducted within six (6) months of each ILI assessment. The third-party expert must be approved by the OSFM prior to being selected.

54. Within one (1) year from date of issuance, Sable must use a NACE-certified expert to conduct an evaluation and determine if alternating current (AC)

---

[16] The coating procedure must be submitted to the OSFM prior to the prior to the effective date of the state waiver.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 12

interference or direct current (DC) interference or shorting that could contribute to external corrosion is occurring. The expert must recommend the frequency of subsequent interference surveys. All evaluations must be approved and signed by the NACE-certified expert.

## Data Requirements for Predicted Failure Analysis

55. Unless the defect dimensions have been verified using a direct examination measurements, Sable must explicitly analyze uncertainties in reported assessment results including but not limited to tool tolerance, detection threshold, probability of detection, probability of identification, sizing accuracy, conservative anomaly, interaction criteria, location accuracy, anomaly findings, and unity chart plots or equivalent for determining uncertainties and verifying tool performance, in identifying and characterizing the type and dimensions of anomalies or defects used in the analyses.

56. The analyses performed in accordance with this state waiver must utilize pipe and material properties of the pipe body and longitudinal weld seam that are documented in *traceable, verifiable, and complete* records.

## Recordkeeping

57. Procedures, records of investigations, data, analyses, and other actions made in accordance with the requirements of this state waiver shall be kept for the life of the pipeline and must be submitted to the OSFM, in the manner requested (electronic, hardcopy, or other format) within 30 days.

58. Sable must maintain the following records:
    a. Technical approach used for the analysis
    b. All data used and analyzed
    c. Pipe and longitudinal weld seam properties
    d. Procedures used to implement state waiver conditions
    e. Evaluation methodology used
    f. Models used
    g. Direct in situ examination data
    h. All in-line inspection tool assessments information evaluated
    i. Pressure test data and results
    j. All in-the-ditch assessments performed on the pipeline segments
    k. All measurement tool, assessment, and evaluation accuracy specifications and tolerances used in technical and operations results
    l. All finite element analysis results
    m. The number of pressure cycles to failure, the equivalent number of annual pressure cycles, and the pressure cycle counting methodology

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 13

      n. The predicted fatigue life and predicted failure pressure from the required fatigue life models and fracture mechanics evaluation methods

      o. Safety factors used for fatigue life and/or predicted failure pressure calculations

      p. Reassessment time interval and safety factors

      q. The date of the review

      r. Confirmation of the results by qualified technical subject matter expert(s)

      s. Approval by responsible Sable management personnel

      t. Records of additional preventive and mitigative (P&M) measures performed

      u. Reports required by this State Waiver.

## Reporting

59. Any release on the pipeline shall be reported to the OSFM at the earliest practicable moment following discovery but no later than 24 hours from the time of discovery via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Accident Notification.*[17]

60. An email notification shall be made at least three (3) days prior to the pipeline being exposed for non-emergency purposes of field evaluation and repair via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Pipeline Repair CA-325 A/B.* The email notification shall include, if applicable:
      d. Tool type and run date
      e. Unique identifier (e.g. Dig Number, Joint Number, Flaw ID, Condition Type)
      f. Dig sheets
      g. Field contact information for Sable
      h. Time and location of the field evaluation and repair.

61. Sable shall provide a Summary of Conditions Report within 210 days of the last date of an ILI run via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Summary of Conditions CA-325 A/B* and include:
      i. Tool type
      j. Run date
      k. Summary of Conditions Report[18]
      l. Final Vendor Report and Pipe Tally

62. Sable shall provide a report to the OSFM by June 15th of every year for the duration of the state waiver. The report shall be addressed to the OSFM Assistant Deputy Director, Chief of Pipeline Safety via email at PipelineNotification@fire.ca.gov, *Subject: OSFM State Waiver – Annual Report*

---

[17] This requirement does not relieve Sable from spill reporting requirements that might exist under local, state or federal regulations.

[18] The OSFM may stipulate specific formatting or other information (e.g. Condition Type, Anomaly Details, Remaining Strength Calculation Method, Failure Pressure, CGRA, etc.) to be included in the Summary of Conditions Reports, Closure Report and Annual Reports if information provided is not deemed sufficient.

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 14

*CA-325 A/B.* At a minimum, the annual report shall contain the following, if applicable:
   a. A Closure Report for the previous calendar (CY) which contains:
      i. Features that were remediated in previous CY
         1. Provide documentation for the in-the-ditch assessments and repairs
      ii. Identify features that remain to be assessed
      iii. Unity Plots for previous ILI runs
   b. Fracture mechanics and pressure cycling analyses in accordance with Condition 49
   c. The third-party ILI expert reviews in accordance with Condition 53
   d. AC and DC Interference surveys that are due in accordance with Condition 54
   e. A copy of the CGRA for prior year including:
      i. Mean corrosion growth rate for the pipeline
      ii. Distribution graph of the corrosion growth rate for the pipeline (e.g. occurrences (#) vs. corrosion rate (mpy)

## Limitations

63. This state waiver is limited to a term of no more than ten (10) years from the date of issuance. If Sable elects to seek renewal of this state waiver, it must submit a renewal request to the OSFM at least 180 days prior to the expiration date, including a justification for continuation of the waiver.
64. Should Sable fail to comply with any conditions of this state waiver or should the OSFM determine that this state waiver is no longer appropriate or is inconsistent with pipeline safety, the OSFM may revoke the state waiver and require Sable to comply with all appropriate regulatory requirements.
65. The OSFM may order the pipeline shutdown at any time.
66. The OSFM may issue a compliance order or may initiate proceedings to determine the nature and extent of the violations and appropriate civil penalty for failure to comply with this state waiver. The terms and conditions of any compliance order shall take precedence over the terms of the state waiver.
67. In the event of conflict between the state waiver conditions and industry standards, the state waiver conditions shall prevail.
68. If Sable sells, merges, transfers or otherwise disposes of all or part of the assets covered by the state waiver, Sable must provide the OSFM written notice of the change within 30 days of the consummation date. In the event of such transfer, the OSFM reserves the right to revoke, suspend, or modify the state waiver.

Fire Marshal Exhibits 031

Docusign Envelope ID: 166BEFF3-211E-476E-8D10-BAFB95600F3B

Lance Yearwood
December 17, 2024
Page 15

Should you have any questions, please contact Alin Podoreanu, Supervising Pipeline Safety Engineer at (916) 212-8891.

Sincerely,



DocuSigned by:

James Hosler

980F8D3AE95C42E...

JAMES HOSLER
Assistant Deputy Director
Chief of Pipeline a Safety and CUPA Programs

Enclosure(s): (1) Pacific Pipeline Company State Waiver Application for CA-325 A/B

cc:    Doug Allen, Supervising Pipeline Safety Engineer, OSFM
       Andy Chau, Supervising Pipeline Safety Engineer, OSFM
       Brendan Feery, Supervising Pipeline Safety Engineer, OSFM
       Huy Nguyen, Supervising Pipeline Safety Engineer, OSFM
       Alin Podoreanu, Supervising Pipeline Safety Engineer, OSFM
       Tuan Tran, Pipeline Safety Engineer, OSFM
       Josh Cleaver, Staff Counsel, CAL FIRE
       Max Kieba, Engineering and Research Division, PHMSA
       Joshua Johnson, Engineering and Research Division, PHMSA

Fire Marshal Exhibits 032

# Exhibit 3

Exhibit 3
to Request for Judicial Notice
in Support of Motion to Dismiss
by CAL FIRE, OSFM, and Fire Marshal Berlant

Fire Marshal Exhibits 033



U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

February 11, 2025

Mr. James Hosler
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs
Department of Forestry and Fire Protection
Office of the State Fire Marshal
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806

**Re: Docket No. PHMSA-2025-0002**

Dear Mr. Hosler:

On December 17, 2024, pursuant to 49 United States Code (USC) § 60118(d), the Pipeline and Hazardous Materials Safety Administration (PHMSA) received a notification letter from CAL FIRE – Office of the State Fire Marshal (OSFM), granting a waiver of 49 Code of Federal Regulations (CFR) § 195.452(h)(4)(iii)(H) to Sable Offshore Corp (Sable). This waiver will allow Sable to manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam insulation and the polyethylene tape wrap.

The OSFM granted the state waiver to Sable in accordance with the terms of the Consent Decree between Plains Pipeline, L.P. (Plains), the United States of America, and the People of the State of California, DOJ Case Ref. No. 90-5-1-1-1130, as well as for variance from the evaluation and remediation requirements of 49 CFR § 195.452(h)(4)(iii)(H) for 10.86 miles of 24-inch diameter pipeline (Sable CA-324) between Las Flores Canyon and Gaviota, California. The state waiver requires Sable comply with over 60 conditions, including this pipeline be hydrostatically tested using a "spike" hydrostatic test prior to putting the pipeline into operation, and the pipeline be inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tools capable of assessing seam integrity and detecting corrosion, deformation, and cracking-type anomalies within seven days of achieving initial steady state operation of the pipeline. Thereafter, the pipeline must be reassessed at least every year.

Fire Marshal Exhibits 034

Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-324 pipeline. PHMSA requests that a copy of OSFM's final waiver to Sable be forwarded to PHMSA within 30 days of the issuance.

If you wish to discuss this or any other pipeline safety matter, my staff would be pleased to assist you. Please contact Max Kieba, Director of Engineering and Research Division at 202-493-0595, for technical matters.

Sincerely,

ALAN KRAMER MAYBERRY
Digitally signed by ALAN KRAMER MAYBERRY
Date: 2025.02.11 12:30:07 -05'00'

Alan K. Mayberry,
Associate Administrator for Pipeline Safety

**PHMSA-2025-0002 – California Office of the State Fire Marshall**          **Page 2 of 2**



U.S. Department
of Transportation
**Pipeline and Hazardous
Materials Safety
Administration**

1200 New Jersey Avenue, SE
Washington, DC 20590

February 11, 2025

Mr. James Hosler
Assistant Deputy Director
Chief of Pipeline Safety and CUPA Programs
Department of Forestry and Fire Protection
Office of the State Fire Marshal
3780 Kilroy Airport Way, Suite 500
Long Beach, CA 90806

**Re: Docket No. PHMSA-2025-0003**

Dear Mr. Hosler:

On December 17, 2024, pursuant to 49 United States Code (USC) § 60118(d), the Pipeline and Hazardous Materials Safety Administration (PHMSA) received a notification letter from CAL FIRE – Office of the State Fire Marshal (OSFM), granting a waiver of 49 Code of Federal Regulations (CFR) § 195.452(h)(4)(iii)(H) to Sable Offshore Corp (Sable). This waiver will allow Sable to manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection due to the shielding effects of the polyurethane foam insulation and the polyethylene tape wrap.

The OSFM granted the state waiver to Sable in accordance with the terms of the Consent Decree between Plains Pipeline, L.P. (Plains), the United States of America, and the People of the State of California, DOJ Case Ref. No. 90-5-1-1-1130, as well as for variance from the evaluation and remediation requirements of 49 CFR § 195.452(h)(4)(iii)(H) for 113.56 miles of 30-inch diameter pipeline (Sable CA-325A/B) between Gaviota, Sisquoc, and Pentland, California. The state waiver requires Sable comply with over 60 conditions, including this pipeline be hydrostatically tested using a "spike" hydrostatic test prior to putting the pipeline into operation, and the pipeline be inspected with ultrasonic thickness wall measurement and ultrasonic shear wave crack detection in-line inspection tools capable of assessing seam integrity and detecting corrosion, deformation, and cracking-type anomalies within seven days of achieving initial steady state operation of the pipeline. Thereafter, the pipeline must be reassessed at least every year.

Fire Marshal Exhibits 036

Pursuant to 49 USC § 60118(d), PHMSA does not object to granting of this waiver by the OSFM for the Sable CA-325A&B pipeline. PHMSA requests that a copy of OSFM's final waiver to Sable be forwarded to PHMSA within 30 days of the issuance.

If you wish to discuss this or any other pipeline safety matter, my staff would be pleased to assist you. Please contact Max Kieba, Director of Engineering and Research Division at 202-493-0595, for technical matters.

Sincerely,

ALAN KRAMER MAYBERRY
Digitally signed by ALAN KRAMER MAYBERRY
Date: 2025.02.11 12:30:44 -05'00'

Alan K. Mayberry,
Associate Administrator for Pipeline Safety

**PHMSA-2025-0003 – California Office of the State Fire Marshall**          **Page 2 of 2**

# Exhibit 4

Exhibit 4
to Request for Judicial Notice
in Support of Motion to Dismiss
by CAL FIRE, OSFM, and Fire Marshal Berlant

Fire Marshal Exhibits 038

Pursuant to CRC 2.259 this document has been electronically filed by the Superior Court of California, County of Santa Barbara, on 7/25/2025

Case 1:26-cv-01486-KES-CDB    Document 53    Filed 07/31/26    Page 42 of 128

TC

Julie Teel Simmonds (Bar No. 208282)
jteelsimmonds@biologicaldiversity.org
David Pettit (Bar No. 67128)
dpettit@biologicaldiversity.org
Talia Nimmer (Bar No. 331002)
tnimmer@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Ste. 375
Oakland, CA 94612
Tel. (510) 844-7100 / Fax: (510) 844-7150

*Attorneys for Petitioners Center for Biological Diversity and Wishtoyo Foundation*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**IN AND FOR THE COUNTY OF SANTA BARBARA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and WISHTOYO FOUNDATION,<br><br>     Petitioners/Plaintiffs,<br><br>     v.<br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION; OFFICE OF THE STATE FIRE MARSHAL; DANIEL BERLANT, in his official capacity as State Fire Marshal; and DOES 1 through 10, inclusive,<br><br>     Respondents/Defendants.<br>───────────────────<br>SABLE OFFSHORE CORP., a Delaware Corporation, PACIFIC PIPELINE COMPANY, a Delaware Corporation, and DOES 11 through 20, inclusive,<br><br>     Real Parties in Interest. | Case No.: 25CV02244<br><br>[~~PROPOSED~~] **ORDER RE: PRELIMINARY INJUNCTION AND UNDERTAKING**<br><br>Hearing: July 18, 2025<br>Time:     10:00 a.m.<br>Dept.:     4<br>Judge:    Hon. Donna D. Geck<br><br>Action Filed: April 15, 2025<br>Trial: None Set |

FILED
SUPERIOR COURT of CALIFORNIA
COUNTY of SANTA BARBARA
**07/29/2025**
Darrel E. Parker, Executive Officer
BY___Chavez, Terri_____
                          Deputy Clerk

Fire Marshal Exhibits 039

**TO RESPONDENTS AND REAL PARTIES IN INTEREST IN THE ABOVE-CAPTIONED ACTION:**

The application of Petitioners Center for Biological Diversity and Wishtoyo Foundation ("Petitioners") for a preliminary injunction was heard on July 18, 2025, at 10:00 A.M. in Department 4 of the above-captioned Court. Appearing as attorneys were Talia Nimmer for Petitioners; Michael Dorsi for Respondents California Department of Fire and Forestry and State Fire Marshal Daniel Berlant (collectively, "Respondents"); and Jeffrey Dintzer, Garret Stanton, and Trevor Large for Real Parties in Interest Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable").

At the hearing, the Court adopted its tentative ruling to grant, in part, Petitioners' application. The order of the Court is set forth in its tentative — and now final — ruling, attached hereto as **Exhibit A.**

**IT IS SO ORDERED.**

DATED: _____, 2025

**07/29/2025**

*[signature]*

JUDGE OF THE SUPERIOR COURT
**Donna D. Geck**

Fire Marshal Exhibits 040

2
[Proposed] Order Re: Preliminary Injunction and Undertaking

# EXHIBIT A

Fire Marshal Exhibits 041

Case 1:26-cv-01486-KES-CDB     Document 53     Filed 07/31/26     Page 45 of 128



## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SANTA BARBARA

NOTICE: Effective September 1, 2025, the cost of e-filing will increase from $6.45 to $10.00 per envelope. For more information click underline(here).

Notice: The court is aware of fraudulent messages and scams being sent to the public. For more information please click underline(here).

# Center for Biological Diversity et al vs California Dept of Forestry and Fire Protection et al

## Case Number

25CV02244

## Case Type

Civil Law & Motion

## Hearing Date / Time

Fri, 07/18/2025 - 10:00

## Nature of Proceedings

CMC; OSC Preliminary Injunction; Motion to Compel; Motion to Strike

## Tentative Ruling

Fire Marshal Exhibits 042

Case 1:26-cv-01486-KES-CDB    Document 53    Filed 07/31/26    Page 46 of 128

(1)      The applications of petitioners in case numbers 25CV02244 and 25CV02247 for issuance of preliminary injunctions are, respectively, granted in part. The applications are granted to enjoin, pending the disposition of these proceedings or further order of the court, the restart of the Las Flores Pipelines, as herein defined, until 10 court days following the filing and service of notice by or on behalf of real parties in interest Sable Offshore Corp., and Pacific Pipeline Company (collectively, Sable) that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. "Restart" shall have the same meaning as in the Federal Consent Decree identified herein. To be effective to commence the 10-court-day period, such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025. The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing or the date of service. The temporary restraining order remains in place until a written order of the court is entered on this preliminary injunction.

(2)      On or before July 25, 2025, petitioners in each case shall lodge with the court an order for signature and filing.

(3)      The court fixes the undertaking required by Code of Civil Procedure section 529 in the amount of $1,000.00, to be filed in each case by the respective petitioners. Petitioners shall file such undertaking on or before July 25, 2025.

(4)      For the reasons set forth herein, the motion of Sable (case No. 25CV02244) to compel the deposition of Richard B. Kuprewicz, the motion of Sable (case No. 25CV02244) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions, the motion of Sable (case No. 25CV02247) to compel the deposition of Kuprewicz, and the motion of Sable (case No. 25CV02247) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions are all denied.

(1)      OSC re Preliminary Injunction

Fire Marshal Exhibits 043

These are two related cases involving the same underlying incidents and activity. Pursuant to the parties' stipulation, the responding parties and real parties in interest have filed the same brief addressing both cases in each of these cases and the respective petitioners have filed reply papers in each of their respective cases. The court therefore will address the orders to show cause re issuance of preliminary injunctions (OSCs) together.

Documents filed by petitioners and plaintiffs Center for Biological Diversity and Wishtoyo Foundation (case No. 25CV02244) will be identified by the prefix, and these parties will be collectively referred to as, "CBD"; documents filed by petitioners and plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (case No. 25CV02247) will be identified by the prefix, and these parties collectively referred to as, "EDC." Petitioners and plaintiffs will collectively be referred to as "petitioners"; respondents and defendants will be collectively referred to as "respondents"; a petition and complaint will be referred to simply as a "petition." Respondents Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California, and Daniel Berlant, in his official capacity as State Fire Marshal will be collectively referred to as "OSFM." Real parties in interest Sable Offshore Corp., and Pacific Pipeline Company will be collectively referred to as "Sable."

## Background:

The parties have submitted voluminous evidence in support of, and in opposition to, these OSCs. The court has reviewed all of the papers presented by the parties, and has relied only upon admissible evidence in making this ruling. The discussion herein is not intended to be exhaustive, but to provide context for the court's analysis and ruling.

These actions involve two oil pipelines connected to three offshore platforms known as the Santa Ynez Unit. (CBD Petition, ¶¶ 33, 34; EDC Petition, ¶ 38, 39.) The two oil pipelines at issue (collectively, the Las Flores Pipelines) consist of Las Flores Pipeline CA-324 (Line 324) and Las Flores Pipeline CA-325 (Line 325). (CBD Petition, ¶¶ 39, 40; EDC Petition, ¶ 41.) Prior to 2015, when owned by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline (collectively, Plains), Line 324 was known as Line 901 and Line 325 was known as Line 903. (CBD Petition, ¶ 49; EDC Petition, ¶ 41, 68.)

The Las Flores Pipelines were constructed and operated following approval by Santa Barbara County in 1986. (CBD Petition, ¶ 35; EDC Petition, ¶ 54.) This approval relied upon an environmental impact report (EIR) drafted in 1984 and finalized in 1985. (CBD Petition, ¶ 35; EDC Petition, ¶ 54 & fn. 1.)

In 2015, Line 324 (formerly Line 901) ruptured causing a serious oil spill (Refugio Oil Spill). (CBD Petition, ¶¶ 50-51; EDC Petition, ¶¶ 69-70.) The Las Flores Pipelines were consequently shut down at that time. (CBD Petition, ¶ 52; EDC Petition, ¶ 82.)

In March 2020, the United States and the State of California sued Plains based upon damages from the Refugio Oil Spill in *United States v. Plains All American Pipeline*, United States District Court for the Central District of California, case No. 2:20-cv-02415 (the Federal Action). (CBD Petition, ¶ 59; EDC Petition, ¶ 85.) The Federal Action was settled by a consent decree (Federal Consent Decree) entered by the court. (Rusch decl., ¶ 33 & exhibit N [the Federal Consent Decree].)

The Federal Consent Decree includes the following provisions:

"1.      State Waivers for Lines 901, 903, and 2000 (not to include any replacement lines):

"A.      Prior to restarting Line 901, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 901. Plains must receive a State Waiver from the OSFM prior to restarting Line 901.

"B.      Prior to restarting non-operational segments of Line 903, Plains shall apply for a State Waiver through the OSFM for the limited effectiveness of cathodic

protection on Line 903. Plains must receive a State Waiver from the OSFM prior

to restarting Line 903.

"C.      Within 90 days of entry of the Consent Decree (CD), Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 903. The State Waiver shall apply to the currently operational segment of Line 903 from Pentland to Emidio.

"D.      Within 90 days of entry of the CD, Plains must apply for a State Waiver through the OSFM for the limited effectiveness of cathodic protection on Line 2000.

Fire Marshal Exhibits 045

"E.      To the extent that a State Waiver directly incorporates terms identified in section 4 (Integrity Management) below, as being applicable to Lines 901, 903, or 2000, Plains shall not contest the inclusion of those terms in the relevant State Waiver. Plains reserves its rights to contest on any grounds any additional terms that the OSFM may require as part of each State Waiver if one is received. Nothing in this CD shall be construed to limit the authority of the OSFM to require additional terms or conditions in the State Waiver. Further, nothing in the State Waiver shall be construed to limit the applicability of the terms set forth in the CD.

"2.      Replacement, Restart, or Abandonment of Lines 901 and 903:

"A.      Plains shall replace the existing Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland with non-insulated pipe, if Plains is able to timely obtain: (1) agreements from shippers to transport sufficient quantities of product to make the cost of replacing the segments economically viable; (2) the Federal, State, and Local permits that may be required; and (3) whatever additional rights are needed, including rights-of-way that may be needed from landowners. Obtaining required commercial commitments, permits, rights-of-way, and any other rights necessary for replacement is the sole responsibility of

Plains.

"1.      On any replacement segments of Lines 901 or 903, Plains shall, prior to commencing operation of such segment(s):

"a.      Test for potential AC/DC interference. Where potential AC/DC interference exists, proper mitigation of interference shall be designed and installed during construction of replacement lines.

"b.      Conduct a close interval survey (CIS) and AC/DC interference survey.

"c.      Based on the CIS and AC/DC interference surveys, place additional cathodic-protection test stations at locations where the surveys demonstrate potential cathodic-protection deficiencies, following review and consultation with the OSFM regarding proposed test station locations.

"B.      As an alternative to replacement of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may restart the existing pipelines in accordance with the CD (including Appendix D) and applicable law.

Fire Marshal Exhibits 046

"C.      As an alternative to replacement or restart of Line 901 and segments of Line 903 from Gaviota to Sisquoc and Sisquoc to Pentland, Plains may abandon all or any segments in accordance with all applicable laws and regulations." (Federal Consent Decree, appen. B, art. I, §§ 1, 2.)

In 2024, Sable acquired the Santa Ynez Unit and the Las Flores Pipelines. (CBD Petition, ¶ 64-65; EDC Petition, ¶ 99.)

In April 2024, Sable submitted State Waiver applications to OSFM for Lines 324 and 325. (EDC Petition, ¶ 110 & exhibit B.)

In May 2024, Sable began conducting repair and maintenance activities to the Las Flores Pipelines. (Rusch decl., ¶ 5.) According to Sable, these activities were completed pursuant to previously granted coastal development permits, approvals, and EIR. (*Ibid.*)

On September 24, 2024, CBD set a letter to OSFM stating that the OSFM had a duty to conduct an analysis and provide opportunities for meaningful public participation under the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.). (CBD Petition, ¶ 68.)

