ROB BONTA
Attorney General of California
BRANDON S. WALKER, State Bar No. 254581
Supervising Deputy Attorney General
ROXANNE J. CARTER, State Bar No. 259441
Deputy Attorneys General
 600 West Broadway, Suite 1800
 San Diego, CA 92101
 Telephone: (619) 321-5627
 Fax: (916) 732-7920
 E-mail: Roxy.Carter@doj.ca.gov
*Attorneys for Defendant*
*California Coastal Commission*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PACIFIC PIPELINE COMPANY, A Delaware Corporation,**<br><br>Plaintiff,<br><br>v.<br><br>**STATE OF CALIFORNIA, a state government; CALIFORNIA COASTAL COMMISSION, a state agency; CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION, a state agency; OFFICE OF THE STATE FIRE MARSHAL, a state agency; DANIEL BERLANT, in his official capacity as State Fire Marshal and DOES 1 through 25, inclusive,**<br><br>Defendants. | 1:26-CV-01486-KES-CDB<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT CALIFORNIA COASTAL COMMISSION'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Date:        September 21, 2026<br>Time:        1:30 p.m.<br>Courtroom:   6 [7th Floor]<br>Judge:       The Honorable Kirk E. Sherriff<br>Trial Date:  None Set<br>Action Filed: September 29, 2025 |

TO PLAINTIFF PACIFIC PIPELINE COMPANY AND ITS COUNSEL:

In support of its Motion to Dismiss, Defendant, California Coastal Commission

("Commission") requests that the Court take judicial notice of the decisions, documents, papers

and records identified below. Under Federal Rules of Evidence 201, facts appropriate for judicial

notice are those "not subject to reasonable dispute in that either (1) generally known within the

1

territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b).

The Court may take judicial notice of matters of public record, such as records of state agencies and administrative bodies. *Minor v. FedEx Off. & Print Servs., Inc.,* 78 F. Supp. 3d 1021, 1027-28 (N.D. Cal. 2015);  *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1224 n.2 (9th Cir. 2004) ("We may take judicial notice of a record of a state agency not subject to reasonable dispute."); *Johnson v. Castillo*, No. 1:22-cv-00637-BAM (PC), 2023 WL 3355260, at *1 (E.D. Cal. Apr. 19, 2023). The documents which the Commission seeks to admit through this Request for Judicial Notice in support of its Motion to Dismiss are attached, and may be described as follows:

A. SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDAMUS AND COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF ("Second Amended Complaint") for Sable Offshore Corp. v. California Coastal Commission, Santa Barbara Superior Court Case No. 23CV00974 ("*Sable I*")

B. Notice of Intent to Commence Cease and Desist Order and Administrative Penalty Proceedings (No. V-9-26-0063)

C. Statement of Defense and Response to Notice of Intent to Commence Cease and Desist Order and Administrative Penalty Proceedings (No. V-9-26-0063)

D. Commission's 1988 Adopted Commission Findings on Permit and Consistency Certification for Exxon's Santa Ynez Unit (File Nos.: E-88-1 & CC(E)-64-87)

E. Minute Order Granting the Commission's Motion for Judgment on the Pleadings in *Sable I* (Case No. 23CV00974)

Exhibit B is the Commission's Notice of Intent to issue a cease-and-desist order and administrative penalties for file No. V-9-26-0063. Exhibit C is Pacific Pipeline Corporation and its parent company, Sable Offshore Company's response to the Commission's Notice of Intent and is part of the Commission's file for No. V-9-26-0063. Exhibit D is the Commission's adopted findings on permit and consistency certification for File No.: E-88-1 & CC(E)-64-87. The Court may take judicial notice of these Exhibits B, C, and D as records of a state agency and proceeding. *Bradford v. Usher*, No. 1:24-CV-00047-KES-EPG (PC), 2025 WL 105917, at 1

2

(E.D. Cal. Jan. 15, 2025) (citing *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1223 n.2 (9th Cir. 2004)).

Exhibit A is the Second Amended Petition for Writ of Mandate and Complaint for Damages and Declaratory and Injunctive Relief filed by Sable Offshore Corp. and Pacific Pipeline Corporation in the *Sable I* matter, Case No. 23CV0974. Exhibit E is the Santa Barbara Superior Court's minute order containing its ruling granting the Commission's motion for judgment on the pleadings in *Sable I*, Case No. 23CV00974. Both Exhibit A and Exhibit E are records of the Superior Court of California in Santa Barabara County. The Court may take judicial notice of its own records and records of other courts. *Nat'l Pub. Radio, Inc. v. U.S. Cent. Command*, 570 F. Supp. 3d 866, 869 n.3 (S.D. Cal. 2021). Courts may also take judicial notice of matters of public record, such as records of administrative agencies, publicly accessible websites, and court filings. *Minor v. FedEx Off. & Print Servs., Inc.*, 78 F. Supp. 3d 1021, 1027-28 (N.D. Cal. 2015); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1224 n.2 (9th Cir. 2004); *Johnson v. Castillo*, No. 1:22-cv-00637-BAM (PC), 2023 WL 3355260, at *1(E.D. Cal. Apr. 19, 2023).

Accordingly, judicial notice is appropriate, and the Commission respectfully requests that the Court grant its Request for Judicial Notice.

Dated: August 3, 2026               Respectfully submitted,

ROB BONTA
Attorney General of California
BRANDON S. WALKER
Supervising Deputy Attorney General

/s/ Roxanne J. Carter

ROXANNE J. CARTER
Deputy Attorney General
*Attorneys for Defendant*
*California Coastal Commission*

EXHIBIT A

**ALSTON & BIRD LLP**
JEFFREY D. DINTZER, SBN 139056
  jeffrey.dintzer@alston.com
GARRETT B. STANTON, SBN 324775
  garrett.stanton@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071-1410
Telephone:    (213) 576-1000
Facsimile:    (213) 576-1100

Attorneys for Plaintiffs
SABLE OFFSHORE CORP.; PACIFIC PIPELINE COMPANY

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| SABLE OFFSHORE CORP., a Delaware corporation;<br>PACIFIC PIPELINE COMPANY, a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>CALIFORNIA COASTAL COMMISSION, a state agency; and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No. 25CV00974<br><br>**SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDAMUS AND COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF**<br><br><br>Trial Date: None Set<br>Action Filed: February 18, 2025 |

1

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES
AND DECLARATORY RELIEF

Petitioners and Plaintiffs Sable Offshore Corp. ("Sable") and Pacific Pipeline Company ("PPC" and, collectively, "Plaintiffs") hereby bring this Complaint for Damages and Declaratory and Injunctive Relief and Petition for Writ of Mandate ("Complaint"), directed to Respondent and Defendant California Coastal Commission ("Coastal Commission" or "Defendant"). By this verified pleading, Plaintiffs allege as follows:

## INTRODUCTION

1.     PPC, a wholly-owned subsidiary of Sable, is the owner of the Las Flores Pipelines, which includes the pipeline segments CA-324 ("Line CA-324") (previously known as Line 901) and CA-325 ("Line CA-325") (previously known as Line 903) (collectively referred herein as the "Las Flores Pipelines"), portions of which are located within the coastal zone in an unincorporated area of the County of Santa Barbara ("County").  Sable is also the owner of the Santa Ynez Unit Pipelines ("SYU Pipelines") located offshore the Gaviota Coast in the County.

2.     This action challenges the Coastal Commission's issuance of Notice of Violation, Violation File No. V-9-24-0152 ("NOV 152"), Notice of Violation File No. V-9-25-0013 ("NOV 0013" and collectively "NOVs"), Executive Director Cease and Desist Order No. ED-24-CD-02 ("EDCDO 24-02"), and Executive Director Cease and Desist Order No. ED-25-CD-01 ("EDCDO 25-01", and collectively "EDCDOs"), Cease and Desist Order No. CCC-25-CD-01 ("Cease and Desist Order"), Restoration Order No. CCC-25-RO-01 ("Restoration Order"), and Administrative Penalty No. CCC-25-AP3-01 ("Administrative Penalty" and collectively referred herein as the "April 10 Orders"), which has effected a taking of Plaintiffs' vested right to [own and] operate the Las Flores Pipelines and SYU Pipelines (collectively referred herein as the "Pipelines") without prior compensation.  Specifically, the NOVs, EDCDOs, Cease and Desist Order, Restoration Order, and Administrative Penalty unlawfully prohibit Plaintiffs' ongoing repair and maintenance activities along portions of the Pipelines.  The anomaly repair work on the Las Flores Pipelines has been previously analyzed and authorized by the County and is required by a prior Consent Decree and applicable law, and valve replacement work was authorized by a settlement agreement with the County and is additionally required by applicable state law.  Further, the span remediation maintenance activities to

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES
AND DECLARATORY RELIEF

the SYU Pipelines do not require further approvals as these activities fall within the scope of the existing Development and Production Plan and coastal development permit.

3.      A pipeline "anomaly" refers to a pipeline segment with some deviation from its original configuration, typically identified using a roving data gathering instrument located within the pipeline interior (referred to as an inspection "PIG") that examines the pipeline's conditions while traveling through the pipeline.   Plaintiffs are required to promptly conduct anomaly inspections and all associated repair work to comply with a Consent Decree involving the Pipelines as well as applicable federal regulations that specifically require pipeline operators to "take prompt action to address all anomalous condition in [any] pipeline.[1]   Under federal law, Plaintiffs are required to "schedule evaluation and remediation… *within 180 days* of discovery of" certain conditions on the Pipelines.[2] Moreover, "[a]n operator must promptly, *but no later than 180 days after an assessment*, obtain sufficient information about a condition to make that determination, unless the operator can demonstrate the 180-day interval is impracticable."[3]  Anomaly inspections and repairs consistent with requirements in the Consent Decree and applicable federal regulations are essential to promote safety and ensure sufficient leak prevention measures along the Pipelines.

4.      The County, under its delegated Coastal Act authority and pursuant to its certified Local Coastal Program ("LCP"), has previously authorized this type of work within the coastal zone under the Las Flores Pipelines' approved Final Development Plan ("FDP") (Case No. 85-DP-66cz), Major Conditional Use Permit ("CUP") (Case No. 83-CP-97cz), Coastal Development Permits ("CDPs") (86-CDP-189 and 86-CUP-205), and associated Conditions of Approval.

5.      The County has consistently found anomaly repairs to be within the scope of the Las Flores Pipeline's original environmental review [under the California Environmental Quality Act and National Environmental Policy Act conducted by the State Lands Commission and federal Bureau of

---

[1] See Consent Decree issued in *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*, Case No. 2:20-cv-02415, (C.D. Cal. Mar. 13, 2020); see also 49 C.F.R. § 195.452(h)(1).

[2] 49 C.F.R. § 195.452(h)(4)(iii) (italics and emphasis added).

[3] 49 C.F.R. § 195.452(h)(2) (italics and emphasis added).

2

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Land Management and Department of the Interior] and the previously issued FDP and CDPs.  The County has never amended the CDPs or determined it was necessary to issue a subsequent CDP for anomaly repairs to the Pipelines within the coastal zone.  Because repair work was previously considered and authorized by the County through approvals of the FDP, CUP, CDPs, and Conditions of Approval, and under its land use and delegated Coastal Act authority, no further authorizations are required to perform the repair work to the Las Flores Pipelines under the Coastal Act or the County's certified LCP.

6.    On February 12, 2025, the County confirmed through correspondence provided to Sable and the Coastal Commission that no further authorizations are required for the anomaly repair work to the Las Flores Pipelines because the County "concluded that the 'anomaly repair work' … is authorized by the existing permits (Final Development Plan, Major Conditional Use Permit, and associated Coastal Development Permits) and was analyzed in the prior Environmental Impact Report/Environmental Impact Statement."[4]  On March 21, 2025, the County additionally confirmed its review of Sable's "informational package regarding anomaly repair activities completed on [the Las Flores Pipelines] in 2024…" and "determined that this work fits within[] the conclusions/directives of our February 12, 2025 letter to [Sable]. *No permits will be required*."[5] The County's confirmation are consistent with informal non-discretionary assessments that it undertakes on a regular basis, are not appealable to the Coastal Commission under the County's Coastal Zoning Ordinance ("CZO") or Coastal Act, and are therefore, final.

7.    Similarly, Plaintiffs undertook the safety valve installation work in compliance with requirements under state law and only after receiving confirmation from the County that no further authorization from the County was required for such work.

8.    In 2015, the California Legislature enacted Assembly Bill 864 ("AB 864"), which requires pipeline operators in environmentally sensitive areas to use best available technology

---

[4] County's February 12, 2025 correspondence, **Exhibit E**, at p. 1.

[5] County's Electronic Correspondence dated March 21, 2025, **Exhibit I** (italics and emphasis added).

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

including, but not limited to, "leak detection technologies, automatic shut-off systems, or remote controlled sectionalized block valves, or any combination of these technologies" to reduce the volume of potential oil spills.[6]  AB 864 charged the Office of the State Fire Marshal (OSFM) with drafting its implementing regulations and granted OSFM the exclusive authority to enforce them.[7]

9.     In April 2021, Plaintiffs' predecessor-in-interest, Plains Pipeline, L.P. ("Plains"), secured approval from OSFM to retrofit the Pipelines with 16 above-ground safety valves as required under AB 864, including seven valves in the Coastal Zone.  The proposal included both motor-operated valves ("MOVs"), which are equipped with an electrical shut-off system connected to utility lines or a solar power source, and check valves ("CHKs"), which involve an automatic shut-off system with one-way flow closure.

10.     Like Plaintiffs' anomaly repair work, the Pipelines' original environmental review contemplated safety valve installation work, including the installation of 15 "block and check" valves that operate in the same way as the MOVs and CHKs approved by OSFM in April 2021.[8]

11.     In December 2021, Plains submitted applications to the County for approval to complete the safety valve installation work.  As a result of litigation related to the County's review of those applications, Plaintiffs revised the proposal such that all safety valves would be installed underground.

12.     On September 4, 2024, in light of Plaintiff's revision to the proposed safety valve installation work, the County confirmed that the County "does not have permit authority or jurisdiction over the sixteen (16) safety valves and their ancillary equipment as currently proposed because they are safety valves required by state law [AB 864], related to the operation of an interstate Pipeline, and one foot or more underground."[9]  Because the County has delegated LCP authority under the Coastal Act, Plaintiffs understood the County's confirmation to extend to Coastal Act permitting as well.

---

[6] Gov't Code, § 51013.1(b)(1).

[7] See *id.*, at §§ 51013.1(g)(2), 51010.

[8] Draft EIR/EIS, p. 2-5.

[9] County's September 4, 2024, Letter.

4

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES
AND DECLARATORY RELIEF

Plaintiffs began the safety valve installation work only after receiving this confirmation that no further County authorization was required.

13.     In March 2025, Plaintiffs requested confirmation from the County that the safety valve installation work complies with the Pipelines' existing FDP, CDPs, and environmental review, and the County has not yet issued any determination with respect to that request that would be appealable to the Coastal Commission under the Coastal Act or the CZO.

14.     Additionally, Plaintiffs' span remediation maintenance activities to the SYU Pipelines do not require further Coastal Commission approval via a new CDP or a consistency certification under the Coastal Act and the Coastal Zone Management Act ("CMZA") because these activities fall within the scope of the existing Development and Production Plan ("DPP") previously approved by the Department of Interior's Minerals Management Service ("MMS"), the Coastal Commission-approved CDP for the SYU Pipelines ("CDP No. E-88-1").

15.     Thus, the Executive Director does not have the authority to issue the NOVs and EDCDOs.  Likewise, the Coastal Commission does not have the authority to order Plaintiffs to cease anomaly repair work, safety valve installation work, and span remediation maintenance activities as purported by its issuance of the April 10 Orders .[10]

16.     Consequently, Plaintiffs hereby seek a writ of mandamus compelling the Coastal Commission to set aside the NOVs, EDCDOs, and April 10 Orders on the grounds that the Coastal Commission has acted arbitrarily and capriciously and has abused its discretion as indicated by the following:

    a.  The EDCDOs, and April 10 Orders were issued despite the Executive Director and Coastal Commission's lack of justification to do so under Public Resources Code §§ 30809(a) and 30810(a).

    b.  The Coastal Commission's issuance of NOV 152, EDCDOs, and April 10 Orders unlawfully usurps the County's delegated costal development

---

[10] The span remediation maintenance activities to the SYU Pipelines and the safety valve installation work to the Las Flores Pipelines are completed.

5

permitting authority under its Local Coastal Program, which was certified by the Coastal Commission pursuant to Public Resources Code § 30519.

c. The Coastal Commission's issuance of NOV 152, EDCDOs, and April 10 Orders are inconsistent with the County's prior conclusions and authoritative findings – adopted after proper and legally required processes and based on comprehensive environmental reviews mandated by California law.

d. The Coastal Commission's issuance of NOV 0013 and EDCDO 25-01 concerning Sable's span remediation maintenance activities to the SYU Pipelines are inconsistent with the Coastal Commission's prior conclusions and authoritative findings – adopted after proper and legally required processes and based on comprehensive environmental reviews mandated by California law.

17. Plaintiffs further seek damages and declaratory relief on the grounds that:

a. The Coastal Commission's issuance of the NOVs, EDCDOs, and April 10 Orders prohibits Plaintiffs' compliance with federal law requiring Plaintiffs to promptly make anomaly repairs and conduct span remediation maintenance activities at the Pipelines as necessary to protect human health and the environment and state law requiring Plaintiffs to promptly conduct safety valve installation work without prior compensation in violation of Article I, Section 19 of the California Constitution and the Takings Clause of the Fifth Amendment of the United States Constitution, as incorporated by the Fourteenth Amendment.

b. The Coastal Commission's NOVs, EDCDOs, and April 10 Orders impair Plaintiffs' vested rights in the continuation of anomaly repair work on the Pipelines as required under obligations set forth in Consent Decrees and applicable federal regulations to ensure safe operation of the Pipelines, and as a result of these vested rights, the Commission may not prohibit the activities previously authorized by approved DPP, FDP, CUP, CDPs, Conditions of

6

Approval, and County's Letter.

18. In pursuing this action, which involves enforcement of important rights affecting the public interest, Plaintiffs will confer a substantial benefit on the general public, the citizens of Santa Barbara County, and the State of California, and therefore will be entitled to attorneys' fees and costs pursuant to, *inter alia*, section 1021.5 of the Code of Civil Procedure.

## THE PARTIES

19. Plaintiff Sable is a Delaware corporation and does business in Santa Barbara County, California. Sable currently acts as an operator of the Las Flores Pipelines and owner/operator of the SYU Pipelines in Santa Barbara County that are harmed by the Coastal Commission's issuance of the NOVs, EDCDOs, and April 10 Orders. As such, Sable has a beneficial interest in the issuance of the writ of mandamus and complaint sought herein.

20. Plaintiff PPC is a Delaware Corporation and does business in Santa Barbara County, California. PPC is the owner of the Las Flores Pipelines in Santa Barbara County and is harmed by the Coastal Commission's issuance of the NOVs, EDCDOs, and April 10 Orders. As such, PPC has a beneficial interest in the issuance of the writ of mandamus and complaint sought herein.

21. Respondent and Defendant Coastal Commission is "a Commission of the State of California established by voter initiative in 1972 (Proposition 20) and later made permanent by the Legislature through adoption of the California Coastal Act of 1976." Specifically, the Coastal Commission is "an independent, quasi-judicial state agency[,]" "[u]nder California's federally-approved Coastal Management Program[] [that] manages development along the California coast except for San Francisco Bay[.]"[11]

22. Plaintiffs are unaware of the true names and/or capacities of Respondents and Defendants DOES 1 through 25, inclusive, and therefore sues said Respondents and Defendants by such fictitious names. Plaintiffs will amend this pleading to insert the true names and/or capacities of DOES 1 through 25, inclusive, when the same have been ascertained. Plaintiffs are informed and

---

[11]See California Coastal Commission's "Mission" Page listed on its Website, accessible at https://www.coastal.ca.gov/whoweare.html.

7

believe and thereon alleges that each such fictitiously named Respondent and Defendant is, in some manner or for some reason, responsible for the actions or omissions alleged in this pleading, and each is subject to the relief being sought herein.

**JURISDICTION AND VENUE**

23.     This Court has jurisdiction pursuant to article I, section 19 of the California Constitution and section 1060 of the Code of Civil Procedure.

24.     Venue is proper in this Court because the Pipelines, and anomaly repair work and span remediation maintenance activities thereon which the NOVs, EDCDOs, and April 10 Orders ordered ceased, are located in Santa Barbara County. The causes of action arose and have caused harm in Santa Barbara County, and thus, venue is proper in this Court pursuant to section 393, subdivision (b), of the California Code of Civil Procedure.

**FACTUAL AND LEGAL STATEMENT**

**D.     The Approvals For the Las Flores Pipelines Contemplated, Analyzed, and Authorized the Anomaly Repair Work.**

> **1.   Santa Barbara County Final Development Plan (FDP) and Coastal Development Permit (CDP) Background**

25.     The Coastal Commission first certified the County's LCP in March 1981, at which point the County became the vested coastal development permitting authority in the County's jurisdiction under the Coastal Act. (See Pub. Res. Code, § 30519.)

26.     The Celeron Pipeline Project (also referred to herein as the "Pipeline Project"), includes Lines CA-324 and CA-325.  Line CA-324 is a twenty-four (24) inch diameter pipeline with a maximum permitted throughput capacity of 150,000-barrels of crude oil per day, which is designed to transport crude oil approximately 10.9 miles from the Las Flores Pump Station in Las Flores Canyon, west along the Gaviota Coast, to the existing Gaviota Pump Station located approximately one mile east of Gaviota State Park in Santa Barbara County.  Line CA-325 is thirty (30) inches in diameter, has a maximum permitted throughput capacity of 300,000-barrels of crude oil per day, and is designed to transport crude oil approximately 113.5 miles north from the Gaviota Pump Station to the Sisquoc

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Pump Station, then east through the Los Padres National Forest and Cuyama Valley, ultimately delivering crude oil to the existing Pentland Delivery Point in the San Joaquin Valley in Kern County. This existing pipeline system also provides a connection to the Phillips 66 Sisquoc Pipeline at the existing Sisquoc Pump Station, which can transport crude oil west to the Phillips 66 Santa Maria Refinery.

27.    The State Lands Commission and federal Bureau of Land Management and Department of the Interior prepared a joint Environmental Impact Report and Environmental Impact Statement ("EIR/EIS") for the Pipeline Project pursuant to California Environmental Quality Act ("CEQA") and National Environmental Policy Act ("NEPA"). During the Pipeline Project's environmental review under the CEQA and NEPA, the locations of Lines CA-324 and CA-325 were identified as an environmentally superior alignment to minimize impacts to environmental resources (including topography, viewshed, watersheds, etc.).[12]   The State Lands Commission certified the EIR/EIS in January 1985.

28.    After reviewing the EIR/EIS, the Santa Barbara County Planning Commission made a final decision to approve the Pipeline Project FDP on February 18, 1986.  The approval was not challenged during the appeal period and the Planning Commission's approval action became final and effective.  The Planning Commission's action included the FDP (Case # 85-DP-66cz) and a Major CUP (Case # 83-CP-97cz).[13]   The FDP was required because the Pipeline Project necessitated comprehensive review, and the CUP was required because the pipelines crossed environmentally sensitive habitat areas.

29.    Consistent with the FDP approval and pursuant to the County's certified LCP, the County issued Coastal Development Permit CDP 86-CDP-189 for the Pipeline Project on July 27, 1986.

30.    CDP 86-CDP-189 approved "[c]learing, grading and trenching activities for [the]

---

[12] See County Planning Commission Actions for Celeron Pipeline Project (Mar. 3, 1986), at p. 54 ["Overall, the route chosen is environmentally preferable to any complete alternative route."].

[13] See County Planning Commission Action on Celeron/All American Pipeline Project FDP.

9

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES
AND DECLARATORY RELIEF

Celeron Pipeline Project as approved by 85-DP-66cz." The CDP incorporated "[t]he project description, pipeline route, conditions and plans required pursuant to those conditions described by the approved Final Development Plan 85-DP-66cz." CDP 86-CDP-189 also excluded "all activities related to pumpstations, river crossings, pipe stringing, welding, and any other activities not normally performed by the clearing, grading and trenching construction crews."

31. On August 5, 1986, the County issued Coastal Development Permit CDP 86-CDP-205 for the "[r]emainder of all construction activities for the Celeron Pipeline [P]roject as approved by 85-DP-66cz." CDP 86-CDP-205 also incorporated "[t]he project description, pipeline route, conditions and plans required pursuant to those conditions described by the approved Final Development Plan 85-DP-66cz."

32. The CDPs were not appealed by any party, including the Coastal Commission. The CDPs are therefore final, valid, and not subject to further appeal.[14]

33. Accordingly, the Conditions of Approval for the Las Flores Pipelines' FDP, CUP, and CDPs are all governed under the same Conditions of Approval found in Case #85-DP-66cz, as amended by the County.

34. The County has amended the Conditions of Approval from time to time, and as such identifies the Conditions of Approval with reference to each of the following case numbers: 88-DPF-033 (RV01)z, 88-CP-60 (RV01), 88-DPF-25cz, 85 DP-66cz, and 88DP-25cz. Although the County has issued separate CDPs for major pipeline improvements such as relocations and realignments since the Las Flores Pipelines' CDPs were first issued, the County has not required new or amended CDPs for the anomaly work and all of the enumerated conditions relevant to the anomaly repairs at issue, and as discussed *infra*, have remained unaltered.

     **1. Prior Approvals and Environmental Review for the Las Flores Pipelines Approved and Analyzed Repair and Maintenance Activities Including the Anomaly Repair Work.**

[14] See Cal. Code Regs., tit. 14 ("Coastal Act Regulations"), § 13313 (CDPs "issued by the local government shall become final unless a valid appeal is filed with the commission").

10

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

35. Repair and maintenance activities such as the anomaly repair work at issue in the Coastal Commission's NOV 152, EDCDOs, April 10 Orders, and any related environmental impacts, also were included and evaluated as part of the Pipeline Project's environmental review.[15]

36. The Pipeline Project's EIR/EIS explains that its impact analysis extends through the pipelines' entire lifetime, including both pipeline "operation" and "maintenance" and specifically acknowledges that routine maintenance activities, including the anomaly repair work, would occur during the pipelines' ongoing operation.

37. For example, the Pipeline Project's EIR/EIS incorporates into the Pipeline Project's project description certain Oil Spill Contingency and Emergency Response Plans that address ongoing pipeline maintenance activities. The EIR/EIS concludes that compliance with these plans would "substantially reduce the oil spill risk" and reduce any significant impacts that would result from a major oil spill, including impacts related to soils, surface water, aquatic biology, and land use and recreation.[16] The County's Statement of Overriding Considerations also concluded that compliance with these plans, identified mitigation measures, and the Conditions of Approval would "mitigate[] as completely as possible" all "potential oil spill impacts" and other potentially significant impacts resulting from the Pipeline Project.[17] These plans (which were directly attached to the Draft EIR/EIS and were available for public review and comment) acknowledged the pipelines' ongoing inspection requirements, including by using inspection "PIGs" to "measure the severity of corrosion and to inspect pipeline defects."[18] If required, identified pipeline defects (i.e., anomalies), once detected, would be repaired, "cleaned and recoated" or "removed and replaced," and "faulty … sections of pipe

---

[15] See Proposed Celeron / All American and Getty Pipeline Projects Environmental Impact Report/Environmental Impact Statement (EIR/EIS), SCH No. 83110902 (1984, 1985). The Draft EIR/EIS for the Pipeline Project is available on the County's website, accessible at https://cosantabarbara.app.box.com/s/gc3vhh8ns8aiwketnq35vwbehnhre672. The Final EIR/EIS for the Pipeline Project is accessible at https://cosantabarbara.app.box.com/s/lkl9oo9xdsaangevdp6pasfo0cmimvlt.

[16] Draft EIR/EIS, pp. S-5 through S-14.

[17] County Planning Commission Action on Celeron/All American Pipeline Project FDP, at pp. 55-56.

[18] Draft EIR/EIS, Appendix H, at p. 37.

11

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

would be replaced as necessary."[19]

38.    The Pipeline Project's EIR/EIS imposes no limitation on the number of sites where anomaly repairs may be undertaken at any one time or over the Las Flores Pipelines' lifetime, and thus, anomaly pipeline repairs contemplated under the Pipeline Project's EIR/EIS for the Las Flores Pipelines may be undertaken where such work is necessary at the same time or over a condensed period without constituting a new project under CEQA. (See *Committee for a Progressive Gilroy v. State Water Resources Control Bd.* (1987) 192 Cal. App. 3d 847, 862-63 [subsequent action approving project operations within limits specified in original EIR does not constitute a new project requiring additional CEQA review]; *County of Mono v. City of Los Angeles* (2022) 81 Cal.App.5th 657, 675 [subsequent action authorized by leases already subject to CEQA review does not constitute a new project triggering additional CEQA review].)

39.    Additionally, the Las Flores Pipeline's Conditions of Approval, which were incorporated by reference into the Las Flores Pipelines' FDP, CUP, and CDPs, encompassed the same operational and maintenance components of the Pipeline Project as described in the Pipeline Project's EIR/EIS, and thus, specifically contemplated and approved ongoing repair and maintenance activities, including the anomaly repair work.[20]

40.    For example, Condition J-11 acknowledges that the pipelines' right-of-way will be used for "operational maintenance" after construction is completed.[21]

41.    Further, Condition P-2 contemplates that the pipeline operator will conduct "regular maintenance and safety inspections," "corrosion monitoring and leak detection," and "periodic safety

---

[19] *Ibid.*; Final EIR/EIS, RTC 37-4. The EIR/EIS's conclusions regarding the risk of oil spills, ruptures or leaks were predicated upon the pipeline operator's ability to repair anomalies detected in the pipelines. See Draft EIR/EIS, p. 4-35 ["Large spills, ruptures, or detectable leaks are less probable in terms of potential groundwater contamination because in these instances the pipeline valves would be closed immediately and the defect repaired."].

[20] See Conditions of Approval, at p. 8 ["This permit is premised upon findings that where feasible, all significant environmental effects of the project identified in the EIR/EIS [], which occur in Santa Barbara County, will be substantially mitigated by the permit conditions."].

[21] Conditions of Approval, at p. 31.

12

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

audits."[22] Condition P-2 also acknowledges that federal regulations require the Pipelines' operator to undertake certain repair and maintenance activities such as the anomaly repair work at issue. The County later amended this Condition in 1987 to expressly state that "[p]ermits may not be withheld or suspended due to County concerns which are under the jurisdiction of 49 CFR Part 195 (Transportation of Hazardous Liquids by Pipeline), with the exception of areas/issues agreed to by the permittee and the County."[23]   Anomaly repair work, therefore, falls directly within Sable's obligations under 49 C.F.R. § 195.452(h)(1), which requires operators to "take prompt action to address all anomalous conditions in the pipeline that the operator discovers." Condition P-2 confirms that required repair and maintenance activities like the anomaly repair work would be undertaken pursuant to the Las Flores Pipelines' Conditions of Approval, FDP, and CDPs rather than requiring new or modified permits. As described above, the County's Statement of Overriding Considerations concluded that the Pipelines operator's compliance with Condition P-2 and other Conditions of Approval would "mitigate[] as completely as possible" all "potential oil spill impacts" and other potentially significant impacts resulting from the Pipeline Project.[24] The County is obligated to ensure compliance with its Statement of Overriding Considerations, including the prompt repair of anomalies, to ensure that significant impacts are mitigated to the maximum extent possible.

42. Moreover, the Conditions of Approval contemplate that biological impacts within the Las Flores Pipelines' operational right-of-way would be permanent, allowing for ongoing repair and maintenance activities like the anomaly repair work. For example, Condition H-1(j) originally required the pipeline operator to develop a "plan for off-site reestablishment of oaks to mitigate impacts to oak savannahs and woodlands along the route."[25] The County later modified this condition to require the pipeline operator to endow an Alternative Oak Mitigation Program to reestablish oak savannahs and woodlands in Santa Barbara County at an off-site location to mitigate for the Project's permanent on-

---

[22] *Id.* at p. 38, Condition P-2.

[23] *Ibid.*

[24] County Planning Commission Action on Celeron/All American Pipeline Project FDP, at pp. 55-56.

[25] *Id.* at pp. 23-24.

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES
AND DECLARATORY RELIEF

site oak tree impacts.[26]  Similarly, Conditions H-10 and H-11 required the pipeline operator to, after construction, replace and revegetate any disturbed catalina mariposa lily and refugio manzanita in locations "in or near" the disturbed area, but "exclusive of the operation [right-of-way]."[27]  Erosion control was the key objective for any required revegetation along the pipelines' operational right-of-way—not the long-term reestablishment of sensitive species—because it was clearly understood that the pipeline's right-of-way would continue to be disturbed by pipeline operation and maintenance.[28]  These Conditions confirm that any biological impacts along the pipelines' operational right-of-way resulting from the Anomaly Repair Work are within the scope of impacts previously approved by the County.

43.    Additionally, the Conditions of Approval do not impose any limit or require new permits based on the number of sites where anomaly repairs may be necessary or undertaken at the same time or over a condensed period. Repair and maintenance activities, including the anomaly repair work, fail to trigger any of the narrow circumstances under which the Conditions of Approval would require Sable to obtain a new or modified permit.  Condition A-13 provides:

> [The pipeline operator] shall obtain a new or modified permit, or authority to continue operation under the existing permit prior to undertaking any of the following activities which may, in the judgement of the County, result in significant changes to the impacts on the County.  Such changes could include but not be limited to 1) major pipeline or pump station modifications; 2) major changes in pipeline throughput; 3) introduction of production to the pipeline from sources other than those described above [noted as the outer continental shelf and other locally produced onshore and offshore petroleum from the Santa Barbara and Santa Maria Basins], and 4) introduction of a different product from any source.[29]

[26] Conditions of Approval at p. 21.

[27] *Id.* at p. 22.

[28] See, e.g., *id.* at p. 20.

[29] Conditions of Approval, at p. 4.

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

44.     The anomaly repair work falls within the scope of approved repair and maintenance activities contemplated by the pipelines' Conditions of Approval, and as analyzed under the Pipeline Project's EIR/EIS, to be undertaken without any subsequent or modified permit or subsequent environmental review because the work does not involve: (1) "major pipeline or pump station modifications," as the anomaly repair work is a standard repair and maintenance activity required by 49 C.F.R. § 195.452(h)(1); (2) "major changes in pipeline throughput," because the anomaly repair work will not alter the pipelines' capacity; (3) "introduction of production … from [new] sources"; or (4) "introduction of a different product."

45.     On February 12, 2025, the County confirmed in a letter to Sable that the future and ongoing anomaly repair work conducted by Plaintiffs to the Las Flores Pipelines is "authorized by the existing permits (Final Development Plan, Major Conditional Use Permit, and associated Coastal Development Permits) and was analyzed in the prior Environmental Impact Report/Environmental Impact Statement.  Thus, no further application to or action by the County is required."[30]

46.     The County reached its conclusion after review of detailed descriptions, plans, and assessments provided to the County by Sable that was included in those Zoning Clearance applications concerning anomaly repair work that was ongoing at the time NOV 152 was received as well as proposed future anomaly repair work in the coastal zone.  Because the County's confirmation was based on substantial evidence, it is entitled to deference.[31] The County's confirmation is also entitled to deference because it approved the FDP, CUP, CDPs, and Conditions of Approval in the first instance.[32]

47.     Although Sable's Zoning Clearance applications allowed the County to confirm that ongoing and future Anomaly Repair Work falls within the scope of the Pipeline Project's existing

---

[30] County Letter dated February 12, 2025, **Exhibit E**, at p. 1.

[31] See *Kurtzke v. City of San Diego* (2017) 11 Cal.App.5th 1034, 1040 [City's finding under Planning and Zoning Law was subject to substantial evidence standard, which does not permit courts to "substitute its own findings and inferences" for that of a local agency].

[32] See Pub. Res. Code, § 30600.5. Compare *Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2010) 184 Cal.App.4th 1032, 1047 [local agency "entitled to significant deference" in interpreting its own Municipal Code].

15

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

CDPs, the County also concluded that such work does not actually require Zoning Clearances. As the County explained, its "assessment is consistent with the type of reviews conducted by the County, both inside and outside the Coastal Zone, on a regular basis to determine whether proposed development activities fall within the scope of existing permits."[33]  Therefore, based on its review, "no further application to or action by the County is required."[34] This reflects a County understanding that Zoning Clearances should be used before commencing initial construction approved under a final development plan and that Zoning Clearances should not be used for each individual element of the approved development or use throughout the life of a project. Accordingly, the County offered to return the Zoning Clearance applications without taking any action on them other than confirming "that the pipeline anomaly repair work is authorized by the existing permits."[35]

48.    On March 6, 2025, SCS Engineers, on behalf of Plaintiffs, submitted "information regarding 48 anomaly repairs previously conducted on portions of the [Las Flores Pipelines] [], and in one County right-of-way…."[36]  On March 21, 2025, the County confirmed that it had "reviewed the information [Plaintiffs] provided and [] determined that this work fits within[] the conclusions/directives of our February 12, 2025 letter to Steve Rusch [].  No permits will be required [for the previous Anomaly Repair Work to the Las Flores Pipelines]."[37]

49.    The County's confirmations are not appealable under the CZO or LCP.  The CZO defines certain actions, decisions, and determinations for which an appeal to the Zoning Administrator, Planning Commission, or Board of Supervisors is permitted.[38]  Such appealable actions include decisions on applications for a CDP or other planning permit, determinations as to the meaning or applicability of the CZO, and other decisions for which the CZO identifies the Planning Director as

---

[33] County Letter dated February 12, 2025, **Exhibit E**.

[34] *Ibid.*

[35] *Ibid.*

[36] County's Electronic Correspondence dated March 21, 2025, **Exhibit I**.

[37] *Ibid.*

[38] See CZO, § 35-57C.

16

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES
AND DECLARATORY RELIEF

the applicable decision-maker.[39]  The County's confirmation that the Anomaly Repair Work was authorized by the Pipeline Project's previously issued permits does not fall within any of these categories and is not identified under the CZO as an appealable action.

50.    The County's letter further confirms that it is "not appealable to the Planning Commission [or] Board of Supervisors."[40]  Nor is the County's electronic correspondence an appealable matter.  Rather, the County's confirmations are consistent with informal non-discretionary assessments that the County undertakes on a regular basis as to assess whether previously-approved development activities conform with their authorizing permits and approvals. Such ministerial confirmations are not subject to an appeal to any decision-maker within the County.

51.    Moreover, neither the County's letter nor electronic correspondence constitute an appealable action under the Coastal Act. The County's confirmations that the work was authorized by the existing CDPs are "not appealable to the … Coastal Commission" because the County is not taking any final action or appealable action on an application for a coastal development permit.[41]  Further, the County's letter is not an appealable determination as to whether anomaly repair work is exempt from coastal development permit requirements under the CZO or the Coastal Act.[42]  Neither the County's letter nor its electronic correspondence constitutes a determination of exemption, but each are instead a confirmation that the work already has been lawfully authorized through the existing CDPs issued by the County.[43]  As such, the Coastal Act provides no basis for an appeal to the Coastal Commission of the County's letter or electronic correspondence confirming that the Anomaly Repair

[39] See *ibid.*, §§ 35-182.3.A, 35-182.4.A.2.

[40] See County Letter dated February 12, 2025, **Exhibit E**.  The County's Letter is not a determination on an "application for development or the request for exemption or categorical exclusion" under Coastal Act Regulations section 13569.  Instead, it is a confirmation that the proposed work already was authorized under the existing FDP and CDPs and that no application was required.

[41] See *ibid.*; CZO § 35-186.6; Pub. Res. Code, §§ 30603, 30625; *City of Dana Point v. Cal. Coastal Commission* (2013) 217 Cal.App.4th 170, 188-189 [Section 30625 allows Coastal Commission appeals for "quasi-adjudicatory actions" on coastal development permits or claims of exemption].

[42] See County Letter dated February 12, 2025, **Exhibit E**; County's Electronic Correspondence dated March 21, 2025, **Exhibit I**.

[43] See Pub. Res. Code, § 30625.

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES
AND DECLARATORY RELIEF

Work falls within the scope of the Pipeline Project's existing approvals. The County's confirmations that the Anomaly Repair Work requires no further Coastal Act authorization are therefore final.

**E.    The County Has Limited Authority Over the Anomaly Repair Work, Safety Repairs and Installation of Underground Safety Valves.**

52.    On February 8, 1988, the Las Flores Pipelines' original proponent, the Celeron Pipeline Company of California (Celeron), and the County entered into a Settlement Agreement regarding the County's jurisdiction over certain project components.[44]

53.    As part of the Settlement Agreement, the County agreed that it was preempted from regulating the Las Flores Pipelines' design, construction, and operation covered under 49 C.F.R. Part 195.[45]

54.    The Settlement Agreement also creates a presumption of preemption where the activity is: (1) covered by 49 C.F.R. Part 195 (PHMSA's implementing regulations), (2) deals with the design, construction, or operation of the pipeline even if not expressly specified under 49 C.F.R. Part 195, or (3) performed a foot or more below the ground surface.[46]

55.    The County reserved the authority, however, to confirm that the Las Flores Pipelines comply with the Conditions of Approval, allowing the County to ensure that the Las Flores Pipelines were constructed and operated consistent with the Pipeline Project's EIR/EIS and original County approvals, including the CDPs.

56.    The Settlement Agreement further details that the County lacks authority, however, to require additional permits or authorizations for any work that is expressly or impliedly covered 49 C.F.R. Part 195, related to pipeline design, construction, or operation, or is performed a foot or more below the ground surface.[47]

57.    Further, on August 30, 2024, Plaintiffs and the County also entered into a settlement

---

[44] See Celeron Settlement Agreement (Feb. 8, 1988).

[45] See *id.* at p. 2.

[46] See *id.* at p. 8.

[47] See *ibid.*

18

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

agreement in litigation regarding safety valves on the Las Flores Pipelines.[48]   The settlement agreement addresses Plaintiffs' revised plan regarding proposed safety valves as well as additional surveillance and response enhancements that will be added to the Las Flores Pipelines.   In the settlement agreement, followed by a subsequent letter from the County on September 4, 2024, the County confirmed that "it does not have permit authority or jurisdiction over the sixteen (16) safety valves and their ancillary equipment because they are safety valves required by state law [AB 864], related to the operation of an interstate pipeline, and one foot or more underground.  [The County] understands the [Las Flores Pipelines] remain[] subject to regulation by the Office of State Fire Marshal and that [Plaintiffs] will be working closely with that office on installation and testing of the safety valves, as well as implementing a number of integrity-related improvements required by that office."[49]

58.    As the August 30, 2024 settlement agreement also details, State law AB 864 and the Office of State Fire Marshal require installation of safety valves to the Las Flores Pipelines must be in place before the Las Flores Pipelines may be operated.  The Office of the State Fire Marshal holds authority over the restart of the Las Flores Pipelines, oversees installation and testing of the safety valves and implementation of several integrity-related improvements before any operation of the Las Flores Pipelines takes place.[50]  Plaintiffs have since installed the safety valves to the Las Flores Pipelines.[51][52]

**F.    The Anomaly Repair Work to the Las Flores Pipelines.**

59.    Sable detects anomalies by using a roving data gathering instrument, known as an in-

---

[48] See County Settlement Agreement (Aug. 30, 2024).

[49] County Letter dated September 4, 2024, at p. 1.

[50] County Settlement Agreement (Aug. 30, 2024).

[51] Sable has further requested for the County to confirm that the safety valve installation work complies with the Las Flores Pipelines' existing FDP and CDPs.  The County's confirmation is pending at this time.

[52] In April 2021, Sable's predecessor, Plains, secured approval from the Office of State Fire Marshall  for its plan to retrofit the Las Flores Pipelines with 16 safety valves as required under AB 864.  Of the 16 safety valves OFSM approved for the Las Flores Pipelines, seven were located in the Coastal Zone.

19

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES
AND DECLARATORY RELIEF

line inspection tool referred to as intelligent pipeline integrity gauges ("PIGs") or smart PIGs that examines a pipeline's interior as the PIG travels through it.  Data collected from the PIG is used to identify the approximate location of anomalies from the surface so that excavation and repair activities can be planned.

60.     Sable generally must complete the following steps to repair any particular anomaly detected by the PIG:  (1) access the affected pipeline segment via existing roadways and rights-of-way, which in some locations requires placing metal plates over water courses; (2) excavate the anomaly site, including the dirt beneath the affected pipeline segment, which in some locations may require dewatering and associated discharge;  (3) expose the pipeline segment by removing insulation and sandblasting; (4) evaluate whether a "Composite Repair" or "Cut-Out Repair" is required;[53] (5) conduct the Composite or Cut-Out Repair as appropriate, sandblast the repaired pipeline segment, and apply an epoxy coating, pipe tape, and rockguard wrap; (6) backfill the anomaly site to its original contours; and (7) conduct final site cleanup including erosion control and revegetation work (collectively, the "Anomaly Repair Work"). The Anomaly Repair Work requires the use of heavy equipment and may involve the removal of vegetation.

61.     Through its pipeline inspection activities, Sable identified one hundred and twenty-one (121) anomalies where Anomaly Repair Work is required within unincorporated Santa Barbara County and within the coastal zone.  Sable completed the Anomaly Repair Work at forty-eight (48) of these anomaly sites before receiving NOV 152 and a letter regarding the work from the Coastal Commission on October 4, 2024. Forty-five (45) anomaly sites were open (i.e., excavation and other steps had been undertaken, but the Anomaly Repair Work had not been completed) at the time Sable received the NOV and October 4 Letter.  Sable subsequently backfilled those open sites (without completing the associated anomaly repairs), implemented erosion control best management practices, and hydroseeded the sites with a local native seed mix approved by Commission staff.  At that time,

---

[53] A "Composite Repair" involves wrapping the exposed pipeline segment in a composite material and allowing the material to cure, whereas a "Cut-Out Repair" involves cutting out and replacing the exposed pipeline segment, welding in place the replaced pipeline segment, and X-raying the replaced segment to confirm the repair is completed.

20

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

twenty-eight (28) remaining anomaly sites were identified for future Anomaly Repair Work.

62.   Plaintiffs proceeded with these activities because they believed they had authorization consistent with past anomaly repair practice at the Las Flores Pipelines.  Plaintiffs agreed to stop work in the Coastal Zone in response to NOV 152 in order to explore Coastal Commission staff's allegations further with both Coastal Commission staff and the County.  To that end, on November 22, 2024 and December 6, 2024, Sable submitted applications to the County for Zoning Clearances for the Anomaly Repair Work, which included providing the County with additional information including site plans, grading quantities, biological and cultural resource surveys, and best management practices, regarding the work and anomaly dig sites.  These Zoning Clearance applications only addressed ongoing and future anomaly repairs.  The County reviewed the information Sable submitted with its Zoning Clearance applications and confirmed in a letter dated February 12, 2025, that the ongoing and future Anomaly Repair Work was already authorized by the Las Flores Pipelines' existing CDPs and, consistent with past practice, no new or separate Coastal Act authorization is required for Sable to perform the work. Moreover, on March 6, 2025, Sable submitted information to the County regarding its previously-completed Anomaly Repair Work conducted in 2024 to portions of the Las Flores Pipelines "and in one County right-of-way."[54]  The County similarly reviewed the information and "determined that the [previous Anomaly Repair Work] fits within[] the conclusions/directives of [the County's] February 12, 2025 letter to [Sable] [].  No permits will be required [for Sable's Anomaly Repair Work previously conducted in 2024 to 48 anomaly dig site and in one County right-of-way]."[55]

**G.   The Span Remediation Maintenance Activities to the SYU Pipelines Are Authorized Under the Existing Development and Production Plan ("DPP"), CDP, and Consistency Certification.**

**1.   Plaintiffs' Approved Development and Production Plan (DPP) Background and Framework**

63.   In December 1982, Exxon Company, U.S.A. ("Exxon") submitted a DPP to MMS for

_____

[54] County's Electronic Correspondence dated March 21, 2025, **Exhibit I**.
[55] *Ibid.*

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

the SYU Pipelines.[56]  In January 1983, Exxon submitted a request for consistency certification for expansion of production in the SYU Pipelines.  The Coastal Commission's 1990 Compendium of California Coastal Commission Decisions Under the Federal Consistency Provisions provides a succinct summary of the Coastal Commission's consideration of the DPP for the SYU Pipelines:

> The 1983 proposal included two options, each of which included …
> platforms, pipelines and electrical cables in [Outer Continental Shelf]
> waters, and expansion of onshore gas processing facilities to
> accommodate the new platforms.  The two options differed in methods
> of treatment, storage and transport of the crude produced from the SYU
> [Pipeline]. Although both options ultimately relied on transport of
> treated crude by tanker to the Gulf Coast, Option "A" involved
> expanding the capacity of the existing [onshore treatment facility],
> while Option "B" involved construction of new onshore oil treatment
> and storage facilities and a new marine terminal about a mile offshore
> of El Capitan. In June of 1983 the [Coastal Commission] concurred with
> the consistency certification for the platforms and pipelines proposed of
> Option "B", but objected to Option "A" … as the preferred means of oil
> storage and treatment prior to shipment (see CC-7-83).[57]

64.    On September 20, 1985, MMS approved Option B in the DPP, except it specifically noted that the DPP approval is not a final approval of the pipeline system.

65.    On September 29, 1987, Exxon's revised DPP, which provided additional details regarding the installation of three platforms in the SYU Pipelines with associated subsea pipelines connecting to onshore facilities in Las Flores Canyon, was found complete by MMS. The Coastal

---

[56] See September 20, 1985 DPP Approval.

[57] See Coastal Commission, Compendium of California Coastal Commission Decisions Under the Federal Consistency Provisions (March 30, 1990), pp. 265-66, available at: https://documents.coastal.ca.gov/assets/fedcd/Compendium-of-CCC-FC-Decisions-OCS-1983-to-present.pdf.

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Commission received the DPP revision from MMS on December 22, 1987.[58]

66.     On February 23, 1988, with Consistency Certification No. CC-64-87, the Coastal Commission concurred with Exxon's certification for the revised DPP nearshore and onshore portions of Option B alternative, having already concurred with the Outer Continental Shelf portions of Option B with Consistency Certification No. CC-7-83.  The Coastal Commission also approved Coastal Development Permit No. E-88-1 for the nearshore portions of Option B, including the SYU Pipelines.[59]

67.     On April 4, 1988, MMS approved the revisions to the DPP.  This version of the DPP was in existence when the Coastal Commission provided its consistency certification (CC-64-87) and approval of its CDP (E-88-1) for the SYU Pipelines.  The DPP has remained as the controlling approval for the SYU Pipelines' installation, as well as for their ongoing maintenance and operation.[60]

**1.     The DPP, Its Environmental Impact Report/Environmental Impact Report, the Consistency Certification, and the SYU Pipelines' CDP Contemplate and Authorize Plaintiffs' Span Remediation Maintenance Activities.**

68.     The DPP addresses the design, construction, and ongoing operation and maintenance of the SYU Pipelines, including relevant geologic and geotechnical design considerations and applicable design codes.  The DPP also expressly requires "[a]ll emulsion and gas pipelines will be maintained in good operating condition at all times."[61]  Likewise, the DPP's Environmental Impact Statement/Environmental Impact Report ("DPP EIS/EIR") confirms that "Exxon's [DPP] has been carefully evaluated to assess the effects due to construction and operation of the facilities.[62]

*a.*     *The DPP's Design Requirements Incorporate Maintaining Static Loads and Spans along the SYU Pipelines*

---

[58] See April 4, 1988 DPP Approval.

[59] See Coastal Commission's March 17, 1988 Letter to Exxon, attaching Consistency Certification Concurrence and CDP.

[60] 1988 DPP.

[61] *Id.* at section VIII-24.

[62] Final Environmental Impact Statement/Environmental Impact Report For Santa Ynez Unit/Las Flores Canyon DPP (June 1984), at p. 6-47.

23

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

69.     The DPP explicitly accounted for static loads and spans in its design and construction criteria for the offshore pipelines. It emphasized that the pipelines would be constructed and operated in a technically sound and environmentally acceptable manner. The routes were "carefully scrutinized for potential hazards to ensure that the pipelines may be safely installed and operated."[63]

70.     The design criteria specifically considered both external environmental loads and internal loads that the pipelines might encounter throughout their operational life, including stresses during installation and expressly requires that stress levels from these conditions remain within acceptable limits.[64]

71.     The DPP addressed external environmental loads arising from meteorological and oceanographic phenomena, as well as the geologic and geotechnical characteristics of the sea bottom along the pipeline routes.[65] These environmental forces included waves, currents, earthquake ground motions, and ambient pressure and temperature. The design parameters were set to account for significant wave height, period, and direction, bottom steady current velocity and direction, and earthquake wave velocities and periods.[66] These criteria were then tailored to the specific locations and directions of the pipelines, ensuring consistency with the platform designs.[67] This comprehensive approach shows that static loads and spans were integral considerations in the DPP's planning and design process.

72.     The DPP provides that "[t]he pipelines will be designed to resist significant horizontal and vertical deflection under the action of bottom steady currents, wave induced oscillatory currents and earthquakes.  Earthquake motion design criteria will be consistent with the values used in the platform designs.  Stability will be accomplished via routing, increased submerged weight, trenching, anchoring, or combinations of these methods."[68]

---

[63] DPP, at VIII-11.

[64] *Id.* at VIII-11-13.

[65] *Id.* at VIII-6-9.

[66] *Id.* at VIII-12.

[67] *Ibid.*

[68] *Id.* at VIII-14.

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES
AND DECLARATORY RELIEF

*b.    The DPP Incorporates Accepted Maintenance Practices in American Petroleum Institute Publication API RP 1111*

73.    Plaintiffs must operate and inspect the SYU Pipelines in compliance with API Recommended Practice 1111 ("API 1111").  The DPP states that "[t]he oil and gas pipelines will be designed, constructed, tested, operated and inspected in compliance with the following standard specifications, as applicable: … Recommended Practice for Design, Construction, Operation and Maintenance of Offshore Hydrocarbon Pipelines, American Petroleum Institute Publication API RP 11111."[69]

74.    Section 4.1.4 to API 1111 discusses how the design of offshore pipelines should consider static loads. It provides in relevant part:

> These include the weight of the pipe, coating, appurtenances, and attachments; external and internal hydrostatic pressure and thermal expansion loads; and the static forces due to bottom subsidence and differential settlement.
>
> The weight-related forces are of special concern where the pipeline is not continuously supported, that is, where spans are expected to occur. Spans are also of concern where seismic liquefaction of the supporting bottom could occur, and where mudslides could occur, such as some areas around the Mississippi River delta.
>
> The weight of the submerged pipeline can be controlled through the combination of the pipe wall thickness and the density and thickness of the external (concrete) weight coating. Weight calculations should consider stability when empty (the usual as- laid condition), full of the fluid to be transported, and flooded with seawater.
>
> Consideration should be given to preventing unacceptably long unsupported lengths by use of dumped gravel, anchor supports, concrete mattresses, sand bagging, or other suitable means.

*c.    The Environmental Impact Statement/Environmental Impact Report for the DPP Contemplates Span Remediation Maintenance Activities*

---

[69] DPP, at VIII-10.

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

75.    The DPP EIS/EIR states that the SYU Pipelines will be designed to withstand up to a foot of local deformation of the seafloor and includes a mitigation measure to "[m]onitor seafloor disturbances after construction using side scan sonar or equivalent to assess need for remedial measures" to address the potential impact of "[d]isruption of seafloor sediments and formation of sea mounds due to construction of offshore platforms and pipelines."[70]

76.    The DPP EIS/EIR also includes a separate mitigation measure to "inspect subsea project components" following earthquakes prior to restart to determine reliability of components and "take remedial actions as appropriate."[71]

77.    The DPP EIS/EIR further notes that "[t]he cumulative geologic impacts are minimized using conventional geotechnical design and construction methods, including ongoing maintenance of slop stabilization operations."[72]

<em>d.    The CDP No. E-88-1 and Consistency Certification</em>

78.    The Coastal Commission provided its concurrence in the project's consistency certification the same day that it approved the project's CDP No. E-88-1, underscoring the Coastal Commission's integrated consideration of the DPP and the Coastal Commission's CDP No. E-88-1:

> On February 23, 1988, by a vote of 8 in favor, 2 opposed, and 1 abstention, the California Coastal Commission concurred with your consistency certification for the Exxon Santa Ynez Unit Development and Production Plan nearshore and onshore portions of Option B alternative. On the same day, the Commission also approved a coastal development permit for the nearshore portions of Option B alternative with conditions. As you know these conditions were amended into the project description of the Development and Production Plan by you

---

[70] DPP EIS/EIR at Table 6.3.6-1

[71] *Ibid.*

[72] *Id.*, at p. 6-52.

26

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

prior to Commission concurrence.[73]

79.    CDP No. E-88-1 specifically included, as part of the project description, oil and produced water pipelines from offshore platforms to onshore facilities.[74]

80.    The Coastal Commission was aware of and relied upon the State Lands Commission's conditions for the Project leases in state waters, which mandated "[a]nnual side-scan surveys of pipelines to check for bridging or other hazards to the pipeline."[75] This requirement was noted as factor in the Coastal Commission's determination that the risks and impacts associated with the project had been mitigated to the maximum extent feasible. The EIS/EIR, which the Coastal Commission also relied upon in connection with its federal consistency certification and CDP approval, further supported this conclusion by noting that "[t]he cumulative geologic impacts are minimized using conventional geotechnical design and construction methods, including ongoing maintenance of slope stabilization operations."[76]

81.    The Coastal Commission's CDP findings recognized that the Project involved complex geotechnical and environmental considerations, particularly concerning the installation and maintenance of the pipelines. The Coastal Commission's findings highlighted the importance of addressing potential geologic constraints through "proper mitigation," which included "avoidance or … engineering design."[77]   This is an explicit contemplation of engineering solutions, such as the deployment of 3/1 (sand/cement) bags to create support piers, as viable methods to address issues like pipeline spans caused by changes to geologic conditions. The CDP findings further noted that "[a]ll potential geologic constraints for the project (both onshore and offshore) have been identified and

---

[73]Letter from Susan M. Hansch, Manager Energy and Ocean Resources Unit of Coastal Commission to Exxon Company U.S.A. (March 17, 1988).

[74] CDP No. E-88-1, at p. 1.

[75] Compendium of California Coastal Commission Decisions Under the Federal Consistency Provisions (March 30, 1990), pp. 254-255, available at: https://documents.coastal.ca.gov/assets/fedcd/Compendium-of-CCC-FC-Decisions-OCS-1983-to-present.pdf.

[76] DPP EIS/EIR, at p. 6-52.

[77] Coastal Commission Staff Recommendation on Permit and Consistency Certification, at p. 78.

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

mitigated by avoidance or engineering design…. Soil movement forces have been minimized on the project by placing the pipelines directly on the seafloor."[78] This finding, consistent with the analysis in the EIR/EIS and the maintenance activities in API 1111 outlined in the existing DPP that was considered by the Coastal Commission in its Consistency Certification, supports providing continued support to the pipelines during operations through the use sandbags to stabilize soil movements.

82.    The Coastal Commission also recognized the need for flexibility in pipeline construction methods, acknowledging that "[p]ipeline construction methods are presently undefined" and allowing Exxon the latitude to "propose their own design solutions."[79] This flexibility permits the adaptation of construction techniques, such as the deployment of the 3/1 sandbags, which align with the original analysis and objectives of the CDP.  Further, the Coastal Commission also anticipated that "[d]redge materials will be piled up on one or both sides of the trench, and backfilling will be done where necessary to anchor the lines, and where natural backfill due to local sediment movement is not expected. Exxon expects that armor rock will be needed to secure the lines, but does not know the amount or size."[80]

83.    Within the required Marine Construction Mitigation Plan that the Coastal Commission ultimately approved for the SYU Pipelines, Exxon stated it would not trench the seafloor beyond twenty-five foot depths and would "modify only those bedrock ridges beyond that point that may result in unacceptable pipe spans."[81] It went on to state that inspection surveys would be completed to "identify unacceptable free spans."[82] Thus, the Coastal Commission specifically approved, under the CDP No. E-88-1's conditions, Plaintiffs' span remediation maintenance activity to (1) inspect the pipelines for unacceptable free spans, and (2) "modify" the seafloor to remediate any identified unacceptable spans.

---

[78] *Id.* at p. 4.

[79] *Id.* at p. 44.

[80] *Id.* at p. 45.

[81] Final Comprehensive Plan for Marine Biological Impact Reduction and Mitigation in Nearshore Waters of Las Flores Canyon, at p. 19.

[82] *Id.* at p. 38.

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES
AND DECLARATORY RELIEF

**e.**     *The DPP's Regulatory Framework Affirms Plaintiffs' Span Remediation Activities Are Permissible Under the Existing DPP, CDP, and Consistency Certification.*

84.     Plaintiffs are operating the SYU Pipelines under an approved DPP, and its span remediation activities are consistent with the requirements of 30 CFR § 550.281, which mandates that before conducting activities under an approved DPP, certain approvals and permits must be obtained from the District Manager or Bureau of Safety and Environmental Enforcement ("BSEE") Regional Supervisor. These include approvals for applications for permits to drill, production safety systems, new platforms, or major modifications, lease term pipelines, and other permits as required by law.

85.     The activities in these applications and permits must conform to the activities detailed in the approved DPP.  Sable's span remediation maintenance activities, involving the placement of sandbags to support existing pipelines, is a maintenance activity that aligns with the scope and intent of the approved DPP.  Accordingly, BSEE approved Plaintiffs' span remediation maintenance activities without requiring any amendments to Plaintiffs' approved DPP for the SYU Pipelines.

86.     30 CFR § 550.281(c) explicitly states that applications for licenses, approvals, or permits to conduct activities under an approved DPP, including those identified in paragraph (a), are not subject to separate State CZMA consistency review.  Although Plaintiffs' span remediation maintenance activities do not fall under the expressly identified activities in paragraph (a), any application for approval under its DPP, such as the request for approval to BSEE for the span remediation maintenance activities, is not subject to a separate CZMA consistency review, reinforcing that Plaintiffs' span remediation maintenance activities do not require additional consistency certifications.

87.     30 CFR § 550.283(a) clarifies the circumstances that require a revision or supplement to an approved DPP. The enumerated circumstances include changes to the type of drilling rig, production facility, or transportation mode and alterations in the surface location of a well or production platform beyond specified distances. Plaintiffs' span remediation maintenance activities, involving the placement of sandbags to support and maintain existing pipelines, do not involve any of

the types of significant changes listed in 30 CFR § 550.283(a). In contrast, the span remediation maintenance activities are routine maintenance measures that do not alter the type or volume of production, emissions, or waste, nor do they involve any significant changes to infrastructure or operational methods.

88.    30 CFR § 250.1008(e) outlines the notification requirements for pipeline repairs. It states that the lessee or right-of-way holder must notify the Regional Supervisor before the repair of any pipeline or as soon as practicable.

89.    As the regulations require only a notification before repair, rather than a revision to the DPP, the regulations further confirm that Plaintiffs' span remediation maintenance activities are anticipated and do not require amendments to the DPP, additional regulatory approvals, or consistency reviews.

*f.    The Contemporary Minerals Management Service ("MMS") Manuals Support Plaintiffs' Span Remediation Maintenance Activities*

90.    The 1992 MMS-sponsored Deepwater Pipeline Maintenance and Repair Manual ("Manual")[83] provides insights into the industry-standard practices around the time of the DPP's approval for maintaining and repairing offshore pipelines, particularly concerning span remediation. The Manual notes that span remediation is a routine maintenance procedure and further details that correction of pipeline spans are a "minor intervention," typically involving methods such as stone dumping, grout bag placement, or mattresses, which align with Plaintiffs' span remediation maintenance activities (including Plaintiffs' use of sandbags).

*g.    Plaintiffs' Span Remediation Maintenance Activities Follow Their Predecessor's Past Practice On the SYU Pipelines*

91.    Likewise, Plaintiffs' span remediation maintenance activities along the SYU Pipelines adhere to past practices on the SYU Pipelines that did not require additional CDPs or consistency certifications.  In 2012, the SLC and BSEE issued approvals to Exxon to conduct maintenance on the

---

[83] See Deepwater Pipeline Maintenance and Repair Manual Prepared for U.S. Department of Interior Minerals Management Service (June 1992).

30

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

SYU Pipelines. This work involved installing the same type of concrete bags using the same methodology employed by Plaintiffs in its span remediation maintenance activities to reduce free span lengths on the emulsion, gas, and water pipelines with the SYU Pipelines, addressing recurring spans caused by high currents.

92.     The scope of Exxon's approved work included the use of a dynamically positioned vessel to conduct an ROV survey of potential span areas and installing cement bag supports on and under the pipelines. This approach was designed to reduce free span lengths, ensuring the continued safe operation of the pipelines. The work was characterized as "minor maintenance and repairs."[84]

93.     Regarding the 2012 maintenance activities, the Coastal Commission staff was copied in a correspondence and aware of the proposed maintenance activities and did not require Exxon to obtain any new CDP or consistency certifications.[85]  Plaintiffs' span remediation maintenance activities are fully consistent with Exxon's maintenance activities from 2012, and similarly do not require a new CDP or consistency certification, and therefore, Plaintiffs are entitled to be treated consistent with the Coastal Commission's treatment of Exxon's maintenance activities.

**H.     The Span Remediation Maintenance Activities to the SYU Pipeline.**

94.     In July and October 2024, Plaintiffs/Sable conducted remotely operated vehicle ("ROV") surveys as part of Sable's State Lands Commission ("SLC") lease obligations.[86]

95.     Specifically, the ROV surveys involved a visual pipeline survey including inspection for scour and pipeline spans, a continuous pipeline-to-electrolyte cathodic potential survey, and documentation of anomalies such as damage or debris.  The survey was conducted in state waters between July 11th and July 16, 2024 and the survey in federal waters was conducted between October 10th and October 16, 20204.

---

[84] July 7, 2011 Letter from Exxon to SLC.

[85] January 27, 2012 Letter from Exxon to SLC.

[86] See State Lands Commission Amendment of Leases Nos. PRC 7163 and PRC 4977, Section 21.b.i ["Lessee shall adhere to and complete a comprehensive series of standard inspection protocols, as described below . . . to assess the presence and risk of hazards including, but not limited to damage, corrosion and pipeline movement.  Inspection methods shall encompass both internal and external evaluations, utilizing established industry practices such as Remotely Operated Vehicle (ROV) . . . assessments."].

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

96.     In addition, and pursuant to the SLC lease obligations, Sable contracted Spire Engineering Services to perform a seismic vulnerability assessment for each of the lines to the SYU Pipeline and to provide a set of maximum allowable span criteria to be used to assess pipeline spans, which revealed that certain pipeline spans along the ocean floor exceeded the allowable span lengths documented in the seismic vulnerability assessment.

97.     Further, a seismic vulnerability study was also performed for the 12" Gas Pipeline in California state waters, and the maximum allowable spans from that study were compared to identified spans from the ROV survey.  No spans on the 12" Gas Pipeline exceeded the maximum allowable span length, and therefore, no remediation within state waters was required.

98.     To address the spans identified by the ROV survey and, Plaintiffs submitted letters to SLC regarding the span remediation work in state waters and to the BSEE regarding the span remediation work in federal waters.  In response, the SLC and BSEE issued approvals for the span remediation work on November 27, 2024[87] and December 5, 2024, respectively.  Sable/Plaintiffs, consistent with the approvals, undertook span remediation maintenance activities in state waters from November 29, 2024 to December 1, 2024, consistent with the API 1111, as outlined in the existing DPP.  Sable/Plaintiffs also undertook span remediation maintenance activities in federal waters from December 5, 2024 to December 7, 2024.  These activities included conducting a pre-installation survey, deploying sand-to-concrete bags, and positioning them to provide necessary support to the pipeline.

99.     While no specific earthquake triggered a pause in operations, the inspections that Sable has conducted prior to restart identified areas of the SYU Pipelines that required remedial actions that are consistent with the remedial actions and associated impacts previously considered in the DPP EIS/EIR.  Sable's span remediation maintenance activities are consistent with the "ongoing maintenance of slope stabilization" that was contemplated and analyzed in the DPP EIS/EIR that was considered by the Coastal Commission in connection with its consistency certification and CDP No.

---

[87] SLC provided an email approval to move forward with the span remediation work in state waters on November 27, 2024, followed by an official approval letter dated December 4, 2024.

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES
AND DECLARATORY RELIEF

E-88-1 for the SYU Pipelines.

100.    Moreover, Plaintiffs' span remediation maintenance activities along the SYU Pipelines that involved sandbags under and around the SYU Pipelines to remediate spans that exceeded applicable criteria are consistent with the practices outlined by API 1111 and is therefore contemplated and approved by the DPP.

**I.    The Coastal Commission's Issuance of the NOV, EDCDOs, and Notices Prior to Issuance of EDCDOs Regarding the Anomaly Repair Work and Underground Safety Valves.**

101.    On September 27, 2024, the Coastal Commission issued a Notice of Violation, Violation File No. V-9-24-0152, to Sable regarding Sable's repair and maintenance activities along portions of Lines CA-324 and CA-325 and Sable's installation of the Underground Safety Valves. The NOV alleges that Sable engaged in unpermitted development related to Sable's work "to address pipeline corrosion" and "to install new safety valves."[88]

102.    On November 12, 2024, the Coastal Commission issued Executive Director Cease and Desist Order No. ED-24-CD-02. EDCDO 24-02 provides, in relevant part:

> Pursuant to my authority under California Public Resources Code ("PRC") Section 30809, as the Executive Director of the California Coastal Commission ("Commission"), I hereby issue this Executive Director Cease and Desist Order ("EDCDO" or "this Order"), which orders you, Sable Offshore Corp. ("Sable"), as the owner and operator of Las Flores Pipelines CA-324 and CA-325, to cease and desist from undertaking any further unpermitted development and immediately undertake steps necessary to avoid irreparable injury to the properties at issue in this order until formal Commission action can occur. Those steps include, among other things, safely securing and stabilizing open pits ("Open Sites") along the existing Las Flores Pipelines CA-324 and CA-325 within the Coastal Zone ("Pipelines") and the immediately surrounding areas so as to prevent potentially significant damage to coastal resources until you have received a final coastal development permit[] for the development or the Commission issues an order to restore the site or otherwise takes action to bring the site into a state that is safe and consistent with the law."[89]

---

[88] See September 27, 2024 NOV 152, **Exhibit A**, p. 2.

[89] See November 12, 2024 EDCDO, **Exhibit B**, at p. 2.

33

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

103.    EDCDO 24-02 states that the "violations addressed in [the EDCDO] involve development that has occurred in the Coastal Zone without the requisite Coastal act authorization, including, but not limited to, excavation with heavy equipment; removal of major vegetation; grading and widening of roads; installation of metal plates over water courses; dewatering and discharge of water; pipeline removal; replacement, and reinforcement; installation of safety valves; and other development associated with the Las Flores Pipelines CA-324 and CA-325."[90]   However, EDCDO 24-02 did not make a finding of a violation of the Coastal Act.[91]

104.    EDCDO 24-02 further provides "[f]ailure to comply with any term or condition of [the EDCDO], including any deadline contained herein will constitute a violation of [the EDCDO] and subject the parties to exposure for penalties under section 30821.6."[92]

105.    On February 16, 2025, the Coastal Commission issued a Notice Prior to Issuance of Executive Director Cease and Desist Order regarding the Las Flores Pipelines.[93]   In its letter, the Coastal Commission threatened the "issuance to Sable of a unilateral Executive Director Cease and Desist Order" for Plaintiffs' Anomaly Repair Work to the Las Flores Pipelines if work is not immediately ceased, confirmed in writing by Plaintiffs by "Monday February 17, 2025, no later than 4pm."[94]   The Coastal Commission's letter asserts that Anomaly Repair Work will constitute a "violation" of the Coastal Act and the County's LCP and states an intention to issue an EDCDO with respect to such work pursuant to Section 30809 of the Coastal Act.

106.    On February 17, 2025, Sable responded in writing to the Coastal Commission's letter and notified the Coastal Commission that "an Executive Director Cease and Desist Order [] may not

---

[90] *Id.* at p. 6.

[91] *Id.* at p. 2, fn. 4 ["Please further note that the term 'violation,' as used throughout this letter, refers to alleged violations of the Coastal Act."].

[92] *Id.*, at p. 9.

[93] Coastal Commission's NOI regarding Las Flores Pipelines dated February 16, 2025, **Exhibit D**.

[94] *Id.* at p. 5.

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

be issued under the Coastal Act and any such issuance would be procedurally improper."[95]  Sable explained that "the County confirmed in writing that Sable's Anomaly Repair Work is authorized by the pipelines' existing coastal development permits [] and, consistent with the County's past practices, no new or separate Coastal Act authorization is required for Sable to perform the work."  Further, Sable explained in its letter that none of the circumstances for which the Coastal Commission may issue an EDCDO under Section 30809 of the Coastal Act are applicable in these circumstances with respect to the anomaly repairs to the Las Flores Pipelines.

107.    On February 18, 2025, the Coastal Commission issued the Executive Director Cease and Desist Order No. ED-25-CD-01 referencing NOVs Nos. V-9-25-0013 and V-9-24-0152, which provides, in relevant part:

> Pursuant to my authority under California Public Resources Code ("PRC") Section 30809, as the Executive Director of the California Coastal Commission ("Commission"), I hereby issue this Executive Director Cease and Desist Order ("EDCDO" or "this Order"), which orders you, Sable Offshore Corp. ("Sable"), as the owner and operator of Las Flores Pipelines CA-324 and CA-325, to cease further work along the Pipeline and immediately surrounding areas unless and until authorized by a new, final coastal development permit. . . .[96]

108.    EDCDO 25-01 purports to address "development that has occurred in the Coastal Zone without the requisite Coastal act authorization, including, but not necessarily limited to, excavation with heavy equipment; removal of major vegetation; grading and widening of roads; installation of metal plates over water courses; placement of fill in wetlands and coastal waters; dewatering and discharge of water; pipeline removal, replacement, and reinforcement; any installation of shutoff valves; and other development associated with the Pipeline[s]."[97]

109.    EDCDO 25-01 alleges that Plaintiffs are "undertaking or [are] threatening to undertake development that may require a CDP, without first securing a CDP and [the Executive Director has]

---

[95] Sable's Letter to Coastal Commission dated February 17, 2025, **Exhibit F**.

[96] See February 18, 2025 EDCDO, **Exhibit J**, at p. 2.

[97] *Id.* at p. 3.

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES
AND DECLARATORY RELIEF

further determined Santa Barbara County has declined to act in a timely manner regarding the coastal act violations as detailed in the EDCDO, and this failure to act will cause damage to coastal resources."[98]  However, EDCDO 25-01 also provides that "[t]he County has indicated that it believes the work at issue is authorized by prior permits, and thus, it does not agree with [Coastal] Commission staff's conclusion that the recently completed, ongoing and threated, future work constitutes a violation of the Coastal Act and LCP."[99]   The Coastal Commission dismissed the County's determination regarding the Anomaly Repair Work along the Las Flores Pipelines and ultimately "concluded that Sable has yet to apply for any CDP, or other valid Coastal Act authorization, covering the work at issue, nor has Sable demonstrated that it possesses the necessary Coastal Act authorization for this work."[100]

110.    An EDCDO may be issued when the Executive Director determines that an activity has been (or is threatened to be) undertaken that "may require a permit *from the commission* without securing a permit."[101] Second, an EDCDO may be issued when the Executive Director determines an activity that has been (or is threatened to be) undertaken "may be inconsistent with any permit *previously issued by the commission*."[102]  Neither of these scenarios are present here.  The County's February 12, 2025 letter and March 21, 2025 electronic correspondence confirmed, along with Sable's February 14, 2025 letter to the Coastal Commission, that Plaintiffs' Anomaly Repair Work was authorized by the Las Flores Pipelines' existing CDPs, which were issued by the County—*not the Coastal Commission*.[103]  All of Sable's Anomaly Repair Work and safety valve installation work, as confirmed through Sable's submissions to the County, is within the County's permitting jurisdiction

---

[98] *Id.* at pp. 7-8.

[99] *Id.* at pp. 3-4.

[100] *Id.* at pp. 4, 8.

[101] Coastal Act (Pub. Res. Code), § 30809(a) (emphasis added).

[102] *Ibid.*

[103] See County Letter dated February 12, 2025, **Exhibit E**; County's Electronic Correspondence dated March 21, 2025, **Exhibit I**; Sable's February 14, 2025 Letter, **Exhibit G**; County Coastal Development Permit 86-CDP-189 (Jul. 27, 1986); and County Coastal Development Permit 86 CDP-205 (Aug. 5, 1986).

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

under the LCP. The February 17, 2025 letter does not allege, and the Anomaly Repair Work does not require, any new or amended coastal development permit "from the Commission" and is not subject to a CDP "previously issued by the Commission."[104]  Therefore, the Coastal Commission may not issue an EDCDO for these activities.

111.   An EDCDO also may be issued "to enforce any requirements of a certified local coastal program …, or any requirements of [the Coastal Act]."[105]  The Coastal Act specifically limits EDCDOs issued under this third scenario to "the following circumstances":

(1) "The local government … requests the commission to assist with, or assume primary responsibility for, issuing a cease and desist order;"

(2) "The commission requests and the local government … declines to act, or does not take action in a timely manner, regarding an alleged violation which could cause significant damage to coastal resources;" or

(3) "The local government … is a party to the violation."[106]

112.   Allowing the Coastal Commission's Executive Director to issue an EDCDO for a purported violation of a certified local coastal program or the Coastal Act only in these three situations ensures that the Coastal Commission does not circumvent the local government's delegated authority under the Coastal Act to implement its local coastal program.[107]

113.   EDCDO 25-01 was not validly issued because the County (not the Coastal Commission), pursuant to its delegated authority from the LCP and Coastal Act, issued the original CDPs authorizing the development of the Las Flores Pipelines, which included the authorization of repair and maintenance activities on the Pipelines throughout their operational lifetime. In its February 12, 2025 letter to Sable, the County confirmed Sable's future and ongoing Anomaly Repair Work to the Las Flores Pipeline that the County "is authorized by the existing permits (Final Development Plan, Major Conditional Use Permit, and associated Coastal Development Permits) and was analyzed

---

[104] Coastal Act, § 30809(a).

[105] *Ibid.*

[106] *Id.*, § 30809(a)(1)-(3).

[107] See *id.*, § 30519(a).

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

in the prior Environmental Impact Report/Environmental Impact Statement."[108]  The County further reviewed Sable's "informational package regarding anomaly repair activities completed on [the Las Flores Pipelines] in 2024… and [] determined that this work fits within[] the conclusions/directives of our February 12, 2025 letter to [Sable]. No permits will be required."[109]

114.    Moreover, the County has not declined to act with respect to Sable's safety valve installation work. Rather, the County initially opted to prepare discrete amendments to the Las Flores Pipelines' FDP and CDPs related to the proposed safety valve installation work, and as part of the process, County staff recommended that the County Zoning Administrator determine the safety valve installation work would be exempt from CEQA review under several categorical exemptions.  The requested amendments were approved on August 22, 2022, and County staff thereafter prepared a draft addendum to the Las Flores Pipelines' EIR/EIS analyzing whether the proposed safety valve installation work triggers a need to prepare a new environmental impact report under CEQA and found that impacts would be less than those identified in the Las Flores Pipelines' EIR/EIS in soils, surface and groundwater, scenic/visual resources impacts, biological impacts, cultural/historical resources, and hazards and risks.  Such findings were subsequently appealed and resulted in a split vote, resulting in litigation in which Sable and the County entered a settlement agreement that acknowledged, pursuant to the Celeron Settlement Agreement discussed *supra*, the County is preempted "in the field of pipeline safety regulation and safety oversight as it relates to the [pipelines]."  Additionally, the parties acknowledged a "presume[ption]" that "the County is preempted when the activity to be performed is one foot or more below the surface of the ground and related to the operation of a pipeline."  Likewise, on September 4, 2024, the County confirmed that it "does not have permit authority or jurisdiction over the sixteen (16) safety valves and their ancillary equipment as currently proposed because they are safety valves required by state law [AB 864], related to the operation of an interstate Pipeline, and one foot or more underground."

115.    Thus, the Coastal Commission's issuance of the EDCDOs for the Anomaly Repair

---

[108] County's February 12, 2025 correspondence, **Exhibit E**, at p. 1.

[109] County's Electronic Correspondence dated March 21, 2025, **Exhibit I**.

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Work and the safety valve installation work at the Las Flores Pipelines is improper.

**J.      The Coastal Commission's Issuance of the NOV Regarding the Span Maintenance Activities.**

116.    On February 11, 2025, the Coastal Commission issued Notice of Violation, Violation File No. V-9-25-0013, to Sable regarding Sable's span remediation maintenance activities along the SYU Pipelines.    The NOV allege that Plaintiffs are in violation for "[u]npermitted offshore development including, but not necessarily limited to, deploying sand/cement bags on the seafloor and positioning them to provide support to Sable's out-of-service offshore oil and water pipelines as part of an effort to restart SYU oil production operations and bring the pipelines back into use[.]"[110]

117.    The NOV for the SYU Pipelines further states that "without first obtaining Commission authorization, Sable placed bags and pallets of concrete fill material in coastal waters below 14 sections of two seafloor pipelines totaling over 750 linear feet, constituting unpermitted fill of coastal waters. As noted above, prior to placing this fill material, Sable had been informed by Coastal Commission staff that such placement would require a permit from the Commission."[111]

118.    The NOV for the SYU Pipelines additionally states that "[t]he placement of bags of concrete and pallets within 14 pipeline sites across roughly 750 linear feet, as described above, clearly constitutes "development" under the Coastal Act. Coastal Act Section 30600(a) requires Sable to obtain a CDP prior to performing or undertaking any development activity in the Coastal Zone, in addition to obtaining any other permit required by law. No such CDP was obtained, and therefore the unpermitted development activities described above constitute Coastal Act violations."[112]

**K.      The Coastal Commission's Issuance of Cease and Desist Order No. CCC-25-CD-01, Restoration Order No. CCC-25-RO-01, and Administrative Penalty No. CCC-25-AP3-01.**

119.    Following the Coastal Commission's April 10, 2025 meeting, Coastal Commission

---

[110] NOV, Violation File No. V-9-25-0013, **Exhibit C**, at p. 1.

[111] *Id.* at p. 3.

[112] *Id.* at p. 4.

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

issued the April 10 Orders. Plaintiffs submitted a detailed statement of defense that the Coastal Commission staff largely ignored,[113] and Plaintiffs were assess arbitrary and capricious order.[114]

120. The April 10 Orders relate to Notices of Violation V-9-24-0152 and V-9-25-0013, described *supra*.

121. The Coastal Commission's March 28, 2025 Staff Report with recommendations and findings, which was posted ahead of the Coastal Commission's April 10, 2025 meeting, provides that the Orders relate to "violations are at sites along or offshore of the Gaviota Coast, in Santa Barbara County, and all of which have adversely impacted, and continue to adversely impact, coastal resources as a result of Sable's outright refusal to comply with the Coastal Act."[115]

122. The Coastal Commission's Staff Report further describes that "Sable undertook development at locations onshore, along the Pipelines, as early as, if not before, September of 2024. Sable undertook activities without prior communication or notification to the California Coastal Commission [] staff, and without Coastal Act authorization. More specifically, at locations onshore, Sable undertook development activities including the following: 1) excavation with heavy equipment; 2) removal of major vegetation; 3) grading and widening of roads; 4) installation of metal plates and other fill material within wetlands; 5) dewatering and discharge of water, including into coastal waterways; 6) pipeline removal, replacement, and reinforcement; 7) installation of shutoff valves; as well as other development associated with the inspection and anomaly correction work on Las Flores Pipelines[]. At locations offshore, Sable undertook development beginning on November 29, 2024, including the placement of sand and cement bags on the seafloor below and adjacent to Sable's out-of-service offshore oil and water pipelines."[116]

123. The Staff Report provides that the "onshore development along the Pipelines has

[113] Sable's Statement of Defense submitted prior to the Coastal Commission's April 10, 2025 meeting.

[114] Before Plaintiffs were even able to present their defense, the Coastal Commission's Chairman referred to Plaintiffs as the "violators" rather than "alleged violators," further demonstrating the arbitrary and capricious nature in which the Coastal Commission acted.

[115] March 28, 2025 Staff Report, at p. 2.

[116] *Id.* at p. 4.

40

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES
AND DECLARATORY RELIEF

resulted in adverse impacts to various sensitive habitat areas…." It further states that "[i]t also appears that Sable carried out work on the Pipelines without implementation of appropriate coastal resource protection measures."[117]

124.    The Staff Report states that "[t]he unpermitted development Sable has undertaken at both onshore and offshore locations has resulted in damage to coastal resources, but the extent of this damage is not fully known because of Sable's continued refusal to provide complete and detailed information as to the work that it has undertaken, as well as proposed, future plans. Additionally, Sable has continued to undertake development activities at onshore locations along the Pipelines, despite issuance of two separate [EDCDOs] and in direct contravention of the resource protection provisions of the Coastal Act."[118]

125.    The Coastal Commission's staff recommended issuance of the Cease and Desist Order "to ensure that Sable ceases any further development activities along the Pipelines, until a complete CDP[] application has been submitted and addressed for future, proposed activities, as well as an ATF CDP application for all development activities already undertaken at the onshore locations along the Pipelines, and for all development activities undertaken along offshore sections of Sable's oil and water pipelines."[119]

126.    The Cease and Desist Order, as issued on April 10, 2025, requires Sable to submit updated CDP applications—or a consolidated CDP application—within 30 days of this Order's effective date.[120] The Cease and Desist Order provides that a completed CDP application for onshore development activities must include, at a minimum: 1) site plans for each anomaly repair location depicting topographic contours, grading, sensitive resources, applicable Best Management Practices ("BMPs"), equipment staging and stockpiles, site-specific work performance details, and surveys of property lines/easements/rights-of-way, among other things; 2) grading totals for each site and all

---

[117] *Id.* at pp. 4-5.

[118] *Id.* at p. 11.

[119] *Ibid.*

[120] April 10 Orders, **Exhibit K**, at 1.3.A.

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

types of work and combined total grading for all work, including already-completed and proposed work; 3) specific details on the amount and type of vegetation clearing and trimming; 4) a list of all construction and control BMPs; 5) geology and soil reports; 6) site-specific biological survey reports prepared by a qualified biologist; 7) site-specific delineation of single parameter wetlands; 8) a site survey of all Environmentally Sensitive Habitat Areas ("ESHAs")  and 100-foot buffers from any ESHA; 9) site-specific delineation of single parameter wetlands; 10) measures to avoid, minimize, and mitigate adverse impacts to ESHAs, wetlands, and sensitive plant and animal species; 11) site-specific cultural resources surveys and measures to avoid potential adverse impacts on cultural resources; 12) a detailed project schedule, with a full breakdown of all construction details; 13) evidence that permits or authorizations from other agencies have been granted or applied for; and 14) a CEQA determination.[121]

127.     For offshore development, the Cease and Desist Order provides that a completed CDP application must include, at a minimum: 1) site plans for each span remediation location that depicts bathymetric contours, fill placement areas, marine habitat surveys, applicable BMPs, and cross sections and diagrams of any work performed, among other things; 2) information on the vessels and ROVs used to perform the work, including how they were maintained to prevent the release of any fuel or oils, how they were moored, and how they transited to/from the site; 3) information on how project activities could have affected commercial and recreational fishing in the area and any advance coordination with affected fishing communities; 4) information on the specific type of cement mix used, including whether it will be safe for the marine life over the course of the development; 5) information on any needed contingency anchors away from sensitive marine habitat and species; 6) analyses of alternatives to the proposed cement bags and measure to avoid or minimize quantity of fill materials used and potential adverse impacts from fill materials; 7) site-specific cultural resource surveys on development areas and measures to avoid and minimize potential adverse impacts on cultural resources; 8) a detailed project schedule, with a full breakdown of all construction details; 9) evidence that permits or authorizations from other agencies have been granted or applied for; and 10)

[121] *Id.* at 1.3.B

42

a CEQA determination.[122]

128.    The Coastal Commission's March 28, 2025 Staff Report recommended the Restoration Order "to address the effects of the unpermitted work."[123]  The Restoration Order, as enacted on April 10, 2025, requires Sable to submit a full Restoration Plan within 60 days and further require that Sable "undertake to implement erosion control measures, undertake remedial grading, revegetate the [areas where the unpermitted development occurred] to address permanent and temporal losses of habitat and other resources affected by the [u]npermitted [d]evelopment, implement cultural resource protections and monitoring, and monitor the restoration to ensure the success of restoration activities."[124]

129.    The Coastal Commission's March 28, 2025 Staff Report recommended a civil penalty in the amount of $14,987,250 with an efficiency discount.[125]  Nevertheless, the Coastal Commission arbitrarily and capriciously issued the Administrative Penalty in the amount of $18,022,500 against Plaintiffs with an "efficiency discount."

130.    As a result of the issuance of the NOVs, EDCDOs, April 10 Orders, Plaintiffs have suffered damages consisting of, but not limited to, lost revenues and profits for Plaintiffs inability to complete all necessary repairs and operate the Pipelines and incurred costs including payroll and other costs anticipated with Plaintiffs' ability to operate and maintain the Pipelines within Plaintiffs' rights without additional authorizations or approvals.

**FIRST CAUSE OF ACTION**

**Petition for Writ of Traditional Mandamus (Code Civ. Proc., § 1085), or, in the alternative, Administrative Mandamus (Code Civ. Proc., § 1094.5)**

131.    Plaintiffs reallege and incorporate herein by reference all foregoing paragraphs.

132.    Plaintiffs hereby seek a writ of traditional mandamus pursuant to California Code of

---

[122] *Ibid.*

[123] March 28, 2025 Staff Report, at p. 11.

[124] April 10 Orders, **Exhibit K**, at 6.0.

[125] March 28, 2025 Staff Report, at pp. 54-55.

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Civil Procedure section 1085, or, alternatively, a writ of administrative mandamus pursuant to Code of Civil Procedure section 1094.5, directing the Coastal Commission to set aside their issuance of the NOVs, EDCDOs, and April 10 Orders on the grounds that the Coastal Commission has acted arbitrarily and capriciously and have abused their discretion.

133.    ***Lack of Justification Under Public Resources Code §§ 30809(a) and 30810.***   The EDCDOs were issued despite the Coastal Commission's lack of justification to do so under Public Resources Code §§ 30809(a).

134.    The Coastal Commission may only issue an EDCDO against Plaintiffs under three circumstances, none of which are applicable here: (1) when the Executive Director determines an activity has been (or is threatened to be) undertaken that "may require a permit from the commission without securing a permit; (2) when the Executive Director determines an activity that has been (or is threatened to be) undertaken "may be inconsistent with any permit previously issued by the commission";  or (3) "to enforce any requirements of a certified local coastal program…, or any requirements of [the Coastal Act]."  (Pub. Res. Code § 30809(a), italics and emphasis added).)

135.    The County, with its delegated Coastal Act authority under the LCP, issued the original CDPs concerning the Las Flores Pipelines that authorized ongoing repair and maintenance activities during the Pipelines' operational lifetime.  On February 12, 2025, the County confirmed that the repair and maintenance activities are authorized by those existing CDPs and do not require any new amended CDPs "from the Commission." (Pub. Res. Code § 30809(a).)  [126] As the County explained, its "assessment is consistent with the type of reviews conducted by the County, both inside and outside the Coastal Zone, on a regular basis to determine whether proposed development activities fall within the scope of existing permits."[127]  Based on its review, "no further application to or action by the County is required." (*Ibid.*) The County also confirmed that previous Anomaly Repair Work to the Las Flores Pipelines conducted in 2024 did not require additional permits and were covered by the

---

[126] See County Letter dated February 12, 2025, **Exhibit E.**

[127] *Ibid.*

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

existing CDPs.[128] Moreover, the safety valve installation work to the Las Flores Pipelines similarly is covered by the existing CDPs *issued by the County*.

136.    The Coastal Act specifically limits EDCDOs issued under the third scenario to "the following circumstances: (1) "The local government … requests the commission to assist with, or assume primary responsibility for, issuing a cease and desist order;" (2) "The commission requests and the local government … declines to act, or does not take action in a timely manner, regarding an alleged violation which could cause significant damage to coastal resources;" or (3) "The local government … is a party to the violation." (Pub. Res. Code § 30809(a)(1)-(3).)

137.    However, the County has not requested the Coastal Commission to assist with, or assume primary responsibility for, issuing an EDCDO and instead has confirmed in writing that the Anomaly Repair Work "is authorized by the [pipelines'] existing … Coastal Development Permits[.]"[129]

138.    The County also has recognized in the Safety Valve Settlement Agreement that the safety valve installation work is required by state law, which similarly creates a presumption of preemption against the County for such work.[130] The Coastal Commission may not issue an EDCDO and commandeer the County's authority over the Pipelines simply because the Coastal Commission does not agree with the County's actions taken under its delegated authority.

139.    Similarly, Public Resources Code § 30810 does not vest the Coastal Commission with a unilateral right to nullify the County's delegated local permitting authority under the Coastal Act. Section 30810 first authorizes a Cease and Desist Order to be issued if the Coastal Commission determines that an activity has been (or is threatened to be) undertaken that may require "*a permit from the commission* without securing a permit."[131]  Second, a cease and desist order may be issued

---

[128] See County Electronic Correspondence dated March 21, 2025, **Exhibit K.**

[129] County Letter dated February 12, 2025, **Exhibit E**; see also County Electronic Correspondence dated March 21, 2025, **Exhibit K**.

[130] Sable has sought further confirmation from the County, which is pending, further demonstrating that the County has not declined to act.

[131] Pub. Res. Code, § 30810(a) (italics and emphasis added.)

45

upon a determination that an activity that has been (or is threatened to be) undertaken that may be "inconsistent with any permit *previously issued by the commission*."[132]  However, this is not the case here.  To the contrary, the Las Flores Pipelines' existing CDPs were issued by the County – not the Coastal Commission.  Recognizing that neither of the above-mentioned triggers exist here, the Coastal Commission relies on a different subsection of Section 30810, which allows cease and desist orders "to enforce any requirements of a certified local coastal program … or any requirements of [the Coastal Act]" when the "commission requests and the local government … declines to act, or does not take action in a timely manner, regarding an alleged violation which could cause significant damage to coastal resources."[133]

140.    The County has not declined to act in this matter.  As discussed in detail *supra*, the County has reviewed informational packages regarding the Anomaly Repair Work and has provided its confirmation that the work is authorized without the need for additional permits.[134]  Additionally, as discussed *supra*, the County has recognized that the safety valve installation work to the Las Flores Pipelines, including on September 4, 2024, in light of Plaintiff's revision to the proposed safety valve installation work, the County confirmed that the County "does not have permit authority or jurisdiction over the sixteen (16) safety valves and their ancillary equipment as currently proposed because they are safety valves required by state law [AB 864], related to the operation of an interstate Pipeline, and one foot or more underground."[135]

141.    *The Coastal Commission Usurps the County's Authority under Public Resources Code § 30519*.    The Coastal Commission's issuance of the NOVs, EDCDOs, April 10 Orders unlawfully usurps the County's delegated costal development permitting authority under its LCP, which was certified by the Coastal Commission pursuant to Public Resources Code § 30519.

142.    As described *supra*, Plaintiffs conducted Anomaly Repair Work, installation of safety

---

[132] *Ibid.*

[133] *Ibid.*

[134] See County Letter dated February 12, 2025, **Exhibit E**; see also County Electronic Correspondence dated March 21, 2025, **Exhibit K**.

[135] County's September 4, 2024, Letter.

46

valves along the Pipelines, which were previously authorized by the FDP, CUP, CDPs .[136]

143.     The Coastal Commission has abused its discretion via its issuance of the EDCDOs, and April 10 Orders, which unlawfully invade the sole jurisdiction of the County and its coastal development permitting authority.

144.     ***The Coastal Commission Orders Are Inconsistent With Prior Environmental Reviews and Findings.***   As described *supra*, Plaintiffs' repair and maintenance activities were previously authorized by the DPP, FDP, CUP, CDPs, Conditions of Approval, which were subject to stringent environmental review mandated by law.   The repair and maintenance activities do not constitute a new project requiring additional environmental review, as all activities were analyzed and mitigated for  by the Pipelines' EIR/EIS, DPP, FDP, CUP, CDPs, Conditions of Approval.

145.     As such, the issuance of the EDCDOs, Cease and Desist Order No. CCC-25-CD-01, Restoration Order No. CCC-25-RO-01, and Administrative Penalty No. CCC-25-AP3-01 constitute an abuse of discretion because they are inconsistent with prior conclusions and authoritative findings – adopted after proper and legally required processes and based on comprehensive environmental reviews mandated by California law.

## SECOND CAUSE OF ACTION

### Declaratory Relief (Code of Civ. Proc., § 1060)

146.     Plaintiffs reallege and incorporate herein by reference all foregoing paragraphs.

147.     Plaintiffs seek a declaration from this Court that the Coastal Commission's issuance of the NOVs, EDCDOs, Cease and Desist Order No. CCC-25-CD-01, Restoration Order No. CCC-25-RO-01, and Administrative Penalty No. CCC-25-AP3-01 (1) are contrary to the Coastal Commission's obligations and authority under the Public Resources Code, (2) unlawfully usurp the County's delegated coastal development authority under its LCP, which was certified by the Coastal Commission pursuant to the Public Resources Code, and (3) are actions not supported by evidence, as they are inconsistent with the County's prior conclusions and findings regarding the Pipelines.

---

[136] See County Letter dated February 12, 2025, **Exhibit E**; see also County Electronic Correspondence dated March 21, 2025, **Exhibit K**.

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

148.    As demonstrated by the Coastal Commission's issuance of the NOVs, EDCDOs, Cease and Desist Order No. CCC-25-CD-01, Restoration Order No. CCC-25-RO-01, and Administrative Penalty No. CCC-25-AP3-01, Plaintiffs are informed and believe that the Coastal Commission disputes Plaintiffs' contentions, and therefore, Plaintiffs seek a judicial declaration of the rights and obligations of the respective parties.

149.    Judicial resolution of this dispute, and a declaration by the Court, is necessary to resolve the legality of the Coastal Commission's actions as described above.

**THIRD CAUSE OF ACTION**

**Complaint for Damages – Violation of Article I, Section 19 of the California Constitution**

**(Inverse Condemnation) and Violation of the Takings Clause of the**

**Fifth and Fourteenth Amendments to the United States Constitution**

150.    Plaintiffs reallege and incorporate herein by reference all foregoing paragraphs.

151.    At the time of the Coastal Commission's acts alleged herein, PPC was the owner of the Pipelines and Sable was operating the Pipelines.

152.    Sable has a vested right to continue its operations and perform repair and maintenance activities on the Pipelines as contemplated and previously authorized under the DPP, FDP, CUP, CDPs, Conditions of Approval, and County Letter.

153.    The Coastal Commission's issuance of the NOVs, EDCDOs, and April 10 Orders requiring Sable to halt all repair and maintenance activities on the Pipelines, seek additional permits, and pay penalties for activities already authorized by the County substantially impairs Sable's property rights to operate at the Pipelines, and PPC's property right in the Pipelines, for the benefit of the public without prior compensation to Sable or PPC.

154.    In taking action to issue the NOVs, EDCDOs, and April 10 Orders, the Coastal Commission violated Article I, Section 19 of the California Constitution, which prohibits the temporary or permanent taking or damaging of private property for public use without prior, just compensation.  Further, the Coastal Commission violated the takings clause of the Fifth Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, which prohibits the temporary

or permanent taking of private property for public use without prior, just compensation.

155.    As a direct result of the Coastal Commission's actions as alleged herein, the enforcement of the NOVs, EDCDOs, and April 10 Orders will interfere with Plaintiffs' reasonable investment-backed expectations.

156.    To date, Plaintiffs have not received any compensation from the Coastal Commission on account of the above alleged taking of, or damage to, their rights concerning the Pipelines.  The Coastal Commission failed to ascertain the just compensation due to Plaintiffs prior to issuance of the NOVs, EDCDOs, and April 10 Orders.

157.    As a direct and proximate result of the Coastal Commission's violation of Article 1, Section 19 of the California Constitution and the takings clause of the Fifth Amendment of the U.S. Constitution, as alleged above, Plaintiffs have been and will be damaged from the interference with its reasonable investment-backed expectations in their respective interests in the Pipelines and will suffer further damages in an amount to be determined at trial.

158.    Plaintiffs are entitled to damages in the amount in excess of $347,000,000 and attorneys' fees for the Coastal Commission's constitutional violation under Sections 1983 and 1988 of the Federal Civil Rights Act of 1871.   Additionally, Plaintiffs are entitled to reputational damages in an amount to be determined.

### FOURTH CAUSE OF ACTION

**Declaratory Relief – Impairment of Plaintiffs' Vested Rights**

159.    Plaintiffs reallege and incorporate herein by reference all foregoing paragraphs.

160.    Sable seeks a declaration from this Court that Sable has a vested right in the continuation of its operation of the Pipelines, in particular as it relates to the impairment of Sable's interests in the Pipelines by virtue of the NOVs, EDCDOs, and April 10 Orders. Sable further seeks a declaration that, if a vested right exists, Defendant violated it when the Coastal Commission issued the NOVs, EDCDOs, and April 10 Orders.

161.    Sable or its predecessors has a property interest in operating the Pipelines.

162.    PPC seeks a declaration from this Court that PPC has a vested right [of ownership] of

the Pipelines, in particular as it relates to the impairment of PPC's ownership interests in the Pipelines by virtue of the NOVs, EDCDOs, April 10 Orders. PPC further seeks a declaration that, if a vested right exists, Defendant violated it when the Coastal Commission issued the NOVs, EDCDOs, and April 10 Orders.

163.    PPC has a property interest in the Pipelines.

164.    The doctrine of vested rights seeks to protect property owners and developers who have substantially relied on past permits and proceeded accordingly with the government's acknowledgement. The doctrine protects a permit holder's right not only to construct, but also to use the premises as authorized by the permit.  (*Cnty. of San Diego v. McClurken* (1951) 37 Cal. 2d 683, 691.)

165.    Sable [or its predecessors] has a vested right to operate the Pipelines, consistent with long-established DPP, FDP, CUP, CDPs, Conditions for Approval, and County Letter. Sable's vested rights to operate the Pipelines include conducting repair and maintenance activities required under the DPP, FDP, CUP, CDPs, and Conditions of Approval and 49 C.F.R. Part 195.

166.    The Coastal Commission impairs Sable's vested rights through the issuance of the NOVs, EDCDOs, and April 10 Orders, requiring Sable to halt Anomaly Repair Work and span remediation maintenance activities previously authorized by the FDP, CUP, CDPs, Conditions of Approval, and County Letter, and as required by 49 C.F.R. Part 195.

167.    The Coastal Commission impairs PPC's vested rights through the issuance of the NOVs, EDCDOs, and April 10 Orders, prohibiting it from enjoying the benefits to the Pipelines of the Anomaly Repair Work and span remediation maintenance activities previously authorized by the DPP, FDP, CUP, CDPs, Conditions of Approval, and County Letter, and as required by 49 C.F.R. Part 195.

168.    Plaintiffs seek a judicial declaration of the rights and obligations of the respective parties.

169.    Judicial resolution of this dispute and a declaration by the Court is necessary to determine if Sable has a vested right in the continuation of its operation of the Pipelines, in particular as it relates to the impairment of Plaintiffs' interests in the Pipelines by virtue of the Coastal

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Commission's NOVs, EDCDOs, and April 10 Orders halting all maintenance activities, and, if so, whether the Coastal Commission's issuances of the NOVs, EDCDOs, and April 10 Orders were improper infringements of this vested right and should be set aside.

### FIFTH CAUSE OF ACTION

### Declaratory Relief - Inverse Condemnation

170. Plaintiffs reallege and incorporate by reference the foregoing paragraphs as though fully set forth herein.

171. The NOVs, EDCDOs, and April 10 Orders are invalid because they substantially impair Sable's vested rights in the continuation of its operations at the Pipelines as previously authorized by the DPP, FDP, CUP, CDPs, Conditions of Approval, and County Letter.

172. The Coastal Commission via its issuance of the NOVs, EDCDOs, and April 10 Orders, prohibits Plaintiffs' compliance with federal law requiring Plaintiffs to promptly make anomaly repairs and conduct span remediation maintenance activities at the Pipelines as necessary to protect human health and the environment. The Coastal Commission, therefore, violated Article 1, Section 19 of the California Constitution, which prohibits the temporary or permanent taking or damaging of private property for public use without prior, just compensation. Further, Coastal Commission violated the takings clause of the Fifth Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, which prohibits the temporary or permanent taking of private property for public use without prior, just compensation.

173. Plaintiffs' ability to comply with federal laws and regulations to ensure the protection of human health and safety at the Pipelines by conducting Anomaly Repair Work and span remediation maintenance activities is materially, substantially, and irreparably harmed by the NOVs, EDCDOs, and April 10 Orders.

174. A bona fide and actual controversy exists between Plaintiffs and the Coastal Commission in that Plaintiffs allege, and the Coastal Commission denies, that the NOVs, EDCDOs, and April 10 Orders violate Article 1, Section 19 of the California Constitution and the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution.

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

175.    Plaintiffs desire a judicial determination of the validity of the NOVs, EDCDOs, and April 10 Orders, to save itself from the harm caused by their issuance, which prevents Sable from performing the Anomaly Repair Work and span remediation maintenance activities at the Pipelines. Plaintiffs' interests in complying with federal law and applicable regulations to perform the necessary Anomaly Repair Work and span remediation maintenance activities in order to protect human health and the environment are materially, substantially, and irreparably harmed by the enforcement of the NOVs, EDCDOs, and April 10 Orders.

**SIXTH CAUSE OF ACTION**

**Declaratory Relief – Cal. Pub. Resources Code § 30803**

176.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs as though fully set forth herein.

177.    Plaintiffs "may maintain an action for declaratory relief and equitable relief to restrain any violation of a cease and desist order issued pursuant to Section 30809 or 30810[.]" (Cal. Pub. Resources Code § 30803.)

178.    The Coastal Commission's EDCDO ED-25-CD-01[137] and April 10 Orders impair Plaintiffs' continuation of Anomaly Repair Work on the Pipelines as required under obligations set forth in Consent Decrees and applicable federal regulations to ensure safe operation of the Pipelines, and the Commission may not prohibit the activities previously authorized by approved DPP, FDP, CUP, CDPs, Conditions of Approval, and County's Letter.

179.    Plaintiffs hereby invoke the provisions of California Public Resources Code Section 30803 to restrain the Coastal Commission's enforcement of EDCDO ED-25-CD-01 and April 10 Orders.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

1.    For a writ of mandamus directing the Coastal Commission to set aside the NOVs,

_____

[137] EDCDO ED-24-CD-02 expired on February 10, 2025. See November 12, 2024 EDCDO, **Exhibit B**, at p. 1.

52

EDCDOs, and April 10 Orders on the grounds that the Coastal Commission's NOVs, EDCDOs, and April 10 Orders are unlawful and void as contrary to the Public Resources Code, including sections 30809 et seq. and 30810 et seq.

2.     For a writ of mandamus directing the Coastal Commission to set aside the NOVs, EDCDOs, and April 10 Orders on the grounds that the Coastal Commission's NOVs, EDCDOs, and April 10 Orders are unlawful and void because they violate and usurp the County's delegated coastal development permitting authority concerning the Pipelines under the County's LCP, pursuant to Public Resources Code section 30519 et seq.

3.     For a writ of mandamus directing the Coastal Commission to set aside the NOVs EDCDOs, and April 10 Orders because their issuance constitutes an abuse of discretion that is unsupported by evidence and inconsistent with prior authoritative conclusions and findings.

4.     For a declaration that the Coastal Commission's, NOVs, EDCDOs, and April 10 Orders because they are contrary to the Coastal Commission's obligations and authority under the Public Resources Code, including sections 30810 and 30809(a).

5.     For a declaration that the Coastal Commission's, NOVs, EDCDOs, and April 10 Orders because they violate and usurp the County's delegated coastal development permitting authority concerning the Pipelines under the County's LCP, pursuant to Public Resources Code section 30519 et seq.

6.     For a declaration that the Coastal Commission's, NOVs, EDCDOs, and April 10 Orders because they are unsupported by evidence and inconsistent with prior authoritative conclusions and findings.

7.     For a declaration that the Coastal Commission's NOVs, EDCDOs, and April 10 Orders are unlawful and void as they infringe upon and violate Plaintiffs' vested rights.

8.     For a declaration that the Coastal Commission's NOVs, EDCDOs, and April 10 Orders are unlawful and void as they violate Article I, Section 19 of the California Constitution and the takings clause of the Fifth and Fourteenth Amendments to the United States Constitution.

9.     For a preliminary and permanent injunction prohibiting the Coastal Commission from

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

taking any action in the furtherance of enforcing any Notice of Violation for the Anomaly Repair Work or span remediation maintenance activities at the Las Flores Pipelines and SYU Pipelines, respectively, as the Coastal Commission lacks the authority to pursue any such remedies.

10. For a preliminary and permanent injunction prohibiting the Coastal Commission from taking any action in the furtherance of enforcing any Executive Director Cease and Desist Order for the Anomaly Repair Work or span remediation maintenance activities at the Las Flores Pipelines and SYU Pipelines, respectively, as the Coastal Commission lacks the authority to pursue any such remedies.

11. For damages in the amount in excess of $347,000,000 for just compensation and interest thereon, according to proof, for the temporary and permanent taking of Plaintiffs' property in violation of Article I, Section 19 of the California Constitution and the Fifth Amendment to the United States Constitution. Additionally, Plaintiffs are entitled to reputational damages in an amount to be determined.

12. For reasonable attorneys' fees incurred in this matter pursuant to sections 1021.5 or 1036 of the California Code of Civil Procedure and other applicable law.

13. For Plaintiffs' costs of suit incurred herein.

14. For such other and further relief as the Court deems just and proper.

DATED:   October 6, 2025              Respectfully submitted,

**ALSTON & BIRD**
JEFFREY D. DINTZER
GARRETT B. STANTON

_____
Jeffrey D. Dintzer

Attorneys for Plaintiffs
**SABLE OFFSHORE CORP.**
**PACIFIC PIPELINE COMPANY**

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES
AND DECLARATORY RELIEF

## VERIFICATION

I, Steven P. Rusch, am Vice President of Regulatory and Environmental Affairs of Sable Offshore Corp., and I am an Authorized Representative of Pacific Pipeline Company.  I am authorized to execute this verification on behalf of them. I have read the attached Second Amended Verified Petition for Writ of Mandate and Complaint for Damages and Declaratory Relief and am familiar with its contents. The facts provided in the petition and complaint are true of my personal knowledge, except for those alleged on information and belief, and I believe those to be true.

DATED:  October 6, 2025

_____
                                      Steven P. Rusch

55

SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DAMAGES
AND DECLARATORY RELIEF

# EXHIBIT A

STATE OF CALIFORNIA – CALIFORNIA NATURAL RESOURCES AGENCY                                 GAVIN NEWSOM, *Governor*

# CALIFORNIA COASTAL COMMISSION

455 MARKET STREET, SUITE 300
SAN FRANCISCO, CA 94105-2421
VOICE (415) 904-5200
FAX (415) 904-5400



## NOTICE OF VIOLATION

## <u>Sent  by Electronic Mail</u>

September 27, 2024

Steve Rusch
VP Environmental & Regulatory Affairs
Sable Offshore Corp.
srusch@sableoffshore.com

| | |
|---|---|
| Violation File No.: | **V-9-24-0152** (Sable Offshore Corporation) |
| Location: | At various locations along the existing Las Flores Pipelines CA-324 and CA-325 (previously known as Lines 901 and 903), which are part of the pipeline system originally constructed by Plains All American in 1988, spanning from the Gaviota coast to the Los Padres National Forest within Santa Barbara County, on 16 different properties. |
| Violation[1] description: | Unpermitted development in the Coastal Zone, including, but not necessarily limited to, excavation with heavy equipment and other activities associated with the Line 324 and 325. |

Dear Mr. Rusch:

As you have recently discussed with Cassidy Teufel and Wesley Horn of our staff, it has come to our attention that unpermitted activities are currently taking place in the Coastal Zone, including excavation and other activities at various locations along the existing Lines 324/325 (formerly known as Lines 901/903) now owned by Sable Offshore Corp. ("Sable")

---

[1] Please note that the description herein of the violation at issue is not necessarily a complete list of all unpermitted development on the subject property that is in violation of the Coastal Act and the Santa Barbara County LCP. Accordingly, you should not treat the Commission's silence regarding (or failure to address) other unpermitted development on the subject property as indicative of Commission acceptance of, or acquiescence in, any such development. Please further note that the term "violation" as used throughout this letter refers to alleged violations of the Coastal Act/County LCP.

Steve Rusch
Sable Offshore Corp.
Page 2


associated with a proposed restart of the Santa Ynez Unit. These activities constitute violations of the Coastal Act[2] and Santa Barbara County's Local Coastal Program ("LCP").

As you may know, the California Coastal Act was enacted by the State Legislature in 1976 to provide long-term protection of California's 1,250-mile coastline through implementation of a comprehensive planning and regulatory program designed to manage conservation and development of coastal resources. The California Coastal Commission ("Commission") is the state agency created by, and charged with administering, the Coastal Act of 1976.  In making its permit and land use planning decisions, the Commission carries out Coastal Act policies, which, amongst other goals, seek to protect and restore sensitive habitats; protect natural landforms; protect scenic landscapes and views of the sea; protect the marine environment and its inhabitants; protect against loss of life and property from coastal hazards; and provide maximum public access to the sea. The Commission plans and regulates development and natural resource use in the coastal zone in keeping with the requirements of the Coastal Act.

**Violations**

It has been confirmed that Sable is currently performing various unpermitted construction activities in the Coastal Zone associated with upgrades to Lines 324/325 in connection with Sable's proposed restart of that pipeline.[3]  As part of that proposed restart, Sable is currently undertaking work including a pipeline upgrade project to address pipeline corrosion in locations within the Coastal Zone and to install new safety valves in portions of the pipeline in the Coastal Zone. These activities constitute development and are not exempt from coastal development permit ("CDP") requirements.

Pursuant to Section 30106 of the Coastal Act and Section 35-58 the Santa Barbara County Local Coastal Program ("LCP"):

> *"Development" means, on land,* **in or under water**, **the placement or erection of any solid material or structure**; *discharge or disposal of any dredged material or of any gaseous, liquid, solid, or thermal waste;* **grading, removing, dredging, mining, or extraction of any materials;** *change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act...change in the intensity of use of water, or of access thereto;* **construction, reconstruction, demolition, or alteration of the size of any structure**…
> (emphasis added)

---

[2] The Coastal Act is codified in the California Public Resources Code, sections 30000 to 30900. Unless otherwise indicated, references to section numbers in this letter are to that code, and thus, to the Coastal Act.

[3] The California Office of the State Fire Marshall has not reviewed or approved the proposed restart of the pipeline, which includes a review of a proposed State Waiver and a final Restart Plan, among other required materials. The Commission's investigation of this matter is continuing, and it reserves its right to review the proposed restart and other associated activities or other matters concerning the pipeline.

Steve Rusch
Sable Offshore Corp.
Page 3

Under this definition, the unpermitted development activities, as described above, constitute "development" under the Coastal Act and the County's LCP. Coastal Act Section 30600(a), and Section 35-58 of the Santa Barbara County LCP, require Sable to obtain authorization under the Coastal Act and/or the LCP prior to performing or undertaking any development activity in the Coastal Zone, in addition to obtaining any other permit required by law. Any non-exempt development activity conducted in the Coastal Zone without such authorization constitutes a violation of the Coastal Act/LCP. Thus, the unpermitted development activities described above constitute Coastal Act and LCP violations.

In addition, the upgrade project does not qualify as CDP-exempt repair and maintenance work. Activities that "result in addition to, or enlargement or expansion of, the object" of the activities require a CDP under the Coastal Act and the LCP.  (Public Resources Code § 30610(d); Coastal Zoning Ordinance § 35-169.2; Appendix C, Section I.)  At a minimum, because the project involves the installation of safety valves, this is an addition to the pipeline that does not qualify as "repair and maintenance."  Even if the project could be considered repair and maintenance (which it cannot), Section 30610(d) of the Coastal Act and the Appendix C, Section III of the LCP nonetheless require a CDP for categories of repair and maintenance activities that are designated as presenting a "risk of substantial adverse environmental impact."  These include the following:

> (3) Any repair or maintenance to facilities or structures or work located in an environmentally sensitive habitat area, any sand area, within 50 feet of the edge of a coastal bluff or environmentally sensitive habitat area, or within 20 feet of coastal waters or streams that include: . . .
>
> (B) The presence, whether temporary or permanent, of mechanized equipment or construction materials.

Title 14, California Code of Regulations § 13252(a)(3); Coastal Zoning Ordinance § 35-169.2; Appendix C, Section III(a)(3).)

Furthermore, although Sable appears to have taken the position that the upgrade project involves work for which the Coastal Act requirement for a CDP is entirely preempted, this is incorrect.  Although the California Office of the State Fire Marshall has authority over certain aspects of pipeline safety under the federal Pipeline Safety Act (49 U.S.C § 60101 *et seq.*), any resulting preemption is limited in scope.  Other state agencies, as well as local governments, may review and impose requirements related to other issues. Thus, the Commission and the County have jurisdiction to review and impose requirements relating to consistency with the Coastal Act and the LCP that do not pertain directly to pipeline safety. For example, a CDP review for construction impacts to environmentally sensitive habitat areas, cultural resources, water quality, or public access (to name a few) are not preempted. Finally, the 1988 settlement between the County and Celeron Pipeline Company does not affect the preemption analysis because the settlement cannot contractually limit the County's duties under the law or the applicability of the law. Thus, a CDP is required for the upgrade project.

Steve Rusch
Sable Offshore Corp.
Page 4

## Resolution

To begin resolution of the Coastal Act/LCP violations, please cease Immediately any unpermitted activities/development in the Coastal Zone associated with Lines 324/325.[4] At this time, we have no information that any development activities are currently taking place related to the three offshore platforms and offshore pipelines owned by Sable. However, if any such activities are taking place, please cease those as well. These are all activities that require a CDP and/or federal consistency review from the Commission.

Please note that in certain cases when unpermitted development takes place, but Commission staff believe that some version of the work could have been found to be consistent with the applicable standard of review and authorized accordingly, staff recommends that the party undertaking the development submit a CDP application to the regulating authority (in this case, Santa Barbara County), seeking after-the-fact ("ATF") authorization for the previously undertaken unpermitted development within the County's LCP jurisdiction. In other cases, when staff has determined that the unpermitted development is not something for which staff would recommend approval due its inconsistency with the Coastal Act/certified LCP, staff advises the alleged violator to seek resolution through removal, mitigation, restoration, and/or payment of penalties, etc., and not to seek a CDP to authorize such development.

In this case, we are uncertain at this time whether Santa Barbara County would be able to approve a CDP application from Sable that was seeking ATF authorization for the unpermitted construction activities that have already taken place, as well as authorization going forward for continued construction or other development activities related to the pipeline, such as the installation of safety valves. More information regarding the project would be necessary to come to any such conclusion at this time; however, since such an application might be found approvable by the County, we recommend that you submit a CDP application to the County as soon as possible. Please note that should the County grant approval of such a CDP application, those portions of the project that are located within the Coastal Commission's appeals jurisdiction would be appealable to the Commission and those portions of the project, if any, that are located within the Commission's original jurisdiction would require a CDP from the Commission.

To help us evaluate the project, it would be helpful if you could submit to us a complete description of all development activities currently taking place, as well as those activities that are being contemplated (e.g., installation of safety valves; any work to the platforms or offshore pipeline) prior to the anticipated restart of the pipeline, including scope of the project; exact locations of where the development activities are taking place/will take place; project schedule, etc.

## Enforcement Remedies

---

[4] Please note that interim measures to stabilize the site may also be necessary to avoid damages to coastal resources, and any such measures should be coordinated with Commission and County staff to avoid additional harm and to ensure consistency with Coastal Act/LCP requirements.

Steve Rusch
Sable Offshore Corp.
Page 5

Santa Barbara County has declined to enforce the above-noted Coastal Act/LCP violations, and thus, pursuant to Section 30810 of the Coastal Act, the Coastal Commission is pursuing enforcement regarding the Coastal Act/LCP violations described above.

Please note that the recent Settlement Agreement between Sable and the County does not preempt the Coastal Act or the LCP, and does not obviate the need for Sable to seek authorization for development activities in the Coastal Zone.

Whenever possible, Commission enforcement staff prefers to work cooperatively with alleged violators to resolve Coastal Act violations administratively. We are hopeful that we can resolve this matter without resorting to formal action. However, should we be unable to resolve this matter through this process, please be advised that the Coastal Act has a number of potential remedies to address violations of the Coastal Act, including the following:

Section 30809 states that if the Executive Director of the Commission determines that any person has undertaken, or is threatening to undertake, any activity that may require a permit from the Coastal Commission without first securing a permit, the Executive Director may issue an order directing that person to cease and desist. Section 30810 states that the Coastal Commission may also issue a cease and desist order. A cease and desist order may be subject to terms and conditions that are necessary to avoid irreparable injury to the area or to ensure compliance with the Coastal Act. Section 30811 also provides the Coastal Commission the authority to issue a restoration order to address violations at a site. A violation of a cease and desist order or restoration order can result in civil fines of up to $6,000 for each day in which each violation persists.

Additionally, Sections 30803 and 30805 authorize the Commission to initiate litigation to seek injunctive relief and an award of civil fines in response to any violation of the Coastal Act. Section 30820(a)(1) provides that any person who undertakes development in violation of the Coastal Act may be subject to a penalty amount that shall not exceed $30,000 and shall not be less than $500 per violation. Section 30820(b) states that, in addition to any other penalties, any person who "knowingly and intentionally" performs or undertakes any development in violation of the Coastal Act can be subject to a civil penalty of not less than $1,000 nor more than $15,000 per violation for each day in which each violation persists.

Finally, as of January 1, 2022, the Commission's administrative penalty authority was expanded, allowing the Commission to administratively impose penalties for all violations of the Coastal Act. Section 30821 and Section 30821.3 collectively authorize the Commission to impose administrative civil penalties in an amount of up to $11,250 per day for each violation.

Failure to resolve the violations noted above could result in formal action under the Coastal Act. Said formal action could include a civil lawsuit, the issuance of an Executive Director

Steve Rusch
Sable Offshore Corp.
Page 6


Cease and Desist Order or Commission Cease and Desist and/or Restoration Order, and/or imposition of monetary penalties, as described above, including imposition of administrative penalties.

We understand that you will be meeting soon with our staff to discuss the pipeline situation. Please contact me by telephone at **415-904-5269** or by email at jo.ginsberg@coastal.ca.gov within a week of that meeting, or by October 21, 2024, whichever is earlier, to discuss how you intend to resolve the Coastal Act/LCP violations associated with the pipeline. Also, you may contact Wesley Horn at Wesley.Horn@coastal.ca.gov to discuss any permitting or planning issues associated with the pipeline.

Failure to meet the deadline noted above may result in formal action by the Commission to resolve this Coastal Act violation, including initiation of the enforcement remedies discussed above.

Thank you for your cooperation and prompt attention to this matter.   I look forward to speaking with you soon.


Sincerely,

*Jo Ginsberg*

Jo Ginsberg,
Enforcement Analyst


cc:     Kate Huckelbridge, CCC, Executive Director
        Cassidy Teufel, CCC, Deputy Director
        Lisa Haage, CCC, Chief of Enforcement
        Sarah Esmaili, CCC, Senior Attorney
        Pat Veesart, CCC, Enforcement Supervisor
        Aaron McLendon, CCC, Deputy Chief of Enforcement
        Alex Helperin, CCC, Assistant Chief Counsel
        Joseph Street, CCC, EORFC Program Manager
        Jonathan Bishop, CCC, Oil Spill Program Coordinator
        Wesley Horn, CCC, Environmental Scientist
        Jim Hossler, CA State Fire Marshal, Jim.Hosler@fire.ca.gov
        Errin Briggs, Deputy Director, Santa Barbara County Planning & Development, ebriggs@countyofsb.org

# EXHIBIT B

STATE OF CALIFORNIA - NATURAL RESOURCES AGENCY                    GAVIN NEWSOM, *GOVERNOR*
_____

## CALIFORNIA COASTAL COMMISSION

455 MARKET ST, SUITE 300
SAN FRANCISCO, CA 94105-2219
FAX (415) 904-5400
TDD (415) 597-5885



**SENT VIA REGULAR, CERTIFIED, AND ELECTRONIC MAIL**

11/12/2024

Sable Offshore Corp.
12000 Calle Real
Goleta, CA 93117

| | |
|---|---|
| Subject: | **Executive Director Cease and Desist Order No. ED-24-CD-02** |
| Date Issued: | 11/12/2024 |
| Expiration Date: | 02/10/2024 |
| Violation File No: | V-9-24-0152 |
| Property Location: | Various open pit locations located along the existing Las Flores Pipelines CA-324 and CA-325[1] (previously known as Lines 901 and 903), where portions of the pipeline have been exposed, within the Coastal Zone between the Gaviota coast and the Las Padres National Forest, in Santa Barbara County, as well as areas surrounding those open pit locations, and any other areas impacted by the development activities at issue here. |
| Violations: | Unpermitted development in the Coastal Zone including, but not necessarily limited to, excavation with heavy equipment; removal of major vegetation; grading and widening of roads; installation of metal plates over water courses; dewatering and discharge or water; pipeline removal, replacement, and reinforcement; installation of safety valves; and other development associated with Las Flores Pipelines CA-324 and CA-325 [2] |

_____

[1] The Las Flores Pipeline spans multiple properties, including those designated with the following Assessor's Parcel Numbers, all of which have open pits with exposed pipe in them: 081-230-021; 081-150-006; 081-150-007; 081-150-032; 081-150-033; 081-150-002; 081-150-028; 081-140-019; 081-140-025.

[2] Please note that the description herein of the violations at issue is not necessarily a complete list of all unpermitted development on the properties in violation of the Coastal Act.

Sable Offshore Corp.
11/11/2024
Page 2 of 10

## I.    ORDER

Pursuant to my authority under California Public Resources Code ("PRC") Section 30809, as the Executive Director of the California Coastal Commission ("Commission"), I hereby issue this Executive Director Cease and Desist Order ("EDCDO" or "this Order"), which orders you, Sable Offshore Corp. ("Sable"), as the owner and operator of Las Flores Pipelines CA-324 and CA-325, to cease and desist from undertaking any further unpermitted development and immediately undertake steps necessary to avoid irreparable injury to the properties at issue in this order until formal Commission action can occur. Those steps include, among other things, safely securing and stabilizing open pits ("Open Sites") along the existing Las Flores Pipelines CA-324 and CA-325 within the Coastal Zone ("Pipelines") and the immediately surrounding areas so as to prevent potentially significant damage to coastal resources until you have received a final coastal development permit[3] for further development or the Commission issues an order to restore the site or otherwise takes action to bring the site into a state that is safe and consistent with the law.

Compliance with the following terms is intended to ensure that all unpermitted development described in Section IV, below, remains halted, ensuring that further damaging effects to coastal resources are avoided, while Sable secures the sites and seeks authorization from the Commission for past and future (proposed) development, and/or for any steps needed restore the site. A future Commission action will likely be needed on a longer-term enforceable document addressing any remaining unpermitted development, any further or longer term remedial steps needed to be taken along the Pipelines, and potentially addressing other enforcement-related matters such as penalties, but this Order provides a more immediate and enforceable mechanism and framework for ensuring the Open Sites are safely secured in the interim.[4]

In addition, and more specifically, I hereby order you to comply with the following terms and conditions to avoid irreparable injury to the Open Sites and surrounding areas, pending any possible action by the Commission under PRC Sections 30810 and 30811 of the Coastal Act[5]:

---

[3] A "final" coastal development permit as used here means one that is: (a) no longer subject to appeal, either within the County system or to the Commission, and whether because the time period for such appeals has elapsed or because all such appeals have been completed; and also (b) no longer subject to judicial review, again whether because the statute of limitations for such a challenge has elapsed or because all such challenges have proceeded to completion.

[4] Please note that the description herein of the violation at issue is not necessarily a complete list of all development on the subject property that is in violation of the Coastal Act that may be of concern to the Commission. Accordingly, you should not treat the Commission's silence regarding (or failure to address) other development on the subject property as indicative of Commission acceptance of, or acquiescence in, any such development. Please further note that the term "violation," as used throughout this letter, refers to alleged violations of the Coastal Act.

[5] The Coastal Act is codified in PRC sections 30,000 *et seq.*

Sable Offshore Corp.
11/11/2024
Page 3 of 10

1. Cease and desist from conducting any further unpermitted development at the Open Sites with the exception of conducting remedial measures, to ensure intermediate securing of the Open Sites, as authorized and required by this Order.

2. Within 3 days of the effective date of this EDCDO, submit an Interim Restoration Plan ("Interim Plan") for the review and approval of the Executive Director of the Commission (the "Executive Director"), that will provide for steps for the interim securing of the Open Sites, including backfilling of the Open Sites, pending the securing of Coastal Act authorization for further development. Implement to completion, and consistent with its terms, the approved version of the Interim Plan, which shall include the following components, and a schedule for setting forth the time frame for commencing and completing each of the following:

   a. Interim Erosion Control Plan

      i. Within 3 days of the Effective Date of this EDCDO, Sable shall submit an Interim Erosion Control Plan.

         1. The Interim Erosion Control Plan shall be prepared by a qualified Restoration Specialist to address ground disturbance and prevent erosion during and after activities undertaken to safely secure the Pipelines under this Interim Plan, and shall include: 1) a narrative report describing all temporary run- off and erosion control measures to be used including replacement and/or recompaction of any excavated materials, and restorative grading to be done during and after removal/restoration activities; and 2) a site plan identifying and delineating the locations of all temporary erosion control measures that will be installed pursuant to this plan, including seeding of location-appropriate plant species to assist in erosion control.

         2. The Interim Erosion Control Plan will include a proposal that will provide a detailed work plan as to the steps to be taken to secure Open Sites, including backfilling the Open Sites with native soil from their respective excavations and compacting the soil, as needed, to achieve a level grade.

         3. The Interim Erosion Control Plan shall indicate that all erosion control measures are required to be installed and fully functional in the area impacted by the unpermitted development prior to, or concurrent with, the initial activities required by this EDCDO and maintained at all times throughout the term of the EDCDO, to minimize erosion across the site.

4. The Interim Erosion Control Plan shall demonstrate that Sable will strategically place and maintain security fencing to ensure that the Open Sites are safely secured, thereby preventing any potential access to the sites, and further disturbance to biological and coastal resources as well as to protect against adverse impacts to humans, wildlife and other animals.

5. The Interim Erosion Control Plan shall also include installation of appropriate erosion control BMPs in, and around, areas where vegetation was mowed or removed, and applying a hydroseed mix comprised of appropriate native plant species.

6. The Interim Control Erosion Plan shall include the following deadlines:

   a. Implement and complete the approved version of the Interim Plan within 7 days of its approval by the Executive Director

   b. Submit, within 5 days from completion of the work required under the Interim Plan, a report, including photographic evidence, documenting the completion of the work authorized by this EDCDO. If, after reviewing the report required by this EDCDO, the Executive Director determines that the work required by this EDCDO failed in whole or in part, Sable shall undertake any work that is required to ensure compliance with the approved plans or the requirements of this EDCDO.

3. Use of Equipment

   a. The Interim Plan shall include a detailed description of all equipment to be used. It is understood that mechanized equipment will likely need to be used to complete the activities required to implement the Interim Plan. The Interim Plan shall prohibit mechanized equipment that adversely impacts coastal resources, including wetlands and ESHA, protected under the Coastal Act. The Interim Plan shall include limitations on the hours of operations for all equipment.

   b. The Interim Plan shall provide for BMPs to govern the work required in the plan and include a contingency plan that addresses, at a minimum: 1)

impacts from equipment use; 2) potential spills of fuel or other hazardous releases that may result from the use of mechanized equipment and responses thereto; 3) impacts from equipment and worksite lighting, 4) impacts from equipment sound; and 5) all water quality concerns. The Interim Plan shall designate areas for staging of any construction equipment and materials including receptacles and temporary stockpiles of materials. All stockpiles and construction materials shall be covered, enclosed on all sides, located as far away as possible from drain inlets and any waterway, and shall not be stored in contact with the soil.

c.  The Interim Plan shall specify that no demolition or construction materials, debris, or waste shall be placed or stored where they may enter sensitive habitat including wetlands, receiving waters, or a storm drain, or be subject to wind or runoff erosion and dispersion.

4.  Within 120 days from effective date of this EDCDO, apply for a CDP for any proposed future work to be undertaken along the Pipelines, as well as for after-the-fact ("ATF") authorization for unpermitted development that has already occurred, by submitting a complete CDP application to Santa Barbara County for any development in its Coastal Act permitting jurisdiction and to the California Coastal Commission for any development in its retained permitting jurisdiction, or by submitting a consolidated permit application to the California Coastal Commission for all such development, if consistent with PRC section 30601.3. The CDP application(s) must include, at minimum, detailed site plans, information on the amount of grading (cut, fill, export) involved, Best Management Practices ("BMPs") to govern the work, wetland and environmentally sensitive habitat area ("ESHA") delineations for any wetlands or ESHA within 100 feet of any of the work, and results of both biological and cultural resource surveys of all areas potentially affected by the unpermitted and proposed development activities.

5.  Any submittal to be provided to the Executive Director pursuant to this Order shall be provided by mail to the attention of Stephanie Cook at 455 Market Street, Suite 300, San Francisco CA 94107, with a copy sent via email to Stephanie Cook at Stephanie.Cook@Coastal.ca.gov and Wesley Horn at Wesley.Horn@Coastal.Ca.gov.

## II.    ENTITIES SUBJECT TO THE ORDER

The parties whose actions or inactions are subject to this Order are Sable Offshore Corp; all employees, agents, and contractors of the foregoing; and any other person or entity acting in concert with the foregoing.

## III.    IDENTIFICATION OF THE PROPERTIES

Sable Offshore Corp.
11/11/2024
Page 6 of 10

The properties[6] that are the subject of this Order, including the various Open Sites, areas surrounded by the Open Sites, and any other areas impacted by the development activities at issue here, are located along the Coastal Zone portion of existing Las Flores Pipeline CA-324 and CA-325 (previously known as Lines 901 and 903), which extends from the Gaviota coast to the Las Padres National Forest within Santa Barbara County.

## IV.    DESCRIPTION OF THE VIOLATIONS

The Coastal Act violations addressed by this Order[7] involve development that has occurred in the Coastal Zone without the requisite Coastal act authorization, including, but not necessarily limited to, excavation with heavy equipment; removal of major vegetation; grading and widening of roads; installation of metal plates over water courses; dewatering and discharge of water; pipeline removal, replacement, and reinforcement; installation of safety valves; and other development associated with the Las Flores Pipelines CA-324 and CA-325.

## V.    COMMISSION AUTHORITY TO ACT

The Executive Director is issuing this Order pursuant to her authority under PRC Section 30809, including, but not necessarily limited to, subdivision (a)(2) thereof.

## VI.    EXECUTIVE DIRECTOR'S FINDINGS

As the Executive Director of the Commission, I am issuing this Order pursuant to my authority under PRC Sections 30809(a) to prevent further significant damage to coastal resources that, without this order, would be likely to occur as a result of the current state of the Open Sites, and likely to be exacerbated by the upcoming rainy season. As such, this order requires Sable to take immediate steps to secure the Open Sites and submit a complete CDP application seeking Coastal Act authorization for all proposed future development along the Pipelines, as well as ATF authorization for any work that has already occurred.

Commission enforcement staff informed Sable of the violations of the Coastal Act in an initial Notice of Violation letter sent to Sable on September 27, 2024, in a follow-up letter sent October 4, 2024, and in multiple virtual meetings over the course of the following weeks.  A more detailed recitation of the history is provided below.

With limited exceptions not applicable here, PRC Section 30600(a) states that, in addition to obtaining any other permit required by law, any person wishing to perform or undertake any development in the coastal zone must obtain a CDP. "Development" is defined by Section 30106 of the Coastal Act as follows:

---

[6] See footnote 1

[7] See footnote 2.

Sable Offshore Corp.
11/11/2024
Page 7 of 10

> *"'Development' means, on land, in or under water, <u>the placement or erection of any solid material or structure</u>; discharge or disposal of any dredged material or of any gaseous, liquid, solid, or thermal waste; grading, removing, dredging, mining, or extraction of any materials; change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act (commencing with Section 66410 of the Government Code), and any other division of land, including lot splits, except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use; <u>change in the intensity of use of water, or of access thereto</u>; <u>construction, reconstruction, demolition, or alteration of the size of any structure,</u> including any facility of any private, public, or municipal utility…"   (emphasis added)*

The Development described herein clearly constitutes "development" within the meaning of the above-quoted definition and therefore requires a CDP. Sable has not submitted an application for a CDP for any proposed future work, nor has Sable submitted any ATF application for work previously undertaken along the Pipelines and within the Coastal Zone. Because of the potential for significant damage to coastal resources, and inherent danger in leaving the Open Sites in their current state, particularly in light of the upcoming rainy season, this Order is necessary to ensure the Open Sites are quickly and safely secured.

As a jurisdictional requirement to issue this Order, I have determined that Sable has undertaken or is threatening to undertake development that may require a CDP, without first securing a CDP.

On October 4, 2024, I notified Sable of my intent to issue an Executive Director CDO pursuant to PRC section 30809 if certain information and assurances were not provided in a satisfactory manner. More specifically, in that letter, I requested detailed information as to the work that Sable has undertaken at the site, as well as proposed measures to temporarily secure the site, specific project plans, and written confirmation of their commitment to apply for an ATF CDP. Sable has failed to satisfactorily provide the information requested and has further failed to provide written confirmation of such intent.

On September 27, 2024, Commission staff sent a "Notice of Violation" letter informing Sable that the Commission had become aware of unpermitted activities taking place within the Coastal Zone, including excavation with heavy machinery, grading, and other activities at various locations along the Pipelines, apparently in connection with a proposed restart of the Santa Ynez Unit, consisting of three offshore platforms, Las Flores Canyon processing facility, and associated electrical transmission and onshore and offshore oil and gas transport pipelines. Commission staff requested Sable immediately cease all unpermitted development within the Coastal Zone, including all activities associated with Lines 324 and 325, as well as any potential development activities taking place along the offshore platforms and pipelines. Commission staff

Sable Offshore Corp.
11/11/2024
Page 8 of 10

further detailed the need for Coastal Act authorization for any development in the Coastal Zone, which should be sought through the submittal of an application(s) for the required CDP(s). On October 1, 2024, Sable met with Commission staff to further discuss the Coastal Act violations, and steps necessary to secure the Open Sites. In this conversation, Commission staff emphasized the need for additional information before any further work, including interim steps to secure the site, could be taken, and that legal authorization was needed. Nonetheless, on October 2, 2024, Sable emailed Commission staff and said work on Pipelines CA-324 and CA-325 within the Coastal Zone had been suspended, "subject to taking interim measures" they characterized as "necessary to stabilize the sites". In response, Commission staff met with Sable, on October 3, 2024, to, again, discuss the Open Sites and reiterate that whatever they apparently were calling interim measures was also development needing Coastal Act authorization, and that work must stop entirely, pending some legal authorization and offered to work with Sable to reach such agreement on interim authorization. On October 4, 2024, Commission staff sent a letter to Sable providing formal notice of the Executive Director's intent to issue an order, if necessary, to halt the ongoing project work and also to provide for a plan for site stabilization, and requested written assurances, by 2:00 pm that day, that Sable had, in fact ceased work entirely. Before this deadline, Sable emailed Commission staff confirming that all work, including what they were calling interim measures, had ceased. Unfortunately, Commission staff were subsequently informed that work along the Pipelines had not ceased. In response, Commission staff sent an additional email at 3pm on October 4, 2024, informing Sable that staff continued to receive reports stating that work was ongoing and asked that Sable confirm that work had fully stopped to which Sable responded to say they had "confirmed with field that all work has stopped."

Our October 4, 2024, letter additionally requested that information relating to the work being conducted along the Pipelines be submitted by 5:00 pm on October 7, 2024, and further requested that Sable provide written confirmation of intent to apply for a CDP(s) seeking ATF authorization for any work that had already occurred in the Coastal Zone and prospective authorization for any proposed future work. On October 7, 2024, Commission staff received an email from Sable providing a spreadsheet detailing the location of current open pit sites, but that stated that a full response to the information request could not be completed and that more time was needed. On October 8, 2024, Sable sent Commission staff a follow-up document which provided additional information as to work that had been undertaken at the Open Sites and steps required to fully complete the work at each site. However, no information was provided as to potential steps that could be taken to secure the sites temporarily but, instead, only information as to steps necessary to fully complete the project were given. In this document, Sable provided that project plans were in process, however Commission staff have yet to receive any full-scale work plans.

In the following weeks, Commission staff have had multiple virtual meetings and phone calls with Sable and their representatives to discuss the additional requested information, the existing state of the Open Sites, and potential paths forward. Much of these conversations have focused on the current state of the Open Sites and potential

Sable Offshore Corp.
11/11/2024
Page 9 of 10

interim steps to be taken to mitigate further damage to the coastal zone during the period of time needed for Sable to apply for CDPs, as detailed above. However, Sable has yet to satisfactorily provide, as required by PRC Section 30809, detailed information as requested in our October 4 letter, and remains unwilling to provide written confirmation as to commitment to apply for an ATF CDP for work previously undertaken within the Coastal Zone. During these conversations, Commission staff discussed with Sable a potential path forward, to ensure the sites could be safely, and legally, secured during the period of time needed for Sable to apply for CDPs as detailed above, through issuance of a Consent Cease and Desist Order. Unfortunately, Commission staff and Sable were unable to reach mutually agreeable terms.

### VII.    COMPLIANCE OBLIGATION

Strict compliance by the parties subject to this Order is required. Failure to comply with any term or condition of this Order, including any deadline contained herein will constitute a violation of this Order and subject the parties to exposure for penalties under section 30821.6. However, pursuant to PRC Section 30803(b), any person or entity to whom this Order is issued may file a petition with the Superior Court and seek a stay of this Order.

### VIII.   EFFECTIVE DATE

This Order shall be effective upon its issuance and shall expire 90 days from the date issued on 11/12/2024 unless extended consistent with the applicable regulations.

Should you have any questions regarding this matter, please contact Stephanie Cook at Stephanie.Cook@Coastal.ca.gov or Wesley Horn at Wesley.Horn@Coastal.ca.gov.

Signed,

Kate Huckelbridge
Executive Director
California Coastal Commission


Date:


Enclosure:



Cc:    Lisa Haage, Chief of Enforcement
       Aaron McLendon, Deputy Chief of Enforcement

Sable Offshore Corp.
11/11/2024
Page 10 of 10

       Alex Helperin, Deputy Chief Counsel
       Wesley Horn, Environmental Scientist
       Stephanie Cook, Enforcement Counsel

# EXHIBIT C

STATE OF CALIFORNIA – CALIFORNIA NATURAL RESOURCES AGENCY                                    GAVIN NEWSOM, *GOVERNOR*

---

## CALIFORNIA COASTAL COMMISSION

455 MARKET STREET, SUITE 300
SAN FRANCISCO, CA 94105-2421
VOICE (415) 904-5200
FAX (415) 904-5400



## NOTICE OF VIOLATION

## Sent  by Electronic Mail

February 11, 2025

Carolyn Bertrand, Deputy General Counsel
cbertrand@sableoffshore.com
Lee Alcock, Assistant General Counsel
Lalcock@Sableoffshore.com
DJ Moore, Latham & Watkins LLP
DJ.Moore@lw.com

Sable Offshore Corporation
12000 Calle Real
Goleta, CA 93117

| | |
|---|---|
| Violation File No.: | **V-9-25-0013** (Sable Offshore Corporation) |
| Location: | Santa Ynez Unit ("SYU") pipeline located in state waters offshore of the Gaviota Coast in Santa Barbara County |
| Violation[1] description: | Unpermitted offshore development including, but not necessarily limited to, deploying sand/cement bags on the seafloor and positioning them to provide support to Sable's out-of-service offshore oil and water pipelines as part of an effort to restart SYU oil production operations and bring the pipelines back into use |

Dear Ms. Bertrand, Mr. Alcock, and Mr. Moore:

---

[1] Please note that the description herein of the violation at issue is not necessarily a complete list of all unpermitted development in state coastal waters that is in violation of the Coastal Act. Accordingly, you should not treat the Commission's silence regarding (or failure to address) other unpermitted development in state coastal waters as indicative of Commission acceptance of, or acquiescence in, any such development. Please further note that the term "violation" as used throughout this letter refers to alleged violations of the Coastal Act.

Carolyn Bertrand
Lee Alcock
DJ Moore
Sable Offshore Corp.
Page 2

As you know, California Coastal Commission ("Commission") Enforcement staff has previously sent a Notice of Violation ("NOV") letter to Sable Offshore Corp. ("Sable"), and the Commission's Executive Director has issued to Sable a Cease and Desist Order ("EDCDO"), ED-24-CD-02, concerning unpermitted development including, but not limited to, excavation, removal of major vegetation, grading, widening of roads, replacement and reinforcement of corroded sections of pipeline, and installation of safety valves, at various locations along the existing Lines 324/325 (formerly known as Lines 901/903) associated with a proposed restart of SYU operations. As we stated, the unpermitted performance of these activities constituted violations of the Coastal Act[2] and Santa Barbara County's Local Coastal Program ("LCP"). In the EDCDO, Sable, which owns Lines 324/325, was directed to apply for a Coastal Development Permit ("CDP") for any proposed future work to be undertaken along the pipelines, as well as for after-the-fact ("ATF") authorization for unpermitted development that has already occurred.

More recently, it has come to our attention that unpermitted activities associated with SYU pipelines have also taken place offshore in state coastal waters, including, but not limited to, the deployment of an unspecified number of "tea-bag pallets," sand-to-concrete bags, and soft-concrete bags, as well as positioning them to provide support to out-of-service offshore oil and water pipelines as part of an effort to restart SYU oil production operations and bring the pipelines back into use. Specifically, the project deployed a remotely operated vehicle ("ROV") to place concrete bags and pallets along more than 750 linear feet of the pipelines to create support piers along 14 identified spans of between 41 and 70 feet. These activities took place over three days from November 29, 2024, to December 1, 2024.

In an email sent on November 21, 2024, from Cassidy Teufel, Deputy Director of the Commission, to Steve Rusch of Sable, Mr. Teufel stated that it was his understanding, based on previous email correspondence, that Sable was not proceeding with any work associated with the offshore pipeline until Commission staff had an opportunity to discuss it and work through any authorizations that may be required. He noted that Mr. Rusch had indicated via email that a recent ROV survey had identified pipeline spans that Sable identified as needing to be addressed, and Mr. Teufel asked for clarification as to when this work was carried out, and for a description of its scope, including equipment and vessels used and the location, timing, and duration of that work. Mr. Teufel also stated that Sable needed to submit to the Commission a complete CDP application for the proposed span remediation work.  Mr. Rusch never disputed or contested anything in this email from Mr. Teufel. Nevertheless, without having received any such application, circa mid-December 2024, the Commission received reports that span remediation work was underway.

---

[2] The Coastal Act is codified in the California Public Resources Code, sections 30000 to 30900. Unless otherwise indicated, references to section numbers in this letter are to that code, and thus, to the Coastal Act.

Carolyn Bertrand
Lee Alcock
DJ Moore
Sable Offshore Corp.
Page 3


On January 10, 2025, Mr. Teufel sent a follow up message informing Sable that the Commission had yet to receive the aforementioned permit application, and requesting a status update. The January email also asked Sable to clarify if Sable did in fact carry out activities and emphasized the Coastal Act permitting requirements previously explained. In a letter dated January 15, 2025, from Duncan Joseph Moore of Latham & Watkins, LLC (representing Sable) to Mr. Teufel, Mr. Moore acknowledged that the span remediation activities had occurred, specifically the placement of concrete fill material across 14 separate areas totaling over 750 linear feet in order to maintain and support the existing offshore pipeline, but claimed those activities did not require a new CDP or Consistency Certification ("CC") under the Coastal Act and the Coastal Zone Management Act, 16 U.S.C. §§ 1541 *et seq.* ("CZMA"), respectively. He asserted that these activities were already authorized by the existing Development and Production Plan ("DPP") previously authorized by the Department of the Interior's Minerals Management Service ("MMS"); the Coastal Commission-approved CDP No. E-88-1, which authorized the SYU pipeline; and the Coastal Commission's concurrence in CC No. CC-64-87, all of which occurred more than 30 years ago.

While Commission staff supports the thorough remediation of any problems that have the potential to adversely affect the structural integrity of active oil and gas pipelines and has a variety of regulatory review mechanisms to help ensure such efforts can be expedited and carried out in a timely manner, it is also critical for the protection of coastal resources that such regulatory review occur in advance. For example, certain methods of pipeline inspection and stability support carry enhanced risks of disturbance and displacement of commercial and recreational fishing activities and gear, marine mammal entanglement, sensitive habitat damage and disturbance, and marine debris generation and release. Given the extended out-of-service status of the Sable pipelines and repeated efforts by Commission permitting staff to engage with Sable regarding advance and expedited permitting options, it is perplexing that Sable disregarded those efforts and instead waited over a month to contend, after-the-fact, that no such regulatory review by the Commission was required.

We discuss below why these activities are not already authorized and instead constitute a violation of the Coastal Act for which ATF Commission authorization is required.

**Violations**

As indicated by Mr. Moore in the letter described above, in late November and early December of 2024, without first obtaining Commission authorization, Sable placed bags and pallets of concrete fill material in coastal waters below 14 sections of two seafloor pipelines totaling over 750 linear feet, constituting unpermitted fill of coastal waters. As noted above, prior to placing this fill material, Sable had been informed by Coastal Commission staff that such placement would require a permit from the Commission. Additionally, the California State Lands Commission ("SLC") informed Sable several times

Carolyn Bertrand
Lee Alcock
DJ Moore
Sable Offshore Corp.
Page 4


in late November 2024 and by letter dated December 5, 2024, regarding the SYU Pipelines Span Remediation Project that it must obtain all necessary permits and approvals from the Coastal Commission and other Federal, State, and local agencies having authority and jurisdiction over the pipelines within the SLC lease premises before commencing the span remediation activities.

Pursuant to Section 30106 of the Coastal Act:

> *"Development" means, on land, **in or under water**, **the placement or erection of any solid material or structure**; discharge or disposal of any dredged material or of any gaseous, liquid, solid, or thermal waste; grading, removing, dredging, mining, or extraction of any materials**; change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act...change in the intensity of use of water, or of access thereto; **construction, reconstruction, demolition, or alteration of the size of any structure**…*
> (emphasis added)

The placement of bags of concrete and pallets within 14 pipeline sites across roughly 750 linear feet, as described above, clearly constitutes "development" under the Coastal Act. Coastal Act Section 30600(a) requires Sable to obtain a CDP prior to performing or undertaking any development activity in the Coastal Zone, in addition to obtaining any other permit required by law. No such CDP was obtained, and therefore the unpermitted development activities described above constitute Coastal Act violations.

Contrary to Mr. Moore's claims, the above-referenced span remediation work was not pre-authorized by the permit the Commission issued for the original installation of the SYU pipeline (CDP No. E-88-1) or otherwise previously authorized by the Commission:

1. Mr. Moore asserts that the Commission's approval of Exxon Company, U.S.A.'s 1987 DPP, through CC No. CC-64-87 and CDP No. E-88-1, authorizes the span remediation activities. However, nowhere in either of those approvals is there any language that expressly pre-authorizes such future activities under the Coastal Act. Moreover, the fact that the DPP requires the pipelines to be maintained in "good operating condition at all times"[3] or that the pipelines meet design standards does not confer any pre-authorization under the Coastal Act for the placement of bags of concrete or any other pipeline span remediation activities constituting development in state coastal waters. The DPP specifies these standards for the *condition* of the pipeline, and not for pre-authorizing pipeline span remediation work and associated activities.

2. Mr. Moore states that because federal, engineering, and industry standards (e.g., American Petroleum Institute) require pipelines to be designed to withstand various

---

[3] DPP, VIII-24.

Carolyn Bertrand
Lee Alcock
DJ Moore
Sable Offshore Corp.
Page 5

conditions within marine environments, span remediation activities do not require authorization. However, these standards may specify the required condition of pipelines in service, but that does not obviate Sable's need to obtain Commission authorization to conduct pipeline span remediation work or other development activities to achieve those conditions, in particular because the pipelines are not currently in-service and have not been in-service for nearly a decade.

3.  Mr. Moore also states that the 1984 EIR/EIS includes a mitigation measure that required a pipeline monitoring and maintenance plan to address any geologic hazards. However, the inclusion of such a mitigation measure in an EIR/EIS does not obviate the need for Sable to obtain Commission authorization to conduct pipeline span remediation work or other development activities.

4.  Additionally, the span remediation activities do not constitute CDP-exempt repair and maintenance, due, at least in part, to their location within coastal waters. First, it's not clear that the work constitutes repair or maintenance at all. However, even if the span remediation project were determined to be a repair and maintenance project, a CDP or other authorization under the Coastal Act was required because the work involved "placement or removal, whether temporary or permanent," of "any forms of solid materials"  "within 20 feet of coastal waters" (which includes work in coastal waters) under Section 13252(a)(3)(B) of the Commission's regulations.

5.  Mr. Moore asserts that the span remediation activities have been pre-authorized by CDP No. E-88-1/CC-64-87. This is incorrect. That CDP authorized Exxon "to develop oil and gas reserves within the Santa Ynez Unit" and to "construct onshore processing, storage and transportation facilities in Las Flores Canyon" and to "construct a marine terminal in state waters" (the latter of which did not occur), as conditioned by the Commission.[4] Thus, the CDP authorized the initial construction of the pipelines, but did not pre-authorize future maintenance activities that qualify as development under the Coastal Act. The February 23, 1988 Adopted Findings for the CDP does not reference the type of work recently completed, and nothing in the project description or conditions includes approval of future repair and maintenance work. Therefore, the span remediation work, which was performed 35 years after the 1988 CDP was issued, is a separate project constituting development that requires a Commission authorization under the Coastal Act.

    We note that the Commission has, on occasion in the past, specifically authorized future maintenance activities for certain projects it has approved, but when it has done so, it is explicit about that, and it has not done so here. We also note that in the recent past, the Commission has issued permits or permit waivers for other

---

[4]  CCC Adopted Findings for CDP No. E-88-1 and CC No. E-64-87 (2/23/88), Section I ("Project Description"), p. 1.

Carolyn Bertrand
Lee Alcock
DJ Moore
Sable Offshore Corp.
Page 6

       span remediation work, and we conclude that such Commission authorization is likewise needed here.

6.   Mr. Moore notes that in 2012, the SLC and the federal Bureau of Safety and Environmental Enforcement ("BSEE") issued approvals to ExxonMobil to conduct maintenance on the active, in-service SYU pipelines, and that this work involved installing the same type of concrete bags using the same methodology employed by Sable in its current activities to reduce free span lengths on the SYU's oil emulsion and water pipelines, addressing recurring spans caused by high currents. He asserts that CCC staff was "copied and aware" of the proposed maintenance activities and did not require any new CDP or CC[5].

     Sable suggests that because Commission staff was copied on a letter sent by Exxon 13 years ago to a third party, and the Commission did not take action on the letter, this evidences the Commission's agreement with Sable's position that no Coastal Act authorization was required for that work. There is no merit to this argument. Based on the facts and the law, Sable was required to obtain Commission authorization under the Coastal Act before conducting the span remediation activities in state waters, and this violation is actionable.

7.   Finally, in his letter, Mr. Moore notes that CZMA may not apply to span remediation work in federal waters, so the work is not subject to the Commission's consistency review authority. This NOV pertains only to violations under the Coastal Act; we do not address any CZMA matters in this letter.[6]

## Resolution

To begin resolution of the outstanding violation discussed above, please immediately cease from performing any unpermitted development activities in state coastal waters (or elsewhere in the Coastal Zone) until and unless proper authorization is obtained.

Please submit to Wesley Horn at Wesley.Horn@coastal.ca.gov by February 18, 2025, a complete CDP application seeking ATF authorization for the unpermitted span remediation activities that have already taken place in state coastal waters.

Please note that a process exists by which a "consolidated permit" may be processed by the Commission to authorize development that is located in both the Commission's retained jurisdiction and the permit/LCP jurisdiction of a local government (in this case, Santa Barbara County), should all three parties agree. In this way, one CDP (rather than

---

[5] If indeed non-exempt repair and maintenance activities took place in 2012 without proper authorization, that would constitute a Coastal Act violation that our staff will need to investigate.

[6] The Commission's investigation of this matter is continuing, and it reserves its right to review this matter further and other matters pertaining to the pipelines.

Carolyn Bertrand
Lee Alcock
DJ Moore
Sable Offshore Corp.
Page 7

two separate ones) might be processed that would address all proposed offshore and onshore development relating to the pipeline. Commission staff would support such permit consolidation in this case, and you may discuss this option with Wesley Horn, if that is of interest to your client.

**Enforcement Remedies**

Whenever possible, Commission enforcement staff prefers to work cooperatively with alleged violators to resolve Coastal Act violations administratively. We are hopeful that we can resolve this matter without resorting to formal action. However, should we be unable to resolve this matter through this process, please be advised that the Coastal Act has a number of potential remedies to address violations of the Coastal Act, including the following:

Section 30809 states that if the Executive Director of the Commission determines that any person has undertaken, or is threatening to undertake, any activity that may require a permit from the Coastal Commission without first securing a permit, the Executive Director may issue an order directing that person to cease and desist. Section 30810 states that the Coastal Commission may also issue a cease and desist order. A cease and desist order may be subject to terms and conditions that are necessary to avoid irreparable injury to the area or to ensure compliance with the Coastal Act. Section 30811 also provides the Coastal Commission the authority to issue a restoration order to address violations at a site. A violation of a cease and desist order or restoration order can result in civil fines of up to $6,000 for each day in which each violation persists.

Additionally, Sections 30803 and 30805 authorize the Commission to initiate litigation to seek injunctive relief and an award of civil fines in response to any violation of the Coastal Act. Section 30820(a)(1) provides that any person who undertakes development in violation of the Coastal Act may be subject to a penalty amount that shall not exceed $30,000 and shall not be less than $500 per violation. Section 30820(b) states that, in addition to any other penalties, any person who "knowingly and intentionally" performs or undertakes any development in violation of the Coastal Act can be subject to a civil penalty of not less than $1,000 nor more than $15,000 per violation for each day in which each violation persists.

Finally, as of January 1, 2022, the Commission's administrative penalty authority was expanded, allowing the Commission to administratively impose penalties for all violations of the Coastal Act. Section 30821 and Section 30821.3 collectively authorize the Commission to impose administrative civil penalties in an amount of up to $11,250 per day for each violation.

Failure to resolve the violations noted above, or to respond by the deadline, could result in formal action under the Coastal Act. As explained above, said formal action could include a civil lawsuit, the issuance of an Executive Director Cease and Desist Order or

Carolyn Bertrand
Lee Alcock
DJ Moore
Sable Offshore Corp.
Page 8


Commission Cease and Desist and/or Restoration Order, and/or imposition of monetary penalties, as described above, including imposition of administrative penalties.  As we have said to you on several occasions, we would prefer not to go this route and believe that the opportunity exists for us to work collaboratively on the permitting for the work already undertaken, and any other work you would like to undertake in the future. Our energy group is more than willing to meet with you to work with you on this, and to provide some pre-filing assistance.

If you have questions about any Enforcement issues, you may contact me by telephone at **415-795-9949** or by email at jo.ginsberg@coastal.ca.gov. Also, you may contact Wesley Horn at Wesley.Horn@coastal.ca.gov to discuss any permitting or planning issues associated with the pipeline.

Thank you for your cooperation and prompt attention to this matter.

Sincerely,

*Jo Ginsberg*

Jo Ginsberg,
Enforcement Analyst


cc:     Steve Rusch, Sable, srusch@sableoffshore.com
        DJ Moore, dj.moore@lw.com
        Lauren Paull, lauren.paull@lw.com
        Kate Huckelbridge, CCC, Executive Director
        Cassidy Teufel, CCC, Deputy Director
        Lisa Haage, CCC, Chief of Enforcement
        Sarah Esmaili, CCC, Senior Attorney
        Ellie Oliver, CCC, Enforcement Supervisor
        Aaron McLendon, CCC, Deputy Chief of Enforcement
        Alex Helperin, CCC, Assistant Chief Counsel
        Joseph Street, CCC, EORFC Program Manager
        Jonathan Bishop, CCC, Oil Spill Program Coordinator
        Wesley Horn, CCC, Environmental Scientist
        Stephanie Cook, CCC, Enforcement Counsel
        Errin Briggs, Deputy Director, Santa Barbara County Planning & Development,
        ebriggs@countyofsb.org

# EXHIBIT D

STATE OF CALIFORNIA— CALIFORNIA NATURAL RESOURCES AGENCY                                                                    GAVIN NEWSOM, *Governor*

**CALIFORNIA COASTAL COMMISSION**

455 MARKET STREET
SAN FRANCISCO, CA 94105-2219
VOICE (415) 904- 5200
FAX (415) 904-5400
TDD (415) 597-5885
WWW.COASTAL.CA.GOV



**VIA CERTIFIED AND ELECTRONIC MAIL**

February 16, 2025

Steve Rusch
Sable Offshore Corporation
12000 Calle Real
Goleta, CA 93117

DJ Moore
Latham & Watkins, LLP
355 South Grand Avenue, Suite 100
Los Angeles, California 90071

| | |
|---|---|
| Subject: | Notice Prior to Issuance of Executive Director Cease and Desist Order |
| Location: | Various locations along the existing Las Flores Pipelines CA-324 and CA-325 within the Coastal Zone, between the Gaviota coast and the Las Padres National Forest, where the parties subject to this notice are performing or intend to perform any of the activities described below, including the areas surrounding the pipelines, and other onshore areas impacted by the development activities at issue here, all within Santa Barbara County |
| Violation Description: | Activities onshore including, but not limited to, excavation with heavy machinery, related soil movement, trimming, mowing and removal of major vegetation, grading and widening of roads, installation of metal plates over water courses, dewatering and discharge or water, installation of any safety valves, pipeline segment removal, segment replacement, and reinforcement, backfilling of soil with heavy equipment, and other potential development associated with the Las Flores Pipelines CA-324 and CA-325 as part of an effort to restart SYU oil production operations and bring the pipelines back into use. |

Dear Mr. Rusch and Mr. Moore,

Sable Offshore Corporation
February 16, 2025
Page 2 of 6

My staff have reviewed your February 14, 2025 letter, in which, at page 4, you cite Santa Barbara County (the "County") as concluding that "no further authorization under the Coastal Act or LCP is required for Sable to proceed" with the work you generally describe as "anomaly repair work" along Las Flores Pipelines CA-324 and CA-325 ("Pipeline"). Your letter suggests that Sable intends to proceed with this work, and we have received evidence suggesting that Sable may already be doing so, despite several conversations with Commission staff, Notice of Violation letters, and a previous Executive Director Cease and Desist Order ("EDCDO") directing Sable to seek Coastal Act authorization for the work already completed and to cease further work until it, too, is authorized by a new coastal development permit ("CDP"), as described in greater detail below. Although your letter argues that the work has been pre-authorized, based on the information we have received to date, I do not agree. Sable's letter provides a great deal of background information about pipeline safety, as well as the history of the pipeline and Sable's recent interactions with the Commission, but the only citations to any CDP language or other evidence of what any CDP may have authorized appears on pages 9 and 12-13. Those sections can generally be summarized as follows:

At page 9, you assert that County CDPs 86-CDP-189 and 86-CDP-205 authorized the activities "as approved by" the Final Development Plan (FDP) 85-DP-66cz, and that those CDPs incorporated the project description and conditions "described by the [FDP]." Even assuming that this were accurate, that would merely make the CDP authorization derivative of the FDP authorization. Nowehere in your letter do you cite to any language in the FDP indicating that it is pre-authorizing repair and maintenance work for decades into the future.

At pages 12-13, you describe certain condition language from the FDP. You state that condition J-11 acknowledges that the pipeline's right-of-way will be used for operational maintenance. However, a statement recognizing that future maintenance will occur in a particular location is different from identifying the type, nature, and effects of such work, and any mitigation required, much less pre-authorizing it. You additionally cite language stating that future permits cannot be withheld on certain bases, but that statement merely reinforces the fact that future permits were, in fact, contemplated. You also cite condition A-13, which provides a list of major changes that were designated as actions that would require further permits, but nowhere does the language state that that list was intended to be an exhaustive list, nor could it have been, since much future work was and is unpredictable. Nor do you offer any evidence or argument that the work recently undertaken and currently being undertaken or threatened does not constitute a major change. Further, you cite language indicating that the originally permitted activity would have certain permanent impacts to oak woodland habitat and that mitigation was required for such impacts, but that statement cannot be read as all inclusive of any potential, future impact, especially for unidentified future work with the unknown circumstances, scoping, and timing of that future work and its resulting impacts, nor does it even suggest an attempt to have predicted and considered all potential impacts of any future work that may be needed, including those to other types of sensitive habitats and coastal resources.

Sable Offshore Corporation
February 16, 2025
Page 3 of 6

In other parts of the letter, you discuss more tangential issues, apparently suggesting that they provide more indirect evidence of the intent of the permit.  However, we find those discussions similarly unavailing.  For example, on page 6, you discuss the County's historical practice for approving the sort of work at issue; however, the fact that the County has allowed this work in the past does not mean that it was correct to have done so or constitute legal authority for it to do so going forward.  On page 10, you assert that the Environmental Impact Report/Environmental Impact Study ("EIS/EIR") prepared by the State Lands Commission and two federal agencies assessed the impacts over the lifetime of the pipeline, including predicting work similar to that which is currently at issue.  Even assuming that to be true, it is not dispositive of Coastal Act analysis or authority, and it does not indicate that the CDP that was approved by the County pre-authorized all such activities.  Evidence of the scope of environmental impacts that are expected to result from work that may be required in the future to repair and maintain a structure can provide important reassurance to a permitting agency in determining whether to approve that structure in the first instance.  However, while it is entirely consistent with environmental regulatory practice for a permitting agency to approve initial construction of such a structure based, in part, on such assurances, that does not in any way imply that in doing so, the agency was providing pre-authorization of future work.

Finally, much of your letter argues that the impacts of the work at issue were predicted and accepted from the inception of the project and therefore should not be of concern.  Arguably, the history of this site has made it clear that the full impacts of the larger pipeline project were, in fact, not predicted when that project was initially approved, as evidenced by the 2015 pipeline failure and resulting Refugio Oil Spill, which demonstrated that the efforts to predict potential impacts, and to impose correlating mitigation requirements, failed, resulting in devastating impacts to coastal resources. Further, even if the aforementioned statement that the initial review involved predictions about impacts of future work, and acceptance of those impacts, this is a separate question from whether the work was pre-authorized. It is precisely through the permitting process that any such prediction is supposed to be evaluated and that the impacts can be mitigated so as to ensure the work is conducted in a manner consistent with the resource-protection policies of the Coastal Act and the County's Local Coastal Program ("LCP").

In sum, pre-authorization of any and all sorts of repair, maintenance, and upgrades that might be required multiple decades into the future, limited only by the list in condition A-13, would be an unprecedented and extraordinary act that would have had to be stated much more explicitly, and we have not seen any information that indicates that the work at issue has been so pre-authorized.[1]  Accordingly, Sable's apparent intent to proceed

---

[1] We are aware that the County issued a letter on February 12, 2025, agreeing with your conclusion, but that letter provided no support for its position. Moreover, separately, in response to a request from an interested party, we are initiating a formal review of that determination under 14 Cal. Code Regs. §13569. Obviously, if that process results in Commission staff changing its position, we will adjust accordingly.

Sable Offshore Corporation
February 16, 2025
Page 4 of 6

without further authorization constitutes a threatened violation of the Coastal Act and the LCP.[2]  Therefore, the purpose of this letter is to inform you of my intention to issue a new EDCDO to Sable, as described in greater detail below, unless Sable agrees to proceed as requested.

The unpermitted development here includes activities conducted onshore including, but not limited to, excavation with heavy machinery, related soil movement, trimming, mowing and removal of vegetation, grading and widening of roads, installation of metal plates over water courses, dewatering and discharge or water, pipeline segment removal, segment replacement, and reinforcement, backfilling of soil with heavy equipment, any installation of safety valves, and other potential development associated with the Las Flores Pipelines CA-324 and CA-325.

**Executive Director Cease and Desist Order**

California Public Resources Code section 30809[3] authorizes the Executive Director of the Commission to issue an order directing a person to cease and desist if (a) that person has undertaken, or is threatening to undertake, any activity that (1) may require a permit from the Commission without securing a permit or (2) may be inconsistent with any permit previously issued by the Commission; or (b) to enforce any requirements of a certified LCP.  Each of the unpermitted activities at issue here constitutes development that required a CDP pursuant to Sections 30106 and 30600 and the County's LCP.  As stated above, based on the information received to date, Commission staff does not agree that this work has been pre-authorized; therefore, the above-described development activities constitute a violation or threatened violation of the Coastal Act and LCP, and form the basis for the issuance of this EDCDO.

Section 30809(b) states that an Executive Director Cease and Desist Order can be issued:

> **If the person … has failed to respond in a satisfactory manner to an oral notice given in person or by telephone, followed by a written confirmation, or a written notice given by certified mail or hand delivered to the landowner or the person performing the activity.**

Section 13180(a) of the Commission's regulations (Title 14, Division 5.5 of the California Code of Regulations (CCR)) defines the term "satisfactory manner" as that term is used in Section 30809(b) as being, in part, "a response which is made in the manner and within the timeframe specified in the notice" and that satisfies the standards of 14 CCR

---

[2] Additionally, as is fully described in Commission staff's September 27, 2024, Notice of Violation ("NOV") letter, November 12, 2024 EDCDO, and February 11, 2025 NOV letter, Sable has undertaken further unpermitted development, both onshore and offshore, along the Pipeline that constitutes additional violations of the Coastal Act and the County's LCP.

[3] All further section references are to the Public Resources Code, and thus, to the Coastal Act, unless otherwise indicated.

Sable Offshore Corporation
February 16, 2025
Page 5 of 6

sections 13180(a)(1) or (2).  The requested manner and timeframe are listed below.  Therefore, to prevent the issuance to Sable of a unilateral Executive Director Cease and Desist Order, the violation of which could subject Sable to additional fines, you must provide a response that satisfies the standards of section 13180(a)(1) or (2) of the Commission's regulations and is made in the manner and timeframe listed below.

Note that if I do issue the EDCDO, Section 30809(c) authorizes me to include such terms and conditions as I deem necessary to avoid irreparable injury to any area within the Commission's jurisdiction pending further action by the Commission.  While it is true that Sable stopped work in response to the prior EDCDO and implemented some measures to prevent resource damage, the recent development activities less than one day after the region's most significant rainfall event of the year and without regulatory review is likely to contribute to environmental impacts that could have been avoided, including the destabilization of rain-soaked hillsides and habitat areas, discharge of mud and debris into watercourses and wetlands, disturbance to nesting birds that could lead to nest and habitat abandonment, and declines in breeding success.  These are the sorts of impacts that an EDCDO could address.

I am therefore informing you that if Sable does not immediately cease all unpermitted development activities, as described above, and comply with the requirement in the next paragraph, it may receive an Executive Director Cease and Desist Order ("EDCDO"), the violation of which may subject Sable to additional fines and penalties.

In order to avoid issuance of an EDCDO, you must confirm, in writing, by **Monday, February 17, 2025, no later than 4pm,** that Sable will cease all development of the sort described in this notice unless and until it either: (a) demonstrates, to my satisfaction and receives my written confirmation, that it already possesses the necessary Coastal Act authorization for the work, which Sable has not yet demonstrated; or (b) obtains a new, final, operative CDP or other valid Coastal Act authorization specifically covering the work at issue and complies with the terms of any final, validly issued CDPs.[4]  As we have noted in our prior letters, we are more than willing to work with you to make this process as efficient and speedy as possible, and again suggest that the option of applying for and obtaining a consolidated permit would be the most efficient means to quickly resolve the legal issues here and move forward in a collaborative manner.  We note that the County remains open to this process, as clarified in their letter of this week, and hope we can use it to most quickly move forward here.

For additional information you may contact Stephanie Cook at (415) 795-9993 Stephanie.Cook@Coastal.ca.gov, or at our Headquarters Enforcement Office at:

California Coastal Commission

---

[4] We offer the first option as an accommodation.  As we have said numerous times, we remain willing to consider any relevant permitting information Sable provides, either at this stage (if you agree to forestall further development until such showing is made) or even after issuance of a new EDCDO.

Sable Offshore Corporation
February 16, 2025
Page 6 of 6

Attn: Stephanie Cook
455 Market Street, Suite 300
San Francisco, CA 94105


Sincerely,

Kate Hucklebridge,
Executive Director
California Coastal Commission

Cc:

Lauren Paull, Latham & Watkins, LLP
Lisa Plowman, Santa Barbara County Planning and Development Department
Errin Briggs, Santa Barbara County Planning and Development Department
Cassidy Teufel, CCC, Deputy Director
Lisa Haage, CCC, Chief of Enforcement
Aaron McLendon, CCC, Deputy Chief of Enforcement
Alex Helperin, CCC, Assistant Chief Counsel
Sarah Esmaili, CCC, Senior Staff Attorney
Stephanie Cook, CCC, Enforcement Counsel
Wesley Horn, CCC, Environmental Scientist
Jo Ginsberg, CCC, Enforcement Analyst

# EXHIBIT E



**Planning and Development**
Lisa Plowman, Director
Jeff Wilson, Assistant Director
Elise Dale, Assistant Director

February 12, 2025

Mr. Steve Rusch
Sable Offshore Corporation/Pacific Pipeline Corporation
12000 Calle Real
Goleta, CA 93117

*Sent via email:* srusch@sableoffshore.com

SUBJECT:     Zoning Clearance Applications - 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, and
             24ZCI-00096

Mr. Rusch,

On November 22, 2024 and December 6, 2024, Santa Barbara County Planning and
Development received four Zoning Clearance applications for pipeline "anomaly repair work" to
Lines 324 and 325a. These applications stated that they sought to permit anomaly repair work
in the enclosed descriptions of work for case numbers 24ZCI-00090, 24ZCI-00091, 24ZCI-00095,
and 24ZCI-00096. Sable's position is that the Zoning Clearance process meets the requirements
of the County's Local Coastal Program because it is a means for the County to determine if the
activities fall within an existing Coastal Development Permit or if a new Coastal Development
Permit is required.

The County conducted a detailed review of pipeline permitting history and the Coastal Zoning
Ordinance. Planning and Development concludes that this pipeline anomaly repair work is
authorized by the existing permits (Final Development Plan, Major Conditional Use Permit, and
associated Coastal Development Permits) and was analyzed in the prior Environmental Impact
Report/Environmental Impact Statement (EIR/EIS). The County previously exercised its
authority under its Local Coastal Program and delegated Coastal Act authority in approving the
permits and the requested anomaly repair work is within the scope of those approved permits.
(Pub. Resources Code § 30519.) The County's assessment is consistent with the type of reviews
conducted by the County, both inside and outside the Coastal Zone, on a regular basis to
determine whether proposed development activities fall within the scope of existing permits.
Planning and Development will be returning the Zoning Clearance applications to Sable without
taking action on them. Alternatively, Sable can choose to withdraw the applications.

This conclusion is related to the requested pipeline anomaly repair work in case numbers 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, and 24ZCI-00096 and the information supplied with those applications and does not speak to permitting or jurisdiction on any other past or future work on or changes to the Pipeline and associated equipment.

This is not a: 1) permit exemption; 2) Director determination on the meaning or applicability of the provisions of the Coastal Zoning Ordinance; 3) decision on an application for a Coastal Development Permit; or 4) any other ground set forth in Article II Section 35-182. Rather, this letter confirms that the requested anomaly repair work was contemplated, analyzed, and approved in the existing Final Development Plan, Major Conditional Use Permit, associated Coastal Development Permits and certified EIR/EIS. Thus, no further application to or action by the County is required. This conclusion is not appealable to the Planning Commission, Board of Supervisors, or Coastal Commission and it does not require a Notice of Final Action. (Article II §§ 35-182; 35-181.4.)

Planning and Development encourages and requests that Sable continue to provide information to the County about any future anomaly repair work consistent with what was supplied in the above-referenced application. Such information will allow the County to evaluate whether particular anomaly repair work results in any different conclusions than those set forth in this letter. That information can be directed to my attention.

Sincerely,

Errin Briggs
Deputy Director, Energy, Minerals, Compliance & Cannabis Division

Enclosures:    24ZCI-00090 Description of Work
               24ZCI-00091 Description of Work
               24ZCI-00095 Description of Work
               24ZCI-00096 Description of Work

CC:            Mickey Johnson, ExxonMobil Upstream Company, via email
               mickey.d.johnson@exxonmobil.com

Sable – Anomaly Repair Work Zoning Clearance Applications

*24ZC1-00090 + 91*

## Zoning Clearance Applications for
## CA-324 Pipeline Routine Anomaly Repair Work – Description of Work

### Scope of Work

In order to repair an anomaly, Sable must undertake the following steps: (1) excavate the site where an anomaly was detected, including the dirt beneath the affected pipeline segment, (2) expose the pipeline segment by removing insulation and sandblasting, (3) evaluate whether a "Composite Repair"[1] or "Cut-Out Repair"[2] is required, (4) conduct the Composite or Cut-Out Repair as appropriate, sandblast the repaired pipeline segment, and apply an epoxy coating, pipe tape, and rockguard wrap, (5) backfill the anomaly site, and (6) conduct final site cleanup, including revegetation activities (collectively, the "Anomaly Repair Work").

Sable previously commenced the Anomaly Repair Work in compliance with Sable's obligation under federal regulations to take "prompt action" to address pipeline anomalies. (See 49 C.F.R., § 195.452, subd. (h)(1).) On September 27, 2024, the California Coastal Commission issued Sable Notice of Violation V-9-24-0152 ("NOV") and required Sable to immediately stop all Anomaly Repair Work. In accordance with the NOV, Sable stopped undertaking the Anomaly Repair Work. On November 12, 2024, Commission staff issued Executive Director Cease and Desist Order No. ED-24-CD-02 ("EDCDO"), which required Sable to submit an Interim Restoration Plan to secure and backfill the open anomaly sites without completing the Anomaly Repair Work. Commission staff approved Sable's proposed Interim Restoration Plan on November 20, 2024 with respect to the remedial grading and BMP segment of the Interim Restoration Plan. As of November 21, 2024, Sable and Commission staff were continuing to coordinate regarding the hydroseeding segment of the plan. Consistent with the Interim Restoration Plan, each anomaly site will be backfilled and restored to original grade without completing the Anomaly Repair Work.

As such, Sable's Zoning Clearance applications seek *both*:

1. After-the-fact Zoning Clearances for the Anomaly Repair Work previously undertaken at each anomaly site identified in the applications; and
2. Zoning Clearances to complete the Anomaly Repair Work at each such anomaly site in the future (including by excavating the anomaly site again after it is backfilled and restored in compliance with the EDCDO and Interim Restoration Plan).

---

[1] A "Composite Repair" involves wrapping the exposed pipeline segment in a composite material and allowing the material to cure.

[2] A "Cut-Out Repair" involves cutting out and replacing the affected pipeline segment, welding the replaced pipeline segment in place, and X-raying the replaced pipeline segment to confirm successful replacement.

## Location

45 anomaly sites require Anomaly Repair Work. As discussed above, these sites are located along existing pipeline CA-324 in APNs 081-140-019, 081-140-025, 081-150-002, 081-150-006, 081-150-007, 081-150-028, 081-150-032, 081-150-033, and 081-230-021. Table 1 details each anomaly site. Attachments C.1 and C.2 include overview and concentrated mapping depicting these sites.

Table 1.    Anomaly Sites

| Legend | |
|---|---|
| | Application #1 |
| | Application #2 |





The proposed work would utilize the existing roads to access each site. No new roads will be constructed.

## Construction & Equipment

Excavation depth would vary for each anomaly site based on unique factors, including the number of immediately proximate anomalies and site-specific requirements. All material will be balanced onsite, and no material will be imported or exported. Shoring boards will be utilized to stabilize the excavation walls prior to entry. Equipment needed to complete the Anomaly Repair Work includes the following:

- Excavator(s)
- Light and heavy-duty work trucks
- Air compressor(s)
- Welding machine(s)
- Bulldozer(s)
- Front loader(s) with back drag
- Backhoe
- Reachlift
- Water buffalo
- Water trucks

## Fire Protection
If welding is required, Sable will provide a mowed work area within a minimum of 50 feet around the welding activities and maintain a fire watch at the location with 500 gallons of

water onsite, in addition to the fire extinguisher requirements of the Office of the State Fire Marshal (OSFM) and the Santa Barbara County Fire Department (SBCFD).

**Construction Best Management Practices**

In addition to the Construction Best Management Practices (BMPs) identified in Attachments D.1 and D.2, the following BMPs will be implemented to ensure potential effects on various environmental resources are avoided:

- Define limits of disturbance including the length/width of dig excavation trench, trench soil stockpile, equipment, staging, access, vehicle parking.
- Before construction activities commence, conduct pre-construction a biological resources survey to confirm the expected limits of work and minimal impact, or ensure that a biologist is onsite the first day of construction to monitor excavation to salvage and release any wildlife encountered.
- Before construction activities commence, conduct an environmental awareness training for all onsite personnel to discuss BMPs and other potential biological resources issues. While not expected in any of the dig sites, awareness of potential occurrence of special-status species should be discussed.
- All oak tree impacts are to be avoided including no vehicles, equipment, or stockpile within the drip line of any oaks.
- Stockpiles should be in uplands and avoid any stockpile, materials storage, vehicles, equipment, etc. in any drainage features or riparian habitat.
- Topsoil (the first 6" to 12" inches) removed for the excavation should be stockpiled separately for use in restoring original contours and grade, and to promote rapid plant growth restoration.
- The open trench should be safely fenced (hog wire, orange construction fence, or similar) at the end of each workday to exclude wildlife entrapment.

**Conclusion**

Sable is committed to designing, constructing, operating and maintaining Line CA-324 and CA-325 in a safe and reliable manner, and to meeting or exceeding applicable federal, state, and local regulatory standards.

Sable – Anomaly Repair Work Zoning Clearance Applications

24 SC1-00095 °, 96

# Zoning Clearance Applications for
# CA-324 and CA-325A Pipeline Routine Anomaly Repair Work –
# Description of Work

## Scope of Work

In order to repair an anomaly, Sable must undertake the following steps: (1) excavate the site where an anomaly was detected, including the dirt beneath the affected pipeline segment, (2) expose the pipeline segment by removing insulation and sandblasting, (3) evaluate whether a "Composite Repair"[1] or "Cut-Out Repair"[2] is required, (4) conduct the Composite or Cut-Out Repair as appropriate, sandblast the repaired pipeline segment, and apply an epoxy coating, pipe tape, and rockguard wrap, (5) backfill the anomaly site, and (6) conduct final site cleanup, including revegetation activities (collectively, the "Anomaly Repair Work").

## Location

28 anomaly sites require Anomaly Repair Work. As discussed above, these sites are located along existing pipeline CA-324 and CA-325A in APNs 081-130-068, 081-140-023, 081-150-002, 081-150-028, 081-150-032, 081-270-011, 083-590-003, 083-650-008, 083-650-009, and 083-650-011. Table 1 details each anomaly site. Attachments C.1 and C.2 include overview and concentrated mapping depicting these sites.

Table 1.    Anomaly Sites

| Legend | |
|---|---|
| | Application #1 |
| | Application #2 |



---

[1] A "Composite Repair" involves wrapping the exposed pipeline segment in a composite material and allowing the material to cure.

[2] A "Cut-Out Repair" involves cutting out and replacing the affected pipeline segment, welding the replaced pipeline segment in place, and X-raying the replaced pipeline segment to confirm successful replacement.



The proposed work would utilize the existing roads to access each site. No new roads will be constructed.

## Construction & Equipment

Excavation depth would vary for each anomaly site based on unique factors, including the number of immediately proximate anomalies and site-specific requirements. All material will be balanced onsite, and no material will be imported or exported. Shoring boards will be utilized to stabilize the excavation walls prior to entry. Equipment needed to complete the Anomaly Repair Work includes the following:
- Excavator(s)
- Light and heavy-duty work trucks
- Air compressor(s)
- Welding machine(s)
- Bulldozer(s)

---

[3] F-9 is associated with two anomaly numbers from separate investigatory tool runs but is associated with one anomaly.

- Front loader(s) with back drag
- Backhoe
- Reachlift
- Water buffalo
- Water trucks

**Fire Protection**

If welding is required, Sable will provide a mowed work area within a minimum of 50 feet around the welding activities and maintain a fire watch at the location with 500 gallons of water onsite, in addition to the fire extinguisher requirements of the Office of the State Fire Marshal (OSFM) and the Santa Barbara County Fire Department (SBCFD).

**Construction Best Management Practices**

In addition to the Construction Best Management Practices (BMPs) identified in Attachments D.1 and D.2, the following BMPs will be implemented to ensure potential effects on various environmental resources are avoided:

- Define limits of disturbance including the length/width of dig excavation trench, trench soil stockpile, equipment, staging, access, vehicle parking.
- Before construction activities commence, conduct pre-construction a biological resources survey to confirm the expected limits of work and minimal impact, or ensure that a biologist is onsite the first day of construction to monitor excavation to salvage and release any wildlife encountered.
- Before construction activities commence, conduct an environmental awareness training for all onsite personnel to discuss BMPs and other potential biological resources issues. While not expected in any of the dig sites, awareness of potential occurrence of special-status species should be discussed.
- All oak tree impacts are to be avoided including no vehicles, equipment, or stockpile within the drip line of any oaks.
- Stockpiles should be in uplands and avoid any stockpile, materials storage, vehicles, equipment, etc. in any drainage features or riparian habitat.
- Topsoil (the first 6" to 12" inches) removed for the excavation should be stockpiled separately for use in restoring original contours and grade, and to promote rapid plant growth restoration.
- The open trench should be safely fenced (hog wire, orange construction fence, or similar) at the end of each workday to exclude wildlife entrapment.

## Conclusion

Sable is committed to designing, constructing, operating and maintaining Line CA-324 and CA-325A in a safe and reliable manner, and to meeting or exceeding applicable federal, state, and local regulatory standards.

# EXHIBIT F

355 South Grand Avenue, Suite 100
Los Angeles, California  90071-1560
Tel: +1.213.485.1234  Fax: +1.213.891.8763
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Silicon Valley |
| Hong Kong | Singapore |
| Houston | Tel Aviv |
| London | Tokyo |
| Los Angeles | Washington, D.C. |
| Madrid | |

February 17, 2025

**<u>VIA EMAIL</u>**

Kate Hucklebridge
Executive Director
California Coastal Commission
455 Market Street, Suite 300
San Francisco, CA 94105

Re:     <u>Sable Offshore Corp. Response to Notice Prior to Issuance of Executive Director Cease and Desist Order</u>

Dear Dr. Hucklebridge:

On behalf of our client, Sable Offshore Corp. ("Sable"), we are providing Sable's responses to your February 16, 2025, Notice Prior to Issuance of Executive Director Cease and Desist Order ("Notice") regarding Sable's anomaly repair activities along portions of Las Flores Pipelines CA-324 and CA-325 (previously known as Lines 901 and 903) located within an unincorporated area of the County of Santa Barbara ("County") and within the coastal zone. Sable strongly disagrees with many of the Notice's assertions and characterizations of the Coastal Act, the County's delegated authority under the Coastal Act and its certified Local Coastal Program ("LCP"), Sable's anomaly repair work, and the permits and approvals previously issued by the County. We will not address those assertions and characterizations in detail here, and Sable reserves all rights to challenge each such point in the future. Instead, Sable is notifying you that an Executive Director Cease and Desist Order ("EDCDO") may not be issued under the Coastal Act and any such issuance would be procedurally improper.

As you know, on February 12, 2025, the County confirmed in writing that Sable's anomaly repair work is authorized by the pipelines' existing coastal development permits (the "CDPs") and, consistent with the County's past practice, no new or separate Coastal Act authorization is required for Sable to perform the work.[1] Despite this written confirmation from

---

[1] See Errin Briggs, County of Santa Barbara, "Zoning Clearance Applications – 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, and 24ZCI-00096" (Feb. 12, 2025) ("County Letter"). As explained in Sable's February 14, 2025,

LATHAM&WATKINS LLP

the County, the Notice asserts that the anomaly repair work will constitute a "violation" of the Coastal Act and the County's LCP and states an intention to issue an EDCDO with respect to such work pursuant to Section 30809 of the Coastal Act. Section 30809 authorizes the issuance of an EDCDO only in three narrow circumstances. None of those circumstances apply here. Accordingly, Sable's position is that an EDCDO may not be issued.

First, an EDCDO may be issued when the Executive Director determines that an activity has been (or is threatened to be) undertaken that "may require a permit *from the commission* without securing a permit."[2] Second, an EDCDO may be issued when the Executive Director determines an activity that has been (or is threatened to be) undertaken "may be inconsistent with any permit *previously issued by the commission*."[3] Neither of these scenarios exist here. As confirmed in the County's February 12, 2025, letter to Sable and Sable's February 14, 2025, letter to Commission staff, Sable's anomaly repair work was authorized by the pipelines' existing CDPs, which were issued by the County – *not the Commission*.[4] All of Sable's anomaly repair work, as confirmed through Sable's submissions to the County, is within the County's permitting jurisdiction under the LCP. The Notice does not allege, and the anomaly repair work does not require, any new or amended coastal development permit "from the Commission" and is not subject to a coastal development permit "previously issued by the Commission."[5] Therefore an EDCDO may not be issued.

Section 30809(a) also allows an EDCDO to be issued in a third scenario: "to enforce any requirements of a certified local coastal program …, or any requirements of [the Coastal Act]."[6] The Coastal Act specifically limits EDCDOs issued under this third scenario to "the following circumstances":

(1) "The local government … requests the commission to assist with, or assume primary responsibility for, issuing a cease and desist order;"

(2) "The commission requests and the local government … declines to act, or does not take action in a timely manner, regarding an alleged violation which could cause significant damage to coastal resources;" or

---

letter to Coastal Commission staff, the County Letter addresses anomaly repair work for which Sable had previously submitted Zoning Clearance applications to the County, including work (i) that was ongoing at the time that Commission staff issued a Notice of Violation (File No. V-9-24-1052) to Sable and (ii) that Sable has identified for completion. Sable is compiling information regarding previously completed anomaly repair work in the coastal zone for submittal to and review by the County. Sable's understanding is that such completed repairs are entirely consistent with the scope of repairs that the County authorized in the County Letter and that no new or amended coastal development permit will be required for those repairs either.

[2] Coastal Act (Pub. Res. Code), § 30809(a) (emphasis added).

[3] *Ibid.*

[4] See County Letter; Sable, "Sable Offshore Corp. Notice of Violation (V-9-24-0152) for Las Flores Pipelines CA-324 and CA-325, Santa Barbara County" (Feb. 14, 2025), Exhibit E (County Coastal Development Permit 86-CDP-189 (Jul. 27, 1986)) and Exhibit F (County Coastal Development Permit 86 CDP-205 (Aug. 5, 1986)).

[5] Coastal Act, § 30809(a).

[6] *Ibid.*

2

US-DOCS\157479984

**LATHAM & WATKINS** LLP

(3) "The local government … is a party to the violation."[7]

Allowing the Executive Director to issue an EDCDO for a purported violation of a certified local coastal program or the Coastal Act only in these three situations ensures that the Commission does not circumvent the local government's delegated authority under the Coastal Act to implement its local coastal program.[8]

The Notice does not allege that any of the three potential prerequisites for the issuance of an EDCDO for a purported violation of the Coastal Act or the County's LCP actually apply here. To the contrary:

(1) The County has not requested the Commission to assist with, or assume primary responsibility for, issuing an EDCDO.  Instead, the County has confirmed in writing that the anomaly repair work "is authorized by the [pipelines'] existing … Coastal Development Permits[.]"[9]

(2) The County has not declined to act upon a request from the Commission regarding Sable's anomaly repair work.  While the Commission has requested additional information from the County, including copies of Sable's zoning clearance applications for the anomaly repair work and "permit files and records" relied upon by the County in assessing whether such work falls within the scope of the existing CDPs, the Commission has not requested that the County take action on an alleged violation.[10]

(3) The County is not alleged to be a party to the activities asserted by the Notice to constitute a violation.

Therefore, none of the prerequisites to issuing an EDCDO exist and it would be procedurally improper to issue an EDCDO.

In sum, Sable's anomaly repair work does not constitute a violation of the Coastal Act or the County's LCP because it is authorized under the pipelines' existing CDPs and other approvals, as recently confirmed by the County.  Further, the Coastal Act does not authorize the issuance of an EDCDO under the present circumstances.  Therefore, and to avoid any ambiguity, Sable intends to proceed with the anomaly repair work authorized by the County in its February 12, 2025, letter.

Based on the foregoing, Sable reiterates its request for an opportunity to discuss the final resolution of the previously issued Notice of Violation (File No. V-9-24-0152) and

---

[7] *Id.*, § 30809(a)(1)-(3).

[8] See *id.*, § 30519(a).

[9] County Letter.

[10] Cassidy Teufel, Letter re: "Dispute Resolution under [14 CCR § 13569] regarding activities of Sable Offshore Corp. Identified in California Coastal Commission's November 12, 2024 Executive Director Cease and Desist Order" (Feb. 16, 2025), p. 2.

US-DOCS\157479984

**LATHAM&WATKINS**LLP

acknowledgement of the County's determination that no further coastal development permit is required for the anomaly repair work.

Very truly yours,

Duncan Joseph Moore
of LATHAM & WATKINS LLP

cc:    Lisa Plowman, County of Santa Barbara
Errin Briggs, County of Santa Barbara
Jenna Richardson, County of Santa Barbara
Anthony Duenner, Sable Offshore Corp.
Carolyn Bertrand, Sable Offshore Corp.
Lee Alcock, Sable Offshore Corp.
Steve Rusch, Sable Offshore Corp.
Lauren Paull, Latham & Watkins LLP

4

# EXHIBIT G

355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Tel: +1.213.485.1234 Fax: +1.213.891.8763
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Silicon Valley |
| Hong Kong | Singapore |
| Houston | Tel Aviv |
| London | Tokyo |
| Los Angeles | Washington, D.C. |
| Madrid | |

# LATHAM&WATKINS LLP

February 14, 2025

**VIA EMAIL**

Stephanie Cook
Headquarters Enforcement Counsel
California Coastal Commission
455 Market Street, Suite 300
San Francisco, CA 94105

Re:  Sable Offshore Corp. Notice of Violation (V-9-24-0152) for Las Flores Pipelines CA-324 and CA-325, Santa Barbara County

Dear Stephanie:

I am writing on behalf of our client, Sable Offshore Corp. ("Sable"), to respond to your (i) September 27, 2024, Notice of Violation letter ("NOV") and (ii) your October 4, 2024, letter ("October 4 Letter") regarding Sable's repair and maintenance activities along portions of Las Flores Pipelines CA-324 and CA-325 (previously known as Lines 901 and 903) located within an unincorporated area of the County of Santa Barbara ("County") and within the coastal zone. I am also responding to additional points raised in the letter you sent to the County and Sable earlier today, February 14, 2025. In sum, the NOV that is the basis for all of the Commission's communications identified above alleges that Sable engaged in unpermitted development related to Sable's work "to address pipeline corrosion" and "to install new safety valves."[1] This letter addresses the NOV allegations regarding Sable's work to address pipeline corrosion, which are referred to herein as anomaly repairs. A more detailed response is provided in **Attachment A**. The NOV allegations regarding certain safety valves previously installed in Line CA-324 will be addressed separately.[2]

As I discussed with Lisa Haage, the Commission's Chief of Enforcement, on February 6, 2025, and reiterated to Commission staff during a meeting on February 11, 2025, it was premature for Sable to provide a detailed response to the NOV and October 4 Letter until the County had the opportunity to consider Zoning Clearance applications that Sable submitted to the County on November 22, 2024, and December 6, 2024. Specifically, and as Commission staff has been aware since December 2024, Sable had submitted those applications so that the County could confirm whether Sable's anomaly repair work already was authorized under

---

[1] Coastal Commission, Notice of Violation, Violation File No. V-9-24-0152 (Sep. 27, 2024), p. 2.

[2] All safety valves installed in Line CA-325 are located outside of the coastal zone.

US-DOCS\157104146

LATHAM&WATKINS LLP

existing permits and approvals for Lines CA-324 and CA-325, including the County's coastal development permits.  As part of that review, the County could have determined whether additional information was required or whether it would require a new or amended coastal development permit.  As requested by Commission staff during our recent discussion just a few days ago, Sable has compiled a complete response to the NOV, including the Zoning Clearance application materials Sable submitted to the County, and is providing those materials with this transmittal.[3]

Prior to receiving the NOV in September 2024, Sable had undertaken several steps to repair certain 'anomalies' detected along Line CA-324 and planned to repair other anomalies along Lines CA-324 and CA-325.[4]  Sable undertook the anomaly work based on its understanding that no new coastal development permit or other Coastal Act authorization was required, consistent with the County's practice of authorizing repair work on the pipelines since they were first permitted and built over 30 years ago.  A pipeline 'anomaly' refers to a pipeline segment with some deviation from its original configuration, typically identified using a roving data gathering instrument located within the pipeline interior (referred to as an inspection 'pig') that examines a pipeline's conditions while traveling through the pipeline.  Sable is required to conduct anomaly inspections and all associated repair work to comply with a Consent Decree involving the pipelines as well as applicable federal regulations that specifically require pipeline operators to "take prompt action to address all anomalous conditions in [any] pipeline," and repair any such conditions that meet thresholds set forth in those regulations.[5]  Anomaly repair work is a standard repair process for oil pipelines and was contemplated, authorized, and analyzed by (i) the pipelines' original environmental review under the California Environmental Quality Act and National Environmental Policy Act conducted by the State Lands Commission and federal Bureau of Land Management and Department of the Interior; and (ii) the County under the pipelines' previously approved Final Development Plan ("FDP") (Case # 85-DP-66cz), Major Conditional Use Permit ("CUP") (Case # 83-CP-97cz), Coastal Development Permits ("CDPs") (86-CDP-189 and 86-CDP-205), and associated Conditions of Approval.  *Because anomaly repair work was previously analyzed and authorized by the County under its land use and delegated Coastal Act authority, it does not require any further authorizations under the Coastal Act or the County's certified Local Coastal Program ("LCP").*  The County has consistently found anomaly repairs to be within the scope of the pipelines' environmental review and previously issued FDP and CDPs.  In fact, since the pipelines were first built, *the County never has amended the CDPs or determined it was necessary to issue a subsequent coastal*

---

[3] Sable is aware that Commission staff and County staff have discussed Sable's Zoning Clearance applications, but Commission staff had not previously requested copies of those applications from Sable until February 11, 2025.

[4] Sable's anomaly repair work was conducted in conformance with the standards of numerous state and federal regulatory agencies and industry standards groups including but not limited to CalOSHA, PHMSA, CDFW-OSFM, American Petroleum Institute (API), American Society of Mechanical Engineers (ASME), American Society of Testing Materials (ASTM), Society for Protective Coatings (SSPC Standards), and American National Standards Institute (ANSI).

[5] 49 C.F.R. § 195.452(h)(1).  See Consent Decree issued in *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*, Case No. 2:20-cv-02415, (C.D. Cal. Mar. 13, 2020).

US-DOCS\157104146

**LATHAM&WATKINS**LLP

*development permit when the County has authorized the pipeline operator to conduct anomaly repairs*.

Despite Sable's obligation to promptly complete the anomaly repair work under the Consent Decree and applicable federal regulations, and its understanding that no further Coastal permitting was required for such work, Sable stopped work at active anomaly repair sites in compliance with the NOV and October 4 Letter in order to explore Coastal Commission staff's allegations further with both Commission staff and the County.  Sable worked cooperatively with Commission staff to address immediate environmental concerns that were created by stopping work and leaving anomaly dig sites open and exposed (e.g., risks related to the structure of the pipeline, corrosion, flooding, hazards for livestock, and terrorism and vandalism).  In light of these concerns related to the open sites, Sable complied with the November 12, 2024 Executive Director Cease and Desist Order No. ED-24-CD-02 ("EDCDO"), backfilled the open anomaly repair sites (without completing the anomaly repairs), implemented erosion control best management practices, hydroseeded restored sites with a local native seed mix approved by Commission staff, installed protective fencing, and continues to monitor each site to ensure effective erosion control measures.  While Sable worked cooperatively with Commission staff to address staff's near-term environmental concerns identified in the EDCDO, Sable did not concede that a coastal development permit was necessary to authorize the anomaly repair work and informed Commission staff that further investigation into the County's records and discussions with County staff were required to determine the type of Coastal Act authorization required.

To that end, since receiving the NOV, Sable also has engaged in extensive discussions with County staff regarding the anomaly repair work and the scope of the County's prior allowances for similar work.  As discussed above, on November 22, 2024 and December 6, 2024, Sable submitted applications to the County for Zoning Clearances for the anomaly repair work, which included providing the County with additional information including site plans, grading quantities, biological and cultural resource surveys, and best management practices, regarding the work and anomaly dig sites.  The County's Coastal Zoning Ordinance (CZO) provides for a Zoning Clearance process whereby the County may review proposed development for compliance with conditions of approval including final development plans, conditional use permits, and coastal development permits.[6]  On the basis of the information Sable submitted with the Zoning Clearance applications, the County had the opportunity to review whether the anomaly repair work was already authorized, whether additional information was needed, or whether the County would require a new or amended coastal development permit.[7]

The County has since reviewed the information Sable submitted with its Zoning Clearance applications and has confirmed in a letter dated February 12, 2025, that the anomaly repair work is already authorized by the pipelines' existing CDPs and, consistent with past practice, no new or separate Coastal Act authorization is required for Sable to perform the work.[8]

---

[6] CZO, §§ 35-174.9.2.c.2, 35-179A.2.b.
[7] See CZO, § 35-179A.2.b.
[8] See Errin Briggs, County of Santa Barbara, "Zoning Clearance Applications – 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, and 24ZCI-00096" (Feb. 12, 2025) ("County Letter").

3

**LATHAM&WATKINS** LLP

The County's letter concludes that the anomaly repair work was "contemplated, analyzed, and approved in the [pipelines'] existing [FDP], [CUP], and associated [CDPs,]" "analyzed in the prior Environmental Impact Report/Environmental Impact Statement," and therefore requires "no further application to or action by the County."[9]

The County's letter addresses the particular anomaly work that was ongoing at the time Sable received the NOV from Commission staff as well as proposed future anomaly repair work in the coastal zone.  The County letter is limited to those anomaly repairs because the information submitted on November 22, 2024, and December 6, 2024, only addressed those ongoing and future anomaly repairs.  While Sable has not yet submitted information regarding previously completed anomaly work in the coastal zone to the County, Sable is in the process of compiling such information for submittal.  Sable's understanding of those previously completed repairs is that they are entirely consistent with the scope of repairs that the County authorized in its February 12, 2025 letter, and that the County's position regarding those previously completed repairs is expected to be the same – specifically that no new or amended coastal development permit is required for those prior repairs either.  **Attachment A** includes a detailed justification to support the County's confirmation that anomaly repair work was authorized by and complies with the pipelines' Conditions of Approval, FDP, CDPs, and environmental review.  As such, the anomaly repair work does not constitute a violation of the Coastal Act or LCP, as asserted in the NOV and October 4 Letter.

Further, the County has confirmed, pursuant to its authority under the Coastal Act and the County's certified LCP, that the anomaly repair work is authorized under the pipelines' existing CDPs and that no further authorization under the Coastal Act or LCP is required for Sable to proceed with the work. Therefore, and contrary to the statements included in your February 14 letter, Sable has the authorization from the County to proceed with completion of the anomaly repair work, and performing that work is not a knowing and willful violation of the Coastal Act.

In addition, because the County has confirmed that no new coastal development permit is required for the anomaly repair work, the consolidated coastal development permit application requested in your February 14 letter is not appropriate.[10] The County has now confirmed that Sable's anomaly repair work is authorized under the pipelines' existing CDPs and that no other County permit or authorization is necessary.  As Commission staff is aware, a consolidated coastal development permit is only appropriate when a "project requires a coastal development permit from both a local government with a certified local coastal program and the commission."[11] Therefore, Sable is not consenting to a consolidated permit.

---

[9] *Ibid.*

[10] We are disappointed with your letter's mischaracterization of our February 11, 2025, discussion regarding the possibility of a consolidated permit. As we have made clear on multiple occasions, the County needed to act on Sable's Zoning Clearance applications before Sable could engage Commission staff on any of staff's requests.

[11] Pub. Res. Code, § 30601.3, subd. (a)(1).

4

**LATHAM**&**WATKINS**LLP

Based on the foregoing, Sable respectfully requests an opportunity to discuss with Commission staff the final resolution of the NOV and acknowledgement of the County's determination that no further coastal development permit is required for anomaly repair work.

Very truly yours,

Duncan Joseph Moore
of LATHAM & WATKINS LLP

cc:     Lisa Plowman, County of Santa Barbara
        Errin Briggs, County of Santa Barbara
        Jenna Richardson, County of Santa Barbara
        Anthony Duenner, Sable Offshore Corp.
        Carolyn Bertrand, Sable Offshore Corp.
        Lee Alcock, Sable Offshore Corp.
        Steve Rusch, Sable Offshore Corp.
        Lauren Paull, Latham & Watkins LLP

5

LATHAM&WATKINS LLP

**Attachment A**
**Sable NOV Response Regarding Anomaly Repair Work**

## I.      EXECUTIVE SUMMARY

Sable's work to repair and remedy Las Flores Pipeline anomalies and all individual components of such work, such as associated excavation and fill activities and work required to access the anomaly sites, were contemplated and approved as ongoing repair and maintenance work that was anticipated to occur over the pipelines' operational lifetime when the County first approved the pipelines in the 1980s.  Because this work is required under applicable federal regulations and to ensure the pipelines' safe operation, its potential environmental impacts were thoroughly analyzed and considered during the pipelines' original environmental review and subject to mitigation and Condition of Approval requirements.  Accordingly, when considering and approving past anomaly repair work on the pipelines, the County has consistently found that work to be within the scope of the previously approved FDP and CDPs.  Although the County has issued separate coastal development permits for major pipeline improvements such as relocations and realignments since the pipelines' CDPs were first issued, the County has *never* required a new or amended coastal development permit for anomaly repair work in the 30 years since the pipelines were built.[12]

Instead, over the last 30 years, the County has employed different procedures to confirm that anomaly repair work complies with the pipelines' existing FDP and CDPs.  These procedures have included using the County's Land Use Permit process, the Zoning Clearance process, as well as informal communications between the pipeline operator and the County through which anomaly repairs have been authorized.[13]  Regardless of the exact process used, the County's review of anomaly repairs has consistently looked at whether the work proposed has been within the scope of the approved FDP and CDPs and those reviews have *never* been subject to the Commission's appellate jurisdiction.  While the CZO and the Coastal Act identify certain actions by the County that may be appealable, Land Use Permits, Zoning Clearances, and other non-discretionary authorizations by the Planning Department are not among them.[14]  The County's February 12, 2025, assessment is consistent with the County's historical reviews of pipeline anomalies confirming that anomaly repairs are authorized under the previously issued CDPs and FDP and are "not appealable to the … Coastal Commission."  As such, Sable may proceed with completing this repair work and the Commission may not continue enforcement proceedings involving that work.

---

[12] See County CDPs 90-CDP-175 (pipeline realignment), 97-CDP-255 (pump station tank replacement), 00-CDP-069 (pipeline realignment).

[13] See County Land Use Permit Nos. 14LUP-00000-00168 (May 28, 2014), 14LUP-00000-00035 (Apr. 2, 2014), 95-LUS-418 (Oct. 30, 1995); see County Zoning Clearance Nos. 14ZCI-00000-00086 (Sep. 24, 2014), 14ZCI-00000-00121 (Nov. 25, 2015).  The County's LCP was amended in 2014 to provide for the Zoning Clearance process.  Land Use Permits have not been issued for anomaly repairs since that time.

[14] See CZO, § 35-182.6.1-3.  The County's 2014 LCP Amendment did not change these provisions of the CZO.

6

LATHAM&WATKINS LLP

## II.    ANOMALY REPAIR AND PIPELINE BACKGROUND

A pipeline "anomaly" refers to a pipeline segment with some deviation from its original configuration.  Federal regulations require Sable and other pipeline operators to take "prompt action" to address and, where required by the regulations or the Consent Decree, repair any pipeline anomalies once discovered.[15]  Sable detects anomalies by using a roving data gathering instrument located within the pipeline interior, typically referred to as an inspection "pig," that examines a pipeline's conditions as the pig travels through the pipeline.  Data collected from the inspection pig is used to identify the approximate location of anomalies from the surface so that excavation and repair activities can be planned.  Sable generally must complete the following steps to repair any particular anomaly detected by the pig:  (1) access the affected pipeline segment via existing roadways and rights-of-way, which in some locations requires placing metal plates over water courses; (2) excavate the anomaly site, including the dirt beneath the affected pipeline segment, which in some locations may require dewatering and associated discharge; (3) expose the pipeline segment by removing insulation and sandblasting; (4) evaluate whether a "Composite Repair" or "Cut-Out Repair" is required,[16] (5) conduct the Composite or Cut-Out Repair as appropriate, sandblast the repaired pipeline segment, and apply an epoxy coating, pipe tape, and rockguard wrap; (6) backfill the anomaly site, and (7) conduct final site cleanup including erosion control and revegetation work (collectively, the "Anomaly Repair Work").[17]  Anomaly Repair Work is short-term and temporary (often lasting less than a week) within the pipelines' operational right-of-way.  It requires the use of heavy equipment and may involve the removal of vegetation.

Through its inspection pig activities, Sable identified one hundred and twenty-one (121) anomalies where Anomaly Repair Work is required within unincorporated Santa Barbara County and within the coastal zone.  Sable completed the Anomaly Repair Work at forty-eight (48) of these anomaly sites before receiving the NOV and October 4 Letter.  Forty-five (45) anomaly sites were open (i.e., excavation and other steps had been undertaken, but the Anomaly Repair Work had not been completed) at the time Sable received the NOV and October 4 Letter.[18]  In compliance with the EDCDO, Sable subsequently backfilled those open sites (without completing the associated anomaly repairs), implemented erosion control best management practices, and hydroseeded the sites with a local native seed mix approved by Commission staff.  Finally, twenty-eight (28) remaining anomaly sites have been identified for future Anomaly Repair Work.[19]

All of the aforementioned anomaly sites are located along two connected pipelines, which the County initially approved on February 18, 1986, as part of what was then known as the "Celeron Pipeline Project" (also referred to herein as the "Pipeline Project").  Las Flores

---

[15] 49 C.F.R. § 195.452(h)(1).

[16] A "Composite Repair" involves wrapping the exposed pipeline segment in a composite material and allowing the material to cure, whereas a "Cut-Out Repair" involves cutting out and replacing the exposed pipeline segment, welding in place the replaced pipeline segment, and X-raying the replaced segment to confirm the repair is completed.

[17] A typical cross-section showing a site undergoing Anomaly Repair Work is attached as Exhibit A.

[18] These open anomaly repair sites are depicted in Exhibit B.

[19] These planned anomaly repair sites are depicted in Exhibit C.

LATHAM&WATKINS LLP

Pipeline CA-324 ("Line CA-324") (previously known as Line 901) is a twenty-four (24) inch diameter pipeline with a maximum permitted throughput capacity of 150,000-barrels of crude oil per day, which is designed to transport crude oil approximately 10.9 miles from the Las Flores Pump Station in Las Flores Canyon, west along the Gaviota Coast, to the existing Gaviota Pump Station located approximately one mile east of Gaviota State Park in Santa Barbara County. Las Flores Pipeline CA-325 ("Line CA-325") (previously known as Line 903) is thirty (30) inches in diameter, has a maximum permitted throughput capacity of 300,000-barrels of crude oil per day, and is designed to transport crude oil approximately 113.5 miles north from the Gaviota Pump Station to the Sisquoc Pump Station, then east through the Los Padres National Forest (LPNF) and Cuyama Valley, ultimately delivering crude oil to the existing Pentland Delivery Point in the San Joaquin Valley in Kern County. This existing pipeline system also provides a connection to the idled Phillips 66 Sisquoc Pipeline at the existing Sisquoc Pump Station, which previously transported crude oil west to the Phillips 66 Santa Maria Refinery.

During the Pipeline Project's environmental review under the California Environmental Quality Act (CEQA) and National Environmental Policy Act (NEPA), the locations of Lines CA-324 and CA-325 were identified as an environmentally superior alignment to minimize impacts to environmental resources (including topography, viewshed, watersheds, etc.).[20] Pipeline construction disturbed a corridor approximately 100-feet in width, resulting in the removal of mature vegetation such as oak trees and minor alterations to existing landforms. Lines CA-324 and CA-325 commenced operations in 1994 and 1991 respectively. Since then, the pipelines' right-of-way has remained relatively devoid of mature vegetation, manmade structures, and other obstructions to prevent root-borne damage to the pipelines and facilitate prompt and continuous maintenance, repair, and inspection of the pipeline system. As such, an October 2020 Biological Resources Assessment confirmed that major work could be conducted in the pipelines' maintenance corridor without "any substantial adverse effects on or significant impacts to biological, botanical, wetland, or riparian habitat resources."[21] The Assessment's conclusion was based in part on the fact that Lines CA-324 and CA-325's maintenance corridor ran through already-disturbed "openings" in woodland and shrubland habitat.[22] The Assessment's conclusion also took into account potential impacts to environmentally sensitive habitat areas (ESHA) located in proximity to the portions of Lines CA-324 and CA-325 located within the coastal zone.[23]

---

[20] See County Planning Commission Actions for Celeron Pipeline Project (Mar. 3, 1986), attached at Exhibit D, p. 54 ("Overall, the route chosen is environmentally preferable to any complete alternative route.").

[21] SCS Engineers, "Line 901 & Line 903 Replacement Project: 2nd Revised Biological Resources Assessment" (October 5, 2020), p. 95. The "Replacement Project" proposed to replace Lines CA-324 and CA-325 (including the portions of the pipelines within the coastal zone) with a new pipeline that would be constructed parallel to the original pipeline. Although the Replacement Project ultimately was abandoned during the entitlement process, the Biological Resources Assessment remains relevant for its analysis of the biological setting surrounding Lines CA-324 and CA-325.

[22] *Ibid.*

[23] See *id.*, p. 56.

LATHAM&WATKINS LLP

### III. THE ORIGINAL APPROVALS FOR THE LAS FLORES PIPELINE CONTEMPLATED, ANALYZED AND AUTHORIZED THE ANOMALY REPAIR WORK

#### A. Santa Barbara County Final Development Plan and Coastal Development Permit Background

The State Lands Commission and federal Bureau of Land Management and Department of the Interior prepared a joint Environmental Impact Report and Environmental Impact Statement (EIR/EIS) for the Celeron Pipeline Project, which included the pipelines now known as Lines CA-324 and CA-325, pursuant to CEQA and NEPA. The State Lands Commission certified the EIR/EIS in January 1985. After reviewing the EIR/EIS, the Santa Barbara County Planning Commission made a final decision to approve the Celeron Pipeline Project FDP on February 18, 1986.[24] The approval was not challenged during the appeal period and the Planning Commission's approval action became final and effective. The Planning Commission's action included the FDP (Case # 85-DP-66cz) and a Major CUP (Case # 83-CP-97cz).[25] The FDP was required because the Pipeline Project necessitated comprehensive review and the CUP was required because the pipelines crossed ESHA.

Consistent with the FDP approval, the County issued Coastal Development Permit CDP 86-CDP-189 for the Celeron Pipeline Project on July 27, 1986.[26] CDP 86-CDP-189 approved "[c]learing, grading and trenching activities for [the] Celeron Pipeline Project as approved by 85-DP-66cz." The CDP incorporated "[t]he project description, pipeline route, conditions and plans required pursuant to those conditions described by the approved Final Development Plan 85-DP-66cz." CDP 86-CDP-189 also excluded "all activities related to pumpstations, river crossings, pipe stringing, welding, and any other activities not normally performed by the clearing, grading and trenching construction crews." Then, on August 5, 1986, the County issued Coastal Development Permit CDP 86-CDP-205 for the "[r]emainder of all construction activities for the Celeron Pipeline [P]roject as approved by 85-DP-66cz."[27] CDP 86-CDP-205 also incorporated "[t]he project description, pipeline route, conditions and plans required pursuant to those conditions described by the approved Final Development Plan 85-DP-66cz." The CDPs were not challenged during the appeal period and became final and effective.[28]

Accordingly, the conditions of approval for the pipelines' FDP, CUP, and CDPs are all governed under the same Conditions of Approval found in Case #85-DP-66cz, as amended by the County. The County has amended the Conditions of Approval from time to time, and as such identifies the Conditions of Approval with reference to each of the following case numbers: 88-DPF-033 (RV01)z, 88-CP-60 (RV01), 88-DPF-25cz, 85 DP-66cz, and 88DP-25cz.[29] Although

---

[24] As indicated in Exhibit D, the Final Development Plan approved by the County contain the Pipeline Project's Conditions of Approval.

[25] See County Planning Commission Action on Celeron/All American Pipeline Project FDP, attached at Exhibit D.

[26] See County Coastal Development Permit 86-CDP-189 (July 27, 1986), attached at Exhibit E.

[27] County Coastal Development Permit 86-CDP-205 (August 5, 1986), attached at Exhibit F.

[28] See Cal. Code Regs., tit. 14 ("Coastal Act Regulations"), § 13313 (CDPs "issued by the local government shall become final unless a valid appeal is filed with the commission").

[29] See Conditions of Approval (Oct. 2024), attached at Exhibit G.

LATHAM&WATKINS LLP

the County has issued separate coastal development permits for major pipeline improvements such as relocations and realignments since the pipelines' CDPs were first issued, the County has not required new or amended coastal development permits for pipeline anomaly repairs.[30]

> **B.    Prior Approvals and Environmental Review for the Pipelines Approved and Analyzed Repair and Maintenance Activities Such as the Anomaly Repair Work**

> **1.    Pipeline Project EIR/EIS**

Repair and maintenance activities such as the Anomaly Repair Work, and any related environmental impacts, also were included and evaluated as part of the Pipeline Project's environmental review.[31]

The EIR/EIS explains that its impact analysis extends through the pipelines' entire lifetime, including both pipeline "operation" and "maintenance."[32]  The EIR/EIS specifically acknowledges that routine maintenance activities like the Anomaly Repair Work would occur during the pipelines' ongoing operation.  For example, the EIR/EIS incorporates into the Pipeline Project's project description certain Oil Spill Contingency and Emergency Response Plans that address ongoing pipeline maintenance activities.  The EIR/EIS concludes that compliance with these plans would "substantially reduce the oil spill risk" and reduce any significant impacts that would result from a major oil spill, including impacts related to soils, surface water, aquatic biology, and land use and recreation.[33]  The County's Statement of Overriding Considerations also concluded that compliance with these plans, identified mitigation measures, and the Conditions of Approval would "mitigate[] as completely as possible" all "potential oil spill impacts" and other potentially significant impacts resulting from the Pipeline Project.[34]

These plans (which were directly attached to the Draft EIR/EIS and were available for public review and comment) acknowledged the pipelines' ongoing inspection requirements, including by using inspection "pigs" to "measure the severity of corrosion and to inspect pipeline defects."[35]  If required, identified pipeline defects (i.e., anomalies) would be repaired, "cleaned and recoated" or "removed and replaced," and "faulty … sections of pipe would be replaced as necessary."[36]  The EIR/EIS imposes no limitation on the number of sites where anomaly repairs

---

[30] See County CDPs 90-CDP-175 (pipeline realignment), 97-CDP-255 (pump station tank replacement), 00-CDP-069 (pipeline realignment).

[31] See Proposed Celeron / All American and Getty Pipeline Projects Environmental Impact Report/Environmental Impact Statement (EIR/EIS), SCH No. 83110902 (1984, 1985).  The Draft EIR/EIS for the pipeline project is available on the County's website here, and the Final EIR/EIS for the pipeline project is available here.

[32] Final EIR/EIS, Abstract, p. 2.

[33] Draft EIR/EIS, pp. S-5 through S-14.

[34] County Planning Commission Action on Celeron/All American Pipeline Project FDP, attached at Exhibit D, pp. 55-56.

[35] Draft EIR/EIS, Appendix H, p. 37.

[36] *Ibid.*; Final EIR/EIS, RTC 37-4.  The EIR/EIS's conclusions regarding the risk of oil spills, ruptures or leaks were predicated upon the pipeline operator's ability to repair anomalies detected in the pipelines.  See Draft EIR/EIS, p. 4-35 ("Large spills, ruptures, or detectable leaks are less probable in terms of potential groundwater contamination because in these instances the pipeline valves would be closed immediately and the defect repaired.").

LATHAM&WATKINS LLP

may be undertaken at any one time or over the pipelines' lifetime.  As such, the pipeline anomaly repairs contemplated under the EIR/EIS may be undertaken at any number of sites where such work is necessary at the same time or over a condensed period without constituting a new project under CEQA.[37]

The scope of anomaly repairs analyzed in the EIR/EIS involve the exact same steps as described above for the Anomaly Repair Work.  First, crews must access the anomaly repair sites using the same methods required to install the pipelines in the first instance.  The EIR/EIS acknowledged that constructing the pipeline route would involve "surface travel" over "[e]xisting roads or the ROW [right-of-way] itself," which could involve crossing "minor unpaved roads" and "stream crossings."[38]  Once an anomaly repair site is accessed, the EIR/EIS anticipated that the anomaly repair work would involve excavating and dewatering (if necessary) the affected pipeline segments, inspecting the pipelines, conducting repairs, reapplying insulation and outer wrap, and backfilling the repaired pipeline area.[39]  Significantly, in performing its analysis of future anomaly repairs along the pipelines' route, the EIR/EIS acknowledges that impacts to environmentally sensitive habitat areas, such as oak woodlands, within the pipelines' right-of-way would be permanent (i.e., extending throughout the pipelines' lifetime due to anticipated and ongoing maintenance activities) and constitute a significant environmental impact.[40]  The Anomaly Repair Work occurs within the boundaries of the right-of-way analyzed in the EIR/EIS, which was disturbed by pipeline construction and has remained impacted by ongoing pipeline inspection and operational activities.[41]

Accordingly, the Anomaly Repair Work – including its inspection, site access, excavation, and backfilling components – falls well within the scope of the repair and maintenance activities disclosed and analyzed under the prior environmental documentation for the Pipeline Project.

## 2.    Conditions of Approval

The pipelines' Conditions of Approval, which were incorporated by reference into the pipelines' FDP, CUP, and CDPs, encompassed the same operational and maintenance

---

[37] See *Committee for a Progressive Gilroy v. State Water Resources Control Bd.* (1987) 192 Cal. App. 3d 847, 862-63 (subsequent action approving project operations within limits specified in original EIR does not constitute a new project requiring additional CEQA review); *County of Mono v. City of Los Angeles* (2022) 81 Cal.App.5th 657, 675 (subsequent action authorized by leases already subject to CEQA review does not constitute a new project triggering additional CEQA review).

[38] Draft EIR/EIS, pp. 2-4, 2-26, 2-30.

[39] See Draft EIR/EIS, pp. 4-35 (acknowledging that "localized dewatering" would result in "negligible" impacts when required as part of pipeline "excavation and burial"); 2-22 ("any repairs would have field applied insulation and outer wrap prior to lowering in and backfill operations").

[40] See, *e.g.*, Draft EIR/EIS, p. 4-57 ("About 220 acres of oak woodlands would be removed for the life of the project.").

[41] See Line 901 & Line 903 Replacement Project: 2nd Revised Biological Resources Assessment, p. 19 ("[A]lthough existing conditions of the pipeline right-of-way vary, the majority of the corridor shows the initial Line 901/903 construction and subsequent ongoing maintenance activities have resulted in a readily recognizable corridor of predominately grassland habitat (60%) ….").

LATHAM&WATKINS LLP

components of the Pipeline Project as described in the EIR/EIS.[42]  Accordingly, the Conditions of Approval specifically contemplated and approved ongoing repair and maintenance activities such as the Anomaly Repair Work.  For example, Condition J-11 acknowledges that the pipelines' right-of-way will be used for "operational maintenance" after construction is completed.[43]

Similarly, Condition P-2 contemplates that the pipeline operator will conduct "regular maintenance and safety inspections," "corrosion monitoring and leak detection," and "periodic safety audits."[44]  Condition P-2 also acknowledges that federal regulations require the pipelines' operator to undertake certain repair and maintenance activities such as the Anomaly Repair Work.  The County later amended this Condition in 1987 to expressly state that "[p]ermits may not be withheld or suspended due to County concerns which are under the jurisdiction of 49 CFR Part 195 (Transportation of Hazardous Liquids by Pipeline), with the exception of areas/issues agreed to by the permittee and the County."[45]  The Anomaly Repair Work falls directly within Sable's obligations under 49 C.F.R. § 195.452(h)(1), which requires operators to "take prompt action to address all anomalous conditions in the pipeline that the operator discovers."  As such, Condition P-2 confirms that required repair and maintenance activities like the Anomaly Repair Work would be undertaken pursuant to the pipelines' Conditions of Approval, FDP, and CDPs rather than requiring new or modified permits.  As described above, the County's Statement of Overriding Considerations concluded that the pipeline operator's compliance with Condition P-2 and other Conditions of Approval would "mitigate[] as completely as possible" all "potential oil spill impacts" and other potentially significant impacts resulting from the Pipeline Project.[46]  The County is obligated to ensure compliance with its Statement of Overriding Considerations, including the prompt repair of anomalies, to ensure that significant impacts are mitigated to the maximum extent possible.[47]

Like the EIR/EIS, the Conditions of Approval do not impose any limit or require new permits based on the number of sites where anomaly repairs may be necessary or undertaken at the same time or over a condensed period.  To the contrary, repair and maintenance activities such as the Anomaly Repair Work fail to trigger any of the narrow circumstances under which the Conditions of Approval would require Sable to obtain a new or modified permit.  Condition A-13 provides:

> [The pipeline operator] shall obtain a new or modified permit, or authority to continue operation under the existing permit prior to undertaking any of the following activities which may, in the judgement of the County, result in significant

---

[42] See Conditions of Approval, attached at Exhibit G, p. 8 ("This permit is premised upon findings that where feasible, all significant environmental effects of the project identified in the EIR/EIS [], which occur in Santa Barbara County, will be substantially mitigated by the permit conditions.")

[43] *Id.*, at p. 31.

[44] *Id.*, at p. 38.

[45] *Ibid.* (emphasis added).

[46] County Planning Commission Action on Celeron/All American Pipeline Project FDP, attached at Exhibit D, pp. 55-56.

[47] See *Sierra Club v. County of San Diego* (2014) 231 Cal. App. 4th 1152, 1167-68 ("Mitigating conditions are not merely expressions of hope.  Once incorporated, mitigation measures cannot be defeated by ignoring them ….").

LATHAM&WATKINS LLP

changes to the impacts on the County.  Such changes could include but not be limited to 1) major pipeline or pump station modifications; 2) major changes in pipeline throughput; 3) introduction of production to the pipeline from sources other than those described above [noted as the outer continental shelf and other locally produced onshore and offshore petroleum from the Santa Barbara and Santa Maria Basins], and 4) introduction of a different product from any source.[48]

The Anomaly Repair Work does not trigger any of these requirements.  The work does <u>not</u> involve: 1) "major pipeline or pump station modifications," as the Anomaly Repair Work is a standard repair and maintenance activity required by 49 C.F.R. § 195.452(h)(1); 2) "major changes in pipeline throughput," because the Work will not increase the pipelines' capacity; 3) "introduction of production … from [new] sources"; or 4) "introduction of a different product."

Moreover, the Conditions of Approval contemplate that biological impacts within the pipelines' operational right-of-way would be permanent, allowing for ongoing repair and maintenance activities like the Anomaly Repair Work.  For example, Condition H-1(j) originally required the pipeline operator to develop a "plan for ***off-site reestablishment*** of oaks to mitigate impacts to oak savannahs and woodlands along the route."[49]  The County later modified this condition to require the pipeline operator to endow an Alternative Oak Mitigation Program to reestablish oak savannahs and woodlands in Santa Barbara County at an off-site location to mitigate for the Project's permanent on-site oak tree impacts.[50]  Similarly, Conditions H-10 and H-11 required the pipeline operator to, after construction, replace and revegetate any disturbed catalina mariposa lily and refugio manzanita in locations "in or near" the disturbed area, but "***exclusive of the operation [right-of-way]***."[51]  Erosion control was the key objective for any required revegetation along the pipelines' operational right-of-way – not the long-term reestablishment of sensitive species – because it was clearly understood that the pipeline's right-of-way would continued to be disturbed by pipeline operation and maintenance.[52]  These Conditions confirm that any biological impacts along the pipelines' operational right-of-way resulting from the Anomaly Repair Work are within the scope of impacts previously approved by the County.

In sum, the Anomaly Repair Work falls within the scope of approved repair and maintenance activities contemplated by the pipelines' Conditions of Approval, and as analyzed under the Pipeline Project's EIR/EIS, to be undertaken without any subsequent or modified permit or subsequent environmental review.

---

[48] Conditions of Approval, attached at Exhibit G, p. 4.

[49] County Planning Commission Action on Celeron/All American Pipeline Project FDP, attached at Exhibit D, pp. 23-24 (emphasis added)

[50] Conditions of Approval, attached at Exhibit G, p. 21.

[51] *Id.*, p. 22 (emphasis added).

[52] See, *e.g.*, *id.*, at p. 20.

LATHAM&WATKINS LLP

### 3.    County's Confirmation that Anomaly Repair Work Falls Within Scope of Previously Issued Permits

The County's February 12, 2025, letter confirmed that Anomaly Repair Work does not require any further authorization under the Coastal Act or County's LCP.[53]

The County issued its letter pursuant to its lawful, delegated authority under the Coastal Act and its certified LCP. The Coastal Commission first certified the County's LCP in March 1981, at which point the County became the vested coastal development permitting authority in the County's jurisdiction under the Coastal Act.[54] Pursuant to that authority, in 1986 the County issued the CDPs pursuant to its certified LCP. The CDPs were not appealed by any party, including the Coastal Commission. The CDPs are therefore final, valid, and not subject to further appeal.[55]

As described above, the Anomaly Repair Work was analyzed as an ongoing maintenance activity under the Pipeline Project's EIR/EIS, and the Conditions of Approval confirm that such work was authorized by the FDP, CUP, and CDPs. The County's letter further confirms that Anomaly Repair Work included within Sable's Zoning Clearance applications falls within the scope of the Pipeline Project's previously issued permits. The County reached this conclusion after review of detailed descriptions, plans, and assessments provided to the County by Sable that was included in those Zoning Clearance applications concerning anomaly repair work that was ongoing at the time the NOV was received as well as proposed future anomaly repair work in the coastal zone. Because the County's confirmation was based on substantial evidence, it is entitled to deference.[56] The County's confirmation is also entitled to deference because it approved the FDP, CUP, CDPs, and Conditions of Approval in the first instance.[57]

Although Sable's Zoning Clearance applications allowed the County to confirm that Anomaly Repair Work falls within the scope of the Pipeline Project's existing CDPs, the County also concluded that such work does not actually require Zoning Clearances. As the County explained, its "assessment is consistent with the type of reviews conducted by the County, both

---

[53] As noted above, the County's letter is limited to the anomaly repairs that were addressed in the Zoning Clearance applications submitted by Sable to the County on November 22, 2024 and December 6, 2024. Those Zoning Clearance applications only addressed ongoing and future anomaly repairs. While the County has not yet reviewed information related to the prior anomaly repairs, there are no differences in the type of work involved between the ongoing, future, and past anomaly repairs. Accordingly, it is anticipated that the County will confirm that past anomaly repair work also falls within the scope of previously issued permits. Sable is working to compile information to the County to obtain written confirmation that the authorization provided in the County letter also applies "after-the-fact" to the past anomaly repairs.

[54] See Pub. Res. Code, § 30519.

[55] See Cal. Code Regs., tit. 14, § 13313 (CDPs "issued by the local government shall become final unless a valid appeal is filed with the commission").

[56] See *Kurtzke v. City of San Diego* (2017) 11 Cal.App.5th 1034, 1040 (City's finding under Planning and Zoning Law was subject to substantial evidence standard, which does not permit courts to "substitute its own findings and inferences" for that of a local agency).

[57] See Pub. Res. Code, § 30600.5. Compare *Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2010) 184 Cal.App.4th 1032, 1047 (local agency "entitled to significant deference" in interpreting its own Municipal Code).

LATHAM&WATKINS LLP

inside and outside the Coastal Zone, on a regular basis to determine whether proposed development activities fall within the scope of existing permits."[58]  Therefore, based on its review, "no further application to or action by the County is required."[59]  This reflects a County understanding that Zoning Clearances should be used before commencing *initial* construction approved under a final development plan and that Zoning Clearances should not be used for each individual element of the approved development or use throughout the life of a project. Accordingly, the County offered to return the Zoning Clearance applications without taking any action on them other than confirming "that the pipeline anomaly repair work is authorized by the existing permits."[60]

The County's confirmation is not appealable under the CZO or LCP.  The CZO defines certain actions, decisions, and determinations for which an appeal to the Zoning Administrator, Planning Commission, or Board of Supervisors is permitted.[61]  Such appealable actions include decisions on applications for a coastal development permit or other planning permit, determinations as to the meaning or applicability of the CZO, and other decisions for which the CZO identifies the Planning Director as the applicable decision-maker.[62]  The County's confirmation that the Anomaly Repair Work was authorized by the Pipeline Project's previously issued permits does not fall within any of these categories and is not identified under the CZO as an appealable action.  The County's letter further confirms that it is "not appealable to the Planning Commission [or] Board of Supervisors."[63]  Rather, the County's confirmation is consistent with informal non-discretionary assessments that the County undertakes on a regular basis to assess whether previously-approved development activities conform with their authorizing permits and approvals.  Such ministerial confirmations are not subject to an appeal to any decision-maker within the County.

Moreover, the County's letter does not constitute an appealable action under the Coastal Act.  The County's confirmation that the work was authorized by the existing CDPs is "not appealable to the … Coastal Commission" because the County is not taking any final action or appealable action on an application for a coastal development permit.[64]  Further, the County's letter is not an appealable determination as to whether anomaly repair work is exempt from coastal development permit requirements under the CZO or the Coastal Act.[65]  The County's letter is not a determination of exemption but is instead a confirmation that the work already has been lawfully authorized through the existing CDPs issued by the County.[66]  As such, the

---

[58] County Letter.
[59] *Ibid.*
[60] *Ibid.*
[61] See CZO, § 35-57C.
[62] See *ibid.*, §§ 35-182.3.A, 35-182.4.A.2.
[63] See County Letter.  The County's Letter is not a determination on an "application for development or the request for exemption or categorical exclusion" under Coastal Act Regulations section 13569. Instead, it is a confirmation that the proposed work already was authorized under the existing FDP and CDPs and that no application was required.
[64] See *ibid.*; CZO § 35-186.6; Pub. Res. Code, §§ 30603, 30625; *City of Dana Point v. Cal. Coastal Commission* (2013) 217 Cal.App.4th 170, 188-189 (Section 30625 allows Coastal Commission appeals for "quasi-adjudicatory actions" on coastal development permits or claims of exemption).
[65] See County Letter.
[66] See Pub. Res. Code, § 30625.

LATHAM&WATKINS LLP

Coastal Act provides no basis for an appeal to the Coastal Commission of the County's letter confirming that the Anomaly Repair Work falls within the scope of the Pipeline Project's existing approvals. The County's confirmation that the Anomaly Repair Work requires no further Coastal Act authorization is therefore final.

———

In sum, the Anomaly Repair Work does not constitute a violation of the Coastal Act or LCP because all work is consistent with a previously issued Coastal Development Permit. Accordingly, Sable may continue with the work without being subject to an NOV or other enforcement action.

## IV.    PREEMPTION BY FEDERAL AND STATE LAW

Provisions of the County's CZO and County Code are preempted and inapplicable where they "conflict" with federal or state law.[67] A "conflict" between local and general laws occurs where the local law "duplicates, contradicts or enters an area fully occupied by general law."[68] Here, provisions of the County's CZO and County Code that conflict with Sable's obligations under applicable federal and state regulations, including those that regulate pipeline safety and repairs, are therefore preempted.

*San Diego Gas & Electric Co. v. City of Carlsbad* illustrates the extent to which the County Code and CZO may be preempted by federal and state law. In that case, SDG&E dredged a lagoon near an electrical generation plant to enable seawater to be used to cool the plant's generation units.[69] The City of Carlsbad required SDG&E to obtain a special use permit, pursuant to a floodplain ordinance and the City's coastal development ordinance, to undertake these dredging activities.[70] SDG&E challenged the City's jurisdiction over its dredging activities under the coastal development and floodplain ordinances.[71] The Court of Appeal held that "the City's requirement of a special use permit for dredging" – an "essential maintenance activity" – placed a "physical and economic burden on SDG&E's operation and maintenance" of the plant and was therefore preempted by the CPUC's "statewide interest in ensuring that utility operations are conducted in a safe and efficient manner."[72]

Similarly, here, federal law preempts any CZO or County Code regulation as to pipeline safety. Applicable federal regulations[73] specifically require Sable to "take prompt action to address all anomalous conditions in [any] pipeline,"[74] and also generally regulate pipeline

---

[67] See, *e.g.*, *U.S. v. City of Pittsburg, Cal.* (9th Cir. 1981) 661 F.2d 783 (federal law preempts local land use regulation); Cal. Const. art. XI, § 7 ("A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations *not in conflict with general laws*.") (emphasis added); *People ex re. Deukmejian v. County of Mendocino* (1984) 36 Cal.3d 476 (state law preempts local land use regulation).

[68] *Viacom Outdoor, Inc. v. City of Arcata* (2006) 140 Cal.App.4th 230, 236.

[69] See *San Diego Gas & Electric Co. v. City of Carlsbad* (1998) 64 Cal.App.4th 785, 789.

[70] See *id.*, at p. 790.

[71] See *id.*, at p. 791.

[72] *Id.*, at p. 802.

[73] See 49 C.F.R. Part 195, adopted by OSFM at 19 C.C.R. § 2000.

[74] 49 C.F.R. § 195.452(h)(1).

LATHAM&WATKINS LLP

design, corrosion control, operation and maintenance activities, and pipeline safety.[75]  As California's enforcement authority for such regulations[76], the Office of the State Fire Marshal (OSFM) issued two State Waivers on December 17, 2024, that require Sable to conduct anomaly repairs on the pipelines within 180 days, if not immediately.[77]  Any local regulations that interfere with Sable's ability to complete these anomaly repairs on the timelines required by OSFM would present a genuine conflict with Sable's ability to comply with federal regulations, and therefore would be preempted.[78]

The County acknowledges that its authority over pipeline safety repairs is preempted. For example, Condition P-2 states that "permits may not be withheld or suspended due to County concerns which are under the jurisdiction of 49 C.F.R. Part 195 (Transportation of Hazardous Liquids by Pipeline), with the exception of areas/issues agreed to by [the pipeline operator] and the County."[79]  Moreover, as part of a Settlement Agreement entered into by the County and the pipelines' original proponent (the Celeron Pipeline Company of California), the County agreed that it was preempted from regulating pipeline design, construction, and operation covered under 49 C.F.R. Part 195.[80]

The County's February 12, 2025, letter does not address preemption related issues. Further discussion of preemption is not necessary at this time because the County has confirmed that the Anomaly Repair Work is authorized under the Pipeline Project's previously issued CDPs, FDP, CUP, and under the Coastal Act and Certified LCP.[81]

## V.    CONCLUSION

The County fully analyzed environmental impacts resulting from, and ultimately approved, repair and maintenance activities on the pipelines such as the Anomaly Repair Work when it initially approved the pipelines' CDPs and associated construction activities in the 1980s.  The County has since confirmed that Sable's anomaly repairs fall within the scope of those prior approvals and do not require a new or modified coastal development permit.

---

[75] See, *e.g.*, *id.*, §§ 195.110(b), 252(a) (requiring backfill for pipeline support), 248 (minimum cover requirements) 246 (preventing external damage to exposed pipelines), 414 (requiring repairs for weather-related damage), 569, 585 (inspections and actions to correct corrosion), 436 (protecting against pipeline vandalism).

[76] See Government Code, § 51010 (vesting OSFM with the "exclusive safety[,] regulatory and enforcement authority over intrastate hazardous liquid pipelines" and establishing OSFM as the implementing authority for the federal Hazardous Liquid Pipeline Safety Act and "federal pipeline safety regulations as to those portions of interstate pipelines" located in California).  See also 19 C.C.R. §§ 2000 (OSFM's adoption of the Pipeline and Hazardous Materials Safety Administration (PHMSA) implementing regulations), 2100 et seq. (regulating new and replacement pipelines in certain areas within the coastal zone).

[77] See OSFM, Letter of Decision on State Waiver Requests (CA-324 and CA-325A/B) (Dec. 17, 2024), attached at Exhibit H.  PHMSA confirmed that it did not object to OSFM's State Waivers on February 11, 2025.  See PHMSA, Letters re: Docket No. PHMSA-2025-0002 and -0003 (Feb. 11, 2025), attached at Exhibit I.

[78] See, *e.g.*, *Bernstein v. Virgin Am., Inc.*, 3 F.4th 1127, 1140 (9th Cir. 2021).

[79] Conditions of Approval, attached at Exhibit G, p. 35, Condition P-2.

[80] See Celeron Settlement Agreement (Feb. 8, 1988), p. 2.  The Celeron Settlement Agreement is available here.

[81] Sable does not waive any right to assert that any future approvals or permitting requirements may be preempted by federal and state law.

**LATHAM&WATKINS**LLP

Therefore, the Anomaly Repair Work does not violate the Coastal Act, LCP, or County Code, and the County has confirmed that Sable is authorized to complete the work.

US-DOCS\157104146

# EXHIBIT H

355 South Grand Avenue, Suite 100
Los Angeles, California  90071-1560
Tel: +1.213.485.1234  Fax: +1.213.891.8763
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Silicon Valley |
| Hong Kong | Singapore |
| Houston | Tel Aviv |
| London | Tokyo |
| Los Angeles | Washington, D.C. |
| Madrid | |

**LATHAM&WATKINS** LLP

January 15, 2025

Cassidy Teufel
Deputy Director
California Coastal Commission
455 Market Street, Suite 228
San Francisco, CA 94105

Re:    **Justification for Santa Ynez Unit (SYU) Pipeline Span Remediation Under Existing Development and Production Plan, Coastal Development Permit No. E-88-1, and Consistency Certification No. CC-64-87**

Dear Cassidy:

I understand you have been in communication with Steve Rusch of Sable Offshore Corp. (Sable) regarding Sable's span remediation work on the SYU pipelines located offshore of the Gaviota Coast in Santa Barbara County. As you may be aware, Mr. Rusch is currently on vacation.  I have been asked to respond on behalf of Sable to the Coastal Commission's (CCC) recent correspondence with Mr. Rusch regarding the span remediation work.  In sum, it is Sable's position that the span remediation maintenance activities, specifically the placement of sandbags to maintain and support the existing offshore pipelines consistent with American Petroleum Institute safety and design standards, do not require a new Coastal Development Permit (CDP) or consistency certification under the Coastal Act and the Coastal Zone Management Act (CZMA). These activities fall within the scope of development authorized under the existing Development and Production Plan (DPP) previously approved by the Department of the Interior's Minerals Management Service (MMS) and the CCC-approved CDP for the SYU pipelines, and do not require additional CCC approval.

## I.    BACKGROUND

In July and October 2024, Sable conducted remotely operated vehicle (ROV) surveys as part of Sable's State Lands Commission (SLC) lease obligations.[1]  Specifically, the ROV

---

[1] See Appendix A, State Lands Commission Amendment of Leases Nos. PRC 7163 and PRC 4977, Section 21.b.i ("Lessee shall adhere to and complete a comprehensive series of standard inspection protocols, as described below … to assess the presence and risk of hazards including, but not limited to damage, corrosion and pipeline movement. Inspection methods shall

US-DOCS\155746947

**LATHAM&WATKINS** LLP

surveys involved a visual pipeline survey including inspection for scour and pipeline spans, a continuous pipeline-to-electrolyte cathodic potential survey, and documentation of anomalies such as damage or debris. The survey in state waters was conducted between July 11th-16th and the survey in federal waters was conducted between October 10th-16th. The state waters survey utilized the Falcon ROV system aboard the M/V Danny C vessel. The federal waters survey utilized the Deep Scout ROV aboard the M/V Loren C vessel. In addition to the requirement to perform an ROV survey, SLC lease obligations include a requirement to perform a seismic vulnerability assessment of the pipelines though California State Waters.[2] Sable contracted Spire Engineering Services (CA PE C82993/C58646) to perform the assessment for each of the lines and provide a set of maximum allowable span criteria to be used to assess pipeline spans.

Based on the survey results, it was determined that certain pipeline spans along the ocean floor exceed allowable span lengths documented in the seismic vulnerability assessment. Specifically, the maximum allowable pipeline span lengths from the vulnerability assessment for the 20" Oil Emulsion Pipeline and 12" Treated Water Pipeline in state waters and federal waters are summarized below in separate tables:

**Maximum Allowable Pipeline Span Lengths: State Waters**

| Pipeline Designation | Wall Thickness (in) | Concrete Coat Thickness (in) | Water Depth Range (ft) | Allowable Span | | Minimum Curve Radius (ft) |
|---|---|---|---|---|---|---|
| | | | | Straight (ft) | Curved (ft) | |
| 20" Oil Emulsion Line | 0.50 | 1.75 | 0-25 | 70.5 | 69.5 | 9000 |
| | 0.50 | 2.50 | 25-50 | 68.5 | 63.5 | 9000 |
| | 0.50 | 1.75 | 50-120 | 70.5 | 69.5 | 9000 |
| | 0.50 | 1.50 | 120-~320 | 55.0 | 50.0 | 9000 |
| 12" Treated Water Line | 0.50 | 1.50 | 0-50 | 47.0 | 47.0 | 9000 |
| | 0.50 | 1.00 | 50-150 | 46.5 | 46.0 | 9000 |
| | 0.50 | 0.00 | 150-~320 | 47.5 | 47.0 | 9000 |

---

encompass both internal and external evaluations, utilizing established industry practices such as Remotely Operated Vehicle (ROV)… assessments.").

[2] *Id.*, Section 21.b.iv ("Lessee shall complete a Pipeline Seismic Vulnerability Assessment … using a third-party California Licensed Professional Engineer.").

LATHAM&WATKINS LLP

## Maximum Allowable Pipeline Span Lengths: Federal Waters

| Pipeline Designation | Wall Thickness (in) | Concrete Coat Thickness (in) | Water Depth Range (ft) | Allowable Span | |
|---|---|---|---|---|---|
| | | | | Straight (ft) | Curved (ft) |
| 12" Treated Water Line | 0.5 | 0 | ~320-700 | 47.5 | 47 |
| | 0.625 | 0 | 700-1200 | 47.5 | 47.5 |
| 20" Oil Emulsion Line | 0.5 | 1.5 | ~320-340 | 55 | 50 |
| | 0.562 | 1.25 | 340-1200 | 35.0-55.0* | 55 |
| 12" POPCO Gas Line | 0.625 | 0 | ~320-805 | 49.8 | |

\* The maximum allowable unsupported span length for the pipeline shall vary linearly from 35.0 feet for a vertical bending radius of 2,100 ft to 55.0 ft for a vertical bending radius of 5,000 ft.

The allowable pipeline span lengths from the vulnerability assessment were compared to the identified spans from the ROV surveys. The tables below document the spans that required remediation with one table for the state waters and one table for the federal waters. These spans include those beyond the allowable length as well as those close to the allowable length which, over time, could have developed into spans requiring remediation.

## Span Remediation: State Waters

| SPAN ID | PIPELINE | SPAN LENGTH | APPROXIMATE WATER DEPTH |
|---|---|---|---|
| | | (Feet) | (Feet) |
| 1 | 20" EMULSION | 48' | 253' |
| 2 | 20" EMULSION | 41' | 253' |
| 3 | 20" EMULSION | 44' | 276' |
| 4 | 20" EMULSION | 50' | 277' |
| 5 | 20" EMULSION | 48' | 279' |
| 6 | 20" EMULSION | 66' | 279' |
| 7 | 20" EMULSION | 61' | 276' |
| 8 | 20" EMULSION | 53' | 281' |
| 9 | 12" WATER | 66' | 265' |
| 10 | 12" WATER | 53' | 265' |
| 11 | 12" WATER | 42' | 275' |
| 12 | 12" WATER | 70' | 275' |
| 13 | 12" WATER | 58' | 278' |
| 14 | 12" WATER | 56' | 277' |

**LATHAM&WATKINS** LLP

**Span Remediation: Federal Waters**

| SPAN ID | PIPELINE | SPAN LENGTH | APPROXIMATE WATER DEPTH |
|---|---|---|---|
| | | (Feet) | (Feet) |
| 15 | 12" WATER | 75' | 550' |
| 16 | 12" WATER | 47' | 577' |
| 17 | 12" WATER | 46' | 600' |
| 18 | 12" WATER | 61' | 641' |
| 19 | 12" WATER | 76' | 647' |
| 20 | 12" WATER | 56' | 657' |
| 21 | 20' EMULSION | 63' | 619' |
| 22 | 20' EMULSION | 60' | 617' |
| 23 | 20' EMULSION | 53' | 580' |
| 24 | 20' EMULSION | 66' | 590' |
| 25 | 20' EMULSION | 50' | 567' |
| 26 | 20" EMULSION | 53' | 550' |
| 27 | 20" EMULSION | 48' | 537' |
| 28 | 12" GAS POPCO | 72' | 567' |
| 29 | 12" GAS POPCO | 46' | 560' |
| 30 | 12" GAS POPCO | 82' | 382' |

A seismic vulnerability study also was performed for the 12" Gas Pipeline in California State waters, and the maximum allowable spans from that study were compared to identified spans from the ROV survey. No spans on the 12" Gas Pipeline exceed the maximum allowable span length, and therefore no remediation within state waters was required.

To address the spans identified through the ROV survey and listed above, Sable submitted letters to SLC regarding the span remediation work in state waters and to the Bureau of Safety and Environmental Enforcement (BSEE) regarding the span remediation work in federal waters. In response to these letters, SLC and BSEE issued approvals for the span remediation work on November 27, 2024[3] and December 5, 2024, respectively. Consistent with those approvals, Sable has informed me that it undertook maintenance activities in state waters over a three-day period from November 29, 2024 to December 1, 2024, consistent with the American Petroleum Institute (API) Recommended Practice 1111, as outlined in the existing DPP.[4] Sable has confirmed these activities included conducting a pre-installation survey, deploying sand-to-concrete bags, and positioning them to provide necessary support to the pipeline. More specifically, utilizing the vessel Curtin Loren-C and an Aqueos ROV, the project deployed 3/1 (sand/cement) bags to create support piers along the identified spans. The remediation vessel was dynamically positioned and no anchors were deployed during the remediation process. The process began with a pre-installation survey conducted by the ROV to

---

[3] SLC provided an email approval to move forward with the work in state waters on November 27, 2024, followed by an official approval letter dated December 4, 2024.

[4] Sable has informed me that maintenance activities were undertaken in federal waters from December 5, 2024 to December 7, 2024.

LATHAM&WATKINS LLP

verify and confirm the exact span locations. The vessel crew then deployed "tea-bag" pallets of soft concrete bags, guided by the ROV to precise locations adjacent to the pipeline. The ROV strategically placed the bags to provide maximum support, ensuring the stability and integrity of the pipeline. This operation was repeated across all predetermined support locations, with additional pallets available for any extra spans identified during the ROV inspection (though no extra spans were identified).

As described in greater detail below, this type of maintenance activity has been conducted previously on the SYU pipelines without the need for additional permitting under either the DPP or the CDP.

## II.    SABLE'S APPROVED DPP

Exxon Company, U.S.A.'s (Exxon) DPP for the SYU was submitted to MMS in December 1982.[5] In January of 1983, Exxon submitted a request for consistency certification for expansion of production in the SYU. The CCC's 1990 Compendium of California Coastal Commission Decisions Under the Federal Consistency Provisions provides a succinct summary of the CCC's consideration of the DPP:

> The 1983 proposal included two options, each of which included … platforms, pipelines, and electrical cables in [Outer Continental Shelf] waters, and expansion of onshore gas processing facilities to accommodate the new platforms. The two options differed in methods of treatment, storage and transport of the crude produced from the SYU. Although both options ultimately relied on transport of treated crude by tanker to the Gulf Coast, Option "A" involved expanding the capacity of the existing [onshore treatment facility], while Option "B" involved construction of new onshore oil treatment and storage facilities and a new marine terminal about a mile offshore of El Capitan. In June of 1983 the [CCC] concurred with the consistency certification for the platforms and pipelines proposed of Option "B", but objected to Option "A" … as the preferred means of oil storage and treatment prior to shipment (see CC-7-83).[6]

---

[5] *See* Appendix B, September 20, 1985 DPP Approval.

[6] *See* CCC, Compendium of California Coastal Commission Decisions Under the Federal Consistency Provisions (March 30, 1990), pp. 265-266, available at: https://documents.coastal.ca.gov/assets/fedcd/Compendium-of-CCC-FC-Decisions-OCS-1983-to-present.pdf.

LATHAM&WATKINS LLP

On September 20, 1985, MMS approved Option B in the DPP, except it specifically noted that the DPP approval is not a final approval of the pipeline system.[7]

On September 29, 1987, Exxon's revised DPP, which provided additional details regarding the installation of three platforms in the SYU with associated subsea pipelines connecting to onshore facilities in Las Flores Canyon, was found complete by MMS. The CCC received the DPP revision from MMS on December 22, 1987.[8]

On February 23, 1988, with Consistency Certification No. CC-64-87, the CCC concurred with Exxon's certification for the revised DPP nearshore and onshore portions of Option B alternative, having already concurred with the OCS portions of Option B with Consistency Certification No. CC-7-83. On the same day, the CCC also approved Coastal Development Permit No. E-88-1 for the nearshore portions of Option B, including the pipelines.[9]

On April 4, 1988 MMS approved the revisions to the DPP.[10] While the DPP has been revised since 1988, as it relates to the offshore pipelines, the 1988 DPP is the controlling approval for the pipelines' installation, as well as for their ongoing maintenance and operation.[11] The 1988 DPP is the version of the DPP in existence when the CCC provided its consistency certification (CC-64-87) and approval of its CDP (E-88-1) for the pipelines.

## A.    1988 DPP

As relevant here, the 1988 DPP includes a detailed discussion of the SYU pipelines that would be installed, maintained, and operated. It describes a new 20-inch emulsion line extending from Platform Harmony to the Las Flores Canyon oil treating facilities, in which all SYU oil production will be transported. It also describes an existing 12-inch pipeline originating at Platform Hondo which would continue to bring gas onshore to the POPCO Gas Plant. A second, new 14-inch gas line would transport gas to onshore facilities. Finally, a new 12-inch pipeline would be installed to carry produced water from the oil treating facilities to an offshore outfall discharge point located at Platform Holly.[12]

The 1988 DPP addresses the design, construction, and ongoing operation and maintenance of the SYU pipelines. This included relevant geologic and geotechnical design considerations and applicable design codes. Regarding maintenance, the DPP expressly *requires*

---

[7] *See* Appendix B, September 20, 1985 DPP Approval.

[8] *See* Appendix C, April 4, 1988 DPP Approval.

[9] *See* Appendix D, March 17, 1988 Letter to Exxon from Coastal Commission, attaching Consistency Certification Concurrence and CDP.

[10] *See* Appendix C, April 4, 1988 DPP Approval.

[11] The 1988 DPP is attached as Appendix E.

[12] 1988 DPP, at VIII-2.

LATHAM&WATKINS LLP

Sable to ensure the pipelines are maintained: "All emulsion and gas pipelines will be maintained in good operating condition at all times."[13] The DPP's Environmental Impact Statement/Environmental Impact Report (EIS/EIR) also recognizes that "Exxon's [DPP] has been carefully evaluated to assess the effects due to construction **and operation** of the facilities."[14]

Specific maintenance activities authorized by the 1988 DPP are summarized below.

### 1.    *Maintaining Static Loads and Spans Were Incorporated into DPP Design Requirements*

The 1988 DPP explicitly accounted for static loads and spans in its design and construction criteria for the offshore pipelines. It emphasized that the pipelines would be constructed and operated in a technically sound and environmentally acceptable manner. The routes were "carefully scrutinized for potential hazards to ensure that the pipelines may be safely installed and operated."[15] The design criteria specifically considered both external environmental loads and internal loads that the pipelines might encounter throughout their operational life, including stresses during installation. The DPP expressly requires that stress levels from these conditions remain within acceptable limits.[16]

The DPP addressed external environmental loads arising from meteorological and oceanographic phenomena, as well as the geologic and geotechnical characteristics of the sea bottom along the pipeline routes.[17] These environmental forces included waves, currents, earthquake ground motions, and ambient pressure and temperature. The design parameters were set to account for significant wave height, period, and direction, bottom steady current velocity and direction, and earthquake wave velocities and periods.[18] These criteria were then tailored to the specific locations and directions of the pipelines, ensuring consistency with the platform designs.[19] This comprehensive approach shows that static loads and spans were integral considerations in the DPP's planning and design process.

The DPP also states that "[t]he pipelines will be designed to resist significant horizontal and vertical deflection under the action of bottom steady currents, wave induced oscillatory currents and earthquakes. Earthquake motion design criteria will be consistent with the values

---

[13] *Id*. at VIII-24

[14] Final Environmental Impact Statement/Report for Santa Ynez Unit/Las Flores Canyon DPP (June 1984), p. 6-47.

[15] 1988 DPP, at VIII-11.

[16] *Id*. at VIII-11-13.

[17] *Id*. at VIII-6-9.

[18] *Id*. at VIII-12.

[19] *Id*. at VIII-12.

LATHAM&WATKINS LLP

used in the platform designs. Stability will be accomplished via routing, increased submerged weight, trenching, anchoring, or combinations of these methods."[20]

### 2.    *The EIS/EIR Contemplates Span Remediation*

The 1984 EIS/EIR for the DPP states that the pipelines will be designed to withstand up to a foot of local deformation of the seafloor. It also includes a mitigation measure to "[m]onitor seafloor disturbances after construction using side scan sonar or equivalent to assess need for remedial measures" to address the potential impact of "[d]isruption of seafloor sediments and formation of sea mounds due to construction of offshore platforms and pipelines."[21]  The EIS/EIR includes a separate mitigation measure to "inspect subsea project components" following earthquakes prior to restart to determine reliability of components and "***take remedial actions as appropriate***."[22] Further, the EIS/EIR notes that "[t]he cumulative geologic impacts are minimized using conventional geotechnical design and construction methods, ***including ongoing maintenance of slope stabilization operations***."[23]

While no specific earthquake triggered a pause in operations, the inspections that Sable has conducted prior to restart identified areas of the pipeline that required remedial actions that are consistent with the remedial actions and associated impacts previously considered in the 1984 EIS/EIR. Sable's maintenance activities here to add additional supports due to changes in the geologic environment over time are consistent with the "ongoing maintenance of slope stabilization" that was clearly contemplated and analyzed in the 1984 EIR/EIS that was considered by the CCC in connection with its consistency certification and CDP for the SYU pipelines.

### B.    *The DPP Incorporates Accepted Maintenance Practices in American Petroleum Institute Publication API RP 1111*

The 1988 DPP states that "[t]he oil and gas pipelines will be designed, constructed, tested, operated and inspected in compliance with the following standard specifications, as applicable: … Recommended Practice for Design, Construction, Operation and Maintenance of Offshore Hydrocarbon Pipelines, American Petroleum Institute Publication API RP 1111."[24] In other words, Sable must operate and inspect the SYU oil and gas pipelines in compliance with

---

[20] *Id*. at VIII-14.

[21] 1984 EIS/EIR, Table 6.3.6-1.

[22] 1984 EIS/EIR, Table 6.3.3-1, emphasis added.

[23] *Id*., at p. 6-52, emphasis added.

[24] 1988 DPP, VIII-10.

LATHAM&WATKINS LLP

API Recommended Practice 1111. The current Fifth Edition of API 1111 was adopted in September 2015 and reaffirmed in January 2021.[25]

Section 4.1.4 discusses how the design of offshore pipelines should consider static loads:

> These include the weight of the pipe, coating, appurtenances, and attachments; external and internal hydrostatic pressure and thermal expansion loads; and the static forces due to bottom subsidence and differential settlement.
>
> The weight-related forces are of special concern where the pipeline is not continuously supported, that is, where spans are expected to occur. Spans are also of concern where seismic liquefaction of the supporting bottom could occur, and where mudslides could occur, such as some areas around the Mississippi River delta.
>
> The weight of the submerged pipeline can be controlled through the combination of the pipe wall thickness and the density and thickness of the external (concrete) weight coating. Weight calculations should consider stability when empty (the usual as-laid condition), full of the fluid to be transported, and flooded with seawater.
>
> Consideration should be given to preventing unacceptably long unsupported lengths *by use of dumped gravel, anchor supports, concrete mattresses, sand bagging, or other suitable means*.[26]

Thus, Sable's maintenance activities that involved installing sandbags under and around the SYU pipeline to remediate spans that exceed applicable criteria are consistent with the practices described in API 1111 and therefore its approved DPP.

### C.    *Contemporary Minerals Management Service (MMS) Manuals Support Span Remediation Work*

The 1992 MMS-sponsored Deepwater Pipeline Maintenance and Repair Manual[27] also provides insights into the industry-standard practices around the time of the DPP's approval for maintaining and repairing offshore pipelines, particularly concerning span remediation. The manual notes that span remediation is a routine maintenance procedure. It also describes the correction of pipeline spans as a "minor intervention," typically involving methods such as stone

---

[25] See Appendix F, API RP 1111, Design, Construction, Operation, and Maintenance of Offshore Hydrocarbon Pipelines (Limit State Design) (January 2021).

[26] API 1111, at p. 9.

[27] See Appendix G, Deepwater Pipeline Maintenance and Repair Manual Prepare for U.S. Department of the Interior Minerals Management Service (June 1992).

LATHAM&WATKINS LLP

dumping, grout bag placement, or mattresses, which align with Sable's use of sandbags. The following examples from the Manual establish that span remediation work using sandbags (or groutbags) is an accepted technique consistent with what would be expected to occur over the course of a pipeline's operational life:

- "Most of the minor repair techniques are well established and have a long history of use with diver, ROV and surface support intervention. There is extensive experience with the use of ROVs alone for span connection and seafloor preparation."

- "For example, the correction of pipeline spans is a minor intervention since the operating status of the pipeline should not be affected."

- "In the case of spans formed after installation, rectification is generally limited to correction by stone dumping, grout bag placement or mattresses."

- "Depending on the height of the spanning pipeline above the seafloor, and on the slope of the seafloor itself, correction can be undertaken utilizing various configurations and variations of grout filled bags.  The bags are usually made of a woven fabric material. Individual cells are interconnected and grouted from inlets on various points on the bags.  Grout bags have the advantage that they are easily handled and, when full, conform to the shape of the underside of the pipeline providing a stable support."

## III.    DPP REGULATORY FRAMEWORK

The regulatory framework governing the conduct of activities under an approved DPP is outlined in 30 CFR §§ 550.281 and 550.283. These regulations collectively affirm that the span remediation activities are permissible under the existing DPP and do not require a new CDP, consistency certification, or any amendments to the DPP.

### A.    *Conducting Activities Consistent with 30 CFR § 550.281*

Sable is operating the SYU, including the SYU pipelines, under an approved DPP, and its span remediation activities are consistent with the requirements of 30 CFR § 550.281. This regulation mandates that before conducting activities under an approved DPP, certain approvals and permits must be obtained from the District Manager or BSEE Regional Supervisor. These include approvals for applications for permits to drill, production safety systems, new platforms, or major modifications, lease term pipelines, and other permits as required by law.

The activities in these applications and permits must conform to the activities detailed in the approved DPP. Sable's span remediation work, involving the placement of sandbags to support existing pipelines, is a maintenance activity that aligns with the scope and intent of the approved DPP. Accordingly, BSEE approved Sable's span remediation work without requiring any amendments to Sable's approved DPP.

**LATHAM&WATKINS**LLP

30 CFR § 550.281(c) explicitly states that applications for licenses, approvals, or permits to conduct activities under an approved DPP, including those identified in paragraph (a), are not subject to separate State CZMA consistency review. Although Sable's span remediation work does not fall under the expressly identified activities in paragraph (a), any application for approval under its DPP, such as the request for approval to BSEE for the span remediation work, is not subject to a separate CZMA consistency review. This regulatory provision reinforces that Sable's span remediation activities do not require additional consistency certifications.

### B.      *Applicability of 30 CFR § 550.283*

Even if there were any question about whether Sable's span remediation activities are explicitly described under the existing DPP, 30 CFR § 550.283(a) clarifies the circumstances that require a revision or supplement to an approved DPP.  The enumerated circumstances include changes to the type of drilling rig, production facility, or transportation mode and alterations in the surface location of a well or production platform beyond specified distances.  Sable's span remediation activities, involving the placement of sandbags to support and maintain existing pipelines, do not involve any of the types of significant changes listed in 30 CFR § 550.283(a). In contrast, the span remediation activities are routine maintenance measures that do not alter the type or volume of production, emissions, or waste, nor do they involve any significant changes to infrastructure or operational methods.

### 1.      *Notification Requirements Under 30 CFR § 250.1008(e)*

Further supporting Sable's position, 30 CFR § 250.1008(e) outlines the notification requirements for pipeline repairs. It states that the lessee or right-of-way holder must notify the Regional Supervisor before the repair of any pipeline or as soon as practicable. Sable's current deadline to file its report with BSEE is January 30.The report should include a description of repairs, results of pressure tests, and the date the pipeline returned to service.

The fact that the regulations require only a notification before repair, rather than a revision to the DPP, indicates that those maintenance and repair activities are anticipated and do not require amendments to the DPP. This further supports Sable's position that the span remediation activities are routine maintenance measures within the scope of the existing DPP and do not require additional regulatory approvals or consistency reviews.

In summary, the regulatory framework, as outlined in 30 CFR §§ 550.281 and 550.283, along with 30 CFR § 250.1008(e), collectively affirms that the span remediation activities are permissible under the existing DPP. They did not require a new consistency certification or any amendments to the DPP.

## IV.     COASTAL ACT AND CONSISTENCY CERTIFICATION

As discussed above, the CCC provided its concurrence in the project's consistency certification the same day that it approved the project's CDP No. E-88-1, underscoring the CCC's integrated consideration of the DPP and the CCC's CDP:

LATHAM&WATKINS LLP

> On February 23, 1988, by a vote of 8 in favor, 2 opposed, and l
> abstention, the California Coastal Commission concurred with
> your consistency certification for the Exxon Santa Ynez Unit
> Development and Production Plan nearshore and onshore portions
> of Option B alternative. On the same day, the Commission also
> approved a coastal development permit for the nearshore portions
> of Option B alternative with conditions. As you know these
> conditions were amended into the project description of the
> Development and Production Plan by you prior to Commission
> concurrence.[28]

CDP No. E-88-1 specifically included, as part of the project description, oil and produced water pipelines from offshore platforms to onshore facilities.[29] Moreover, the CCC was aware of and relied upon the State Lands Commission's conditions for the Project leases in state waters, which mandated "[a]nnual side-scan surveys of pipelines to check for bridging or other hazards to the pipeline."[30] This requirement was noted as factor in the CCC's determination that the risks and impacts associated with the project had been mitigated to the maximum extent feasible. The EIS/EIR, which the CCC also relied upon in connection with its federal consistency certification and CDP approval, further supported this conclusion by noting that "[t]he cumulative geologic impacts are minimized using conventional geotechnical design and construction methods, *including ongoing maintenance of slope stabilization operations*."[31]

The CCC's CDP findings recognized that the Project involved complex geotechnical and environmental considerations, particularly concerning the installation and maintenance of the pipelines. The CCC's findings highlighted the importance of addressing potential geologic constraints through "proper mitigation," which included "avoidance or … engineering design."[32] This is an explicit contemplation of engineering solutions, such as the deployment of 3/1 (sand/cement) bags to create support piers, as viable methods to address issues like pipeline spans caused by changes to geologic conditions. The CDP findings further noted that "[a]ll potential geologic constraints for the project (both onshore and offshore) have been identified and mitigated by avoidance or engineering design…. Soil movement forces have been minimized on the project by placing the pipelines directly on the seafloor."[33] This finding,

---

[28] Appendix D, Letter from Susan M. Hansch, Manager Energy and Ocean Resources Unit of CCC to Exxon Company U.S.A. (March 17, 1988).

[29] Appendix D, CDP No. E-88-1, p. 1 of 13.

[30] *See* CCC, Compendium of California Coastal Commission Decisions Under the Federal Consistency Provisions (March 30, 1990), pp. 254-255, available at: https://documents.coastal.ca.gov/assets/fedcd/Compendium-of-CCC-FC-Decisions-OCS-1983-to-present.pdf.

[31] 1984 EIS/EIR, p. 6-52, emphasis added.

[32] Appendix H, CCC Staff Recommendation on Permit and Consistency Certification, p. 78.

[33] *Id*., at p. 4.

LATHAM&WATKINS LLP

consistent with the analysis in the EIR/EIS and the maintenance activities in API Recommended Practice 1111 outlined in the existing DPP that was considered by the CCC in its Consistency Certification, supports providing continued support to the pipelines during operations through the use sandbags to stabilize soil movements.

Moreover, the CCC recognized the need for flexibility in pipeline construction methods, acknowledging that "[p]ipeline construction methods are presently undefined" and allowing Exxon the latitude to "propose their own design solutions."[34] This flexibility permits the adaptation of construction techniques, such as the deployment of the 3/1 sandbags, which align with the original analysis and objectives of the CDP. Further, the CCC also anticipated that "[d]redge materials will be piled up on one or both sides of the trench, and backfilling will be done where necessary to anchor the lines, and where natural backfill due to local sediment movement is not expected. Exxon expects that armor rock will be needed to secure the lines, but does not know the amount or size."[35] This demonstrates that similar techniques to Sable's span remediation procedures were specifically contemplated, and thus, the impacts of such methods were adequately considered within the scope of the CCC's CDP approval.

In addition, within the required Marine Construction Mitigation Plan that the CCC ultimately approved for the SYU pipelines, Exxon stated it would not trench the seafloor beyond twenty-five foot depths and would "modify only those bedrock ridges beyond that point that may result in unacceptable pipe spans."[36] It went on to state that inspection surveys would be completed to "identify unacceptable free spans."[37] Thus, the CCC specifically approved, under the CDP's conditions, this sort of span remediation activity to (1) inspect the pipelines for unacceptable free spans, and (2) "modify" the seafloor to remediate any identified unacceptable spans.

In summary, the CCC's CDP findings and related documents acknowledged that addressing hazardous geologic conditions through design and construction techniques, such as those performed by Sable, was part of the CCC's analysis and approval of the Project.

## V. SPAN REMEDIATION WORK ADHERES TO PAST PRACTICE ON SYU PIPELINES

Exxon's previous pipeline span remediation activities also serve as a clear precedent for the approval of similar maintenance work under existing regulatory frameworks, without the need for additional CDPs or consistency certifications.

---

[34] *Id.*, at p. 44.

[35] *Id.*, at p. 45.

[36] Appendix I, Final Comprehensive Plan for Marine Biological Impact Reduction and Mitigation in Nearshore Waters of Las Flores Canyon, p. 19.

[37] *Id.*, at p. 38.

LATHAM&WATKINS LLP

In 2012, the SLC and BSEE issued approvals to ExxonMobil to conduct maintenance on the Santa Ynez Unit pipelines. This work involved installing the same type of concrete bags using the same methodology employed by Sable in its maintenance activities to reduce free span lengths on the SYU's emulsion, gas, and water pipelines, addressing recurring spans caused by high currents. The scope of ExxonMobil's approved work included the use of a dynamically positioned vessel to conduct an ROV survey of potential span areas and installing cement bag supports on and under the pipelines. This approach was designed to reduce free span lengths, ensuring the continued safe operation of the pipelines. The work was characterized as "minor maintenance and repairs."[38]

As shown in the attached correspondence regarding this 2012 work, CCC staff was copied and aware of the proposed maintenance activities and did not require any new CDP or consistency certifications.[39] Sable's maintenance activities are fully consistent with Exxon's maintenance activities from 2012, and similarly do not require a new CDP or consistency certification.

## VI.    CONCLUSION

In conclusion, the span remediation work undertaken by Sable is fully permissible under the existing DPP and CDP. The work is a routine maintenance measure, consistent with the technical specifications outlined in the DPP, the analysis in the certified EIR/EIS and applicable regulatory requirements, ensuring the continued safe maintenance and operation of the SYU pipelines.

We are committed to ensuring compliance with all of the SYU's federal and state permits. We would be happy to discuss any questions you may have at your convenience.

Very truly yours,

Duncan Joseph Moore
of LATHAM & WATKINS LLP

cc:    Errin Briggs, Santa Barbara County
Drew Simpkin, State Lands Commission
Minatte Matta, Bureau of Safety and Environmental Enforcement
Steve Rusch, Sable Offshore Corp.

---

[38] See Appendix J, July 7, 2011 Letter from Exxon to SLC.

[39] See Appendix K, January 27, 2012 Letter from Exxon to SLC.

# EXHIBIT I

**Niz, Kim**

| | |
|---|---|
| **From:** | Briggs, Errin <ebriggs@countyofsb.org> |
| **Sent:** | Friday, March 21, 2025 10:52 AM |
| **To:** | Thompson, James; Ybarra, Jacquelynn; Plowman, Lisa |
| **Cc:** | Rusch, Steve; Yearwood, Lance; Surmeier, Patrice; Alcock, Lee; Lauren.Paull@lw.com |
| **Subject:** | RE: Sable - Completed Anomaly Repairs |
| **Attachments:** | Feb 12, 2025, Letter from Errin Briggs to Steve Rusch.pdf |

CAUTION: External Sender

Hi James,

Thank you for the informational package regarding anomaly repair activities completed on Line 324 in 2024.

We have reviewed the information you provided and have determined that this work fits withing the conclusions/directives of our February 12, 2025 letter to Steve Rusch (attached). No permits will be required.

Thank you for the continued cooperation on these matters, we would appreciate if you could continue to provide similar information in advance for future projects of this type.

Sincerely,



**Errin Briggs**
**Deputy Director, Energy Minerals & Compliance**
Planning & Development
County of Santa Barbara
123 E. Anapamu St.
Santa Barbara, CA 93101
805-568-2047
ebriggs@countyofsb.org
https://www.countyofsb.org/160/Planning-Development

**From:** Thompson, James <JSThompson@scsengineers.com>
**Sent:** Thursday, March 6, 2025 11:34 AM
**To:** Briggs, Errin <ebriggs@countyofsb.org>; Ybarra, Jacquelynn <jybarra@countyofsb.org>
**Cc:** Rusch, Steve <srusch@sableoffshore.com>; Yearwood, Lance <lyearwood@sableoffshore.com>; Surmeier, Patrice <psurmeier@sableoffshore.com>; Alcock, Lee <lalcock@sableoffshore.com>; Lauren.Paull@lw.com
**Subject:** Sable - Completed Anomaly Repairs

**Caution: This email originated from a source outside of the County of Santa Barbara. Do not click links or open attachments unless you verify the sender and know the content is safe.**

Good Morning Errin,
On behalf of Sable Offshore Corp. – Pacific Pipeline Company (Sable), SCS Engineers is providing information regarding 48 anomaly repairs previously conducted on portions of the existing pipeline CA-324 located on APNs 081-140-019, 081-140-025, 081-150-006, 081-150-028, 081-150-032, 081-150-033,

081-150-041, 081-150-042, 081-200-033, 081-210-047, 081-210-050, 081-210-051, 081-230-021, and in one County right-of-way not associated with an APN.

Please use the links below to download the cover letter and associated attachments. Let me know if you have any questions or comments.



**1 - Sable Completed Anomaly Cover Letter.pdf (113k)**

**Completed Anomaly - Attachments.zip (17M)**

File links in this email will be active until April 5, 2025

Thanks,
James


**James Thompson**
Project Manager

SCS ENGINEERS

316-250-1224 (cell)
661-606-6001 (office)
jsthompson@scsengineers.com

# EXHIBIT J

# CALIFORNIA COASTAL COMMISSION
455 MARKET STREET, SUITE 300
SAN FRANCISCO, CA 94105-2421
VOICE (415) 904-5200
FAX (415) 904-5400



VIA CERTIFIED AND ELECTRONIC MAIL

February 18, 2025

Steve Rusch
Sable Offshore Corp.
12000 Calle Real
Goleta, CA 93117

DJ Moore
Latham & Watkins, LLP
355 South Grand Avenue, Suite 100
Los Angeles, California 90071

| | |
|---|---|
| Subject: | **Executive Director Cease and Desist Order No. ED-25-CD-01 and Notice of Intent to Commence Proceedings for a Commission Cease and Desist Order, Restoration Order, and Administrative Penalty Order** |
| Date Issued: | 02/18/2025 |
| Expiration Date: | 05/19/2025 |
| Violation Nos.: | V-9-25-0013 and V-9-24-0152 |
| Location: | The properties that are subject to this order are at various locations along the existing Las Flores Pipelines CA-324 and CA-325 within the Coastal Zone, between the Gaviota coast and the Las Padres National Forest, and areas surrounding the pipelines that are being or could be impacted by the development activities at issue here, in which the parties subject to this order are performing or intend to perform any of the activities described below, all within Santa Barbara County. The properties that are subject to the Notice of Intent to commence further enforcement proceedings are those same properties as well as areas previously impacted by similar work and offshore locations along the larger Santa Ynez Unit pipeline, in state waters, where the parties subject to this notice have undertaken unpermitted development in placing sand/cement bags |

and pallets on the seafloor below and adjacent to Sable's out-of-service offshore oil and water pipelines as part of an effort to restart SYU oil production operations and bring the pipelines back into use.

Violation Description:    Activities onshore including, but not limited to, excavation with heavy equipment; removal of major vegetation; grading and widening of roads; installation of metal plates over water courses; dewatering and discharge of water; pipeline removal, replacement, and reinforcement; installation of shutoff valves; and other development associated with the Las Flores Pipelines CA-324 and CA-325; as well as offshore development including, but not necessarily limited to, placing sand/cement bags and pallets on the seafloor below and adjacent to Sable's out-of-service offshore oil and water pipelines; all without the requisite Coastal Act authorization, as part of an effort to restart Santa Ynez Unit oil production operations and bring the pipelines back into use [1]

Dear Sirs,

This is in furtherance of our discussions regarding the recent activities of Sable.  I want to note that we are not taking a position regarding the underlying merits of the pipeline and of Sable's recent activities here, but want to work with you to ensure that any actions taken here, in this iconic area, are done in a way that protects the fragile ecosystem, and the humans and animals in the area.  We remain more than willing to work with you to ensure that any work contains any necessary protections and conforms with applicable laws. We again offer to work with you and the County on a consolidated permit to move forward in the most efficient and streamlined manner possible and are available to discuss options with you going forward.

## I.    Order

Pursuant to my authority under California Public Resources Code ("PRC") Section 30809, as the Executive Director of the California Coastal Commission ("Commission"), I hereby issue this Executive Director Cease and Desist Order ("EDCDO" or "this Order"), which orders you, Sable Offshore Corp.  ("Sable"), as the owner and operator of Las Flores Pipelines CA-324 and CA-325 ("Pipeline"), to cease further work along the Pipeline and immediately surrounding areas unless and until authorized by a new, final coastal development permit ("CDP").[2]

---

[1] Please note that the description herein of the violations at issue is not necessarily a complete list of all unpermitted development on the properties in violation of the Coastal Act.

[2] A "final" coastal development permit as used here means one that is: (a) no longer subject to appeal, either within the County system or to the Commission, and whether because the time period for such appeals has elapsed or because all such appeals have been completed.

Sable Offshore Corp.
02/18/2025
Page 3 of 14

Compliance with the following terms is intended to ensure that all development described in Section E, below, remains halted, ensuring that further unnecessary damaging effects to coastal resources are avoided, while Sable obtains the legally necessary authorization for future, proposed development, and/or for any steps needed restore the site, as follows.

Pursuant to my authority under PRC Section 30809, I hereby order Sable:

1. To cease and desist from conducting any further development at the onshore locations described above unless you have submitted evidence, for my review and approval, demonstrating that you possess the necessary Coastal Act authorization for the work and have received my written approval to proceed.

2. If you decide you wish to proceed, either: (a) demonstrate, to my satisfaction, that Sable already possesses the necessary Coastal Act authorization for the work, which Sable has not yet demonstrated;[3] or (b) obtain a new, final, operative CDP or other valid Coastal Act authorization specifically covering the work at issue and comply with the terms of any final, validly issued CDPs.

## A. ENTITITES SUBJECT TO THE ORDER

The parties whose actions or inactions are subject to this Order are Sable Offshore Corp; all employees, agents, and contractors of the foregoing; and any other person or entity acting in concert with the foregoing.

## B. IDENTIFICATION OF THE PROPERTIES

The properties that are subject to this are various locations along the existing Las Flores Pipelines CA-324 and CA-325 within the Coastal Zone, between the Gaviota coast and the Las Padres National Forest, areas surrounding the Pipeline and impacted by the development activities at issue here, all within Santa Barbara County.

## C. DESCRIPTION OF THE VIOLATIONS

The Coastal Act violations and threatened violations addressed by this Order involve development that has occurred in the Coastal Zone without the requisite Coastal act authorization, including, but not necessarily limited to, excavation with heavy equipment; removal of major vegetation; grading and widening of roads; installation of metal plates over water courses; placement of fill in wetlands and coastal waters; dewatering and discharge of water; pipeline removal, replacement, and reinforcement; any installation of shutoff valves; and other development associated with Pipeline.

## D. COMMISSION AUTHORITY TO ACT

The Executive Director is issuing this Order pursuant to her authority under PRC Section 30809, including, but not necessarily limited to, subdivision (a)(2) thereof. The County has

---

[3] We offer this option as an accommodation and remain willing to review and consider any additional permit language Sable may provide at any time, including after issuance of this EDCDO.

indicated that it believes the work at issue is authorized by prior permits, and thus, it does not agree with Commission staff's conclusion that the recently completed, ongoing and threatened, future work constitutes a violation of the Coastal Act and LCP.  Commission staff has explained its contrary position to the County on multiple occasions, most recently in a letter dated February 14, 2025.  In addition, on February 17, 2025, after a representative of Sable responded to my request that Sable forestall further activities and instead indicated that "Sable intends to proceed,"[4] Commission staff specifically requested that the County either take enforcement action or confirm that they were, in fact, not willing to take action to address the alleged violations noted above, pursuant to PRC Section 30809(a)(2).  Having received no response from the County by 12pm February 18, 2025, I am moving forward with issuing this EDCDO.

### E.  EXECUTIVE DIRECTOR'S FINDINGS

As the Executive Director of the Commission, I am issuing this Order pursuant to my authority under PRC Sections 30809(a) to prevent further significant damage to coastal resources that, without this order, would be likely to occur. As noted in our Notice, Sable's continued work on the Pipeline would be likely to contribute to environmental impacts that could have been avoided, including the destabilization of rain-soaked hillsides and habitat areas, discharge of mud and debris into watercourses and wetlands, disturbance to nesting birds that could lead to nest and habitat abandonment, and declines in breeding success. Further, the history of this site has made it clear that the utmost caution, and safety, must be taken to avoid catastrophic damage to coastal resources such as those seen after the 2015 pipeline failure and resulting Refugio Oil Spill.

Commission enforcement staff informed Sable of the violations of the Coastal Act in an initial Notice of Violation letter sent to Sable on September 27, 2024, a follow-up letter sent October 4, 2024, and continued to discuss the violations in multiple virtual meetings over the course of the following weeks.  On November 12, 2024, an EDCDO was issued directing Sable to immediately cease and desist from conducting any further unpermitted development along the Pipeline, submit an interim restoration plan to safely secure those sites where unpermitted development had occurred, and apply for a CDP for any proposed future work to be undertaken along the Pipeline, as well as for after-the-fact (ATF) authorization for unpermitted development that had already occurred.  On February 11, 2025, Commission staff additionally issued a Notice of Violation letter for unpermitted development undertaken by Sable at locations offshore, in state waters.  A more detailed recitation of the history is provided below.

With limited exceptions not applicable here, PRC Section 30600(a) states that, in addition to obtaining any other permit required by law, any person wishing to perform or undertake any development in the coastal zone must obtain a CDP. "Development" is defined by Section 30106 of the Coastal Act as follows:

> "'Development' means, <u>on land, in or under water</u>, <u>the placement or erection of any solid material or structure</u>; <u>discharge</u> or disposal of any dredged material or of any gaseous, <u>liquid</u>, solid, or thermal waste; <u>grading, removing</u>, dredging, mining, or

---

[4] February 17, 2025, letter from DJ Moore, of Latham & Watkins LLP, writing on behalf of Sable.

Sable Offshore Corp.
02/18/2025
Page 5 of 14

> *extraction of any materials; change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act (commencing with Section 66410 of the Government Code), and any other division of land, including lot splits, except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use; change in the intensity of use of water, or of access thereto; construction, reconstruction, demolition, or alteration of the size of any structure, including any facility of any private, public, or municipal utility…"*   (emphasis added)

The Development described herein clearly constitutes "development" within the meaning of the above-quoted definition and therefore requires a CDP. Sable has not submitted an application for a CDP for any of its proposed future work at either onshore, or offshore locations, as described above, nor has Sable submitted any ATF application for work previously undertaken along the Pipeline and within the Coastal Zone.

On September 27, 2024, Commission staff sent a "Notice of Violation" letter informing Sable that the Commission had become aware of unpermitted development activities taking place within the Coastal Zone, including excavation with heavy machinery, grading, and other activities at various locations along the Pipeline, apparently in connection with a proposed restart of the Santa Ynez Unit, consisting of three offshore platforms, Las Flores Canyon processing facility, and associated electrical transmission and onshore and offshore oil and gas transport pipelines. Commission staff requested Sable immediately cease all unpermitted development within the Coastal Zone, including all activities associated with Lines 324 and 325, as well as any potential development activities taking place along the offshore platforms and Pipeline. Commission staff further detailed the need for Coastal Act authorization for any development in the Coastal Zone, which should be sought through the submittal of an application(s) for the required CDP(s).

On October 1, 2024, Sable met with Commission staff to discuss the above-mentioned Coastal Act violations. In this conversation, Commission staff conveyed to Sable that all unpermitted development activities, along the Pipeline, must cease immediately. Immediate cessation of all work would result in several open pit sites, where excavation activities had already begun.  Because of this, Commission staff and Sable discussed steps necessary to ensure the open pit sites could be temporarily secured. However, my staff made it clear to Sable that all work must stop immediately. Nonetheless, Commission staff received an email from Sable on October 2, 2025, stating that work had been suspended, "subject to taking interim measures".  Commission staff met with Sable on October 3, 2025, to reiterate that all work must fully cease, and including any such "interim measures" which still amounted to development requiring Coastal Act authorization.

Despite these conversations, Commission staff received notice that Sable had yet to cease all work. Thus, on October 4, 2024, Commission staff sent a letter to Sable providing formal notice of the Executive Director's intent to issue an order, if necessary, to halt the ongoing project work, and requested written assurances by 2:00 pm that day, that Sable had, in fact ceased work entirely. Though Sable did send an email to Commission staff before this deadline to state that all work, including the actions in which Sable characterized as interim work measures, had ceased, Commission staff continued to

Sable Offshore Corp.
02/18/2025
Page 6 of 14

receive messages that work had not ceased and therefore, again, requested Sable provide written assurances that all work had, in fact, ceased. In response, Sable, confirmed all work, including any such interim measures, had ceased.

In addition to the cessation of all work, the October 4, 2024 letter required Sable provide information as to work undertaken along the Pipeline, specific plans as to future, proposed work, and written confirmation of intent to apply for a CDP(s) for ATF authorization for any work that had already occurred in the Coastal Zone and prospective authorization for any proposed future work.

Because Sable did not satisfactorily provide, as required by PRC Section 30809, detailed information as requested in Commission staff's October 4 letter, and further, failed to provide written confirmation as to its commitment to apply for an ATF CDP for work previously undertaken within the Coastal Zone, I issued a EDCDO on November 12, 2024. In this EDCDO, I directed Sable to complete an Interim Restoration Plan to safely secure the sites in the interim period necessary for Sable to apply for both an ATF CDP for all work previously undertaken along the Pipeline as well as CDP for future, proposed work. As an accommodation, I granted 120 days from the issuance of the EDCDO for Sable to apply for requisite CDPs. On December 20, 2024, Sable successfully completed the Interim Restoration Plan. However, to date, Sable has not submitted any application for an ATF CDP for work previously undertaken, or for a CDP for any future, proposed work to be taken along the Pipeline. Commission staff had repeatedly asked for greater information, including any full-scale workplans, so as to better understand the overall project. Without detailed information as to these plans, it is difficult for Commission staff to fully understand the scope of the work Sable has undertaken, as well as any proposed future plans and it is further difficult for Commission staff to provide a fully analysis as to what, if any, work has been authorized under applicable law.

Instead, Sable shifted operations offshore and carried out additional development activities without the benefit of a CDP including, but not limited to, the deployment of an unspecified number of "tea-bag pallets," sand-to-concrete bags, and soft-concrete bags, as part of an effort to restart oil production operations and bring the Santa Ynez Unit pipeline back into use. Specifically, the project deployed a remotely operated vehicle ("ROV") to place concrete bags and pallets along more than 750 linear feet of the pipelines to create support piers along 14 identified spans of between 41 and 70 feet. These activities took place over three days from November 29, 2024, to December 1, 2024.

Sable also sought authorization for the onshore violations described in the EDCDO through the County's zoning clearance process. On November 22, 2024, and December 5, 2024, Sable submitted applications to the County requesting authorization for pipeline "anomaly repair work" conducted along the Las Flores Pipelines, CA-324 and CA-325.

On January 10, 2025, the Commission held a conference call with the Santa Barbabra County Planning and Development Department ("County") to discuss Sable's pending Zoning Clearance applications, as well as the potential for a consolidated coastal development permit covering both onshore and offshore development activities. During this conversation, the County agreed to follow up with information, including the citations

Sable Offshore Corp.
02/18/2025
Page 7 of 14

and provisions within existing County issued permit(s) that the County believed might have pre-authorized the recently completed and proposed Pipeline work, as well as any other evidence Sable provided that the County found to be compelling.  The parties to the call further confirmed that they would have a follow-up discussion before any County approval of Sable's Zoning Clearance applications.  Despite this, however, no such information was received, and the Commission, therefore, followed up on this conversation through email, on February 7, 2025, again requesting this information.

On February 12, 2025, Commission staff received a letter from the County, in response to the prior request made by Commission staff that the County agree to the Commission's review of a consolidated permit application, pursuant to California Public Resources Code section 30601.3(a)(2). In this letter, the County stated that it had concluded that the "anomaly repair work" addressed in Sable's zoning clearance applications "is authorized by existing permits" and therefore no further application to, or action by, the County is required. However, the County expressed its support for the Commission's review of a consolidated permit application, if submitted by Sable.

In addition to this letter, the County provided the Commission with copy of an additional letter, which the County sent to Sable, notifying Sable that work addressed in Sable's zoning clearance permits "is covered by prior permits," though neither letter provided any citation to or quotation of any language in any such permits to support this assertion.

In response to these two letters and a February 14 request from the Environmental Defense Center, on February 16, 2025, I issued a letter to the County initiating a review of the County's determination, pursuant to Section 13569 of the Commission's regulations, and requesting a complete copy of any coastal development permit applications submitted by Sable and/or its predecessor(s) for the shutoff valve installation work on the Pipeline and Sable's application for the zoning clearance(s) for the repair anomaly work along the Pipeline.

Additionally, on February 16, 2025, I provided Sable with notice of my intention to issue a new EDCDO to Sable. In this letter, I responded to arguments that Sable submitted on February 14, purporting to support the position the County had taken, and I explained why, despite those argument, based on the information I had received to date, I continued to believe that Sable's proposed activities lacked the necessary Coastal Act authorization.  I therefore directed Sable to confirm in writing by February 17, 2025, that Sable would cease all development as described in, and subject of, that letter unless and until Sable either: (a) demonstrates, to my satisfaction, that it already possesses the necessary Coastal Act authorization for the work, which Sable has not yet demonstrated.[5] On February 17, 2025, I received a letter from Sable reiterating their position that Sable's work "does not constitute a violation of the Coastal Act or the County's LCP because it is authorized under the pipelines' existing CDPs and other approvals,".

As a jurisdictional requirement to issue this Order, I have determined that Sable is undertaking or is threatening to undertake development that may require a CDP, without

_____

[5] We offer this option as an accommodation and remain willing to review and consider any additional permit language Sable may provide either before, or after, issuance of Coastal Act authorization.

Sable Offshore Corp.
02/18/2025
Page 8 of 14

first securing a CDP and further determined Santa Barbara County has declined to act in a timely manner regarding the coastal act violations as detailed in the EDCDO, and this failure to act will cause damage to coastal resources.

Thus, as of the issuance of this Order, I have concluded that Sable has yet to apply for any CDP, or other valid Coastal Act authorization, covering the work at issue, nor has Sable demonstrated that it possesses the necessary Coastal Act authorization for this work. As such, I am issuing this EDCDO pursuant to my authority under PRC Sections 30809(a)(2).

## F.  COMPLIANCE OBLIGATION

Respondent's strict compliance with this Consent Order is required. Failure to comply with any term or condition of this Consent Order, including any deadline contained herein, unless the Executive Director grants an extension under Section I.5, above, will constitute a violation of this Consent Order and shall result in Respondent being liable for stipulated penalties in the amount of $1,000 per day per violation. Respondent shall pay stipulated penalties within 10 days of receipt of written demand by the Executive Director, regardless of whether Respondent subsequently complies. If Respondent violates this Consent Order, nothing in this agreement shall be construed as prohibiting, altering, or in any way limiting the ability of the Commission to seek any other remedies available, including the imposition of civil penalties and other remedies pursuant to PRC Sections 30820, 30821, 30821.6, and 30822, as a result of the lack of compliance with this Consent Order.

## G.  CHALLENGE

Pursuant to PRC Section 30803(b), any person or entity to whom this Consent Order is issued may file a petition with the Superior Court and seek a stay of this Consent Order. Also pursuant to PRC Section 30803(a), any person may maintain an action for declaratory and equitable relief to restrain any violation of this division, including of any orders issued pursuant to Section 30809, 30810 or 30811.

## H.  EFFECTIVE DATE

This Order shall be effective upon its issuance and shall expire 90 days from the date issued on 02/18/2025 unless extended consistent with the applicable regulations.

## II.    NOTICE OF INTENT TO COMMENCE A CEASE AND DESIST ORDER, RESTORATION ORDER, AND ADMINISTRATIVE CIVIL PENALTY PROCEEDINGS

While we hope that these matters can be addressed quickly via the EDCDO and that a Commission-issued order may not be necessary, I am also notifying you, as is provided for in Section 13187(B) and Section 13191(a) of the Commission's regulations (Title 14, Division 5.5 of the California Code of Regulations), of my intent to commence proceedings for issuance by the Commission of a Cease and Desist Restoration Order and Administrative Penalty Proceeding, which would include a direction to cease and desist from undertaking further unpermitted development, should such an order be required.

Sable Offshore Corp.
02/18/2025
Page 9 of 14

The EDCDO provides an interim solution to safeguard against damage to coastal resources immediately, and an interim period needed for Sable to obtain necessary CDPs. However, it does not address the work that has already been completed without the necessary authorization, including the additional work described below which will require a future order.

In addition to the above actions regarding Sable's unpermitted development activities undertaken onshore, Commission staff were additionally made aware of unpermitted activities undertaken offshore, at locations along the Santa Ynez Unit pipeline, and in state waters. On February 11, 2025, Commission staff provided a Notice of Violation letter to Sable regarding unpermitted development including, but not limited to, deploying sand/cement fill materials and pallets on the seafloor adjacent to and below Sable's out-of-service offshore oil and water pipelines as part of an effort to restart SYU oil production operations and bring the Pipeline back into use.

In an email sent on November 21, 2024, from Cassidy Teufel, Deputy Director of the Commission, to Steve Rusch of Sable, Mr. Teufel stated that it was his understanding, based on previous email correspondence, that Sable was not proceeding with any work associated with the offshore pipeline until Commission staff had an opportunity to discuss it and work through any authorizations that may be required. He noted that Mr. Rusch had indicated via email that a recent ROV survey had identified pipeline spans that Sable identified as needing to be addressed, and Mr. Teufel asked for clarification as to when this work was carried out, and for a description of its scope, including equipment and vessels used and the location, timing, and duration of that work. Mr. Teufel also reiterated that Sable needed to submit to the Commission a complete CDP application for the proposed span remediation work. Mr. Rusch never disputed or contested anything in this email from Mr. Teufel. Nevertheless, without having received any such application, circa mid-December 2024, the Commission received reports that span remediation work was underway.

On January 10, 2025, Mr. Teufel sent a follow up message informing Sable that the Commission had yet to receive the aforementioned permit application, and requesting a status update. The January email also asked Sable to clarify if Sable did in fact carry out activities and reemphasized the Coastal Act permitting requirements as previously explained.

In a letter dated January 15, 2025, from DJ Moore of Latham & Watkins, LLC (representing Sable) to Mr. Teufel, Mr. Moore acknowledged that the span remediation activities had occurred, specifically the placement of concrete fill material across 14 separate areas totaling over 750 linear feet adjacent to and below two seafloor pipelines, but claimed those activities did not require a new CDP or Consistency Certification ("CC") under the Coastal Act and the Coastal Zone Management Act, 16 U.S.C. §§ 1541 *et seq.* ("CZMA"), respectively. He asserted that these activities were already authorized by the existing Development and Production Plan ("DPP") previously authorized by the Department of the Interior's Minerals Management Service ("MMS"); the Coastal Commission-approved CDP No. E-88-1, which originally authorized the SYU pipeline in 1988; and the Coastal

Sable Offshore Corp.
02/18/2025
Page 10 of 14

Commission's concurrence in CC No. CC-64-87, all of which occurred more than 30 years ago and did not address the work undertaken in 2024-2025. Thus, on February 11, 2025, Commission staff issued a Notice of Violation letter directing Sable to immediately cease from performing any unpermitted development activities in state coastal waters (or elsewhere in the Coastal Zone) until and unless proper authorization is obtained.

Contrary to these claims, and as individually answered and described in greater detail in the Notice of Violation letter, the span remediation work conducted was not, and could not have been, pre-authorized by the permit in which the Commission issued for the original installation of the SYU Pipeline, nor was this work otherwise pre-authorized by the Commission. While the Commission has, on occasion in the past, specifically authorized future maintenance activities for certain projects it has approved, when it has done so, it is explicit about that, and it has not done so here. Further, Mr. Moore's claim that the DPP requires the pipeline to be in "good working condition" or that the Pipeline must meet federal standards has no bearing on the question as to whether pre-authorization of specific work was granted. The Pipeline in question is not currently in service, have been purged off all oil and does not pose a risk of oil spill if not addressed.  Mr. Moore's letter additionally asserts that inclusion of Commission staff on an email, sent from Exxon to a third party, 13 years ago, evidences the Commission's agreement with Sable's position that no further coastal act authorization is needed for this work. Again, this bears no evidence to support that the Commission pre-authorized future work or span remediation activities on the site.

In order to resolve this violation, Sable must complete a CDP application seeking ATF authorization for the unpermitted span remediation activities that have already taken place in state coastal waters, and which addresses any necessary restoration, and payment of administrative penalties to resolve civil liability.

I am hopeful that Sable will work with my staff to reach a consensual resolution of the entirety of this matter through a future Consent Cease and Desist Order and Restoration Order and Consent Administrative Penalty ("Consent Agreement"), which would then be taken to the California Coastal Commission ("Commission") for its approval in a formal public hearing.  We are available to assist you in this process.

Prior to bringing an order to the Commission, including a consent order, unless the requirement is waived, our regulations require notification of the initiation of formal proceedings. Therefore, in accordance with those regulations, this letter notifies you of my intent, as the Executive Director of the Commission, to commence formal enforcement proceedings to address the Coastal Act violations noted above by bringing to the Commission a recommendation for a Cease and Desist Order, Restoration Order, and assessment of an Administrative Penalty. The intent of this letter is not to discourage or supersede productive settlement discussions; rather it is to provide formal notice of our intent, consistent with our regulations, to resolve these issues through the order process, which in no way precludes a consensual resolution. However, please note that should we be unable to reach an amicable resolution in a timely manner this letter also lays the foundation for Commission staff to initiate a hearing before the Commission unilaterally, during which a proposed order or orders, including an assessment of administrative

Sable Offshore Corp.
02/18/2025
Page 11 of 14

penalties against you, would be presented for the Commission's consideration and possible adoption.

Again, if we are to settle this matter, such actions still must be addressed through this formal order process. This letter is intended to facilitate the resolution here, whether we address this matter through a consent or unilateral action, in providing you with the notice required under the Commission's Regulations; it in no way is intended to subvert the possibility of resolving this matter collaboratively.

The Commission's authority to issue Cease and Desist Orders is set forth in Section 30810(a) of the Coastal Act, which states, in part:

> **If the commission, after public hearing, determines that any person … has undertaken, or is threatening to undertake, any activity that (1) requires a permit from the commission without securing the permit or (2) is inconsistent with any permit previously issued by the commission, the commission may issue an order directing that person … to cease and desist. The order may also be issued to enforce any requirements of a certified local coastal program or port master plan, or any requirements of this division which are subject to the jurisdiction of the certified program or plan, under any of the following circumstances:**
>
> > **(1) The local government or port governing body requests the commission to assist with, or assume primary responsibility for, issuing a cease and desist order.**
> >
> > **(2) The commission requests and the local government or port governing body declines to act, or does not take action within a timely manner, regarding an alleged violation which could cause significant damage to coastal resources.**

Section 30810(b) of the Coastal Act states that the cease and desist order may be subject to such terms and conditions that the Commission determines are necessary to ensure compliance with the Coastal Act, including removal of any items of unpermitted development.

Section 30600(a) of the Coastal Act states that, in addition to obtaining any other permit required by law, any person wishing to perform or undertake any development in the Coastal Zone must obtain a CDP through Section 35-169.2 of the County's certified LCP. As stated above, "Development" is defined by Section 30106 of the Coastal Act and Section 35-58 of the City's LCP.

The various instances of unpermitted development at issue here clearly constitute "development" within the meaning of the above-quoted definition and therefore are subject to the permit requirement of Section 30600(a) and Section 312-3.1.5 of the County's certified LCP. A CDP has not been issued to authorize the unpermitted development, thus

Sable Offshore Corp.
02/18/2025
Page 12 of 14

independent criteria for issuance of a cease and desist order under Section 30810(a) of the Coastal Act are thus satisfied.

In addition to the aforementioned items, any resolution of this matter via Consent Agreement would also include settlement of monetary claims associated with your civil liability under the Coastal Act for these violations. If a consensual resolution is not reached, resolution of penalties under Section 30821.3 of the Coastal Act would be addressed unilaterally via an Administrative Penalty Action, as described below.

**Restoration Order**

The Commission's authority to issue Restoration Orders is set forth in Section 30811 of the Coastal Act, which states, in part:

> **In addition to any other authority to order restoration, the commission…may, after a public hearing, order restoration of a site if it finds that the development has occurred without a coastal development permit from the commission…, the development is inconsistent with this division, and the development is causing continuing resource damage.**

Pursuant to Section 13191 of the Commission's regulations, I have determined that the activities specified in this letter meet the criteria of Section 30811 of the Coastal Act, based on the following:

1) "Development" as that term is defined by section 30106 of the Coastal Act, has occurred without a CDP from the Commission.

2) This unpermitted development is inconsistent with the resource protection policies of the Coastal Act including, but not necessarily limited to Coastal Act Section 30240 (protection of environmentally sensitive habitat areas), Section 30233 (protection of wetlands from filling), Section 30230 (protection of marine resources) and Section 30231 (protecting biological productivity).

3) The unpermitted development remains in place and/or unaddressed and therefore continues to cause resource damage, which is defined by Section 13190 of the Commission's regulations as: "any degradation or other reduction in quality, abundance, or other quantitative or qualitative characteristic of the resource as compared to the condition the resource was in before it was disturbed by unpermitted development." The unpermitted development continues to exist and therefore, it continues to cause damage to resources and prevent the Coastal Act resources that were displaced from re-establishing, and it continues to cause degradation and reduction in quality of surrounding resources as compared to their condition before the unpermitted development occurred.

For the reasons stated above, I am therefore issuing this "Notice of Intent" letter to commence proceedings for a Restoration Order before the Commission in order to require the restoration of the Property. The procedures for the issuance of Restoration Orders are

Sable Offshore Corp.
02/18/2025
Page 13 of 14

described in Sections 13190 through 13197 of the Commission's regulations, which are codified in Title 14 of the California Code of Regulations.

**Administrative Civil Penalties, Civil Liability, and Exemplary Damages**

Under Section 30821.3 of the Coastal Act, in cases involving violations of the Coastal Act, the Commission is authorized to impose administrative civil penalties by a majority vote of the Commissioners present at a public hearing. In this case, as described above, there are multiple violations of the resource protection provisions of the Coastal Act; and therefore, the criteria of Section 30821.3 have been satisfied. The penalties imposed may be in an amount up to $11,250, for each violation, for each day each violation has persisted or is persisting, for up to five (5) years. In addition, the 60-day time period to correct a violation that is allowed under the statute does not apply to violations of a CDP. If a person fails to pay an administrative penalty imposed by the Commission, under 30821.3(e) the Commission may record a lien on that person's property in the amount of the assessed penalty. This lien shall be equal in force, effect, and priority to a judgment lien.

The Coastal Act also includes several other penalty provisions that may be applicable as well. Section 30820(a)(1) provides for civil liability to be imposed on any person who performs or undertakes development without a CDP and/or that is inconsistent with any CDP previously issued by the Commission in an amount that shall not exceed $30,000 and shall not be less than $500 for each instance of development that is in violation of the Coastal Act. Section 30820(b) provides that additional civil liability may be imposed on any person who performs or undertakes development without a CDP and/or that is inconsistent with any CDP previously issued by the Commission when the person intentionally and knowingly performs or undertakes such development. Civil liability under Section 30820(b) shall be imposed in an amount not less than $1,000 per day and not more than $15,000 per day, for each violation and for each day in which each violation persists. Section 30821.6 also provides that a violation of a Cease and Desist Order of the Commission can result in civil liabilities of up to $6,000 for each day in which each violation persists. Lastly, Section 30822 provides for additional exemplary damages for intentional and knowing violations of the Coastal Act or a Commission Cease and Desist Order.

**Response Procedure**

In accordance with Sections 13181(a) and 13191 of the Commission's regulations, you have the opportunity to respond to the Commission staff's allegations as set forth in this notice of intent to commence Cease and Desist and Restoration Order proceedings by completing the enclosed statement of defense ("SOD") form. The SOD form would be directed to the attention of Stephanie Cook, no later than March 10, 2025.

We remain hopeful that we can reach an agreeable solution and that a Consent Order will fully address this matter so that we will not have to resort to bringing a formal action before our Commission. This additional notice to commence Commission proceedings is to give us options for the possibility that Sable fails to comply with the Consent Order or that the actions required in the Consent Order do not completely resolve the violations. Therefore, should this matter be resolved via the Consent Order (or if we do have to proceed with a

Sable Offshore Corp.
02/18/2025
Page 14 of 14

Commission action and we are able to still resolve this matter via a Consent Commission Order), an SOD form would not be necessary.  In any case and in the interim, staff would be happy to accept any information you wish to share regarding this matter and staff can extend deadlines for submittal of the SOD form to account for the goal of resolving this via this Consent Order and specifically allow additional time to discuss terms of Commission consent orders if that is necessary.  If it is necessary, Commission staff would schedule the hearings for the Cease and Desist and Restoration Order for the Commission's April or May 2025 hearing.  Again, we are hopeful that this matter can be fully resolved by compliance with this Consent Order and there will not be a need to commence a formal proceeding before the Commission.

For additional information you may contact Stephanie Cook at (415) 904-5220, Stephanie.Cook@Coastal.ca.gov, or at our Headquarters Enforcement Office at:

California Coastal Commission
Attn: Stephanie Cook
455 Market Street, Suite 300
San Francisco, CA 94105

Again, we remain willing and available to work with you to resolve these matters quickly and amicably and look forward to hearing from you.


Signed,

Kate Huckelbridge
Executive Director
California Coastal Commission


Enclosure:    Notice of Intent to Issue an Executive Director's Cease and Desist Order,
              dated February 16, 2025
              Statement of Defense Form

Cc:
              Lauren Paull, Latham & Watkins, LLP
              Cassidy Teufel, CCC, Deputy Director
              Lisa Haage, CCC, Chief of Enforcement
              Aaron McLendon, Deputy Chief of Enforcement
              Alex Helperin, CCC, Deputy Chief Counsel
              Sarah Esmaili, CCC, Senior Staff Attorney
              Wesley Horn, CCC, Environmental Scientist
              Stephanie Cook, CCC, Enforcement Counsel

# EXHIBIT K

Sable Offshore Corp.
Cease and Desist Order, Restoration Order and Administrative Penalty
CCC-25-CD-01, CCC-25-RO-01 & CCC-25-AP3-01
Page **1** of **26**

## CEASE AND DESIST ORDER CCC-25-CD-01,
## RESTORATION ORDER CCC-25-RO-01,
## ADMINISTRATIVE CIVIL PENALTY CCC-25-AP3-01

**1.0    CEASE AND DESIST ORDER CCC-25-CD-01**

Pursuant to its authority under California Public Resource Code ("PRC") Section 30810, the California Coastal Commission ("the Commission") hereby orders and authorizes Sable Offshore Corporation ("Sable"); its successors in interest, heirs, officers, managers, assigns, employees, agents, and contractors; and any other persons or entities acting in concert with any of the foregoing (hereinafter collectively referred to as "Sable") to take all actions required by this Cease and Desist Order, in compliance with its terms, including by complying with the following:

**1.1**    Cease and desist from engaging in or undertaking any development, as that term is defined in the Coastal Act (PRC Section 30106) and the Santa Barbara County Local Coastal Program (at Section 35-58), on any of the property and/or locations defined in Section 4.3, below, as the Santa Ynez Unit, including but not limited to the following development undertaken or planned at A) locations onshore: excavation; removal of major vegetation; fill of wetlands; grading and widening of roads; installation of metal plates over water courses; dewatering and discharge of water; removal, replacement, and reinforcement of pipeline and pipeline infrastructure; and other development associated with the return to service of Las Flores Pipelines CA-324 and CA-325; andB) at locations offshore: placement of sand and cement bags on the seafloor below and adjacent to Sable's out-of-service offshore oil and water pipelines; as part of an effort to restart the Santa Ynez Unit oil production operations and bring the pipelines back into use*;* unless and until either: (a) Sable secures a new, final, operative CDP specifically covering the work to be performed; (b) Sables secures another final, operative, valid form of Coastal Act authorization for the work to be performed; or (c) Sable secures a final, formal determination that the work it will perform is exempt from the Coastal Act's permitting requirement.  The word "final" as used in the prior sentence shall mean that it is no longer subject to an administrative appeal, including to the Commission.

**1.2**    Fully and completely comply with the terms and conditions set forth herein, including the terms and conditions of Cease and Desist Order No. CCC-25-CD-01, Restoration Order No. CCC-25-RO-01, and Administrative Penalty No. CCC-25-AP3-01 (collectively, "Orders"). These Orders provide authorization under the Coastal Act for the development required herein, including any restoration activities described below, so long as such development is undertaken in accordance with the terms and conditions of these Orders.

Sable Offshore Corp.
April 10, 2025
Page **2** of **26**

1.3.A Within 30 days of the effective date of these Orders, submit complete coastal development permit ("CDP") applications or a single consolidated CDP application (as provided for in the Coastal Act in PRC Section 30601.3) for: (a) after the fact ("ATF") authorization for all unpermitted development as defined in Section 4.2, below, conducted at both onshore and offshore locations; as well as (b) prospective authorization for any proposed development activities that have not yet been completed but that are contemplated in Sable's current plans. Sable shall not withdraw or impede final action in any way on this CDP application(s). Sable shall comply with the terms and conditions of any CDP approved pursuant to the application(s) submitted under these Orders by the deadlines required in the CDP(s).

1.3.B A complete CDP application shall include, at a minimum,

For onshore development:

- Site plans for each anomaly repair location depicting, but not limited to: topographic contours, grading (cut, fill, export), sensitive resources (Environmentally Sensitive Habitat Area ("ESHA"), wetlands), applicable Best Management Practices ("BMPs"), equipment staging, stockpiles, details specific to work to be performed at each site (wrap, pipeline cut and replacement), cross sections and diagrams of the work to be performed, and surveys of property lines/easements/right-of-ways;
- Grading totals (cut, fill, export) for each site and all of the types of work (anomaly excavation, road creation/widening/maintenance, crossings of wetlands or watercourses, etc.) plus the combined total grading for all of the work (both that already occurred and future proposed development);
- Specific details on the amount and type of vegetation clearing and trimming (area, amount of limbing, plant species and alliances, per the Manual of California Vegetation);
- List of all construction and erosion control BMPs;
- Geology and soils report;
- Site-specific biological survey reports prepared by a qualified biologist;
- A site survey of all ESHA buffers of 100 feet from location of ESHA;
- Site-specific delineation of single parameter wetlands;
- Measures to avoid, minimize and mitigate for adverse impacts to ESHA, wetlands and sensitive plant and animal species;
- Site-specific cultural resources surveys and measures to avoid and minimize potential adverse impacts on cultural resources (including outreach and coordination with Tribes that may have cultural connections to the restoration area and use of tribal monitors during ground disturbance activities);

Sable Offshore Corp.
April 10, 2025
Page **3** of **26**

- Project schedule (with a breakdown of the hours of construction, number of days and time of year that construction took place or is proposed to take place at each location);
- Evidence that permits or authorization from other agencies have been granted or applied for;
- CEQA determination.

  For offshore development:
- Site plans for each span remediation location depicting, but not limited to: bathymetric contours, fill placement areas, results of marine habitat surveys (such as sandy bottom, rocky, reef, kelp), applicable BMPs including material staging/stockpiles/hazardous materials and spill response, details specific to work to be performed at each site (such as number of bags, slopes), cross sections and diagrams of the work performed;
- Information on the vessels and ROVs that were used for the work and information on how the vessels and ROVs were maintained to prevent the release of any fuel or oils;
- Information on where the vessels were moored and how they transited to and from the site;
- Information on any commercial and recreational fishing in the area that could have been affected by project activities and any advance coordination that occurred with fishing communities;
- Information on the specific type of cement mix used and information demonstrating how it will be safe for use in the marine environment over the life of the development;
- In the event that anchors are needed, identify contingency anchor areas away from sensitive marine habitat and species;
- Marine resources survey including survey of the seafloor and information on marine species in the area of the development. This should also include a quantification of the totals of each type of benthic habitat impacted by the development as well as the methodology used for the survey;
- Analysis of alternatives to the proposed cement bags, and measures to avoid or minimize quantity of fill and potential adverse impacts from the fill (e.g. use different materials other than concrete that may have less of an environmentally impact (i.e., 100% sand, use of "T bar" support, change in orientation/slope of the bags to minimize their impact on the seafloor);
- Site-specific cultural resources surveys of the development area and measures to avoid and minimize potential adverse impacts on cultural resources;
- Project schedule with hours of construction, total number of days, and time of year work occurred;
- Evidence that permits or authorization from other agencies have been granted or applied for;

Sable Offshore Corp.
April 10, 2025
Page **4** of **26**

- CEQA determination

  Sable shall provide complete responses to any request for information made by the appropriate permitting agency within 10 days of the date of such request, unless additional time is provided by the Executive Director pursuant to Section 14, below.

1.3.C  Sable shall submit the application(s) required by Section 1.3.A in one of the following manners: (a) as one, consolidated permit application, submitted to the Commission pursuant to PRC section 30601.3; or (b) if the County agrees to process an application for the work within its LCP permitting jurisdiction, Sable may submit an application for the work in that area to the County, and a separate application for the work in the Commission's permitting jurisdiction to the Commission. To maximize the likelihood of compliance with these Orders and to rectify this matter in the most efficient manner possible, thereby limiting the costs to the state and increasing the potential for accelerated restoration and reduced impacts on resources, if Sable elects to proceed with option (a), above (consolidated CDP application), the Administrative Penalty outlined in Section 3, below, will be reduced according to the provisions of that section. The Executive Director may extend the deadline for submittal of the CDP application pursuant to Section 14, below.

1.3.D  In the event the appropriate permitting agency denies the CDP application in whole or in part, Sable shall submit, for the review and approval of the Executive Director of the Commission, a Removal Plan that provides for the removal of that development that was already completed but for which after-the-fact authorization was denied. Sable shall submit this Removal Plan within 30 days of final action on said denial and shall commence implementation of this Removal Plan within 30 days of Executive Director approval thereof and shall complete all removal and activities within 30 days of commencement, unless an extension is granted by the Executive Director for good cause pursuant to Section 14, below. If the Executive Director determines that any removal activities negatively impacted resources protected under the Coastal Act, Respondent shall submit an amendment to the Restoration Plan required pursuant to Section 6, below, to restore any resources impacted.

**1.3**  Obtain and comply with the terms and conditions of all other mandatory approvals or permits for the work required herein that are issued by other government agencies having jurisdiction over that work, consistent with these Orders, and comply with the terms and conditions of such approvals/permits.

**1.4**  Any questions of intent or interpretation of any condition in the CDP issued pursuant to the terms of these Orders will be resolved by the Executive Director of the Commission after consultation with Sable.

Sable Offshore Corp.
April 10, 2025
Page **5** of **26**

## 2.0    RESTORATION ORDER CCC-25-RO-01

Pursuant to its authority under PRC Section 30811, the Commission hereby orders and authorizes Sable to undertake all the restorative actions set forth in Section 6.0, below.

## 3.0    ADMINISTRATIVE PENALTY CCC-25-AP3-01

3.1.    Pursuant to its authority under PRC Section 30821.3, the Commission hereby imposes on Sable an administrative penalty of $18,022,500.

3.2    To maximize the likelihood of compliance with these Orders and to rectify this matter in the most efficient manner possible, thereby limiting the costs to the state and increasing the potential for accelerated restoration and reduced impacts on resources, if Sable elects to proceed with option (a) as described in Section 1.3.C, above (consolidated CDP application), the Administrative Penalty will be reduced to $14,987,250.  If, however, at any point prior to the Commission staff filing the CDP application as complete, Sable takes any steps that would interfere with the processing of the CDP application, including any attempt to delay or avoid submittal of the CDP application, the penalty amount shall not be reduced, and Sable shall be required to pay any remaining penalty amount to bring the full payment up to $18,022,500.

3.3    Within 180 days of the effective date of this Administrative Penalty, Sable shall pay the full penalty (or reduced penalty pursuant to Section 3.2, above). The monetary penalty shall be made out to and deposited in the Violation Remediation Account administered by the California State Coastal Conservancy (see PRC Section 30821.3(k) and 30823). The monetary penalty shall be submitted to the Commission's San Francisco office, at the address provided in Section 7.0, to the attention of Stephanie Cook of the Commission, payable to the account designated under the Coastal Act, and include a reference to these Orders by number.

## 4.0    DEFINITIONS COMMON TO ALL ORDERS

**4.1**    Orders: Cease and Desist Order No. CCC-25-CD-01, Restoration Order No. CCC-25-RO-01, and Administrative Civil Penalty CCC-25-AP3-01 are collectively referred to herein as "the" or "these Orders."

**4.2**    Unpermitted Development: The phrase "Unpermitted Development" as used herein means all "development" as that term is defined in PRC Section 30106 that Sable has undertaken in the Coastal Zone that required authorization pursuant to the Coastal Act but for which no such authorization was obtained, including, but not limited to, excavation with heavy equipment; removal of major vegetation; grading and widening of roads; installation of metal plates and other fill material within wetlands;

Sable Offshore Corp.
April 10, 2025
Page **6** of **26**

dewatering and discharge of water; pipeline removal, replacement, and reinforcement; installation of shutoff valves; and other development associated with the Las Flores Pipelines CA-324 and CA-325; as well as offshore development including, but not necessarily limited to, placing sand and cement bags on the seafloor below and adjacent to out-of-service offshore oil and water pipelines; all without the requisite Coastal Act authorization, as part of an effort to restart Santa Ynez Unit oil production operations and bring the pipelines back into use.

**4.3**   Santa Ynez Unit**:** The Santa Ynez Unit consists of three offshore platforms (Hondo, Harmony, and Heritage), Las Flores Canyon processing facility, Pacific Offshore Pipeline Company (POPCO) Gas Plant, associated electrical transmission facilities and lines, oil, natural gas and produced water transport pipelines, including pipelines CA-325 and CA-325 and associated rights-of-way (ROW) and easements.

**4.4**   Restoration Area: All areas within, along, or around the Santa Ynez Unit, as defined above, and any other areas impacted in connection with work on any portion of the Santa Ynez Unit that are determined to require restoration pursuant to the process described in Section 6.1.A."

## 5.0    ENTITIES AND PERSONS SUBJECT TO THIS CEASE AND DESIST ORDER, RESTORATION ORDER, AND ADMINISTRATIVE PENALTY ACTION

Sable Offshore Corp.; its successors in interest, assigns, lessees, officers, managers, employees, agents, and contractors; and any other persons or entities acting in concert with or on behalf of any of the foregoing are jointly and severally subject to all requirements of these Orders.

## 6.0    RESTORATION PLAN

Within 60 days of issuance of these Orders, Sable shall submit, for the review and approval of the Commission's Executive Director a Revegetation Plan; a Temporary Erosion Control Plan, a Remedial Grading Plan, a Cultural Resources Plan, and a Monitoring Plan (hereinafter collectively referred to as "the Restoration Plan"). The Restoration Plan shall set forth the measures that Sable shall undertake to implement erosion control measures, undertake remedial grading, revegetate the Restoration Area to address permanent and temporal losses of habitat and other resources affected by the Unpermitted Development, implement cultural resource protections and monitoring, and monitor the restoration to ensure the success of restoration activities.

**6.1**   General Provisions of the Restoration Plan:

6.1.A   The Restoration Plan shall include an initial assessment of all Unpermitted Development and a site-specific biological assessment for all of the areas in

Sable Offshore Corp.
April 10, 2025
Page **7** of **26**

which Unpermitted Development occurred. This will form the basis of the Restoration Area as defined in Section 4.4.  These initial site assessments shall include, at a minimum, a plan that (a) delineates all areas where the development listed in Section 4.2 was undertaken, (b) details the nature of the work undertaken, and (c) identifies the coastal resources, specifically: on the ground environmentally sensitive habitat areas ("ESHA"), including but not limited to riparian, oak woodland, chaparral, coastal sage scrub, and/or native grasslands, as shown on a biological resources survey, (d) a single-parameter wetlands delineation, (e) an evaluation of protected plant and animal species in those areas that could have been affected by the Unpermitted Development, and the timing and duration of all Unpermitted Development, including as such development relates to the timing of bird and other animals' nesting and breeding seasons, including but not limited to those species identified under the California Endangered Species Act or federal Endangered Species Act such as the southern California steelhead, southwestern pond turtle, tidewater goby, and California red-legged frog.  For Unpermitted Development that occurred offshore, Sable shall also include in this initial assessment: the physical and chemical composition of the materials used to form the concrete bags, a survey of the seafloor identifying the type of substrate(s) within the area of the Unpermitted Development (i.e., sandy bottom or rock reef/bedrock) and a quantification of the total of each type of substrate impacted by the Unpermitted Development, a survey identifying the marine species in the area of the Unpermitted Development, and location of any anchor points that were used. Based on this initial assessment, Sable shall identify areas where the work may have adversely affected coastal resources protected under the Coastal Act and/or the Santa Barbara County Local Coastal Program, and where restoration is needed to address temporal and permanent losses of habitat. The Executive Director will make the final determination of the size and scale of location of, and impacts caused by, the Unpermitted Development. These areas will be known as the Restoration Area.

6.1.A.1    Within 15 days of the effective date of these Orders and prior to the submittal of the Restoration Plan, Sable shall submit, for the Executive Director's review and approval, a description of the qualifications of the proposed Specialist(s), including a description of their educational background, training, and experience related to the preparation and implementation of the Restoration Plan described herein. To meet the requirements to be a qualified Specialist specifically for the restoration component of the Restoration Plan, one must have experience successfully completing restoration projects of a similar scale and scope involving restoration of ESHA in the Gaviota region of Santa Barbara County. A qualified Specialist must also have experience in wildlife surveys, including those species identified under the California Endangered Species Act or federal Endangered Species Act that may be present in or near the Restoration Area (see also Section 6.3.A, below). In

addition, to meet the requirements for the development and implementation of plans related to the remedial grading, and erosion activities required herein, a qualified Specialist must have experience successfully designing plans for and implementing these plans for restoration of wetlands, restorative grading, erosion control, and hydrology.

6.1.A.2    The Restoration Plan shall include a survey map from a licensed surveyor, with input from the Specialist(s), drawn to scale, that shows the specific parameters, locations and extents of: 1) the boundaries of the Restoration Area and associated areas affected by the Unpermitted Development; 2) the physical items placed or allowed to come to rest on or in the Restoration Area; 3) the areas from which native vegetation and wetlands were removed or impacted; 4) the current topography of all landscape features within the Restoration Area and the topography of all landscape features within 100 feet of the Restoration Area; 5) the locations of all erosion control measures to be installed pursuant to Section 6.7, below; 6) the locations of all species, individually delineated and labeled, to be planted pursuant to Section 6.9, below; 8) the specific locations and directions from which photographs will be taken for the annual monitoring reports; and 9) the locations where remedial grading will take place. Pursuant to Section 6.8, below.

6.1.A.3    The Restoration Plan shall provide that, prior to the initiation of any restoration activities, the boundaries of the Restoration Area shall be physically delineated in the field using temporary non-plastic measures such as fencing or colored wooden stakes. The Restoration Plan shall further provide that all delineation materials shall be removed when no longer needed, and verification of such removal shall be provided in the annual monitoring report corresponding to the reporting period during which the removal occurred. No more than one week prior to commencement of ground disturbance in a particular work area at all restoration sites, a qualified biologist shall survey the ground-disturbance area for any sensitive, protected and/or endangered species, which may include, but be not limited to, California red-legged frog (*Rana draytonii*), southerwestern pond turtle (*Actinemys pallida*), tidewater goby (Eucyclogobius newberryi) and southern California steelhead (*Oncorhynchus mykiss irideus*), and if any such animals are present within the Restoration Area, shall coordinate with the California Department of Fish and Wildlife ("CDFW") staff to determine if work should be delayed until the species is no longer present or if it can be relocated to nearby suitable habitats an appropriate distance away from the work area.

6.1.A.4    The Restoration Plan shall include a specific schedule/timeline of activities for each of the Restoration Plan components; the procedures to be used,

Sable Offshore Corp.
April 10, 2025
Page **9** of **26**

and identification of the parties who will be conducting the restoration activities. The schedule/timeline of activities in the Restoration Plan shall be in accordance with the deadlines in these Orders and shall be in accordance with the ideal planting seasons. In addition, the schedule/timeline of activities shall incorporate the following restrictions:

6.1.A.4.1    The Restoration Plan shall include a detailed explanation of how Sable will proactively address potential impacts to raptors and protected bird species and other protected animals, from restoration activities. This explanation shall be based on a nesting bird/habitat survey of areas within 500 feet of all work to be conducted.  In the event that Sable is unable to obtain access to neighboring properties for surveying, survey areas shall be limited to on or along the Sable easements to which impact from the Unpermitted Development occurred. The survey shall be attached to and incorporated into the Restoration Plan. Both the biologist and the methods for the survey must be approved by the Executive Director.

6.1.A.4.2    All in-creek or stream work for temporary erosion control and remedial grading activities under the approved Restoration Plan shall occur during the dry season from May 1 through October 31. This period may be extended for a limited period of time if the situation warrants such a limited extension, if approved by the Executive Director. Restoration activities restricted to this period include any work within the bed to the bank or the outer edge of riparian vegetation, whichever is the greater distance.

6.1.A.4.3    If during the rainy season (Nov 1-April 30) season, in-creek or stream work is necessary and such work is authorized by the Executive Director to occur during this time, Sable shall implement the following best management practices (BMPs), and include such measures in the Restoration Plan:

6.1.A.4.3.1    In addition to other measures that may be required by CDFW and the Regional Water Quality Control Board (RWQCB), all in-water construction work shall, at a minimum, be done with a qualified biological monitor with expertise in the identification of threatened, endangered and/or sensitive species on-site at all times during all in-water restoration work. Should the biological monitor identify any sensitive species that could be adversely affected by restoration activities, restoration work shall be halted and Sable shall contact the appropriate resource agency (USFWS or CDFW) to determine an appropriate course of action.

6.1.A.4.3.2    Any materials or structures temporarily placed within the creek or stream where protected species, such as those noted

Sable Offshore Corp.
April 10, 2025
Page **10** of **26**

above, are or may be present, shall be designed, constructed, and maintained such that it does not constitute a barrier to upstream or downstream movement of the species.  Additionally, Sable shall include: 1) measures to avoid capture of fish and wildlife in pumps or other equipment that contain mechanisms; 2) measures to maintain acceptable noise levels (e.g. using low-noise equipment, placing sandbags or another noise reduction device around pumps); and 3) measures to prevent sediment and debris from entering the creek channel or adjacent areas.  Dust control measures shall be provided. Any and all debris resulting from construction activities shall be removed immediately. Any debris inadvertently discharged into coastal waters shall be recovered immediately and disposed of consistent with the requirements of this order.

6.1.A.4.3.3    Equipment shall avoid contact with water to the extent feasible. If that is infeasible, there shall be protocols for ensuring that all equipment that may come into contact with surface or subsurface water in the creek or stream channel is cleaned prior to contact, in order to prevent introduction of invasive species or substances that could impact the water quality of or native habitat in the creek or stream.

6.1.A.4.3.4    Water in the creek or stream shall either be diverted from work areas or barriers, such as coffer dams, shall be installed to prevent water from entering the work area.

6.1.A.4.3.5    Any fueling, maintenance and washing of construction equipment shall occur within upland areas outside of ESHA/wetlands and within designated staging areas. Mechanized heavy equipment or other vehicles shall not be refueled, maintained or washed within 100 feet of coastal waters.

6.1.A.4.3.6    Fuels, lubricants, and solvents shall not be allowed to enter coastal waters. Hazardous materials management equipment including oil containment booms and absorbent pads shall be available immediately on-hand at the project site, and a registered first-response, professional hazardous materials clean-up/remediation service shall be locally available on call. Any accidental spill shall be rapidly contained and cleaned up.

6.1.A.5 Each component of the Restoration Plan shall include a narrative report, specific to that component, describing the restoration activities to take place, the procedures to be used, and identification of the parties who will be conducting such activities. Along with a narrative report of each

Sable Offshore Corp.
April 10, 2025
Page **11** of **26**

component of the Restoration Plan to be completed, Sable shall also submit photographs depicting the work, taken from the designated photo points. The photographic report shall show implementation of each component of the Restoration Plan, demonstrating progress before, during, and after completion of each component of the work.

6.1.A.6 The Restoration Plan shall provide appropriate contact information for each landowner where restoration activities would be carried out to facilitate coordination with Commission staff regarding the scope of proposed work.  Commission staff will use that information to make all reasonable efforts to reach out to and consider input provided by such landowners prior to approval of the Restoration Plan.

**6.2**    The Restoration Plan shall include a detailed description of all equipment to be used. Non-mechanized hand tools shall be used for invasive, non-native plant removal. The Restoration Plan shall state that any equipment utilized to implement the Restoration Plan shall not adversely impact resources protected under the Coastal Act, including, but not limited to: public access, geological stability, erosion, integrity of landforms, water quality, sensitive species, and the existing and restored native vegetation. If circumstances require the use of mechanized equipment, Sable shall submit a supplemental plan, for the review and approval of the Executive Director, that describes the proposed use of such equipment, including routes the equipment will take and locations of such use, and shall detail the following in the supplemental plan:

6.2.A   Limitations on the hours of operations for all equipment and measures that addresses, at a minimum: 1) potential impacts from equipment use, including disturbance of areas where revegetation will occur and the responses thereto; 2) potential spills of fuel or other hazardous releases that may result from the use of mechanized equipment and the responses thereto; and 3) any potential water quality impacts.

6.2.B   Designated areas for staging of any mechanized equipment and other materials, including receptacles and temporary stockpiles of materials, provided that equipment shall be covered, enclosed on all sides, located as far away as possible from drain inlets and any waterway, a minimum of 100 feet from any sensitive habitat, and not stored in contact with the soil or sandy beach, and not stored in areas reserved for public parking.

6.2.C   Designated and confined areas for fueling, maintaining and washing machinery and equipment shall be specifically designed to control runoff. Thinners or solvents shall not be discharged into sanitary or storm sewer systems. The discharge of hazardous materials into any receiving waters is prohibited.

Sable Offshore Corp.
April 10, 2025
Page **12** of **26**

6.2.D  Prior to commencement of work under the approved Restoration Plan, Sable shall submit to the Executive Director written evidence that all necessary approvals have been obtained. If an agency requires a change to the Restoration Plan as submitted and/or approved, Sable shall submit proposed revisions for Executive Director review and approval.

**6.3**    Wildlife Protection

6.3.A  Sable shall retain the services of a qualified biologist (hereinafter, "biologist") with appropriate qualifications acceptable to the Executive Director, to monitor the site during restoration activities and conduct surveys of sensitive species and to monitor all restoration activities. Sable shall submit the contact information and qualifications of all monitors with a description of their duties and their on-site schedule to the Executive Director for review and approval pursuant to Section 6.1.A.1, above. Should a biological monitor identify any sensitive species that could be adversely affected by restoration activities, such work shall be halted, and Sable shall contact the appropriate resource agency (USFWS or CDFW) to determine an appropriate course of action. For the purpose of these Orders, "sensitive species" shall be taken to mean any special-status wildlife species. Special-status species are species listed as: Endangered, Threatened, or Rare under the federal or state Endangered Species Acts; Candidate Species, California Fully Protected Species, and, pursuant to CEQA Guidelines Section 15380(d), all other species tracked by the California Natural Diversity Database (CNDDB), which are considered by the CDFW to be those species of greatest conservation concern (e.g. S1-S3 and G1-G3 Listed Species), and locally important species including, but not limited to: raptors, Steelhead trout, California red-legged frog, Tidewater goby, and Western pond turtle.

6.3.B  To avoid impacts to nesting birds, restoration activities shall be scheduled outside of the avian breeding and nesting season (February 1 through September 15). No restoration activities shall occur within 300 feet of roosting or foraging birds. If the Executive Director determines that restoration activities may occur during the breeding and nesting season, then restoration activities shall be done with the following protective measures:

6.3.C  If restoration activities must occur during bird nesting season (February 1 through September 15), a qualified biologist with experience conducting bird surveys shall survey for active nests of any federally or state listed threatened or endangered species, species of special concern, fully protected species, species with global rarity rankings of G1-G3 and/or state rarity rankings of S1-S3, or any species of raptor or wading birds, within 7 days prior to commencement of restoration activities, and once a week thereafter during construction, to detect any such activity within 500 feet of the project area.

Sable Offshore Corp.
April 10, 2025
Page **13** of **26**

6.3.D   If an active nest(s) of any of the above species is located within 300 feet of construction activities (500 feet for raptors), the qualified biologist shall halt construction activities to enable Respondent to employ BMPs to ensure that construction activities do not disturb or disrupt nesting activities.

6.3.E   Results of nesting bird surveys, ambient noise studies, and any follow-up construction avoidance measures shall be documented in monthly reports by the qualified biologist and submitted to the Commission Executive Director throughout the bird breeding season.

**6.4**   Prior to commencement of work under the approved Restoration Plan, Sable shall submit to the Executive Director written evidence that all other necessary government approvals have been obtained. If an agency requires a change to the approved Restoration Plan, Sable shall submit proposed revisions for the Executive Director's review and approval under Section 7.0 (Submittal of Documents). These Orders provide Coastal Act authorization for all development required herein.

**6.5**   These Orders require the following deadlines that shall be reflected in the Restoration Plan:

6.5.A   Within 15 days of the effective date of these Orders, Sable shall submit the qualifications of the proposed Specialist(s) for the Executive Director's review and approval.

6.5.B   Within 60 days of the approval of the Specialist(s) by the Executive Director, Sable shall submit the proposed Restoration Plan to the Commission's Executive Director for their review and written approval.

6.5.C   Within 30 days of the approval of the Restoration Plan by the Executive Director, Sable shall commence implementation of the Restoration Plan through commencing the restoration activities and installing temporary erosion control measures. Sable shall implement each phase of the Restoration Plan according to the deadlines set forth in each section, as described more fully, below.

6.5.D   Within 15 days of the completion of each element of the Restoration Plan (i.e., Erosion Control Plan, Remedial Grading Plan, etc.), Sable shall submit a narrative report pursuant to Section 6.1.A.5, prepared by the Specialist(s), for the review and approval of the Executive Director, documenting all restoration work performed pursuant to the plan, which shall include a summary of dates on which work was performed and accompanying photographs documenting implementation of the respective components of the Restoration Plan.

6.5.E   If timing in which the Executive Director approves the Restoration Plan creates a situation that causes work to occur during avian nesting season, breeding season for protected species, or outside of the ideal planting season as

Sable Offshore Corp.
April 10, 2025
Page **14** of **26**

determined by the Specialist, Sable shall request an extension of deadlines pursuant to Section 14.0 and the Executive Director may, for good cause, extend this deadline to provide for a more successful restoration and to protect such species.

6.6    Sable shall actively monitor for trash and/or other debris and promptly remove any such debris or trash from the Restoration Area, as necessary, to ensure the ongoing success of the restoration activities.

6.7    <u>TEMPORARY EROSION CONTROL PLAN</u>

6.7.A    Sable shall submit, as part of the Restoration Plan, a Temporary Erosion Control Plan, prepared by a qualified Specialist approved pursuant to Section 6.1.A.1, to stabilize the soil and prevent erosion, to address ground disturbance during any restoration activities, and to stabilize the soil and prevent erosion during the establishment of any vegetation planted pursuant to Section 6.9, below.

6.7.B    The Temporary Erosion Control Plan shall include: 1) a narrative report describing all temporary run- off and erosion control measures to be used including replacement and/or re-compaction of any excavated materials, and restorative grading to be done during and after restoration activities; and 2) a site plan identifying and delineating the locations of all temporary erosion control measures that will be installed pursuant to this plan, including seeding of location-appropriate plant species to assist in erosion control and 3) specify that the remedial grading and installation of erosion control features shall take place only during the dry season (May 1 through October 31).

6.7.C    The Temporary Erosion Control Plan shall indicate that all erosion control measures are required to be installed and fully functional in the Restoration Area prior to, or concurrent with, the initial restoration activities required by these Orders and maintained at all times of the year throughout the remedial grading, revegetation, and monitoring process, to minimize erosion across the site, and consistent with the deadlines established herein for the removal of the temporary erosion control measures.

6.7.D    All temporary construction related erosion control materials shall be comprised of bio-degradable materials, including the material used to encase fiber rolls and other erosion control devices. To minimize wildlife entanglement and plastic debris pollution, the use of temporary rolled erosion and sediment control products with plastic netting (such as polypropylene, nylon, polyethylene, polyester, or other synthetic fibers used in fiber rolls, erosion control blankets, and mulch control netting) is prohibited. Any erosion-control associated netting shall be made of natural fibers and constructed in a loose-weave design with movable joints between the horizontal and vertical twines.

6.7.E    The erosion control measures shall remain in place and be maintained at all times of the year until the plantings have become established, or in the case of

Sable Offshore Corp.
April 10, 2025
Page **15** of **26**

erosion control measures for winter rainstorms, until such time period established by the approved Restoration Plan, and then all such measures shall be removed and properly disposed of by Sable. Verification of such removal shall be provided in the monitoring or completion report for the monitoring report period during which the removal occurred.

6.7.F   The Temporary Erosion Control Plan shall include the following deadlines:

6.7.F.1   Within 15 days of the approval of the Restoration Plan by the Executive Director, Sable shall commence the implementation of the Temporary Erosion Control Plan.

6.7.F.2   Within 15 days of commencing installation activities under the Temporary Erosion Control Plan, Sable shall conclude installation.

6.7.F.3   Within 15 days of the completion of the installation of erosion control measures under the Temporary Erosion Control Plan, Sable shall submit evidence for the Executive Director's review and approval in the form of a narrative report. The Temporary Erosion Control Plan Report shall also show the devices installed, the type of devices installed, and document their impact, if any.

6.8   REMEDIAL GRADING PLAN

6.8.A   The Restoration Plan shall include a Remedial Grading Plan prepared by a qualified Specialist approved pursuant to Section 6.1.A.1 above, that will describe all measures necessary to return the Restoration Area to the original, pre-violation topography if it is determined by the Executive Director, based upon the information received pursuant to Section 6.1.A, that such remedial grading is necessary to restore the pre-violation topography.

6.8.B   The Remedial Grading Plan shall include a narrative description that demonstrates how the proposed remedial grading will restore the Restoration Areas to the pre-violation topography.  If fill materials are to be used, the narrative shall discuss which fill materials will be used, the origin of the fill materials, how the fill materials are compatible for use within the Restoration Area, how much of each type of material will be used, and the differences and similarities between the fill materials and existing materials located in the corresponding portions of the Restoration Area.

6.8.C   If historic data or topographical maps are not available for this location, Sable shall propose an approximation of the topography which existed in the area prior to the Unpermitted Development based on undisturbed slopes in the area, for the review and approval of the Executive Director. If an approximation is used, the Specialist shall submit in writing that the proposed approximation is the most

Sable Offshore Corp.
April 10, 2025
Page **16** of **26**

accurate depiction of what the topography looked like prior to the occurrence of the Unpermitted Development. If it is determined by the Specialist that a different topography will result in a more successful restoration and will benefit coastal resources, the Specialist may propose a different topography to meet these goals.

6.8.D    The Remedial Grading Plan shall include sections showing original and finished grades, and a quantitative breakdown of grading amounts (cut/fill/export), drawn to scale with contours that clearly illustrate, as accurately as possible, the pre-violation topography and the current, unpermitted topography. The Remedial Grading Plan shall demonstrate how the proposed remedial grading will restore impacted areas to their original, pre-violation topography. The Remedial Grading Plan shall identify the source and date for all of the data used to produce this information.

6.8.E    The Remedial Grading Plan shall state that remedial grading activities undertaken pursuant to the Restoration Plan shall not disturb areas outside of the Restoration Area. Prior to initiation of any activities resulting in physical alteration of the areas affected by the Unpermitted Development, the disturbance boundary shall be physically delineated in the field using temporary non-plastic measures such as fencing or colored wooden stakes.

6.8.F    The Remedial Grading Plan shall include the following deadlines:

6.8.F.1    Within 15 days of completing Temporary Erosion Control Plan, Sable shall begin implementation of the Remedial Grading Plan.

6.8.F.2    Within 45 days of commencing implementation of the remedial grading activities, Sable shall complete implementation of the Remedial Grading Plan.

6.8.F.3    Within 15 days of the completion of the implementation of the Remedial Grading Plan Sable shall submit evidence, for the Executive Director's review and approval, in the form of a narrative report as described in 6.1.A.5, showing that the remedial grading has been completed pursuant to the approved Restoration Plan.

6.9    REVEGETATION PLAN

6.9.A    The Restoration Plan shall include a Revegetation Plan prepared by a qualified Specialist, approved pursuant to Section 6.1.A.1 above, that will describe the measures necessary to revegetate the Restoration Areas such that these areas meet the goals, standards and objectives of these Orders.

6.9.B    The Revegetation Plan shall include a detailed description of the methods that shall be utilized to restore the Restoration Area that is determined, pursuant to

Sable Offshore Corp.
April 10, 2025
Page **17** of **26**

Section 6.1.A, to have been adversely impacted by the Unpermitted Development. The Revegetation Plan shall include detailed descriptions, including graphic representations, narrative reports, and photographic evidence, as necessary. The Revegetation Plan shall demonstrate that the Restoration Area and additional areas to account for the temporal and permanent losses of habitat caused by the Unpermitted Development will be revegetated using plant species endemic to and appropriate for the locations where Unpermitted Development occurred.

6.9.C    The Revegetation Plan shall identify the natural habitat type(s) that are the reference site(s)/model(s) for the restoration and shall describe the desired relative abundance of particular species in each vegetation community. The reference site(s) shall be natural areas with the least amount of disturbance and located as close as possible to the Restoration Area, so long as the habitat type is similar to that impacted by the Unpermitted Development. If an undisturbed reference site does not exist, an otherwise representative area may be proposed, accounting for vegetation and topography changes due to disturbance, and in conjunction with published descriptions of local habitat using relevant, peer-reviewed literature. Alternatively, if an undisturbed reference site or otherwise representative area are not available or suitable for the proposed restoration, the peer-reviewed literature along with membership rules per the Manual of California Vegetation (Sawyer,Keeler-Wolf and Evens 2009; available online at https://vegetation.cnps.org) for the appropriate habitat alliance-level, may be used to determine the desired relative abundance of native vegetation and particular species in each vegetation community.  The Revegetation Plan shall be based on one or more reference sites specific to the habitat type(s) upon which the Unpermitted Development occurred. The Revegetation Plan shall explicitly lay out the restoration goals, standards and objectives for the restoration based on the respective model(s).

6.9.D    The Revegetation Plan shall be based on these Reference Sites, which, along with information from the scientific literature, shall be used to identify the plant species that are native to the site and will be planted in the areas determined by the Executive Director pursuant to Section 6.1.A, above, to be adversely impacted in the Restoration Area. The Revegetation Plan shall explicitly state the restoration goals, standards and objectives for the revegetation effort, with the goal of achieving the revegetation performance standards in the allotted period, which may include, but are not limited to, diversity and native plant cover requirements and require the control of invasive plants. Based on these goals, the Revegetation Plan shall identify the species that are to be planted (plant "palette") and provide a rationale for and description of the size and number of container plants, seed mix, the rate and method of seed application, the method of planting, irrigation requirements and irrigation schedule. The Revegetation Plan shall indicate that plant propagules and seeds must come from local, native stock. If plants, cuttings, or seeds are obtained from a nursery, the nursery must

Sable Offshore Corp.
April 10, 2025
Page **18** of **26**

certify that they are of local origin and are not cultivars. The Revegetation Plan shall provide specifications for preparation of nursery stock. Technical details of planting methods (e.g., spacing, mycorrhizal inoculation, etc.) shall be included. shall not employ non-native plant species, which could supplant native plant species in the Restoration Area.

6.9.E    The Revegetation Plan shall include a schedule for installation of plants, removal of non-native plants, and completion of revegetation within the Restoration Area and any other area revegetated to account for the temporal and permanent losses of habitat caused by the Unpermitted Development. The Specialist shall recommend removal of non-natives outside the Restoration Area if they determine that such non-natives could impact or limit the success of the native plantings within the Restoration Area.

6.9.F    The revegetation schedule shall include specific time periods and deadlines, including identifiable interim goals for planting, other revegetation activities, and additional non-native species removal work spread out over the time period established in this section.

6.9.G    Sable is responsible for ensuring the ongoing survival of the plantings, shall undertake measures necessary to ensure the success of such plantings, and shall replace any dead or dying plants with native plants approved through this Revegetation Plan.

6.9.H    The Revegetation Plan shall describe the proposed use of artificial inputs, such as irrigation, fertilizer, or herbicides, including the full range of amounts of the inputs that may be utilized. The minimum amount necessary to support the establishment of the plantings for successful restoration shall be utilized.

6.9.I    The Revegetation Plan shall include the following deadlines:

6.9.I.1    Within 15 days of completing implementation of the Remedial Grading Plan, Sable shall begin implementation of the Revegetation Plan. The schedule/timeline of activities in the Restoration Plan shall be in accordance with the deadlines in these Orders and shall be in accordance with the ideal planting seasons.

6.9.I.2    Within 45 days of commencing implementation of activities under the Revegetation Plan, Sable shall complete implementation of all planting activities under the Revegetation Plan.

6.9.I.3    Within 15 days of the completion of all revegetation activities, Sable shall submit evidence, for the Executive Director's review and approval, in the form of a narrative report as described in Section 6.1.A.5,

Sable Offshore Corp.
April 10, 2025
Page **19** of **26**

demonstrating that the revegetation has been completed pursuant to these Orders and the approved Restoration Plan.

6.10    CULTURAL RESOURES SURVEY AND PLAN

6.10.A  Sable shall submit, for review and approval of the Executive Director, a Cultural Resources Survey and Cultural Materials Plan prepared by a qualified professional, defined in Section 6.1.A.1 below as the "Archeological Specialist", which shall assess the extent to which the restoration activities required by these Orders have any potential to uncover or otherwise disturb cultural resources. Prior to the preparation of the Cultural Resources Survey and Cultural Materials Plan, Sable shall submit the qualifications of the proposed Archeological Specialist for the Executive Director's review and approval, including a description of the archeologist's background, training, and experience.

After the Executive Director has approved the Restoration Plan, but before the first commencement of activities required by the Restoration Plan, Sable shall convene an on-site pre-meeting with the Archeological Specialist, the Native American Most Likely Descendant(s) (MLD) and Native American Monitor(s), as defined in Section 6.10.D, below, to ensure that all parties understand the procedures to be followed pursuant to these Orders and the approved Cultural Resources Survey and Cultural Materials Plan

In order to protect cultural resources on any location where restoration activities will occur pursuant to these Orders, the Cultural Resources Survey and Cultural Materials Plan shall incorporate the following measures and procedures, and Sable shall implement such measures and procedures.

6.10.B  In preparing Cultural Resources Survey and Cultural Materials Plan, the Archeological Specialist, as defined in Section 6.10.C, below, shall consult with the Native American Monitor(s), as defined in Section 6.10.D, below.

6.10.C  The Archeologist Specialist shall be a professional archeologist who has experience in cultural and archeological fieldwork, preferably in Santa Barbara County. The archeologist must be selected in consultation with the Executive Director consistent with the standards of the Native American Heritage Commission ("NAHC"). The Cultural Resources Survey and Cultural Materials Plan shall identify the Archaeological Specialist and include a description of his/her education, training, and experience. Native American Monitors

6.10.D  The Native American Monitor(s) shall be the monitor(s) who will monitor work to be conducted pursuant to these Orders, according to the provisions of the Cultural Resources Survey and Cultural Materials Plan. The Native American monitors shall be selected by the appropriate tribe as designated by the NAHC.

Sable Offshore Corp.
April 10, 2025
Page **20** of **26**

6.10.E The Cultural Resources Survey and Cultural Materials Plan shall require that the Archeological Specialist shall document any cultural materials, including but not limited to, human remains and grave-related artifacts, traditional cultural sites, religious or spiritual site, village sites, or other artifacts, ("Cultural Materials") encountered during the course of work conducted pursuant to these Orders, and such documentation shall be included in a report to the Executive Director within 15 days of identification.

6.10.F During all ground disturbance and subsurface activity that occurs on the Restoration Area or any location where restoration activities may occur pursuant to the requirements of these Orders that have any potential to uncover or otherwise disturb cultural deposits, the Native American Monitors may be present on the Restoration Area.

6.10.G **Sable shall fund sufficient Native American Monitors to assure that all remedial grading or other restoration activities that have any potential to uncover or otherwise disturb cultural deposits are monitored at all times.** More than one Monitor at the Restoration Area may be necessary during times with multiple soil disturbance locations. In instances where more than one Monitor is necessary and less than all Native American Monitors necessary respond to request to monitor particular areas within 7 days, **Sable shall halt work until Native American Monitors are available.**

6.10.H Prior to the disposal of any materials from the restoration activities, the Archeological Specialist shall identify, as best as possible, soil that may contain cultural materials and, if determined by the Archeological Specialist and the MLD and Native American Monitors to be necessary, screen it for evidence of such materials. Any cultural materials, including cultural midden materials, human remains, and archeological features, shall be documented and reburied, or transported offsite in coordination with guidance from the Archeological Specialist and Native American Monitors. If human remains are encountered during soil screening, Sable shall comply with all applicable State and Federal laws, including but not limited to, contacting the County Coroner, NAHC, and the MLDs

6.10.I All identification of soil, soil screening, and restoration activities conducted pursuant to these Orders shall be monitored by the Native American Monitors. In addition, the Native American Monitors shall be provided access to the site to inspect the Restoration Area prior to removal and/or restoration. Sable shall not restrict the Native American Monitors from communicating with Commission staff. If human remains are encountered during inspection of the Restoration Area, Sable shall comply with all applicable State and Federal laws including, but not limited to, immediately stopping working and contacting the County Coroner, NAHC, and the MLD.

6.10.J If any Cultural Materials are discovered, all restoration activities in that particular area shall cease. The Archaeological Specialist shall submit a proposal to the

Sable Offshore Corp.
April 10, 2025
Page **21** of **26**

Executive Director for his review and approval on how Sable will address such discovery, consistent with the Cultural Resources Survey and Cultural Materials Plan. Restoration activity may proceed only at such time as the Executive Director has determined that Sable has complied with all obligations of the Cultural Resources Survey and Cultural Materials Plan.

6.10.K          Should human remains be discovered on-site during the course of the restoration activities, immediately after such discovery, the on-site archaeologist and Native American monitor(s) shall notify the County Coroner within 24 hours of such discovery, and all restoration activities shall be temporarily halted until the remains can be identified. An "exclusion zone" may be established around the discovery area. If the County coroner determines that the human remains are those of a Native American, the coroner shall contact the NAHC within 24 hours, pursuant to Health and Safety Code Section 7050.5. The NAHC shall deem the Native American most likely descendant (MLD) to be invited to participate in the identification process pursuant to Public Resources Code Section 5097.98. Sable shall comply with the requirements of Section 5097.98 and work with the MLD person(s) to preserve the remains in place, move the remains elsewhere onsite, relinquish the remains to the descendants for treatment, or determine other culturally appropriate treatment. Within five (5) calendar days of notification to NAHC, Sable shall notify the Executive Director of the discovery of human remains and identify any changes to the proposed Cultural Resources Survey and Cultural Materials Plan that may be needed related to the inadvertent discovery. The Executive Director will maintain confidentiality regarding the presence of human remains on the site. If such discovery requires changes to the Restoration Plan, Sable shall submit, within 30 days of notifying the Executive Director, and amendment to the plan for the Executive Director's review and approval.

6.11    MONITORING PLAN

6.11.A The Restoration Plan shall include a Monitoring Plan prepared by a qualified Specialist, approved pursuant to Section 6.1.A.1 above, that will provide for monitoring the Restoration Area over a period of, at a minimum, 5 years from the completion and full implementation of the Restoration Plan to ensure successful restoration.

6.11.B The Monitoring Plan shall describe the monitoring and maintenance methodology, including sampling procedures, sampling frequency, goals, standards, objectives, and contingency plans to address potential problems with restoration activities or unsuccessful restoration of the Restoration Area.

6.11.C The Monitoring Plan shall include an initial site survey showing the Restoration Area, the areas and types of revegetation mapped to the appropriate alliance-

level, and specific photo points that will be used for the annual reports and site visits described below.

6.11.D The Monitoring Plan shall specify the number of site visits (at a minimum on a quarterly basis) that the Specialist shall conduct annually for the duration of the monitoring period for the purpose of inspecting and maintaining, at a minimum, the following: all erosion control measures; non-native species eradication; trash and debris removal; and the health and abundance of original and/or replacement plantings planted pursuant to these Orders and consistent with the Revegetation Plan. It is Sable's obligation to ensure a successful restoration that will meet the established goals, standards, and objectives, which may necessitate more site visits than required herein.

6.11.E Sable shall submit no later than December 31 of the first year of monitoring and subsequently on an annual basis and during the same one-month period of each year for at least 5 years from the completion of the revegetation phase of the Restoration Plan, for the review and approval of the Executive Director, a monitoring report prepared by the Specialist that evaluates compliance with the approved Restoration Plan. These reports shall also include photographs taken during the periodic site inspections demonstrating the success of the restoration. The locations from which the photographs are taken shall not change over the course of the monitoring period.

6.11.F If periodic inspections or the annual monitoring reports indicate that the restoration project or a portion thereof is not in conformance with the Restoration Plan or these Orders or has failed to meet the goals and/or performance standards specified in the Restoration Plan, Sable shall implement approved contingency plans.

6.11.G At the end of the five-year monitoring period, Sable shall submit, for the review and approval of the Executive Director, a final detailed report prepared by the Specialist that documents the successful implementation of the Restoration Plan. If the Executive Director determines from this final report that the restoration has in part, or in whole, been unsuccessful and/or did not meet the final success criteria, based on the requirements of the respective plan, Sable shall submit a Revised Restoration Plan, and the monitoring program shall be revised accordingly.

6.11.H The Revised Restoration Plan shall be prepared by the Specialist, approved by the Executive Director, and shall specify measures to correct those restoration activities that have failed or are not in conformance with the original, approved Restoration Plan. The Executive Director will then determine whether the Revised Restoration Plan must be processed as a new Restoration Order, or a CDP. After the Revised Restoration Plan has been approved, these measures, and any subsequent measures necessary to carry out the original, approved Restoration Plan, shall be undertaken by Sable as required by the Executive

Sable Offshore Corp.
April 10, 2025
Page **23** of **26**

Director until the goals of the original, approved Restoration Plan have been met. Following Sable's full implementation of the Revised Restoration Plan, the duration of the monitoring period shall be extended for a period of time equal to that during which the project remained out of compliance, but in no case less than two annual reporting periods.

6.11.I  The Monitoring Plan shall include the following deadlines:

6.11.I.1   As part of the Restoration Plan, within 60 days of the effective date of these Orders, Sable shall submit, for review and approval of the Executive Director, the Monitoring Plan.

6.11.I.2   The monitoring period shall begin immediately upon the full implementation of the Restoration Plan and shall extend for a period of, at a minimum, 5 years.

6.11.I.3   Sable shall submit no later than December 31 of the first year of monitoring and subsequently on an annual basis and during the same one-month period of each year for at least 5 years from the completion of the revegetation phase of the Restoration Plan, for the review and approval of the Executive Director, a monitoring report.

6.11.I.4   At the end of the five-year monitoring, Sable shall submit, for the review and approval of the Executive Director, a final detailed report prepared by the Specialist that documents the successful implementation of the Restoration Plan.

**ADDITIONAL PROVISIONS COMMON TO THESE ORDERS**

**7.0    SUBMITTAL OF DOCUMENTS**

All plans, reports, photographs, documents and funds submitted to the Commission pursuant to these Orders shall be sent to both of the following addresses, with the original sent to the San Francisco office, and additionally sent via electronic mail to:

<u>With a copy sent to:</u>

California Coastal Commission
Attn:  Stephanie Cook
455 Market Street, Suite 300
San Francisco, CA 94105
Stephanie.Cook@coastal.ca.gov

California Coastal Commission
Attn: Wesley Horn
89 S. California Street, STE 200
Ventura, CA 93001
<u>Wesley.Horn@coastal.ca.gov</u>

**8.0    FINDINGS**

This Cease and Desist Order, Restoration Order, and Administrative Penalty Assessment are issued on the basis of the findings adopted by the Commission, as set forth in the document entitled "Staff Report: Recommendations and

Sable Offshore Corp.
April 10, 2025
Page **24** of **26**

Findings for Cease and Desist Order, Restoration Order, and Administrative Civil Penalties." The Commission has ordered and authorized the activities required in these Orders and has determined them to be consistent with the resource protection policies set forth in Chapter 3 of the Coastal Act if carried out in compliance with the terms of these Orders.

## 9.0    EFFECTIVE DATE AND TERMS OF THESE ORDERS

The effective date of these Orders is the date the Commission votes to approve these Orders. These Orders shall remain in effect permanently unless and until rescinded by the Commission.

## 10.0    COMMISSION JURISDICTION

The Commission has jurisdiction to issue the Cease and Desist Order pursuant to PRC Section 30810, jurisdiction to issue the Restoration Order pursuant to PRC Section 30811, and jurisdiction to impose the Administrative Civil Penalties pursuant to PRC Section 30821.3.

## 11.0    SITE ACCESS

11.1    Sable shall provide Commission staff and staff of any agency having jurisdiction over the work being performed under these Orders with access to all portions of the Restoration Area and any area needed for Commission staff to safely access the Restoration area  Nothing in these Orders is intended to limit in any way the right of entry or inspection that any agency may otherwise have by operation of any law. The Commission staff and other relevant agency staff may enter and move freely about the following areas: (1) any areas on which the development as defined in Section 4.2, above, occurred, (2) any areas where work is to be performed pursuant to these Orders or pursuant to any plans adopted pursuant to these Orders, (3) any areas necessary in order to view the areas where work is being performed pursuant to the requirements of these Orders, (4) any areas where evidence of compliance with these Orders may lie for purposes including but not limited to, inspecting records, logs and contracts; and overseeing, inspecting, documenting, and reviewing the progress of Sable in carrying out the terms of these Orders.

11.2    Sable shall provide Commission staff with documentation of their right to enter and take action as required pursuant to these Orders on any property not owned by Sable.

## 12.0    APPEAL

Pursuant to PRC Section 30803 (b), any person or entity against whom this Cease and Desist Order under Section 1.0 is issued may file a petition with the

Sable Offshore Corp.
April 10, 2025
Page **25** of **26**

Superior Court for a stay of this Cease and Desist Order. Pursuant to Section 30803(a), any person may maintain an action for declaratory and equitable relief to restrain any violation of this division, including violations of a cease and desist or restoration order issued pursuant to this division.

## 13.0   GOVERNMENT LIABILITY

Neither the State of California, nor the Commission, nor its employees shall be liable for injuries or damages to persons or property resulting from acts or omissions by Sable in carrying out activities pursuant to these Orders; nor shall the State of California, the Commission or its employees be held as a party to any contract entered into by Sable or their agents in carrying out activities pursuant to these Orders.

## 14.0   DEADLINES

The Executive Director may extend deadlines specified herein. Any extension request must be made in writing and received by Commission staff ten (10) days prior to expiration of the subject deadline. Any such request shall be sent to the address listed in Section 7.0, above

## 15.0   SUCCESSORS AND ASSIGNS

These Orders shall bind Sable and all its successors in interest, newly created LLCs, partnerships, and corporations, heirs, and assigns.

## 16.0   REVISION OF DELIVERABLES

The Executive Director may require revisions to deliverables under these Orders, as necessary to satisfy the requirements in these Orders, and Sable shall revise any such deliverable consistent with the Executive Director's specifications and resubmit them for review and approval by the Executive Director by the deadline established by the modification request from the Executive Director.

## 17.0   MODIFICATION AND AMENDMENTS

Except as provided in Section 14 of these Orders, or for ministerial corrections, these Orders may be amended or modified only in accordance with the standards and procedures set forth in Section 13188(b) and 13197 of Title 14 of the California Code of Regulations.

## 18.0   SEVERABILITY

Should any provision of these Orders be found invalid, void, or unenforceable, such illegality or unenforceability shall not invalidate the whole, but these Orders shall be construed as if the provision(s) containing the illegal or unenforceable part were not a part hereof.

## 19.0   GOVERNMENT JURISDICTION

These Orders shall be interpreted, construed, governed, and enforced under and pursuant to the laws of the State of California.

## 20.0   COMPLIANCE OBLIGATION

Strict compliance with this Cease and Desist Order, Restoration Order, and Administrative Penalty by all parties subject hereto is required. Failure to resolve violations addressed herein or comply with any term or condition of this Cease and Desist Order, Restoration Order, and Administrative Penalty, including any deadline contained herein, will constitute a violation of these Orders and may result in the imposition of civil penalties under PRC Section 30821.6 of up to six thousand dollars ($6,000) per day for each day in which each violation persists. In addition, failure to comply with any terms or conditions of these Orders may result in the Commission seeking judicial relief and additional penalties as authorized under Chapter 9 of the Coastal Act, including PRC Sections 30820, 30821.3(d), and 30822

## 21.0   NO LIMITATION OF AUTHORITY

Except as expressly provided herein, nothing in these Orders shall limit or restrict the exercise of the Commission's enforcement authority pursuant to Chapter 9 of the Coastal Act (PRC Sections 30800 to 30824), including the authority to require and enforce compliance with these Orders and the authority to take enforcement action for Coastal Act violations beyond those that are specified in Section 4.2 of these Orders.

Executed in ___Santa Barbara___ on behalf of the California Coastal Commission:

_____          ___4/10/25___
Dr. Kate Huckelbridge                                         Date
Executive Director
California Coastal Commission

# EXHIBIT L

355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Tel: +1.213.485.1234  Fax: +1.213.891.8763
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Silicon Valley |
| Hong Kong | Singapore |
| Houston | Tel Aviv |
| London | Tokyo |
| Los Angeles | Washington, D.C. |
| Madrid | |

## LATHAM&WATKINS LLP

March 10, 2025

**VIA EMAIL**

Kate Huckelbridge
Executive Director
California Coastal Commission
455 Market Street, Suite 300
San Francisco, CA 94105

Stephanie Cook
Headquarters Enforcement Counsel
California Coastal Commission
455 Market Street, Suite 300
San Francisco, CA 94105

> Re:  Sable Offshore Corp. – Statement of Defense and Response to Notice of Intent to Commence Proceedings for a Commission Cease and Desist Order, Restoration Order, and Administrative Penalty Order (Feb. 18, 2025)

Dear Dr. Huckelbridge and Ms. Cook:

On behalf of our client, Sable Offshore Corp. ("Sable"), we are providing responses to your February 18, 2025, Executive Director Cease and Desist Order No. ED-25-CD-01 and Notice of Intent to Commence Proceedings for a Commission Cease and Desist Order, Restoration Order, and Administrative Penalty Order ("EDCDO/NOI") regarding Sable's:

> (i)   work along portions of Las Flores Pipelines CA-324 and CA-325 (previously known as Lines 901 and 903) (collectively the "Onshore Pipelines"[1]) located within an unincorporated area of the County of Santa Barbara ("County") and within the Coastal Zone to conduct repair and maintenance activities required under applicable federal regulations to repair pipeline anomalies and install additional safety valves[2] required under state law;[3] and

---

[1] The Onshore Pipelines are owned by Pacific Pipeline Company ("PPC"), which is a wholly owned subsidiary of Sable.

[2] All safety valves installed in Line CA-325 are located outside of the Coastal Zone.

[3] This package also constitutes Sable's response to Notice of Violation File No. V-9-24-0152's allegations regarding certain safety valves previously installed in Line CA-324 and Notice of Violation File No. V-9-25-0013. Sable previously responded to Notice of Violation File No. V-9-24-0152's allegations regarding Sable's repair and maintenance work, also referred to as the anomaly repair work, on February 14, 2025.

US-DOCS\157775115

**LATHAM&WATKINS**LLP

(ii)    span remediation maintenance activities consistent with State Lands Commission lease requirements on Santa Ynez Unit ("SYU") pipelines located in State waters offshore of the County's Gaviota Coast (collectively the "Offshore Pipelines").

Contrary to the EDCDO/NOI's assertions, *none of Sable's activities constitute violations of the County's Coastal Zoning Ordinance ("CZO"), certified Local Coastal Program ("LCP"), or the Coastal Act*.  As such, *no cease and desist order is warranted* – whether issued by the Executive Director or the full Coastal Commission – *and Sable strongly disagrees with the EDCDO/NOI's allegations and contends they are not supported by applicable law*.

Consistent with our prior letters to and discussions with Coastal Commission staff, the activities discussed in the EDCDO/NOI *are fully authorized by coastal development permits previously approved by the County and this Commission*.  Therefore, those activities do not require new or amended coastal development permits and are not otherwise subject to the Commission's jurisdiction or enforcement authority.  Attachment A addresses those activities and the prior Coastal Act authorizations Sable or its predecessors obtained in detail.  A short summary of each type of activity and its authorization is provided below:

Anomaly Repair Work.  The County has confirmed in writing that the repair and maintenance activities on the Onshore Pipelines referenced in the EDCDO/NOI related to pipeline anomalies are *already authorized under the County's existing coastal development permits, final development plan, and environmental review*.  Pipeline operators have repeatedly performed these types of repair activities on the Onshore Pipelines since they were first built following the County's approval in 1986, and neither the County nor the Coastal Commission ever have asserted that a new or amended coastal development permit for this type of work is required.  While Commission staff appear to disagree with the County's determination, the Coastal Commission does not have the authority to override or otherwise nullify either the County's determination or the County's interpretation of its own previously issued coastal development permits for the Onshore Pipelines.  The County lawfully issued those coastal development permits pursuant to its delegated LCP permitting authority under the Coastal Act[4] in July and August, 1986, and if the Commission objected to the breadth of those permits – including the allowance to conduct ongoing repair and maintenance activities throughout the Onshore Pipeline's operational lifetime – the Commission could have appealed the County's approvals at that time.  *The Commission did not file an appeal in 1986, and does not have the authority to remake the County's approved coastal development permits now*.

Safety Valve Work.  Similarly, Sable was required to undertake the safety valve repair and maintenance activities described in the EDCDO/NOI pursuant to state law that the Coastal Commission itself supported.  The work occurred within the boundaries of the Onshore Pipelines' already-disturbed operational right-of-way and *involves the exact same type of work described above for pipeline anomaly repairs and previously authorized under the County's existing coastal development permits, final development plan, and environmental review*.  Sable completed the safety valve installation work only after the County confirmed in writing that no further authorization from the County was required to complete the safety valve

---

[4] The Coastal Commission certified the County's Local Coastal Program in March 1981.

2

LATHAM&WATKINSLLP

installation.[5]  The County has delegated LCP permitting authority under the Coastal Act and therefore the County's prior authorization was understood by Sable to extend to Coastal Act permitting as well.  Notwithstanding the County's prior authorization of this work, and in light of Commission staff's allegations, Sable is preparing to submit additional materials regarding this work to the County for confirmation that no new after-the-fact authorizations, including new or amended coastal development permits, are required.  Until the County responds to Sable's request for review, any enforcement action by the Commission regarding this work is premature and would usurp the County's delegated LCP permitting authority under the Coastal Act.

Span Remediation Work.  Finally, Sable's span remediation maintenance activities were fully contemplated within the original coastal development permit approved by the Coastal Commission for the Offshore Pipelines in 1988 and the Development and Production Plan approved by the Department of the Interior, which is the comprehensive document that outlines Sable's authorized activities for the development and production of offshore resources. The Development and Production Plan was specifically analyzed by the Commission when it concurrently issued the Offshore Pipeline's coastal development permit and federal consistency certification.[6]  The span remediation maintenance activities involve the placement of sand-cement bags beneath certain segments of the Offshore Pipelines on the seafloor where contact between the pipelines and the seafloor has been lost due to the movement and loss of sand. This provides both vertical and lateral support to the Offshore Pipelines, ensuring their structural integrity. ***The exact same span remediation activities have been performed in the past on these same Offshore Pipelines without requiring any new Coastal Act authorizations, and no further Coastal Act authorization is required at this time***.

In sum, and as described more fully in this package, ***none of the work referenced in the EDCDO/NOI constitutes a violation of the Coastal Act or the County's LCP or requires new or amended coastal development permits***.  Rather than acknowledge that this work was previously permitted as required under the Coastal Act, the EDCDO/NOI and Commission staff claim that the Coastal Commission can assert *sua sponte* jurisdiction over these activities and demand that Sable apply for new or amended coastal development permits.  Commission staff appears to be asserting Commission jurisdiction over these already permitted activities in order to exert some influence over Sable's planned restart of the Santa Ynez Unit oil production operations.  Jurisdiction over restart activities is entirely outside of the Commission's jurisdiction and is separately regulated by other agencies.[7]  Because of the Commission's efforts to assert jurisdiction it does not have, Sable was forced to file suit against the Commission in Santa Barbara County Superior Court to protect its property rights to operate and maintain its facilities.[8] While that lawsuit remains pending and these jurisdictional issues have not yet been

---

[5] Document No. 47, Letter from Errin Briggs to J. Caldwell Flores (September 4, 2024).

[6] See Document No. 11, Staff Recommendation on Permit and Consistency Certification, p. 24 ("By concurring in Exxon's certification, the Commission informs [federal agencies] that it considers the nearshore and onshore portions of Exxon's [DPP] to be consistent with the [California Coastal Management Program under the CZMA].").

[7] See, e.g., Document No. 35, Consent Decree issued in *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*, Case No. 2:20-cv-02415, (C.D. Cal. Mar. 13, 2020) (requiring, in part, approval of a Restart Plan by the Office of the State Fire Marshal).

[8] See *Sable Offshore Corp. v. Cal. Coastal Commission*, Santa Barbara County Superior Court, Case No. 25CV00974.

3

**LATHAM&WATKINS**LLP

resolved by the Court, Commission staff has elected to proceed with enforcement proceedings under the EDCDO/NOI, which has required Sable to prepare this detailed response.

This letter and each of its attachments collectively comprise Sable's formal "Statement of Defense" in response to the EDCDO/NOI.[9]  Attachment A addresses the EDCDO/NOI's allegations in detail.  Attachment B includes the completed "Statement of Defense" form transmitted to Sable with the EDCDO/NOI.  Attachment C individually responds to each paragraph of the EDCDO/NOI.  Attachment D includes documents and records to be made part of the administrative record in any enforcement proceedings regarding these matters.  By submitting these materials, Sable does not concede that the Coastal Commission possesses the authority either to issue the EDCDO/NOI or commence any enforcement proceedings regarding the above-referenced work.

Based on the foregoing, Sable respectfully requests an opportunity to discuss with Commission staff the final resolution of the EDCDO/NOI.

Very truly yours,

Duncan Joseph Moore
of LATHAM & WATKINS LLP

cc:     Lisa Haage, California Coastal Commission
        Alex Helperin, California Coastal Commission
        Cassidy Teufel, California Coastal Commission
        Wes Horn, California Coastal Commission
        Lisa Plowman, County of Santa Barbara
        Errin Briggs, County of Santa Barbara
        Jenna Richardson, County of Santa Barbara
        Anthony Duenner, Sable Offshore Corp.
        Carolyn Bertrand, Sable Offshore Corp.
        Lee Alcock, Sable Offshore Corp.
        Steve Rusch, Sable Offshore Corp.
        Lauren Paull, Latham & Watkins LLP

---

[9] See Cal. Code of Regs., tit. 14 ("Coastal Act Regulations"), § 13181(a).

4

LATHAM&WATKINS LLP

**Attachment A**

## I.    EXECUTIVE SUMMARY

Sable received the requisite Coastal Act authorization for the onshore repair and maintenance activities, including the onshore pipeline anomaly repair work and safety valve installation work, and offshore span remediation work described in the EDCDO/NOI.  More specifically, this work occurred on onshore pipeline facilities comprising the Las Flores Pipeline system, which is located along the Gaviota Coast in Santa Barbara County, and the connected Santa Ynez Unit ("SYU") and its associated offshore pipeline facilities, which produces crude oil and natural gas off the California Coast in the Santa Barbara Channel.  Although the EDCDO/NOI discusses the onshore and offshore work together, the Coastal Commission issued separate Notices of Violation for the onshore work (Violation File No. V-9-24-0152, the "2024 NOV") and the offshore work (Violation File No. V-0-25-0013, the "2025 NOV"), as described further herein.  Contrary to the allegations contained in the Notices of Violation and EDCDO/NOI, all required Coastal Act authorizations for the onshore and offshore work were obtained.

This Attachment A first provides background on the SYU and the Las Flores Pipeline system.  Next, this document addresses Sable's onshore work described in the EDCDO/NOI and subject to the Commission's 2024 NOV.  Sable's onshore repair and maintenance activities (also known as anomaly repair work) is addressed first, followed by Sable's safety valve installation work.  Then, Sable's offshore span remediation work described in the EDCDO/NOI and subject to the Commission's 2025 NOV is addressed.

## II.    BACKGROUND

Sable Offshore Corp. ("Sable") is managed by James C. Flores and a management team that have extensive experience in the oil and gas exploration and production business.  Sable's management team prides itself on their strong record of operating safely and successfully in many jurisdictions, including California and the Pacific Region of the Outer Continental Shelf.  The Sable team has received numerous awards for operational excellence, national industry leadership, employee safety, occupational excellence, environmental lease maintenance, operator of the year, and best management practices in habitat conservation from several agencies such as the National Safety Council, the California Department of Conservation Division of Geologic Energy Management, and the U.S. Bureau of Land Management.  Specific to the County of Santa Barbara ("County"), a company operated by Sable's management team was awarded the County's first and only "Resolution for Good Operator" recognition for outstanding operator performance and a County Commendation for outstanding maintenance.  Sable acquired the Las Flores Pipeline system and Santa Ynez Unit facilities in February 2024.

Since that time, Sable has worked with applicable federal and state agencies toward restarting production, including performing repair and maintenance work on the facilities and submitting various required materials to the applicable federal and state agencies with jurisdiction over such work.  As discussed further herein, all of Sable's work within the Coastal

5

LATHAM&WATKINS LLP

Zone previously was authorized under the Coastal Act and therefore the Commission lacks any authority to issue a cease and desist order, restoration order, or penalties with respect to such work.

This section discusses relevant background, existing permits, and authorizations related to both the SYU and the Las Flores Pipeline system, where the alleged unpermitted development described in the EDCDO/NOI occurred. Both of these facilities were constructed in the 1980s and 1990s after detailed analysis under applicable environmental laws and after having received coastal development permits and other requisite entitlements. Since these facilities were constructed, the Coastal Commission has never asserted that any new or amended coastal development permits would be required for the type of anomaly repair and maintenance activities, safety valve installation work, or span remediation work described in the EDCDO/NOI. Rather, these types of activities have been performed under the authorizations provided by the original coastal development permits for the SYU and Las Flores Pipeline facilities. The EDCDO/NOI's sudden assertion that such activities require new or amended coastal development – decades after these permits and authorizations were issued – lacks merit and is inconsistent with the permitting history for these facilities.

The SYU consists of sixteen federal leases across approximately 76,000 acres of the outer continental shelf (OCS) and produces crude oil and natural gas from Platforms Hondo, Harmony and Heritage, which are located in federal waters off the California coast in the Santa Barbara Channel. The oil and gas are transported through subsea pipelines (collectively the "Offshore Pipelines") to the onshore Las Flores Canyon Oil and Gas Plant and the Pacific Offshore Pipeline Company Gas Plant, which are both located in Las Flores Canyon in unincorporated Santa Barbara County – approximately 20 miles west of the City of Santa Barbara. The onshore facilities separate oil, propane, butane, sulfur products, and fuel quality gas. The natural gas is dried, treated, compressed, and sold to local utility companies. Oil is transferred for final processing at a refinery through the Las Flores Pipeline system.

Las Flores Pipeline CA-324 ("Line CA-324") (previously known as Line 901) is a twenty-four (24) inch diameter pipeline with a maximum permitted throughput capacity of 150,000-barrels of crude oil per day, which is designed to transport crude oil approximately 10.9 miles from the Las Flores Pump Station in Las Flores Canyon, west along the Gaviota Coast, to the existing Gaviota Pump Station located approximately one mile east of Gaviota State Park in Santa Barbara County. Las Flores Pipeline CA-325 ("Line CA-325") (previously known as Line 903) is thirty (30) inches in diameter, has a maximum permitted throughput capacity of 300,000-barrels of crude oil per day, and is designed to transport crude oil approximately 113.5 miles north from the Gaviota Pump Station to the Sisquoc Pump Station, then east through the Los Padres National Forest (LPNF) and Cuyama Valley, ultimately delivering crude oil to the existing Pentland Delivery Point in the San Joaquin Valley in Kern County. This existing pipeline system also provides a connection to the idled Phillips 66 Sisquoc Pipeline at the existing Sisquoc Pump Station, which previously transported crude oil west to the Phillips 66 Santa Maria Refinery. Together, Line CA-324 and Line CA-325 are collectively referred to herein as the "Onshore Pipelines."

US-DOCS\157775115

LATHAM&WATKINS LLP

### A.      Santa Ynez Unit

In a 1968 federal Bureau of Land Management lease sale, Exxon Company U.S.A. ("Exxon"), which is Sable's predecessor in interest, was awarded the rights to sixteen leases to explore and develop three major oil and gas fields off the coast of Santa Barbara: Hondo, Pescado, and Sacate. These fields became known as the SYU, with Exxon designated as the operator.

Exxon submitted a Development and Production Plan ("DPP") for the SYU to the federal Minerals Management Service ("MMS") in December 1982.[10] The DPP governs the development and production activities for oil and gas on a lease unit in the OCS and must be submitted and approved before these activities can commence.[11] In January of 1983, pursuant to the Coastal Zone Management Act ("CZMA"), Exxon submitted a request for a Coastal Commission concurrence in its consistency certification for the planned oil and gas production activities in the SYU.  In June of 1983, through consistency certification No. CC-8-83, the Coastal Commission partially concurred with the consistency certification for the OCS portions of the platforms and pipelines proposed, but objected to the expansion of an existing onshore treatment facility.[12]

In 1987, Exxon revised the DPP for the SYU to include additional details regarding the installation of the three platforms in the SYU, which are now known as Hondo, Harmony and Heritage.  The revised DPP also included additional information regarding the Offshore Pipelines and their connection to onshore facilities in Las Flores Canyon.  This DPP was found complete by MMS on September 29, 1987. The Commission received the DPP revision from MMS on December 22, 1987.[13]

After analyzing the revised DPP, on February 23, 1988, through Consistency Certification No. CC-64-87 ("Consistency Certification"), the Commission concurred with Exxon's certification for the revised DPP nearshore and onshore portions of the SYU, having already concurred with the OCS portions of the SYU through consistency certification No. CC-8-83 . The Commission stated that: "By concurring in Exxon's certification, the Commission informs [federal agencies] that it considers the nearshore and onshore portions of Exxon's [DPP] to be consistent with the [California Coastal Management Program under the CZMA]."[14] On the same day, after reviewing the revised DPP that set forth the work to be undertaken in state waters, the Commission also approved Coastal Development Permit No. E-88-1 for the nearshore portions of the SYU, including the Offshore Pipelines (the "Offshore CDP").[15]

---

[10] See Document No. 4, Minerals Management Service, Development and Production Plan Approval (September 20, 1985).

[11] 30 C.F.R. §550.201(a).

[12] See Document No. 16, Compendium of California Coastal Commission Decisions Under the Federal Consistency Provisions (March 30, 1990), pp. 265-266.

[13] See Document No. 13, MMS, DPP Approval (April 4, 1988).

[14] See Document No. 11, Staff Recommendation on Permit and Consistency Certification, p. 24.

[15] See Document No. 12, Coastal Commission, Letter to Exxon from Coastal Commission, attaching Consistency Certification Concurrence and CDP (March 17, 1988).

LATHAM&WATKINS LLP

On April 4, 1988, MMS approved the revisions to the DPP.[16]  While the DPP has been revised since 1988, as it relates to the offshore pipelines, the 1988 DPP is the controlling approval for the offshore pipelines' installation, as well as for their ongoing maintenance and operation.[17]  The 1988 DPP is the version of the DPP in existence when the Commission provided its Consistency Certification and approval of the Offshore CDP for the Offshore Pipelines. The 1988 DPP continues to govern the maintenance and operation of the pipelines today.

### B.      Las Flores Pipeline System

The State Lands Commission ("SLC") and federal Bureau of Land Management and Department of the Interior prepared a joint Environmental Impact Report and Environmental Impact Statement ("EIR/EIS") for what was then known as the "Celeron Pipeline Project" (also referred to herein as the "Pipeline Project"), which included the Onshore Pipelines that are now known as Lines CA-324 and CA-325, pursuant to the California Environmental Quality Act ("CEQA") and National Environmental Policy Act ("NEPA").  The SLC certified the EIR/EIS in January 1985.  Lines CA-324 and CA-325 were located as an environmentally superior alignment to minimize impacts to environmental resources (including topography, viewshed, watersheds, etc.).[18]  After reviewing the EIR/EIS, the County Planning Commission made a final decision to approve the Pipeline Project Final Development Plan ("FDP") (Case # 85-DP-66cz) and Major Conditional Use Permit ("CUP") (Case # 83-CP-97cz) on February 18, 1986.[19]  The approval was not challenged during the appeal period and the Planning Commission's approval action became final and effective.

Consistent with the Onshore Pipelines' FDP approval, the County issued Coastal Development Permit CDP 86-CDP-189 for the Pipeline Project on July 27, 1986.[20]  CDP 86-CDP-189 approved "[c]learing, grading and trenching activities for [the] Celeron Pipeline Project as approved by 85-DP-66cz."  The CDP incorporated "[t]he project description, pipeline route, conditions and plans required pursuant to those conditions described by the approved Final Development Plan 85-DP-66cz."  CDP 86-CDP-189 also excluded "all activities related to pumpstations, river crossings, pipe stringing, welding, and any other activities not normally performed by the clearing, grading and trenching construction crews."  Then, on August 5, 1986, the County issued Coastal Development Permit CDP 86-CDP-205 for the "[r]emainder of all construction activities for the Celeron Pipeline [P]roject as approved by 85-DP-66cz."[21]  CDP 86-CDP-205 also incorporated "[t]he project description, pipeline route, conditions and plans required pursuant to those conditions described by the approved Final Development Plan 85-DP-66cz."  CDP 86-CDP-189 and CDP 86-CDP-205 are collectively referred to herein as the

---

[16] See Document No. 13, DPP Approval (April 4, 1988).

[17] The 1988 DPP is attached as Document No. 8.

[18] See Document No. 5, County Planning Commission Actions for Celeron Pipeline Project (Mar. 3, 1986) ("1986 Planning Commission Action"), p. 54 ("Overall, the route chosen is environmentally preferable to any complete alternative route.").

[19] The Final Development Plan approved by the County contain the Pipeline Project's Conditions of Approval.  See Document No. 5, 1986 Planning Commission Action.

[20] See Document No. 6, County Coastal Development Permit 86-CDP-189 (July 27, 1986).

[21] Document No. 7, County Coastal Development Permit 86-CDP-205 (August 5, 1986).

**LATHAM&WATKINS**LLP

"Onshore CDPs." The Onshore CDPs were not challenged during the appeal period and became final and effective.[22] The conditions of approval for the pipelines' FDP, CUP, and Onshore CDPs are all governed under the same Conditions of Approval found in Case #85-DP-66cz, as amended by the County. The County has amended the Conditions of Approval from time to time, and as such identifies the Conditions of Approval with reference to each of the following case numbers: 88-DPF-033 (RV01)z, 88-CP-60 (RV01), 88-DPF-25cz, 85 DP-66cz, and 88DP-25cz.[23]

## III.    ONSHORE PIPELINE ACTIVITIES

### A.    Introduction

On September 27, 2024, Commission staff issued the 2024 NOV regarding Sable's "work to address pipeline corrosion" (also known as anomaly repair work) and "install new safety valves" along the Onshore Pipelines.[24] Commission staff subsequently issued a letter requesting more information regarding such work on October 4, 2024 ("October 4 Letter").[25] Sable provided the information requested in the October 4 Letter to Commission staff on October 8, 2024.[26] Sable provided additional information in response to Commission staff's requests on October 11, 2024.[27] On October 22, 2024, Sable submitted a written request asking that Commission staff authorize it to complete interim restoration work to alleviate the risk of immediate environmental harm resulting from Sable's work stoppage in compliance with the 2024 NOV and October 4 Letter.[28] On November 12, 2024, Commission staff issued Executive Director Cease and Desist Order ED 24-CD-02 ("2024 EDCDO"), which allowed for Sable's preparation of an Interim Restoration Plan, to be approved by Commission staff, in order to address such risks of immediate environmental harm resulting from open excavation sites.[29] Sable worked cooperatively with Commission staff to finalize and implement the Interim Restoration Plan required under the 2024 EDCDO. On February 14, 2025, following the County's written confirmation that Sable's anomaly repair work had been authorized by the Onshore CDPs for the Onshore Pipelines, Sable formally responded to the 2024 NOV.[30]

This section first addresses the 2024 NOV's allegations regarding Sable's anomaly repair work including additional detail regarding the communications between Commission staff and

---

[22] See Coastal Act Regulations, § 13313 (coastal development permits "issued by the local government shall become final unless a valid appeal is filed with the commission").

[23] See Document No. 56, Las Flores Pipeline System Final Development Plan Conditions (October 30, 2024) ("2024 Conditions").

[24] Document No. 48, Coastal Commission, Notice of Violation V-9-24-0152 (September 27, 2024) ("2024 NOV").

[25] Document No. 50, Coastal Commission, Letter re: "Confirmation of Suspension of Current Operations" (October 4, 2024) ("October 4 Letter").

[26] See Document No. 51, Letter re: "Sable Offshore Corporation Notice of Violation (V-9-24-0152) – Responses to October 4, 2024 Letter" (October 8, 2024).

[27] See Document No. 52, Map re: "Coastal Zone Open Digs" (October 11, 2024),

[28] See Document No. 54, Letter re: "Sable Offshore Corporation Notice of Violation (V-9-24-0152) – Request to Complete Interim Work" (October 22, 2024).

[29] See Document No. 58, Executive Director Cease and Desist Order ED-24-CD-02 (November 12, 2024).

[30] See Document No. 86, Letter re: "Sable Offshore Corp. Notice of Violation (V-9-24-0152) for Las Flores Pipelines CA-324 and CA-325, Santa Barbara County" (February 14, 2025).

LATHAM&WATKINS LLP

Sable noted above, and then separately addresses allegations regarding Sable's safety valve installation work.

### B.    Anomaly Repair Work

#### 1.    Short Summary

Contrary to the EDCDO/NOI's assertion that Sable's anomaly repair work lacks "the requisite Coastal Act authorization," the County expressly has confirmed to the Commission in writing that no new or amended coastal development permit is required for such work because it was authorized under the Onshore CDPs previously approved by the County.[31]  Specifically the County confirmed that Sable's work to repair and remedy the Onshore Pipeline's anomalies and all individual components of such work, such as associated excavation and fill activities and work required to access the anomaly sites, were contemplated and approved as ongoing repair and maintenance work that was anticipated to occur over the pipelines' operational lifetime when the County first approved the Onshore Pipelines in the 1980s.  Because this work is required under applicable federal regulations and to ensure the pipelines' safe operation, its potential environmental impacts were thoroughly analyzed and considered during the pipelines' original environmental review and subject to mitigation and Condition of Approval requirements.

As a result, throughout the Onshore Pipelines' operating history the County consistently has found anomaly repairs to be within the scope of, contemplated, authorized, and analyzed by (i) the Onshore Pipelines' original environmental review under CEQA and NEPA conducted by the SLC and federal Bureau of Land Management and Department of the Interior; and (ii) the County under the pipelines' previously approved FDP, CUP, Onshore CDPs, and associated Conditions of Approval.  Although the County has issued separate coastal development permits for major pipeline improvements such as relocations and realignments since the pipelines' CDPs were first issued, the County has *never* required a new or amended coastal development permit for anomaly repair work in the 30 years since the pipelines were built.[32] Importantly, *during that 30-year history the Coastal Commission has never asserted that any anomaly repairs have required a new or amended coastal development permit or any other Coastal Act authorization*, and the Commission never has attempted to take jurisdiction or assert enforcement authority over any County-authorized anomaly repair work.

As described in further detail below, the Commission lacks the authority to supersede the County's confirmation as to the scope of the County's own Onshore CDPs issued pursuant to its delegated Local Coastal Program ("LCP") permitting authority under the Coastal Act.  As such, because Sable's anomaly repair work has been fully authorized by the County under the Coastal Act, no new or amended coastal development permit is required for such work, and the Commission may not undertake enforcement action with respect to such work as asserted in the EDCDO/NOI.

---

[31] Document No. 90, EDCDO/NOI, p. 2.

[32] See Document Nos. 17, 20, and 21, County CDPs 90-CDP-175 (pipeline realignment), 97-CDP-255 (pump station tank replacement), 00-CDP-069 (pipeline realignment).

LATHAM&WATKINS LLP

2.      Anomaly Repair Work Background

Several months ago, Sable had undertaken steps to repair certain 'anomalies' detected along Line CA-324 and planned to repair other identified anomalies along both Lines CA-324 and CA-325.[33]  Sable undertook the anomaly work based on its understanding that no new coastal development permit or other Coastal Act authorization was required, consistent with the County's practice of authorizing repair work on the Onshore Pipelines since they were first permitted and built over 30 years ago.  Any impacts associated with ongoing repair and maintenance activities along the Onshore Pipelines, including anomaly repair work, were thoroughly analyzed, subject to mitigation requirements, and previously approved under the Onshore Pipelines' environmental review, Onshore CDPs, FDP, CUP, and Conditions of Approval.  Additionally, throughout the course of Sable's anomaly repair work, Sable implemented several construction best management practices to ensure that impacts to coastal resources, biological resources, and archaeological resources remained consistent with and within the scope of the Onshore Pipelines' prior impact analyses.[34]  Contrary to the EDCDO/NOI's assertion that such work threatened "significant damage to coastal resources," ecological and archaeological resources analyses have confirmed that with implementation of the best management practices there are no new significant impacts from the work and impacts remain within the scope of those previously analyzed and approved.[35]

A pipeline "anomaly" refers to a pipeline segment with some deviation from its original configuration.  Sable is required to conduct anomaly inspections and all associated repair work to comply with a Consent Decree involving the Onshore Pipelines as well as applicable federal regulations that specifically require pipeline operators to "take prompt action to address all anomalous conditions in [any] pipeline," and repair any such conditions that meet thresholds set forth in those regulations.[36]  The EDCDO/NOI urges that, due to the "history of the site," the "2015 pipeline failure and resulting Refugio Oil Spill," "utmost caution" is required before any anomaly repair work is undertaken.[37]  However, the Consent Decree and federal regulations require anomaly repair work specifically because such work *reduces and avoids* the risk of

---

[33] Sable's anomaly repair work was conducted in conformance with the standards of numerous state and federal regulatory agencies and industry standards groups including but not limited to CalOSHA, PHMSA, CDFW-OSFM, American Petroleum Institute (API), American Society of Mechanical Engineers (ASME), American Society of Testing Materials (ASTM), Society for Protective Coatings (SSPC Standards), and American National Standards Institute (ANSI).

[34] See Documents No. 65 and 92, "Zoning Clearance Application for Open Anomaly Sites" (November 22, 2024), Attachment A, "Materials Regarding Completed Anomaly Sites" (March 6, 2025), Attachment A.  Similarly, Sable intended to complete all remaining "Planned" anomaly repairs in the Coastal Zone subject to construction best management practices.  See Document No. 74, "Zoning Clearance Application for Planned Anomaly Sites" (December 6, 2024), Attachment A.

[35] Document No. 90, EDCDO/NOI, p. 4.  See Documents No. 65 and 92, "Zoning Clearance Application for Open Anomaly Sites" (November 22, 2024), Attachments D.1, and D.2, "Materials Regarding Completed Anomaly Sites" (March 6, 2025), Attachments D.1 and D.2.  See also Document No. 74, "Zoning Clearance Application for Planned Anomaly Sites" (December 6, 2024), Attachments D.1 and D.2.

[36] 49 C.F.R. § 195.452(h)(1).  See Document No. 35, Consent Decree issued in *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*, Case No. 2:20-cv-02415, (C.D. Cal. Mar. 13, 2020).

[37] Document No. 90, EDCDO/NOI, p. 4.

LATHAM&WATKINS LLP

"damage to coastal resources" resulting from an oil spill.[38]  Put differently, Sable's anomaly repair work is an important protective measure for coastal resources and part of exercising the "utmost caution" urged by Commission staff – not an activity that threatens coastal harm or increases the risk of a potential future oil spill.

Sable detects anomalies by using a roving data gathering instrument located within the pipeline interior, typically referred to as an inspection "pig," which examines a pipeline's conditions as the pig travels through the Onshore Pipelines.  Data collected from the inspection pig is used to identify the approximate location of anomalies from the surface so that excavation and repair activities can be planned.  Sable generally must complete the following steps to repair any particular anomaly detected by the pig:  (1) access the affected pipeline segment via existing roadways and rights-of-way, which in some locations requires placing metal plates over water courses; (2) excavate the anomaly site, including the dirt beneath the affected pipeline segment, which in some locations may require dewatering and associated discharge; (3) expose the pipeline segment by removing insulation and sandblasting; (4) evaluate whether a "Composite Repair" or "Cut-Out Repair" is required,[39] (5) conduct the Composite or Cut-Out Repair as appropriate, sandblast the repaired pipeline segment, and apply an epoxy coating, pipe tape, and rockguard wrap; (6) backfill the anomaly site, and (7) conduct final site cleanup including erosion control and revegetation work (collectively, the "Anomaly Repair Work").[40]  Anomaly Repair Work is short-term and temporary (often lasting less than a week) within the Onshore Pipelines' operational right-of-way.  It requires the use of heavy equipment and may involve the removal of vegetation.

Through its inspection pig activities, Sable identified one hundred and twenty-one (121) anomalies where Anomaly Repair Work was required within unincorporated Santa Barbara County and within the Coastal Zone.  Sable completed the Anomaly Repair Work at forty-eight (48) of these anomaly sites before receiving the 2024 NOV and October 4 Letter.[41]  Forty-five (45) anomaly sites were open (i.e., excavation and other steps had been undertaken, but the Anomaly Repair Work had not been completed) at the time Sable received the 2024 NOV and October 4 Letter.[42]  At that time, twenty-eight (28) remaining anomaly sites had been identified for future Anomaly Repair Work that had not yet commenced.[43]

Despite Sable's obligation to promptly complete the Anomaly Repair Work under the Consent Decree and applicable federal regulations, and its understanding that no further Coastal Act permitting was required for such work, Sable stopped work at active anomaly repair sites in compliance with the 2024 NOV and October 4 Letter in order to explore Coastal Commission staff's allegations further with both Commission staff and the County.  Sable worked

---

[38] *Ibid.*

[39] A "Composite Repair" involves wrapping the exposed pipeline segment in a composite material and allowing the material to cure, whereas a "Cut-Out Repair" involves cutting out and replacing the exposed pipeline segment, welding in place the replaced pipeline segment, and X-raying the replaced segment to confirm the repair is completed.

[40] A typical cross-section showing a site undergoing Anomaly Repair Work is attached as Document No. 53.

[41] See Document No. 92, "Materials Regarding Completed Anomaly Sites" (March 6, 2025), Attachment C-1.

[42] These open anomaly repair sites are depicted in Document No. 52.

[43] These planned anomaly repair sites are depicted in Document No. 75.

LATHAM&WATKINS LLP

cooperatively with Commission staff to address immediate environmental concerns that were created by stopping work and leaving anomaly dig sites open and exposed (e.g., risks related to the structure of the Onshore Pipelines, corrosion, flooding, hazards for livestock, and terrorism and vandalism).  In light of these concerns, Commission staff issued the 2024 EDCDO and Sable complied with its requirements regarding the preparation of an Interim Restoration Plan, obtained Commission staff's approval for that plan, backfilled the open anomaly repair sites (without completing the anomaly repairs), implemented erosion control best management practices, hydroseeded restored sites with a local native seed mix approved by Commission staff, and installed protective fencing.  Sable did not concede that a coastal development permit was necessary to authorize the Anomaly Repair Work and informed Commission staff that further investigation into the County's records and discussions with County staff were required to determine whether any further Coastal Act authorization was required.

As detailed below, based on Sable's extensive review of the County's records, as well as the County's subsequent confirmation, the record shows that Sable's Anomaly Repair work was authorized by the Onshore CDPs.  Specifically, the Onshore CDPs approved ongoing repair and maintenance activities on the Onshore Pipelines, including the excavation and repair of identified anomalies, during the Onshore Pipelines' lifetime.

3.    The Original Approvals and Environmental Review for the Onshore Pipelines Contemplated and Analyzed Future Anomaly Repair Work

a.    *Pipeline Project EIR/EIS*

Future repair and maintenance activities such as the Anomaly Repair Work, and any related environmental impacts, were included and evaluated as part of the Pipeline Project's environmental review under the California Environmental Quality Act and National Environmental Policy Act (the "Onshore EIR/EIS").[44]

The Onshore EIR/EIS explains that its impact analysis extends through the Onshore Pipelines' entire lifetime, including both pipeline "operation" and "maintenance."[45]  The Onshore EIR/EIS specifically acknowledges that routine maintenance activities like the Anomaly Repair Work would occur during the Onshore Pipelines' ongoing operation.  For example, the Onshore EIR/EIS incorporates into the Pipeline Project's project description certain Oil Spill Contingency and Emergency Response Plans that address ongoing pipeline maintenance activities.  These plans (which were directly attached to the Draft Onshore EIR/EIS and were available for public review and comment) acknowledged the Onshore Pipelines' ongoing inspection requirements, including the use of inspection "pigs" to "measure the severity of

---

[44] See Proposed Celeron / All American and Getty Pipeline Projects Environmental Impact Report/Environmental Impact Statement (EIR/EIS), SCH No. 83110902 (1984, 1985).  The Draft Onshore EIR/EIS for the Pipeline Project is attached as Document No. 2 and available on the County's website here, and the Final EIR/EIS for the Pipeline Project is attached as Document No. 3 and available here.

[45] Document No. 3, Final Onshore EIR/EIS, Abstract, p. 2.  The operational life of the Onshore Pipelines was assumed to continue until the "availability of crude oil" for the use in the pipelines was exhausted.  Document No. 2, Draft Onshore EIR/EIS, p. 2-35.

LATHAM&WATKINS LLP

corrosion and to inspect pipeline defects."[46]  The plans confirmed that, if required, identified pipeline defects (i.e., anomalies) would be repaired, "cleaned and recoated" or "removed and replaced," and "faulty … sections of pipe would be replaced as necessary."[47]  The Onshore EIR/EIS concludes that compliance with these plans would "substantially reduce the oil spill risk" and reduce any significant impacts that would result from a major oil spill, including impacts related to soils, surface water, aquatic biology, and land use and recreation.[48]  The County's Statement of Overriding Considerations also concluded that compliance with these plans, identified mitigation measures, and the Conditions of Approval would "mitigate[] as completely as possible" all "potential oil spill impacts" and other potentially significant impacts resulting from the Pipeline Project.[49]

The scope of anomaly repairs analyzed in the Onshore EIR/EIS involve the exact same steps as described above for the Anomaly Repair Work.  First, crews must access the anomaly repair sites using the same methods required to install the Onshore Pipelines in the first instance.  The Onshore EIR/EIS acknowledged that constructing the pipeline route would involve "surface travel" over "[e]xisting roads or the ROW [right-of-way] itself," which could involve crossing "minor unpaved roads" and "stream crossings."[50]  Once an anomaly repair site is accessed, the Onshore EIR/EIS anticipated that the anomaly repairs would involve excavating and dewatering (if necessary) the affected pipeline segments, inspecting the pipelines, conducting repairs, reapplying insulation and outer wrap, and backfilling the repaired pipeline area.[51]  Significantly, in performing its analysis of future anomaly repairs along the pipelines' route, the Onshore EIR/EIS acknowledges that impacts to environmentally sensitive habitat areas (ESHA), such as oak woodlands, within the pipelines' right-of-way would be permanent (i.e., extending throughout the pipelines' lifetime due to anticipated and ongoing maintenance activities) and constitute a significant environmental impact.[52]  The Onshore EIR/EIS imposes no limitation on the number of sites where anomaly repairs may be undertaken at any one time or over the Onshore Pipelines' lifetime.  As such, the pipeline anomaly repairs contemplated under the Onshore EIR/EIS may be undertaken at any number of sites where such work is necessary at the same time or over a condensed period without constituting a new or modified project under CEQA.[53]

---

[46] Document No. 2, Draft Onshore EIR/EIS, Appendix H, p. 37.

[47] *Ibid.*; Document No. 3, Final Onshore EIR/EIS, RTC 37-4.  The Onshore EIR/EIS's conclusions regarding the risk of oil spills, ruptures or leaks were predicated upon the pipeline operator's ability to repair anomalies detected in the pipelines.  See Document No. 2, Draft Onshore EIR/EIS, p. 4-35 ("Large spills, ruptures, or detectable leaks are less probable in terms of potential groundwater contamination because in these instances the pipeline valves would be closed immediately and the defect repaired.").

[48] Document No. 2, Draft Onshore EIR/EIS, pp. S-5 through S-14.

[49] Document No. 5, 1986 Planning Commission Action, pp. 55-56.

[50] Document No. 2, Draft Onshore EIR/EIS, pp. 2-4, 2-26, 2-30.

[51] See Document No. 2, Draft Onshore EIR/EIS, pp. 4-35 (acknowledging that "localized dewatering" would result in "negligible" impacts when required as part of pipeline "excavation and burial"); 2-22 ("any repairs would have field applied insulation and outer wrap prior to lowering in and backfill operations").

[52] See, *e.g.*, *id.*, p. 4-57 ("About 220 acres of oak woodlands would be removed for the life of the project.").

[53] See *Committee for a Progressive Gilroy v. State Water Resources Control Bd.* (1987) 192 Cal. App. 3d 847, 862-63 (subsequent action approving project operations within limits specified in original EIR does not constitute a new

LATHAM&WATKINS LLP

The Anomaly Repair Work occurs within the boundaries of the right-of-way analyzed in the Onshore EIR/EIS, which was disturbed by Onshore Pipeline construction and has remained impacted by ongoing pipeline inspection and operational activities.[54]  Pipeline construction disturbed a corridor approximately 100-feet in width in the Coastal Zone, resulting in the removal of mature vegetation and ESHA, such as oak trees, and minor alterations to existing landforms.  Lines CA-324 and CA-325 commenced operations in 1994 and 1991 respectively.  Since then, the Onshore Pipelines' right-of-way has remained relatively devoid of mature vegetation, manmade structures, and other obstructions to prevent root-borne damage to the pipelines and facilitate prompt and continuous maintenance, repair, and inspection of the pipeline system.  As such, an October 2020 Biological Resources Assessment confirmed that major work could be conducted in the Onshore Pipelines' maintenance corridor without "any substantial adverse effects on or significant impacts to biological, botanical, wetland, or riparian habitat resources."[55]  The Assessment's conclusion was based in part on the fact that Lines CA-324 and CA-325's maintenance corridor ran through already-disturbed "openings" in woodland and shrubland habitat.[56]  The Assessment's conclusion also took into account potential impacts to ESHA located in proximity to the portions of Lines CA-324 and CA-325 located within the Coastal Zone.[57]

Accordingly, the Anomaly Repair Work – including its inspection, site access, excavation, and backfilling components – falls well within the scope of the repair and maintenance activities disclosed and analyzed under the prior environmental documentation for the Pipeline Project.

>           b.           *Conditions of Approval*

The Pipeline Project's Conditions of Approval, which were incorporated by reference into the FDP, CUP, and Onshore CDPs for the Onshore Pipelines, encompassed the same operational and maintenance components of the Pipeline Project as described in the Onshore

---

project requiring additional CEQA review); *County of Mono v. City of Los Angeles* (2022) 81 Cal.App.5th 657, 675 (subsequent action authorized by leases already subject to CEQA review does not constitute a new project triggering additional CEQA review).

[54] See Document No. 36, SCS Engineers, "Line 901 & Line 903 Replacement Project: 2nd Revised Biological Resources Assessment" (October 5, 2020), p. 19 ("[A]lthough existing conditions of the pipeline right-of-way vary, the majority of the corridor shows the initial Line 901/903 construction and subsequent ongoing maintenance activities have resulted in a readily recognizable corridor of predominately grassland habitat (60%) ….").  The "Replacement Project" proposed to replace Lines CA-324 and CA-325 (including the portions of the pipelines within the Coastal Zone) with a new pipeline that would be constructed parallel to the original pipeline.  Although the Replacement Project ultimately was abandoned during the entitlement process, the Biological Resources Assessment remains relevant for its analysis of the biological setting surrounding Lines CA-324 and CA-325.

[55] *Id.*, p. 95.

[56] *Ibid.*

[57] See *id.*, p. 56.

US-DOCS\157775115

**LATHAM**&**WATKINS**LLP

EIR/EIS and, contrary to the EDCDO/NOI's assertions, confirm that no new or amended coastal development permit is required for the Anomaly Repair Work.[58]

For example, Condition J-11 acknowledges that the Onshore Pipelines' right-of-way will be used for "operational maintenance" after construction is completed.[59] Commission staff dismisses this acknowledgement as vague because it is "different from identifying the type, nature, and effects of such work."[60] To the contrary, Condition J-11 is broadly drafted to cover the varied types of repair and maintenance activities discussed in the Onshore EIR/EIS, which are necessary for the safe operation of the Onshore Pipelines. Specifically, Condition J-11 provides "[f]ollowing installation of the [Onshore Pipelines], use of the right-of-way is restricted to operational maintenance …." Just as Condition J-11 acknowledges ongoing operational maintenance activities in the right-of-way, the Conditions of Approval expressly incorporate the Onshore EIR/EIS's project description, which, as described above, included analysis of impacts extending throughout the Onshore Pipelines' operational life, including repair and maintenance activities like the Anomaly Repair Work.[61] The Onshore EIR/EIS's assumption that anomaly repairs would be performed on an ongoing basis is consistent with federal regulatory requirements that pipeline operators must "take prompt action to address all anomalous conditions in the pipeline that the operator discovers."[62]

Condition P-2 similarly contemplates that the pipeline operator will conduct "regular maintenance and safety inspections," "corrosion monitoring and leak detection," and "periodic safety audits."[63] Condition P-2 also acknowledges that federal regulations require the pipelines' operator to undertake certain repair and maintenance activities such as the Anomaly Repair Work. The County later amended this Condition in 1987 to expressly state that "[p]ermits may not be withheld or suspended due to County concerns which are under the jurisdiction of 49 CFR Part 195 (Transportation of Hazardous Liquids by Pipeline), with the exception of areas/issues agreed to by the permittee and the County."[64] The Anomaly Repair Work falls directly within Sable's obligations under 49 C.F.R. § 195.452(h)(1), which requires operators to "take prompt action to address all anomalous conditions in the pipeline that the operator discovers." As such, Condition P-2 confirms that required repair and maintenance activities like the Anomaly Repair Work would be undertaken pursuant to the pipelines' Conditions of Approval, FDP, and CDPs rather than requiring new or modified permits.

Commission staff argues that Condition P-2's requirement that permits cannot be "withheld or suspended due to County concerns which are under the jurisdiction of 49 CFR Part

---

[58] See Document No. 56, 2024 Conditions, p. 8 ("This permit is premised upon findings that where feasible, all significant environmental effects of the project identified in the EIR/EIS [], which occur in Santa Barbara County, will be substantially mitigated by the permit conditions.")

[59] *Id.*, at p. 31.

[60] Document No. 88, Coastal Commission, Letter re: "Notice Prior to Issuance of Executive Director Cease and Desist Order" (February 16, 2025).

[61] See Document No. 56, 2024 Conditions, p. 8.

[62] 49 C.F.R. § 195.452(h)(1).

[63] Document No. 56, 2024 Conditions, at p. 38.

[64] *Ibid.*

LATHAM&WATKINS LLP

195" actually "reinforces the fact that future permits were, in fact, contemplated."[65]  Commission staff's interpretation reaches too far.  Condition P-2's language simply constitutes an acknowledgement by the County that its authority over pipeline safety repairs is limited; it does not affirmatively suggest that future pipeline repair work requires new coastal development permits or other Coastal Act authorizations.[66]  Moreover, Commission staff's interpretation is in direct conflict with the County's permitting history for the Onshore Pipelines over the past 30 years where the County consistently has authorized Anomaly Repair Work without requiring a new or amended coastal development permit.[67]  The County's interpretation of the Onshore CDPs and its associated permits and environmental analysis are entitled to deference particularly where, as is the situation here, the Coastal Commission has not objected to or sought authority over the County's permitting actions for decades.[68]

Commission staff also argue that the Conditions of Approval did not account for "unidentified future work with [] unknown circumstances, scoping and timing … and its resulting impacts," and failed to consider potential impacts to "other types of sensitive coastal resources."[69]  To the contrary, the Onshore EIR/EIS and Conditions of Approval addressed biological impacts from the installation of the Onshore Pipelines and their ongoing repair and maintenance, such as the Anomaly Repair Work and imposed mitigation to account for permanent impacts during the Onshore Pipelines' operational lifetime.  The Commission never objected to these impact analyses or argued that they insufficiently captured impacts to coastal resources when the County first issued the Onshore CDPs initially authorizing this work.

More specifically, rather than attempting to predict specific timelines for such common, frequent repair work on any pipeline, the Onshore EIR/EIS assumed that terrestrial biology within the Onshore Pipelines' operational right-of-way would be *permanently* impacted by ongoing repair and maintenance activities like the Anomaly Repair Work, and the Conditions of Approval incorporated mitigation to account for these permanent impacts.[70]  For example, Condition H-1(j) originally required the pipeline operator to develop a "plan for *off-site*

---

[65] Document No. 88, Coastal Commission, Letter re: "Notice Prior to Issuance of Executive Director Cease and Desist Order" (February 16, 2025).

[66] Whether Sable's repair and maintenance work also implicates permitting obligations with respect to the California Department of Fish and Wildlife or Regional Water Quality Control Board is irrelevant to whether such work is authorized under the County's Onshore CDPs, which constituted the authorization for such work under the Coastal Act.

[67] See Document Nos. 26, 25, and 19, County Land Use Permit Nos. 14LUP-00000-00168 (May 28, 2014), 14LUP-00000-00035 (Apr. 2, 2014), 95-LUS-418 (Oct. 30, 1995); see Document Nos. 27 and 31, County Zoning Clearance Nos. 14ZCI-00000-00086 (Sep. 24, 2014), 14ZCI-00000-00121 (Nov. 25, 2015).

[68] For example, in *Malaga County Water Dist. v. State Water Resources Control Bd.*, the Court of Appeal held that laches is an equitable defense to a state agency's administrative enforcement action where the agency's claim was unreasonably delayed and thereby resulted in prejudice. ((2020) 58 Cal.App.5th 447, 462-471.)  Similarly, here, the Coastal Commission's sudden assertion that the County's Onshore CDPs do not allow for the Anomaly Repair Work is unreasonably delayed and prejudiced Sable because the County has allowed anomaly repair work to occur for decades under the Onshore CDPs and Sable undertook the Anomaly Repair Work without seeking additional Coastal Act authorization based on that past practice, which the Commission had never challenged.

[69] Document No. 88, Coastal Commission, Letter re: "Notice Prior to Issuance of Executive Director Cease and Desist Order" (February 16, 2025).

[70] See Document No. 56, 2024 Conditions, p. 13.

LATHAM&WATKINS LLP

*reestablishment* of oaks to mitigate impacts to oak savannahs and woodlands along the route."[71] The County later modified this condition to require the pipeline operator to endow an Alternative Oak Mitigation Program to reestablish oak savannahs and woodlands in Santa Barbara County at an off-site location to mitigate for the Project's permanent on-site oak tree impacts.[72] Similarly, Conditions H-10 and H-11 required the pipeline operator to, after construction, replace and revegetate any disturbed catalina mariposa lily and refugio manzanita in locations "in or near" the disturbed area, but "*exclusive of the operation [right-of-way]*."[73] Erosion control was the key objective for any required revegetation along the pipelines' operational right-of-way – not the long-term reestablishment of sensitive species – because it was clearly understood that the Onshore Pipeline's right-of-way would continue to be disturbed regularly in the coming decades by ongoing pipeline operation and maintenance.[74]

These Conditions confirm that any biological impacts along the Onshore Pipelines' operational right-of-way resulting from the Anomaly Repair Work are within the scope of impacts previously approved by the County. Sable also implemented several construction best management practices to ensure that impacts to coastal resources, biological resources, and archaeological resources were consistent with the Onshore Pipelines' prior impact analyses related to ongoing repair and maintenance, and subsequent ecological and archaeological resources analyses have confirmed that impacts resulting from such work remained within the scope of impacts previously analyzed and approved.[75] As such, any impacts resulting from the Anomaly Repair Work already have been considered, approved, authorized, and subject to mitigation. Neither the Conditions of Approval nor the Onshore EIR/EIS' analysis contemplate that additional environmental review or permitting would be required to undertake the operational maintenance work that the Onshore EIR/EIS identified would occur over the pipelines' lifetime.

As described above, the County's Statement of Overriding Considerations concluded that the pipeline operator's compliance with the Conditions of Approval would "mitigate[] as completely as possible" all "potential oil spill impacts" and other potentially significant impacts resulting from the Pipeline Project.[76] The County is obligated to ensure compliance with its Statement of Overriding Considerations, including the prompt repair of anomalies, to ensure that significant impacts are mitigated to the maximum extent possible.[77] Contrary to the EDCDO/NOI's assertion that the "utmost caution" must be taken before allowing any Anomaly Repair Work, the County's Statement of Overriding Considerations confirms that completing the

---

[71] Document No. 5, 1986 Planning Commission Action, pp. 23-24 (emphasis added)

[72] Document No. 56, 2024 Conditions, p. 21.

[73] *Id.*, p. 22 (emphasis added).

[74] See, *e.g.*, *id.*, at p. 20.

[75] See Documents No. 65 and 92, "Zoning Clearance Application for Open Anomaly Sites" (November 22, 2024), Attachments A, D.1, and D.2, "Materials Regarding Completed Anomaly Sites" (March 6, 2025), Attachments A, D.1 and D.2. See also Document No. 74, "Zoning Clearance Application for Planned Anomaly Sites" (December 6, 2024), Attachments A, D.1 and D.2.

[76] Document No. 5, 1986 Planning Commission Action, pp. 55-56.

[77] See *Sierra Club v. County of San Diego* (2014) 231 Cal. App. 4th 1152, 1167-68 ("Mitigating conditions are not merely expressions of hope. Once incorporated, mitigation measures cannot be defeated by ignoring them ….").

LATHAM&WATKINS LLP

Anomaly Repair Work will serve as a protective measure for coastal resources and *reduce and avoid* any potential oil spill impacts.[78]

Like the Onshore EIR/EIS, the Conditions of Approval also do not impose any limit or require new permits based on the number of sites where anomaly repairs may be necessary or undertaken at the same time or over a condensed period. To the contrary, repair and maintenance activities such as the Anomaly Repair Work fail to trigger any of the narrow circumstances under which the Conditions of Approval would require Sable to obtain a new or modified permit. Condition A-13 provides:

> [The pipeline operator] shall obtain a new or modified permit, or authority to continue operation under the existing permit prior to undertaking any of the following activities which may, in the judgement of the County, result in significant changes to the impacts on the County. Such changes could include but not be limited to 1) major pipeline or pump station modifications; 2) major changes in pipeline throughput; 3) introduction of production to the pipeline from sources other than those described above [noted as the outer continental shelf and other locally produced onshore and offshore petroleum from the Santa Barbara and Santa Maria Basins], and 4) introduction of a different product from any source.[79]

The Anomaly Repair Work does not trigger any of these requirements. The work does <u>not</u> involve: 1) "major pipeline or pump station modifications," as the Anomaly Repair Work is a standard repair and maintenance activity required by 49 C.F.R. § 195.452(h)(1); 2) "major changes in pipeline throughput," because the Work will not increase the pipelines' capacity; 3) "introduction of production … from [new] sources"; or 4) "introduction of a different product."

Commission staff point to Condition A-13's language indicating that major changes requiring a new or modified permit also may include "any … activities which may, *in the judgment of the County*, result in significant changes to the impacts on the County."[80] Here, however, the County has repeatedly determined – and recently confirmed to the Commission in writing – that Anomaly Repair Work does *not* require any new or modified permit.[81] As such, the Anomaly Repair Work does constitute a major change as contemplated under Condition A-13.

In sum, the Anomaly Repair Work falls within the scope of approved repair and maintenance activities contemplated by the Onshore Pipelines' Conditions of Approval, and as analyzed under the Onshore EIR/EIS, to be undertaken without any subsequent or modified coastal development permit or subsequent environmental review.

---

[78] See Document 90, EDCDO/NOI, p. 4.

[79] Document No. 56, 2024 Conditions, p. 4.

[80] See Document No. 88, Coastal Commission, Letter re: "Notice Prior to Issuance of Executive Director Cease and Desist Order" (February 16, 2025); Document No. 56, 2024 Conditions, p. 12. (emphasis added).

[81] Document No. 84, County, Letter re: "Zoning Clearance Applications – 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, 24ZCI-00096" (February 12, 2025).

          c.       *County's Confirmation that Anomaly Repair Work Falls Within Scope of Previously Issued Permits*

Since receiving the 2024 NOV, Sable has engaged in extensive discussions with County staff regarding the Anomaly Repair Work and the scope of the County's prior allowances for similar work. The EDCDO/NOI asserts that "Sable has not submitted any [after-the-fact application] for work previously undertaken along the [Onshore P]ipeline[s]."[82] To the contrary, on November 22, 2024 and December 6, 2024, Sable submitted applications to the County for Zoning Clearances for the Anomaly Repair Work, which included providing the County with additional information including site plans, grading quantities, biological and cultural resource surveys, and best management practices, regarding the work and anomaly dig sites. The County's CZO provides for a Zoning Clearance process whereby the County may review proposed development for compliance with conditions of approval including final development plans, conditional use permits, and coastal development permits.[83] On the basis of the information Sable submitted with the Zoning Clearance applications, the County had the opportunity to review whether the Anomaly Repair Work already was authorized, whether additional information was needed, or whether the County would require a new or amended coastal development permit.[84]

The County reviewed the information Sable submitted with its Zoning Clearance applications and has confirmed in a letter dated February 12, 2025, that the Anomaly Repair Work already is authorized by the pipelines' existing coastal development permits and, consistent with past practice, no new or separate Coastal Act authorization is required for Sable to perform the work ("Anomaly Repair Confirmation Letter").[85] The County's Anomaly Repair Confirmation Letter concludes that the Anomaly Repair Work was "contemplated, analyzed, and approved in the [Onshore Pipelines'] existing Final Development Plan, Major Conditional Use Permit, and associated Coastal Development Permits," "analyzed in the prior Environmental Impact Report/Environmental Impact Statement," and therefore requires "no further application to or action by the County."[86]

As described above, the Anomaly Repair Work was analyzed as an ongoing maintenance activity under the Onshore EIR/EIS, and the Conditions of Approval confirm that such work was authorized by the FDP, CUP, and Onshore CDPs. The County's letter further confirms that Anomaly Repair Work included within Sable's Zoning Clearance applications falls within the scope of the Pipeline Project's previously issued permits. The County reached this conclusion after review of detailed descriptions, plans, and assessments provided to the County by Sable that was included in those Zoning Clearance applications concerning Anomaly Repair Work that was ongoing at the time the 2024 NOV was received as well as proposed future Anomaly Repair Work in the Coastal Zone.

---

[82] Document No. 90, EDCDO/NOI, p. 6.

[83] CZO, §§ 35-174.9.2.c.2, 35-179A.2.b.

[84] See CZO, § 35-179A.2.b.

[85] See Document No. 84, County, Letter re: "Zoning Clearance Applications – 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, 24ZCI-00096" (February 12, 2025).

[86] *Ibid.*

LATHAM&WATKINS LLP

The County's Anomaly Repair Confirmation Letter addressed the particular Anomaly Repair Work that was ongoing at the time Sable received the 2024 NOV as well as proposed future Anomaly Repair Work in the Coastal Zone. The Anomaly Repair Confirmation Letter is limited to those anomaly repairs because the information submitted by Sable to the County on November 22, 2024, and December 6, 2024, only addressed those ongoing and future anomaly repairs. On March 6, 2025, Sable submitted information regarding previously completed anomaly work in the Coastal Zone to the County, and such work is currently under review by the County. Sable's understanding of those previously completed repairs is that they are entirely consistent with the scope of Anomaly Repair Work that the County authorized in the Anomaly Repair Confirmation Letter, and Sable expects that the County's position regarding those previously completed repairs will be the same – specifically that no new or amended coastal development permit is required for those prior repairs either. Like Sable's other Anomaly Repair Work, Sable implemented several construction best management practices to ensure that impacts to coastal resources, biological resources, and archaeological resources were consistent with the Onshore Pipelines' prior impact analyses related to ongoing repair and maintenance, and subsequent ecological and archaeological resources analyses have confirmed that impacts resulting from such work remained within the scope of impacts previously analyzed and approved.[87] Sable will submit to Commission staff any future correspondence from the County regarding these previously completed anomaly repairs.

The County is the delegated permitting authority under the Coastal Act pursuant to its certified LCP. The Coastal Commission first certified the County's LCP in March 1981, at which point the County became the lawful coastal development permitting authority within the County's jurisdiction under the Coastal Act.[88] Pursuant to that authority, in 1986 the County issued the Onshore CDPs. The Onshore CDPs were not appealed by any party, including the Coastal Commission. The CDPs are therefore final, valid, and not subject to further appeal.[89] The County assessed Sable's Anomaly Repair Work, evaluated whether it fell within the scope of the Onshore CDPs, and in the Anomaly Repair Confirmation Letter the County expressly confirmed that such work was fully authorized by the Onshore CDPs.

Commission staff disagrees with the County's assessment and instead asserts that the above-cited Conditions of Approval, EIR/EIS, and mitigation measures imposed by both documents do not constitute "pre-authorization of any and all sorts of repair, maintenance, and upgrades that might be required multiple decades into the future."[90] However, neither Sable nor the County have asserted that "any and all sorts of repair, maintenance, and upgrades that might be required multiple decades into the future" are expressly authorized by the Pipeline Project's existing Onshore CDPs, FDP, and Conditions of Approval. Rather, the only repair and maintenance work that the County authorized in the Anomaly Repair Confirmation Letter relates

---

[87] See Document No. 92, "Materials Regarding Completed Anomaly Sites" (March 6, 2025), Attachments A, D.1 and D.2.

[88] See Pub. Res. Code, § 30519.

[89] See Coastal Act Regulations, § 13313 (CDPs "issued by the local government shall become final unless a valid appeal is filed with the commission").

[90] Document No. 88, Coastal Commission, Letter re: "Notice Prior to Issuance of Executive Director Cease and Desist Order" (February 16, 2025), pp. 2-3.

to the Anomaly Repair Work that Sable identified in its 2024 Zoning Clearance applications. The Anomaly Repair Confirmation Letter does not extend beyond the scope of that work.

In fact, the County repeatedly has required new coastal development permits for other types of pipeline activities that involve more significant work that is beyond the type of repair and maintenance activities involved with the Anomaly Repair Work. For example, in 2000, the County issued CDP 00-CDP-169 for the Gaviota Creek Pipeline Lowering and Relocation Project, which replaced a section of the Onshore Pipelines at the Gaviota Creek crossing with a relocated pipeline segment installed deeper into bedrock.[91] Unlike that far more significant project, the Anomaly Repair Work at issue here is being conducted within the Onshore Pipelines' already-disturbed operational right-of-way and does not result in any changes to the pipelines' alignment or installed depth.

Commission staff ignores that the County – as the applicable agency with delegated authority under the Coastal Act – expressly has confirmed that the Anomaly Repair Work was authorized by the Onshore Pipelines' existing Onshore CDPs, FDP, and Conditions of Approval. Because the County's confirmation was based on substantial evidence, it is entitled to deference.[92] The County's Anomaly Repair Confirmation Letter also is entitled to deference because the County approved the FDP, CUP, Onshore CDPs, and Conditions of Approval in the first instance.[93] The County issued the Onshore CDPs in 1986, and the Onshore CDPs were not appealed by any party, including the Coastal Commission. The County repeatedly has interpreted those Onshore CDPs to have authorized Anomaly Repair Work – while requiring new coastal development permits for more significant Onshore Pipeline work – and has *never* required a new or amended coastal development permit for Anomaly Repair Work in the 30 years since the Onshore Pipelines were built. Notably, the Commission has never asserted that such decisions were made in error or did not comply with the Onshore CDPs. Commission staff has not cited any authority authorizing the Commission to impose its interpretation of the County's previously-issued Onshore CDPs decades after the Onshore CDPs became final.

Although Sable's Zoning Clearance applications allowed the County to confirm that Anomaly Repair Work falls within the scope of the Onshore CDPs, the County also concluded that such work does not actually require Zoning Clearances. As the County's Anomaly Repair Confirmation Letter explained, its "assessment is consistent with the type of reviews conducted by the County, both inside and outside the Coastal Zone, on a regular basis to determine whether proposed development activities fall within the scope of existing permits."[94] Therefore, based on its review, the County confirmed that "no further application to or action by the County is

---

[91] See Document No. 21, Coastal Development Permit 00-CDP-169 (September 19, 2000).

[92] See *Kurtzke v. City of San Diego* (2017) 11 Cal.App.5th 1034, 1040 (City's finding under Planning and Zoning Law was subject to substantial evidence standard, which does not permit courts to "substitute its own findings and inferences" for that of a local agency).

[93] See Pub. Res. Code, § 30600.5. Compare *Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2010) 184 Cal.App.4th 1032, 1047 (local agency "entitled to significant deference" in interpreting its own Municipal Code).

[94] Document No. 84, County, Letter re: "Zoning Clearance Applications – 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, 24ZCI-00096" (February 12, 2025).

LATHAM&WATKINS LLP

required."[95]  This reflects a County understanding that Zoning Clearances should be used before commencing *initial* construction approved under a final development plan and that Zoning Clearances should not be used for each individual element of the approved development or use throughout the life of a project.  Accordingly, the County offered to return the Zoning Clearance applications without taking any action on them other than confirming "that the pipeline anomaly repair work is authorized by the existing permits."[96]

The County's Anomaly Repair Confirmation Letter is not appealable under the CZO or LCP.  The CZO defines certain actions, decisions, and determinations for which an appeal to the Zoning Administrator, Planning Commission, or Board of Supervisors is permitted.[97]  Such appealable actions include decisions on applications for a coastal development permit or other planning permit, determinations as to the meaning or applicability of the CZO, and other decisions for which the CZO identifies the Planning Director as the applicable decision-maker.[98]  The County's Anomaly Repair Confirmation Letter does not fall within any of these categories and is not identified under the CZO as an appealable action.  The Anomaly Repair Confirmation Letter further confirms that it is "not appealable to the Planning Commission [or] Board of Supervisors."[99]  Rather, the Letter is consistent with informal non-discretionary assessments that the County undertakes on a regular basis to assess whether previously-approved development activities conform with their authorizing permits and approvals.  Such ministerial confirmations are not subject to an appeal to any decision-maker within the County.

Moreover, the County's Anomaly Repair Confirmation Letter does not constitute an appealable action under the Coastal Act.  Over the last 30 years, the County has employed different procedures to confirm that anomaly repair work complies with the pipelines' existing FDP and Onshore CDPs.  These procedures have included using the County's Land Use Permit process, the Zoning Clearance process, as well as informal communications between the pipeline operator and the County through which certain anomaly repairs have been authorized.[100]  Regardless of the exact process used, the County's review of anomaly repairs consistently has looked at whether the work proposed has been within the scope of the approved FDP and Onshore CDPs and those reviews have *never* been subject to the Commission's appellate jurisdiction.  The County's confirmation that the work was authorized by the existing Onshore CDPs is "not appealable to the … Coastal Commission" because the County is not taking any

---

[95] *Ibid.*

[96] *Ibid.*

[97] See CZO, § 35-57C.

[98] See *ibid.*, §§ 35-182.3.A, 35-182.4.A.2.

[99] See Document No. 84, County, Letter re: "Zoning Clearance Applications – 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, 24ZCI-00096" (February 12, 2025).  The County's letter is not a determination on an "application for development or the request for exemption or categorical exclusion" under Coastal Act Regulations section 13569.  Instead, it is a confirmation that the proposed work already was authorized under the existing FDP and CDPs and that no application was required.

[100] See Document Nos. 26, 25, and 19, County Land Use Permit Nos. 14LUP-00000-00168 (May 28, 2014), 14LUP-00000-00035 (Apr. 2, 2014), 95-LUS-418 (Oct. 30, 1995); see Document Nos. 27 and 31, County Zoning Clearance Nos. 14ZCI-00000-00086 (Sep. 24, 2014), 14ZCI-00000-00121 (Nov. 25, 2015).  The County's LCP was amended in 2014 to provide for the Zoning Clearance process.  Land Use Permits have not been issued for anomaly repairs since that time.

US-DOCS\157775115

LATHAM&WATKINS LLP

final action or appealable action on an application for a coastal development permit.[101]  Further, the County's letter is not an appealable determination as to whether the Anomaly Repair Work is exempt from coastal development permit requirements under the CZO or the Coastal Act.[102]  The County's Anomaly Repair Confirmation Letter is not a determination of exemption but instead is a confirmation that the work already has been lawfully authorized through the existing Onshore CDPs issued by the County.[103]  As such, the Coastal Act provides no basis for an appeal to the Coastal Commission of the County's Anomaly Repair Confirmation Letter confirming that the Anomaly Repair Work falls within the scope of the Onshore Pipelines' existing approvals. While the CZO and the Coastal Act identify certain actions by the County that may be appealable, Land Use Permits, Zoning Clearances, and other non-discretionary authorizations by the Planning Department are not among them.[104]  The County's confirmation that the Anomaly Repair Work requires no further Coastal Act authorization is therefore final.

> 4.    The County's Confirmation is Not Subject to Sections 30809 or 30810 of the Coastal Act

Commission staff erroneously cite Coastal Act sections 30809 and 30810 for the authority to issue the EDCDO/NOI.  Sections 30809 and 30810 do not, however, vest Commission staff or the full Coastal Commission with a unilateral right to nullify the County's delegated local permitting authority under the Coastal Act simply because Commission staff disagree with the County's interpretation of its own previously-issued coastal development permits.

Sections 30809 and 30810 first authorize a cease and desist order to be issued if the Executive Director or the Coastal Commission determines that an activity has been (or is threatened to be) undertaken that may require "a permit *from the commission* without securing a permit."[105]  Second, a cease and desist order may be issued upon a determination that an activity that has been (or is threatened to be) undertaken that may be "inconsistent with any permit *previously issued by the commission*."[106]  Neither of these scenarios exist here.  To the contrary, as confirmed in the County's Anomaly Repair Confirmation Letter and Sable's February 14, 2025, letter to Commission staff, Sable's Anomaly Repair Work was authorized by the Onshore CDPs, which were issued by the County – *not the Commission*.[107]  The EDCDO/NOI does not allege, and the Anomaly Repair Work does not require, any new or amended coastal

---

[101] See *ibid.*; CZO § 35-186.6; Pub. Res. Code, §§ 30603, 30625; *City of Dana Point v. Cal. Coastal Commission* (2013) 217 Cal.App.4th 170, 188-189 (Section 30625 allows Coastal Commission appeals for "quasi-adjudicatory actions" on coastal development permits or claims of exemption).

[102] See Document No. 84, County, Letter re: "Zoning Clearance Applications – 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, 24ZCI-00096" (February 12, 2025).

[103] See Pub. Res. Code, § 30625.

[104] See CZO, § 35-182.6.1-3.  The County's 2014 LCP Amendment did not change these provisions of the CZO.

[105] Pub. Res. Code, §§ 30809(a), 30810(a) (emphasis added).

[106] *Ibid.*

[107] See Document No. 84, County, Letter re: "Zoning Clearance Applications – 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, 24ZCI-00096" (February 12, 2025).

development permit "from the Commission" and is not subject to a coastal development permit "previously issued by the Commission."[108]

Recognizing that neither of the above-mentioned triggers exist here, Commission staff cite a different subsection of Sections 30809 and 30810, which allow cease and desist orders "to enforce any requirements of a certified local coastal program … or any requirements of [the Coastal Act]" when the "commission requests and the local government … declines to act, or does not take action in a timely manner, regarding an alleged violation which could cause significant damage to coastal resources."[109]  Contrary to the EDCDO/NOI's assertion that "Santa Barbara County has declined to act in a timely manner" regarding the EDCDO/NOI's alleged Coastal Act violations, Commission staff acknowledge that the "County has indicated that it believes the [anomaly repair] work at issue is authorized by prior permits, and [the County] does not agree with Commission staff's conclusion that the [work] constitutes a violation of the Coastal Act and LCP."[110]  Commission staff's disagreement with the County's Anomaly Repair Confirmation Letter does not mean that the County has "declined" to exercise its delegated local permitting authority under the Coastal Act within the meaning of Section 30809 and 30810 and does not vest Commission staff with the right to impose its interpretation upon the County. Because the County has determined that the Anomaly Repair Work does not constitute a violation of the Coastal Act, no cease and desist order may be issued here.

### 5.    No Restoration Order or Penalties May Be Issued

Commission staff also assert that the Commission may issue a restoration order with respect to Sable's Anomaly Repair Work.  To the contrary, the Coastal Act does not allow for a restoration order or any associated administrative penalties to be issued.

Section 30811 of the Coastal Act allows the Commission to issue a restoration order "if it finds that the development has occurred without a coastal development permit from the commission [or] local government, the development is inconsistent with [the Coastal Act], and the development is causing continuing resource damage."[111]  None of those conditions exist here. As described above, the County's Anomaly Repair Confirmation Letter confirmed that the Anomaly Repair Work is authorized by the existing Onshore CDPs, and therefore the work did not "occur[] without a coastal development permit."[112]  The County also confirmed that no further Coastal Act authorization was required for the Anomaly Repair Work, demonstrating that the work was not "inconsistent" with the Coastal Act.[113]  Finally, Sable implemented several construction best management practices to ensure that impacts to coastal resources, biological

---

[108] Pub. Res. Code, § 30809(a).

[109] Pub. Res. Code, §§ 30809(a), 30810(a).

[110] Document No. 90, EDCDO/NOI, pp. 3-4, 8.

[111] Pub. Res. Code, § 30811.  Even if Sable's anomaly repair work were not authorized by the Onshore EIR/EIS, Onshore CDPs, and Pipeline Project's related approvals, such work is not inconsistent with the Coastal Act and could receive a coastal development permit from the County.

[112] *Ibid.*, Document No. 84, County, Letter re: "Zoning Clearance Applications – 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, 24ZCI-00096" (February 12, 2025).

[113] Pub. Res. Code, § 30811; See Document No. 84, County, Letter re: "Zoning Clearance Applications – 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, 24ZCI-00096" (February 12, 2025).

LATHAM&WATKINS LLP

resources, and archaeological resources were consistent with the Onshore Pipelines' prior impact analyses related to ongoing repair and maintenance, and subsequent ecological and archaeological resources analyses have confirmed that impacts resulting from such work remained within the scope of impacts previously analyzed and approved.[114]  Therefore, Sable's Anomaly Repair Work is not "causing continuing resource damage."[115]  Because none of statutorily required conditions exist for the issuance of a restoration order, no restoration order may be issued.

Commission staff also assert that Coastal Act sections 30820, 30821.3, 30821.6, and 30822 authorize penalties to be levied against Sable related to the Anomaly Repair Work.[116] None of those sections apply here and thus no penalties may be levied.

Section 30820 authorizes civil penalties to be imposed by the superior court when a person "undertakes development that is in violation [of the Coastal Act] or that is inconsistent with any coastal development permit previously issued by the commission [or] a local government," and section 30822 authorizes actions for exemplary damages when a person has "intentionally and knowingly violated any provision of [the Coastal Act]."[117]  Similarly, section 30821.3 authorizes the Commission to levy administrative penalties against a person "who is in violation of any provision of [the Coastal Act.]"[118]  Here, Sable's Anomaly Repair Work was expressly authorized by the County's Anomaly Repair Confirmation Letter, which confirmed that the Anomaly Repair Work was authorized under the Onshore Pipelines' existing Onshore CDPs.[119]  As such, Sable's Anomaly Repair Work did not constitute any violation of the Coastal Act, any coastal development permits, or any knowing and intentional violation.

Finally, section 30821.6 authorizes civil liability against persons who "intentionally or negligently violate[] any cease and desist order," with the "actual penalty imposed [to] be reasonably proportionate to the damage suffered as a consequence of the violation."[120]  Here, for the reasons discussed above, neither Commission staff nor the full Commission possess the authority to issue any cease and desist order with respect to the Anomaly Repair Work because such work was authorized by the County's existing Onshore CDPs, as the County's Anomaly Repair Confirmation Letter confirmed.  Sable's continued Anomaly Repair Work occurred pursuant to this express authorization, and therefore does not constitute an intentional or negligent violation of any cease and desist order.  Moreover, Sable implemented several construction best management practices to ensure that impacts to coastal resources, biological resources, and archaeological resources were consistent with the Onshore Pipelines' prior impact

---

[114] See Documents No. 65 and 92, "Zoning Clearance Application for Open Anomaly Sites" (November 22, 2024), Attachments A, D.1, and D.2, "Materials Regarding Completed Anomaly Sites" (March 6, 2025), Attachments A, D.1 and D.2.  See also Document No. 74, "Zoning Clearance Application for Planned Anomaly Sites" (December 6, 2024), Attachments A, D.1 and D.2.

[115] Pub. Res. Code, § 30811.

[116] See Document No. 90, EDCDO/NOI, p. 13 (citing Pub. Res. Code, §§ 30821.3, 30820, 30821.6, 30822).

[117] Pub. Res. Code, § 30820.

[118] Pub. Res. Code, § 30821.3.

[119] Document No. 84, County, Letter re: "Zoning Clearance Applications – 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, 24ZCI-00096" (February 12, 2025).

[120] Pub. Res. Code, § 30821.6.

**LATHAM&WATKINS**LLP

analyses related to ongoing repair and maintenance, and subsequent ecological and archaeological resources analyses have confirmed that impacts resulting from such work remained within the scope of impacts previously analyzed and approved.[121]  Accordingly, and contrary to the EDCDO/NOI's allegations, no penalties may be levied against Sable related to the Anomaly Repair Work.

>6.    The County's Anomaly Repair Confirmation Letter Demonstrates that Any Consolidated Permit or Dispute Resolution Process Would Be Procedurally Improper

The EDCDO/NOI suggests that Commission staff would "work with [Sable] and the County on a consolidated permit to move forward in the most efficient and streamlined manner possible."[122]  This "offer" is another attempt by the Commission to assert jurisdiction over Sable's Anomaly Repair Work where no such jurisdiction exists.  As Commission staff is aware, a consolidated coastal development permit is only appropriate when a "project requires a coastal development permit from ***both*** a local government with a certified local coastal program and the commission."[123]  Here, the County's Anomaly Repair Confirmation Letter confirmed that no new coastal development permit is required from the County for the Anomaly Repair Work, and the EDCDO/NOI does not allege that the Anomaly Repair Work is subject to the Commission's retained original permitting jurisdiction.[124]  Any consolidated coastal development permit application for the Anomaly Repair Work would be procedurally improper, and Sable has not consented to submitting such an application.

The EDCDO/NOI also states that Commission staff "initiat[ed] a review of the County's [February 12, 2025] determination, pursuant to Section 13569 of the Commission's regulations."[125]  Section 13569 of the Coastal Act Regulations provide for a dispute resolution process where Commission staff and a local agency disagree about "whether a proposed development is exempt or categorically excluded [from the Coastal Act's permitting requirements], or whether a decision on the proposal would be appealable to the Commission."[126]  The County's Anomaly Repair Confirmation Letter falls into neither category.  As the County confirmed in writing, the Anomaly Repair Confirmation Letter "did not allow activity without a permit, nor did the County take action on a permit or development application that may be appealable to the Coastal Commission."[127]  As such, any dispute resolution process regarding the County's determination is not authorized by the Coastal Act Regulations.

---

[121] See Documents No. 65 and 92, "Zoning Clearance Application for Open Anomaly Sites" (November 22, 2024), Attachments A, D.1, and D.2, "Materials Regarding Completed Anomaly Sites" (March 6, 2025), Attachments A, D.1 and D.2.  See also Document No. 74, "Zoning Clearance Application for Planned Anomaly Sites" (December 6, 2024), Attachments A, D.1 and D.2.

[122] Document No. 90, EDCDO/NOI, p. 2.

[123] Pub. Res. Code, § 30601.3(a)(1) (emphasis added).

[124] See Document No. 84, County, Letter re: "Zoning Clearance Applications – 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, 24ZCI-00096" (February 12, 2025).

[125] Document No. 90, EDCDO/NOI, p. 7.

[126] Coastal Act Regulations, § 13569(a).

[127] Document No. 91, County, Letter re: "Sable Offshore Corp. – California Coastal Commission's (CCC) Reference to Dispute Resolution Process" (February 24, 2025).

LATHAM&WATKINS LLP

### 7.    Preemption by Federal and State Law

Provisions of the County's CZO and County's Code of Ordinances ("County Code") are preempted and inapplicable where they "conflict" with federal or state law.[128]  A "conflict" between local and general laws occurs where the local law "duplicates, contradicts or enters an area fully occupied by general law."[129]  Here, provisions of the County's CZO and County Code that conflict with Sable's obligations under applicable federal and state regulations, including those that regulate pipeline safety and repairs, are preempted.

*San Diego Gas & Electric Co. v. City of Carlsbad* illustrates the extent to which the County Code and CZO may be preempted by federal and state law.  In that case, SDG&E dredged a lagoon near an electrical generation plant to enable seawater to be used to cool the plant's generation units.[130]  The City of Carlsbad required SDG&E to obtain a special use permit, pursuant to a floodplain ordinance and the City's coastal development ordinance, to undertake these dredging activities.[131]  SDG&E challenged the City's jurisdiction over its dredging activities under the coastal development and floodplain ordinances.[132]  The Court of Appeal held that "the City's requirement of a special use permit for dredging" – an "essential maintenance activity" – placed a "physical and economic burden on SDG&E's operation and maintenance" of the plant and was therefore preempted by the CPUC's "statewide interest in ensuring that utility operations are conducted in a safe and efficient manner."[133]

Similarly, here, federal law preempts any CZO or County Code regulation as to pipeline safety.  Applicable federal regulations[134] specifically require Sable to "take prompt action to address all anomalous conditions in [any] pipeline,"[135] and also generally regulate pipeline design, corrosion control, operation and maintenance activities, and pipeline safety.[136]  As California's enforcement authority for such regulations[137], the Office of the State Fire Marshal (OSFM) issued two State Waivers on December 17, 2024, that require Sable to conduct anomaly

---

[128] See, *e.g.*, *U.S. v. City of Pittsburg, Cal.* (9th Cir. 1981) 661 F.2d 783 (federal law preempts local land use regulation); Cal. Const. art. XI, § 7 ("A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations *not in conflict with general laws*.") (emphasis added); *People ex re. Deukmejian v. County of Mendocino* (1984) 36 Cal.3d 476 (state law preempts local land use regulation).

[129] *Viacom Outdoor, Inc. v. City of Arcata* (2006) 140 Cal.App.4th 230, 236.

[130] See *San Diego Gas & Electric Co. v. City of Carlsbad* (1998) 64 Cal.App.4th 785,  789.

[131] See *id.*, at p. 790.

[132] See *id.*, at p. 791.

[133] *Id.*, at p. 802.

[134] See 49 C.F.R. Part 195, adopted by OSFM at 19 C.C.R. § 2000.

[135] 49 C.F.R. § 195.452(h)(1).

[136] See, *e.g.*, *id.*, §§ 195.110(b), 252(a) (requiring backfill for pipeline support), 248 (minimum cover requirements) 246 (preventing external damage to exposed pipelines), 414 (requiring repairs for weather-related damage), 569, 585 (inspections and actions to correct corrosion), 436 (protecting against pipeline vandalism).

[137] See Government Code, § 51010 (vesting OSFM with the "exclusive safety[,] regulatory and enforcement authority over intrastate hazardous liquid pipelines" and establishing OSFM as the implementing authority for the federal Hazardous Liquid Pipeline Safety Act and "federal pipeline safety regulations as to those portions of interstate pipelines" located in California).  See also 19 C.C.R. §§ 2000 (OSFM's adoption of the Pipeline and Hazardous Materials Safety Administration (PHMSA) implementing regulations), 2100 et seq. (regulating new and replacement pipelines in certain areas within the Coastal Zone).

LATHAM&WATKINS LLP

repairs on the pipelines within 180 days, if not immediately.[138] Any local regulations that interfere with Sable's ability to complete these anomaly repairs on the timelines required by OSFM would present a genuine conflict with Sable's ability to comply with federal regulations, and therefore would be preempted.[139]

The County acknowledges that its authority over pipeline safety repairs is preempted. For example, Condition P-2 states that "permits may not be withheld or suspended due to County concerns which are under the jurisdiction of 49 C.F.R. Part 195 (Transportation of Hazardous Liquids by Pipeline), with the exception of areas/issues agreed to by [the pipeline operator] and the County."[140] Moreover, as part of a Settlement Agreement entered into by the County and the pipelines' original proponent (the Celeron Pipeline Company of California), the County agreed that it was preempted from regulating pipeline design, construction, and operation covered under 49 C.F.R. Part 195.[141]

The County's February 12, 2025, letter does not address preemption related issues and confirms that Sable's Anomaly Repair Work already is authorized under the County's Certified LCP and the Onshore CDPs. However, Sable notes for the record that it is not waiving any preemption related defenses.[142]

### 8.    Conclusion

Despite the EDCDO/NOI's allegations to the contrary, the Anomaly Repair Work has received all required authorizations under the Coastal Act. The County fully analyzed environmental impacts resulting from, and ultimately approved, repair and maintenance activities on the Onshore Pipelines such as the Anomaly Repair Work when it initially approved the pipelines' CDPs and associated construction activities in the 1980s. The County's Anomaly Repair Confirmation Letter has since confirmed that Sable's Anomaly Repair Work falls within the scope of those prior approvals and does not require a new or modified coastal development permit. Sable's continued Anomaly Repair Work has occurred pursuant to this authorization. Therefore, the Anomaly Repair Work does not violate the Coastal Act, LCP, or County Code, Sable has not intentionally, negligently, or knowing violated the Coastal Act or any Cease and Desist Order, and no cease and desist order, restoration order, or penalties are appropriate or warranted.

---

[138] See Document Nos. 77 and 82, OSFM, Letter of Decision on State Waiver Requests (CA-324 and CA-325A/B) (Dec. 17, 2024). PHMSA confirmed that it did not object to OSFM's State Waivers on February 11, 2025. See PHMSA, Letters re: Docket No. PHMSA-2025-0002 and -0003 (Feb. 11, 2025).

[139] See, *e.g.*, *Bernstein v. Virgin Am., Inc.*, 3 F.4th 1127, 1140 (9th Cir. 2021).

[140] Document No. 56, 2024 Conditions, p. 35, Condition P-2.

[141] See Document No. 10, Celeron Settlement Agreement (Feb. 8, 1988), p. 2. The Celeron Settlement Agreement is also available here.

[142] Sable does not waive any right to assert that any future approvals or permitting requirements may be preempted by federal and state law.

LATHAM&WATKINS LLP

### C.     Safety Valve Installation Work

#### 1.     Short Summary

The 2024 NOV, October 4 Letter, and EDCDO/NOI also allege that Sable installed safety valves along the Onshore Pipelines "without the requisite Coastal Act authorization."  To the contrary, Sable completed repair and maintenance work to install the referenced safety valves in compliance with requirements under state law – which the Coastal Commission supported – and only after receiving confirmation from the County under its delegated LCP authority, that no further authorization from the County was required.

In light of Commission staff's allegations, Sable is preparing to submit additional materials regarding the safety valve installation work to the County for confirmation as to whether a new or amended coastal development permit is required.  Until the County responds, any assertion that such work violated the Coastal Act, as asserted in the EDCDO/NOI, is premature and would usurp the County's authority to interpret its previously issued coastal development permits and LCP.

#### 2.     AB 864 Background

In 2015, the California Legislature enacted Assembly Bill 864 ("AB 864") to add Section 51013.1 to the Elder California Pipeline Safety Act in order to improve pipeline safety and reduce the risks associated with potential releases of oil from pipelines in the Coastal Zone.  The legislation requires pipeline operators in environmentally sensitive areas to use best available technology ("BAT") including, but not limited to, "leak detection technologies, automatic shutoff systems, or remote controlled sectionalized block valves, or any combination of these technologies" to reduce the volume of potential spills in these areas.[143]  When considering AB 864, the State Senate's analysis stated that "[e]arly oil spill detection technology and automatic shut-off controls are critical tools in preserving California's ocean waters, coastline, and wildlife."[144]

Coastal Commission staff recommended that the Commission support the bill, stating that:

> "[I]n a time of emergency, when confusion can impede decisions and delay crucial actions, and every passing minute results in greater environmental harm, the time saved by an automatic shutoff system can make the difference between a minor spill and a catastrophe.  Requiring best achievable technologies, including but not limited to automatic shutoff systems, in pipelines near state waters and sensitive habitat areas has the potential to prevent or substantially reduce the amount of oil released into state waters, including coastal waters, beaches, bluffs, and other sensitive coastal habitats."[145]

---

[143] Gov't Code, § 51013.1(b)(1); see also Cal. Code Regs., tit. 14, §§ 2100-2120 ("AB 864 Regulations").

[144] Document No. 30, Senate Rules Committee, AB 864 Third Reading (Sep. 1, 2015), p. 7.

[145] Document No. 29, Coastal Commission, Bill Analysis:  AB 864 (Jul. 8, 2015).

LATHAM&WATKINS LLP

The Coastal Commission accepted staff's recommendation and supported AB 864.[146]  Several other agencies and environmental groups also supported AB 864's adoption as well.[147]  The Legislature enacted AB 864 and it became effective January 1, 2016.

AB 864 charged OSFM with drafting its implementing regulations and granted OSFM the exclusive authority to enforce them.[148]  OSFM's AB 864 Regulations became effective on October 1, 2020, and set an aggressive compliance schedule.  Pipeline operators subject to AB 864 were required to submit a risk analysis and plan to retrofit existing pipelines with BAT by October 1, 2021.[149]  OSFM anticipated that all pipeline BAT retrofits would be completed by April 1, 2023 – just eighteen months after operators were required to submit their plan for OSFM approval.[150]  This timeline was based in part on an assumption that "[p]ermitting costs to install [AB 864's required safety valves] would be negligible" and that "[i]n most cases, a permit [] may not be required."[151]

In April 2021, Sable's predecessor-in-interest for the Onshore Pipelines, Plains Pipeline, L.P. ("Plains"), secured approval from OSFM for its plan to retrofit the Onshore Pipelines with 16 safety valves as required under AB 864.  Plains' plan included both motor-operated valves ("MOVs"), which are equipped with an electrical shut-off system connected to utility lines or a solar power source, and check valves ("CHKs"), which involve an automatic shut-off system with one-way flow closure.  Of the 16 safety valves OSFM approved for the Onshore Pipelines, seven were located in the Coastal Zone.

> ### 3. The Onshore Pipelines' EIR/EIS, FDP, and CDPs Contemplated Valve Installations and Analyzed Resulting Impacts

Although AB 864 became effective in 2016, safety valves are neither unique nor uncommon.  To the contrary, the Onshore EIR/EIS, FDP, and Onshore CDPs each contemplated safety valve installation work.

---

[146] See Document No. 30, Senate Rules Committee, AB 864 Third Reading, p. 5.

[147] See *id.*, at pp. 5-6.  Supporting organizations included the Center for Biological Diversity, Citizens Planning Association of Santa Barbara County, Community Environmental Council, Environmental Defense Center, Gaviota Coast Conservancy, Get Oil Out!, Heal the Bay, Heal the Ocean, Natural Resources Defense Council, Santa Barbara Audobon, Santa Barbara Channelkeeper, Santa Barbara County Action Network, Santa Barbara County Board of Supervisors, Sierra Club California, Surfrider Foundation (Santa Barbara Chapter), and Wishtoyo Foundation.

[148] See Gov't Code §§ 51013.1(g)(2), 51010 ("It is the intent of the Legislature . . . that the State Fire Marshal shall exercise exclusive safety regulatory and enforcement authority over intrastate hazardous liquid pipelines. . ..");  § 51013.1(c) (directing OSFM to promulgate regulations pursuant to this section, including defining automatic shutoff systems, creating a process to assess the adequacy of the operator's risk analysis, creating a process by which an operator may request confidential treatment of information submitted in the plan, and determining how near to an environmentally and ecologically sensitive area a pipeline must be to be subject to the requirements of Section 51013.1).

[149] See AB 864 Regulations, § 2108(b).

[150] See *ibid.*

[151] Document No. 34, CalFIRE, Standardized Regulatory Impact Assessment: Requirements for New, Replacement, or Existing Pipelines Near Environmentally and Ecologically Sensitive Areas in the Coastal Zone (Oct. 31, 2018), p. 21.

**LATHAM&WATKINS**LLP

The Onshore EIR/EIS analyzed the installation of fifteen "[p]ipeline block and check valves [] located at strategic locations along the route," including at "sensitive water crossings[,] to minimize oil losses into streams should the pipeline fail or be damaged."[152]  'Check valves,' like the CHKs approved for the Onshore Pipelines by OSFM, would be "designed to automatically prevent the backward flow of oil."[153]  'Block valves,' on the other hand, were anticipated to operate in the same basic way as MOVs: "us[ing] an electric motor to open and close the valve."[154]  Block valves contemplated by the Onshore EIR/EIS also involved permanent above-grade equipment and a guard fence (protecting an approximately 200 square foot area) within the Onshore Pipelines' already-disturbed 50-foot operational right-of-way.[155] The Onshore EIR/EIS acknowledged that these fenced areas "would be kept clear of woody vegetation" and that operators would regularly access the operational right-of-way to "ensure proper operation and prevent encroachment of woody vegetation."[156]  According to the Onshore EIR/EIS, this "series of block and check valves" would "control [] the loss of oil in the event of a leak or rupture."[157]  The Onshore EIR/EIS ultimately concluded that the "[u]se of automatic block valves and check valves [], as part of the project description, would substantially reduce the oil spill risk" and reduce any significant impacts that would result from a major oil spill, including impacts related to soils, surface water, aquatic biology, and land use and recreation.[158] As such, installing safety valves is a coastal resources protective measure that reduces and avoids impacts resulting from a potential oil spill – not an improvement that has the potential to exacerbate or cause "damage to coastal resources," as the EDCDO/NOI alleges.[159]

The Onshore Pipelines' FDP and CDPs also acknowledged that the operator would undertake certain safety valve installation work.  Condition P-13 required the operator to "design the pipeline such that the entire pipeline will have effective control communication … [with] all remotely activated valves.  Any break, rupture, and/or damage to the pipeline shall result in the orderly shutdown of the pumping operations, and will activate the shut off valves, if appropriate, in a manner which will minimize environmental damage."[160]  Conditions of Approval E-4 and F-7 further required the operator to install "isolation valves" at "all places where the pipeline crosses an active fault," "on either side of all perennial stream and river crossings," and at potential additional locations "as required by the Coastal Zoning Ordinance."[161]  Condition M-5 also acknowledged that block valve sites would be "visible along [the] route after the completion of pipeline construction."[162]

The additional safety valves approved by OSFM under the AB 864 compliance plan were consistent with these requirements and the work required to install safety valves is consistent

---

[152] Document No. 2, Draft Onshore EIR/EIS, pp. 2-5, 4-117.

[153] *Id*., Glossary.

[154] *Ibid.*

[155] *Id.*, pp. 2-6 through 2-7.

[156] *Id.* p. 2-32.

[157] *Id.*, p. 4-107.

[158] *Id.*, pp. S-5 through S-14, 4-39.

[159] Document No. 90, EDCDO/NOI, p. 4.

[160] Document No. 5, 1986 Planning Commission Action.

[161] *Ibid.*

[162] *Ibid.*

**LATHAM&WATKINS** LLP

with previously authorized, ongoing repair and maintenance activities along the Onshore Pipelines. More specifically, the additional valves were located within the Onshore Pipelines' already-disturbed operational right-of-way where permanent impacts to terrestrial biology were assumed to extend throughout the pipelines' lifetime.[163] As discussed below, County staff's analysis confirmed that installing these valves would not result in any new or substantially more severe impacts to biological resources, including coastal resources, than were approved for the pipelines in the first instance. The MOVs approved by OSFM were similarly anticipated to have minimal above-ground infrastructure, consistent with the visual impacts associated with block valves as analyzed under the EIR/EIS. Like the valves contemplated under the Onshore EIR/EIS, FDP, and Onshore CDPs, the additional safety valves also would minimize environmental damage in the event of a leak, reducing significant impacts resulting from a potential oil spill as described in the Onshore EIR/EIS.

> 4.      The County Acknowledged Lack of Jurisdiction Over Safety Valve Installation Work

Because the OSFM-approved safety valve installation work was consistent with the impacts considered, analyzed, and mitigated for under the Onshore Pipelines' FDP, Onshore CDPs, and Onshore EIR/EIS, individual zoning clearance applications for the safety valve installation work were submitted to the County in December 2021 and March 2022. Under the County's CZO, Zoning Clearances allow the County to review proposed development for compliance with conditions of approval including final development plans, conditional use permits, and coastal development permits.[164]

County staff initially opted to prepare discrete amendments to the Onshore Pipelines' FDP and Onshore CDPs related to the proposed safety valve installation work.[165] As part of that process, staff recommended that the County Zoning Administrator determine the safety valve installation work would be exempt from CEQA review under several categorical exemptions.[166] The Zoning Administrator approved staff's requested amendments to the Onshore Pipelines' FDP and Onshore CDPs and approved the safety valve installation work on August 22, 2022.[167] County staff prepared a draft addendum to the Onshore EIR/EIS analyzing whether the proposed safety valve installation work would trigger the need to prepare a new environmental impact report under CEQA.

The draft addendum concluded that safety valve installation work "presents minor incremental impacts *that remain less than those identified for the originally approved [Pipeline*

---

[163] Document No. 2, Draft EIR/EIS, p. 4-57.

[164] CZO, §§ 35-174.9.2.c.2, 35-179A.2.b.

[165] See Document No. 38, County Zoning Administrator Staff Report, Plains Line 901-903 Valve Upgrade Project (Jul. 7, 2022).

[166] See *id.*, Attachment A, p. A-1 (citing 14 C.C.R., §§ 15301(b), 15303(d), 15311, and Pub. Res. Code § 21080.23(a)).

[167] See Document No. 39, County, Zoning Administrator Action Summary (August 22, 2022).

**LATHAM&WATKINS** LLP

*P]roject*."[168]  The draft further confirmed that incremental impacts in each of the following impact areas would be less than those identified in the Onshore EIR/EIS:

- **Soils:**  "[The] additional valves will provide more control to limit potential oil spills from the pipelines that could negatively impact soils.  The proposed project will result in reduced impacts to soils when compared to the originally approved project."

- **Surface and Groundwater:**  "[C]onstruction areas were specifically chosen to avoid riparian habitats and stream areas. The use of block and check valves was included in the original EIR/EIS to mitigate for spills into coastal streams. The proposed project will increase the number of valves and utilize updated, best available technology for better control. As identified by the Office of State Fire Marshal's approved BAT Implementation Plan, the additional valves included in the proposed project will significantly reduce the volume of a potential pipeline release by affording the operator more control to limit the volume of a spill. Disturbance areas will be restricted to within the existing 50-foot ROW and such disturbances will be revegetated and restored after construction activities conclude. … The proposed project will result in reduced impacts to water resources when compared to the originally approved project and the placement of each valve site will not present an environmental impact to water resources."

- **Scenic/Visual Resources Impacts:**  "The size and scale of the proposed valve stations are compatible with the character of the surrounding environment and existing agrarian developments. None of the proposed valve sites will obstruct views of scenic coastal areas, or alter natural landforms. None of the valve locations are located near any streams or within a Flood Hazard Overlay or floodway. No signs or new lighting sources are proposed. … The valve sites will be visually subordinate to the surrounding environment.  … Therefore, impacts to visual resources from the proposed project will be less than those of the originally approved project and no new measures will be needed to address these impacts."

- **Biological Impacts:**  "The [safety valve installation work] would result in substantially reduced impacts to biological resources because of the limited footprints of the individual work areas and the fact [that] the construction areas are located outside of sensitive habitat areas. … The use of block and check valves was included in the original EIR/EIS to mitigate for spills into coastal streams. The [safety valve installation work] would increase the number of valves and utilize updated, best available technology for better control. As identified by the Office of State Fire Marshal's approved BAT Implementation Plan, the additional valves [] would significantly reduce the volume of a potential pipeline release by affording the operator more control to limit the volume of a spill. Disturbance areas would be restricted to within the existing 50-foot ROW and such disturbances would be revegetated and restored after construction activities conclude. The proposed project

---

[168] Document No. 41, County Planning Commission Staff Report, Gaviota Coast Conservancy & GreyFox, LLC Appeal of Plains Valve Upgrade Project, Attachment C-1, p. C-6 (March 3, 2023).

LATHAM&WATKINS LLP

will not result in any new significant environmental effects or a substantial increase in the severity of previously identified significant effects."

- **Cultural/Historic Resources:** "A Phase I Cultural Resources Inventory, dated March 2022, for the Lines 901 and 903 AB 864 Valve Installation project, prepared by Albion was conducted to confirm cultural sites along the pipeline's ROW have been avoided in the placement of the proposed valve sites. With the information produced from the Cultural investigation [], and due to the limited footprint of the valve construction areas, the proposed project will be less impactful to cultural resources when compared to the originally approved project. Thus, the proposed project will not present new or increased cultural resource impacts."

- **Hazards and Risks:** "Installation of the proposed [safety valves] would reduce the baseline worst case spill volume of 3,622.20 bbls to 1,871.40 bbls, a 48% reduction from existing conditions. Therefore, while impacts from a potential oil spill continue to be significant and unavoidable, the proposed project would reduce the potential volume of an oil spill by installing additional check and motor operated valves."[169]

The Zoning Administrator's decision was subsequently appealed to the County Planning Commission. On April 26, 2023, the Planning Commission granted the appeals, denied staff's requested amendments, and did not approve County staff's CEQA exemption determination or addendum.[170] The Planning Commission's action was then appealed to the Board of Supervisors. The Board of Supervisors held a hearing on August 22, 2023, to consider the appeals, but the Board ended its hearing with a 2-2 split vote regarding whether the grant or deny the appeals.[171] This tied vote resulted in "no action," effectively leaving the Planning Commission's denial of the safety valve installation work intact.[172] Sable subsequently commenced litigation against the County, alleging that the Planning Commission's denial constituted an abuse of discretion that effectively prevented Sable from complying with AB 864. Sable also revised OSFM's approved AB 864 compliance plans such that all additional safety valves – both CHKs and MOVs – would be installed below- or at-grade. These revisions would further reduce permanent visual impacts related to the safety valve installation work relative to those disclosed in the Onshore EIR/EIS.

On August 30, 2024, Sable and the County entered into a Settlement Agreement in which both parties acknowledged that, pursuant to the Celeron Settlement Agreement discussed above, the County is preempted "in the field of pipeline safety regulation and safety oversight as it relates to the [pipelines]."[173] Moreover, the parties acknowledged a "presum[ption]" that "the County is preempted when the activity to be performed is one foot or more below the surface of the ground and related to the operation of a pipeline."[174] On September 4, 2024, County staff

---

[169] *Id.*, pp. C-6 through C-15.

[170] See Document No. 42, County, Planning Commission Action Summary (April 26, 2023).

[171] See Document No. 43, County, Board of Supervisors Action Summary (August 23, 2023).

[172] *Ibid.*

[173] Document No. 46, Conditional Settlement Agreement and Release (August 30, 2024).

[174] *Ibid.*

LATHAM&WATKINS LLP

confirmed that the County "does not have permit authority or jurisdiction over the sixteen (16) safety valves and their ancillary equipment as currently proposed because they are safety valves required by state law [AB 864], related to the operation of an interstate Pipeline, and one foot or more underground" ("Safety Valve Confirmation Letter").[175]

> 5.    Sable Plans to Submit Additional Information Regarding Safety Valve Installation

Consistent with the County's Safety Valve Confirmation Letter, Sable installed the safety valves in compliance with AB 864.  Like the valves approved by OSFM, Sable installed seven total valves in the Coastal Zone, including six MOVs and one CHK valve.  Sable's safety valve installation work required similar (and in some cases less) construction disturbance as other authorized repair and maintenance activities, including the Anomaly Repair Work.  All work associated with the safety valve installations took place within the Onshore Pipelines' already-disturbed operational right-of-way, where both the Onshore EIR/EIS and Conditions of Approval anticipated that impacts to terrestrial biology would be permanent and ongoing during the Onshore Pipelines' operational lifetime.  Accordingly, consistent with the discussion above regarding the Anomaly Repair Work, the safety valve installation work was previously analyzed and approved pursuant to the Onshore Pipelines' EIR/EIS and Conditions of Approval.

Sable undertook the following steps to install each valve:

For the six MOV valves:

> (1) excavating the site, including the dirt beneath the targeted pipeline segment, (2) exposing the pipeline segment at the proposed installation location, (3) removing insulation and sandblasting the pipeline segment, (4) removing an approximately 10-foot segment of the pipeline, (5) installing the valve and pipeline connections, including a concrete foundation for the valve, welding the seams together, sandblasting the welded area, applying an epoxy coating, pipe tape, and rockguard wrap, (6) installing battery and related infrastructure approximately 10 feet from the valve and connecting such infrastructure via below grade conduit, (7) installing a vertical corrugated metal chamber with a 10-foot diameter around the valve below grade and installing a vertical corrugated metal chamber with an eight-foot diameter around the battery infrastructure, (8) installing access lids one foot below grade to allow for ongoing access to the valve and battery infrastructure, (9) backfilling the exterior of the corrugated metal chamber(s), (10) installation of rock around the corrugated metal access lid to allow for water runoff, (11) conducting final site cleanup, including revegetation activities.

For the one CHK valve:

> (1) excavating the site, including the dirt beneath the targeted pipeline segment, (2) exposing the pipeline segment at the proposed installation location, (3) removing insulation and sandblasting the pipeline segment, (4) removing an approximately 10-foot

---

[175] Document No. 47, Letter from Errin Briggs to J. Caldwell Flores (September 4, 2024).

LATHAM&WATKINSLLP

segment of the pipeline, (5) installing the valve and pipeline connections, including a rock foundation for the valve, welding the seams together, sandblasting the welded area, applying an epoxy coating, pipe tape, and rockguard wrap, (6) installing a vertical corrugated metal chamber with a 10-foot diameter around the valve below grade, (7) installing an access lid one foot below grade to allow for ongoing access to the valve, (8) backfilling the exterior of the corrugated metal chamber, (9) installation of rock around the corrugated metal access lid to allow for water runoff (10) conducting final site cleanup, including revegetation activities.

Unlike the valves proposed in OSFM's initially approved AB 864 compliance plan, Sable's installed MOVs involve no above-ground equipment, representing a reduced visual impact. Sable also implemented several construction best management practices to ensure that impacts to coastal resources, biological resources, and archaeological resources were consistent with the Onshore Pipelines' prior impact analyses related to ongoing repair and maintenance, and subsequent ecological and archaeological resources analyses have confirmed that impacts resulting from such work remained within the scope of impacts previously analyzed and approved.

Sable undertook this work based on the County's Safety Valve Confirmation Letter, which confirmed that no further County authorization was required to complete this safety valve installation work. The County has delegated local permitting authority under the Coastal Act and therefore the County's prior authorization was understood by Sable to extend to Coastal Act permitting as well. However, Sable recognizes that there is some ambiguity about whether the Safety Valve Confirmation Letter included the County's authorization under its delegated LCP authority. Accordingly, Sable is preparing to submit additional materials regarding this work to the County for its confirmation as that such work complies with the Pipeline Project's existing FDP, Onshore CDPs, and Onshore EIR/EIS. Sable is submitting these materials for the County's consideration in light of the 2024 NOV, October 4 Letter, and subsequent discussions with Coastal Commission staff. Sable reserves the right to supplement this Statement of Defense, including this Attachment A and Attachment D, with those materials.[176] It therefore would be premature for the Commission to commence enforcement proceedings against Sable for such valve installation work until the County has an opportunity to consider Sable's submissions regarding the work.

6.    The Safety Valve Installation Work Does Not Trigger Sections 30809 or 30810

Commission staff erroneously cite Coastal Act sections 30809 and 30810 for the authority to issue the EDCDO/NOI as to the safety valve installation work. Sections 30809 and 30810 do not, however, vest Commission staff or the full Coastal Commission with a unilateral

---

[176] Sable requested a two-day extension from Commission staff to submit this Statement of Defense, which would have allowed Sable to submit the valve installation materials to the County and provide those materials with the initial submission of the Statement of Defense. Commission staff rejected that request.

LATHAM&WATKINS LLP

right to usurp the County's delegated local permitting authority under the Coastal Act to assess whether such work complies with the existing Onshore CDPs.

As discussed above, Sections 30809 and 30810 first authorize a Cease and Desist Order to be issued if the Executive Director or the Coastal Commission determines that an activity has been (or is threatened to be) undertaken that may require "a permit *from the commission* without securing a permit."[177]  Second, a cease and desist order may be issued upon a determination that an activity that has been (or is threatened to be) undertaken that may be "inconsistent with any permit *previously issued by the commission*."[178]  Neither of these scenarios exist here.  To the contrary, the Onshore Pipelines' existing Onshore CDPs were issued by the County – *not the Commission*.[179]  Sable is preparing to submit materials related to the safety valve installation work to the County for its confirmation that  no new or amended coastal development permit *from the County* will be required, consistent with the County's Safety Valve Confirmation Letter.  The EDCDO/NOI does not allege, and the safety valve installation work does not require, any new or amended coastal development permit "from the Commission" and is not subject to a coastal development permit "previously issued by the Commission."[180]

Recognizing that neither of the above-mentioned triggers exist here, Commission staff cite a different subsection of Sections 30809 and 30810, which allow cease and desist orders "to enforce any requirements of a certified local coastal program … or any requirements of [the Coastal Act]" when the "commission requests and the local government … declines to act, or does not take action in a timely manner, regarding an alleged violation which could cause significant damage to coastal resources."[181]  Contrary to the EDCDO/NOI's assertion that "Santa Barbara County has declined to act in a timely manner" regarding the EDCDO/NOI's alleged Coastal Act violations, however, the County issued the Safety Valve Confirmation Letter confirming that no further authorization from the County was required for such work.  Sable is preparing to submit materials related to the safety valve installation work to the County for its confirmation that no new or amended coastal development permit is required.  The County's Safety Valve Confirmation Letter and any future County confirmation that the safety valve installation work is authorized by the Onshore CDPs does not mean that the County has "declined to act" with respect to such work such that a cease and desist order may be issued under Sections 30809 or 30810.  Moreover, ecological and archaeological analyses have confirmed that impacts to biological, coastal, and archaeological resources resulting from the safety valve installation work remained within the scope of impacts previously analyzed and approved, demonstrating that such work could not "cause significant damage to coastal resources" as required for a cease and desist order.  As such, no cease and desist order may be issued.

---

[177] Pub. Res. Code, §§ 30809(a), 30810(a) (emphasis added).

[178] *Ibid.*

[179] See Document Nos. 6 and 7, County Coastal Development Permit 86-CDP-189 (Jul. 27, 1986) and County Coastal Development Permit 86 CDP-205 (Aug. 5, 1986).

[180] Pub. Res. Code, § 30809(a).

[181] Pub. Res. Code, §§ 30809(a), 30810(a).

LATHAM&WATKINSLLP

7.     No Restoration Order or Penalties May Be Issued

Commission staff also assert that the Commission may issue a restoration order with respect to Sable's safety valve installation work. To the contrary, the Coastal Act does not allow for a restoration order to be issued regarding this work.

Section 30811 of the Coastal Act allows the Commission to issue a restoration order "if it finds that the development has occurred without a coastal development permit from the commission [or] local government, the development is inconsistent with [the Coastal Act], and the development is causing continuing resource damage."[182]  None of those conditions exist here. As described above, the County's Safety Valve Confirmation Letter confirmed that the safety valve installation work required no further authorization from the County, which possesses delegated local permitting authority under the Coastal Act.[183]  As such, the safety valve installation work did not "occur[] without a coastal development permit" and was not otherwise "inconsistent" with the Coastal Act.[184]  Sable is preparing to submit additional materials regarding the safety valve installation work to the County for its confirmation that no new or amended coastal development permit is required, consistent with the Safety Valve Confirmation Letter.  Further, Sable's safety valve installation work is not "causing continuing resource damage."[185]  The County's prior analysis determined that the safety valve installation work would not result in any new or substantially more severe significant impacts to biological resources.[186]  Sable also implemented several construction best management practices to ensure that impacts to coastal resources, biological resources, and archaeological resources were consistent with the Onshore Pipelines' prior impact analyses related to ongoing repair and maintenance, and subsequent ecological and archaeological resources analyses have confirmed that impacts resulting from such work remained within the scope of impacts previously analyzed and approved.[187]  In sum, because none of statutorily required conditions exist for the issuance of a restoration order, no restoration order may be issued.

Commission staff also assert that Coastal Act sections 30820, 30821.3, 30821.6, and 30822 authorize penalties to be levied against Sable related to the safety valve installation work.[188]  None of those sections apply here and thus no penalties may be levied.

Section 30820 authorize civil penalties to be imposed by the superior court when a person "undertakes development that is in violation [of the Coastal Act] or that is inconsistent with any coastal development permit previously issued by the commission [or] a local government," and

---

[182] Pub. Res. Code, § 30811.  Even if Sable's safety valve installation work were not authorized by the Onshore EIR/EIS, Onshore CDPs, and Pipeline Project's related approvals, such work is not inconsistent with the Coastal Act and could receive a coastal development permit from the County.

[183] Document No. 47, Letter from Errin Briggs to J. Caldwell Flores (September 4, 2024).

[184] Pub. Res. Code, § 30811; Document No. 47, Letter from Errin Briggs to J. Caldwell Flores (September 4, 2024).

[185] Pub. Res. Code, § 30811.

[186] Document No. 41, County Planning Commission Staff Report, Gaviota Coast Conservancy & GreyFox, LLC Appeal of Plains Valve Upgrade Project, Attachment C-1, p. C-6.

[187] Sable reserves the right to supplement this Statement of Defense with these analyses as part of the materials that it will submit the County.  Sable requested a two-day extension to submit this Statement of Defense from Commission staff, which would have allowed Sable to finalize these materials, but that request was denied.

[188] See Document No. 90, EDCDO/NOI, p. 13 (citing Pub. Res. Code, §§ 30821.3, 30820, 30821.6, 30822).

LATHAM&WATKINS LLP

section 30822 authorizes actions for exemplary damages when a person has "intentionally and knowingly violated any provision of [the Coastal Act]."[189]  Similarly, section 30821.3 authorizes the Commission to levy administrative penalties against a person "who is in violation of any provision of [the Coastal Act.]"[190]  Here, the County's Safety Valve Confirmation Letter confirmed that no further authorization from the County – which possesses delegated local permitting authority under the Coastal Act – was required for the safety valve installation work.[191]  Sable undertook the safety valve installation work in light of this authorization, and therefore the work did not constitute a violation of the Coastal Act, any previously issued coastal development permit, or any intentional and knowing violation.  Sable is preparing to submit materials regarding the safety valve installation work to the County for its confirmation that no new or amended coastal development permit is required, consistent with the Safety Valve Confirmation Letter.  Finally, section 30821.6 authorizes civil liability against persons who "intentionally or negligently violate[] any cease and desist order," with the "actual penalty imposed [to] be reasonably proportionate to the damage suffered as a consequence of the violation."[192]  Here, for the reasons discussed above, neither Commission staff nor the full Commission possessed the authority to issue any cease and desist order with respect to the safety valve installation work.  Sable completed the safety valve installation work after receiving the County's Safety Valve Confirmation Letter, which confirmed that no further authorization for such work was required from the County.  No cease and desist order precluded Sable from completing that work.  Moreover, Sable implemented several construction best management practices to ensure that impacts to coastal resources, biological resources, and archaeological resources were consistent with the Onshore Pipelines' prior impact analyses related to ongoing repair and maintenance, and subsequent ecological and archaeological resources analyses have confirmed that impacts resulting from such work remained within the scope of impacts previously analyzed and approved.[193]  Accordingly, contrary to the EDCDO/NOI's allegations, no penalties may be levied against Sable related to the safety valve installation work.

### 8.    Any Consolidated Permit or Dispute Resolution Process Would Be Procedurally Improper

The EDCDO/NOI suggests that Commission staff would "work with [Sable] and the County on a consolidated permit to move forward in the most efficient and streamlined manner possible."[194]  This "offer" is an attempt by the Commission to assert jurisdiction over Sable's safety valve installation work where no such jurisdiction exists.  As Commission staff is aware, a consolidated coastal development permit is only appropriate when a "project requires a coastal development permit from ***both*** a local government with a certified local coastal program and the commission."[195]  Here, the County already confirmed to Sable that no further authorization from

---

[189] Pub. Res. Code, § 30820.

[190] Pub. Res. Code, § 30821.3.

[191] Document No. 47, Letter from Errin Briggs to J. Caldwell Flores (September 4, 2024).

[192] Pub. Res. Code, § 30821.6.

[193] Sable reserves the right to supplement this Statement of Defense with these analyses as part of the materials that it will submit the County.  Sable requested a two-day extension to submit this Statement of Defense from Commission staff, which would have allowed Sable to finalize these materials, but that request was denied.

[194] Document No. 90, EDCDO/NOI, p. 2.

[195] Pub. Res. Code, § 30601.3(a)(1) (emphasis added).

LATHAM&WATKINS LLP

the County was required prior to undertaking the safety valve installation work.[196]  Sable undertook the safety valve installation work pursuant to this confirmation.  Sable is preparing to submit additional materials to the County for its confirmation that this work does not require a new or amended coastal development permit, consistent with the County's Safety Valve Confirmation Letter.  Finally, the EDCDO/NOI does not allege that the safety valve installation work is subject to the Commission's retained original permitting jurisdiction.[197]  Accordingly, any consolidated coastal development permit application for the safety valve installation work would be procedurally improper, and like the Anomaly Repair Work discussed above, Sable has not consented to submitting such an application.

Section 13569 of the Coastal Act Regulations provides for a dispute resolution process where Commission staff and a local agency disagree about "whether a proposed development is exempt or categorically excluded [from the Coastal Act's permitting requirements], or whether a decision on the proposal would be appealable to the Commission."[198]  As described above, the County's Safety Valve Confirmation Letter confirmed that no further authorization from the County was required to undertake the safety valve installation work.  Sable is preparing to submit additional materials to the County regarding such work for its confirmation that no new or amended coastal development permit is required, consistent with the Safety Valve Confirmation Letter.  Until the County reviews and responds to those materials, any dispute resolution process regarding the safety valve installation work would be procedurally premature.

         9.      Preemption

As discussed above, provisions of the County's CZO and County Code are preempted and inapplicable where they "conflict" with federal or state law.[199]  A "conflict" between local and general laws occurs where the local law "duplicates, contradicts or enters an area fully occupied by general law."[200]  Here, provisions of the County's CZO and County Code that conflict with Sable's obligations under applicable federal and state regulations, including those that regulate pipeline safety and repairs, are preempted.

In this case, AB 864 preempts any CZO or County Code regulation as to pipeline safety.  Accordingly, the County has confirmed that it is preempted "in the field of pipeline safety regulation and safety oversight," and therefore "does not have permit authority or jurisdiction" of

---

[196] See Document No. 47, County, Letter from Errin Briggs to J. Caldwell Flores (September 4, 2024).

[197] See Document No. 84, County, Letter re: "Zoning Clearance Applications – 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, 24ZCI-00096" (February 12, 2025).

[198] Coastal Act Regulation, § 13569.

[199] See, *e.g.*, *U.S. v. City of Pittsburg, Cal.* (9th Cir. 1981) 661 F.2d 783 (federal law preempts local land use regulation); Cal. Const. art. XI, § 7 ("A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations *not in conflict with general laws*.") (emphasis added); *People ex re. Deukmejian v. County of Mendocino* (1984) 36 Cal.3d 476 (state law preempts local land use regulation).

[200] *Viacom Outdoor, Inc. v. City of Arcata* (2006) 140 Cal.App.4th 230, 236.

the safety valves.[201]  Given this confirmation by the County in the Safety Valve Confirmation Letter, further discussion of preemption is not necessary at this time.[202]

### 10.    Conclusion

Despite the 2024 NOV and EDCDO/NOI's allegations to the contrary, the safety valve installation work does not constitute a violation of the Coastal Act.  Sable undertook such work in compliance with state law, guidance from the County that no further County approvals were required, and all environmental impacts of such work fell within the scope of the Onshore Pipelines' prior environmental review, Conditions of Approval, FDP, and Onshore CDPs.  Sable is preparing to submit materials regarding such work to the County for specific confirmation as to whether any new or coastal development permit is required.  Any enforcement proceeding by the Coastal Commission prior to the County's response would be premature and inappropriately usurp the County's delegated local permitting authority under the Coastal Act.

## IV.    OFFSHORE PIPELINE ACTIVITIES

### A.    Short Summary

Between November 29 and December 1, 2024, Sable conducted routine span remediation maintenance on Sable's Offshore Pipelines in both state and federal waters ("Span Remediation Work").[203]  The Span Remediation Work consisted of adding support with sand and cement bags under small segments of the Offshore Pipelines to reduce the distance of "free spans" along the pipelines.  A "free span" or "span" occurs when a portion of a pipeline is not resting on the bottom of the seafloor due to sand being scoured from beneath the pipeline over time.  This work is routine, low-impact, and consistent with maintenance work previously performed on the Offshore Pipelines during their operational lifetime.

On February 11, 2025, Commission staff issued the 2025 NOV to Sable for "deploying sand/cement bags on the seafloor and positioning them to provide support to Sable's out-of-service offshore oil and water pipelines."[204] The EDCDO/NOI alleged that Sable's Span Remediation Work was not, and could not have been, preauthorized by Sable's existing Offshore CDP. The Commission's 2025 NOV and EDCDO/NOI further characterize Sable's Span Remediation Work as requiring a new CDP.

Contrary to the Commission staff's claims, the Span Remediation Work was fully contemplated and authorized within the existing DPP previously approved by the MMS and the

---

[201] Document No. 46, Conditional Settlement Agreement and Release (August 30, 2024); Document No. 47, Letter from Errin Briggs to J. Caldwell Flores (September 4, 2024).

[202] Sable does not waive any right to assert that any future approvals or permitting requirements may be preempted by federal and state law.

[203] The discussion that follows is solely related to the work conducted in state waters given the focus of the EDCDO/NOI and NOV. The EDCDO/NOI and NOV excluded work done in federal waters and we have therefore not provided information related to the work conducted in federal waters but we reserve the right to do so should the Commission modify the EDCDO/NOI or NOV or take other action regarding federal waters work.

[204] See Document No. 81, Coastal Commission, Notice of Violation V-9-25-0013 (February 11, 2025) ("2025 NOV").

LATHAM&WATKINS LLP

Commission's approved Offshore CDP and Consistency Certification for the Offshore Pipelines, and does not require additional Commission approval. As discussed above, the SYU's DPP is a comprehensive document that outlines the proposed activities for the development and production of offshore oil and gas resources. MMS approved the SYU DPP in 1988 and it is that DPP that formed the basis for the Commission's issuance of the Offshore CDP and Consistency Certification. Indeed, the Commission approved the Offshore CDP and concurred in Exxon's federal Consistency Certification for the DPP on the same day pursuant to the same staff report and findings—demonstrating that in its approvals the Commission understood the entirety of what was contemplated both for construction and ongoing operation and maintenance of the Offshore Pipelines as set forth therein.

Tellingly, the federal Bureau of Safety and Environmental Enforcement ("BSEE") (the successor agency to MMS) considered the proposed Span Remediation Work in the fall of 2024, and in its letter approving that work in federal waters dated December 5, 2024, BSEE did not require any new approvals or amendments to the project's DPP for the work. Therefore, BSEE's determination indicates that the maintenance activities involved in the Span Remediation Work were authorized both within the DPP and in the original Consistency Certification concurred with by the Commission alongside the Offshore CDP for the Offshore Pipelines in state waters.[205]

Commission staff describes the Span Remediation Work as requiring further Commission authorization under the Coastal Act, but as detailed below, Sable's activities were (1) contemplated and authorized by the existing DPP, Consistency Certification, and Offshore CDP; (2) approved by the SLC; (3) consistent with past maintenance practices where the Commission did not require a new CDP, and (4) conducted with no adverse environmental impacts. Furthermore, to the extent the Commission has exercised jurisdiction over similar work in the past (which it has never done with respect to Sable's Offshore Pipelines) the Commission has issued *de minimis* waivers, underscoring the minimal impact associated with this type of work. Contrary to the allegations in the 2025 NOV and EDCDO/NOI, the Span Remediation Work was previously authorized and aligns with established regulatory and environmental standards.

### B.    Span Remediation Work Contemplated by Original Approvals

The EDCDO/NOI states that the "span remediation work conducted was not, and could not have been, pre-authorized by the permit in which the Coastal Commission issued for the original installation of the SYU Pipeline." While Commission staff may have different permit-writing practices today than 35 years ago and might provide more explicit language in a coastal development permit issued today concerning ongoing maintenance activities that are authorized, it does not change the fact that, as described in greater detail below, span remediation maintenance activities already were authorized under the DPP, federal Consistency Certification

---

[205] It is notable that Commission staff did not include the Span Remediation Work performed in federal waters in its 2025 NOV or EDCDO/NOI. This indicates staff's understanding that this work was in fact contemplated and authorized in the DPP, consistent with BSEE's December 5, 2024 letter authorizing the Span Remediation Work to proceed.

LATHAM&WATKINS LLP

and Offshore CDP.  Thus, the Span Remediation Work does not require additional permitting consistent with similar maintenance work previously conducted on the SYU Offshore Pipelines.

1.    The DPP Formed the Basis for Consistency Certification and Offshore CDP

Exxon's DPP for the SYU was submitted to MMS in December 1982.[206] In January 1983, Exxon submitted a request for consistency certification for expansion of production in the SYU. The Coastal Commission's 1990 Compendium of California Coastal Commission Decisions Under the Federal Consistency Provisions provides a succinct summary of the Commission's consideration of the DPP:

> The 1983 proposal included two options, each of which included … platforms, pipelines, and electrical cables in [Outer Continental Shelf] waters, and expansion of onshore gas processing facilities to accommodate the new platforms. The two options differed in methods of treatment, storage and transport of the crude produced from the SYU. Although both options ultimately relied on transport of treated crude by tanker to the Gulf Coast, Option "A" involved expanding the capacity of the existing [onshore treatment facility], while Option "B" involved construction of new onshore oil treatment and storage facilities and a new marine terminal about a mile offshore of El Capitan. In June of 1983 the [Commission] concurred with the consistency certification for the platforms and pipelines proposed of Option "B", but objected to Option "A" … as the preferred means of oil storage and treatment prior to shipment (see CC-7-83).[207]

On September 20, 1985, MMS approved Option B in the DPP, except it specifically noted that the DPP approval is not a final approval of the Offshore Pipelines.[208]

On September 29, 1987, Exxon's revised DPP, which provided additional details regarding the installation of three platforms in the SYU with associated subsea pipelines connecting to onshore facilities in Las Flores Canyon, was found complete by MMS. The Coastal Commission received the DPP revision from MMS on December 22, 1987.[209]

On February 23, 1988, with its Consistency Certification (No. CC-64-87), the Coastal Commission concurred with Exxon's certification for the revised DPP nearshore and onshore portions of Option B alternative, having already concurred with the OCS portions of Option B with consistency certification No. CC-7-83. On the same day, the Commission also approved the

---

[206] See Document No. 4, September 20, 1985 DPP Approval.
[207] See Document No. 16, Compendium of California Coastal Commission Decisions Under the Federal Consistency Provisions (March 30, 1990), pp. 265-266.
[208] See Document No. 4, September 20, 1985 DPP Approval.
[209] See Document No. 13, April 4, 1988 DPP Approval.

LATHAM&WATKINS LLP

Offshore CDP (Coastal Development Permit No. E-88-1) for the nearshore portions of Option B, including the Offshore Pipelines.[210]

On April 4, 1988 MMS approved the revisions to the DPP.[211] While the DPP has been revised since 1988, as it relates to the Offshore Pipelines, the 1988 DPP is the controlling approval for the Offshore Pipelines' installation, as well as for their ongoing maintenance and operation.[212] The 1988 DPP is the version of the DPP in existence when the Commission provided its Consistency Certification concurrence and approval of the Offshore CDP for the Offshore Pipelines.

The Commission's findings are clear that the activities contemplated by the DPP were the basis for both the Consistency Certification and the Offshore CDP. Significantly, the staff report's "Project Title" was "Exxon Santa Ynez Unit *Development and Production Plan* nearshore and onshore portions of Option B alternative," demonstrating that the DPP was the fundamental aspect of what was being reviewed by the Commission as part of the Consistency Certification and the Offshore CDP. The Commission also utilized a single staff report and findings document for both the DPP's Consistency Certification concurrence and the Offshore CDP.[213] Thus, the 1988 DPP is the document that describes the universe of activities that were analyzed and approved with the Consistency Certification concurrence and Offshore CDP, including the Span Remediation Work at issue here.

2.     The 1988 DPP Contemplated Span Remediation Work

As relevant here, the 1988 DPP includes a detailed discussion of the Offshore Pipelines that would be installed, maintained, and operated. It describes a new 20-inch emulsion line extending from Platform Harmony to the Las Flores Canyon oil treating facilities, in which all SYU oil production will be transported. It also describes an existing 12-inch pipeline originating at Platform Hondo which would continue to bring gas onshore to the POPCO Gas Plant. A second, new 14-inch gas line would transport gas to onshore facilities. Finally, a new 12-inch pipeline would be installed to carry produced water from the oil treating facilities to an offshore outfall discharge point located at Platform Holly.[214]

The 1988 DPP addresses the design, construction, and ongoing operation and maintenance of the Offshore Pipelines. This included relevant geologic and geotechnical design considerations and applicable design codes. Regarding maintenance, the DPP expressly *requires* Sable to ensure the pipelines are maintained: "All emulsion and gas pipelines will be maintained

---

[210] See Document No. 12, March 17, 1988 Letter to Exxon from Coastal Commission, attaching Consistency Certification Concurrence and CDP.
[211] See Document No. 13, April 4, 1988 DPP Approval.
[212] The 1988 DPP is attached as Document No. 8.
[213] See Document No. 11, Staff Recommendation on Permit and Consistency Certification, "Staff Note" ("To minimize duplication and speed the project's review process, the staff has combined the coastal permit and consistency certification review into one staff report scheduled for one Commission hearing. A coastal permit is required for the … pipeline portion of the project in state waters …. A consistency certification is required for the same portion of the project.").
[214] 1988 DPP, at VIII-2.

LATHAM&WATKINS LLP

in good operating condition at all times."[215] The DPP's June 1984 Environmental Impact Statement/Environmental Impact Report ("Offshore EIS/EIR") also recognizes that "Exxon's [DPP] has been carefully evaluated to assess the effects due to construction ***and operation*** of the facilities."[216]

Specific maintenance activities authorized by the 1988 DPP are summarized below.

> a. *Maintaining Static Loads and Spans Were Incorporated into DPP Design Requirements*

The 1988 DPP explicitly accounted for static loads and spans in its design and construction criteria for the Offshore Pipelines. It emphasized that the pipelines would be constructed, operated and maintained long-term in a technically sound and environmentally acceptable manner. The routes were "carefully scrutinized for potential hazards to ensure that the pipelines may be safely installed and operated."[217] The design criteria specifically considered both external environmental loads and internal loads that the pipelines might encounter throughout their operational life, including stresses during installation. The DPP expressly requires that stress levels from these conditions remain within acceptable limits.[218]

The DPP addressed external environmental loads arising from meteorological and oceanographic phenomena, as well as the geologic and geotechnical characteristics of the sea bottom along the Offshore Pipeline routes.[219] These environmental forces included waves, currents, earthquake ground motions, and ambient pressure and temperature. The design parameters were set to account for significant wave height, period, and direction, bottom steady current velocity and direction, and earthquake wave velocities and periods.[220] These criteria were then tailored to the specific locations and directions of the pipelines, ensuring consistency with the platform designs.[221] This comprehensive approach shows that the Offshore Pipelines' static loads and spans were integral considerations in the DPP's planning and design process.

The DPP also states that "[t]he pipelines will be designed to resist significant horizontal and vertical deflection under the action of bottom steady currents, wave induced oscillatory currents and earthquakes. Earthquake motion design criteria will be consistent with the values used in the platform designs. Stability will be accomplished via routing, increased submerged weight, trenching, anchoring, or combinations of these methods."[222]

---

[215] *Id*. at VIII-24

[216] See Document No. 1, Final Environmental Impact Statement/Report for Santa Ynez Unit/Las Flores Canyon DPP SCH No. 83030805 (June 1984), p. 6-47 (emphasis added).

[217] 1988 DPP, at VIII-11.

[218] *Id*. at VIII-11-13.

[219] *Id*. at VIII-6-9.

[220] *Id*. at VIII-12.

[221] *Id*. at VIII-12.

[222] *Id*. at VIII-14.

LATHAM&WATKINS LLP

b.      *The Offshore EIS/EIR Contemplates Ongoing Span Remediation*

The Offshore EIS/EIR for the DPP states that the Offshore Pipelines will be designed to withstand up to a foot of local deformation of the seafloor.  It also includes a mitigation measure to "[m]onitor seafloor disturbances after construction using side scan sonar or equivalent to assess need for remedial measures" to address the potential impact of "[d]isruption of seafloor sediments and formation of sea mounds due to construction of offshore platforms and pipelines."[223]  The Offshore EIS/EIR includes a separate mitigation measure to "inspect subsea project components" following earthquakes prior to restart to determine reliability of components and "*take remedial actions as appropriate*."[224] Further, the Offshore EIS/EIR notes that "[t]he cumulative geologic impacts are minimized using conventional geotechnical design and construction methods, *including ongoing maintenance of slope stabilization operations*."[225]

While no specific earthquake triggered a pause in operations, the inspections that Sable has conducted to identify areas of the Offshore Pipelines that required remedial actions are consistent with the remedial actions and associated impacts previously considered in the Offshore EIS/EIR. Sable's maintenance activities here to add additional supports due to changes in the geologic environment over time are consistent with the "ongoing maintenance of slope stabilization" that was clearly contemplated and analyzed in the Offshore EIS/EIR that was considered by the Commission in connection with its Consistency Certification and Offshore CDP for the SYU pipelines.

c.      *The DPP Incorporates Accepted Maintenance Practices in American Petroleum Institute Publication API RP 1111*

The 1988 DPP states that "[t]he oil and gas pipelines will be designed, constructed, tested, operated and inspected in compliance with the following standard specifications, as applicable: … Recommended Practice for Design, Construction, Operation and Maintenance of Offshore Hydrocarbon Pipelines, American Petroleum Institute Publication API RP 1111."[226] In other words, Sable must operate and inspect the SYU oil and gas pipelines in compliance with API Recommended Practice 1111. The current Fifth Edition of API 1111 was adopted in September 2015 and reaffirmed in January 2021.[227]

Section 4.1.4 discusses how the design of offshore pipelines should consider static loads:

> These include the weight of the pipe, coating, appurtenances, and attachments; external and internal hydrostatic pressure and thermal expansion loads; and the static forces due to bottom subsidence and differential settlement.

---

[223] Offshore EIS/EIR, Table 6.3.6-1.

[224] Offshore EIS/EIR, Table 6.3.3-1, emphasis added.

[225] *Id.*, at p. 6-52, emphasis added.

[226] 1988 DPP, VIII-10.

[227] See Document No. 37, API RP 1111, Design, Construction, Operation, and Maintenance of Offshore Hydrocarbon Pipelines (Limit State Design) (January 2021).

LATHAM&WATKINS LLP

> The weight-related forces are of special concern where the pipeline is not continuously supported, that is, where spans are expected to occur. Spans are also of concern where seismic liquefaction of the supporting bottom could occur, and where mudslides could occur, such as some areas around the Mississippi River delta.
>
> The weight of the submerged pipeline can be controlled through the combination of the pipe wall thickness and the density and thickness of the external (concrete) weight coating. Weight calculations should consider stability when empty (the usual as-laid condition), full of the fluid to be transported, and flooded with seawater.
>
> Consideration should be given to preventing unacceptably long unsupported lengths **by use of dumped gravel, anchor supports, concrete mattresses, sand bagging, or other suitable means**.[228]

Thus, Sable's maintenance activities that involved installing 3:1 sand-to-cement burlap bags under and around the Offshore Pipelines to remediate spans that exceed applicable criteria are consistent with the practices described in API 1111 and therefore its approved DPP.

d. *Contemporary MMS Manuals Support Span Remediation Work*

The 1992 MMS-sponsored Deepwater Pipeline Maintenance and Repair Manual[229] also provides insights into the industry-standard practices around the time of the DPP's approval for maintaining and repairing offshore pipelines, particularly concerning span remediation. The manual notes that span remediation is a routine maintenance procedure. It also describes the correction of pipeline spans as a "minor intervention," typically involving methods such as stone dumping, grout bag placement, or mattresses, which align with Sable's use of 3:1 sand-to-cement burlap bags. The following examples from the Manual establish that span remediation work using 3:1 sand-to-cement burlap bags (also known as grout bags) is an accepted technique consistent with what would be expected to occur over the course of a pipeline's operational life:

- "Most of the minor repair techniques are well established and have a long history of use with diver, ROV and surface support intervention. There is extensive experience with the use of ROVs alone for span connection and seafloor preparation."

- "For example, the correction of pipeline spans is a minor intervention since the operating status of the pipeline should not be affected."

---

[228] API 1111, at p. 9.

[229] See Document No. 18, Deepwater Pipeline Maintenance and Repair Manual Prepare for U.S. Department of the Interior Minerals Management Service (June 1992).

LATHAM&WATKINS LLP

- "In the case of spans formed after installation, rectification is generally limited to correction by stone dumping, grout bag placement or mattresses."

- "Depending on the height of the spanning pipeline above the seafloor, and on the slope of the seafloor itself, correction can be undertaken utilizing various configurations and variations of grout filled bags.  The bags are usually made of a woven fabric material. Individual cells are interconnected and grouted from inlets on various points on the bags.  Grout bags have the advantage that they are easily handled and, when full, conform to the shape of the underside of the pipeline providing a stable support."

    3.    <u>The DPP Served as Project Description for the Offshore CDP and Consistency Certification</u>

As discussed above, the Commission provided its concurrence in the SYU DPP Consistency Certification on the same day and as part of the same combined staff report that it approved the SYU Offshore CDP, underscoring the Commission's integrated consideration of the DPP and the Commission's Offshore CDP:

> On February 23, 1988, by a vote of 8 in favor, 2 opposed, and l abstention, the California Coastal Commission concurred with your consistency certification for the Exxon Santa Ynez Unit Development and Production Plan nearshore and onshore portions of Option B alternative. On the same day, the Commission also approved a coastal development permit for the nearshore portions of Option B alternative with conditions. As you know these conditions were amended into the project description of the Development and Production Plan by you prior to Commission concurrence.[230]

Thus, the DPP, including the contemplated Span Remediation Work, is the project description that the Coastal Commission utilized when considering and approving the Offshore CDP. Indeed, as noted above, the "Project Title" of the project that the Coastal Commission considered and approved was "Exxon Santa Ynez Unit Development and Production Plan nearshore and onshore portions of Option B Alternative."[231]  The Coastal Commission's staff report also was explicit that other agencies' conditions pursuant to their approvals of the Offshore Pipelines were ***included as part of the project*** that the Coastal Commission considered and approved.[232]  These conditions include the SLC's approved conditions for the SYU leases in state waters, which mandated "[a]nnual side-scan surveys of pipelines to check for bridging or

---

[230] Document No. 12, Letter from Susan M. Hansch, Manager Energy and Ocean Resources Unit of CCC to Exxon Company U.S.A. (March 17, 1988).

[231] See Document No. 13, Staff Recommendation on Permit and Consistency Certification.

[232] See Document No. 13, Staff Recommendation on Permit and Consistency Certification, p. 23 ("[T]he project as described includes the conditions imposed in the Santa Barbara County and APCD, and the State Lands Commission approvals.").

LATHAM&WATKINS LLP

other hazards to the pipeline."[233] Safety measures included in the SLC leases, such as this, were noted as a factor in the Coastal Commission's determination that the risks and impacts associated with the SYU and Offshore Pipelines had been mitigated to the maximum extent feasible.[234]

The Commission also relied upon and incorporated analysis from the Offshore EIS/EIR, when it issued its federal Consistency Certification and Offshore CDP approval.[235]  As discussed above, the Offshore EIS/EIR shows that the Commission understood that activities like the Span Remediation Work would occur by noting that "[t]he cumulative geologic impacts are minimized using conventional geotechnical design and construction methods, *including ongoing maintenance of slope stabilization operations*."[236]

The Commission's Offshore CDP and Consistency Certification findings recognized that the SYU and Offshore Pipeline involved complex geotechnical and environmental considerations, particularly concerning the installation and maintenance of the Offshore Pipelines. The Commission's findings highlighted the importance of addressing potential geologic constraints through "proper mitigation," which included "avoidance or … engineering design."[237] This is an explicit contemplation of engineering solutions, such as the deployment of 3:1 sand-to-cement burlap bags to create support piers, as viable methods to address issues like pipeline spans caused by changes to geologic conditions.  The Offshore CDP and Consistency Certification findings added that "[a]ll potential geologic constraints for the project (both onshore and offshore) have been identified and mitigated by avoidance or engineering design…. Soil movement forces have been minimized on the project by placing the pipelines directly on the seafloor."[238]  This finding is consistent with the analysis in the Offshore EIS/EIR and aligns with the maintenance activities in API Recommended Practice 1111. Thus, the existing DPP that was considered by the Commission in its Consistency Certification and Offshore CDP clearly supports the use of 3:1 sand-to-cement burlap bags to stabilize soil movements, thereby providing continued support to the pipelines during operations.

The Commission also recognized the need for flexibility in pipeline construction methods, acknowledging that "[p]ipeline construction methods are presently undefined" and allowing Exxon the latitude to "propose their own design solutions."[239]  This flexibility permits the adaptation of construction techniques, such as the deployment of the 3:1 sand-to-cement burlap bags, which align with the original analysis and objectives of the Offshore CDP and Consistency Certification. The Commission also expected that "[d]redge materials will be piled up on one or both sides of the trench, and backfilling will be done where necessary to anchor the lines, and where natural backfill due to local sediment movement is not expected. Exxon expects

---

[233] See Document No. 16, Compendium of California Coastal Commission Decisions Under the Federal Consistency Provisions (March 30, 1990), pp. 254-255.

[234] Document No. 13, CCC Staff Recommendation on Permit and Consistency Certification, p. 72.

[235] See e.g., Document No 13, CCC Staff Recommendation on Permit and Consistency Certification, pp. 25, 34, 37, 73, 88, 99, 100, 105, 107, 108, 118.

[236] Offshore EIS/EIR, p. 6-52, emphasis added.

[237] Document No. 13, CCC Staff Recommendation on Permit and Consistency Certification, p. 78.

[238] *Id*., at p. 4.

[239] *Id*., at p. 44.

LATHAM&WATKINS LLP

that armor rock will be needed to secure the lines, but does not know the amount or size."[240] This description of work demonstrates that similar techniques to Sable's Span Remediation Work were specifically contemplated, and thus the impacts of such methods were adequately considered within the scope of the Commission's Offshore CDP and Consistency Certification approval.

In addition, the Offshore CDP included Condition No. 9 that required a Marine Construction Mitigation Plan.[241] That Marine Construction Mitigation Plan specifically contemplated the management of pipeline spans and the modification of the seafloor to address geologic constraints. As set forth in section III of that plan, Exxon stated it would not trench the seafloor beyond twenty-five foot depths and would "modify only those bedrock ridges beyond that point that may result in unacceptable pipe spans."[242] The plan went on to state that post-construction inspection surveys would be completed to "identify unacceptable free spans."[243] Thus, the Commission specifically approved future Span Remediation Work to (1) inspect the pipelines for unacceptable free spans, and (2) "modify" the seafloor to remediate any identified unacceptable spans as part of the Offshore CDP.

In summary, the Commission's Offshore CDP and Consistency Certification findings and the Offshore CDP conditions acknowledged that addressing hazardous geologic conditions through design and construction techniques, such as the Span Remediation Work performed by Sable, was part of the Commission's analysis and approval of the Offshore CDP and Consistency Certification.

### 4. The NOV and EDCDO/NOI's Lack of Reference to Federal Waters is Noteworthy

The absence of any reference to the Span Remediation Work conducted in federal waters in the Commission's NOV and EDCDO/NOI is noteworthy, since the work performed in both state and federal waters is the same. This omission suggests that Commission staff understands that the work was contemplated and authorized under the original DPP. If the Span Remediation Work had not been anticipated within the DPP, it would have triggered federal regulatory requirements for amendments or additional approvals, which BSEE did not require. The fact that the Commission's enforcement actions focus solely on state waters further underscores that the Span Remediation Work was consistent with and authorized by the existing DPP and therefore considered by the Coastal Commission as part of the project description in the Commission's approval of the Consistency Certification and Offshore CDP.

---

[240] *Id.*, at p. 45.
[241] Document No. 12, Offshore CDP, Condition 9.
[242] Document No. 15, Final Comprehensive Plan for Marine Biological Impact Reduction and Mitigation in Nearshore Waters of Las Flores Canyon, p. 19.
[243] *Id.*, at p. 38.

LATHAM&WATKINS LLP

### C.    State Lands Commission Lease Requirement for Ongoing Surveys and Span Remediation

While the Span Remediation Work was contemplated by and approved as part of the DPP, Consistency Certification, and Offshore CDP, determining when to conduct these maintenance activities is determined based on surveys required pursuant to Sable's SYU leases with the SLC. As part of the Offshore Pipelines associated with the SYU, Sable operates a 12-inch-diameter water pipeline, a 20-inch-diameter oil emulsion pipeline, and a 12-inch-diameter gas pipeline in state waters that are authorized pursuant to SLC leases.[244] These leases have been in effect since the late 1980s. The leases require that the Offshore Pipelines are kept "in good order and repair and safe condition."[245] The leases also require that should inspections on the pipeline "show bridging… then further detailed inspections shall be made and corrective action taken, if necessary."[246] As noted above, these leases were in front of the Coastal Commission when it issued its Consistency Certification and Offshore CDP, and the conditions contained within these leases were expressly incorporated into the project that the Coastal Commission reviewed and approved.[247]

Further, recent lease amendments have provided more specificity regarding the scope of inspection activities that are required to ensure that potential offshore hazards to the Offshore Pipelines are identified:

> "Lessee shall adhere to and complete a comprehensive series of standard inspection protocols, as described below … to assess the presence and risk of hazards including, but not limited to damage, corrosion and pipeline movement. Inspection methods shall encompass both internal and external evaluations, utilizing established industry practices such as Remotely Operated Vehicle (ROV)… assessments."[248]

Accordingly, in July 2024, Sable conducted SLC-approved ROV surveys of the Offshore Pipelines as part of the SLC lease obligations. Specifically, the ROV surveys involved a visual pipeline survey including inspection for scour and pipeline spans, a continuous pipeline-to-electrolyte cathodic potential survey, and documentation of anomalies such as damage or debris. The survey equipment, including the Falcon ROV system was loaded aboard M/V Danny C vessel on July 11, 2024 in Port Hueneme, CA. The survey in state waters was conducted between

---

[244] See Document No. 9, Lease No. 7163.1 and Document No. 14, Lease No. 4977.1.

[245] See Document No. 9, Lease No. 7163.1, Section 4, General Provision No. 4(b) (January 21, 1988).

[246] See Document No. 9, Lease No. 7163.1, Section 2, Special Provisions No. 11(j) (January 21, 1988).

[247] See Document No. 13, Staff Recommendation on Permit and Consistency Certification, p. 23 ("[T]he project as described includes the conditions imposed in the Santa Barbara County and APCD, and the State Lands Commission approvals.").

[248] See Document No. 44, State Lands Commission Amendment of Leases Nos. PRC 7163, Section 19.b.i and PRC 4977, Section 21.b.i (December 2023).

**LATHAM&WATKINS** LLP

July 11th-16th. The inspection results found that the "Santa Ynez Unit pipelines were generally found to be in good condition with no visible external damage."[249]

The inspection included a pipeline free span survey performed by the ROV equipped with a high-resolution color video camera and color sonar for span documentation. The Offshore Pipeline free spans were measured using conventional navigation methods and by sonar. Any unsupported pipe (i.e., visible water underneath the pipeline) was considered a span. Span lengths that were determined to be greater than 80 feet by using conventional navigation methods were re-measured. The ROV was moved back along the span on the opposite side of the pipeline to re-locate the beginning of the span. Once the beginning of the span was re-located, the distance was re-measured. Span heights were estimated visually and identified for the pipeline's maximum height off of the seabed of noted spans.

Twenty-one free spans were located on the 20-inch oil emulsion pipeline in state waters from Platform Harmony to shore, ranging from 10 feet to 66 feet. Seventeen free spans were located on the 12-inch treated water pipeline in state waters from shore to Platform Harmony ranging from 15 feet to 70 feet. No significant free spans were identified on the 12-inch gas pipeline in state waters.

In addition to the requirement to perform an ROV survey, SLC lease obligations include a requirement to perform a seismic vulnerability assessment of the pipelines though state waters.[250] Sable contracted Spire Engineering Services to perform the assessment for each of the lines and provide a set of maximum allowable span criteria to be used to assess which of the identified pipeline spans needed remediation.[251] The maximum allowable pipeline span lengths from the vulnerability assessment for the 20-inch Oil Emulsion Pipeline and 12-inch Treated Water Pipeline in state waters are summarized in the table below.[252]

---

[249] See Document No. 45, Sable Offshore Santa Ynez Unit (SYU) to Shore External Subsea Pipeline Inspection Report State Waters to Shore (July 2024), p. 6.

[250] Document No. 44, Section 21.b.iv ("Lessee shall complete a Pipeline Seismic Vulnerability Assessment … using a third-party California Licensed Professional Engineer.").

[251] See Document No. 55, Spire Engineering, "SYU Expansion Pipelines Seismic Vulnerability Review" and "POPCO Pipeline Seismic Vulnerability Assessment" (October 2024).

[252] The maximum allowable span length for the 12-inch gas pipeline was determined to be 54 feet. Because the identified spans on the 12-inch gas pipeline in state waters were shorter than 54 feet, no span remediation activities in state waters were necessary on that pipeline.

LATHAM&WATKINS LLP

**Maximum Allowable Pipeline Span Lengths: State Waters**

| Pipeline Designation | Wall Thickness (in) | Concrete Coat Thickness (in) | Water Depth Range (ft) | Allowable Span | | Minimum Curve Radius (ft) |
|---|---|---|---|---|---|---|
| | | | | Straight (ft) | Curved (ft) | |
| 20" Oil Emulsion Line | 0.50 | 1.75 | 0-25 | 70.5 | 69.5 | 9000 |
| | 0.50 | 2.50 | 25-50 | 68.5 | 63.5 | 9000 |
| | 0.50 | 1.75 | 50-120 | 70.5 | 69.5 | 9000 |
| | 0.50 | 1.50 | 120-~320 | 55.0 | 50.0 | 9000 |
| 12" Treated Water Line | 0.50 | 1.50 | 0-50 | 47.0 | 47.0 | 9000 |
| | 0.50 | 1.00 | 50-150 | 46.5 | 46.0 | 9000 |
| | 0.50 | 0.00 | 150-~320 | 47.5 | 47.0 | 9000 |

The allowable pipeline span lengths from the vulnerability assessment were compared to the identified spans from the ROV surveys. The table below documents the spans that required remediation. These spans include those beyond the allowable length as well as those close to the allowable length which, over time, could develop into spans requiring remediation.

**Span Remediation: State Waters**

| SPAN ID | PIPELINE | SPAN LENGTH | APPROXIMATE WATER DEPTH |
|---|---|---|---|
| | | (Feet) | (Feet) |
| 1 | 20" EMULSION | 48' | 253' |
| 2 | 20" EMULSION | 41' | 253' |
| 3 | 20" EMULSION | 44' | 276' |
| 4 | 20" EMULSION | 50' | 277' |
| 5 | 20" EMULSION | 48' | 279' |
| 6 | 20" EMULSION | 66' | 279' |
| 7 | 20" EMULSION | 61' | 276' |
| 8 | 20" EMULSION | 53' | 281' |
| 9 | 12" WATER | 66' | 265' |
| 10 | 12" WATER | 53' | 265' |
| 11 | 12" WATER | 42' | 275' |
| 12 | 12" WATER | 70' | 275' |
| 13 | 12" WATER | 58' | 278' |
| 14 | 12" WATER | 56' | 277' |

LATHAM&WATKINS LLP

### 1. The Span Remediation Work Was Approved by SLC

After identifying the spans that require remediation pursuant to Sable's SLC leases, on November 19, Sable sought approval from SLC to undertake the Span Remediation Work. As Sable explained to SLC, "[t]he process to complete this project is the same as has been completed in past SYU pipeline span remediation programs.  The steps to complete this work are as follows:

- The SBCo APCD approved project vessel MV Loren-C with an Aqueos ROV will be mobilized to the work site with sand/cement bags.

- The ROV will conduct a pre-installation survey to verify the location.

- The sand/cement bags will be deployed to the seafloor near the span remediation site.

- The ROV will place the sand/cement bags under and against the span at the remediation site.  This will be completed for each side of the span remediation location.

- The ROV will verify that all sand/cement bags are in the proper position.

- This process will be repeated at all identified span remediation locations.

- A Notice to Fishermen has been filed the Joint Oil/Fisheries Liaison Office.

- A Notice to Mariners has been filed with the USCG."[253]

Sable also submitted the following documents to SLC for review:

1. ROV Pipeline Span Mitigation Execution Plan[254]

2. Map of the Span Locations[255]

3. Seismic Vulnerability Reviews for State Waters.[256]

On November 26, 2024, the SLC responded, acknowledging receipt of Sable's request and requesting additional information, including:

---

[253] See Document No. 60, Sable Letter to SLC re: Santa Ynez Unit Pipeline Span Remediation (November 19, 2024).

[254] See Document No. 49, Execution Plan – Pipeline Span Mitigations (October 2024).

[255] See Document No. 57, SYU in State Waters Span Investigation 2024 ROV Inspection Survey Post-Plot (November 2024).

[256] See Document No. 55, Spire Engineering, SYU Expansion Pipelines Seismic Vulnerability Review (October 2024).

**LATHAM&WATKINS**LLP

- Certification of seismic vulnerability assessments.

- Detailed calculations and definitions.

- A hazardous spill contingency plan.

- Confirmation of anchoring plans.

- A critical operations and curtailment plan.

- A construction schedule and Environmental, Health, and Safety Manual.[257]

Sable met with SLC on November 27, 2024 to discuss the requested information and sent in all of the requested documentation later that day.[258]  The same day, SLC then emailed approval to Sable to proceed with the work.[259]  SLC sent an official approval letter on December 4th.[260]

### 2. The Span Remediation Work Was Routine Maintenance Conducted With No Harm to Coastal Resources

Sable undertook the approved Span Remediation Work in state waters over a three-day period from November 29, 2024 to December 1, 2024, consistent with the API Recommended Practice 1111, as outlined in the existing DPP, discussed above.

The Span Remediation Work included conducting a pre-installation survey, deploying 3:1 sand-to-cement burlap bags, and positioning them to provide necessary support to the Offshore Pipelines. Utilizing the vessel Curtin Loren-C and an Aqueos ROV, the project deployed 3:1 sand-to-cement burlap bags via a specially designed "SlingBag" to create support piers along the identified spans.

#### a. *The SlingBag and 3:1 Burlap Bags*

The SlingBag[261] is specially designed for efficient and environmentally friendly pipeline stabilization, particularly suitable for offshore pipeline span remediation projects.  Each SlingBag is constructed from a heavy-duty woven polypropylene fabric, equipped with four 24-inch polyester lifting loops, and contains fifty-six 60-lb burlap bags, totaling about one cubic

---

[257] See Document No. 67, SLC Letter to Sable Offshore, Re: Sable Santa Ynez Unit – Emulsion, Gas and Water Pipelines Span Remediation Project (November 26, 2024).

[258] See Document No. 68, Sable Letter to SLC, Re: Sable Santa Ynez Unit- Emulsion, Gas and Water Pipelines Span Remediation Project – Additional Information Request, With Attachments (November 27, 2024).

[259] See Document No. 69, SLC Email to SLC, Re: SYU Pipeline – Span Remediation – Request for Information (November 27, 2024).

[260] See Document No. 71, SLC Letter to Sable, Re: Re: Sable Santa Ynez Unit – Emulsion, Gas and Water Pipelines Span Remediation Project (December 4, 2024).

[261] See Document No. 33, Burlap SlingBag Brochure.

LATHAM&WATKINS LLP

yard of volume.  As shown on the manufacturer's website, Slingbags have been used extensively for pipeline support, stabilization, and protection projects.[262]



**Figure 1. The SlingBag**

High-strength, 4000 PSI (27.5 MPa) commercial-grade blend of graded sand and Portland cement are packaged in biodegradable 10 oz. burlap bags, which prevent the cement from escaping into the water.  According to the manufacturer, the sand-cement blend is formulated to harden after initial placement, is harmless to wildlife and as the bags degrade, there is the appearance of a natural stone.[263] This composition ensures that the bags bond together effectively, providing a stable and durable support structure once hardened.  The biodegradable burlap material is also harmless to wildlife, with no chemical print on the bags.[264]



**Figure 2. 3:1 Sand-to-Cement Burlap Bags**

---

[262] See Project Gallery, available at: https://slingbag.net/project.html.
[263] See Document No. 32, SlingBag Product Description.
[264] *Id.*

LATHAM&WATKINS LLP

The SlingBag system is engineered for safe, efficient use, allowing for single-point pick-up and placement underwater. This system has been successfully utilized many times for the precise application used here.[265] The deployment process is straightforward: an ROV can release and place the 3:1 sand-to-cement burlap bags by unhooking any two lifting loops in a row and lifting the SlingBag. This method facilitates up to five times faster placement than other techniques, creating a bonded support pyramid that stabilizes pipelines and provides easy access to valves and other protected structures. The SlingBag is then immediately brought back up to the vessel, leaving nothing behind in the water.

b.      *Span Remediation Report*

As detailed in Aqueos' "Sable Offshore State Waters SYU Pipeline Span Remediation Report," attached as Document No. 80, the Curtin Loren-C was dynamically positioned and no anchors were deployed during the Span Remediation Work process. The process began with a pre-installation survey conducted by the ROV to verify and confirm the exact span locations. The vessel crew then removed the 3:1 burlap bags from pallets on the deck of the Curtin Loren-C and placed them into SlingBags. The vessel crew then deployed the SlingBag, guided by the ROV to precise locations adjacent to the pipeline. Once lowered, one end of the SlingBag was released, depositing the 3:1 sand-to-cement burlap bags in close proximity to where they needed to be placed. The SlingBag was then immediately brought back to the deck of the Curtin Loren-C.



**Figure 3. SlingBag Releasing 3:1 Burlap Bags**

The ROV then strategically placed the 3:1 sand-to-cement burlap bags to provide maximum support, ensuring the stability and integrity of the pipeline requiring span remediation.

---

[265] See Project Gallery, available at: https://slingbag.net/project.html.

LATHAM&WATKINS LLP



**Figure 4. ROV Positioning 3:1 Burlap Bags**

This operation was repeated across all predetermined support locations for the Offshore Pipelines, with additional SlingBags available for any extra spans identified during the ROV inspection (though no extra spans were identified).



**Figure 5. Example of Completed Span Remediation**

SlingBags were deployed along the 14 identified locations to place the 3:1 burlap bags. Fifty-six 3:1 sand-to-cement burlap bags were placed within each SlingBag. For most locations, one SlingBag was used on each side of the pipeline to locate the 3:1 sand-to-cement burlap bags in the middle of the identified span. All Span Remediation Work was documented and can be found in Document No. 80. In the EDCDO/NOI and 2025 NOV, Commission staff mischaracterize the Span Remediation Work stating that: "concrete fill material [was placed] across 14 separate areas totaling over 750 linear feet." This is incorrect. The supports were installed across approximately 150 linear feet of the pipeline. Commission staff further

LATHAM&WATKINS LLP

mischaracterize the Span Remediation Work by stating that "pallets" were placed along the pipeline.  This is incorrect.  As described above, the pallets remained on board the Curtin Loren-C at all times.  The only materials that remained in the water following the Span Remediation Work were the 3:1 sand-to-cement burlap bags that made up the pipeline supports.[266]

On January 30, 2025, Sable sent SLC a Pipeline Span Remediation Report, providing a post construction report, a copy of daily job logs compiled during the daily activities, a post construction seafloor survey of the project area to provide a graphic record of the work accomplished and to confirm sea floor cleanup and site restoration, confirmation that no dropped objects or debris were created during this project, with all materials being recovered and no debris or spills from the vessel were lost to the water.[267]

### c.    *No Harm to Coastal Resources*

During the Span Remediation Work, no coastal resources were harmed, as the contractors prioritized environmental protection and utilized best management practices.  Biodegradable burlap bags filled with a sand-cement blend were used to create stable support structures for the pipelines.  All SlingBags were successfully recovered, and no debris or spills occurred from the vessel.  The use of a dynamically positioned vessel eliminated the need for anchors, reducing environmental disturbance.  Notifications were sent to the U.S. Coast Guard and the Joint Oil/Fisheries Liaison Office to facilitate coordination and address any potential conflicts with the fishing community.  The 3:1 sand-to-cement bags were strategically placed in a mounded support structure, providing pipeline support without leaving any slings, ropes, or loops subsea, thus preventing potential entanglement of marine mammals.  Deck personnel monitored for marine mammals during SlingBag deployment and recovery.  All SlingBags and plastic packaging were contained on the deck and disposed of onshore at the completion of the Span Remediation Work.  The 3:1 sand-to-cement bags were deployed within the existing pipeline right-of-way, adjacent to either side of the pipeline from a low height, ensuring precise placement and minimal impact.

### d.    *Span Remediation Work Adheres to Past Maintenance Practice on SYU Pipelines*

Exxon's previous pipeline span remediation activities serve as a clear precedent for the approval of similar maintenance work under existing regulatory frameworks, without the need for additional CDPs or consistency certifications.

For example, in 2012, SLC and BSEE issued approvals to Exxon to conduct span remediation maintenance on the Santa Ynez Unit pipelines.  This work involved installing the same type of sand-concrete bags using the same methodology employed by Sable in its recent

---

[266] Commission staff further state that "soft-concrete" bags were also used in addition to the 3:1 sand-to-cement burlap bags. This is not accurate. Only 3:1 sand-to-cement burlap bags were used. Once in the water, the sand-cement bags harden into concrete.

[267] See Document No. 80, Santa Ynez Unit Pipeline Span Remediation Report, with Attachments (January 30, 2025).

Span Remediation Work.[268]  The scope of Exxon's approved work included the use of a dynamically positioned vessel to conduct an ROV survey of potential span areas and installing cement bag supports on and under the pipelines.  This approach was designed to reduce free span lengths, ensuring the continued safe operation of the pipelines.  The work was characterized as "minor maintenance and repairs."[269]

As shown in correspondence regarding this 2012 work, Coastal Commission staff was copied on and aware of Exxon's proposed maintenance activities and did not object to BSEE and SLC's approvals or require any new CDP, Coastal Act authorization, or consistency certification.[270]  While Commission staff claim in the EDCDO/NOI that this notification is insufficient to provide Coastal Act authorization for the work, the fact remains that the work already was authorized by the Off-Shore CDP and Consistency Certification.[271]  Sable's Span Remediation Work is fully consistent with Exxon's maintenance activities from 2012, and similarly does not require a new CDP or consistency certification.  Commission staff cannot now require Sable to obtain new permits for span remediation activities, when similar work by Exxon did not necessitate the additional permits that staff is requesting.

3.     Limited Precedent Demonstrates *De Minimis Impacts*

Sable has located only two instances where an applicant sought Commission authorization for similar work as the Span Remediation Work. While the facts may be different as to why the applicants sought Commission approval (e.g., the history of the relevant CDPs did not contemplate this sort of activity), what is similar is that the actual work completed had *de minimis* impacts on the environment.  In both cases, the Commission issued a *de minimis* waiver, recognizing the minimal environmental impact of the proposed activities.

In the first instance, Aera Energy LLC received a *de minimis* waiver in December 2010 for stabilizing a section of Platform Emmy's offshore oil production pipeline using sandbags.[272]  The work involved placing sandbags in a pyramid formation to support a spanning pipeline, similar to the method used by Sable. In that matter, the Coastal Commission determined that the project would not have a significant adverse effect on coastal resources.[273]

Similarly, in November 2022, California Resources Corporation was granted *a de minimis* waiver for rectification work on two existing pipelines offshore Huntington Beach.[274]  This involved installing sandbags at locations where the pipeline had lost contact with the seafloor, akin to Sable's Span Remediation Work. The Coastal Commission again recognized the

---

[268] See Document No. 28, BSEE Update of Pacific OCS Region Pipelines (Oct. 2014), pp. 11-16.
[269] See Document No. 23, July 7, 2011 Letter from Exxon to SLC.
[270] See Document No. 24, January 27, 2012 Letter from Exxon to SLC.
[271] See Document No. 90, EDCDO/NOI, p. 10.
[272] See Document No. 22, Notice of Coastal Development Permit Waiver – De Minimis (Dec. 9, 2010).
[273] *Id*. at p. 2.
[274] See Document No. 40, Notice of Coastal Development Permit De Minimis Waiver Coastal Act Section 30624.7 (Oct. 18, 2022).

**LATHAM&WATKINS**LLP

limited environmental impact, noting that the work would not adversely affect coastal resources.[275]

These examples demonstrate that the Commission previously has acknowledged the routine and low-impact nature of similar maintenance activities by issuing *de minimis* waivers. Therefore, Sable's Span Remediation Work, which does not involve impacts that are different from this precedent, should not be judged to require a new CDP. As discussed above, the activities were conducted with minimal environmental impact, caused no harm to coastal resources, and were consistent with established practices for which the Commission had previously waived any requirements.

### D.    No Restoration Order or Penalties May Be Issued

Commission staff assert that the Commission may issue a restoration order concerning Sable's Span Remediation Work. However, the Coastal Act does not permit a restoration order or any penalties to be issued regarding this work. Section 30811 of the Coastal Act allows the Commission to issue a restoration order "if it finds that the development has occurred without a coastal development permit from the commission [or] local government, the development is inconsistent with [the Coastal Act], and the development is causing continuing resource damage."[276] None of these conditions exist here. As detailed above, the Span Remediation Work was conducted under the oversight of the SLC and in accordance with the original Offshore CDP, meaning the work did not "occur[] without a coastal development permit." The activities were consistent with the Coastal Act, as they were anticipated within the original permitting framework and aligned with both federal and state regulatory standards. Furthermore, Sable implemented several best management practices during the Span Remediation Work to avoid impacts on coastal resources. Therefore, Sable's Span Remediation Work is not "causing continuing resource damage." Because none of the statutorily required conditions exist for the issuance of a restoration order, no such order may be issued.

Commission staff also assert that Coastal Act sections 30820, 30821.3, 30821.6, and 30822 authorize penalties against Sable related to the Span Remediation Work. None of these sections apply here, and thus no penalties may be levied. Section 30820 authorizes civil penalties to be imposed by the superior court when a person "undertakes development that is in violation [of the Coastal Act] or that is inconsistent with any coastal development permit previously issued by the commission [or] a local government,"[277] and section 30822 authorizes actions for exemplary damages when a person has "intentionally and knowingly violated any provision of [the Coastal Act]."[278] Here, the Span Remediation Work was authorized under the existing Offshore CDP, and thus no Coastal Act violation occurred. Similarly, section 30821.3 authorizes the Commission to levy administrative penalties against a person "who is in violation of any provision of [the Coastal Act]." Again, as the Span Remediation Work was conducted

---

[275] *Id*. at p. 2.
[276] Pub. Res. Code, § 30811.  Even if Sable's Span Remediation Work were not authorized by the Offshore CDP, such work is not inconsistent with the Coastal Act and could receive a coastal development permit from the Commission.
[277] Pub. Res. Code, § 30820.
[278] Pub. Res. Code, § 30822.

**LATHAM&WATKINS** LLP

with authorization under the Coastal Act pursuant to the existing Offshore CDP, no Coastal Act violation occurred.  Finally, section 30821.6 authorizes civil liability against persons who "intentionally or negligently violate[] any cease and desist order," with the "actual penalty imposed [to] be reasonably proportionate to the damage suffered as a consequence of the violation."[279]  Here, neither Commission staff nor the full Commission possessed the authority to issue any Cease and Desist Order with respect to the Span Remediation Work because such work was authorized by the existing Offshore CDP. Moreover, as discussed above, Sable implemented several best management practices to ensure that no damage to coastal resources occurred as a result of the work.  Finally, Sable was not under any alleged cease and desist order related to the offshore pipelines when the work was completed.  Accordingly, contrary to the EDCDO's allegations, no penalties may be levied against Sable related to the Span Remediation Work.

### E.     Conclusion

In conclusion, the Commission, in issuing the Offshore CDP already reviewed and approved Sable's Span Remediation Work on the SYU pipelines.  Thus, no new authorization from the Commission was required.  Further, the work was conducted in compliance with industry standards and regulatory requirements, ensuring pipeline integrity and environmental protection.  The activities were executed under the guidelines and oversight of the SLC and in line with the Offshore CDP. This work was consistent with past maintenance practices and anticipated within the original permitting framework.

The Commission's allegations in the 2025 NOV and EDCDO/NOI are incorrect, both factually and legally.  The Span Remediation Work previously was authorized and aligns with both federal and state regulatory standards.  The Commission's claim that a new CDP is required overlooks the fact that such maintenance was included in the DPP, the original federal Consistency Certification, and Offshore CDP.

---

[279] Pub. Res. Code, § 30821.6.

STATE OF CALIFORNIA – CALIFORNIA NATURAL RESOURCES AGENCY                                         GAVIN NEWSOM, *GOVERNOR*

# CALIFORNIA COASTAL COMMISSION

455 MARKET STREET, SUITE 300
SAN FRANCISCO, CA 94105-2421
VOICE (415) 904-5200
FAX (415) 904-5400



**Attachment B**

### STATEMENT OF DEFENSE FORM

**DEPENDING ON THE OUTCOME OF FURTHER DISCUSSIONS THAT OCCUR WITH COMMISSION ENFORCEMENT STAFF AFTER YOU HAVE COMPLETED AND RETURNED THIS FORM, ADMINISTRATIVE OR JUDICIAL ENFORCEMENT PROCEEDINGS MAY PROCEED AGAINST YOU. IF THAT OCCURS, ANY STATEMENTS THAT YOU MAKE ON THIS FORM WILL BECOME PART OF THE ENFORCEMENT RECORD AND MAY BE USED AGAINST YOU.**

**YOU MAY WISH TO CONSULT WITH OR RETAIN AN ATTORNEY BEFORE COMPLETING THIS FORM OR OTHERWISE CONTACT THE COMMISSION ENFORCEMENT STAFF.**

This form is accompanied by either a cease and desist order issued by the executive director or a notice of intent to initiate cease and desist order proceedings before the commission. This document indicates that you are or may be responsible for or in some way involved in either a violation of the commission's laws or a commission permit. The document summarizes what the (possible) violation involves, who is or may be responsible for it, where and when it (may have) occurred, and other pertinent information concerning the (possible) violation.

This form requires you to respond to the (alleged) facts contained in the document, to raise any affirmative defenses that you believe apply, and to inform the staff of all facts that you believe may exonerate you of any legal responsibility for the (possible) violation or may mitigate your responsibility. This form also requires you to enclose with the completed statement of defense form copies of all written documents, such as letters, photographs, maps, drawings, etc. and written declarations under penalty of perjury that you want the commission to consider as part of this enforcement hearing.

You should complete the form as fully and accurately as you can and as quickly as you can and return it no later than _____ to the commission's enforcement staff at the following address:

_____
California Coastal Commission
45 Fremont Street, Suite 2000
San Francisco, California 94105

If you have any questions, please contact as soon as possible Stephanie Cook of the Commission enforcement staff at telephone number (415) 795-9993.

Sable Offshore Corp.
03/10/2025
Page 2 of 3

1.      **Facts or allegations contained in the cease and desist order or the notice of intent that you admit (with specific reference to the paragraph number in the order):**

Please see Attachment C for specific responses to each allegation contained in the Executive Director Cease and Desist Order No. ED-25-CD-01 and Notice of Intent to Commence Proceedings for a Commission Cease and Desist Order, Restoration Order, and Administrative Penalty Order ("EDCDO/NOI").

_____

2.      **Facts or allegations contained in the cease and desist order or notice of intent that you deny (with specific reference to paragraph number in the order):**

Please see Attachment C for specific responses to each allegation contained in the EDCDO/NOI.

_____

3.      **Facts or allegations contained in the cease and desist order or notice of intent of which you have no personal knowledge (with specific reference to paragraph number in the order):**

Please see Attachment C for specific responses to each allegation contained in the EDCDO/NOI.

_____

4.      **Other facts which may exonerate or mitigate your possible responsibility or otherwise explain your relationship to the possible violation (be as specific as you can; if you have or know of any document(s), photograph(s), map(s), letter(s), or other evidence that you believe is/are relevant, please identify it/them by name, date, type, and any other identifying information and provide the original(s) or (a) copy(ies) if you can:**

Please see Attachment A for a narrative explanation of Sable's conduct and position with respect to the alleged Coastal Act violations.  Please see Attachment D for documents and evidence supporting Sable's narrative explanation in Attachment A and specific responses to the allegations in Attachment C.

_____

5.      **Any other information, statement, etc. that you want to offer or make:**

Please see Attachment A for a narrative explanation of Sable's conduct and position with respect to the alleged Coastal Act violations.

_____

6.      **Documents, exhibits, declarations under penalty of perjury or other materials that you have attached to this form to support your answers or that you want to be made part of the**

Sable Offshore Corp.
03/10/2025
Page 3 of 3

        **administrative record for this enforcement proceeding (Please list in chronological order by date, author, and title, and enclose a copy with this completed form):**

Please see Attachment A for a narrative explanation of Sable's conduct and position with respect to the alleged Coastal Act violations.  Please see Attachment D for documents and evidence supporting Sable's narrative explanation in Attachment A and specific responses to the allegations in Attachment C.

_____

**Attachment C**

**Responses to EDCDO/NOI Allegations**

This Attachment C responds to each statement in Coastal Commission staff's February 18, 2025, Executive Director Cease and Desist Order No. ED-25-CD-01 and Notice of Intent to Commence Proceedings for a Commission Cease and Desist Order, Restoration Order, and Administrative Penalty Order ("EDCDO/NOI"). This Attachment C responds to the Statement of Defense Form questions 1, 2, and 3, which request the facts or allegations contained in the EDCDO/NOI that are being admitted, denied, or for which there is no personal knowledge. The Statement of Defense requests that each response include a specific reference to a paragraph number from the EDCDO/NOI. Accordingly, the EDCDO/NOI has been copied below and separated by paragraph. Each numbered "Paragraph" statement refers to a direct quote from the EDCDO/NOI. Each "Response" statement responds to the immediately preceding Paragraph statement and is numbered accordingly.

**Paragraph 1.**    *Subject: Executive Director Cease and Desist Order No. ED- 25-CD-01 and Notice of Intent to Commence Proceedings for a Commission Cease and Desist Order, Restoration Order, and Administrative Penalty Order*

*Date Issued: 02/18/2025*

*Expiration Date: 05/19/2025*

*Violation Nos.: V-9-25-0013 and V-9-24-0152*

**Response 1.**    Paragraph 1 speaks for itself and no response is required. Sable Offshore Corp. ("Sable") denies that the Coastal Commission ("Commission") possesses the authority to issue any Cease and Desist Order, whether issued by the Executive Director or Commission. Sable denies all allegations of Coastal Act violations. Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial.

**Paragraph 2.**    *Location:*

*The properties that are subject to this order are at various locations along the existing Las Flores Pipelines CA-324 and CA-325 within the Coastal Zone, between the Gaviota coast and the Las Padres National Forest, and areas surrounding the pipelines that are being or could be impacted by the development activities at issue here, in which the parties subject to this order are performing or intend to perform any of the activities described below, all within Santa Barbara County. The properties that are subject to the Notice of Intent to commence further enforcement proceedings are those same properties as well as areas previously impacted by similar work and offshore locations along the larger Santa Ynez Unit pipeline, in state waters, where the parties subject to this notice have undertaken unpermitted development in placing sand/cement bags and pallets on the seafloor below and adjacent to Sable's out-of-service offshore oil and water pipelines as part of an effort to restart SYU oil production operations and bring the pipelines back into use.*

**Response 2.**    Sable denies that the Commission possesses the authority to issue any Cease and Desist Order and further denies each and every allegation of unpermitted development contained in Paragraph 2. Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial. Sable admits that the properties at issue are all located either in Santa Barbara County between the Gaviota coast and the Los Padres

1

National Forest along the existing Las Flores Pipelines CA-324 and CA-325 within the Coastal Zone or offshore along existing Santa Ynez Unit ("SYU") pipeline locations.

**Paragraph 3.**    *Violation Description:  Activities onshore including, but not limited to, excavation with heavy equipment; removal of major vegetation; grading and widening of roads; installation of metal plates over water courses; dewatering and discharge of water; pipeline removal, replacement, and reinforcement; installation of shutoff valves; and other development associated with the Las Flores Pipelines CA-324 and CA-325; as well as offshore development including, but not necessarily limited to, placing sand/cement bags and pallets on the seafloor below and adjacent to Sable's out-of-service offshore oil and water pipelines; all without the requisite Coastal Act authorization, as part of an effort to restart Santa Ynez Unit oil production operations and bring the pipelines back into use.[1]*

**Response 3.**    Sable denies all allegations of Coastal Act violations and further denies each and every allegation of unpermitted development contained in Paragraph 3.  Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial.

**Paragraph 4.**    *Dear Sirs,  This is in furtherance of our discussions regarding the recent activities of Sable.  I want to note that we are not taking a position regarding the underlying merits of the pipeline and of Sable's recent activities here, but want to work with you to ensure that any actions taken here, in this iconic area, are done in a way that protects the fragile ecosystem, and the humans and animals in the area.  We remain more than willing to work with you to ensure that any work contains any necessary protections and conforms with applicable laws. We again offer to work with you and the County on a consolidated permit to move forward in the most efficient and streamlined manner possible and are available to discuss options with you going forward.*

**Response 4.**    Sable denies that a consolidated permit is procedurally proper, as further addressed in Attachment A, Sections III.B.6 and III.C.8, and further denies each and every remaining allegation contained in Paragraph 4.  Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial.

## I.  ORDER

**Paragraph 5.**    *Pursuant to my authority under California Public Resources Code ("PRC") Section 30809, as the Executive Director of the California Coastal Commission ("Commission"), I hereby issue this Executive Director Cease and Desist Order ("EDCDO" or "this Order"), which orders you, Sable Offshore Corp.  ("Sable"), as the owner and operator of Las Flores Pipelines CA-324 and CA-325 ("Pipeline"), to cease further work along the Pipeline and immediately surrounding areas unless and until authorized by a new, final coastal development permit ("CDP").[2]*

**Response 5.**    Paragraph 5 speaks for itself and no response is required.  Sable denies that the Commission possesses the authority under the Coastal Act to issue any Cease and Desist Orders, including the EDCDO pursuant to PRC Section 30809, because, as further addressed in

---

[1]  Please note that the description herein of the violations at issue is not necessarily a complete list of all unpermitted development on the properties in violation of the Coastal Act.

[2]  A "final" coastal development permit as used here means one that is: (a) no longer subject to appeal, either within the County system or to the Commission, and whether because the time period for such appeals has elapsed or because all such appeals have been completed.

US-DOCS\157757697

Attachment A, Sections III.B.4 and III.C.6, Santa Barbara County has authorized Sable's work along Las Flores Pipelines CA-324 and CA-325 under the County's approved coastal development permits for those facilities. Please see Attachment A, Section III, for additional background and support regarding Sable's denial.

**Paragraph 6.**   *Compliance with the following terms is intended to ensure that all development described in Section E, below, remains halted, ensuring that further unnecessary damaging effects to coastal resources are avoided, while Sable obtains the legally necessary authorization for future, proposed development, and/or for any steps needed restore the site, as follows.*

**Response 6.**   Sable denies each and every allegation contained in Paragraph 6, including without limitation that Sable's activities are causing damaging effects to coastal resources. Please see Attachment A, Section III, for additional background and support regarding Sable's denial.

**Paragraph 7.**   *Pursuant to my authority under PRC Section 30809, I hereby order Sable:*

*1.    To cease and desist from conducting any further development at the onshore locations described above unless you have submitted evidence, for my review and approval, demonstrating that you possess the necessary Coastal Act authorization for the work and have received my written approval to proceed.*

*2.    If you decide you wish to proceed, either: (a) demonstrate, to my satisfaction, that Sable already possesses the necessary Coastal Act authorization for the work, which Sable has not yet demonstrated;[3] or (b) obtain a new, final, operative CDP or other valid Coastal Act authorization specifically covering the work at issue and comply with the terms of any final, validly issued CDPs.*

**Response 7.**   Sable denies that the Commission possesses the authority to issue any Cease and Desist Orders, including the EDCDO, pursuant to PRC Section 30809, because, as further addressed in Attachment A, Sections III.B.4 and III.C.6, Santa Barbara County has authorized Sable's work along Las Flores Pipelines CA-324 and CA-325 under the County's approved coastal development permits for those facilities, which are both final and no longer subject to appeal. Sable previously has demonstrated to Commission staff that Sable possesses the necessary Coastal Act authorization for the work at issue. Sable denies each and every remaining allegation in Paragraph 7. Please see Attachment A, Section III, for additional background and support regarding Sable's denial.

## A.    ENTITIES SUBJECT TO THE ORDER

**Paragraph 8.**   *The parties whose actions or inactions are subject to this Order are Sable Offshore Corp; all employees, agents, and contractors of the foregoing; and any other person or entity acting in concert with the foregoing.*

**Response 8.**   Sable admits that it is involved in certain activities described in the EDCDO. Sable denies that the Commission possesses the authority to issue any Cease and Desist Orders, including the EDCDO, as further addressed in Attachment A, Sections III.B.4 and III.C.6, and further denies each and every remaining allegation contained in Paragraph 8. Please

---

[3] We offer this option as an accommodation and remain willing to review and consider any additional permit language Sable may provide at any time, including after issuance of this EDCDO.

US-DOCS\157757697

see Attachment A, Section III, for additional background and support regarding Sable's denial.

## B.    IDENTIFICATION OF THE PROPERTIES

**Paragraph 9.**    *The properties that are subject to this are various locations along the existing Las Flores Pipelines CA-324 and CA-325 within the Coastal Zone, between the Gaviota coast and the Las Padres National Forest, areas surrounding the Pipeline and impacted by the development activities at issue here, all within Santa Barbara County.*

**Response 9.**    Sable admits that the onshore properties at issue are all located either in Santa Barbara County between the Gaviota coast and the Los Padres National Forest along the existing Las Flores Pipelines CA-324 and CA-325 within the Coastal Zone.  Sable denies that the Commission possesses the authority to issue any Cease and Desist Orders, including the EDCDO, as further addressed in Attachment A, Sections III.B.4 and III.C.6, and further denies each and every remaining allegation contained in Paragraph 9.  Please see Attachment A, Section III, for additional background and support regarding Sable's denial.

## C.    DESCRIPTION OF THE VIOLATIONS

**Paragraph 10.**    *The Coastal Act violations and threatened violations addressed by this Order involve development that has occurred in the Coastal Zone without the requisite Coastal act authorization, including, but not necessarily limited to, excavation with heavy equipment; removal of major vegetation; grading and widening of roads; installation of metal plates over water courses; placement of fill in wetlands and coastal waters; dewatering and discharge of water; pipeline removal, replacement, and reinforcement; any installation of shutoff valves; and other development associated with Pipeline.*

**Response 10.**    Sable denies all allegations of any Coastal Act violations or unpermitted development, and further denies each and every allegation contained in Paragraph 10.  Please see Attachment A, Section III, for additional background and support regarding Sable's denial.

## D.    COMMISSION AUTHORITY TO ACT

**Paragraph 11.**    *The Executive Director is issuing this Order pursuant to her authority under PRC Section 30809, including, but not necessarily limited to, subdivision (a)(2) thereof.  The County has indicated that it believes the work at issue is authorized by prior permits, and thus, it does not agree with Commission staff's conclusion that the recently completed, ongoing and threatened, future work constitutes a violation of the Coastal Act and LCP.  Commission staff has explained its contrary position to the County on multiple occasions, most recently in a letter dated February 14, 2025.  In addition, on February 17, 2025, after a representative of Sable responded to my request that Sable forestall further activities and instead indicated that "Sable intends to proceed,"[4] Commission staff specifically requested that the County either take enforcement action or confirm that they were, in fact, not willing to take action to address the alleged violations noted above, pursuant to PRC Section 30809(a)(2).  Having received no response from the County by 12pm February 18, 2025, I am moving forward with issuing this EDCDO.*

**Response 11.**    Documents and communications described in Paragraph 11 speak for themselves.  Sable denies that the Executive Director possesses the authority to issue any Cease and Desist

---

[4] February 17, 2025, letter from DJ Moore, of Latham & Watkins LLP, writing on behalf of Sable.

4

US-DOCS\157757697

Orders, including the EDCDO pursuant to PRC Section 30809(a)(2), because, as further addressed in Attachment A, Sections III.B.4 and III.C.6, the County has confirmed that no further Coastal Act authorization was required for the onshore activities discussed in the EDCDO. Sable further denies each and every remaining allegation contained in Paragraph 11. Please see Attachment A, Section III, for additional background and support regarding Sable's denial.

### E.    EXECUTIVE DIRECTOR'S FINDINGS

**Paragraph 12.**    *As the Executive Director of the Commission, I am issuing this Order pursuant to my authority under PRC Sections 30809(a) to prevent further significant damage to coastal resources that, without this order, would be likely to occur. As noted in our Notice, Sable's continued work on the Pipeline would be likely to contribute to environmental impacts that could have been avoided, including the destabilization of rain-soaked hillsides and habitat areas, discharge of mud and debris into watercourses and wetlands, disturbance to nesting birds that could lead to nest and habitat abandonment, and declines in breeding success. Further, the history of this site has made it clear that the utmost caution, and safety, must be taken to avoid catastrophic damage to coastal resources such as those seen after the 2015 pipeline failure and resulting Refugio Oil Spill.*

**Response 12.**    As discussed above in Response 11, Sable denies that the Executive Director possesses the authority to issue any Cease and Desist Orders, including the EDCDO pursuant to PRC Section 30809(a), because the County has confirmed that no further Coastal Act authorization was required for the onshore activities described in the EDCDO, as further addressed in Attachment A, Sections III.B.4 and III.C.6. Sable denies that the subject work either has previously resulted, or in the future would result in any environmental impacts that were not already analyzed, mitigated for, and approved under the onshore pipelines' environmental review and the County's previously issued coastal development permits for the pipelines, as further discussed in Attachment A, Sections III.B.3 and III.C.3. Sable denies that Paragraph 12's discussion of the Refugio Oil Spill is proper or relevant because the Coastal Commission possesses no authority or jurisdiction over pipeline safety, which is subject to the exclusive jurisdiction of the Office of the State Fire Marshal. Sable further denies each and every remaining allegation contained in Paragraph 12. Please see Attachment A, Section III, for additional background and support regarding Sable's denial.

**Paragraph 13.**    *Commission enforcement staff informed Sable of the violations of the Coastal Act in an initial Notice of Violation letter sent to Sable on September 27, 2024, a follow-up letter sent October 4, 2024, and continued to discuss the violations in multiple virtual meetings over the course of the following weeks. On November 12, 2024, an EDCDO was issued directing Sable to immediately cease and desist from conducting any further unpermitted development along the Pipeline, submit an interim restoration plan to safely secure those sites where unpermitted development had occurred, and apply for a CDP for any proposed future work to be undertaken along the Pipeline, as well as for after-the-fact (ATF) authorization for unpermitted development that had already occurred. On February 11, 2025, Commission staff additionally issued a Notice of Violation letter for unpermitted development undertaken by Sable at locations offshore, in state waters. A more detailed recitation of the history is provided below.*

**Response 13.**    Documents and communications described in Paragraph 13 speak for themselves. Sable denies all allegations of Coastal Act violations and further denies each and every remaining

5

allegation contained in Paragraph 13.  Please see Attachment A, Section III, for additional background and support regarding Sable's denial.

**Paragraph 14.**  *With limited exceptions not applicable here, PRC Section 30600(a) states that, in addition to obtaining any other permit required by law, any person wishing to perform or undertake any development in the coastal zone must obtain a CDP. "Development" is defined by Section 30106 of the Coastal Act as follows:*

> *"'Development' means, <u>on land, in or under water</u>, <u>the placement or erection of any solid material or structure</u>; <u>discharge</u> or disposal of any dredged material or of any gaseous, <u>liquid</u>, solid, or thermal waste; <u>grading, removing</u>, dredging, mining, or <u>extraction of any materials</u>; change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act (commencing with Section 66410 of the Government Code), and any other division of land, including lot splits, except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use; <u>change in the intensity of use of water, or of access thereto</u>; <u>construction, reconstruction, demolition, or alteration of the size of any structure</u>, including any facility of any private, public, or municipal utility…" (emphasis added)*

**Response 14.**  Paragraph 14 quotes the Coastal Act, which speaks for itself.  Sable denies the allegation that no exceptions are applicable and further denies each and every remaining allegation contained in Paragraph 14. Please see Attachment A, Section III, for additional background and support regarding Sable's denial.

**Paragraph 15.**  *The Development described herein clearly constitutes "development" within the meaning of the above-quoted definition and therefore requires a CDP. Sable has not submitted an application for a CDP for any of its proposed future work at either onshore, or offshore locations, as described above, nor has Sable submitted any ATF application for work previously undertaken along the Pipeline and within the Coastal Zone.*

**Response 15.**  Sable denies all allegations of unpermitted development and further denies each and every remaining allegation contained in Paragraph 15.  Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial.  As set forth therein, Sable has submitted applications to the County for Coastal Act authorizations for both proposed future work and for work previously undertaken along the onshore pipelines within the Coastal Zone.

**Paragraph 16.**  *On September 27, 2024, Commission staff sent a "Notice of Violation" letter informing Sable that the Commission had become aware of unpermitted development activities taking place within the Coastal Zone, including excavation with heavy machinery, grading, and other activities at various locations along the Pipeline, apparently in connection with a proposed restart of the Santa Ynez Unit, consisting of three offshore platforms, Las Flores Canyon processing facility, and associated electrical transmission and onshore and offshore oil and gas transport pipelines. Commission staff requested Sable immediately cease all unpermitted development within the Coastal Zone, including all activities associated with Lines 324 and 325, as well as any potential development activities taking place along the offshore platforms and Pipeline. Commission staff further detailed the need for Coastal Act authorization for any development in the Coastal Zone, which should be sought through the submittal of an application(s) for the required CDP(s).*

6

US-DOCS\157757697

**Response 16.**    Documents and communications described in Paragraph 16 speak for themselves.  Sable denies all allegations of unpermitted development and further denies each and every remaining allegation contained in Paragraph 16.  Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial.

**Paragraph 17.**    *On October 1, 2024, Sable met with Commission staff to discuss the above-mentioned Coastal Act violations. In this conversation, Commission staff conveyed to Sable that all unpermitted development activities, along the Pipeline, must cease immediately. Immediate cessation of all work would result in several open pit sites, where excavation activities had already begun. Because of this, Commission staff and Sable discussed steps necessary to ensure the open pit sites could be temporarily secured. However, my staff made it clear to Sable that all work must stop immediately. Nonetheless, Commission staff received an email from Sable on October 2, 2025, stating that work had been suspended, "subject to taking interim measures". Commission staff met with Sable on October 3, 2025, to reiterate that all work must fully cease, and including any such "interim measures" which still amounted to development requiring Coastal Act authorization.*

**Response 17.**    Documents and communications described in Paragraph 17 speak for themselves.  Sable denies all allegations of unpermitted development and further denies each and every remaining allegation contained in Paragraph 17.  Please see Attachment A, Section III.B, for additional background and support regarding Sable's denial.

**Paragraph 18.**    *Despite these conversations, Commission staff received notice that Sable had yet to cease all work.*

**Response 18.**    Sable has no personal knowledge as to the allegations contained in Paragraph 18 and, on that basis, denies all such allegations.  Please see Attachment A, Section III.B.

**Paragraph 19.**    *Thus, on October 4, 2024, Commission staff sent a letter to Sable providing formal notice of the Executive Director's intent to issue an order, if necessary, to halt the ongoing project work, and requested written assurances by 2:00 pm that day, that Sable had, in fact ceased work entirely.*

**Response 19.**    Documents and communications described in Paragraph 19 speak for themselves.  Please see Attachment A, Section III.B.

**Paragraph 20.**    *Though Sable did send an email to Commission staff before this deadline to state that all work, including the actions in which Sable characterized as interim work measures, had ceased, Commission staff continued to receive messages that work had not ceased and therefore, again, requested Sable provide written assurances that all work had, in fact, ceased.*

**Response 20.**    Sable has no personal knowledge as to the allegations contained in Paragraph 20 and, on that basis, denies all such allegations.  Please see Attachment A, Section III.B.

**Paragraph 21.**    *In response, Sable, confirmed all work, including any such interim measures, had ceased.*

**Response 21.**    Documents and communications described in Paragraph 21 speak for themselves.  Please see Attachment A, Section III.B.

7

US-DOCS\157757697

**Paragraph 22.** *In addition to the cessation of all work, the October 4, 2024 letter required Sable provide information as to work undertaken along the Pipeline, specific plans as to future, proposed work, and written confirmation of intent to apply for a CDP(s) for ATF authorization for any work that had already occurred in the Coastal Zone and prospective authorization for any proposed future work.*

**Response 22.** Documents and communications described in Paragraph 22 speak for themselves. Sable denies all allegations of unpermitted development and further denies each and every remaining allegation contained in Paragraph 22. Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial.

**Paragraph 23.** *Because Sable did not satisfactorily provide, as required by PRC Section 30809, detailed information as requested in Commission staff's October 4 letter, and further, failed to provide written confirmation as to its commitment to apply for an ATF CDP for work previously undertaken within the Coastal Zone, I issued a EDCDO on November 12, 2024.*

**Response 23.** Documents and communications described in Paragraph 23 speak for themselves. Sable denies that it failed to provide the information requested in Commission staff's October 4 letter or provide written confirmation as to its commitment to apply for an ATF CDP. As addressed more fully in Attachment A, Section III.B, Sable provided the information requested in the October 4 letter to Commission staff on October 8, 2024. Sable provided additional information in response to staff's requests on October 11, 2024. On October 22, 2024, Sable submitted a written request asking that Commission staff authorize it to complete interim restoration work to alleviate the risk of immediate environmental harm resulting from Sable's work stoppage in compliance with the Commission's September 27, 2024, Notice of Violation and October 4 letter. After extensive, collaborative discussions with Commission staff, staff issued the November 12, 2024, EDCDO to allow such work to occur. Sable also informed Commission staff that it was discussing with Santa Barbara County staff whether an ATF CDP or other Coastal Act authorization would be required. Sable denies each and every remaining allegation contained in Paragraph 23. Please see Attachment A, Section III.B, for additional background and support regarding Sable's denial.

**Paragraph 24.** *In this EDCDO, I directed Sable to complete an Interim Restoration Plan to safely secure the sites in the interim period necessary for Sable to apply for both an ATF CDP for all work previously undertaken along the Pipeline as well as CDP for future, proposed work. As an accommodation, I granted 120 days from the issuance of the EDCDO for Sable to apply for requisite CDPs.*

**Response 24.** Documents and communications described in Paragraph 24 speak for themselves. Sable prepared, submitted, obtained Commission staff's approval for, and implemented an Interim Restoration Plan as required by the EDCDO. Sable also informed Commission staff that it was discussing with County staff whether an ATF CDP or other Coastal Act authorization would be required by the County as the permitting authority under the County's certified Local Coastal Program. Sable denies each and every remaining allegation contained in Paragraph 24. Please see Attachment A, Section III.B, for additional background and support regarding Sable's denial.

**Paragraph 25.** *On December 20, 2024, Sable successfully completed the Interim Restoration Plan. However, to date, Sable has not submitted any application for an ATF CDP for work previously undertaken, or for a CDP for any future, proposed work to be taken along the Pipeline.*

8

*Commission staff had repeatedly asked for greater information, including any full-scale workplans, so as to better understand the overall project.*

**Response 25.** Sable admits that it completed the work required under the Interim Restoration Plan by December 20, 2024. Sable denies that the Commission possessed the authority to require Sable to submit an application for any CDP and further denies each and every remaining allegation contained in Paragraph 25. As described in Attachment A, Section III, Sable submitted applications and materials regarding its repair and maintenance activities to Santa Barbara County on November 22, 2024 and December 5, 2024 for the County's review and consideration of whether a new or amended coastal development permit would be required. Sable denies that Commission staff has not been provided with information regarding the subject work because Sable provided to Commission staff the materials it previously submitted to the County for Commission staff's review. Please see Attachment A, Section III, for additional background and support regarding Sable's denial.

**Paragraph 26.** *Without detailed information as to these plans, it is difficult for Commission staff to fully understand the scope of the work Sable has undertaken, as well as any proposed future plans and it is further difficult for Commission staff to provide a fully analysis as to what, if any, work has been authorized under applicable law.*

**Response 26.** Sable denies each and every allegation contained in Paragraph 26. As explained in Response 25, Sable provided Commission staff with the applications and materials regarding its repair and maintenance activities that Sable previously submitted to the County. Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial.

**Paragraph 27.** *Instead, Sable shifted operations offshore and carried out additional development activities without the benefit of a CDP including, but not limited to, the deployment of an unspecified number of "tea-bag pallets," sand-to-concrete bags, and soft-concrete bags, as part of an effort to restart oil production operations and bring the Santa Ynez Unit pipeline back into use.*

**Response 27.** Sable denies all allegations of unpermitted development offshore and further denies each and every remaining allegation contained in Paragraph 27. Sable admits that it has placed sand-cement bags beneath certain segments of the offshore pipelines on the seafloor where contact between the offshore pipelines and the seafloor has been lost due to the movement and loss of sand consistent with work previously authorized by both federal approvals and the existing coastal development permit for those pipelines. Please see Attachment A, Section IV, for additional background and support regarding Sable's denial.

**Paragraph 28.** *Specifically, the project deployed a remotely operated vehicle ("ROV") to place concrete bags and pallets along more than 750 linear feet of the pipelines to create support piers along 14 identified spans of between 41 and 70 feet. These activities took place over three days from November 29, 2024, to December 1, 2024.*

**Response 28.** Sable denies all allegations of unpermitted development and further denies each and every remaining allegation contained in Paragraph 28. Please see Attachment A, Section IV.C for a detailed description of the span remediation work, which Sable admits occurred in state waters over three days from November 29, 2024 to December 1, 2024.

9

US-DOCS\157757697

**Paragraph 29.**   *Sable also sought authorization for the onshore violations described in the EDCDO through the County's zoning clearance process. On November 22, 2024, and December 5, 2024, Sable submitted applications to the County requesting authorization for pipeline "anomaly repair work" conducted along the Las Flores Pipelines, CA-324 and CA-325*

**Response 29.**   Documents and communications described in Paragraph 29 speak for themselves.  Sable admits that it submitted applications to Santa Barbara County on November 22, 2024, and December 6, 2024, and that those applications also have been provide to Coastal Commission staff.  Please see Attachment A, Section III.B.

**Paragraph 30.**   *On January 10, 2025, the Commission held a conference call with the Santa Barbara County Planning and Development Department ("County") to discuss Sable's pending Zoning Clearance applications, as well as the potential for a consolidated coastal development permit covering both onshore and offshore development activities.  During this conversation, the County agreed to follow up with information, including the citations and provisions within existing County issued permit(s) that the County believed might have pre-authorized the recently completed and proposed Pipeline work, as well as any other evidence Sable provided that the County found to be compelling.  The parties to the call further confirmed that they would have a follow-up discussion before any County approval of Sable's Zoning Clearance applications.  Despite this, however, no such information was received, and the Commission, therefore, followed up on this conversation through email, on February 7, 2025, again requesting this information.*

**Response 30.**   Sable has no personal knowledge as to the allegations contained in Paragraph 30 and, on that basis, denies all such allegations.  Please see Attachment A, Section III.B.

**Paragraph 31.**   *On February 12, 2025, Commission staff received a letter from the County, in response to the prior request made by Commission staff that the County agree to the Commission's review of a consolidated permit application, pursuant to California Public Resources Code section 30601.3(a)(2). In this letter, the County stated that it had concluded that the "anomaly repair work" addressed in Sable's zoning clearance applications "is authorized by existing permits" and therefore no further application to, or action by, the County is required. However, the County expressed its support for the Commission's review of a consolidated permit application, if submitted by Sable.*

**Response 31.**   Documents and communications described in Paragraph 31 speak for themselves.  Sable denies that a consolidated permit would be procedurally proper, as further addressed in Attachment A, Sections III.B.6 and III.C.8, and further denies each and every remaining allegation contained in Paragraph 31.  Please see Attachment A, Section III.B, for additional background and support regarding Sable's denial.

**Paragraph 32.**   *In addition to this letter, the County provided the Commission with copy of an additional letter, which the County sent to Sable, notifying Sable that work addressed in Sable's zoning clearance permits "is covered by prior permits," though neither letter provided any citation to or quotation of any language in any such permits to support this assertion.*

**Response 32.**   Documents and communications described in Paragraph 32 speak for themselves. However, Sable notes that the letter quoted in Paragraph 32 also specifically stated that the work addressed in Sable's zoning clearance applications "was contemplated, analyzed, and approved in the [onshore pipelines'] existing Final Development Plan, Major Conditional Use Permit, associated Coastal Development Permits and certified EIR/EIS."  Please see

10

Attachment A, Section III.B for additional background and support regarding the County's letter.

**Paragraph 33.**   *In response to these two letters and a February 14 request from the Environmental Defense Center, on February 16, 2025, I issued a letter to the County initiating a review of the County's determination, pursuant to Section 13569 of the Commission's regulations, and requesting a complete copy of any coastal development permit applications submitted by Sable and/or its predecessor(s) for the shutoff valve installation work on the Pipeline and Sable's application for the zoning clearance(s) for the repair anomaly work along the Pipeline.*

**Response 33.**   Documents and communications described in Paragraph 33 speak for themselves. Sable has no personal knowledge as to the request from the Environmental Defense Center noted in Paragraph 33. As more fully set forth in Attachment A, Sections III.B.6 and III.C.8, as well as the County's February 24, 2025, letter to the Coastal Commission, Sable denies that dispute resolution under Section 13569 is procedurally proper. Specifically, the County, which possesses delegated local coastal program permitting authority under the Coastal Act, determined that Sable's onshore work required no further authorization or approval from the County in order for Sable to proceed with the work. This did not constitute a determination of whether the proposed development is exempt or categorically excluded from the Coastal Act as required under Section 13569 for the dispute resolution procedures  to apply. As such, and consistent with the County's February 24 letter, Section 13569's dispute resolution provisions are not applicable. Sable further denies each and every remaining allegation contained in Paragraph 33. Please see Attachment A, Section III.B and III.C, for additional background and support regarding Sable's denial.

**Paragraph 34.**   *Additionally, on February 16, 2025, I provided Sable with notice of my intention to issue a new EDCDO to Sable.*

**Response 34.**   Documents and communications described in Paragraph 33 speak for themselves. Please see Attachment A, Section III.

**Paragraph 35.**    *In this letter, I responded to arguments that Sable submitted on February 14, purporting to support the position the County had taken, and I explained why, despite those argument, based on the information I had received to date, I continued to believe that Sable's proposed activities lacked the necessary Coastal Act authorization.*

**Response 35.**   Documents and communications described in Paragraph 35 speak for themselves. Sable denies all allegations of Coastal Act violations and unpermitted development and further denies each and every remaining allegation contained in Paragraph 35. Please see Attachment A, Section III, for additional background and support regarding Sable's denial.

**Paragraph 36.**   *I therefore directed Sable to confirm in writing by February 17, 2025, that Sable would  cease all development as described in, and subject of, that letter unless and until Sable either: (a) demonstrates, to my satisfaction, that it already possesses the necessary Coastal Act authorization for the work, which Sable has not yet demonstrated.[5]*

**Response 36.**   Documents and communications described in Paragraph 36 speak for themselves. Sable denies all allegations of Coastal Act violations and unpermitted development and further

---

[5] We offer this option as an accommodation and remain willing to review and consider any additional permit language Sable may provide either before, or after, issuance of Coastal Act authorization.

11

denies each and every remaining allegation contained in Paragraph 36. Please see Attachment A, Section III, for additional background and support regarding Sable's denial.

**Paragraph 37.** *On February 17, 2025, I received a letter from Sable reiterating their position that Sable's work "does not constitute a violation of the Coastal Act or the County's LCP because it is authorized under the pipelines' existing CDPs and other approvals."*

**Response 37.** Documents and communications described in Paragraph 37 speak for themselves. Please see Attachment A, Section III.

**Paragraph 38.** *As a jurisdictional requirement to issue this Order, I have determined that Sable is undertaking or is threatening to undertake development that may require a CDP, without first securing a CDP and further determined Santa Barbara County has declined to act in a timely manner regarding the coastal act violations as detailed in the EDCDO, and this failure to act will cause damage to coastal resources.*

**Response 38.** Sable denies that the Commission possesses the authority to issue any Cease and Desist Order or that Santa Barbara County has declined to act in a timely manner regarding the alleged Coastal Act violations, as further addressed in Attachment A, Sections III.B.4 and III.C.6, and further denies each and every remaining allegation contained in Paragraph 38. Please see Attachment A, Section III, for additional background and support regarding Sable's denial.

**Paragraph 39.** *Thus, as of the issuance of this Order, I have concluded that Sable has yet to apply for any CDP, or other valid Coastal Act authorization, covering the work at issue, nor has Sable demonstrated that it possesses the necessary Coastal Act authorization for this work. As such, I am issuing this EDCDO pursuant to my authority under PRC Sections 30809(a)(2).*

**Response 39.** Sable denies that the Commission possesses the authority to issue any Cease and Desist Orders, including the EDCDO, denies all allegations of Coastal Act violations and unpermitted development, and further denies each and every remaining allegation contained in Paragraph 39. To the contrary, and as set forth in Santa Barbara County's February 12, 2025, letter, Sable applied for Coastal Act authorizations from the County and the County confirmed that "no further application to or action by the County is required" for Sable to proceed with the proposed work. Please see Attachment A, Section III, for additional background and support regarding Sable's denial.

## F.    COMPLIANCE OBLIGATION

**Paragraph 40.** *Respondent's strict compliance with this Consent Order is required. Failure to comply with any term or condition of this Consent Order, including any deadline contained herein, unless the Executive Director grants an extension under Section I.5, above, will constitute a violation of this Consent Order and shall result in Respondent being liable for stipulated penalties in the amount of $1,000 per day per violation. Respondent shall pay stipulated penalties within 10 days of receipt of written demand by the Executive Director, regardless of whether Respondent subsequently complies. If Respondent violates this Consent Order, nothing in this agreement shall be construed as prohibiting, altering, or in any way limiting the ability of the Commission to seek any other remedies available, including the imposition of civil penalties and other remedies pursuant to PRC Sections 30820, 30821, 30821.6, and 30822, as a result of the lack of compliance with this Consent Order.*

12

***Response 40.*** The EDCDO and the Public Resources Code speak for themselves.  Sable denies that the Commission possesses the authority to issue any Cease and Desist Orders, including the EDCDO, as further addressed in Attachment A, Sections III.B.4 and III.C.6, and further denies each and every remaining allegation contained in Paragraph 40.  Please see Attachment A, Section III, for additional background and support regarding Sable's denial.

## G.     CHALLENGE

***Paragraph 41.*** *Pursuant to PRC Section 30803(b), any person or entity to whom this Consent Order is issued may file a petition with the Superior Court and seek a stay of this Consent Order. Also pursuant to PRC Section 30803(a), any person may maintain an action for declaratory and equitable relief to restrain any violation of this division, including of any orders issued pursuant to Section 30809, 30810 or 30811.*

***Response 41.*** Paragraph 41 and the Public Resources Code speak for themselves and no response is required.  Sable denies that the Commission possesses the authority to issue any Cease and Desist Orders, as further addressed in Attachment A, Sections III.B.4 and III.C.6.  Please see Attachment A, Section III, for additional background and support regarding Sable's denial.

## H.     EFFECTIVE DATE

***Paragraph 42.*** *This Order shall be effective upon its issuance and shall expire 90 days from the date issued on 02/18/2025 unless extended consistent with the applicable regulations.*

***Response 42.*** Paragraph 42 speaks for itself and no response is required.  Sable denies that the Commission possesses the authority to issue any Cease and Desist Orders, as further addressed in Attachment A, Sections III.B.4 and III.C.6.  Please see Attachment A, Section III, for additional background and support regarding Sable's denial.

## II.     NOTICE OF INTENT TO COMMENCE A CEASE AND DESIST ORDER, RESTORATION ORDER, AND ADMINISTRATIVE CIVIL PENALTY PROCEEDINGS

***Paragraph 43.*** *While we hope that these matters can be addressed quickly via the EDCDO and that a Commission-issued order may not be necessary, I am also notifying you, as is provided for in Section 13187(B) and Section 13191(a) of the Commission's regulations (Title 14, Division 5.5 of the California Code of Regulations), of my intent to commence proceedings for issuance by the Commission of a Cease and Desist Restoration Order and Administrative Penalty Proceeding, which would include a direction to cease and desist from undertaking further unpermitted development, should such an order be required.*

***Response 43.*** Sable denies that the Commission possesses the authority to issue an EDCDO or other Cease and Desist Order, as further addressed in Attachment A, Sections III.B.4 and III.C.6, denies all allegations of Coastal Act violations and unpermitted development, and further denies each and every remaining allegation contained in Paragraph 43.  Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial.

***Paragraph 44.*** *The EDCDO provides an interim solution to safeguard against damage to coastal resources immediately, and an interim period needed for Sable to obtain necessary CDPs. However, it does not address the work that has already been completed without the necessary*

13

US-DOCS\157757697

*authorization, including the additional work described below which will require a future order.*

**Response 44.**  Sable denies that the Commission possesses the authority to issue an EDCDO or other Cease and Desist Order, as further addressed in Attachment A, Sections III.B.4 and III.C.6, denies all allegations of Coastal Act violations and unpermitted development, and further denies each and every remaining allegation contained in Paragraph 44.  Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial.

**Paragraph 45.**  *In addition to the above actions regarding Sable's unpermitted development activities undertaken onshore, Commission staff were additionally made aware of unpermitted activities undertaken offshore, at locations along the Santa Ynez Unit pipeline, and in state waters.*

**Response 45.**  Sable has no personal knowledge as to Commission staff's knowledge of Sable's offshore activities and, on that basis, denies all such allegations.  Sable provided a letter to Commission staff providing details of such activities on January 15, 2025, which document speaks for itself.  Sable denies all allegations of unpermitted development and further denies each and every remaining allegation contained in Paragraph 45.  Please see Attachment A, Section IV, for additional background and support regarding Sable's denial.

**Paragraph 46.**  *On February 11, 2025, Commission staff provided a Notice of Violation letter to Sable regarding unpermitted development including, but not limited to, deploying sand/cement fill materials and pallets on the seafloor adjacent to and below Sable's out-of- service offshore oil and water pipelines as part of an effort to restart SYU oil production operations and bring the Pipeline back into use.*

**Response 46.**  Documents and communications described in Paragraph 46 speak for themselves.  Sable denies that Paragraph 46's discussion of the Refugio Oil Spill is proper or relevant because the Coastal Commission possesses no authority or jurisdiction over pipeline restart activities, which is subject to the exclusive jurisdiction of the Office of the State Fire Marshal.  (See Government Code, § 51010 [vesting OSFM with the "exclusive safety[,] regulatory and enforcement authority over intrastate hazardous liquid pipelines" and establishing OSFM as the implementing authority for the federal Hazardous Liquid Pipeline Safety Act and "federal pipeline safety regulations as to those portions of interstate pipelines" located in California].)  Sable denies all allegations of Coastal Act violations or unpermitted development and further denies each and every remaining allegation contained in Paragraph 46.  Please see Attachment A, Section IV, for additional background and support regarding Sable's denial.

**Paragraph 47.**  *In an email sent on November 21, 2024, from Cassidy Teufel, Deputy Director of the Commission, to Steve Rusch of Sable, Mr. Teufel stated that it was his understanding, based on previous email correspondence, that Sable was not proceeding with any work associated with the offshore pipeline until Commission staff had an opportunity to discuss it and work through any authorizations that may be required.*

**Response 47.**  Documents and communications described in Paragraph 47 speak for themselves.  Please see Attachment A, Section IV.

**Paragraph 48.**  *He noted that Mr. Rusch had indicated via email that a recent ROV survey had identified pipeline spans that Sable identified as needing to be addressed, and Mr. Teufel asked for*

14

US-DOCS\157757697

*clarification as to when this work was carried out, and for a description of its scope, including equipment and vessels used and the location, timing, and duration of that work.*

**Response 48.**  Documents and communications described in Paragraph 48 speak for themselves.  Please see Attachment A, Section IV.

**Paragraph 49.**  *Mr. Teufel also reiterated that Sable needed to submit to the Commission a complete CDP application for the proposed span remediation work.*

**Response 49.**  Documents and communications described in Paragraph 49 speak for themselves.  Please see Attachment A, Section IV.

**Paragraph 50.**  *Mr. Rusch never disputed or contested anything in this email from Mr. Teufel.*

**Response 50.**  Sable denies each and every allegation contained in Paragraph 50.  Please see Attachment A, Section IV, for additional background and support regarding Sable's denial.

**Paragraph 51.**  *Nevertheless, without having received any such application, circa mid-December 2024, the Commission received reports that span remediation work was underway.*

**Response 51.**  Sable has no personal knowledge as to the reports of span remediation work received by Commission staff.  Sable admits it did not submit a CDP application to the Commission concerning the span remediation work.  Sable denies all allegations of unpermitted development and further denies each and every remaining allegation contained in Paragraph 51.  Please see Attachment A, Section IV, for additional background and support regarding Sable's denial.

**Paragraph 52.**  *On January 10, 2025, Mr. Teufel sent a follow up message informing Sable that the Commission had yet to receive the aforementioned permit application, and requesting a status update. The January email also asked Sable to clarify if Sable did in fact carry out activities and reemphasized the Coastal Act permitting requirements as previously explained.*

**Response 52.**  Documents and communications described in Paragraph 52 speak for themselves.  Sable denies all allegations of unpermitted development contained in Paragraph 52.  Please see Attachment A, Section IV, for additional background and support regarding Sable's denial.

**Paragraph 53.**  *In a letter dated January 15, 2025, from DJ Moore of Latham & Watkins, LLC (representing Sable) to Mr. Teufel, Mr. Moore acknowledged that the span remediation activities had occurred, specifically the placement of concrete fill material across 14 separate areas totaling over 750 linear feet adjacent to and below two seafloor pipelines, but claimed those activities did not require a new CDP or Consistency Certification ("CC") under the Coastal Act and the Coastal Zone Management Act, 16 U.S.C. §§ 1541 et seq. ("CZMA"), respectively.*

**Response 53.**  Documents and communications described in Paragraph 53 speak for themselves.  Sable denies each and every remaining allegation contained in Paragraph 53, including the allegation that fill material was placed on areas totaling over 750 linear feet. The actual span remediation work was conducted on about 150 linear feet along the offshore pipelines. Please see Attachment A, Section IV, for additional background and support regarding Sable's denial.

15

**Paragraph 54.**  *He asserted that these activities were already authorized by the existing Development and Production Plan ("DPP") previously authorized by the Department of the Interior's Minerals Management Service ("MMS"); the Coastal Commission-approved CDP No. E-88-1, which originally authorized the SYU pipeline in 1988; and the Coastal Commission's concurrence in CC No. CC-64-87, all of which occurred more than 30 years ago and did not address the work undertaken in 2024-2025.*

**Response 54.**  Documents and communications described in Paragraph 55 speak for themselves.  Sable denies all allegations of unpermitted development contained in Paragraph 54, including without limitation the allegation that Coastal Commission-approved CDP No. E-88-1 and consistency concurrence CC No. CC-64-87 did not authorize span remediation work undertaken in 2024.  Please see Attachment A, Section IV, for additional background and support regarding Sable's denial.

**Paragraph 55.**  *Thus, on February 11, 2025, Commission staff issued a Notice of Violation letter directing Sable to immediately cease from performing any unpermitted development activities in state coastal waters (or elsewhere in the Coastal Zone) until and unless proper authorization is obtained.*

**Response 55.**  Documents and communications described in Paragraph 55 speak for themselves.  Sable denies all allegations of unpermitted development and further denies each and every remaining allegation contained in Paragraph 55.  Please see Attachment A, Section IV, for additional background and support regarding Sable's denial.

**Paragraph 56.**  *Contrary to these claims, and as individually answered and described in greater detail in the Notice of Violation letter, the span remediation work conducted was not, and could not have been, pre-authorized by the permit in which the Commission issued for the original installation of the SYU Pipeline, nor was this work otherwise pre-authorized by the Commission. While the Commission has, on occasion in the past, specifically authorized future maintenance activities for certain projects it has approved, when it has done so, it is explicit about that, and it has not done so here.*

**Response 56.**  Documents and communications described in Paragraph 56 speak for themselves.  Sable denies all allegations of unpermitted development and further denies each and every remaining allegation contained in Paragraph 56.  Please see Attachment A, Section IV, for additional background and support regarding Sable's denial.

**Paragraph 57.**  *Further, Mr. Moore's claim that the DPP requires the pipeline to be in "good working condition" or that the Pipeline must meet federal standards has no bearing on the question as to whether pre-authorization of specific work was granted. The Pipeline in question is not currently in service, have been purged off [sic] all oil and does not pose a risk of oil spill if not addressed.*

**Response 57.**  Documents and communications described in Paragraph 57 speak for themselves.  Sable denies each and every allegation contained in Paragraph 57.  The requirement in the DPP to maintain the pipelines in good operating condition remains regardless of whether there is oil, gas or other materials in the pipelines. Further, the State Lands Commission leases also require that the offshore pipelines are kept in good order and repair and safe condition – regardless of whether there is oil, gas or other materials in the pipelines. The span remediation work was necessary to comply with these state and federal requirements, which were in effect and contemplated by the Coastal Commission when it provided its

16

concurrence with the DPP's consistency certification and the CDP for the offshore pipelines.  Please see Attachment A, Section IV, for additional background and support regarding Sable's denial.

**Paragraph 58.** *Mr. Moore's letter additionally asserts that inclusion of Commission staff on an email, sent from Exxon to a third party, 13 years ago, evidences the Commission's agreement with Sable's position that no further coastal act authorization is needed for this work. Again, this bears no evidence to support that the Commission pre-authorized future work or span remediation activities on the site.*

**Response 58.** Documents and communications described in Paragraph 58 speak for themselves.  Sable denies all allegations of unpermitted development and further denies each and every remaining allegation contained in Paragraph 58.  Further, past Commission staff conduct in considering similar work is relevant to whether staff is now acting arbitrarily. Please see Attachment A, Section IV.C.2.d, for additional background and support regarding Sable's denial.

**Paragraph 59.** *In order to resolve this violation, Sable must complete a CDP application seeking ATF authorization for the unpermitted span remediation activities that have already taken place in state coastal waters, and which addresses any necessary restoration, and payment of administrative penalties to resolve civil liability.*

**Response 59.** Sable denies that a CDP application for an ATF authorization is required, denies all allegations of unpermitted development and further denies each and every remaining allegation contained in Paragraph 59.  Please see Attachment A, Section IV, for additional background and support regarding Sable's denial.

**Paragraph 60.** *I am hopeful that Sable will work with my staff to reach a consensual resolution of the entirety of this matter through a future Consent Cease and Desist Order and Restoration Order and Consent Administrative Penalty ("Consent Agreement"), which would then be taken to the California Coastal Commission ("Commission") for its approval in a formal public hearing. We are available to assist you in this process.*

**Response 60.** Sable denies that the Commission possesses the authority to issue any Cease and Desist Orders, as further addressed in Attachment A, Sections III.B.4 and III.C.6. Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial. As Sable's representatives have discussed multiple times with Commission staff, Sable remains open to discussing a potential Consent Agreement, but Sable and Commission staff have not yet discussed the terms of such an agreement, including any potential Consent Administrative Penalty, and have not yet been provided with any proposed terms by Commission staff.

**Paragraph 61.** *Prior to bringing an order to the Commission, including a consent order, unless the requirement is waived, our regulations require notification of the initiation of formal proceedings. Therefore, in accordance with those regulations, this letter notifies you of my intent, as the Executive Director of the Commission, to commence formal enforcement proceedings to address the Coastal Act violations noted above by bringing to the Commission a recommendation for a Cease and Desist Order, Restoration Order, and assessment of an Administrative Penalty. The intent of this letter is not to discourage or supersede productive settlement discussions; rather it is to provide formal notice of our intent, consistent with our*

17

*regulations, to resolve these issues through the order process, which in no way precludes a consensual resolution. However, please note that should we be unable to reach an amicable resolution in a timely manner this letter also lays the foundation for Commission staff to initiate a hearing before the Commission unilaterally, during which a proposed order or orders, including an assessment of administrative penalties against you, would be presented for the Commission's consideration and possible adoption.*

**Response 61.**    Sable denies that the Commission possesses the authority to issue any Cease and Desist Orders, or to impose an Administrative Penalty, as further addressed in Attachment A, Sections III.B.4, III.C.6, and IV.D.  Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial.  Please also see Response 60 regarding a potential Consent Agreement.

**Paragraph 62.**    *Again, if we are to settle this matter, such actions still must be addressed through this formal order process. This letter is intended to facilitate the resolution here, whether we address this matter through a consent or unilateral action, in providing you with the notice required under the Commission's Regulations; it in no way is intended to subvert the possibility of resolving this matter collaboratively.*

**Response 62.**    Sable denies that the Commission possesses the authority to issue any Cease and Desist Orders, as further addressed in Attachment A, Sections III.B.4 and III.C.6.  Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial.  Further, the Commission's Regulations speak for themselves.  Please also see Response 60 regarding a potential Consent Agreement.

**Paragraph 63.**    *The Commission's authority to issue Cease and Desist Orders is set forth in Section 30810(a) of the Coastal Act, which states, in part:*

*If the commission, after public hearing, determines that any person … has undertaken, or is threatening to undertake, any activity that (1) requires a permit from the commission without securing the permit or (2) is inconsistent with any permit previously issued by the commission, the commission may issue an order directing that person … to cease and desist. The order may also be issued to enforce any requirements of a certified local coastal program or port master plan, or any requirements of this division which are subject to the jurisdiction of the certified program or plan, under any of the following circumstances:*

*(1)  The local government or port governing body requests the commission to assist with, or assume primary responsibility for, issuing a cease and desist order.*

*(2)  The commission requests and the local government or port governing body declines to act, or does not take action within a timely manner, regarding an alleged violation which could cause significant damage to coastal resources.*

**Response 63.**    Paragraph 63 quotes the Coastal Act, which speaks for itself.  Sable denies that the Commission possesses the authority to issue any Cease and Desist Orders, as further addressed in Attachment A, Sections III.B.4 and III.C.6.  Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial.

**Paragraph 64.**    *Section 30810(b) of the Coastal Act states that the cease and desist order may be subject to such terms and conditions that the Commission determines are necessary to ensure compliance with the Coastal Act, including removal of any items of unpermitted development.*

18

***Response 64.***    Paragraph 64 summarizes the Coastal Act, which speaks for itself.  Sable denies that the Commission possesses the authority to issue any Cease and Desist Orders, as further addressed in Attachment A, Sections III.B.4 and III.C.6.  Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial.

***Paragraph 65.***    *Section 30600(a) of the Coastal Act states that, in addition to obtaining any other permit required by law, any person wishing to perform or undertake any development in the Coastal Zone must obtain a CDP through Section 35-169.2 of the County's certified LCP. As stated above, "Development" is defined by Section 30106 of the Coastal Act and Section 35-58 of the City's LCP.*

***Response 65.***    Sable denies that any "City's LCP" is relevant to Sable's activities.  To the extent Paragraph 65 is intended to quote and cite provisions of the County's LCP, Sable responds that the County's LCP speaks for itself.  Paragraph 65 also summarizes and cites provisions of the Coastal Act, which speaks for itself.

***Paragraph 66.***    *The various instances of unpermitted development at issue here clearly constitute "development" within the meaning of the above-quoted definition and therefore are subject to the permit requirement of Section 30600(a) and Section 312-3.1.5 of the County's certified LCP. A CDP has not been issued to authorize the unpermitted development, thus independent criteria for issuance of a cease and desist order under Section 30810(a) of the Coastal Act are thus satisfied.*

***Response 66.***    Sable denies all allegations of Coastal Act violations and unpermitted development and further denies each and every remaining allegation contained in Paragraph 66, including without limitation that the criteria of Section 30810(a) of the Coastal Act have been satisfied, as further addressed in Attachment A, Sections III.B.4 and III.C.6.  Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial.

***Paragraph 67.***    *In addition to the aforementioned items, any resolution of this matter via Consent Agreement would also include settlement of monetary claims associated with your civil liability under the Coastal Act for these violations. If a consensual resolution is not reached, resolution of penalties under Section 30821.3 of the Coastal Act would be addressed unilaterally via an Administrative Penalty Action, as described below.*

***Response 67.***    Sable denies all allegations of Coastal Act violations and unpermitted development and further denies each and every remaining allegation contained in Paragraph 67, including without limitation that the criteria of Section 30821.3 of the Coastal Act have been satisfied, as further addressed in Attachment A, Sections III.B.4, III.C.6, and IV.D.  Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial. Please also see Response 60 regarding a potential Consent Agreement.

***Paragraph 68.***    *Restoration Order*

*The Commission's authority to issue Restoration Orders is set forth in Section 30811 of the Coastal Act, which states, in part:*

*In addition to any other authority to order restoration, the commission…may, after a public hearing, order restoration of a site if it finds that the development has occurred without a*

19

*coastal development permit from the commission…, the development is inconsistent with this division, and the development is causing continuing resource damage.*

**Response 68.**   Paragraph 68 quotes the Coastal Act, which speaks for itself.

**Paragraph 69.**   *Pursuant to Section 13191 of the Commission's regulations, I have determined that the activities specified in this letter meet the criteria of Section 30811 of the Coastal Act, based on the following:*

1. *Development" as that term is defined by section 30106 of the Coastal Act, has occurred without a CDP from the Commission.*

**Response 69.**   Sable denies all allegations of Coastal Act violations and unpermitted development and further denies each and every remaining allegation contained in Paragraph 69, including without limitation that the requirements of Section 13191 of the Commission's regulations and Section 30811 of the Coastal Act have been met, as further addressed in Attachment A, Sections III.B.5, III.C.7, and IV.D.  Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial.

**Paragraph 70.**

2. *This unpermitted development is inconsistent with the resource protection policies of the Coastal Act including, but not necessarily limited to Coastal Act Section 30240 (protection of environmentally sensitive habitat areas), Section 30233 (protection of wetlands from filling), Section 30230 (protection of marine resources) and Section 30231 (protecting biological productivity).*

**Response 70.**   Sable denies all allegations of Coastal Act violations and unpermitted development and further denies each and every remaining allegation contained in Paragraph 70.  Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial.

**Paragraph 71.**

3. *The unpermitted development remains in place and/or unaddressed and therefore continues to cause resource damage, which is defined by Section 13190 of the Commission's regulations as: "any degradation or other reduction in quality, abundance, or other quantitative or qualitative characteristic of the resource as compared to the condition the resource was in before it was disturbed by unpermitted development." The unpermitted development continues to exist and therefore, it continues to cause damage to resources and prevent the Coastal Act resources that were displaced from re-establishing, and it continues to cause degradation and reduction in quality of surrounding resources as compared to their condition before the unpermitted development occurred.*

**Response 71.**   Sable admits that the development referenced in Paragraph 71 remains in place, but denies the allegation that such development has caused or continues to cause resource damage. Sable denies all allegations of Coastal Act violations, unpermitted development, and further denies each and every remaining allegation contained in Paragraph 71.  Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial.

20

**Paragraph 72.**   *For the reasons stated above, I am therefore issuing this "Notice of Intent" letter to commence proceedings for a Restoration Order before the Commission in order to require the restoration of the Property. The procedures for the issuance of Restoration Orders are described in Sections 13190 through 13197 of the Commission's regulations, which are codified in Title 14 of the California Code of Regulations.*

**Response 72.**   Paragraph 72 cites provisions of the Coastal Commissions' regulations, which speak for themselves.  Sable denies that the Commission possesses the authority to issue any Restoration Order, as further addressed in Attachment A, Sections III.B.5, III.C.7, and IV.D, and further denies each and every remaining allegation contained in Paragraph 72. Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial.

**Paragraph 73.**   *Administrative Civil Penalties, Civil Liability, and Exemplary Damages*

*Under Section 30821.3 of the Coastal Act, in cases involving violations of the Coastal Act, the Commission is authorized to impose administrative civil penalties by a majority vote of the Commissioners present at a public hearing. In this case, as described above, there are multiple violations of the resource protection provisions of the Coastal Act; and therefore, the criteria of Section 30821.3 have been satisfied. The penalties imposed may be in an amount up to $11,250, for each violation, for each day each violation has persisted or is persisting, for up to five (5) years. In addition, the 60-day time period to correct a violation that is allowed under the statute does not apply to violations of a CDP. If a person fails to pay an administrative penalty imposed by the Commission, under 30821.3(e) the Commission may record a lien on that person's property in the amount of the assessed penalty. This lien shall be equal in force, effect, and priority to a judgment lien.*

**Response 73.**   Paragraph 73 summarizes and cites to provisions of the Coastal Act, which speak for themselves.  Sable denies all allegations of Coastal Act violations and unpermitted development and further denies each and every remaining allegation contained in Paragraph 73, including without limitation that the requirements of Paragraph 73's cited provisions of the Coastal Act have been met, as discussed further in Attachment A, Sections III.B.5, III.C.7, and IV.D.  Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial.

**Paragraph 74.**   *The Coastal Act also includes several other penalty provisions that may be applicable as well. Section 30820(a)(1) provides for civil liability to be imposed on any person who performs or undertakes development without a CDP and/or that is inconsistent with any CDP previously issued by the Commission in an amount that shall not exceed $30,000 and shall not be less than $500 for each instance of development that is in violation of the Coastal Act. Section 30820(b) provides that additional civil liability may be imposed on any person who performs or undertakes development without a CDP and/or that is inconsistent with any CDP previously issued by the Commission when the person intentionally and knowingly performs or undertakes such development. Civil liability under Section 30820(b) shall be imposed in an amount not less than $1,000 per day and not more than $15,000 per day, for each violation and for each day in which each violation persists. Section 30821.6 also provides that a violation of a Cease and Desist Order of the Commission can result in civil liabilities of up to $6,000 for each day in which each violation persists. Lastly, Section 30822 provides for additional exemplary damages for intentional and knowing violations of the Coastal Act or a Commission Cease and Desist Order.*

US-DOCS\157757697

**Response 74.**   Paragraph 74 summarizes the Coastal Act, which speaks for itself.  Sable denies each and every allegation contained in Paragraph 74, including without limitation that the requirements of Paragraph 74's cited provisions of the Coastal Act have been met, as discussed further in Attachment A, Sections III.B.5, III.C.7, and IV.D.  Sable undertook all onshore work pursuant to lawfully issued coastal development permits and the County's confirmation that no further authorization was required.  Further, Sable undertook all offshore work pursuant to a lawfully issued coastal development permit.  As such, Sable denies that its work constituted an intentional and knowing violation of the Coastal Act.  Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial.

**Paragraph 75.**   *Response Procedure*

*In accordance with Sections 13181(a) and 13191 of the Commission's regulations, you have the opportunity to respond to the Commission staff's allegations as set forth in this notice of intent to commence Cease and Desist and Restoration Order proceedings by completing the enclosed statement of defense ("SOD") form. The SOD form would be directed to the attention of Stephanie Cook, no later than March 10, 2025.*

**Response 75.**   Paragraph 75 speaks for itself and requires no response.  Please see Attachment A for additional background and support regarding Sable's SOD, which Sable submitted to Commission staff on March 10, 2025.

**Paragraph 76.**   *We remain hopeful that we can reach an agreeable solution and that a Consent Order will fully address this matter so that we will not have to resort to bringing a formal action before our Commission. This additional notice to commence Commission proceedings is to give us options for the possibility that Sable fails to comply with the Consent Order or that the actions required in the Consent Order do not completely resolve the violations. Therefore, should this matter be resolved via the Consent Order (or if we do have to proceed with a Commission action and we are able to still resolve this matter via a Consent Commission Order), an SOD form would not be necessary.  In any case and in the interim, staff would be happy to accept any information you wish to share regarding this matter and staff can extend deadlines for submittal of the SOD form to account for the goal of resolving this via this Consent Order and specifically allow additional time to discuss terms of Commission consent orders if that is necessary.  If it is necessary, Commission staff would schedule the hearings for the Cease and Desist and Restoration Order for the Commission's April or May 2025 hearing.  Again, we are hopeful that this matter can be fully resolved by compliance with this Consent Order and there will not be a need to commence a formal proceeding before the Commission.*

**Response 76.**   Commission staff's representations in Paragraph 76 speak for themselves.  Sable denies that the Commission possesses the authority to issue any Cease and Desist Orders, as further addressed in Attachment A, Sections III.B.4 and III.C.6, and further denies each and every remaining allegation contained in Paragraph 76.  Please see Attachment A, Sections III and IV, for additional background and support regarding Sable's denial.  Sable notes that it requested a two-day extension from the deadline stated in Paragraph 75 in order to negotiate a potential Consent Order with Commission staff, but Commission staff denied Sable's request.

**Paragraph 77.**   *For additional information you may contact Stephanie Cook at (415) 904-5220, Stephanie.Cook@Coastal.ca.gov, or at our Headquarters Enforcement Office at:*

22

*California Coastal Commission*
*Attn:  Stephanie Cook*
*455 Market Street, Suite 300*
*San Francisco, CA 94105*

**Response 77.**     Paragraph 77 speaks for itself and requires no response.

**Paragraph 78.**     *Again, we remain willing and available to work with you to resolve these matters quickly and amicably and look forward to hearing from you.*

**Response 78.**     Paragraph 78 speaks for itself and requires no response.

23

US-DOCS\157757697

**PROOF OF SERVICE**

I, Kim Niz, declare:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is Alston & Bird LLP, 350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071.

On December 11, 2025, I served the document **SECOND AMENDED VERIFIED PETITION FOR WRIT OF MANDAMUS AND COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF** on the interested parties in this action addressed as follows:  **See Attached Service List**

☒      BY ELECTRONIC SERVICE on the date stated below, I caused the document(s) described above to be served electronically on the recipients designated on the Transaction Receipt pursuant to the parties' stipulation establishing the authorizing e-service of documents.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on December 11, 2025, at Los Angeles, California.


                                 */s/Kim Niz*
                                    Kim Niz

**SERVICE LIST**

| | |
|---|---|
| **Wyatt Sloan-Tribe**<br>**Isabella Langone**<br>**Kevin Kelly**<br>**Thomas Kinzinger**<br>**John Natalizio**<br>Deputy Attorney General<br>California Department of Justice<br>Office of the Attorney General<br>Public Rights Division<br>Land Use and Conservation Section<br>300 S. Spring Street, Suite 1702<br>Los Angeles, California 90013<br>Telephone (213) 269-6380 | **ATTORNEYS FOR DEFENDANTS:**<br>California Coastal Commission<br><br>Email:  Wyatt.Sloan-Tribe@doj.ca.gov<br>        Isabella.Langone@doj.ca.gov<br>        Kevin.Kelly@doj.ca.gov<br>        Thomas.Kinzinger@doj.ca.gov<br>        John.Natalizio@doj.ca.gov |

# EXHIBIT B

STATE OF CALIFORNIA - NATURAL RESOURCES AGENCY                               GAVIN NEWSOM,   *GOVERNOR*

**CALIFORNIA COASTAL COMMISSION**
455 MARKET ST, SUITE 300
SAN FRANCISCO, CA 94105
FAX (415) 904-5400
TDD (415) 597-5885



### VIA ELECTRONIC, REGULAR, AND CERTIFIED MAIL

June 9, 2026

Email: srush@sableoffshore.com
Steve Rusch Sable Offshore
Corp.
12000 Calle Real
Goleta, CA 93117
Certified Mail No. 7019 2280 0001 3614 2044

| | |
|---|---|
| Subject: | **Notice of Intent to Commence Cease and Desist Order and Administrative Penalty Proceedings** |
| Violation No.: | V-9-26-0063 |
| Location: | The properties that are subject to this order are the properties wherein the portions of the Las Flores Pipelines, CA-324 and CA-325, that lie within the Coastal Zone are located, between the Gaviota coast and the Los Padres National Forest, all within Santa Barbara County. |
| Violation[1] Description: | Unpermitted development in the form of reactivation of the Las Flores Pipelines, CA-324 and CA-325, after more than five years of those pipelines being idled, inactive, and out of service. |

Dear Mr. Rusch:

I am directing this notice to you, Steve Rusch, as Vice President of Regulatory & Environmental Affairs for Sable Offshore Corporation and an authorized representative of Pacific Pipeline Company (collectively, "Sable"). I am notifying you, as is provided for

---

[1] Please note that the description herein of the violations at issue is not a complete list of all development on the subject property that is in violation of the Coastal Act and/or the County of Santa Barbara LCP that is of concern to the Commission. Accordingly, you should not treat the Commission's silence regarding (or failure to address) other development on the properties as indicative of Commission acceptance of or acquiescence to such development. Please also note that "violation" as used in this letter refers to alleged violations of the Coastal Act and/or the County of Santa Barbara LCP, as identified by Commission staff.

Sable Offshore Corp. (V-9-26-0063)
Page 2 of 12

in Section 13181(a) of the California Coastal Commission's ("Commission's") regulations (Title 14, Division 5.5 of the California Code of Regulations), of my intent to commence proceedings for issuance by the Commission of a Cease and Desist Order to Sable and imposition of an Administrative Penalty to Sable to address the Coastal

Act[2] violations identified above, which would include a direction to cease and desist from the active use of the portions of the Las Flores Pipelines, CA-324 and CA-325 (collectively, the "Pipelines"), that lie within the Coastal Zone for the transport of oil until a Coastal Development Permit ("CDP") authorizing reactivation of the Pipelines is secured.

As you are aware, these violations can be resolved amicably by collaborating with staff to come to a consensual resolution of the Coastal Act violations at issue and entering into a Consent Cease and Desist Order and Consent Administrative Penalties (collectively, "Consent Orders"). If you would like to pursue a consent resolution including a commitment to apply for a CDP, please contact Liam Stowe of my staff at the contact information at the end of this letter, by COB June 12. However, if such a settlement is not possible, we will be forced to resolve this violation through the proposal of unilateral orders at a hearing, as we have before against Sable. In the meantime, as is also explained below, as long as the violation persists, Sable's exposure to the potential for the assessment of penalties for the Coastal Act violations continues to accrue by operation of law.

## I.      Background

As noted in recent letters to Sable, pipelines CA-324 and CA-325 have been idled, inactive and out-of-service since the Refugio Oil Spill in 2015, and the reactivation of the Pipelines on March 14, 2026, constituted new or expanded development as defined in the Coastal Act that required Coastal Act authorization. Because no such authorization has been obtained, the reactivation of those Pipelines constituted violations of the Coastal Act. However, as you know, the instant violations are not an isolated event, and the complete enforcement history pertaining to Sable is extensive. The Coastal Act violations at issue in this Notice of Intent letter are part of an ongoing series of violations that Sable has instigated in recent years, with the reactivation of the Pipelines being the objective that prior violations were meant to facilitate. Thus, below is a brief summary of the enforcement and violation history as context.

### a. *Enforcement History*

Commission enforcement staff first learned of Sable's work on and around the Pipelines in September of 2024 and informed Sable that its unauthorized activities constituted

---

[2] As you know, the Coastal Act is codified at California Public Resources Code sections 30000 *et seq.* All further references to Coastal Act sections are to sections of that code.

Sable Offshore Corp. (V-9-26-0063)
Page 3 of 12

violations of the Coastal Act via a Notice of Violation letter sent to Sable on September 27, 2024. The violations discussed in that letter included construction activities and disturbances to the surrounding environment taking place within the Coastal Zone, apparently connected with the proposed reactivation of the Pipelines. As that letter explained, these activities were not exempt from CDP requirements. Commission staff requested that Sable immediately cease all unpermitted development within the Coastal Zone, including all activities associated with the repair, upgrade, and proposed restart of CA-324 and CA-325, as well as any other development that might have been occurring along the Pipelines, on the offshore platforms, or along the pipelines leading from those offshore platforms to shore, and offered for Sable to work with the Commission to resolve the unpermitted development. To these ends, Commission staff stated that Sable must submit applications and obtain the requisite CDP authorization before further development may continue.

In October 2024, Commission staff and Sable representatives engaged in a series of meetings and exchanged letters and emails regarding Sable's activities. During some interactions, Sable indicated an interest in cooperating with the Commission to resolve the Coastal Act violations. However, staff continued to receive reports of ongoing work, and Sable refused to commit to apply for CDPs to permit its work.

As a result, on November 12, 2024, I issued an Executive Director Cease and Desist Order ("EDCDO") under the authority granted to me by Section 30809(a) of the Coastal Act to address situations where an entity has undertaken, or is threatening to undertake, development that may require a CDP without first securing a CDP. The EDCDO was issued in response to Sable's failure to satisfactorily provide the assurances and information requested in my October 4, 2024, letter, including its failure to provide written confirmation of its commitment to apply for an "after the fact" ("ATF") CDP(s) for work previously undertaken within the Coastal Zone. In this EDCDO, in addition to directing Sable to cease unpermitted development, I also directed Sable to complete an Interim Restoration Plan to safely secure the sites, to apply for an ATF CDP for all work previously undertaken along the Pipelines, and to apply for a future CDP(s) to cover the remaining proposed work. As an accommodation, I granted 120 days from the issuance of the EDCDO for Sable to apply for requisite CDPs. Sable ceased some of its activities, and on December 20, 2024, Sable successfully completed the Interim Restoration Plan. However, around this same time—and unknown to Commission staff at the time—Sable shifted its pipeline-related operations offshore, where it carried out additional development activities also without the benefit of a CDP. The EDCDO expired on February 10, 2025, 90 days from the date of issuance, by operation of law.

Two days later, on February 12, 2025, Santa Barbara County ("County") Planning staff issued two letters taking the position that Sable's work on and around the Pipelines was authorized by permits from the 1980s. The County did not assert that authorization was provided regarding the development activities carried out for the separate offshore pipelines. On February 14, Commission enforcement staff sent a letter to the County

Sable Offshore Corp. (V-9-26-0063)
Page 4 of 12

disputing its conclusion regarding the Pipelines and objecting to its letters.  On that same day, we also received a lengthy letter from Sable, presenting its arguments in support of the County's conclusion and providing word that Sable had recommenced work.  In response, on February 16, 2025, I provided Sable with notice of my intention to issue a new EDCDO, again giving Sable the opportunity to provide satisfactory assurances that it would cease all unpermitted development until adequate CDPs are validly issued. In this letter, I responded to arguments that Sable submitted on February 14. Additionally, I explained why Commission staff continued to believe that Sable's proposed activities lacked the necessary Coastal Act authorization. I directed Sable to confirm in writing by February 17, 2025, that Sable would cease all development as described in, and subject of, that letter unless and until Sable demonstrated, to my satisfaction, that it already possesses the necessary Coastal Act authorization for the work, which Sable failed to do.

On February 17, 2025, I received a letter from Sable reiterating its position that Sable's work "does not constitute a violation of the Coastal Act or the County's LCP because it is authorized under the pipelines' existing CDPs and other approvals." Further, Sable stated that it "intends to proceed with anomaly repair work" without further Coastal Act authorization.

Therefore, on February 18, 2025, I issued a second EDCDO along with a Notice of Intent to Commence Proceedings for a Commission Cease and Desist Order, Restoration Order, and Administrative Penalty Order, likely at the Commission's April or May 2025 meeting. The EDCDO directed Sable to cease further work along the Pipelines and the immediately surrounding areas unless and until authorized by a new CDP. Furthermore, the EDCDO reiterated Commission staff's resolve to address the unpermitted development through negotiations with Sable's representatives and to work on a consensual resolution. Unfortunately, following the issuance of the second EDCDO, Sable disregarded the order, continued work unabated, and failed to collaborate towards Consent Orders.

Also on February 18, 2025, before I issued the second EDCDO, Sable sued the Commission. In the lawsuit, Sable alleged that the Notices of Violation and first EDCDO were illegal and constituted a taking of Sable's property. All of Sable's claims have since been rejected by the Santa Barbara Superior Court, but to date, that lawsuit is ongoing in the trial court due to the Commission's cross-complaint.

On March 10, 2025, Sable submitted its statement of defense ("SOD") form contending that Sable's activities were not in violation of the County's Coastal Zone Ordinance, certified Local Coastal Program ("LCP"), or Coastal Act. The arguments that Sable presented in this SOD were wide-ranging, including an argument that the retrofitting of the Pipelines in 2024-2025 with new technology was envisioned by the Final Development Plan and CDPs that its predecessor acquired in the 1980s authorizing the construction of the Pipelines. The SOD further contended that the Commission failed to

Sable Offshore Corp. (V-9-26-0063)
Page 5 of 12

adequately obtain enforcement jurisdiction and that the Commission's exercise of its statutorily granted authority violated Constitutional law.

On April 10, 2025, the Commission heard and considered recommendations from staff for a Cease and Desist Order, Restoration Order, and Administrative Civil Penalty, along with comments made by many members of the public and elected representatives. The Commission also considered material and oral presentations as presented by Sable and its representatives for an equal time compared to Commission staff's presentation. The onshore violations presented at the hearing included excavation with heavy equipment; removal of major vegetation; grading and widening of roads; installation of metal plates and other fill material within wetlands; dewatering and discharge of water; pipeline removal, replacement, and reinforcement; installation of shutoff valves; and other development associated with the prospective reactivation of CA-324 and CA-325. Offshore, alleged violations included placing sand and cement bags on the seafloor below and adjacent to out-of-service offshore oil and water pipelines without Coastal Act authorization, also as part of efforts to reactivate offshore oil extraction operations. Sable presented countervailing arguments; however, after the full public hearing and testimony and documents received from Sable, Sable's counsel, elected representatives, and the public, the Commission issued the proposed Cease and Desist Order ("CDO") and Restoration Order, and it assessed an Administrative Penalty of $18,022,500 (collectively, the "April 10 Orders"). Pertinently to the violations discussed in this June 9, 2026, letter, Section 1.1 of the CDO prohibits Sable from performing any further development, as that term is defined in the Coastal Act, anywhere along the Santa Ynez Unit, including the Pipelines, unless Sable first secured Coastal Act authorization or confirmation that the work is exempt.

Sable failed to comply with any of the April 10 Orders, and on April 16, the Commission filed a cross-complaint to enforce the CDO. In May of 2025, the trial court granted the Commission's request for a preliminary injunction prohibiting further development in violation of the CDO. That preliminary injunction remains in effect to date.

b. *Violation History*

On February 18, 2026, I issued a letter to you, Mr. Rusch, reminding you of the Commission's independent authority over any reactivated use of the Pipelines, which had been idled, inactive and out of service for more than five years. This letter emphasized that reactivation of idled, inactive or out of service facilities such as pipelines CA-324 and CA-325 would constitute expanded oil extraction and new or expanded development requiring a coastal development permit that is consistent with the standards in Coastal Act section 30262. Thus, Sable would be required to apply for and receive from the Commission a valid CDP consistent with the standards in that section to reactivate the Pipelines to resume the transport of oil.

Sable Offshore Corp. (V-9-26-0063)
Page 6 of 12

On March 5, 2026, Sable's representative acknowledged receipt of the February 18 letter and argued that the relevant law, including Section 30262(b) of the Coastal Act, did not apply to CA-324 and CA-325. The acknowledgement also stated that issues presented in the Commission's letter were being actively litigated in the *Pacific Pipeline Co. v. State of California* case (E.D. Cal. Case No. 1:26-CV-01486-KES-CDB).

On March 13, 2026, United States Secretary of Energy Chris Wright issued an order entitled "Pipeline Capacity Prioritization and Allocation Order," purportedly pursuant to the Defense Production Act of 1950 (50 U.S.C. § 4501). This order (the "DPA Order") directed Sable to, among other things, "immediately commence performance under contracts or orders for services . . . for hydrocarbon transportation capacity in the [Santa Ynez Pipeline System] . . ., including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California."

Soon thereafter, Sable issued a press release, conceding that the company had reactivated CA-324 and CA-325 by stating that it had resumed oil flow through the Pipelines on March 14, 2026, as a result of the DPA Order, resuming transportation of oil from Las Flores Canyon to the Pentland Station for the first time since such transportation had been halted in 2015.[3] In doing so here as well as elsewhere, Sable has unequivocally confirmed that the Pipelines have been reactivated in 2026, after being idled, inactive, or out of service since May 19, 2015.

On March 19, 2026, I issued you a letter stating that the reactivation of lines CA-324 and CA-325 constituted development that lacked the requisite Coastal Act authorization, and that as a result, the Commission would need to explore potential enforcement actions. The letter also reminded Sable of existing injunctions either prohibiting such development or specifically prohibiting restart of the Pipelines prior to securing all necessary approvals. The letter also acknowledged the DPA Order but noted that it could not and did not absolve Sable of the above-referenced legal obligations.[4]

On March 20, 2026, Sable's representative acknowledged receipt of the March 19 letter and restated that the arguments made in the previous letters to Sable are the subject of ongoing litigation. Sable's representative also referred to the company's March 16, 2026, Form 8-K filing for recent developments concerning the Pipelines.

---

[3] During proceedings before Judge Geck on January 7, 2026, in *Center for Biological Diversity, et al. v. California Dep't of Forestry and Fire Protection*, Santa Barbara Co. Superior Court Case No. 25CV02244 ("*CBD v. CalFIRE*"), counsel for Sable confirmed that no oil had yet been re-introduced into lines CA-324 and CA-325 as of that date.  Transcript of hearing at p. 18-19.

[4] The legal limitations of the DPA Order are discussed at length in multiple briefs and pleadings of which you are no doubt aware, including the Complaint filed by the State of California in *State v. Wright*, C.D. Cal. Case No. 2:26-cv-3396, and briefing related to Sable's motion to dissolve or modify the injunction imposed by Judge Geck in *CBD v. CalFIRE*. In fact, the latter case is the only one in which a court has so far addressed the substantive question of the limits of the DPA Order. In its April 17, 2026, ruling, that court confirmed that the DPA Order "does not permit the violation of applicable state regulatory law."

## II.      Violations of the Coastal Act

Section 30600(a) of the Coastal Act requires that any development occurring within the Coastal Zone must first be authorized by an approved CDP, unless an exclusion or exemption applies. Section 30106 of the Coastal Act, and as incorporated into the County's certified LCP, defines "development" as:

*"Development" means, on land, in or under water, the placement or erection of any solid material or structure; discharge or disposal of any dredged material or of any gaseous, liquid, solid, or thermal waste; grading, removing, dredging, mining, or extraction of materials; change in the density or intensity of use of land, … change in the intensity of use of water, or of access thereto; construction, reconstruction, demolition, or alteration of the size of any*

*structure… and the removal or harvesting of major vegetation other than for agricultural purposes, kelp harvesting, and timber operations . . . "*

Section 30262(b) of the Coastal Act further clarifies that:

*"(2) Repair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more shall be considered a new or expanded development requiring a new coastal development permit consistent with this section.*

*(3)      Development associated with the repair, reactivation, or maintenance of an oil pipeline that has been idled, inactive or out of service for five years or more requires a new coastal development permit consistent with this section.*

*(4)      The commission or local government with a certified local coastal program shall review and approve, modify, condition, or deny the permit based on the requirements of this section."*

Under Section 30106, change of intensity of land use constitutes development, such that a CDP must be obtained. Additionally, Section 30262(b) of the Coastal Act clarifies reactivation of pipelines that have been idled, inactive, or out of service for five years or more is development requiring a new CDP consistent with that section. The standards applied under the Coastal Act to protect coastal resources are distinct from those applied by the Pipeline and Hazardous Materials Safety Administration (PHMSA). Under PHMSA regulations, a pipeline is either "active" or "abandoned." These regulations are

Sable Offshore Corp. (V-9-26-0063)
Page 8 of 12

explicitly created to promote pipeline safety. However, Section 30262(b) of the Coastal Act deploys the terms "idled," "inactive," or "out of service." Despite federal pipeline safety law defining certain similar terms, the Coastal Act is not limited to using the terminology or definitions employed in the federal law. Moreover, the Coastal Act's use of three different terms highlights the Legislature's intent that these terms not be interpreted as analogous to abandonment under federal law, and their inclusion in the Coastal Act was specifically intended to safeguard coastal resources rather than ensure pipeline safety. Therefore, applying the binary of active pipelines versus abandoned pipelines under PHMSA regulation would be inappropriate here, as Section 30262(b) allows the Commission to apply distinct terminology where an idled, inactive, or out of service pipeline may be different than an abandoned pipeline under PHMSA regulations without the two laws conflicting.

In the present case, following the events of the 2015 Refugio Oil Spill, any remaining hydrocarbon product within CA-324 and CA-325 was removed. Next, the pipelines were purged with Nitrogen gas, capped, and remained out of service and not used for the transportation of oil for nearly eleven years. Section 30262(b) clarified that reactivation of a pipeline that has been idled, inactive, or out of service for more than five years constitutes development. This law took effect on January 1, 2026. It applies to all pipelines that were (1) repaired, reactivated, or maintained on or after January 1, 2026; and (2) were idled, inactive, or out of service for five years or more as of or after January 1, 2026. The law does not apply retroactively, as it does not look back to regulate pipelines that reactivated prior to January 1; however, it does apply to pipelines that have been reactivated post January 1 after being idled, inactive, or out of service for a period of five years. In this case, Sable has admitted that it reactivated CA-324 and CA-325 on March 14, 2026. Furthermore, these Pipelines have not been in use or transported oil since 2015, a period of dormancy more than five years. While separate offshore pipelines, including the one that terminates at the Las Flores Canyon processing facility  may have transported oil to that facility in May 2025 (also after our April 10 Orders were issued), such pipelines are distinct from the CA-324 and CA-325 pipelines. Sable has admitted that CA-324 and CA-325 remained inactive until the DPA order was issued, and once they were reactivated and oil transportation resumed, unpermitted development occurred under the Section 30262(b) definition.

As described above, unpermitted development occurred at the Properties in violation of the Coastal Act.


### III.    Cease and Desist Orders

We hope that we will reach an amicable resolution to this matter by working towards a consensual agreement where Sable will stop the use of CA-324 and CA-325 for the transport of oil until a proper CDP addressing their reactivation is applied for and received. This letter is intended to facilitate the resolution here, whether we do so

Sable Offshore Corp. (V-9-26-0063)
Page 9 of 12

through a consent or unilateral action, in providing you with the notice required under the Commission's Regulations.

The Commission's authority to issue Cease and Desist Orders is set forth in Section 30810(a) of the Coastal Act, which states, in part:

> *"If the commission, after public hearing, determines that any person . . . has undertaken, or is threatening to undertake, any activity that (1) requires a permit from the commission without securing the permit or (2) is inconsistent with any permit previously issued by the commission, the commission may issue an order directing that person . . . to cease and desist. The order may also be issued to enforce any requirements of a certified local coastal program . . . under any of the following circumstances:*
>
> *. . .*
>
> *(2) The commission requests and the local government … declines to act, or does not take action in a timely manner, regarding an alleged violation which could cause significant damage to coastal resources."*

As to jurisdictional requirements, the Commission has jurisdiction to bring an enforcement order for two reasons. First, a portion of line CA-324 lies within the Commission's retained permitting jurisdiction. Thus, reactivation of that portion of line CA-324 required a permit from the Commission, and none was secured. Second, regarding the remainder of the line, the Commission has jurisdiction because the County of Santa Barbara has failed to act in a timely manner in response to Commission staff's request. Under Section 30810(a)(2) of the Coastal Act, the Commission may exercise jurisdiction in areas with a certified LCP if the Commission requests the local government to act and it declines or fails to do so in a timely manner. In this case, Commission staff asked the County to act in a letter dated March 27, 2026, and requested that the County communicate its decision by March 30, 2026. The County never even provided a response. Thus, it has failed to act in a timely manner, and given the gravity of this situation, the violation could cause significant damage to coastal resources. Therefore, enforcement in this case falls to the Commission.

Section 30810(b) of the Coastal Act states that the Cease and Desist Order may be subject to such terms and conditions as the Commission determines are necessary to ensure compliance with the Coastal Act, including cessation of ongoing unpermitted development. In this case, unpermitted development includes the reactivation and continuing use of pipelines that, on January, 1, 2026,  had been idled, inactive, and out of service for more than five years, and compliance may require that Sable cease operations of CA-324 and CA-325 in the Coastal Zone until a CDP has been obtained in compliance with the requirements of the Coastal Act.

Sable Offshore Corp. (V-9-26-0063)
Page 10 of 12

In addition to the aforementioned items, any resolution of this matter via Consent Orders would also include settlement of monetary claims associated with your civil liability under the Coastal Act for these violations. If a consensual resolution is not reached, resolution of penalties under Section 30821.3 of the Coastal Act would be addressed unilaterally via Administrative Penalty Action, as described below.

## IV.    Administrative Civil Penalties, Civil Liability, and Exemplary Damages

Under Section 30821.3 of the Coastal Act, in cases involving violations of provisions of the Coastal Act other than the public access provisions, the Commission is authorized to impose administrative civil penalties by a majority vote of the Commissioners present at a public hearing. In this case, as described above, the violation includes the reactivation, without the required CDP, of two oil pipelines that, as of January 1, 2026, were idled, inactive, or out of service for more than five years. This unpermitted development constitutes a non-access violation, such that Section 30821.3 applies. The penalties imposed for violations of Sections 30821.3 may be in an amount up to $11,250 for each day that each violation has persisted or is persisting, for up to five (5) years. Further, the 60-day period that Sable had to cure the violation has lapsed, as Commission staff notified Sable of the unpermitted development on March 19, 2026; hence, the cure period lapsed on May 18, 2026.

The Coastal Act also includes other penalty provisions that may be applicable as well. Section 30820(a)(1) provides for civil liability to be imposed on any person who performs or undertakes development without a CDP in an amount that shall not exceed $30,000 or be less than $500 for each instance of development that is in violation of the Coastal Act. Section 30820(b) provides that additional civil liability may be imposed on any person who performs or undertakes development without a CDP when the person intentionally and knowingly performs or undertakes such development. Civil liability under Section 30820(b) is to be imposed in an amount not less than $1,000 per day and not more than $15,000 per day, for each violation and for each day in which each violation persists. Section 30821.6 also provides that a violation of a Cease and Desist Order of the Commission can result in civil liabilities of up to $6,000 for each day in which each violation persists. Lastly, Section 30822 provides for additional exemplary damages for intentional and knowing violations of the Coastal Act or a Commission Cease and Desist Order.

## V.    Response Procedure

In accordance with Coastal Act Section 30821.3(b) and Section 13181(a) of the Commission's regulations, you have the opportunity to respond to the Commission

staff's allegations as set forth in this notice of intent to commence Cease and Desist Order and Administrative Penalty proceedings by completing the enclosed SOD form.

The SOD form should be directed to the attention of Liam Stowe, at the address listed below, with a copy transmitted by email to his email address noted below, not later than **June 29, 2026**. However, should this matter be resolved via Consent Orders, an SOD form would not be necessary. In any case and in the interim, Commission staff would be happy to accept any information you wish to share regarding this matter, and staff can extend deadlines for submittal of the SOD form to specifically allow additional time to discuss terms of a Consent Order and to resolve this matter amicably. Commission staff currently intend to schedule the hearings for the Cease and Desist Order and Administrative Penalties for the Commission's August 2026 hearing.

### VI.    Resolution

This case involves a significant violation of the Coastal Act, and we hope to address the violations in an expeditious manner through the Consent Order process. Should we settle this matter, you do not need to expend the time and resources to fill out and return the SOD form mentioned above in this letter. However, my staff are prepared to resolve the ongoing unpermitted development through unilateral orders if Sable fails to collaborate in good faith to resolve the pertinent violation and meaningfully pursue a CDP so that coastal resources may be adequately protected.

For additional information, you may contact Liam Stowe at (415) 729-1646 or via email at Liam.Stowe@coastal.ca.gov, or at our Headquarters Enforcement Office at:

California Coastal Commission
Attn: Liam Stowe
455 Market Street, Suite 300
San Francisco, CA 94105

Sincerely,

Dr. Kate Huckelbridge
Executive Director

Enclosures:

Sable Offshore Corp. (V-9-26-0063)
Page 12 of 12

Statement of Defense Form for Cease and Desist Order and Administrative
Penalties

Cc:    Lisa Haage, Chief of Enforcement
       Cassidy Teufel, Deputy Director
       Alex Helperin, Deputy Chief Counsel
       Aaron McLendon, Deputy Chief of Enforcement
       Liam Stowe, Enforcement Counsel

STATE OF CALIFORNIA – CALIFORNIA NATURAL RESOURCES AGENCY                           GAVIN NEWSOM, *GOVERNOR*

## CALIFORNIA COASTAL COMMISSION
455 MARKET STREET, SUITE 300
SAN FRANCISCO, CA 94105-2421
VOICE (415) 904-5200
FAX (415) 904-5400



## STATEMENT OF DEFENSE FORM

**DEPENDING ON THE OUTCOME OF FURTHER DISCUSSIONS THAT OCCUR WITH COMMISSION ENFORCEMENT STAFF AFTER YOU HAVE COMPLETED AND RETURNED THIS FORM, ADMINISTRATIVE OR JUDICIAL ENFORCEMENT PROCEEDINGS MAY PROCEED AGAINST YOU. IF THAT OCCURS, ANY STATEMENTS THAT YOU MAKE ON THIS FORM WILL BECOME PART OF THE ENFORCEMENT RECORD AND MAY BE USED AGAINST YOU.**

**YOU MAY WISH TO CONSULT WITH OR RETAIN AN ATTORNEY BEFORE COMPLETING THIS FORM OR OTHERWISE CONTACT THE COMMISSION ENFORCEMENT STAFF.**

This form is accompanied by either a cease and desist order issued by the executive director or a notice of intent to initiate cease and desist order proceedings before the commission.  This document indicates that you are or may be responsible for or in some way involved in either a violation of the commission's laws or a commission permit. The document summarizes what the (possible) violation involves, who is or may be responsible for it, where and when it (may have) occurred, and other pertinent information concerning the (possible) violation.

This form requires you to respond to the (alleged) facts contained in the document, to raise any affirmative defenses that you believe apply, and to inform the staff of all facts that you believe may exonerate you of any legal responsibility for the (possible) violation or may mitigate your responsibility. This form also requires you to enclose with the completed statement of defense form copies of all written documents, such as letters, photographs, maps, drawings, etc. and written declarations under penalty of perjury that you want the commission to consider as part of this enforcement hearing.

You should complete the form as fully and accurately as you can and as quickly as you can and return it no later than **June 29, 2026,** to the commission's enforcement staff at the following address:

> Liam Stowe
> California Coastal Commission
> 455 Market Street, Suite 300
> San Francisco, California 94105-2421

If you have any questions, please contact as soon as possible Liam Stowe of the Commission enforcement staff at the telephone number (415) 729-1646 or via email at Liam.Stowe@coastal.ca.gov.

Sable Offshore Corp.
06/10/2026
Page 2 of 4

1.    **Facts or allegations contained in the cease and desist order or the notice of intent that you admit (with specific reference to the paragraph number in the order):**

 

_____

_____

_____

_____

_____

_____

2.    **Facts or allegations contained in the cease and desist order or notice of intent that you deny (with specific reference to paragraph number in the order):**

 

_____

_____

_____

_____

_____

_____

Sable Offshore Corp.
06/10/2026
Page 3 of 4

_____

_____

_____

3.    **Facts or allegations contained in the cease and desist order or notice of intent of which you have no personal knowledge (with specific reference to paragraph number in the order):**

_____

_____

_____

_____

_____

_____

4.    **Other facts which may exonerate or mitigate your possible responsibility or otherwise explain your relationship to the possible violation (be as specific as you can; if you have or know of any document(s), photograph(s), map(s), letter(s), or other evidence that you believe is/are relevant, please identify it/them by name, date, type, and any other identifying information and provide the original(s) or (a) copy(ies) if you can:**

_____

_____

_____

_____

_____

_____

Sable Offshore Corp.
06/10/2026
Page 4 of 4

_____

**5.**      **Any other information, statement, etc. that you want to offer or make:**

_____

_____

_____

_____

_____

**6.**      **Documents, exhibits, declarations under penalty of perjury or other materials that you have attached to this form to support your answers or that you want to be made part of the administrative record for this enforcement proceeding (Please list in chronological order by date, author, and title, and enclose a copy with this completed form):**

_____

_____

_____

_____

_____

# EXHIBIT C



1-310-620-5779
djmoore@paulhastings.com


June 29, 2026


Kate Huckelbridge
Executive Director
California Coastal Commission
455 Market Street, Suite 300
San Francisco, CA 94105
Kate.Huckelbridge@coastal.ca.gov

Attn: Liam Stowe
Liam.Stowe@coastal.ca.gov

Re:    Sable Offshore Corp. – Statement of Defense and Response to Notice of Intent to Commence
       Cease and Desist Order and Administrative Penalty Proceedings (No. V-9-26-0063)

Dear Dr. Huckelbridge:

On behalf of our clients, Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable"), this
Statement of Defense provides responses to your June 9, 2026, Notice of Intent to Commence Cease
and Desist Order and Administrative Penalty Proceedings (No. V-9-26-0063) ("Notice")[1] regarding Sable's
resumption of petroleum transportation through certain onshore pipeline segments ("Segments CA-324
and CA-325") of the integrated interstate pipeline facility known as the "Santa Ynez Pipeline System" in
compliance with an order issued by the U.S. Secretary of Energy pursuant to the federal Defense
Production Act (50 U.S.C. §§ 4501 *et seq.*).[2]  The Notice alleges that resuming petroleum transportation
constitutes unpermitted development that violates the California Coastal Act as recently amended by
California Senate Bill 237 ("SB 237").

Contrary to the allegations set forth in the Notice, resuming petroleum transportation through Segments
CA-324 and CA-325 ***does not constitute unpermitted development or a violation of the Coastal Act***
and the Commission enforcement proceedings described in the Notice would ***directly interfere with
Sable's longstanding vested rights to operate Segments CA-324 and CA-325*** pursuant to valid and
in-effect coastal development permits issued by the County of Santa Barbara.  As such, ***no cease and
desist order or administrative penalty is warranted***.

Importantly, the Notice is premised upon Coastal Commission staff's legal opinion regarding the
applicability of Section 30262, subd. (b)(2)-(4), of the Coastal Act to Sable's resumption of petroleum
transportation in the Santa Ynez Pipeline System.  These legal opinions are similar to legal positions that
Commission staff previously asserted in letters to Sable dated February 18, 2026, and March 19, 2026.
As Sable repeatedly has explained in responses to those letters, dated March 5, 2026 and March 20,
2026, respectively, and in Sable's initial response to the Notice, dated June 12, 2026, these exact legal
issues implicate fundamental legal questions that are currently the subject of active litigation involving the
State of California (E.D. Cal., Case No. 1:26-cv-01486-KES-CDB) ("SB 237 Litigation").  Importantly,
there currently is a pending motion before the SB 237 Litigation court to add the Coastal Commission as

---

[1] The Notice is attached hereto as Exhibit 41 to Attachment D.
[2] See Attachment D, Exhibit 31, U.S. Secretary of Energy, "Pipeline Capacity Prioritization and Allocation Order" (Mar. 13, 2026)
("DPA Order"), p. 3.

PAUL
HASTINGS

June 29, 2026
Page 2

a defendant.  Putting these enforcement proceedings before the Commission now—more than three months since petroleum transportation through Segments CA-324 and CA-325 resumed and while the underlying legal issues are in the process of being considered by a court of law—is an unnecessary waste of the Commission's limited resources and part of a continual effort by the Coastal Commission to exert new permit authority over a long-existing pipeline that has operated for decades pursuant to vested rights established by lawfully issued permits.

In our initial response to the Notice, dated June 12, 2026, we therefore requested that the Notice be held in abeyance or withdrawn until the court rules on the pending motion to add the Coastal Commission as a defendant, at which point the matters raised in the Notice would be squarely before the court and appropriately resolved in that forum.  Commission staff refused our request, leaving Sable no choice but to prepare this Statement of Defense and response to the Notice.  Attachment A responds to the Notice's substantive allegations and explains in detail that resuming petroleum transportation through Segments CA-324 and CA-325 does not constitute unpermitted development under the Coastal Act.  In short:

- Resuming petroleum transportation through Segments CA-324 and CA-325 does not constitute a "change in the … intensity of use of land" or other "development" under Coastal Act Section 30106 because Sable already is permitted to flow petroleum through Segments CA-324 and CA-325 pursuant to vested rights to operate under applicable zoning and longstanding permits.

- Resuming petroleum transportation through Segments CA-324 and CA-325 does not constitute "new or expanded development" under Coastal Act Section 30262, subd. (b)(2)-(4), because the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, has not been "idled, inactive, or out of service for five years or more," Section 30262 does not apply retroactively, and any application of Section 30262 to Segments CA-324 and CA-325 is preempted under applicable federal law and would be unconstitutional violations of Sable's vested rights and rights under the U.S. and California Constitutions.

In sum, and as described more fully in this package, ***resuming petroleum transportation through Segments CA-324 and CA-325 does not constitute a violation of the Coastal Act or require new or amended Coastal Act authorization***.

This letter and each of its attachments collectively comprise Sable's formal "Statement of Defense" in response to the Notice.[3]  As noted above, Attachment A addresses the Notice's allegations in detail. Attachment B includes the completed "Statement of Defense" form transmitted to Sable with the Notice. Attachment C individually responds to each statement in the Notice.  Attachment D includes documents and records to be made part of the administrative record in any enforcement proceedings regarding this matter.  By submitting these materials, Sable does not concede that the Coastal Commission possesses the authority either to issue the Notice or commence any enforcement proceedings regarding the resumption of petroleum transportation through Segments CA-324 and CA-325.

Based on the foregoing, Sable respectfully requests that the Notice be held in abeyance or withdrawn until the court in the SB 237 Litigation rules on the pending motion to add the Coastal Commission as a

---

[3] See Cal. Code of Regs., tit. 14 ("Coastal Act Regulations"), § 13181, subd. (a).

# PAUL HASTINGS

June 29, 2026
Page 3

defendant, at which point the matters raised in the Notice would be before the court and appropriately resolved in that forum.

Sincerely,

Duncan Joseph Moore
of PAUL HASTINGS LLP

cc:  Lisa Haage, California Coastal Commission
Alex Helperin, California Coastal Commission
Cassidy Teufel, California Coastal Commission
Aaron McLendon, California Coastal Commission
Liam Stowe, California Coastal Commission
Anthony Duenner, Sable Offshore Corp.
Lee Alcock, Sable Offshore Corp.
Steve Rusch, Sable Offshore Corp.
Lauren Paull, Paul Hastings LLP
Cullen Tyndall, Paul Hastings LLP

PAUL
HASTINGS

June 29, 2026
Page 1


### Attachment A

#### I.    EXECUTIVE SUMMARY

Contrary to the assertions set forth in the Notice, Sable's resumption of petroleum transportation through Segments CA-324 and CA-325 of the Santa Ynez Pipeline System does not constitute unpermitted development under the Coastal Act.[4]

The Notice primarily asserts that Segments CA-324 and CA-325 previously were "idled, inactive, or out-of-service for five years or more" such that resuming petroleum transportation through them constitutes "new or expanded development" under Section 30262, subd. (b)(2)-(4), of the Coastal Act, as recently amended by SB 237.  These allegations raise fundamental legal questions that are currently the subject of active litigation involving the State of California, in which there is a pending motion before the court to add the Coastal Commission as a defendant.[5]  Coastal Commission staff has been informed of these proceedings on multiple occasions, including through letters from Sable to Commission staff dated March 5 and March 20, 2026.[6]

Any Cease and Desist Order or Administrative Penalty proceedings before those legal questions are resolved in court is premature and an unnecessary use of the Commission's limited resources.  Moreover, Section 30262, subd. (b)(2)-(4), is inapplicable here because Segments CA-324 and CA-325 never have been "idled, inactive, or out-of-service for five years or more."  Rather, and as explained in detail below, the Santa Ynez Pipeline System, including Segments CA-324 and CA-325, is active pursuant to federal regulations.  Sable and its predecessors have maintained the Santa Ynez Pipeline System, conducted extensive repairs on Segments CA-324 and CA-325, and have never undertaken any measures to abandon the Segments.  Resuming petroleum transportation through Segments CA-324 and CA-325 also does not constitute "development" under Section 30106 of the Coastal Act because Sable possesses vested rights to transport petroleum through Segments CA-324 and CA-325 under existing approvals and authorizations lawfully issued by the County of Santa Barbara pursuant to its delegated local coastal program permitting authority.  Because resuming petroleum transportation through Segments CA-324 and CA-325 does not constitute unpermitted development under the Coastal Act, no Coastal Act violation has occurred and no Cease and Desist Order or Administrative Penalty may be issued by the Commission.

This Attachment A first provides background on the Santa Ynez Unit and the Santa Ynez Pipeline System.  Next, this document demonstrates that resuming petroleum transportation through Segments CA-324 and CA-325 does not constitute "development" under Coastal Act Section 30106.  Then, this document addresses the Notice's allegation that resuming petroleum transportation constitutes "new or expanded development" under Coastal Act Section 30262, subd. (b)(2)-(4).

#### II.    BACKGROUND

---

[4] The Coastal Act is codified at California Public Resources Code sections 30000 *et seq*.
[5] See *Pacific Pipeline Company v. State of California, et al.* (E.D. Cal., Case No. 1:26-cv-01486-KES-CDB) ("SB 237 Litigation"). Sable's Verified First Amended Complaint in the SB 237 Litigation is attached hereto as Exhibit 25 to Attachment D.  Sable's Motion for Leave to File Second Amended Complaint and supporting declaration are attached as Exhibits 38 and 39 to Attachment D.
[6] See Attachment D, Exhibit 29, Sable, Letter re: "Restart of Lines CA-324 and CA-325 of the Santa Ynez Pipeline System" (Mar. 5, 2026); Attachment D, Exhibit 35, Sable, Letter re: "Lines CA-324 and CA-325 of the Santa Ynez Pipeline System" (Mar. 20, 2026).

PAUL
HASTINGS

June 29, 2026
Page 2

Sable's management team, including its Chief Executive Officer, James C. Flores, has extensive experience in oil and gas exploration and production.  Sable's management team prides itself on their strong record of operating safely and successfully in many jurisdictions, including California and the Pacific Region of the Outer Continental Shelf.  The Sable team has received numerous awards for operational excellence, national industry leadership, employee safety, occupational excellence, environmental lease maintenance, operator of the year, and best management practices in habitat conservation from several agencies such as the National Safety Council, the California Department of Conservation Division of Geologic Energy Management, and the U.S. Bureau of Land Management.  Specific to the County of Santa Barbara ("County"), a company operated by Sable's management team was awarded the County's first and only "Resolution for Good Operator" recognition for outstanding operator performance and a County Commendation for outstanding maintenance.

Sable acquired the federal offshore oil production facilities known as the Santa Ynez Unit ("SYU") and the interconnected, interstate pipeline system and associated facilities known as the "Santa Ynez Pipeline System" ("SYPS") in February 2024.  The SYU consists of sixteen federal leases across approximately 76,000 acres of the outer continental shelf and produces crude oil and natural gas from Platforms Hondo, Harmony and Heritage, which are located in federal waters off the California coast in the Santa Barbara Channel.  The SYPS consists of (i) offshore pipeline segments ("Offshore SYPS Segments") that transport petroleum from the SYU onshore, (ii) intermediate onshore processing facilities at Las Flores Canyon, located approximately 20 miles west of the City of Santa Barbara in unincorporated Santa Barbara County ("LFC Facilities"), and (iii) onshore pipeline segments that transport petroleum from the LFC Facilities to Gaviota and Pentland Stations.

The onshore pipeline segments of the SYPS include (i) "Segment CA-324" (previously known as Line 901), which is a twenty-four (24) inch diameter pipeline segment with a maximum permitted throughput capacity of 150,000-barrels of crude oil per day and is designed to transport crude oil approximately 10.9 miles from the LFC Facilities, west along the Gaviota Coast, to the existing Gaviota Pump Station located approximately one mile east of Gaviota State Park in Santa Barbara County, and (ii) "Segment CA-325" (previously known as Line 903), which is thirty (30) inches in diameter, has a maximum permitted throughput capacity of 300,000-barrels of crude oil per day, and is designed to transport crude oil approximately 113.5 miles north from the Gaviota Pump Station to the Sisquoc Pump Station, then east through the Los Padres National Forest (LPNF) and Cuyama Valley, ultimately delivering crude oil to the existing Pentland Delivery Point in the San Joaquin Valley in Kern County.  Together, Segment CA-324 and Segment CA-325 are collectively referred to herein as "Segments CA-324 and CA-325."

Since acquiring the SYU and SYPS, Sable has worked with applicable regulatory agencies toward resuming petroleum transportation through the SYPS, including performing repair and maintenance work on the facilities and submitting various required materials to the applicable governmental bodies with jurisdiction over such work.  On May 19, 2025, Sable announced that as of May 15, 2025, it had resumed production at the SYU and begun transporting petroleum to the LFC Facilities through the Offshore SYPS Segments.[7]  On March 13, 2026, pursuant to authority delegated by the President of the United States under the federal Defense Production Act ("DPA") (50 U.S.C. §§ 4501 *et seq*.),[8] the United States Secretary of Energy Chris Wright issued an order ("DPA Order") directing Sable to "immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS, including

---

[7] See Attachment D, Exhibit 14, Sable, "8-K and Press Release" (May 19, 2025).
[8] See Attachment D, Exhibit 30, U.S. President, 91 Fed. Reg. 13199, Executive Order 14391 (Mar. 13, 2026).

PAUL
HASTINGS

June 29, 2026
Page 3

transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California."[9]  On March 16, 2026, Sable publicly announced that as of March 14, 2026, Sable had resumed petroleum transportation through Segments CA-324 and CA-325 in compliance with the DPA Order.[10]  Sable also confirmed that it had resumed petroleum transportation through Segments CA-324 and CA-325 on March 20, 2026, in response to a letter from Commission staff.[11]

This section discusses relevant background, existing permits, and authorizations related to both the SYU and the SYPS.  As described further herein (and in the referenced materials), all of Sable's activities within the Coastal Zone—including resuming petroleum transportation through Segments CA-324 and CA-325—had the requisite Coastal Act authorizations and do not constitute unpermitted development or any violations of the Coastal Act.

### A.  Offshore Approvals: Santa Ynez Unit and Offshore SYPS Segments[12]

Beginning in 1968 and over the course of the subsequent 14 years, Exxon Mobil Corporation and Mobil Pacific Pipeline Company consolidated more than a dozen offshore federal oil leases and organized them into a streamlined production unit known as the SYU.

Exxon submitted a Development and Production Plan ("DPP") for the SYU to the federal Minerals Management Service ("MMS") in December 1982.[13]  In January 1983, pursuant to the Coastal Zone Management Act ("CZMA"), Exxon submitted a request for the Coastal Commission's concurrence in Exxon's consistency certification for planned oil and gas production activities in the SYU.  In June 1983, the Coastal Commission issued Consistency Certification No. CC-8-83 concurring in part with Exxon's consistency certification for the Outer Continental Shelf (OCS) portions of the proposed SYU platforms and Offshore SYPS Segments, but objecting to Exxon's proposed expansion of an existing onshore treatment facility.[14]  In 1987, Exxon revised the DPP for the SYU to include additional details regarding the installation of the three platforms in the SYU, which are now known as Hondo, Harmony and Heritage. The revised DPP also included additional information regarding the Offshore SYPS Segments and their connection to proposed onshore facilities in Las Flores Canyon.  MMS determined that Exxon's revised DPP application was complete on September 29, 1987.[15]

---

[9] Attachment D, Exhibit 31, U.S. Secretary of Energy, "DPA Order" (Mar. 13, 2026), p. 3.

[10] See Attachment D, Exhibit 32, Sable, "8-K and Press Release" (Mar. 16, 2026).

[11] See Attachment D, Exhibit 35, Sable, Letter re: "Lines CA-324 and CA-325 of the Santa Ynez Pipeline System" (Mar. 20, 2026).

[12] The Notice does not allege that any unpermitted development or Coastal Act violation has occurred with respect to the Santa Ynez Unit or the Offshore SYPS Segments.

[13] See Attachment D, Exhibit 2, "Sable Offshore Corp. – Statement of Defense and Response to Notice of Intent to Commence Proceedings for a Commission Cease and Desist Order, Restoration Order, and Administrative Penalty Order" (Mar. 10, 2025) ("2025 Statement of Defense"), Attachment D, Document No. 4, Minerals Management Service, Development and Production Plan Approval (Sept. 20, 1985).  In Sable's 2025 Statement of Defense, Document No. 45 was erroneously included in place of Document No. 4.  The correct document has been included as Document No. 4 to the 2025 Statement of Defense as part of this submittal.

[14] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 16, Coastal Commission, Compendium of California Coastal Commission Decisions Under the Federal Consistency Provisions (Mar. 30, 1990), pp. 265-266.

[15] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 13, MMS, DPP Approval (Apr. 4, 1988).

PAUL
HASTINGS

June 29, 2026
Page 4

The Coastal Commission received the proposed revised DPP from MMS on December 22, 1987.[16]  After reviewing and analyzing the revised DPP, on February 23, 1988, the Commission issued Consistency Certification No. CC-64-87 concurring with Exxon's certification for the remaining portions of the Offshore SYPS Segments and associated onshore facilities.  The Commission stated that: "By concurring in Exxon's certification, the Commission informs [federal agencies] that it considers the nearshore and onshore portions of Exxon's [DPP] to be consistent with the [California Coastal Management Program under the CZMA]."[17]  On the same day, after reviewing the revised DPP that set forth the work to be undertaken in state waters, the Commission also approved Coastal Development Permit No. E-88-1 for the nearshore portions of the Offshore SYPS Segments (the "Offshore CDP").[18]

On April 4, 1988, MMS approved Exxon's proposed revisions to the DPP.[19]  While the DPP has been revised since 1988, the 1988 DPP is the controlling approval for the original installation and ongoing operation and maintenance of the Offshore SYPS Segments pursuant to the Commission's Consistency Certification No. CC-64-87 and the Offshore CDP.[20]

### B. Onshore Approvals: SYPS Segments CA-324 and CA-325

The California State Lands Commission ("SLC") and federal Bureau of Land Management and Department of the Interior prepared a joint Environmental Impact Report and Environmental Impact Statement ("Onshore EIR/EIS") for what was then known as the "Celeron Pipeline Project" (also referred to herein as the "Pipeline Project"), which included the onshore pipeline segments now known as Segments CA-324 and CA-325, in compliance with the California Environmental Quality Act ("CEQA") and National Environmental Policy Act ("NEPA").[21]  The Onshore EIR/EIS explains that its impact analysis extends through the Pipeline Project's entire lifetime, including both "operation" and "maintenance."[22]  The SLC certified the Onshore EIR/EIS in January 1985.  Segments CA-324 and CA-325 were identified as an environmentally superior alignment to minimize impacts to environmental resources (including topography, viewshed, watersheds, etc.).[23]

After reviewing the Onshore EIR/EIS, the County Planning Commission made a final decision to approve the Pipeline Project's Final Development Plan ("FDP") (Case # 85-DP-66cz) and Major Conditional Use

---

[16] See *ibid*.

[17] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 11, Coastal Commission, Staff Recommendation on Permit and Consistency Certification (Feb. 23, 1988), p. 24.

[18] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 12, Coastal Commission, Letter to Exxon from Coastal Commission, attaching Consistency Certification Concurrence and CDP (Mar. 17, 1988).

[19] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, MMS, Document No. 13, DPP Approval (Apr. 4, 1988).

[20] The 1988 DPP is attached as Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 8.

[21] See Proposed Celeron / All American and Getty Pipeline Projects Environmental Impact Report/Environmental Impact Statement (EIR/EIS), SCH No. 83110902 (1984, 1985). The Draft Onshore EIR/EIS for the Pipeline Project is attached at Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 2 and the Final EIR/EIS for the Pipeline Project is attached at Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 3.

[22] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 3, Final Onshore EIR/EIS, Abstract, p. 2. The operational life of Segments CA-324 and CA-325 was assumed to continue until the "availability of crude oil" for the use in the pipelines was exhausted. See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 2, Draft Onshore EIR/EIS, p. 2-35.

[23] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 5, County, County Planning Commission Action for Celeron Pipeline Project (Mar. 3, 1986) ("1986 Planning Commission Action"), p. 54 ("Overall, the route chosen is environmentally preferable to any complete alternative route.").



June 29, 2026
Page 5

Permit ("CUP") (Case # 83-CP-97cz) on February 18, 1986.[24]  The Planning Commission's action approved the environmentally superior alignment for the pipeline segments now identified as Segments CA-324 and CA-325, "cover[ed] all aspects of the project proposal" and defined the project "site" as "a 100-foot wide construction [corridor and] 50-foot wide operations corridor covering approximately 70 miles in Santa Barbara County" that "begins at Las Flores Canyon, … pass[es] through the Gaviota consolidated processing facility, and traverse[s] the environmentally preferred route out of the County."[25] The Planning Commission also made findings with respect to the Pipeline Project's consistency with the County's certified Local Coastal Program ("LCP"), which consisted of the County's Coastal Land Use Plan and Coastal Zoning Ordinance.[26]  First, the Planning Commission confirmed that the County's "Coastal Zoning Ordinance applies to all segments of the pipeline within the Coastal Zone as indicated on County maps."[27,28]  The Planning Commission then made a finding that "[a]s conditioned, the project is in conformance with the applicable provisions of the Coastal Zoning Ordinance and the Coastal Land Use Plan."[29]  The approval was not challenged during the appeal period and the Planning Commission's approval action became final and effective.[30]

Then, on July 27, 1986, the County issued Coastal Development Permit CDP 86-CDP-189 for the Pipeline Project.[31]  The CDP incorporated "[t]he project description, pipeline route, conditions and plans required pursuant to those conditions described by the approved Final Development Plan 85-DP-66cz."[32] CDP 86-CDP-189 excluded "all activities related to pumpstations, river crossings, pipe stringing, welding, and any other activities not normally performed by the clearing, grading and trenching construction crews."[33]  On August 5, 1986, the County issued Coastal Development Permit CDP 86-CDP-205 for the "[r]emainder of all construction activities for the Celeron Pipeline [P]roject as approved by 85-DP-66cz."[34] CDP 86-CDP-205 also incorporated "[t]he project description, pipeline route, conditions and plans required pursuant to those conditions described by the approved Final Development Plan 85-DP-66cz."[35] CDP 86-CDP-189 and CDP 86-CDP-205 are collectively referred to herein as the "Onshore CDPs."

---

[24] The Final Development Plan approved by the County contains the Pipeline Project's Conditions of Approval. See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 5, County, 1986 Planning Commission Action.

[25] *Id.*, at pp. 1, 46.

[26] The Coastal Commission certified the County's LCP in March 1981, at which point the County became the lawful coastal development permitting authority within the County's jurisdiction under the Coastal Act.  See Coastal Act, § 30519.

[27] Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 5, County, 1986 Planning Commission Action, p. 49.

[28] The Notice asserts that "a portion of [Segment] CA-324 lies within the Commission's retained permitting jurisdiction," but does not identify which portion of the nearly 11-mile pipeline segment purportedly lies within the Commission's retained jurisdiction.  Without more detail, Sable cannot meaningfully respond to this assertion at this time.  Attachment D, Exhibit 41, Coastal Commission, Notice, p. 9.

[29] Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 5, County, 1986 Planning Commission Action, p. 49.

[30] See *Id.*, at p. 1.

[31] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 6, County, County Coastal Development Permit 86-CDP-189 (Jul. 27, 1986).

[32] *Ibid.*

[33] *Ibid.*

[34] Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 7, County, County Coastal Development Permit 86-CDP-205 (Aug. 5, 1986).

[35] *Ibid.*



June 29, 2026
Page 6

The Onshore CDPs were not challenged during the appeal period and became final and effective.[36]  The conditions of approval for the pipeline project's FDP, CUP, and Onshore CDPs are all governed under the same Conditions of Approval found in Case #85-DP-66cz, as amended by the County.  The County has amended the Conditions of Approval from time to time, and as such identifies the Conditions of Approval with reference to each of the following case numbers: 88-DPF-033 (RV01)z, 88-CP-60 (RV01), 88-DPF-25cz, 85-DP-66cz, and 88-DP- 25cz.[37]

### C.  Operational History

Between 1981 and 2014, the SYU produced over 671 MMBoe (millions of barrels of oil equivalent) of oil and gas.  Segments CA-324 and CA-325 were constructed pursuant to the County's FDP, CUP, and Onshore CDPs and commenced operations in the early 1990s.  Once Segments CA-324 and CA-325 were constructed, petroleum from the SYU was transported through the SYPS on an ongoing basis for nearly 25 years.  During that period, the operators of the SYPS performed standard repair and maintenance activities along the Offshore SYPS Segments and Segments CA-324 and CA-325 pursuant to the Offshore CDP and Onshore CDPs and in accordance with applicable regulations.[38]

In May 2015, while operated by Plains All American Pipeline, L.P. ("Plains"), a crude oil release occurred along Segment CA-324 (then known as "Line 901") in unincorporated Santa Barbara County.  Production at the SYU was suspended and all equipment remained in place in an operation-ready state, requiring ongoing inspections, maintenance and surveillance.  Similarly, the SYPS was maintained in a safe state and regularly monitored.  Segments CA-324 and CA-325 were filled with nitrogen to prevent oxidation and internal corrosion, their cathodic protection system was regularly inspected and maintained, and Segments CA-324 and CA-325 remained in an active state while SYU production was suspended.

On March 13, 2020, Plains entered into a settlement agreement concerning the 2015 crude oil release in the form of a Consent Decree ("Consent Decree") with the U.S. Department of Justice, Environmental and Natural Resources Division, U.S. Department of Transportation, U.S. Pipeline and Hazardous Materials Safety Administration ("PHMSA"), the U.S. Environmental Protection Agency, California Department of Fish and Wildlife, California Department of Parks and Recreation, SLC, the California Department of Forestry and Fire Protection's Office of the State Fire Marshal ("OSFM"), Central Coast Water Quality Control Board, and Regents of the University of California.[39]  The Consent Decree was approved and entered by the U.S. District Court for the Central District of California on October 14, 2020.  The Consent Decree resolved all regulatory claims related to the May 2015 crude oil release, and Plains was required to pay various civil penalties and compensation.  The Consent Decree imposed on Plains certain

---

[36] See Coastal Act Regulations, § 13313 (coastal development permits "issued by the local government shall become final unless a valid appeal is filed with the commission").

[37] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 56, County, Las Flores Pipeline System Final Development Plan Conditions (October 30, 2024) ("2024 Conditions").

[38] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document Nos. 28, 24 (span remediation work performed on Offshore SYPS Segments pursuant to Offshore CDP), Document Nos. 26, 25, 19, 27, and 31 (anomaly repair work performed along Segments CA-324 and CA-325 pursuant to Onshore CDPs).

[39] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 35, "Consent Decree" issued in *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*, Case No. 2:20-cv-02415, (C.D. Cal. Mar. 13, 2020) ("Consent Decree Litigation").

PAUL
HASTINGS

June 29, 2026
Page 7

requirements related to resuming petroleum transportation through Segments CA-324 and CA-325 in the future.[40]

Sable acquired the SYU and SYPS in February 2024.  Since that time, Sable has undertaken several steps to prepare the SYPS—and Segments CA-324 and CA-325 in particular—for resumed petroleum transportation under applicable regulations consistent with the Consent Decree's requirements.  These steps, as well as several relevant events that have occurred since Sable acquired the SYU and SYPS, are addressed in the subsections below.

### 1.    State Waivers

Because Segments CA-324 and CA-325 transport crude oil, a petroleum product, they are subject to the federal Hazardous Liquid Pipeline Safety Act ("PSA") which is administered by PHMSA.[41]  PHMSA has adopted detailed regulations governing the design, construction, pressure testing, operation, and maintenance of hazardous liquid pipelines.[42]  The PSA also contemplates that some pipeline facilities may necessitate modifications to those regulatory standards based on the particular characteristics of the facility at issue.  As such, the PSA grants PHMSA the authority to "waive compliance with any part of an applicable standard … on terms [PHMSA] considers appropriate if [PHMSA] determines that the waiver is not inconsistent with pipeline safety."[43]

Separately, the PSA allows state agencies to apply and become certified to enforce equivalent or more stringent regulations with respect to intrastate pipelines.[44]  In California, the State Legislature vested OSFM with the "exclusive safety[,] regulatory and enforcement authority over intrastate [] hazardous liquid pipelines ...."[45]  In turn, OSFM adopted PHMSA's implementing regulations, and PHMSA certified OSFM to implement the PSA with respect to intrastate pipelines in California.[46]  The PSA also authorizes certified state agencies like OSFM to "waive compliance with a safety standard" if the requested modification is not inconsistent with pipeline safety.[47]  Any such "State Waiver" may become effective only after providing PHMSA with 60 days' notice and the opportunity to make a written objection to its issuance.[48]

At the time the Consent Decree was entered, Segments CA-324 and CA-325 were considered "intrastate" pipeline facilities under the regulatory oversight of OSFM.[49]  The Consent Decree required Plains to "apply for a State Waiver through [OSFM]" before resuming petroleum transportation through Segments

---

[40] On March 30, 2026, the United States filed a Motion to Terminate or Modify the Consent Decree in the Consent Decree Litigation. See Attachment D, Exhibit 36, Consent Decree Litigation, United States, "Memorandum of Points and Authorities in Support of United States' Motion to Terminate or Modify the Consent Decree" (Mar. 30, 2026).  On April 1, 2026, Sable (as nonparties to the case), filed a Memorandum in Support of the United States' motion.  See Attachment D, Exhibit 37, Consent Decree Litigation, Sable, "Brief in Support of United States' Motion to Terminate the Consent Decree" (Apr. 1, 2026).  That motion is pending.

[41] See 49 U.S.C. §§ 60101 *et seq*.

[42] See 49 C.F.R. Part 195.

[43] 49 U.S.C. § 60118, subd. (c)(1)(a).

[44] See 49 U.S.C. § 60105.

[45] Gov't Code, § 51010.

[46] See Cal. Code Regs., tit. 19, § 2000.

[47] See 49 U.S.C. § 60118, subd. (d).

[48] See *ibid*.

[49] See Attachment D, Exhibit 21, PHMSA, Letter re: "Determination of Interstate Classification" (Dec. 17, 2025), p. 1.

PAUL
HASTINGS

June 29, 2026
Page 8

CA-324 and CA-325.[50]  In April 2024, Sable (through Pacific Pipeline Company) submitted "State Waiver" applications for Segments CA-324 and CA-325 to OSFM, seeking to modify certain regulatory standards applicable to each Segment, consistent with Consent Decree requirements.

On December 17, 2024, OSFM granted both State Waivers and imposed over sixty separate conditions on Sable's operation of Segments CA-324 and CA-325.[51]  On February 11, 2025, PHMSA notified OSFM that it had no objection to its issuance of the State Waivers.[52]

On April 15, 2025, two lawsuits were filed against OSFM (as defendant) and Sable (as real parties in interest) challenging OSFM's issuance of the State Waivers (collectively, the "State Waivers Litigation").[53] On July 29, 2025, the court in the State Waivers Litigation issued a preliminary injunction stating that Sable may resume petroleum transportation through Segments CA-324 and CA-325 10 court days after filing a notice that Sable has received all necessary approvals and permits to do so.[54]

On October 22, 2025, OSFM sent a letter to Sable alleging deficiencies in the Sable's compliance with the State Waivers.[55]  Sable strongly disagrees with the allegations, which are inconsistent with the State Waivers' plain language and numerous discussions between Sable and OSFM experts in which OSFM experts confirmed that Sable was in compliance with the State Waivers.  Sable responded to OSFM's letter on October 23, 2025, setting forth Sable's objections to OSFM's new interpretation of the State Waiver conditions.[56]

On February 26, 2026, Sable notified OSFM that, effective immediately, it had "relinquishe[d], surrender[ed] and abandon[ed] the State Waivers" given PHMSA's determination and exercise of regulatory oversight for Segments CA-324 and CA-325, as described below.[57]  OSFM acknowledged receipt of Sable's relinquishment of the State Waivers on March 16, 2026.[58]

On May 14, 2026, Sable and the United States (as a non-party) removed the State Waivers Litigation to federal court.[59]  On May 15, 2026, Sable filed a Motion for Reconsideration and to Dissolve Injunction in

---

[50] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 35, Consent Decree Litigation, Consent Decree, Appendix B.

[51] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 77, OSFM, Letters of Decision on State Waiver Requests (CA-324 and CA-325A/B) (Dec. 17, 2024).

[52] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document 82, PHMSA, Letters re Docket Nos. PHMSA-2025-0002 and PHMSA-2025-0003.

[53] See *Environmental Defense Center, et al. v. California Department of Forestry and Fire Protection, et al.*, Santa Barbara County Superior Court, Case No. 25CV02247; *Center for Biological Diversity, et al. v. California Department of Forestry and Fire Protection, et al.*, Santa Barbara County Superior Court, Case No. 25CV02244.

[54] See Attachment D, Exhibit 16, State Waivers Litigation, "Order for Preliminary Injunction and Undertaking" (Jul. 29, 2025).

[55] See Attachment D, Exhibit 19, OSFM, Letter re: "State Waiver Requirements Prior to Restart of Lines CA-324 and CA-325A/B" (Oct. 22, 2025).

[56] See Attachment D, Exhibit 20, Sable, Letter re: "Response to October 22, 2025 OSFM Letter re CA-324 and CA-325A/B" (Oct. 23, 2025).

[57] Attachment D, Exhibit 28, Sable, Letter re: "Sable – Relinquishment of State Waivers" (Feb. 26, 2026).

[58] See Attachment D, Exhibit 33, OSFM, Letter re "Sable – Relinquishment of State Waivers Lines 324 and 325A/B" (Mar. 16, 2026).

[59] See *Center for Biological Diversity, et al. v. California Department of Forestry and Fire Protection, et al.*, Case No. 2:26-cv-05242-SVW-SSC (C.D. Cal.).

PAUL
HASTINGS

June 29, 2026
Page 9

the State Waivers Litigation, and that Motion is now pending before the court.[60]  The State Waivers Litigation is ongoing.

### 2.  Anomaly Repair Work

After submitting its State Waiver applications to OSFM in April 2024, Sable consulted with OSFM regarding the repair and maintenance standards that OSFM likely would impose as part of any State Waivers, including with respect to repairing certain 'anomalies' detected along Segments CA-324 and CA-325.  A pipeline "anomaly" refers to a portion of a pipeline segment with some deviation from its original configuration. Applicable federal regulations specifically require pipeline operators to "take prompt action to address all anomalous conditions in [any] pipeline" and repair any such conditions that meet thresholds set forth in those regulations.[61]  In May 2024, based on its discussions with OSFM, Sable began to repair identified anomalies along Segments CA-324 and CA-325 consistent with the standards identified by OSFM as likely to be incorporated into any State Waivers.  The State Waivers ultimately issued by OSFM in December 2024 imposed anomaly repair standards that were consistent with Sable's prior discussions with OSFM and Sable's prior anomaly repair work.  Those standards included more stringent criteria for when anomaly repair and maintenance activities must be performed on Segments CA-324 and CA-325 than are imposed under applicable federal regulations for other pipeline facilities.[62]  Sable undertook this anomaly repair work based on its understanding that no new coastal development permit or other Coastal Act authorization was required, consistent with the Onshore EIR/EIS, Onshore CDPs, and the County's practice of authorizing repair work on Segments CA-324 and CA-325 since they were first permitted and constructed over 30 years ago.[63]

Despite Sable's obligation to promptly repair these anomalies under applicable federal regulations, and its understanding that no further Coastal Act permitting was required for such work, on September 27, 2024, Commission staff issued Notice of Violation No. V-9-24-0152 ("2024 NOV") to Sable regarding Sable's anomaly repair work along Segments CA-324 and CA-325.[64]  Commission staff subsequently issued a letter requesting more information regarding such work on October 4, 2024 ("October 4 Letter").[65]  Sable stopped work at active anomaly repair sites within the Coastal Zone in compliance with the 2024 NOV and October 4 Letter in order to further explore Coastal Commission staff's allegations that such work required new or additional Coastal Act authorization with both Commission staff and the County, which is the delegated local coastal program authority for Segments CA-324 and CA-325.   Sable also provided

---

[60] See Attachment D, Exhibit 40, State Waivers Litigation, Sable, "Notice of Motion For Reconsideration and to Dissolve Injunction and Memorandum of Points and Authorities" (May 15, 2026).

[61] 49 C.F.R. § 195.452, subd. (h)(1).

[62] For example, federal regulations require pipeline operators to repair any anomalous conditions with greater than 50% predicted metal loss within 180 days (see 49 C.F.R. § 195.452, subd. (h)(4)(iii)(E)), whereas the State Waivers required Sable to repair anomalies with greater than 40% wall loss within 180 days (see Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 77, OSFM, Letters of Decision on State Waiver Requests (CA-324 and CA-325A/B) (Dec. 17, 2024)).

[63] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment A, Section III.B.

[64] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 48, Coastal Commission, Notice of Violation V-9-24-0152 (Sept. 27, 2024) ("2024 NOV").

[65] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 50, Coastal Commission, Letter re: "Confirmation of Suspension of Current Operations" (Oct. 4, 2024) ("October 4 Letter").



June 29, 2026
Page 10


the information requested in the October 4 Letter to Commission staff on October 8, 2024.[66]  Sable provided additional information in response to Commission staff's requests on October 11, 2024.[67]

On October 22, 2024, Sable submitted a written request asking that Commission staff authorize it to complete interim restoration work to alleviate the risk of immediate environmental harm resulting from Sable's work stoppage in compliance with the 2024 NOV and October 4 Letter.[68]  On November 12, 2024, Commission staff issued Executive Director Cease and Desist Order ED 24-CD-02 ("2024 EDCDO"), which allowed for Sable's preparation of an Interim Restoration Plan, to be approved by Commission staff, in order to address the risks of immediate environmental harm resulting from open excavation sites.[69] Sable worked cooperatively with Commission staff to finalize and implement the Interim Restoration Plan required under the 2024 EDCDO.

The 2024 EDCDO also directed Sable to seek Coastal Act authorization for any proposed future work along Segments CA-324 and CA-325, and after-the-fact authorization for any work previously undertaken, from the County or the Coastal Commission (for any work within the Commission's retained permitting jurisdiction).[70]  Accordingly, Sable submitted applications to the County for Zoning Clearances for the anomaly repair work, which included additional information including site plans, grading quantities, biological and cultural resource surveys, and best management practices, regarding the work and anomaly dig sites.[71]  On the basis of the information Sable submitted with the Zoning Clearance applications, the County had the opportunity to review whether the anomaly repair work already was authorized, whether additional information was needed, or whether the County would require a new or amended coastal development permit.

On February 12, 2025, the County delivered a letter to Sable confirming that the anomaly repair work referenced in the Coastal Commission's 2024 NOV was "contemplated, analyzed, and approved in [Segments CA-324 and CA-325's] existing Final Development Plan [FDP], Major Conditional Use Permit [CUP], and associated Coastal Development Permits [Onshore CDPs]," "analyzed in the prior Environmental Impact Report/Environmental Impact Statement [Onshore EIR/EIS]," and therefore requires "no further application to or action by the County."[72]  The letter states in part that "[t]he County previously exercised its authority under its Local Coastal Program and delegated Coastal Act authority in

---

[66] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 51, Sable, Letter re: "Sable Offshore Corporation Notice of Violation (V-9-24-0152) – Responses to October 4, 2024 Letter" (Oct. 8, 2024).

[67] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 52, Sable, Map re: "Coastal Zone Open Digs" (Oct. 11, 2024).

[68] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 54, Sable, Letter re: "Sable Offshore Corporation Notice of Violation (V-9-24-0152) – Request to Complete Interim Work" (Oct. 22, 2024).

[69] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 58, Coastal Commission, Executive Director Cease and Desist Order ED-24-CD-02 (Nov. 12, 2024) ("2024 EDCDO").

[70] See id., at p. 5.

[71] Sable submitted a Zoning Clearance application to the County for anomaly repair sites where work was stopped after Sable received the 2024 NOV and October 4 Letter on November 22, 2024.  See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 65, Sable, "Zoning Clearance Application for Open Anomaly Sites" (Nov. 22, 2024).  On December 6, 2024, Sable submitted a Zoning Clearance application to the County for future anomaly repair sites.  See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 74, Sable, "Zoning Clearance Applications for Planned Anomaly Sites" (Dec. 6, 2024).  Sable submitted similar materials to the County regarding previously completed anomaly repair sites on March 6, 2025.  See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 92, Sable, "Materials Regarding Completed Anomaly Repair Sites" (Mar. 6, 2025).

[72] Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 84, County, Letter re: "Zoning Clearance Applications – 24ZCI-00090, 24ZCI-00091, 24ZCI- 00095, 24ZCI-00096" (Feb. 12, 2025), pp. 1-2.



June 29, 2026
Page 11


approving the permits and the requested anomaly repair work is within the scope of those approved permits."[73]  Following the County's written confirmation that Sable's anomaly repair work along Segments CA-324 and CA-325 was authorized by the Onshore CDPs, Sable formally responded to the 2024 NOV on February 14, 2025, and recommenced its anomaly repair and maintenance activities.[74]  On May 19, 2025, Sable announced that it had completed its anomaly repair program on Segments CA-324 and CA-325.[75]

On February 18, 2025, Sable filed a complaint against the Coastal Commission in the Superior Court of the State of California for the County of Santa Barbara (Case No. 25CV00974) challenging the Coastal Commission's issuance of the 2024 NOV and seeking a declaration that the Coastal Commission's actions with respect to the anomaly repair work are unlawful ("Coastal Commission Litigation").[76]  Also on February 18, 2025, the Coastal Commission issued a second Executive Director Cease and Desist Order and Notice of Intent to Commence Proceedings for a Commission Cease and Desist Order, Restoration Order, and Administrative Penalty Order ("2025 EDCDO/NOI") to Sable related to, among other things, Sable's anomaly repair work.[77]  Sable submitted a response to the Coastal Commission's 2025 EDCDO/NOI titled "Statement of Defense and Response to Notice of Intent to Commence Proceedings for a Commission Cease and Desist Order, Restoration Order, and Administrative Penalty Order (Feb. 18, 2025)" ("2025 Statement of Defense") to the Commission on March 10, 2025.[78]  On March 28, 2025, Coastal Commission staff issued a Staff Report recommending that the Commission issue a Cease and Desist Order, Restoration Order, and Administrative Penalty Order to Sable related to, in part, Sable's anomaly repair work.[79]  On April 4, 2026, Sable submitted a response to the Staff Report.[80]  Commission Staff issued an addendum to the Staff Report that responded to Sable's April 4 response on April 9, 2026.[81]  Also on April 9, 2026, the County of Santa Barbara submitted a letter to the Coastal Commission confirming that "Commission staff has all of the information that the County considered prior to concluding that the pipeline anomaly repair work ... is authorized by the existing permits and was analyzed in the

[73] *Id.*, at p. 1. On March 21, 2025, the County confirmed that the work associated with Sable's completed anomaly repair sites also "fits within[] the conclusions/directives of [the County's] February 12, 2025 letter …. No permits will be required." Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 93, County, "RE: Sable – Completed Anomaly Repairs" (Mar. 21, 2025).

[74] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document 86, Sable, Letter re: "Sable Offshore Corp. Notice of Violation (V-9-24-0152) for Las Flores Pipelines CA-324 and CA-325, Santa Barbara County" (Feb. 14, 2025).

[75] See Attachment D, Exhibit 15, Sable, "8-K and Press Release" (May 19, 2025).

[76] See Attachment D, Exhibit 1, Verified Complaint for Damages and Declaratory and Injunctive Relief, *Sable Offshore Corp.*, *et al. v. Cal. Coastal Commission*, *et al.* (Santa Barbara County Superior Court, Case No. 25CV00974) ("Coastal Commission Litigation") (Feb. 18. 2025).

[77] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document 90, Coastal Commission, "Executive Director Cease and Desist Order No. ED-25-CD-01 and Notice of Intent to Commence Proceedings for a Commission Cease and Desist Order, Restoration Order, and Administrative Penalty Order" (Feb. 18, 2025) ("2025 EDCDO/NOI").

[78] See Attachment D, Exhibit 2, 2025 Statement of Defense. Sable supplemented its 2025 Statement of Defense with an additional document (Document 93) on March 28, 2025.

[79] See Attachment D, Exhibit 3, Coastal Commission, Staff Report: Recommendations and Findings for Cease and Desist Order, Restoration Order, and Administrative Civil Penalty (Mar. 28, 2025). Attachment A to the Staff Report included Staff's proposed Cease and Desist Order, Restoration Order, and Administrative Penalty. Volume 4 of the Exhibits to the Staff Report (Exhibits 58 and 59) included Sable's 2025 Statement of Defense and associated attachments/documents. Because Sable's 2025 Statement of Defense and all associated attachments/documents are attached hereto as Exhibit 2 to Attachment D, Volume 4 of the Exhibits to the Staff Report have been omitted to avoid duplication.

[80] See Attachment D, Exhibit 5, Sable, Letter re: "April 10, 2025, Meeting Agenda Items Th8.1, 8.2, & 8.3: Sable Offshore Corp., Cease and Desist Order No. CCC-25-CD-01, Restoration Order No. CCC-25-RO-01, and Administrative Penalty Order No. CCC-25-AP3-01" (Apr. 4, 2025).

[81] See Attachment D, Exhibit 6, Coastal Commission, "Addendum to Items Th8.1-Th8.3: Cease and Desist Order No. CCC-25-CD-01, Restoration Order No. CCC-25-RO-01, and Administrative Penalty No. CCC-25-AP3-01, for the Commission Meeting of April 10, 2025" (Apr. 9, 2025).

PAUL
HASTINGS

June 29, 2026
Page 12

prior environmental review."[82]  On April 10, 2026, the Coastal Commission approved Cease and Desist Order CCC-25-CD-01, Restoration Order CCC-25-RO-01, and Administrative Penalty Order CCC-25-AP3-01 ("April 10 Orders").[83]  On April 16, 2025, Sable amended its complaint in the Coastal Commission Litigation to challenge the Commission's issuance of the April 10 Orders.[84]  Also on April 16, 2025, the Coastal Commission filed a cross-complaint to compel Sable's compliance with the April 10 Orders.[85]  The Coastal Commission Litigation is ongoing.

The Notice cites the Commission's prior allegations that Sable's anomaly repair work violated the Coastal Act—allegations which remain the subject of active litigation—to support the Notice's claim that resuming petroleum transportation through Segments CA-324 and CA-325 is "part of an ongoing series of violations that Sable has instigated in recent years."[86]  Section I.a of the Notice repeats these allegations and attempts to recharacterize the Commission's past enforcement actions related to such work.[87]  Attachment C responds to each of these allegations and characterizations.  Sable continues to deny the Commission's allegations that the anomaly repair work violated the Coastal Act.  For the reasons described in Sable's 2025 Statement of Defense and in Sable's pleadings as part of the ongoing Coastal Commission Litigation, Sable's anomaly repair work was fully authorized by the County under the Coastal Act, no new or amended coastal development permit was required for such work, and the Commission lacked jurisdiction to issue the April 10 Orders related to Sable's anomaly repair work.[88]  Sable respectfully directs the Commission to the 2025 Statement of Defense and operative pleadings in the Coastal Commission Litigation with respect to these allegations, all of which are incorporated by reference into this response.

### 3.    Safety Valve Installation Work

In 2015, the California Legislature enacted Assembly Bill 864 ("AB 864") and added Section 51013.1 to the Elder California Pipeline Safety Act in order to improve pipeline safety and reduce the risks associated with potential releases of oil from pipelines in the Coastal Zone.  The legislation requires pipeline operators in environmentally sensitive areas to use best available technology ("BAT") including, but not limited to, "leak detection technologies, automatic shutoff systems, or remote controlled sectionalized block valves, or any combination of these technologies" to reduce the volume of potential spills in these areas.[89]  AB 864 became effective January 1, 2016.

In April 2021, Plains secured approval from OSFM to retrofit the portions of Segments CA-324 and CA-325 in the County with 16 safety valves as required under AB 864.  Plains planned to install both motor-operated valves ("MOVs"), which are equipped with an electrical shut-off system connected to utility lines or a solar power source, and check valves ("CHKs"), which involve an automatic shut-off system with one-

---

[82] Attachment D, Exhibit 7, County of Santa Barbara, Letter re: "Sable Offshore Corp. - Authorization for Anomaly Repair Work" (Apr. 9, 2025).
[83] See Attachment D, Exhibit 12, Executed Cease and Desist Order No. CCC-25-CD-01, Restoration Order CCC-25-RO-01, Administrative Civil Penalty CCC-25-AP3-01 (Apr. 10, 2025) (collectively, "April 10 Orders").
[84] See Attachment D, Exhibit 14, "Verified Amended Petition for Writ of Mandamus and Complaint for Damages and Declaratory and Injunctive Relief," Coastal Commission Litigation (Apr. 16, 2025).
[85] Attachment D, Exhibit 13, "Coastal Commission's Cross-Complaint for Declaratory Relief and Injunctive Relief," Coastal Commission Litigation (Apr. 16, 2025).
[86] Attachment D, Exhibit 41, Coastal Commission, Notice, p. 2.
[87] See id., pp. 2-5.
[88] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment A, Section III.B; see generally Coastal Commission Litigation.
[89] Cal. Government Code, § 51013.1, subd. (b)(1); see also Cal. Code Regs., tit. 14, §§ 2100-2120.



June 29, 2026
Page 13

way flow closure.  Of the 16 safety valves OSFM approved for Segments CA-324 and CA-325 within the County, seven were located in the Coastal Zone.

Individual zoning clearance applications for the safety valve installation work were submitted to the County in December 2021 and March 2022.  The Zoning Administrator approved County staff's requested amendments to the FDP and Onshore CDPs for Segments CA-324 and CA-325 and approved the safety valve installation work on August 22, 2022.[90]  The Zoning Administrator's decision was subsequently appealed to the County Planning Commission.  On April 26, 2023, the Planning Commission granted the appeals and denied staff's requested amendments.[91]  The Planning Commission's action was then appealed to the Board of Supervisors.  The Board of Supervisors held a hearing on August 22, 2023, to consider the appeals, but the Board ended its hearing with a 2-2 split vote regarding whether to grant or deny the appeals.[92]  Sable subsequently commenced litigation against the County, alleging that the Planning Commission's denial constituted an abuse of discretion that effectively prevented Sable from complying with AB 864.  Sable also revised OSFM's approved AB 864 compliance plans such that all additional safety valves (both CHKs and MOVs) would be installed below- or at-grade, further reducing permanent visual impacts related to the safety valve installation work.

On August 30, 2024, Sable and the County entered into a Settlement Agreement in which both parties acknowledged that the County is preempted "in the field of pipeline safety regulation and safety oversight as it relates to [Segments CA-324 and CA-325]."[93]  Moreover, the parties acknowledged a "presum[ption]" that "the County is preempted when the activity to be performed is one foot or more below the surface of the ground and related to the operation of a pipeline."[94]  On September 4, 2024, County staff confirmed that the County "does not have permit authority or jurisdiction over the sixteen (16) safety valves and their ancillary equipment as currently proposed …."[95]  Given this confirmation from the County, which has delegated local coastal program permitting authority under the Coastal Act, Sable installed the safety valves in compliance with AB 864.  All work associated with the safety valve installations took place within the already-disturbed operational corridor surrounding Segments CA-324 and CA-325, where the Onshore EIR/EIS, FDP, and Onshore CDPs anticipated that any project impacts would be permanent due to the need for ongoing repair and maintenance.[96]

The Coastal Commission's 2024 NOV, October 4 Letter, and 2025 EDCDO/NOI also alleged that Sable's safety valve installation work lacked the requisite Coastal Act authorization.[97]  Sable responded to the Commission's allegations with respect to the safety valve installation work as part of its 2025 Statement of Defense.[98]  The Commission's April 10 Orders nevertheless continued to assert that Sable's safety

---

[90] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 39, County, Zoning Administrator Action Summary (Aug. 22, 2022).

[91] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 42, County, Planning Commission Action Summary (Apr. 26, 2023).

[92] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 43, County, Board of Supervisors Action Summary (Aug. 22, 2023).

[93] Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 46, Conditional Settlement Agreement and Release (Aug. 30, 2024).

[94] *Ibid.*

[95] Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 47, Letter from Errin Briggs to J. Caldwell Flores (Sept. 4, 2024).

[96] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment A, Section III.C.

[97] See Attachment D, Exhibit 2, 2025 Statement of Defense, Document Nos. 48, 50, and 90, 2024 NOV, October 4 Letter, and 2025 EDCDO/NOI.

[98] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment A, Section III.C.

PAUL
HASTINGS

June 29, 2026
Page 14

valve installation work violated the Coastal Act.[99]  Sable challenged the Commission's allegations and issuance of the 2024 NOV, 2025 EDCDO/NOI, and April 10 Orders with respect to the safety valve installation work as part of its February 18 and April 16 complaints in the Coastal Commission Litigation.[100]  The Coastal Commission Litigation is ongoing.

The Notice cites the Commission's prior allegations that Sable's safety valve installation work violated the Coastal Act—allegations which remain the subject of active litigation—to support the Notice's claim that resuming petroleum transportation through Segments CA-324 and CA-325 is "part of an ongoing series of violations that Sable has instigated in recent years."[101]  Section I.a of the Notice repeats these allegations and attempts to recharacterize the Commission's past enforcement actions related to such work.[102]  Attachment C responds to each of these allegations and characterizations.  Sable continues to deny the Commission's allegations that the safety valve installation work violated the Coastal Act for the reasons described in Sable's 2025 Statement of Defense and in Sable's pleadings as part of the ongoing Coastal Commission Litigation.[103]  Sable respectfully directs the Commission to the 2025 Statement of Defense and operative pleadings in the Coastal Commission Litigation with respect to these allegations, all of which are incorporated by reference into this response.

### 4. Span Remediation Work

Between November 29 and December 1, 2024, Sable conducted routine span remediation maintenance on the Offshore SYPS Segments in both state and federal waters.  Sable's span remediation work consisted of adding support with sand and cement bags under limited portions of the Offshore SYPS Segments to reduce the distance of "free spans."  A "free span" or "span" occurs when a portion of a pipeline segment no longer rests on the bottom of the seafloor as sand is scoured from beneath the pipeline segment over time.  The work is routine, low-impact, and consistent with maintenance work previously performed on the Offshore SYPS Segments during their operational lifetime for which no new or additional Coastal Act authorization was required.  Sable's span remediation work also was contemplated and authorized by the 1988 DPP and Offshore CDP, approved by the SLC, and conducted with no adverse environmental impacts.[104]

On February 11, 2025, Commission staff issued Notice of Violation No. V-9-25-0013 ("2025 NOV") to Sable for "deploying sand/cement bags on the seafloor and positioning them to provide support to Sable's out-of-service offshore oil and water pipelines."[105]  The Commission's 2025 EDCDO/NOI similarly alleged that Sable's span remediation work lacked the requisite Coastal Act authorization.[106]  Sable responded to the Commission's allegations with respect to the span remediation work as part of its 2025 Statement of

---

[99] See Attachment D, Exhibit 12, Coastal Commission, April 10 Orders.
[100] See Attachment D, Exhibit 1, Coastal Commission Litigation, "Verified Complaint for Damages and Declaratory and Injunctive Relief" (Feb. 18, 2025); Attachment D, Exhibit 14, Coastal Commission Litigation, "Verified Amended Petition for Writ of Mandamus and Complaint for Damages and Declaratory and Injunctive Relief" (Apr. 16, 2025).
[101] Attachment D, Exhibit 41, Coastal Commission, Notice, p. 2.
[102] See id., pp. 2-5.
[103] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment A, Section III.C.; see generally Coastal Commission Litigation.
[104] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment A, Section IV.
[105] Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 81, "Notice of Violation (V-9-25-0013)" (Feb. 11, 2025) ("2025 NOV").
[106] See Attachment D, Exhibit 2, 2025 Statement of Defense, Document No. 90, 2025 EDCDO/NOI.

PAUL
HASTINGS

June 29, 2026
Page 15

Defense.[107]  The Commission's April 10 Orders nevertheless continued to assert that Sable's span remediation work violated the Coastal Act.[108]  Sable challenged the Commission's allegations and issuance of the 2025 NOV, 2025 EDCDO/NOI, and April 10 Orders with respect to the span remediation work as part of its February 18 and April 16 complaints in the Coastal Commission Litigation.[109]  The Coastal Commission Litigation is ongoing.

The Notice cites the Commission's prior allegations that Sable's span remediation work violated the Coastal Act—allegations which remain the subject of active litigation—to support the Notice's claim that resuming petroleum transportation through Segments CA-324 and CA-325 is "part of an ongoing series of violations that Sable has instigated in recent years."[110]  Section I.a of the Notice repeats these allegations and attempts to recharacterize the Commission's past enforcement actions related to such work.[111]  Attachment C responds to each of these allegations and characterizations.  Sable continues to deny the Commission's allegations that the span remediation work violated the Coastal Act for the reasons described in Sable's 2025 Statement of Defense and in Sable's pleadings as part of the ongoing Coastal Commission Litigation.[112]  Sable respectfully directs the Commission to the 2025 Statement of Defense and operative pleadings in the Coastal Commission Litigation with respect to these allegations, all of which are incorporated by reference into this response.

### 5.     Resumption of Petroleum Transportation Through Offshore SYPS Segments

On May 19, 2025, Sable publicly announced that it had resumed petroleum transportation from the SYU to the LFC Facilities through the Offshore SYPS Segments.[113]  In doing so, Sable resumed petroleum transportation through the Santa Ynez Pipeline System for the first time since petroleum transportation temporarily was paused in 2015.

### 6.     PHMSA's "Interstate Pipeline" Determination and Restart Plan Approvals

On November 26, 2025, Sable notified PHMSA of its determination that the SYPS, including Segments CA-324 and CA-325, constitutes an interstate pipeline facility under the PSA and requested that PHMSA exercise regulatory oversight over the Santa Ynez Pipeline System and transition regulatory oversight from OSFM.[114]  PHMSA and OSFM conducted an on-site inspection of the SYPS from December 9 to December 11, 2025.[115]  PHMSA also "reviewed Sable's written procedures and records[,] conducted field observations of the [LFC Facilities], the pump stations at Gaviota and Sisquoc, the control room in Santa Maria, [] the offshore Harmony platform," and "reviewed the 2025 program inspections conducted by OSFM."[116]  On the basis of those reviews, on December 17, 2025, PHMSA issued a letter to Sable

---

[107] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment A, Section IV.
[108]  See Attachment D, Exhibit 12, Coastal Commission, April 10 Orders.
[109] See Attachment D, Exhibit 1, Coastal Commission Litigation, "Verified Complaint for Damages and Declaratory and Injunctive Relief" (Feb. 18, 2025); Attachment D, Exhibit 14, Coastal Commission Litigation, "Verified Amended Petition for Writ of Mandamus and Complaint for Damages and Declaratory and Injunctive Relief" (Apr. 16, 2025).
[110] Attachment D, Exhibit 41, Coastal Commission, Notice, p. 2.
[111] See id., pp. 2-5.
[112] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment A, Section IV; see generally Coastal Commission Litigation.
[113] See Attachment D, Exhibit 15, Sable, "8-K and Press Release" (May 19, 2025).
[114] See Attachment D, Exhibit 21, PHMSA, Letter re: "Determination of Interstate Classification" (Dec. 17, 2025), p. 1.
[115] See ibid.
[116] Ibid.

PAUL
HASTINGS

June 29, 2026
Page 16


concurring in its determination that the Santa Ynez Pipeline System "is an interstate pipeline" under the PSA, and informing Sable that "PHMSA is notifying OSFM that [Segments CA-324 and CA-325 are] subject to the regulatory oversight of PHMSA."[117]  As part of its December 17 letter, PHMSA also confirmed that Segments CA-324 and CA-325 are part of an "active" pipeline under PHMSA's regulations.[118]

On December 22, 2025, after reviewing extensive documentation provided by Sable to PHMSA and conducting a multi-day field inspection, PHMSA notified Sable that PHMSA had approved Sable's "Restart Plan" for Segments CA-324 and CA-325.[119]  The Consent Decree includes provisions addressing a "Restart Plan" prior to resuming petroleum transportation through Segments CA-324 and CA-325.[120] The Consent Decree contemplated that the Restart Plan approval would be issued by OSFM because, at the time the Consent Decree was issued, Segments CA-324 and CA-325 were considered "intrastate" pipelines subject to OSFM's jurisdiction.[121]

On December 23, 2025, PHMSA issued an Emergency Special Permit to Sable which imposed substantially the same conditions on Sable's operation of Segments CA-324 and CA-325 as were imposed under the State Waivers.[122]  On January 22, 2026, Sable applied to PHMSA for a non-emergency Special Permit to operate Segments CA-324 and CA-325.  On June 25, 2026, PHMSA issued a Special Permit to Sable which imposed substantially the same conditions on Sable's operation of Segments CA-324 and CA-325 as were imposed under the State Waivers and the Emergency Special Permit.[123]  PHMSA described the Special Permit's "enhanced integrity management conditions" to include "significantly increased frequency of in-line inspections and more stringent anomaly repair criteria."[124]

### 7.  Defense Production Act Order and Resumption of Petroleum Transportation Through Segments CA-324 and CA-325

On March 13, 2026, the President of the United States signed an Executive Order to, among other things, delegate certain authorities under the DPA to the United States Secretary of Energy.[125]  Subsequently on March 13, 2026, the United States Secretary of Energy, Chris Wright, issued the DPA Order directing Sable "to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS" and "immediately commence performance under contracts or orders for services… for hydrocarbon transportation capacity in the SYPS[.]"[126]  The DPA Order further requires

---

[117] *Id.*, at pp. 2-3.
[118] See *id.*, at p. 3, fn. 8.
[119] See Attachment D, Exhibit 22, PHMSA, Letter re: "Approval of Sable Offshore Corp.'s Restart Plan for the Las Flores Pipeline System Line CA-324 and CA-325" (Dec. 22, 2025).
[120] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 35, Consent Decree, Appendix D.
[121] See Attachment D, Exhibit 36, Consent Decree Litigation, United States, "Memorandum of Points and Authorities in Support of United States' Motion to Terminate or Modify the Consent Decree" (Mar. 30, 2026), pp. 3-7; Attachment D, Exhibit 21, PHMSA, Letter re: "Determination of Interstate Classification" (Dec. 17, 2025), p. 1.
[122] See Attachment D, Exhibit 23, PHMSA, "Emergency Special Permit" (Dec. 23, 2025).
[123] See Attachment D, Exhibit 45, PHMSA, "Special Permit" (Jun. 25, 2026).  See also Attachment D, Exhibit 46, PHMSA, "Jurisdictional Determination in Support of Special Permit" (Jun. 25, 2026); Attachment D, Exhibit 44, PHMSA, "Findings After Environmental Review" (Jun. 25, 2026).
[124] Attachment D, Exhibit 47, PHMSA, Letter re: "Docket No. PHMSA-2026-0464" (Jun. 25, 2026).
[125] See Attachment D, Exhibit 30, 91 Fed. Reg. 13199, Executive Order 14391 (Mar. 13, 2026).
[126] Attachment D, Exhibit 31, U.S. Secretary of Energy, DPA Order.



June 29, 2026
Page 17

Sable to "comply with this order immediately and maintain such compliance until such time as the conditions necessitating the issuance of this order abate or until Sable is directed otherwise."[127]

On March 16, 2026, Sable announced that, as of March 14, 2026, it had resumed petroleum transportation through Segments CA-324 and CA-325 in compliance with the DPA Order.[128]

### III.   Resuming Petroleum Transportation Through Segments CA-324 and CA-325 Does Not Violate the Coastal Act

The Notice asserts that Sable undertook unpermitted development and violated the Coastal Act by resuming petroleum transportation through Segments CA-324 and CA-325 of the SYPS.  The Notice is incorrect.

This section addresses both Coastal Act provisions cited by Commission staff in the Notice to support staff's assertion that resuming petroleum transportation through Segments CA-324 and CA-325 constitutes unpermitted "development."  For the reasons described below, resuming petroleum transportation through Segments CA-324 and CA-325 does not constitute "development" or "new or amended development" under the Coastal Act or require any new or amended Coastal Act authorization. As such, no violation of the Coastal Act has occurred and no Cease and Desist Order or Administrative Penalty is appropriate.

#### A.   No New Coastal Act Authorization is Required under Section 30106

Unless an exclusion or exemption applies, any "development" undertaken within the Coastal Zone must be authorized by a Coastal Development Permit.[129]  Section 30106 of the Coastal Act defines several types of activities that constitute "development" under the Coastal Act.[130]  The Notice cites to Section 30106 and appears to assert that resuming petroleum transportation through Segments CA-324 and CA-325 constitutes a "change in the … intensity of use of land," which is one of the several types of activities enumerated as "development" under Section 30106.[131]  The Commission's interpretation is incorrect.

Applicable caselaw is clear that whether an action constitutes a "change in the density or intensity of use of land" under Section 30106 turns on the permissible density and intensity of the "land's existing use."[132] In *Coastal Protection Alliance, Inc. v. Airbnb, Inc.* (2023) 95 Cal.App.5th 207, the plaintiffs argued that the conversion of a single family home to a short-term rental constitutes per se "development" under the Coastal Act because such conversions "increase access to the property, thereby resulting in a change in the density or intensity of land use" under Section 30106.[133]  The court rejected plaintiffs' argument.  The

---

[127] *Ibid.*
[128] See Attachment D, Exhibit 32, Sable, "8-K and Press Release" (Mar. 16, 2026).
[129] See Coastal Act, § 30600, subd. (a).
[130] See Coastal Act, § 30106.
[131] Attachment D, Exhibit 41, Coastal Commission, Notice, p. 7.  The Notice does not assert that resuming petroleum transportation through Segments CA-324 and CA-325 constitutes development under any other type of action set forth in Section 30106.
[132] *Coastal Protection Alliance, Inc. v. Airbnb, Inc.* (2023) 95 Cal.App.5th 207, 217-219 ("*Coastal Protection Alliance*").
[133] *Id.*, at p. 217.

PAUL
HASTINGS

June 29, 2026
Page 18


court expressly noted that plaintiffs' argument was "untenable" because, "[t]aken literally, [plaintiffs'] argument would apply any time there is an increase in the number of occupants at a residence."[134]

In addition, the court emphasized that plaintiffs' "interpretation of a 'change in the density and intensity of use of land' [under Section 30106] is *untethered to the land's existing use*."[135]  Instead, the court found that "[t]o determine whether [a short-term rental] changes the 'density or intensity of use' of a residence, the appropriate starting point is whether using a residence as [a short-term rental] is consistent with residential use."[136]  The court held that where short-term rentals are permitted as a residential use under the applicable zoning ordinance and designation for the subject property, use of a single family home as a short-term rental does not constitute a "change in the density or intensity of use" such that development under Section 30106 has occurred.[137]  The court's holding confirms that a "change in the density or intensity of use" under Section 30106 only occurs when there is a change in the *authorized* use of a property—not every time use patterns fluctuate within the scope of what is already allowed by existing land use regulations and permits.

By extension, a change in intensity occurs when an action bans or prohibits a use that previously had been permitted.  The *Coastal Protection Alliance* court cited to *Greenfield v. Mandalay Shores Community Assn.* (2018) 21 Cal.App.5th 896 as instructive.  In *Greenfield*, the court held that a ban on short-term rentals changed the intensity of land uses and constituted development under Section 30106 because short-term rentals historically had been treated as permissible uses under the applicable zoning ordinance.[138]  The *Coastal Protection Alliance* court also cited to *Kracke v. City of Santa Barbara* (2021) 63 Cal.App.5th 1089, in which a court held that an agency's new regulation on short-term rentals constituted development "where the city's LCP did not address [short-term rentals] and the city had historically treated them as 'permissible residential uses.'"[139]  These cases further illustrate that a change in intensity of use under Section 30106 only occurs where a proposed future use is different than what is authorized by existing zoning and associated approvals.  Otherwise, "[a]n intensification of use would also occur if the occupants of a residence had a baby, took in a house guest or hired a live-in nanny."[140]

Here, the transportation of petroleum through Segments CA-324 and CA-325 is authorized under existing zoning and approvals.  The Santa Barbara County Planning Commission approved the FDP and CUP for the construction and operation of Segments CA-324 and CA-325 (then known as the Celeron Pipeline Project) on February 18, 1986.  The Planning Commission's approval specifically "cover[ed] all aspects of the project proposal."[141]  The project "site" approved in the Planning Commission's approval action included the entirety of the route within Santa Barbara County, including "a 100-foot wide construction [corridor and] 50-foot wide operations corridor covering approximately 70 miles in Santa Barbara County" that "begins at Las Flores Canyon, … pass[es] through the Gaviota consolidated processing facility, and traverse[s] the environmentally preferred route out of the County."[142]  The Planning Commission's

---

[134] *Ibid.*

[135] *Ibid.* (emphasis added).

[136] *Id.*, at pp. 217-218.

[137] *Id.*, at p. 218 ("[W]here a residential zoning code is silent regarding [short-term rentals], using a residence as a [short-term rental] is a residential use, not a change in use.") (citing *Keen v. City of Manhattan Beach* (2022) 77 Cal.App.5th 142).

[138] See *Greenfield*, *supra*, 21 Cal.App.5th at 899, 901.

[139] *Coastal Protection Alliance*, *supra*, 95 Cal.App.5th at p. 218 (quoting *Kracke*, *supra*, 63 Cal.App.5th at p. 1092).

[140] *Id.*, at p. 217.

[141] Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 5, 1986 Planning Commission Action, p. 1.

[142] *Id.*, at p. 46.

PAUL
HASTINGS

June 29, 2026
Page 19

approval also specifically confirmed that the County's "Coastal Zoning Ordinance applies to all segments of the pipeline within the Coastal Zone as indicated on County maps."[143]  And the Planning Commission found that "[a]s conditioned, the project is in conformance with the applicable provisions of the Coastal Zoning Ordinance and the Coastal Land Use Plan."[144]  The approval was not challenged during the appeal period and the Planning Commission's approval action became final and effective.[145]  Then, on July 27 and August 5, 1986, the County issued the Onshore CDPs authorizing the activities approved by the Planning Commission's FDP approval.  Both Onshore CDPs incorporated "the project description, pipeline route, conditions, and plans required pursuant to those conditions described by the approved Final Development Plan 85-DP-66cz."[146]  Both Onshore CDPs also state that their "terms and conditions shall be perpetual."[147]  The Onshore CDPs were never appealed by any party—including the Coastal Commission—and are therefore final, effective, and not subject to further appeal under the Coastal Act.[148]

Sable's predecessors acquired vested rights to construct and operate Segments CA-324 and CA-325 as set forth in the FDP, CUP, and Onshore CDPs by commencing and completing construction and transporting petroleum through those pipeline segments for decades pursuant to those permits.[149]  Neither Sable nor its predecessors have ever relinquished those permits or Sable's vested rights to operate under them.  In fact, Sable has continued to maintain and perform repairs on Segments CA-324 and CA-325 in reliance on the FDP, CUP, and Onshore CDPs—and the County expressly has confirmed that Sable's anomaly repair work on the Segments was authorized by those existing approvals.[150]  As such, Sable continues to hold a vested right to operate Segments CA-324 and CA-325 for petroleum transportation under applicable zoning and Sable's longstanding, valid permits.  Because transporting oil through Segments CA-324 and CA-325 already is authorized by existing zoning and Sable's vested rights, resuming petroleum transportation is not a change in intensity of use.  If anything, Commission staff's assertion that new Coastal Act authorization is required for already authorized uses itself constitutes a change in intensity of use – much like bans on short-term rentals where such uses already were allowed.

Further, there has been no allegation that Sable has resumed petroleum transportation in throughput amounts that exceed the existing pipeline capacity permitted under the current FDP, CUP, or Onshore CDPs.  The FDP's project description (which was incorporated by reference into the Onshore CDPs) contemplates that Segments CA-324 and CA-325 could "transport up to a maximum of 425,000 barrels per day (BPD) with an optimal throughput of 300,000 BPD."[151]  As constructed, however, Segment CA-324 only has a maximum throughput capacity of 150,000 BPD, whereas Segment CA-325 has a

---

[143] *Id.*, at p. 49.
[144] *Ibid*.
[145] See *id.*, at p. 1.
[146] Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document Nos. 6 and 7, County Coastal Development Permit 86-CDP-189 (Jul. 27, 1986) and 86-CDP-205 (Aug. 5, 1986).
[147] *Ibid*.
[148] See Coastal Act Regulations, § 13313.
[149] See *Avco Community Developers, Inc. v. South Coast Regional Com.* (1976) 17 Cal.3d 785, 791 (when "a property owner has performed substantial work and incurred substantial liabilities in good faith reliance upon a permit issued by the government, he acquires a vested right to complete construction in accordance with the terms of the permit") (citations omitted).
[150] See Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 84, County, Letter re: "Zoning Clearance Applications – 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, 24ZCI-00096" (Feb. 12, 2025), pp. 1-2.
[151] Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 5, 1986 Planning Commission Action, p. 2.

PAUL
HASTINGS

June 29, 2026
Page 20

maximum throughput capacity of 300,000 BPD.  These maximum throughput capacities are within the maximums contemplated by the FDP and Onshore CDPs.

Finally, the temporary pause in petroleum transportation through Segments CA-324 and CA-325 after 2015 is irrelevant to whether resuming petroleum transportation constitutes a change in intensity of use pursuant to Section 30106.  Under *Coastal Protection Alliance*, a "change in the density or intensity of use" does not occur every time the number of occupants within a residence changes or even if the residence were to remain vacant for a certain period.[152]  Instead, development under Section 30106 only occurs when there is a change in the intensity of the uses authorized under applicable zoning and approvals.  Here, there is no requirement that Segments CA-324 and CA-325 be continuously used to transport petroleum on an ongoing basis to retain their authorization under the FDP, CUP, and Onshore CDPs to transport petroleum.  Resuming petroleum transportation is therefore entirely consistent with Sable's existing authorizations and vested rights to operate Segments CA-324 and CA-325 and does not constitute a change in intensity of use.  Moreover, oil and gas pipelines remain authorized uses in all zoning districts within the County's coastal zone with a conditional use permit for any crossings in the ESHA overlay zone.[153]  Segments CA-324 and CA-325 have an active CUP for all ESHA crossings, and therefore remain an authorized use under the existing Coastal Zoning Ordinance.

In sum, because Sable already is permitted to flow petroleum through Segments CA-324 and CA-325, and that use was authorized under applicable zoning at the time the permits for those Segments were approved, resuming petroleum transportation through those Segments does not constitute a change in intensity of use such that "development" under Section 30106 of the Coastal Act has occurred.

### B.  No New Coastal Act Authorization is Required under Section 30262, subd. (b)(2)-(4)

The Notice also asserts that Sable's resumption of petroleum transportation through Segments CA-324 and CA-325 requires a new coastal development permit under Section 30262, subd. (b)(2)-(4), of the Coastal Act.[154]  Section 30262, subd. (b)(2)-(4), became effective on January 1, 2026, as part of the recently enacted SB 237.  For the reasons described herein, resuming petroleum transportation through Segments CA-324 and CA-325 does not constitute "new or expanded development" or require new or amended Coastal Act authorization under Section 30262, subd. (b)(2)-(4).

Notably, and as Sable stated in its initial response to the Notice,[155] this ***exact*** legal issue—whether resuming petroleum transportation through Segments CA-324 and CA-325 requires new or amended Coastal Act authorization under Section 30262, subd. (b)(2)-(4)—is ***already the subject of ongoing litigation*** between Sable and the State of California.[156]  There is a pending motion in that litigation for leave to file an amended complaint to, among other things, add the Coastal Commission as a defendant.  Because the fundamental legal issues alleged in the Notice will soon be resolved by a court of law, commencing any Cease and Desist and Administrative Penalty Order proceedings before the

---

[152] *Coastal Protection Alliance*, *supra*, 95 Cal.App.5th at p. 217.
[153] See Santa Barbara County, Coastal Zoning Ordinance, § 35-157.2.
[154] See Attachment D, Exhibit 41, Notice, pp. 5-8.
[155] See Attachment D, Exhibit 42, Sable, Letter re: "Initial Response to Notice of Intent to Commence Cease and Desist Order and Administrative Penalty Proceedings (No. V-9-26-0063)" (Jun. 12, 2026).
[156] See generally SB 237 Litigation; Attachment D, Exhibit 25, SB 237 Litigation, Sable, Verified First Amended Complaint (Jan. 21, 2026), and Exhibits 38 and 39, Sable, Motion for Leave to File Second Amended Complaint (Apr. 10, 2026) and Supporting Declaration (Apr. 10, 2026).

PAUL
HASTINGS

June 29, 2026
Page 21

Commission is both premature and a waste of all parties' resources.[157]  While Sable requested in a letter to Commission staff dated June 12, 2026, that the Notice be held in abeyance or withdrawn until the court ruled on the pending motion to add the Coastal Commission as a defendant, at which point the issues raised in this Notice would be squarely before the court and appropriately resolved in that forum, Commission staff declined that request.[158]  Sable therefore had no choice but to prepare this response.

This section provides relevant background regarding the recent enactment of Section 30262, subd. (b)(2)-(4), as part of SB 237, and describes why resuming petroleum transportation through Segments CA-324 and CA-325 does not require new or amended Coastal Act authorization under those provisions.

### 1.  Background

Section 30262, (b)(2)-(4), did not exist until January 1, 2026, when SB 237 became effective.  The California State Legislature passed SB 237 on September 13, 2025, and SB 237 was signed into law by Governor Gavin Newsom on September 19, 2025.

SB 237 added subd. (b)(2)-(4) to Section 30262 of the Coastal Act.  As enacted, Section 30262, subd. (b)(2)-(4) state as follows:

> (2) Repair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, *that has been idled, inactive, or out of service for five years or more* shall be considered a new or expanded development requiring a new coastal development permit consistent with this section.
>
> (3) Development associated with the repair, reactivation, or maintenance of an oil pipeline *that has been idled, inactive, or out of service for five years or more* requires a new coastal development permit consistent with this section.
>
> (4) The commission or local government with a certified local coastal program shall review and approve, modify, condition, or deny the permit based on the requirements of this section.
>
> (emphasis added.)

Public comments from SB 237's author, the Coastal Commission, and statements made as part of a bill analysis prepared for SB 237 by the Legislature's Senate Rules Committee suggested that California agencies, including the Coastal Commission, might attempt to argue that Section 30262, subd. (b)(2)-(4) required Sable to obtain new or amended Coastal Act authorization before resuming petroleum transportation through Segments CA-324 and CA-325.

---

[157] Sable reserves all rights to supplement and augment the arguments presented in this Statement of Defense as part of its prosecution of the SB 237 Litigation.

[158] See Attachment D, Exhibit 42, Sable, Letter re: "Initial Response to Notice of Intent to Commence Cease and Desist Order and Administrative Penalty Proceedings (No. V-9-26-0063)" (Jun. 12, 2026); Attachment D, Exhibit 43, Coastal Commission, Letter re: "Sable Offshore Corp.'s Initial Responses to the California Coastal Commission's June 9, 2026, Notice of Intent Letter" (Jun. 19, 2026).

PAUL
HASTINGS

June 29, 2026
Page 22

As such, on September 29, 2025, Sable filed a Complaint for Declaratory Relief against the State of California in Kern County Superior Court seeking a declaratory judgment that Segments CA-324 and CA-325 are not subject to Section 30262, subd. (b)(2)-(4), because the Segments were not "idled, inactive, or out of service for five years or more" and because the Legislature did not give SB 237 retroactive effect.[159]  On January 21, 2026, Sable filed its First Amended Complaint, which additionally argued that any application of SB 237 to the SYPS is preempted by federal law.[160]  On February 20, 2026, the State of California removed the case to the U.S. District Court for the Eastern District of California.[161]  This ongoing litigation is referred to herein as the "SB 237 Litigation."

On February 18, 2026, the Coastal Commission's Executive Director issued a letter to Sable asserting that Segments CA-324 and CA-325 "have remained idle, inactive, and out of service since" 2015 ("February 18 Letter").[162]  The February 18 Letter further claimed:

> "Since [Segments CA-324 and CA-325] have been in that state for a period of more than five years, pursuant to the amended text of Section 30262, the repair, reactivation, or maintenance of those pipelines, as well as any other development associated with the repair, reactivation, or maintenance of the pipelines, is the sort of development that would require a coastal development permit (CDP) …."[163]

On March 5, 2026, Sable's representatives responded to the February 18 Letter and stated that the "exact legal issues raised in your letter are being actively litigated" as part of the SB 237 Litigation.[164]  Then, on March 16, 2026, Sable announced that as of March 14, 2026, it had resumed petroleum transportation through Segments CA-324 and CA-325 in compliance with the DPA Order.[165]

On March 19, 2026, the Coastal Commission's Executive Director issued a second letter to Sable ("March 19 Letter").[166]  The March 19 Letter asserted:

> "As of January 1, 2026, [Segments CA-324 and CA-325] had been idled, inactive, and out of service for more than five years, since oil production was halted at the Santa Ynez Unit in 2015. Sable has not obtained a new Coastal Development Permit for reactivation of the [Segments]. Thus, any reactivation of the [Segments] is unpermitted development and would be grounds for further enforcement action by the Commission."[167,168]

---

[159] See Attachment D, Exhibit 18, SB 237 Litigation, "Verified Complaint for Declaratory Relief" (Sep. 29, 2025).

[160] See Attachment D, Exhibit 25, SB 237 Litigation, Sable's Verified First Amended Complaint (Jan. 21, 2026).

[161] See Attachment D, Exhibit 27, SB 237 Litigation, "Notice of Removal of Action Under 28 U.S.C. Section 1441(a) (Federal Question)" (Feb. 20, 2026).

[162] Attachment D, Exhibit 26, Coastal Commission, Letter re: "Restart of Las Flores Pipelines" (Feb. 18, 2026).

[163] Ibid.

[164] Attachment D, Exhibit 29, Sable, Letter re: "Restart of Lines CA-324 and CA-325 of the Santa Ynez Pipeline System" (Mar. 5, 2026).

[165] See Attachment D, Exhibit 32, Sable, "8-K and Press Release" (Mar. 16, 2026).

[166] See Attachment D, Exhibit 34, Coastal Commission, Letter re: "Announcement of Pipeline Reactivation and Implications" (Mar. 19, 2026).

[167] Ibid.

[168] The March 19 Letter also claimed that an injunction in the litigation captioned *Center for Biological Diversity, et al. v. California Dept. of Forestry and Fire Protection, et al.* (Santa Barbara County Superior Case No. 25CV02244) "prohibits Sable's legal authority to reactivate" Segments CA-324 and CA-325, and argued that "any reactivation of [Segments CA-324 and CA-325] would violate this court order."  Commission staff's legal conclusion about the scope of the injunction in that litigation—in which the Commission is



June 29, 2026
Page 23

On March 20, 2026, Sable's representatives responded to the March 19 Letter and stated that "the legal issues pertaining to SB 237 … are the subject of litigation" and directed Commission staff to the ongoing SB 237 Litigation.[169]  On April 10, 2026, Sable filed a Motion for Leave to File Second Amended Complaint in the SB 237 Litigation to, among other things, add the Coastal Commission as a defendant.[170]

Coastal Commission staff issued the Notice on June 9, 2026, nearly three months after Sable resumed petroleum transportation through Segments CA-324 and CA-325 in compliance with the DPA Order.

### 2.   Segments CA-324 and CA-325 Are Part of an "Active" Pipeline System

The entire SYPS—including Segments CA-324 and CA-325—is active and has retained its active status under state and federal law since 2015.  The Segments are not "idled, inactive, or out of service" under Coastal Act Section 30262.

Section 30262 does not define "idled, inactive, or out of service," as the Notice acknowledges.  Nor does the plain text of Section 30262 require petroleum to be flowing for a pipeline to avoid being classified as "idled, inactive, or out of service."  Indeed, such an interpretation would fly in the face of PHMSA's regulations.  PHMSA recognizes only two categories of pipeline status: active or abandoned.[171]  Federal regulations for hazardous liquid pipelines define the term "abandoned" to mean "permanently removed from service."[172]  In fact, federal regulations do not recognize "idled," "inactive," or "out of service" status at all.[173]  "If a pipeline is not properly abandoned and may be used in the future for transportation of hazardous liquid or gas, PHMSA regulations consider it as an active pipeline."[174]  "Owners and operators of pipelines that are not operating but contain hazardous liquids and gas must comply with all applicable safety requirements, including periodic maintenance, integrity management assessments, damage prevention programs, response planning, and public awareness programs." [175] As discussed below, Sable and its predecessors have complied with these obligations in maintaining Segments CA-324 and CA-325 in an active state.

On December 17, 2025, PHMSA determined that the SYPS is an interstate pipeline under its exclusive pipeline safety jurisdiction.[176]  In making its determination, ***PHMSA also confirmed the SYPS is***

---

not a party—is irrelevant to the issues raised in the Notice.  Moreover, Sable notes that no court in that proceeding has found Sable's resumption of petroleum transportation to constitute a violation of the injunction.  Commission staff similarly asserted in the March 19 Letter that an injunction in the Coastal Commission Litigation "requir[es] Sable to adhere to the provisions of the Commission's [April 10 Orders], which prohibits Sable from engaging in any further development in the Coastal Zone unless it is authorized by a new Coastal Act authorization or acknowledged as exempt, pending resolution of the litigation."  Sable disputes the Notice's apparent assertion that Sable's resumption of petroleum transportation through Segments CA-324 and CA-325 somehow violates the April 10 Orders, as the resumption of petroleum transportation does not constitute "development" as that term was defined under the Coastal Act as of the date the April 10 Orders were issued.  Moreover, for the reasons described in herein, resuming petroleum transportation does not constitute development under the Coastal Act, and therefore Commission staff's legal opinion as to the scope of that injunction is not relevant to the allegations in the Notice.

[169] Attachment D, Exhibit 35, Sable, Letter re: "Lines CA-324 and CA-325 of the Santa Ynez Pipeline System" (Mar. 20, 2026).

[170] See Attachment D, Exhibit 38, Sable, SB 237 Litigation, "Motion for Leave to File Second Amended Complaint" (Apr. 10, 2026).

[171] See 81 Fed. Reg. 54512 (federal "regulations consider pipelines to be either active and fully subject to all relevant parts of the safety regulations or abandoned"); see also PHMSA Advisory Bulletin ADB 2016-0075 (Aug. 11, 2016).

[172] See 49 C.F.R. § 192.3.

[173] See 81 Fed. Reg. 54512.

[174] 81 Fed. Reg. 54513.

[175] *Ibid*.

[176] Attachment D, Exhibit 21, PHMSA, Letter re: "Determination of Interstate Classification" (Dec. 17, 2025).

PAUL
HASTINGS

June 29, 2026
Page 24

***considered an "active" pipeline***: "PHMSA regulations consider the [SYPS] to be an 'active' pipeline."[177] On June 25, 2026, in connection with PHMSA's issuance of the Special Permit to Sable, PHMSA further confirmed that "[Segments] CA-324 and CA-325 remained 'active' pursuant to PHMSA's Part 195 regulations but did not transport crude oil from May 19, 2015, until March 14, 2026."[178]

Although petroleum had not flowed through Segments CA-324 and CA-325 since 2015, Sable has maintained the Segments in an active state. The Segments were filled with nitrogen to prevent oxidation and internal corrosion, and the cathodic protection system is active and has been regularly inspected and maintained. In addition, Sable and its predecessor Plains have undertaken substantial efforts to diligently repair Segments CA-324 and CA-325 to ensure compliance with industry standards for active pipelines and resume petroleum transportation. In April 2021, Plains secured approval from OSFM to retrofit Segments CA-324 and CA-325 with 16 safety valves as required by law. In December 2021, Plains submitted applications to the County for approval to complete the safety valve installation work. Sable has since installed the safety valves along Segments CA-324 and CA-325.

Moreover, multiple in-line inspections ("ILI") have been conducted on Segments CA-324 and CA-325. Two ILI runs were performed on Segment CA-324 in February and December 2022. One ILI run was performed on a portion of Segment CA-325 in September 2023. And one ILI run was performed on the remainder of Segment CA-325 in October 2023. Then, in May 2024, Sable separately began anomaly repair and maintenance work on the Segments as authorized under the County's 1986 approvals and permits that expressly allowed the Segments' owner to perform ongoing pipeline maintenance. Sable has since completed the anomaly repairs, as well as subsequent pipeline hydrotesting, under OSFM supervision. In August and September 2025, OSFM performed multiple inspections of the Segments. PHMSA also conducted on-site inspections of Segments CA-324 and CA-325 from December 9 through December 11, 2025. Additionally, Sable has conducted annual response planning "spill drills" with applicable regulatory bodies, including on July 25, 2024, and July 17, 2025, and has participated in annual public awareness meetings. Sable's ongoing maintenance, integrity assessments, and participation response planning and public awareness programs further demonstrates that Segments CA-324 and CA-325 have remained in an "active" state pursuant to PHMSA regulations.

The Notice nevertheless appears to assert that a pipeline is "idled, inactive, or out of service" under Section 30262, subd. (b)(2)-(4), unless petroleum is flowing through it.[179] However, and importantly, ***Segments CA-324 and CA-325 are components of the larger, interconnected and interstate SYPS***. PHMSA specifically confirmed that "Sable operates the [SYPS] as a ***single pipeline system*** transporting crude oil from the OCS to the Pentland Station terminal in Kern County, California."[180] Commission staff argue that Segments CA-324 and CA-325 are "distinct" from the Offshore SYPS Segments.[181] But Section 30262 refers to a single oil pipeline system—not distinct pipeline components. Indeed, Commission staff does not cite any support for the argument that Section 30262, subd. (b)(2)-(4), separately applies to components of an interconnected pipeline system such as the SYPS or identify how such components would be delineated under the statute. Here, the SYPS was active prior to the effective date of Section 30262, subd. (b)(2)-(4). On May 15, 2025, Sable resumed petroleum transportation

---

[177] *Id.*, at p. 3, fn. 8.
[178] Attachment D, Exhibit 48, PHMSA, "Special Permit Analysis and Findings: Sable Special Permit" (Jun. 25, 2026), pp. 7-8.
[179] Attachment D, Exhibit 41, Coastal Commission, Notice, p. 8.
[180] Attachment D, Exhibit 21, PHMSA, Letter re: "Determination of Interstate Classification" (Dec. 17, 2025), p. 1 (emphasis added).
[181] Attachment D, Exhibit 41, Coastal Commission, Notice, p. 8.

PAUL
HASTINGS

June 29, 2026
Page 25

through the SYPS by flowing oil through the Offshore SYPS Segments to the LFC Facilities, and as such—and even under the Commission's apparent interpretation of the law—the entire SYPS could not have been "idled, inactive, or out of service" beginning in May 2025, long before Section 30262, subd. (b)(2)-(4), became effective.

In sum, the SYPS, including Segments CA-324 and CA-325, are active pipelines under PHMSA's regulations. Sable and its predecessor have maintained the Segments, conducted extensive repairs, and did not undertake any measures to formally abandon the Segments. Given that Segments CA-324 and CA-325 remained active, Section 30262, subdivisions (b)(2) through (4) do not apply to the Segments.

### 3. SB 237 Cannot Apply Retroactively

Section 30262, subd. (b)(2)-(4), only applies to pipeline facilities that have been "idled, inactive, or out of service *for five years or more*." The Notice interprets this text to mean "idled, inactive, or out of service for five years or more *as of* or after *January 1, 2026*."[182] Put differently, Commission staff allege that the five-year lookback period established in Section 30262, subd. (b)(2)-(4), runs immediately backward from SB 237's effective date.

Again, the Notice is incorrect. California courts have long held that "[g]enerally, statutes operate prospectively only."[183] As such, "[i]n construing statutes, there is a presumption against retroactive application unless the Legislature *plainly has directed otherwise* by means of *express language* of retroactivity or other sources [that] provide a *clear and unavoidable implication* that the Legislature intended retroactive application."[184] "*Ambiguous statutory language will not suffice* to dispel the presumption against retroactivity; rather *a statute that is ambiguous* with respect to retroactive application *is construed to be unambiguously prospective*."[185] This exacting requirement by courts is informed in part by constitutional concerns. Specifically:

> "If retroactive laws change the legal consequences of transactions long closed, the change can destroy the reasonable certainty and security which are the very objects of property ownership. As a consequence, due process protection for property must be understood to incorporate our settled tradition against retroactive laws of great severity. Groups targeted by retroactive laws, were they to be denied all protection, would have a justified fear that a government once formed to protect expectations now can destroy them. Both stability of investment and confidence in the constitutional system, then, are secured by due process restrictions against severe retroactive legislation."[186]

---

[182] Attachment D, Exhibit 41, Coastal Commission, Notice, p. 8 (emphasis added).
[183] *Myers v. Phillip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 840.
[184] *Quarry v. Doe I* (2012) 53 Cal.4th 945, 955 (citing *McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 475; *Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 231 ("*Disability Rights*"); *Myers, supra*, 28 Cal.4th at p. 841 [internal citations omitted]) (emphasis added).
[185] *Quarry, supra*, 53 Cal.4th at p. 955 (citing *Myers, supra*, 28 Cal.4th at p. 841; *Disability Rights, supra*, 39 Cal.4th at pp. 229-230; *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1209, fn. 13 [internal citations omitted]) (emphasis added).
[186] *Myers, supra*, 28 Cal.4th at p. 846 (quoting *Eastern Enterprises v. Apfel* (1998) 524 U.S. 498, 548-549 (conc. opn. of Kennedy, J.)).

PAUL
HASTINGS

June 29, 2026
Page 26

Here, Commission staff has not identified any evidence suggesting that the high bar to apply SB 237 retroactively has been cleared.  First, the Commission has not identified any language in Section 30262, subd. (b)(2)-(4)—much less express and unambiguous language—that is indicative of an intent to retroactively apply the five-year lookback period backward from January 1, 2026. The statutory language is entirely limited to the phrase "five years or more."  There is no suggestion in the text that "five years or more" begins at some point in the past before SB 237 became law.  In the absence of having been "plainly [] directed" by the Legislature with "express language of retroactivity," the general "presumption against retroactive application" controls and Section 30262, subd. (b)(2)-(4), must only be interpreted to apply prospectively.[187]

The Commission also has not identified any extrinsic evidence indicating a "clear and unavoidable" conclusion that Section 30262, subd. (b)(2)-(4), were intended by the Legislature to apply retroactively.[188] One Senate Rules Committee Analysis of SB 237 referenced Sable and Segments CA-324 and CA-325, but solely within the context of SB 237's other provisions regarding pipeline testing—not Section 30262, subd. (b)(2)-(4).[189]  Similarly, SB 237 author Assemblymember Gregg Hart repeatedly indicated his personal intent to give the Coastal Commission authority over Sable's resumption of petroleum transportation through Segments CA-324 and CA-325,[190] but courts "decline[] to discern legislative intent from comments by a bill's author because they reflect only the views of a single legislator instead of the Legislature as a whole."[191]  Nothing in SB 237's legislative history suggests that the Legislature specifically intended that the five-year lookback period established in Section 30262, subd. (b)(2)-(4), should run backward from January 1, 2026.  And, notably, the Legislature could have made Section 30262, subd. (b)(2)-(4) retroactive if it intended to do so.  In fact, the Legislature specifically stated that a different provision of SB 237 (related to claims or causes of action brought under CEQA for certain oil and gas projects in Kern County) "applies prospectively **and retroactively**."[192]  The Legislature chose not to include similar language in Section 30262, subd. (b)(2)-(4), demonstrating an intent not to apply Section 30262, subd. (b)(2)-(4), retroactively.  In sum, there is no extrinsic evidence suggesting that the Legislature intended the five-year lookback period in Section 30262, subd. (b)(2)-(4), to apply retroactively as Commission staff argues.

Instead of identifying any evidence suggesting Section 30262, subd. (b)(2)-(4), applies retroactively, the Notice asserts that SB 237 "does not apply retroactively, as it does not look back to regulate pipelines

---

[187] *Quarry*, *supra*, 53 Cal.4th at p. 955 (citing *McClung*, *supra*, 34 Cal.4th at p. 475; *Disability Rights*, *supra*, 39 Cal.4th at p. 230; *Myers*, *supra*, 28 Cal.4th at p. 841 [internal citations omitted].)

[188] *Quarry*, *supra*, 53 Cal.4th at p. 955 (citing *McClung*, *supra*, 34 Cal.4th at p. 475; *Disability Rights*, *supra*, 39 Cal.4th at p. 230; *Myers*, *supra*, 28 Cal.4th at p. 841 [internal citations omitted].)  Although Sable instituted the SB 237 Litigation based on its reasonable concern that state agencies like the Coastal Commission might attempt to apply Section 30262, subd. (b)(2)-(4), to Segments CA-324 and CA-325, the factors supporting Sable's concern are insufficient to establish a "clear and unambiguous" legislative intent to apply SB 237 retroactively.

[189] See Attachment D, Exhibit 13, Senate Rules Committee Report (Sep. 13, 2025), pp. 3 ("[The bill r]equires pipelines of a certain size that have been out of service for more than five years (which would notably include certain pipelines serving the Sable Corporation's Santa Ynez Unit), to **meet specific testing requirements**."), 5 ("Sable announced they were restarting oil production in the Santa Ynez [U]nit (in federal waters) on May 15, 2025, and restarting the use of those two pipelines.  Sable has not replaced, but has rather made repairs to the pipelines.  Some of the provisions of SB 237 are intended to address concerns surrounding the safety of restarting use of the repaired pipelines **by requiring testing of the pipelines' durability**.") (emphases added).

[190] See Attachment D, Exhibit 39, SB 237 Litigation, Declaration in Support of Sable's Motion for Leave to File Second Amended Complaint, Exhibit F (Sep. 19, 2025).

[191] *Myers*, *supra*, 28 Cal.4th at p. 845.

[192] See Senate Bill 237 (2025), § 6 (adding Section 21080.81 to the Public Resources Code) (emphasis added).

PAUL
HASTINGS

June 29, 2026
Page 27

that reactivated prior to January 1[, 2026]."[193]  Regardless of whether that is accurate, Commission staff ignore that applying the statute's five-year lookback period as if it runs backward from January 1, 2026, amounts to an **independent** retroactive application of the law.  The U.S. Supreme Court and California Supreme Court have advised that "[e]very statute[] which … creates a new obligation [or] imposes a new duty … in respect to … considerations already past, must be deemed retrospective."[194]  Put differently, "a law has retroactive effect when it functions to change the legal consequences of past conduct by imposing new or different liabilities based upon such conduct."[195]  Here, the Commission's interpretation would impose a new duty to obtain new or amended Coastal Act authorization on owners of pipeline facilities for conduct undertaken wholly before SB 237 became effective:  allowing their facilities to remain "idled, inactive, or out-of-service" between January 1, 2021, and January 1, 2026.  The Commission's interpretation of the five-year lookback period in Section 30262, subd. (b)(2)-(4), therefore requires that SB 237 apply retroactively—and Commission staff have not identified any evidence confirming a "clear and unavoidable implication" that the Legislature intended retroactive application here.[196]

Because there is no evidence that the Legislature intended the five-year lookback period in Section 30262, subd. (b)(2)-(4), to apply retroactively, Section 30262, subd. (b)(2)-(4), must be interpreted to apply prospectively.  Commission staff's argument that "idled, inactive, or out-of-service for five years or more" runs backward from January 1, 2026, is therefore unsupported and must fail.  Applied prospectively, the record is clear that Segments CA-324 and CA-325 indisputably have not been "idled, inactive, or out of service for five years or more" since January 1, 2026.  As such resuming petroleum transportation through Segments CA-324 and CA-325 does not implicate Section 30262, subd. (b)(2)-(4).

4.    **The Coastal Commission's Regulatory Authority Over Segments CA-324 and CA-325 Has Been Preempted**

Not only does SB 237 not apply based on its plain terms, more fundamentally, the application of SB 237 to Segments CA-324 and CA-325 has been preempted as it attempts to regulate pipeline safety.

Article VI, Clause 2 of the U.S. Constitution provides that "the Laws of the United States … shall be the supreme Law of the Land," such that federal laws preempt state laws that purport to override or otherwise conflict with the implementation of federal laws.[197]  The federal Pipeline Safety Act[198] (the "PSA") establishes a federal scheme for both interstate and intrastate pipeline safety and expressly limits state authority over such regulated pipeline facilities. "**A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation**."[199]  In

---

[193] Attachment D, Exhibit 41, Coastal Commission, Notice, p. 8.

[194] *Myers*, *supra*, 28 Cal.4th at p. 839 (quoting *Landgraf v. USI Film Products* (1994) 511 U.S. 244, 269).

[195] *Quarry*, *supra*, 53 Cal.4th at p. 956 (quoting *Disability Rights*, *supra*, 39 Cal.4th at p. 231 [internal citations omitted]).

[196] *Quarry*, *supra*, 53 Cal.4th at p. 955.

[197] See also *Silkwood v. Kerr-McGee Corp.* (1984) 464 U.S. 238, 248 (conflict preemption arises when "it is impossible to comply with both state and federal law … or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.").

[198] See 49 U.S.C. §§ 60101 *et seq.*

[199] 49 U.S.C. § 60104, subd. (c) (emphasis added).  Similarly, the PSA only authorizes "[a] State authority that has submitted a current certification under [49 U.S.C.§ 60105, subd. (a)] [to] adopt additional or more stringent safety standards for intrastate pipeline facilities and intrastate pipeline transportation [] if those standards are compatible with the minimum standards prescribed under [the PSA]."  *Ibid.*  In California, the State Legislature vested OSFM with the "exclusive safety[,] regulatory and enforcement authority over intrastate hazardous liquid pipelines and … to implement the [PSA] and federal pipeline safety regulations as to those portions of interstate pipelines located within [California] as necessary to obtain annual federal certification."  Gov't Code, § 51010.



June 29, 2026
Page 28

December 2025, PHMSA asserted exclusive jurisdiction over the SYPS and expressly confirmed that Segments CA-324 and CA-325 are part of an interstate pipeline facility.[200]  The PSA "clearly expresses the intent of Congress to fully occupy the field of oil and gas operations and interstate pipeline safety so that any state law that touches upon the area, even consistent state law, is preempted."[201]  Thus, the PSA expressly precludes state agencies, such as the Coastal Commission, from imposing any safety standards for interstate pipeline facilities, such as the SYPS, which are under PHMSA's exclusive jurisdiction.[202]

For example, in *Olympic Pipe Line Co. v. City of Seattle*, the City of Seattle attempted to condition continued operation of an interstate hazardous-liquid pipeline on compliance with local regulatory demands and threatened to shut down pipeline operations if the operator refused.[203]  In finding for the pipeline operator, the Ninth Circuit held that, "[f]or interstate pipelines, state and local authorities generally 'may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation.'"[204]  The court further held that "[f]ederal preemption of the regulation of interstate pipeline safety in any other manner is manifest in the language of the PSA provision entitled 'Preemption.'"[205]  Therefore, given that the SYPS is under PHMSA's exclusive regulatory oversight, state agencies, including the Coastal Commission, no longer retain any pipeline safety authority over Segments CA-324 and CA-325 or over the resumption of petroleum transportation through the Segments.[206]  Moreover, the implementation of any regulation by a state agency that encroaches upon pipeline safety also is preempted.[207]

Separately, in March 2026, the Secretary of Energy issued the DPA Order under delegated authority from the President, which required Sable "to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the SYU through the SYPS."[208]  The DPA Order further preempts any attempt by the Coastal Commission (or any other state agency) to limit or condition Sable's resumption of petroleum transportation through Segments CA-324 and CA-325.[209]  When enacting the Defense Production Act ("DPA"), Congress found "the development of domestic productive capacity" critical for ensuring the national defense, and similarly found it necessary "to assure the availability of domestic energy supplies."[210]  The DPA thus vests "the President with an array of authorities," all designed to "maintain

---

In turn, OSFM adopted PHMSA's implementing regulations, and PHMSA certified OSFM to implement the HLPSA with respect to intrastate pipelines in California.  See Cal. Code Regs., tit. 19, § 2000.

[200] Attachment D, Exhibit 21, PHMSA, Letter re: "Determination of Interstate Classification" (Dec. 17, 2025).

[201] *People ex rel. Sneddon v. Torch Energy Servs., Inc.* (2002) 102 Cal.App.4th 181, 187.

[202] The PSA also would preempt the Coastal Commission from imposing any safety standards on Segments CA-324 and CA-325 even if they were classified as intrastate pipeline facilities because OSFM is the only state agency certified by PHMSA under the PSA to adopt pipeline safety standards for intrastate pipeline facilities.  See 49 U.S.C. § 60104, subd. (c).

[203] See *Olympic Pipe Line Co. v. City of Seattle* (9th Cir. 2006) 437 F.3d 872, 875–76.

[204] *Id.* at 878 (quoting 49 U.S.C. § 60104, subd. (c)).

[205] *Ibid*.

[206] Although the State of California has challenged PHMSA's designation of the SYPS as an interstate pipeline, the Ninth Circuit declined to stay PHMSA's assertion of jurisdiction.  See Attachment D, Exhibit 24, *Environmental Defense Center et al. v. PHMSA*, Case No. 25-8059 (9th Cir.), "Order Denying Motion to Stay PHMSA's Approval of Restart Plan and Emergency Special Permit" (Dec. 31, 2025) (Dkt. 21.1).

[207] See *People ex rel. Sneddon*, *supra*, 102 Cal.App.4th at p. 187 (The PSA "clearly expresses the intent of Congress to fully occupy the field of oil and gas operations and interstate pipeline safety so that any state law that touches upon the area, even consistent state law, is preempted.").

[208] Attachment D, Exhibit 31, U.S. Secretary of Energy, DPA Order.

[209] See *Old Dominion Branch No. 496 v. Austin* (1974) 418 U.S. 264, 273; *Alario v. Knudsen* (D. Mont. 2023) 704 F.Supp.3d 1061, 1085 (finding conflict preemption where a state law conflicted with an executive order issued under the DPA's "ability to … regulate" a private entity).

[210] 50 U.S.C. § 4502, subd. (a)(3), (a)(5).



June 29, 2026
Page 29

and enhance the domestic industrial base."[211]  The President may use those authorities "whether or not an 'emergency' situation exists."[212]  Thus, the DPA confers "broad and flexible" authority on the President to regulate private parties and preempt contrary state law to shape domestic industry in the interest of national defense.[213]

"[T]he President's prioritization authority under [DPA] section 4511(a)(1) also allows him to preempt state law."[214]  The President also may use the DPA to "facilitate petroleum transportation," such as "by requiring pipelines, marine terminals, and other facilities to perform oil transport contracts necessary or appropriate to promote the national defense."[215]  The Department of Justice's Office of Legal Counsel has opined that the DPA Order preempts those laws that, in the President's judgment, impair or delay prioritized contract performance as required by the DPA Order—including SB 237.[216]  Finally, Section 4557 explicitly provides "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter."[217]

In sum, the federal PSA and DPA Order preempt the Coastal Commission's attempt to apply SB 237 and Public Resources Code Section 30262 to Sable and its resumption of the transportation of oil through Segments CA-324 and CA-325.

### 5. Application of Coastal Act Section 30262, Subd. (b)(2)-(4) to Sable Is Unconstitutional

Coastal Act Section 30262, subdivisions (b)(2) through (4) would be unconstitutional as applied to Sable, violating federal and state Due Process and Equal Protection Clauses, Sable's vested rights, and prohibitions on Bills of Attainder and takings without just compensation.

***Due Process Violation.*** In enforcing Coastal Act Sections 30262, subd. (b)(2)-(4) against Sable, the Coastal Commission would violate Sable's substantive and procedural due process rights.  The United States Constitution's Fifth Amendment provides, in relevant part: "No person shall ...be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."[218]  Likewise, the Due Process Clause of the 14th Amendment to the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."[219]  The California Constitution also separately prohibits a person from being "deprived of life, liberty, or property without due process of law[.]"[220]  The Constitutional due process guarantees have both procedural and substantive components, the latter which protects fundamental rights that are so "implicit in the concept of ordered liberty" that "neither liberty nor justice would exist if

---

[211] 50 U.S.C. § 4502, subd. (a)(4).

[212] Legal Authorities Available to the President to Respond to a Severe Energy Supply Interruption or Other Substantial Reduction in Available Petroleum Products (1982) 6 Op. O.L.C. 644, 662.

[213] *Ibid.* (quoting H.R. Rep. No. 81-2759, p. 4 (1950)).

[214] DOJ Office of Legal Counsel Opinion, Preemptive Effect of Defense Production Act Order on State Law (Mar. 3, 2026), at p. 18.

[215] 6 Op. O.L.C., *supra*, at p. 665.

[216] See DOJ Office of Legal Counsel Opinion, Preemptive Effect of Defense Production Act Order on State Law (Mar. 3, 2026), at pp. 18-19 (citing *E. Air Lines, Inc. v. McDonnell Douglas Corp.* (5th Cir. 1976) 532 F.2d 957, 993).

[217] 50 U.S.C. § 4557.

[218] U.S. Const. 5th amend.

[219] U.S. Const. 14th amend.

[220] Cal. Const. art. I, § 7.

PAUL
HASTINGS

June 29, 2026
Page 30

they were sacrificed."[221]  Coastal Act Section 30262, subd. (b)(2)-(4), imposes requirements prior to resuming the flow of crude oil that are not tied to any harm allegedly caused by SYPS operation, including Segments CA-324 and CA-325.  There is no rational basis for imposing such requirements.

*Equal Protection Violation.* Coastal Act Section 30262, subd. (b)(2)-(4), singles out and discriminates against Sable, violating Equal Protection principles.  The United States and California Constitutions guarantee that a person may not be denied equal protection of the laws.[222]  Corporations are "persons" within the meaning of this provision and thus entitled to equal protection of the laws.  The purpose of the Equal Protection Clause is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by the express terms of a statute or by its improper execution through duly constituted agents.  The Equal Protection Clause of the California Constitution requires that similarly situated individuals be treated similarly, absent an adequate basis for disparate treatment by the state legislature. Coastal Act Section 30262, subd. (b)(2)-(4) imposes additional permitting requirements applicable only to the SYPS and does not appear to impose any requirements on any other pipeline facilities located in the State.  Thus, the provisions apply to Sable as a "class of one."[223]

*Violation of Sable's Vested Rights.* As discussed above, Sable has vested rights of ownership of the SYPS, including Segments CA-324 and CA-325.  As a result of these vested rights, the Coastal Commission may not enforce the provisions of Section 30262, subdivisions (b)(2)-(4) to punish Sable's ownership interests in the SYPS, including the Segments.  The doctrine of vested rights seeks to protect property owners and developers who have substantially relied on past permits and proceeded accordingly with the government's acknowledgement.  The doctrine protects a permit holder's right not only to construct, but also to use the facilities as authorized by the permit.[224]

*Violation of the Prohibition on Bills of Attainder.*  The United States and California Constitutions prohibit passage of a bill of attainder, which imposes punishment on a specific individual or group.  The Commission is attempting to enforce the requirements of Section 30262, subd. (b)(2)-(4), exclusively upon Sable as the owner of the SYPS rather than any other entities that own pipeline facilities in the State.  Applying these provisions only as to Sable and the SYPS amounts to a trial by Legislature, usurping the role of the judicial branch by punishing the conduct of a single, specific entity, in the absence of any evidentiary basis that the harm which the statute purportedly addresses actually exists.

*Violation of the Takings Clause.* Section 30262, subdivisions (b)(2)-(4) is invalid as applied to Sable because it substantially impairs Sable's ownership interest and operating rights in the SYPS, including Segments CA-324 and CA-325.  By enforcing these provisions of the Coastal Act, the Coastal Commission would violate the state and federal Takings Clauses, which prohibit the temporary or permanent taking or damaging of private property for public use without prior, just compensation.[225]  Enforcement of Coastal Act Section 30262, subdivisions (b)(2)-(4), substantially impairs Sable's vested

---

[221] *Palko v. Conn.* (1937) 302 U.S. 319, 325, 327.

[222] See Cal. Const. art. 1, § 7(a); U.S. Const. 14th amend.

[223] See *Willowbrook v. Olech* (2000) 528 U.S. 562, 564 ("Our cases have recognized successful equal protection claims brought by a 'class of one' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."); *Genesis Environmental Services v. San Joaquin Valley Unified Air Pollution Control Dist.* (2003) 113 Cal.App.4th 597, 604-608 (plaintiff sufficiently alleged equal protection claim for class of one by alleging plaintiff was treated differently from similarly situated persons, difference in treatment was intentional, and there was no rational basis for difference in treatment).

[224] See *Cnty. of San Diego v. McClurken* (1951) 37 Cal.2d 683, 691.

[225] See Cal. Const. art. I, § 19; U.S. Const. amends. 5, 14.

PAUL
HASTINGS

June 29, 2026
Page 31

rights in the SYPS and eliminates substantially all of Sable's economically viable use of the SYPS, including Segments CA-324 and CA-325.  To date, Sable has not received any compensation from the State of California on account of the alleged taking of, or damage to, its property rights.

***Violation of the Commerce Clause.***  The Coastal Commission's attempt to enforce Section 30262, subd. (b)(2)-(4), as to Segments CA-324 and CA-325 of the SYPS, which is an interstate pipeline facility, also violates the United States Constitution's Commerce Clause.  Under the Commerce Clause, a State may not take "any action which may fairly be deemed to have the effect of impeding the free flow of trade between States."[226]  Here, requiring Sable to obtain a new or amended coastal development permit under Section 30262, subd. (b)(2)-(4), in order to continue petroleum transportation through Segments CA-324 and CA-325, impedes the free flow of petroleum in interstate commerce.

### 6.   Summary

Resuming petroleum transportation through Segments CA-324 and CA-325 does not constitute "development" under Section 30106 of the Coastal Act or "new or expanded development" under Section 30262, subd. (b)(2)-(4), of the Coastal Act.  As such, no unpermitted development has occurred and Sable did not violate the Coastal by resuming petroleum transportation through Segments CA-324 and CA-325.

### C.  No Cease and Desist Order or Administrative Penalty May Be Issued

The Notice asserts that that the Commission may issue a Cease and Desist Order pursuant to Section 30810, subd. (a), of the Coastal Act.[227]  For the reasons described below, no Cease and Desist Order may be issued here.

Section 30810, subd. (a), allows the Commission to issue a Cease and Desist Order when an activity "requires a permit from the commission without securing a permit" or "is inconsistent with any permit previously issued by the commission."  Here, the Commission has alleged that "a portion of [Segment] CA-324 lies within the Commission's retained permitting jurisdiction"—appearing to allege that resuming petroleum transportation through Segment CA-324 requires a coastal development permit from the Commission.[228]  Notably, the Notice does not identify which portion of the nearly 11-mile pipeline segment purportedly lies within the Commission's retained jurisdiction.  Without more detail, Sable cannot meaningfully respond to this assertion at this time.   Sable notes, however, that the County Planning Commission specifically confirmed that the County's "Coastal Zoning Ordinance applies to all segments of the pipeline within the Coastal Zone as indicated on County maps."[229]  Moreover, Sable is unaware of any prior assertion by the Commission that a portion of Segment CA-324 lies within the Commission's retained jurisdiction or requires a permit from the Coastal Commission.  In any event, for the reasons described above, resuming petroleum transportation through Segments CA-324 and CA-325 does not constitute unpermitted development or any violation of the Coastal Act, and therefore no Cease and Desist Order could be issued even if a portion of Segment CA-324 lies within the Commission's retained permitting jurisdiction.

---

[226] *W. Oil & Gas Ass'n v. Cory* (9th Cir. 1984) 726 F.2d 1340, 1342 (citation omitted).
[227] See Attachment D, Exhibit 41, Coastal Commission, Notice, pp. 9-10.
[228] *Id.*, at p. 9.
[229] Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document No. 5, 1986 Planning Commission Action, p. 49.



June 29, 2026
Page 32

Section 30810, subd. (a)(2), also allows the Commission to issue a Cease and Desist Order to "enforce any requirements of a certified local coastal program" when the "commission requests and the local government ... declines to act, or does not take action in a timely manner, regarding an alleged violation which could cause significant damage to coastal resources."  The Notice asserts that Commission staff requested that the County act with respect to Sable's resumption of petroleum transportation through Segments CA-324 and CA-325, but that the County failed to respond.[230]  For the reasons described above, however, resuming petroleum transportation through Segments CA-324 and CA-325 does not constitute unpermitted development or any violation of the Coastal Act.  As such, there is no violation of the County's local coastal program or the Coastal Act that warrants enforcement by the County or the Commission under Section 30810, subd. (a)(2).

The Notice also asserts that penalties may be issued under Sections 30821.3, 30820, subd. (a)-(b), 30821.6, and 30822 of the Coastal Act.[231]  Again, the Notice is incorrect.  Sections 30821.3 and 30820, subd. (a)-(b), authorize the issuance of penalties only where a violation of the Coastal Act has occurred.[232]  Similarly, Section 30821.6 addresses violations of existing cease and desist orders and Section 30822 authorizes the Commission to seek exemplary damages for any knowing and intentional violations of the Coastal Act or any cease and desist order.[233]  For the reasons described above, resuming petroleum transportation through Segments CA-324 and CA-325 does not constitute unpermitted development, a violation of the Coastal Act, or any existing cease and desist orders.  As such, no penalties are warranted or appropriate here.  Moreover, as described above, Section 4557 of the DPA explicitly provides "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this chapter."[234]  As such, Sable is immune from any damages or penalties that Commission staff assert could apply here because the DPA Order required Sable to resumed petroleum transportation through Segments CA-324 and CA-325.

## IV.     CONCLUSION

For the reasons described above, Sable's resumption of petroleum transportation through Segments CA-324 and C-325 does not require any new or amended Coastal Act authorization or otherwise constitute unpermitted development or any violation of the Coastal Act.  As such, no cease and desist order or administrative penalty is warranted.

---

[230] See Attachment D, Exhibit 41, Coastal Commission, Notice, p. 9.

[231] See *id.*, at p. 10.

[232] See Coastal Act, §§ 30821.3, subd. (a) ("[A] person ... who is in violation of any provision of this division ... is subject to an administrative civil penalty ...."), 30820, subd. (a) ("Any person who violates any provision of this division may be civilly liable ...."), subd. (b) ("Any person who performs or undertakes development that is in violation of this division or that is inconsistent with any coastal development permit ... when the person intentionally and knowingly performs or undertakes the development ..., may, in addition to any other penalties, be civilly liable ....").

[233] See Coastal Act, §§ 30821.6, 30822.

[234] 50 U.S.C. § 4557.

STATE OF CALIFORNIA – CALIFORNIA NATURAL RESOURCES AGENCY                                GAVIN NEWSOM, *Governor*

## CALIFORNIA COASTAL COMMISSION
455 MARKET STREET, SUITE 300
SAN FRANCISCO, CA 94105-2421
VOICE (415) 904-5200
FAX (415) 904-5400



**Attachment B**

### STATEMENT OF DEFENSE FORM

**DEPENDING ON THE OUTCOME OF FURTHER DISCUSSIONS THAT OCCUR WITH COMMISSION ENFORCEMENT STAFF AFTER YOU HAVE COMPLETED AND RETURNED THIS FORM, ADMINISTRATIVE OR JUDICIAL ENFORCEMENT PROCEEDINGS MAY PROCEED AGAINST YOU. IF THAT OCCURS, ANY STATEMENTS THAT YOU MAKE ON THIS FORM WILL BECOME PART OF THE ENFORCEMENT RECORD AND MAY BE USED AGAINST YOU.**

**YOU MAY WISH TO CONSULT WITH OR RETAIN AN ATTORNEY BEFORE COMPLETING THIS FORM OR OTHERWISE CONTACT THE COMMISSION ENFORCEMENT STAFF.**

This form is accompanied by either a cease and desist order issued by the executive director or a notice of intent to initiate cease and desist order proceedings before the commission.  This document indicates that you are or may be responsible for or in some way involved in either a violation of the commission's laws or a commission permit. The document summarizes what the (possible) violation involves, who is or may be responsible for it, where and when it (may have) occurred, and other pertinent information concerning the (possible) violation.

This form requires you to respond to the (alleged) facts contained in the document, to raise any affirmative defenses that you believe apply, and to inform the staff of all facts that you believe may exonerate you of any legal responsibility for the (possible) violation or may mitigate your responsibility. This form also requires you to enclose with the completed statement of defense form copies of all written documents, such as letters, photographs, maps, drawings, etc. and written declarations under penalty of perjury that you want the commission to consider as part of this enforcement hearing.

You should complete the form as fully and accurately as you can and as quickly as you can and return it no later than **June 29, 2026,** to the commission's enforcement staff at the following address:

> Liam Stowe
> California Coastal Commission
> 455 Market Street, Suite 300
> San Francisco, California 94105-2421

If you have any questions, please contact as soon as possible Liam Stowe of the Commission enforcement staff at the telephone number (415) 729-1646 or via email at Liam.Stowe@coastal.ca.gov.

Sable Offshore Corp.
06/10/2026
Page 2 of 4

**1.      Facts or allegations contained in the cease and desist order or the notice of intent that you admit (with specific reference to the paragraph number in the order):**

Please see Attachment C for specific responses to each allegation contained in the Notice of Intent to

Commence Cease and Desist Order and Administrative Penalty Proceedings (No. V-9-26-0063)

("Notice").

_____

_____

_____

_____

_____

**2.      Facts or allegations contained in the cease and desist order or notice of intent that you deny (with specific reference to paragraph number in the order):**

Please see Attachment C for specific responses to each allegation contained in the Notice.

_____

_____

_____

_____

_____

_____

Sable Offshore Corp.
06/10/2026
Page 3 of 4

_____

_____

_____

**3.    Facts or allegations contained in the cease and desist order or notice of intent of which you have no personal knowledge (with specific reference to paragraph number in the order):**

Please see Attachment C for specific responses to each allegation contained in the Notice.

_____

_____

_____

_____

_____

**4.    Other facts which may exonerate or mitigate your possible responsibility or otherwise explain your relationship to the possible violation (be as specific as you can; if you have or know of any document(s), photograph(s), map(s), letter(s), or other evidence that you believe is/are relevant, please identify it/them by name, date, type, and any other identifying information and provide the original(s) or (a) copy(ies) if you can:**

Please see Attachment A for a narrative explanation of Sable's conduct and position with respect to the

alleged Coastal Act violations.  Please see Attachment D for documents and evidence supporting

(i) Sable's narrative explanation in Attachment A and (ii) specific responses to the Notice's allegations in

Attachment C.

_____

_____

_____

Sable Offshore Corp.
06/10/2026
Page 4 of 4

**5.**      **Any other information, statement, etc. that you want to offer or make:**

Please see Attachment A for a narrative explanation of Sable's conduct and position with respect to the

alleged Coastal Act violations.

**6.**      **Documents, exhibits, declarations under penalty of perjury or other materials that you have attached to this form to support your answers or that you want to be made part of the administrative record for this enforcement proceeding (Please list in chronological order by date, author, and title, and enclose a copy with this completed form):**

Please see Attachment A for a narrative explanation of Sable's conduct and position with respect to the

alleged Coastal Act violations.  Please see Attachment D for documents and evidence supporting

(i) Sable's narrative explanation in Attachment A and (ii) specific responses to the Notice's allegations in

Attachment C.

**Attachment C**

**Responses to Notice of Intent to Commence Cease and Desist Order and Administrative Penalty Proceedings**

This Attachment C responds to each statement in Coastal Commission staff's June 9, 2026, Notice of Intent to Commence Cease and Desist Order and Administrative Penalty Proceedings ("Notice"). Specifically, this Attachment C addresses Statement of Defense Form (attached as Attachment B) questions 1, 2, and 3, which direct Sable to identify facts or allegations contained in the Notice that Sable admits, denies, or for which Sable lacks any personal knowledge. The Statement of Defense Form also requests that each response includes a specific reference to a paragraph number from the Notice. Accordingly, the Notice has been copied in full below and separated into individual "Paragraphs." Each "Paragraph" statement refers to a direct quote from the Notice. Each "Response" statement responds to the immediately preceding Paragraph statement and is numbered accordingly.

| | |
|---|---|
| ***Paragraph 1.*** | *Subject: Notice of Intent to Commence Cease and Desist Order and Administrative Penalty Proceedings* |
| | *Violation No.: V-9-26-0063* |
| ***Response 1.*** | Paragraph 1 speaks for itself, and no further response is required. Sable Offshore Corp. ("Sable") denies all allegations of Coastal Act violations set forth in the Notice and, for that reason, denies that the Coastal Commission ("Commission") possesses the authority to issue any Cease and Desist Order or Administrative Penalty. Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial. |
| ***Paragraph 2.*** | *Location: The properties that are subject to this order are the properties wherein the portions of the Las Flores Pipelines, CA-324 and CA-325, that lie within the Coastal Zone are located, between the Gaviota coast and the Los Padres National Forest, all within Santa Barbara County.* |
| ***Response 2.*** | Sable confirms that Segments CA-324 and CA-325 of the Santa Ynez Pipeline System traverse properties located in Santa Barbara County between the Gaviota coast and the Los Padres National Forest within the Coastal Zone. |
| ***Paragraph 3.*** | *Violation[1] Description: Unpermitted development in the form of reactivation of the Las Flores Pipelines, CA-324 and CA-325, after more than five years of those pipelines being idled, inactive, and out of service.* |

---

[1] Please note that the description herein of the violations at issue is not a complete list of all development on the subject property that is in violation of the Coastal Act and/or the County of Santa Barbara LCP that is of concern to the Commission. Accordingly, you should not treat the Commission's silence regarding (or failure to address) other development on the properties as indicative of Commission acceptance of or acquiescence to such development. Please also note that "violation" as used in this letter refers to alleged violations of the Coastal Act and/or the County of Santa Barbara LCP, as identified by Commission staff.

1

**Response 3.**     Sable denies all allegations of Coastal Act violations and unpermitted development, denies that the Commission possesses the authority to issue any Cease and Desist Order or Administrative Penalty, and further denies each and every allegation contained in Paragraph 3. Sable further denies that Section 30262, subd. (b)(2)-(4), of the Coastal Act apply retroactively.  Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.

**Paragraph 4.**     *Dear Mr. Rusch: I am directing this notice to you, Steve Rusch, as Vice President of Regulatory & Environmental Affairs for Sable Offshore Corporation and an authorized representative of Pacific Pipeline Company (collectively, "Sable"). I am notifying you, as is provided for in Section 13181(a) of the California Coastal Commission's ("Commission's") regulations (Title 14, Division 5.5 of the California Code of Regulations), of my intent to commence proceedings for issuance by the Commission of a Cease and Desist Order to Sable and imposition of an Administrative Penalty to Sable to address the Coastal Act[2] violations identified above, which would include a direction to cease and desist from the active use of the portions of the Las Flores Pipelines, CA-324 and CA-325 (collectively, the "Pipelines"), that lie within the Coastal Zone for the transport of oil until a Coastal Development Permit ("CDP") authorizing reactivation of the Pipelines is secured.*

**Response 4.**     Sable confirms that Steve Rusch is the Vice President of Regulatory & Environmental Affairs for Sable Offshore Corporation and an authorized representative of Pacific Pipeline Company.  Sable denies all allegations of Coastal Act violations and unpermitted development, denies that the Commission possesses the authority to issue any Cease and Desist Order or Administrative Penalty, and further denies each and every allegation contained in Paragraph 4.  Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.

**Paragraph 5.**     *As you are aware, these violations can be resolved amicably by collaborating with staff to come to a consensual resolution of the Coastal Act violations at issue and entering into a Consent Cease and Desist Order and Consent Administrative Penalties (collectively, "Consent Orders"). If you would like to pursue a consent resolution including a commitment to apply for a CDP, please contact Liam Stowe of my staff at the contact information at the end of this letter, by COB June 12. However, if such a settlement is not possible, we will be forced to resolve this violation through the proposal of unilateral orders at a hearing, as we have before against Sable. In the meantime, as is also explained below, as long as the violation persists, Sable's exposure to the potential for the assessment of penalties for the Coastal Act violations continues to accrue by operation of law.*

**Response 5.**     Sable denies all allegations of Coastal Act violations and unpermitted development, denies that the Commission possesses the authority to issue any Cease and Desist Order or Administrative Penalty, and further denies each and every allegation contained in Paragraph 5. Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial. For those reasons, Sable also denies that any consent resolution, settlement, or agreement to apply for a coastal development permit is appropriate here.  On June 12, 2026, Sable provided an initial written response to the Notice and confirmed that the exact legal issues raised in the

---

[2] As you know, the Coastal Act is codified at California Public Resources Code sections 30000 *et seq.* All further references to Coastal Act sections are to sections of that code.

2

Notice already are the subject of ongoing litigation between Sable and the State of California. See *Pacific Pipeline Company v. State of California, et al.* (E.D. Cal., Case No. 1:26-cv-01486-KES-CDB). In that ongoing litigation, there is currently a pending motion for leave to file an amended complaint to, among other things, add the Coastal Commission as a defendant. Sable therefore requested that the Notice be held in abeyance or withdrawn until the court rules on the pending motion to add the Coastal Commission as a defendant, at which point the matters raised in the Notice would be squarely before the court and appropriately resolved in that forum. This approach would help to preserve the Coastal Commission's limited resources as well as Sable's resources necessary to prepare a Statement of Defense. On June 19, 2026, Commission staff denied Sable's request, and therefore Sable was forced to prepare this response.

## I.      Background

**Paragraph 6.**    *As noted in recent letters to Sable, pipelines CA-324 and CA-325 have been idled, inactive and out-of-service since the Refugio Oil Spill in 2015, and the reactivation of the Pipelines on March 14, 2026, constituted new or expanded development as defined in the Coastal Act that required Coastal Act authorization. Because no such authorization has been obtained, the reactivation of those Pipelines constituted violations of the Coastal Act.*

**Response 6.**    Documents and communications described in Paragraph 6 speak for themselves, and no further response is required. Sable denies that Segments CA-324 and CA-325 of the Santa Ynez Pipeline System ever were "idled, inactive and out-of-service," including after the Refugio Oil Spill in 2015, denies that resuming petroleum transportation through Segments CA-324 and CA-325 of the Santa Ynez Pipeline System constituted new or expanded development that required new or amended Coastal Act authorization, denies all allegations of Coastal Act violations and unpermitted development and further denies each and every allegation contained in Paragraph 6. Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.

**Paragraph 7**    *However, as you know, the instant violations are not an isolated event, and the complete enforcement history pertaining to Sable is extensive. The Coastal Act violations at issue in this Notice of Intent letter are part of an ongoing series of violations that Sable has instigated in recent years, with the reactivation of the Pipelines being the objective that prior violations were meant to facilitate. Thus, below is a brief summary of the enforcement and violation history as context.*

**Response 7**    Sable denies all allegations of Coastal Act violations and unpermitted development and further denies each and every allegation contained in Paragraph 7, including with respect to prior enforcement actions undertaken by the Commission against Sable. Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial of all allegations of Coastal Act violations related to the resumption of petroleum transportation through Segments CA-324 and CA-325 of the Santa Ynez Pipeline System. Please see Attachment D, Exhibit 2, "Sable Offshore Corp. – Statement of Defense and Response to Notice of Intent to Commence Proceedings for a Commission Cease and Desist Order, Restoration Order, and Administrative Penalty Order (Feb. 18, 2025)" (Mar. 10, 2025) ("2025 Statement of Defense"), Attachment A, Sections II-IV, for additional background and

3

support regarding Sable's denial of all allegations of Coastal Act violations previously made by the Commission in prior enforcement actions against Sable.

### a.       Enforcement History

*Paragraph 8.*      *Commission enforcement staff first learned of Sable's work on and around the Pipelines in September of 2024 and informed Sable that its unauthorized activities constituted violations of the Coastal Act via a Notice of Violation letter sent to Sable on September 27, 2024. The violations discussed in that letter included construction activities and disturbances to the surrounding environment taking place within the Coastal Zone, apparently connected with the proposed reactivation of the Pipelines. As that letter explained, these activities were not exempt from CDP requirements. Commission staff requested that Sable immediately cease all unpermitted development within the Coastal Zone, including all activities associated with the repair, upgrade, and proposed restart of CA-324 and CA-325, as well as any other development that might have been occurring along the Pipelines, on the offshore platforms, or along the pipelines leading from those offshore platforms to shore, and offered for Sable to work with the Commission to resolve the unpermitted development. To these ends, Commission staff stated that Sable must submit applications and obtain the requisite CDP authorization before further development may continue.*

*Response 8.*      Documents and communications described in Paragraph 8 speak for themselves, and no further response is required. Sable denies all allegations of Coastal Act violations and unpermitted development and further denies each and every allegation contained in Paragraph 8.  Please see Attachment D, Exhibit 2, "2025 Statement of Defense," Attachment A, Sections II-IV, for additional background and support regarding Sable's denial of all allegations of Coastal Act violations made by the Commission in prior enforcement actions against Sable.

*Paragraph 9.*      *In October 2024, Commission staff and Sable representatives engaged in a series of meetings and exchanged letters and emails regarding Sable's activities. During some interactions, Sable indicated an interest in cooperating with the Commission to resolve the Coastal Act violations. However, staff continued to receive reports of ongoing work, and Sable refused to commit to apply for CDPs to permit its work.*

*Response 9.*      Documents and communications described in Paragraph 9 speak for themselves, and no further response is required. Sable denies all allegations of Coastal Act violations and unpermitted development and further denies each and every allegation contained in Paragraph 9. Please see Attachment D, Exhibit 2, "2025 Statement of Defense," Attachment A, Sections II-IV, for additional background and support regarding Sable's denial of all allegations of Coastal Act violations made by the Commission in prior enforcement actions against Sable.  In particular, as Sable has stated and confirmed explicitly in writing to Commission staff, Sable stopped work along Segments CA-324 and CA-325 within the Coastal Zone on October 4, 2024, in order to engage in cooperative discussions with Commission staff.  See Attachment D, Exhibit 2, "2025 Statement of Defense," Attachment D, Document No. 51.  Sable did not engage in additional work involving Segments CA-324 and CA-325 until it was authorized to do so in connection with the implementation of an Interim Restoration Plan as authorized by Executive Director Cease and Desist Order (EDCDO) No. ED-

4

24-CD-02.  See Attachment D, Exhibit 2, "2025 Statement of Defense," Attachment D, Document No. 58.

**Paragraph 10.**     *As a result, on November 12, 2024, I issued an Executive Director Cease and Desist Order ("EDCDO") under the authority granted to me by Section 30809(a) of the Coastal Act to address situations where an entity has undertaken, or is threatening to undertake, development that may require a CDP without first securing a CDP. The EDCDO was issued in response to Sable's failure to satisfactorily provide the assurances and information requested in my October 4, 2024, letter, including its failure to provide written confirmation of its commitment to apply for an "after the fact" ("ATF") CDP(s) for work previously undertaken within the Coastal Zone. In this EDCDO, in addition to directing Sable to cease unpermitted development, I also directed Sable to complete an Interim Restoration Plan to safely secure the sites, to apply for an ATF CDP for all work previously undertaken along the Pipelines, and to apply for a future CDP(s) to cover the remaining proposed work. As an accommodation, I granted 120 days from the issuance of the EDCDO for Sable to apply for requisite CDPs. Sable ceased some of its activities, and on December 20, 2024, Sable successfully completed the Interim Restoration Plan. However, around this same time—and unknown to Commission staff at the time—Sable shifted its pipeline-related operations offshore, where it carried out additional development activities also without the benefit of a CDP. The EDCDO expired on February 10, 2025, 90 days from the date of issuance, by operation of law.*

**Response 10.**     Documents and communications described in Paragraph 10 speak for themselves, and no further response is required. Sable denies that it failed to provide the information requested in Commission staff's October 4, 2024, letter or provide written confirmation as to its commitment to apply for an ATF CDP. As addressed more fully in Attachment D, Exhibit 2, "2025 Statement of Defense," Attachment A, Sections II-III, Sable provided the information requested in the October 4, 2024, letter to Commission staff on October 8, 2024.  Sable provided additional information in response to staff's requests on October 11, 2024.  On October 22, 2024, Sable submitted a written request asking that Commission staff authorize it to complete interim restoration work to alleviate the risk of immediate environmental harm resulting from Sable's work stoppage in compliance with the Commission's September 27, 2024, Notice of Violation and October 4, 2024, letter.  After extensive, collaborative discussions with Commission staff, staff issued the November 12, 2024, EDCDO to allow such work to occur.  Sable also informed Commission staff that it was evaluating historic approvals and authorizations to determine whether an ATF CDP or other Coastal Act authorization would be required to authorize Sable's work on Segments CA-324 and CA-325 within the Coastal Zone. Sable prepared, submitted, obtained Commission staff approval for, and implemented an Interim Restoration Plan as required by the EDCDO on December 20, 2024.  As described in Attachment D, Exhibit 2, "2025 Statement of Defense," Attachment A, Sections II-III, Sable submitted applications and materials regarding its repair and maintenance activities on Segments CA-324 and CA-325 within the Coastal Zone to Santa Barbara County on November 22, 2024, and December 5, 2024, for the County's review and consideration of whether a new or amended CDP would be required.

Regarding claims of unpermitted development on the offshore segments of the Santa Ynez Pipeline System ("Offshore SYPS Segments"), between November 29 and December 1, 2024, Sable placed sand-cement bags beneath certain portions of the

Offshore SYPS Segments on the seafloor consistent with work previously authorized by both federal approvals and an existing Coastal Development Permit, No. E-88-1 ("Offshore CDP") previously issued by the Commission for those the Offshore SYPS Segments. Sable denies all allegations of unpermitted development and further denies each and every remaining allegation contained in Paragraph 10. Please see Attachment D, Exhibit 2, "2025 Statement of Defense," Attachment A, Sections II-IV, for additional background and support regarding Sable's denial of all allegations of Coastal Act violations made by the Commission in prior enforcement actions against Sable.

**Paragraph 11.**     *Two days later, on February 12, 2025, Santa Barbara County ("County") Planning staff issued two letters taking the position that Sable's work on and around the Pipelines was authorized by permits from the 1980s. The County did not assert that authorization was provided regarding the development activities carried out for the separate offshore pipelines. On February 14, Commission enforcement staff sent a letter to the County disputing its conclusion regarding the Pipelines and objecting to its letters. On that same day, we also received a lengthy letter from Sable, presenting its arguments in support of the County's conclusion and providing word that Sable had recommenced work. In response, on February 16, 2025, I provided Sable with notice of my intention to issue a new EDCDO, again giving Sable the opportunity to provide satisfactory assurances that it would cease all unpermitted development until adequate CDPs are validly issued. In this letter, I responded to arguments that Sable submitted on February 14. Additionally, I explained why Commission staff continued to believe that Sable's proposed activities lacked the necessary Coastal Act authorization. I directed Sable to confirm in writing by February 17, 2025, that Sable would cease all development as described in, and subject of, that letter unless and until Sable demonstrated, to my satisfaction, that it already possesses the necessary Coastal Act authorization for the work, which Sable failed to do.*

**Response 11.**     Documents and communications described in Paragraph 11 speak for themselves, and no further response is required. As explained in Sable's February 14, 2025 letter to Commission staff, the County expressly confirmed that Sable's anomaly repair and maintenance work on Segments CA-324 and CA-325 was "authorized by the existing permits (Final Development Plan, Major Conditional Use Permit, and associated Coastal Development Permits [(the "Onshore CDPs")]) and was analyzed in the prior Environmental Impact Report/Environmental Impact Statement" for Segments CA-324 and CA-325 within the County, and therefore "no further application to or action by the County is required." See Attachment D, Exhibit 2, "2025 Statement of Defense," Attachment D, Document Nos. 84 & 86. Sable resumed its anomaly repair work on Segments CA-324 and CA-325 only after receiving this confirmation from the County that no further Coastal Act or other authorization was needed. Sable denies that the County of Santa Barbara could have made any assertion as to any work performed on the Offshore SYPS Segments, which was authorized pursuant to the Offshore CDP that separately was issued by the Coastal Commission rather than the County. Sable denies all allegations of Coastal Act violations and unpermitted development and further denies each and every allegation contained in Paragraph 11. Please see Attachment D, Exhibit 2, "2025 Statement of Defense," Attachment A, Sections II-IV, for additional background and support regarding Sable's denial of all allegations of Coastal Act violations made by the Commission in prior enforcement actions against Sable.

6

**Paragraph 12.** *On February 17, 2025, I received a letter from Sable reiterating its position that Sable's work "does not constitute a violation of the Coastal Act or the County's LCP because it is authorized under the pipelines' existing CDPs and other approvals." Further, Sable stated that it "intends to proceed with anomaly repair work" without further Coastal Act authorization.*

**Response 12.** Documents and communications described in Paragraph 12 speak for themselves, and no further response is required. Sable denies that it stated it intended to proceed with anomaly repair work "without further Coastal Act authorization." Please see Attachment D, Exhibit 2, 2025 Statement of Defense, Attachment D, Document 89. Sable's February 17, 2025, letter stated that "Sable intends to proceed with the anomaly repair work authorized by the County in its February 12, 2025, letter." Sable denies all allegations of Coastal Act violations and unpermitted development and further denies each and every allegation contained in Paragraph 12. Please see Attachment D, Exhibit 2, "2025 Statement of Defense," Attachment A, Sections II-IV, for additional background and support regarding Sable's denial of all allegations of Coastal Act violations made by the Commission in prior enforcement actions against Sable.

**Paragraph 13.** *Therefore, on February 18, 2025, I issued a second EDCDO along with a Notice of Intent to Commence Proceedings for a Commission Cease and Desist Order, Restoration Order, and Administrative Penalty Order, likely at the Commission's April or May 2025 meeting. The EDCDO directed Sable to cease further work along the Pipelines and the immediately surrounding areas unless and until authorized by a new CDP. Furthermore, the EDCDO reiterated Commission staff's resolve to address the unpermitted development through negotiations with Sable's representatives and to work on a consensual resolution. Unfortunately, following the issuance of the second EDCDO, Sable disregarded the order, continued work unabated, and failed to collaborate towards Consent Orders.*

**Response 13.** Documents and communications described in Paragraph 13 speak for themselves, and no further response is required. Sable denies that the Commission possessed the authority to issue any Cease and Desist Order, including the EDCDO, in the Commission's prior enforcement proceedings against Sable, denies all allegations of Coastal Act violations and unpermitted development, and further denies each and every remaining allegation contained in Paragraph 13. As set forth in the County's February 12, 2025, letter, Sable applied for Coastal Act authorizations from the County and the County confirmed that "no further application to or action by the County is required" for Sable to proceed with the proposed work. Please see Attachment D, Exhibit 2, "2025 Statement of Defense," Attachment A, Sections II-IV, for additional background and support regarding Sable's denial of all allegations of Coastal Act violations made by the Commission in prior enforcement actions against Sable. Sable further denies that it "failed to collaborate towards Consent Orders." As Commission staff's March 28, 2025, Staff Report acknowledged, Sable's representatives meaningfully engaged with Commission staff in March 2025 "in hopes of finding an amicable resolution" and "Commission staff [] worked exhaustively with Sable in an effort to find an agreeable path forward … but, unfortunately, [were] unable to reach any such agreement." See Attachment D, Exhibit 3, "Staff Report: Recommendations and Findings for Cease and Desist Order, Restoration Order, and Administrative Civil Penalty" (Mar. 28, 2025), p. 10.

*Paragraph 14.*     *Also on February 18, 2025, before I issued the second EDCDO, Sable sued the Commission. In the lawsuit, Sable alleged that the Notices of Violation and first EDCDO were illegal and constituted a taking of Sable's property. All of Sable's claims have since been rejected by the Santa Barbara Superior Court, but to date, that lawsuit is ongoing in the trial court due to the Commission's cross-complaint.*

*Response 14.*     On February 18, 2025, Sable brought suit against the Commission, challenging the Commission's prior enforcement actions against Sable.  A trial date is set for February 2027 and discovery is ongoing.  Paragraph 14 characterizes the Santa Barbara Superior Court's record of proceedings, which speaks for itself, and no further response is required.  Sable reserves all rights to continue challenging the Commission's prior enforcement actions against Sable in litigation, including on appeal.  Sable denies each and every remaining allegation contained in Paragraph 14. Please see Attachment D, Exhibit 2, "2025 Statement of Defense," Attachment A, Sections II-IV, for additional background and support regarding Sable's denial of all allegations of Coastal Act violations made by the Commission in prior enforcement actions against Sable.

*Paragraph 15.*     *On March 10, 2025, Sable submitted its statement of defense ("SOD") form contending that Sable's activities were not in violation of the County's Coastal Zone Ordinance, certified Local Coastal Program ("LCP"), or Coastal Act. The arguments that Sable presented in this SOD were wide-ranging, including an argument that the retrofitting of the Pipelines in 2024-2025 with new technology was envisioned by the Final Development Plan and CDPs that its predecessor acquired in the 1980s authorizing the construction of the Pipelines. The SOD further contended that the Commission failed to adequately obtain enforcement jurisdiction and that the Commission's exercise of its statutorily granted authority violated Constitutional law.*

*Response 15.*     Documents and communications described in Paragraph 15 speak for themselves, and no further response is required.  Sable denies all allegations of Coastal Act violations and unpermitted development and further denies each and every remaining allegation contained in Paragraph 14. Please see Attachment D, Exhibit 2, "2025 Statement of Defense," Attachment A, Sections II-IV, for additional background and support regarding Sable's denial of all allegations of Coastal Act violations made by the Commission in prior enforcement actions against Sable.

*Paragraph 16.*     *On April 10, 2025, the Commission heard and considered recommendations from staff for a Cease and Desist Order, Restoration Order, and Administrative Civil Penalty, along with comments made by many members of the public and elected representatives. The Commission also considered material and oral presentations as presented by Sable and its representatives for an equal time compared to Commission staff's presentation. The onshore violations presented at the hearing included excavation with heavy equipment; removal of major vegetation; grading and widening of roads; installation of metal plates and other fill material within wetlands; dewatering and discharge of water; pipeline removal, replacement, and reinforcement; installation of shutoff valves; and other development associated with the prospective reactivation of CA-324 and CA-325. Offshore, alleged violations included placing sand and cement bags on the seafloor below and adjacent to out-of-service offshore oil and water pipelines without Coastal Act authorization, also as part of efforts to reactivate offshore oil extraction operations. Sable presented*

8

*countervailing arguments; however, after the full public hearing and testimony and documents received from Sable, Sable's counsel, elected representatives, and the public, the Commission issued the proposed Cease and Desist Order ("CDO") and Restoration Order, and it assessed an Administrative Penalty of $18,022,500 (collectively, the "April 10 Orders"). Pertinently to the violations discussed in this June 9, 2026, letter, Section 1.1 of the CDO prohibits Sable from performing any further development, as that term is defined in the Coastal Act, anywhere along the Santa Ynez Unit, including the Pipelines, unless Sable first secured Coastal Act authorization or confirmation that the work is exempt.*

**Response 16.**    Documents, communications, and the records of proceedings described in Paragraph 16 speak for themselves, and no further response is required. Sable denies all allegations of Coastal Act violations and unpermitted development and further denies each and every allegation contained in Paragraph 16. Please see Attachment D, Exhibit 2, "2025 Statement of Defense," Attachment A, Sections II-IV, for additional background and support regarding Sable's denial of all allegations of Coastal Act violations made by the Commission in prior enforcement actions against Sable. Sable further denies the Notice's apparent assertion that Sable's resumption of petroleum transportation through Segments CA-324 and CA-325 somehow violates the CDO, as the resumption of petroleum transportation does not constitute "development" as that term was defined under the Coastal Act as of the date the CDO was issued.

**Paragraph 17.**    *Sable failed to comply with any of the April 10 Orders, and on April 16, the Commission filed a cross-complaint to enforce the CDO. In May of 2025, the trial court granted the Commission's request for a preliminary injunction prohibiting further development in violation of the CDO. That preliminary injunction remains in effect to date.*

**Response 17.**    Documents, communications, and records of proceedings described in Paragraph 17 speak for themselves, including without limitation the scope of the trial court's preliminary injunction, and no further response is required. Sable denies all allegations of Coastal Act violations and unpermitted development and further denies each and every allegation contained in Paragraph 17. Please see Attachment D, Exhibit 2, "2025 Statement of Defense," Attachment A, Sections II-IV, for additional background and support regarding Sable's denial of all allegations of Coastal Act violations made by the Commission in prior enforcement actions against Sable.

**b.    Violation History**

**Paragraph 18.**    *On February 18, 2026, I issued a letter to you, Mr. Rusch, reminding you of the Commission's independent authority over any reactivated use of the Pipelines, which had been idled, inactive and out of service for more than five years. This letter emphasized that reactivation of idled, inactive or out of service facilities such as pipelines CA-324 and CA-325 would constitute expanded oil extraction and new or expanded development requiring a coastal development permit that is consistent with the standards in Coastal Act section 30262. Thus, Sable would be required to apply for and receive from the Commission a valid CDP consistent with the standards in that section to reactivate the Pipelines to resume the transport of oil.*

**Response 18.**    Documents and communications described in Paragraph 18 speak for themselves, and no further response is required. Sable denies all allegations of Coastal Act violations

9

and unpermitted development and further denies each and every allegation contained in Paragraph 18. Sable further denies that Section 30262, subd. (b)(2)-(4), of the Coastal Act apply retroactively.  Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.

**Paragraph 19.**    *On March 5, 2026, Sable's representative acknowledged receipt of the February 18 letter and argued that the relevant law, including Section 30262(b) of the Coastal Act, did not apply to CA-324 and CA-325. The acknowledgement also stated that issues presented in the Commission's letter were being actively litigated in the Pacific Pipeline Co. v. State of California case (E.D. Cal. Case No. 1:26-CV-01486-KES-CDB).*

**Response 19.**    Documents and communications described in Paragraph 19 speak for themselves, and no further response is required.  Sable denies all allegations of Coastal Act violations and unpermitted development and further denies each and every allegation contained in Paragraph 19. Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.

**Paragraph 20.**    *On March 13, 2026, United States Secretary of Energy Chris Wright issued an order entitled "Pipeline Capacity Prioritization and Allocation Order," purportedly pursuant to the Defense Production Act of 1950 (50 U.S.C. § 4501). This order (the "DPA Order") directed Sable to, among other things, "immediately commence performance under contracts or orders for services . . . for hydrocarbon transportation capacity in the [Santa Ynez Pipeline System] . . ., including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California."*

**Response 20.**    Documents and communications described in Paragraph 20 speak for themselves, and no further response is required.

**Paragraph 21.**    *Soon thereafter, Sable issued a press release, conceding that the company had reactivated CA-324 and CA-325 by stating that it had resumed oil flow through the Pipelines on March 14, 2026, as a result of the DPA Order, resuming transportation of oil from Las Flores Canyon to the Pentland Station for the first time since such transportation had been halted in 2015.[3] In doing so here as well as elsewhere, Sable has unequivocally confirmed that the Pipelines have been reactivated in 2026, after being idled, inactive, or out of service since May 19, 2015.*

**Response 21.**    Documents and communications described in Paragraph 21 speak for themselves, and no further response is required. Sable denies all allegations of Coastal Act violations and unpermitted development and further denies each and every allegation contained in Paragraph 21. Sable further denies that Segments CA-324 and CA-325 were "reactivated in 2026[] after being idled, inactive, or out of service since May 19, 2015."  Specifically, Segments CA-324 and CA-325 have remained part of an "active" pipeline system under applicable federal regulations even while petroleum

---

[3] During proceedings before Judge Geck on January 7, 2026, in Center for Biological Diversity, *et al. v. California Dep't of Forestry and Fire Protection*, Santa Barbara Co. Superior Court Case No. 25CV02244 ("*CBD v. CalFIRE*"), counsel for Sable confirmed that no oil had yet been re-introduced into Segments CA-324 and CA-325 of the Santa Ynez Pipeline System as of that date. Transcript of hearing at p. 18-19.

10

transportation temporarily was paused.  Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.

***Paragraph 22.***   *On March 19, 2026, I issued you a letter stating that the reactivation of lines CA-324 and CA-325 constituted development that lacked the requisite Coastal Act authorization, and that as a result, the Commission would need to explore potential enforcement actions. The letter also reminded Sable of existing injunctions either prohibiting such development or specifically prohibiting restart of the Pipelines prior to securing all necessary approvals. The letter also acknowledged the DPA Order but noted that it could not and did not absolve Sable of the above-referenced legal obligations.[4]*

***Response 22.***   Documents, communications, and records of proceedings described in Paragraph 22 speak for themselves, and no further response is required.  Sable denies all allegations of Coastal Act violations and specifically denies that resuming petroleum transportation through Segments CA-324 and CA-325 of the Santa Ynez Pipeline System constitutes development under the Coastal Act.  Sable further denies each and every remaining allegation contained in Paragraph 22. Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.  In addition, Paragraph 22 characterizes other legal proceedings and the Defense Production Act order issued by the U.S. Secretary of Energy to Sable on March 13, 2026, and contains the Commission's proffered legal conclusions, to which no response is required.

***Paragraph 23.***   *On March 20, 2026, Sable's representative acknowledged receipt of the March 19 letter and restated that the arguments made in the previous letters to Sable are the subject of ongoing litigation. Sable's representative also referred to the company's March 16, 2026, Form 8-K filing for recent developments concerning the Pipelines.*

***Response 23.***   Documents and communications described in Paragraph 23 speak for themselves, and no further response is required.  Sable denies each and every remaining allegation contained in Paragraph 22.

## II.   Violations of the Coastal Act

***Paragraph 24.***   *Section 30600(a) of the Coastal Act requires that any development occurring within the Coastal Zone must first be authorized by an approved CDP, unless an exclusion or exemption applies. Section 30106 of the Coastal Act, and as incorporated into the County's certified LCP, defines "development" as:*

> *"Development" means, on land, in or under water, the placement or erection of any solid material or structure; discharge or disposal of any dredged material or of any gaseous, liquid, solid, or thermal waste; grading, removing, dredging, mining, or extraction of materials; change in the density or intensity of use of land, ... change in the intensity of use of water, or of access thereto; construction,*

---

[4] The legal limitations of the DPA Order are discussed at length in multiple briefs and pleadings of which you are no doubt aware, including the Complaint filed by the State of California in *State v. Wright*, C.D. Cal. Case No. 2:26-cv-3396, and briefing related to Sable's motion to dissolve or modify the injunction imposed by Judge Geck in *CBD v. CalFIRE*. In fact, the latter case is the only one in which a court has so far addressed the substantive question of the limits of the DPA Order. In its April 17, 2026, ruling, that court confirmed that the DPA Order "does not permit the violation of applicable state regulatory law."

*reconstruction, demolition, or alteration of the size of any structure… and the removal or harvesting of major vegetation other than for agricultural purposes, kelp harvesting, and timber operations . . . "*

**Response 24.**   Paragraph 24 quotes and characterizes provisions of the Coastal Act, which speak for themselves, and no further response is required.  Sable denies all allegations of Coastal Act violations and unpermitted development and further denies each and every remaining allegation contained in Paragraph 24. Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.

**Paragraph 25.**   *Section 30262(b) of the Coastal Act further clarifies that:*

*"(2) Repair, reactivation, and maintenance of an oil and gas facility, including an oil pipeline, that has been idled, inactive, or out of service for five years or more shall be considered a new or expanded development requiring a new coastal development permit consistent with this section.*

*(3) Development associated with the repair, reactivation, or maintenance of an oil pipeline that has been idled, inactive or out of service for five years or more requires a new coastal development permit consistent with this section.*

*(4) The commission or local government with a certified local coastal program shall review and approve, modify, condition, or deny the permit based on the requirements of this section."*

**Response 25.**   Paragraph 25 quotes and characterizes provisions of the Coastal Act, which speak for themselves, and no further response is required.  Sable denies all allegations of Coastal Act violations and unpermitted development and denies each and every remaining allegation contained in Paragraph 25. Sable further denies that Section 30262, subd. (b)(2)-(4), of the Coastal Act apply retroactively.  Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.

**Paragraph 26.**   *Under Section 30106, change of intensity of land use constitutes development, such that a CDP must be obtained. Additionally, Section 30262(b) of the Coastal Act clarifies reactivation of pipelines that have been idled, inactive, or out of service for five years or more is development requiring a new CDP consistent with that section. The standards applied under the Coastal Act to protect coastal resources are distinct from those applied by the Pipeline and Hazardous Materials Safety Administration (PHMSA). Under PHMSA regulations, a pipeline is either "active" or "abandoned." These regulations are explicitly created to promote pipeline safety. However, Section 30262(b) of the Coastal Act deploys the terms "idled," "inactive," or "out of service." Despite federal pipeline safety law defining certain similar terms, the Coastal Act is not limited to using the terminology or definitions employed in the federal law. Moreover, the Coastal Act's use of three different terms highlights the Legislature's intent that these terms not be interpreted as analogous to abandonment under federal law, and their inclusion in the Coastal Act was specifically intended to safeguard coastal resources rather than ensure pipeline safety. Therefore, applying the binary of active pipelines versus abandoned pipelines under PHMSA regulation would be inappropriate here, as Section 30262(b) allows the Commission to apply distinct terminology where an idled, inactive, or out of service pipeline may be*

12

*different than an abandoned pipeline under PHMSA regulations without the two laws conflicting.*

**Response 26.**    Paragraph 26 consists of Commission staff's proffered legal conclusions and characterizations of provisions of the Coastal Act and federal pipeline safety regulations, to which no response is required. Sable denies that resuming petroleum transportation through Segments CA-324 and CA-325 of the Santa Ynez Pipeline System constituted a change in the intensity of land use requiring a coastal development permit, denies that Section 30262, subd. (b)(2)-(4) applies to Segments CA-324 and CA-325 of the Santa Ynez Pipeline System, and denies each and every remaining allegation contained in Paragraph 26. Sable further denies that the plain text of Section 30262, subd. (b)(2)-(4), or any legislative history related to the adoption of Senate Bill 237, demonstrate or otherwise suggest a legislative intent to grant the Commission authority to regulate interstate pipelines pursuant to or define terms that are distinct from those used in applicable federal regulations. Sable also denies that Section 30262, subd. (b)(2)-(4), of the Coastal Act apply retroactively. Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.

**Paragraph 27.**    *In the present case, following the events of the 2015 Refugio Oil Spill, any remaining hydrocarbon product within CA-324 and CA-325 was removed. Next, the pipelines were purged with Nitrogen gas, capped, and remained out of service and not used for the transportation of oil for nearly eleven years.*

**Response 27.**    Sable admits that petroleum transportation through the Santa Ynez Pipeline System was paused in 2015 and resumed on May 15, 2025, when Sable resumed petroleum transportation through the Offshore SYPS Segments. Sable resumed petroleum transportation through Segments CA-324 and CA-325 on March 14, 2026, pursuant to and in compliance with the DPA Order. Between 2015 and March 14, 2026, Segments CA-324 and CA-325 were filled with an inert nitrogen gas and maintained in an active state under applicable federal regulations promulgated by PHMSA. Sable denies that Segments CA-324 and CA-325 of the Santa Ynez Pipeline System were "out of service" from 2015 to March 2026. Sable further denies all allegations of Coastal Act violations, unpermitted development, and each and every remaining allegation contained in Paragraph 27. Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.

**Paragraph 28**    *Section 30262(b) clarified that reactivation of a pipeline that has been idled, inactive, or out of service for more than five years constitutes development. This law took effect on January 1, 2026. It applies to all pipelines that were (1) repaired, reactivated, or maintained on or after January 1, 2026; and (2) were idled, inactive, or out of service for five years or more as of or after January 1, 2026. The law does not apply retroactively, as it does not look back to regulate pipelines that reactivated prior to January 1; however, it does apply to pipelines that have been reactivated post January 1 after being idled, inactive, or out of service for a period of five years.*

**Response 28**    Paragraph 28 characterizes and contains Commission staff's proffered legal conclusions regarding provisions of the Coastal Act, which speak for themselves, and no further response is required. For the reasons described in Attachment A, Section III.B, Sable denies that the cited provisions of the Coastal Act apply retroactively or applies to "all pipelines that were (1) repaired, reactivated, or maintained on or after

13

January 1, 2026; and (2) were idled, inactive, or out of service for five years or more as of or after January 1, 2026." Sable further denies that Section 30262, subd. (b)(2)-(4), of the Coastal Act apply retroactively. Sable denies all allegations of Coastal Act violations and unpermitted development in Paragraph 28. Sable further denies each and every remaining allegation Paragraph 28. Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.

**Paragraph 29**       *In this case, Sable has admitted that it reactivated CA-324 and CA-325 on March 14, 2026. Furthermore, these Pipelines have not been in use or transported oil since 2015, a period of dormancy more than five years.*

**Response 29**       Sable admits that petroleum transportation through Segments CA-324 and CA-325 of the Santa Ynez Pipeline System was paused in 2015 and resumed on March 14, 2026, pursuant to and in compliance with the DPA Order. Sable denies that resuming petroleum transportation through Segments CA-324 and CA-325 constitutes "reactivat[ing]" those Segments within the meaning of Section 30262, subd. (b)(2)-(4), of the Coastal Act. Sable further denies that Section 30262, subd. (b)(2)-(4), of the Coastal Act apply retroactively. Sable denies that Segments CA-324 and CA-325 of the Santa Ynez Pipeline System were in "a period of dormancy" from 2015 to 2026. During that period, Segments CA-324 and CA-325 of the Santa Ynez Pipeline System were filled with an inert nitrogen gas, regularly inspected, and maintained in an active state under applicable federal regulations promulgated by PHMSA. Sable denies all allegations of Coastal Act violations and unpermitted development in Paragraph 29. Sable further denies each and every remaining allegation Paragraph 29. Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.

**Paragraph 30**       *While separate offshore pipelines, including the one that terminates at the Las Flores Canyon processing facility may have transported oil to that facility in May 2025 (also after our April 10 Orders were issued), such pipelines are distinct from the CA-324 and CA-325 pipelines.*

**Response 30**       Sable denies that the Segments of the Santa Ynez Pipeline System located offshore are distinct from Segments CA-324 and CA-325 of the Santa Ynez Pipeline System. As described more fully in Attachment A, Section III.B, Sable operates—and PHMSA regulates—the entire Santa Ynez Pipeline System, including the Offshore SYPS Segments and Segments CA-324 and CA-325, as a single integrated interstate pipeline system. Sable admits that it resumed petroleum transportation through the Santa Ynez Pipeline System in May 2025 (through the Offshore SYPS Segments). Sable denies all allegations of Coastal Act violations and unpermitted development in Paragraph 30. Sable further denies each and every remaining allegation Paragraph 30. Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.

**Paragraph 31**       *Sable has admitted that CA-324 and CA-325 remained inactive until the DPA order was issued, and once they were reactivated and oil transportation resumed, unpermitted development occurred under the Section 30262(b) definition.*

**Response 31**       Documents and communications described in Paragraph 31 speak for themselves, and no further response is required. Sable denies that Segments CA-324 and CA-325 of the Santa Ynez Pipeline System "remained inactive until the DPA order was issued"

14

within the meaning of "inactive" used in Section 30262, subd. (b)(2)-(4), of the Coastal Act. Sable denies that Segments CA-324 and CA-325 of the Santa Ynez Pipeline System were "reactivated" within the meaning of Section 30262, subd. (b)(2)-(4), of the Coastal Act. Sable denies that resuming petroleum transportation through Segments CA-324 and CA-325 of the Santa Ynez Pipeline System constituted unpermitted development under the Coastal Act. Sable denies all allegations of Coastal Act violations and unpermitted development in Paragraph 31. Sable further denies each and every remaining allegation Paragraph 31. Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.

**Paragraph 32.**   *As described above, unpermitted development occurred at the Properties in violation of the Coastal Act.*

**Response 32.**   Sable denies all allegations of Coastal Act violations and unpermitted development contained in Paragraph 32, and further denies each and every remaining allegation contained in Paragraph 32. Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.

## III.   Cease and Desist Orders

**Paragraph 33.**   *We hope that we will reach an amicable resolution to this matter by working towards a consensual agreement where Sable will stop the use of CA-324 and CA-325 for the transport of oil until a proper CDP addressing their reactivation is applied for and received. This letter is intended to facilitate the resolution here, whether we do so through a consent or unilateral action, in providing you with the notice required under the Commission's Regulations.*

**Response 33.**   Paragraph 33 characterizes Commission staff's position, which speaks for itself, and no further response is required. The legal conclusions stated in the Notice are already the subject of active litigation between Sable and the State of California, and there is a pending motion for leave in that litigation to, among other things, add the Commission as a defendant. Sable's initial response to the Notice on June 12, 2026, therefore requested that the Notice be withdrawn or held in abeyance until the court rules on the pending motion to add the Coastal Commission as a defendant, at which point the matters raised in the Notice would be squarely before the court and appropriately resolved in that forum. Commission staff declined Sable's reasonable request, and therefore Sable had no choice but to prepare this response. Sable denies that resuming petroleum transportation through Segments CA-324 and CA-325 of the Santa Ynez Pipeline System requires any new or amended Coastal Act authorization, denies all allegations of Coastal Act violations and unpermitted development, denies that either a consent order or unilateral enforcement order is warranted, and denies each and every remaining allegation contained in Paragraph 33. Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.

**Paragraph 34.**   *The Commission's authority to issue Cease and Desist Orders is set forth in Section 30810(a) of the Coastal Act, which states, in part:*

> *"If the commission, after public hearing, determines that any person . . . has undertaken, or is threatening to undertake, any activity that (1) requires a permit*

15

> *from the commission without securing the permit or (2) is inconsistent with any permit previously issued by the commission, the commission may issue an order directing that person . . . to cease and desist. The order may also be issued to enforce any requirements of a certified local coastal program . . . under any of the following circumstances:*
>
> *. . .*
>
> *(2) The commission requests and the local government ... declines to act, or does not take action in a timely manner, regarding an alleged violation which could cause significant damage to coastal resources."*

**Response 34.**   Paragraph 34 quotes Section 30810, subd. (a), of the Coastal Act, which speaks for itself, and no further response is required.

**Paragraph 35.**   *As to jurisdictional requirements, the Commission has jurisdiction to bring an enforcement order for two reasons. First, a portion of line CA-324 lies within the Commission's retained permitting jurisdiction. Thus, reactivation of that portion of line CA-324 required a permit from the Commission, and none was secured. Second, regarding the remainder of the line, the Commission has jurisdiction because the County of Santa Barbara has failed to act in a timely manner in response to Commission staff's request. Under Section 30810(a)(2) of the Coastal Act, the Commission may exercise jurisdiction in areas with a certified LCP if the Commission requests the local government to act and it declines or fails to do so in a timely manner. In this case, Commission staff asked the County to act in a letter dated March 27, 2026, and requested that the County communicate its decision by March 30, 2026. The County never even provided a response. Thus, it has failed to act in a timely manner, and given the gravity of this situation, the violation could cause significant damage to coastal resources. Therefore, enforcement in this case falls to the Commission.*

**Response 35.**   Sable lacks sufficient information to assess the Notice's claim that a portion of Segment CA-324 of the Santa Ynez Pipeline System lies within the Commission's retained permitting jurisdiction, and on that basis, denies the claim. Sable is unaware of any prior assertion by Commission staff, including as part of the Commission's prior enforcement actions against Sable, that any portion of Segment CA-324 lies within the Commission's retained jurisdiction or otherwise requires a permit from the Coastal Commission pursuant to that retained jurisdiction, and Sable therefore denies this new allegation in the Notice as unsupported by the record. Please see Attachment A, Section II.B, for a discussion of the County of Santa Barbara's issuance of a Final Development Plan and Coastal Development Permits for the construction and operation of Segments CA-324 and CA-325 of the Santa Ynez Pipeline System. As described therein, the County specifically found that the County's "Coastal Zoning Ordinance applies to all segments of the pipeline within the Coastal Zone as indicated on County maps." (See Attachment D, Ex. 2, 2025 Statement of Defense, Attachment D, Document 5, p. 49.)   Other documents and communications, including with the County, described in Paragraph 35, speak for themselves, and no further response is required.  Moreover, Sable lacks sufficient information as to alleged communications between Commission staff and the County, and on that basis, denies Paragraph 35's claims regarding those communications.  Paragraph 35 also includes Commission staff's characterizations and proffered legal conclusions regarding certain provisions

16

of the Coastal Act, which speak for themselves, and no further response is required. Sable denies all allegations of Coastal Act violations and unpermitted development, and further denies each and every remaining allegation contained in Paragraph 35. Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.

**Paragraph 36.**    *Section 30810(b) of the Coastal Act states that the Cease and Desist Order may be subject to such terms and conditions as the Commission determines are necessary to ensure compliance with the Coastal Act, including cessation of ongoing unpermitted development. In this case, unpermitted development includes the reactivation and continuing use of pipelines that, on January, 1, 2026, had been idled, inactive, and out of service for more than five years, and compliance may require that Sable cease operations of CA-324 and CA-325 in the Coastal Zone until a CDP has been obtained in compliance with the requirements of the Coastal Act.*

**Response 36.**    Paragraph 31 characterizes Section 30810, subd. (b), of the Coastal Act, which speaks for itself, and no further response is required.  Sable denies all allegations of Coastal Act violations and unpermitted development.  Sable further denies that Section 30262, subd. (b)(2)-(4), of the Coastal Act apply retroactively.  Sable denies that Segments CA-324 and CA-325 of the Santa Ynez Pipeline System are "pipelines that, on January 1, 2026, had been idled, inactive, and out of service for more than five years."  Sable denies that resuming and continuing petroleum transportation through Segments CA-324 and CA-325 of the Santa Ynez Pipeline System requires new or amended Coastal Act authorization.  Sable further denies each and every remaining allegation contained in Paragraph 36. Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.

**Paragraph 37.**    *In addition to the aforementioned items, any resolution of this matter via Consent Orders would also include settlement of monetary claims associated with your civil liability under the Coastal Act for these violations. If a consensual resolution is not reached, resolution of penalties under Section 30821.3 of the Coastal Act would be addressed unilaterally via Administrative Penalty Action, as described below.*

**Response 37.**    Sable denies that any monetary claims, civil liability, administrative penalties, or other penalties are warranted or available under the Coastal Act in connection with the allegations described in the Notice. Sable denies all allegations of Coastal Act violations and unpermitted development.  Sable further denies that unilateral administrative penalty proceedings under Section 30821.3 are warranted or appropriate and denies each and every remaining allegation contained in Paragraph 37. Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.

**IV    Administrative Civil Penalties, Civil Liability, and Exemplary Damages**

**Paragraph 38.**    *Under Section 30821.3 of the Coastal Act, in cases involving violations of provisions of the Coastal Act other than the public access provisions, the Commission is authorized to impose administrative civil penalties by a majority vote of the Commissioners present at a public hearing. In this case, as described above, the violation includes the reactivation, without the required CDP, of two oil pipelines that, as of January 1, 2026, were idled, inactive, or out of service for more than five years. This unpermitted development constitutes a non-access violation, such that*

17

*Section 30821.3 applies. The penalties imposed for violations of Sections 30821.3 may be in an amount up to $11,250 for each day that each violation has persisted or is persisting, for up to five (5) years. Further, the 60-day period that Sable had to cure the violation has lapsed, as Commission staff notified Sable of the unpermitted development on March 19, 2026; hence, the cure period lapsed on May 18, 2026.*

**Response 38.**    Paragraph 38 quotes and characterizes Section 30821.3 of the Coastal Act, which speaks for itself, and no further response is required. Sable denies all allegations of Coastal Act violations and unpermitted development. Sable denies that Segments CA-324 and CA-325 of the Santa Ynez Pipeline System were "as of January 1, 2026, [] idled, inactive, or out of service for more than five years." Sable denies that Section 30262, subd. (b)(2)-(4), apply retroactively. Sable denies that any application of Section 30821.3 is warranted or appropriate, denies that any administrative penalties may be imposed, denies that any alleged violation has persisted or is persisting, denies that any 60-day cure period was triggered or lapsed as alleged, and denies each and every remaining allegation contained in Paragraph 38. Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.

**Paragraph 39.**    *The Coastal Act also includes other penalty provisions that may be applicable as well. Section 30820(a)(1) provides for civil liability to be imposed on any person who performs or undertakes development without a CDP in an amount that shall not exceed $30,000 or be less than $500 for each instance of development that is in violation of the Coastal Act. Section 30820(b) provides that additional civil liability may be imposed on any person who performs or undertakes development without a CDP when the person intentionally and knowingly performs or undertakes such development. Civil liability under Section 30820(b) is to be imposed in an amount not less than $1,000 per day and not more than $15,000 per day, for each violation and for each day in which each violation persists. Section 30821.6 also provides that a violation of a Cease and Desist Order of the Commission can result in civil liabilities of up to $6,000 for each day in which each violation persists. Lastly, Section 30822 provides for additional exemplary damages for intentional and knowing violations of the Coastal Act or a Commission Cease and Desist Order.*

**Response 39.**    Paragraph 39 quotes and characterizes certain provisions of the Coastal Act, which speak for themselves, and no further response is required. Sable denies that any application of Sections 30820, subd. (a)(1), 30820, subd. (b), 30821.6, or 30822 is warranted or appropriate. Sable denies all allegations of Coastal Act violations or unpermitted development. Sable denies that it intentionally or knowingly violated the Coastal Act or any Commission order, denies that any cease and desist order was lawfully issued or violated, denies that any civil liability or exemplary damages are available, and denies each and every remaining allegation contained in Paragraph 39. Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.

## V.    Response Procedure

**Paragraph 40.**    *In accordance with Coastal Act Section 30821.3(b) and Section 13181(a) of the Commission's regulations, you have the opportunity to respond to the Commission staff's allegations as set forth in this notice of intent to commence Cease and Desist*

18

*Order and Administrative Penalty proceedings by completing the enclosed SOD form.*

**Response 40.**   Paragraph 40 quotes and characterizes Coastal Act Section 30821.3, subd. (b), and Section 13181, subd. (a), of the Commission's regulations, which speak for themselves, and no further response is required. To the extent a response is required, Sable has submitted this Statement of Defense in response to Commission staff's allegations. Sable denies that its submission of this Statement of Defense constitutes any admission of violation, liability, or Commission enforcement authority, and denies each and every remaining allegation contained in Paragraph 40. Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.

**Paragraph 41.**   *The SOD form should be directed to the attention of Liam Stowe, at the address listed below, with a copy transmitted by email to his email address noted below, not later than June 29, 2026. However, should this matter be resolved via Consent Orders, an SOD form would not be necessary. In any case and in the interim, Commission staff would be happy to accept any information you wish to share regarding this matter, and staff can extend deadlines for submittal of the SOD form to specifically allow additional time to discuss terms of a Consent Order and to resolve this matter amicably. Commission staff currently intend to schedule the hearings for the Cease and Desist Order and Administrative Penalties for the Commission's August 2026 hearing.*

**Response 41.**   Paragraph 36 describes the procedure for submitting the Statement of Defense form and Commission staff's anticipated hearing schedule, which speaks for itself, and no further response is required. Sable denies all allegations of Coastal Act violations and unpermitted development. Sable further denies each and every remaining allegation contained in Paragraph 41.

## VI   Resolution

**Paragraph 42.**   *This case involves a significant violation of the Coastal Act, and we hope to address the violations in an expeditious manner through the Consent Order process. Should we settle this matter, you do not need to expend the time and resources to fill out and return the SOD form mentioned above in this letter. However, my staff are prepared to resolve the ongoing unpermitted development through unilateral orders if Sable fails to collaborate in good faith to resolve the pertinent violation and meaningfully pursue a CDP so that coastal resources may be adequately protected.*

**Response 42.**   Sable denies all allegations of Coastal Act violations and unpermitted development, denies that Sable resuming petroleum transportation requires any new or amended Coastal Act authorization, and denies that unilateral orders are warranted or appropriate. Sable further denies each and every remaining allegation contained in Paragraph 42. Sable remains willing to engage with Commission staff regarding resolution of this matter without conceding any violation, liability, or Commission enforcement authority. Please see Attachment A, Sections II-III, for additional background and support regarding Sable's denial.

**Paragraph 43.**    *For additional information, you may contact Liam Stowe at (415) 729-1646 or via email at Liam.Stowe@coastal.ca.gov, or at our Headquarters Enforcement Office at:*

*California Coastal Commission*
*Attn: Liam Stowe*
*455 Market Street, Suite 300*
*San Francisco, CA 94105*

**Response 43.**    Paragraph 43 provides contact information for Commission staff and the Commission's Headquarters Enforcement Office, which speaks for itself, and no further response is required.

**Paragraph 44.**    *Sincerely,*

*Dr. Kate Huckelbridge*
*Executive Director*

**Response 44.**    Paragraph 44 contains the signature block and enclosure notation for the Notice, which speak for themselves, and no further response is required.

**Paragraph 45.**    *Enclosures:*

*Statement of Defense Form for Cease and Desist Order and Administrative Penalties*

*Cc: Lisa Haage, Chief of Enforcement*
    *Cassidy Teufel, Deputy Director*
    *Alex Helperin, Deputy Chief Counsel*
    *Aaron McLendon, Deputy Chief of Enforcement*
    *Liam Stowe, Enforcement Counsel*

**Response 45.**    Paragraph 45 identifies the Statement of Defense form and persons copied on the Notice, which speaks for itself, and no further response is required.

20

**Attachment D**

This <u>Attachment D</u> includes the exhibits supporting Sable's narrative explanation in <u>Attachment A</u> and specific responses to the allegations in <u>Attachment C</u>. These exhibits should be made part of the administrative record for this proceeding and address questions 4 and 6 of the Statement of Defense form (attached as <u>Attachment B</u>).

| Ex. | Date | Author | Title |
|---|---|---|---|
| 1. | 2025/02/18 | Alston & Bird LLP ("Alston") on behalf of Sable Offshore Corp. and Pacific Pipeline Company (collectively, "Sable") | Verified Complaint for Damages and Declaratory and Injunctive Relief in *Sable Offshore Corp., et al. v. California Coastal Commission, et al.*, Santa Barbara County Superior Court, Case No. 25CV00974 |
| 2. | 2025/03/10 | Latham & Watkins LLP ("LW") on behalf of Sable | Sable Offshore Corp. – Statement of Defense and Response to Notice of Intent to Commence Proceedings for a Commission Cease and Desist Order, Restoration Order, and Administrative Penalty Order (Feb. 18, 2025) ("2025 Statement of Defense")* *Includes Attachments A-D.  Documents appended to Attachment D are listed individually below.* |
|  | 1984/06 | Minerals Management Service (MMS) | 2025 Statement of Defense, Attachment D, Document 1: Final Environmental Impact Statement/Report for Santa Ynez Unit Las Flores Canyon Development and Production Plan |
|  | 1984/08 | State Lands Commission (SLC) and Bureau of Land Management (BLM) | 2025 Statement of Defense, Attachment D, Document 2: Draft Environmental Impact Report/Environmental Impact Statement for Celeron All American and Getty Pipeline Projects |
|  | 1985/01 | SLC and BLM | 2025 Statement of Defense, Attachment D, Document 3: Final Environmental Impact Report/Environmental Impact Statement for Celeron All American and Getty Pipeline Projects |

1

| Ex. | Date | Author | Title |
|---|---|---|---|
| | 1985/09/20 | MMS | 2025 Statement of Defense, Attachment D, Document 4: Development and Production Plan Approval |
| | 1986/03/03 | County of Santa Barbara (County) | 2025 Statement of Defense, Attachment D, Document 5: Planning Commission Action for Celeron Pipeline Project |
| | 1986/07/27 | County | 2025 Statement of Defense, Attachment D, Document 6: County Coastal Development Permit 86-CDP-189 |
| | 1986/08/05 | County | 2025 Statement of Defense, Attachment D, Document 7: County Coastal Development Permit 86-CDP-205 |
| | 1987/09 | Exxon Company, U.S.A. (Exxon) | 2025 Statement of Defense, Attachment D, Document 8: Development and Production Plan (Cumulative Updates) Santa Ynez Unit Development |
| | 1988/01/21 | SLC | 2025 Statement of Defense, Attachment D, Document 9: Lease No. 7163.1 |
| | 1988/02/08 | County and Celeron Pipeline Company of California | 2025 Statement of Defense, Attachment D, Document 10: Settlement Agreement |
| | 1988/2/23 | Coastal Commission (CCC) | 2025 Statement of Defense, Attachment D, Document 11: Staff Recommendation on Permit and Consistency Certification |
| | 1988/03/17 | CCC | 2025 Statement of Defense, Attachment D, Document 12: Letter to Exxon from Coastal Commission, attaching Consistency Certification Concurrence and CDP |
| | 1988/04/04 | MMS | 2025 Statement of Defense, Attachment D, Document 13: Development and Production Plan Approval |

2

LEGAL_AMERICAS # 601293798.1

| Ex. | Date | Author | Title |
|-----|------|--------|-------|
| | 1989/8/30 | SLC | 2025 Statement of Defense, Attachment D, Document 14:<br><br>Lease PRC 4977.1 |
| | 1989/10 | Exxon | 2025 Statement of Defense, Attachment D, Document 15:<br><br>Final Comprehensive Plan for Marine Biological Impact Reduction and Mitigation in Nearshore Waters of Las Flores Canyon |
| | 1990/03/30 | CCC | 2025 Statement of Defense, Attachment D, Document 16:<br><br>Compendium of California Coastal Commission Decisions Under the Federal Consistency Provisions |
| | 1990/07/27 | County | 2025 Statement of Defense, Attachment D, Document 17:<br><br>County Coastal Development Permit 90-CDP-175 |
| | 1992/06 | MMS | 2025 Statement of Defense, Attachment D, Document 18:<br><br>Deepwater Pipeline Maintenance and Repair Manual Prepare for U.S. Department of the Interior Minerals Management Service |
| | 1995/10/30 | County | 2025 Statement of Defense, Attachment D, Document 19:<br><br>County Land Use Permit No. 95-LUS-418 |
| | 1998/03/03 | County | 2025 Statement of Defense, Attachment D, Document 20:<br><br>County Coastal Development Permit 97-CDP-255 |
| | 2000/09/19 | County | 2025 Statement of Defense, Attachment D, Document 21:<br><br>County Coastal Development Permit 00-CDP-169 |
| | 2010/12/09 | CCC | 2025 Statement of Defense, Attachment D, Document 22:<br><br>Notice of Coastal Development Permit Waiver – De Minimis |

3

| Ex. | Date | Author | Title |
|---|---|---|---|
| | 2011/07/07 | Exxon | 2025 Statement of Defense, Attachment D, Document 23: <br><br> Letter to SLC re: Minor Maintenance and Repair of Emulsion, Gas, and Water Pipeline Spans |
| | 2012/01/27 | Exxon | 2025 Statement of Defense, Attachment D, Document 24: <br><br> Letter to SLC re: Minor Maintenance and Repair of Emulsion, Gas, and Water Pipeline Spans |
| | 2014/04/02 | County | 2025 Statement of Defense, Attachment D, Document 25: <br><br> County Land Use Permit No. 14LUP-00000-00035 |
| | 2014/05/28 | County | 2025 Statement of Defense, Attachment D, Document 26: <br><br> 14LUP-00000-00168 |
| | 2014/02/24 | County | 2025 Statement of Defense, Attachment D, Document 27: <br><br> County Zoning Clearance No. 14ZCI-0000-00086 |
| | 2014/10 | Bureau of Safety and Environmental Enforcement (BSEE) | 2025 Statement of Defense, Attachment D, Document 28: <br><br> BSEE Update of Pacific OCS Region Pipelines |
| | 2015/07/08 | CCC | 2025 Statement of Defense, Attachment D, Document 29: <br><br> Legislative Report for July 2015:  Bill Analysis: AB 864 (Williams) |
| | 2015/09/01 | California Legislature - Senate Rules Committee | 2025 Statement of Defense, Attachment D, Document 30: <br><br> Third Reading:  Assembly Bill 864 |
| | 2015/11/25 | County | 2025 Statement of Defense, Attachment D, Document 31: <br><br> County Zoning Clearance No. 14ZCI-00000-00121 |
| | 2017/07/18 | SlingBag | 2025 Statement of Defense, Attachment D, Document 32: <br><br> SlingBag Product Description |

4

| Ex. | Date | Author | Title |
|---|---|---|---|
| | 2018/03 | Quikrete | 2025 Statement of Defense, Attachment D, Document 33:<br><br>Burlap SlingBag Brochure |
| | 2018/10/31 | California Department of Forestry and Fire Protection (CalFIRE) | 2025 Statement of Defense, Attachment D, Document 34:<br><br>Standardized Regulatory Impact Assessment: Requirements for New, Replacement, or Existing Pipelines Near Environmentally and Ecologically Sensitive Areas in the Coastal Zone |
| | 2020/03/13 | U.S. District Court, Central District of California | 2025 Statement of Defense, Attachment D, Document 35:<br><br>Consent Decree issued in *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*, Case No. 2:20-cv-02415 |
| | 2020/10/05 | SCS | 2025 Statement of Defense, Attachment D, Document 36:<br><br>Line 901 & Line 903 Replacement Project:  2nd Revised Biological Resources Assessment |
| | 2021/01 | American Petroleum Institute | 2025 Statement of Defense, Attachment D, Document 37:<br><br>API RP 1111, Design, Construction, Operation, and Maintenance of Offshore Hydrocarbon Pipelines (Limit State Design) |
| | 2022/07/07 | County | 2025 Statement of Defense, Attachment D, Document 38:<br><br>Zoning Administrator Staff Report, Plains Line 901-903 Valve Upgrade Project |
| | 2022/08/22 | County | 2025 Statement of Defense, Attachment D, Document 39:<br><br>Zoning Administrator Action Summary |
| | 2022/10/18 | CCC | 2025 Statement of Defense, Attachment D, Document 40:<br><br>Notice of Coastal Development Permit De Minimis Waiver Coastal Act Section 30624.7 |
| | 2023/03/01 | County | 2025 Statement of Defense, Attachment D, Document 41:<br><br>Planning Commission Staff Report, Gaviota Coast Conservancy & GreyFox, LLC Appeal of Plains Valve Upgrade Project, Attachment C-1:  Draft Addendum to Final Environmental Impact Report / Environmental Impact Statement, SCH No. 1983110902 – Plains Pipeline 901/903 Valve Upgrade Project |

5

| Ex. | Date | Author | Title |
|---|---|---|---|
| | 2023/04/26 | County | 2025 Statement of Defense, Attachment D, Document 42: Planning Commission Action Summary |
| | 2023/08/24 | County | 2025 Statement of Defense, Attachment D, Document 43: Board of Supervisors Action Summary |
| | 2023/12/5 | SLC | 2025 Statement of Defense, Attachment D, Document 44: Amendment of Leases Nos. PRC 7163 and PRC 4977 |
| | 2024/07 | Aqueos | 2025 Statement of Defense, Attachment D, Document 45: Sable Offshore Santa Ynez Unit (SYU) to Shore External Subsea Pipeline Inspection Report State Waters to Shore |
| | 2024/08/30 | County and Sable Offshore Corp. (Sable) | 2025 Statement of Defense, Attachment D, Document 46: Conditional Settlement Agreement and Release |
| | 2024/09/04 | County | 2025 Statement of Defense, Attachment D, Document 47: Letter from Errin Briggs to J. Caldwell Flores |
| | 2024/09/27 | CCC | 2025 Statement of Defense, Attachment D, Document 48: Notice of Violation V-9-24-0152 |
| | 2024/10 | Sable | 2025 Statement of Defense, Attachment D, Document 49: Execution Plan – Pipeline Span Mitigations |
| | 2024/10/04 | CCC | 2025 Statement of Defense, Attachment D, Document 50: Letter re: "Confirmation of Suspension of Current Operations" |
| | 2024/10/08 | LW on behalf of Sable | 2025 Statement of Defense, Attachment D, Document 51: Letter re: "Sable Offshore Corporation Notice of Violation (V-9-24-0152) – Responses to October 4, 2024 Letter" |

6

| Ex. | Date | Author | Title |
|---|---|---|---|
| | 2024/10/11 | Sable | 2025 Statement of Defense, Attachment D, Document 52: <br><br> Map re: "Coastal Zone Open Digs" |
| | 2024/10/14 | Sable | 2025 Statement of Defense, Attachment D, Document 53: <br><br> Cross Section of Anomaly Repair Work |
| | 2024/10/22 | LW on behalf of Sable | 2025 Statement of Defense, Attachment D, Document 54: <br><br> Letter re: "Sable Offshore Corporation Notice of Violation (V-9-24-0152) – Request to Complete Interim Work" |
| | 2024/10/29 | Spire Engineering | 2025 Statement of Defense, Attachment D, Document 55: <br><br> SYU Expansion Pipelines Seismic Vulnerability Review and POPCO Pipeline Seismic Vulnerability Assessment |
| | 2024/10/30 | County | 2025 Statement of Defense, Attachment D, Document 56: <br><br> Las Flores Pipeline System Final Development Plan Conditions |
| | 2024/11 | Sable | 2025 Statement of Defense, Attachment D, Document 57: <br><br> SYU in State Waters Span Investigation 2024 ROV Inspection Survey Post-Plot |
| | 2024/11/12 | CCC | 2025 Statement of Defense, Attachment D, Document 58: <br><br> Executive Director Cease and Desist Order ED-24-CD-02 |
| | 2024/11/15 | David Wolff Environmental, LLC (DWE) and SCS Engineers (SCS) on behalf of Sable | 2025 Statement of Defense, Attachment D, Document 59: <br><br> Sable Offshore Corp. – Pacific Pipeline Company: Line 324 Open Anomaly Site Interim Restoration Plan |
| | 2024/11/19 | Sable | 2025 Statement of Defense, Attachment D, Document 60: <br><br> Letter to SLC re: Santa Ynez Unit Pipeline Span Remediation |

7

LEGAL_AMERICAS # 601293798.1

| Ex. | Date | Author | Title |
|-----|------|--------|-------|
| | 2024/11/20 | CCC Staff | 2025 Statement of Defense, Attachment D, Document 61:<br><br>Letter re: "Sable Interim Restoration Plan Requested Revisions" |
| | 2024/11/20 | DWE and SCS on behalf of Sable | 2025 Statement of Defense, Attachment D, Document 62:<br><br>Sable Offshore Corp. – Pacific Pipeline Company: Line 324 Open Anomaly Site Interim Restoration Plan (Updated 11.20.2024) |
| | 2024/11/20 | CCC | 2025 Statement of Defense, Attachment D, Document 63:<br><br>Letter re: "Executive Director Approval of Remedial Grading and BMPs Segments of Sable Interim Restoration Plan" |
| | 2024/11/21 | CCC | 2025 Statement of Defense, Attachment D, Document 64:<br><br>Letter re: "Plant Palette for Hydroseed Mix – Sable Interim Restoration Plan" |
| | 2024/11/22 | SCS on behalf of Sable | 2025 Statement of Defense, Attachment D, Document 65:<br><br>Zoning Clearance Application for Open Anomaly Sites |
| | 2024/11/22 | Sable | 2025 Statement of Defense, Attachment D, Document 66:<br><br>Map re: Coastal Zone Open Digs |
| | 2024/11/26 | SLC | 2025 Statement of Defense, Attachment D, Document 67:<br><br>Letter re: "Sable Santa Ynez Unit – Emulsion, Gas and Water Pipelines Span Remediation Project" |
| | 2024/11/27 | Sable | 2025 Statement of Defense, Attachment D, Document 68:<br><br>Letter re: "Sable Santa Ynez Unit- Emulsion, Gas and Water Pipelines Span Remediation Project – Additional Information Request," with Attachments |
| | 2024/11/27 | SLC | 2025 Statement of Defense, Attachment D, Document 69:<br><br>Email re: SYU Pipeline – Span Remediation – Request for Information |

LEGAL_AMERICAS # 601293798.1

| Ex. | Date | Author | Title |
|---|---|---|---|
| | 2024/11/27 | DWE and SCS on behalf of Sable | 2025 Statement of Defense, Attachment D, Document 70: Sable Offshore Corp. – Pacific Pipeline Company: Line 324 Open Anomaly Site Interim Restoration Plan (Updated 11.27.2024) |
| | 2024/12/04 | SLC | 2025 Statement of Defense, Attachment D, Document 71: Letter re: Sable Santa Ynez Unit – Emulsion, Gas and Water Pipelines Span Remediation Project |
| | 2024/12/04 | DWE and SCS on behalf of Sable | 2025 Statement of Defense, Attachment D, Document 72: Sable Offshore Corp. – Pacific Pipeline Company: Line 324 Open Anomaly Site Interim Restoration Plan (Updated 12.4.2024) |
| | 2024/12/05 | CCC | 2025 Statement of Defense, Attachment D, Document 73: Letter re: "Executive Director Approval of Hydroseeding Segment of Sable Interim Restoration Plan" |
| | 2024/12/06 | SCS on behalf of Sable | 2025 Statement of Defense, Attachment D, Document 74: Zoning Clearance Applications for Planned Anomaly Sites |
| | 2024/12/06 | Sable | 2025 Statement of Defense, Attachment D, Document 75: Map re: Coastal Zone Planned Digs |
| | 2024/12/11 | CCC | 2025 Statement of Defense, Attachment D, Document 76: Email re: "Extension for Completion of Hydroseeding Segment of Interim Restoration Plan" |
| | 2024/12/17 | Office of State Fire Marshal (OSFM) | 2025 Statement of Defense, Attachment D, Document 77: Letters of Decision on the State Waiver Requests for Limited Effectiveness of Cathodic Protection on Thermally Insulated Pipeline and Corrosion of or Along a Longitudinal Seam Weld (CA-324 and CA-325A/B) |
| | 2024/12/19 | Pacific Pipeline Company (PPC) | 2025 Statement of Defense, Attachment D, Document 78: Final Completion Report: Line 324 Anomaly Site Interim Restoration Plan |

9

| Ex. | Date | Author | Title |
|---|---|---|---|
| | 2025/01/15 | LW on behalf of Sable | 2025 Statement of Defense, Attachment D, Document 79: <br><br> Letter re: "Justification for Santa Ynez Unit (SYU) Pipeline Span Remediation Under Existing Development and Production Plan, Coastal Development Permit No. E-88-1, and Consistency Certification No. CC-64-87" |
| | 2025/01/30 | Sable | 2025 Statement of Defense, Attachment D, Document 80: <br><br> Santa Ynez Unit Pipeline Span Remediation Report, with Attachments |
| | 2025/02/11 | CCC | 2025 Statement of Defense, Attachment D, Document 81: <br><br> Notice of Violation V-9-25-0013 |
| | 2025/02/11 | Pipeline and Hazardous Materials Safety Administration (PHMSA) | 2025 Statement of Defense, Attachment D, Document 82: <br><br> Letters re: Docket Nos. PHMSA-2025-0002 and PHMSA-2025-0003 |
| | 2025/02/12 | County | 2025 Statement of Defense, Attachment D, Document 83: <br><br> Letter re: "Sable Offshore Corp. – California Coastal Commission (CCC) Consolidated Permit Request" |
| | 2025/02/12 | County | 2025 Statement of Defense, Attachment D, Document 84: <br><br> Letter re: "Zoning Clearance Applications – 24ZCI-00090, 24ZCI-00091, 24ZCI-00095, 24ZCI-00096" |
| | 2025/02/14 | CCC | 2025 Statement of Defense, Attachment D, Document 85: <br><br> Letter re: "Santa Barbara County Planning and Development Response to Sable Offshore Corporation Zoning Clearance Applications and California Coastal Commission Consolidated Permit Request" |
| | 2025/02/14 | LW on behalf of Sable | 2025 Statement of Defense, Attachment D, Document 86: <br><br> Letter re: "Sable Offshore Corp. Notice of Violation (V-9-24-0152) for Las Flores Pipelines CA-324 and CA-325, Santa Barbara County" |

10

| Ex. | Date | Author | Title |
|---|---|---|---|
| | 2025/02/16 | CCC | 2025 Statement of Defense, Attachment D, Document 87:<br><br>Letter re: "Dispute Resolution under California Code of Regulations, Title 14, Section 13569 regarding activities of Sable Offshore Corp. Identified In California Coastal Commission's November 12, 2024 Executive Director Cease and Desist Order" |
| | 2025/02/16 | CCC | 2025 Statement of Defense, Attachment D, Document 88:<br><br>Letter re: "Notice Prior to Issuance of Executive Director Cease and Desist Order" |
| | 2025/02/17 | LW on behalf of Sable | 2025 Statement of Defense, Attachment D, Document 89:<br><br>Letter re: "Sable Offshore Corp. Response to Notice Prior to Issuance of Executive Director Cease and Desist Order" |
| | 2025/02/18 | CCC | 2025 Statement of Defense, Attachment D, Document 90:<br><br>Executive Director Cease and Desist Order No. ED-25-CD-01 and Notice of Intent to Commence Proceedings for a Commission Cease and Desist Order, Restoration Order, and Administrative Penalty Order |
| | 2025/02/24 | County | 2025 Statement of Defense, Attachment D, Document 91:<br><br>Letter re: "Sable Offshore Corp. – California Coastal Commission's (CCC) Reference to Dispute Resolution Process" |
| | 2025/03/06 | SCS on behalf of Sable | 2025 Statement of Defense, Attachment D, Document 92:<br><br>Materials Regarding Completed Anomaly Repair Sites |
| | 2025/03/21 | County | 2025 Statement of Defense, Attachment D, Document 93:<br><br>"RE: Sable – Completed Anomaly Repairs" |
| 3. | 2025/03/28 | CCC | Staff Report:  Recommendations and Findings for Cease and Desist Order, Restoration Order, and Administrative Civil Penalty |
| 4. | 2025/03/28 | LW on behalf of Sable | Letter re: "Sable Offshore Corp. – Supplement to [2025 Statement of Defense]" |

11

| Ex. | Date | Author | Title |
|---|---|---|---|
| 5. | 2025/04/04 | LW on behalf of Sable | Letter re: "April 10, 2025, Meeting Agenda Items Th8.1, 8.2, & 8.3: Sable Offshore Corp., Cease and Desist Order No. CCC-25-CD-01, Restoration Order No. CCC-25-RO-01, and Administrative Penalty Order No. CCC-25-AP3-01" |
| 6. | 2025/04/09 | CCC | Addendum to Item Nos. Th8.1-Th8.3: Cease and Desist Order No. CCC-25-CD-01, Restoration Order No. CCC-25-RO-01, and Administrative Penalty Order No. CCC-25-AP3-01, for the Commission Meeting of April 10, 2025 |
| 7. | 2025/04/09 | County | Letter re: "Sable Offshore Corp. – Authorization for Anomaly Repair Work" |
| 8. | 2025/04/10 | CCC | Staff Presentation re: "Cease and Desist Order No. CCC-25-CD-01, Restoration Order No. CCC-25-RO-01, and Administrative Penalty No. CCC-25-AP3-01" |
| 9. | 2025/04/10 | Sable | Sable Presentation re: "Agenda Items Th8.1, 8.2, & 8.3, April 10, 2025" |
| 10. | 2025/04/10 | TP.One Court Reporting | Transcript of April 10, 2025, Coastal Commission Hearing, Items Th8.1-Th8.3 |
| 11. | 2025/04/10 | CCC | Coastal Commission Hearing Meeting Minutes |
| 12. | 2025/04/10 | CCC | Cease and Desist Order No. CCC-25-CD-01, Restoration Order No. CCC-25-RO-01, and Administrative Civil Penalty CCC-25-AP3-01 |
| 13. | 2025/04/16 | CCC | Coastal Commission's Cross-Complaint for Declaratory Relief and Injunctive Relief in *Sable Offshore Corp.*, *et al. v. California Coastal Commission*, *et al.*, Santa Barbara County Superior Court, Case No. 25CV00974 |
| 14. | 2025/04/16 | Alston on behalf of Sable | Verified Amended Petition for Writ of Mandamus and Complaint for Damages and Declaratory and Injunctive Relief in *Sable Offshore Corp.*, *et al. v. California Coastal Commission*, *et al.*, Santa Barbara County Superior Court, Case No. 25CV00974 |
| 15. | 2025/05/19 | Sable | 8-K and Press Release |
| 16. | 2025/07/29 | Santa Barbara County Superior Court | Order for Preliminary Injunction in *Environmental Defense Center, et al. v. California Department of Forestry and Fire Protection, et al.*, Santa Barbara County Superior Court, Case No. 25CV02247 |

12

| Ex. | Date | Author | Title |
|---|---|---|---|
| 17. | 2025/09/13 | California State Legislature – Senate Rules Committee | Analysis of Senate Bill 237 |
| 18. | 2025/09/29 | Alston and Paul Hastings LLP ("PH") on behalf of Sable | Verified Complaint for Declaratory Relief in *Pacific Pipeline Company v. State of California*, *et al.*, Kern County Superior Court, Case No. BCV-25-103508 |
| 19. | 2025/10/22 | OSFM | Letter re: "State Waiver Requirements Prior to Restart of Lines CA-324 and CA-325A/B" |
| 20. | 2025/10/23 | Sable | Letter re: "Response to October 22, 2025, OSFM Letter re CA-324 and CA-325A/B" |
| 21. | 2025/12/17 | PHMSA | Letter re: "Determination of Interstate Classification" |
| 22. | 2025/12/22 | PHMSA | Letter re: "Approval of Sable Offshore Corp.'s Restart Plan for the Las Flores Pipeline System Line CA-324 and CA-325" |
| 23. | 2025/12/23 | PHMSA | Emergency Special Permit, Docket No. 2025-1502 |
| 24. | 2025/12/31 | U.S. Court of Appeals for Ninth Circuit | Order Denying Motion to Stay PHMSA's Approval of Restart Plan and Emergency Special Permit in *Environmental Defense Center, et al. v. PHMSA*, 9th Cir., Case No. 25-8059 |
| 25. | 2026/01/21 | Alston & PH on behalf of Sable | Verified First Amended Complaint for Declaratory Relief in *Pacific Pipeline Company v. State of California*, *et al.*, Kern County Superior Court, Case No. BCV-25-103508 |
| 26. | 2026/02/18 | CCC | Letter re: "Restart of Las Flores Pipelines" |
| 27. | 2026/02/20 | State of California | Notice of Removal of Action under 28 U.S.C. Section 1441(a) (Federal Question) in *Pacific Pipeline Company v. State of California*, *et al.*, E.D. Cal., Case No. 1:26-cv-01486-KES-CDB (originally filed as *Pacific Pipeline Company v. State of California*, *et al.*, Kern County Superior Court, Case No. BCV-25-103508) |
| 28. | 2026/02/26 | PH on behalf of Sable | Letter re "Sable – Relinquishment of State Waivers" |
| 29. | 2026/03/05 | Alston on behalf of Sable | Letter re: "Restart of Lines CA-324 and CA-325 of the Santa Ynez Pipeline System" |

13

| Ex. | Date | Author | Title |
|---|---|---|---|
| 30. | 2026/03/13 | U.S. President | Executive Order 14391 of March 13, 2026: "Adjusting Certain Delegations Under the Defense Production Act" |
| 31. | 2026/03/13 | U.S. Secretary of Energy | Pipeline Capacity Prioritization and Allocation Order |
| 32. | 2026/03/16 | Sable | 8-K and Press Release |
| 33. | 2026/03/16 | OSFM | Letter re: "Sable - Relinquishment of State Waivers Lines 324 and 325A/B" |
| 34. | 2026/03/19 | CCC | Letter re: "Announcement of Pipeline Reactivation and Implications" |
| 35. | 2026/03/20 | Alston on behalf of Sable | Letter re: "Lines CA-324 and CA-325 of the Santa Ynez Pipeline System" |
| 36. | 2026/03/30 | United States | Motion to Terminate or Modify the Consent Decree in *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*, C.D. Cal., Case No. 2:20-cv-02415-SVW-SSC |
| 37. | 2026/04/01 | LW and Babst Calland ("BC") on behalf of Sable | Brief in Support of United States' Motion to Terminate the Consent Decree in *United States of America and the People of the State of California v. Plains All American Pipeline, L.P. and Plains Pipeline, L.P.*, C.D. Cal., Case No. 2:20-cv-02415-SVW-SSC |
| 38. | 2026/04/10 | Alston and PH on behalf of Sable | Motion for Leave to File Second Amended Complaint; Memorandum of Points and Authorities in *Pacific Pipeline Company v. State of California, et al.*, E.D. Cal., Case No. 1:26-cv-01486-KES-CDB (originally filed as *Pacific Pipeline Company v. State of California, et al.*, Kern County Superior Court, Case No. BCV-25-103508) |
| 39. | 2026/04/10 | Alston | Declaration of Jeffrey Dintzer in support of Plaintiff's Motion for Leave to File Second Amended Complaint in *Pacific Pipeline Company v. State of California, et al.*, E.D. Cal., Case No. 1:26-cv-01486-KES-CDB (originally filed as *Pacific Pipeline Company v. State of California, et al.*, Kern County Superior Court, Case No. BCV-25-103508) |
| 40. | 2026/05/15 | Holland & Knight LLP ("HK"), LW, and BC on behalf of Sable | Motion for Reconsideration and to Dissolve Injunction in *Center for Biological Diversity, et al., v. California Department of Forestry and Fire Protection, et al.*, C.D. Cal., Case No. 2:26-cv-05242 (originally filed as *Center for Biological Diversity, et al. v. California Department of Forestry and Fire Protection, et al.*, Santa Barbara County Superior Court, Case No. 25CV02244) |

14

| Ex. | Date | Author | Title |
|---|---|---|---|
| 41. | 2026/06/09 | CCC | Notice of Intent to Commence Cease and Desist Order and Administrative Penalty Proceedings |
| 42. | 2026/06/12 | PH on behalf of Sable | Letter re: "Initial Response to Notice of Intent to Commence Cease and Desist Order and Administrative Penalty Proceedings (No. V-9-26-0063)" |
| 43. | 2026/06/19 | CCC | Letter re: "Sable Offshore Corp.'s Initial Responses to the California Coastal Commission's June 9, 2026, Notice of Intent Letter" |
| 44. | 2026/06/25 | PHMSA | Findings After Environmental Review, Docket No. PHMSA-2026-0464 |
| 45. | 2026/06/25 | PHMSA | Special Permit, Docket No. PHMSA-2026-0464 |
| 46. | 2026/06/25 | PHMSA | Jurisdictional Determination in Support of Special Permit, Docket No. PHMSA-2026-0464 |
| 47. | 2026/06/25 | PHMSA | Letter re: "Docket No. PHMSA-2026-0464," Docket No. PHMSA-2026-0464 |
| 48. | 2026/06/25 | PHMSA | Special Permit Analysis and Findings: Sable Special Permit, Docket No. PHMSA-2026-0464 |

15

# EXHIBIT D

STATE OF CALIFORNIA—THE RESOURCES AGENCY                                    PETE WILSON, *Governor*

# CALIFORNIA COASTAL COMMISSION

45 FREMONT, SUITE 2000
SAN FRANCISCO, CA  94105-2219
VOICE AND TDD (415) 904-5200

File Nos.:  E-88-1 & CC(E)-64-87
Date Filed:  (E) 2/5/88 & (CC) 12/21/87
49th Day:  (E) 3/25/88
3-Month Period End:  (CC) 3/21/88
Staff:  J. Johnson/Energy Staff
Adoption Date:  2/23/88

## REGULAR CALENDAR

## Adopted Commission Findings on Permit and Consistency Certification

Applicant:                  Exxon Company U.S.A.

Project Title:              Exxon Santa Ynez Unit
                            Development and Production Plan
                            nearshore and onshore portions of
                            Option B alternative

Project Description:        Onshore:  Installation of Las Flores Canyon
                            consolidated processing facilities and oil
                            transportation terminal consisting of: 140,000 barrels
                            per day (BPD) oil processing facility; as previously
                            permitted, expansion of gas processing at POPCO
                            facility to 60 million standard cubic feet per day
                            (MSCFD); 21 MSCFD stripping gas treating facility;
                            natural gas liquid/liquid petroleum gas (NGL/LPG)
                            storage and transportation terminal facilities;
                            540,000 barrel crude oil storage tanks; 49 megawatt
                            (MW) cogeneration power plant; oil and gas pipelines
                            and power cables; produced water treatment facilities;
                            and associated utility systems.

                            Offshore:  Installation of: consolidated marine
                            terminal, single anchor leg mooring (SALM) at 11,250
                            feet offshore; pipelines from SALM to onshore
                            facilities; oil and produced water pipelines and power
                            cables from offshore platforms to shore facilities.

Project Location:           Nearshore Santa Barbara County between El Capitan and
                            Refugio State Parks, within state waters offshore Las
                            Flores Canyon.

Substantive
 File Documents:            See Appendix C.

## Staff Note

To minimize duplication and speed the project's review process, the staff has combined the coastal permit and consistency certification review into one staff report scheduled for one Commission hearing.  A coastal permit is required for the marine terminal and pipeline portion of the project in state waters (nearshore Option B).  A consistency certification is required for the same portion of the project and also for the onshore portion of the project. In 1983 the Commission concurred with a consistency certification for Platforms Harmony, Heritage, Heather, and the OCS pipelines.  As reported to the Commission on January 15, 1988, staff determined that no further review of the OCS portion of the Exxon SYU project is necessary.

Recommendation  This report recommends that two Commission actions on the project be taken:

1)    approval with conditions on the coastal permit for the nearshore Option B portion of the project;

2)    concurrence with the consistency certification for the nearshore Option B that includes both facilities in state waters and onshore, after Exxon incorporates the coastal permit conditions into its project description.

To assure that no questions regarding the timeliness of Commission action can be raised, action on the Consistency should occur at the February hearing.

Project History  In June 1983, the Commission acted on Exxon's consistency certifications for two Options, A and B, to develop the Santa Ynez Unit.  The Commission concurred with the OCS portion of Option B, including the platforms and connecting pipelines.  Option B also included an onshore oil and gas processing facility and a marine terminal.  The onshore portion and marine terminal were withdrawn in 1983 and later resubmitted in 1985.  The major difference between the two options was that Option A included offshore oil processing and tankering while Option B proposed onshore oil processing and the potential for pipeline transport of oil.  Option A included the expansion of an existing offshore storage and treatment (OS&T) vessel.  The Commission objected to Option A, in part, because of increased risks of oil spills and air pollution emissions adversely affecting the coastal zone.  In 1985, the Commission concurred with the nearshore (state waters) and onshore portion of Option B.  A revised consistency review for Nearshore and Onshore portions of Option B is now necessary for several reasons; including relocating the marine terminal and pipelines to shore, the addition and enlargement of onshore facilities, and significant additional grading.

Coastal Permit Appeal  The County of Santa Barbara has a certified Local Coastal Program.  At the time this report was completed, the County's onshore coastal permit had not been appealed to the Commission.  Unless an appeal is received by February 4, 1988, a coastal permit from the Commission is only required for the offshore portion of the project in state waters.

**NPDES Consistency**  A consistency certification for the National Pollution Discharge and Elimination' System (NPDES) permit to be issued by the Environmental Protection Agency (EPA) is not part of this project.  In the future, Exxon must submit a consistency review for an NPDES permit for the produced water discharge system and hydrostatic test discharges, unless the Commission concurs in a general discharge permit with terms which eliminate the need for a specific permit and consistency certification.

**Other Agency Permits**  Exxon must also obtain new or amended Minerals Management Service and Army Corps of Engineers permits for portions of the project.

## Table of Contents

|  |  | Page |
|---|---|---|
| I. | Executive Summary | 1 |
| II. | Staff Recommendation | 6 |
| | A. Resolutions | 6 |
| |     1. Approval with Conditions | 6 |
| |     2. Concurrence with Consistency Certification | 6 |
| | B. Conditions | 7 |
| |     – Standard | 7 |
| |     – Special | 7 |
| III. | Findings and Declarations | 18 |
| | A. Project Description and Location | 18 |
| | B. Project History | 23 |
| | C. Commission Review of Development Plans | 24 |
| | D. Other Agency Actions/Response | 25 |
| | E. Coastal Dependency and Relation to Industrial Development | 26 |
| | F. Coastal Act Issues | 28 |
| |     1. Transportation of Crude Oil | 28 |
| |     2. Containment and Cleanup of Crude Oil Spills | 32 |
| |     3. Marine Resources | 39 |
| |     4. Commercial Fishing | 58 |
| |     5. Vessel Traffic and System Safety | 63 |
| |     6. Geologic Hazards | 75 |
| |     7. Air Quality | 79 |
| |     8. Habitat and Land Resources | 84 |
| |     9. Public Access, Recreation, and Scenic and Visual Resources | 89 |
| |     10. Cultural Resources | 97 |

                                                                    Page

    11. Cumulative Impacts                                           100

    12. Consolidation of Facilities                                  111

    13. Compliance with Coastal Act Section 30260                    114

        a. Maximum Feasible Mitigation                               114
        b. Public Welfare                                            114
        c. Alternative Locations                                     117

    14. California Environmental Quality Act                         119

Exhibits

    Exhibits 1 - 13

Appendices

    Appendix A - Background History
    Appendix B - Standard Conditions
    Appendix C - Substantive File Documents
    Appendix D - Santa Barbara County Local Coastal Program Policies
    Appendix E - Current Oil Spill Cleanup Capability
                 and Clean Seas Oil Spill Cooperative Data
    Appendix F - Section 7 Formal Endangered Species Consultation (3/14/84)
                 and Informal Consultation (1/19/88)
    Appendix G - Exxon Consolidation Agreement
    Appendix H - Letters to Commissioners
    Appendix I*- Santa Barbara County Final Development Plan
                 Conditions of Approval
    Appendix J*- State Lands Commission Project Lease Provisions


* Appendices I and J were sent to Coastal Commissioners only - available to
  others upon request from the Commission's Energy Unit (415) 543-8555.

-1-

I.    EXECUTIVE SUMMARY

Project Description and Location  Exxon Company U.S.A. proposes to develop oil and gas reserves within the Santa Ynez Unit on the Outer Continental Shelf (OCS) in the western end of the Santa Barbara Channel, construct onshore processing, storage and transportation facilities in Las Flores Canyon; and construct a marine terminal in state waters.  Project plans are shown on Exhibits 1 through 10 and 12.  Federal consistency certifications for this development were acted upon by the Commission in 1983 (portion on the OCS) and 1985 (portion in state waters and onshore).  However, Exxon has since revised its proposal.  The Santa Ynez Unit Development and Production Plan Nearshore Option B, includes a consolidated pipeline and marine terminal transportation facility; offshore and onshore pipelines and power cables; oil and gas treating facilities; oil storage facilities; a natural gas liquid/liquid petroleum gas (NGL/LPG) storage and transportation facility; a cogeneration power plant; a produced water treatment system; and the removal of an offshore storage and treatment (OS&T) vessel located on the OCS.  The Option B proposal also includes three new drilling and production platforms, Harmony, Heritage, and Heather, and OCS pipelines and power cables, which were approved by the Commission in 1983.  As reported to the Commission on January 15, 1988, staff has determined that no further Commission review of the OCS portion of the project is necessary.

The proposed onshore facility would be located in Santa Barbara County, 20 miles west of the City of Santa Barbara between El Capitan and Refugio State Beach Parks and about one third mile inland of the coastal zone.  The marine terminal would be located from two miles offshore of Las Flores Canyon on state lease PRC 2991.  The pipelines and cables would be located on leases 2198 and 2155, and onshore into Las Flores Canyon.  The platforms within the Santa Ynez Unit on the OCS would be located about five to nine miles offshore between Las Flores Canyon on the east and Point Conception on the west.

Existing Facilities  As a result of the 1968 Bureau of Land Management lease sale (P-4), Exxon has installed one platform in the Santa Ynez Unit, Hondo A, which is currently producing oil and gas.  Facility plans are shown on Exhibits 9 and 11.  Gas is piped to an existing onshore treating facility in Las Flores Canyon (POPCO).  The oil is processed and stored on an offshore storage and treatment (OS&T) vessel near Hondo A and then taken by tanker to refineries on the Gulf and West Coast.  Exxon has an inoperative marine terminal site at El Capitan which has a multiple buoy mooring system, pipeline, and onshore storage facilities.

Staff Recommendation  The staff recommends approval of the coastal permit with conditions listed in section II. B. below and concurrence with the consistency certification for the nearshore and onshore portions of Nearshore Option B of the Exxon Company Santa Ynez Unit Project after incorporation of the coastal permit conditions.  Exxon's project description includes the terms and conditions of prior agency approvals.  This proposed nearshore Option B raises issues related to oil transportation, oil spill containment, marine resources, commercial fishing, vessel traffic and marine terminal safety, geologic hazards, air quality, habitat and land resources, visual and scenic resources, public access and recreation, archaeological resources, cumulative impacts, and consolidation of facilities.  For the reasons specified below, the staff concludes that the project meets the policies of the Coastal Act.  The coastal

-2-

dependent portions of the project are inconsistent with some of the policies of the Coastal Act; however, the Coastal Commission may nevertheless find concurrence because those portions of Option B comply with the override provisions of Section 30260 for coastal dependent industrial facilities, and are therefore consistent with the California Coastal Management Program.

Coastal Act Issues

1. Transportation of Crude Oil - Pipelines will be used to transport oil to market destinations when available, consistent with Santa Barbara County Local Coastal Program (LCP) policies. The use of marine tankers, although limited by pipeline requirements, will increase the risks of oil spills and the level of air pollutant emissions over those risks associated with pipeline transportation of oil from this facility. A consolidated marine terminal is necessary because it will allow oil transportation by tankers when pipelines do not serve certain market destinations or when pipelines are not available for use consistent with Santa Barbara County LCP policies, i.e., during emergencies or when pipeline use is infeasible.

   The project is consistent with Section 30253 air quality requirements, because of mitigation measures and offsets required by the Santa Barbara Air Pollution Control District (SBAPCD). The project is inconsistent with Sections 30230, 30231, and 30232 for the offshore portions of the project because oil spill prevention and cleanup cannot be assured. The project is a coastal dependent industrial facility because the consolidated marine terminal and offshore pipelines require a coastal location to function. Because of this coastal dependency, the project can be found consistent if it meets the requirements of Sections 30260, 30261, and 30262 of the Coastal Act. The onshore portions of the project in Las Flores and Corral Canyons, may not meet the requirements of Section 30232 because spills, even on land, may be difficult to effectively clean up completely. However, the site is the least environmentally damaging of the alternatives on a cumulative basis and no additional measures are feasible to reduce the impacts of onshore oil spills. Therefore, pursuant to Section 30007.5 of the Coastal Act, the Commission finds that on balance, the project is consistent with the Coastal Act.

   In summary, this aspect of the project can be found consistent with these policies because it maximizes the use of pipelines, proposes marine tankering only to those locations not served by pipelines, and is consistent with Santa Barbara County LCP policies.

2. Containment and Cleanup of Crude Oil Spills - The project will increase the risks for onshore and offshore oil spills. The proposal to use pipelines when available (consistent with LCP policies) will reduce the incidence of offshore oil spills. The construction and use of the marine terminal for destinations not served by pipeline, would be consistent with the Commission's findings of preference for pipeline transportation when it determines in a particular case that clear benefits are demonstrated with maximum facility consolidation in the long term. Further, the marine terminal, as conditioned, will provide maximum feasible oil spill equipment, response procedures for oil spill cleanup, an unannounced oil spill containment and cleanup drill, annual review of oil spill response equipment and procedures, a study of methods to reduce oil spill risk to

-3-

sea otters and proportionate funding for improvements, and provisions for updates based on these reviews. Additionally, all terminal users will utilize tanker routes which will be between 25 and 35 miles offshore of the range of the southern sea otter to reduce the chances of potential oil spills reaching the species. Even with these mitigations the offshore portions of the project cannot be found consistent with Coastal Act sections 30230, 30231, and 30232 because of potential impacts to sea otters and other species. However, Exxon is providing the maximum feasible mitigation for offshore oil spills should they occur, and its proposed project, as conditioned, can be found consistent with Section 30260(3) of the Coastal Act.

The onshore portions of the project in Las Flores and Corral Canyons, may not meet the requirements of Section 30232 because spills, even on land, may be difficult to effectively clean up completely. However, the site is the least environmentally damaging of the alternatives on a cumulative basis and no additional measures are feasible to reduce the impacts of onshore oil spills. Therefore, pursuant to Section 30007.5 of the Coastal Act, the Commission finds that on balance, the project is consistent with the Coastal Act.

3.  <u>Marine Resources</u> - Nearshore construction of the proposed project pipelines will damage surf grass and kelp beds. Surf grass is an important habitat for lobster, and supports a unique biological community. Trenching will destroy a wide area of these beds, and will likely remove much of the substrate necessary for surf grass attachment in the trenched surf zone. Kelp beds are highly productive, and support a diversity of species. Barge anchor lines could cause the most damage by entangling kelp and either ripping it out or cropping it off far enough below the canopy that it will not recover. Construction offshore of the kelp beds will impact soft bottom habitats with anchor scarring, and potentially damage rare hard bottom. Because of the total distance of project pipelines which will have to be constructed with a lay barge, a large number of anchor scars will contribute long-term disturbance to a significant level of cumulative soft bottom impacts. Anchors, anchor drag, anchor lines, and pipeline laying will cause potential damage to hard bottom. Oil spill risks associated with the pipelines and tankers will further threaten endangered species and other vulnerable marine resources such as marsh and lagoon habitats and sea birds. Risks to marine resources from tankers are particularly high, but will diminish if oil is routed through an onshore pipeline. Because of the potential for oil spills, construction impacts to surf grass beds, kelp beds, hard bottom habitat, and soft bottom habitat, and potential cumulative effects on gray whales, the project cannot be found consistent with Sections 30230, 30231, and 30240. Proposed mitigation measures include a construction mitigation plan, mitigation of operations impacts on gray whales, wildlife cleanup and rehabilitation facilities, tanker routing outside the area of major risk to sea otters, and a limit on the average marine terminal annual oil throughput. With these mitigation measures, plus mitigation measures imposed through Santa Barbara County's permit and the State Lands Commission lease, impacts to marine resources are mitigated to the maximum extent feasible, and the project as proposed and conditioned is consistent with Section 30260(3) of the Coastal Act.

-4-

4. Commercial Fishing - Construction and operation of the proposed marine terminal and pipelines would adversely affect commercial fishing by precluding fishing opportunities in productive fishing areas. As submitted, including the conditions imposed by the County and the State Lands Commission, the project includes mitigation measures designed to reduce impacts on commercial fishing. Even with these mitigation measures, the project still would have substantial adverse impacts due to its preclusion of commercial fishing opportunities. Consequently, Santa Barbara County and the State Lands Commission have required payments to County and State fisheries enhancement programs. The County has required Exxon to contribute $400,000 to the County's Fisheries Enhancement Fund, and the State Lands Commission has required Exxon to contribute $6,000 per year to the recently established State of California Fisheries Development Corporation (or other State approved fund), to be used for fisheries enhancement in the Santa Barbara Channel. The State Lands Commission has also required compensation for any marine terminal and pipeline construction period disturbance of the nearshore marine benthic environment found, once the required marine biological survey is complete, to affect commercial fishing. With these mitigation measures and funds for fisheries programs, the project's impacts on commercial fishing have been mitigated to the maximum extent feasible, and the project is consistent with Section 30260 of the Coastal Act.

5. Vessel Traffic and System Safety - As a result of this project, vessels calling at the terminal could be involved in collisions with other vessels, collisions with platforms, explosions and/or fires. Accidents including explosions and/or fires and toxic spills could occur at the onshore facilities. The consolidated terminal, as conditioned, includes the following safety measures: review of vapor recovery/inert gas system; fire protection and hazardous waste and toxic substance control plans; pro-rated contributions to a fire inspector; County Emergency Response Plan; a Vessel Traffic Corridor Plan; an assist vessel for tankers while at the terminal; mooring masters; and a Risk Management Plan and Marine Terminal Operations Manual. Accidents resulting in oil spills could still occur, and therefore the project does not meet the requirements of Section 30232. However, the offshore project, as proposed and conditioned, is mitigated to the maximum extent feasible and therefore can be found consistent with Sections 30260, and 30261(a) of the Coastal Act.

6. Geologic Hazards - All potential geologic constraints for the project (both onshore and offshore) have been identified and mitigated by avoidance or engineering design. Offshore, the project has avoided geologic hazards where possible. Soil movement forces have been minimized on the project by placing the pipelines directly on the seafloor. Onshore, Exxon has identified numerous large landslides in Las Flores Canyon and has submitted a landslide stabilization plan that utilizes grading, retaining devices, subdrains, and revegetation. Facilities within the canyon will be located on engineered fill. The onshore and offshore facilities meet the requirements of Section 30253(1) and (2) of the Coastal Act.

7. Air Quality - The project meets the requirements of the Santa Barbara County Air Pollution Control District (SBCAPCD), which has granted a permit for the project. The project includes pipeline transport of oil to

-5-

refinery destinations and an onshore cogeneration plant providing electricity to offshore platforms. Project mitigation measures include construction and operation phasing, best available control technology (BACT) and full offsets for residual emissions. Overall the project as mitigated will result in a net air quality benefit. The project, as conditioned, is found consistent with air quality requirements incorporated into the CCMP under section 307 of the CZMA, Sections 30250 and 30253 of the Coastal Act.

8.  Habitat and Land Resources - The project that lies both within and landward of the coastal zone causes impacts to habitats, surface water, and groundwater through construction disturbances, increased sediment loading in Corral Creek, groundwater drawdowns, habitat removal, and onshore oil spills and fires. With the exception of upset conditions that are addressed elsewhere in this report, most of the impacts can be mitigated to a level of insignificance through the County's conditions requiring drainage plans, erosion and revegetation plans, landscaping and restoration plans, groundwater management plans, buffer zones, and water quality monitoring. Therefore, the project as proposed and conditioned is on balance consistent with Sections 30231, 30236, 30240, and 30250(a) of the Coastal Act.

9.  Public Access, Recreation, and Scenic and Visual Resources - The shoreline in the project area is an area of unique scenic and recreational features and contains a number of State beaches and County parks. As a result of the project's marine terminal and pipeline construction and operation caused visual and noise intrusion and other industrialization impacts, the project would degrade the area's park and recreation areas and lower cost recreational facilities, primarily due to the industrial features introduced into the the scenic ocean views resulting from tanker traffic and the proposed platforms, and secondarily due to construction noise impacts on the public beaches. These portions of the project are therefore inconsistent with Sections 30213 and 30240(b) and 30251 of the Coastal Act. The County's requirement to provide up to $327,000 per year to the County's Coastal Resource Enhancement Fund to mitigate the "industrialization" impacts on recreational amenities brings the project into conformance with the Section 30260 requirement that adverse impacts be mitigated to the maximum extent feasible.

10. Cultural Resources - Five prehistoric or historic sites and two archaeologically sensitive areas in the coastal zone, will be directly or indirectly impacted by the project including the capping (12 feet of fill) of one significant site. With the exception of capping, the impacts have been mitigated to an insignificant level through reasonable requirements for site avoidance, construction monitoring, and mitigation plans. While it is impossible to mitigate the impacts of capping completely, the project as proposed and conditioned contains reasonable mitigation measures and thus can be found on balance consistent with Sections 30244 and 30250(a).

-6-

II.    STAFF RECOMMENDATION

The staff recommends that the Commission adopt the following resolutions, conditions, findings, and declarations:

A.    RESOLUTIONS

1.    Approval of the Coastal Permit with Conditions

The Commission hereby grants a permit for the portion of the proposed Exxon Santa Ynez Unit DPP and marine terminal development which will be located in state waters, subject to the conditions below, on the grounds that the development as conditioned, will be in conformity with the provisions of Chapter 3 of the California Coastal Act of 1976 and will be in conformity with the California Environmental Quality Act.

The conditions specified for the permit are necessary for the findings of consistency. Therefore, Exxon must incorporate them into the DPP so that they are included in the project for purposes of the following resolution regarding the consistency certification. The conditions shall apply to all portions of the project subject to this permit and consistency review. Chapter 11 of the CCMP provides that issuance of a permit will be deemed to be a determination by the State that the proposed permit activity is consistent with the management program, and no further certification is needed. Because not all portions of the project before the Commission require a permit, and for clarity, the concurrence below covers the entire nearshore and onshore project.

2.    Concurrence with Consistency Certification

The Commission hereby concurs with the consistency certification made by Exxon Company, U.S.A. for the nearshore and onshore portions of Option B of its Development and Production Plan (DPP) for the Santa Ynez Unit. These portions of the plan consists of a marine terminal, nearshore and onshore pipelines and power cables and onshore facilities. Although the project will affect the coastal zone, it will meet the policies of the approved California Coastal Management Program (CCMP), and is therefore consistent with the CCMP. The Commission specifically finds that the proposed project includes adequate information to permit an assessment of the probable coastal zone effects of these portions of the project, including cumulative impacts, and that the project complies with the enforceable policy requirements of the California Coastal Management Plan (CCMP). The Commission furthermore finds that the project implements the national interest as required by Chapter 11 of the CCMP and Sections 302 and 303 of the CZMA.

-7-

B. **CONDITIONS**

- **STANDARD CONDITIONS**: See Appendix B.

- **SPECIAL CONDITIONS**:

### TERMS OF PERMIT AND ABANDONMENT

1. **Terms of Permit**

All construction activities shall be completed no later than February 1, 1993, unless an extension is granted in accordance with Commission regulations.

2. **Terms of Marine Terminal Operation**

The operation of the marine terminal shall cease in the year 2022, unless a permit amendment is granted in accordance with Commission regulations.

3. **Abandonment permit**

Prior to any termination of the operation of any of the facilities authorized by this permit, Exxon shall apply for a coastal permit for the abandonment of the subject facilities. A permit application for facility abandonment shall include plans for site restoration. Exxon shall abandon the facilities in accordance with the terms of any permit granted by the Commission.

### OIL SPILL CONDITIONS

4. **Oil Spill Contingency Plan**

Prior to the operation of any SYU facilities permitted herein involving the production, processing, or transportation of any petroleum products, Exxon shall submit a site specific oil spill contingency plan for the Executive Director's approval. Operations shall not commence until the final plan has been approved by the Executive Director and Exxon has implemented the changes determined necessary from this review.

5. **Oil Spill Containment and Clean-up Drill**

Exxon agrees to allow an unannounced oil spill containment and clean-up drill(s) to be conducted at the marine terminal, if built, in accordance with the terms of this condition. The Executive Director of the Coastal Commission or his designated representative, in coordination with the Department of Fish and Game, the State Lands Commission, the U.S. Coast Guard, and the Minerals Management Service, will call an unannounced oil spill containment and cleanup drill during times when tankers are at the terminal to test the ability of Exxon and the Clean Seas Oil Spill Cooperative to respond to spills at this facility. If, in the opinion of the Executive Director or his designated representative, critical operations are underway which could become hazardous if a drill is called,

-8-

the exercise will be postponed.  The Executive Director shall determine whether a drill is successful based on the following criteria:  Upon notification by the Executive Director, Exxon shall deploy the 1500 feet of boom and oil recovery devices at their facility consistent with the procedures listed in their oil spill contingency plan.  The oil skimmer, hoses, and storage container will all be deployed and demonstrated by pumping seawater through the devices.  All of this onsite equipment must be deployed and operational within <u>one hour and thirty minutes of the time the drill is called</u>.  Upon notification that the drill has commenced Exxon shall notify Clean Seas to send the Mr. Clean I vessel or equivalent vessel to the scene.  The Mr. Clean I vessel or equivalent vessel shall perform skimming operations by deploying their stationary skimmer in the apex of the deployed boom.  Mr. Clean I vessel or equivalent vessel shall be onsite within <u>two and one-half hours of notification that the drill has commenced</u>.  The stationary skimmer on Mr. Clean I or equivalent vessel shall be deployed and operational within 30 minutes of arriving onsite.

The first drill will be called within the first month of operation at the marine terminal.  If the Executive Director or his designated representative determines that Exxon does not successfully complete the drill, the Executive Director will call a second unannounced drill.  Prior to calling the second drill, the Commission staff will identify those aspects of the first drill which were not successfully completed, and inform Exxon of its recommendations, if any, for improvement.  If Exxon does not successfully complete the second drill, the applicant agrees that vessel loading operations may be suspended until a successful unannounced drill is conducted.  A subsequent drill will be held within one month of any suspension of operations.

6.   <u>Notice to Commission of any Oil Spill</u>

If an oil spill larger than five barrels occurs as a result of operations at the Exxon Las Flores Canyon Consolidated Marine Terminal or of any other Santa Ynez Unit facility or contract vessel, Exxon shall notify the Executive Director or his designee within 24 hours.

7.   <u>Annual Review of Oil Spill Response Equipment and Procedures</u>

Exxon agrees to an annual review of oil spill response equipment and procedures to be conducted in accordance with the terms of this condition.  The Executive Director of the Coastal Commission will review oil spill response equipment and procedures for Exxon operations annually to determine if improvements in state-of-the-art oil spill clean-up equipment warrant additional equipment or improved response procedures. In this review, the Executive Director shall consult with the Department of Fish and Game, the State Lands Commission, Minerals Management Service, and the U.S. Coast Guard.  If the Executive Director determines improvements to be reasonable and feasible, he shall require Exxon to make such improvements.  Except as provided below, Exxon agrees to implement such improvements within one month of notification by the Executive Director.  A longer period for implementation of improvements may be authorized by the Executive Director, if he determines that implementation within one month is not feasible.

-9-

8.  <u>Oil Spill Risk Reduction in the Sea Otter Range.</u>

Exxon shall participate in a joint industry/government study group to evaluate the ability of industry groups and governmental agencies to contain and clean up oil spills in the sea otter range (as defined by the United States Fish and Wildlife Service) with available resources.  The Gaviota Marine Terminal Company (GTC), of which Exxon is a member, is preparing the scope of such a study for review and approval by the Executive Director in consultation with the USFWS, the Department of Fish and Game, and the Coast Guard.  The GTC study shall be completed and submitted to the Executive Director for his review and approval within three months of the Executive Director's approval of the scope of the study.  After the Executive Director's approval, Exxon may submit the results of the GTC study for the purposes of the Las Flores Canyon consolidated marine terminal operations.  If the Executive Director determines that the evaluation demonstrates the need for additional oil spill prevention and/or cleanup equipment, and determines such measures to be feasible, Exxon, as the operator of the Las Flores marine terminal, shall complete the following tasks.  These shall be completed one year prior to the operation of the marine terminal:

<u>Workshop to Assess Oil Spill Equipment Needs in Sea Otter Range</u>

a.  Organize and hold a workshop consisting of the membership of the Clean Seas Oil Spill Cooperative, the Clean Bay Cooperative, and any industry organizations involved in exploration, production, and/or transportation of oil that could affect the sea otter range to determine potential arrangements to acquire the necessary oil spill prevention and/or cleanup equipment necessary to respond to oil spills in the sea otter range.  Exxon shall prepare and present a report detailing their estimates of the cost of equipment, its operation and maintenance, and other necessary support services determined necessary by the Executive Director.  Other attendees shall include, but not be limited to, the Commission staff, representatives of the Coast Guard, the Department of Fish and Game, the US Fish and Wildlife Service, and the State Lands Commission. Exxon shall submit a report to the Executive Director detailing the views expressed by these groups regarding the acquisition of the appropriate level of oil spill response capability.  If such equipment and support services have been acquired prior to this time to the satisfaction of the Executive Director, no such workshop shall be necessary.

<u>Oil Spill Equipment Acquisition</u>

b.  Provide funds equitably and proportionately (with other parties contributing to oil spill risk through oil exploration, production, or transportation of oil affecting the sea otter range), in an amount and to a recipient to be determined by the Executive Director, for the acquisition of additional equipment and to support operations as may be reasonably required to reduce the total risk of spills in the sea otter range to the maximum extent feasible.

-10-

Oil Spill Equipment Operation

c.    Assure that the equipment and support services, identified pursuant
to sections a. and b. of this permit condition, will be acquired and
available on-site for use prior to the operation of the marine
terminal.

MARINE RESOURCE CONDITIONS

9.    Marine Construction Mitigation Plan

Exxon shall, no less than two months prior to the commencement of
construction, submit a plan to mitigate construction impacts to marine
resources to the maximum extent feasible.  This plan shall be submitted to
the Executive Director of the Coastal Commission.  The Executive Director
shall, in his review of the plan, consult with the DFG, USFWS, NMFS, Santa
Barbara County, and the State Lands Commission.  The plan shall include
time limits for construction, as included in the special provisions of the
State Lands Commission leases and requested by DFG.  The plan shall be
supported by a detailed description of construction techniques, and
include the following major components:

a.    Use of Explosives

A blasting plan, including location, number, and kind of explosives
to be used, the expected sphere of damage to fish and invertebrates
from each charge, and the directional characteristics of the charges
shall be included.  To ensure that this methodology minimizes
impacts, the plan shall also explain why methods other than blasting
are infeasible, and why this methodology will cause less damage to
marine resources than other alternative explosive methodology.

To protect marine mammals and diving seabirds from mortality or
injury, the plan shall also include, but not be limited to, one or
more qualified marine wildlife observers, and their location(s),
authority, and means of communication with blasting personnel.  Exxon
shall suspend blasting when cetaceans are within two miles of the
blasting zone.  The usefulness and feasibility of "poppers" to scare
wildlife and fish away shall be discussed.

b.    Protection and Mitigation for Surfgrass Beds

A mitigation plan for surfgrass shall include avoidance of impacts to
the maximum extent feasible, restoration of surfgrass to the maximum
extent feasible, and restoration of substrate to the maximum extent
feasible.  The plan shall include a discussion of possible and/or
successful techniques for restoring and/or replanting.  In order to
ensure protection and document loss, Exxon shall submit up-to-date
and detailed pre- and post-construction maps of the surfgrass beds
within the area which could be disturbed by construction.  All areas
which could be disturbed by equipment and construction operations,
including but not limited to vehicles, anchors, anchor lines,
blasting, trenching, installation of a trestle, and burial by dredged
or excavated material, shall be mapped.  Map information will

-11-

include, but is not limited to, coverage (area and density) at all depths, as well as substrate type, size, and location.

Exxon shall, within three months of the issuance of this permit, submit to the Executive Director information on methodology and success of any previous surf grass restoration attempts, and a discussion about the applicability of this work to the project impact area. If the Executive Director, in consultation with DFG and USFWS, determines that there is a high likelihood of successful restoration based on previous attempts, Exxon shall include plans to implement and monitor one (or more) of these methods in the Marine Construction Mitigation Plan. If the likelihood of success is low, or previously tested methods are unavailable, Exxon shall fund a study by an expert in surfgrass or eelgrass restoration to develop, implement, and monitor methods for surfgrass protection and restoration. The study shall be conducted in accordance with a plan and at a cost reviewed and approved by the Executive Director in consultation with DFG and the USFWS. The study plan shall be submitted 12 months prior to commencement of pipeline construction through the surfgrass beds, in order to ensure that any methods limited to certain seasons can be evaluated, and any necessary work to develop successful restoration techniques shall be accomplished before final review of the construction mitigation plan, and incorporated into that plan. If complete evaluation of restoration techniques cannot be accomplished because of the short time period available before construction, analysis of those techniques which need a longer time for evaluation, and will not have to be begun before construction, may be completed after final review of the Marine Construction Mitigation Plan. The anticipated completion date shall be part of the Marine Construction Mitigation Plan. The techniques recommended in this study shall be used to protect and restore surfgrass lost due to construction, and to monitor the success of protection and restoration, unless the Executive Director finds that other techniques are feasible and will provide a greater level of protection and restoration.

c. Anchor Placement to Reduce Impacts

If a dredge barge is to be used, or if any construction equipment will require anchoring shoreward of the outer edge of the kelp bed, the plan shall show all potential anchor, drop locations, probable drag, and lines superimposed on a map with current giant kelp, surfgrass, and substrate (soft bottom, bedrock reef, and boulder/cobble) distributions. The plan shall identify all feasible methods of avoiding kelp, surfgrass, bedrock reefs, and other important hard bottom areas with anchors and anchor lines.

Significant hard bottom features offshore of the kelp bed, which are identifiable by high resolution side scan sonar, and which could be damaged by pipeline laying and laybarge anchoring, shall be identified and mapped. To ensure that damage to these features shall be minimized, the pipelines and the potential anchor, probable anchor drag, and anchor line bottom sweep locations shall be superimposed on the map of these features.

-12-

The plan shall explain how disturbance to the bottom from anchor scars will be minimized to the extent feasible in all areas and habitats.  Methods of placing, setting, and retrieving anchors, and minimizing the number of anchor settings, shall be included, as well as information on the feasibility and usefulness of an anchor testing procedure, such as described in MMS study 84-0058, "Sea Floor Conflicts Between Oil and Gas Pipelines and Commercial Trawl Fisheries on the California Outer Continental Shelf," Section 8.0. The plan shall also include provisions for restoring bottom scarred by anchors if the "as-built" survey (Provision 8(b)) provided to the State Lands Commission, shows that the area of anchor scar damage is more than anticipated in the SEIR (State Lands Commission, Dec. 1987), (i.e. a maximum of 165 ft. long, an average of 50 ft. long, and an average of 10 ft. wide), or that the scars are unusually deep, or the berms unusually extensive.

d.    Kelp Survey and Mitigation

A pre-construction survey of the kelp bed shall be included, with aerial photographs, diving transects along both pipeline routes, and down-looking sonar (or fathometer) transects covering the entire construction zone, i.e., anchor and anchor line locations, the construction corridor for boats, and the expected width of the disturbed area from pipeline pulls and associated turbidity.  The specific methodology for the survey shall be based on the extent and condition of the kelp bed at time of construction, and shall be used to assess the damage from construction and to determine the need for a re-survey and restoration, as previously agreed to by Exxon (letter from T.J. Tibbitts to S. Hansch, Dec. 4, 1987).  The methodology and success of ongoing efforts to restore kelp beds anchored in soft bottom shall be discussed in the plan.  In order to determine whether turbidity has significantly affected recruitment of new kelp plants, the surveys shall include measures to assess recruitment in both the project area and a control area nearby.

To ensure that the 150' construction vessel traffic corridors required by the State Lands Commission are located, if feasible, where kelp is less dense, the corridors shall be superimposed on an up-to-date map of existing kelp.  Vessel traffic through the kelp bed necessary for continuing operations or upset conditions shall also be discussed, with plans for minimizing kelp loss from this source.

e.    Minimizing Turbidity

The plan shall include a discussion of possible methods of minimizing turbidity, especially within the nearshore hard bottom habitats, within the kelp bed, and near important offshore hard bottom. Feasible methods shall be identified and incorporated into construction methodology.

f.    Construction Impacts on Gray Whales

The Marine Construction Mitigation Plan shall include measures which can be immediately implemented to reduce construction impacts to gray

-13-

whales should observations from the daily aerial survey required by the State Lands Commission show significant changes to the gray whale migration pattern. The level of change in the migration pattern which will trigger these measures shall be identified.

This Marine Construction Mitigation Plan may be prepared pursuant to Santa Barbara County Condition XIV-7, State Lands Commission marine terminal lease, and Environmental Mitigation Provision 3, in satisfaction of this condition, as long as it includes the information identified above in (a)-(f). Exxon shall not commence construction until the Executive Director finds that the plan provides for maximum feasible mitigation of construction impacts. All construction activities shall be carried out in accordance with the approved plan. A post construction survey covering the same information as specified in support to (b) and (d) of this condition shall be provided to the Executive Director for review and approval of condition compliance. The post construction survey shall commence within one year of the preconstruction survey and not more than two months after completion of pipeline construction in state waters.

10. Mitigation of Operations Impacts on Gray Whales

If the gray whale study at the Gaviota Interim Marine Terminal shows significant disturbance to gray whales or their migration routes from the additional support boat and tanker traffic at that terminal, Exxon shall submit to the Executive Director of the Coastal Commission for his review and approval a plan to mitigate to the maximum extent feasible significant disturbance to gray whales or their migration routes from the Exxon SYU facilities which could cause cumulative effects. This plan shall be submitted at least two months before tankers begin using the Exxon terminal. All operations shall be conducted in accordance with the plan as approved by the Executive Director.

11. Wildlife Cleaning and Rehabilitation

As per the USFWS recommendation in the latest Endangered Species Consultation, if the marine terminal is constructed, Exxon shall provide funding for the construction and operation of at least two operational rehabilitation facilities which may be utilized to care for threatened and endangered species in the event of an oil spill. Exxon's commitment to fund these facilities shall be for the life of the Las Flores Canyon Marine Terminal. These facilities shall be designed under the joint guidance of the USFWS and the DFG, shall be built with necessary permits and in accordance with plans approved by the Executive Director, and shall be operational before tankers begin using the Las Flores Consolidated Marine Terminal. The risk from the entire project, including pipelines, tanker loading, and the entire extent of tanker travel from the terminal, shall be covered by this condition, should the marine terminal be built. Evidence of the readiness of the above facilities to receive oiled wildlife shall be submitted to and approved by the Executive Director one month before tanker operations begin or the pipelines begin carrying oil.

Exxon also shall participate equitably in the identification of facilities, equipment, and personnel needed for oiled wildlife cleaning and rehabilitation already begun by Cities Service/Shell, Arco, and

-14-

Gaviota Terminal Company. Risks from the marine terminal and pipelines shall be addressed in this study. This evaluation of the needs for wildlife rehabilitation facilities is a result of past Commission action on projects by the aforementioned companies. Exxon and the other participating companies shall equitably provide necessary facilities, equipment, and personnel, based on this study and the recommendations of DFG, NMFS, and USFWS. Because the terminal is not scheduled for operation until 1992, Exxon's responsibility for providing their equitable share (at least two) clean-up centers (for the marine terminal) may have been met through their proportionate funding of industry cooperative wildlife clean-up programs.

12. <u>Tanker Routes to Protect Marine Resources</u>

All oil tankships using the Exxon Las Flores Marine Terminal, when enroute north of the terminal, shall remain outside the 5% 30-day conditional spill risk contour based on annually averaged trajectory runs, as derived and mapped by Ecological Consulting in the report "Trajectory Analysis of Simulated Oil Outflow from Release Sites Offshore of the California Sea Otter Range, and identification of a 5% Probability Contour", except when approaching San Francisco Bay.

The route shall be on or westward of the route designated #1 in the above study (Table 4, P. 11), and illustrated in Figure 13 (of this permit), and the route into San Francisco Bay shall be the main approach into the San Francisco TSS from the west (i.e. entrance to eastbound traffic lane in main approach to the San Francisco TSS). A plan for implementing this condition shall be submitted to the Executive Director for his review and approval at least two months before tankers begin using the terminal.

Exxon shall obtain from each user of the marine terminal a written agreement committing to compliance with the provisions of this condition. The agreement shall be in the form of a contract between Exxon and the user, and shall include a provision recognizing that the Commission is a third part beneficiary to the contract, and may fully enforce its provisions. Operation of the terminal shall not commence until Exxon has received the Executive Director's approval of the terms of the contract to be used. A user shall not be permitted to use the terminal until the approved contract has been fully executed by Exxon and the user. Exxon shall, within 10 days of the execution of any contract pursuant to this provision, provide a written copy to the Executive Director.

To allow Commission review of compliance with the terms of this condition, certified copies of ships' logs of tankers using the Las Flores terminal shall be available for inspection within seven days of tanker voyage completion by the Coastal Commission at any time in Exxon's Las Flores Canyon Terminal Office. In addition, an annual report documenting the number of tankers using the terminal with routes north of the terminal, the volume of oil moved by these vessels, and the routing distance from shore (based on navigational coordinates or some other verifiable means), shall be submitted to the Coastal Commission.

-15-

13. <u>Limit on Oil Throughput to Protect Endangered and Threatened Species</u>

The oil throughput of the Exxon consolidated marine terminal shall not exceed 100,000 bbls of oil per day based on an annual average, consistent with the findings of the latest USFWS Endangered Species Act consultation.  Exxon shall not exceed this throughput of 100,000 bbls of oil per day based on an annual average unless it obtains a new Endangered Species Act consultation on the increased capacity and the Commission approves an amendment to this coastal permit.

14. <u>Consultation with Commercial Fishermen</u>

Exxon shall consult with affected commercial fishermen in coordination with the Fisheries Liaison office and schedule construction activities to the maximum extent feasible in order to minimize adverse impacts on commercial fishing.  Exxon shall submit a final construction schedule minimizing interference with commercial fishing impacts to the Executive Director for review and approval at least two months prior to construction of any offshore portions of the project.

SYSTEMS SAFETY CONDITIONS

15. <u>Vapor Recovery/Inert Gas System</u>

Prior to construction of the marine terminal facilities, a group consisting of representatives of Exxon, the U.S. Coast Guard, the California Maritime Academy (CMA), the Santa Barbara County Fire Department, and the California Coastal Commission shall examine the CMA's technical report on the vapor recovery/inert gas system at the Texaco Gaviota Interim Marine Terminal.  After analysis of the report, this committee shall advise the applicant and the applicable regulatory agencies as to what, if any, safety problems exist in the operation or design of the vapor recovery/inert gas system as they apply to the Las Flores Canyon Consolidated Marine Terminal.  If problems are identified, Exxon shall undertake engineering studies to identify corrective measures and institute any changes determined to be necessary and feasible by any of the appropriate agencies.

16. <u>Fire Fighting Capabilities</u>

Santa Barbara County Condition X1.2.1 requires, prior to approval of any County Land Use Permits or Coastal Development Permits for marine terminal facilities (except pipelines), that a panel investigate the need for a vessel with fire fighting capabilities at Las Flores Canyon.  The results of this study by the panel or other group convened by Santa Barbara County, shall be presented to the Executive Director for his review and approval.  The Executive Director, in consultation with the State Lands Commission, the Santa Barbara County Fire Department, the applicant, and the U.S. Coast Guard, shall determine if a dedicated fire protection vessel is needed at the project site.  If the vessel is found to be needed by the Executive Director, the applicant will furnish and operate such a vessel unless an appropriate agency does so.

-16-

### 17. Risk Management Plan

Prior to operation of the marine terminal, the applicant shall submit to the Executive Director, for his review and approval, a Risk Management Program for the marine terminal portion of the Santa Ynez Unit Project. The submittal may be the offshore sections of the plan developed for Santa Barbara County.  The program shall include hazard identification, risk assessment and mitigation, safety inspection and maintenance programs, and emergency response plans.· Exxon shall implement the plan as approved by the Executive Director.

### 18. Marine Terminal Operation Manual

Prior to operation of the marine terminal, the applicant shall submit a marine terminal operations manual to the Executive Director for review and approval.  The manual shall include a critical operations and curtailment plan which shall specify operational conditions during which the marine terminal shall suspend operations.  Exxon shall implement the manual as approved by the Executive Director.

### MARINE WATER QUALITY CONDITIONS

### 19. Vessel Ballast Facilities

Exxon shall provide deballasting and onshore treatment facilities, or shall require that all vessels using the facility must have segregated ballast tanks.  Exxon and other terminal users may utilize another method, if, prior to initiating utilization of such method, Exxon receives a determination from the Executive Director, after technical consultation with the United States Coast Guard, that the equivalent level of marine water quality and marine resource protection can be achieved through the proposed alternative method.

### GEOLOGIC CONDITIONS

### 20. Pipeline Stability

Exxon shall submit information demonstrating that all pipelines are stable in environmental design conditions and that the pipeline protection method at the shoreline will be designed and constructed so that no additional shoreline protective devices which would increase the pipeline profile will be required at any time during the pipelines' intended design life.

The top of the pipelines shall be placed at least three feet below the maximum point of scour when in unconsolidated sediments.  If the maximum point of scour is bedrock, Exxon shall, at the very minimum, trench into the bedrock so that the top of the pipelines and any protective armor rock over the pipelines will remain at or below the level of the naturally exposed bedrock.  To assure that this design objective is achieved, Exxon shall submit the following information for the review and approval of the Executive Director two months prior to offshore pipeline construction:

-17-

a.  <u>Engineered Plans</u>.  Engineered plans (in cross section) of the
pipelines crossing the intertidal zone.  These plans shall show the
elevations of the bottom of the trench, the top of the trench, the
top of all pipelines within the trench, the maximum point of scour,
the bedrock profile, and the top of the armor rock backfill.

b.  <u>Plan View Map</u>.  A plan view map illustrating those areas where
the trenches will be backfilled with armor rock and those locations
that will be left to self-cover with littoral material.

c.  <u>Installation Method</u>.  Identification of Exxon's preferred
installation method for pipelines.  A written explanation of the
reasons for Exxon's preferred trenching method (dredge barge or
trestle), or combination of methods, to be used for excavation of
pipeline corridors to the -25MLLW level.

Exxon shall install pipelines in conformance with approved plans.

-18-

III.    FINDINGS AND DECLARATIONS

The information set forth above is incorporated as a part of these Commission findings.  In addition, the Commission finds and declares as follows:

A.  Project Description and Location

The project before the Commission is a modified version of the Santa Ynez Unit (SYU) nearshore Option B approved by the Commission in 1985.  Three summaries of the proposed project follow.  A summary description of the entire Santa Ynez Unit (SYU) project precedes summaries of the nearshore and onshore project changes and a description of the nearshore portions of the project. The Commission concurred with a consistency certification in 1983 for OCS Platforms Heritage, Harmony, and Heather and the OCS pipelines.  As reported to the Commission on January 15, 1988, staff determined that no further review of the OCS portions of the Exxon SYU project is necessary.  Under its consistency review, the Commission at this time is taking action only with respect to the nearshore portion of the project located in state waters, associated activities, and the onshore portion of the project.  Commission coastal permit review is limited to the nearshore portion of the project in state waters.  This project description does not reflect the staff recommended conditions.

Entire Santa Ynez Unit Project

Exxon Company, U.S.A. is developing oil and gas reserves on the Outer Continental Shelf (OCS), in the Santa Ynez Unit (SYU).  Existing facilities include: Hondo A, a platform producing approximately 30 thousand barrels per day (KBD) of crude oil; which is processed, stored, and transported from the offshore storage and treatment (OS&T) vessel located on the OCS.  Hondo's gas production is about 30 MSCFD, and is processed at Pacific Offshore Pipeline Company's (POPCO) onshore gas processing facility located within Las Flores Canyon.  An unused marine terminal, Exxon's El Capitan Marine Terminal, is intended to be removed and abandoned; however, the Commission has not received a consistency certification or permit application for those activities.

Exxon now proposes to further develop oil and gas reserves in the Santa Ynez Unit.  The entire SYU project is located: offshore, on the OCS and within state waters; and onshore within the coastal zone and landward of the coastal zone.  Commission review of onshore project impacts is limited to effects on the coastal zone.  The ten major elements of this entire proposed SYU development consist of:

1)    Install three new drilling and production platforms on the Hondo, Pescado, and Sacate oil and gas fields on the OCS which are part of offshore Option B (These platforms have received Commission concurrence during Commission review of the offshore portion of Option B in 1983, see exhibit 10.);

2)    Construct in two phases a new consolidated oil treating facility in the Corral/Las Flores Canyon area with 140,000 barrel per day (BD) capacity (125,000 BD annual average, outside coastal zone);

-19-

3)    Increase onshore gas sales to 60 MSCFD annual average from 30 MSCFD, to be processed in POPCO's permitted consolidated gas treating facility (outside coastal zone);

4)    Install a 49 megawatt (MW) cogeneration power plant (outside coastal zone);

5)    Install a gas stripping treatment facility capable of peak processing of 21 MSCFD of sour gas derived from offshore platforms and onshore crude oil processing (the treated gas is to be used as fuel for the cogeneration power plant and as sweet stripping gas for oil processing, outside coastal zone);

6)    Construct a natural gas liquid and liquid petroleum gas (NGL/LPG) consolidated storage and transportation facility on a new consolidated facility site (outside coastal zone);

7)    Install a 540,000 barrel crude oil consolidated storage and transportation terminal facility (outside coastal zone) phased to transport crude oil by pipeline (Phase I), followed by the installation of a marine terminal facility (Single Anchor Leg Mooring, SALM within coastal zone) at 11,250 feet offshore on state lease PRC 2991 for oil transport to non-pipeline destinations (Phase II);

8)    Install produced water treatment and other associated utility systems (partially outside and partially within coastal zone);

9)    Install onshore and offshore pipelines, power supply and distribution equipment partially outside and partially within Coastal Zone); and

10)   Decommission and remove the offshore storage and treatment (OS&T) vessel on the federal OCS after the onshore oil treatment facilities are operational and debugged.  Remove and abandon when permitted, the El Capitan marine terminal within the coastal zone (onshore and offshore).

Exxon estimates that the total primary recovery of the proposed development would amount to approximately 300 to 400 million barrels of crude oil and 600 to 700 billion standard cubic feet of natural gas.  Recovery of these reserves would take place over a period of approximately 25 to 35 years.  Proposed facilities are designed for a SYU estimated peak daily production rate of 140,000 barrels of oil and 72 million standard cubic feet per day (MSCF) of natural gas (60 MSCFD through the existing POPCO gas plant and 12 MSCFD through the stripping gas treating plant).  The maximum gas rate through the stripping gas treating plant is 21 MSCFD.  Additional gas will be sent to this plant from the oil processing facility since some gas is entrained in the crude oil.  The proposed onshore facility site plan is illustrated in Exhibit 8.

Exxon's proposed SYU onshore processing facility will be located in Santa Barbara County, 20 miles west of the City of Santa Barbara and about one third of a mile inland of the coastal zone between El Capitan and Refugio State

-20-

Beach Parks.  The marine terminal will be located about two and one half miles offshore of Las Flores Canyon within state waters and within the coastal zone.  The marine terminal and pipelines will be located on state parcel PRC 2991, which is presently also leased to Unocal Company for potential oil and gas exploration and development.  The pipelines from shore to the OCS are also located on: parcel PRC 2991; parcel PRC 2955, now leased to Phillips; and on parcel 2198, quitclaimed to the state.  The platforms and offshore pipelines are to be located on the Outer Continental Shelf (OCS) within the Santa Ynez Unit between Las Flores Canyon on the east and Point Conception on the west. The platforms would be located from five miles to nine miles offshore in water depths ranging from 620 feet to 1200 feet.

## Santa Ynez Unit Nearshore and Onshore Project Changes

In 1985, the Commission concurred with a consistency certification for a previous version of the Santa Ynez Unit DPP nearshore Option B alternative. That proposal included a consolidated marine terminal; onshore and offshore pipelines and power cables; oil and gas treating facilities; and oil storage facilities.  Within state waters, the 1985 approved project included: a Single Anchor Leg Mooring (SALM) at 14,000 feet offshore of Las Flores Canyon; crude oil loading and vapor balance pipelines to the SALM; crude oil emulsion, gas pipelines and electric power cables to the platforms on the OCS; and an ocean outfall located 1.5 miles offshore.  Approval of discharges was not included in the Commission's action.  The onshore portions of the project in Las Flores Canyon included: a 140,000 barrel oil processing facility; a 135 MSCFD gas treating facility; a 15-25 megawatt cogeneration plant; a 650,000 barrel oil storage facility; and connecting oil and gas pipelines.

Nearshore and onshore components of the current SYU project incorporate numerous mitigation measures and project improvements.  These project revisions differ from those previously proposed and concurred with by the Commission in eight important respects:

1)  The consolidated oil transportation system will be constructed in two phases; phase I includes the construction of onshore crude oil storage tanks, tank vapor recovery, pipeline booster pumps and pipelines, and phase II includes the construction of the offshore SALM located at approximately 11,250 feet offshore with onshore crude oil loading pumps. The SALM has been relocated to the east within the same state parcel PRC 2991.

2)  The oil treatment plant will be constructed in two phases: 100,000 BPD, and 140,000 BPD peak capacity.

3)  The POPCO gas treatment facility will be expanded to the already permitted 60 MSCFD.  The initial plants to increase sales gas processing to 135 MSCFD were deleted.

4)  Crude oil storage capacity will be reduced from 650,000 to 540,000 barrels.

5)  The cogeneration plant capacity will be increased from 15-25 to 49 megawatts.

-21-

6)    The stripping gas treatment plant will be increased to 21 MSCFD.

7)    The natural gas liquid/liquid petroleum gas (NGL/LPG) storage and transportation facility was relocated.

8)    Utility facilities are relocated.

9)    Grading in Las Flores Canyon is increased over original proposal

## Santa Ynez Unit Nearshore Project Within State Waters

**Pipelines**  Three principal pipelines will be installed from the onshore facilities to the SALM: a 48-inch diameter crude oil loading line and two 18-inch diameter vapor balance lines.  In addition to the three principal pipelines, a service bundle containing hydraulic lines will be installed.  The hydraulic lines will permit automatic operation of the subsea manifold valves on the crude oil transfer and marine vessel vapor balance lines.

Exxon proposes to install another two pipelines: one 20-inch crude oil pipeline; one 12-inch produced water outfall pipeline to serve the three previously permitted OCS platforms; and three power cables.

The offshore pipeline corridor extends from two pipeline tunnels crossing beneath highway 101 to state waters.  Within state waters, the pipelines will run south through two corridors.  The corridor to the SALM site will bring pipelines to a manifold connected to the underwater base hoses of the SALM. This corridor is 150 feet wide close to shore extending to 400 feet wide approximately one half mile offshore enroute to the SALM.  The second corridor will connect the onshore processing facility to the platforms on the OCS. This corridor is again 150 feet wide close to shore extending to 500 feet wide approximately one third mile offshore enroute to the platforms.

The construction method anticipated for pipeline installation is the conventional pipe lay barge stinger method.  Surf zone trenching operations may require the use of a trestle to prevent sanding in the trench.  Power cables will be installed in the same corridors as pipelines.  Nearshore pipeline construction is scheduled for late 1989 to early 1990, requiring about three months.

**Marine Terminal**  A single anchor leg mooring (SALM) will be installed approximately 11,250 feet offshore in 200 feet of water.  Marine vessels loaded at the SALM will be American flag ships.  As proposed, all tankers berthing at the SALM will have either adequate segregated ballast tanks or be required to retain onboard any non-segregated ballast for subsequent discharge acceptable to USCG.  The applicant anticipates that annual oil volumes will average 125,000 BPD.

The consolidated marine terminal will be equipped with an innovative closed vapor recovery system designed to eliminate over 99.8 percent of the hydrocarbon vapors generated by the crude storage and loading operation.  The system is comprised of dual tanker vapor recovery lines from the SALM to shore, vapor compressors, storage tank vapor recovery, an incinerator and a comprehensive fugitive emission surveillance plan.

-22-

A standby vessel will be on station at the SALM during tanker mooring. The vessel will be equipped with firefighting capability approved by the County Fire Department, and oil spill containment and cleanup equipment. The boat would travel from Ellwood Pier. Estimated tanker frequency for the consolidated marine terminal is a maximum of 175 trips per year.

Exxon intends as required by the County to remove the onshore facilities of the El Capitan marine terminal and associated facilities by September 1988. The removal or abandonment of the El Capitan terminal offshore facilities is not part of this application.

Exxon proposes, as required by the County, to discontinue use of the OS&T within 30 days after the time onshore oil facilities are fully operational and debugged, or within one year of initial start-up of oil processing. The existing SALM for the OS&T will be removed within three months after OS&T removal.

Exxon will take the lead in the venture formation for a consolidated marine terminal. Any interested user will be offered non-discriminatory access to the facility; Appendix G includes the project consolidation agreement. Construction and operating costs will be shared among the users on a mutually agreed upon basis.

The applicant has scheduled the SALM and pipeline construction for the fourth quarter of 1989 through the first quarter 1991. The earliest SALM start-up date is scheduled for first quarter 1992. The Texaco Gaviota Marine Terminal is permitted to operate through mid 1990 only, unless it is granted an extension by the County, State Lands Commission, and a permit amendment by the Coastal Commission. Texaco's plans to request a permit extension are unknown at this time. As required by County Coastal Plan policies, only one consolidated marine terminal is permitted to operate. Under the Santa Barbara County permit, Exxon's marine terminal may be installed to operate only when the Texaco marine terminal operation permits are to expire and the County has determined that a new consolidated marine terminal is needed.

Santa Barbara County Conditions of Approval  In approving the onshore facilities on September 15, 1987, Santa Barbara County imposed numerous conditions mitigating impacts to commercial fishing, habitat, and air quality, among others, and added requirements to consolidate the onshore processing and marine terminal facilities and transport oil by pipeline to the shipper's refinery center. These conditions are included in Appendix I. The County will require a public hearing to determine if onshore facilities should be abandoned where oil and gas processing, transportation, or storage throughput is reduced to 3% or less of permitted capacity. If such a determination to abandon is made for the onshore facilities, Exxon must remove all such facilities constructed under the County permit, recontour, and revegetate the site in accordance with the approved plan.

In addition, the County's permit requires Exxon within one year of the final development plan approval, to remove the old El Capitan marine terminal tank and associated facilities, and to recontour and revegetate the site located immediately north of the highway frontage road and east of the boundaries of the Exxon property. Use of the OS&T must be discontinued within 30 days of

-23-

the time that onshore oil facilities are fully operational and debugged.  The OS&T must be removed within one year of the initial start-up of oil processing facilities.  The existing SALM for the OS&T must be removed within three months after OS&T vessel is removed.

<u>Santa Barbara County Air Pollution Control District Conditions of Approval</u> On November 19, 1987 the Santa Barbara County Air Pollution Control District granted Exxon the final authority to construct (FATC) permit with sixty conditions for the entire project.

<u>State Lands Commission Lease Provisions</u>  On January 21, 1988 the State Lands Commission granted a lease for the proposed marine terminal and pipelines through state waters.  Major conditions addressed marine terminal safety, tanker ballast systems, commercial fishing and marine biology issues, among others.  Appendix J includes these conditions in the lease provisions.

As noted, the project as described includes the conditions imposed in the Santa Barbara County and APCD, and the State Lands Commission approvals. Thus, these provisions are enforceable by the Commission.  However, the Commission's findings and conditions are to prevail in the event of any conflict.  The activities approved in this permit and consistency certification and permit are limited to those specifically listed above on pages 20, 21, and 22, although additional activities are addressed in the other agency approvals.  To the extent that the Commission relies on the conditions of these previous approvals, its action is based on the project as now authorized by those permits, although they contemplate some future changes.  Thus, the incorporation of these conditions does not change the requirement that Exxon obtain additional Commission approval for project changes in accordance with the Coastal Act and the Commission's regulations.

B.    <u>Project History</u>  (Refer to Appendix A for more details)

Following a 1968 federal Bureau of Land Management lease sale (Lease sale P-4), three major oil and gas fields, the Hondo, Pescado, and Sacate, were explored by Exxon and its partners.  These fields became known as the Santa Ynez Unit (SYU), with Exxon designated as the operator.  In 1976, the Hondo A platform was installed.  Exxon chose to process the Hondo field oil on an offshore storage and treatment (OS&T) vessel in federal waters, to use tanker transport <u>rather than</u> build an onshore processing facility, and to use an onshore pipeline to transport oil to refineries.  The OS&T vessel was approved by Minerals Management Service (MMS) (formerly the Bureau of Land Management) prior to the time the Commission obtained consistency authority.  (See Exhibit 9.)  A gas pipeline from Hondo A to a Las Flores Canyon gas treatment facility was constructed by Pacific Offshore Pipeline Company (POPCO) in 1983.

In June 1983, the Commission reviewed consistency certifications for two alternative plans for further development of the SYU, Options A and B.  The Commission objected to Option A, because of unacceptable impacts to the coastal zone resulting from increased risks of oil spills and increased air pollution emissions.  Option A included the expansion of the OS&T vessel, installation of 3 to 4 platforms, expansion of the Las Flores gas treatment facility, and installation of offshore pipelines from platforms to the expanded OS&T vessel.  The Commission concurred on the federal (offshore) portion of Option B, because the overall plan incorporated measures for

-24-

pipeline transportation of crude oil to refinery destinations, onshore processing and other measures to mitigate impacts to the maximum extent feasible.  In view of Commission concerns regarding, among other issues, pipeline transportation and marine terminal location, Exxon withdrew the nearshore portion of Option B which included the onshore treatment facilities, marine terminal at 5,000 feet from shore, and pipelines to shore in state waters. At that time, Exxon appealed the Commission's objection to Option A to the Secretary of Commerce, and, at the same time, filed an action in federal district court.  As explained below, no final determination has been issued in either proceeding.  Later, lawsuits were also filed by Exxon against the County, and by the County against MMS.  These proceedings were subsequently dismissed in late 1987.

In August 1984, Santa Barbara County conditionally approved an Exxon application for onshore oil storage and oil and gas processing facilities, and a cogeneration plant.  That marine terminal proposed to be located 5,000 feet offshore was denied without prejudice due to air impacts.

In August 1985, the Commission acted on a consistency certification for a revised version of the nearshore portion of Exxon's 1983 proposal.  The Commission concurred with nearshore Option B as modified, in part on the basis that issues could be resolved during permit review.  At that time, Exxon did not request a coastal permit for the portions of the project in state waters, which included the proposed marine terminal and pipelines.

In October 1985, Santa Barbara County approved in concept the Exxon Las Flores Canyon consolidated marine terminal, proposed to be located at 14,000 feet offshore of Las Flores Canyon.  In addition, the County approved the preliminary development plan for the Gaviota (Texaco) interim marine terminal.

In September 1986, the County then conditionally approved a revised preliminary siting and development plan for the project, requiring Exxon to fully mitigate adverse air quality impacts affecting the County.  Exxon then withdrew its final development plan from further County review, rejecting the air quality mitigation condition, and requested that consideration of its lawsuits against the County and Coastal Commission and its appeal to the Secretary of Commerce resume.

From December 1986 through June 1987, Exxon resumed informal discussions with the County and representatives of local environmental groups.  Further stays were requested and received from the Secretary of Commerce and in the pending litigation.  Based on these discussions, and because of other modifications it sought to make, in June 1987, Exxon revised the SYU project and submitted a new final development plan, which was approved by the County Planning Commission in September 1987.  In November 1987, the County's air pollution control permit was granted.

In May 1987, the County approved the final development plan for the Texaco Gaviota interim marine terminal.  In August 1987, the Coastal Commission approved the Texaco Gaviota interim marine terminal to operate until July 1, 1990.

On January 21, 1988, the State Lands Commission approved Exxon's marine terminal and pipeline leases in state waters.

-25-

## C.  Commission Review of Development Plans

The Commission has the authority to review DPPs for consistency with the California Coastal Act because the federal government has approved the California Coastal Management Program (CCMP) under the CZMA.

Exxon has stated that it has applied, or will be applying for the federal licenses and permits listed below.  By concurring in Exxon's certification, the Commission informs these respective federal agencies listed below that it considers the nearshore and onshore portions of Exxon's OCS plan to be consistent with the CCMP.  Although some of the permits and licenses listed below apply to OCS portions of the project as well, the project before the Commission includes only the nearshore and onshore portions of the project, thus, the listings below are intended to apply only to those project components.

| Federal Agency | License or Permit Required |
|---|---|
| Minerals Management Service | Approval of Development and Production Plan (DPP) and Environmental Report |
| U. S. Environmental Protection Agency | Prevention of Significant Deterioration Permit (authority delegated to Santa Barbara County Air Pollution Control District) |
| U.S. Army Corps of Engineers | Section 10 and 404 Permits; Section 7 Endangered Species Act Consultation with U.S. Fish and Wildlife |
| U.S. Coast Guard | Approval for platform modification and SALM |
| Federal Communications Commission | Communications License |
| Federal Energy Regulatory Commission | Producers Certificate |

NEPA/CEQA.  Because the federal Minerals Management Service has determined that Exxon's project is a "major federal action" under the National Environmental Policy Act (NEPA), the MMS has prepared an Environmental Impact Statement (EIS) on the project.  This document was prepared jointly with the state's Environmental Impact Report (EIR), required by the California Environmental Quality Act (CEQA).  The EIS/EIR  was certified as complete by the County of Santa Barbara, the lead agency, on July 6, 1984.  MMS determined the subsequent project modifications to require only the preparation of an Environmental Assessment, to be completed in the near future, and not a supplemental EIS.  Two Supplemental EIR's and one EIR Addendum on the proposed modified Exxon SYU and Consolidated Marine Terminal at Las Flores Canyon have been certified by the County of Santa Barbara in August 1985, August 1986, and August 1987, respectively.  The State Lands Commission has certified a third Supplemental EIR on January 21, 1988.

-26-

**D.    Other Agency Actions/Response**

1.    U.S. Army Corps of Engineers

The U. S. Army Corps of Engineers will review a permit for the offshore pipeline and power cables and marine terminal facilities (Section 10, River and Harbors Act of 1899 and Section 404 Clean Water Act). A formal consultation under Section 7(c) of the Endangered Species Act was required as part of the 1984 SYU project. U. S. Fish and Wildlife Service (USFWS) completed a final biological opinion for the Minerals Management Service in 1984. An informal consultation was completed January 19, 1988 by USFWS for the Army Corps of Engineers consideration. (Appendix F includes these consultations) This 1984 formal consultation and 1988 informal consultation indicate that no rare or endangered species will be in jeopardy as a result of the modified project, if carried out in compliance with specified limitations and alternatives. The 1988 informal opinion determined that marine terminal throughput should be no greater than Texaco's Gaviota interim terminal at an annual average of 100,000 barrels per day.

2.    The staff consulted with other agencies regarding their concerns on the project. These concerns are discussed in other sections of this report.

**E.    Coastal Dependency and Relation to Industrial Development**

Section 30101 of the Act defines a coastal dependent development or use as that which "requires a site on or adjacent to the sea to be able to function at all." Ports, commercial fishing facilities, and offshore oil and gas development are specifically mentioned in the Coastal Act as coastal dependent (section 30001.2), although not all activities or facilities associated with such development would be considered coastal dependent uses. In its previous consistency certifications, (CC-7-83 and CC-7-83R) the Commission found that the platforms and the pipelines to shore were coastal dependent industrial facilities. Also, in prior permit decisions, the Commission has found pipelines to be coastal dependent industrial facilities only when they transport products directly from offshore facilities (Four Corners, Permit E-81-12). Exxon's processing and storage facilities, which are proposed in the coastal zone and outside the coastal zone at Las Flores Canyon, respectively, do not require a site on or adjacent to the sea within the meaning of Section 30101. Exxon's proposed onshore pipelines are generally not coastal dependent. However, in order to be operational they must cross the onshore coastal zone; those pipelines from Exxon's coastal dependent offshore facilities to Exxon's onshore Las Flores/Corral Canyon Facility are coastal dependent. The pipelines route is also the least environmentally damaging and shortest distance across the onshore coastal zone. Nor do other onshore facilities directly related to oil and gas processing and tank storage require a site on or adjacent to the sea. Therefore, the Commission finds that these facilities are not coastal dependent and therefore cannot be permitted unless they are consistent with the specific policies of the Coastal Act.

-27-

A special override provision of the Act, Section 30260 permits further consideration of coastal dependent industrial facilities which fail to meet the policies contained in sections 30200-30255 of Chapter 3.  Coastal dependent developments are given priority over other development on or near the shoreline under section 30255.  Under Section 30260, a coastal dependent industrial facility may be permitted "in accordance with this section and sections 30261 and 30262 if: (1) there are no feasible, less environmentally damaging locations for the project; (2) denial of or objection to the project would adversely affect the public welfare; and (3) adverse environmental effects are mitigated to the maximum extent feasible."  Section 30260 thus provides special standards under which coastal dependent facilities that otherwise fail to satisfy Coastal Act requirements may, in the discretion of the Commission, be approved.  Section 30261 provides that marine terminal facilities be consolidated to the maximum extent feasible and legally permissible, sited to avoid environmentally sensitive areas, and use a monobouy system unless an alternative is shown to be preferable.  Section 30262 provides that new or expanded oil and gas development be consolidated to the maximum extent feasible.  It also contains specific requirements pertaining to geological and vessel system safety, reinjection and monitoring of land and ocean floor movements.

As specifically discussed in the issue sections below, many impacts to the coastal zone related to both the coastal dependent and non-coastal dependent facilities can be found consistent with Chapter 3 Coastal Act policies through the applicant's project as proposed and the required conditions.  Further, some non-coastal dependent significant impacts on the coastal zone resulting from onshore oil spills and upset conditions can only be partially mitigated and, therefore, may not be found entirely consistent with Chapter 3 Coastal Act policies.

However, despite these particular significant impacts, the non-coastal dependent facilities can be found to be consistent overall with Coastal Act policies through Section 30007.5, which provides that conflicts between one or more policies be resolved in a manner which on balance is the most protective of significant coastal resources.

Through extensive environmental analysis and studies, the onshore Las Flores site has been determined to be the least environmentally damaging site for a consolidated marine terminal and processing facilities on a cumulative basis, consistent with the policies set forth in Section 30250.  This is further discussed in Sections III. F. 2, 5, 6, 7, 8, and 11 of this staff report.  The Commission can find the non-coastal dependent facilities to be consistent overall with Coastal Act policies through Coastal Act Section 30007.5 since the canyon site will resolve conflicts arising in this instance among Coastal Act policies in a manner most protective overall of significant coastal resources.

-28-

## F.    COASTAL ACT ISSUES

## 1.    TRANSPORTATION OF CRUDE OIL

In Section 30265 (b) of the Coastal Act, the Legislature finds that:

> Transportation studies have concluded that pipeline transport of oil is generally both economically feasible and environmentally preferable to other forms of crude oil transport.

Section 30232 of the Coastal Act states that:

> **Protection against the spillage of crude oil, gas, petroleum products, or hazardous substances shall be provided in relation to any development or transportation of such materials.  Effective containment and cleanup facilities and procedures shall be provided for accidental spills that do occur.**

Sections 30230 and 30231 of the Act require protection of the biological productivity of the marine environment, and Section 30253 of the Coastal Act and Section 307 of the Coastal Zone Management Act (CZMA) require consistency with air quality requirements.  As discussed below, oil spill containment and cleanup equipment is not considered "effective" for spills in the open ocean.    Therefore, the requirements of Section 30232 cannot be met. Additionally, the requirements of sections 30230 and 30231 cannot be met because of the inability to assure protection of marine resources from oil spills.   Therefore, the oil transportation methods for this project must be evaluated under Section 30260 of the Coastal Act.  As discussed above, Section 30260 will allow the approval of coastal dependent industrial facilities (which includes marine terminals) not otherwise consistent with Chapter 3 of the Coastal Act, if among other provisions, the adverse impacts are mitigated to the maximum extent feasible, and the project is consistent with Sections 30261 and 30262.  Section 30261 applies to all tanker facilities.  It requires in part that tanker facilities be designed to minimize impacts.  Section 30262 requires consolidation of new or expanded oil and gas facilities to the maximum extent feasible and legally permissible.  Among other aspects of the project contributing to oil spill risks, the transportation method must be evaluated against these policies.  The Commission finds that the cited Coastal Act provisions mandate the use of the most environmentally protective feasible method of oil transportation.  As noted, the Legislature has concluded that that method is generally pipeline transportation.

In past permit federal consistency actions, the Commission has made detailed findings or otherwise documented the advantages of onshore pipeline transportation of crude over transportation by tanker to reduce the risk of oil spills and reduce the level of air pollutant emissions.  See for example the Commission's findings for Exxon's Santa Ynez Unit [CC-7-83], Chevron's Platform Hermosa [CC-12-83], Texaco's Platform Eureka [CC-4-84], Chevron's Platform Hidalgo [CC-24-84], Texaco/GTC Gaviota Marine Terminal permit E-87-4 and Consistency [CC-36-87].  In addition, the Commission's briefs and exhibits in the Exxon Santa Ynez Unit Appeal to Secretary of Commerce, also,

-29-

incorporated by reference into these findings, have demonstrated that pipeline transportation will minimize the environmental impacts of development of the Santa Ynez Unit.  Each of these documents is incorporated by reference as part of these findings.  As noted in the above-identified findings, they are supported by data compiled by the Commission, the Department of Interior, the Council on Environmental Quality (1975), the Rand Corporation (1975), the State Lands Commission (1982), the Oil Spill Intelligence Report (1981), the U.S. Coast Guard (1981, 1982), the Department of the Interior (1983), the County of Santa Barbara (1984), and the All American Pipeline Company (1984). These documents, identified more specifically in the findings referenced above, are also incorporated by reference as part of these Commission findings.  The incorporated materials demonstrate the general environmental advantages of pipeline transportation over the use of tankers.  This evidence supports the conclusion that oil transportation by pipeline where determined to be feasible after a case by case review provides the maximum mitigation from adverse impacts to coastal resources, and is therefore necessary to meet Coastal Act policies.

Santa Barbara County's certified LCP oil transportation policies recognize the environmental advantages of pipeline transportation and specifically implement the Santa Barbara County policy for crude oil to be transported by pipeline when feasible.  Policy 6-8 states in part,

> "If an onshore pipeline for transporting crude oil to refineries is determined to be technically and economically feasible, proposals for expansion, modification, or construction of new coastal dependent oil and gas processing facilities shall be conditioned to require transportation of oil through the pipeline when constructed, unless such condition would not be feasible for a particular shipper.... "

In addition, policies 6-11 and 6-11A state the following:

> Policy 6-11
>
> "If an onshore pipeline is determined to be technically and economically feasible, existing marine terminals shall become, after a specified period, non-conforming uses. Crude oil shall be transported by pipeline, unless the County makes the finding that transportation of oil by pipeline is not feasible for a particular shipper according to the provisions of Policies 6-8 and 6-8A."
>
> Policy 6-11A
>
> "Consistent with other provisions of this Plan, permits for expansions of an existing terminal to a larger consolidated facility or for a new consolidated marine terminal may be issued with capacity to permit transportation of only the amount of oil reasonably necessary to serve emergency or non-pipeline refinery destinations...."

-30-

Additionally, Condition II-6 of the County final development permit requires the following:

> " Prior to RMD final approval of any construction plans associated with the consolidated marine terminal, Exxon must demonstrate to the Planning Commission either that industry's oil transportation demand for situations set forth in Local Coastal Plan Policy 6-8 and Coastal Zoning Ordinance Section 35-154.5(i) is greater than the capacity of the Gaviota Interim Marine Terminal, or that the impacts associated with the consolidated marine terminal are environmentally preferable to those associated with continued use of the Gaviota Interim Marine Terminal. Upon such reasonable demonstration, the Planning Commission shall not withhold approval of construction plans.
>
> If by July 1, 1988, or later, Exxon and Celeron/All American Pipeline Company have come to an agreement on a tariff rate and other essential contract terms, and Exxon has, consistent with LCP Policy 6-8 and Coastal Zoning Ordinance Section 35-154.5 (i), committed to using the pipeline pursuant to that agreement for the transportation of SYU crude oil destined for refineries served by that pipeline, the preceding paragraph shall be nullified. Construction of the marine terminal shall not commence prior to July 1, 1988."

The requirements of this permit condition must be satisfied in order for the Commission to issue its permit or to find the project consistent with the Coastal Act. Exxon has accepted all of the County's permit conditions for their development of the SYU and its related facilities.

Santa Barbara County has approved two proposals to accomplish long-term transportation of processed crude to producer refineries: (1) the Celeron Pipeline to Texas, and (2) the Southern California Pipeline System to Los Angeles. Santa Barbara County has also conditionally approved the Las Flores Canyon Consolidated Marine Terminal discussed in this report.

However, oil production from the Point Arguello Oil System (PAOS) is anticipated to commence prior to the completion and operation of a pipeline transportation system. Several of the Point Arguello producers initial market destinations for Point Arguello crude appears to be the Los Angeles area. The Southern California Pipeline System, which will serve Los Angeles refineries, may not be operational until the early 1990s. This gap could be much longer if the startup of the Southern California Pipeline System is delayed. The Celeron/All American Pipeline System will serve gulf coast destinations. It is the intention of Celeron/All American to accept oil in the pipeline by the forth quarter of 1988. Interim tankering needs will be served by the recently approved Gaviota interim marine terminal which is permitted to operate until July 1, 1990. As pipelines become available to market destinations tankering to those locations will be eliminated consistent with Santa Barbara County LCP

-31-

policies.  Long term tankering needs, where pipelines are not available to market destinations, will be met through the Las Flores marine terminal if constructed.  This terminal could operate for 25 to 35 years.  The Santa Barbara LCP provides for only one consolidated facility.

Because analysis of oil transportation systems for this project has demonstrated that tankers cause greater impacts, transporting the majority of oil by pipeline when feasible is necessary to support a finding that marine resources are protected to the maximum extent feasible.  As noted above, pipeline transportation also reduces air quality impacts.  Exxon has agreed to transport oil by pipeline when feasible, consistent with Santa Barbara LCP Policies.  In addition, they are sizing their pipeline system to accommodate all production from the Santa Ynez Unit consistent with consolidation policies.  This is important because of the large area covered by the development and the high production volumes expected.

Coastal Act Conclusion - The Coastal Commission finds that transporting oil by pipeline when feasible is necessary to protect marine resources.  All market destinations are not currently served by pipeline and therefore some marine transportation of oil is necessary.  In addition, emergencies may necessitate pipeline use.  Because of the risks and impacts of marine transportation, the proposed development is not consistent with Sections 30230, 30231 and 30232, as specifically discussed below in the marine resources and oil spill containment sections of this report.  In addition, air impacts can be minimized through pipeline transportation.

Exxon's offshore development is considered a coastal dependent industrial facility and is thus eligible for the override under section 30260.  It must also comply with sections 30261 and 30262 of the Coastal Act.   Specifically, the oil transportation method can be found consistent if the impacts are mitigated to the maximum extent feasible and oil spill risks are minimized.  Various pipeline systems are being constructed to market destinations on the west coast and the Gulf Coast.  Other markets may never be served by pipeline.  Therefore, marine transportation of oil is necessary until pipelines are complete to specified market destinations, and to serve destinations which may never be served by pipeline.  Conditions imposed by the County of Santa Barbara require pipeline use and limit tanker use consistent with the County's LCP policies.  Under these policies, tankers shall only be used in emergencies or upon demonstration that pipeline use will be infeasible based on an analysis of alternative transportation modes, economic costs, environmental impacts, and the public welfare.  In addition, Exxon has agreed to allow other users access to the facility so that the marine terminal is consolidated to the maximum extent feasible, thus limiting spill risks from multiple facilities.  Based on requirements for Exxon to use available pipeline facilities, and for operation of the marine terminal as a consolidated facility, oil spill and air quality impacts will be reduced to the maximum extent feasible.

Therefore, the Commission can find that the development, as conditioned, is consistent with Section 30260(3), 30261, and 30262 of the Coastal Act.

-32-

## 2.   CONTAINMENT AND CLEANUP OF CRUDE OIL SPILLS

Section 30232 of the Coastal Act, cited previously, requires protection of the marine environment against spilling of crude oil, gas petroleum products, or other hazardous substances.  For any development or transportation of these materials, the section further requires the provision of "effective containment and cleanup facilities and procedures" for spills that do occur. The following section discusses methods to contain, recover, or disperse oil spills.  The marine resources section of this report (Section III.F.3) discusses the use of oil spill trajectory models to help predict the movement of the oil and a detailed discussion of the risks of oil spills.

### Increased Risks of Offshore Oil Spills.

The construction and operation of the proposed marine terminal and associated pipelines increase the risk of an oil spill in the surrounding area, and up and down the coastline as a result of tanker activity.  Collision risks at the facility would be highest while a tanker is approaching or leaving the mooring area, crossing the sea lanes, or in the open seas of the Santa Barbara Channel.  Grounding risks would be highest in the mooring area.  The specific statistical data regarding the risk of spills from collision or groundings are provided in the Marine Resources section of this report.  Generally, this information indicates that small spills as well as spills over 1,000 barrels are likely during the operation of the facility.  Massive oil spills are at least a physical possibility regardless of the probabilities assigned to them.  For instance, the oil spill contingency plan for the Gaviota Marine Terminal operations, of which Exxon is a member, states that a worst case tanker spill assuming total loss of cargo could be 380,000 barrels of crude oil based on a 70,000 DWT tanker capacity (largest tanker expected to call at the interim terminal or the Las Flores terminal).  This would represent an incident with the lowest probability of occurrence, but with the highest consequences should it occur.  The fact that a spill greater than 1,000 barrels can be considered likely, and that a major spill of 380,000 barrels (worst case capacity of largest likely tanker) is at least a physical possibility, underscores the importance of the Coastal Act requirement for Exxon to provide the maximum feasible oil spill containment and cleanup equipment available.

To put these spill volumes in perspective, the National Oil Spill Contingency Plan, implemented under the Clean Water Act, places oil spills into the following categories:

1.   Small spills:      238 barrels or less.

2.   Medium spills:     238 to 2380 barrels.

3.   Large spills:      2380 barrels or greater

Because many of the potential spills at this facility are likely to occur in the nearshore environment, the likelihood of shoreline contact is greatly enhanced.  This increases the demand for spill containment and cleanup equipment to be located onsite and ready to go whenever transfer operations are being undertaken.

-33-

## Offshore Oil Spills

As stated previously, Section 30232 of the Coastal Act requires "effective" containment and cleanup facilities.  In view of the impacts of oiling coastal zone resources discussed below in the marine resources section and the inconsistency of such impacts with Coastal Act policies, oil must be prevented from contacting the coastline, or environmentally sensitive areas or species. Thus, to be "effective", oil spill containment and recovery equipment must have the ability to keep oil off the coastline, or away from any environmentally sensitive areas.  However, the equipment currently available does not have the capability to recover all of the oil from large oil spills and often even small spills in non-protected ocean waters.  Cleanup personnel at many large oil spills have been unable to keep spilled oil off beaches. Testing results of equipment at government research facilities in the United States and in Canada have demonstrated that oil recovery equipment functions with about 50 percent efficiency in relatively calm waters (less than 2 foot harbor chop).  These tests, and actual experience in the field, demonstrate that recovery efficiencies decrease as the sea states increase.  Cleanup capability in the open ocean will continue to deteriorate if sea states increase.  Generally, equipment is not considered to be able to recover measurable amounts of oil in seas exceeding six feet.  (Appendix E includes more detail on oil spill cleanup capability).

Because of the limitations mentioned previously, the spill cleanup equipment in non-protected ocean waters cannot provide "effective" containment and recovery of the oil.  Therefore, the proposed project is inconsistent with Section 30232 of the Coastal Act.  Additionally, the requirements of Sections 30230 and 30231 cannot be met because of the inability to assure protection of marine resources from oil spills.

The marine terminal and subsea pipeline components of the project are found to be coastal dependent industrial facilities and therefore may be given additional consideration under Sections 30260 and 30261 of the Act.  Oil spill containment and cleanup equipment (including response time and contingency planning) associated with the marine terminal and the pipelines to shore must provide maximum feasible mitigation of adverse environmental effects for the project to be consistent with Section 30260(3) and 30261 of the CCMP.

Onsite Oil Spill Containment Equipment and Response. The Commission has determined in past permit and federal consistency certification decisions that the following oil spill containment and cleanup equipment must be located at the site of offshore drilling operations to help provide the first line of defense against oil spills:

   o    1500 feet of oil spill containment boom capable of open ocean use;

   o    An oil recovery device (skimmer) capable of open ocean use;

   o    Oil storage capacity to handle skimmer throughput until the oil spill cooperative can arrive from shore with additional equipment;

   o    A boat located at the site of operations for boom deployment operations equipped with the oil skimming device and oil storage capacity; and

-34-

o    Oil sorbent material capable of absorbing 15 barrels of crude oil.

To provide the earliest feasible response time with the most appropriate equipment, Exxon has agreed to locate a spill response vessel at the site of oil operations.  This vessel will be equipped with 1500 feet of open ocean oil containment boom, an oil skimmer, adequate oil storage capacity, and oil sorbent materials.  Initial containment activities will be conducted using the onsite boat.  As appropriate vessels will be summoned from Exxon's offshore platform operations and the Clean Seas oil spill cooperative to assist in the initial booming operations.  Large scale skimming or oil recovery will be conducted by the Clean Seas fleet of vessels.  Mr. Clean III can be onsite within 2 1/2 to 3 hours, and Mr. Clean I can be onsite within 2 to 2 1/2 hours.  The 32 foot fast response boat in the Santa Barbara Harbor can respond to any SYU facility within 2 to 2 1/2 hours.  In case the oil from the facility is viscous enough to cause difficulties in the recovery operation (too thick to pump through hoses), a net-boom system has been put on Mr. Clean III.  This net-boom is designed to physically trap the oil in a net system for later recovery (specific information about the Clean Seas oil spill cooperative is provided in Appendix E).

Exxon has provided the Commission with all information regarding oil spill response equipment and response time data.  Condition 5 will require an oil spill drill to test those response times and procedures to be included in the site specific oil spill contingency plan.  However, Exxon has not formalized their oil spill contingency plan for the facilities because operations will not commence for several years.  Therefore, Exxon must submit their site specific oil spill contingency plan for the review and approval by the Executive Director prior to the start-up of the facilities, as required by Condition 4.

The EIS/EIR and the Commission's analysis indicates that the equipment now proposed represents the maximum feasible mitigation at this time.  Therefore, with the above described condition, the Commission finds that Exxon has provided the maximum feasible mitigation as required by Section 30260(3) and 30261 of the Coastal Act by providing the maximum feasible onsite equipment, as well as Clean Seas equipment and personnel response.

Oil Spill Containment and Clean-up Drill.  The best way for the Commission to determine Exxon's ability to respond to spills at their facility is for the Commission to require an unannounced oil spill containment and cleanup drill for a simulated oil spill.  Condition 5 requires the applicant to agree to an unannounced oil spill containment and clean-up drill that will be called by the Commission in coordination with the Department of Fish and Game, the State Lands Commission, the Minerals Management Service, and the U.S. Coast Guard to test the response actions of Exxon and the Clean Seas Oil Spill Cooperative. An unannounced oil spill containment and clean-up drill will help determine if the personnel, training procedures, and equipment are adequate to provide the maximum feasible protection of oil spills in the marine environment.  If problems are encountered during the drill, the Commission staff will meet with Exxon to identify its recommendations, if any, for Exxon to correct the deficiencies.  The response procedures will then be tested in a subsequent drill.  If Exxon fails to successfully complete two drills, operations may be terminated by the Executive Director until a successful drill is called.

-35-

<u>Oil Spill Risk Reduction In the Sea Otter Range</u>  An unspecified number of
tankers will be transiting the waters offshore the range of the southern sea
otter.  The potential for oil spill impacts from the tankers on their routes
as originally proposed would have resulted in significantly increased impacts
to the southern sea otter population.  However, through implementation of
alternative 1 of the reasonable and prudent alternatives from the Gaviota
Marine Terminal Endangered Species Act consultation, Exxon has been able to
reduce this risk to levels acceptable to the USFWS (See Section 3, Marine
Resources).  This alternative requires Exxon to assure that all northbound
tankers maintain a distance of approximate 25 to 35 miles offshore the coast
while traveling along the range of the southern sea otter.  Use of this route
is expected to reduce the risk of potential oil spills reaching the otter
population to less than 5%.  Condition 12 requires that all Exxon tankers use
this route, and for Exxon to secure the agreement of other marine terminal
users to use this route.  Additionally, the USFWS states that their opinion is
only applicable for a throughput of 100,000 barrels per day (annual average),
and that the risks associated with a 140,000 barrel per day throughput are not
known.  Therefore, Condition 13 limits the throughput of this facility to
100,000 barrels per day (annual average) consistent with the existing USFWS
analysis.  If Exxon wishes to increase this throughput, they must obtain
another an Endangered Species Act consultation which demonstrates that the
facility can operate at this higher level.  Exxon could then submit an
application for amendment to this coastal permit and consistency.

However, even with these measures the Commission remains concerned with the
adequacy of equipment to be used to reduce this risk by either preventing
spills or providing the maximum feasible measures to clean them up in the sea
otter range.  Oil spills can still occur from these tankers and the spills can
still impact the sea otter range.  Therefore, Condition 8 requires Exxon to
participate in a study of the adequacy of existing equipment and methods to
reduce the risk of spills in this area to sea otters.  This analysis goes
beyond the measures proposed by the USFWS and will focus on the maximum
feasible measures to reduce this risk.  The Executive Director will review the
results of the study, and if warranted, require Exxon to contribute reasonable
and proportionate funding toward equipment and support services to reduce this
risk prior to the operation of this terminal.

<u>Need For Ongoing Review</u>  The Commission must continually review the oil spill
cleanup capabilities for this project to assure that maximum feasible
mitigation for the impacts of the entire proposal are being provided.  Exxon
proposes to operate the marine terminal for 34 years and during that period
significant improvements to spill cleanup technology could occur.

The Commission finds that the current oil spill cleanup equipment at the site
of terminal operations and in southern tanker routes provides maximum feasible
mitigation based on the current state of the art.  Condition 8 will evaluate
equipment needs for northern routes and requires Exxon to contribute a
reasonable and proportionate funding toward acquisition of that equipment.
The condition requires the study be complete, and the equipment funding
provided, prior to the operation of this terminal.  In addition, where
feasible, the company must upgrade its equipment after operations begin if the
state of the art improves.  Therefore, to find maximum feasible mitigation,
the Commission must have the ability to review the equipment and response

-36-

procedures on an ongoing basis to determine if future improvements can be made. Therefore, Condition 7 requires the applicant to submit to an annual review by the Commission of the adequacy of their oil spill containment, cleanup, and dispersant equipment and to make improvements determined necessary by the Executive Director.

Oil Spill Dispersing Chemicals  One method for fighting oil spills is to attempt to disperse them using chemical surfactants that attempt to break up the slicks. Oil spill contingency plans must address the methods used, effectiveness, and potential toxicity of these chemicals. These chemicals cannot be used without the approval of the Environmental Protection Agency and the State Agency Coordinator for oil spills from the Department of Fish and Game (if oil threatens state waters).

The oil spill dispersant currently planned for use by Exxon is Exxon Chemical's Corexit 9527 or if approved by the State of California, Corexit 9550. Dispersants often do not work well on many heavy oils. In addition, the dispersant and oil mixtures may be more toxic to fish and wildlife than the oil alone, according to some reports such as the Environment Canada report, Acute Lethal Toxicity of Prudhoe Bay Crude Oil and Corexit 9527 to Arctic Marine Fish and Invertebrates, 1982. Exxon's Corexit 9550 has proven to be more effective on many types of heavy oil.

The Clean Seas oil spill cooperative is equipped with supplies of Exxon's 9527 and can obtain 9550 if approved by the State of California. Ongoing studies are being conducted to determine the effectiveness and toxicity of these dispersants. If these studies indicate that a less toxic and more effective dispersant is available, Exxon will be required to provide it pursuant to Condition 7. The cooperative has access to aircraft which can apply dispersants, if dispersant use is approved by the state and federal governments. Exxon, through the Clean Seas oil spill cooperative, has provided dispersants and application equipment that represents the maximum feasible mitigation as required by Section 30260 (3) of the Coastal Act. Use of dispersants is possible only if this method of response is deemed necessary and approved by appropriate federal and State agencies.

Oil Spill Risks and Impacts From Onshore Facilities  The onshore processing facilities will be equipped with two 270,000 barrel crude oil storage tanks. The large tanks will have a diameter of 200 feet and will be 56 feet high. They will be constructed with cone roofs with internal floating roof structures. The tanks are fabricated onsite and will be API 650 weak seam cone roof type with an internal pontoon type floating roof. An emergency containment basin will be constructed which has the capability of containing 110% of the contents of one tank in the event of a tank failure. In addition, the facility is equipped with two 30,000 barrel crude oil re-run tanks. These tanks will be surrounded by 6 foot high earthen dikes. The dike system will have the capacity of containing 110% of the volume of one of the tanks. The 110% containment system on all of the tanks is consistent with the National Fire Protection Association Flammable and Combustible Liquids Code 30 to contain the volume of the largest tank in a tank field. Each of these tanks will by hydrostatically tested prior to operation.

The onshore pipeline system from the landfall to the processing plant is equipped with block valves located just inland of the highway and at the

-37-

plant.  A shutdown system is also located at the platform.  In the event of a
loss of pressure due to a leak in the system these block valves will close and
stop the flow of oil.  In the event of a spill that gets out of the
containment systems from the tanks, Exxon plans to locate a containment gate
in Corral Canyon which is intended to hold back oil within the canyon
(Personnel Communication: Rick Papsin, Exxon).  In the event oil spills and
gets beyond this gate, or if underground pipelines spill oil, measures will be
implemented to close off drainages in the lower portion of Las Flores Canyon.

Exxon has taken measures to avoid spills from tanks and pipelines and to
contain oil if spilled from these onshore facilities.  If an incident occurs
and it is contained within the facility, or if it escapes, Exxon will call
upon the Clean Seas oil spill cooperative or other contractors to recover or
dispose of the spilled product.  If spilled oil reaches the ocean, Exxon would
implement the portion of their oil spill contingency plan which addresses
offshore oil spills.  Exxon has provided spill containment methods to contain
potential oil spills.  If spills occur, containment and other mitigation
measures have been put in place to avoid or reduce damage from onshore tank or
pipeline spills.  These onshore facilities are consistent with the Coastal Act
for the reasons stated below under Coastal Act conclusion.

Coastal Act Conclusion

Offshore Facilities  Exxon has provided oil spill cleanup equipment through
their own resources and those of the oil spill cleanup cooperative Clean
Seas.  They have designed containment dikes around land based tanks to reduce
or eliminate the potential for spills to contaminate surrounding areas.
Condition 5 requires an oil spill cleanup drill to test the speed and quality
of spill cleanup response actions by both Exxon personnel onsite and by the
major cleanup cooperative, Clean Seas.  Condition 7 provides a procedure to
ensure that this equipment will continue to provide maximum feasible
mitigation as the state-of-the-art of cleanup equipment advances.  Condition 8
requires an assessment of existing equipment and methods to reduce the risk of
spills in the sea otter range.  It requires Exxon to contribute a "reasonable
and proportionate" share to the acquisition of equipment or support services
to reduce the risk of spills and their impacts along this portion of coastline.

Although currently available equipment for offshore spills cannot provide
"effective" cleanup as required by Section 30232, the proposed equipment
represents the state-of-the-art as it is available today.  Therefore, and on
the basis that new equipment may be required pursuant to continuing review,
the oil spill response equipment, procedures, and future studies proposed by
Exxon are consistent with Section 30260(3) and 30261 of the CCMP, because they
provide the maximum feasible protection of the coastline from oil spills.

The facilities located inland of the coastal zone, including pipelines,
processing facilities, and storage tanks, are not coastal dependent.  In most
cases, emergency response to upset conditions such as oil spills at these land
based facilities can be achieved more easily than similar incidents offshore.
Mitigation measures have been incorporated to reduce the chance of such
accidents, and their impacts, should an incident occur.  It is difficult for
the Commission to find this portion of the project consistent with the
specific provisions of Section 30232 because accidents are always possible

-38-

which may exceed all conceivable preparations.  However, as more fully discussed in the onshore facilities portion of Section 5, Las Flores Canyon has been determined to be the least environmentally damaging site for these facilities based on extensive review and analysis in the EIS/EIR, by Santa Barbara County, and the Commission.  All other alternatives would pose more substantial negative impacts when the project is viewed in its entirety.  The Commission turns to Section 30007.5 of the Coastal Act which provides that conflicts between one or more policies be resolved in a manner which, on balance, is the most protective of significant coastal resources.  The Commission finds that, on balance, the onshore facilities are consistent with Coastal Act policies.

3.  MARINE RESOURCES

The Coastal Act gives high priority to the protection of marine biological systems.  Special protections are provided for areas and species of special biological significance (Section 30230), for rare, threatened and endangered species and their habitats (Section 30240), and for biological productivity of coastal waters (Sections 30230 and 30231).  The following discussion provides:  (a) a background description of the habitats and species of importance within the immediate project area and the tanker route from the SALM; (b) the expected impacts of the project; and (c) an analysis of the project's compliance with Coastal Act policies.  Two water quality issues are also discussed in this marine resource section:  the NPDES permit and ballast water.

a.  Background

1)  Intertidal.  At the mouth of Corral Canyon the upper beach is sand, while the lower intertidal and subtidal out to a depth of between 8 and 20 ft (about 600 ft offshore) consists of boulders and bedrock ridges interspersed with sand.  Rocky habitats such as these are less common and more productive than the sand beaches which comprise about 80% of the Santa Barbara Channel mainland shoreline.  The typical intertidal marine community associated with this boulder field includes anemones, hermit crabs, limpets, chitons, predatory snails, shore crabs, and red, green, and brown algae.  This community is subject to smothering from sanding in, is patchy, and in many stages of succession.  Nearby intertidal rock outcrops are covered with mussels and barnacles, and are grazed by abundant populations of limpets (State Lands Comm., SEIR, Dec. 1987).

2)  Surfgrass beds.  In the project area surfgrass (Phyllospadix torreyi) beds are rooted to boulders and raised ridges in the low intertidal and nearshore subtidal, from depths of 0 to 20 ft MLLW.  Dames and Moore surveyed the general extent of the surfgrass in December, 1987 (Dames & Moore, letter to Exxon, Dec. 29, 1987).  At a depth of 1 ft the cover is nearly continuous; between 1 and 5 ft the cover is approximately 10%; and between 5 and 20 ft small patches occupy about 1% of the available rock surface.  Dames and Moore estimates that the zone dominated by surf grass extends 20 to 40 ft offshore.

This true grass is of particular importance as a physical buffer, a habitat for a unique biological community, and a nursery for lobster.  The presence of surfgrass in the surf zone alters the surrounding environment, reducing wave energy and decreasing wave-caused erosion.  Sediment accumulates around the roots, forming a microhabitat for species unable to live elsewhere, such as certain species of annelid worms (lumbrinereids).  In addition, a number of species are unique to the leaves of this grass.  These include a species of coralline alga, the surf grass limpet, the one-banded lacuna snail, a hydroid, and an isopod crustacean (SWRCB, Water Quality Monitoring Rpt. No. 79-5, March  979).  Surf grass is particularly important to the lobster, Panulirus interruptus.  The last larval stage (puerulus) preferentially settles on Phyllospadix in the summer months, and the grass acts as a nursery during the ensuing two to three years (J. Duffy, DFG, pers. comm., Jan. 4, 1988).  Although surf grass is common on hard substrate in the project area, its distribution is spotty along the mainland coast of the Santa Barbara Channel, since 80% of the coast is sandy beaches.

        3) <u>Bedrock Ridges and Boulders</u>.  Seaward of the surfgrass, boulders and rock outcrops provide subtidal rocky habitat.  These reefs support abundant marine invertebrates.  The biological community associated with these habitats includes algae, soft corals, mollusks, crustaceans, starfish and sea urchins.  Commercially important species include lobster, crabs, abalone, and red sea urchins (SAI, EIR/S, Marine Biology Tech. App., April 1984).

Adult lobsters frequent the subtidal boulder areas in the spring and summer, particularly where there is surf grass (SWRCB, March 1979).  Beginning in March, lobster move into these shallow areas, often foraging in water 2-3 inches deep or intertidally at night (J. Duffy, DFG, pers. comm., Jan. 4, 1988).  Females are carrying attached egg masses during this period, and lobster larvae are released into the plankton from nearshore.  Adults remain in the shallows until about October, when they move to deep waters offshore for the winter (D. Nitsos, DFG, pers. comm., Dec. 31, 1987).

        4) <u>Kelp Bed</u>.  The nearshore subtidal from Pt. Conception to Rincon Pt. (east of Santa Barbara) has historically supported one of the largest and most dense stands of kelp on the California coast, and almost half of the mainland total within the Southern California Bight (A.D. Little, July 1984, Draft Pt. Arguello Field and Gaviota Processing Facility EIR/EIS, Technical Appendix I).  The beds in this area have been highly stable relative to more southern beds since 1911.  Large sections of these kelp beds are anchored in compacted sand and on the tubes of the bristle worm <u>Diopatra</u>.

Kelp beds provide a complex habitat for an abundant and diverse biological community associated with them.  Not only do kelp forests directly provide shelter, attachment substrate, and food, they also export food to other nearby areas in the form of drift kelp detached from plants and collected on the bottom (State Lands Comm. <u>et al</u>., 1986, EIR Proposed Arco Coal Oil Point Project, Appendix 5C - Marine Biology).  Such kelp beds contribute a major proportion of the total productivity in nearshore coastal waters where they live (Mann, 1982).

The kelp beds offshore of Las Flores/Corral Canyon are on sand bottom.  In 1972, kelp bed width was estimated at 500 yards, with a depth range from 25 to 55 ft.  A cursory survey of the kelp bed-associated community yielded a total of 82 species, including 23 species of fish (SAI, EIR/S, Marine Biology Tech. App., April 1984).  In 1982 the kelp bed width along the POPCO gas pipeline corridor was estimated at 300 meters, without distinct edges.  In an early 1984 survey all adult kelp plants were gone, due to the devastation of storms and El Nino conditions of 1983 and 1984 (State Lands Comm., Final SEIR, Exxon Santa Ynex Unit Offshore Oil Development, Dec. 1987).  Kelp has now returned to the area, but kelp densities and holdfast sizes are still below pre-El Nino conditions (State Lands Comm., SEIR, Dec. 1987).

        5) <u>Benthos</u>.  A survey of the produced water pipeline corridor was conducted with a remote operated vehicle (ROV) in August 1987.  The ROV traveled 4 transects, one up the middle of the pipeline corridor, and three more shorter transects near the three mile state lands limit.  A general picture of the kind of habitat and the common biota was gained from this survey.  At the three mile state lands limit, in depths of 270 to 320 feet,

there is an extensive scattered hard bottom consisting of small rocks, plus a number of large exposed rock features with a relief greater than 6 inches. Epifauna of the scattered rock area, as well as adjoining shell debris/turf and transition areas, is dominated by sea urchins, octopus, crinoids, and hydroids. Individuals of the commercially fished sea cucumber Parastichopus californicus also were observed in this region by the ROV. Common fish in areas deeper than 300 ft are rex sole, bearded eelpout, shortspine thornyhead, and blacktip poacher. Shallower, at depths of 115 to 295 ft, common fish include Pacific sanddab, longspine combfish, midshipmen, stripetail and halfbanded rockfishes, and pink seaperch. Ridgeback shrimp, a commercially fished species, was commonly seen during the ROV survey between 175 and 250 ft depths. Biota attached to the high relief hard bottom features is dominated by the solitary coral Paracyathus stearnsi, the anemone Metridium senile, as well as sea stars, crinoids, hydroids, tube worms, bryozoans, and sponges. Rockfishes aggregate around these features, and crabs such as the commercially harvested yellow crab, Cancer anthonyi, use them as shelter. Such hard bottom features are rare at this depth in the Santa Barbara Channel (State Lands Comm., SEIR, Dec. 1987).

Between these offshore features and the kelp bed, the terrain is soft bottom, dominated by sea urchins, sea pens, tube worms, ophiuroids, and various polychaetes. Results of the ROV survey distinguished between a "bioturbid soft bottom" inshore of about 260 ft depth, and a flat, featureless soft bottom from this depth out to the rock feature described above. In these soft bottom areas fishermen trawl for halibut, sea cucumber and prawn outside of a mile from shore, and set gill nets for halibut and angel shark inside of a mile. Sea urchins are also harvested by divers, and crab and lobster are caught in traps.

6) Biologically Sensitive Areas Onshore. Coastal lagoons and marshes that could be affected by an oil spill from the pipelines and mooring operations offshore Las Flores are: estuarine wetlands at Devereaux Slough, Goleta Slough, Carpenteria Marsh, Mugu Lagoon, Ventura River mouth, and Santa Clara River mouth (SAI, EIR/S, Marine Biology Tech. App., April 1984). Other areas at risk in the Santa Barbara Channel, especially from increased tanker traffic, include the rich subtidal and intertidal areas, marine mammal haulout and pupping grounds, and bird nesting sites of the northern Channel Islands; Naples reef, an important commercial and sport fishing area, and UC Santa Barbara's principal offshore research site; and the rocky intertidal and bird nesting areas at Pt. Conception (FEIR, Proposed Getty Gaviota Consolidated Coastal Facility at Gaviota, Calif., Feb. 1985). Many other biologically sensitive areas both up and downcoast from the proposed SALM are vulnerable to impacts from the tanker traffic associated with this project, especially marshes, seabird nesting sites, and endangered species habitat. Trajectory analyses for the tanker routes are discussed in the marine resources impact section below.

7) Endangered and Threatened Species. Species protected by the Endangered Species Act which could be affected by the project include: southern sea otter, California least tern, California brown pelican, light-footed clapper rail, salt marsh bird's beak, American peregrine falcon, and gray whale. The status of these species is briefly discussed below.

Endangered Species Act consultations on the proposed project between the U.S. Fish and Wildlife Service (USFWS) and the Minerals Management Service (MMS), and between the National Marine Fisheries Service (NMFS) and MMS were originally completed in 1984. The potential effect of the project on endangered species was evaluated in these consultations. More recent information on the status of many of these populations was provided in the Endangered Species Act consultation with the USFWS for the Gaviota Interim Marine Terminal (USFWS, July 24, 1987) and Shell Western Exploration and Production Incorporated's proposed Platform Hercules (Dec. 11, 1987).

The current southern sea otter range, as delineated by the USFWS, is from Ano Nuevo Point in Santa Cruz County to the Santa Maria River in San Luis Obispo County. However, sea otters have recently been spotted periodically below Pt. Conception (R. Britton, USFWS, pers. comm., Jan. 12, 1988; M. O'Farrell, Gaviota Interim Marine Terminal Project Gray Whale Monitoring During Construction, Dec. 1987). They appear to be moving around the point occasionally and then swimming back north again. The major reason the sea otter population is protected under the Endangered Species Act is because of the threat from oil spills, particularly from tanker traffic near their range. Recently 60 sea otters have been translocated to San Nicolas Island in an attempt to establish a second colony. It is not known yet whether this will be successful. As part of this effort, the rest of the Southern California Bight is to be maintained as a "no-otter zone". It is unlikely therefore that sea otters will be established permanently in the Santa Barbara Channel within the lifetime of the project unless the translocation is declared a failure, but it is possible that a few individual sea otters will be vulnerable to oil spill risk from the project.

The endangered California least tern is a migratory species which nests on California beaches and feeds in nearby shallow waters from the beginning of April into September. Twenty of the remaining 43 nesting sites are within the area of potential impact from the project, due to the risk of oil spills from tankers moving south from the terminal. California least terns have been repeatedly sighted within the immediate project area (SAI, EIR/S Marine Biology Appendix, April, 1984).

The California brown pelican was originally declared endangered due to pesticide induced reproductive failure. The population has not yet been reproductively successful enough to ensure its continued survival, and is still endangered. The only consistent breeding colony of California brown pelicans in the United States is on Anacapa Island. Santa Barbara Island and Scorpion Rock may also be breeding sites during years of good conditions and higher reproductive success. Major mainland roosting sites in the Santa Barbara Channel are at the mouths of Goleta Slough, Santa Barbara Harbor, Santa Clara River, and Mugu Lagoon. Other major roosting areas are on the northern Channel Islands.

The light-footed clapper rail inhabits coastal marshes. The continued decline of this species is mainly due to the loss or degradation of these marshes. Recent surveys have documented drastic population declines between 1984 and 1986, with a drop from 277 breeding pairs to 178. The USFWS considers a minimum of 1,600 breeding birds on 10,000 acres of protected habitat in at least 20 marshes to be necessary for the recovery of this species. Goleta

Marsh has historically supported a population of this species, and there is an ongoing effort to protect the habitat for future reoccupation by rails. It is important to keep this marsh free of contamination.

The endangered plant, salt-marsh bird's beak, is found in relatively few coastal marshes, and like the light-footed clapper rail is endangered mainly due to loss of the marshes which provide the necessary conditions for its survival. This species is found in Carpenteria Marsh.

The American peregrine falcon population declined precipitously due to reproductive failure caused by widespread environmental contamination with chlorinated hydrocarbon pesticides in the years following World War II. Following a ban on the use of the pesticide DDT, the population has begun to recover in California, but is still below pre-World War II levels. Ten pairs of American peregrine falcons are now breeding along the Big Sur coast between Morro Bay and Carmel. In addition, peregrines are consistently observed on the Channel Islands bordering the Santa Barbara channel, and concentrate in the coastal wetlands south of Point Conception during the winter (USFWS Endangered Species consultation, March 14, 1984).

The gray whale population was drastically reduced by whalers. Since protection the population has grown to about 18,000 individuals. The entire population migrates annually along the California coast from Alaska to lagoons in Baja California for calving. At Pt. Piedras Blancas sightings during the northward migration were between 10 m and 3.2 km of shore (Poole, 1984). The cows and calves are found closest to shore, often in or at the seaward edge of kelp beds. There is little information about migration routes in the Santa Barbara Channel. Sightings incidental to other studies compiled by A.D. Little (July, 1984) include 69 sightings inshore of a depth of 70 feet at Little Cojo Bay, and observations of upcoast migration inshore near Hollister Ranch. Information from the BLM study of marine mammal and seabird distribution in the Southern California Bight indicates that on the southward migration some individuals turn directly south at Pt. Conception, others move down the mainland coast to about El Capitan (just south of Las Flores) and then cross the channel, while others continue on down the mainland coast (A.D. Little, July 1984).

b. <u>Marine Water Quality: NPDES Permits</u>. Exxon has included a general description of the physical plant to support a waste treatment program for the discharge of drilling muds, cuttings, produced waters and miscellaneous discharges (including hydrostatic test water). Exxon has requested that the Commission consider the discharge aspects of the project separately from the overall project and after a draft individual or a general National Pollution Discharge and Elimination System (NPDES) permit (or permits) has been issued by the Environmental Protection Agency (EPA), and has committed to obtaining necessary approvals prior to any discharges. When EPA issues such a permit(s), the Commission would conduct a consistency review on the discharge aspects of the project prior to Exxon being able to discharge wastes. Exxon may also need a discharge permit from the Regional Water Quality Control Board.

In requesting the Commission to consider NPDES permits in the future for this project, Exxon assumes the risk that additional equipment or modifications to

the physical plant, currently being designed, may be necessary in order to comply with NPDES permits that are consistent with California's coastal management program. Exxon's design and purchase agreements, undertaken at the present time, cannot be guaranteed a finding of consistency with the CCMP, nor do they assure Exxon that retrofit, relocation, alternative disposal methods, or other equipment changes will not be required subject to the NPDES permit and consistency process. Potential modifications at the NPDES permit stage could include a change in the outfall location. Exxon understands that identification of the components of the physical plant necessary to support a finding of consistency for a waste treatment program are contingent upon such NPDES permits and future consistency review, and that any additional or alternative equipment necessary for such NPDES permits will be Exxon's responsibility.

Potential mitigation measures for waste discharges from Exxon's project include various treatment and filtration options to control pollutants in drilling muds, cuttings, produced water and other miscellaneous wastes. Another mitigation measure, necessarily addressed under Coastal Act Section 30262(d), includes reinjection of produced water. Exxon must address, as part of the NPDES permit and consistency process, partial and complete reinjection of produced water at the onset of production and spread out over time, over the life of the field. In many instances, reinjection may not be feasible during the early production years, but during later years, it may be used to increase the yield from the oil field and/or as a disposal alternative. When Exxon applies for an NPDES permit and consistency certification in the future, Exxon must address reinjection and coordinate with the Minerals Management Service any changes in the production plan resulting from reinjection of produced waters.

    b.   **Impacts**

        1.  **Construction**

Construction of the proposed project will affect the nearshore subtidal and intertidal areas in the immediate vicinity of Las Flores Canyon, and the deeper subtidal along the pipeline corridors. Of particular concern are the surfgrass beds, the intertidal and nearshore subtidal rocky habitat, the kelp bed, the higher relief rock features offshore, and the long-term disturbance of soft bottom from anchor scarring.

        a). **Project Description**. A 20" oil emulsion line, a 12" produced water line, and three 6" electrical cables will be laid in the westward corridor, connecting with the offshore platforms. A 48" crude oil line, two 18" vapor recovery lines, and an hydraulic bundle will connect with the SALM through the eastward corridor (Exhibit 3). Pipeline construction methods are presently undefined, since Exxon has not committed to specific methods at this time. They would like to allow bidding contractors the flexibility to propose their own design solutions. While specific methodology is unavailable, a number of alternatives are possible and their impacts are discussed below.

        b) **Intertidal**. Recent information provided by Exxon in response to filing questions (Exxon, letter from T.J. Tibbitts to S. Hansch)

indicates that one pipeline corridor approximately 170 ft wide (including sloped sides) will be excavated across the upper beach and into the intertidal cobble/bedrock area.  If sheet pilings are used, this width may be lessened (R. Appleby, pers. comm., Feb. 1, 1988).  The pipeline corridors will bifurcate in the intertidal, and a 64 ft wide trench (40 ft corridor plus two 12 ft wide sloping sides) will be excavated out to a depth of 25 ft for the pipelines to the SALM, while a 59 ft wide trench will be excavated out to a depth of 25 ft for the pipelines to the offshore platforms (Exhibit 7).  The estimated total area of direct disturbance in the intertidal is a 500 ft swath of beach (State Lands Comm., SEIR, Dec. 1987).  The area of highest impact will be the trenches and areas adjacent to the trenches where the excavated materials will be deposited.  Lessened impacts would be expected from a single trenched corridor, however because of concerns about damaging the present POPCO gas line (see Exhibit 7), the corridors will need to be separated at the beach.  A mature intertidal biological community on boulders may take 4 or more years to reestablish (SEIR, Dec. 1987).  It is possible less time will be needed in the project area, since it appears that repair of the most obvious damage from the POPCO line took less time (SEIR, Dec. 1987).  The damage from this project, however, will be much more extensive, and cannot be expected to repair itself easily.

        c)  Nearshore subtidal.  Alternative methods of dredging include hydraulic suction, jetting, dredging with a clamshell dredge, either from a barge, a trestle, or from shore, or using a backhoe in the very nearshore subtidal (R. Appleby, Exxon, pers. comm., Jan. 10, 1988).  Exxon is planning to use a clamshell dredge, either from a trestle or from a barge.  It is likely (R. Appleby, M. Fedak, pers. comm., Jan. 20, 1988) that (two) trestles will be used out to about a 12 ft depth, and a barge from 12 ft to 25 ft depths.  The boulders and sand will be able to be removed by dredging, but the bedrock ridges will require blasting, with subsequent removal of the resulting rocks by dredging.  Dredge materials will be piled up on one or both sides of the trench, and backfilling will be done where necessary to anchor the lines, and where natural backfill due to local sediment movement is not expected.  Exxon expects that armor rock will be needed to secure the lines, but does not know the amount or size (R. Appleby, M. Fedak, pers. comm., Jan. 20, 1988).

The combination of dredging and blasting for two trenches will damage a wide area of productive rocky subtidal habitat.  Based on the understanding that one trench was to be constructed through this habitat, the SEIR (State Lands Comm., Jan. 1988) estimated 17.25 acres disturbed.  With the recent change of plans to two trenches, this estimate is now low, and up to twice this area could be disturbed.  This will disrupt a diverse biological community hiding among, foraging on, and attached to these rocks.  The attached surf grass beds provide a particularly important habitat.  The Department of Fish and Game (letter to S. Hansch from P. Bontadelli, Jan. 11, 1988) states that the department "considers kelp and surf grass as valuable resources and habitats", and that the loss of surfgrass "would result in a loss of an important habitat component utilized by juvenile California spiny lobster."  Therefore, DFG views "the loss of this habitat component as significant."  Because surf grass is very long-lived (up to 50 years), spreads mainly by vegetative growth, probably recruits very slowly, and is an important nursery for juvenile fish and young spiny lobster, the State Water Resources Control Board (SWRCB, Water Quality Monitoring Report No. 79-5, March 1979) states that "this species

warrants special protection from both physical removal and potential pollutants as it has a particularly important ecological role and is not easily replaced." The recent SEIR (State Lands Comm., Jan. 1988) considered the impact to this habitat class I (significant and not mitigable to insignificance).

Blasting will be required for trenching the pipelines through the surf zone, since bedrock is at or close to the surface. Fish, birds and marine mammals are at risk if they are in the water nearby. Fitch and Young (1948) reported that blasting associated with seismic surveys caused swimbladder rupture and internal bleeding in fish, mortality to brown pelicans and cormorants, injury to gulls and phalaropes, and mortality to sea lions. During construction of the gas pipeline to Platform Hondo (POPCO line) twelve blasts (11 inshore of the kelp bed and one at the inshore edge of the kelp) caused mortality to at least 394 fish (Chambers Consultants and Planners, 1982). The proposed project includes two trenches each 3 to 4 times as wide as the POPCO line trench. Therefore blasting may kill 6 to 8 times as many fish (i.e. 2,000-3,000), since the trenches are wider, and there are two of them. Impacts to biota could be significant if fish or wildlife are nearby in the water when blasting occurs.

If a dredge barge is used, it will have to anchor in the kelp bed when dredging the farthest offshore portion of the trench, and anchor in the hard bottom area as well. According to Exxon (letter from T.J. Tibbitts to S. Hansch, Dec. 4, 1987), the anchor lines for this barge will be approximately 400 ft long. Any anchor lines placed within the kelp bed can cause substantial damage if they contact kelp, since the kelp is likely to wrap around the lines and be uprooted or broken off. These pipeline construction impacts were documented by Chambers Consultants and Planners (1982) in association with the construction of the POPCO pipeline offshore of Corral Canyon. Damage to the kelp bed was extensive in a swath 0.2 miles (or 300m) across. Many plants were uprooted, and much of the destruction was due to the barge anchor lines. Therefore every effort must be made to minimize the number of anchor lines which could contact kelp, and to insure that kelp is protected during anchor lines setting and retrieval. In addition, bedrock ridges and the attached biota could be damaged if anchors or anchor lines were set on them or dragged across them.

Exxon has proposed to pull the pipeline through the trench and kelp bed with a lay barge whose anchors and anchor lines are located completely outside the kelp bed. Therefore no kelp should be lost due to anchoring of this barge. Pipeline laying is likely to damage or uproot kelp in two 35 to 50 ft swaths, as the lines are pulled through the kelp bed. In addition kelp will be damaged from boat traffic through the bed. Exxon has agreed to two 150 ft vessel traffic corridors through the kelp beds as a provision of the State Lands Commission permit. 150 ft is necessary because of the size of the dredge barge. This will keep impacts from vessel traffic confined to these corridors.

Suspended sediments from construction could affect kelp due to reduced light transmittance, particularly if recruitment, which is highly episodic, was significantly depressed (State Lands Comm., SEIR, Dec. 1987). Recruitment episodes normally occur in the spring (March through May) or in the fall

(Sept. through Nov.). The most intense episodes are in the fall (R. Lewis, DFG, pers. comm.). According to Exxon's present schedule, (Exhibit 12) pipeline pulls through'the kelp bed and nearshore trenching will not be finished until about mid-March. The project could substantially reduce recruitment of new kelp plants if there was strong recruitment during early spring, or a delay in pipeline construction.

d) Offshore Subtidal. Impacts to benthos will occur from anchoring and re-anchoring of the lay barge, the bottom sweep of the anchor cables, positioning and laying the pipelines, and turbidity from these operations. The SEIR (State Lands Comm., Dec. 1987) estimates that the disturbance from construction in the pipeline corridor to the platforms alone is 750 acres of soft bottom, or 6.6% of the offshore soft bottom within the project area. The SEIR estimates the probable cumulative disturbance to soft bottom at 23.7% in the project area. This disturbance is discussed in the cumulative impacts section.

Because the lay barge will have to anchor with a minimum of 8 anchors every 1,500 to 2,000 ft, there will be a minimum of 432 anchor scars (State Lands Comm., SEIR, Dec. 1987). With an average drag of 50 ft, this will be approximately 5 acres of disturbance from scars, plus additional disturbance from the sweep of the anchor cables. The extent of this impact could be .substantially higher if anchors were dragged hundreds to thousands of feet, as they were during the Hope to Grace pipeline construction, or if the scars were very deep or the berms extensive. While disturbance to soft bottom habitat is usually thought to be short-term, this is not true of anchor scars (State Lands Comm., SEIR, Dec. 1987). It is likely, although there is no direct evidence, that these pits will trap organics and fine sediment, may go anaerobic. Side scan sonar from years after the scarring has shown that these anchor scars represent long term disturbances to the environment (State Lands Comm., SEIR, Dec. 1987).

Rocky habitat at the three-mile limit of state waters may be damaged by sedimentation, anchors and anchor lines (State Lands Comm., SEIR, Dec. 1987). The location of all important outcrops likely to be impacted by the pipelines or barge anchors (up to 12,000 ft on either side) is not available from the ROV survey. The ROV only views a 5 ft path, and only uses side scan out to 10 ft to either side to look for features. Some significant outcrops were identified in the view path of the ROV survey (State Lands Comm., SEIR, Dec. 1987). Because the path was so small, however, it will be necessary to further survey the area to locate features likely to be impacted, so that the pipelines and anchors may be routed away from them.

e) Gray Whales. Pipeline construction could impact gray whales by temporarily altering their migration route (Supplement to the Getty Gaviota Consolidated Coastal Facility EIR, August, 1985). Whether this construction will contribute to a cumulative level of offshore oil and gas development affecting gray whales is unknown at this time. A MMS funded study of platform and pipeline construction effects on gray whales is planned at Pt. Sal. The results of this study will not be available until after construction of the Platform Julius project.

-48-

### 2). <u>Operations</u>

'    a) <u>Oil Spill Risk</u>.  A major oil spill will cause the greatest
operational impact on marine resources.  Project related oil spills could
result from pipeline ruptures, tanker collision, grounding, other accidents,
and loading.  Oil spills from tankers could occur at the SALM or anywhere
along the route.  Tankers are expected to travel to either Long Beach or San
Francisco.  Exxon states that the tanker and SALM analysis for the GTC Interim
Marine Terminal can be used for quantification of the risk of oil spills and
the probability that these will come ashore (i.e. conditional probability)
(letter from M. E. Fedak to S. Hansch, Dec. 22, 1987).  Exxon also submitted
additional information from Dames and Moore which states:  (1) despite the
change in location of the SALM to approximately 1 additional mile offshore,
the original Environmental Review (Production) trajectory and dispersion
analysis (Dames and Moore, 1982) is applicable; (2) to use the consolidated
portion of the Santa Barbara County Getty-Gaviota analysis (Santa Barbara Co.,
Aug. 1, 1985), an adjustment factor of 0.97 must be used to reflect 175 ship
calls instead of 180;  (3) Exxon's best estimate for lifetime of the SALM is
25-35 years based on anticipated oil production from the Santa Ynez Unit; and
(4) annual average throughput at peak operation will be approximately 45.6
million barrels of oil (letter from M. E. Fedak to S. Hansch, Dec. 22, 1987).
Staff provides a detailed analysis of oil spill risk here, since reanalysis
was necessary based on the above additional information.  This analysis is <u>not</u>
a comparative risk analysis between Exxon's original 1985 Santa Ynez Unit
Development and Production Plan Options A and B.

Exxon estimates that the average throughput during peak operation will be 45.6
million bbls/yr.  This is based on an average of 125,000 bbls/day during peak
operation.  Santa Barbara County has limited throughput to a peak processing
of 140,000 bbls/day.  At this level, the throughput would be 51.1 million
bbls/yr.  Over the lifetime of the project, estimated by Exxon as 25-35 years
based on the expected life of the Santa Ynez field, the throughput for the
project could be about 1.37 billion bbls (45.6 million bbls/yr; 30 years), or
as high as about 1.79 billion bbls (51.1 million bbls/yr; 35 years).  The
expected number of spills greater than or equal to 1,000 bbls, based on
worldwide historical data, is 1.3 per 1 billion bbls of transported oil (ERT,
March 1987).  This is the rate that is used by the Minerals Management Service
in their analyses of risk from tanker movement of oil (Donna Brewer, USFWS,
pers. comm.).  Based on this spill rate, the expected number of spills of this
size is 1.78, and could range as high as 2.33.  Sixty-nine percent are
expected to occur at sea, and 31% are expected to occur in port.  The
probability of one or more spills of this size from the tankers associated
with the proposed terminal is 83% and could range as high as 90%, based on the
assumption that each spill is independent of any other spill, and the use of a
Poisson distribution to describe the probabilities.  According to the USFWS
(USFWS Endangered Species Consultation, July 24, 1987), the additional level
of tanker activity at the GTC Interim Marine Terminal is already increasing
the expected number of oil spills (1,000 bbls. or more) by approximately 35%.
The additional traffic at the Las Flores terminal, over and above the traffic
previously using the Gaviota terminal, will increase this number another 9%.
The interim facility increased the potential frequency of such an oil spill
from 1 in 10 years to 1 in 7 years.  The additional tankships from Las Flores
will increase the potential frequency even more.

Based on the model results from the (Batelle Columbus Laboratories) study reported in the Getty-Gaviota EIR supplement (Santa Barbara County, Aug. 1985), oil spills are most likely in the area of the mooring. This study used port calls as the basic data unit, rather than amount of oil transported, as above. Using this data, and assuming 175 port calls per year (the expected number carrying average peak production levels of 45.6 million bbls/yr) and that the life of the project is 30 years, there are 105 expected spills from tanker loading at the mooring. Most of these are expected to be small (87% less than 100 bbls). Based on the Batelle study, the probability of one or more oil spills 1,000 bbls or larger at the mooring from large loading spills plus tanker accidents is 67%.

The SEIR (State Lands Comm., Dec. 1987) identifies a potential worst case situation in the event of an onshore pipeline failure, and consequent mandatory use of the marine terminal for oil transport. Such an event could mean 350 vessel calls and, for a limited time, an annual throughput, at 250 kBD, of 0.91 billion bbls. This would mean an 11% probability of a 1,000 bbl or greater spill for any one year that such conditions exist.

The offshore pipelines also contribute substantially to the oil spill risk to marine resources. At present MMS uses an expected spill rate for subsea pipelines of 1.6 spills of 1,000 bbls or greater per 1 billion bbls transported by this method. Using this information, the risk of oil spills from the pipelines is even higher than the risk from the tankers. This represents, over the life of the field, a 33% chance of one or more spills 1,000 bbls or greater from the pipeline from the platforms, and an 89 to 94% chance of this level of spills from the pipeline from the SALM. Reanalysis with more recent data by MMS has lowered this rate, but the results are not yet officially published.

These estimates are based on average use at peak operation, and would diminish substantially if oil was routed through an onshore pipeline rather than routed through the SALM pipeline and carried by tankers. Impacts from this alternative (Option B) are expected to be less than the Option A with the OS&T. This is because the OS&T itself poses a substantial risk of a large oil spill affecting marine resources, and because, with Option A, all oil would be moved by tankers. The high oil spill risk from tankers associated with this project would therefore not diminish for 30 or more years.

Additional oil spill risks to marine resources come from the proposed onshore facilities. Tanks and onshore pipelines could fail, sending oil down the canyon to the ocean. These facilities and the precautionary measures taken to avoid major oil spills are discussed in the section on containment and cleanup of oil spills.

b) Impacts from Oil Spills. Of most concern are risks to endangered and threatened species, and coastal marsh and lagoon habitats. Any loss to populations of endangered and threatened species puts them at further risk of extinction. Marsh and lagoon habitats are particularly vulnerable because they are increasingly degraded, contain endangered species, and are low energy systems which will take years to recover if contaminated with oil.

Other marine resources particularly vulnerable to the effects of oil spills include marine bird species which rest or forage by diving in coastal waters.

The most obvious and immediate effect on these birds is matted feathers, causing loss of bouyancy and hypothermia. In recent years thousands of these birds have died from contact with oil, despite attempts to capture and clean as many as possible. Results of a recently released study (Nero & Assoc., Seabird Oil Toxicity Study, OCS Study, MMS-87-0005, February 1987) show that even small amounts (1 ml to 2 ml) of weathered oil applied once to breast plumage caused a high proportion of both Cassin's auklets and wedge-tailed shearwaters to abandon their breeding colonies. Those that remained in the colonies experienced delayed egg laying, and low hatching success. The net breeding success of both orally (2 ml) and externally (2 ml) dosed groups was lower than a control group in the second year, suggesting long-term breeding depression after exposure to a single small dose of oil. Toxic reactions in orally dosed (3 to 5 ml) captive auklets, and common murres at cleanup and rehabilitation centers, included anemia and liver and kidney damage. Despite lower risk to both the southern sea otter population and sensitive areas along much of the central California coast because of Exxon's agreement to route tankers 20 to 30 nautical miles offshore (see endangered species discussion, below), the major sea bird nesting sites surrounding the Gulf of the Farallones and on the northern Channel Islands (Sowls, et al., Catalog of California Seabird Colonies, FWS/OBS-80/37, 1980), and the major foraging areas on the shelf between Bodega and Ano Nuevo Island, the San Luis Obispo County shelf, both ends of the Santa Barbara Channel, and the San Pedro Channel (Institute of Marine Sciences, U.C. Santa Cruz & Pt. Reyes Bird Observatory, Feeding Ecology of Nesting Seabirds, OCS Study, MMS 87-0055, 1987) will experience substantially higher risk from this project. Should reproductive success already be depressed or near zero for a number of years due to natural conditions, such as an El Nino, additional stress on a seabird population from substantial adult mortality and long-term breeding depression, such as is likely to occur as a result of a major oil spill, will do great damage.

Depending on the size and extent of an oil spill, should one occur, benthic and intertidal communities could also be significantly affected, and take years to recover. Frequent oil spills at the SALM are likely to result in continual degradation of the intertidal and nearshore subtidal. In addition there is a high probability of a significant spill from the subsea pipelines. A number of species may be affected, including surf grass, which experienced measurable mortality from the Santa Barbara oil spill (SAI, EIR/S, Tech. App. 8, Marine Biology, April 1984). Because tankers from the terminal will move both north and south, the area of increased risk includes the Gulf of the Farallones and San Francisco Bay, and all areas between the Santa Maria River and the Los Angeles Harbor. As noted above in the discussion of oil spill risk, the risk of these impacts will depend on the extent of tanker activity. The risk will be reduced substantially as onshore pipeline transport replaces tanker transport.

## Endangered and Threatened Species

The risks to endangered and threatened species from oil spills from the offshore portion of the project were analyzed in an Endangered Species Act consultation with the Minerals Management Service (MMS) (USFWS, March 14, 1984). This consultation did not include a specific discussion of the risk to endangered and threatened species from tanker traffic associated with the terminal.

-51-

<u>Southern Sea Otter</u>.  Southern sea otters are highly vulnerable to mortality from oiling, and the potential oil spills resulting from additional tanker traffic could cause significant harm to the population.  In the Gaviota Interim Marine Terminal Endangered Species Consultation (USFWS, July 24, 1987), the USFWS found that the risk to sea otters of oil spills from the addition of up to 137 tankers moving past the sea otter range would jeopardize the continued existence of the southern sea otter.  Under the Endangered Species Act (Section 7(b)(3)), the USFWS must provide "reasonable and prudent alternatives" necessary to minimize the impacts when jeopardy is found.  The three alternatives are listed in the USFWS informal consultation letter of Jan. 19, 1988 (see Appendix F).  Exxon offered to incorporate Alternative 1, below, into their project in order to eliminate the need for a formal consultation (letter from Nancy Kaufman, USFWS to Col. Tadahiko Ono, USCOE, Jan. 19, 1988).

Alternative 1:

    i)    All oil tankships using Gaviota Marine Terminal, when in route north of the terminal, must remain at a minimum distance from shore such that the 30 day conditional spill risk probability of affecting the existing sea otter range from any given point in route is 5 percent or less.

AND

    ii)    An annual report be submitted to the Corps and Service documenting the number of tankships using the terminal with routes north of the terminal, the volume of oil moved by these vessels, and the routing distance from shore (based on navigational coordinates or some other verifiable means).

The USFWS has agreed that a new formal consultation is not needed if Alternative 1 is adopted, if Las Flores operations conform to those consulted on for the Gaviota terminal (i.e. an annual average throughput of 100,000 bbls per day), and if Exxon provides funding for construction and operation of two wildlife rehabilitation facilities for the life of the project (letter from Nancy Kaufman to Col. Tadahiko Ono, Jan. 19, 1988).  Because the Army Corps permit has not yet been issued, these measures are not yet part of the project.

The study to define the 30 day 5% probability contour was completed in November 1987 for GTC by Ecological Consulting, Inc.  The USFWS has reviewed the report and has agreed with the methodology and results of the study, (U.S. Fish & Wildlife letter dated February 2, 1988) including the suggested tanker routes.  Based on these results, tankers will need to travel 20 to 25 nautical miles offshore to be outside the 5% probability contour (Exhibit 13).  In order to reach San Francisco Bay, they will not be able to stay outside this contour.  Therefore, there is still residual risk to sea otters, although the risk is small (9.5%).  Although this will greatly reduce the probability of an oil spill contacting shore or sea otters between the Santa Maria River and the Gulf of the Farallones, there is still a major risk to other marine resources, including foraging and nesting seabirds, along the northern route.

No restrictions have been placed on tanker traffic moving downcoast from the proposed Las Flores terminal. The tanker traffic from this facility constitutes, as a worst case, an 83 to 90% probability of an oil spill of 1,000 bbls or more if terminal operators decide to send all 175 tankers downcoast. Should only half the oil move down coast in tankers, this would still constitute a 59% probability of an oil spill of 1,000 bbls or more.

Should an oil spill originate from the tanker traffic associated with the proposed terminal, the risk that it will contact various areas along the shoreline, and thus vulnerable habitats and endangered species, is similar to that of the Gaviota interim facility, since the proposed location is close to Gaviota. The available information on this risk is identical to that available for the Gaviota facility, and therefore the following discussion is reiterated from the Commission Findings on the Gaviota Interim Marine Terminal (E-87-4 & CC-36-87; Aug. 25, 1987).

The oil spill risk analysis (ERT, May 1987) prepared for the Gaviota Endangered Species Consultation (June 24, 1987) included both probability of a spill of 1,000 bbls. or more, as discussed above, and "conditional" probabilities of an oil spill contacting land. These probabilities are conditional on a spill occurring, and so represent the chance that an oil spill will hit land should one occur. These conditional probabilities are based on trajectory modeling of the direction a spill is expected to travel, and the speed with which it will move. The model results thus include both the pathway and the time it takes an oil spill to contact land. The results are reported as the probability of a spill originating at a certain place contacting land within a specified number of hours or days.

ERT analyzed the probability of oil spills contacting land in 3, 10, or 30 days assuming a spill has occurred (conditional probability). Probabilities of spills contacting land are very high (up to 94% chance) from tankers moving downcoast from the project (ERT, March 1987). This means that any vulnerable areas or endangered species south of the terminal are particularly at risk.

<u>California Least Tern</u>. Mortality could result from direct oiling of adults, oiling of eggs and young from contact with oiled adults at the nest, and loss of food resources. The probability of an oil spill affecting least terns is presently very high (USFWS, July 24, 1987). This project increases the risk. The conditional probability of oil reaching areas in the vicinity of least tern breeding sites within 3 days are as high as 68% if a spill were to occur from traffic moving in toward the Los Angeles harbor. Spills from other parts of the tanker routes downcoast of Gaviota are also likely to reach the vicinity of least tern breeding sites, with 3 day conditional probabilities as high as 26%, and 30 day probabilities as high as 42% (USFWS, July 24, 1987).

<u>Light-footed</u> Clapper Rail. Oil in marshes inhabited by these rails would be devastating to individuals affected. Mortality could result from oiling of the birds themselves, oiling of eggs, ingestion of contaminated food, or loss of food resources and subsequent starvation (USFWS, July 24, 1987). Although marsh areas are easier than more open shores to enclose with a boom in an effort to prevent oil contamination, weather, current, and sea conditions may make this impossible. The highest conditional probabilities for an oil spill

contacting clapper rail breeding habitat are from the tanker lanes into and out of the terminal (54% in 3 days; 83% in 10 days) and the tanker lane into Los Angeles Harbor (68% in 3 Days, 70% in 10 days).

Salt-marsh Bird's Beak.  Toxicity to roots and leaves from oiling would be detrimental, and because of the very limited number of individuals still existing, any loss would be unacceptable (USFWS, July 24, 1987).  Conditional probabilities are similar to those for the light-footed clapper rail. Therefore there is a high probability of oil contacting land near where this species is found.  As discussed above, protection from oiling may be possible in the marsh habitats where these plants live, but is not certain.

American Peregrine Falcon.  These birds appear to be susceptible to the effects of direct oiling of their feathers as well as the toxic effects from ingestion of oiled prey.  There is little information, however.  One bird has been oiled, cleaned and released, but reproductive problems have since developed.  The highest risk is to San Miguel Island, a possible breeding site, with a 3 day conditional probability of 18% for a spill contacting land from a tanker beginning its upcoast journey.

California Brown Pelican.  Risks to pelicans from oil spills includes mortality to adults, juveniles and eggs.  An oil spill which contacted Anacapa Island in the summer could be catastrophic for the breeding colony there. Conditional probabilities of contact of Anacapa Island should there be an oil spill in the shipping lanes south of the terminal are as high as 10% within 10 days and 11% within 30 days.  Santa Barbara Island, the other recent breeding site, is also at risk with a 5% conditional probability (USFWS, July 24, 1987).

      c) Marine Water Quality; Ballast Water.  The greatest portion of marine vessel pollution comes from standard marine operations like cleaning cargo tanks and discharging dirty ballast.  "The volume of operational pollution exceeds accidental pollution by a wide margin," according to Captain Arthur McKenzie, Director of the Tanker Advisory Center in New York.  The National Academy of Sciences concluded in a study several years ago that tar masses are appearing in increased quantity in formerly unpolluted areas, and most of these materials originate from tanker washings and bilge discharges.

    c.    Compliance with Coastal Act Policies

The Coastal Act gives high priority to the protection of marine biological systems.  Special protections are provided for areas and species of special biological significance (Section 30230), for rare, threatened and endangered species and their habitats (Section 30240), and for biological productivity of coastal waters (Sections 30230 and 30231).

> Section 30230.  Marine resources shall be maintained, enhanced, and where feasible, restored.  Special protection shall be given to areas and species of special biological or economic significance.  Uses of the marine environment shall be carried out in a manner that will sustain the biological productivity of coastal waters and that will maintain healthy populations of all species of marine organisms adequate for long-term commercial, recreational, scientific, and educational purposes.

-54-

Section 30231. The biological productivity and the quality of coastal waters, streams, wetlands, estuaries, and lakes appropriate to maintain optimum populations of marine organisms and for the protection of human health shall be maintained and, where feasible, restored ...

Section 30240(a). Environmentally sensitive habitat areas shall be protected against any significant disruption of habitat values, and only uses dependent on such resources shall be allowed within such areas.

In addition, Section 30261 requires, in part, that tanker facilities be designed to minimize the total volume of oil spilled.

### 1) Construction

Important marine resources of both the nearshore and offshore will be damaged by pipeline installation. Trenching, blasting, anchoring, sediment burial, pipeline pulls, and movement of heavy equipment and boats will cause loss of surf grass, disruption of nearshore hard bottom subtidal and intertidal habitats, and damage to the kelp bed. Offshore hard bottom is also likely to be impacted by barge anchors and turbidity. Because of the impact construction of the proposed project will have on these marine resources and habitats, the Commission finds that marine resources and biological productivity of coastal waters will not be maintained, and that the project will not be carried out in a manner that will sustain biological productivity. Therefore the project does not meet the requirements of Sections 30230 and 30231, and must be considered under Section 30260(3), which requires "maximum feasible mitigation."

A wide area of the intertidal (up to 500 ft) and nearshore subtidal (up to 202 acres, including hard bottom habitat and kelp beds; SEIR, Dec. 1987) will be disturbed by pipeline installation, and it is important to minimize the destruction and disturbance of hard bottom habitats, kelp beds, and surfgrass beds in the project area. Without knowing the specific techniques and engineering constraints, it is not possible at this time to work with Exxon to minimize these impacts. The Commission has therefore analyzed the most likely alternatives and discussed possible impacts. The Commission has included a condition requiring that a Marine Construction Mitigation Plan for minimizing marine resources impacts be submitted to the Executive Director of the Coastal Commission for review and approval before construction. Such a plan is already required by Santa Barbara County and the State Lands Commission. In order to ensure that a determination of "maximum feasible mitigation" can be made, specific and detailed information necessary for plan evaluation is listed in Condition 9.

a) Surf Grass Bed. A wide area of surf grass (a continuous swath between 150 and 500 ft along the surf zone very nearshore, and a more than 17 acre area out to a depth of 20 ft. less completely covered; SEIR, Dec. 1987), will be lost and damaged. This habitat is important as a habitat for juvenile lobster and a unique biological community. If techniques for restoring such damage, and protecting surf grass beds, are not available, they will be developed early as a focused research effort

in the preparation of the marine construction mitigation plan (condition 9b).
With the results of this research effort available in advance of the plan,
there will be enough information for a finding of maximum feasible
mitigation.  In addition, a construction timetable submitted as part of the
Marine Construction Mitigation Plan will protect adult lobsters to the maximum
extent feasible in the surf grass and nearshore hard bottom habitats from
blasting.

        b) <u>Kelp Bed</u>.  Pipeline construction will be through a kelp bed
recovering from the devastation of the storms and El Nino conditions of 1982
and 1983.  Maintenance of the health of the kelp bed is particularly
important, since it is just now beginning to recover from the El Nino years.
Any existing kelp plants should be protected, since they provide much of the
substrate on which new plants will be able to settle and survive.  It is
likely that the kelp bed will be further degraded from boat traffic through
the kelp bed area, the laying of the pipeline, and dredge barge anchor lines
stretching into the bed, plus disturbance from the anchors themselves.
Turbidity may also affect kelp recruitment.  Exxon states that the anchors
from the lay barge will be located seaward of the kelp bed.  Therefore, these
anchors and anchor lines should not damage kelp.  The project itself provides
some small potential for long-term kelp enhancement.  Kelp is expected to grow
on the pipelines, but the area will be small.

As a provision of the State Lands Commission Lease Agreement, Exxon will
establish and restrict vessel traffic to two 150 ft wide vessel corridors.  To
minimize the risk of long-term damage, these corridors should be sited, if
possible, where kelp is less abundant.  Vessel traffic could kill plants if
kelp is cropped too near the bottom, although it is likely that cropped plants
will grow back.  Longer-term impacts such as ripping out plants, and the loss
of kelp recruitment substrate, can be expected from anchor lines and possibly
from the laying of the pipeline, as documented in the post-construction survey
for the POPCO pipeline, discussed in the impacts section above.  Exxon has
submitted plans for pre- and post-construction kelp surveys and restoration,
similar to the Commission's permit condition for the Gaviota Interim Marine
Terminal (letter from T.J. Tibbitts to S. Hansch, Dec. 4, 1987).  Since kelp
bed conformation and density may change, and construction methods at the inner
edge of the kelp bed are not yet decided, final survey methods will be
submitted to the Executive Director for his review and approval closer to the
time of construction (Condition 9d).  In addition, the mitigation plan
submitted to the Executive Director will include provisions for locating
anchors, anchor lines and construction vessel corridors to minimize damage to
kelp (Conditions 9c and 9d), and minimizing damage from turbidity (Condition
9e).

        c)<u>Offshore Hard and Soft Bottom</u>.  The major impact to offshore
soft bottom habitats will be from laybarge anchor scarring.  The disruption to
soft bottom habitats will be minimized by the marine construction mitigation
plan. Condition 9c provides for minimizing the number of anchor settings, and
using methodology to place, set and retrieve anchors with a minimum of damage
to the sea floor.  In addition, if anchor scar damage is excessive, provisions
will be available to restore the damaged areas.

Potential impacts to hard bottom will also be minimized by implementation of
the Marine Construction Mitigation Plan.  Important hard bottom areas will be

-56-

identified, and a plan to avoid them, if at all possible, will be provided in Condition 9c. Where they cannot be avoided, measures will be provided to minimize the damage.

d) <u>Gray Whales</u>. For the short-term, construction may alter the gray whale migration pattern past Las Flores. In the longer-term, heavy vessel traffic through the gray whale migration corridor and activity at the terminal may also force whales to alter their route and behavior. The Commission has found previously that maximum feasible mitigation, as required by Section 30260(3), includes limiting pipeline construction to times when whales are not migrating through the area of construction. Until information on the effect of pipeline construction to gray whale migration is available, the Commission will be unable to correctly assess the impact, or know whether constraints on timing of construction or alteration of vessel routes are necessary for a finding of maximum feasible mitigation. In particular, there is no information on whether whale behavior and migration routes are altered because of heavy tanker vessel traffic or pipeline construction. The Commission has included permit conditions 9a, 9f, and 10 which are designed to provide maximum feasible mitigation.

e) <u>Blasting</u>. The potential impacts of blasting are considerable, including mortality to fish, birds, and possibly marine mammals. Blasting is thus not in conformance with Sections 30230 and 30231 which require protection of marine resources. This activity must be evaluated under Section 30260(3), and condition 9a requires necessary information to make a finding of "maximum feasible mitigation." Mitigation could include directing and arraying explosives to cause the least damage, delaying the blast until any observed wildlife is out of the area, or setting 'poppers' to scare away fish or wildlife without harming them. The Department of Fish and Game also has permit jurisdiction over the use of explosives. The Department is particularly concerned about lobster, and has stated in response to the USCOE public notice 87-246 on the Exxon project that explosives will only be permitted from September 15 to March 1 (letter from P. Bontadelli to G. Snow, Aug. 26, 1987). Nearshore pipeline construction is scheduled within this time, and thus adult lobster should not be harmed by blasting. A more definite timetable protecting lobster will be included in the Marine Construction Mitigation Plan (Condition 9). The National Marine Fisheries Service (NMFS) is concerned about gray whales and other endangered species entering the project area during a blast, and state that they routinely recommend, and the USCOE routinely implements, "seasonal restrictions on blasting which limit activities to periods when gray whales and other endangered species are absent from the project area" (NMFS, Endangered Species consultation, Mar. 7, 1984). The NMFS routinely requires blasting cessation when whales are within 2 miles (J. Lecky, pers. comm., Feb. 3, 1988). Based on the most protective feasible explosive methodology, Exxon will minimize the threat to marine mammals, and include in the Marine Construction Mitigation Plan methods to monitor whale movements and avoid blasting when they are within 2 miles (Condition 9a).

2) <u>Operations</u>

a) <u>Oil Spills</u>. The risk of oil spills from this project is potentially very high; estimated to be higher than recent production and development projects which have come before the Commission. For example, a

14% probability of an oil spill of 1,000 or more bbls. was estimated for Platform Julius, while the probability of an oil spill of 1,000 or more bbls. associated with only the tankers for 30 years of operation of the Las Flores Marine Terminal is 83%.  In addition, the risk from the marine terminal pipeline, based on the risk analysis in current use by MMS, is 89%, while the pipeline to the platforms carries a risk of 33% for one or more oil spills of a size 1,000 bbls or larger.  There is further risk from failure of the pipelines and tanks onshore.  Because of the risk to marine resources all the way from San Francisco to Los Angeles from this project, and in particular to species protected under the Endangered Species Act, the Commission finds that this project does not meet the requirements of the marine resource protection sections (30230 and 30231) and the section (30240) requiring special protection for rare, threatened, and endangered species and their habitats. It is therefore evaluated here under Section 30260.

Section 30260(3) requires maximum feasible mitigation for the project to go forward.  Mitigation for potential oil spills includes provision of oil capture and clean-up capability, as discussed in the oil spill sections of this report.  In addition, to ensure that endangered and threatened species are protected, and based on recommendations by the USFWS, conditions to limit the marine terminal output to the level permitted for the Gaviota Interim Marine Terminal (Condition 13), to route tankers outside the 5% 30 day conditional probability contour (condition 12), to require verification of tanker routing (Condition 12), and to provide funding for wildlife cleaning and rehabilitation centers (Condition 11) are integral parts of this coastal permit.  These mitigations provide assurances that facilities and equipment for clean-up and rehabilitation of oiled sea otters and other wildlife will be available when they are needed, and that Exxon will participate in the provision of these assurances.  Additionally, as discussed in other sections of this report, the fact that the facilities will be consolidated and will comply with Section 30261, reduces overall construction and operation impacts.

       b) <u>Marine Water Quality; Ballast Water</u>.  Section 30231 specifically requires maintaining the quality of coastal waters necessary for optimum populations of marine organisms and protection of human health. Section 30230 also requires protection marine resources and sustaining biological productivity.  In addition Section 30261 requires onshore deballasting facilities to receive any fouled ballast water from tankers where operationally or legally required.  In its application for the Gaviota Interim Marine Terminal, Texaco stated that "tankers without segregated ballast will be prohibited from utilizing the facility" (GTC/Texaco, August, 1986).  The Commission found that this was essential to meet the requirement set forth in Section 30260 and 30261, that the project be mitigated to the maximum extent feasible.

In a vessel with segregated ballast tanks, the ship's ballasting tanks are separated from the cargo tanks, and are never used to transport oil. Therefore, any ballast water discharged will be clean seawater.  If all vessels using the proposed terminal have segregated ballast, no fouled ballast water will have to be disposed of, and there is no need for onshore deballasting facilities.

In order to avoid as much as possible operational impacts to marine water quality from the Las Flores Canyon Marine Terminal project, the Commission

finds that the applicant must assure that the proposed terminal shall have deballasting and onshore treatment facilities, or all vessels using the facility must have segregated ballast tanks. As an alternative, terminal users may utilize another method, if prior to initiating utilization of such method, they receive a determination from the Executive Director, after technical consultation with the United States Coast Guard that the equivalent level of marine water quality and marine resource protection can be achieved through the proposed alternative method. It is critical that the Las Flores Canyon Marine Terminal be a fully consolidated facility. Exxon has stated that all its vessels currently proposed for marine terminal use will have segregated ballast tanks. Because some vessels (owned by companies other than Exxon) may not have segregated ballast tanks, but should still be allowed access to the consolidated terminal, the Commission offers the above alternatives to protect marine resources from ballast discharges.

The Commission finds that as the chief source of vessel pollution, discharges of fouled ballast are inconsistent with the requirements of Sections 30231 and 30230, and must be considered under 30260. With the ballast mitigations described above, the Commission finds the project consistent with Section 30260, which requires maximum feasible mitigation, and with provisions of Section 30261 requiring maximum feasible multi-company use of marine terminals, and onshore deballasting where operationally required.

### 4.   COMMERCIAL FISHING

#### a.   Summary of Issues

Construction and operation of the Santa Ynez Unit project would adversely affect commercial fishing by precluding fishing opportunities in productive fishing areas. Consistent with the staff's report to the Commission on January 15, 1988, this current review does not include re-analyzing the impact of the proposed platforms in federal waters. Thus, this review of the commercial fishing impacts is limited to reviewing the portion of the project within State waters (i.e., the SALM, pipelines and power cables).

As submitted, including the conditions imposed by the County and the State Lands Commission, the project includes mitigation measures designed to reduce impacts on commercial fishing. However, even with these mitigation measures, the project still would have substantial adverse impacts due to its preclusion of commercial fishing opportunities. Consequently, Santa Barbara County and the State Lands Commission have required payments to County and State fisheries enhancement programs.

In 1984, the County estimated the economic impact to fisheries from the SYU project, using 1981 fish catch data and 1984 fish prices, to be $400,000. The County did not revise this requirement in its subsequent permitting, but included a reopener for future review. On January 21, 1988, the State Lands Commission determined additional requirements would be necessary to mitigate impacts caused by construction and operation of the marine terminal. The State Lands Commission conditions require mitigation of the loss of purse seine fishing and trawling from the marine terminal through payment of $6,000 per year to the recently established State of California Fisheries Development Corporation (or other State approved fund), to be used for fisheries

enhancement in the Santa Barbara Channel.  The State Lands Commission conditions also require mitigation of any marine terminal and pipeline construction period disturbance of the nearshore marine benthic environment affecting commercial fishing.

The issue before the Commission on commercial fishing is whether these requirements are sufficient to enable the Commission to find the project conforms with Coastal Act policies requiring protection of the commercial fishing industry.

### b.  Coastal Act Policies

Coastal Act policies which protect commercial fisheries and associated commercial fishing industries are contained in sections 30230, 30231, 30234, 30255, and 30703 of the Coastal Act.  Implementation of these must take into account the consideration of social and economic impacts of proposed development called for in sections 30001 (d) and 30001.5.  In addition, Section 30260 requires the Commission to consider the public welfare when making decisions on coastal dependent industrial development found to be inconsistent with other Coastal Act policies.  The applicability of these sections are summarized in previous Commission actions including (CC-36-84) Union, Section 4. Commercial Fishing, and (CC-7-85) Exxon, Section 4. Commercial Fishing.

### c.  Previous Commission Findings

The following discussion highlights the most relevant portions of the Commission's previous findings on the Exxon SYU project, which are useful as background information.  The full text of these findings are contained in Consistency Certifications No. CC-7-83 and CC-7-83R, and are hereby incorporated by reference into this document.  The major project modification affecting commercial fishing not previously reviewed by the Commission is the proposed new location for the SALM at 11,250 ft. offshore.  In addition, the Commission deferred detailed mitigation of commercial fishing impact within State waters to the subsequent (now occurring) permit review stage.

In reviewing CC-7-83 in June 1983, the Commission found:

> The project as proposed by Exxon will significantly impact commercial fishing activities.  The platforms and the buoys will displace a portion of a shrimp trawl tow.  ...Nearshore trapping, diving, and gillnetting activities will be disturbed by support boat traffic and displaced by the marine terminal and the associated vessel traffic. ...  Since Exxon withdrew the onshore portion of the project, the Commission does not make findings on the consistency of the marine terminal and its associated vessel traffic with these policies.

The Commission noted that compensation for displaced fishing efforts and the issues of the cumulative impacts of fishing activities precluded by oil and gas development in the Santa Barbara Channel remained an outstanding concern and could not be specifically quantified at the time of the Commission's review in 1983.

construction of the POPCO pipeline closed off fishing from El Capitan

The following are among the relevant quotes from the Commission's subsequent review of CC-7-83R, which occurred in August 1985:

> The effects of this project upon the state's commercial fishing industry will affect the land and water uses of the coastal zone. In addition to the primary fishing jobs, the industry generates many additional secondary jobs for seafood processors, brokers, dock workers, truck drivers, and boat yard crew members. Most businesses which support these workers are located in local harbors and ports and require a waterfront location to function. These coastal dependent industries are dependent on the commercial fishing industry, and thus a significant reduction in the commercial fishing effort could affect these businesses, and their use of land and water in the coastal zone.

> Conversations with representative trappers, gillnetters, and trawlers indicate that the major impacts from the proposed offshore development will occur in the nearshore waters, and mainly from the construction activities. The SYU FEIS/R states that a two mile wide area encompassing the pipeline corridor and SALM site will be excluded by these activities for one year and that 80 trappers and 55 set gillnetters will be affected by the SYU development. These impacts will be caused by the support vessel traffic, the construction activities and associated equipment, including tugboats and the pipelaying barge. Representative trappers have stated that

Point to Refugio, a distance of approximately three miles. In addition, use of the proposed marine terminal could further impact the drift fishery because the associated transiting tanker traffic could limit access to existing fishing areas.

### d.  County Conditions

The project as submitted includes the conditions required by the County. The County determined that:

> The project-specific and cumulative impacts on commercial and sport fishing are mitigated to the maximum extent feasible through conditions X-10 through X-16, which require: a) notice to fishermen before commencing construction activities; b) participation in the Local Fishermen's Contingency Fund; c) a plan to minimize impacts to commercial fishing activities from moored boats; d) the removal of construction-related mooring buoys and equipment lost overboard after construction; 3) all pipelines to be designed such that they will not snag or damage trawling equipment; f) all support boat operators to participate in a Fisheries Training Program; and, g) contributions to the Fisheries Enhancement Fund during construction.

In addition, County condition XIV-8 requires reduction of impacts on fishing through use of defined vessel corridors, during construction and operations phases, by minimizing impacts in kelp bed areas and by complying with the Santa Barbara Channel Support Vessel Corridor Program as established by the Joint Oil/Fisheries Committee.

-61-

County Condition X-16 requires a contribution of $400,000 to the County's Fisheries Enhancement Fund. In consultation with area commercial fishermen, the County has identified likely mitigation projects that would be funded by the Fisheries Enhancement Fund, as follows: an additional fish hoist at the Santa Barbara Harbor; a net repair area; marketing assistance of underutilized species; compilation of the hang-log of seafloor debris; funding for the "Oil and Gas Project Newsletter"; and funding to pursue permits and funding options necessary to install an ice machine at or near the harbor within the next two years.

In determining in 1984 that $400,000 would mitigate the project's commercial fishing impacts, the County relied on calculations based on 1984 fish prices and 1981 fish catch data. In addition, the County's determination was made based on the formerly proposed SALM location at 5,000 ft. offshore, which is a less productive area for commercial fishing than the currently proposed location at 11,250 ft. offshore. The County did not update its estimate based on the new proposed SALM location 11,250 ft. offshore in its current review; however, through its condition the County retained the ability to reopen its determination. The County states in its October 7, 1987, letter that:

> The County's determination of $400,000 as an appropriate amount to mitigate fisheries impacts was "derived from information presented in the 1984 FEIS/R (Section 9.9, Appendix 9)."

> The County's recent approval of the Exxon project included the value originally developed as described above and was not modified for the revised project for the following reasons:

> - Excluding the SALM and the ocean outfall diffuser, the components of the project that could affect commercial fishing have not changed significantly from those reviewed in the 1984 FEIS/R.

> - The SALM was relocated from 5,000 ft. offshore to a more productive fishing area 11,250 ft. offshore; however the SALM may only be constructed upon Exxon's demonstration of a need for marine oil transportation ... Condition II-2 ... allows the County to require additional mitigation for impacts ... that are not fully mitigated through the existing ... conditions. ... Therefore, if the SALM is constructed and operated, the County may impose additional mitigation measures...

e. <u>State Lands Commission Conditions</u>

The project as submitted to the Coastal Commission also includes conditions imposed on January 21, 1987, by the State Lands Commission. By providing for additional enhancement fund mitigation, based on the same project within State waters as is currently before the Commission, these conditions alleviate the need for the Commission to determine whether the County's conditions by themselves adequately mitigate the project as currently proposed. The State Lands Commission conditions cover mitigation of construction and operation impacts of the marine terminal and pipelines in State waters. Marine Terminal Lease Condition 1 requires mitigation of marine terminal operation impacts

through payment of $6,000 per year to the recently established State of California Fisheries Development Corporation (or other State approved fund), to be used for fisheries enhancement in the Santa Barbara Channel.  Lease Condition 3 requires submittal of a construction impact reduction plan, including preparation of a marine biological survey, both prior to and after construction, which (1) minimizes construction time, seafloor modifications, intrusion into kelp beds, blasting, anchor scars, and turbidity; (2) provides for restoration of damaged kelp beds or surf grass; (3) establishes vessel corridors; (4) limits the nearshore construction period to November 1 to March 31, to minimize impacts to lobster populations, air quality, and recreation at nearby State beaches; and (5) mitigates any marine terminal construction period disturbance of the nearshore marine benthic environment affecting commercial fishing, to be determined through the marine biological survey, and with the amount of compensation to be calculated once the extent of any such disturbance has been analyzed.  Lease Condition 4 requires notice to fishermen of all seafloor modifications created.  Conditions requiring impact minimization and restoration are also attached to the Marine Pipeline Lease issued by the State Lands Commission.

### f. Conclusion

Construction and operation of the marine terminal and pipelines would preclude commercial fishing activities in portions of Fish Block 655.  The above discussion describes the measures required by Santa Barbara County and the State Lands Commission to minimize this impact, as well as the payments to County and State fisheries enhancement programs to compensate for the residual preclusion of fishing opportunities.  In 1984, the County estimated the economic impact to fisheries from the total SYU project, using 1981 fish catch data and 1984 fish prices, to be $400,000.  The County has required this amount (at $133,000/yr. for three years) to be contributed to the County's established Fisheries Enhancement Fund.  On January 21, 1988, the State Lands Commission imposed additional requirements covering mitigation of construction and operation of the marine terminal.  The State Lands Commission conditions require payment of $6,000 per year to the recently established State of California Fisheries Development Corporation (or other State approved fund), to be used for fisheries enhancement in the Santa Barbara Channel.  This estimate is based on current information and the project as currently proposed within State waters, determined by the State Lands Commission based on project preclusion of purse seine and trawling fishing.  The State Lands Commission conditions also require mitigation of any marine terminal construction period disturbance of the nearshore marine benthic environment affecting commercial fishing, to be determined through the marine biological survey, and with the amount of compensation to be calculated once the extent of any such disturbance has been analyzed.

Finally, the Commission notes that Exxon has reduced its construction time and the number of support boat trips, and has begun consultation with commercial fishermen to avoid peak fishing seasons to the extent feasible.  Two conditions are necessary to incorporate the Commission into the review process of this consultation with fishermen and the marine biological survey. Condition 14 requires completion of this consultation process.  Condition 9 requires submittal of the pre- and post-construction marine biological survey results to the Executive Director; compliance with this condition will enable

the Executive Director to determine that impacts from anchor scars have been minimized and that commercial fishermen have been notified as to the location of anchor scars and other disturbances.

Despite the above mitigation measures, the project will continue to displace commercial fishing.  Payments to County and State fisheries enhancement programs will provide some assistance to commercial fishermen; however they cannot make up for the long term loss of fishing grounds.  The Commission therefore finds the proposed project inconsistent with Sections  30230, 30231, 30234, 30250, and 30255 of the Coastal Act, due to adverse individual and cumulative impacts on commercial fishing.

Reviewed under Section 30260, the Commission finds that the nearshore portion of the project is coastal dependent, in that a marine terminal and pipelines are necessary to the extent that tankers must be used in connection with the offshore platform.  In determining the least environmentally damaging location, the Commission notes that the current relocation of the marine terminal from 5,000 ft. offshore to 11,250 ft. offshore increases adverse impacts to commercial fishing, but that this impact is outweighed by decreased impacts to air quality, scenic views, noise, lighting, and public safety.  The Commission therefore finds the project is coastal dependent and located in the least environmentally damaging manner, as discussed in other sections of this report.  Also, the fact that the terminal will be consolidated will minimize the preclusion impacts that could result from other facilities.

In addressing the final test of Section 30260, the Commission concludes that, based on the above-discussed County and State Lands Commission conditions, which have been incorporated into the project as submitted, and with the above-discussed additional conditions imposed by the Commission, that commercial fishing impacts have been mitigated to the maximum extent feasible, and that the project is therefore consistent with Section 30260 of the Coastal Act.

5.  **VESSEL TRAFFIC AND SYSTEM SAFETY**

Section 30232 of the Coastal Act states:

> Protection against the spillage of crude oil, gas, petroleum products, or hazardous substances shall be provided in relation to any development or transportation of such materials.  Effective containment and cleanup facilities and procedures shall be provided for accidental spills that do occur.

Section 30261(a) states:

> Multicompany use of existing and new tanker facilities shall be encouraged to the maximum extent feasible and legally permissible, except where to do so would result in increased tanker operations and associated onshore development incompatible with the land use and environmental goals for the area.  New tanker terminals outside of existing terminal areas shall be situated as to avoid risk to environmentally sensitive areas and shall use a monobuoy system, unless an alternative type of system can be shown to be environmentally preferable for a specific site.  Tanker facilities

shall be designed to (1) minimize the total volume of oil spilled, (2) minimize the risk of collision from movement of other vessels, (3) have ready access to the most effective feasible containment and recovery equipment for oil spills, and (4) have onshore deballasting facilities to receive any fouled ballast water from tankers where operationally or legally required.

## Marine Terminal Components and Operations

The Las Flores consolidated terminal is proposed to be constructed in two phases. Phase one consists of the installation and operation of equipment and facilities to transport crude oil by overland pipeline. Marine terminal pipelines in the onshore pipeline corridor will also be installed during phase one. Phase two would involve the construction and operation of the marine terminal. Under permit conditions imposed by Santa Barbara County, this would only occur if Exxon demonstrated to the County industry's need for the proposed marine terminal.

The terminal facility is proposed to include oil storage capacity of 540,000 barrels, pipeline loading capacity of 12,500 barrels per hour, and a tanker loading capacity of approximately 45,000 barrels per hour of crude oil. The single point mooring marine terminal will utilize a closed hydrocarbon vapor control system to capture vapors displaced from marine vessels during loading.

**Pipelines**  The pipelines servicing the SALM include a 48-inch crude pipeline and the 18-inch looped vapor balance line (i.e., two 18-inch pipelines looped into a "U" at the SALM). The 48-inch pipeline will transfer crude from the shore facilities to the SALM. During the loading process, the 18-inch looped vapor balance pipeline will return crude oil vapors displaced from the vessel tanks to the shore facilities for disposal. The crude line is designed to accommodate a peak loading of 45,000 bbl/hr. The vapor balance system is designed to handle the tank vapor displaced during filling at the 45,000 bbl/hr rate plus allowance for vapor expansion. Shutdown valves for the crude loading line will be located at several points and, in the event of an emergency, these valves will block off the crude line into segments and thus minimize the volume of leakage.

**Single Anchor Leg Mooring (SALM)**  The consolidated transportation terminal tanker berth consists of one SALM (Single Anchor Leg Mooring). Located at a site in the Santa Barbara Channel approximately 11,250 feet offshore Las Flores Canyon, the SALM will transfer crude oil and displaced inert gas and hydrocarbon vapors between the pipelines and a single moored tanker.

Major components of the SALM system (See Exhibit 6) include the following:

o    **A mooring base** anchors the SALM system to the ocean floor.

o    **Universal Joints** at the top and bottom of the riser shaft will be capable of rotating up to 60 degrees from the vertical in any azimuthal direction while carrying the design anchor leg load.

o    **A riser shaft** constitutes the single anchor leg. It extends from the mooring base to the mooring buoy. It includes crude oil and vapor return piping and valves for connection to the base hoses which connect the SALM to the pipeline end manifold.

o   <u>A mooring buoy</u> connects the riser shaft subsurface and the tanker mooring
    hawser topside.

o   <u>A dual product fluid swivel assembly</u>, consisting of two individual fluid
    conduits, is provided for transfer of crude oil and inert gas and
    hydrocarbon vapors.

o   <u>A mooring hawser</u> is attached to the mooring buoy.

o   <u>The hose system</u> consists of dual underwater and floating hose strings.
    One hose string is for crude oil loading and the other hose string is for
    vapor return.

The SALM will be installed using a conventional derrick barge and diving
operation.  The SALM base will be gravity founded or pinned by piles driven
into the sea floor from the derrick barge.  The pipelines and pipeline end
manifold will be installed, the anchor leg and mooring buoy will be attached
to the base and the loading hoses will be connected.  The SALM and the
pipeline end manifold will be prefabricated offsite; the work in state waters
will be limited to installation operations.

<u>Vapor Recovery System</u>  The vapor recovery system (VRS) is designed to capture
hydrocarbon vapors from the tanker's storage tanks using closed vapor recovery
equipment, rather than venting the cargo tanks to the atmosphere.  The system
includes: tanker vapor recovery lines; vapor compressors; storage tank vapor
recovery; a hydrocarbon refrigeration unit; and an incinerator.  Vapor control
system facilities will be located at Las Flores Canyon except for the
pipelines to and from the SALM. The vapors will be used to fill the space in
the onshore tanks previously occupied by the crude oil being loaded into the
tankers.  Vapor in excess of that required for blanketing will be routed to a
refrigerated hydrocarbon recovery unit.  Vapors not condensed in this unit
will be fed to an incinerator for disposal.

<u>Operations</u>  Tanker loadings will occur approximately two to three times per
week.  Tankers of between 40,000 and 52,000 gross deadweight tons (DWT) or
their emissions equivalent and capacities of approximately 300 thousand
barrels of oil will approach the SALM from downwind, retrieve the mooring
hawser, retrieve the crude oil and vapor return hoses, and hook the hoses into
midship manifolds.

A manned control, surveillance and communications center will be provided in
the terminal's central control room.  Marine terminal data available to the
operator at the control room will include the following:

o   The open/closed position of all operating valves and the on/off condition
    of each shipping pump;

o   Flow rate and total flow for each meter;

o   Shipping pump suction and discharge pressures.  Discharge pressure will be
    recorded and remotely controlled downstream of the meter battery;

o   Temperature of the flowing system.  Temperature will also be recorded;

-66-

o    The status of the vapor balance system.

Radio communications equipment will be installed to permit continuous
communication with the marine vessel during mooring, loading, and deberthing.

Manually and automatically activated safety shutdown systems will be
provided.  The safety shutdown system can be manually activated at any time by
the control room operator and will be activated if all communication with the
marine vessel is lost at any time during loading operations.  An automatic
shutdown will be initiated on the crude loading system in the event that the
vapor recovery system shuts down while crude is still being loaded onto the
tanker.

Exxon has stated in writing that all marine vessels calling at the marine
terminal will be American flag ships. The vessels will be equipped with a
compass, echo sounder, radar, doppler sonar, VHF radio, anemometer, and Loran
C.  Tankers will normally approach the SALM using lanes established in
cooperation with the Fisheries/Oil Liaison Office.

Changes in Onshore Components

The changes in onshore components of the project are discussed in detail in
the project description.  Exxon's proposed modifications which have effects on
system safety onshore include:

    o    Indefinite deferral of the POPCO expansion to 135 MSCFD (though
         it will be expanded to 60 MSCFD);
    o    Reinjection of gas from the new platforms;
    o.   Relocation of the NGL/LPG storage and loading facilities;
    o    Use of a 48-inch crude line to the SALM;
    o    Reduction in total number of NGL/LPG truck trips; and
    o    Development of 21 MSCFD stripping gas treating plant.

Upset Conditions and Conflicts With Oil and Gas Development

Marine Terminal and Vessel Traffic  Potential accidents to vessels calling at
the terminal include collisions with other vessels, collisions with platforms,
and explosions and/or fires.  A tanker/platform collision can result in the
release of oil from one of the tanker's cargo tanks, a maximum of
approximately 10,000 barrels per tank.  It is also possible that a disabled
vessel might deploy an anchor which could damage or cause a leak to submarine
pipelines if it were dragged over the pipeline.  Although pipelines are
designed to resist damage, this sort of incident is still a possibility.  If a
disabled tanker were to drag anchor and damage a pipeline in the project area,
the result could be a large oil spill (over 10,000 bbl) or releases of toxic
$H_2S$, which might reach shore (1988 Supplemental Environmental Impact Report).

Permitted surface structures in the area include platforms Heather, Harmony,
and Heritage from this project, and the Texaco Gaviota Marine Terminal.
Platform Hondo currently exists and is approximately six miles southwest of
the proposed marine terminal.  The Gaviota terminal would not overlap the Las
Flores terminal for more than a short period of time, because the Commission
conditioned the Texaco permit to cease operations with the availability of a

consolidated marine terminal at Las Flores or operational pipelines to Texas and Los Angeles.  Tanker traffic to and from Las Flores, either north or south, could be accomplished with a minimum of a three mile distance between the tanker and any of the permitted or existing Santa Ynez Unit platforms.

As indicated in the Project Description Section, the project has changed since the Commission's 1985 Consistency Review. The State waters marine terminal facilities have been modified by relocating the SALM approximately 1.1 miles to the northeast.  The change in SALM location was required by the State Lands Commission in order to minimize interference with exploration and development of potential oil and gas reserves underlying adjacent state leases.

The Commission stated in its findings on the Consistency Certification for Exxon's Santa Ynez Unit Development and Production Plan Nearshore Option B, on August 30, 1985:

> The proposed terminal would be on a State Lands tract 2991 which Union Oil Company has leased and has expressed interest in exploring.  The State Lands Commission has stated that "...the proposed location of the marine terminal presents a major problem in terms of interference with potential development in this area..." The Coastal Commission retains original coastal development permit jurisdiction in State waters at this site.  The Commission must address at the permit stage potential conflicts from such competing uses under its obligation to provide for the orderly development of coastal resources.

The 1988 Supplemental Environmental Impact Report for this project states:

> For collisions between tankers and a platform on Lease PRC 2991, the probability is considered rare and the consequence considered severe for damage to the tanker.  This impact is considered significant but subject to effective mitigation by having a sufficiently powerful support vessel available to hold a tanker off the platform in the event it is disabled.  The potential impact of damage to a pipeline in the project area by a disabled tanker's anchor is considered significant since the consequence of damage to pipelines, considered to be severe, could result in either a large oil spill (over 10,000 bbl) or releases of toxic $H_2S$ which might reach shore.  This could be mitigated to insignificant levels again by the immediate availability of a sufficiently powerful support boat to control the tanker in the event it is disabled.

The State Lands Commission has authorized siting of the marine terminal at the new location.  State Lands considers the possibility of conflicts with future Union production low, but if they do occur, and no substitute mitigation has been identified, State Lands Commission has stated in lease conditions that it would require the marine terminal to be moved.  The Coastal Commission notes that a finding of compatibility by the State Lands Commission would not necessarily ensure a finding that siting a platform near the marine terminal would be consistent with the Coastal Act.  For a number of reasons, including

those identified below, the Commission has concerns regarding any proposal which would potentially conflict with the marine terminal or which could coexist with a terminal only if the terminal were relocated. Depending on the analysis presented, the Commission may not be able to approve such a platform because of this potential conflict. However, the Commission notes that its resolution to this type of conflict should it arise may necessitate the ultimate modification of Exxon's operations. The Coastal Commission finds that a future determination of significant hazard to vessel traffic posing a threat of oil spills would therefore conflict with Section 30232. Further, it would not conform to Section 30262 of the Coastal Act, which allows the permitting of oil and gas development only if it is _not_ sited where a substantial hazard to vessel traffic might result from the facility or related operations. The conclusion of the 1988 SEIR that a sufficiently powerful support boat is "effective mitigation" for this type of conflict is not the same finding as the Commission must make, in the case of Section 30260, of "mitigated to the maximum extent feasible." Additionally, there may be conflicts with other Coastal Act policies.

The Commission cannot make any determination at this time that the marine terminal should be moved in the future. With the information now available, there is no way to make a determination that such a move would be consistent with Coastal Act policies. The Commission is particularly concerned with the impacts which would result from removal of the terminal and installation at a new site. In relation to this concern, the Commission observes that Union and other lessees have been informed of the Commission's proceedings and given an opportunity to comment.

Effects of Changes of Onshore Components  The "Exxon Santa Ynez Unit Project Supplemental Environmental Impact Report" (SEIR), prepared for Santa Barbara County (August 6, 1986) states:

> Overall, this analysis has shown that the proposed project modifications have very little effect on total system safety and reliability. Most of the changes represent reductions in activity levels or facilities previously approved. Even the consolidated NGL/LPG storage and loading facilities represent relocations of previously permitted facilities, not new facilities. The permit conditions already in place were found to still be applicable and to generally be sufficiently effective in terms of identifying, understanding, and managing those elements of the project which pose some level of risk to the public or the environment.

The SEIR goes on to analyze the systems safety impacts of the changes in the onshore components of the project. The reinjection of gas, and the associated deferral of the POPCO expansion to 135 MSCFD, reduces the risk associated with gas pipeline rupture. For the onshore portion of the project there would no longer be any risk associated with this scenario, as the second gas line would not be installed. The vapor recovery lines looped from the transportation terminal to the SALM would not carry sour gas, would be run at a slight vacuum, would not be in continuous use, and are very well instrumented.

The relocation of the stripping gas treating plant from the vicinity of POPCO in order to process the gas separated from the oil has several effects.

Primarily these all relate to the amount of risk reduction offered by the indefinite deferral of the POPCO expansion.  The number of NGL/LPG truck trips would be reduced, but not enough to change the frequency and severity classifications from unlikely and major, respectively.

Other risks of NGL or gas releases might be expected from: vapor recovery line pigging operations; process upsets; and breaks in the propane or butane lines connecting the stripping gas treating plant with the storage area.  The relocated loading racks would pose some risk of release, but probably less than before they were isolated from most truck traffic and potential impacts from other process events.  Pipelines between the storage and loading areas and the POPCO slugcatcher and the stripping gas treating plant also pose the potential for releases.  Considering all these sources, it is considered to be a likely event that an NGL or gas release will occur, but any release is expected to be minor in consequence.  This is due partially to the quantities expected to be released and partially to the distance to the public.  The tanks are in closer proximity to public areas (such as Highway 101) than they were in the previous design.  However, NGL/LPG releases associated with storage tank failures would be less likely to occur due both to the reduced number of tanks and the separation of the tanks from process operations.

Santa Barbara County Systems Safety Conditions

As discussed above, the project as submitted for Commission review includes conditions imposed by Santa Barbara County, including many systems safety conditions.

Marine Terminal Conditions  The County has set up a System Safety and Reliability Review (SS&RR) Committee, consisting of representatives from the County Public Works Department, County Flood Control District, the APCD, the County Fire Department, the Emergency Services Coordinator, and the Resource Management Department.  This Committee will review all design and construction drawings and operational procedural documents for pipelines (onshore and offshore within State Tidelands), SALM, and onshore facilities for hazard identification, risk assessment, and mitigation of design hazards prior to construction of each project element.  The SS&RR Committee review may determine that additional mitigation will be required which shall be incorporated into the terminal plans.

Santa Barbara County permit conditions limit the use of the marine terminal facilities solely to the transfer of crude oil onto marine vessels. Prior to operation, the County must approve an emergency response plan submitted by Exxon.  Exxon must also provide its pro-rata share of funds to the County in order to develop and implement a County Emergency Response Plan for oil and gas industry related emergencies.  Prior to start-up, onshore and offshore oil spill prevention control and countermeasure plans, hazardous waste plans and toxic substance control plans addressing the operations phase must be submitted to the County for review and approval.  Prior to approval of the Final Development Plan, the County must approve a site security plan. Exxon has already received approval of a Fire Control Plan from the County Fire Department, and the company is financially responsible for implementing all requirements of the plan.  The County has required Exxon to demonstrate oil spill response capability by responding to a maximum of two surprise oil spill drills each year.

A panel composed of representatives of Santa Barbara County Fire Department, Exxon, and three additional independent experts shall decide if a dedicated fire protection vessel is justified at Las Flores Canyon, and present their recommendation to the Board of Supervisors. The Board shall "make a final decision as to what marine fire protection system shall be required."

Prior to operation of the marine terminal facilities, the Santa Barbara County Fire Department shall hire a full-time fire inspector to be stationed in the project vicinity. This inspector's expenses shall be paid for on a pro-rated basis by Exxon and other companies having projects in the area. This inspector shall, among other duties, coordinate with the U.S. Coast Guard to assure that fire protection systems and equipment onboard tankers are in proper working order, and coordinate necessary onboard inspections. Exxon is to have a oil spill response vessel standing by during tanker loading operations, and the company shall contribute on a pro rata basis to a regional study on petroleum related coastal and marine fire protection and vessel safety.

NGL/LPG Transportation Conditions  The Santa Barbara County Board of Supervisors adopted a resolution in July 1985 which specified allowable modes of transportation of liquefied petroleum gases and natural gas liquids. The resolution was premised on the assumption that without alternative transportation, approximately 100 trucks per day will be needed at peak production to transport these materials from the various oil and gas processing facilities in the County to market destinations, and that both pipeline and rail transport of these materials are safer than truck transport.

The County resolution therefore restricted the circumstances under which truck transport is allowable. Specifically, after June 30, 1988, truck transport is only allowed when: 1) products are distributed to local users; or 2) trucks are used to transport products to and from a centralized pipeline or rail loading facility; or 3) when other facilities are temporarily unable to accommodate additional production; or 4) during an emergency.

Exxon's consolidated truck loading and storage facility is not scheduled to begin operation until 1992, and may only be used under one or more of the four circumstances described above.

POPCO owns and operates a truck loading facility in Las Flores Canyon adjacent to the POPCO gas processing plant. Its design capacity matches the NGL/LPG production of POPCO at capacity (60 MSCFD gas). While adjacent land could be used to expand this truck facility, such use would constrain the area available for future gas processing. In addition, there are advantages from a system safety standpoint to locating the new truck facility away from the sour gas processing operations. Since the size of the truck loading facilities in the canyon must be increased to accommodate Exxon and other potential producers, the County found that the location chosen for the new consolidated truck facility is preferable to expanding the POPCO truck facility.

Santa Barbara County permit conditions state that all LPG and NGL processed by Exxon's oil and gas treatment facilities shall be transported from the facilities in a manner consistent with the County-wide NGL/LPG transportation policy resolution approved by the Board of Supervisors. Compliance with this

condition shall specifically require Exxon to retain or blend the maximum feasible volume of NGLs within its processed crude oil, and require Exxon to use a regional NGL/LPG transmission facility for its Las Flores Canyon NGL/LPG transportation requirements.

In the absence of another active application, Exxon shall apply for, or participate in an application for, a regional NGL/LPG transmission facility (dedicated pipeline or rail loading) no later than January 1, 1989, unless a time extension is granted by the County pursuant to modifications of the NGL/LPG transportation policy resolution. The environmental analysis required for this facility shall include assessments of alternative project locations to an equivalent level of detail as the proposed site. As appropriate, Exxon shall contribute on a pro-rata and equitable basis to a regional study to assess relative risk and risk reduction measures associated with the transportation of gas liquids by truck and by rail.

## State Lands Commission Systems Safety Conditions

In addition to Santa Barbara County conditions, the State Lands Commission has placed systems safety conditions upon this project. These include the requirement that all tankers using the terminal shall be accompanied by a vessel of at least 1200 horse power engine capacity and capable of steering or holding the tanker in the event of the tanker becoming disabled enroute between the terminal and the vessel traffic separation corridors (VTSS). This assist vessel shall be deployed at the terminal once a tanker departs the VTSS.

The State Lands Commission also has required that a mooring master shall be on board any tanker enroute between the marine terminal and the VTSS and while the tanker is moored at the marine terminal. The mooring master may be a crew member who has had training in ship handling at an approved simulator facility and is knowledgeable of the characteristics of coastal waters in the vicinity of the marine terminal. The State Lands Commission must approve a training program to ensure that the personnel designated as "mooring masters" are properly trained and qualified to operate vessels in and around the marine terminal. Refresher courses shall be conducted every five years for personnel who have completed the training program. Exxon is to assure that qualified mooring masters can be contracted for by third party users of the terminal who do not have designated personnel who have successfully completed the training program.

## Commission Conditions

**Vapor Recovery System** The most hazardous period for potential tanker explosions is when they are empty and begin loading. Therefore, the Commission is particularly concerned with reducing the risk of any malfunction in the vapor recovery/inert gas system at this marine terminal where vessels will be arriving empty and then loading. As stated above, the purpose of the vapor recovery system (VRS) is to reduce air pollution by capturing hydrocarbon vapors from the tanker's storage tanks as those tanks are being unloaded, rather than venting the cargo tanks to the atmosphere. The purpose of the inert gas system (IGS) is to supply gas, usually from the ship's stacks, of sufficiently low oxygen content to prevent the formation of flammable atmospheres in the cargo spaces of vessels. In the case of the Las Flores Marine Terminal, as well as the Gaviota Marine Terminal approved by the

Commission last year, the VRS is tied into the IGS.   A vapor recovery system of the type proposed is not in operation in any other location, other than Gaviota, though various subcomponents have been incorporated in other marine terminals.   Some oil and maritime company representatives have stated that recovering vapors of petroleum products during vessel loading could create dangers of explosion and fire.

Where the Commission relies on certain equipment in making its findings, it must have assurance that the equipment will operate properly.   Some of the equipment proposed has not been used at previous sites prior to Gaviota, and therefore the Commission found additional technical review and training was necessary to assure effectiveness.   In consultation with the California Maritime Academy (CMA), the Santa Barbara County Fire Department, the U.S. Coast Guard, and the applicant, the Commission conditioned the Gaviota Marine Terminal project to require a technical review of the operations and quality control of the vapor recovery system.   The Commission's permit required that prior to issuance of a final coastal development permit for the Gaviota Terminal, Texaco will submit to the Executive Director for his review and approval a work program and contract with the CMA for this vapor system review.   A committee consisting of representatives from Texaco, the U.S. Coast Guard, the California Maritime Academy, the Santa Barbara County Fire Department, and the Coastal Commission shall review the CMA's technical report.   After analyzing the report, the Committee shall advise the operator and the applicable regulatory agencies as to what, if any, safety problems exist in the operation or design of the vapor recovery/inert gas system.   If problems are identified, Texaco will undertake engineering studies to identify corrective measures and institute any changes determined to be feasible by any of the agencies.   As the Vapor Recovery System proposed for the Las Flores Terminal will be virtually the same as that proposed for the Gaviota Terminal, changes incorporated into the Gaviota system must be examined in relation to the Las Flores system.   Exxon shall institute any changes determined to be feasible and appropriate by the committee of agency representatives after study and consultation with Exxon.   The Commission finds that the safe operation of the facility requires that the vapor recovery system be subjected to the same review and analysis as the system at the Gaviota Terminal, and has set forth this requirement in Condition 15.

Fire Protection Vessel  In order to avoid duplication of effort and unnecessary expense, the Commission will make every effort not to duplicate work currently planned to be conducted by other agencies.   The Commission is attempting to join with the State Lands Commission and Santa Barbara County in any studies being undertaken to determine whether a fire protection vessel is justified at the Las Flores Marine Terminal.   The results of such studies, done to the greatest degree possible in cooperation with the County, the State Lands Commission, and the applicant, shall be presented to the Executive Director for his review and approval, as required by the Commission in Condition 16.   The condition goes on to require that the Executive Director, in consultation with the State Lands Commission, the Santa Barbara County Fire Department, the applicant, and the U.S. Coast Guard, shall determine if a dedicated fire protection vessel is justified at the project site.   If the vessel is found to be justified, the applicant will furnish and operate such a vessel if no appropriate agency does so.

Risk Management Plan  In its August 30, 1985, consistency certification, the Commission stated:

> Staff has discussed with Exxon its intent to recommend that the company be required to develop a risk management plan for the marine terminal as a condition of permit approval.  Specific appropriate mitigation measures, which are available, will thus be specified in the permit process.  These will address the problems of fire fighting, inert gas systems (IGS) inspections, tug assistance for disabled tankers, and other components of a risk management plan necessary for a new consolidated marine terminal.

As stated above, Santa Barbara County has formed a panel composed of various county agencies.to review and approve a hazards identification and risk assessment for the Las Flores facility.  As in the case of the fire boat study, the Commission will attempt to work with Santa Barbara County and the State Lands Commission in eliminating duplication in relation to a risk management study for the marine terminal.  Condition 17 requires that the applicant shall submit to the Executive Director, for his review and approval, a Risk Management Program for the marine terminal portion·of the Las Flores project.

Marine Terminal Operations Manual  Section 30261 of the Coastal Act requires, in part, that tanker facilities shall be designed to minimize the total volume of oil spilled and minimize the risk of collision from movement of other vessels.  Review and approval of the operations manual by the Executive Director provides a means for the Commission to assure that adequate safety features are included in the design, construction, and operation of the terminal.  This will contribute to safe terminal operations.  The Commission, therefore, finds that Condition 18 is necessary to minimize the total volume of oil spilled and minimize the risk of vessel collision in and around the terminal; and brings the project into conformance with Section 30261 of the Coastal Act.

Coastal Act Conclusions

With the safety measures included in the project proposal, those placed on the Santa Barbara County permit and the State Lands Commission lease, and the additional vapor recovery system, fire boat study, and risk management and terminal operations plans mitigation measures required by the Commission as conditions, the Commission finds that the marine terminal at this site could still result in an accident that could cause an environmentally damaging oil spill, and therefore is inconsistent with Section 30230, 30231, and 30232 policies in Chapter 3 of the Coastal Act.  However, the risks and impacts of the proposed marine terminal and offshore pipelines are mitigated to the maximum extent feasible and therefore are consistent with Sections 30261(a), and 30260(3) of the Coastal Act.  These findings are also based in part on the compliance with the marine terminal with the Coastal Act's consolidation policies, as discussed in Section III. F. 12, and required by Sections 30261 and 30262.  The Commission makes it clear that this approval can be given only because there are no exploratory or production activities in the immediate area.  If an application for such activities were to be received, the

-74-

Commission would have to address future proposed projects in relation to potential conflicts from such competing uses under its obligation to provide for the orderly development of coastal resources.

Onshore Facilities  The facilities located onshore within and landward of the coastal zone, including pipelines, processing facilities, transportation facilities, and storage tanks, are not coastal dependent.  Therefore, the override provisions of Section 30260 cannot be used to approve these portions of the project.  As discussed above, significant safety measures, and requirements to ensure the adequacy and performance of these facilities will be provided or required through conditions.  In addition, the location of these facilities onshore and outside the coastal zone will minimize these risks and impacts.  In particular, in most cases, emergency response to upset conditions such as oil spills at land based facilities can be achieved more easily than for similar incidents offshore.  In addition, the buffer between the major elements of the project and the coastal zone will reduce potential impacts because the site is located a substantial distance up the canyon.  The oil spill containment facilities for the large oil storage tanks are designed for the spilled oil to flow inland away from the coastal zone.  As a result, the Commission finds that oil spill, fire and explosion risks to the coastal zone are reduced to the maximum extent feasible for this facility.

However, even with the proposed mitigation, accidents and upset conditions with significant consequences to coastal zone resources continue to raise concerns under the marine resources and oil spill policies of the Coastal Act.  Because of the remaining risks, the Commission turns to the provisions of Section 30007.5 of the Coastal Act, which provides that conflicts between one or more policies of the Act shall be resolved in a manner which on balance is the most protective of coastal resources.  In applying this provision, the Commission finds that an important factor in its consideration is the question of whether the facility can be relocated.  In this regard, the Commission again notes that the onshore components of the facilities are not coastal-dependent or coastal related.  In this case, the terrain of the Santa Ynez Mountains constitutes a significant limitation on the potential for relocation of the facility in a manner resolving the conflicts.  Significantly, Las Flores Canyon was determined to be the least environmentally damaging site for these facilities based on extensive review and analysis in the EIS/EIR, and by Santa Barbara County.  In this regard, a significant consideration is again the location of the major facilities in a canyon, with a buffer from the coastal zone.  The Commission finds, in Section III.F.13.c. of these findings, based in part of the EIS/EIR analysis, that the project will be located in the least environmentally damaging location.

The proposed development is consistent with Section 30250(b), which provides that, "Where feasible, new hazardous industrial development shall be located away from existing developed areas."  In addition, this location will enable the co-location of facilities, reducing the potential for multiple facilities with impacts to different locations of the coastal zone.  The Commission finds in this case that, while spreading the facilities over a wider area would limit to some degree the risks in each individual area, it would make certain mitigation measures more costly and spread valuable resources for dealing with potential accidents and upset conditions.  For example, the consolidation of the facility helped to ensure that onsite location of fire fighting capability

was feasible.   Because the facility is to be consolidated, and with the mitigation package to be included under Exxon's proposal and the Commission's conditions, the Commission finds that the impacts of 'the project to the coastal zone will be mitigated to the degree of consistency with Coastal Act policies feasible under the circumstances.   Based on the determination that the project will be placed in the least damaging location, the contours of the site, its location outside the coastal zone, and the other factors identified above, the Commission concludes that approval of the project is consistent with Coastal Act policies as applied in consideration of Section 30007.5.

-76-

6.  GEOLOGIC HAZARDS

Section 30253(1) and (2) of the Act states that:

"New development shall:

(1)  Minimize risk to life and property in areas of high
     geologic, flood, and fire hazard.

(2)  Assure stability and structural integrity, and neither
     create nor contribute significantly to erosion, geologic
     instability, destruction of the site or surrounding area or
     in any way require the construction of protective devices
     that would substantially alter natural landforms along bluffs
     and cliffs."

Exxon's proposed project now before the Commission consists of Santa Ynez Unit
pipelines and power cables extending through state waters to shore (3 nautical
miles) and components of a marine terminal loading system consisting of a
SALM, vapor balance lines, a utility bundle, and a crude oil loading line.
These subsea pipelines will occupy a common corridor through the intertidal
zone.  The marine terminal loading lines will extend to the southeast and
terminate at the SALM approximately 11,250 feet offshore. From the beach, the
subsea pipeline system will trend to the southwest and continue through state
waters to Platform Heritage in federal waters.  In addition, the onshore
pipelines and Las Flores Canyon facilities are also before the Commission.

Subsea Pipeline System Within State Waters.  Exxon's proposed pipeline
corridor (Mesa$^2$, 3/82) enters state tidelands approximately 8,000 feet
northeast of Exxon's platform Hondo A. Within this corridor, Exxon proposes
to install one 20" crude oil emulsion pipeline, one 12" produced water
pipeline, and 3 power cables.  The water depth at the federal-state boundary
is approximately 480 feet.  The sea floor gradient within state tidelands is
very low, ranging from 0.3 to 1.4 degrees.  Generally, the exposed seafloor
consists of fine to very fine grained bioturbated sand to sandy silt.  No
seafloor instability was recorded along the pipeline route.

Regional seismicity and its impacts on the Santa Ynez Unit development was
discussed in the Commission's findings on the offshore portion of Option B
(CC-7-83).  Exxon's site specific studies within the project area have
identified two faults, and a possible third, which cross the offshore pipeline
corridor.  According to Exxon's geotechnical consultant (Mesa$^2$, 3/24/82),
the first two features do not cut Holocene age sediments and do not offset the
seafloor.  The third feature may be shallow gas, active faulting, a lithologic
or facies change, or a filled channel deposit (Mesa$^2$, 3/82, p. 26).  If this
feature is a fault, Exxon has interpreted its activity as follows (Mesa$^2$,
3/82, p. 26):

The questionable fault or "highly reflective zone" may be considered as a
potentially active minor fault zone.  But the subtle bowing of the modern
shelf surface over this zone and the absence of visible offset of the
bedrock surface below the Holocene suggests that surface rupture along the
zone is unlikely.  There is no visible offset of the bedrock surface below
the Holocene.  Such offset would be anticipated if the fault were capable

of significant surface rupture.  Such surface offsets are observed east of Santa Barbara along the offshore extension of the Red Mountain fault.

No other Late Quaternary fault activity was identified along the route. Nor were such faults mapped in the  Near Shore Marine Terminal area east of the inner portion of the shallow water segment of this study.

The Commission agrees that the likelihood of surface rupture along this feature is remote, if in fact it is a fault.  Should this feature offset the seafloor during an earthquake, several feet of seafloor displacement could result.  The pipelines will rest directly on the seafloor at the location where they cross this feature.  Minimal confining forces should allow the pipelines to withstand several feet of offset without rupture.

Bedrock ridges are exposed where the pipeline corridor crosses the shelf break.  These ridges have a relief of up to 3 feet and largest area of exposed bedrock is approximately 300 by 450 feet.  The water depth of these ridges ranges from 270 to 300 feet.

<u>Marine Terminal Loading Lines</u>.  Exxon proposes to locate one 48" crude oil loading line, two 18" vapor balance lines, a utility bundle, and a single anchor leg mooring (SALM) within the marine terminal loading line corridor. The SALM will be located in 198 feet of water 11,250 feet from shore. The seafloor gradient slopes to the south and ranges between one and 3.5 degrees.

No active faults underlie the SALM site or cross the subsea marine terminal pipeline route.  However, the Santa Barbara Channel is a seismically active area and secondary effects, such as liquefaction, can occur due to earthquake ground shaking.  One of these major secondary effects that could impact the seafloor within the marine terminal pipeline route is liquefaction.

The development of high pore-water pressure in certain types of sediments due to ground vibrations (which can occur during an earthquake) can cause sediments to be altered from a solid state to a liquid (liquefaction).  In some cases, the liquefaction of sandy soils induced by earthquake ground motions can cause overlying, sloping soil to slide laterally along the liquefied layer.  Liquefied unconsolidated sediments within the pipeline corridor would probably move downslope (to the south) and could impact the SALM site.  Exxon has identified and considered this potential geologic constraint (Mesa$^2$, 1982) in the design of the subsea pipelines and the SALM.  Soil movement forces on the pipeline are minimal when the pipe is placed on the seabed.  Exxon will select a pipe specific gravity such that the weight of the pipe, and its contents, is heavy enough for the pipe to remain stable under the most severe wave conditions yet remain light enough so that the pipe does not embed itself below mudline (even if liquefaction of the underlying soils should occur during an earthquake).

<u>Intertidal Pipeline Trenching</u>.  Exxon proposes two wide trenches, 1,100 and 1,000 feet in length, with pipelines to be laid as close as possible (10 foot spacing) within each trench.  Trenching will occur to the -25 foot MSL isobath and blasting will probably be required to remove exposed bedrock or high relief hardbottom areas.  Proposed trench widths range between 35 and 40 feet (see exhibit 7) with proposed trench depths measured from the top of the minimum winter beach sand cover.  Exxon has not yet submitted any detailed

profiles showing the winter thickness of beach sand and the elevations of the underlying bedrock.  The Commission's requirement for a pipeline crossing the intertidal zone is that the pipeline will never be exposed due to wave attack at any time during the project design life.  At intertidal locations (including this area) where bedrock is exposed during the winter storm season, the Commission must require, at the minimum, that the pipeline be placed in a trench so that the top of the pipe (and any armor  rock covering the pipeline) is at or below the exposed bedrock.  Therefore, after site specific engineering studies it may be necessary that Exxon trench well into bedrock to assure minimum exposure of the pipelines and backfill during winter storms. Condition 20 requires Exxon to prepare final design plans for the pipelines' intertidal crossing  for the review and approval of the Executive Director.

Exxon has proposed to use dredge barges for the excavation of the offshore trenches and has requested the option to construct and utilize a temporary trestle, if necessary, to help establish and maintain the trenches.  Condition 20 requires Exxon to justify the selection of an installation method, or if needed, some combination of both techniques.  Proper utilization of the trestle or the dredge barge options will enable Exxon to meet the Commission's design objectives for pipelines transecting the intertidal area.

Sporadic hard bottom exposures lie near the shelf break in water depths ranging from 270 to 300 feet.  The proposed subsea pipelines follow the existing POPCO alignment which avoids these exposed rocks or ridges.

Onshore Facilities.  Exxon's proposed onshore development within Las Flores Canyon consists of two 270,000 barrel crude storage tanks (and other field tanks), onshore pipelines, cables, an oil treating plant, a stripping gas treatment plant, a cogeneration power plant, a transportation terminal, and NGL/LPG storage and transportation facilities.  To mitigate potential geohazards presented to these facilities from unstable slopes and to provide stable building pad sites (35.4 acres) within the canyon, Exxon has proposed to grade 4.7 million cubic yards of material.  For slope stabilization, Exxon proposes to utilize tie-back walls, reinforced earth walls, geo-grid reinforced earth, buttresses, drainage and erosion control systems, a reseeding and irrigation system, and appropriate foundation design for the facilities.

Las Flores Canyon ranges in elevation from sea level at the pipeline landfall to about 220 feet on the valley floor at the north end of the area.  The hills east and west of the canyon rise to elevations of more than 850 feet and rock units within the canyon consist of Miocene age Rincon and Monterey shale formations.  Both of these formations are fine grained marine siltstone and shale, dip to the south between 30 to 60 degrees, and are landslide prone on moderate to steep slopes (exhibit 8).  The following is a generalized description of the types of slope failures that have been identified within the project area (Exxon, 1987, p. 11):

> Several areas are characterized by landsliding and slope distress features.  The majority of the landslides have originated from the Rincon formation, occuring mainly in a weathered zone.  Many of the landslides have occurred on slopes that are either perpendicular to or opposite to the dip of the underlying rock.  The larger landslides generally have failed as a relatively viscous mass or debris flow with little or no

internal structure.  Smaller landslides exhibiting rotational failure surfaces were also observed, particularly on the slopes east of the Transportation Terminal Tankfield.  Groundwater was observed in most of the landslide masses.

The Commission believes that landsliding within the project area represents the most significant hazard to the proposed facilities.  Earthquake shaking, heavy rainfall, stream erosion within the canyon, and other factors, could induce movement of these large masses.  Based on detailed field mapping and engineering testing (data obtained from numerous borings and test pits), Exxon has designed an elaborate slope stabilization plan.  This plan has developed design "factors of safety" for retaining structures based upon the impacts of additional loading on earth buttresses and retaining walls due to two seismic events (given a 50 year project design life), the maximum probable and maximum credible earthquakes.  These events have return periods of 72 and 475 years, respectively.

Instrumentation will be used to measure ground water levels and deformations (both horizontal and vertical) in deep fills.  In addition, instrumentation has been proposed to measure the deflection of walls and structures both during and after construction at reinforced soil walls and other sensitive structures or equipment.  These instruments include survey monuments, inclinometers, piezometers, multi-point settlement gauges, and tieback load cells.

Santa Ynez Unit pipelines and the marine terminal loading lines must pass beneath Highway 101.  The SYU pipelines will be placed within an existing tunnel constructed in 1982 beneath the highway for the POPCO gas line.  Exxon will construct a new tunnel located 30 feet to the east of the existing tunnel for the marine terminal loading lines.  The proposed tunnel will be approximately 400 feet long, 9 feet in diameter, and pass through the road fill which crosses Corral Creek Valley.  This fill material supports Highway 101, the frontage road Calle Real, and two sets of Southern Pacific Railroad tracks.  The amount of cover over the proposed tunnel ranges from 30 to 40 feet.

An emergency containment basin has been designed for spillage from the transportation terminal tankage area (see oil spill containment; section 2). Exxon has designed this basin and the surrounding area so that as all natural drainage  from the surrounding hillside will be diverted to prevent it from entering the emergency containment basin.  Only drainage from the tank pads to the south and east will enter the basin.

Coastal Act Conclusions.  The Commission has reviewed Exxon's geotechnical studies and finds that all potential geologic constraints at the SALM site and within both offshore pipeline corridors have been identified.  Proper mitigation of these features as conditioned has included either avoidance or, as explained above, engineering design.  For the onshore portion of the project, the Commission finds that Exxon has identified all the potential geologic hazards and has submitted an adequate stabilization plan to mitigate any potential impacts that these hazards pose to the proposed facilities. Based on this, the Commission finds that Exxon has mitigated the proposed project consistent with Coastal Act Section 30253 for geologic hazards.

7.  **AIR QUALITY**

The Coastal Act includes several policies addressing air quality requirements.

Section 30253(3) of the Coastal Act states in part, that:

> "New development shall...[be] consistent with the requirements imposed by an air pollution control district or the State Air Resources Control Board as to each particular development."

Section 30250(a) requires in part that new development be located where it will not have "significant adverse effects, either individually or cumulatively, on coastal resources..." Cumulatively is defined in Section 30105.5 to mean:

> "...the incremental effects of an individual project shall be reviewed in connection with the effect of past projects, the effects of other current projects and the effects of probable future projects."

Section 30414(a) provides:

> "The State Air Resources Board and air pollution control districts, established pursuant to state law and consistent with requirements of federal law, are the principal public agencies responsible for the establishment of ambient air quality and emission standards and air pollution control programs.  The provisions of this division do not authorize the Commission or any local government to establish any ambient air quality standard or emission standard, air pollution control program or facility, or to modify any ambient air quality standard, emission standard, or air pollution control program or facility which has been established by the state board or by an air pollution control district."

Further, Section 307(f) of the Coastal Zone Management Act directs that federal, state, and local provisions established pursuant to the Clean Air Act (CAA) shall be incorporated into state coastal management programs and "shall be the...air pollution control requirements applicable to such program."

Pursuant to the Clean Air Act, the state has established programs to attain and maintain national ambient air quality standards adopted by the Environmental Protection Agency (EPA).  Under the State Health and Safety Code, and consistent with the provisions of the Clean Air Act, this responsibility is carried out through programs, rules and regulations established by the State Air Resources Board and by local air pollution control districts.  The local Air Pollution Control Districts (APCDs) are required to establish air quality programs, which include rules and regulations for the attainment and maintenance of both the federal and state ambient air quality standards including standards for ozone within their districts.

Air Quality in South Central Coast Air Basin  The southern portion of Santa Barbara County, in which the proposed project would be located, and neighboring Ventura County, downwind to the east, continue to experience exceedences of several federal and state standards.  Santa Barbara County is divided into three air quality regions.  Region 1, the south coast portion of the County, is designated nonattainment for ozone ($O_3$).  All three regions are designated as attainment for carbon monoxide (CO).  The Santa Maria area of region 2 is designated nonattainment for total suspended particulates (TSP).  Ventura County is also designated nonattainment for ozone ($O_3$). Both Counties therefore, are classified as non-attainment by the federal government for ozone.  Although Santa Barbara County planned in 1982 to meet air quality standards by 1987, the standards have not been met.  The Santa Barbara County Air Quality Attainment Plan (AQAP) is now being updated to predict attainment of these standards in the next few years.  Ventura County's Air Quality Maintenance Plan predicts attainment sometime after the year 2000.

Santa Barbara County Air Pollution Control District  The Santa Barbara County Air Pollution Control District (SBCAPCD) has exercised permit authority over the project now under review by the Commission.  On November 19, 1987, SBCAPCD issued a final authority to construct (FATC) permit (number 5651) determining that the project meets district requirements, including those adopted to implement state and federal requirements.  The County's Final Development Plan included conditions which were found by the SBCAPCD to be met in the FATC. The project is also subject to U.S. Environmental Protection Agency (EPA) Prevention of Significant Deterioration (PSD) requirements through the FATC.

District requirements applicable to the project include numerous rules identified in the FATC.  These rules generally include: Air Quality Attainment Plan (AQAP) provisions; Health and Safety Code provisions; District New Source Review rules; Prevention of Significant Deterioration (PSD) requirements; and other rules listed in the District's FATC.  Generally stated, these rules require: reduction of pollutants subject to ambient air quality standards including those pollutants listed below; best available control technology (BACT); adequate offsets for residual emissions to result in a net air quality benefit; ambient air quality monitoring; emission source testing, continuous emission monitoring and consistency with lead agency permit; and various technology development studies to further reduce air emissions in the future.

An air quality impact analysis using emission modeling was conducted for both the construction and operation phases of the project.  The following project pollutants were examined relative to district requirements:  carbon monoxide (CO); oxides of nitrogen ($NO_x$); total suspended particulates (TSP); particulate matter less than 10 microns ($PM_{10}$); reactive organic compounds (ROC); and sulfur dioxide ($SO_2$).

Project Emissions  The proposed transportation terminal will consist of oil storage facilities, a a tank vapor recovery system, pipeline booster pumps, tanker loading pumps, and a single anchor mooring system (SALM).  The transportation terminal will be capable of serving both the Celeron/All American pipeline and the consolidated marine terminal.  For marine tanker loading, oil will be pumped through a subsea pipeline from the Las Flores Canyon storage tanks to the SALM.  Treated oil from the onshore facility will be stored in two cone-roof tanks with internal floating roofs, each with a working storage capacity of 270 thousand barrels.  The transportation terminal will be equipped with a vapor control unit.  Any excess vapors from the

storage tanks generated by tank filling or tanker loading will be processed in these units to remove and recover more than 99.8 percent of the hydrocarbons. The vapor control unit includes an incinerator equipped with a thermal DeNOx unit designed to reduce $NO_x$ emissions by 70 percent or more. All tankers serving the marine terminal will be equipped with inert gas blanketing and vapor balance systems compatible with the marine terminal.

A 35 Kilovolt (KV) cable system will be installed to transmit power to the offshore platforms. The cables will extend from an Exxon substation located in the Canyon to the platforms along the the pipeline corridors.

<u>Project Impacts</u> SBCAPCD examined air quality project impacts during construction and operation prior to applying mitigation to determine compliance with District air quality standards. Impacts were estimated using inert pollutant models for $NO_2$, ROC, CO, $SO_2$, TSP, and $PM_{10}$, while photochemical modeling to determine ozone ($O_3$) impacts was not done in the FATC process. However, the 1986 SEIR conducted photochemical modeling for the project's precurser emissions, $NO_x$ and ROC. The SEIR concluded that the previous project, which lacked the pollution control measures now proposed by Exxon, could generate precurser emissions that would exceed federal ozone standards. Since Santa Barbara and Ventura Counties are in non-attainment for ozone pollution, project contributions to ozone need to be identified and mitigated to ensure the project meets the District's air quality attainment plan and the prevention of significant deterioration requirements. The results of the modeling for other pollutants is noted below.

<u>Construction</u> The majority of project construction emissions are generated by diesel engines and onshore grading. Project impacts for onshore construction, including pipeline installation, site work and tank erection, indicated short-term potential exceedences of state 1-hour $NO_2$ and both state and federal 24-hour $PM_{10}$ standards. Project impacts were modeled for two construction scenarios in state waters. These scenarios predicted violations of two state standards for $NO_2$ and $PM_{10}$. First, a potential violation of the state one-hour $NO_2$ standard was predicted for both scenarios, the nearshore pipeline installation and the beach crossing pipeline installation. Second, a potential violation of the 24 hour $PM_{10}$ standard was also predicted for both scenarios. Project $PM_{10}$ emissions will contribute to an exacerbation of the standard, since the state $PM_{10}$ standard is currently exceeded. These violations of state standards were predicted as a result of diesel engine particulates from the lay barge, tug boats and service vessels and onshore diesel engines and onshore grading creating dust.

<u>Operation</u> The majority of operation emissions will be from the onshore facilities and tankers loading crude oil at the marine terminal. Emissions from the proposed onshore production facilities will not cause standard exceedences during routine operations, except for exacerbation of the 24-hour $PM_{10}$ standard (part of the TSP pollutant) for which Santa Barbara is in non-attainment. Anticipated emission impacts for routine operations at the transportation terminal were evaluated and determined not to cause state standard exceedences except for project $PM_{10}$ emissions which will again contribute to an existing exceedence of the 24 hour $PM_{10}$ standard.

The majority of project emissions will be $NO_x$, generated in state waters as a result of crew and supply boats and tankers.

<u>Project Mitigation Measures</u>  There are four general approaches to mitigate air pollutant emissions: 1) activity management or project phasing; 2) changes to emission producing processes; 3) the use of pollution control technology; and 4) the use of emission offsets.

The overall project design incorporates partial electric platforms powered by an onshore cogeneration facility.  This design provides a substantial emission reduction over the former proposed on-platform turbine generators.  The cogeneration facility is equipped with best available control technology (BACT) including steam injection and selective catalytic reduction to reduce $NO_x$ emissions.  Exxon proposes to use gas fired process heaters on the three new platforms.  In addition, the project incorporates oil pipeline transport to refinery destinations.  SBCAPCD is also requiring Exxon to phase construction activities onshore and in state waters to reduce peak quarterly emissions.  In addition, construction activities are scheduled so that peak emissions will occur during the non-ozone season.

SBCAPCD has required numerous BACT measures to be incorporated into the project.  District BACT requirements are specified as the more stringent of the following:

> The most effective emissions control technique which has been achieved in practice for such category of class of source; <u>or</u>
>
> Any other emission control technique found, after public hearing by the Control Officer or the Air Resources Board, to be technologically feasible and cost effective for such class or category of sources or for a specific source.

BACT requirements required by the SBCAPCD on this project apply to ROC, $NO_x$, $SO_2$, CO and PM emissions.  BACT for the cogeneration facility includes: use of pipeline quality gas; proper combustor operation; steam injection and selective catalytic reduction (SCR) on the turbine; and low $NO_x$ burner design plus SCR on the duct burner.  Cogeneration BACT will result in at least 80% and up to 90% $NO_x$ control.  BACT for the stripping gas treating plant includes; a sulfur recovery unit to recover 99.9 percent of sulfur in the gas and a tail gas treater in the sulfur recovery unit.  Marine terminal BACT includes a tandem vapor control system and use of pipeline quality fuel in the onshore vapor incinerator resulting in a system efficiency of at least 99.8 percent.  A District approved inspection and maintenance program will be required to reduce fugitive emissions.  For the crew and supply boats, BACT will include turbo charging and intercooling engines and ignition timing retard, or equivalent.

SBCAPCD addressed the potential for an $NO_2$ standard violation during onshore and nearshore construction by requiring the applicant to monitor air quality during that phase.  In the event monitored pollutant levels exceed 90% or more of the $NO_2$ air quality standard, Exxon's construction activities will be curtailed by the SBCAPCD.  Construction activities must then either be reduced or stopped until the potential for violating the $NO_2$ standard ends.

SBCAPCD addressed the exacerbation of the $PM_{10}$ standard by requiring Exxon to participate in a background particulate concentration reduction and mitigation study, and to implement within one year of study completion, control measures identified in the study to the extent determined feasible by

-84-

the District.  In addition, SBCAPCD required Exxon to carry out a study which will include developing measures to reduce $NO_x$ emissions due to construction equipment and mobile sources.  This two-year study will develop new technologies and methodologies for use in the future.

Exxon is required to provide offsets for all remaining onshore and nearshore construction emissions on a basis approaching 1 to 1 and all operation emissions on at least a 1.2 to 1 basis in accordance with district rules.  The FATC specifically identifies the number of tons of pollutant emissions and offsets provided.  Exxon has submitted binding agreements to the SBCAPCD for the control of existing emission sources that will satisfy the offset requirements of the District's New Source Review rules and be consistent with the Air Quality Attainment Plan requirements.

Project Consistency with Coastal Act  For the Commission to find this project consistent with Section 30253 of the Coastal Act, the project must meet the requirements of the SBCAPCD and the Air Resources Board (ARB).  On November 19, 1987, the  SBCAPCD made a decision to issue the final authority to construct (FATC) permit, Number 5651, for the project with sixty (60) conditions.  Major conditions include:  requirements to reduce oxides of nitrogen ($NO_x$); reactive organic compounds (ROC); sulfur dioxide ($SO_2$); total suspended particulate matter (TSP); particulate matter ($PM_{10}$); carbon monoxide (CO) emissions; and the provision of full emission offsets for all remaining emissions; best available control technology (BACT); ambient air quality monitoring; emission source testing; and continuous emission monitoring.  SBCAPCD has required the project to provide emission offsets for all construction and operation emissions, as stated above, to ensure the project provides a net air quality benefit.  SBCAPCD has evaluated the project under its requirements rules listed above, and found the project consistent with its requirements noted in the FATC.  Thus, the SBCAPCD, has found its requirements to be met.

The Ventura County Air Pollution Control District has commented in a letter dated December 1, 1987, from the Board of Supervisors supporting the project as approved by Santa Barbara County.  The Air Resources Board has commented, January 12, 1988, that they have no objections to a finding of consistency for Exxon's proposal.

Coastal Act Conclusion  The Commission has found above that this project meets the requirements of Sections 30253 of the Coastal Act and those incorporated by section 307 of the CZMA.

-85-

## 8.  HABITAT AND LAND RESOURCES

Under the CZMA, the Coastal Commission is authorized to review activities including activities outside the coastal zone affecting land and water uses of the coastal zone to ensure that impacts to the coastal zone are consistent with the CCMP (CZMA Section 1456).  The following Coastal Act policies must be reviewed for consistency.

Section 30231 of the Coastal Act states:

> The biological productivity and the quality of coastal waters, streams, wetlands, estuaries, and lakes appropriate to maintain optimum populations of marine organisms and for the protection of human health shall be maintained and, where feasible, restored through, among other means, minimizing adverse effects of waste water discharges and entrainment, controlling runoff, preventing depletion of ground water supplies and substantial interference with surface water flow, encouraging waste water reclamation, maintaining natural vegetation buffer areas that protect riparian habitats, and minimizing alteration of natural streams.

Section 30236 of the Coastal Act states:

> Channelizations, dams, or other substantial alterations of rivers and streams shall incorporate the best mitigation measures feasible, and be limited to (1) necessary water supply projects, (2) flood control projects where no other method for protecting existing structures in the floodplain is feasible and where such protection is necessary for public safety or to protect existing development, or (3) developments where the primary function is the improvement of fish and wildlife habitat.

Section 30240 of the Coastal Act states:

> (a) Environmentally sensitive habitat areas shall be protected against any significant disruption of habitat values, and only uses dependent on such resources shall be allowed within such areas.
>
> (b) Development in areas adjacent to environmentally sensitive habitat areas and parks and recreation areas shall be sited and designed to prevent impacts which would significantly degrade such areas, and shall be compatible with the continuance of such habitat areas.

And, Section 30250 of the Coastal Act states in part:

> (a) New residential, commercial, or industrial development, except as otherwise provided in this division, shall be located within, contiguous with, or in close proximity to, existing developed areas able to accommodate it or, where such areas are not able to accommodate it, in other areas with adequate public services and where it will not have a significant adverse effects, either individually or cumulatively, on coastal resources.  In addition, land divisions, other than leases for agricultural uses, outside existing developed areas shall be permitted only where 50 percent of

the usable parcels in the area have been developed and the created
parcels would be no smaller than the average size of surrounding
parcels.

(b) Where feasible, new hazardous industrial development shall be
located away from existing developed areas.

## Description of Onshore Resources

Exxon proposes to locate substantial onshore facilities within and
landward of the coastal zone impacting environmentally sensitive
habitats, surface water, and groundwater in the coastal zone.  These
spillover effects on resources within the coastal zone are required to be
consistent with the CCMP.

The project area in the coastal zone and coastal zone area which could be
affected by spillover impacts from activities outside the zone includes a
number of vegetation types.  Coastal strand and bluff vegetation occurs
between the beach and the railroad right-of-way.  At the mouth of Corral
Canyon, there is an avocado orchard, a mixture of coastal bluff and
coastal sage scrub species and grasslands on the surrounding canyon
sides.  Well-developed riparian woodlands, the most important wildlife
habitat, are present along lower Corral Creek down to Highway 101 and are
dominated by large sycamores and coast live oak with an understory of
willows, elderberry, and various shrubs.  Many birds, mammals, reptiles,
and amphibians are expected to occur in Corral/Las Flores Canyon areas.
Several shallow pools in portions of Corral Creek provide habitat for the
Western Pond Turtle and the California Red-legged frog; recently
designated as federal candidates for listing as threatened or endangered
by U.S. Fish and Wildlife Service.

Corral and Las Flores Creek drains the Exxon site to the shoreline area
below Highway 101.  Las Flores Creek is intermittent while Corral Creek
may have perennial flow during wet years.  The median annual stream flow
for Corral Canyon is approximately 691 AFY (acre feet per year) and for
Las Flores it is 145 AFY.

There are three on site wells tapping the entire Vaqueros formation and
top part of the Sespe formation.  The project will require water from
onsite wells.  The average annual recharge and safe yield of the Canada
de las Flores-Canada del Corral watershed is estimated to be
approximately 350-400 AFY.  Existing watershed for operations,
irrigation, and existing consumers is approximately 15 AFY.

As indicated in the project description section III.A. above, the onshore
project has changed since the Commission's 1985 Consistency review.

## Description of Project Impacts

The modified project requires more grading, 4.7 million cubic yards, to
provide 34.5 acres of facilities pad space and disturbing 130.5 acres.
Additional grading is necessary to ensure soil material stability above the
facility pads.  Areas affected by the proposed construction include:
grassland, riparian woodland in Corral Canyon and chaparral at the northern
end of the site.

Because site development and the total construction period has increased from 12 to 19 months, and 24 to 48 months, respectively, impacts within and landward of the coastal zone will intensify due to increased noise, night lighting, and human presence.

Additional cut and fill slope areas will increase creek sediment loads flowing to the shoreline. Increased grading and site preparation will require additional aquifer water for compaction, dust control, and irrigation that may result in streamflow declines and possible stream character changes from perennial to intermittent in drier years. Potential flooding and sediment loss impacts may occur at a temporary Corral Creek road crossing and additional permanent crossings of Las Flores Creek and Corral Creek.

Exxon's proposed sanitary waste disposal leach field is relocated just north of the Shell oil storage tank near the mouth of Corral Canyon and approximately 250 feet west of Corral Creek. The new site, further downstream from and a greater distance from Corral Creek, will substantially reduce potential leach field effluent effects on Corral Creek.

The increased power capacity of the cogeneration facility will require an increase in water use for both cooling and steam cycle makeup. This increase is expected to be 90 AFY for the 49 MW facility compared to 47 AFY for the 25 MW system. Water use for the proposed Exxon facilities including irrigation, plus POPCO gas processing facilities, is expected to peak at approximately 323 AFY, and level off at 309 AFY for the remainder of the project life. This is approximately 20 percent below the most conservative estimates of average annual recharge to the Las Flores/Corral Canyon watersheds of 350-400 AFY. Thus, significant (Class II) impacts from the increased use of groundwater are not expected to change as discussed in the previous consistency report and 1986 SEIR.

Description of Mitigation Measures

Mitigation measures proposed by the applicant within the pipeline corridor include hydromulching (hydroseeding), to repair grading damage and to prevent surface erosion of soil. Any subsequent repairs or work within the corridor disturbing vegetation will be hydromulched. After ground cover is established, the corridor will be mowed on a regular basis for pipeline maintenance. Trees and shrubs would be replanted to recreate a natural landscape and to replace habitats removed during construction. Water conserving landscape techniques will be used until the landscaping is established and can survive on normal yearly rainfall. Hydromulching would occur in the fall to take advantage of winter rains.

All disturbed areas, including staging and marshalling areas will be planted. Installed plant material will serve many purposes including: erosion control, the reestablishment of former habitats, the creation of a natural looking transition between the graded and non-graded areas, the visual screening of facilities, and improving the appearance of the area. Plant materials chosen will be primarily drought tolerant California natives, and except for the riparian habitat. Building plantings will be drought tolerant and ornamental in character.

The County Board of Supervisors adopted conditions to mitigate resource impacts. Conditions were adopted to require a landscaping plan, a grading and

erosion control plan, maximum avoidance of riparian habitat areas, restoring riparian habitat areas on a two-to-one ratio, revegetating with local native vegetation, trenching riparian habitat areas during the dry season, and allowing grading in the State Parks only during the winter months.  Vegetation surveys prior to and after construction are required with additional mitigation measures to be determined in the future if necessary by the Resource Management Department of the County.

The proposed road crossing Corral Creek is a reinforced concrete double box culvert with each opening roughly 12 x 10 feet in size.  The design is similar to the crossing constructed near the confluence with Las Flores Creek.  During construction, a temporary creek bypass would be constructed to prevent flooding and erosion of the construction area.  Bypass flow would be channeled through a large diameter drainage pipe to maintain stream flow characteristics, thus minimizing impacts on fish movement when stream is flowing.  The proposed pipeline corridor also crosses Corral Creek and would cause disruption and diminishment of stream associated habitat.  During construction, corrugated metal drainage pipes would be installed to carry creek flow past the construction area so that flooding and/or erosion of the area does not occur.  The design of the Corral Creek crossings allows for animal passage through the culverts.

During construction, storm water runoff will be controlled with temporary graded ditches, berms, hold-up ponds, and/or silt retention basins.

Santa Barbara County Board of Supervisors adopted conditions to mitigate adverse affects on stream crossings, storm water runoff, water quality and groundwater withdrawals including:

o    establishing a Corral Creek buffer zone to protect riparian vegetation during construction;

o    developing a surface water quality management program;

o    preparing a groundwater management plan including remedial actions by Exxon should pumping or safe yield be exceeded; and

o    providing water to impacted water districts through approved programs, such as contributing to local water development projects within the County for that proportion of water necessary to support the growth attributed to their project.

Although Exxon's analysis in the DPP and in the environmental documents indicate that the onshore facilities would use large amounts of groundwater, but not result in overdraft problems, the County has required Exxon to commit to unspecified mitigation programs developed as a result of additional studies and plans subject to County approval.

The Port of Hueneme, in its EIR for a recent Port Master Plan amendment for Port expansion, analyzed proposed projects in the Santa Barbara Channel and Santa Maria Basin, including Exxon's SYU project.  The EIR determined that the port facilities can accommodate the supply vessel activities generated by the proposed projects without creating the need for additional port facilities.

Coastal Act Conclusions

As discussed above, impacts to environmentally sensitive habitats, surface water, and groundwater in the coastal zone from the proposed Exxon project that lie both within and landward of the coastal zone include: construction disturbances; increased sediment loading in Corral Creek; groundwater drawdowns; habitat removal from Lower Corral Creek project facilities and activities; onshore oil spills; and fires.

Many of the impacts to habitat, surface water, and groundwater can be mitigated to a level of insignificance through the County's conditions requiring; drainage plans, erosion and revegetation plans, landscaping and restoration plans, groundwater management plans, buffer zones, and water quality monitoring.

However, certain adverse impacts to land resources cannot be mitigated to a level of insignificance, even though all feasible mitigation measures have been incorporated into the project. These include wildlife habitat loss and/or degradation, loss of native vegetation, and potential impacts to lower Corral Creek from a major onshore oil spill or fire. It is difficult for the Commission to find these portions of the project consistent with the specific provisions of sections 30231, 30236, and 30240 because it is not possible to eliminate all impacts of this consolidated facility. However, Las Flores canyon has been determined to be the least environmentally damaging site for these facilities based upon extensive review and analysis in the EIS/EIR, by Santa Barbara County, and the Commission. All other alternatives would pose more substantial adverse impacts when the project is reviewed in its entirety. The Commission turns to Section 30007.5 of the Coastal Act which provides that conflicts between one or more policies be resolved in a manner which, on balance, is most protective of significant coastal resources. The Commission therefore, finds that on balance, the onshore facilities are consistent with Coastal Act policies.

9. PUBLIC ACCESS, RECREATION, AND SCENIC AND VISUAL RESOURCES

a. Coastal Act Policies

The Coastal Act provides:

Section 30210:

In carrying out the requirement of Section 4 of Article X of the California Constitution, maximum access, which shall be conspicuously posted, and recreational opportunities shall be provided for all the people consistent with public safety needs and the need to protect public rights, rights of private property owners, and natural resource areas from overuse.

Section 30211:

Development shall not interfere with the public's right of access to the sea where acquired through use or legislative authorization, including, but not limited to, the use of dry sand and rocky coastal beaches to the first line of terrestrial vegetation.

Section 30212:

(a) Public access from the nearest public roadway to the shoreline and along the coast shall be provided in new development projects except where (1) it is inconsistent with public safety, military security needs, or the protection of fragile coastal resources, (2) adequate access exists nearby, or, (3) agriculture would be adversely affected. Dedicated accessway shall not be required to be opened to public use until a public agency or private association agrees to accept responsibility for maintenance and liability of the accessway.

Section 30213:

Lower cost visitor and recreational facilities shall be protected, encouraged, and where feasible, provided. Developments providing public recreational opportunities are preferred.

Section 30240(b):

Development in areas adjacent to environmentally sensitive habitat areas and parks and recreation areas shall be sited and designed to prevent impacts which would significantly degrade such areas, and shall be compatible with the continuance of such habitat areas.

Section 30251:

The scenic and visual qualities of coastal areas shall be considered and protected as a resource of public importance. Permitted development shall be sited and designed to protect views to and along the ocean and scenic coastal areas, to minimize the alteration of natural land forms, to be visually compatible with the character of surrounding areas, and, where feasible, to restore and enhance visual quality in visually degraded areas.

Section 30252:

> The location and amount of new development should maintain and
> enhance public access to the coast by (1) facilitating the provision
> or extension of transit service, ... (3) providing non-automobile
> circulation within the development, (4) providing adequate parking
> facilities or providing substitute means of serving the development
> with public transportation, ... and by (6) assuring that the
> recreational needs of new residents will not overload nearby coastal
> recreation areas by correlating the amount of development with local
> park acquisition and development plans with the provision of onsite
> recreational facilities to serve the new development.

b.  Previous Commission Findings

The Commission's previous findings on review of consistency certification
CC-7-83R (Exxon's Nearshore Option B), adopted on August 30, 1985, addressed
the public access and recreation issues raised by the project on a preliminary
basis.  Those findings are hereby incorporated by reference into these
findings.  Therefore these findings will be limited primarily to addressing
project revisions since the August 1985 decision and the impacts of the
onshore portions of the project, which the Commission's previous action
deferred for discussion during permit review.  The Commission noted at that
time that:

> ...the construction of the pipelines through the sandy beach and
> across the State Park coastal bike trail will impede lateral access
> and impact public recreation during a two-three month construction
> period.
>
> Santa Barbara County's Land Use Plan notes that the existing State
> and County Beach parks are being used to capacity, especially during
> summer weekends.  The beaches are used extensively by both regional
> visitors and local residents.  Access is provided to this stretch of
> beach at these two state beaches.  A coastal bicycle trail runs along
> the shoreline in this area, linking El Capitan and Refugio State
> Beaches.  Extension of this trail is proposed east to the University
> of California and west to Gaviota State Beach Park.  Immediately east
> of the existing gas pipeline landfall is an access ramp connecting
> the bicycle trail with sandy beach.  It provides beach access for the
> handicapped, the general public and emergency vehicles.  Overnight
> camping areas of El Capitan State Beach Park are located .8 miles
> from the pipeline crossing of the beach.

The Commission determined it would address the pipeline construction issues,
including the need to schedule construction to avoid peak recreational
periods, during future review stages of the project.  Other access and
recreational concerns expressed previously by the Commission are the use of
campgrounds and recreational vehicle parks by temporary construction workers,
noise impacts during construction and helicopter operations affecting State
beaches, and adverse visual impact.  Since Exxon had not at that time
submitted a permit application, the Commission determined it would review
these issues at the time of review of the permit application for the marine
terminal and pipeline.

The Commission's previous findings on visual impact are also incorporated into these findings on public access and recreation, since the most significant adverse visual impact of the project, the impact of the proposed platforms and marine terminal on scenic ocean views, would result in a degradation in the quality of the recreational experience. To summarize these previous Commission findings, the Commission stated:

> The scenic areas and views of the southern Santa Barbara County coastline are a resource of public importance. The coastal area is generally rural with views inland of the Santa Ynez mountains and of the Channel Islands. The coastal area has major park and recreation areas of statewide significance and the tourist and recreation industries rely heavily on the natural scenic quality of the coast.

The Santa Barbara LCP notes that:

> The coastal zone between Ellwood and Gaviota is an area of unique scenic value. The entire viewshed is a traveler's delight, as it provides beautiful contrasts between the ocean on one side and the canyons and foothills on the other...

### c.  Project Impacts

The 1984 (April) Revised Draft EIR/S (Technical Appendix 9 – Socioeconomics) establishes that the proposed platforms "would introduce an industrial appearance to the largely unmodified seascape." These would be highly visible from El Capitan Beach State Park. The EIR/S states "Given that the coastal area is a sensitive area (scenic quality is a locally and regionally important resource), such effects would be significant." The EIR/S notes that this adverse visual impact would also be perceived from Refugio Beach and Gaviota Beach State Parks. Mooring of tankers at the proposed SALM would also adversely affect scenic views from these State beaches. The EIR/S notes that the onshore facilities proposed for Las Flores Canyon would not be visible from public viewpoints.

Because the scenic character of the area is an integral part of the area's recreational values, adverse scenic impacts are also adverse impacts on important recreational experiences. For example, the EIR/S notes:

> A survey by Mead and Sorensen ...found that about 77% of respondents objected to the presence of oil platforms in the Santa Barbara Channel, for one or more reasons.... About 51% were conditionally or unconditionally willing to pay or to have the oil companies pay to relocate the platforms underwater where they would not be visible. ...[T]his is an indication of ... the degree to which the placement of additional platforms could affect visitation at these parks.

> ...The primary attractions of Santa Barbara, ... are its "beautiful scenery, clean beaches and ocean, good climate, its quiet and peacefulness, and good restaurants" (Santa Barbara Visitors Bureau, 1981).

> ...[B]y 1990, visitors to the South Coast will average 33,000 per day. Total visitor expenditures would be $340 million.

Users of Gaviota State Park - projected at 235,000 in 1990 - would experience a loss of presently undisturbed ocean vistas due to the offshore platforms.  Visitors to El Capitan and Refugio State Beaches - projected at 620,000 in 1990 - would be subjected to visual changes in the seascape due to tanker loading at a near-shore marine terminal and noise impact from crew and supply boats, helicopters and truck traffic.

The EIR/S also notes that the cumulative impact of in-migration caused by Exxon's project and other proposed oil and gas related development will increase demand for recreational facilities such as state beaches.  In addition, temporary construction workers may reside at campgrounds and recreational use campground and recreational vehicle parks for temporary living quarters, in an area where the supply of these facilities is far short of demand.  The EIR/S notes:  "Experience on POPCO plant construction indicates that about 5% of the 375 workers employed on the project chose to stay at public or private campgrounds near the site," and that the three state parks "are well situated in terms of commuting to Ellwood Pier and Las Flores Canyon."  The EIR/S states:  "Any additional demand for these [campground] facilities is a significant impact."  To help mitigate these impacts, the EIR/S recommends:

Additional publicity campaigns to attract more visitors to the South Coast could partially offset possible tourism losses.  The applicant should provide funding for such an effort.  Also, the applicant should help to fund the establishment of new or enhanced recreational facilities in the area.  That could also serve to attract more tourists in the long run.

Potential impacts to local campgrounds could be avoided if the applicant were to provide temporary housing for immigrant workers during their off-duty periods onshore.

Other potential impacts on recreation and traffic could occur from unregulated parking and truck traffic from project construction and operation, and the pipeline construction-caused temporary closure of the Coastal Bikeway.

d.  <u>County-imposed Mitigation/Findings</u>

Santa Barbara County has performed a detailed analysis and a determination of appropriate measures to mitigate these impacts.  The County has an established mitigation program covering socioeconomic impacts, which addresses the Coastal Act need to protect campgrounds and other overnight recreational facilities. This program is the SEMP (Tri-County Socioeconomic Monitoring and Mitigation Program), designed to obtain realistic information regarding a project's impacts.  The SEMP program was adopted by the County in November 1985.  The SEMP program addresses such impacts as temporary housing, camping facilities, recreational vehicle parks, motels and hotels, general housing needs, infrastructure needs such as water demand, traffic, and other economic impacts.  As part of this program, the County's condition X-1 requires Exxon to make a donation to the California Department of Parks and Recreation for development of up to 20 new campsites to offset worker use of these sites during the summer months.

County condition X-8 requires that:

> Exxon shall make payments to the industry-wide Coastal Resource
> Enhancement Fund established for enhancement of the region to offset
> the impacts of increased industrial development associated with
> cumulative oil development in Santa Barbara County as identified in
> the FEIS/R.
>
> It is recognized that given the proposed cumulative offshore oil and
> gas development in the Santa Barbara Channel, the impacts to
> recreation and tourism in the County will be adverse and significant,
> and that each applicant should be responsible for a pro-rata share of
> the cost of reducing these impacts.

This condition notes that the County will, at a future public hearing,
determine the amount Exxon will contribute to this fund. The condition states
the maximum amount will not exceed $327,400 annually for the life of the
project; however the condition does not specifically determine the amount that
will be required. The condition states the $327,400 "cap" is based on
information contained in the FEIS/R. The County's July 29, 1987 staff report
notes:

> In their written commitment, Exxon agrees to pay up to $327,400
> annually into the Coastal Resource Enhancement Fund. (As
> conditionally stipulated, the actual contribution amount will be
> determined in a public hearing before the Board of Supervisors.)

County Condition IV-E.1 requires any new onsite and offsite parking areas to
be screened from public view. Condition IV-E.2 requires assurance of
restoration of any areas within County jurisdiction damaged by oil spills.
Condition IV-E.4 requires Exxon to contribute $25,000 to be used for removal
of abandoned steel pilings in the beach at El Capitan State Beach Park.
Condition IV-E.6 requires Exxon to maintain adequate vertical access during
and after pipeline construction through the beach. Condition IV-E.7 requires
Exxon to mitigate construction-caused temporary closure of the Coastal Bikeway
by funding:

> ...reconstruction of the existing bikepath between El Capitan and
> Refugio State Beach Parks according to the Standards of the State
> Department of Parks and Recreation or provide to the Department of
> Parks and Recreation an equal amount of funding for the construction
> of a new link in the Coastal Bikeway System.

County Condition X-19 requires mitigation of any project induced displacement
of recreational boating space in the Santa Barbara Harbor. Condition X-17
prohibits Exxon's use of recreational piers except during emergencies, and
requires that if such emergency use occurs, the impact on recreation shall be
mitigated through a landing fee assessment, with monies appropriated for
improvements to Goleta Beach Park. Condition X-21 requires Exxon to mitigate
traffic impacts through payment of an in lieu fee to the County Department of
Transportation (to be determined by multiplying the peak project trip amount
of 252 "times the fee developed for the area of impact in the Goleta area of
$1300)." Condition X-22 requires Exxon to submit a plan to the County

Department of Public Works addressing impacts to traffic at the main local intersections with Highway 101. This plan must consider staggered work shifts, truck traffic avoidance of peak congestion periods, and incentives for car and van pools. Conditions XV-1 through XV-8 address noise impacts, and require Exxon to prepare a noise control program including monitoring noise levels at the State beaches in the project vicinity, compliance with local noise ordinances, assuring maximum noise levels at 65 dBa (decibels) during daytime and 50 dBa during nighttime hours and, at the State beaches, minimizing the effects of blasting, and minimizing helicopter and crew and supply boat noise.

The County's July 29, 1987, report notes that Exxon has submitted assurance that onshore facilities visible from Highway 101 will be painted a "Sagebrush" color to blend with the surrounding area, and that the County Board of Architectural Review has approved this color treatment.

The State Lands Commission and Santa Barbara County conditions require that pipeline construction activities in the nearshore and beach areas will avoid peak recreational periods.

The County found that, as they will be in Las Flores Canyon and thus isolated from prime recreational and residential areas, the proposed onshore facilities in Las Flores Canyon would not be incompatible with the surrounding area, and that specific conditions have been incorporated to mitigate impacts associated with lighting, noise, odor, grading and traffic. The County found these facilities "will not be highly visible from any public areas." The County found that operation of the marine terminal would not physically conflict with beach use. While construction operations would temporarily close the coastal bike path, the County found that "condition IV-E.7 effectively mitigates this impact by requiring Exxon to reconstruct the bikepath between El Capitan and Refugio State Beach Parks, or construct a new link in the coastal bikeway system."

The County noted that the overall project has both beneficial and adverse impacts on recreation and tourism. The beneficial impacts are the removal of the old El Capitan marine terminal tank and associated onshore facilities located immediately north of Highway 101, Exxon's agreement to donate $25,000 towards the removal of old pilings at El Capitan Beach State Park, and removal of the existing offshore storage and treatment (OS&T) vessel. The adverse impacts noted by the County are "a potentially significant adverse decline in tourism due to negative perceptions regarding increased noise, degradation of offshore visual environment, air quality and oil spill potential." These types of impacts cannot be avoided; they constitute the project's increased individual and cumulative industrialization of Santa Barbara County's coast, which adversely affects public recreation. The County found these effects would be mitigated to a level of insignificance through the above conditions and the requirement that Exxon contribute to the Coastal Resource Enhancement Fund, "proceeds of which shall be used to offset the impacts of increased industrial development in the County." The County noted that the "visual impacts associated with the offshore platforms are unavoidable; the County realizes that these facilities will degrade the visual quality of the coast." The County concluded that, although not all recreation impacts would be completely mitigated, that, as conditioned, the adverse impacts would be mitigated to the maximum extent feasible.

-96-

e.   Commission Conclusion

The Commission agrees with the County's analysis and conclusions.  The
Commission finds that the project as submitted to the Commission with Santa
Barbara County conditions is consistent with the public access requirement of
the Coastal Act (Section 30212) that new development located between the sea
and the first public road provide adequate physical access.  The Commission
finds the impacts of the non-coastal dependent onshore portions of the project
have been mitigated through the County's conditions on screening,
transportation in lieu fees and plan review, and the SEMP program.  Therefore
these portions of the project are consistent with the access, recreation, and
visual policies of the Coastal Act.  The only adverse effect on direct
physical access is the project's pipeline construction period blocking of the
Coastal Bikepath.  This impact has been mitigated through County conditions
IV-E.6 and IV-E.7.  Other noise and visual intrusion impacts from pipeline and
marine terminal construction and operation have been reduced where possible
through conditions.  However while these will help alleviate some of the
project's impacts, industrialization of the coast and disturbance of
recreational amenities will nevertheless occur from these portions of the
project.  The Commission finds that, as a result of these visual and noise
intrusion and other industrialization impacts, the project would degrade the
area's park and recreation areas and lower cost recreational facilities,
primarily due to the industrial features introduced into the the scenic ocean
views resulting from tanker traffic and the proposed platforms, and
secondarily due to construction noise impacts on the public beaches.  The
Commission therefore finds the project, based on its offshore and pipeline
construction and operation impacts, inconsistent with Sections 30213 and
30240(b) and 30251 of the Coastal Act, which require protection of lower cost
visitor and recreational facilities, prohibit degradation of parks and
recreation areas, and require new development to be visually compatible with
the character of surrounding areas and protection of the scenic and visual
qualities of coastal areas.

To be approved, these portions of the project must therefore be reviewed under
Section 30260, which allows approval of coastal dependent industrial
facilities not otherwise consistent with the Coastal Act if, among other
things, adverse impacts are mitigated to the maximum extent feasible.  The
Commission finds that the project as submitted to the Commission with the
County conditions to contribute to the Coastal Resource Enhancement Fund to
mitigate the "industrialization" impacts on recreational amenities represents
compliance with the Section 30260 requirement that adverse impacts be
mitigated to the maximum extent feasible.  This fund has been designed by the
local government to provide enhancement through projects benefiting coastal
wildlife, tourism, recreation, research and education, quality of life, or
"other activities of benefit to the natural resources of the County's coastal
areas or to the enjoyment of these resources."

The Fund's statement of purpose states:

    Recent environmental documents have concluded that Santa Barbara
    County's coastal resources will be adversely affected by the impacts
    of cumulative offshore oil and gas development along or near the
    County's coast.  The purpose of the Coastal Resource Enhancement Fund
    ("Coastal Fund") is to provide the required mitigation for impacts

that are not fully mitigated by other project-specific mitigation
measures or country-wide programs or funds.  The Coastal Fund is
designed specifically to mitigate impacts to coastal recreation,
aesthetics, tourism, and environmentally-sensitive resources.

The Commission notes the County has not yet determined either the level of
Exxon's contribution or the enhancement project that would be the beneficiary
of Exxon's contribution.  The reason the specific amount has not yet been
determined is because additional analysis is needed before the County can
determine the appropriate amount.  The Fund guidelines establish a method of
assessment for determining the amount.  This assessment process as currently
conceived includes ongoing monitoring throughout the project life, with
automatic reassessments at five year intervals.  Projects to be funded will be
prioritized based on the County's Local Coastal Plan (LCP) or a Mitigation
Implementation Plan based on the LCP, according to the Fund guidelines.

According to the County staff, the County has imposed similar requirements on
Union for the Point Pedernales project, Chevron for the Point Arguello
project, and Texaco for the Gaviota interim marine terminal.  The County staff
states Exxon and these other companies have all agreed in concept to the
program as designed by the County.  In its recent review of Texaco's interim
marine terminal at Gaviota (E-87-4 & CC-36-87), the Commission found that
project to be consistent with the public access and recreation policies of the
Coastal Act, in part because as proposed to the Commission it included
contributions to the CREF fund.  The County staff states likely projects to be
funded by the program include restoration of Carpinteria marsh, land
acquisitions in the Guadalupe dunes, acquisitions and public recreation and
access improvements in the Point Sal area, extension of the Coastal Bikeway
between Ellwood and El Capitan State beach, and other LCP-identified access
improvements along the Gaviota coast.

The Commission finds that the project as submitted to the Commission with
County requirements will provide mitigation of adverse recreational impacts to
the maximum extent feasible.  The Commission therefore concludes the project,
as submitted to the Commission with County requirements, is consistent with
Section 30260 of the Coastal Act with respect to the Act's public access and
recreation and visual resource protection policies.

10. <u>CULTURAL RESOURCES</u>

Section 30244 of the Act states:

> Where development would adversely impact archaeological or
> paleontological resources as identified by the State Historic
> Preservation Officer, reasonable mitigation measures shall be
> required.

The Santa Barbara mainland and Channel provide a unique resource for the
understanding of prehistoric human history. Archaeological sites and
ethnographic data are abundant. The mouths of every drainage between Ventura
and Point Conception contain evidence of Chumash villages, including
cemeteries, sweathouses, and other structures. Augmenting the prehistoric
record is the rich history of Spanish and Mexican exploration and
colonization. The mouth of Corral Canyon was the focus of much human activity
in past times. Common in offshore areas are historic shipwrecks within the
Channel and prehistoric artifacts found in waters less than 90 feet deep.

<u>Onshore Resources</u>

Five archaeological sites and two areas of prehistoric archaeological
sensitivity cluster within 1/4 mile of each other at the mouth of Corral
Canyon in the coastal zone near the access road, pipeline corridors,
marshalling yard, and additional project component areas. The sites are as
follows:

o    SBa-1731, a significant prehistoric site is located near the
     beach south of Highway 101. Previous archaeological
     investigations indicated that the western edge of the site was
     used for resource processing and tool manufacture while the
     residential area was further to the east. The POPCO excavations
     occurred at the impact area near the site's western edge
     although a profile of the entire site was developed. The
     proposed pipeline would be installed to the east of the previous
     impact area.

o    Prehistoric site SBa-1733 and surrounding zones of secondary and
     low archaeological sensitivity located north of U.S. Highway
     101. Excavations at this site uncovered a variety of materials,
     including flaked stone, shell, and bone. A Native American
     burial and a rock feature identified by Native Americans as a
     "medicine wheel" and potentially associated with two additional
     burials. SBa-1733, the two sensitive areas and SBa-1731,
     discussed above, may comprise one large village site [Moore, et
     al., 1983].

o    Sensitive area beneath highway fill. Previous construction
     monitoring revealed the  presence of cultural materials that
     were thought to be graded off nearby sites rather than "in situ."

o    The probable site of the historic Ortega Adobe, (exact location
     unknown). This adobe was probably constructed in the
     mid-Nineteenth Century and dismantled in the early twentieth
     Century.

o    SBa-85, a potentially significant prehistoric site located on a marine terrace overlooking the creek mouth.

o    SBa-1675, a possible Early Period site on a terrace located across the canyon from SBa-85.

o    SBa-1732 is a historic archaeological site located in the creek floodplain.  It is considered a potentially significant historic site.

As previously indicated, Lower Corral Canyon is particularly sensitive since human burials and prehistoric Native American sites are known to exist.  Class I impacts (significant only partially mitigated) were identified to Native American Cultural values from the mitigation of known archaeological sites in Lower Corral Canyon.

In the 1985 analysis, marshalling, grading, and trenching activities associated with pipeline and facility construction and construction traffic were identified as having direct Class II impacts (can be mitigated to an insignificant level) to the above sites.

Under the Cultural Resources Management Plan (CRMP) originally required by the County, Exxon intends to cover substantial portions of Lower Corral Canyon with up to 12 feet of fill. Specifically, prehistoric site SBa-1733, the surrounding zones of secondary and low sensitivity and the Ortega Adobe site will be capped.  Capping will eliminate impacts from marshalling activities and parking during the site development period.  However, the capping process can potentially disturb subsurface deposits and limit opportunities for further investigation that results in long-term Class II impacts.

Direct Class II impacts to SBa-1731 and sensitive fill area beneath the highway are and will remain Class II impacts.  The expansion of marshalling and parking areas in Lower Corral Canyon, the number of construction workers, and NGL/LPG pipeline corridor may increase the likelihood of indirect impacts to SBa-85, SBa-1675, and Orella Adobes.

Mitigation measures proposed by the applicant include:  contribute proportionally to fund development of a Cultural Resource Compliance Program to guide surveys and testing of cultural resources in the region, expand curation space, document structures, avoidance if possible, and monitoring of construction activities.  Other mitigation measures include: surface artifact collection, detailed mapping and photographic records, subsurface testing, variable percentage recovery of artifacts, and preservation.

The County of Santa Barbara has required Exxon to complete a Cultural Resource Management Plan (CRMP) that incorporates all archaeological regulations and FEIS/R and supplemental mitigations.  In addition, Exxon is required to fund all testing and mitigation measures.  The major components include procedures for avoidance of known sites whenever feasible and test excavations of known sites that cannot be avoided for their importance; methods for site avoidance and mitigation plans for unavoidable significant sites; field work for mitigation plans; commitment to implement all required mitigation measures; and procedures that demonstrate that capping impacts are mitigated to maximum extent feasible including use of sterile and contrasting buffer soils.

-100-

It is difficult for the Commission to find this portion of the project consistent with the specific provisions of sections 30244 because it is not possible to eliminate all impacts of this consolidated facility. However, Las Flores canyon has been determined to be the least environmentally damaging site for these facilities based upon extensive review and analysis in the EIS/EIR, by Santa Barbara County, and the Commission. All other alternatives would pose more substantial adverse impacts when the project is reviewed in its entirety. The Commission turns to Section 30007.5 of the Coastal Act which provides that conflicts between one or more policies be resolved in a manner which, on balance, is most protective of significant coastal resources. The Commission therefore, finds that on balance, the onshore facilities are consistent with Coastal Act policies.

In addition, this plan would call for a qualified archaeologist and a representative of the local Chumash Community to be present during clearing and grading of development areas, including: the electrical substation, oil treatment facility, staging area, and cogeneration power plant, and the installation of onshore pipelines and power cable. If any cultural resources are found, the observers would evaluate the resources and recommend appropriate mitigation measures that are not already called for by the Cultural Resources Management Plan.

The County has also required Exxon to sponsor a workshop for its pipeline contractors and Native American consultants to review and explain the mutual concerns and activities of the parties during pipeline installation work.

## Offshore Resources

The previous offshore analysis in state waters identified one anomaly with possible cultural significance in the vicinity of the SALM/pipeline route to shore. The relocation of the SALM to 11,250 feet has eliminated this impact.

A recent 1986 Pelagos survey identified several additional anomalies on the pipeline corridor leading to the SALM. One of the anomalies is interpreted as a potential cultural resource located within the zone of impact from anchoring. This anomaly is subject to a Class II local long term impact.

This potential impact will be mitigated through the County's required Cultural Resources Management Plan implementation measures.

## Coastal Act Conclusions

The Commission finds that, with the exception of capping one significant site, the cultural resource impacts and potential impacts have been mitigated to an insignificant level through reasonable requirements for site avoidance, construction monitoring, and mitigation plans. While it is impossible to mitigate the impacts of capping completely, the Commission finds that project as proposed and conditioned contains reasonable mitigation measures and on balance per Section 30007.5 is consistent with Section 30244 of the Coastal Act.

11.  CUMULATIVE IMPACTS

The Coastal Commission is required by the Coastal Act to evaluate the cumulative impacts of proposed development, including offshore oil and gas development.  The Commission has expressed its concerns about cumulative impacts of energy development during oil and gas lease sales and during the review of exploration and production plans on the OCS and in state waters.

Legislative Mandate.  In Section 30001.5(b) of the Coastal Act, the Legislature has recognized the importance of:

> "orderly, balanced utilization and conservation of coastal zone resources taking into account the social and economic needs of the people of the state..." (emphasis added)

Specific policies of the CCMP implement this legislative intent.  These policies include Section 30250(a) which requires that:

> "New residential, commercial, or industrial development, except as otherwise provided in this division, shall be located within, contiguous with, or in close proximity to, existing developed areas able to accommodate it or, where such areas are not able to accommodate it, in other areas with adequate public services and where it will not have significant adverse effects, either individually or cumulatively, on coastal resources....."(emphasis added)

Section 30105.5 defines the terms "cumulatively" or "cumulative effect":

> "Cumulatively" or "cumulative effect" means the incremental effects of an individual project shall be reviewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects."

Section 30250(b) provides that:

> "Where feasible, new hazardous industrial development shall be located away from existing developed areas.

The project's EIS/EIR, three SEIR's and EA, analyzed cumulative impacts of the project and marine terminal as it relates to other energy and non-energy developments in the south coast area. (Santa Maria Basin and Santa Barbara Channel)

Existing, Approved, Proposed, and Hypothetical Platforms  The Santa Barbara Channel area has thirteen existing OCS platforms and five state platforms plus one production island.  Three platforms are approved, but not yet installed in the OCS.  No state platforms have been approved, but there are five proposed platforms.  Two additional OCS and six state hypothetical platforms are projected in the future.

In the OCS area of the Santa Maria Basin, there are currently four existing (installed) platforms and two approved but not yet constructed platforms. Based on general geologic information, there are an additional eight hypothetical platforms projected in the future.  For the state waters, there are ten hypothetical platforms. (State Lands Commission and Minerals Management Service latest information)

| | Existing | Platform Status Approved | Proposed | Hypothetical |
|---|---|---|---|---|
| | | Santa Barbara Channel | | |
| OCS | 13 | 3 | 0 | 2 |
| STATE | 5* and 1 island | 0 | 5 | 6 |
| | | Santa Maria Basin | | |
| OCS | 4 | 2 | 0 | 8 |
| STATE | 0 | 0 | 0 | 10 |

\* Two platforms (Herman and Helen) are inactive. The Commission has granted a permit for their removal. These are not counted as existing and operational.

## Approved and Proposed Onshore Oil Related Development

There are numerous approved and proposed onshore energy-related projects as a result of offshore development. In Santa Barbara County, processing facilities or expansion of five existing oil and gas related facilities have been approved by Santa Barbara County and the Coastal Commission (consistency and/or permit review): Unocal's Lompoc facility for Platform Irene; Chevron's Gaviota facility for the Point Arguello field platforms; Texaco's Gaviota interim marine terminal; Shell's modified gas plant at Canada de la Huerta; and Phillip's modified gas plant at Tajiguas Canyon. The Commission's permit authorizes operation of Texaco's Gaviota terminal only until July 1990. The County has approved Las Flores Canyon for Exxon's consolidated SYU development. Arco had proposed processing expansions of Ellwood and Las Flores Canyon for the Arco Coal Oil Point offshore development. Although the Arco project has been denied by State Lands Commission and Santa Barbara County, it is included as a potential future development in this analysis.

In addition, Shell has proposed onshore processing facilities for production from Platform Julius in San Luis Obispo County.

### Other Existing Terminal Operations

There are four other terminals presently operating or which can be operated and one that is non-operational. First, Unocal's Cojo Bay terminal located 1 mile east of Point Conception has 1 or 2 barge loadings a year. Second, Arco's (formerly Aminoil) marine terminal, one half mile west of Coal Oil Point, has 90 barges and 12 tanker loadings a year. Third, Exxon's OS&T vessel and SALM, 4 miles off Tajiguas, has 70 tanker loadings a year. (Oil Transportation Plan, 1984) And last, Texaco's Gaviota consolidated interim marine terminal is being upgraded and is expected to be operational in early 1988 with maximum throughput of 100,000 barrels per day and 137 vessel calls per year. Exxon also has a non-operational marine terminal at El Capitan. In addition, there is existing tanker traffic moving north and south along the coast that is unrelated to these terminal operations.

## Cumulative Impacts from the Proposal

The Commission has identified the following cumulative impacts that may result from this project.

### a. Marine Resources

The SEIR (State Lands Comm., Dec. 1987) identifies cumulative loss of surf grass and cumulative impacts on soft bottom as Class I impacts (significant and not mitigable to insignificance). The cumulative impacts to nearshore hard bottom, offshore hard bottom, and kelp beds are indentified as Class II (significant and mitigable to insignificance).

Surf grass is a valuable habitat, and loss cannot be avoided at this location. The permit is conditioned to protect surfgrass to the maximum extent feasible, and to explore ways to restore trenched areas where loss is certain.

The cumulative disturbance to soft bottom is estimated by the SEIR at 24.1% of the total soft bottom in the project area. This is a large percentage. Much of this disturbance is expected to be short-term (less than 5 years), but anchor scarring, well holes and spud can holes are long-term disturbances. This project will cause many long-term anchor scars, and the permit is conditioned to minimize the damage from these scars to the maximum extent feasible.

Total cumulative disturbance to hard bottom in the project area is estimated at 11.7%. The SEIR considers this significant because of the relative rarity of this habitat, and the time it would take these areas to recover. Project impacts are mitigated to the maximum extent feasible by the inclusion of a condition to protect this habitat from damage by anchors, anchor lines, and pipelines.

Any loss of kelp due to pipeline construction is significant because of recent damage to the kelp beds from natural causes, and the slow rate of recovery. Loss of kelp at other sites from continual boat traffic through the canopy and construction is an ongoing problem. Any degradation of kelp forests should be avoided, since they are highly productive and relatively rare in relation to sandy bottom, particularly in the Southern California Bight. The permit is conditioned to protect kelp to the maximum extent feasible.

The risk of a large oil spill along the California coast is already substantial. Based on world-wide spill rates from tankers alone, one spill greater than 1,000 bbls is expected approximately every 10 years along the coast between San Francisco and Los Angeles (USFWS, July 24, 1987). The expected spill rates for the transport legs into San Francisco Bay and the Los Angeles Harbor are 3 to 4 times higher (ERT, April 1987). Additional risk from exploration, development and production is also substantial. The risk of an oil spill associated with this project would significantly increase these expected spill rates and associated probabilities of a spill detrimental to marine resources. The potential impact of high cumulative probabilities are two-fold. The first is the increased probability that spills will occur more often, and therefore not allow species populations or habitats the time to recover between spills. This could lead to a progressive loss of various marine resources along the California coast, depending on the length of time

between oil spills and the species or habitat recovery rate. The second potential impact is the increased probability of a major oil spill with catastrophic effects for vulnerable species such as California least terns. The longer the time that the marine terminal is in operation the higher the risks to marine resources. Oil transport from the Las Flores Canyon processing facility through a land-based pipeline will reduce risks to marine resources, although risk from other tanker and ship traffic, pipelines, platforms and exploratory drilling remain high.

Pipeline construction through the gray whale migration corridor is part of almost all offshore energy projects. The Supplement to the Getty Gaviota Consolidated Coastal Facility EIR (Santa Barbara Co., August 1985) identifies both vessel traffic and construction as possible sources of alteration in gray whale migration patterns and lists this impact as Class I; a significant impact which cannot be mitigated to insignificance. High levels of vessel traffic nearshore and/or continuing construction could have cumulative effects, forcing migration farther offshore, making whales more vulnerable to predation and harsher weather, and farther from the nearshore food resources they may need during their long migration. There is limited specific information on the extent or significance of the impact which could be expected from levels of either pipeline construction or vessel traffic associated with this project or with other projects.

Because of the significant cumulative loss of kelp, surf grass, hard bottom and soft bottom habitats to development, the risk of oil spills with potential for significant damage to marine resources, and the probability of cumulative effects on the gray whale migration, the Commission finds that the project is not consistent with Section 30250. The project will contribute unmitigable cumulative impacts to coastal resources. However, as the project is proposed and conditioned, Exxon will provide the maximum feasible mitigation to protect marine resources as required by Section 30260(3).

b.  Commercial Fishing

Construction and operation of the offshore platforms and nearshore marine terminal and pipelines would interfere with commercial fishing activities in Fish Blocks 655, 656, and 657. The offshore platforms alone would preclude 20% of drift gill net fishing in the Santa Barbara Channel on a long term basis, and when added to other offshore oil and gas projects in the Santa Barbara Channel and offshore Santa Maria Basin, represents a significant cumulative threat to the health of the commercial fishing industry. Past OCS oil and gas development EIS/R's, such as the Point Pedernales FEIS/R, have concluded that offshore oil and gas development will significantly affect nearshore and offshore fishing opportunities in the Santa Barbara Channel and Santa Maria Basin due to disposal of waste water from onshore processing facilities, offshore pipelines, platforms, routine discharges from the platforms, and potential oil spills. In addition, the original Exxon SYU FEIS/R (SAI, 1984) addressed cumulative impacts on fishing, noting that:

> As the major contributor to both the cumulative oil spill potential along the Santa Barbara County South Coast and to the preemption of drift fishing in the Western Santa Barbara, the proposed SYU project would be a disproportionately large contributor to cumulative fishing impacts.

In 1984, the County estimated the economic impact to fisheries from the SYU project, using 1981 fish catch data and 1984 fish prices, to be $400,000. On January 21, 1988, the State Lands Commission imposed additional requirements covering mitigation of construction and operation of the marine terminal. The State Lands Commission conditions require mitigation of marine terminal operation impacts through payment of $6,000 per year to the recently established State of California Fisheries Development Corporation (or other State approved fund), to be used for fisheries enhancement in the Santa Barbara Channel. The State Lands Commission conditions require mitigation of any marine terminal construction period disturbance of the nearshore marine benthic environment affecting commercial fishing, to be determined through the marine biological survey, and with the amount of compensation to be calculated once the extent of any such disturbance has been analyzed.

The Point Pedernales EIS was the first OCS project EIS to conclusively show that offshore platforms adversely affect commercial fishing. In the Chevron Platform Gail project, mitigation measures agreed to by Chevron included contribution of $600,000 towards a local fishermen's contingency fund, a local fishermen's insurance trust fund, and a study of cumulative impacts on commercial fishing in the Santa Barbara Channel. In the Cities Platform Julius project, based on information in the EIS, Cities agreed to contribute approximately $750,000 over the life of the project for fishermen's enhancement and contingency programs. In the Texaco Gaviota Marine Terminal, the County required Texaco to contribute $100,000 per year during construction and $23,000 per year during operation to the County's Fisheries Enhancement Fund.

Despite these mitigation measures, the extensive OCS development in the Santa Barbara Channel and offshore Santa Maria Basin will continue to displace commercial fishing. Payments to fisheries enhancement programs will provide some assistance to commercial fishermen; however they cannot make up for the long term loss of fishing grounds. The Commission therefore finds the proposed project inconsistent with Section 30250 (a) of the Coastal Act, due to adverse individual and cumulative impacts on commercial fishing. However, based on the County and State Lands Commission conditions, as summarized in the previous paragraph and discussed further in Section III. F. 4. above, and because the facility will be consolidated, the Commission finds that commercial fishing impacts have been mitigated to the maximum extent feasible, and that the project is therefore consistent with Section 30260 (3) which provides that environmental effects must be mitigated to the maximum extent feasible.

c.   **Vessel Traffic and System Safety**

**Offshore Facilities.** Exxon's proposed Las Flores Consolidated Marine Terminal raises serious concern over cumulative effects on coastal resources--both from the project itself, and from its contribution along with those of several other proposed projects in the western Channel/Santa Maria Basin area. The potential for vessel accidents, including tanker accidents resulting in oil spills, increases as the amount of vessel traffic and number of structures in the channel increases. A large spill, such as one that might result from a major accident like a tanker rupture, would have a severe impact on marine birds and mammals, endangered species, commercial fishing, and estuaries and coastal wetlands. Such a spill could have severe long-term effects.

The Commission finds that the proposed nearshore portion of the project will increase the risk of accidents which will have a significant and adverse cumulative impact in relation to the protection of marine resources, commercial fishing, recreation and visual resources. Thus the proposed project fails to meet the requirements of Section 30250(a).

The project therefore must be analyzed under Section 30260 requirements, which provides for further consideration of certain facilities even if they fail to meet other Chapter 3 policies. Under Section 30260, a coastal dependent industrial facility may be permitted if: (1) there are no feasible less environmentally damaging locations for the project; (2) denial of or objection to the project would adversely affect the public welfare; and (3) adverse environmental effects are mitigated to the maximum extent feasible. In addition, Section 30261 applies to all marine terminals.

As discussed more specifically below, several alternative marine terminal locations have been analyzed in previous environmental documents. A number of documents have assessed alternatives in varying levels of detail: (1) The Oil Transportation Plan (OTP); (2) the Exxon Santa Ynez Unit EIS/EIR; and (3) the Getty/Texaco Gaviota Consolidated Coastal Facility EIR that includes the Marine Terminal Siting Study. The Gaviota and Las Flores Canyon sites were determined to be the best alternatives. Therefore, the Commission finds that there are no feasible, less environmentally damaging locations for the project.

The second requirement related to public welfare is discussed in Section III. 13.b.

Mitigation of adverse environmental effects to the maximum extent feasible is the third requirement of 30260. As stated in the previous sections, Exxon's proposal, as conditioned by Santa Barbara County, the State Lands Commission, and the Coastal Commission, provides mitigation measures which address system safety cumulative impacts. These measures are discussed in detail in Section III. F. 5., Vessel Traffic and Systems Safety. These include a Risk Management Plan, a County-approved emergency response plan, oil spill prevention control and counter measure plans, hazardous waste and toxic substance control plans, and a Fire Control Plan. In addition, Exxon will contribute its pro-rata share of the cost of a full-time fire inspector to be stationed in the project vicinity. And, finally, Exxon shall contribute on a pro-rata basis to a regional study on petroleum related coastal and marine fire protection and vessel safety. In addition, the Commission has imposed additional mitigation measures and review requirements through its conditions.

Therefore, the Commission finds that the coastal dependent portions of the project have been mitigated to the maximum extent feasible and are thus consistent with Section 30260(3).

Onshore Facilities and Natural Gas Liquids/Liquid Petroleum Gas (NGL/LPG) Transportation  The project's 1986 SEIR states that, given the risks identified in the Point Arguello Field EIS/EIR for the Gaviota Facility, it is evident that the necessary tens of thousands of yearly LPG and NGL shipments by truck from the various gas processing facilities would pose a significant safety risk to the public. The cumulative risk of such shipments, assuming full operation of the Exxon SYU and Arco Coal Oil Point developments, is estimated to be more than four times the risk associated with the peak

operation levels of the proposed Gaviota facility.  These risk levels are considered likely, and the consequences severe.  However, the Coal Oil Point development was recently denied by the State Lands Commission and the chance of future submittals by Arco in this area are not known at this time.  Oil transport by truck might also be fairly likely to yield spills, but the consequences would be much less.

An alternative transportation method would be a LPG pipeline to a central distribution location.  If such a pipeline were constructed to the Los Angeles area, it has been estimated that it would experience about ten spill accidents over a 25-year lifetime, with perhaps one major spill occurrence.  The overall public risks would likely be considerably less than for truck transportation. The Santa Barbara County Board of Supervisors adopted a resolution in July 1985 which specified allowable modes of transportation of liquefied petroleum gases and natural gas liquids.  The resolution was premised on the assumption that without alternative transportation, approximately 100 trucks per day will be needed at peak production to transport these materials from the various oil and gas processing facilities in the County to market destinations, and that both pipeline and rail transport of these materials are safer than truck transport.

The County resolution therefore restricted the circumstances under which truck transport is allowable.  Specifically, after June 30, 1988, truck transport is only allowed when: 1) products are distributed to local users; or 2) trucks are used to transport products to and from a centralized pipeline or rail loading facility; or 3) when other facilities are temporarily unable to accommodate additional production; or 4) during an emergency.

Exxon's consolidated truck loading and storage facility is not scheduled to begin operation until 1992, and may only be used under one or more of the four circumstances described above.

These risks of gas processing by-products would be in addition to the transportation risks associated with liquid oxygen shipments to Vandenberg AFB and with various types of hazardous waste shipments to Casmalia, both of which utilize the South Coast Highway 101 corridor.  Transportation of various materials which could include (depending upon the gas processing procedures) sulphur slurry, spent caustic, gas treatment purge liquids, sludge, and untreated oil, and of liquid oxygen fuels along this route is likely to increase over the next few years.  However, the 1986 SEIR concludes that the public risks due to the transportation of gas by-products would remain as the most important source of public risk from cumulative development.  Other sources of risk include potential spills from onshore oil storage tanks and pipelines.  Measures for reduction of this risk are discussed in section III. F. 2, Oil Spill Containment.  The construction and operation of these facilities will increase the cumulative risk of onshore spills.

The onshore portions of the project in Las Flores and Corral Canyons raise concerns under the requirements of Sections 30232 and 30250(a).  However, as more fully discussed above in Section III. F. 5, the site is the least environmentally damaging of all alternatives on a cumulative basis and no feasible measures can be taken to reduce the impacts of onshore systems safety upsets.  Therefore, pursuant to Section 30007.5 of the Coastal Act, the Commission finds that on balance, the project is consistent with the Coastal Act.

### d. Air Quality

The project EIS/EIR analyzed cumulative emission impacts of the applicant's proposed 1983 project prior to the required mitigation by adding this project's emissions with numerous future emission sources to the air quality baseline emissions. The modeling determined that there would be significant air quality standard violations and, therefore, impacts for the one-hour $NO_2$ and 24-hour $SO_2$ standards. The document concluded that further pollution controls may be required to mitigate these significant air quality impacts.

The 1986 SEIR concluded that the 1986 revised project without the pollution control measures proposed by Exxon and required by the County and SBCAPCD could generate precursor emissions that would exceed federal ozone standards.

The January 1988 SEIR concluded that the same $NO_2$ and $SO_2$ standards would be exceeded and in addition, TSP and $PM_{10}$ standards would be exceeded with the future cumulative projects.

SBCAPCD approved the project's final authority to construct (FATC) permit requiring the mitigation measures listed in the project's EIS/EIR and SEIR's, and required pursuant to SBCAPCD rules; including offsets at a 1.2 to 1 basis during project operations. County condition number XII - 3, required Exxon to demonstrate that the consolidated Las Flores Canyon facility including the proposed SYU facility would not individually or in conjunction with any other sources result in violations of any applicable air quality standard, regulation or increment. The consolidated plan included a 210,000 BPD oil treating, 200 MSCFD gas treating, oil storage of 1,200,000 barrels, a marine terminal, offshore platforms, and other facilities. The FATC found that air quality modeling did not indicate any violations of air quality standards, with the exception of exacerbating an existing violation of the 24-hour $PM_{10}$ standard.

The project's consistency with Section 30253 has been discussed above. The Commission has also found above that the project's individual emissions are mitigated to the maximum extent feasible.

The Commission finds that the addition of new emissions, even with offsets, in an air basin already having significant air quality problems may cause a cumulative impact inconsistent with Section 30250. However, as noted in the air quality section III F.7. above, project emissions will be minimized and meet the requirements of the SBCAPCD, in particular, through the County permit conditions requiring pipeline transport when feasible. Thus, offset needs have been significantly reduced. Additionally, through SBCAPCD offset requirements, the project will result in a net air quality benefit. Therefore, the Commission finds the project's cumulative impacts are consistent with Section 30250(a) of the Coastal Act.

### e. Habitat and Land Resources

The proposed onshore facilities would add to the cumulative impacts of certain land resources in the coastal zone. Along with the construction and operation of other oil-related projects, this project will contribute to the increased erosion of soils and downstream loadings in streams as well as increased habitat loss and/or degradation. The project will contribute to the cumulative demand for water as a result of the project groundwater

withdrawals.  This will impact aquatic and wildlife habitat quality and already limited water supplies.

Most impacts to habitat and land resources have been mitigated to levels of insignificance by numerous County conditions related to grading and erosion control plans; restoration of habitats; revegetation and landscaping; avoidance measures; lighting and noise controls; and groundwater and surface water quality management.  However, certain adverse impacts to land resources cannot be mitigated to a level of insignificance, even though all feasible mitigation measures have been incorporated into the project.  These include wildlife habitat loss and/or degradation, loss of native vegetation, and potential impacts to lower Corral Creek from a major onshore oil spill or fire.  It is difficult for the Commission to find these portions of the project consistent with the specific provisions of sections 30231, 30236, and 30240 because it is not possible to eliminate all impacts of this consolidated facility.  However, Las Flores canyon has been determined to be the least environmentally damaging site for these facilities based upon extensive review and analysis in the EIS/EIR, by Santa Barbara County, and the Commission.  All other alternatives would pose more substantial adverse impacts when the project is reviewed in its entirety.  The Commission turns to Section 30007.5 of the Coastal Act which provides that conflicts between one or more policies be resolved in a manner which, on balance, is most protective of significant coastal resources.  The Commission therefore finds the onshore facilities can be found individually and cumulatively consistent with Section 30250(a) because other alternatives would cause greater environmental damage..

Major onshore oil spills and other upset conditions (fires, explosions etc) would contribute to the cumulative impacts on habitat resources along this coastal area.  Upset conditions are discussed are discussed in Sections III.F.2 and 5, and Section III.F.11.c. of these findings.

f.   Public Access, Recreation, and Scenic and Visual Resources

The shoreline in the project area is an area of unique scenic and recreational features and contains a number of State beaches and County parks.  The proposed marine terminal and pipeline construction activities, both individually and cumulatively with other ongoing oil and gas construction and operation programs, would disturb and detract from the area's scenic and recreational values.  The proposed offshore platforms and the tanker activity at the proposed marine terminal constitute the major long term operation impacts detracting from the scenic values of the area.  These will be visible from Highway 101 and from the State and County beaches in the area.  Short term impacts consist of marine terminal and pipeline construction period noise and disruption of recreation opportunities such as the Coastal Bikeway and beach recreation.  Cumulatively, the extensive amount of onshore and offshore industrial oil and gas development is highly disturbing to the areas scenic rural values that make it so attractive to visitors from all over the State and nation.  The County has characterized this impact as "the increased industrialization" of this portion of the coast, and has required Exxon to contribute up to $327,400 per year to a Coastal Resources Enhancement Fund (CREF) to provide recreational amenities to partially mitigate this "industrialization" impact.  The Exxon project as submitted to the Commission includes this County CREF requirement and other County requirements which serve to minimize the project's adverse impacts on recreation, access, and

scenic views, allowing the Commission to find that, while the marine terminal
and pipeline portions of the project are inconsistent with Section 30250 due
to cumulative impacts on recreation, access, and scenic views, these impacts
have been mitigated to the maximum extent feasible.  The Commission finds the
project consistent with Section 30260.

g.  Cultural Resources

The project contributes to the cumulative impact of County-wide development
upon archaeological, historical, and cultural resources.

Except for certain aspects of capping one onshore archaeological site, onshore
and offshore cultural resources impacts have been mitigated to an
insignificant level through the county required Cultural Resources Management
Plan which requires avoidance of sites to the maximum extent feasible, and an
extensive mitigation program for known sites and those uncovered during
construction which cannot be avoided.

The impacts from capping have been mitigated to a reasonable level by the
Cultural Resources Management Plan procedures, conditions to lessen the impact
to Native American cultural values, and the Comprehensive Risk Management
Program.  Section 30007.5 provides that conflicts between one or more policies
be resolved in a manner which, on balance, is most protective of significant
coastal resources.  As noted above in other sections of this report, Las
Flores canyon has been determined to be the least environmentally damaging
site for these facilities based upon extensive review and analysis.

With the exception of the issue of capping the archaelogical site, the project
as proposed and conditioned, can be mitigated to an insignificant level.  The
Commission finds that on balance per Section 30007.5 the issue of capping the
archaeological site is adequately mitigated, and thus the project can be found
individually and cumulatively consistent with Section 30250(a).

Cumulative Coastal Act Conclusions

The Commission has reviewed in detail the data submitted by the applicant, the
data presented in the EIR, and the comments submitted by private individuals
and various local, state, and federal agencies on this project.  As explained
above, the Commission has found the cumulative impacts of certain aspects of
the project to meet the requirements of Section 30250(a).

The onshore portions of the project in Las Flores and Corral Canyons, could
exceed some of the requirements of Chapter 3 of the Coastal Act.  However, the
site is the least environmentally damaging of all alternatives on a cumulative
basis and no further measures are feasible to reduce the impacts of onshore
oil spills and other impacts to the coastal zone.  Therefore, pursuant to
section 30007.5 of the Coastal Act, the Commission finds that on balance, the
project is consistent with the Coastal Act.  In addition, the project is
consistent with Section 32050(b), which requires that hazardous facilities be
located away from developed areas.  (See system safety section F-5 for more
information)

The Commission has also found above that this development as currently
proposed and as conditioned will provide the maximum feasible protection from
or mitigation of potential impacts.

For the coastal dependent portions, the Commission has found that although the individual or cumulative impacts concerning offshore oil spill protection, commercial fishing, protection of habitat and land 'resources, scenic quality, marine resources, and offshore system safety are inconsistent with Section 30250(a) of the Coastal Act, the impacts are mitigated to the maximum extent feasible and are therefore consistent with Section 30260(3).

-112-

## 12.  CONSOLIDATION OF FACILITIES

Coastal Act policies relevant to the question of consolidation are enumerated below.

Section 30250 states in part:

> (a) New residential, commercial, or industrial development, except as otherwise provided in this division, shall be located within, contiguous with, or in close proximity to, existing developed areas able to accommodate it or, where such areas are not able to accommodate it, in other areas with adequate public services and where it will not have a significant adverse effects, either individually or cumulatively, on coastal resources...

Section 30260 states:

> Coastal-dependent industrial facilities shall be encouraged to locate or expand within existing sites and shall be permitted reasonable long-term growth where consistent with this division.  However, where new or expanded coastal-dependent industrial facilities cannot feasibly be accommodated consistent with other policies of this division, they may nonetheless be permitted in accordance with this section and Sections 30261 and 30262 if (1) alternative locations are infeasible or more environmentally damaging; (2) to do otherwise would adversely affect the public welfare; and (3) adverse environmental effects are mitigated to the maximum extent feasible.

Section 30262 states in part:

> Oil and gas development shall be permitted in accordance with Section 30260, if the following conditions are met:
>
> (a)  The development is performed safely and consistent with the geologic conditions of the well site.
>
> (b)  New or expanded facilities related to such development are consolidated, to the maximum extent feasible and legally permissible, unless consolidation will have adverse environmental consequences and will not significantly reduce the number of producing wells, support facilities, or sites required to produce the reservoir economically and with minimal environmental impacts.

Section 30261 states in part:

> (a) Multicompany use of existing and new tanker facilities shall be encouraged to the maximum extent feasible and legally permissible, except where to do so would result in increased tanker operations and associated onshore development incompatible with the land use and environmental goals for the area.....

The proposed Exxon Santa Ynez Unit Development and Production Plan and Marine Terminal facility will be a consolidated facility available for use by other companies.  County conditions VII – 1-4 set forth requirements regarding consolidation of facilities.  Per County Condition VII-2, Exxon has agreed to

numerous consolidation terms listed in Appendix G.  County conditions IX - 1, 3, and 6 also address consolidation of the marine terminal.  These consolidation terms generally require Exxon to allow any other producer of oil and gas resources to use the Las Flores Canyon onshore processing and marine terminal facilities.

The onshore facilities will be located adjacent to the existing POPCO treatment plant.  The canyon site can accommodate additional energy facilities.

As discussed in this staff report under Section 13c, alternative consolidated marine terminal locations were assessed along with using existing capacities of all operational facilities.  It was determined that the alternative locations were more environmentally damaging.

In their approval, the County has required that Exxon's facilities and property be available to all users on a nondiscriminatory basis.  Condition VII-1 states:

> Exxon shall make its facilities and property available for consolidation and co-location of oil and gas facilities on a non-discriminatory and equitable basis.  County retains the right to verify that the use of the facilities and property is conforming with County policies regarding consolidation and to impose additional permit conditions where necessary to assure these policies are being fulfilled.
>
> Consistent with the approved policy resolution regarding the consolidation of oil and gas processing facilities, in the event that the need for such facilities is demonstrated by other developers to the Planning Commission, Exxon shall make available to such other developers any excess capacity of the SYU project facilities.  In the event that sufficient excess capacity does not exist within the SYU project facilities to serve the needs of such other developers as demonstrated to the Planning Commission, Exxon shall make its Las Flores/Corral Canyon property available to other developers for the construction of additional permitted oil and gas-related facilities.  In the event that such necessary facilities are not permittable pursuant to the County's consolidation policies, Exxon shall reduce its throughput on a pro-rata basis to accommodate such other developers.
>
> The intent of this condition is to ensure the efficient and maximum use of oil and gas-related facilities in order to avoid the construction of redundant facilities.

Also, as conditioned by the County and the Commission, the Texaco interim marine terminal facility will cease to operate when Exxon's new consolidated marine terminal at Las Flores Canyon is operational since the operation of two facilities would not provide consolidation to the maximum extent feasible. The two terminals are thus prevented from operating at the same time, as it is feasible to accommodate all production at one facility.  The pipelines when operational will also be "more consolidated" and less environmentally damaging.  The pipelines are sized to accommodate all the production from the Santa Ynez Unit.  This is particularly important because of the large size of

the unit and the high levels of production that are anticipated.  This is consistent with previous proposals where pipelines were designed to be large enough to handle the oil throughput of a unit basin.

## Coastal Act Conclusion

The proposed Exxon SYU Development and Production facility and marine terminal, as proposed and conditioned by the County of Santa Barbara and the Coastal Commission and as more thoroughly described in the above findings, has provided for consolidation to the maximum extent feasible.  Therefore, the Commission finds that the Exxon marine terminal is consistent with Coastal Act Sections 30250, 30260(3) and 30261(a).

13. **COMPLIANCE WITH COASTAL ACT SECTION 30260 COASTAL DEPENDENT INDUSTRIAL FACILITIES**

Section 30260 specifically sets forth three policies which a project must meet in order to be approved where it cannot meet the other policies of Chapter 3. This section applies only to coastal dependent industrial facilities, and thus, may be used only for those portions of the project which are coastal dependent. Under this provision, the Commission must find that the impacts of the project have been mitigated to the maximum extent feasible (Section 30260(3)) and that alternative locations are infeasible or more environmentally damaging (Section 30260(2)). Section 30260(2) specifies that, to approve a project under Section 30260, the Commission must find that "to do otherwise would adversely affect the public welfare."

### a. Maximum Feasible Mitigation

The third requirement under Section 30260 is that adverse environmental effects be mitigated to the maximum extent feasible. As explained in previous sections, impacts from coastal dependent portions of this project, individually and cumulatively on marine resources, commercial fishing activities, air quality, system safety, and scenic quality, are mitigated in compliance with this portion of 30260. While the override may be used only for the coastal dependent elements of the project, the Commission notes that in several instances it has found that the onshore portion of the project will cause signficant impacts, but that those impacts have been mitigated to the maximum degree feasible. The Commission notes that, in a number of instances, its findings of mitigation to the maximum extent feasible regarding a particular impact are dependent on its findings with respect to a related aspect of the project. For example, with respect to mitigation of the visual impacts of the marine terminal, the fact that the terminal will be a consolidated facility will avoid the increased impacts of a proliferation of individual facilities, and therefore is a component of the finding of maximum feasible mitigation. This interrelationship is specifically noted in several instances, but applies throughout. Thus, the Commission's findings in the various sections are in fact interdependent, and the Commission intends for each of of its findings be read in this context.

### b. Public Welfare

The second criteria of Section 30260 deals with public welfare. That section provides that new or expanded coastal-dependent industrial facilities which cannot feasibly be accommodated consistent with the policies of the Coastal Act may be permitted if "to do otherwise would adversely affect the public welfare." The language of this section calls for more than a finding that, on balance, a project as proposed is in the interests of the public. It requires that the Commission find that not permitting the project to go forward would be adverse to the public welfare. In previous findings, the Commission has also found this provision to raise the question of whether any effect on the public which would result from its disapproval is outweighed by its effects on the coastal environment. Finally, this section raises the question of whether environmental effects may feasibly be mitigated while preserving any national interest benefits of a project.

In previous findings, the Commission has found several considerations to be involved in its evaluation of the public welfare. The Commission has given

recognition to the importance of considering the national security and energy benefits which may result from oil and gas development and that certain facilities are necessary to support such development. The Commission has also found that preservation of significant environmental resources is in the national interest and important to public welfare. Both the Coastal Zone Management Act and the California Coastal Management Program, while providing for accommodation of coastal-dependent industrial uses, recognize the importance of protecting natural and scenic resources.

Section 30001(c) of the Coastal Act underscores the legislative intent with the regard to the relationship of the protection of coastal resources to the public welfare. It states:

"The Legislature hereby finds and declares:

(c) That to promote the public safety, health, and welfare, and to protect public and private property, wildlife, marine fisheries, and other ocean resources, and the natural environment, it is necessary to protect the ecological balance of the coastal zone and prevent its deterioration and destruction."

Several other legislative findings are also particularly relevant to the Commission's determination with respect to public welfare. Section 30001.5 identifies basic state goals for the coastal zone. Among these goals are to:

(b) Assure orderly balanced utilization and conservation of coastal zone resources taking into account the social and economic needs of the people of the state.

(d) Assure priority for coastal-dependent and coastal-related development over other development on the coast.

In addition to these policies, Chapter 11 of the California Coastal Management Program addresses issues regarding the protection of natural resources and implementation of the national interest in certain energy and industrial facilities. The goals and objectives set forth in Sections 302 and 303 of the CZMA include effective management, beneficial use, protection, and development of the coastal zone. These sections acknowledge "the competing demands upon the lands and waters of our coastal zone", and note that state programs should provide for both protection of resources and priority consideration for coastal-dependent uses.

The project before the Commission in this instance is a facility that would serve other oil and gas activity. Some of that activity predates the Commission's consistency authority. However, the OCS oil and gas development and production which would be served by the marine terminal includes a number of projects which were approved by the Coastal Commission. The Commission has found those activities to be consistent with the Coastal Act's public welfare policy. The approved activities include the additional platforms and OCS pipelines for Exxon's further development of the Santa Ynez Unit. In addition, permission for additional oil and gas development in the Santa Barbara Channel may be sought in the future. While the Coastal Commission makes no determination here as to whether that development will be found consistent with the Coastal Management Program, it notes that the proposed marine terminal would accommodate this future development, as well as existing

and approved development. In addition, the pipeline corridors will be sized to accommodate future pipelines, and thus minimize the disturbance of their installation.

The fact that the purpose of the proposed activities includes the support of projects already found to be in the public welfare is a factor in the Commission's consideration here. However, this alone is insufficient to support a finding that the project meets the policy set forth in Section 30260(2). Rather, the Commission must consider whether the project as proposed and conditioned would provide that support in a manner consistent with this provision.

In this case, the transportation of oil would be accomplished in large part by the use of pipeline transport. As discussed above, this form of transportation significantly minimizes impacts and risks to the coastal zone over the use of tankers. In addition, the facilities would be consolidated. Consolidation is an important, long-range management tool which avoids the need for individual facilities, each with additional impacts, to be built to accommodate other existing, planned or future projects. 'In view of the already significant build-out in the Santa Barbara Channel, the importance of avoiding a proliferation of individual facilities is clearly apparent. In addition to being consolidated, the scope and use of the facilities has been limited to the particular support necessary for the activities to be served. Excess risks and impacts have also been avoided through these limitations. Additionally, installation of this facility will ultimately result in the decommissioning and removal of the OS&T and the GTC Texaco Interim Marine Terminal, and potentially, after Commission consideration of a permit application for its removal, the facilities at El Capitan.

Elsewhere in these findings, the Commission has found that the project's impacts would be mitigated to a level of consistency with the Chapter 3 policies, or the maximum extent feasible. These findings also play a role in the Commission's findings with respect to the public welfare. However, the Commission must also consider the remaining impacts in determining whether disapproval of the project would be adverse to the public welfare.

The project under consideration is a significant industrial project, and thus will result in certain impacts to the coastal zone which cannot be fully mitigated. Among those are the risks of oil spills and their potential damage, the visual impacts of tankers and the marine terminal, the use of offsets, and the preclusion of fishing areas. However, the Commission finds that certain impacts cannot be avoided if the national interest benefits of of oil and gas development are to be realized. Specifically, as explained above, facilities such as those proposed here are necessary to support other oil and gas activities. In that the facilities under consideration here would do so in a consolidated manner, avoiding efforts to secure approval of individual facilities which would collectively have greater impacts, and in view of the reliance on pipeline transportation and the level of mitigation of environmental risks and impacts, the Commission finds that not allowing this facility to go forward would be adverse to the public welfare. For these reasons, the Commission also finds that the impacts of this project are minimized to the extent feasible while still enabling its national interest benefits to be realized, and that the remaining effects on the coastal zone do not outweigh its national interest benefits. Additionally, the Commission finds below that the use of alternative sites is not feasible or would be more environmentally damaging.

Therefore, the Commission concludes that the proposed development is consistent with Section 30260(2) of the Coastal Act.

Although only the coastal dependent portions of the project are eligible for approval under the override criteria of Section 30260, the Commission notes that the discussion above is equally applicable to the onshore facilities.  In addition, the Commission specifically finds there to be a need for onshore storage and treatment facilities to support offshore oil and gas development and production.  Again, the impacts of such activities are minimized if they are carried out at a consolidated site within a canyon as would be the case here.  Additionally, oil spill risks and other impacts to the coastal zone are minimized through the siting of these facilities onshore, rather than on an offshore storage and treatment vessel.  Based on these considerations, the Commission concludes that the disapproval of the proposed development would be adverse to the public welfare, and that its national interest benefits would not be outweighed by its coastal zone impacts.

   c. Alternative Locations

The Commission is required under Section 30260(1) to determine if alternative ocations are infeasible or could result in more environmental damage.

In the environmental analysis, alternative marine terminal locations were assessed in order to determine the impacts associated with the proposed project.  A site to the west at Tajiquas was assessed in the alternative analysis along with the existing marine terminal sites.  In addition to the upgraded Texaco Gaviota interim marine terminal, four marine terminals exist on the South Coast; Unocal (at Cojo Bay), Exxon (at El Capitan: the OS&T in federal waters and one terminal in state waters), and Arco (at Ellwood).

Several of these sites have been discussed extensively in the Commission's findings on the GTC Interim Marine Terminal (E-87-4 and CC-36-87).  In addition, the Commission's 1983 findings on Options A and B, and the Commission's briefs and exhibits in the appeal to the Secretary of Commerce on the Commission's objection to Option A, extensively discuss this issue with respect to the preference of the onshore alternative to continued use of the OS&T vessel.  These documents are incorporated by reference as part of these findings.

Marine Resources  Project construction in the nearshore area at Las Flores/Corral Canyon will cause significant impacts, because of the hard bottom habitat, kelp and surf grass.  Alternative locations which have sandy bottom, no surf grass, and less kelp cause less environmental damage.  However, a determination has been made that Las Flores Canyon is the least environmentally damaging site for a consolidated processing facility.  The pipeline cannot be rerouted into the canyon across less important marine habitats because to use the existing tunnel limits the possible routes.  The tunnel is located at the mouth of Las Flores and Corral canyon beneath Highway 101.  As part of the Marine Construction Mitigation Plan, Condition 9, Exxon will demonstrate that the offshore location of the pipelines is the least environmentally damaging route.

Project operations will increase the risk of oil spill impacts to marine resources, particularly due to increased tanker traffic south of the terminal, and at the marine terminal itself.  While altering the terminal location may

change certain risks to marine resources, changes in the risk created by loaded tankers transiting the coast would generally be limited to those from changes in the route. The risks to marine resources associated with this site are similar to those at the Gaviota interim marine terminal site, since the terminals are in close proximity. Although areas downcoast are more developed, vulnerable marine resources, particularly marshes, lagoons and endangered species, are more prevalent. Locations upcoast are also more vulnerable, as well as more pristine, due to bird breeding areas, rocky intertidal habitat, and larger wetlands with associated endangered species. On balance, the proposed project site is less environmentally damaging than other sites up or downcoast.

Unocal .at Cojo Bay and Arco at Ellwood would require major expansion of industrial facilities in the coastal zone. Facilities at Cojo Bay would impact an otherwise non-industrialized section of the coast at Point Conception. Arco Ellwood is located in close proximity to sensitive coastal resources (the Ellwood Slough) and heavily settled areas of Goleta. The inactive Exxon El Capitan facility would require complete reconstruction and expansion of highly visible industrial facilities in the coastal zone. Designation of the Gaviota site for a consolidated facility would represent the long-term existence of industrial facilities in the coastal zone.

The OS&T vessel in federal waters is not consistent with policies regarding consolidation of oil and gas processing facilities, pipeline transportation, visual resources, air quality and oil spill risks. The Marine Terminal Siting Study found that the Las Flores Canyon site had clear environmental advantages over the Tajiquas site in terms of available land for onsite storage tanks and potential damage from oil spills.

As discussed above, most of Exxon onshore facilities will be located at a consolidated site outside the coastal zone. The necessary facilities will be constructed at the consolidated onshore site in Las Flores Canyon and offshore. Increased employee traffic will directly use Highway 101. There are no heavily populated areas at Exxon's Las Flores Canyon site which would be impacted by increased activity and expanded terminal facilities. The onshore facilities will be located outside the coastal viewshed landward of Highway 101 mostly screened from public view. There are sufficient water supplies for the marine terminal needs. The relocated SALM will be outside the kelp bed. As a result of the project, the OS&T vessel will be decommissioned and removed, and the Commission will review a permit for abandonment and removal of the offshore portion of the El Capitan marine terminal.

## Coastal Act Conclusion

Based on extensive environmental analysis conducted in the EIS/EIR and Marine Terminal Siting Study, the Commission finds that alternative locations for the project were less feasible and/or would result in more environmental damage. Therefore, the Commission finds that there are no feasible less environmentally damaging locations for the consolidated marine terminal project which can thus be found consistent with Section 30260(1) at its present location.

## 14. CALIFORNIA ENVIRONMENTAL QUALITY ACT

Provisions of the California Environmental Quality Act (CEQA) and its implementing regulations (CEQA Guidelines) mandate consideration of the individual and cumulative impacts of a proposed development.  Section 21002 of CEQA provides as follows:

> The Legislature finds and declares that it is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental impacts of such projects...  The Legislature further finds and declares that in the event specific economic, social or other conditions make infeasible such project alternatives or such mitigation measures, individual projects may be approved in spite of one or more significant impacts thereof.

Agencies are required to carry out the objectives of this provision.  (Section 21002.1, Public Resources Code.)

The Secretary of the Resources Agency has certified the Commission's program of reviewing permit applications under Section 21080.5 of CEQA.  Under this provision, other written documentation may be submitted by the Commission in lieu of the environmental impact report.  However, the Commission remains subject to CEQA's substantive standards of environmental review.  Section 13096(a) of the Commission's regulations requires that the Commission's action on a permit application be supported "by written conclusions about the consistency of the application with Public Resources Code, Section 21000 and following..." i.e., with the provisions of CEQA.

In making these findings, the Commission relies on previous sections of these findings.  Those sections contain extensive documentation of the significant adverse cumulative impacts the development as proposed would have on the environment, and identify feasible mitigation to be applied to address these impacts.  In addition, Section 13 of this report specifically addresses alternative locations for the elements of this project, and concludes that they are to be sited in the environmentally preferred locations.  For the reasons set forth previously in these findings, the mitigation measures are necessary in order to lessen the documented impacts.  Therefore, only as conditioned in the manner set forth previously in these findings may this development proposal be found consistent with applicable requirements of CEQA.

The Commission further finds that certain of the impacts remaining after mitigation would be significant.  However, as discussed in the section of the findings dealing with Section 30260, the Commission recognizes that, in appropriate circumstances, oil and gas development is important to the nation's energy security and well-being.  As also discussed in that section, the Commission has already approved a number of offshore oil and gas projects in the Santa Barbara Channel, and finds the proposed facilities to be necessary to support that oil and gas development, and that the proposed activities will be conducted in a manner consistent with the public welfare.  Therefore, the Commission finds there to be overriding considerations making approval of this project consistent with CEQA.

EXHIBIT E

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SANTA BARBARA**

Dated and Entered:  05/20/2026                        Time:  10:00 AM
Judicial Officer:    Thomas P Anderle
Deputy Clerk:        Veronica Robles                  Dept:  SB Dept 3
Deputy Sheriff:
Bailiff/Court Officer:  Brandon Thillman              Case No: 25CV00974
Court Reporter:      Christopher Dunsmore

---

## Sable Offshore Corp et al vs California Coastal Commission

Parties Present:

Trevor Large          Attorney for Plaintiff
Jeffrey Dintzer       Attorney for Plaintiff
Isabella Panicucci    Attorney for Defendant (via zoom)
Wyatt Sloan -Tribe    Attorney for Defendant (via Zoom)

---

**NATURE OF PROCEEDINGS***:*  **Motion: Judgment on Pleadings; Motion of Sable Offshore Corp. an Motion of Sable Offshore Corp. and Pacific Pipeline Co. to Compel Discovery. d Pacific Pipeline Co. for Leave to File Third Amended Complaint and to File Amended Answer;**

The matter was held with appearances as stated above.

Plaintiff's attorney, Trevor Large and Jeffrey Dintzer presented oral argument.  At the conclusion of argument, the Court adopted the tentative ruling as follows:

### HEARING

(1) Motion of California Coastal Commission for Judgment on the Pleadings.

(2) Motion of Sable Offshore Corp. and Pacific Pipeline Co. for Leave to File Third Amended Complaint and to File Amended Answer.

(3) Motion of Sable Offshore Corp. and Pacific Pipeline Co. to Compel Discovery.

### ATTORNEYS

*For Plaintiffs and Petitioners Sable Offshore Corp. and Pacific Pipeline Company*:
Jeffrey D. Dintzer, Garrett B. Stanton, Alston & Bird LLP; Trevor D. Large,
Fauver, Large, Archbald & Spray LLP

*For Defendant and Respondent California Coastal Commission*: Rob Bonta, Norman
N. Franklin, Wyatt E. Sloan-Tribe, Isabella A. Panicucci, Office of the California
Attorney General

Emails: Jeffrey.dintzer@alston.com; tlarge@flasllp.com; wyatt.sloan-tribe@doj.ca.gov;

---

SC-2411 (Revised July 1, 2013)                **MINUTE ORDER**

thomas.kinzinger@doj.ca.gov; john.natalizio@bbklaw.com;

**RULING**

**(1) For the reasons set forth herein, the motion of defendant and respondent California Coastal Commission for judgment on the pleadings is granted as to the second, third, fourth, and fifth causes of action of plaintiffs and petitioners Sable Offshore Corp. and Pacific Pipeline Company's second amended complaint without leave to amend.**

**(2) For the reasons set forth herein, the motion of Sable Offshore Corp. and Pacific Pipeline Company to file amended pleadings is granted in part and denied in part. The motion is denied as to the request for leave to file a third amended complaint. The motion is granted as to the request for leave to file a first amended answer. Moving parties shall file and serve their amended answer, substantially in the form attached to the motion, on or before June 4, 2026.**

**(3) As for any scheduling issues for the resolution of the remaining issues, if any, a CMC is set for June 24, and the parties shall first meet and confer and as for those issues that remain unresolved, the lawyers shall present their respective positions as to how to move forward by CMC reports filed 10 days or so before the CMC.**

**(4) The case was filed 2/18/25; the FAC was filed 4/16/25 [277 pages]; a cross-complaint was filed; the case needs a resolution. Plaintiff estimated 10 days for trial and 10 days is reserved. Trial is set for 2/17/27 at 11:30 am for pretrial; trial to begin 2/18/27; all trial documents due one week in advance.**

Background

This matter arises out of work done by petitioners Sable Offshore Corp. (Sable OC) and Pacific Pipeline Company (PPC) (collectively, Sable or petitioners) subject to the California Coastal Act of 1976 (Coastal Act, Pub. Resources Code, § 30000 et seq.).

The factual background is set forth in the court's ruling of October 15, 2025, which is incorporated herein by reference. Citations to the Administrative Record (AR) are in the form of "AR [page number(s)]" with leading zeros omitted.

(1)     Procedural History

On February 18, 2025, Sable filed its initial petition and complaint in this matter asserting four causes of action: (1) damages for inverse condemnation; (2) declaratory relief for impairment of vested rights; (3) declaratory relief for inverse condemnation; and (4) declaratory relief re Public Resources Code section 30803.

On March 10, 2025, Sable submitted a Statement of Defense to the Commission. (AR 1740-10165.)

The Commission set the matter for a formal administrative adjudication and, on March 28, 2025 issued its staff report and recommendation. (AR 117-205.)

On April 10, 2025, the Commission held a public hearing on its proposed enforcement orders against Sable. (AR 12973-13227.) At this hearing, Sable presented its defense. (*Ibid*.) At the conclusion of the hearing, following deliberation among the Commissioners, the Commission voted to issue three orders (collectively, the April 10 Orders): Cease and Desist Order No. CCC-25-CD-01 (CDO); Restoration Order No. CCC-25-RO-01 (RO); and Administrative Penalty No. CCC-25-AP3-01 (AP). (AR 12497-12522.) The AP provided an administrative penalty of $18,022,500. (AR 12501.)

Also on April 10, 2025, the Commission filed a demurer to Sable's original complaint in this court.

On April 16, 2025, Sable filed its first amended petition and complaint (FAC). The FAC asserts six causes of action: (1) for writ of traditional mandamus, or alternatively for administrative mandamus; (2) for declaratory relief; (3) for inverse condemnation; (4) for declaratory relief for impairment of vested rights; (5) for declaratory relief for inverse condemnation; and (6) for declaratory relief under Public Resources Code section 30803. The first cause of action seeks issuance of a writ of mandate to set aside the NOVs, EDCDOs, and April 10 orders.

Also on April 16, 2025, the Commission filed a cross-complaint against Sable asserting two causes of action: (1) equitable relief to restrain violation of a cease and desist order; and (2) for declaratory relief.

On May 15, 2025, the Commission filed its first amended cross-complaint (FACC) asserting five causes of action: (1) equitable relief to restrain violation of a cease and desist order; (2) equitable relief to restrain violation of a restoration order; (3) equitable relief to restrain violation of an administrative civil penalty order; (4) for declaratory relief for Sable's violation of CDO CCC-25-CD-01; and (5) for declaratory relief for Sable's violation of RO CCC-25-RO-01.

On May 16, 2025, the Commission made a motion to bifurcate and separately try the writ of mandate claims before the non-writ claims. Also on May 16, the Commission filed its demurrer to the FAC.

On May 28, 2025, the court granted the Commission's motion for issuance of a preliminary injunction. The court entered its written order on June 10, 2025.

On June 16, 2025, Sable filed its demurrer to the FACC.

On June 18, 2025, the court sustained, without leave to amend, the Commission's demurrer to the sixth cause of action of the FAC and otherwise overruled the demurrer.

On July 9, 2025, the court denied Sable's motion to stay the Commission's cease and desist order. Also on July 9, 2025, Sable filed its notice of appeal of the June 10, 2025, written order granting preliminary injunction.

On July 23, 2025, the court overruled Sable's demurrer to the FACC. The court also granted the Commission's motion to bifurcate. The court set a briefing schedule for resolution of the writ claims on the administrative record.

On August 18, 2025, Sable filed its motion to compel the deposition of Commission Deputy Director Cassidy Teufel. The motion was originally noticed for hearing on October 22. The motion is opposed by the Commission.

On August 22, 2025, the parties stipulated to augment the AR by the addition of two exhibits.

On August 29, 2025, Sable filed its motion for writ of mandate on Sable's first cause of action. The parties subsequently filed their respective briefs on the merits of Sable's motion for writ of mandate.

On October 6, 2025, Sable filed its motion for leave to file a second amended complaint (SAC). The motion was opposed by the Commission.

On October 15, 2025, the court addressed the merits of Sable's motion for issuance of writ of mandate. The court adopted its tentative ruling finding in favor of the Commission and against Sable on Sable's first cause of action for issuance of a writ of mandate. The court also rejected Sable's request for a ruling at that hearing, taking up the matter at the hearing on December 3. The court also continued Sable's motion to compel to December 3 and noted that Sable's motion for leave to file a SAC was also set for hearing on December 3.

On November 6, 2025, the Commission filed its motion for judgment on the pleadings seeking a judgment in its favor on its FACC. This motion was opposed by Sable.

On December 2, 2025, Sable filed a request to reopen the hearing on the writ of mandate to submit extra-record evidence. The court formally denied this request on December 8, 2025.

On December 3, 2025, the court made a number of rulings. The court denied the Commission's motion for judgment on the pleadings noting that the matters could not then be resolved on the pleadings. The court granted Sable's motion for leave to file a second amended complaint and to deem the Commission's answer to the FAC to apply to the SAC, when filed, to deny all material allegations set forth in the amendments. The court also continued the hearing on Sable's motion to compel a deposition. The court also supplemented and adopted its ruling of October 15 denying Sable's petition for issuance of a writ of mandate. The court requested that the parties provide further briefing on the manner in which to proceed to resolve the remaining claims.

On December 11, 2025, Sable filed its SAC.

On December 12, 2025, Sable filed motions: (1) for reconsideration of the court's ruling on the motion for writ of mandate, as well as orders of May 12 (motion to quash deposition), July 23 (bifurcation order), and August 27 (order on motion to compel); and (2) for reconsideration of the preliminary injunction and stay of cease and desist order.

On February 18, 2026, the court denied the motions for reconsideration. The court also set a briefing schedule on the Commission's motion for judgment on the pleadings to address the remainder of Sable's SAC. The court also continued the motion to compel the deposition of Cassidy Teufel to May 20.

On April 21, 2026, Sable filed its motion for leave to file a third amended complaint (TAC) and an amended answer (FAA).

On April 22, 2026, Sable filed its opposition to the Commission's motion for judgment on the pleadings.

SC-2411 (Revised July 1, 2013)                    **MINUTE ORDER**

On May 6, 2026, the Commission filed its reply as to its motion for judgment on the pleadings.

On May 7, 2026, the Commission filed its opposition to Sable's motion for leave to file a TAC and FAA.

On May 11, 2026, Sable filed an ex parte application to continue the May 20 hearings until after disposition of the appeal of preliminary injunction. On May 12, 2026, the court denied the ex parte application.

On May 13, 2026, Sable filed its reply as to its motion for leave to file a TAC and FAA.

**Analysis**

(1)      Motion for Judgment on the Pleadings

A motion for judgment on the pleadings is proper where the complaint does not state facts sufficient to constitute a cause of action against that defendant. (Code Civ. Proc., § 438, subd. (c)(1)(B)(ii).)

(A)      Request to Continue Hearing

In its opposition to the motion, Sable requests that consideration of the motion be stayed pending disposition of the appeal of the preliminary injunction. The Court of Appeal recently heard oral argument on that appeal and a decision will be forthcoming. Sable also notes that granting the request for leave to amend would moot a motion for judgment on the pleadings directed to a prior pleading.

The court has fully addressed the continuance based on the pending disposition of the appeal by denying the ex parte application. The reasons for that denial are fully applicable here. The court will not defer disposition on that basis. The court will address the motion for judgment on the pleadings in its present posture as directed to the SAC.

(B)      Requests for Judicial Notice

In support of the opposition to the motion, Sable requests that the court take judicial notice of: (Sable Request for Judicial Notice, exhibit A) the order of the Court of Appeal continuing oral argument on the preliminary injunction appeal to May 14, 2026; (exhibit B) Executive Order No. 14391 (91 Fed.Reg. 13199 (Mar. 13, 2026)); (exhibit C) the Pipeline Capacity Prioritization and Allocation Order, dated March 13, 2026; (exhibit D) a letter to Sable from the Executive Director of the Commission, dated February 18, 2026; (exhibit E) a letter to Sable from the Executive Director of the Commission, dated March 19, 2026.

These unopposed requests for judicial notice are granted. (See Evid. Code, § 452, subds. (c), (d)(1), (h).) Judicial notice does not extend to the truth of facts set forth in documents subject to judicial notice. (*Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 113.)

(C)      Declaratory Relief

The operative pleading is Sable's SAC. Sable's motion for leave to file a TAC is discussed below. Sable's SAC contains four causes of action (the second, fourth, fifth, and sixth) seeking declaratory relief. On

June 18, 2025, the court sustained the Commission's demurrer to the sixth cause of action without leave to amend.

"Any person interested under a written instrument, excluding a will or a trust, or under a contract, or who desires a declaration of his or her rights or duties with respect to another, or in respect to, in, over or upon property, or with respect to the location of the natural channel of a watercourse, may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action or cross-complaint in the superior court for a declaration of his or her rights and duties in the premises, including a determination of any question of construction or validity arising under the instrument or contract. He or she may ask for a declaration of rights or duties, either alone or with other relief; and the court may make a binding declaration of these rights or duties, whether or not further relief is or could be claimed at the time. The declaration may be either affirmative or negative in form and effect, and the declaration shall have the force of a final judgment. The declaration may be had before there has been any breach of the obligation in respect to which said declaration is sought." (Code Civ. Proc., § 1060.)

As previously discussed, by its orders on October 15, 2025, and supplemented and adopted on December 3, 2025, the court resolved the merits of Sable's first cause of action for writ of traditional mandamus, or alternatively for administrative mandamus. Those rulings are incorporated herein by reference.

Sable's second cause of action alleges the following:

"Plaintiffs seek a declaration from this Court that the Coastal Commission's issuance of the NOVs, EDCDOs, Cease and Desist Order No. CCC-25-CD-01, Restoration Order No. CCC-25-RO-01, and Administrative Penalty No. CCC-25-AP3-01 (1) are contrary to the Coastal Commission's obligations and authority under the Public Resources Code, (2) unlawfully usurp the County's delegated coastal development authority under its LCP, which was certified by the Coastal Commission pursuant to the Public Resources Code, and (3) are actions not supported by evidence, as they are inconsistent with the County's prior conclusions and findings regarding the Pipelines." (SAC, ¶ 147.)

"As demonstrated by the Coastal Commission's issuance of the NOVs, EDCDOs, Cease and Desist Order No. CCC-25-CD-01, Restoration Order No. CCC-25-RO-01, and Administrative Penalty No. CCC-25-AP3-01, Plaintiffs are informed and believe that the Coastal Commission disputes Plaintiffs' contentions, and therefore, Plaintiffs seek a judicial declaration of the rights and obligations of the respective parties." (SAC, ¶ 148.)

"It is settled that an action for declaratory relief is not appropriate to review an administrative decision." (*State of California v. Superior Court* (1974) 12 Cal.3d 237, 249.)

Each of the issues asserted in the second cause of action were raised in support of Sable's first cause of action for issuance of a writ. Each of these issues were addressed on the merits by the resolution of the first cause of action for writ. "The court may refuse to exercise the power granted by this chapter in any case where its declaration or determination is not necessary or proper at the time under all the circumstances." (Code Civ. Proc., § 1061.) In overruling the demurrer to this cause of action in the FAC, the court noted that broader claims may or may not be included within this cause of action. Nonetheless, the court concludes that the resolution of the merits of the first cause of action satisfactorily resolves the declaratory relief sought by Sable in the second cause of action and determines that a further declaration

is neither necessary nor proper under all of the circumstances. The motion for judgment on the pleadings will be granted as to the second cause of action.

Sable's fourth cause of action alleges: "Sable seeks a declaration from this Court that Sable has a vested right in the continuation of its operation of the Pipelines, in particular as it relates to the impairment of Sable's interests in the Pipelines by virtue of the NOVs, EDCDOs, and April 10 Orders. Sable further seeks a declaration that, if a vested right exists, Defendant violated it when the Coastal Commission issued the NOVs, EDCDOs, and April 10 Orders." (SAC, ¶ 160.)

As with the second cause of action, each of the issues asserted in the second cause of action were raised in support of Sable's first cause of action for issuance of a writ. Each of these issues were addressed on the merits by the resolution of the first cause of action for writ. So, for the same reasons as with the second cause of action, the court concludes that the resolution of the merits of the first cause of action satisfactorily resolves the declaratory relief sought by Sable in the fourth cause of action and determines that a further declaration is neither necessary nor proper under all of the circumstances. The motion for judgment on the pleadings will be granted as to the fourth cause of action.

Sable's fifth cause of action for declaratory relief is discussed below.

     (D)    Inverse Condemnation

Sable's third cause of action is for inverse condemnation. Sable alleges:

"Sable has a vested right to continue its operations and perform repair and maintenance activities on the Pipelines as contemplated and previously authorized under the DPP, FDP, CUP, CDPs, Conditions of Approval, and County Letter." (SAC, ¶ 152.)

"The Coastal Commission's issuance of the NOVs, EDCDOs, and April 10 Orders requiring Sable to halt all repair and maintenance activities on the Pipelines, seek additional permits, and pay penalties for activities already authorized by the County substantially impairs Sable's property rights to operate at the Pipelines, and PPC's property right in the Pipelines, for the benefit of the public without prior compensation to Sable or PPC." (SAC, ¶ 153.)

The court's ruling on the first cause of action is to the effect that the April 10 Orders are proper because the scope of activities of Sable here at issue exceeded the authority of Sable's existing rights to repair and maintain the Pipelines. This determination defeats the basis of Sable's inverse condemnation claims. The motion for judgment on the pleadings will be granted as to the third cause of action.

Sable's fifth cause of action alleges:

"The NOVs, EDCDOs, and April 10 Orders are invalid because they substantially impair Sable's vested rights in the continuation of its operations at the Pipelines as previously authorized by the DPP, FDP, CUP, CDPs, Conditions of Approval, and County Letter." (SAC, ¶ 171.)

"The Coastal Commission via its issuance of the NOVs, EDCDOs, and April 10 Orders, prohibits Plaintiffs' compliance with federal law requiring Plaintiffs to promptly make anomaly repairs and conduct span remediation maintenance activities at the Pipelines as necessary to protect human health and the

environment. The Coastal Commission, therefore, violated Article 1, Section 19 of the California Constitution, which prohibits the temporary or permanent taking or damaging of private property for public use without prior, just compensation. Further, Coastal Commission violated the takings clause of the Fifth Amendment to the U.S. Constitution, as incorporated by the Fourteenth Amendment, which prohibits the temporary or permanent taking of private property for public use without prior, just compensation." (SAC, ¶ 172.)

Sable's fifth cause of action is for declaratory relief that follows the substantive claim for inverse condemnation. For the same reasons as with the second cause of action, the court concludes that the resolution of the merits of the first cause of action satisfactorily resolves the declaratory relief sought by Sable in the fifth cause of action and determines that a further declaration is neither necessary nor proper under all of the circumstances. The motion for judgment on the pleadings will be granted as to the fifth cause of action.

> (E)    Conclusion

Based upon the foregoing, the court grants the Commission's motion for judgment on the pleadings as the second, third, fourth, and fifth causes of action of Sable's SAC. The issue of leave to amend is discussed below in the context of Sable's motion for leave to amend.

(2)    Sable's Motion for Leave to Amend

Sable's motion seeks leave to file two different amended pleadings. As discussed below, these different pleadings raise different issues.

> (A)    Requests for Judicial Notice

In support of its opposition to the motion, the Commission requests that the court take judicial notice of: (Commission Opposition to Motion to Amend Request for Judicial Notice, exhibit A) Consent Decree filed in *United States of America, et al. v. Plains All American Pipeline L.P., et al.*, case No. 2:20-cv-02415 (C.D.Cal. 2020); (exhibit B) petition filed in *State of California, et al. v. PHMSA, et al.*, case No. 26-508 (9th Cir. 2026); (exhibit C) petition filed in *Environmental Defense Center, et al. v. U.S. Department of Transportation, et al.*, Case No. 25-8059 (9th Cir. 2025); (exhibit D) complaint filed in *State of California v. Wright, et al.*, case No. 2:26-cv-03396 (C.D.Cal. 2026); (exhibit E) complaint filed in *California Department of Parks and Recreation v. Sable Offshore Corp., et al.*, case No. 2:26-cv-02946 (C.D.Cal. 2026), initially filed in state court prior to removal to federal court; (exhibit F) complaint filed in *Sable Offshore Corp., et al. v. Armando Quintero*, Case No. 2:26-cv-02739 (C.D.Cal. 2026); (exhibit G) first amended complaint filed in *Pacific Pipeline Company v. State of California*, Case No. 1:26-cv-01486 (E.D.Cal. 2026), initially filed in state court prior to removal to federal court; (exhibit H) ruling on motion for reconsideration of preliminary injunction filed in *Center for Biological Diversity, et al. v. California Department of Forestry and Fire Protection*, case No. 25CV02244 (Santa Barbara Sup. Ct. 2025); (exhibit I) ruling on motion to dissolve preliminary injunction filed in *Center for Biological Diversity, et al. v. California Department of Forestry and Fire Protection*, Case No. 25CV02244 (Santa Barbara Sup. Ct. 2025); (exhibit J) California Plaintiffs' motion to enforce consent decree filed in *United States of America, et al. v. Plains All American Pipeline L.P., et al.*, Case No. 2:20-cv-02415 (C.D.Cal. 2020).

The court will grant these requests for judicial notice. (See Evid. Code, § 452, subd. (d)(1).) Judicial notice does not extend to the truth of matters set forth in court records. (*Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1569.)

> (B)    Leave to Amend Sable's Second Amended Complaint

"The Third Amended Complaint introduces claims for federal preemption over the Commission's enforcement authority over the Santa Ynez Pipeline System, including the NOVs, EDCDOs, and April 10 Orders, based on the Pipeline and Hazardous Safety Administration's ('PHMSA') authority over the interstate Santa Ynez Pipeline System under the federal Pipeline Safety Act and the United States Secretary of Energy's Defense Production Act Order ('DPA Order') issued on March 13, 2026." (Notice of Motion, at p. 2.) A review of Sable's proposed third amended complaint (PTAC) confirms that the principal basis for the requested amendment is to incorporate new legal theories arising from recent events involving the federal government.

The timing of events asserted in the PTAC changes the nature of the proposed amended pleading. "A 'supplemental' pleading is used to allege facts occurring *after* the original pleading was filed. [Citation.] In contrast, the additional allegations in an 'amended' pleading address matters that had occurred before the original pleading was filed." (*Foster v. Sexton* (2021) 61 Cal.App.5th 998, 1032.) The PTAC is thus more properly considered as a proposed amended and supplemental complaint rather than merely as a proposed amended complaint. (See *Hutnick v. U.S. Fidelity & Guaranty Co.* (1988) 47 Cal.3d 456, 464, fn. 6 [title of complaint not determinative].)

"It is the general policy that courts should exercise liberality in permitting the filing of supplemental pleadings when the alleged 'occurring-after' facts are pertinent to the case. [Citations.] Nonetheless, the motion to file a supplemental pleading is addressed to the sound legal discretion of the court, and its ruling will not be disturbed on appeal in the absence of a showing of a manifest abuse of that discretion. [Citation.]" (*Flood v. Simpson* (1975) 45 Cal.App.3d 644, 647.) Even so, a court may properly deny a motion "on the basis that the supplement to the complaint sought to introduce new causes of action." (*Ibid*.)

The standard for granting leave for supplemental complaints is similar to the standard for permitting amended complaints: " 'Although courts are bound to apply a policy of great liberality in permitting amendments to the complaint at any stage of the proceedings, up to and including trial [citations], this policy should be applied only "[w]here no prejudice is shown to the adverse party...." [Citation.]' [Citation.]" (*Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 761.)

Sable's SAC seeks to resolve claims and issues regarding the propriety of the April 10 Orders. Those matters have now fully been resolved by the court's disposition of the causes of action now in the SAC. The PTAC seeks to inject into this resolution a new set of legal theories based on subsequent events inapplicable to the resolution of the SAC. Consequently, granting leave to amend to permit Sable to assert supplemental claims would reopen an otherwise resolved discrete set of claims. This constitutes significant prejudice to the Commission and defeats the purposes of judicial efficiency in resolving claims ready for disposition by the court. The motion for leave to file the PTAC with thus be denied. For the same reasons, the court will deny leave to amend in its granting of the Commission's motion for judgment on the pleadings.

---

Although the court denies this motion, it is important to point out that in so doing the court is not expressing any position on the viability, or not, of Sable's arguments with respect to prospective conduct. As this matter now sits, Sable is free to assert in a different action any claims that it may have based upon these new legal theories arising out of federal actions subsequent to the April 10 Orders and the filing of this action. Although declaratory relief is, by its nature, prospective relief, the allegations in the PTAC are sufficiently vague that any declaration issued by the court on a broader basis would be advisory. The inappropriateness of the court addressing by declaratory relief newly proposed conduct is further demonstrated by the complex and seemingly fast-changing legal landscape.

  (C)  Leave to Amend Sable's Answer to Commission Cross-Complaint

Sable's proposed amended (and supplemental) answer to the Commission's FACC, on the other hand, raises different issues. Where Sable's SAC asserts claims arising out of the Commission's past conduct, the Commission's FACC asserts claims for permanent injunctive relief. The general rule is "that equity acts in injunctive proceedings upon the situation[ ] as it appears at the termination of litigation as distinguished from that at the time of or prior to the commencement of the action …." (*Mallon v. City of Long Beach* (1958) 164 Cal.App.2d 178, 187.) The scope and limits of permanent injunctive relief sought by the Commission in its FACC may be affected by the new issues raised in the FAA. It is therefore appropriate to permit the pleading of such new matter by supplemental answer. The motion will be granted to permit the filing of the FAA. To the extent it is disputed that matter raised in the FAA constitutes a defense as a matter of law, those issues are best raised by appropriate motion rather than in addressing leave to amend.

(3)  Remaining Issues

Based upon the above discussion, there are no remaining issues for disposition in Sable's SAC against the Commission. This disposition renders moot Sable's motion to compel the deposition of Cassidy Teufel as to issues relevant to Sable's SAC. At the same time, there remain issues, at least including remedial issues, to be resolved by trial or otherwise as to the Commission's FACC against Sable. It is unclear whether the deposition of Cassidy Teufel is necessary or appropriate as to these remaining issues.

ANGELA BRAUN, EXECUTIVE OFFICER    Minutes Prepared by:

                 _____Veronica Robles_____ , Deputy

SC-2411 (Revised July 1, 2013)      **MINUTE ORDER**