On September 27, 2024, EDC sent a letter to OSFM renewing their March 2024 request for a public process. (EDC Petition, ¶ 112.) EDC also stated that operating the Las Flores Pipeline System without effective cathodic protection was neither anticipated nor reviewed in the 1985 EIR or any project approval, and the potential impacts of doing so have never been fully considered. (*Id.* & exhibit C.) OSFM never responded to the letter. (EDC Petition, ¶ 112.)

On December 17, 2024, OSFM issued State Waivers for Lines 324 and 325 with conditions. (Rusch decl., ¶ 7 & exhibits B, C.) OSFM did not offer any sort of public process in advance of its decision. (EDC Petition, ¶ 115.)

On February 11, 2025, the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) sent a letter to OSFM indicating that it would not object to the OSFM's issuance of the State Waivers. (Rusch decl., ¶ 9 & exhibit E.)

On April 2, 2025, OSFM issued letters noting its receipt of PHMSA's decision stating that it has no objection to granting the State Waivers. (Rusch decl., ¶ 10 & exhibits F, G.)

Fire Marshal Exhibits 047

Case 1:26-cv-01486-KES-CDB    Document 53    Filed 07/31/26    Page 51 of 128

On April 15, 2025, CBD filed their verified petition (case No. 25CV02244) seeking writ and injunctive relief asserting three causes of action: (1) violation of federal pipeline safety laws (49 U.S.C. § 60118); (2) violation of state pipeline safety laws (Gov. Code, § 51011); and (3) violations of CEQA.

Also on April 15, 2025, EDC filed their verified petition (case No. 25CV02247) seeking writ, injunctive, and declaratory relief asserting eight causes of action: (1) violation of the federal Pipeline Safety Act (FPSA, 49 U.S.C. § 60118(d))—failure to provide a public process; (2) violation of the FPSA (49 U.S.C. § 60118(d))—failure to provide a statement of reasons; (3) declaratory relief—state waiver procedures required under the FPSA (49 U.S.C. § 60118(d)); (4) abuse of discretion under the FPSA (49 U.S.C. § 60118(d)); (5) violation of the Elder California Pipeline Safety Act of 1981 (CPSA, Gov. Code, § 51011, subd. (c)); (6) abuse of discretion under the CPSA (Gov. Code, § 51011, subd. (b)); (7) declaratory relief—standards and procedures required under the CPSA (Gov. Code, § 51011, subds. (b), (c)); and (8) CEQA—failure to prepare a subsequent EIR (Pub. Resources Code, § 21166).

On June 3, 2025, the court heard petitioners' ex parte applications for an administrative stay, or for an OSC re preliminary injunction and temporary restraining order (TRO). The court granted the petitioners' requests for a TRO and set a hearing on the OSCs for this date.

The applications for issuance of a preliminary injunction are opposed by OSFM and by Sable.

**Analysis:**

Notwithstanding the issuance of the TRO, the burden is on petitioners, as the parties seeking injunctive relief, to show all elements necessary to support issuance of a preliminary injunction. (*O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1481.) A preliminary injunction is available "[w]hen it appears by the complaint or affidavits that the commission or continuance of some act during the litigation would produce waste, or great or irreparable injury, to a party to the action." (Code Civ. Proc., § 526, subd. (a)(2).)

"The trial courts consider two interrelated questions in deciding whether to issue a preliminary injunction: 1) are the plaintiffs likely to suffer greater injury from a denial of the injunction than the defendants are likely to suffer from its grant; and 2) is there a reasonable probability that the plaintiffs will prevail on the merits. [Citations.] '[By] balancing the respective equities of the parties, [the court] concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed by him.' [Citations.]" (*Robbins v. Superior Court* (1985) 38 Cal.3d 199, 206.)

Fire Marshal Exhibits 048

(A)    Likelihood of Success on the Merits

Petitioners raise multiple claims in their petitions that separately could support issuance of an injunction. It is therefore necessary to address these claims in turn.

(i)    CEQA

Petitioners each assert a claim under CEQA based upon OSFM's issuance of the State Waivers without preparing environmental documentation, without providing public notice, and without providing an opportunity for public comment. (CBD Petition, ¶¶ 128-129; EDC Petition, ¶ 224.)

"[CEQA] and the regulations implementing it (Cal. Code Regs., tit. 14, § 15000 et seq.) embody California's strong public policy of protecting the environment. 'The basic purposes of CEQA are to: [¶] (1) Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities. [¶] (2) Identify ways that environmental damage can be avoided or significantly reduced. [¶] (3) Prevent significant, avoidable damage to the environment by requiring changes in projects through the use of alternatives or mitigation measures when the governmental agency finds the changes to be feasible. [¶] (4) Disclose to the public the reasons why a governmental agency approved the project in the manner the agency chose if significant environmental effects are involved.' [Citation.]" (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285–286 (*Tomlinson*).)

"To achieve these goals, CEQA and the implementing regulations provide for a three-step process. In the first step, the public agency must determine whether the proposed development is a 'project,' that is, 'an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment' undertaken, supported, or approved by a public agency. (§ 21065.)" (*Tomlinson, supra,* 54 Cal.4th at p. 286.)

Fire Marshal Exhibits 049

"The second step of the process is required if the proposed activity is a 'project.' The public agency must then decide whether it is exempt from compliance with CEQA under either a statutory exemption (§ 21080) or a categorical exemption set forth in the regulations (§ 21084, subd. (a); Cal. Code Regs., tit. 14, § 15300). A categorically exempt project is not subject to CEQA, and no further environmental review is required. [Citations.] If the project is not exempt, the agency must determine whether the project may have a significant effect on the environment. If the agency decides the project will not have such an effect, it must 'adopt a negative declaration to that effect.' [Citations.] Otherwise, the agency must proceed to the third step, which entails preparation of an environmental impact report before approval of the project. (§§ 21100, subd. (a), 21151, subd. (a).)" (*Tomlinson*, *supra*, 54 Cal.4th at p. 286.)

CBD asserts that restarting the Las Flores Pipelines by issuance of the State Waivers is a "project" under CEQA requiring environmental review. (CBD Application, at pp. 21-23.) OSFM and Sable argue that the issuance of the State Waivers is not a "project" or is otherwise not subject to CEQA.

" 'Project' means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] … [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (Pub. Resources Code, § 21065.)

"The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Cal. Code Regs., tit. 14, § 15378, subd. (c).)

Under this definition, the issuance of the State Waivers does not appear to constitute a "project" separately subject to CEQA review. The State Waivers would at most constitute a separate governmental approval for the underlying activity, which is the restart of the Las Flores Pipelines. The court concludes that the issuance of the State Waivers does not itself cause a change or authorize a change in the environment. (See *Simons v. City of Los Angeles* (1976) 63 Cal.App.3d 455, 466.)

If the State Waivers were considered more broadly, i.e., as a proxy for the restart of the Las Flores Pipelines, the resolution under CEQA is not clear. OSFM and Sable argue that, in such instance, the categorical existing facilities exemption applies.

Fire Marshal Exhibits 050

"Class 1 consists of the operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of existing public or private structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of existing or former use. The types of 'existing facilities' itemized below are not intended to be all-inclusive of the types of projects which might fall within Class 1." (Cal. Code Regs., tit. 14, § 15301; see also Pub. Resources Code, § 21084; Cal. Code Regs., tit. 14, § 15300.)

"Examples include but are not limited to: [¶] … [¶] (d) Restoration or rehabilitation of deteriorated or damaged structures, facilities, or mechanical equipment to meet current standards of public health and safety, unless it is determined that the damage was substantial and resulted from an environmental hazard such as earthquake, landslide, or flood." (Cal. Code Regs., tit. 14, § 15301, subd. (d).)

An issue now before the California Supreme Court is whether "negligible" in this exemption pertains to a negligible change in use or to a change that presents a negligible risk of environmental harm. (*Sunflower Alliance v. Department of Conservation* (2024) 105 Cal.App.5th 771, review granted Dec. 18, 2024, S287414 (*Sunflower*).) Under broader circumstances, this issue may bear upon the application of the exemption. But as the issue is presented here, such analysis is premature because the State Waivers are not themselves directly or indirectly causing change to the environment.

EDC, in particular, focuses its argument on the need for updated environmental review:

"When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs:

"(a)     Substantial changes are proposed in the project which will require major revisions of the environmental impact report.

"(b)     Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report.

"(c)     New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available." (Pub. Resources Code, § 21166.)

Fire Marshal Exhibits 051

Case 1:26-cv-01486-KES-CDB    Document 53    Filed 07/31/26    Page 55 of 128

"When an EIR has been certified or a negative declaration adopted for a project, no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in the light of the whole record, one or more of the following:

"(1)    Substantial changes are proposed in the project which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;

"(2)    Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or

"(3)    New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete or the negative declaration was adopted, shows any of the following:

"(A)    The project will have one or more significant effects not discussed in the previous EIR or negative declaration;

"(B)    Significant effects previously examined will be substantially more severe than shown in the previous EIR;

"(C)    Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or

"(D)    Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative."

(Cal. Code Regs., tit. 14, § 15162, subd. (a).)

Fire Marshal Exhibits 052

Case 1:26-cv-01486-KES-CDB     Document 53     Filed 07/31/26     Page 56 of 128

EDC argues that a subsequent EIR is required because: (1) operating the pipeline system without an effective cathodic protection system throughout the entire length of the pipeline constitutes a change in the project that increases the risk and severity of impacts, requiring major revisions to the 1985 EIR; (2) the failure of the pipeline system's cathodic protection system and resulting corrosion constitutes a change in circumstances; (3) it was only after the 2015 oil spill that the pipeline system was discovered to lack effective cathodic protection, which constitutes new information showing that the risk of an oil spill is substantially more severe than previously determined.

The petitioners rely largely upon the declaration and reports of expert Richard Kuprewicz for evidence regarding pipeline safety. The testimony of Kuprewicz is the subject of other motions also pending before the court (discussed below) based in part upon Kuprewicz's present unavailability to be subject to a deposition. For purposes of these motions, the court will consider Kuprewicz's evidence with Kuprewicz's unavailability going to the weight of the evidence in the context of these applications for preliminary injunctions.

"After an initial EIR is certified, CEQA establishes a presumption against additional environmental review. An agency has jurisdiction to prepare a subsequent or supplemental EIR only if the agency grants a 'discretionary' approval on the project [citation, fn.], and certain statutorily enumerated new circumstances occur." (*San Diego Navy Broadway Complex Coalition v. City of San Diego* (2010) 185 Cal.App.4th 924, 928.)

The 1985 EIR addressed the potential for an oil spill from pipeline operation. (Dorsi decl., exhibit 5.) There is a dispute among the parties as to whether the 2015 spill and the failure of effective cathodic protection demonstrate new information requiring more or different analysis than present the 1985 EIR. However, this analysis, like the discussion above, is an analysis of a "project," and in particular the restart of pipeline operations as compared with the State Waivers at issue here.

The court concludes that, in the present administrative posture, petitioners are not likely to succeed on the merits of showing a violation of CEQA. Nonetheless, the court finds that petitioners have shown some likelihood of success on the merits which may be weighed against the relative harms and equities to support issuance of a preliminary injunction.

       (ii)    Federal Claims

In addition to violations of CEQA, petitioners assert violations of the FPSA in failing to provide a public process and failing to provide a statement of reasons.

Fire Marshal Exhibits 053

"General requirements.--A person owning or operating a pipeline facility shall--

"(1)    comply with applicable safety standards prescribed under this chapter, except as provided in this section or in section 60126;

"(2)    prepare and carry out a plan for inspection and maintenance required under section 60108(a) and (b) of this title;

"(3)    allow access to or copying of records, make reports and provide information, and allow entry or inspection required under subsections (a) through (e) of section 60117 of this title; and

"(4)    conduct a risk analysis, and adopt and implement an integrity management program, for pipeline facilities as required under section 60109(c)." (49 U.S.C. § 60118(a).)

"Waivers by Secretary.--

(1)     Nonemergency waivers.--

"(A)    In general.--On application of an owner or operator of a pipeline facility, the Secretary by order may waive compliance with any part of an applicable standard prescribed under this chapter with respect to such facility on terms the Secretary considers appropriate if the Secretary determines that the waiver is not inconsistent with pipeline safety.

"(B) Hearing.--The Secretary may act on a waiver under this paragraph only after notice and an opportunity for a hearing."

(49 U.S.C. § 60118(c)(1).)

"Statement of reasons.--The Secretary shall state in an order issued under this subsection the reasons for granting the waiver." (49 U.S.C. § 60118(c)(3).)

Fire Marshal Exhibits 054

"Waivers by State authorities.--If a certification under section 60105 of this title or an agreement under section 60106 of this title is in effect, the State authority may waive compliance with a safety standard to which the certification or agreement applies in the same way and to the same extent the Secretary may waive compliance under subsection (c) of this section. However, the authority must give the Secretary written notice of the waiver at least 60 days before its effective date. If the Secretary makes a written objection before the effective date of the waiver, the waiver is stayed. After notifying the authority of the objection, the Secretary shall provide a prompt opportunity for a hearing. The Secretary shall make the final decision on granting the waiver." (49 U.S.C. § 60118(d).)

Petitioners argue that, because "the State authority may waive compliance with a safety standard to which the certification or agreement applies in the same way and to the same extent the Secretary may waive compliance under subsection (c)" and because the Secretary may act on a waiver only after notice and an opportunity for a hearing and by stating reasons, petitioners may set aside the State Waivers until the OSFM complies with section 60118.

OSFM and Sable argue that petitioners may not seek such remedies under federal law for violation of these non-discretionary procedural requirements, citing *City and County of San Francisco v. U.S. Dept. of Transp.* (9th Cir. 2015) 796 F.3d 993 (*San Francisco*). In *San Francisco*, the litigation was initiated following an explosion of a natural gas transmission pipeline. (*Id*. at p. 995.) Fearing a recurrence, the City and County of San Francisco sued under the FPSA's citizen suit provision alleging that the PHMSA failed to comply with the FPSA. (*Ibid*.) The city sought declaratory and injunctive relief to compel the FPSA to comply with its duties under the FPSA. (*Id*. at pp. 997-998.) The District Court dismissed the suit with leave to amend, finding that the citizen suit provision (49 U.S.C. § 60121) was " 'not an appropriate vehicle for seeking mandamus relief regarding defendants' performance of their regulatory obligations.' " (*Id*. at p. 998.) The city amended its complaint to include claims under the Administrative Procedures Act, arguing that the PHMSA approval of the state agency's certification was arbitrary and capricious, and a failure to act, in violation of title 5, United States Code section 706. (*Ibid*.) The District Court dismissed these claims as well. (*Ibid*.)

Fire Marshal Exhibits 055

On appeal in *San Francisco*, the Ninth Circuit affirmed. (*San Francisco, supra*, 796 F.3d at p. 1004.) "The Pipeline Safety Act, by its plain language, allows only a very limited private right of action. It permits injunctive citizen suits against the United States or other entities 'for a violation of this chapter or a regulation prescribed or order issued under this chapter.' [Citation.] In other words, private citizen suits are authorized for substantive statutory or regulatory violations. By its terms, the provision does not authorize a mandamus-type action to compel the Agency to perform non-discretionary regulatory duties." (*Id.* at pp. 998–999.)

The OSFM also argues that the notice and hearing requirements of section 60121 appear in the FPSA as procedural protections for the benefit of the applicant seeking the waiver and not for the more general purpose of public participation. This latter point is consistent with the corresponding regulations: "Hearing means an informal conference or a proceeding for oral presentation. Unless otherwise specifically prescribed in this part, the use of 'hearing' is not intended to require a hearing on the record in accordance with section 554 of title 5, U.S.C." (49 C.F.R. § 190.3 (2025).)

Considering these regulations and the reasoning of *San Francisco*, there is a reasonable basis to find that federal law does not require a hearing with generalized public participation and hence to find no violation of the procedural aspects of the FPSA. Despite this lack of requirement, petitioners, nonetheless, actually submitted evidence to the OSFM. (CDB Petition, ¶¶ 68-74; EDC Petition, ¶ 116.) A reasonable inference is that the petitioners have had an opportunity to present evidence to OSFM regardless of whether there is a public participation requirement.

The court finds that petitioners have not shown a likelihood of success on the merits as to claims based on federal law, but again petitioners have shown some likelihood of success on the merits which may be weighed against the relative harms and equities to support issuance of a preliminary injunction.

> (iii)    State Claims

Corresponding to their FPSA claims, petitioners also assert violations of the CPSA.

Fire Marshal Exhibits 056

"It is the intent of the Legislature, in enacting this chapter, that the State Fire Marshal shall exercise exclusive safety regulatory and enforcement authority over intrastate hazardous liquid pipelines and, to the extent authorized by agreement between the State Fire Marshal and the United States Secretary of Transportation, may act as agent for the United States Secretary of Transportation to implement the federal Hazardous Liquid Pipeline Safety Act of 1979 (49 U.S.C. Sec. 60101 et seq.) and federal pipeline safety regulations as to those portions of interstate pipelines located within this state, as necessary to obtain annual federal certification." (Gov. Code, § 51010.)

"The State Fire Marshal shall adopt hazardous liquid pipeline safety regulations in compliance with the federal law relating to hazardous liquid pipeline safety, including, but not limited to, compliance orders, penalties, and inspection and maintenance provisions, and including amendments to those laws and regulations that may be hereafter enacted and adopted." (Gov. Code, § 51011, subd. (a).)

"The State Fire Marshal may exempt the application of regulations adopted pursuant to this section to any pipeline, or portion thereof, when it is determined that the risk to public safety is slight and the probability of injury or damage remote." (Gov. Code, § 51011, subd. (b).)

"Notification of exemptions shall be written, and shall include a discussion of those factors that the State Fire Marshal considers significant to the granting of the exemption." (Gov. Code, § 51011, subd. (c).)

"Title 49 of the Code of Federal Regulations, Part 195 is hereby adopted by reference as it relates to hazardous liquid pipelines." (Cal. Code Regs., tit. 19, § 2000.)

While federal procedural law may not separately provide for mandate remedies, California procedural law generally provides for writs of mandate to command California officials to comply with the law. (See Code Civ. Proc., §§ 1085, 1094.5.)

Reviewing the State Waivers, the court concludes that the State Waivers do not contain a discussion of factors that the OSFM considered significant in granting the exemption beyond conclusions.

"Administrative agency findings are generally permitted considerable latitude with regard to their precision, formality, and matters reasonably implied therein. [Citation.] However, findings by implication cannot be substituted for specific findings when they are required by law." (*Southern Pacific Transportation Co. v. State Bd. of Equalization* (1987) 191 Cal.App.3d 938, 954.)

Fire Marshal Exhibits 057

Case 1:26-cv-01486-KES-CDB Document 53 Filed 07/31/26 Page 61 of 128

Given the specific findings required by section 51011, subdivision (b), it appears that the statutorily-required discussion of subdivision (c) must in some appropriate way at least connect the factors stated (and their significance) to the findings that the risk to public safety is slight and the probability of injury or damage remote. The court finds that petitioners have established a reasonable probability of success on the merits on this claim.

### (B)     Greater Harms

Petitioners argue that they, and the portion of the public they represent, would suffer the greater harm by the erroneous denial of a preliminary injunction. In particular, petitioners argue that the potential harm to natural resources and the failure to consider impacts of the project or to allow public input outweigh any delay for Sable. Sable argues that such harm is purely speculative and that it, and the general public, would suffer economic harms delaying or preventing the domestic oil production from Sable's use of the pipelines by the erroneous issuance of a preliminary injunction. The OSFM argues that erroneous issuance of an injunction against public officers in performing their duties is a form of irreparable injury.

As discussed below, because the petitions focus on deficiencies in the State Waivers as issued by OSFM and because additional approvals are required before the pipelines subject to the State Waivers may be restarted, the court finds that no party has made a strong showing that it would suffer greater harm by the erroneous grant or denial of the preliminary injunction.

### (C)     Balance of Equities

In arguing that CEQA is inapplicable, Sable and OSFM make the point that the State Waivers constitute but one approval of several necessary to restart the Las Flores Pipelines. This argument is carried forward into their analysis of the relative harms: "Petitioners' alleged harm from restart of the Pipelines [citations] is purely speculative due to the additional approval Sable must obtain before the Pipelines are operational. [Citation.] As Petitioners acknowledge, and as required by the Consent Decree, OSFM must approve a Restart Plan before Sable can restart the Pipelines. [Citations.] When reviewing Sable's Restart Plan, OSFM will necessarily consider the safety of operations and integrity of the pipelines to minimize potential safety risks." (Sable Opposition, at p. 19.)

Fire Marshal Exhibits 058

Case 1:26-cv-01486-KES-CDB     Document 53     Filed 07/31/26     Page 62 of 128

The principal harms argued both by petitioners and by Sable are based upon what would or would not happen when the Las Flores Pipelines are restarted. The evidence presented by all parties, however, shows that the restart of the Las Flores Pipelines is dependent upon approvals that have not yet been given. The respective potential harms are thus premature in this analysis. As the OSFM argues, there are potential harms in premature and potentially unnecessary judicial interference with the activities of regulators.

As the evidence and arguments of the petitioners most strongly demonstrate, the principal harm to be avoided is the restart of the Las Flores Pipelines without compliance with all applicable law. Because such a restart requires additional approvals, this harm may be avoided in the present by having adequate notice that a restart has been approved and so providing petitioners with a reasonable opportunity to address compliance issues of such a restart based upon such future approvals. By the same token, Sable would not be materially harmed by being restrained from restarting the Las Flores Pipelines without first providing such adequate notice. The OSFM would not be restrained or constrained in the interim to address all such matters within its regulatory purview.

Accordingly, the court will narrowly grant the motions for preliminary injunctions to enjoin the restart of the Las Flores Pipelines, as herein defined, until 10 court days following Sable's filing and service of notice that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. "Restart" shall have the same meaning as in the Federal Consent Decree. Such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025 (the date of the court's grant of the TRO in these matters). The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing and the date of service.

Fire Marshal Exhibits 059

Under these terms of the preliminary injunction, absent further order of the court, Sable may restart the Las Flores Pipelines 10 court days following the giving of notice of receiving all necessary approvals and permits. Sable is not prevented by this injunction from taking steps towards restarting the Las Flores Pipelines short of actual restart. The OSFM is not impeded by the injunction from taking steps it finds appropriate in its regulatory capacity, including any steps OSFM may find desirable following this order. The conditions of the injunction do not allow restart without prior notice. This notice requirement and intervening waiting period provides reasonable time and opportunity for the petitioners and for the OSFM to take any requisite procedural step they may find appropriate before restart is to occur. The ruling is without prejudice to petitioners to seek additional, further, or other relief from the court, if any is warranted, before such restart. The court would be in a position to assess the evidence and arguments of the parties as they then exist, including, presumably, the fact and effects of actions taken as a result of obtaining the remaining necessary approvals and permits.

(D)    Bond

"On granting an injunction, the court or judge must require an undertaking on the part of the applicant to the effect that the applicant will pay to the party enjoined any damages, not exceeding an amount to be specified, the party may sustain by reason of the injunction, if the court finally decides that the applicant was not entitled to the injunction." (Code Civ. Proc., § 529, subd. (a).)

In view of the nature of the injunction issued, the potential damages caused by a wrongful injunction are minimal. The court fixes the amount of the undertaking required by section 529 at $1,000.00, to be filed by CBD and EDU, respectively in each case, on or before July 25, 2025.

(2)    Motions re Richard B. Kuprewicz

In addition to the applications for issuance of preliminary injunctions, the parties have filed motions related to petitioners' expert witness Richard B. Kuprewicz: (1) motion of Sable (case No. 25CV02244) to compel the deposition of Kuprewicz; (2) the motion of Sable (case No. 25CV02244) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions; (3) motion of Sable (case No. 25CV02247) to compel the deposition of Kuprewicz; and (4) the motion of Sable (case No. 25CV02247) to strike the declaration of Kuprewicz filed in support of petitioners' applications for preliminary injunctions. There are also motions now set for hearing in October in each case to quash Sable's deposition subpoena and notice of deposition, and to stay the deposition of Kuprewicz.

Fire Marshal Exhibits 060

Case 1:26-cv-01486-KES-CDB    Document 53    Filed 07/31/26    Page 64 of 128

As discussed briefly above, the court has considered, but does not rely upon, the substance of the declaration of Kuprewicz to reach its conclusions in this ruling. The motions to strike the declaration will be denied. The motions to compel the deposition of Kuprewicz are denied as moot. To the extent these ruling moot the pending motions to quash, the court expects the parties to advise the court of that fact.

Based upon the court's ruling on the merits of the applications for preliminary injunction, it is not necessary at this time to determine what role, if any, the testimony of Kuprewicz may have in further proceedings. The court expects that petitioners will fully consider the issues raised by Sable in these motions in any further filings with the court.

## JUDGES

### JUDGE DONNA GECK

Dept. 4 SB-Anacapa

1100 Anacapa Street P.O. Box 21107

Santa Barbara, CA 93121-1107

US

Fire Marshal Exhibits 061

# Exhibit 5

Exhibit 5
to Request for Judicial Notice
in Support of Motion to Dismiss
by CAL FIRE, OSFM, and Fire Marshal Berlant

Fire Marshal Exhibits 062

Case 1:26-cv-01486-KES-CDB     Document 53     Filed 07/31/26     Page 66 of 128



**DEPARTMENT OF FORESTRY AND FIRE PROTECTION**
**OFFICE OF THE STATE FIRE MARSHAL**
P.O. Box 944246
Sacramento, California 94244-2460
(916) 568-3800
Website:  www.fire.ca.gov



October 22, 2025


Lance Yearwood
Vice President
Sable Offshore Corp
845 Texas Avenue, Suite 2920
Houston, Texas 77002

**SUBJECT:   STATE WAIVER REQUIREMENTS PRIOR TO RESTART OF LINES CA-324 AND CA-325A/B**


Dear Mr. Yearwood,

On December 17, 2024, the CAL FIRE - Office of the State Fire Marshal (OSFM) issued State Waivers for the above captioned pipelines. The Pipeline and Hazardous Materials Safety Administration (PHMSA) issued the concurrence with the terms of the State Waivers on February 11, 2025. Those State Waivers were issued in accordance with the terms of the Consent Decree (CD) between Plains Pipeline, L.P. and the United States of America and the People of the State of California, DOJ Case REF. NO. 90-5-1-1-1130 (Appendix B, Article 1.1.D).

Sable sought the State Waivers to manage the risk of corrosion under insulation that may occur as a result of inadequate cathodic protection (CP) due to the shielding effects of the polyurethane foam and the polyethylene tape wrap surrounding the pipelines. It is critical to stress that a State Waiver prescribes alternative measures that provide an equal or greater level of safety than the required regulation. The OSFM granted the State Waivers on the condition that Sable complies with the specific requirements contained therein.

On September 11, 2025, Sable submitted a restart plan to OSFM for review and approval. OSFM's review of the restart plan is ongoing. During this process, OSFM identified a requirement of the State Waivers that has not yet been met and that Sable must complete prior to any potential restart. Pursuant to item 9 in the State Waivers, Sable must repair all immediate and 180-day repair conditions prior to restart. Those conditions are further clarified in the sections titled "Immediate Repair Conditions" and "180-Day Repair Conditions." Most pertinent here is the 180-day repair condition language (see Condition 35 in the CA-324 State Waiver and Condition 36 in the CA-325A/B State Waiver) that includes "anomalies that have an ILI reported depth of 40% or greater wall loss, including tool sizing tolerance for depth." Footnotes 7 and 9 further

Lance Yearwood
October 22, 2025
Page 2

clarify that remediation means "a permanent repair method." The State Waivers require all such anomalies to be remediated, including tool tolerance. According to OSFM records, Sable has not satisfied this condition in the State Waivers.

The above findings alone and the inconsistencies with the State Waiver requirements prevent restart under the law. The OSFM continues to review the restart plan submitted by Sable in September, and while OSFM is providing this initial notification of deficiency to Sable regarding the State Waiver requirements, OSFM may have further comment or requirements arising out of that review.

Sincerely,

DANIEL BERLANT
State Fire Marshal

cc:    James Hosler, OSFM, Assistant Deputy Director
       Alin Podoreanu, OSFM, Supervising Pipeline Safety Engineer
       Joshua Cleaver, CAL FIRE, Staff Counsel

# Exhibit 6

Exhibit 6
to Request for Judicial Notice
in Support of Motion to Dismiss
by CAL FIRE, OSFM, and Fire Marshal Berlant

Fire Marshal Exhibits 065



November 26, 2025

Linda Daugherty
Acting Associate Administrator for Pipeline Safety
Pipeline and Hazardous Materials Administration (PHMSA)
United States Department of Transportation
1200 New Jersey Ave, SE
Washington, DC 20590

*Via E-Mail and U.S. Mail*

Dear Ms. Daugherty,

Sable Offshore Corp. (Sable) is writing to notify the Pipeline and Hazardous Materials Safety Administration (PHMSA) of its determination that a pipeline facility that it operates on the Outer Continental Shelf (OCS) and in southern California constitutes an interstate pipeline facility under the Pipeline Safety Act (PSA).  Consequently, Sable believes that PHMSA is the agency responsible for pipeline safety regulatory oversight on the portions of the pipeline facility that are subject to 49 C.F.R. Parts 194, 195 and 199.  Sable requests from PHMSA concurrence with Sable's determination, as well as guidance on the orderly transition of regulatory oversight from the California Office of the State Fire Marshal (OSFM) to PHMSA.

Sable shares PHMSA's commitment to pipeline safety and looks forward to working with the agency.  Sable also notes that this transition only affects the interstate status of the subject pipelines, and will not otherwise change the regulatory classification of the pipelines.  All portions of the pipelines that are currently subject to the pipeline safety regulations at 49 C.F.R. Parts 194, 195, and 199 will remain subject to those programs going forward.

## Background

In 2024, Sable acquired certain assets, including, among other things, three offshore oil production platforms on the OCS off the coast of Santa Barbara, CA (Hondo, Heritage, and Harmony platforms), offshore subsea pipelines transporting oil from these platforms to onshore pipelines that, in turn, transport oil to the Las Flores Canyon facility to process crude oil for subsequent transportation, and onshore pipelines to transport oil from Las Flores Canyon to the Pentland Station terminal in Kern County, CA (Las Flores Pipeline).  Sable operates all of these assets as part of a single system that moves crude oil from the OCS into California.  Attachment A to this letter contains a map of these assets.

Fire Marshal Exhibits 066

*Sable Offshore Corp.*
*Determination of Interstate Classification*
*November 26, 2025*

Prior to October 2022, Plains All American (Plains) owned and operated the Las Flores Pipeline (then-called Lines 901 and 903), and ExxonMobil owned the offshore platforms, subsea lines, and the Las Flores Canyon processing facility.  Before 2016, Plains filed Interstate Commerce Act (ICA) tariffs with the Federal Energy Regulatory Commission (FERC) for Lines 901 and 903, and these pipelines were considered interstate pipelines subject to PHMSA's regulatory oversight.  On February 12 and April 29, 2016, respectively, Plains cancelled these tariffs following the May 2015 release.  On May 18, 2016, PHMSA sent a letter to OSFM indicating that, as a result of the cancelled tariffs, these pipelines were considered intrastate pipelines, subject to the regulatory jurisdiction of OSFM, pursuant to its state certification from PHMSA under 49 U.S.C. § 60105(a).  The May 2016 letter indicated that the determination of intrastate status is "subject to change based on future events or newly-discovered facts."

**Interstate Classification**

Since PHMSA's May 2016 letter, there have been intervening events affecting the pipelines, which merit reassessment of the interstate versus intrastate status of these assets.  As noted, Sable operates each of the offshore and onshore assets described above, which is distinct from the arrangement considered by PHMSA in 2016 where different, unrelated entities operated portions of the facility. Sable has determined that this pipeline facility is properly considered as an interstate hazardous liquid pipeline facility PSA, and therefore subject to PHMSA's exclusive regulatory authority under 49 U.S.C. § 60104(c).

This conclusion is based on applicable language from the PSA and PHMSA's hazardous liquid pipeline safety regulations at 49 C.F.R. Part 195.  Under 49 U.S.C. § 60101(a)(5), a "hazardous liquid pipeline facility" is broadly defined as inclusive of "a pipeline, a right of way, a facility, a building, or equipment intended to be used in transporting hazardous liquid."  The term "transporting hazardous liquid" is, in turn, defined at § 60101(a)(22) as "the movement of hazardous liquid by pipeline, or the storage of hazardous liquid incidental to the movement of hazardous liquid by pipeline, in or affecting interstate or foreign commerce", but excludes, in relevant part, "onshore production, refining, or manufacturing facilities".  Furthermore, the term "interstate or foreign commerce" is defined at § 60101(a)(8)(B) to mean, in the context of hazardous liquid, commerce between "a place in a State and a place outside that State."

Although PHMSA has generally considered the presence of a filed tariff to be an indicator of whether a line is interstate, PHMSA has recognized in Appendix A to its Part 195 regulations that there are certain situations in which a pipeline facility is interstate "despite the lack of a filing with FERC," providing specific examples of such circumstances.  In one example, PHMSA stated that hazardous liquid pipelines that "originate[] on the Outer Continental Shelf" may be considered interstate pipeline facilities, regardless of whether the operator filed tariffs with FERC for them.  See Part 195, Appendix A, Example 7.

As noted above, the assets that Sable operates include offshore lines connecting offshore production platforms to an onshore processing facility, as well as the Las Flores Pipeline.  Collectively, these pipelines constitute a "pipeline facility" through which hazardous liquid

Fire Marshal Exhibits 067

*Sable Offshore Corp.*
*Determination of Interstate Classification*
*November 26, 2025*

moves in transportation from its point of production on the OCS to the onshore Pentland Station terminal in California, and are not otherwise excluded in the PSA's definition of "transporting hazardous liquid." As this pipeline facility originates on the OCS (which is located outside of California), and then travels within California, it constitutes commerce between a place in California and a place outside California and is thus properly considered as "interstate" pursuant to the PSA and Part 195, Appendix A.

**Transition of Regulatory Authority**

Sable seeks to coordinate with PHMSA to obtain concurrence with this determination and rescind the May 18, 2016 letter to OSFM, and to establish an orderly process to transition regulatory oversight over the pipeline facility from OSFM to PHMSA. This includes, among other things, a framework for review of Sable's procedures, transitioning OSFM's December 17, 2024 State Waivers to federally administered special permits, review and approval of a Restart Plan submitted consistent with the 2020 Consent Decree in *U.S. et al v. Plains All American Pipeline, LP and Plains Pipeline, LP*, No. 20-cv-2415 (C.D. Cal.), as well as, more generally, Sable's performance of restart actions consistent with the applicable provisions of this Consent Decree. Sable will provide all reasonable assistance to PHMSA in coordinating with OSFM to facilitate this transition. Transition of regulatory oversight to PHMSA does not affect Sable's adherence to Part 195 or its performance of action items indicated in the Consent Decree. Moreover, applicable injunctive measures specified in the Consent Decree, as well as the applicable requirements of the State Waivers, will be incorporated on a prospective basis into Sable's procedures, which are enforceable under Part 195.

Sable appreciates the positive working relationship it has developed with OSFM staff and looks forward to developing a similarly productive relationship with PHMSA going forward.

Sincerely,

J. Caldwell Flores
President and Chief Operating Officer
Sable Offshore Corp.

Cc:     Ben Fred (PHMSA)

3

Fire Marshal Exhibits 068

*Sable Offshore Corp.*
*Determination of Interstate Classification*
*November 26, 2025*

ATTACHMENT A – Map of Assets Acquired by Sable



Fire Marshal Exhibits 069

# Exhibit 7

Exhibit 7
to Request for Judicial Notice
in Support of Motion to Dismiss
by CAL FIRE, OSFM, and Fire Marshal Berlant



1(310) 620-5779
djmoore@paulhastings.com


February 26, 2026


Daniel Berlant, State Fire Marshal

California Department of Forestry and Fire Protection
715 P Street
Sacramento, CA 94244
calfire.statefiremarshal@fire.ca.gov

Re:  Sable – Relinquishment of State Waivers

Dear Fire Marshal Berlant:

As you know, our firm has represented Sable Offshore Corp. and Pacific Pipeline Company (collectively, Sable) in matters before the Office of the State Fire Marshal (OSFM) regarding Segments CA-324 (OSFM Line ID 0015) and CA-325 (OSFM Line ID 0001) of the Santa Ynez Pipeline System (previously referred to as Las Flores Pipeline Lines CA-324 and CA-325A/B).  On behalf of Sable, I am writing to you with regard to the "State Waivers" issued by OSFM on December 17, 2024, with respect to Segments CA-324 and CA-325.

Although Sable has complied with the terms of the State Waivers, Sable has not exercised any rights or privileges under the State Waivers since they were issued.  On December 17, 2025, the federal Pipeline & Hazardous Materials Safety Administration (PHMSA) notified Sable that it concurred in Sable's determination that the Santa Ynez Pipeline System—including Segments CA-324 and CA-325—is an interstate pipeline facility under the Pipeline Safety Act, and that the Santa Ynez Pipeline System is therefore "subject to the regulatory oversight of PHMSA" rather than that of OSFM.[1]  On December 23, 2025, PHMSA issued an emergency special permit with respect to Segments CA-324 and CA-325, which included conditions that are "substantially the same" as those included in OSFM's State Waivers, and reconfirmed that "PHMSA has exclusive pipeline safety regulatory authority" over Segments CA-324 and CA-325.[2]  PHMSA has since confirmed again that the "California [OSFM] issued [the State W]aivers before PHMSA assumed regulatory jurisdiction," and because "States cannot regulate interstate pipelines … Sable may not rely on [OSFM's State W]aivers."[3]

Because Segments CA-324 and CA-325 are now subject to PHMSA's exclusive jurisdiction under the federal Pipeline Safety Act, Sable has determined it is appropriate to relinquish its rights under OSFM's previously issued State Waivers.  Therefore, by this letter and effective immediately, Sable hereby relinquishes, surrenders and abandons the State Waivers.

//

---

[1] PHMSA, Letter to J. Caldwell Flores, "Determination of Interstate Classification" (Dec. 17, 2025).
[2] PHMSA, Docket No. PHMSA-2025-1502, Emergency Special Permit (Dec. 23, 2025).
[3] *Environmental Defense Center v. Pipeline & Hazardous Materials Safety Administration*, 9th Cir. Case No. 25-8059, Federal Respondents' Opposition to Emergency Stay Motion (Dec. 30, 2025), p. 18.

Fire Marshal Exhibits 07.1

**PAUL**
**HASTINGS**

February 26, 2026
Page 2

Please do not hesitate to contact me with any questions.

Sincerely,

Duncan Joseph Moore
of PAUL HASTINGS LLP

CC:
James Hosler, Assistant Deputy Director, OSFM
Linda Gail Daugherty, Acting Associate Administrator for Pipeline Safety, PHMSA
Josh Cleaver, Staff Counsel, OSFM
J. Caldwell Flores, President, Sable Offshore Corp.
Anthony Duenner, General Counsel, Sable Offshore Corp.

LEGAL_US_W # 185921873.7

# Exhibit 8

Exhibit 8
to Request for Judicial Notice
in Support of Motion to Dismiss
by CAL FIRE, OSFM, and Fire Marshal Berlant

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SANTA BARBARA**

| | | | |
|---|---|---|---|
| Dated and Entered: | 02/27/2026 | Time: | 10:00 AM |
| Judicial Officer: | Donna D Geck | | |
| Deputy Clerk: | Preston Frye | Dept: | SB Dept 4 |
| Bailiff/Court Officer: | Eduardo Munoz | Case No: | 25CV02244 |
| Court Reporter: | Elizabeth Mooy | | |

---

**Center for Biological Diversity et al vs California Department of Forestry and Fire Protection et al**

Parties Present:

| | |
|---|---|
| Dintzer, Jeffrey D | Attorney for Real Parties Interest |
| Dorsi, Michael S | Attorney for Respondents |
| Krop, Linda J | Attorney for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper and Environmental Defense Center |
| Large, Trevor | Attorney for Real Parties Interest |
| Stanton, Garrett B | Attorney for Real Parties Interest |
| Pettit, David | Attorney for Petitioners Center for Biological Diversity and Wishtoyo Foundation |
| Frankel, Jeremy | Attorney for Petitioners Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, Santa Barbara Channelkeeper and Environmental Defense Center |

---

**NATURE OF PROCEEDINGS*:*  Case Management Conference**

The matter was called with appearances as stated above.

Mr. Dintzer, Ms. Krop, and Mr. Dorsi presented oral argument regarding the Court's Tentative Ruling.

At the conclusion of oral argument, the Court adopted its Tentative Ruling as follows:

**TENTATIVE RULING**:

For the reasons set forth herein, the motion of real parties in interest Sable Offshore Corp. and Pacific Pipeline Company for reconsideration and to dissolve or modify the preliminary injunction issued in this case is denied.

---

These are two consolidated cases involving the same underlying incidents and activity.

Documents filed by petitioners and plaintiffs Center for Biological Diversity and Wishtoyo Foundation (case No. 25CV02244) will be identified by the prefix, and these parties will be collectively referred to as, "CBD"; documents filed by petitioners and plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (case No. 25CV02247) will be identified by the prefix, and these parties collectively referred to as, "EDC." Petitioners and plaintiffs will collectively be referred to as "petitioners"; respondents and defendants will be collectively referred to as "respondents"; a petition and complaint will be referred to simply as a "petition."

---

SC-2411 (Revised July 1, 2013)                    **MINUTE ORDER**

Fire Marshal Exhibits 074

Respondents Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California, and Daniel Berlant, in his official capacity as State Fire Marshal will be collectively referred to as "OSFM." Real parties in interest Sable Offshore Corp., and Pacific Pipeline Company will be collectively referred to as "Sable."

**Background:**

As alleged in the petitioners' respective petitions:

These actions involve two oil pipelines connected to three offshore platforms known as the Santa Ynez Unit. (CBD Petition, ¶¶ 33, 34; EDC Petition, ¶ 38, 39.) The two oil pipelines at issue (collectively, the Las Flores Pipelines) consist of Las Flores Pipeline CA-324 (Line 324) and Las Flores Pipeline CA-325 (Line 325). (CBD Petition, ¶¶ 39, 40; EDC Petition, ¶ 41.) Prior to 2015, when owned by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline (collectively, Plains), Line 324 was known as Line 901 and Line 325 was known as Line 903. (CBD Petition, ¶ 49; EDC Petition, ¶ 41, 68.)

The Las Flores Pipelines were constructed and operated following approval by Santa Barbara County in 1986. (CBD Petition, ¶ 35; EDC Petition, ¶ 54.) This approval relied upon an environmental impact report (EIR) drafted in 1984 and finalized in 1985. (CBD Petition, ¶ 35; EDC Petition, ¶ 54 & fn. 1.)

In 2015, Line 324 (formerly Line 901) ruptured causing a serious oil spill (Refugio Oil Spill). (CBD Petition, ¶¶ 50-51; EDC Petition, ¶¶ 69-70.) The Las Flores Pipelines were consequently shut down at that time. (CBD Petition, ¶ 52; EDC Petition, ¶ 82.)

In March 2020, the United States and the State of California sued Plains based upon damages from the Refugio Oil Spill in *United States v. Plains All American Pipeline*, United States District Court for the Central District of California, case No. 2:20-cv-02415 (the Federal Action). (CBD Petition, ¶ 59; EDC Petition, ¶ 85.) The Federal Action was settled by a consent decree (Federal Consent Decree) entered by the court. (CBD Petition, ¶¶ 59-62; EDC Petition, ¶¶ 85-88 & fn. 3 [the Federal Consent Decree].)

The Federal Consent Decree required the operator to "remediate all internal or external metal loss anomalies that have an ILI reported depth of 40 [percent] or greater wall loss, within one year of discovery." (CBD Petition, ¶ 60.) The Federal Consent Decree also expressly required that prior to any restart, the operator
"shall apply for a State Waiver through [OSFM] for the limited effectiveness of cathodic protection" and that it "must receive a State Waiver from [OSFM] prior to restarting." (CBD Petition, ¶ 61.) The Federal Consent Decree stated that OSFM has the discretion to require additional terms and conditions if it grants any request for a State Waiver. (CBD Petition, ¶ 62.)

In 2024, Sable acquired the Santa Ynez Unit and the Las Flores Pipelines. (CBD Petition, ¶ 64-65; EDC Petition, ¶ 99.)

In April 2024, Sable submitted State Waiver applications to OSFM for Lines 324 and 325. (EDC Petition, ¶ 110 & exhibit B.)

On September 24, 2024, CBD set a letter to OSFM stating that the OSFM had a duty to conduct an analysis and provide opportunities for meaningful public participation under the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.). (CBD Petition, ¶ 68.)

On September 27, 2024, EDC sent a letter to OSFM renewing their March 2024 request for a public process. (EDC Petition, ¶ 112.) EDC also stated that operating the Las Flores Pipeline System without effective cathodic protection was neither anticipated nor reviewed in the 1985 EIR or any project approval, and the potential impacts of doing so have never been fully considered. (*Id*. & exhibit C.) OSFM never responded to the letter. (EDC Petition, ¶ 112.)

On December 17, 2024, OSFM issued State Waivers for Lines 324 and 325 with conditions. (EDC Petition, ¶ 115; CBD Petition, ¶ 71.) OSFM did not offer any sort of public process in advance of its decision. (EDC Petition, ¶ 115.)

On February 11, 2025, the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) sent a letter to OSFM indicating that it would not object to the OSFM's issuance of the State Waivers. (EDC Petition, ¶ 117.)

On April 15, 2025, CBD filed their verified petition (case No. 25CV02244) seeking writ and injunctive relief asserting three causes of action: (1) violation of federal pipeline safety laws (49 U.S.C. § 60118); (2) violation of state pipeline safety laws (Gov. Code, § 51011); and (3) violations of CEQA.

Also on April 15, 2025, EDC filed their verified petition (case No. 25CV02247) seeking writ, injunctive, and declaratory relief asserting eight causes of action: (1) violation of the federal Pipeline Safety Act (FPSA, 49 U.S.C. § 60118(d))—failure to provide a public process; (2) violation of the FPSA (49 U.S.C. § 60118(d))—failure to provide a statement of reasons; (3) declaratory relief—state waiver procedures required under the FPSA (49 U.S.C. § 60118(d)); (4) abuse of discretion under the FPSA (49 U.S.C. § 60118(d)); (5) violation of the Elder California Pipeline Safety Act of 1981 (CPSA, Gov. Code, § 51011, subd. (c)); (6) abuse of discretion under the CPSA (Gov. Code, § 51011, subd. (b)); (7) declaratory relief—standards and procedures required under the CPSA (Gov. Code, § 51011, subds. (b), (c)); and (8) CEQA—failure to prepare a subsequent EIR (Pub. Resources Code, § 21166).

On June 3, 2025, the court heard petitioners' ex parte applications for an administrative stay, or for an OSC re preliminary injunction and temporary restraining order (TRO). The court granted the petitioners' requests for a TRO and set a hearing on the OSCs for July 18, 2025.

On July 8, 2025, Sable filed demurrers and motions to strike as to the CBD Petition and EDC Petition, all noticed for hearing on September 19, 2025.

On July 18, 2025, the court granted in part petitioners' applications for issuance of preliminary injunctions.

On July 29, 2025, the court entered its written orders granting preliminary injunctions. The orders provide:

"The applications of petitioners in case numbers 25CV02244 and 25CV02247 for issuance of preliminary injunctions are, respectively, granted in part. The applications are granted to enjoin, pending the

disposition of these proceedings or further order of the court, the restart of the Las Flores Pipelines, as herein defined, until 10 court days following the filing and service of notice by or on behalf of real parties in interest Sable Offshore Corp., and Pacific Pipeline Company (collectively, Sable) that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. "Restart" shall have the same meaning as in the Federal Consent Decree identified herein. To be effective to commence the 10-court-day period, such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025. The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing or the date of service. The temporary restraining order remains in place until a written order of the court is entered on this preliminary injunction." (Order, filed July 29, 2025, exhibit A.)

On August 27, 2025, petitioners filed their motions to bifurcate "procedural" from "substantive" claims.

On September 8, 2025, Sable withdrew their demurrers and motions to strike. On September 17, 2025, Sable filed their answers to the petitions, admitting and denying allegations in the petitions and asserting 25 (in answer to the CBD Petition) and 19 (in answer to the EDC Petition) affirmative defenses.

On September 19, 2025, the court denied the motions to bifurcate.

On December 2, 2025, on the stipulation of the parties, the court entered its order consolidating both cases with case No. 25CV02244 as the lead case.

On January 5, 2026, Sable filed their motion for reconsideration of the preliminary injunction. As discussed below, the basis for this motion is the assertion of jurisdiction over the Las Flores Pipelines by the federal Pipeline and Hazardous Materials Safety Administration (PHMSA).

On January 7, 2026, the court heard Sable's ex parte application for reconsideration or alternatively to advance the hearing on the motion for reconsideration. The court set this hearing of February 27 on the motion for reconsideration.

On February 13, 2026, petitioners jointly filed opposition. OSFM filed separate opposition.

On February 18, 2026, Sable filed their reply.

On February 23, 2026, Sable filed a supplemental declaration.

**Analysis:**

(1)    Requests for Judicial Notice

In opposition to Sable's motion, petitioners request that the court take judicial notice of the following documents: (Petitioners' Opposition Request for Judicial Notice [Petitioners RJN], exhibit A) excerpts of the Consent Decree entered into by Sable's predecessor, Plains All American Pipeline, the Office of the

State Fire Marshal (OSFM), and the Pipeline and Hazardous Materials Safety Administration (PHMSA) (among other parties); (exhibit B) the California Natural Resources Agency's (CNRA) December 31, 2025 updated Summary of State Regulation of Crude Oil Pipelines in Santa Barbara County; (exhibit C) an October 22, 2025 letter from the OSFM to Sable regarding unmet State Waiver conditions; (exhibit D) a November 26, 2025 letter from Sable to PHMSA requesting that the pipelines be redesignated as interstate; (exhibit E) a December 19, 2025 application letter from Sable to PHMSA for an Emergency Special Permit; (exhibit F) petitioners' December 24, 2025 Petition for Review filed in the Ninth Circuit Court of Appeals challenging PHMSA's approval of Sable's Restart Plan and issuance of an Emergency Special Permit for the Las Flores Pipeline System; (exhibit G) the Ninth Circuit Court of Appeals' denial of Petitioners' Emergency Motion and Order expediting briefing in the case; (exhibit H) the State of California's January 23, 2026 Petition in the Ninth Circuit Court of Appeals; (exhibit I) the January 30, 2026 Motion to Consolidate Petitioners' and the State of California's Petitions, filed in the Ninth Circuit Court of Appeals; (exhibit J) the Ninth Circuit Court of Appeals' February 5, 2026 Order granting the Motion to Consolidate; (exhibit K) the Santa Barbara County Board of Supervisors' December 23, 2025 Action Letter; (exhibit L) the May 18, 2016 letter from PHMSA to OSFM memorializing the understanding between the two agencies with respect to the regulatory oversight of the pipelines; (exhibit M) the United States District Court, Central District of California's October 14, 2020 Order to Enter Consent Decree; and (exhibit N) the certified transcript from the Court's January 7, 2026 hearing on the parties' ex parte motions.

The court will grant judicial notice as to these documents, all of which constitute court records, official documents, or official filings of government agencies. (See Evid. Code, § 452, subds. (b), (c), (d), (h).) Judicial notice does not extend to the truth of factual matters set forth in such documents. (*Steed v. Department of Consumer Affairs* (2012) 204 Cal.App.4th 112, 120; *Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 113.)

Also in opposition to the motion, OSFM requests that the court take judicial notice of the following documents: (OSFM Request for Judicial Notice [OSFM RJN], exhibit A) the Petition for Review filed by California on January 23, 2026; (exhibit A-1) PHMSA Preemption Letter, dated December 17, 2025; (exhibit A-2) PHMSA Restart Plan Approval, dated December 22, 2025; (exhibit A-3) PHMSA Special Permit, dated December 23, 2025; (exhibit B) Complaint, *Pacific Pipeline Company v. California* (Kern County), filed September 29, 2025, with exhibits omitted; (exhibit C) Amended Complaint, *Pacific Pipeline Company v. California* (Kern County), filed January 21, 2026, with exhibits omitted; (exhibit D) selected pages from the Consent Decree, filed March 13, 2020; (exhibit E) Sable Assumption Agreement, dated February 19, 2024; (exhibit F) selected pages from Preliminary Injunction Order, entered on July 29, 2025; (exhibit G) selected pages from Answer by Sable Offshore Corp and Pacific Pipeline Company, filed on September 17, 2025; (exhibit H) letter from PHMSA to OSFM re Intrastate Designation, dated May 18, 2016; (exhibit I) selected pages from State Waiver for CA-324; (exhibit J) selected pages from State Waiver for CA-325; (exhibit K) OSFM letter to Sable re Tool Tolerance, dated October 22, 2025; (exhibit L) Sable letter to OSFM re Tool Tolerance, dated October 23, 2025; (exhibit M) Sable letter to PHMSA re Interstate Designation, dated November 26, 2025; (exhibit N) Order on Consent Decree, entered October 14, 2020; (exhibit O) selected pages from Santa Barbara County Air District permit; (exhibit P) Appendix to 49 CFR Part 195, Appendix A; (exhibit Q) Sable 8-K Form (Securities and Exchange Com.), dated September 29, 2025; and (exhibit R) selected pages from Sable Exhibit 99.2 to SEC filings.

The court will grant judicial notice as to these documents, all of which constitute court records, official documents, or official filings of government agencies. (See Evid. Code, § 452, subds. (b), (c), (d), (h).) As before, judicial notice does not extend to the truth of factual matters set forth in such documents.

In reply, Sable requests that the court take judicial notice of: (Sable Reply Request for Judicial Notice [Sable Reply RJN], exhibit 1) excerpts of the Consent Decree entered in *United States of America and People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*, case No. 2:20-cv-02415 in the United States District Court for the Central District of California; and (2) an order denying the State of California's Motion to Change Venue, dated February 3, 2026, by the Superior Court of Kern County in *Pacific Pipeline Company v. State of California*, Case No. BCV-25-103508.

The court will grant judicial notice as to these documents, which are court records. (See Evid. Code, § 452, subd. (d).) As before, judicial notice does not extend to the truth of factual matters set forth in such documents.

(2)     Standards for Sable's Motion

Sable frames its motion as a motion for "reconsideration" pursuant to Code of Civil Procedure sections 1008 and 533. (Notice, at p. 3.) Reconsideration of rulings on motions generally is governed by section 1008:

"When an application for an order has been made to a judge, or to a court, and refused in whole or in part, or granted, or granted conditionally, or on terms, any party affected by the order may, within 10 days after service upon the party of written notice of entry of the order and based upon new or different facts, circumstances, or law, make application to the same judge or court that made the order, to reconsider the matter and modify, amend, or revoke the prior order. The party making the application shall state by affidavit what application was made before, when and to what judge, what order or decisions were made, and what new or different facts, circumstances, or law are claimed to be shown." (Code Civ. Proc., § 1008, subd. (a).)

Sable asserts that this motion is timely under section 1008 because it was made within 10 days of the new or different facts and no notice of entry was served on them. Petitioners argue it is untimely under section 1008 because it has been more than five months since the court entered its order. Here, there is no evidence that there has been service of notice of entry of the order, which starts the 10-day period running. The motion is therefore timely under section 1008. (See *Novak v. Fay* (2015) 236 Cal.App.4th 329, 335–336 [service of notice of entry is applicable start date].) In any event, however, there is no time limit in making a motion to modify or dissolve an injunction under section 533:

"In any action, the court may on notice modify or dissolve an injunction or temporary restraining order upon a showing that there has been a material change in the facts upon which the injunction or temporary restraining order was granted, that the law upon which the injunction or temporary restraining order was granted has changed, or that the ends of justice would be served by the modification or dissolution of the injunction or temporary restraining order." (Code Civ. Proc., § 533.)

In either case, the party seeking modification or dissolution of an injunction bears the burden to show that changed circumstances justifies modification or dissolution of the order. (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1504.)

(3)    Prior Ruling on Preliminary Injunction and Subsequent Events

The court need not here repeat the background and analysis set forth in the court's July 2025 ruling granting plaintiffs' applications for preliminary injunction, which ruling is incorporated by this reference. However, it is useful to highlight past events reflected in the court's record in order to evaluate Sable's motion for reconsideration.

In ruling on plaintiffs' applications for preliminary injunction, the court did not find that plaintiffs had made a sufficient evidentiary showing of a likelihood of success on the merits of plaintiffs' causes of action except as related to the State Fire Marshal's findings under the Elder California Pipeline Safety Act of 1981 (CPSA, Gov. Code, § 51010 et seq.).

In opposing the issuance of the preliminary injunction, Sable and OSFM argued that much, if not all, of plaintiffs' claims of harm were premature because those claims depended upon the restart of the Las Flores Pipelines and that multiple approvals were necessary before such restart. As argued by Sable in that opposition:

"Petitioners' alleged harm from restart of the Pipelines [citations] is purely speculative due to the additional approval Sable must obtain before the Pipelines are operational. [Citation.] As Petitioners acknowledge, and as required by the Consent Decree, OSFM must approve a Restart Plan before Sable can restart the Pipelines. [Citations.] When reviewing Sable's Restart Plan, OSFM will necessarily consider the safety of operations and integrity of the pipelines to minimize potential safety risks." (Sable Opposition re Preliminary Injunction, filed July 8, 2025, at p. 19.)

Accepting this argument in part, the court granted the preliminary injunction narrowly. As the court stated in its July 18 ruling:

"As the evidence and arguments of the petitioners most strongly demonstrate, the principal harm to be avoided is the restart of the Las Flores Pipelines without compliance with all applicable law. Because such a restart requires additional approvals, this harm may be avoided in the present by having adequate notice that a restart has been approved and so providing petitioners with a reasonable opportunity to address compliance issues of such a restart based upon such future approvals. By the same token, Sable would not be materially harmed by being restrained from restarting the Las Flores Pipelines without first providing such adequate notice. The OSFM would not be restrained or constrained in the interim to address all such matters within its regulatory purview.

"Accordingly, the court will narrowly grant the motions for preliminary injunctions to enjoin the restart of the Las Flores Pipelines, as herein defined, until 10 court days following Sable's filing and service of notice that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. 'Restart' shall have the same meaning as in the Federal Consent Decree. Such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not

Fire Marshal Exhibits 080

identify or provide information for any approval or permit given or received prior to June 3, 2025 (the date of the court's grant of the TRO in these matters). The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing and the date of service.

"Under these terms of the preliminary injunction, absent further order of the court, Sable may restart the Las Flores Pipelines 10 court days following the giving of notice of receiving all necessary approvals and permits. Sable is not prevented by this injunction from taking steps towards restarting the Las Flores Pipelines short of actual restart. The OSFM is not impeded by the injunction from taking steps it finds appropriate in its regulatory capacity, including any steps OSFM may find desirable following this order. The conditions of the injunction do not allow restart without prior notice. This notice requirement and intervening waiting period provides reasonable time and opportunity for the petitioners and for the OSFM to take any requisite procedural step they may find appropriate before restart is to occur. The ruling is without prejudice to petitioners to seek additional, further, or other relief from the court, if any is warranted, before such restart. The court would be in a position to assess the evidence and arguments of the parties as they then exist, including, presumably, the fact and effects of actions taken as a result of obtaining the remaining necessary approvals and permits." (Minute Order, filed July 18, 2025, at pp. 13-14.)

Sable has not filed and served a notice under the existing terms of the preliminary injunction to restart the Las Flores Pipelines.

Subsequent to the court's grant of the preliminary injunction, the PHMSA has asserted that the Las Flores Pipelines constitute an interstate pipeline subject to PHMSA's exclusive jurisdiction. (Flores decl., ¶ 3 & exhibit A.) The PHMSA further issued their own approvals and an emergency special permit. (Flores decl., ¶¶ 4-7 & exhibits B, C.) These approvals are the subject of proceedings in the Ninth Circuit Court of Appeals, which has not issued a final ruling. (OSFM RJN, exhibit A; Simmonds decl., ¶¶ 7-11 & exhibits F-J.)

(4)     Reconsideration

Sable argues that because the PHMSA has asserted exclusive jurisdiction over the Las Flores Pipelines, the preliminary injunction issued by this court has been preempted. Acknowledging that preemption issues are being resolved in other jurisdictions, including the Ninth Circuit Court of Appeals, OSFM and Petitioners argue that, at least until there is binding authority otherwise, this court is bound by the terms of the Federal Consent Degree and the preliminary injunction remains on a firm foundation.

The Federal Consent Decree provides, among other things, that "Plains must receive a State Waiver from the OSFM prior to restarting Line 901." (Federal Consent Decree, appen. B, art. I, § 1(A).) While Sable now argues that it is not a party to the proceedings in which the Federal Consent Decree was entered, Sable's authority to operate the Las Flores Pipelines derives from rights obtained by Plains, for which Plains was, and remains, subject to conditions including conditions set forth in the Federal Consent Decree. Sable has not demonstrated any right to operate the Las Flores Pipelines separate from the rights derived from Plains and subject to the Federal Consent Decree. (See, e.g., Federal Consent Decree, art. III, § 4 [obligations binding on successors and assigns].)
The arguments raised by Sable thus question the continuing authority of the Federal Consent Decree.

Fire Marshal Exhibits 081

"In a stipulated judgment, or consent decree, litigants voluntarily terminate a lawsuit by assenting to specified terms, which the court agrees to enforce as a judgment. [Citations.] As the high court has recognized, stipulated judgments bear the earmarks both of judgments entered after litigation and contracts derived through mutual agreement: '[C]onsent decrees "have attributes both of contracts and of judicial decrees"; a dual character that has resulted in different treatment for different purposes.' As in [*Firefighters v. City of Cleveland* (1986) 478 U.S. 501 [106 S.Ct. 3063, 92 L.Ed.2d 405]*, the issue before us is 'not whether we can label a consent decree as a "contract" or a "judgment," for we can do both.' [Citation.]" (*California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1990) 50 Cal.3d 658, 663–664.)

For purposes of this discussion, it is sufficient to observe that by the Federal Consent Decree, the Las Flores Pipelines may not be restarted (as defined therein) without obtaining a State Waiver from the OSFM. Thus, the Federal Consent Decree by its terms requires authorization from the OSFM, whether that authorization is couched in regulatory, contract, or collateral estoppel terms. The court is not persuaded on this record that administrative actions taken by PHMSA necessarily eliminates OSFM participation in the restart process.

As pertinent to the preliminary injunction ruling, Petitioners' actions challenge whether OSFM meets OSFM's statutory and regulatory obligations in providing the authorization directed by the Federal Consent Decree. The court's grant of the preliminary injunction is narrow precisely so that all parties will have the opportunity to put this matter in a procedural posture specific to the circumstances existing when Sable is, by its own reckoning, fully authorized and ready to restart the Las Flores Pipelines. At that time the court can resolve, to the extent necessary, the restart issues presented by the parties without being sidetracked by speculative harms (such as those highlighted previously by Sable) and with the benefit of any then-existing legal developments from the federal courts.

After considering all of the arguments, facts, and circumstances presented in Sable's motion for reconsideration, the court does not find the evidence of subsequent events involving PHMSA and federal appellate proceedings are sufficient to reconsider its ruling on the preliminary injunction or to modify or dissolve the preliminary injunction. The motion will therefore be denied.

---

The Court continued the Case Management Conference as indicated below.
Notice was waived by all parties.

*Future Scheduled Hearings:*
June 26, 2026 8:30 AM Case Management Conference
Geck, Donna D- SB Dept 4
ANGELA BRAUN, EXECUTIVE OFFICER                    Minutes Prepared by:

_____ Preston Frye _____ , Deputy

# Exhibit 9

Exhibit 9
to Request for Judicial Notice
in Support of Motion to Dismiss
by CAL FIRE, OSFM, and Fire Marshal Berlant

Fire Marshal Exhibits 083

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SANTA BARBARA**

Dated and Entered:   04/17/2026                    Time:   10:00 AM
Judicial Officer:      Donna D Geck
Deputy Clerk:         Preston Frye                  Dept:   SB Dept 4
Bailiff/Court Officer:  Eduardo Munoz               Case No: 25CV02244
Court Reporter:       Michele McNeil

---

**Center for Biological Diversity  et al vs California Department of Forestry and Fire Protection  et al**

Parties Present:
Dintzer, Jeffrey D            Attorney for Real Parties in Interest
Dorsi, Michael S             Attorney for Respondents
Krop, Linda J                Attorney for Petitioners Environmental Defense Center, Get Oil Oult!,
                             Santa Barbara County Action Network, Sierra Club, Santa Barbara
                             Channelkeeper and Environmental Defense Center
Large, Trevor                Attorney for Real Parties in Interest
Stanton, Garrett B           Attorney for Real Parties in Interest
Nimmer, Talia                Attorney for Petitioners Center for Biological Diversity and Wishtoyo
                             Foundation
Frankel, Jeremy              Attorney for Petitioners Environmental Defense Center, Get Oil Outt!,
                             Santa Barbara County Action Network, Sierra Club, Santa Barbara
                             Channelkeeper and Environmental Defense Center
Simmonds, Julie Teel         Attorney for Petitioner (via Zoom)
Roessler, Alicia             Attorney for Respondents

---

**NATURE OF PROCEEDINGS*: *Ex Parte Hearing re Application for Enforcement of Preliminary Injunction and for an Order to Show Cause Why Real Parties in Interest Should not be Found in Contempt of Court; Ex Parte Hearing re Request for Immediate Recission of Preliminary Injunction**

The matter was called with appearances as stated above.

Mr. Dintzler, Mr. Dorsi, and Ms. Krop provided oral argument as to the Court's Tentative Ruling.

At the conclusion of oral argument, the Court adopted its Tentative Ruling as follows:

# Tentative Ruling

1. (1)     For the reasons set forth herein, the motion of real parties in interest Sable Offshore Corp. and Pacific Pipeline Company to dissolve or modify the preliminary injunction issued in this case is denied.
2. (2)     The application of petitioners for issuance of an order to show cause why real parties should not be found in contempt and to enter additional orders is continued to May 22, 2026.

These are two consolidated cases involving the same underlying incidents and activity.

---

SC-2411 (Revised July 1, 2013)                    **MINUTE ORDER**

Fire Marshal Exhibits 084

Documents filed by petitioners and plaintiffs Center for Biological Diversity and Wishtoyo Foundation (case No. 25CV02244) will be identified by the prefix, and these parties will be collectively referred to as, "CBD"; documents filed by petitioners and plaintiffs Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper (case No. 25CV02247) will be identified by the prefix, and these parties collectively referred to as, "EDC." Petitioners and plaintiffs will collectively be referred to as "petitioners"; respondents and defendants will be collectively referred to as "respondents"; a petition and complaint will be referred to simply as a "petition." Respondents Department of Forestry and Fire Protection, by and through the Office of the State Fire Marshal, an agency of the State of California, and Daniel Berlant, in his official capacity as State Fire Marshal will be collectively referred to as "OSFM." Real parties in interest Sable Offshore Corp., and Pacific Pipeline Company will be collectively referred to as "Sable."

The court has reviewed all of the papers filed by the parties in reaching this decision. The discussion below provides background to understand the court's reasoning; the discussion is not intended to be a comprehensive summary of the facts or arguments of the parties.
**Background:**

As alleged in the petitioners' respective petitions:

These actions involve two oil pipelines connected to three offshore platforms known as the Santa Ynez Unit. (CBD Petition, ¶¶ 33, 34; EDC Petition, ¶ 38, 39.) The two oil pipelines at issue (collectively, the Las Flores Pipelines) consist of Las Flores Pipeline CA-324 (Line 324) and Las Flores Pipeline CA-325 (Line 325). (CBD Petition, ¶¶ 39, 40; EDC Petition, ¶ 41.) Prior to 2015, when owned by Plains Pipeline, L.P., a wholly owned subsidiary of Plains All American Pipeline (collectively, Plains), Line 324 was known as Line 901 and Line 325 was known as Line 903. (CBD Petition, ¶ 49; EDC Petition, ¶ 41, 68.)

The Las Flores Pipelines were constructed and operated following approval by Santa Barbara County in 1986. (CBD Petition, ¶ 35; EDC Petition, ¶ 54.) This approval relied upon an environmental impact report (EIR) drafted in 1984 and finalized in 1985. (CBD Petition, ¶ 35; EDC Petition, ¶ 54 & fn. 1.)

In 2015, Line 324 (formerly Line 901) ruptured causing a serious oil spill (Refugio Oil Spill). (CBD Petition, ¶¶ 50-51; EDC Petition, ¶¶ 69-70.) The Las Flores Pipelines were consequently shut down at that time. (CBD Petition, ¶ 52; EDC Petition, ¶ 82.)
In March 2020, the United States and the State of California sued Plains based upon damages from the Refugio Oil Spill in *United States v. Plains All American Pipeline*, United States District Court for the Central District of California, case No. 2:20-cv-02415 (the Federal Action). (CBD Petition, ¶ 59; EDC Petition, ¶ 85.) The Federal Action was settled by a consent decree (Federal Consent Decree) entered by the court. (CBD Petition, ¶¶ 59-62; EDC Petition, ¶¶ 85-88 & fn. 3 [the Federal Consent Decree].)

The Federal Consent Decree required the operator to "remediate all internal or external metal loss anomalies that have an ILI reported depth of 40 [percent] or greater wall loss, within one year of discovery." (CBD Petition, ¶ 60.) The Federal Consent Decree also expressly required that prior to any restart, the operator

"shall apply for a State Waiver through [OSFM] for the limited effectiveness of cathodic protection" and that it "must receive a State Waiver from [OSFM] prior to restarting." (CBD Petition, ¶ 61.) The Federal Consent Decree stated that OSFM has the discretion to require additional terms and conditions if it grants any request for a State Waiver. (CBD Petition, ¶ 62.)

In 2024, Sable acquired the Santa Ynez Unit and the Las Flores Pipelines. (CBD Petition, ¶ 64-65; EDC Petition, ¶ 99.)

---

In April 2024, Sable submitted State Waiver applications to OSFM for Lines 324 and 325. (EDC Petition, ¶ 110 & exhibit B.)

On September 24, 2024, CBD set a letter to OSFM stating that the OSFM had a duty to conduct an analysis and provide opportunities for meaningful public participation under the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.). (CBD Petition, ¶ 68.)
On September 27, 2024, EDC sent a letter to OSFM renewing their March 2024 request for a public process. (EDC Petition, ¶ 112.) EDC also stated that operating the Las Flores Pipeline System without effective cathodic protection was neither anticipated nor reviewed in the 1985 EIR or any project approval, and the potential impacts of doing so have never been fully considered. (*Id*. & exhibit C.) OSFM never responded to the letter. (EDC Petition, ¶ 112.)

On December 17, 2024, OSFM issued State Waivers for Lines 324 and 325 with conditions. (EDC Petition, ¶ 115; CBD Petition, ¶ 71.) OSFM did not offer any sort of public process in advance of its decision. (EDC Petition, ¶ 115.)

On February 11, 2025, the United States Department of Transportation Pipeline and Hazardous Materials Safety Administration (PHMSA) sent a letter to OSFM indicating that it would not object to the OSFM's issuance of the State Waivers. (EDC Petition, ¶ 117.)

On April 15, 2025, CBD filed their verified petition (case No. 25CV02244) seeking writ and injunctive relief asserting three causes of action: (1) violation of federal pipeline safety laws (49 U.S.C. § 60118); (2) violation of state pipeline safety laws (Gov. Code, § 51011); and (3) violations of CEQA.

Also on April 15, 2025, EDC filed their verified petition (case No. 25CV02247) seeking writ, injunctive, and declaratory relief asserting eight causes of action: (1) violation of the federal Pipeline Safety Act (FPSA, 49 U.S.C. § 60118(d))—failure to provide a public process; (2) violation of the FPSA (49 U.S.C. § 60118(d))—failure to provide a statement of reasons; (3) declaratory relief—state waiver procedures required under the FPSA (49 U.S.C. § 60118(d)); (4) abuse of discretion under the FPSA (49 U.S.C. § 60118(d)); (5) violation of the Elder California Pipeline Safety Act of 1981 (CPSA, Gov. Code, § 51011, subd. (c)); (6) abuse of discretion under the CPSA (Gov. Code, § 51011, subd. (b)); (7) declaratory relief—standards and procedures required under the CPSA (Gov. Code, § 51011, subds. (b), (c)); and (8) CEQA—failure to prepare a subsequent EIR (Pub. Resources Code, § 21166).

On June 3, 2025, the court heard petitioners' ex parte applications for an administrative stay, or for an OSC re preliminary injunction and temporary restraining order (TRO). The court granted the petitioners' requests for a TRO and set a hearing on the OSCs for July 18, 2025.

On July 8, 2025, Sable filed demurrers and motions to strike as to the CBD Petition and EDC Petition, all noticed for hearing on September 19, 2025.

On July 18, 2025, the court granted in part petitioners' applications for issuance of preliminary injunctions.

On July 29, 2025, the court entered its written orders granting preliminary injunctions. The orders provide:

"The applications of petitioners in case numbers 25CV02244 and 25CV02247 for issuance of preliminary injunctions are, respectively, granted in part. The applications are granted to enjoin, pending the disposition of these proceedings or further order of the court, the restart of the Las Flores Pipelines, as herein defined, until 10 court days following the filing and service of notice by or on behalf of real parties in interest Sable Offshore Corp., and Pacific Pipeline Company (collectively, Sable) that Sable has

**MINUTE ORDER**

Fire Marshal Exhibits 086

received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. "Restart" shall have the same meaning as in the Federal Consent Decree identified herein. To be effective to commence the 10-court-day period, such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025. The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing or the date of service. The temporary restraining order remains in place until a written order of the court is entered on this preliminary injunction." (Order, filed July 29, 2025, exhibit A.)

On August 27, 2025, petitioners filed their motions to bifurcate "procedural" from "substantive" claims.

On September 8, 2025, Sable withdrew their demurrers and motions to strike. On September 17, 2025, Sable filed their answers to the petitions, admitting and denying allegations in the petitions and asserting 25 (in answer to the CBD Petition) and 19 (in answer to the EDC Petition) affirmative defenses.

On September 19, 2025, the court denied the motions to bifurcate.

On December 2, 2025, on the stipulation of the parties, the court entered its order consolidating both cases with case No. 25CV02244 as the lead case.

On January 5, 2026, Sable filed their motion for reconsideration of the preliminary injunction. The basis for this motion was the assertion of jurisdiction over the Las Flores Pipelines by the federal Pipeline and Hazardous Materials Safety Administration (PHMSA).

On February 27, 2026, the court denied Sable's motion for reconsideration.

On March 16, 2026, petitioners filed their ex parte application for an order to show cause (OSC) why Sable should not be held in contempt for violating the preliminary injunction. Also on March 16, Sable filed their ex parte application for an order dissolving the preliminary injunction.

The court held a hearing on the two ex parte applications on March 17, 2026. Noting that the two applications raised issues too complex reasonably to address at an ex parte hearing, the court continued the hearing on both applications to this hearing date of April 17, allowing all parties to file supplemental briefs.

The parties have filed extensive papers both in connection with the original applications and as supplemental briefing.

**Analysis:**

(1)     Requests for Judicial Notice

In support of its application, Sable requests that the court take judicial notice of the following documents: (Sable Request for Judicial Notice, filed Mar. 16, 2026 [Sable RJN], exhibit A) the Pipeline Capacity Prioritization and Allocation Order, dated March 13, 2026; and (exhibit F) Executive Order No. 14391 (91 Fed.Reg. 13199 (Mar. 13, 2026)).

In further support of its application, Sable also requests that the court take judicial notice of the following documents: (Sable Second Request for Judicial Notice, filed Apr. 1, 2026 [Sable RJN2], exhibit H) Executive Order No. 14156 (90 Fed.Reg. 8433 (Jan. 20, 2025)); and (exhibit J) a minute order, dated

March 23, 2026, in *United States v. Plains All American Pipeline L.P.*, United States District Court for the Central District of California, case No. 2:20-cv-02415-SVW-SSC.

The court will grant judicial notice as to these documents, all of which constitute court records or official acts. (See Evid. Code, § 452, subds. (c), (d).) Judicial notice does not extend to the truth of factual matters set forth in such documents. (*Steed v. Department of Consumer Affairs* (2012) 204 Cal.App.4th 112, 120; *Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 113.)

(2)    Application to Dissolve Preliminary Injunction

"In any action, the court may on notice modify or dissolve an injunction or temporary restraining order upon a showing that there has been a material change in the facts upon which the injunction or temporary restraining order was granted, that the law upon which the injunction or temporary restraining order was granted has changed, or that the ends of justice would be served by the modification or dissolution of the injunction or temporary restraining order." (Code Civ. Proc., § 533.)

The party seeking modification or dissolution of an injunction bears the burden to show that changed circumstances justifies modification or dissolution of the order. (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1504.)

Sable argues that the order of the Secretary of Energy (Sable RJN, exhibit A) constitutes a material change justifying dissolution of the preliminary injunction order.

(A)    Prior Ruling on Preliminary Injunction and Subsequent Events

The court need not here repeat the background and analysis set forth in the court's July 2025 ruling granting plaintiffs' applications for preliminary injunction, which ruling is incorporated by this reference. However, it is useful to highlight past events reflected in the court's record in order to evaluate Sable's motion for dissolution.

In ruling on plaintiffs' applications for preliminary injunction, the court did not find that plaintiffs had made a sufficient evidentiary showing of a likelihood of success on the merits of plaintiffs' causes of action except as related to the State Fire Marshal's findings under the Elder California Pipeline Safety Act of 1981 (CPSA, Gov. Code, § 51010 et seq.).

In opposing the issuance of the preliminary injunction, Sable and OSFM argued that much, if not all, of plaintiffs' claims of harm were premature because those claims depended upon the restart of the Las Flores Pipelines and that multiple approvals were necessary before such restart. As argued by Sable in that opposition:

"Petitioners' alleged harm from restart of the Pipelines [citations] is purely speculative due to the additional approval Sable must obtain before the Pipelines are operational. [Citation.] As Petitioners acknowledge, and as required by the Consent Decree, OSFM must approve a Restart Plan before Sable can restart the Pipelines. [Citations.] When reviewing Sable's Restart Plan, OSFM will necessarily consider the safety of operations and integrity of the pipelines to minimize potential safety risks." (Sable Opposition re Preliminary Injunction, filed July 8, 2025, at p. 19.)

Accepting this argument in part, the court granted the preliminary injunction narrowly. As the court stated in its July 18 ruling:

"As the evidence and arguments of the petitioners most strongly demonstrate, the principal harm to be avoided is the restart of the Las Flores Pipelines without compliance with all applicable law. Because such a restart requires additional approvals, this harm may be avoided in the present by having adequate notice that a restart has been approved and so providing petitioners with a reasonable opportunity to

Fire Marshal Exhibits 088

address compliance issues of such a restart based upon such future approvals. By the same token, Sable would not be materially harmed by being restrained from restarting the Las Flores Pipelines without first providing such adequate notice. The OSFM would not be restrained or constrained in the interim to address all such matters within its regulatory purview.

"Accordingly, the court will narrowly grant the motions for preliminary injunctions to enjoin the restart of the Las Flores Pipelines, as herein defined, until 10 court days following Sable's filing and service of notice that Sable has received all necessary approvals and permits for restarting the Las Flores Pipelines and that Sable intends to commence such restart. 'Restart' shall have the same meaning as in the Federal Consent Decree. Such notice shall be signed by an officer of Sable under penalty of perjury under the laws of the State of California and shall identify each such approval or permit, the agency giving such approval or permit, and the date such approval or permit was given by the agency; the notice need not identify or provide information for any approval or permit given or received prior to June 3, 2025 (the date of the court's grant of the TRO in these matters). The 10-court-day time period shall be extended based upon the manner of service of the notice as provided in Code of Civil Procedure sections 1013 and 1010.6, and shall be calculated from the later of the date of filing and the date of service.

"Under these terms of the preliminary injunction, absent further order of the court, Sable may restart the Las Flores Pipelines 10 court days following the giving of notice of receiving all necessary approvals and permits. Sable is not prevented by this injunction from taking steps towards restarting the Las Flores Pipelines short of actual restart. The OSFM is not impeded by the injunction from taking steps it finds appropriate in its regulatory capacity, including any steps OSFM may find desirable following this order. The conditions of the injunction do not allow restart without prior notice. This notice requirement and intervening waiting period provides reasonable time and opportunity for the petitioners and for the OSFM to take any requisite procedural step they may find appropriate before restart is to occur. The ruling is without prejudice to petitioners to seek additional, further, or other relief from the court, if any is warranted, before such restart. The court would be in a position to assess the evidence and arguments of the parties as they then exist, including, presumably, the fact and effects of actions taken as a result of obtaining the remaining necessary approvals and permits." (Minute Order, filed July 18, 2025, at pp. 13-14.)

Sable has not filed and served a notice under the existing terms of the preliminary injunction to restart the Las Flores Pipelines.

Subsequent to the court's grant of the preliminary injunction, the PHMSA has asserted that the Las Flores Pipelines constitute an interstate pipeline subject to PHMSA's exclusive jurisdiction. (Flores decl., dated Jan. 5, 2026, ¶ 3 & exhibit A.) The PHMSA further issued their own approvals and an emergency special permit. (Flores decl., dated Jan. 5, 2026, ¶¶ 4-7 & exhibits B, C.) These approvals are the subject of proceedings in the Ninth Circuit Court of Appeals, which has not issued a final ruling. (OSFM RJN, filed Feb. 13, 2026, exhibit A; Simmonds decl., dated Jan. 6, 2026, ¶¶ 7-11 & exhibits F-J.)

In denying Sable's request for reconsideration or for modification or dissolution of the preliminary injunction on the grounds of the PHMSA actions, the court stated:

"Sable argues that because the PHMSA has asserted exclusive jurisdiction over the Las Flores Pipelines, the preliminary injunction issued by this court has been preempted. Acknowledging that preemption issues are being resolved in other jurisdictions, including the Ninth Circuit Court of Appeals, OSFM and Petitioners argue that, at least until there is binding authority otherwise, this court is bound by the terms of the Federal Consent Degree and the preliminary injunction remains on a firm foundation.

"The Federal Consent Decree provides, among other things, that 'Plains must receive a State Waiver from the OSFM prior to restarting Line 901.' (Federal Consent Decree, appen. B, art. I, § 1(A).) While Sable now argues that it is not a party to the proceedings in which the Federal Consent Decree was entered, Sable's authority to operate the Las Flores Pipelines derives from rights obtained by Plains, for which Plains was, and remains, subject to conditions including conditions set forth in the Federal Consent Decree. Sable has not demonstrated any right to operate the Las Flores Pipelines separate from the rights derived from Plains and subject to the Federal Consent Decree. (See, e.g., Federal Consent Decree, art. III, § 4 [obligations binding on successors and assigns].)

"The arguments raised by Sable thus question the continuing authority of the Federal Consent Decree. " 'In a stipulated judgment, or consent decree, litigants voluntarily terminate a lawsuit by assenting to specified terms, which the court agrees to enforce as a judgment. [Citations.] As the high court has recognized, stipulated judgments bear the earmarks both of judgments entered after litigation and contracts derived through mutual agreement: "[C]onsent decrees 'have attributes both of contracts and of judicial decrees'; a dual character that has resulted in different treatment for different purposes." As in [*Firefighters v. City of Cleveland* (1986) 478 U.S. 501 [106 S.Ct. 3063, 92 L.Ed.2d 405], the issue before us is "not whether we can label a consent decree as a 'contract' or a 'judgment,' for we can do both." [Citation.]' (*California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1990) 50 Cal.3d 658, 663–664.)

"For purposes of this discussion, it is sufficient to observe that by the Federal Consent Decree, the Las Flores Pipelines may not be restarted (as defined therein) without obtaining a State Waiver from the OSFM. Thus, the Federal Consent Decree by its terms requires authorization from the OSFM, whether that authorization is couched in regulatory, contract, or collateral estoppel terms. The court is not persuaded on this record that administrative actions taken by PHMSA necessarily eliminates OSFM participation in the restart process.

"As pertinent to the preliminary injunction ruling, Petitioners' actions challenge whether OSFM meets OSFM's statutory and regulatory obligations in providing the authorization directed by the Federal Consent Decree. The court's grant of the preliminary injunction is narrow precisely so that all parties will have the opportunity to put this matter in a procedural posture specific to the circumstances existing when Sable is, by its own reckoning, fully authorized and ready to restart the Las Flores Pipelines. At that time the court can resolve, to the extent necessary, the restart issues presented by the parties without being sidetracked by speculative harms (such as those highlighted previously by Sable) and with the benefit of any then-existing legal developments from the federal courts." (Minute Order, filed Feb. 27, 2026, pp. 8-9.)

After the court denied Sable's application on February 27, the President issued an Executive Order which was followed by an order (DPA Order) from the Secretary of Energy under the Defense Production Act of 1950 (DPA, 50 U.S.C. § 4501 et seq.). Sable's current application is based upon Sable's argument that the DPA Order preempts the preliminary injunction. Petitioners and OSFM dispute the effect of the DPA Order on the preliminary injunction.

     (B)    Defense Production Act

As set forth in the DPA Order: "Pursuant to sections 101(a) and (c) of the DPA, Sable is directed to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS, including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California." (DPA Order, § IV(A).) The authority for this order, and the other orders in the DPA Order, is listed as section 101 of the DPA. (DPA Order, § I.)

          **MINUTE ORDER**

Fire Marshal Exhibits 090

Section 101 of the DPA is codified in title 50 United States Code section 4511. (See 64 Stat. 799, ch. 932 (Sept. 8, 1950).)

"The President is hereby authorized (1) to require that performance under contracts or orders (other than contracts of employment) which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order, and, for the purpose of assuring such priority, to require acceptance and performance of such contracts or orders in preference to other contracts or orders by any person he finds to be capable of their performance, and (2) to allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." (50 U.S.C. § 4511(a).)

"(1)    Notwithstanding any other provision of this chapter, the President may, by rule or order, require the allocation of, or the priority performance under contracts or orders (other than contracts of employment) relating to, materials, equipment, and services in order to maximize domestic energy supplies if he makes the findings required by paragraph (3) of this subsection.

"(2)    The authority granted by this subsection may not be used to require priority performance of contracts or orders, or to control the distribution of any supplies of materials, services, and facilities in the marketplace, unless the President finds that--

"(A)    such materials, services, and facilities are scarce, critical, and essential--

"(i)    to maintain or expand exploration, production, refining, transportation;

"(ii)    to conserve energy supplies; or

"(iii)   to construct or maintain energy facilities; and

"(B)    maintenance or expansion of exploration, production, refining, transportation, or conservation of energy supplies or the construction and maintenance of energy facilities cannot reasonably be accomplished without exercising the authority specified in paragraph (1) of this subsection.

"(3)    During any period when the authority conferred by this subsection is being exercised, the President shall take such action as may be appropriate to assure that such authority is being exercised in a manner which assures the coordinated administration of such authority with any priorities or allocations established under subsection (a) of this section and in effect during the same period." (50 U.S.C. § 4511(c).)

"No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter, notwithstanding that any such rule, regulation, or order shall thereafter be declared by judicial or other competent authority to be invalid. No person shall discriminate against orders or contracts to which priority is assigned or for which materials or facilities are allocated under subchapter I of this chapter or under any rule, regulation, or order issued thereunder, by charging higher prices or by imposing different terms and conditions for such orders or contracts than for other generally comparable orders or contracts, or in any other manner." (50 U.S.C. § 4557.)

        (C)    Preemption
Sable argues that the DPA Order is inconsistent with the preliminary injunction and therefore the preliminary injunction is preempted by the federal order. "[C]onflict preemption will be found when simultaneous compliance with both state and federal directives is impossible." (*Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 936.) " ' "[C]ourts are

reluctant to infer preemption, and it is the burden of the party claiming that Congress intended to preempt state law to prove it." ' [Citations.]" (*Ibid*.)

In order to consider this issue, it is important to re-emphasize the limited scope of the court's preliminary injunction. The court determined to enter the preliminary injunction based upon its conclusion that the Federal Consent Decree by its terms requires that Sable, whose rights to use the Las Flores Pipelines are derivative of Plains, obtain State Waivers from the OSFM. The entry of the preliminary injunction rested upon noncompliance of the OSFM to the required State Waivers.

By design, performance consistent with the Federal Consent Decree is performance permitted under the preliminary injunction. Correspondingly, there is no conflict between the Federal Consent Decree and the preliminary injunction. The conflict issue raised by Sable is not a conflict between state law and federal law, but a conflict between the DPA Order, as interpreted here by Sable, and the Federal Consent Decree. To the extent that the Federal Consent Decree is binding on the parties, there is no preemption issue.

(D)    DPA Order and the Federal Consent Decree

The parties have informed this court of the multiple actions and proceedings pending in the federal courts regarding the operation of the Las Flores Pipelines, including particularly efforts to modify the Federal Consent Decree. Nonetheless, in the present, the Federal Consent Decree remains a binding determination as to the requirements for operations of the Las Flores Pipelines. Against this legal backdrop, Sable argues that the DPA Order supersedes the requirements of the Federal Consent Decree.

As quoted above, the DPA is concerned with allocation of resources and performance of contracts. This is backed by the immunity provision of section 4557. Two cases are instructive as to the scope of the DPA in the present context, *Hercules Inc. v. U.S.* (Fed. Cir. 1994) 24 F.3d 188 (*Hercules*), affirmed on other grounds (1996) 516 U.S. 417 [116 S.Ct. 981, 134 L.Ed.2d 47], and *U.S. v. Vertac Chemical Corp.* (8th Cir. 1995) 46 F.3d 803 (*Vertac*).

In *Hercules*, plaintiff chemical manufacturers of Agent Orange (a defoliant used for military purposes during the Vietnam War) were involved in numerous tort actions filed by Vietnam veterans and their families alleging that the veterans' exposure to components in Agent Orange caused cancer and other health problems. (*Hercules, supra*, 24 F.3d at p. 191.) Following settlement of the tort actions, the plaintiffs brought an action against the United States in the Claims Court seeking indemnification for their respective contributions to the settlement. (*Id*. at p. 193.) The Claims Court held for the United States. (*Id*. at pp. 195-196.) Among other things, the Claims Court "rejected the contention that an implied-in-fact contract indemnification term arose from section 707 of the DPA [now, 50 U.S.C. § 4557], because that section merely 'excuses a Government contractor's breach of its other, non-Government contracts which were adversely affected by the priority given to the Government's procurement demands under the DPA.' [Citation.]" (*Id*. at p. 195.)

In affirming the judgment of the Claims Court, the Federal Circuit in *Hercules* stated:

"The language of section 101(a) [now, 50 U.S.C. § 4511(a)] makes it clear that the purpose of the statute is to authorize the President to dictate that preference be given to government contracts which are necessary to promote the national defense. Indeed, section 101 is titled 'Priority in contracts and orders.' Although Thompson correctly observes that the statute authorizes the President to compel both contract performance and contract acceptance, section 101(a) expressly states that the granting of such authority is 'for the purpose of assuring ... priority.' Significantly, section 101(a) does not mention either the specific nature of performance under a DPA contract, or the subsequent use of goods produced under such a contract. Therefore, we conclude that, while the risk imposed by section 101(a) does include the possible need of a contractor to break its contracts with third parties in order to give preference to a DPA

contract, it does not include the risk that the product produced under the DPA contract will be inherently unsafe to users.

"Once a contractor has been compelled to accept a national defense contract under section 101(a), section 707 acts to shield the contractor from liability resulting from compliance with that section. At issue in this case is the nature of the liability against which the contractor is shielded.

"As noted above, in complying with DPA section 101(a) a contractor may have to re-prioritize its outstanding contracts in order to give the required preference to a compelled DPA contract. It stands to reason that the protection provided by DPA section 707 extends only to shield a contractor from breach of contract liability arising as a consequence of such re-prioritization. First, it is a settled rule of statutory interpretation that separate provisions of a statute are to be construed and interpreted together and in light of each other to ascertain the true legislative intent. This court has explained:
" [']When the legislative purpose is incorporated in a complex piece of legislation, such as those establishing a major regulatory or entitlement program, the meaning of any particular phrase or provision cannot be securely known simply by taking the words out of context and treating them as self-evident. This rather straightforward homily is captured in the more pretentious proposition that parts of a statute *in pari materia* must be construed together.[']

"[Citations.] To hold that section 707 protects contractors against a risk which is greater than that created by the statute with which it operates would violate this rule.
"Furthermore, the language of section 707 itself supports the conclusion that the section does not extend the kind of indemnity asserted by Hercules. The second sentence of section 707, which prohibits discrimination 'against contracts to which priority is assigned ...,' reinforces the view that the immunity from suit provided by section 707 does not extend to tort suits in which it is alleged that the item produced by the DPA contractor is inherently unsafe to users. Rather, we conclude that to the extent relevant here, the intended protection of section 707 is analogous to that provided under the common-law doctrine of impossibility of performance, which excuses delay or nonperformance of a contract when the agreed upon performance has been rendered 'commercially impracticable' by an unforeseen supervening event not within the contemplation of the parties at the time the contract was formed. [Citation.] We also agree with the district court, [citation], that if Congress had intended section 707 to impose upon the government the kind of liability asserted by Thompson, it would have said so in clear and unequivocal terms. [Citation.]" (*Hercules, supra*, 24 F.3d at pp. 203–204.)
As explained in *Vertac*, back in 1967, the United States issued a DPA directive ordering a chemical company to accelerate its production and delivery of Agent Orange. (*Vertac, supra*, 46 F.3d at p. 807.) As a result, the chemical company devoted all of its efforts at its Jacksonville, Arkansas, facility to producing Agent Orange. (*Ibid*.) The production of Agent Orange produces hazardous waste, which the chemical company buried on-site. (*Ibid*.) Much later, the United States brought a cost recovery action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA, 42 U.S.C. § 9601 et seq.) because of the disposal of waste at the Jacksonville facility. (*Vertac, supra*, at pp. 805-806.) Among other things, the District Court held as a matter of law that the chemical company was not entitled to immunity under the DPA. (*Id*. at p. 807.)
On appeal in *Vertac*, the chemical company argued that "the language of § 707 is clear and unambiguous and that nothing in its language supports an interpretation that would exclude [the chemical company's] CERCLA liability, or any other liability, arising out of its performance of the Agent Orange contracts. In response, the United States argues that the language of § 707 is not clear and unambiguous and that the interpretation advanced by [the chemical company] would have the absurd result of allowing a government contractor to violate the laws with impunity, so long as it is performing a rated contract." (*Vertac, supra*, 46 F.3d at p. 812.)
The *Vertac* court agreed with *Hercules, supra*, that " 'the protection afforded by section 707 of the DPA extends no further than the risk imposed by section 101(a) of the DPA.' [Citation.]" (*Vertac, supra*, 46 F.3d at p. 812.) The *Vertac* court thus held that the immunity of section 707 did not shield the chemical

company from liability it may have under CERCLA arising out if its performance of the Agent Orange contracts because such immunity would exceed the risk imposed by section 101(a). (*Ibid.*)
In both *Hercules* and *Vertac*, the federal circuit courts held that the scope of immunity under current section 4557 only extends to the risk imposed by section 4511(a) in prioritizing contracts with the United States pursuant to a DPA order. Nothing in section 4511 or, by implication, in section 4557, permits a party subject to a DPA Order to violate other laws, especially including applicable other federal law. Moreover, the reasoning of *Hercules* and *Vertac* strongly implies that the DPA order, by itself, does not permit the violation of applicable state regulatory law—for example, no one suggests that Sable could steal materials or money to fulfill a DPA order without state law consequence under the section 4557 immunity.

There is now, albeit subject to pending proceedings, a binding federal judgment in the Federal Consent Decree which requires favorable action by the OSFM before Sable is permitted to restart the Las Flores Pipelines. As construed by the federal courts, a DPA Order does not by itself permit violation of other federal law to accomplish the goals of the DPA Order. Consequently, in the present procedural posture of the requirements binding on Sable, Sable continues to be obligated to the requirements of the Federal Consent Decree. The DPA Order therefore does not constitute a basis for dissolving or modifying the preliminary injunction.

### (E)    Mootness

Sable also argues that this matter, and the preliminary injunction in particular, is moot because Sable has voluntarily relinquished the State Waivers and the preliminary injunction is premised on the procedures involved with the State Waivers. This argument fails to persuade that the preliminary injunction should be dissolved for two reasons. First, Sable admittedly has not abandoned the project of restarting the Las Flores Pipelines. For the reasons explained above, under the Federal Consent Decree, Sable remains required to obtain approvals from the OSFM. In order to implement the restart project consistent with the Federal Consent Decree, the sufficiency of the OSFM's procedures remain at issue. (See *Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 872-873 [absent abandonment of project, effective relief may still be awarded].) Sable's argument for mootness depends upon its argument that the OSFM can have no further involvement in the project. Under the current procedural posture of the project, the OSFM remains involved.

Second, in granting the preliminary injunction on a limited basis, the court partially agreed with Sable that much of the basis for petitioners' claims were premature because Sable remained engaged in obtaining authorization required under the Federal Consent Decree. Given the continuing requirements of the Federal Consent Decree and the voluntary relinquishment of the State Waivers by Sable, it is unclear that petitioners' other claims are now premature. Again, Sable's argument begins and ends with state law playing no further part in the project. Since the OSFM is bound by state law procedures, in the present circumstances, essential parts of state procedures are incorporated into the Federal Consent Decree. Sable has not persuasively shown that subsequent events make this matter moot and so warrant dissolution of the preliminary injunction.

### (F)    Conclusion

The court is mindful that there are many moving judicial and administrative parts relating to the restart of the Las Flores Pipelines. Sable has not persuaded the court that the DPA Order renders compliance with Federal Consent Decree unnecessary. The Federal Consent Decree requires approvals from the OSFM, which in turn must comply with state procedures in granting such approvals. Sable has not met its burden to show that the preliminary injunction should be dissolved or modified. Sable's motion will therefore be denied.

### (3)    Application for Order to Show Cause re Contempt

As discussed above, the court makes its position clear as to the current vitality of the preliminary injunction in light of recent events. Considering this position, the court is deeply concerned with noncompliance with the preliminary injunction. At the same time, the court is again mindful of the pendency of numerous other proceedings bearing on the Las Flores Pipelines. The court concludes that the most reasonable approach to addressing compliance with the injunction is to continue the hearing on the application for the order to show cause to allow the parties to take whatever steps they deem appropriate based upon this court's conclusions on the status of the preliminary injunction.

*Future Scheduled Hearings:*
May 22, 2026 10:00 AM Ex Parte Hearing
Geck, Donna D- SB Dept 4

ANGELA BRAUN, EXECUTIVE OFFICER                Minutes Prepared by:

_____Preston Frye_____ , Deputy

SC-2411 (Revised July 1, 2013)                **MINUTE ORDER**

Fire Marshal Exhibits 095

# Exhibit 10

Exhibit 10
to Request for Judicial Notice
in Support of Motion to Dismiss
by CAL FIRE, OSFM, and Fire Marshal Berlant

Fire Marshal Exhibits 096

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | *Sable Offshore Corp., et al. v. County of Santa Barbara, et al.* | Page | 1 of 25 |
|---|---|---|---|

Present: The Honorable    DOLLY M. GEE, CHIEF UNITED STATES DISTRICT JUDGE

| DEREK DAVIS | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

Attorneys Present for Plaintiff(s)
None Present

Attorneys Present for Defendant(s)
None Present

**Proceedings: IN CHAMBERS—ORDER RE DEFENDANTS' MOTION TO DISMISS AND INTERVENORS' MOTION TO DISMISS [69] [70]**

On March 16, 2026, Plaintiffs/Petitioners Sable Offshore Corp. ("Sable Offshore"), Pacific Pipeline Company ("PPC"), and Pacific Offshore Pipeline Company ("POPCO") (collectively, "Sable") and Exxon Mobile Corporation ("ExxonMobil"), Mobil Pacific Pipeline Company ("MPPC"), and ExxonMobil Pipeline Company ("EMPCo") (collectively, "Exxon Mobil Affiliates") filed an Amended and Supplemental Petition for writ of mandate and Complaint for declaratory relief. [Doc. # 64 ("First Amended Petition/Complaint" or "FAC").]

Plaintiffs bring four petitions for writ of mandate under California Code of Civil Procedure 1085 and 1094.5. *See* FAC at ¶¶ 118–159. In addition, Plaintiffs bring claims for: (5) injunctive relief pursuant to 42 U.S.C. section 1983 for violation of the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 19 of the California Constitution; (6) declaratory relief that Santa Barbara County Code Chapter 25B (hereinafter "Chapter 25B") as applied violates the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 19 of the California Constitution; (7) declaratory and injunctive relief for violation of the Supremacy Clause of the United States Constitution (Art. VI, cl. 2) and Article XI, Section 7 of the California Constitution; and (8) breach of the February 8, 1988 Celeron Settlement Agreement (the "Celeron Agreement"). *Id.* at ¶¶ 160–195.

Before the Court are two motions to dismiss the constitutional claims and breach of contract claim filed by Respondents/Defendants the Board and the County of Santa Barbara (together, "the County") and Intervenors Environmental Defense Center ("EDC"), Get Oil Out! ("GOO"), Santa Barbara County Action Network ("SBCAN"), Sierra Club, and Santa Barbara Channelkeeper ("SBCK"). [Doc. ## 69-1 ("County MTD"), 70-1 ("Intervenors MTD").] The

---

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk DD |
|---|---|---|

Fire Marshal Exhibits 097

Case 2:25-cv-04165-DMG-CTS    Document 83    Filed 07/14/26    Page 2 of 25    Page ID
#:18788
Case 1:26-cv-01486-KES-CDB    Document 53    Filed 07/31/26    Page 101 of 128

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 2 of 25 |
|---|---|---|---|

motions are fully briefed.  [Doc. ## 73 ("Opp.")[1], 75 ("County Reply"), 76 ("Intervenors Reply").]
The Court held a hearing on the motions on July 10, 2026.

For the reasons set forth below, the Court **GRANTS** the County's and the Intervenors'
motions to dismiss.

**I.**
**FACTUAL AND PROCEDURAL BACKGROUND**

**A.**      **Chapter 25B and the Board**

On September 12, 2025, the Court issued an order resolving cross-motions for summary
judgment brought by Plaintiffs and Intervenors.  [Doc. # 52 ("MSJ Ord.").]  The Court incorporates
by reference its summary of the procedural and factual history of this case from the Order.  *See*
MSJ Ord. at 2–11.[2]  In brief, Plaintiffs sought a writ of mandate following the Santa Barbara
County Board of Supervisors' (the "Board") tie vote on the appeal of the Santa Barbara County
Planning Commission's (the "Planning Commission") decision to approve the transfer of Final
Development Permits ("FDPs") pursuant to Chapter 25B.  *Id.* at 2.  There are three transfer
applications at issue for eight FDPs.  *See id.* at 3.[3]  The FDPs apply to the Santa Ynez Unit
("SYU"), the POPCO facility, and the Las Flores Pipeline (the "Pipeline") (collectively, the
"Facilities").[4]  *Id.*  The Court issued a peremptory writ of mandate pursuant to California Code of
Civil Procedure 1085 directing the Board to "affirm, reverse, or modify" the Planning
Commission's decision in compliance with Santa Barbara County Code Chapter 25B.  *Id.* at 25;
*see also* Doc. # 53 (Peremptory Writ of Mandate).

---

[1] The Court granted Plaintiffs leave to file a consolidated brief in opposition to the motions to dismiss.  *See*
Doc. # 72.

[2] All page citations herein refer to the page numbers inserted by the CM/ECF system.

[3] The transfers and FDPs at issue, specifically, are:  (1) the SYU (FDP No. 87-DP-32cz) from ExxonMobil
to Sable (owner, operator, and guarantor); (2) the POPCO facility (FDP No. 93-FDP-015 and 74-CP-11) from
ExxonMobil Corporation to Sable (operator and guarantor); and (3)  the pipeline (FDP Nos. 88-DPF-033 (RV01)z,
88-CP-60 (RV01), 88-DPF-25cz, 85-DP-66cz, 83-DP-25cv) from EMPCo to Sable (operator) and ExxonMobil to
Sable (guarantor).  MSJ Ord. at 3.

[4] Previously, the Court distinguished between the SYU and POPCO properties as "facilities" and the pipeline
as a separate structure.  *See* MSJ Ord. at 3.  Because Plaintiffs allege all three as "Facilities" (SYU, POPCO, and
pipeline), the Court refers to all three structures collectively as the "Facilities" for clarity.  *See* FAC at ¶ 1.

---

Fire Marshal Exhibits 098

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 3 of 25 |
|---|---|---|---|

Following the Court's MSJ Order and peremptory writ of mandate, the Board held a hearing on November 4, 2025. FAC at ¶ 10. County staff recommended the Board approve the FDP applications and deny the appeals. *Id.* Hartmann and Capps did not recuse themselves. *Id.* Plaintiffs allege Hartmann specifically asked questions related to the potential of a spill and sought confirmation that Sable or its insurers would cover damages from a spill. *Id.* at ¶ 11. She stated, "I do believe it helps to keep Exxon on the hook, both for spill and for abandonment if necessary." *Id.* At the end of the hearing, the Board voted four-to-one to continue the hearing with direction to County staff to prepare written findings denying the FDPs. *Id.* at ¶ 14.

The Board held a hearing on December 16, 2025. *Id.* at ¶ 15. Hartmann recused herself. *Id.* at ¶ 16. The Board voted three-to-one to approve the appeals, deny the FDP applications, and adopt the County's proposed findings in support. *Id.*

**B.      Relevant History of the FDPs**

As relevant to this Order, the FDPs initially were issued in 1987 (SYU), 1988 (Pipeline), and 1993 (POPCO Facilities). *Id.* at ¶ 47. Chapter 25B was enacted in 2001. *Id.* at ¶ 50. In 2023, the Exxon Mobil Affiliates applied to transfer the pipeline-related FDPs from then-owner, guarantor, and operator Plains Pipeline L.P. to themselves. *Id.* at ¶¶ 59, 65. The Planning Commission approved the applications to transfer the pipeline-related FDPs. *Id.* at ¶ 61. Interested parties appealed the Planning Commission's determination to the Board. *Id.* The appellants argued about permit conditions and maintenance, including about the installation and operation of a cathodic protection system. *Id.* at ¶ 62. The Board denied the appeal and affirmed the Planning Commission's approval. *Id.* Following the denial of the appeals, the County transferred the pipeline-related FDPs to the Exxon Mobil Affiliates. *Id.* at ¶ 65.

**C.      The DPA Order**

On January 20, 2025, the President of the United States issued Executive Order 14156. *Id.* at ¶ 110. The Executive Order entitled "Declaring a National Energy Emergency" first set forth the "Nation's dangerous energy situation." 90 Fed. Reg. 8433, 8434. The Executive Order *inter alia* identified the "West Coast" as an area of "insufficient energy production, transportation, refining, and generation" and asserted this status "constitute[d] an unusual and extraordinary threat to [the] Nation's economy, national security, and foreign policy." *Id.* at 8434. The President therefore declared a national emergency. *Id.*

//
//

---

Fire Marshal Exhibits 099

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | | Date | July 14, 2026 |
|---|---|---|---|---|

| Title | *Sable Offshore Corp., et al. v. County of Santa Barbara, et al.* | | Page | 4 of 25 |
|---|---|---|---|---|

The Executive Order directed the following as related to the Defense Production Act, 50 U.S.C. § 4501 *et seq.* (the "DPA"):

> The heads of executive departments and agencies ("agencies") shall identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate the identification, leasing, siting, production, transportation, refining, and generation of domestic energy resources, including, but not limited to, on Federal lands. If an agency assesses that use of either Federal eminent domain authorities or authorities afforded under the Defense Production Act (Public Law 81-774, 50 U.S.C. 4501 *et seq.*) are necessary to achieve this objective, the agency shall submit recommendations for a course of action to the President, through the Assistant to the President for National Security Affairs.

*Id.*

On March 13, 2026, the Secretary of Energy issued a "Pipeline Capacity Prioritization and Allocation Order" (the "DPA Order") pursuant to Executive Order 13603. FAC at ¶ 115, Ex. 11 [Doc. # 64-11]. Executive Order 13603, entitled "National Defense Resources Preparedness," was issued on March 16, 2012. Executive Order 13603 generally "delegate[d] authorities and address[ed] national defense resource policies and programs under [the DPA]." Executive Order 13603 § 101 ("Purpose"). Specifically, Executive Order 13603 allocated the President's "authority . . . to require acceptance and priority performance of contracts or orders (other than contracts of employment) to promote the national defense over performance of any other contracts or orders, and to allocate materials, services, and facilities as deemed necessary or appropriate to promote the national defense" to the Secretary of Energy "with respect to all forms of energy[.]" *Id.* at § 201.

The DPA Order listed Sable as the only covered entity. FAC, Ex. 11 at 2. First, it defined a need for the use of the SYU and transport of oil and gas in light of Executive Order 14156. *Id.* at 2–3. It found Sable informed the Secretary of Energy that "California agencies" were using "state measures" to "block pipeline operations. *Id.* at 3. In light of these findings and "in accordance with Title I of the DPA, that the actions directed [. . .] are appropriate to promote the national defense and to maximize domestic energy supplies . . .[,]" the Secretary of Energy directed Sable to "immediately commence performance under contracts or orders for services . . . for hydrocarbon transportation capacity[.]" *Id.* at 4. "Such contracts for hydrocarbon transportation services . . . shall take priority over other non-[Facilities] hydrocarbon transportation contracts or others for such services from the SYU that are entered, hereinafter are entered, or could as an alternative to the [Facilities] be entered into for hydrocarbon transportation services[.]" *Id.*

---

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk DD |
|---|---|---|

Case 2:25-cv-04165-DMG-CTS    Document 83    Filed 07/14/26    Page 5 of 25    Page ID
#:18786
Case 1:26-cv-01486-KES-CDB    Document 53    Filed 07/31/26    Page 104 of 128

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | | Date | July 14, 2026 |
|---|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 5 of 25 |
|---|---|---|---|

Sable was ordered to "comply with [the DPA Order] immediately" and to maintain compliance "until the conditions necessitating the issuance of this order abate or until Sable is directed otherwise." *Id.*

### D.    RJNs

The County requests judicial notice of Sable Offshore Corp's Form 8-K.  [Doc. # 69-2.] Intervenors request judicial notice of:  (1) a 2015 consent decree entered in a separate action (*United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.* (No. CV 20-2415)); (2) a 2016 letter from the Office of Pipeline Safety for the Pipeline and Hazardous Materials Safety Administration ("PHMSA") to the California Office of State Fire Marshal ("OSFM"); and (3) orders issued in a separate action (*Center for Biological Diversity, et al., v. California Dept. of Forestry and Fire Protection, et al.* (No. CV 25-2244)).  [Doc. # 70-3.]  Since the Court did not rely on these exhibits in reaching its decision, the requests for judicial notice ("RJNs") are **DENIED as moot**.

## II.
## LEGAL STANDARD

Under Rule 12(b)(6), a defendant may seek to dismiss a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint must articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Although a pleading need not contain "detailed factual allegations," it must contain "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In evaluating the sufficiency of a complaint, courts must accept all factual allegations as true.  *Id.* (citing *Twombly*, 550 U.S. at 555).  Legal conclusions, in contrast, are not entitled to the assumption of truth.  *Id.*  The Court draws all reasonable inferences in favor of the nonmoving party.  *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014).

//
//
//
//
//

---

Fire Marshal Exhibits 101

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |

| | | | |
|---|---|---|---|
| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 6 of 25 |

**III.**
**DISCUSSION**

**A.      The Takings Clause**

The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, prohibits the government from taking private property for public use without just compensation.  U.S. Const. amend. V, XIV.   Courts in the Ninth Circuit employ a two-step analysis to determine whether a constitutional taking has occurred.  *Bowers v. Whitman*, 671 F.3d 905, 912 (9th Cir. 2012).  First, the Court determines "whether the subject matter is 'property' within the meaning of the Fifth Amendment."  *Id.*  Upon finding a cognizable property interest, the Court moves to the second step which is whether "there has been a taking of that property, for which compensation is due."  *Id.*

Beyond the classic taking where the government takes physical property, the Supreme Court recognizes regulatory takings where the government "instead imposes regulations that restrict an owner's ability to use his own property."  *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021).  There are two "relatively narrow categories" of regulatory action that constitute *per se* takings under the Fifth Amendment:  (1) where the government "requires an owner to suffer a permanent physical invasion of her property"; or (2) where a regulatory action completely deprives an owner of all economically beneficial use of her property.  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005).  For all other regulatory takings challenges, courts apply the standard set forth in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978).  *Penn Central* instructs courts to consider the following factors as principal guidelines:  (1) the "economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action."  *Id.* at 124. The Court determines whether a regulatory taking has occurred in the second step of the analysis. *See Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 1002 n.17 (9th Cir. 2007), *aff'd sub nom. Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591 (2008).

Article I, section 19 of the California Constitution states that "[p]rivate property may be taken or damaged for public use only when just compensation . . . has first been paid to . . . the owner."  Cal. Const. art. I, § 19.  The Takings Clause in the California Constitution "should be construed 'congruently' with the federal [T]akings [C]lause" with the "minor difference[]" that the California clause also includes damage to property.  *Bottini v. City of San Diego*, 27 Cal. App. 5th 281, 311 (2018); *San Remo Hotel L.P. v. City and Cnty. of San Francisco*, 27 Cal. 4th 643, 664 (2002).

---

**CIVIL MINUTES—GENERAL**

Fire Marshal Exhibits 102

Case 2:25-cv-04165-DMG-CTS   Document 83   Filed 07/14/26   Page 7 of 25   Page ID
#:18788
Case 1:26-cv-01486-KES-CDB   Document 53   Filed 07/31/26   Page 106 of 128

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 7 of 25 |
|---|---|---|---|

### 1.      Property Interest

The parties dispute whether Plaintiffs have a constitutionally protected property interest. Plaintiffs plead the following interests:  (1) the FDPs themselves are vested entitlements that "run[] with the Facilities"; (2) ExxonMobil and MPPC have a vested right to "sell their assets and exit the FDPs without improper County interference"; (3) Sable has a vested right to "operate the Facilities consistent with the FDPs."  FAC at ¶¶ 46–49, 162; Opp. at 21–22.  Plaintiffs characterize these interests as separate from the "transfer paperwork itself."  Opp. at 22.  The Court will address each alleged interest in turn.

#### a.  If the FDPs are rights that run with the Facilities, they are not vested entitlements as to Sable and the Exxon Mobil Affiliates.

Certain property rights "run with the land."  Plaintiffs do not provide authority for the proposition that FDPs are rights that run with the Facilities.[5]  Nonetheless, property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  *Bowers*, 671 F.3d at 912 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).  "Property's core meaning is determined by reference to traditional background principles of property law."  *Zeyen v. Bonneville Joint Dist., # 93*, 114 F.4th 1129, 1142 (9th Cir. 2024) (quoting *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1200 (9th Cir. 1998)).

An FDP is akin to a Conditional Use Permit ("CUP"), which is recognized in California law as a property right that runs with the land rather than the owner.  *See Budd v. City of Santa Maria*, 266 F. App'x 661, 663 (9th Cir. 2008) (citing *Malibu Mountains Recreation, Inc. v. Cnty. of Los Angeles*, 67 Cal. App. 4th 359 (1998)); *see Bennett v. City of Kingman*, 543 F. Supp. 3d 794, 807 (D. Ariz. 2021), *aff'd*, No. 21-16105, 2023 WL 118740 (9th Cir. Jan. 6, 2023) (finding a property interest in a zoning permit analogous to a CUP).  Like a CUP, an FDP vests when it "has been granted and the successful applicant has thereafter acted upon the grant to his or her detriment."  *Malibu Mountains Recreation, Inc.*, 67 Cal. App. 4th at 367.  If the permit or license has been denied, the right has not yet vested.  *Id.*

---

[5] Plaintiffs cite only to the general, well-known, and undisputed principle that "property" is a bundle of rights related to the physical object, including the right to possess, use, and dispose of it.  *See* Opp. at 22 (*citing Gregory v. City of San Juan Capistrano*, 142 Cal. App. 3d 72, 88 (Ct. App. 1983), *disapproved of on other grounds by Fisher v. City of Berkeley*, 37 Cal. 3d 644 (1984) (quoting *U.S. v. General Motors Corp.*, 323 U.S. 373, 377–78 (1945)).

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk <u>DD</u> |
|---|---|---|

Fire Marshal Exhibits 103

Case 2:25-cv-04165-DMG-CTS   Document 83   Filed 07/14/26   Page 8 of 25   Page ID
#:18789
Case 1:26-cv-01486-KES-CDB   Document 93   Filed 07/31/26   Page 107 of 128

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 8 of 25 |
|---|---|---|---|

Sable's FDP applications have conclusively been denied.  FAC at ¶ 16.  Accordingly, even if an FDP is a property right that runs with the Facilities, it is not a vested entitlement as to Sable.  "[T]o be cognizable under the Takings Clause, a constitutionally protected property right must be vested."  *Zeyen*, 114 F.4th at 1141 (citing *Bowers*, 671 F.3d at 912).  With respect to the Exxon Mobil Affiliates, while they can be considered the current owners of the FDPs, Plaintiffs have alleged generalized but not specific facts indicating that the Exxon Mobil Affiliates have acted upon them to their detriment.  *See* FAC at ¶ 171; *Malibu Mountains Recreation, Inc.*, 67 Cal. App. 4th at 367; *see also Bowers*, 671 F.3d at 916 ("[A]n interest in a particular land use does not constitute a protected property interest, unless the interest has vested in equity based on principles of detrimental reliance.").

### b.  Sable does not have a vested right to operate the Facilities with the FDPs or a vested right to approval of the FDP applications.

The Court turns next to Plaintiffs' other interests as pleaded.  Sable's alleged property right to obtain the FDPs—whether characterized as a right "to operate the Facilities consistent with the FDPs" because they have begun operation notwithstanding the denials, or an "interest in the FDPs" and transfer thereof—also is not vested.  *See* FAC at ¶ 48; Opp. at 25.  To determine whether a property right has vested for a Takings Clause claim, the inquiry is "the certainty of one's expectation in the property interest at issue."  *Zeyen*, 114 F.4th at 1141 (quoting *Bowers*, 671 F.3d at 913).  "[I]f the property interest is 'contingent and uncertain' or the receipt of the interest is 'speculative' or 'discretionary,' then the government's modification or removal of the interest will not constitute a constitutional taking."  *Bowers*, 671 F.3d at 913 (quoting *Engquist*, 478 F.3d at 1003–04).  A "vested right" is a "right that so completely and definitely belongs to a person that it cannot be impaired or taken away without the person's consent."  *Zeyen*, 114 F.4th at 1141 (quoting Black's Law Dictionary (12th ed. 2024)).  There must be a "high threshold of certainty" to find an entitlement has vested.  *Id.* at 1141–42 (collecting Supreme Court cases).

Sable cannot claim a vested right to approval of its FDP applications.  An application, by its nature, is contingent and nothing in Chapter 25B suggests Sable is entitled to the Board's approval of these applications as a matter of right.  *See, e.g., Gypsum Res., LLC v. Clark Cnty.*, 674 F. Supp. 3d 985, 1007 (D. Nev. 2023) (finding plaintiff lacked a vested right to approval of its major project application for a residential development).  Sable's desire to receive a favorable disposition on the applications, as strong as it may be, is unilateral.  *See Bennett*, 543 F. Supp. 3d at 807 ("Protected property interests do not arise from mere desires or unilateral expectations: there must be a legitimate claim of entitlement.") (citing *Roth*, 408 U.S. at 577).

Fire Marshal Exhibits 104

Case 2:25-cv-04165-DMG-CTS   Document 83   Filed 07/14/26   Page 9 of 25   Page ID
#:18700
Case 1:26-cv-01486-KES-CDB   Document 93   Filed 07/31/26   Page 108 of 128

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 9 of 25 |
|---|---|---|---|

Indeed, as the Court pointed out in its order on the cross-motions for summary judgment, the Board's review of the FDP applications involves discretionary elements such as *de novo* review and the requirement to make factual findings. *See* MSJ Ord. at 17–19; *cf. Evans Creek, LLC v. City of Reno*, No. 21-16620, 2022 WL 14955145, at *2 (9th Cir. Oct. 26, 2022) (holding plaintiffs should have known their "requests" for annexation might be denied where the government had discretion, based on "multiple statutorily prescribed factors," to deny the request). Contrary to Plaintiffs' arguments, the Court did not find the entire Chapter 25B process was mandatory and ministerial. *See* Opp. at 24. It merely found the duty to act upon the appeal was mandatory and ministerial. MSJ Ord. at 21. In other words, the Board did not have a mandatory and ministerial duty to *approve* the transfer of FDPs to Sable. To the extent Plaintiffs allege otherwise, it is a legal conclusion not entitled to the assumption of truth. *Iqbal*, 556 U.S. at 678.

> **c. The Exxon Mobil Affiliates have a property interest in disposing of the FDPs.**

The Exxon Mobil Affiliates are differently situated from Sable in this action. The Exxon Mobil Affiliates allege they remain owner, operator, guarantor and holder of the FDPs. FAC at ¶ 34. As Plaintiffs allege, and apparent from the plain language of Chapter 25B, the Exxon Mobil Affiliates remain responsible and liable for applicable potential harms contemplated by Chapter 25B. FAC at ¶¶ 18, 34; County Code §§ 25B-4.[6] The Exxon Mobil Affiliates have a property interest in disposing of the FDPs and eliminating their exposure to various liabilities as the current owner, operator, and guarantor of the Facilities. *See* FAC at ¶ 171 ("ExxonMobil and MPPC have a vested right to transfer their assets, including the FDPs"); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 436 (1982) (recognizing "the bare legal right to dispose of the occupied space by transfer or sale").

> **2. Regulatory Taking as to the Exxon Mobil Affiliates**

Given that Plaintiffs have adequately alleged that the Exxon Mobil Affiliates have a property interest in disposing of the FDPs, the next issue before the Court is whether the Exxon Mobil Affiliates have plausibly pled a compensable taking. Plaintiffs do not allege or raise the possibility of a regulatory *per se* taking. Accordingly, the Court turns to the *Penn Central* factors. *See* Opp. at 26. *Penn Central* instructs courts to consider the following factors as principal

---

[6] Chapter 25B provides that until a change of owner, or guarantor, is approved pursuant to the chapter, the former owner or guarantor "shall continue to be liable for compliance with all terms and conditions of the permit and any applicable county ordinances." County Code §§ 25B-4(e), (g). Owners, operators, or guarantors are liable to comply with the FDP conditions. *Id.* at § 25B-4(h). Owners and operators are liable for proper abandonment of the facility. *Id.* at § 25B-4(i).

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk DD |
|---|---|---|

Fire Marshal Exhibits 105

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 10 of 25 |
|---|---|---|---|

guidelines: (1) the "economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." 483 U.S. at 124. The first and second factors are the "primary factors." *Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 630 (9th Cir. 2020) (citing *Lingle*, 544 U.S. at 538–39 (2005)). The inquiry "depends largely upon the particular circumstances in the case at hand." *Id.* (internal quotation marks and punctuation removed).

### a. The Exxon Mobil Affiliates have not adequately alleged an economic impact.

Plaintiffs allege the Exxon Mobil Affiliates remain subject to "potential legal and financial exposure" and have "suffered and continue to suffer substantial damages in an amount to be proven at trial." FAC at ¶¶ 171, 174. Aside from these vague and conclusory statements, Plaintiffs do not allege any economic impact to the Exxon Mobil Affiliates specifically. Nor do they allege sufficient facts that would allow the court to measure the diminution of value of the property as connected to the Exxon Mobil Affiliates' rights. *See Bridge Aina Le'a, LLC*, 950 F.3d at 631.

### b. The Exxon Mobil Affiliates have not adequately alleged reasonable investment-backed expectations.

The Court uses an "objective analysis to determine the reasonable investment-backed expectations of the [o]wners." *Bridge Aina Le'a, LLC*, 950 F.3d at 633 (quoting *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 452 (9th Cir. 2018)). The investment-backed expectations must be *reasonable*. *Id.* "[U]nilateral expectations or abstract needs cannot form the basis of a claim that the government has interfered with property rights." *Id.* (internal quotation marks and punctuation omitted). Plaintiffs argue ExxonMobil "had reasonable, investment-backed expectations that it would be able to sell the Facilities unencumbered to Sable." Opp. at 29. Plaintiffs allege the Exxon Mobil Affiliates "invest[ed] substantial time, money, and resources" and "invested many millions of dollars in the Facilities." FAC at ¶¶ 18, 48.

As a threshold matter, it is unclear what investments the Exxon Mobil Affiliates have made here. The Exxon Mobil Affiliates successfully sold the Facilities to Sable for $625,000,000—this sale proceeded unhindered and without interference from the County. *See* MSJ Ord. at 4. To the extent the Exxon Mobil Affiliates invested money *into* the Facilities while they were owner, operator, and guarantor, it is unclear what return the Exxon Mobil Affiliates expect from those investments beyond the sale price. *See* FAC at ¶ 48 ("Over the years, the Facilities' prior owners, including ExxonMobil, invested many millions of dollars in the Facilities."). Indeed, the Exxon Mobil Affiliates seek to clean its hands of the Facilities entirely.

---

Fire Marshal Exhibits 106

Case 2:25-cv-04165-DMG-CTS   Document 83   Filed 07/14/26   Page 11 of 25   Page ID
#:18792
Case 1:26-cv-01486-KES-CDB   Document 53   Filed 07/31/26   Page 110 of 128

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 11 of 25 |
|---|---|---|---|

Assuming the Exxon Mobil Affiliates could allege with greater specificity what "investments" they made, they fail to allege reasonable expectations at least as to the pipeline. *See* FAC at ¶ 48. As explained above, an FDP application is contingent by its nature and the Exxon Mobil Affiliates' desire to have Sable's FDP applications approved by the County was unilateral. To judge "reasonable expectations," the Court evaluates "the regulatory environment at the time of the acquisition of the property." *Bridge Aina Le'a, LLC*, 950 F.3d at 634.

Chapter 25B was adopted in 2001. FAC at ¶ 50. In 2023, the Exxon Mobil Affiliates submitted applications for transfer of the pipeline-related FDPs from then-owner, guarantor, and operator Plains Pipeline L.P. to themselves. *Id.* at ¶ 59. Indeed, according to Plaintiffs' allegations, this process was characterized by extensive debate and "similar" "argument[.]" *Id.* at ¶¶ 60–65. Such an environment shows the Exxon Mobil Affiliates could not have reasonably expected the FDP process to be a seamless rubber-stamping exercise when they faced "similar" challenges one year prior to the sale of the Facilities to Sable. *See* FAC at ¶ 66; *accord Pakdel v. City & Cnty. of San Francisco*, 636 F. Supp. 3d 1065, 1076 (N.D. Cal. 2022) (finding landlord plaintiffs' expectation to be "continually unencumbered" by government regulation was unreasonable).

As for the SYU and POPCO facilities, however, it became apparent during the July 10, 2026 hearing that it is unclear when those FDPs were transferred to the Exxon Mobil Affiliates. *See* FAC at ¶ 65 (limiting FAC paragraphs 58 to 65 to the pipeline-related FDPs). It is possible that the Exxon Mobil Affiliates came into possession of the FDPs before the enactment of Chapter 25B or that the transfer of those FDPs went without any challenges or appeal.

### c. Chapter 25B's interest in protecting public health and safety counsels against finding a taking.

Finally, the Court considers the character of the County's actions. A taking "may more readily be found when the interference with the property can be characterized as a physical invasion by the government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124.[7] Plaintiffs allege and argue the County acted in accordance with its "duty 'to the public[.]'" Opp. at 32 (citing FAC at ¶¶ 11, 90)). This counsels *against* finding a taking. *See Colony Cove*

---

[7] Plaintiffs raise the principle that the Government should not "force[] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Bridge Aina Le'a, LLC*, 950 F.3d at 636 (quoting *Lingle*, 544 U.S. at 537 (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960))). Although this a "general principle" that speaks to the purpose of the Takings Clause, it does not replace or resolve the third *Penn Central* factor. *Lingle*, 544 U.S. at 542.

---

CV-90             **CIVIL MINUTES—GENERAL**             Initials of Deputy Clerk DD

Fire Marshal Exhibits 107

Case 2:25-cv-04165-DMG-CTS   Document 83   Filed 07/14/26   Page 12 of 25   Page ID
#:18703
Case 1:26-cv-01486-KES-CDB   Document 53   Filed 07/31/26   Page 111 of 128

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
| --- | --- | --- | --- |

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 12 of 25 |
| --- | --- | --- | --- |

*Props., LLC v. City of Carson*, 888 F.3d 445, 454 (9th Cir. 2018) (holding rent control ordinance designed to protect the public counseled against finding a *Penn Central* taking). Indeed, the purpose of Chapter 25B is, in part, to protect public health and safety. *See* MSJ Ord. at 4 (citing County Code § 25B-1). The "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law[.]" *Penn Central*, 438 U.S. at 124 (internal quotation marks omitted).

### d. Leave to amend.

Should a court dismiss certain claims, "[l]eave to amend should be granted unless the district court 'determines that the pleading could not possibly be cured by the allegation of other facts.'" *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (*en banc*)); *see* Fed. R. Civ. P. 15(a)(2). Here, it is possible that Plaintiffs could allege further facts that show an economic impact suffered by the Exxon Mobil Affiliates or investment-backed expectations. Plaintiffs could also allege facts as to the regulatory environment when the SYU and POPCO facility-related FDPs were transferred to the Exxon Mobil Affiliates and potentially add new facts as to the same for the pipeline-related FDPs. They could, in addition, allege facts that establish detrimental reliance on their FDPs which potentially would show a plausible vested property right that runs with the land. The Exxon Mobil Affiliates Takings Clause claims are therefore **DISMISSED with leave to amend**.

With regard to Sable, however, Plaintiffs cannot amend a vested property right into existence—Sable does not hold the FDPs and its unilateral interest in the approval of its applications cannot be cured. Amendment would therefore be futile as to Sable's Takings Clause claim. Sable's Taking Clause claim is **DISMISSED without leave to amend**.

## B.    Federal Preemption

Plaintiffs claim the Board's denial of the FDP applications was preempted pursuant to the Supremacy Clause. U.S. Const. art. VI, cl. 2. Plaintiffs claim preemption by the Pipeline Safety Improvement Act of 2002, 49 U.S.C. § 60101 *et seq.* ("PSA") and the DPA. The Court will address each of these arguments *seriatim*.

### 1.    The Supremacy Clause

Federal law "shall be the supreme Law of the Land . . ., any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under the Supremacy Clause, "if federal law imposes restrictions or confers rights on private actors and a

---

CV-90                               **CIVIL MINUTES—GENERAL**                 Initials of Deputy Clerk DD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 13 of 25 |
|---|---|---|---|

state law confers rights or imposes restrictions that conflict with the federal law, the federal law takes precedence and the state law is preempted." *ConocoPhillips Alaska, Inc. v. Alaska Oil & Gas Conservation Comm'n*, 177 F.4th 964, 968 (9th Cir. 2026) (quoting *Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (internal quotation marks and punctuation removed)).  Federal law includes statutes and regulations "properly adopted in accordance with statutory authorization." *City of New York v. F.C.C.*, 486 U.S. 57, 63 (1988).  For the purposes of the Supremacy Clause, courts analyze local ordinances in the same way as state laws. *See, e.g.*, *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624 (1973).  The Court begins with a presumption against preemption. *Gonzalez v. Arizona*, 677 F.3d 383, 395 (9th Cir. 2012).

Preemption may be express or implied.  At issue with regard to the PSA is express preemption.  Express preemption occurs when Congress enacts a clear statement "expressly" preempting the state law. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig. ("In re Volkswagen")*, 959 F.3d 1201, 1211 (9th Cir. 2020) (citing *Kansas*, 589 U.S. at 202). "If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Id.* (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)).

Plaintiffs' assertion of preemption by the DPA focuses on implied preemption.  Implied preemption has been recognized by the Supreme Court in two circumstances, commonly referred to as "field preemption" and "conflict preemption." *Id.* at 1212.  In these instances, "a high threshold must be met" for the Court to find implied preemption. *Id.*  The Court's analysis is "guided by two cornerstones of . . . pre-emption jurisprudence." *Id.* at 1211 (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)).  First, the "ultimate touchstone" is "the purpose of Congress." *Id.* (quoting *Wyeth*, 555 U.S. at 565).  The purpose is "grounded in the text and structure of the statute at issue." *Id.* (quoting *Kansas*, 589 U.S. at 208) (internal quotation marks and citation removed)).  Second, courts "start with the assumption that the historic police powers of the States" are not preempted "unless that was the clear and manifest purpose of Congress." *Id.* at 1212 (quoting *Wyeth*, 555 U.S. at 565).

Express preemption pursuant to the PSA and implied preemption by the DPA are discussed in greater detail below.

**2.      The Pipeline Safety Act (PSA)**

The PSA's purpose is to "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities by improving the regulatory and

---

CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk DD

Fire Marshal Exhibits 109

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 14 of 25 |
|---|---|---|---|

enforcement authority of the Secretary of Transportation."  49 U.S.C. § 60102(a)(1).  "Federal legislation seeks to provide 'a national hazardous liquid pipeline safety program with nationally uniform minimal standards and with enforcement administered through a Federal–State partnership.'"  *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 877–78 (9th Cir. 2006) (quoting 49 C.F.R. pt. 195, app. A).[8]

As a threshold matter, Intervenors dispute who holds jurisdiction over the Pipeline—the California Office of the State Fire Marshal ("OSFM") or the Pipeline Hazardous Materials Safety Administration ("PHMSA").  Intervenors MTD at 12.  The Intervenors argue the Pipeline is an *intra*state pipeline and therefore the OSFM has jurisdiction.  *Id.*  In contrast, Plaintiffs contend that the Pipeline is an *inter*state pipeline and therefore PHMSA has jurisdiction.  Opp. at 37.  This issue is the subject of litigation in the Ninth Circuit.  *See California v. PHMSA*, Nos. 25-8059, 26-508 (9th Cir. 2026).  The Court need not resolve this question to determine whether the County's action was preempted.

The PSA's express preemption clause applies to both intrastate and interstate pipelines.  If the Pipeline is interstate, the PSA provides that state and local authorities "may not adopt or continue in force safety standards[.]"  49 U.S.C. § 60104(c).[9]  If the Pipeline is intrastate, the PSA allows a state authority with PSA certification (such as OSFM) to "adopt additional or more stringent safety standards . . . only if those standards are compatible with the minimum standards prescribed under this chapter."  *Id.*  No party alleges the County applied for PSA certification.[10]  Regardless of which entity has jurisdiction, however, the County has not attempted to impose any safety standard that would run afoul of either of them.[11]

---

[8] The regulation references the Hazardous Liquids Pipeline Safety Act of 1979 ("HLPSA"), which was combined with National Gas Pipeline Safety Act of 1968 and recodified into the PSA.  *See Olympic Pipe Line Co.*, 437 F.3d at 877 n.14.

[9] There are two "exceptions to this prohibition":  a state authority may enter into an agreement with the Department of Transportation ("DOT") to participate in the oversight of the interstate pipeline facilities, or the DOT may designate an agent to conduct inspections on behalf of the DOT.  *See Olympic Pipe Line Co.*, 437 F.3d at 878 (citing 49 U.S.C. §§ 60106(a), 60117(c)).  Neither are alleged in this action.

[10] The Court notes that a "State agency" under the PSA could include a municipality.  *See Olympic Pipe Line Co.*, 437 F.3d at 880 (citing *Shell Oil Co. v. City of Santa Monica*, 830 F.2d 1052 (9th Cir. 1987)).  The County *could* qualify as a "State agency" delegated authority under the PSA *if* it had applied for certification.  49 U.S.C. § 60104(c).  But it did not.

[11] This obviates Intervenors' argument that the Board vote could not have been preempted because PHMSA "had not asserted control" over the Facilities at the time of the vote.  *See* Intervenors MTD at 9.  It is irrelevant to this action which entity asserted jurisdiction at that point in time.

---

**CIVIL MINUTES—GENERAL**  Initials of Deputy Clerk DD

Fire Marshal Exhibits 110

Case 2:25-cv-04165-DMG-CTS   Document 83   Filed 07/14/26   Page 15 of 25   Page ID
#:18796
Case 1:26-cv-01486-KES-CDB   Document 53   Filed 07/31/26   Page 114 of 128

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |

| | | | |
|---|---|---|---|
| Title | *Sable Offshore Corp., et al. v. County of Santa Barbara, et al.* | Page | 15 of 25 |

The Ninth Circuit's opinion in *Olympic Pipe Line Co.* is instructive. In *Olympic Pipe Line Co.*, the City of Seattle refused to "automatically renew" the Olympic Pipe Line Company's ("Olympic") franchise for the Seattle Lateral Pipeline following an explosion. 437 F.3d at 875. The Washington Utilities and Transportation Commission ("WUTC") applied for and received authority under the PSA to participate in and ensure compliance with the PSA's safety standards. *Id.* at 879. The WUTC was therefore delegated authority to inspect pipeline operators and facilities under the PSA. *Id.* at 880. As in this case, the question was whether actions by an entity outside of PHMSA or a state agency (WUTC/OSFM) were preempted by the PSA. The Ninth Circuit held the PSA expressly preempted the City of Seattle's "attempt to impose safety regulations" on the Seattle Lateral Pipeline. *Id.*

The key distinction between *Olympic Pipe Line Co.* and this case is that the County's actions are not analogous to those taken by the City of Seattle. The City of Seattle demanded Olympic respond to 33 safety concerns, including a request to conduct an additional hydrostatic test of the Seattle Lateral Pipeline after a section of the pipeline failed prior tests requested by a different municipality. *Id.* at 875. Because Olympic refused, the City of Seattle ordered the suspension of Olympic's operations of the Seattle Lateral Pipeline but indicated it would rescind the order if Olympic would perform the hydrostatic test and two inspection digs. *Id.* Here, even assuming all facts alleged in the FAC are true, Plaintiffs have not shown a comparable attempt by the County to impermissibly regulate pipeline "safety standards."

The text of the PSA's preemption clause is explicit in asserting jurisdiction over "safety standards" for interstate and intrastate pipelines. *See* 49 U.S.C. § 60104(c). Where a statute contains an express preemption clause, the "plain wording of the clause" is the first focus of the court and "contains the best evidence of Congress' pre-emptive intent." *In re Volkswagen*, 959 F.3d at 1211 (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). Here, Plaintiffs point to comments made by certain Board members in advance of the December 2025 vote. *See* FAC at ¶¶ 89–100, 180–182. Even assuming Hartmann affected the vote despite her decision to recuse herself, her comments do not come near to the preempted actions by the City of Seattle in *Olympic Pipe Line Co. See, e.g.,* FAC at ¶ 92 (Hartmann stated other agencies' accusations of violations, presumably against Sable, "are not necessarily related to Sable's ability to ensure the facilities are safe for operation."). Nor do Hartmann's questions about insurance in the event of a spill equate to imposing safety standards upon Plaintiffs. *See* Opp. at 35 (citing FAC at ¶¶ 11, 92, 134). Plaintiffs do not allege the Board, at any point, has ordered them *through the FDP process* to cease operations in the Facilities. The PSA provides for this authority, but Chapter 25B does not. *See* 49 U.S.C. § 60117(p) (providing the Secretary of Transportation authority to issue an emergency order imposing emergency restrictions, prohibitions, and safety measures). The Board members' comments do not plausibly amount to an attempt to regulate "safety standards."

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|----------|---------------------------|------|---------------|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 16 of 25 |
|-------|---------------------------------------------------------------------|------|----------|

Chapter 25B does include generalized considerations of "safety." After all, one of Chapter 25B's purposes is to "safeguard the natural resources and environment of the county of Santa Barbara, by ensuring [] safe operation[.]" County Code § 25B-1. The Board is required to make the factual finding that the new operator "does not reflect a record of non-compliant or unsafe operations[.]" *Id.* at § 25B-10(a)(9). Plaintiffs do not claim Chapter 25B alone, outside of these errant comments by Board members, is facially preempted by the PSA. *See* Opp. at 34 n.9. Indeed, Chapter 25B largely dictates *who* can hold the FDPs and who *bears* liability and responsibility for certain standards. The PSA appears to divest itself from such concerns by incorporating a savings clause for tort claims. *See* 49 U.S.C. § 60120 ("This chapter does not affect the tort liability of any person."). Plaintiffs' broad theory of preemption would transform any passing mention of "safety" in a local ordinance into an act preempted by the PSA's jurisdiction over "safety standards." That is not consistent with the weight of authority.[12]

At the July 10, 2026 hearing, Plaintiffs represented that PHMSA approved Sable as operator of the Facilities purportedly in December of 2025. Plaintiffs did not include this allegation in their amended complaint. Because it is unclear what factors were considered in PHMSA's findings and the extent of overlap, if any, with findings required under Chapter 25B, it is *possible* that aspects of PHMSA's approval of Sable conflict with the Board's denial. The Court also notes, however, that ongoing litigation in the Ninth Circuit may determine that the OSFM has jurisdiction over the Facilities rather than the PHMSA, which could render PHMSA's approval arguably inapplicable.

---

[12] The County's and the Intervenors' out of circuit authorities are not binding upon this Court, but are persuasive and are consistent with *Olympic Pipe Line Co.* and this Court's Order insofar as they draw distinctions between mere mentions of safety and actual safety standard regulations. *See Couser v. Shelby Cnty., Iowa*, 139 F.4th 664, 671 (8th Cir. 2025), *cert. denied*, 146 S. Ct. 1509 (2026) ("The evidence supports that, at their core, the setbacks regulate safety [. . .]. Their direct and substantial effect on safety [is preempted by the PSA]. This holding does not prohibit local governments from considering safety, nor prevent them from enacting all zoning ordinances, as the Counties suggest. **This court emphasizes the distinction between safety standards—which the PSA preempts— and safety considerations—which the PSA does not preempt.**") (emphasis added); *Washington Gas Light Co. v. Prince George's Cnty. Council*, 711 F.3d 412, 421 (4th Cir. 2013) ("Even assuming safety concerns played some part in the enactment of the County Zoning Plans, those concerns would have been merely incidental to the overall purpose of the County Zoning Plans. This is insufficient to justify a finding that the County Zoning Plans were, in fact, safety regulations."); *Texas Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 212 (5th Cir. 2010) ("Here, Congress has spoken clearly. The PSA preempts safety standards for natural gas pipeline facilities. Grand Prairie's setback requirement is not a safety standard in letter, purpose, or effect. It may remain in force.").

---

**CIVIL MINUTES—GENERAL**                   Initials of Deputy Clerk DD

Fire Marshal Exhibits 112

Case 2:25-cv-04165-DMG-CTS   Document 83   Filed 07/14/26   Page 17 of 25   Page ID
#:18798
Case 1:26-cv-01486-KES-CDB   Document 53   Filed 07/31/26   Page 116 of 128

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 17 of 25 |
|---|---|---|---|

Nonetheless, because it is uncertain whether Plaintiffs could allege new facts that would cure the deficiencies in the pleadings as to their PSA-related preemption claim, Plaintiffs' Supremacy Clause claim based on the PSA is **DISMISSED with leave to amend**.

**3.      The Defense Production Act (DPA)**

Plaintiffs allege the Board used Chapter 25B "as a tool to frustrate Sable's compliance with the DPA Order" and the denial of the FDP applications "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress and the Executive Branch."  FAC at ¶ 183.

As a threshold matter, the County and the Intervenors contest whether this claim can be plausible considering the DPA Order was issued approximately three months *after* the Board denied the FDP applications.  *See* County MTD at 20; Intervenors MTD at 17.  Plaintiffs argue their request for relief is prospective based upon current preemption rather than retroactive preemption.  *See* Opp. at 39, 42.  As a matter of logic, it is patently implausible that the Board denied the FDP applications in order to frustrate an order that did not exist at the time of its decision.  Plaintiffs do allege, however, a claim of conflict preemption to the effect that it is impossible for Sable to comply with both the DPA Order and the Board's denial of the FPD applications and/or the denial stands as an obstacle to the implementation of the DPA Order.  *See* Opp. at 39–40; FAC at ¶ 183.  This current alleged conflict may exist, and persist, regardless of whether the Board was aware of the DPA Order at the time of the vote.  *See Gonzalez v. Drew Indus. Inc.*, 750 F. Supp. 2d 1061, 1064 (C.D. Cal. 2007) (citing *Michigan Canners & Freezers Ass'n. v. Agricultural Marketing and Bargaining Board*, 467 U.S. 461, 469 (1984)) ("The general rule is that federal law does not displace existing state law.  Preemption is the exception to this rule.").

Conflict preemption occurs where a state law "actually conflicts with federal law[.]"  *In re Volkswagen*, 969 F.3d at 1212 (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)).   An actual conflict may arise when "compliance with both state and federal law is impossible" or where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id.* (quoting *Oneok, Inc. v. Learjet*, Inc., 575 U.S. 373, 377 (2015)) (internal quotation marks removed).  To evaluate obstacle preemption, the Court must identify the "full purposes and objectives of the federal law from the text and structure of the statute at issue."  *Id.* (internal quotation marks omitted).

The Court begins with the text and structure of the DPA to ascertain Congressional purpose.  *See In re Volkswagen*, 959 F.3d at 1211.  The DPA was enacted to "ensure the vitality

---

Fire Marshal Exhibits 113

Case 2:25-cv-04165-DMG-CTS   Document 83   Filed 07/14/26   Page 18 of 25   Page ID
#:18799
Case 1:26-cv-01486-KES-CDB   Document 93   Filed 07/31/26   Page 117 of 128

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
| --- | --- | --- | --- |

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 18 of 25 |
| --- | --- | --- | --- |

of the domestic industrial base" and "provide for the national security [and] the national defense preparedness effort of the United States Government." 50 U.S.C. §§ 4502(a)(2), (3). To advance these goals, the President is provided with "an array of authorities to shape national defense preparedness programs and to take appropriate steps to maintain and enhance the domestic industrial base[.]" *Id.* at § 4502(a)(4). The President's authorities include the following abilities: to require persons/companies to prioritize and accept contracts; to incentivize the domestic industrial base to expand the production and supply of goods (through loans, loan guarantees, purchases, procurement and installation of equipment); and to establish agreements with private industry, block mergers/acquisitions/takeovers, and employ specific persons. *See* Michael H. Cecire & Heidi M. Peters, Cong. Rsch. Serv., R43767, The Defense Production Act of 1950: History, Authorities, and Considerations for Congress (2020) (summarizing 50 U.S.C. §§ 4511– 4589). The President may delegate these authorities to other executive branch officials. *See id.*; *see, e.g.,* 50 U.S.C. § 4511(d).

As evidenced by the text and structure of the statute, the DPA is designed to provide the President delegable authorities to influence domestic industry in the interest of national security through market vehicles such as contracts, loans, employment, and procurement. Regarding contracts specifically, the DPA authorizes the President to:

> require that performance under contracts or orders . . . which he[/she] deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order, and, for the purpose of assuring such priority, to require acceptance and performance of such contracts or orders in preference to other contracts or orders by any person he[/she] finds to be capable of their performance[.]

50 U.S.C. § 4511(a)(1).[13] With this "grounding" in mind, the Court turns to the DPA Order.

First, Plaintiffs argue the DPA Order, issued by the Secretary of Energy, is the source of preemption rather than the DPA itself. *See* Opp. at 41. The Supreme Court has ruled that a statutorily authorized Executive Order can create rights with preemptive power under the

---

[13] Plaintiffs cite to the district court's order in *Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382, 388 (N.D. Tex. 2022), *aff'd*, No. 22-10171, 2023 WL 2645553 (5th Cir. Mar. 27, 2023). *See* Opp. at 40 n.12. *Johnson* is distinguishable. The DPA Order references the President's delegated authority under clause (a)(1) of section 4511 while the district court's order in *Johnson* relies upon clause (a)(2). *See* 50 U.S.C. § 4511(a)(2) ("The President is hereby authorized . . . (2) to allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense.").

---

CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk DD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 19 of 25 |
|---|---|---|---|

Supremacy Clause. *See Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 273 n.5 (1974). Similarly, the DPA as enacted by Congress delegated specific authority to the President and provided for the delegation of this authority to executive officers such as the Secretary of Energy. *Accord City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1108 (9th Cir. 2022) ("DPA directives are basically regulations."); *Washington v. Monsanto Co.*, 738 F. App'x 554, 556 (9th Cir. 2018) (referring to letters sent by the federal government directing a company to purchase certain goods under the DPA as "federal law").

Plaintiffs did not provide—and the Court could not locate—authority for the proposition that, in the event of a conflict, an order by an agency official can override a Congressionally enacted statute.[14] Such a proposition would grant agency officials freewheeling authority to overstep or singlehandedly create federal law. Even a federal regulation cannot preempt state law more than the statute it implements. *ConocoPhillips Alaska, Inc.*, 177 F.4th at (citing *Cohen v. Apple Inc.*, 46 F.4th 1012, 1028 (9th Cir. 2022)). Moreover, the Supreme Court has ruled that the Supremacy Clause "gives priority to 'the Laws of the United States,' not . . . preferences of federal officers." *Kansas*, 589 U.S. at 212 (quoting Art. VI, cl. 2.). Because the Court finds *infra* that the DPA and the DPA Order do not conflict, however, it need not resolve these broad questions.

The DPA Order directs Sable to "immediately commence performance under contracts or orders for services, including contracts or orders hereinafter entered into or sought" for entities including the Facilities at issue. DPA Order at 4. "Such contracts for hydrocarbon transportation services [for the Facilities] shall take priority over other non-[Facilities] hydrocarbon transportation contracts or orders for such services from the [Facilities] that are entered, hereinafter are entered, or could as an alternative to the [Facilities] be entered into for hydrocarbon transportation services[.] [. . .] For purposes of assuring such priority, Sable is directed to accept and perform such contracts or order up to and so long as the [pipeline] has capacity to transport." *Id.*

Sable argues the federal government, the State of California, and Sable "all [understand] the DPA Order to require Sable to immediately operate the Facilities." Opp. at 40. This proposition, however, is not alleged in the Complaint. Plaintiffs cite to documents filed in other cases involving Plaintiffs and the Facilities. See Opp. at 40. These are not documents attached to the FAC, incorporated by reference in the FAC, or matters of judicial notice. *See United States*

---

[14] Plaintiffs cite to an unpublished decision by the Ninth Circuit. *See* Opp. at 41 (citing *Silver Dollar Grazing Ass'n v. U.S. Fish & Wildlife Serv.*, No. 07-35612, 2009 WL 166924, at *2 (9th Cir. Jan. 13, 2009)). The Ninth Circuit in *Silver Dollar Grazing Ass'n* did not address whether an order by an agency official can prevail over a conflicting Congressionally enacted statute. It merely held that an executive order may have the force of law and therefore be reviewable under the APA. *See id.*

---

CV-90                    **CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk DD

Fire Marshal Exhibits 115

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | | Date | July 14, 2026 |
|---|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | | Page | 20 of 25 |
|---|---|---|---|---|

*v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Judicial notice for the truth of the facts from another case is not appropriate. *See Wyatt v. Terhune*, 315 F.3d 1108, 1114 n. 5 (9th Cir. 2003), *overruled on other grounds by Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014) (*en banc*); *see also* Fed. R. Evid. 201 ("The court may judicially notice a fact that is *not subject to reasonable dispute . . . .*") (emphasis added). Accordingly, the Court may not consider this evidence without converting the Rule 12(b)(6) motion into a Rule 56 motion for summary judgment. *Id.* at 907. The Court declines to do so considering the current stage of the case, the still unresolved petitions for writ of mandate, and ongoing litigation regarding the effect of the DPA Order.[15] See FAC at ¶¶ 118–158.

Even if Sable *believes* the DPA Order commands it to commence operation of the Facilities, it is evident that Plaintiffs do not allege in the FAC any applicable contracts or orders for services *prioritized* over other contracts or orders pursuant to both the DPA and the DPA Order. *See accord Hercules Inc. v. United States*, 24 F.3d 188, 191 n.4 (Fed. Cir. 1994), *aff'd*, 516 U.S. 417 (1996) ("The DPA authorizes the President, *inter alia*, to require acceptance and performance of contracts which he deems necessary or appropriate to promote the national defense *in preference to* other contracts.") (emphasis added). To the extent Plaintiffs argue other contracts or orders are not required, this interpretation of federal law appears to be an erroneous conclusion of law and is not grounded in the language of the DPA or the DPA Order. *See Iqbal*, 556 U.S. at 678. Without these other contracts or orders, Plaintiffs' claim that it cannot comply with the DPA or the DPA Order (whether due to impossibility or obstacle preemption) is deficient—there are no alleged contracts or orders to perform under or deprioritize. Accordingly, Plaintiffs' Supremacy Clause claim premised on the DPA is **DISMISSED with leave to amend**.

## C.    State Preemption

Plaintiffs claim the California Department of Fish and Wildlife Office of Spill Prevention and Response ("OSPR") has the "exclusive authority to require that owners and operators have the financial wherewithal to cover costs associated with a worst-case-scenario incident[] and sets specific requirements." FAC at ¶ 186. The California Constitution provides "[a] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." Cal. Const. art. XI, § 7. Conflicting ordinances are preempted by state law and therefore void. *O'Connell v. City of Stockton*, 41 Cal. 4th 1061, 1065 (2007). The party alleging preemption has the burden of demonstrating it. *Chevron U.S.A. Inc. v. Cnty. of Monterey*, 15 Cal. 5th 135, 142 (2023).

---

[15] The parties dispute whether the DPA Order is a valid extension of the President's authority to dictate the prioritization of contracts under the DPA—this is the subject of litigation in a separate case and this Court need not resolve the issue at this time. *See* Opp. at 41 and *California v. Wright*, CV No. 26-3396-SVW (SSCx) (C.D. Cal. Mar. 31, 2026).

---

**CIVIL MINUTES—GENERAL**            Initials of Deputy Clerk DD

Fire Marshal Exhibits 116

Case 2:25-cv-04165-DMG-CTS   Document 83   Filed 07/14/26   Page 21 of 25   Page ID
#:18802
Case 1:26-cv-01486-KES-CDB   Document 53   Filed 07/31/26   Page 120 of 128

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 21 of 25 |
|---|---|---|---|

A conflict exists where the ordinance "duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication." *O'Connell*, 41 Cal. 4th at 1065 (quoting *Sherwin-Williams Co. v. City of Los Angeles*, 4 Cal. 4th 893, 897 (1993)). An ordinance "duplicates" state law when it is "coextensive," "contradicts" state law when it is "inimical to or cannot be reconciled with state law," and "enters a field fully occupied by state law" when the Legislature expressly or impliedly wholly occupies the field. *Id.* The Legislature may impliedly occupy an area of law where: "(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the locality." *Id.* (internal quotation marks omitted).

Here, Plaintiffs recognize the lack of an express preemption provision. *See* Opp. at 43. Accordingly, any preemption here must be implied. Plaintiffs argue the Legislature implicitly occupied this area of law—the financial responsibility of owners and operators for oil spills—by regulating full and complete coverage of the area. *See* Opp. at 43.

"Field preemption generally exists where the Legislature has comprehensively regulated in an area, leaving no room for additional local action." *T-Mobile W. LLC v. City & Cnty. of San Francisco*, 6 Cal. 5th 1107, 1122 (2019). The Court must look to the language of the statute and the "whole purpose and scope of the legislative scheme." *O'Connell*, 41 Cal. 4th at 1068 (quoting *Am. Fin. Servs. Assn. v. City of Oakland*, 34 Cal. 4th 1239, 1252 (2005)). The financial certificate requirement was enacted as part and parcel of the State of California's Lempert-Keene-Seastrand Oil Spill Prevention and Response Act ("Lempert-Keene Act"). *See Ass'n of Am. R.R. v. California Off. of Spill Prevention & Response*, 113 F. Supp. 3d 1052, 1055 (E.D. Cal. 2015). The Lempert-Keene Act regulates the transportation of "oil through or near the waters of the state" and accordingly imposes requirements on various forms of transportation that may pass through waters (tank vessels, railroads) and maritime based buildings (marine terminals, facilities that impact waters). *See id.*; Cal. Gov't Code § 8670.37.51. The financial certificate requirement follows if owners or operators of any applicable entity are required to have an oil spill contingency plan pursuant to a separate section of the Lempert-Keene Act. *See* 14 C.C.R. § 791.6 ("Purpose and Scope").

The Lempert-Keene Act provides "[a]n owner or operator of a facility where a spill could impact waters of the state shall apply for and obtain a certificate of financial responsibility issued by the administrator for the facility or the oil to be handled, stored, or transported by the facility."

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk <u>DD</u> |
|---|---|---|

Fire Marshal Exhibits 117

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | | Date | July 14, 2026 |
|---|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 22 of 25 |
|---|---|---|---|

Cal. Gov't Code § 8670.37.51(d)(1). The certificate is "conclusive evidence that the person or entity holding the certificate is the party responsible for the specified vessel, facility, or oil for purposes of determining liability *pursuant to this chapter*." *Id.* at § 8670.37.52 (emphasis added). If a spill occurs, the Lempert-Keene Act imposes strict liability for responsible parties and provides for a variety of damages. Cal. Gov't Code § 8670.56.5; *see Loretz v. Regal Stone, Ltd.*, 756 F. Supp. 2d 1203, 1216 (N.D. Cal. 2010).

Plaintiffs' claim of state law preemption does not hold up under close inspection. Upon review of the Lempert-Keene Act, it is evident that it did not regulate the area so comprehensively that it left no room for additional local action by the County. The Lempert-Keene Act is cabined to vessels and buildings that affect waters—these arguably do not include facilities such as sections of the pipeline here that run underground. The Lempert-Keene Act is tailored specifically to oil spills into state waters, including the imposition of oil spill contingency plans. The financial certificate follows the owner or operator who is required to have an oil spill contingency plan. The certificate also only designates who is strictly liable under the Lempert-Kenne Act in the event of a spill. Even if strict liability is imposed, the certificate does not "restrict[] or set[] financial limitations on any duty, obligation, or liability of the responsible party to the State of California or any other public or private entity." 14 C.C.R. § 791.6(d).

Indeed, rather than assert sole control over liability for oil spills, the Lempert-Keene Act explicitly accommodates civil penalties from violations of "local laws." *Id.* ("This includes civil penalties assessed pursuant to all applicable federal, state and local laws."). It also contemplates payments "to cover liabilities arising from a discharge of oil" that could *also* arise separately under "any other provision of federal, state, or local law." Cal. Gov't Code § 8670.56.5(k). Finally, it expressly declines to "limit the authority of another state or local agency to implement and enforce state or local laws under its jurisdiction" or to "limit the authority of an agency to enforce existing permits or permit conditions." Cal. Gov't Code § 8670.7(h)(3). Considering California courts are "reluctant to invoke the doctrine of implied preemption," based upon the Lempert-Keene Act's language, purpose, and general scheme, the Court cannot conclude the Legislature implicitly intended to comprehensively occupy the field. *Garcia v. Four Points Sheraton LAX*, 188 Cal. App. 4th 364, 374 (2010).

Even if the Lempert-Keene Act occupied the field of oil spill contingency planning, Plaintiffs have not alleged a plausible conflict. Plaintiffs allege preemption based, again, on isolated comments by Board members in the November and December hearings. Specifically, Plaintiffs point to Hartmann's question of whether the FDPs require the owner or operator to have the financial responsibility to clean up a spill and Capps' statement that Sable has "unresolved financial concerns." FAC at ¶ 187. These comments do not plausibly constitute a claim that the

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk DD |
|---|---|---|

Fire Marshal Exhibits 118

Case 2:25-cv-04165-DMG-CTS   Document 83   Filed 07/14/26   Page 23 of 25   Page ID
#:18804
Case 1:26-cv-01486-KES-CDB   Document 53   Filed 07/31/26   Page 122 of 128

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | | Date | July 14, 2026 |
|---|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | | Page | 23 of 25 |
|---|---|---|---|---|

County impermissibly infringed on the field of oil spill contingency planning.  The FAC is devoid of any allegations that the County imposed any requirements around oil spills.  Furthermore, Chapter 25B is not limited to oil spills.  It also designates who is liable in the event of abandonment of the facility, which can occur absent an oil spill, and liability for non-oil spill related fires or injuries to members of the public that occur outside of the facility's premises.  County Code §§ 25B-3, 25B-4(i), 25B-10(a)(9).  Chapter 25B also does not *impose* liability in any way, shape, or form.  It merely identifies the owner, operator, or guarantor of the facility.

Amendment would be futile as the Court finds there is no implied field preemption as a matter of law.  In light of the foregoing, Plaintiffs' state preemption claim based on the Lempert-Keene Act (OSPR) is **DISMISSED without leave to amend**.

**D.     The Celeron Settlement Agreement**

"The interpretation of a settlement agreement is governed by principles of state contract law." *Botefur v. City of Eagle Point, Or.*, 7 F.3d 152, 156 (9th Cir. 1993).  To state a breach of contract claim under California law, the plaintiff must allege:  (1) the existence of a contract; (2) performance; (3) breach; and (4) resulting damages.  *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 610 (9th Cir. 2020).

On February 8, 1988, the Celeron Pipeline Company of California (hereinafter "Celeron") entered into a binding settlement agreement with the County.  FAC at ¶ 43.  Plaintiffs assert they are successors to the Celeron Agreement.  *Id.* at ¶ 191 n.11.  According to Plaintiffs, the parties agreed that "[a]s to areas covered by Part 195, the County is generally without jurisdiction." *Id.* (quoting the Celeron Agreement).  "Part 195" is a regulation promulgated by the Department of Transportation.[16]  In the Celeron Agreement, the County allegedly agreed it had "no authority over the design, construction and operation" of the pipeline except as set forth in the agreement and an attached final development plan/conditional use plan.  FAC at ¶ 43 (quoting the Celeron Agreement).  The Celeron Agreement also provided the County cannot take "any action which involve[s] Part 195 areas and is not authorized under 2.5.1 [in the Celeron Agreement], including suspending or withholding ministerial permits, and which will stop or delay [the permit holder's] construction and/or operation." *Id.* (quoting the Celeron Agreement).

Plaintiffs allege the County breached the Celeron Agreement by failing to approve the FDP applications.  FAC at ¶ 191.  Specifically, Plaintiffs claim the findings made by the Board in the

---

[16] As explained *infra*, "Part 195" refers to a regulation promulgated by the Department of Transportation pursuant to the HLPSA.  *See* 49 C.F.R. pt. 195; *see Exxon Corp. v. U.S. Sec'y of Transp.*, 978 F. Supp. 946, 947 (E.D. Wash. 1997).  The HLPSA was recodified into the PSA.  *See Olympic Pipe Line Co.*, 437 F.3d at 877 n.14.

Fire Marshal Exhibits 119

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | | |
|---|---|---|---|---|
| Case No. | **CV 25-4165-DMG (CTSx)** | | Date | July 14, 2026 |

| | | | | |
|---|---|---|---|---|
| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | | Page | 24 of 25 |

December 2025 hearing violated the Celeron Agreement's term that the County lacked authority over the "operation" of the pipeline. *Id.* at ¶ 193. As a result of this breach, Plaintiffs allege Sable has "incur[ed] excessive costs to operate" the pipeline. *Id.* at ¶ 194.

Plaintiffs do not claim Chapter 25B as enacted violates the Celeron Agreement. Indeed, this would not be permitted because "a municipality may not 'contract away' its legislative and governmental functions." *Discovery Builders, Inc. v. City of Oakland*, 92 Cal. App. 5th 799, 810 (2023) (quoting *Cnty. Mobilehome Positive Action Comm., Inc. v. Cnty. of San Diego*, 62 Cal. App. 4th 727, 736 (1998)). Rather, Plaintiffs claim that Chapter 25B as applied through the Board's comments during deliberations violates the Celeron Agreement. *See* Opp. at 45. "Part 195" is a regulation promulgated by the Department of Transportation pursuant to the HLPSA, which was recodified into the PSA. *See* 49 C.F.R. pt. 195; *Exxon Corp. v. U.S. Sec'y of Transp.*, 978 F. Supp. 946, 947 (E.D. Wash. 1997); *Olympic Pipe Line Co.*, 437 F.3d at 877 n.14. The Celeron Agreement's restrictions, including against the withholding of "ministerial permits," are defined pursuant to the PSA. For the same reasons explained above, *see* Part III(B)(2), the PSA governs safety standards—but the Board's deliberations did not delve into safety standards. The County complied with the Celeron Agreement and Plaintiffs therefore have not alleged a plausible breach. Leave to amend this claim as to terms in the Celeron Agreement related to "Part 195" would be futile. *See id.*

To the extent Plaintiffs allege a term of the Celeron Agreement separate from Part 195 bars "withholding" of "ministerial permits" which "delay operation," the FAC is devoid of the facts needed to plead a plausible breach of contract claim. Plaintiffs did not attach a copy of the Celeron Agreement to the FAC or submit it for judicial notice. It is unclear what section "2.5.1" refers to or what "ministerial permits" the contracting parties considered at the time the Celeron Agreement was entered into. Indeed, it is unclear if Chapter 25B-related topics would even fall within the Agreement's ambit since it was entered into 13 years before Chapter 25B was enacted. Nonetheless, because it is uncertain whether Plaintiffs could plead additional facts to allege a breach of contract claim unrelated to "Part 195," the Court **DISMISSES** the breach of contract claim **with leave to amend**.

**IV.**
**CONCLUSION**

In light of the foregoing, the County's and the Intervenors' motions to dismiss are **GRANTED**. Plaintiffs' fifth and sixth causes of action for Takings Clause violations as to the Exxon Mobil Affiliates; seventh cause of action under the Supremacy Clause, based on PSA and DPA-related preemption; and eighth cause of action for breach of contract are **DISMISSED with**

---

Fire Marshal Exhibits 120

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 25-4165-DMG (CTSx)** | Date | July 14, 2026 |
|---|---|---|---|

| Title | ***Sable Offshore Corp., et al. v. County of Santa Barbara, et al.*** | Page | 25 of 25 |
|---|---|---|---|

**leave to amend**.  The fifth and sixth causes of action for Takings Clause violations as to Sable and the seventh cause of action for state law preemption pursuant to the California Constitution are **DISMISSED without leave to amend and with prejudice**.

By **August 4, 2026**, Plaintiffs shall file their Second Amended Petition and Complaint consistent with the Court's Order or a notice of their intent not to amend.  Defendants shall file a response within **21 days** after the filing and service of any Second Amended Petition and Complaint.

**IT IS SO ORDERED.**

---

CV-90                                        **CIVIL MINUTES—GENERAL**                        Initials of Deputy Clerk DD

Fire Marshal Exhibits 121

# Exhibit 11

Exhibit 11
to Request for Judicial Notice
in Support of Motion to Dismiss
by CAL FIRE, OSFM, and Fire Marshal Berlant

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

JUL 13 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER; et al., <br><br> Petitioners, <br><br> v. <br><br> PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION, <br><br> Respondent, <br><br> ---------------------------------------- <br><br> SABLE OFFSHORE CORP. and PACIFIC PIPELINE COMPANY, <br><br> Intervenors. | No. 25-8059 <br><br> Agency No. 2025-1502 <br> Department of Transportation, National Transportation Safety Board <br><br> ORDER |
| STATE OF CALIFORNIA, <br><br> Petitioner, <br><br> v. <br><br> PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION; et al., <br><br> Respondents, <br><br> ---------------------------------------- | No. 26-508 <br> Agency No. 2025-1502 <br> Department of Transportation, National Transportation Safety Board |

Fire Marshal Exhibits 123

PACIFIC PIPELINE COMPANY and
SABLE OFFSHORE CORP.,

        Intervenors.

Before: PAEZ, TALLMAN, and BENNETT, Circuit Judges.

The parties are directed to file supplemental briefs addressing the following questions:

1) What is the relevance, if any, of *Flowers Foods, Inc. v. Brock*, 146 S. Ct. 1358 (2026) to this case?  While giving effect to the whole statute, the parties are invited to explain the relevance of that decision to the scopes of the phrases "interstate pipeline facilities" and "interstate pipeline transportation," 49 U.S.C. § 60104(c), as defined in 49 U.S.C. § 60101, and to explain whether those provisions apply to pipelines or pipeline facilities that do not cross state borders.

2) Absent a petition that specifically challenges PHMSA's new jurisdictional determination, can this court rule on whether PHMSA properly asserted exclusive federal jurisdiction over Lines CA-324 and CA-325.

These briefs shall not exceed 7,000 words in length.  Petitioners' briefs shall be filed and served within 7 days of the file date of this order.  Respondents' and Intervenors' briefs shall be filed and served within 14 days of the file date of this

2

Fire Marshal Exhibits 124

order.  Any replies shall be filed and served within 17 days of the file date of this

order.

25-8059
Fire Marshal Exhibits 125